# Exhibit 38

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the Quarterly Period Ended September 30, 2023**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____**

**Commission File Number: 001-38073**

# CARVANA CO.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **81-4549921** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| | | | |
|---|---|---|---|
| **300 E. Rio Salado Parkway** | **Tempe** | **Arizona** | **85281** |
| (Address of principal executive offices) | | | (Zip Code) |

**(602) 852-6604**
(Registrant's telephone number, including area code)

**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, Par Value $0.001 Per Share | CVNA | New York Stock Exchange |
| Preferred Stock Purchase Rights | — | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒   Yes ☐   No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒   Yes ☐   No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐Yes ☒No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

As of October 30, 2023, the registrant had 114,030,364 shares of Class A common stock outstanding and 85,619,471 shares of Class B common stock outstanding.

**INDEX TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

|  |  | Page |
|---|---|---|
| **PART I.** | **FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | |
| | Unaudited Condensed Consolidated Balance Sheets as of September 30, 2023 and December 31, 2022 | 1 |
| | Unaudited Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2023 and 2022 | 2 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity (Deficit) for the Three and Nine Months Ended September 30, 2023 and 2022 | 3 |
| | Unaudited Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2023 and 2022 | 7 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 8 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 64 |
| Item 4. | Controls and Procedures | 64 |
| **PART II.** | **OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 65 |
| Item 1A. | Risk Factors | 65 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 66 |
| Item 3. | Defaults Upon Senior Securities | 66 |
| Item 4. | Mine Safety Disclosures | 66 |
| Item 5. | Other Information | 66 |
| Item 6. | Exhibits | 67 |

**PART I. FINANCIAL INFORMATION**

**ITEM I. FINANCIAL STATEMENTS**

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and par values)**

| | | September 30, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 544 | $ | 434 |
| Restricted cash | | 72 | | 194 |
| Accounts receivable, net | | 318 | | 253 |
| Finance receivables held for sale, net | | 650 | | 1,334 |
| Vehicle inventory | | 1,085 | | 1,876 |
| Beneficial interests in securitizations | | 371 | | 321 |
| Other current assets, including $0 and $6, respectively, due from related parties | | 146 | | 182 |
| Total current assets | | 3,186 | | 4,594 |
| Property and equipment, net | | 3,051 | | 3,244 |
| Operating lease right-of-use assets, including $11 and $14, respectively, from leases with related parties | | 473 | | 536 |
| Intangible assets, net | | 56 | | 70 |
| Other assets, including $0 and $1, respectively, due from related parties | | 259 | | 254 |
| Total assets | $ | 7,025 | $ | 8,698 |
| **LIABILITIES & STOCKHOLDERS' DEFICIT** | | | | |
| Current liabilities: | | | | |
| Accounts payable and accrued liabilities, including $1 and $16, respectively, due to related parties | $ | 681 | $ | 777 |
| Short-term revolving facilities | | 429 | | 1,534 |
| Current portion of long-term debt | | 200 | | 201 |
| Other current liabilities, including $3 and $4, respectively, from leases with related parties | | 85 | | 80 |
| Total current liabilities | | 1,395 | | 2,592 |
| Long-term debt, excluding current portion | | 5,305 | | 6,574 |
| Operating lease liabilities, excluding current portion, including $7 and $9, respectively, from leases with related parties | | 450 | | 507 |
| Other liabilities, including $11 and $0, respectively, due to related parties | | 77 | | 78 |
| Total liabilities | | 7,227 | | 9,751 |
| Commitments and contingencies (Note 17) | | | | |
| Stockholders' deficit: | | | | |
| Preferred stock, $0.01 par value - 50,000 shares authorized; none issued and outstanding as of September 30, 2023 and December 31, 2022 | | — | | — |
| Class A common stock, $0.001 par value - 500,000 shares authorized; 113,975 and 106,037 shares issued and outstanding as of September 30, 2023 and December 31, 2022, respectively | | — | | — |
| Class B common stock, $0.001 par value - 125,000 shares authorized; 85,619 and 82,900 shares issued and outstanding as of September 30, 2023 and December 31, 2022, respectively | | — | | — |
| Additional paid-in capital | | 1,851 | | 1,558 |
| Accumulated deficit | | (1,512) | | (2,076) |
| Total stockholders' equity (deficit) attributable to Carvana Co. | | 339 | | (518) |
| Non-controlling interests | | (541) | | (535) |
| Total stockholders' deficit | | (202) | | (1,053) |
| Total liabilities & stockholders' deficit | $ | 7,025 | $ | 8,698 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

1

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands, and per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| **Sales and operating revenues:** | | | | |
| Retail vehicle sales, net | $ 1,949 | $ 2,492 | $ 5,737 | $ 8,186 |
| Wholesale sales and revenues, including $4, $6, $14 and $27, respectively, from related parties | 610 | 697 | 2,005 | 1,976 |
| Other sales and revenues, including $35, $39, $104 and $137, respectively, from related parties | 214 | 197 | 605 | 605 |
| **Net sales and operating revenues** | 2,773 | 3,386 | 8,347 | 10,767 |
| Cost of sales, including $1, $2, $3 and $20, respectively, to related parties | 2,291 | 3,027 | 7,025 | 9,714 |
| **Gross profit** | 482 | 359 | 1,322 | 1,053 |
| Selling, general and administrative expenses, including $8, $7, $26 and $20, respectively, to related parties | 433 | 656 | 1,357 | 2,104 |
| Interest expense | 153 | 153 | 467 | 333 |
| Gain on debt extinguishment | (878) | — | (878) | — |
| Other (income) expense, net | 4 | 58 | (1) | 68 |
| **Net income (loss) before income taxes** | 770 | (508) | 377 | (1,452) |
| Income tax provision | 29 | — | 27 | 1 |
| **Net income (loss)** | 741 | (508) | 350 | (1,453) |
| Net loss attributable to non-controlling interests | (41) | (225) | (214) | (672) |
| **Net income (loss) attributable to Carvana Co.** | $ 782 | $ (283) | $ 564 | $ (781) |
| | | | | |
| Net earnings (loss) per share of Class A common stock - basic | $ 7.05 | $ (2.67) | $ 5.24 | $ (7.88) |
| Net earnings (loss) per share of Class A common stock - diluted | $ 3.60 | $ (2.67) | $ 1.78 | $ (7.88) |
| | | | | |
| Weighted-average shares of Class A common stock outstanding - basic [1] | 110,844 | 105,857 | 107,692 | 99,134 |
| Weighted-average shares of Class A common stock outstanding - diluted | 205,958 | 105,857 | 197,124 | 99,134 |

(1) Weighted-average shares of Class A common stock outstanding - basic, have been adjusted for unvested restricted stock awards.

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

2

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2021** | 89,930 | $ — | 82,900 | $ — | $ 795 | $ (489) | $ 219 | $ 525 |
| Net loss | — | — | — | — | — | (260) | (246) | (506) |
| Exchanges of LLC Units | 27 | — | — | — | 1 | — | (1) | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 1 | — | — | 1 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (1) | — | — | (1) |
| Contribution of Class A common stock from related party | (97) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 139 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (12) | — | — | (12) |
| Options exercised | 63 | — | — | — | 2 | — | — | 2 |
| Equity-based compensation | — | — | — | — | 43 | — | — | 43 |
| **Balance, March 31, 2022** | 90,062 | $ — | 82,900 | $ — | $ 829 | $ (749) | $ (28) | $ 52 |
| Net loss | — | — | — | — | — | (238) | (201) | (439) |
| Issuance of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 15,625 | — | — | — | 1,227 | — | — | 1,227 |
| Adjustments to the non-controlling interests related to equity offering | — | — | — | — | (554) | — | 554 | — |
| Exchanges of LLC Units | 19 | — | — | — | — | — | — | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 21 | — | — | 21 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (21) | — | — | (21) |
| Contribution of Class A common stock from related party | (2) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 48 | — | — | — | — | — | — | — |
| Issuance of Class A common stock under ESPP | 27 | — | — | — | 1 | — | — | 1 |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | 5 | — | — | 5 |

3

| | Shares | $ | Shares | $ | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Options exercised | 10 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 18 | — | — | 18 |
| **Balance, June 30, 2022** | 105,789 | $ — | 82,900 | $ — | $ 1,526 | $ (987) | $ 325 | $ 864 |
| Net loss | — | — | — | — | — | (283) | (225) | (508) |
| Contribution of Class A common stock from related party | (14) | — | — | — | — | — | — | |
| Issuance of Class A common stock to settle vested restricted stock units | 142 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (1) | — | — | (1) |
| Options exercised | 15 | — | — | — | 1 | — | — | 1 |
| Equity-based compensation | — | — | — | — | 18 | — | — | 18 |
| **Balance, September 30, 2022** | 105,932 | $ — | 82,900 | $ — | $ 1,544 | $ (1,270) | $ 100 | $ 374 |

4

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT) - (Continued)**
**(Unaudited)**
**(In millions, except number of shares, which are reflected in thousands)**

| | Class A Common Stock | | Class B Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Non-controlling Interests | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2022** | 106,037 | $ — | 82,900 | $ — | $ 1,558 | $ (2,076) | $ (535) | $ (1,053) |
| Net loss | — | — | — | — | — | (160) | (126) | (286) |
| Exchanges of LLC Units | 14 | — | — | — | 1 | — | (1) | — |
| Contribution of Class A common stock from related party | (16) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 39 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | (30) | — | — | — | — | — | — | — |
| Options exercised | 3 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 17 | — | — | 17 |
| **Balance, March 31, 2023** | 106,047 | $ — | 82,900 | $ — | $ 1,576 | $ (2,236) | $ (662) | $ (1,322) |
| Net loss | — | — | — | — | — | (58) | (47) | (105) |
| Contribution of Class A common stock from related party | (16) | — | — | — | — | — | — | — |
| Issuance of Class A common stock to settle vested restricted stock units | 415 | — | — | — | — | — | — | — |
| Issuance of Class A common stock under ESPP | 20 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (2) | — | — | (2) |
| Options exercised | 3 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 23 | — | — | 23 |
| **Balance, June 30, 2023** | 106,469 | $ — | 82,900 | $ — | $ 1,597 | $ (2,294) | $ (709) | $ (1,406) |
| Net income (loss) | — | — | — | — | — | 782 | (41) | 741 |
| Issuance of Class A common stock, net of underwriters' discounts and commissions and offering expenses | 7,157 | — | — | — | 327 | — | — | 327 |
| Issuance of Class B common stock and LLC Units | — | — | 2,721 | — | — | — | 126 | 126 |
| Adjustment to non-controlling interests related to equity offerings | — | — | — | — | (83) | — | 83 | — |
| Exchanges of LLC Units | 17 | — | (2) | — | — | — | — | — |
| Establishment of deferred tax assets related to increases in tax basis in Carvana Group | — | — | — | — | 21 | — | — | 21 |
| Establishment of valuation allowance related to deferred tax assets associated with increases in tax basis in Carvana Group | — | — | — | — | (21) | — | — | (21) |
| Contribution of Class A common stock from related party | (17) | — | — | — | — | — | — | — |

5

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Issuance of Class A common stock as restricted stock awards and to settle vested restricted stock units | 344 | — | — | — | — | — | — | — |
| Forfeitures of restricted stock and restricted stock surrendered in lieu of withholding taxes | — | — | — | — | (10) | — | — | (10) |
| Options exercised | 5 | — | — | — | — | — | — | — |
| Equity-based compensation | — | — | — | — | 20 | — | — | 20 |
| **Balance, September 30, 2023** | 113,975 | $ — | 85,619 | $ — | $ 1,851 | $ (1,512) | $ (541) | $ (202) |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

6

**CARVANA CO. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Unaudited, In millions)**

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| **Cash Flows from Operating Activities:** | | |
| Net income (loss) | $ 350 | $ (1,453) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization expense | 270 | 179 |
| Equity-based compensation expense | 52 | 57 |
| Loss on disposal of property and equipment | 8 | 3 |
| Gain on debt extinguishment | (878) | — |
| Payment-in-kind interest expense | 46 | — |
| Provision for bad debt and valuation allowance | 34 | 11 |
| Amortization and write-off of debt issuance costs and debt premium | 20 | 20 |
| Unrealized (gain) loss on warrants to acquire Root's Class A common stock | (3) | 77 |
| Unrealized (gain) loss on beneficial interests in securitization | (12) | 1 |
| Changes in finance receivable related assets: | | |
| Originations of finance receivables | (4,509) | (5,690) |
| Proceeds from sale of finance receivables, net | 5,207 | 5,628 |
| Gain on loan sales | (360) | (361) |
| Principal payments received on finance receivables held for sale | 160 | 146 |
| Other changes in assets and liabilities: | | |
| Vehicle inventory | 777 | 638 |
| Accounts receivable | (73) | 40 |
| Other assets | 27 | (75) |
| Accounts payable and accrued liabilities | (84) | 155 |
| Operating lease right-of-use assets | 63 | (132) |
| Operating lease liabilities | (52) | 178 |
| Other liabilities | (1) | (7) |
| Net cash provided by (used in) operating activities | 1,042 | (585) |
| **Cash Flows from Investing Activities:** | | |
| Purchases of property and equipment | (69) | (451) |
| Proceeds from disposal of property and equipment | 58 | — |
| Payments for acquisitions, net of cash acquired | (7) | (2,189) |
| Principal payments received on and proceeds from sale of beneficial interests | 40 | 72 |
| Net cash provided by (used in) investing activities | 22 | (2,568) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from short-term revolving facilities | 5,756 | 10,596 |
| Payments on short-term revolving facilities | (6,861) | (12,074) |
| Proceeds from issuance of long-term debt | 110 | 3,435 |
| Payments on long-term debt | (470) | (111) |
| Payments of debt issuance costs | (52) | (75) |
| Net proceeds from issuance of Class A common stock and LLC Units | 453 | 1,227 |
| Proceeds from equity-based compensation plans | — | 4 |
| Tax withholdings related to restricted stock units and awards | (12) | (8) |
| Net cash (used in) provided by financing activities | (1,076) | 2,994 |
| **Net decrease in cash, cash equivalents and restricted cash** | (12) | (159) |
| Cash, cash equivalents and restricted cash at beginning of period | 628 | 636 |
| Cash, cash equivalents and restricted cash at end of period | $ 616 | $ 477 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

7

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

## NOTE 1 — BUSINESS ORGANIZATION

**Description of Business**

Carvana Co. and its wholly-owned subsidiary Carvana Co. Sub LLC (collectively, "Carvana Co.", and, together with its consolidated subsidiaries, the "Company"), is the leading e-commerce platform for buying and selling used cars. The Company is transforming the used car sales experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Using the website, customers can complete all phases of a used vehicle transaction, including financing their purchase, trading in their current vehicle, and purchasing complementary products such as vehicle service contracts ("VSC"), auto insurance, and GAP waiver coverage. Each element of the Company's business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

**Organization**

Carvana Co. is a holding company that was formed as a Delaware corporation on November 29, 2016, for the purpose of completing its initial public offering ("IPO") and related transactions in order to operate the business of Carvana Group, LLC and its subsidiaries (collectively, "Carvana Group"). Substantially all of the Company's assets and liabilities represent the assets and liabilities of Carvana Group, except the Company's Senior Secured Notes and Senior Unsecured Notes (each as defined in Note 10 — Debt Instruments) which were issued by Carvana Co. and are guaranteed by its and Carvana Group's existing domestic restricted subsidiaries, excluding, in the case of the Senior Unsecured Notes, ADESA US Auction, LLC ("ADESA"), and its subsidiaries.

In accordance with Carvana Group, LLC's amended and restated limited liability company agreement (the "LLC Agreement"), Carvana Co. is the sole manager of Carvana Group and conducts, directs and exercises full control over the activities of Carvana Group. There are two classes of common ownership interests in Carvana Group, Class A common units (the "Class A Units") and Class B common units (the "Class B Units"). As further discussed in Note 11 — Stockholders' Equity (Deficit), the Class A Units and Class B Units (collectively, the "LLC Units") do not hold voting rights, which results in Carvana Group being considered a variable interest entity ("VIE"). Due to Carvana Co.'s power to control and its significant economic interest in Carvana Group, it is considered the primary beneficiary of the VIE and the Company consolidates the financial results of Carvana Group. As of September 30, 2023, Carvana Co. owned approximately 56.6% of Carvana Group and the LLC Unitholders (as defined in Note 11 — Stockholders' Equity (Deficit)) owned the remaining 43.4%.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The accompanying unaudited condensed consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") for interim financial information. All intercompany balances and transactions have been eliminated. Certain information and footnote disclosures normally included in annual financial statements have been condensed or omitted. The Company believes the disclosures made are adequate to prevent the information presented from being misleading. However, the accompanying unaudited condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included within the Company's most recent Annual Report on Form 10-K filed on February 23, 2023.

The accompanying unaudited condensed consolidated financial statements reflect all adjustments (consisting only of normal and recurring items) necessary to present fairly the Company's financial position as of September 30, 2023, results of operations and changes in stockholder's equity (deficit) for the three and nine months ended September 30, 2023 and 2022, and cash flows for the nine months ended September 30, 2023 and 2022. Interim results are not necessarily indicative of full year performance because of the impact of seasonal and short-term variations.

As discussed in Note 1 — Business Organization, Carvana Group is considered a VIE and Carvana Co. consolidates its financial results due to the determination that it is the primary beneficiary.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Liquidity**

The Company has incurred losses in prior periods and expects to incur additional losses in the future as it continues to shift priorities to focus on driving profitability through operating efficiency and reducing expenses. Historically, the Company's capital and liquidity needs were primarily satisfied through its debt and equity financings, operating cash flows, Floor Plan Facility, and Finance Receivable Facilities (each as defined below). During the three months ended September 30, 2023, the Company (i) received net cash proceeds of $327 million from its "at-the-market offering" program and $126 million from its private placement of Class A Units and Class B common stock to the Garcia Parties; (ii) launched and closed an offer to exchange its Senior Unsecured Notes for new Senior Secured Notes that significantly reduced near-term cash interest expense and total debt outstanding; and (iii) amended two revolving credit facilities to fund certain finance receivables originated by the Company to increase the line of credit of one facility from $300 million to $500 million and extend the maturity date of the other facility to September 18, 2024. On November 1, 2023, the Company resized the Floor Plan Facility to $1.5 billion and extended its maturity date to April 30, 2025. Management believes that current working capital, cash flows from operations, and expected continued or new financing arrangements will be sufficient to fund operations for at least one year from the financial statement issuance date.

**Use of Estimates**

The preparation of these unaudited condensed consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions. Certain accounting estimates involve significant judgments, assumptions and estimates by management that have a material impact on the carrying value of certain assets and liabilities, disclosures of contingent assets and liabilities and the reported amounts of revenues and expenses during the reporting period, which management considers to be critical accounting estimates. The judgments, assumptions and estimates used by management are based on historical experience, management's experience, and other factors, which are believed to be reasonable under the circumstances. Because of the nature of the judgments and assumptions made by management, actual results could differ materially from these judgments and estimates, which could have a material impact on the carrying values of the Company's assets and liabilities and the results of operations.

**Recently Issued But Not Yet Adopted Accounting Standards**

The Company assessed all Accounting Standards Updates issued but not yet adopted and determined they are not relevant to the Company or are not expected to have a material impact upon adoption.

**NOTE 3 — BUSINESS COMBINATIONS**

**Acquisition of ADESA U.S. Physical Auction Business**

On May 9, 2022, the Company completed its acquisition of 100% of the equity interests in the U.S. physical auction business of ADESA from KAR Auction Services, Inc. for approximately $2.2 billion in cash (the "ADESA Acquisition"). Proceeds from the issuance and sale of the 2030 Senior Unsecured Notes (as defined below) were used to fund the acquisition. The acquisition included 56 auction sites throughout the U.S. with 6.5 million square feet of buildings on more than 4,000 acres of land, significantly expanding the Company's infrastructure and enhancing its customer offering by facilitating a broader selection of vehicles and faster delivery times.

9

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table summarizes the allocation of the purchase price consideration to identifiable assets acquired and liabilities assumed as of December 31, 2022:

|  | Purchase Price Allocation |
|---|---:|
|  | (in millions) |
| **Assets Acquired** |  |
| Current assets | $ 208 |
| Property and equipment | 1,281 |
| Operating lease right-of-use assets | 188 |
| Intangible assets | 79 |
| Other assets | 1 |
|    Total Assets Acquired | 1,757 |
|  |  |
| **Liabilities Assumed** |  |
| Current liabilities | 233 |
| Operating lease liabilities | 167 |
|    Total Liabilities Assumed | 400 |
|  |  |
| **Net Assets Acquired** | 1,357 |
| Purchase price consideration | 2,195 |
| **Goodwill** | $ 838 |

Identifiable intangible assets acquired consist of the following:

|  | Fair Value | Useful Life |
|---|---:|---:|
| Customer relationships | $ 50 | 10 years |
| Developed technology | $ 29 | 3 years |

Customer relationships were valued using the multi-period excess earnings method of the income approach. Developed technology was valued using the replacement cost method of the cost approach. Significant assumptions used in the valuations were forecasted revenues and attrition rate and are classified as Level 3 due to the lack of observable market data. No residual values were assigned to the customer relationships and developed technology intangible assets and they are amortized on an economic useful life basis commensurate with future anticipated cash flows and straight line, respectively. As of September 30, 2023, the remaining weighted-average amortization period for the intangible assets acquired was approximately 5.8 years.

Real property was valued using market comparable transactions of the market approach, for which the key assumption is the similarity of the acquired property to market comparable transactions. Personal property was valued using the replacement cost method of the cost approach, for which the key assumptions are the costs of similar personal property in new condition and economic obsolescence rates.

The acquisition resulted in the recognition of $838 million of goodwill, which is deductible for tax purposes and represents the future economic benefits expected to arise from anticipated synergies and intangible assets that do not qualify for separate recognition, including an assembled workforce, non-contractual relationships and other agreements.

For the three and nine months ended September 30, 2023, the Company recognized $217 million and $651 million, respectively, of wholesale sales and revenues, $195 million and $577 million, respectively, of cost of sales, and a net loss of $21 million and $56 million, respectively, from ADESA operations, which includes $30 million and $92 million, respectively, of depreciation and amortization, including acquired intangible assets amortization expense of $3 million and $11 million, respectively.

10

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

For the three and nine months ended September 30, 2022, the Company recognized $193 million and $301 million of wholesale sales and revenues, respectively, $180 million and $283 million of cost of sales, respectively, and a net loss of $36 million and $57 million, respectively, from ADESA operations, which includes $31 million and $51 million, respectively, of depreciation and amortization, including acquired intangible assets amortization expense of $6 million and $10 million, respectively.

The following unaudited pro forma combined results of operations information for the three and nine months ended September 30, 2022 have been prepared as if the ADESA Acquisition occurred on January 1, 2021:

| | | Unaudited | | |
| --- | --- | --- | --- | --- |
| | | Three Months Ended September 30, 2022 | | Nine Months Ended September 30, 2022 |
| | | (in millions) | | |
| Revenues | $ | 3,386 | $ | 11,066 |
| Net loss | | (508) | | (1,583) |
| Net loss attributable to non-controlling interests | | (225) | | (703) |
| Net loss attributable to Carvana Co. | $ | (283) | $ | (880) |
| Net loss per share of Class A common stock - basic and diluted | $ | (2.67) | $ | (8.32) |
| Weighted-average shares of Class A common stock - basic and diluted | | 105,857 | | 105,774 |

The unaudited pro forma combined results of operations information reflect the following pro forma adjustments:

| | | Unaudited | | |
| --- | --- | --- | --- | --- |
| | | Three Months Ended September 30, 2022 | | Nine Months Ended September 30, 2022 |
| | | (in millions) | | |
| Interest expense | $ | — | $ | 123 |
| Lease expense | | — | | 5 |
| Depreciation and amortization expense | | — | | 13 |
| Intercompany revenues and cost of sales | | — | | (7) |

The unaudited pro forma combined results of operations information is provided for informational purposes only and is not necessarily intended to represent the results that would have been achieved had the ADESA Acquisition been consummated on January 1, 2021 or indicative of the results that may be achieved in the future.

11

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

## NOTE 4 — PROPERTY AND EQUIPMENT, NET

The following table summarizes property and equipment, net as of September 30, 2023 and December 31, 2022:

| | | September 30, 2023 | | December 31, 2022 |
|---|---|---:|---|---:|
| | | (in millions) | | |
| Land and site improvements | $ | 1,331 | $ | 1,331 |
| Buildings and improvements | | 1,339 | | 1,267 |
| Transportation fleet | | 587 | | 673 |
| Software | | 281 | | 245 |
| Furniture, fixtures and equipment | | 140 | | 158 |
| Total property and equipment excluding construction in progress | | 3,678 | | 3,674 |
| Less: accumulated depreciation and amortization on property and equipment | | (707) | | (564) |
| Property and equipment excluding construction in progress, net | | 2,971 | | 3,110 |
| Construction in progress | | 80 | | 134 |
| Property and equipment, net | $ | 3,051 | $ | 3,244 |

Depreciation and amortization expense on property and equipment was $95 million and $100 million for the three months ended September 30, 2023 and 2022, respectively, of which $40 million and $51 million were recorded to selling, general and administrative expense, respectively, $13 million were capitalized to vehicle inventory during each of the three months ended September 30, 2023 and 2022, and $42 million and $36 million were recorded to cost of sales, respectively, including $16 million and $13 million previously capitalized to vehicle inventory, respectively.

Depreciation and amortization expense on property and equipment was $294 million and $238 million for the nine months ended September 30, 2023 and 2022, respectively, of which $126 million and $132 million were recorded to selling, general and administrative expense, respectively, $38 million and $34 million were capitalized to vehicle inventory, respectively, and $130 million and $72 million were recorded to cost of sales, respectively, including $53 million and $31 million previously capitalized to vehicle inventory, respectively.

## NOTE 5 — INTANGIBLE ASSETS

The following table summarizes intangible assets, net as of September 30, 2023 and December 31, 2022:

| | | September 30, 2023 | | December 31, 2022 |
|---|---|---:|---|---:|
| | | (in millions) | | |
| Intangible assets: | | | | |
| Customer relationships | $ | 50 | $ | 50 |
| Developed technology | | 41 | | 41 |
| Non-compete agreements | | — | | 1 |
| Intangible assets, acquired cost | | 91 | | 92 |
| Less: accumulated amortization | | (35) | | (22) |
| Intangible assets, net | $ | 56 | $ | 70 |

Amortization expense was $5 million and $6 million during the three months ended September 30, 2023 and 2022, respectively, and $13 million and $10 million during the nine months ended September 30, 2023 and 2022, respectively. As of

12

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

September 30, 2023, the remaining weighted-average amortization period for definite-lived intangible assets was approximately 5.3 years. The anticipated annual amortization expense to be recognized in future years as of September 30, 2023, is as follows:

| | Expected Future Amortization |
| --- | --- |
| | (in millions) |
| Remainder of 2023 | $ 4 |
| 2024 | 18 |
| 2025 | 14 |
| 2026 | 7 |
| 2027 | 5 |
| Thereafter | 8 |
| Total | $ 56 |

### NOTE 6 — ACCOUNTS PAYABLE AND OTHER ACCRUED LIABILITIES

The following table summarizes accounts payable and other accrued liabilities as of September 30, 2023 and December 31, 2022:

| | September 30, 2023 | December 31, 2022 |
| --- | --- | --- |
| | (in millions) | |
| Accounts payable, including $1 and $16, respectively, due to related parties | $ 251 | $ 232 |
| Sales taxes and vehicle licenses and fees | 91 | 76 |
| Accrued compensation and benefits | 64 | 65 |
| Reserve for returns and cancellations | 60 | 60 |
| Customer deposits | 31 | 23 |
| Income tax liability | 27 | — |
| Accrued interest expense [1] | 10 | 99 |
| Accrued advertising costs | 3 | 7 |
| Accrued property and equipment | 2 | 10 |
| Other accrued liabilities | 142 | 205 |
| Total accounts payable and other accrued liabilities | $ 681 | $ 777 |

(1) As discussed in Note 10 — Debt Instruments, accrued payment-in-kind ("PIK") interest is included in long-term debt within the condensed consolidated balance sheets.

### NOTE 7 — RELATED PARTY TRANSACTIONS

**Lease Agreements**

In November 2014, the Company and DriveTime Automotive Group, Inc. (together with its consolidated affiliates, collectively, "DriveTime"), a related party of the Company due to Ernest Garcia II, Ernest Garcia III, and entities controlled by one or both of them (collectively the "Garcia Parties") controlling and owning substantially all of the interests in DriveTime, entered into a lease agreement (the "DriveTime Lease Agreement") that governs the Company's access to and utilization of temporary storage, reconditioning, offices and parking space at various DriveTime facilities, including hubs and inspection and reconditioning centers. The DriveTime Lease Agreement was most recently amended in December 2018. The last hub facility

13

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

lease remaining under the DriveTime Lease Agreement expired in April 2023, and the leases for the inspection and reconditioning centers expire between 2024 and 2026.

In March 2017, the Company and DriveTime entered into a lease agreement that governs the Company's access to and utilization of office and parking space at various DriveTime facilities (the "DriveTime Hub Lease Agreement"). The DriveTime Hub Lease Agreement was most recently amended in July 2021. The last facility remaining under the DriveTime Hub Lease Agreement expired in April 2023 and was not renewed.

Prior to expiration, the hub locations under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement both had cancellable lease terms of less than twelve months with rights to terminate at the Company's election with 60 days' prior written notice and certain one-year renewal options provided. At non-reconditioning locations, because it was not reasonably certain that the Company would exercise its options to extend the leases or abstain from exercising its termination rights within these lease agreements to create a lease term greater than one year, the Company accounted for them as short-term leases. For these locations, the Company made variable monthly lease payments based on its pro rata utilization of space at each facility plus a pro rata share of each facility's actual insurance costs and real estate taxes. Management had determined that the costs allocated to the Company were based on a reasonable methodology. The DriveTime Lease Agreement also includes the Blue Mound and Delanco inspection and reconditioning centers. At both of these locations, the Company expects the lease to continue beyond twelve months, therefore, those locations are not considered short-term leases. The Company occupies all of the space at these inspection and reconditioning centers and makes monthly lease payments based on DriveTime's actual rent expense. In addition, the Company is responsible for the actual insurance costs and real estate taxes at these inspection and reconditioning centers locations.

At all locations, the Company is additionally responsible for paying for any tenant improvements it requires to conduct its operations. Management has determined that the costs allocated to the Company are based on a reasonable methodology.

In February 2017, the Company entered into a lease agreement with DriveTime for sole occupancy of a fully operational inspection and reconditioning center in Winder, Georgia. The lease has an initial term of eight years, subject to the Company's ability to exercise three renewal options of five years each.

Expenses related to these operating lease agreements are allocated based on usage to inventory and selling, general and administrative expenses in the accompanying unaudited condensed consolidated balance sheets and statements of operations. Costs allocated to inventory are recognized as cost of sales when the inventory is sold. Total costs related to these operating lease agreements, including those noted above, were $1 million during each of the three months ended September 30, 2023 and 2022, and $2 million and $3 million during the nine months ended September 30, 2023 and 2022, respectively, allocated between inventory and selling, general and administrative expenses.

**Office Leases**

In September 2016, the Company entered into a lease for office space in Tempe, Arizona. In connection with that lease, the Company entered into a sublease with DriveTime for the use of another floor in the same building. The lease and sublease each have a term of 83 months, subject to the right to exercise three five-year extension options. Pursuant to the sublease, the Company pays the rent equal to the amounts due under DriveTime's master lease directly to DriveTime's landlord. The rent expense incurred related to this first floor sublease was less than $1 million during each of the three and nine months ended September 30, 2023 and 2022.

In December 2019, Verde Investments, Inc., an affiliate of DriveTime ("Verde"), purchased an office building in Tempe, Arizona that the Company leased from an unrelated landlord prior to Verde's purchase. In connection with the purchase, Verde assumed that lease. The lease has an initial term of ten years, subject to the right to exercise two five-year extension options. The rent expense incurred under the lease with Verde was less than $1 million during each of the three and nine months ended September 30, 2023 and 2022.

**Wholesale Sales and Revenues**

DriveTime purchases and sells wholesale vehicles from and to the Company through competitive online auctions that are managed by an unrelated third party, and through the Company's wholesale marketplace platform. Beginning in September 2023, the Company also provides DriveTime with certain reconditioning services through its wholesale marketplace platform.

14

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The Company recognized $4 million and $6 million of wholesale sales and revenues from DriveTime, including for reconditioning services, during the three months ended September 30, 2023 and 2022, respectively, and $14 million and $27 million during the nine months ended September 30, 2023 and 2022, respectively.

**Retail Vehicle Acquisitions and Reconditioning**

During the second quarter of 2021, the Company began acquiring reconditioned retail vehicles from DriveTime. The purchase price of each vehicle was equal to the wholesale price of the vehicle plus a fee for transportation and reconditioning services. In addition, DriveTime performs reconditioning services for the Company at DriveTime reconditioning centers. As of September 30, 2023 and 2022, less than $1 million and $2 million, respectively, related to vehicles and reconditioning services were included in vehicle inventory in the accompanying unaudited condensed consolidated balance sheets. The Company also recognized $1 million of cost of goods sold during each of the three months ended September 30, 2023 and 2022, and $3 million and $19 million during the nine months ended September 30, 2023 and 2022, respectively.

**Master Dealer Agreement**

In December 2016, the Company entered into a master dealer agreement with DriveTime (the "Master Dealer Agreement"), pursuant to which the Company may sell VSCs to customers purchasing a vehicle from the Company. The Company earns a commission on each VSC sold to its customers and DriveTime is obligated by and subsequently administers the VSCs. The Company collects the retail purchase price of the VSCs from its customers and remits the purchase price net of commission to DriveTime. In November 2018, the Company amended the Master Dealer Agreement to allow the Company to receive payments for excess reserves based on the performance of the VSCs versus the reserves held by the VSC administrator, once a required claims period for such VSCs has passed. In August 2020 and April 2021, the Company and DriveTime amended the Master Dealer Agreement to adjust excess reserve payment calculations and timing and the scope of DriveTime's after-sale administration services, respectively. During the three months ended September 30, 2023 and 2022, the Company recognized $32 million and $42 million, respectively, and during the nine months ended September 30, 2023 and 2022, the Company recognized $100 million and $138 million, respectively, of commissions earned on VSCs sold to its customers and administered by DriveTime, net of a reserve for estimated contract cancellations, and payments for excess reserves to which it expects to be entitled. The commission earned on the sale of these VSCs and expected payments for excess reserves is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

Beginning in 2017, DriveTime also administers the Company's limited warranty provided to all customers and administered a portion of the Company's GAP waiver coverage under the Master Dealer Agreement. Since the first quarter of 2020, the Company's GAP waiver coverage sales have been administered by an unrelated third party. The Company pays a per-vehicle fee to DriveTime to administer the limited warranty included with every purchase and prior to the first quarter of 2020 paid a per-contract fee to DriveTime to administer a portion of the GAP waiver coverage it sells to its customers. The Company incurred $4 million and $5 million during the three months ended September 30, 2023 and 2022, respectively, and $13 million and $14 million during the nine months ended September 30, 2023 and 2022, respectively, related to the administration of limited warranty.

**Profit Sharing Agreement**

In June 2018, the Company entered into an agreement with an unaffiliated third party, pursuant to which the Company would sell certain Road Hazard ("RH") and Pre-Paid Maintenance ("PPM") contracts. Under this agreement, third parties would administer the RH and PPM contracts, including providing customer and administrative services, and pay a profit sharing component to the Company. In 2022, the Company began selling equivalent offerings from DriveTime, pursuant to the Master Dealer Agreement discussed above, and all rights and obligations in connection with existing RH and PPM contracts were transferred to DriveTime (the "Transferred Contracts"). Finally, in December 2022, the Company entered into a profit sharing agreement with DriveTime with regard to the Transferred Contracts (the "Profit Sharing Agreement"). The Company recognized $3 million and $4 million in revenue during the three and nine months ended September 30, 2023, respectively, under the Profit Sharing Agreement.

15

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Servicing and Administrative Fees**

DriveTime provides servicing and administrative functions associated with the Company's finance receivables. The Company incurred expenses of $2 million and $3 million during the three months ended September 30, 2023 and 2022, respectively, and $10 million and $7 million during the nine months ended September 30, 2023 and 2022, respectively, related to these services.

**Aircraft Time Sharing Agreement**

The Company entered into an agreement to share usage of two aircraft owned by Verde and operated by DriveTime on October 22, 2015, and the agreement was subsequently amended in 2017. Pursuant to the agreement, the Company agreed to reimburse DriveTime for actual expenses for each of its flights. The original agreement was for 12 months, with perpetual 12-month automatic renewals. Either the Company or DriveTime can terminate the agreement with 30 days' prior written notice. The Company reimbursed DriveTime less than $1 million under this agreement during each of the three and nine months ended September 30, 2023 and 2022.

**Shared Services Agreement with DriveTime**

In November 2014, the Company and DriveTime entered into a shared services agreement whereby DriveTime provided certain accounting and tax, legal and compliance, information technology, telecommunications, benefits, insurance, real estate, equipment, corporate communications, software and production, and other services primarily to facilitate the transition of these services to the Company on a standalone basis (the "Shared Services Agreement"). The Shared Services Agreement was most recently amended and restated in February 2021 and operates on a year-to-year basis, with the Company having the right to terminate any or all services with 30 days' prior written notice and DriveTime having the right to terminate any or all services with 90 days' prior written notice. Charges allocated to the Company are based on the Company's actual use of the specific services detailed in the Shared Services Agreement. The Company incurred less than $1 million in expenses related to the Shared Services Agreement during each of the three and nine months ended September 30, 2023 and 2022.

**Accounts Payable Due to Related Party**

As of September 30, 2023 and December 31, 2022, $1 million and $16 million, respectively, was due to related parties primarily related to the agreements mentioned above, and is included in accounts payable and accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**Contributions of Class A Common Stock From Ernest Garcia III**

On January 5, 2022, in recognition of the Company selling its 1 millionth vehicle in the fourth quarter of 2021, the Company's CEO, Ernest Garcia III ("Mr. Garcia"), committed to giving then-current employees 23 shares of Class A common stock each from his personal shareholdings once employees reach their two-year employment anniversary ("CEO Milestone Gift" or "Gift"). As a result and during the three months ended March 31, 2022, the Company granted 23 restricted stock units ("RSUs") to each current employee, which vest after they complete their second year of employment, for a total of 435,035 RSUs granted during the period. For every gift that vests, and pursuant to a contribution agreement (the "Contribution Agreement") entered into by and between the Company and Mr. Garcia on February 22, 2022, Mr. Garcia contributes to the Company, at the end of each fiscal quarter, the number of shares of Class A common stock, granted pursuant to the CEO Milestone Gift, that have vested during such quarter. The shares contributed shall be shares of Class A common stock that Mr. Garcia individually owns, at no charge. The contribution is intended to fund RSU awards to certain employees of the Company upon their satisfying the applicable employment tenure requirements. During the three months ended September 30, 2023 and 2022, 16,859 and 14,099 RSUs, respectively, and during the nine months ended September 30, 2023 and 2022, 48,484 and 113,206 RSUs, respectively, vested and an equal number of shares of Class A common stock were contributed by Mr. Garcia. Although the Company does not expect Mr. Garcia to incur any tax obligations related to the contribution, the Company has agreed to indemnify Mr. Garcia from any such obligations that may arise.

**Private Placement**

On July 17, 2023, the Company entered into a Transaction Support Agreement pursuant to which, among other things, and subject to certain conditions, the Garcia Parties committed to purchase up to $126 million of equity in the Company. In satisfaction of that commitment, on August 18, 2023, the Company entered into a Securities Purchase Agreement with the

16

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Garcia Parties providing for the purchase of an aggregate of 3.4 million Class A Units, together with 2.7 million shares of Class B common stock, at a price equivalent to $46.31 per share of Class A common stock, or $37.048 per Class A Unit on an as-exchanged basis. The Company used the proceeds therefrom to partially fund the cash tender offer to purchase a portion of the 2025 Senior Unsecured Notes (as defined below).

## NOTE 8 — FINANCE RECEIVABLE SALE AGREEMENTS

The Company originates loans for its customers and sells them to partners and investors pursuant to finance receivable sale agreements. Historically, the Company has sold loans through two types of arrangements: forward flow agreements and fixed pool loan sales, including securitization transactions.

### Master Purchase and Sale Agreement

In December 2016, the Company entered into a master purchase and sale agreement (the "Master Purchase and Sale Agreement" or "MPSA") with Ally Bank and Ally Financial Inc. (collectively the "Ally Parties"). Pursuant to the MPSA, the Company sells finance receivables meeting certain underwriting criteria under a committed forward flow arrangement without recourse to the Company for their post-sale performance. The Company and the Ally Parties amended the MPSA at various times throughout 2021 and 2022, and on January 13, 2023 and January 20, 2023 the MPSA was further amended to extend the scheduled commitment termination date to January 12, 2024, and establish a commitment by the Ally Parties to purchase up to a maximum of $4.0 billion of principal balances of finance receivables between January 13, 2023 and the scheduled commitment termination date. Finally, the Company and the Ally Parties entered into additional amendments to the MPSA on March 24, 2023 and April 17, 2023 to broaden the scope of finance receivables eligible for sale to the Ally Parties and update account information.

During the three months ended September 30, 2023 and 2022, the Company sold $1.0 billion and $1.3 billion, respectively, in principal balances of finance receivables under the MPSA. During the nine months ended September 30, 2023 and 2022, the Company sold $2.7 billion and $3.1 billion, respectively, in principal balances of finance receivables under the MPSA and had $1.3 billion of unused capacity as of September 30, 2023.

### Securitization Transactions

The Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with the Risk Retention Rules (as defined below), as further discussed in Note 9 — Securitizations and Variable Interest Entities.

During the three months ended September 30, 2023 and 2022, the Company sold $1.0 billion and $364 million, respectively, in principal balances of finance receivables through securitization transactions. During the nine months ended September 30, 2023 and 2022, the Company sold $2.3 billion and $2.4 billion, respectively, in principal balances of finance receivables through securitization transactions.

### Gain on Loan Sales

The total gain related to finance receivables sold to financing partners and pursuant to securitization transactions was $146 million and $126 million during the three months ended September 30, 2023 and 2022, respectively, and $360 million and $361 million during the nine months ended September 30, 2023 and 2022, respectively, which is included in other sales and revenues in the accompanying unaudited condensed consolidated statements of operations.

## NOTE 9 — SECURITIZATIONS AND VARIABLE INTEREST ENTITIES

As noted in Note 8 — Finance Receivable Sale Agreements, the Company sponsors and establishes securitization trusts to purchase finance receivables from the Company. The securitization trusts issue asset-backed securities, some of which are

17

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

collateralized by the finance receivables that the Company sells to the securitization trusts. Upon sale of the finance receivables to the securitization trusts, the Company recognizes a gain or loss on sales of finance receivables. The net proceeds from the sales are the fair value of the assets obtained as part of the transactions and typically include cash and at least 5% of the beneficial interests issued by the securitization trusts to comply with Regulation RR of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Risk Retention Rules"). The beneficial interests retained by the Company include, but are not limited to, rated notes and certificates of the securitization trusts. The holders of the certificates issued by the securitization trusts have rights to cash flows only after the holders of the notes issued by the securitization trusts have received their contractual cash flows. The securitization trusts have no direct recourse to the Company's assets, and holders of the securities issued by the securitization trusts can look only to the assets of the securitization trusts that issued their securities for payment. The beneficial interests held by the Company are subject principally to the credit and prepayment risk stemming from the underlying finance receivables.

The securitization trusts established in connection with asset-backed securitization transactions are VIEs. For each VIE that the Company establishes in its role as sponsor of securitization transactions, it performs an analysis to determine whether or not it is the primary beneficiary of the VIE. The Company's continuing involvement with the VIEs consists of retaining a portion of the securities issued by the VIEs, providing industry standard representations and warranties regarding the underlying finance receivables, and performing ministerial duties as the trust administrator. As of September 30, 2023, the Company is not the primary beneficiary of these securitization trusts because its retained interests in the VIEs do not have exposures to losses or benefits that could potentially be significant to the VIEs. As such, the Company does not consolidate the securitization trusts.

The assets the Company retains in the unconsolidated VIEs are presented as beneficial interests in securitizations on the accompanying unaudited condensed consolidated balance sheets, which as of September 30, 2023 and December 31, 2022 were $371 million and $321 million, respectively. The Company held no other assets or liabilities related to its involvement with unconsolidated VIEs as of September 30, 2023 and December 31, 2022.

The following table summarizes the carrying value and total exposure to losses of its assets related to unconsolidated VIEs with which the Company has continuing involvement, but is not the primary beneficiary at September 30, 2023 and December 31, 2022. Total exposure represents the estimated loss the Company would incur under severe, hypothetical circumstances, such as if the value of the interests in the securitization trusts and any associated collateral declined to zero. The Company believes the possibility of this is remote. As such, the total exposure presented below is not an indication of the Company's expected losses.

|  | September 30, 2023 | | December 31, 2022 | |
|  | Carrying Value | Total Exposure | Carrying Value | Total Exposure |
| --- | --- | --- | --- | --- |
|  | (in millions) | | | |
| Rated notes | $ 289 | $ 289 | $ 252 | $ 252 |
| Certificates and other assets | 82 | 82 | 69 | 69 |
| Total unconsolidated VIEs | $ 371 | $ 371 | $ 321 | $ 321 |

The beneficial interests in securitizations are considered securities available for sale subject to restrictions on transfer pursuant to the Company's obligations as a sponsor under the Risk Retention Rules. As described in Note 10 — Debt Instruments, the Company has entered into secured borrowing facilities through which it finances certain of these retained beneficial interests in securitizations. These securities are interests in securitization trusts, thus there are no contractual

18

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

maturities. The amortized cost and fair value of securities available for sale as of September 30, 2023 and December 31, 2022 were as follows:

| | September 30, 2023 | | December 31, 2022 | |
| --- | --- | --- | --- | --- |
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | (in millions) | | | |
| Rated notes | $ 299 | $ 289 | $ 268 | $ 252 |
| Certificates and other assets | 68 | 82 | 43 | 69 |
| Total securities available for sale | $ 367 | $ 371 | $ 311 | $ 321 |

**NOTE 10 — DEBT INSTRUMENTS**

Debt instruments, excluding finance leases, which are discussed in Note 16 — Leases, as of September 30, 2023 and December 31, 2022 consisted of the following:

| | September 30, 2023 | December 31, 2022 |
| --- | --- | --- |
| | (in millions) | |
| Asset-based financing: | | |
| Floor plan facility | $ 117 | $ 569 |
| Finance receivable facilities | 312 | 965 |
| Financing of beneficial interest in securitizations | 299 | 268 |
| Notes payable | 2 | 3 |
| Real estate financing | 485 | 486 |
| Total asset-based financing | 1,215 | 2,291 |
| Senior Secured Notes [1] | 4,240 | — |
| Senior Unsecured Notes | 205 | 5,725 |
| Total debt | 5,660 | 8,016 |
| Less: current portion | (545) | (1,638) |
| Less: unamortized debt issuance costs [2] | (58) | (82) |
| Plus: unamortized premium [3] | 39 | — |
| Total included in long-term debt, net | $ 5,096 | $ 6,296 |

(1) Includes $46 million of accrued PIK interest through September 30, 2023, which will increase the principal amount of Senior Secured Notes on February 15, 2024, the next semi-annual interest payment date.
(2) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on the accompanying unaudited condensed consolidated balance sheets. Unamortized debt issuance costs related to revolving debt arrangements are presented within other assets on the accompanying unaudited condensed consolidated balance sheets and not included here.
(3) The unamortized premium relates to a portion of the Offers (as defined below) which were accounted for as a debt modification.

**Short-Term Revolving Facilities**

*Floor Plan Facility*

The Company previously entered into a floor plan facility with a lender to finance its vehicle inventory, which was secured by Carvana LLC's vehicle inventory, general intangibles, accounts receivable, and finance receivables (as amended, the "Floor Plan Facility"). The facility was amended at various times and effective September 22, 2022, the Company amended and restated the facility to extend the maturity date, with a line of credit of $2.2 billion through September 22, 2023, and $2.0

19

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

billion through March 22, 2024, and tie the interest rate to a prime rate plus 1.00%. On May 31, 2023, the Company amended the facility to have a single line of credit of $2.0 billion through March 22, 2024. On September 1, 2023, the Company amended the facility in connection with the issuance of the Senior Secured Notes discussed below to provide for an additional exclusive grant of collateral over certain deposit accounts and the cash on deposit in those accounts in favor of the lender and to amend certain other affirmative and negative covenants. Finally, on November 1, 2023, the Company amended the facility to resize the single line of credit to $1.5 billion through April 30, 2025 and to lower the interest rate to (i) a prime rate plus 0.10% when amounts drawn under the facility are under 50% of the then current inventory balance and (ii) a prime rate plus 0.50% when amounts drawn are over 50%.

Under the facility, repayment of amounts drawn for the purchase of a vehicle should generally be made within several days after selling or otherwise disposing of the vehicle. Outstanding balances related to vehicles held in inventory for more than 120 days require monthly principal payments equal to 10% of the original principal amount of that vehicle until the remaining outstanding balance is equal to the lesser of (i) 50% of the original principal amount or (ii) 50% of the wholesale value. Prepayments may be made without incurring a premium or penalty. Additionally, the Company is permitted to make prepayments to the lender to be held as principal payments under the facility and subsequently reborrow such amounts. The facility also requires monthly interest payments and required that at least 12.5% of the total principal amount owed to the lender be held as restricted cash. On November 1, 2023, the restricted cash requirements were amended to introduce a sliding scale whereby at least 12.5% of the total principal amount owed to the lender is required to be held as restricted cash if amounts drawn are under 50% of the then current inventory balance, which requirement increases to (i) 17.5% required to be held as restricted cash if amounts drawn are between 50% and 59.99%, (ii) 22.5% required to be held as restricted cash if amounts drawn are between 60% and 69.99%, and (iii)25% required to be held as restricted cash if amounts drawn are equal to or over 70%. The Company is also required to pay the lender an availability fee based on the average unused capacity during the prior calendar quarter under the facility.

As of September 30, 2023, the Company had $117 million outstanding under the facility, unused capacity of $1.9 billion, and held $15 million in restricted cash related to this facility. During the three months ended September 30, 2023, the Company's effective interest rate on the facility was approximately 7.06%.

As of December 31, 2022, the Company had $569 million outstanding under the facility, unused capacity of $1.6 billion, and held $71 million in restricted cash related to this facility. For the year ended December 31, 2022, the Company's effective interest rate on the facility was approximately 3.57%.

*Active Finance Receivable Facilities*

The Company has various short-term revolving credit facilities to fund certain finance receivables originated by the Company prior to selling them, which are typically secured by the finance receivables pledged to them (the "Finance Receivable Facilities").

In January 2020, the Company entered into an agreement pursuant to which a lender agreed to provide a revolving credit facility to fund certain finance receivables originated by the Company. In 2023, the Company amended its agreement to, among other things, adjust the line of credit to $500 million and extend the maturity date to January 24, 2024.

In February 2020, the Company entered into an agreement pursuant to which a second lender agreed to provide a $500 million revolving credit facility to fund certain finance receivables originated by the Company. In December 2021, the Company amended its agreement to, among other things, increase the line of credit to $600 million and extend the maturity date to December 8, 2023.

In April 2021, the Company entered into an agreement pursuant to which a third lender agreed to provide a $500 million revolving credit facility to fund certain finance receivables originated by the Company. In December 2021 and September 2022, the Company amended its agreement to, among other things, increase this line of credit to $600 million, and extend the maturity date to March 30, 2024.

In October 2021, the Company entered into an agreement pursuant to which a fourth lender agreed to provide a $350 million revolving credit facility to fund certain finance receivables originated by the Company. On May 8, 2023, the Company settled all outstanding amounts owed and terminated the agreement with the lender.

20

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

In March 2022, the Company entered into an agreement pursuant to which a fifth lender agreed to provide a $500 million revolving credit facility to fund certain finance receivables originated by the Company. In September 2023, the Company amended its agreement to extend the maturity date to September 18, 2024.

In May 2023, the Company entered into an agreement pursuant to which a sixth lender agreed to provide a $500 million revolving credit facility to fund certain finance receivables originated by the Company. The Company can draw upon this facility until May 31, 2024.

The Finance Receivable Facilities require that any undistributed amounts collected on the pledged finance receivables be held as restricted cash. The Finance Receivable Facilities require monthly payments of interest and fees based on usage and unused facility amounts. The Finance Receivable Facilities self-amortize from the end of the draw period until maturity, offer full prepayment rights, and have no credit sublimits or aging restrictions, subject to negotiated concentration limits. The subsidiaries that entered into these Finance Receivable Facilities are each wholly-owned, special purpose entities whose assets are not available to the general creditors of the Company. As of September 30, 2023 and December 31, 2022, the Company had $312 million and $965 million, respectively, outstanding under these Finance Receivable Facilities, unused capacity of $2.4 billion and $1.6 billion, respectively, and held $15 million and $36 million, respectively, in restricted cash related to these Finance Receivable Facilities. During the three months ended September 30, 2023, the Company's effective interest rate on these Finance Receivable Facilities was approximately 6.93%. For the year ended December 31, 2022, the Company's effective interest rate on these Finance Receivable Facilities was approximately 2.93%.

**Long-Term Debt**

*Senior Secured Notes*

On September 1, 2023, the Company completed a series of transactions whereby it exchanged validly tendered senior unsecured notes for newly issued senior secured notes (the "Exchange Offers"). Concurrently with the Exchange Offers, the Company also completed a cash tender offer to purchase any and all of the Company's outstanding 2025 Senior Unsecured Notes for cash at a purchase price equal to 85.0% of the aggregate principal amount thereof (the "Cash Tender Offer" and together with the Exchange Offers, the "Offers"). Upon consummation of the Offers, the Company exchanged Senior Unsecured Notes with an aggregate outstanding principal amount of $5.5 billion for $4.2 billion in aggregate principal amount of newly issued senior secured notes (collectively the "Senior Secured Notes"), paid $341 million in cash for validly tendered 2025 Senior Unsecured Notes, and paid $146 million in cash related to accrued and unpaid interest for validly tendered Senior Unsecured Notes. Additionally, the Company wrote off $66 million of debt issuance costs in connection with the Offers.

The Company assessed the Offers to determine whether the transactions represent debt modifications or debt extinguishments under Accounting Standards Codification 470. As a result of certain lenders that participated in the Offers, the Company determined that a majority of the Offers were a debt extinguishment and the remainder of the Offers were a debt modification, which resulted in a gain on debt extinguishment of $878 million. As a result, the Company recognized a $40 million premium which is reflected as an addition to the principal balance of the Senior Secured Notes and will be amortized against interest expense over the respective lives of the Senior Secured Notes.

The aggregate principal amounts of the Senior Unsecured Notes that were validly tendered and accepted by the Company in the Offers are set forth in the table below.

21

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

| | | | | | Allocation to Senior Secured Notes Issued | | | |
| Senior Unsecured Notes | Outstanding Principal Prior to Exchange | Principal Amount Validly Tendered and Accepted | Accepted as % of Outstanding | Cash Tender Offer Payment | 2028 Senior Secured Notes | 2030 Senior Secured Notes | 2031 Senior Secured Notes | Total Senior Secured Notes |
|---|---|---|---|---|---|---|---|---|
| | | | | (in millions, except percentages) | | | | |
| 2025 Senior Unsecured Notes | $ 500 | $ 402 | 80.3 % | $ 341 | $ — | $ — | $ — | $ — |
| 2027 Senior Unsecured Notes | 600 | 568 | 94.7 % | — | 102 | 153 | 181 | $ 436 |
| 2028 Senior Unsecured Notes | 600 | 578 | 96.3 % | — | 90 | 135 | 160 | $ 385 |
| 2029 Senior Unsecured Notes | 750 | 724 | 96.6 % | — | 110 | 165 | 195 | $ 470 |
| 2030 Senior Unsecured Notes | 3,275 | 3,248 | 99.2 % | — | 679 | 1,018 | 1,205 | $ 2,902 |
| Total | $ 5,725 | $ 5,520 | 96.4 % | $ 341 | $ 981 | $ 1,471 | $ 1,741 | $ 4,193 |

The following table summarizes interest rate terms of the Company's Senior Secured Notes:

| Senior Secured Notes | September 30, 2023 | December 31, 2022 | Year 1 PIK Interest Rate | Year 2 Cash/PIK Toggle Interest Rate | Thereafter Cash Interest Rate |
|---|---|---|---|---|---|
| | (in millions, except percentages) | | | | |
| 2028 notes due December 1, 2028 (the "2028 Senior Secured Notes") | $ 981 | $ — | 12% | 9%/12% | 9% |
| 2030 notes due June 1, 2030 (the "2030 Senior Secured Notes") | 1,471 | — | 13% | 11%/13% | 9% |
| 2031 notes due June 1, 2031 (the "2031 Senior Secured Notes") | 1,741 | — | 14% | --/14% | 9% |
| Total principal amount | $ 4,193 | $ — | | | |

Interest on each of the Senior Secured Notes is payable semi-annually on February 15 and August 15, commencing on February 15, 2024.

The Company may redeem some or all of each series of Senior Secured Notes at any time prior to certain specified redemption dates (the "Secured Early Redemption Dates") and at 100% of the principal amount outstanding plus applicable make-whole premiums set forth in each respective indenture, plus any accrued and unpaid interest to the redemption date. Prior to the Secured Early Redemption Dates, the Company may also redeem up to 35% of the original aggregate principal amount of the 2028 and 2030 Senior Secured Notes at a redemption price equal to 109% of the principal amount outstanding, together with accrued and unpaid interest to, but not including, the date of redemption, using the net cash proceeds of certain equity offerings. Finally, on or after the Secured Early Redemption Dates, the Company may redeem its Senior Secured Notes in whole or in part at redemption prices set forth in each respective indenture, plus accrued and unpaid interest up to but excluding the redemption date. If the Company experiences certain change of control events, it must make an offer to purchase all of the Senior Secured Notes at 101% of the principal amount thereof, plus any accrued and unpaid interest, to the repurchase date.

The Senior Secured Notes mature as specified in the table above unless earlier repurchased or redeemed and are fully and unconditionally guaranteed on a senior secured basis, jointly and severally, by all of the domestic restricted subsidiaries of the

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

Company (other than the subsidiaries formed for inventory, finance receivables, securitization facilities, immaterial subsidiaries, or unrestricted subsidiaries). The Senior Secured Notes and the guarantees are secured by (i) second-priority liens on certain assets and property of the Company, pledged in favor of the Ally Parties under the Floor Plan Facility and (ii) first-priority liens on certain assets and property of the Company and the guarantors, as identified in the indentures to the Senior Secured Notes.

The indentures to the Senior Secured Notes contain restrictive covenants that limit the ability of the Company and its restricted subsidiaries to, among other things and subject to certain exceptions, incur additional debt or issue preferred stock, create new liens, create restrictions on intercompany payments, pay dividends and make other distributions in respect of the Company's capital stock, redeem or repurchase the Company's capital stock or prepay subordinated indebtedness, make certain investments or certain other restricted payments, guarantee indebtedness, designate unrestricted subsidiaries, sell certain kinds of assets, enter into certain types of transactions with affiliates, and effect mergers or consolidations.

*Senior Unsecured Notes*

The Company has issued various tranches of senior unsecured notes (the "Senior Unsecured Notes") each under a separate indenture, as further described below.

The following table summarizes components of the Company's Senior Unsecured Notes:

| | September 30, 2023 | | December 31, 2022 | Interest Rate |
|---|---|---|---|---|
| | | (in millions, except percentages) | | |
| 2025 senior unsecured notes due October 1, 2025 ("2025 Senior Unsecured Notes") | $ 98 | $ | 500 | 5.625 % |
| 2027 senior unsecured notes due April 15, 2027 ("2027 Senior Unsecured Notes") | 32 | | 600 | 5.500 % |
| 2028 senior unsecured notes due October 1, 2028 ("2028 Senior Unsecured Notes") | 22 | | 600 | 5.875 % |
| 2029 senior unsecured notes due September 1, 2029 ("2029 Senior Unsecured Notes") | 26 | | 750 | 4.875 % |
| 2030 senior unsecured notes due May 1, 2030 ("2030 Senior Unsecured Notes") | 27 | | 3,275 | 10.250 % |
| Total principal amount | 205 | | 5,725 | |
| Less: unamortized debt issuance costs | (1) | | (76) | |
| Total debt | $ 204 | $ | 5,649 | |

Each of the 2025, 2027, 2028 and 2029 Senior Unsecured Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank National Association, as trustee. The 2030 Senior Unsecured Notes were issued pursuant to an indenture entered into by and among the Company, each of the guarantors party thereto and U.S. Bank Trust Company, National Association, as trustee. Interest on each of the Senior Unsecured Notes is payable semi-annually. The Senior Unsecured Notes mature as specified in the table above unless earlier repurchased or redeemed and are guaranteed by the Company's existing domestic restricted subsidiaries (other than the subsidiaries formed for inventory, finance receivables, securitization facilities, immaterial subsidiaries, or unrestricted subsidiaries). In March 2023, the Company designated ADESA and its subsidiaries as unrestricted subsidiaries under the indentures governing the Senior Unsecured Notes.

The Company may redeem some or all of each series of Senior Unsecured Notes at any time prior to certain specified redemption dates (the "Unsecured Early Redemption Dates") at the redemption prices and applicable make-whole premiums set forth in each respective indenture, plus any accrued and unpaid interest to the redemption date. Prior to the Unsecured Early Redemption Dates, the Company may also redeem up to 35% of the aggregate principal amount at a redemption price equal to 100% plus the respective interest rate specified in the table above, together with accrued and unpaid interest to, but not including, the date of redemption, with the net cash proceeds of certain equity offerings. With respect to the 2030 Senior Unsecured Notes, the Company may, at its option, redeem in the aggregate up to 10% of the original aggregate principal amount of the 2030 Senior Unsecured Notes during the period from, and including, May 1, 2025 to, but excluding May 1, 2027, at a redemption price equal to 105.125% of the 2030 Senior Unsecured Notes to be redeemed, plus accrued and unpaid interest

23

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

thereon to the relevant redemption rate. Finally, on or after the Unsecured Early Redemption Dates, the Company may redeem some or all of the Senior Unsecured Notes in whole or in part at redemption prices set forth in each respective indenture, plus accrued and unpaid interest up to but excluding the redemption date.

As discussed above, on September 1, 2023, the Company completed the Offers, including the Exchange Offers to exchange an outstanding principal amount of $5.1 billion of the Senior Unsecured Notes for newly issued Senior Secured Notes, and the Cash Tender Offer to purchase an outstanding principal amount of $402 million of the 2025 Senior Unsecured Notes, leading to a total reduction of an aggregate outstanding principal amount of $5.5 billion of the Senior Unsecured Notes. In connection with the Exchange Offers, the Company obtained consents from holders of each series of Senior Unsecured Notes to amend the indentures governing the notes to eliminate substantially all of the restrictive covenants as well as certain events of default and related provisions therein, and on August 30, 2023, the Company and the trustee entered into supplemental indentures to effect such amendments.

*Notes Payable*

The Company has entered into promissory note and disbursement agreements to finance certain equipment for its transportation fleet and building improvements. The assets financed with the proceeds from these notes serve as the collateral for each note and certain security agreements related to these assets have cross collateralization and cross default provisions with respect to one another. The notes have a fixed annual interest rate, a two- to three-year term and require monthly payments. As of September 30, 2023 and December 31, 2022, the outstanding principal of these notes had a weighted-average interest rate of 8.4% and 7.5%, respectively, and totaled $2 million and $3 million, respectively, net of unamortized debt issuance costs, of which $2 million and $1 million, respectively, was due within the next twelve months and is included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Real Estate Financing*

The Company finances certain purchases and construction of its property and equipment through various sale and leaseback transactions. As of September 30, 2023, none of these transactions have qualified for sale accounting due to meeting the criteria for finance leases, or forms of continuing involvement, such as repurchase options or renewal periods that extend the lease for substantially all of the asset's remaining useful life, and are therefore accounted for as financing transactions. These arrangements require monthly payments and have initial terms of 20 to 25 years. Some of the agreements are subject to renewal options of up to 25 years and some are subject to base rent increases throughout the term. As of September 30, 2023 and December 31, 2022, the outstanding liability associated with these sale and leaseback arrangements, net of unamortized debt issuance costs, was $482 million and $483 million, respectively, and was included in long-term debt in the accompanying unaudited condensed consolidated balance sheets.

*Financing of Beneficial Interests in Securitizations*

As discussed in Note 9 — Securitizations and Variable Interest Entities, the Company has retained certain beneficial interests in securitizations pursuant to the Company's obligations as a sponsor under the Risk Retention Rules. Beginning in June 2019, the Company entered into secured borrowing facilities through which it finances certain retained beneficial interests in securitizations whereby the Company sells such interests and agrees to repurchase them for their fair value at a stated time of repurchase.

As of September 30, 2023 and December 31, 2022, the Company has pledged $299 million and $268 million, respectively, of its beneficial interests in securitizations as collateral under the repurchase agreements with expected repurchases ranging from March 2024 to October 2030. The securitization trusts distribute payments related to the Company's pledged beneficial interests in securitizations directly to the lenders, which reduces the beneficial interests in securitizations and the related debt balance. Pledged collateral levels are monitored daily and are generally maintained at an agreed-upon percentage of the fair value of the amounts borrowed during the life of the transactions. In the event of a decline in the fair value of the pledged collateral, the repurchase price of the pledged collateral will be increased by the amount of the decline.

24

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The outstanding balance of these facilities, net of unamortized debt issuance costs, was $296 million and $265 million as of September 30, 2023 and December 31, 2022, respectively, of which $114 million and $102 million, respectively, was included in current portion of long-term debt in the accompanying unaudited condensed consolidated balance sheets.

As of September 30, 2023, the Company was in compliance with all debt covenants.

## NOTE 11 — STOCKHOLDERS' EQUITY (DEFICIT)

**Organizational Transactions**

Carvana Co.'s amended and restated certificate of incorporation, among other things, authorizes (i) 50 million shares of Preferred Stock, par value $0.01 per share, (ii) 500 million shares of Class A common stock, par value $0.001 per share, and (iii) 125 million shares of Class B common stock, par value $0.001 per share. Each share of Class A common stock generally entitles its holder to one vote on all matters to be voted on by stockholders. Each share of Class B common stock held by the Garcia Parties generally entitles its holder to ten votes on all matters to be voted on by stockholders, for so long as the Garcia Parties maintain direct or indirect beneficial ownership of at least 25% of the outstanding shares of Carvana Co.'s Class A common stock determined on an as-exchanged basis assuming that all of the Class A Units and Class B Units were exchanged for Class A common stock. All other shares of Class B common stock generally entitle their holders to one vote per share on all matters to be voted on by stockholders. Holders of Class B common stock are not entitled to receive dividends and would not be entitled to receive any distributions upon the liquidation, dissolution or winding down of the Company. Holders of Class A and Class B common stock vote together as a single class on all matters presented to stockholders for their vote or approval, except as otherwise required by applicable law.

Carvana Group's amended and restated LLC Agreement provides for two classes of common ownership interests in Carvana Group: (i) Class A Units and (ii) Class B Units (together, the "LLC Units"). Carvana Co. is required to, at all times, maintain (i) a four-to-five ratio between the number of shares of Class A common stock issued and outstanding by Carvana Co. and the number of Class A Units owned by Carvana Co. (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities and subject to adjustment as set forth in the exchange agreement (the "Exchange Agreement") further discussed below, and taking into account Carvana Co. Sub LLC's 0.1% ownership interest in Carvana, LLC) and (ii) a four-to-five ratio between the number of shares of Class B common stock owned by the original holders of LLC units prior to the IPO (the "Original LLC Unitholders") and the number of Class A Units owned by the Original LLC Unitholders. The Company may issue shares of Class B common stock only to the extent necessary to maintain these ratios. Shares of Class B common stock are transferable only if an Original LLC Unitholder elects to exchange them, together with 1.25 times as many LLC Units, for consideration from the Company. Such consideration from the Company can be, at the Company's election, either shares of Class A common stock or cash.

As of September 30, 2023 and December 31, 2022, there were 249 million and 236 million Class A Units and 2 million and 1 million Class B Units, respectively, (as adjusted for the participation thresholds and closing price of Class A common stock on September 30, 2023 and December 31, 2022) issued and outstanding. As discussed in Note 13 — Equity-Based Compensation, Class B Units were issued under the Company's LLC Equity Incentive Plan (the "LLC Equity Incentive Plan") and are subject to a participation threshold, and are earned over the requisite service period.

**Equity Offerings**

On April 26, 2022, the Company completed a public offering of 15.625 million shares of its Class A common stock at an offering price of $80 for total net proceeds of $1.2 billion, after deducting underwriting discounts and offering expenses. The Garcia Parties purchased an aggregate of 5.4 million shares of the Class A common stock offered at the public offering price. The Company used the net proceeds to purchase 19.5 million newly-issued LLC Units in Carvana Group.

**At-the-Market Offering**

On July 19, 2023, the Company entered into a distribution agreement with Citigroup Global Markets Inc. and Moelis & Company LLC, whereby the Company may sell up to the greater of (i) shares of Class A common stock representing an

25

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

aggregate offering price of $1.0 billion, or (ii) an aggregate of 35 million shares of Class A common stock, from time to time, through an "at-the-market offering" program (the "ATM Offering").

The following table summarizes the activity pursuant to the ATM Offering for the period presented:

| | Three Months Ended September 30, 2023 |
|---|---|
| | (in millions, except share and per share amounts) |
| Shares of Class A common stock issued | 7,156,838 |
| Weighted-average issuance price per share | $ 46.9387 |
| Gross proceeds[1] | $ 336 |

(1) Net proceeds were $327 million after deducting $9 million of commissions and other offering expenses incurred.

**Private Placement**

On July 17, 2023, the Company entered into a Transaction Support Agreement pursuant to which, among other things, and subject to certain conditions, the Garcia Parties committed to purchase up to $126 million of equity in the Company. In satisfaction of that commitment, on August 18, 2023, the Company entered into a Securities Purchase Agreement with the Garcia Parties providing for the purchase of an aggregate of 3.4 million Class A Units, together with 2.7 million shares of Class B common stock, at a price equivalent to $46.31 per share of Class A common stock. The price equivalent of $46.31 per share of Class A common stock was equal to the weighted average sale price per share of Class A common stock sold under the ATM Offering through August 18, 2023. As further described below, Class B Units are exchangeable for an equivalent number of shares of Class A common stock, which exchange must be accompanied by 1.25 times as many Class A Units. As exchanged, the price per Class A Unit was $37.048. The Company may, at its election, pay consideration for such exchange in either shares of Class A common stock or in cash. The Company used the proceeds therefrom to partially fund the Cash Tender Offer as discussed in Note 10 — Debt Instruments.

**Exchange Agreement**

Carvana Co. and the Original LLC Unitholders together with any holders of LLC Units issued subsequent to the IPO (together, the "LLC Unitholders") entered into an Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to (i) conversion ratio adjustments for stock splits, stock dividends, reclassifications and similar transactions, (ii) vesting for certain LLC Units, and (iii) the respective participation threshold for Class B Units. To the extent such owners also hold Class B common stock, they are required to deliver to Carvana Co. a number of shares of Class B common stock equal to the number of shares of Class A common stock being exchanged for. Any shares of Class B common stock so delivered are canceled. The number of exchangeable Class B Units is determined based on the value of Carvana Co.'s Class A common stock and the applicable participation threshold.

During each of the three and nine months ended September 30, 2023 and 2022, certain LLC Unitholders exchanged less than 1 million LLC Units and no shares of Class B common stock for less than 1 million newly-issued shares of Class A common stock. Simultaneously, and in connection with these exchanges, Carvana Co. received less than 1 million and zero LLC Units during the three months ended September 30, 2023 and 2022, respectively, and less than 1 million LLC Units during each of the nine months ended September 30, 2023 and 2022, increasing its total ownership interest in Carvana Group for the three months ended September 30, 2022.

**Class A Non-Convertible Preferred Units**

On October 2, 2018, Carvana Group, LLC amended its LLC Agreement to create a class of non-convertible preferred units (the "Class A Non-Convertible Preferred Units"), effective September 21, 2018. The Class A Non-Convertible Preferred Units were created in connection with Carvana Co.'s issuance of its Senior Unsecured Notes, as discussed further and defined in Note 10 — Debt Instruments. On October 2, 2020, Carvana Group, LLC amended and restated its LLC Agreement to, among other

26

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

things, authorize the issuance of 1.1 million Class A Non-Convertible Preferred Units to be sold to Carvana Co. in connection with the issuance of its 2025 and 2028 Senior Unsecured Notes and authorize the issuance of additional Class A Non-Convertible Preferred Units, in each case in consideration for the capital contribution made or deemed to have been made by Carvana Co. of the net proceeds of notes issuances. Carvana Co. used the net proceeds from the issuance of its Senior Unsecured Notes to purchase the Class A Non-Convertible Preferred Units, and, in the case of the Senior Secured Notes, received Class A Non-Convertible Preferred Units upon the cancellation of units previously issued in connection with the issuance of the Senior Unsecured Notes, as specified below:

| Date | Senior Notes Issuance | Class A Non-Convertible Preferred Units | Cancelled in Connection with Offers | Net Total Class A Non-Convertible Preferred Units |
|---|---|---|---|---|
| October 2020 | 2025 Senior Unsecured Notes | 500,000 | (401,742) | 98,258 |
| March 2021 | 2027 Senior Unsecured Notes | 600,000 | (568,165) | 31,835 |
| October 2020 | 2028 Senior Unsecured Notes | 600,000 | (577,527) | 22,473 |
| August 2021 | 2029 Senior Unsecured Notes | 750,000 | (724,349) | 25,651 |
| May 2022 | 2030 Senior Unsecured Notes | 3,275,000 | (3,247,959) | 27,041 |
| September 2023 | 2028 Senior Secured Notes | 980,815 | — | 980,815 |
| September 2023 | 2030 Senior Secured Notes | 1,471,430 | — | 1,471,430 |
| September 2023 | 2031 Senior Secured Notes | 1,741,259 | — | 1,741,259 |
| | | 9,918,504 | (5,519,742) | 4,398,762 |

When Carvana Co. makes payments on the Senior Unsecured Notes and Senior Secured Notes (collectively the "Senior Notes"), Carvana Group makes an equal cash distribution, as necessary, to the Class A Non-Convertible Preferred Units. For each $1,000 principal amount of Senior Notes that Carvana Co. repays or otherwise retires, one Class A Non-Convertible Preferred Unit is canceled and retired. As discussed in Note 10 — Debt Instruments, the Company exchanged a portion of its Senior Unsecured Notes for new Senior Secured Notes, at which time 5.5 million Class A Non-Convertible Preferred Units were canceled and retired.

**Tax Asset Preservation Plan**

On January 16, 2023, the Company entered into a Section 382 Rights Agreement (the "Tax Asset Preservation Plan") designed to preserve shareholder value and the value of certain tax assets primarily associated with federal net operating loss carryforwards and built-in losses under Section 382 of the Internal Revenue Code of 1986, as amended (the "Code"). The Tax Asset Preservation Plan is intended to act as a deterrent to any person or group acquiring 4.9% or more of the Company's outstanding Class A common stock (any such person an "Acquiring Person"), without the approval of the Company's board of directors (the "Board").

In connection therewith, the Board declared a dividend of one preferred share purchase right (a "Right") for each share of Class A common stock, par value $0.001 per share, of the Company. Each Right entitles the registered holder to purchase from the Company one one-thousandth of a share of Series B Preferred Stock, par value $0.01 per share, of the Company (the "Preferred Shares") at a price of $50.00 per one one-thousandth of a Preferred Share represented by a Right, subject to adjustment. The Rights will separate and begin trading separately from the Class A common stock, and right certificates will be caused to evidence the Rights, on the earlier to occur of (i) the Close of Business (as such term is defined in the Tax Asset Preservation Plan) on the tenth day following a public announcement, or the public disclosure of facts indicating, that a Person (as such term is defined in the Tax Asset Preservation Plan) or group of affiliated or associated Persons has acquired Beneficial Ownership (as such term is defined in the Tax Asset Preservation Plan) of 4.9% or more of the outstanding Class A common stock (or, in the event that the Board determines to effect an exchange in accordance with Section 24 of the Tax Asset Preservation Plan and the Board determines that a later date is advisable, then such later date) and (ii) the close of business on the tenth business day (or such later date as may be determined by action of the Board prior to such time as any Person becomes an Acquiring Person) following the commencement of a tender offer or exchange offer the consummation of which would result in the Beneficial Ownership by a Person or group of 4.9% or more of the outstanding Class A common stock. If issued, each Right, other than Rights beneficially owned by the Acquiring Person (which will thereupon become void) will become exercisable for Class A common stock having a value equal to two times the exercise price of the Right. However, prior to

27

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

exercise, a Right does not give its holder any rights as a stockholder of the Company, including without limitation any dividend, voting or liquidation rights.

On July 18, 2023, the Company amended and restated its Tax Asset Preservation Plan in order to adjust the definition of Beneficial Ownership to exclude derivatives that may only be settled in cash, do not confer voting rights, and lack other features consistent with beneficial ownership of shares of Class A common stock.

## NOTE 12 — NON-CONTROLLING INTERESTS

As discussed in Note 1 — Business Organization, Carvana Co. consolidates the financial results of Carvana Group and reports a non-controlling interest related to the portion of Carvana Group owned by the LLC Unitholders. Changes in the ownership interest in Carvana Group while Carvana Co. retains its controlling interest will be accounted for as equity transactions. Exchanges of LLC Units result in a change in ownership and reduce the amount recorded as non-controlling interests and increase additional paid-in capital.

Upon the issuance of shares of Class A common stock by Carvana Co. related to the Company's equity compensation plans such as the exercise of options, issuance of restricted or non-restricted stock, payment of bonuses in stock or settlement of stock appreciation rights in stock, Carvana Group is required to issue to Carvana Co. a number of Class A Units equal to 1.25 times the number of shares of Class A common stock being issued in connection with the exercise of such options or issuance of other types of equity compensation, subject to adjustment for stock splits, stock dividends, reclassifications, and similar transactions. Activity related to the Company's equity compensation plans may result in a change in ownership which will impact the amount recorded as non-controlling interest and additional paid-in capital.

The non-controlling interest related to the Class B Units is determined based on the respective participation thresholds and the share price of Class A common stock on an as-converted basis. To the extent that the number of as-converted Class B Units change or Class B Units are forfeited, the resulting difference in ownership will be accounted for as equity transactions adjusting the non-controlling interest and additional paid-in capital.

During the nine months ended September 30, 2023 and 2022, the total adjustments related to exchanges of LLC Units were a decrease in non-controlling interests and a corresponding increase in additional paid-in capital of $1 million each, which have been included in exchanges of LLC Units in the accompanying unaudited condensed consolidated statements of stockholders' equity (deficit). During the nine months ended September 30, 2023 and 2022, Carvana Co. utilized its net proceeds from its equity offerings to purchase LLC Units, which resulted in net adjustments to increase non-controlling interests and to decrease additional paid-in capital by $83 million and $554 million, respectively, which have been included in adjustment to non-controlling interests related to equity offerings in the accompanying unaudited condensed consolidated statements of stockholders' equity (deficit).

As of September 30, 2023, Carvana Co. owned approximately 56.6% of Carvana Group with the LLC Unitholders owning the remaining 43.4%. The net loss attributable to the non-controlling interests on the accompanying unaudited condensed consolidated statements of operations represents the portion of the net income (loss) attributable to the economic interest in Carvana Group held by the non-controlling LLC Unitholders calculated based on the weighted average non-controlling interests' ownership during the periods presented.

| | Nine Months Ended September 30, | | |
| --- | --- | --- | --- |
| | 2023 | | 2022 |
| | (in millions) | | |
| Transfers from (to) non-controlling interests: | | | |
| Decrease as a result of issuances of Class A and B common stock | $ | (83) | $ | (554) |
| Increase as a result of exchanges of LLC Units | | 1 | | 1 |
| Total transfers to non-controlling interests | $ | (82) | $ | (553) |

28

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 13 — EQUITY-BASED COMPENSATION**

Equity-based compensation is recognized based on amortizing the grant-date fair value on a straight-line basis over the requisite service period, which is generally the vesting period of the award, less actual forfeitures. A summary of equity-based compensation recognized during the three and nine months ended September 30, 2023 and 2022 is as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| | 2023 | 2022 | 2023 | 2022 |
|---|---|---|---|---|
| | (in millions) | | | |
| Restricted Stock Units and Awards excluding those granted in relation to the CEO Milestone Gift | $ 16 | $ 12 | $ 49 | $ 29 |
| Restricted Stock Units granted in relation to the CEO Milestone Gift | — | 3 | (1) | 40 |
| Options | 4 | 3 | 12 | 10 |
| Total equity-based compensation | 20 | 18 | 60 | 79 |
| Equity-based compensation capitalized to property and equipment | (2) | (3) | (7) | (7) |
| Equity-based compensation capitalized to inventory | — | (1) | (1) | (16) |
| Equity-based compensation, net of capitalized amounts | $ 18 | $ 14 | $ 52 | $ 56 |

As of September 30, 2023, the total unrecognized compensation related to outstanding equity awards was $198 million, which the Company expects to recognize over a weighted-average period of approximately 2.9 years. Total unrecognized equity-based compensation will be adjusted for actual forfeitures.

**2017 Omnibus Incentive Plan**

In connection with the IPO, the Company adopted the 2017 Omnibus Incentive Plan (the "2017 Incentive Plan"). The number of shares authorized for issuance under the 2017 Incentive Plan is subject to an automatic annual increase of the lesser of two percent of the Company's outstanding common stock or an amount determined by the Compensation and Nominating Committee of the Board. While the Compensation and Nominating Committee determined not to increase the number of shares authorized for issuance in prior years, the automatic annual increase on January 1, 2023 was approved. As a result, in February 2023, the Company registered approximately 2 million additional shares (the "Automatic Increase"). In addition, on February 22, 2023, the Board approved an amendment, subject to stockholder approval, to increase the number of shares available under the 2017 Incentive Plan by 20 million shares (the "Amendment Increase"). On February 22, 2023, Ernest Garcia II also granted the Board an irrevocable proxy to vote the shares of Class A and Class B common stock directly held and beneficially owned by Mr. Garcia II in favor of the Amendment Increase. The Company's stockholders approved the Amendment Increase at the annual stockholder meeting on May 1, 2023. After taking into account the Automatic Increase and the Amendment Increase, approximately 36 million shares of Class A common stock are available for issuance under the 2017 Incentive Plan, which the Company may grant as stock options, stock appreciation rights, restricted stock, restricted stock units and other equity-based awards to employees, directors, officers and consultants. The majority of equity granted by the Company vests over four-year periods based on continued employment with the Company. As of September 30, 2023, approximately 17 million shares remain available for future equity-based award grants under this plan.

*Employee Stock Purchase Plan*

In May 2021, the Company adopted an employee stock purchase plan (the "ESPP"). On July 1, 2021, the ESPP went into effect. The ESPP allows substantially all employees, excluding members of senior management, to acquire shares of the Company's Class A common stock through payroll deductions over six-month offering periods, commencing on January 1 and July 1 of each year. The per share purchase price is equal to 90% of the fair market value of a share of the Company's Class A common stock on the last day of the offering period. Participant purchases are limited to maximums that may vary between

29

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

$10,000 and $25,000 of stock per calendar year. The Company is authorized to grant up to 0.5 million shares of Class A common stock under the ESPP.

During the nine months ended September 30, 2023 and 2022, the Company issued 20,127 and 27,462 shares of Class A common stock, respectively, and recognized less than $1 million of equity-based compensation expense in each period. As of September 30, 2023, 391,027 shares remained available for future issuance.

**Class A Units**

During 2018, the Company granted certain employees Class A Units with service-based vesting over two- to four-year periods and a grant-date fair value of $18.58 per Class A Unit. The grantees entered into the Exchange Agreement under which each LLC Unitholder (and certain permitted transferees thereof) may receive shares of the Company's Class A common stock in exchange for their LLC Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting.

**Class B Units**

In March 2015, Carvana Group adopted the LLC Equity Incentive Plan. Under the LLC Equity Incentive Plan, Carvana Group could grant Class B Units to eligible employees, non-employee officers, consultants and directors with service-based vesting, typically four to five years. In connection with the completion of the IPO, Carvana Group discontinued the grant of new awards under the LLC Equity Incentive Plan, however the LLC Equity Incentive Plan will continue in connection with administration of existing awards that remain outstanding. Grantees may receive shares of the Company's Class A common stock in exchange for Class B Units on a four-to-five conversion ratio, or cash at the option of the Company, subject to conversion ratio adjustments for stock splits, stock dividends, reclassifications, and similar transactions and subject to vesting and the respective participation threshold for Class B Units. Class B Units do not expire. There were no Class B Units issued during the three and nine months ended September 30, 2023 or 2022. As of September 30, 2023, outstanding Class B Units had participation thresholds between $0.00 to $12.00.

**NOTE 14 — NET EARNINGS (LOSS) PER SHARE**

Basic and diluted net earnings (loss) per share is computed by dividing the net earnings (loss) attributable to Class A common stockholders by the weighted-average shares of Class A common stock outstanding during the period. Diluted net earnings (loss) per share is computed by giving effect to all potentially dilutive shares. For the three and nine months ended September 30, 2022, potentially dilutive shares are excluded from diluted net earnings (loss) per share because they would have an anti-dilutive impact. Net earnings (loss) for all periods presented is attributable only to Class A common stockholders, due to no activity related to convertible preferred stock during those periods.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents the calculation of basic and diluted net earnings (loss) per share during the three and nine months ended September 30, 2023 and 2022:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| | (in millions, except number of shares, which are reflected in thousands, and per share amounts) | | | |
| **Numerator:** | | | | |
| Net income (loss) attributable to Carvana Co. Class A common stockholders - basic | $ 782 | $ (283) | $ 564 | $ (781) |
| Income impact of assumed conversions from LLC Units | (41) | — | (214) | — |
| Net income (loss) attributable to Carvana Co. Class A common stockholders - diluted | $ 741 | $ (283) | $ 350 | $ (781) |
| | | | | |
| **Denominator:** | | | | |
| Weighted-average shares of Class A common stock outstanding | 110,856 | 105,878 | 107,721 | 99,141 |
| Nonvested weighted-average restricted stock awards | (12) | (21) | (29) | (7) |
| Weighted-average shares of Class A common stock outstanding - basic | 110,844 | 105,857 | 107,692 | 99,134 |
| Dilutive effect of Class A common shares: | | | | |
| Options [1] | 1,939 | — | 626 | — |
| Restricted Stock Units and Awards [1] | 7,203 | — | 4,015 | — |
| Class A Units [2] | 84,263 | — | 83,401 | — |
| Class B Units [2] | 1,709 | — | 1,390 | — |
| Weighted-average shares of Class A common stock outstanding - diluted | 205,958 | 105,857 | 197,124 | 99,134 |
| | | | | |
| Net earnings (loss) per share of Class A common stock - basic | $ 7.05 | $ (2.67) | $ 5.24 | $ (7.88) |
| Net earnings (loss) per share of Class A common stock - diluted | $ 3.60 | $ (2.67) | $ 1.78 | $ (7.88) |

(1) Calculated using the treasury stock method, if dilutive
(2) Calculated using the if-converted method, if dilutive

Shares of Class B common stock do not share in the losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted net earnings (loss) per share of Class B common stock under the two-class method has not been presented.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table presents potentially dilutive securities, as of the end of the period, excluded from the computations of diluted net earnings (loss) per share of Class A common stock for the three and nine months ended September 30, 2023 and 2022.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| | (in thousands) | | | |
| Options [1] | 640 | 1,265 | 979 | 1,265 |
| Restricted Stock Units and Awards [1] | 650 | 826 | 1,822 | 826 |
| Class A Units [2] | — | 82,963 | — | 82,963 |
| Class B Units [2] | — | 1,580 | — | 1,580 |

(1) Represents number of instruments outstanding at the end of the period that were evaluated under the treasury stock method for potentially dilutive effects and were determined to be anti-dilutive.
(2) Represents the weighted-average as-converted LLC units that were evaluated under the if-converted method for potentially dilutive effects and were determined to be anti-dilutive.

**NOTE 15 — INCOME TAXES**

As described in Note 1 — Business Organization and Note 11 — Stockholders' Equity (Deficit), as a result of the IPO, Carvana Co. began consolidating the financial results of Carvana Group. Carvana Group is treated as a partnership for U.S. federal and most applicable state and local income tax purposes. As a partnership, Carvana Group is not subject to U.S. federal and certain state and local income taxes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. was formed on November 29, 2016 and did not engage in any operations prior to the IPO. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

As described in Note 11 — Stockholders' Equity (Deficit), the Company acquired less than 1 million and zero LLC Units during the three months ended September 30, 2023, and 2022, respectively, and less than 1 million LLC Units during each of the nine months ended September 30, 2023 and 2022 in connection with exchanges with LLC Unitholders. During the three months ended September 30, 2023, and 2022, the Company recorded a gross deferred tax asset of less than $1 million and zero, respectively, and less than $1 million and $1 million, respectively, during the nine months ended September 30, 2023 and 2022 associated with the basis difference in its investment in Carvana Group related to the acquisition of the LLC Units which is reflected as an increase to additional paid-in capital in the accompanying unaudited condensed consolidated statements of stockholders' equity (deficit).

During the nine months ended September 30, 2023, management performed an assessment of the recoverability of deferred tax assets. Management determined, based on the accounting standards applicable to such assessment, that there was sufficient evidence as a result of the Company's cumulative losses to conclude it was more likely than not that its deferred tax assets would not be realized and has recorded a full valuation allowance against its deferred tax assets. In the event that management was to determine that the Company would be able to realize its deferred tax assets in the future in excess of their net recorded amount, an adjustment to the valuation allowance would be made which would reduce the provision for income taxes.

As described in Note 10 — Debt Instruments, the Company completed the Exchange Offers, whereby it exchanged validly tendered Senior Unsecured Notes for newly issued Senior Secured Notes. For U.S. tax purposes the Company is required to recognize cancellation of debt income ("CODI") on the difference between the adjusted issue price of the debt exchanged and the fair market value of the new debt issued. The Company has determined that it should recognize an estimated $1.4 billion of CODI for tax purposes.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The Company recognizes uncertain income tax positions when it is more-likely-than-not the position will be sustained upon examination. As of September 30, 2023 and December 31, 2022, the Company has not identified any uncertain tax positions and has not recognized any related reserves.

The Company's effective tax rate for the three months ended September 30, 2023 and 2022 was an expense of 8.2% and 0.1%, respectively, and for the nine months ended September 30, 2023 and 2022 was an expense of 7.1% and 0.1%, respectively. The effective tax rate for the three and nine months ended September 30, 2023 differs from the statutory tax rate primarily due to the current year income tax expense related to the impact of CODI, partially offset by a change to the valuation allowance on the Company's deferred tax assets.

**Tax Receivable Agreement**

Carvana Co. expects to obtain an increase in its share of the tax basis in the net assets of Carvana Group when LLC Units are exchanged by the LLC Unitholders and other qualifying transactions. As described in Note 11 — Stockholders' Equity (Deficit), each change in outstanding shares of Class A common stock results in a corresponding increase or decrease in Carvana Co.'s ownership of LLC Units. The Company intends to treat any exchanges of LLC Units as direct purchases of LLC interests for U.S. federal income tax purposes. These increases in tax basis may reduce the amounts that Carvana Co. would otherwise pay in the future to various taxing authorities. They may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

In connection with the IPO, the Company entered into a Tax Receivable Agreement (the "TRA"). Under the TRA, the Company generally will be required to pay to the LLC Unitholders 85% of the amount of cash savings, if any, in U.S. federal, state or local tax that the Company actually realizes directly or indirectly (or are deemed to realize in certain circumstances) as a result of (i) certain tax attributes created as a result of any sales or exchanges (as determined for U.S. federal income tax purposes) to or with the Company of their interests in Carvana Group for shares of Carvana Co.'s Class A common stock or cash, including any basis adjustment relating to the assets of Carvana Group and (ii) tax benefits attributable to payments made under the TRA (including imputed interest). The Company expects to benefit from the remaining 15% of any tax benefits that it may actually realize. To the extent that the Company is unable to timely make payments under the TRA for any reason, such payments generally will be deferred and will accrue interest until paid.

If the Internal Revenue Service or a state or local taxing authority challenges the tax basis adjustments that give rise to payments under the TRA and the tax basis adjustments are subsequently disallowed, the recipients of payments under the agreement will not reimburse the Company for any payments the Company previously made to them. Any such disallowance would be taken into account in determining future payments under the TRA and would, therefore, reduce the amount of any such future payments. Nevertheless, if the claimed tax benefits from the tax basis adjustments are disallowed, the Company's payments under the TRA could exceed its actual tax savings, and the Company may not be able to recoup payments under the TRA that were calculated on the assumption that the disallowed tax savings were available.

The TRA provides that if (i) certain mergers, asset sales, other forms of business combinations, or other changes of control were to occur, (ii) there is a material breach of any material obligations under the TRA; or (iii) the Company elects an early termination of the TRA, then the TRA will terminate and the Company's obligations, or the Company's successor's obligations, under the TRA will accelerate and become due and payable, based on certain assumptions, including an assumption that the Company would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the TRA and that any LLC Units that have not been exchanged are deemed exchanged for the fair market value of the Company's Class A common stock at the time of termination.

As of September 30, 2023, the Company has recorded a $14 million TRA liability related to the estimated cash savings in U.S. federal, state or local tax related to the tax benefits utilized to offset recognized CODI, which is included in other liabilities in the accompanying unaudited condensed consolidated balance sheets, and of which $11 million will be paid to related parties. For the remaining $1.6 billion TRA liability as of September 30, 2023, the Company has concluded, based on applicable accounting standards, that it was more likely than not that its deferred tax assets subject to the TRA would not be realized; therefore, the Company has not recorded an additional liability related to the tax savings it may realize from utilization of such deferred tax assets. If utilization of the deferred tax assets subject to the TRA becomes more likely than not in the future, the Company will record a liability related to the TRA which will be recognized as expense within its consolidated statements of operations.

33

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**NOTE 16 — LEASES**

The Company is party to various lease agreements for real estate and transportation equipment. For each lease agreement, the Company determines its lease term as the non-cancellable period of the lease and includes options to extend or terminate the lease when it is reasonably certain that it will exercise that option. The Company also assesses whether each lease is an operating or finance lease at the lease commencement date. Rent expense of operating leases is recognized on a straight-line basis over the lease term and includes scheduled rent increases as well as amortization of tenant improvement allowances.

**Operating Leases**

As of September 30, 2023, the Company is a tenant under various operating leases related to certain of its hubs, vending machines, inspection and reconditioning centers, auction locations with reconditioning capacity, storage, parking and corporate offices. The initial terms expire at various dates between 2023 and 2038. Many of the leases include one or more renewal options ranging from one to twenty years and some contain purchase options.

The Company's operating leases are included in operating lease right-of-use assets, other current liabilities, and operating lease liabilities on the accompanying unaudited condensed consolidated balance sheets.

Refer to Note 7 — Related Party Transactions for further discussion of operating leases with related parties.

**Finance Leases**

The Company has finance leases for certain equipment in its transportation fleet. The leases have initial terms of two to five years, some of which include extension options for up to four additional years, and require monthly payments. The Company's finance leases are included in long-term debt on the accompanying unaudited condensed consolidated balance sheets.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Lease Costs and Activity**

The Company's lease costs and activity during the three and nine months ended September 30, 2023 and 2022 were as follows:

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2023 | | 2022 | | 2023 | | 2022 | |
| | (in millions) | | | | | | | |
| **Lease costs:** | | | | | | | | |
| Finance leases: | | | | | | | | |
| Amortization of finance lease assets | $ | 26 | $ | 27 | $ | 82 | $ | 68 |
| Interest obligations under finance leases | | 4 | | 5 | | 14 | | 13 |
| Total finance lease costs | $ | 30 | $ | 32 | $ | 96 | $ | 81 |
| | | | | | | | | |
| Operating leases: | | | | | | | | |
| Fixed lease costs to non-related parties | $ | 15 | $ | 26 | $ | 50 | $ | 78 |
| Fixed lease costs to related parties | | 1 | | 1 | | 3 | | 3 |
| Total operating lease costs | $ | 16 | $ | 27 | $ | 53 | $ | 81 |
| | | | | | | | | |
| **Cash payments related to lease liabilities included in operating cash flows:** | | | | | | | | |
| Operating lease liabilities to non-related parties | | | | | $ | 80 | $ | 56 |
| Operating lease liabilities to related parties | | | | | $ | 4 | $ | 4 |
| Interest payments on finance lease liabilities | | | | | $ | 14 | $ | 13 |
| | | | | | | | | |
| **Cash payments related to lease liabilities included in financing cash flows:** | | | | | | | | |
| Principal payments on finance lease liabilities | | | | | $ | 91 | $ | 106 |

35

CARVANA CO. AND SUBSIDIARIES
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)
(Unaudited)

**Maturity Analysis of Lease Liabilities**

The following table summarizes maturities of lease liabilities as of September 30, 2023:

| | Finance Leases | Operating Leases [1] Related Party [2] | Non-Related Party | Total Operating | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Remainder of 2023 | $ 26 | $ 1 | $ 23 | $ 24 | $ 50 |
| 2024 | 97 | 3 | 94 | 97 | 194 |
| 2025 | 87 | 2 | 91 | 93 | 180 |
| 2026 | 73 | 2 | 87 | 89 | 162 |
| 2027 | 35 | 2 | 79 | 81 | 116 |
| Thereafter | 7 | 2 | 293 | 295 | 302 |
| Total minimum lease payments | 325 | 12 | 667 | 679 | 1,004 |
| Less: amount representing interest | (31) | (2) | (167) | (169) | (200) |
| Total lease liabilities | $ 294 | $ 10 | $ 500 | $ 510 | $ 804 |

(1) Leases that are on a month-to-month basis, short-term leases, and lease extensions that the Company does not expect to exercise are not included.
(2) Related party lease payments exclude rent payments due under the DriveTime Lease Agreement and the DriveTime Hub Lease Agreement for locations where the Company shares space with DriveTime, as those are variable lease payments contingent upon the Company's utilization of the leased assets.

As of September 30, 2023 and December 31, 2022, none of the Company's lease agreements contain material residual value guarantees or material restrictive covenants.

**Lease Terms and Discount Rates**

The weighted-average remaining lease terms and discount rates as of September 30, 2023 and 2022 were as follows, excluding short-term operating leases:

| | As of September 30, | |
|---|---|---|
| | 2023 | 2022 |
| **Weighted-average remaining lease terms (years)** | | |
| Operating leases | 7.9 | 8.6 |
| Finance leases | 3.7 | 4.3 |
| **Weighted-average discount rate** | | |
| Operating leases | 7.1 % | 7.1 % |
| Finance leases | 5.9 % | 5.6 % |

## NOTE 17 — COMMITMENTS AND CONTINGENCIES

**Accrued Limited Warranty**

As part of its retail strategy, the Company provides a 100-day or 4,189-mile limited warranty to customers to repair certain broken or defective components of each retail vehicle sold. As such, the Company accrues for such repairs based on actual claims incurred to-date and repair reserves based on historical trends. The liability was $16 million and $19 million as of September 30, 2023 and December 31, 2022, respectively, and is included in accounts payable and other accrued liabilities in the accompanying unaudited condensed consolidated balance sheets.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

**Purchase Obligations**

The Company has purchase obligations for certain customary services related to operating a wholesale auction business of $145 million in aggregate over the next six years, as of September 30, 2023. These purchase obligations are recorded as liabilities when the services are rendered.

**Legal Matters**

From time to time, the Company is involved in various claims and legal actions that arise in the ordinary course of business for a publicly traded auto retail and e-commerce company. For example, the Company is currently a party to legal and regulatory disputes, including putative class action and shareholder derivative lawsuits, alleging, among other things, the violation of federal securities and antitrust laws and state laws regarding consumer protection, stockholders' rights and the titling and registration of vehicles sold to its customers. These disputes include, but are not limited to, *In re Carvana Co. Securities Litigation*, United States District Court for the District of Arizona (Case No. CV-22-2126-PHX-MTL); *In re Carvana Co. Stockholders Litigation*, Delaware Chancery Court (Case No. 2020-0415-KSJM); *Taiae Bradley v. Carvana, LLC*, United States District Court for the Eastern District of Pennsylvania (Case No. 2:22-cv-02525-MMB); *Dana Jennings, et al. v. Carvana, LLC*, United States District Court for the Eastern District of Pennsylvania (Case No. 5:21-cv-05400-EGS); *Syretta Harvin et al. v. Carvana, LLC et al.*, United States District Court for the Eastern District of Pennsylvania (Case No. 2:23-cv-02068-MRP); and *In re Carvana Co. Stockholders Litigation*, Delaware Chancery Court (Case No. 2023-0600-KSJM).

*Neal Vestal v. Carvana Co.*, et al., Delaware Chancery Court (Case No. 2022-0609-KSJM) was dismissed with prejudice in September 2023. *Mountaineer Motors of Lenoir, LLC v. Carvana, LLC, et al.*, United States District Court for the Western District of North Carolina (Case No. 5:22-cv-00171) and *City of Warwick Retirement System v. Carvana Co., et al.*, Maricopa County, Arizona Superior Court (Case No. CV2022-013054) were dismissed with prejudice in October 2023.

The Company believes the claims in these matters are not material or are without merit and intends to defend the matters vigorously. The Company also continues to work closely with government agencies to respond to their requests. It is not possible to determine the probability of loss or estimate damages, if any, for any of the above matters, and therefore, the Company has not established reserves for any of these proceedings. If the Company determines that a loss is both probable and reasonably estimable, the Company will record a liability, and, if the liability is material, disclose the amount of the liability reserved. If an unfavorable ruling or development were to occur, there exists the possibility of a material adverse impact on the Company's business, results of operations, financial condition or cash flows.

Future litigation may be necessary to defend the Company and its partners by determining the scope, enforceability and validity of third party proprietary rights or to establish its proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources, and other factors.

**NOTE 18 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

The Company holds certain assets that are required to be measured at fair value on a recurring basis, and beneficial interests in securitizations for which it elected the fair value option. A description of the fair value hierarchy and the Company's methodologies are included in Note 2 — Summary of Significant Accounting Policies in its most recent Annual Report on Form 10-K.

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following tables are a summary of fair value measurements and hierarchy level at September 30, 2023 and December 31, 2022:

| | September 30, 2023 | | | |
| --- | --- | --- | --- | --- |
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 485 | $ 485 | $ — | $ — |
| Beneficial interests in securitizations | $ 371 | $ — | $ — | $ 371 |
| | December 31, 2022 | | | |
| | Carrying Value | Level 1 | Level 2 | Level 3 |
| | (in millions) | | | |
| **Assets:** | | | | |
| Money market funds [1] | $ 272 | $ 272 | $ — | $ — |
| Beneficial interests in securitizations | $ 321 | $ — | $ — | $ 321 |

(1) Consists of highly liquid investments with original maturities of three months or less and classified in cash and cash equivalents and restricted cash in the accompanying unaudited condensed consolidated balance sheets.

As of September 30, 2023 and December 31, 2022, the Company has purchase price adjustment receivables of $11 million and $37 million, respectively, which are carried at fair value and classified as other assets in the accompanying consolidated balance sheets. Under the MPSA, the purchaser will make future cash payments to the Company based on the performance of the finance receivables sold. The fair value of the purchase price adjustment receivables are determined based on the extent to which the Company's estimated performance of the underlying finance receivables exceeds a mutually agreed upon performance threshold of the underlying finance receivables as of measurement dates specified in the MPSA. The Company develops its estimate of future cumulative losses based on the historical performance of finance receivables it originated with similar characteristics as well as general macro-economic trends. The Company then utilizes a discounted cash flow model to calculate the present value of the expected future payment amounts. Due to the lack of observable market data these receivables are classified as Level 3. The adjustments to the fair value of the purchase price adjustment receivables were a loss of $1 million and gain of $5 million during the three months ended September 30, 2023 and 2022, respectively, and a gain of $1 million and $11 million during the nine months ended September 30, 2023 and 2022, respectively, and are reflected in other (income) expense, net in the accompanying unaudited condensed consolidated statements of operations.

**Beneficial Interests in Securitizations**

Beneficial interests in securitizations include rated notes and certificates of the securitization trusts, the same securities as issued to other investors as described in Note 9 — Securitizations and Variable Interest Entities. Beneficial interests in securitizations are initially treated as Level 2 assets when the securitization transaction occurs in close proximity to the end of the period and there is a lack of observable changes in the economic inputs. When the securitization transaction does not occur in close proximity to the end of the period and there have been observable changes in the economic inputs, beneficial interests in securitizations are classified as Level 3.

The Company's beneficial interests in securitizations include rated notes and certificates and other assets, all of which are classified as Level 3 due to the lack of observable market data. The Company determines the fair value of its notes based on non-binding broker quotes. The non-binding broker quotes are based on models that consider the prevailing interest rates, recent market transactions, and current business conditions. The Company determines the fair value of its certificates and other assets using a combination of non-binding market quotes and internally developed discounted cash flow models. The discounted cash flow models use discount rates based on prevailing interest rates and the characteristics of the specific instruments. As of September 30, 2023 and December 31, 2022, the range of discount rates were 6.2% to 13.2% and 7.1% to 11.3%, respectively. Significant increases or decreases in the inputs to the models could result in a significantly higher or lower fair value measurement. The Company elected the fair value option on its beneficial interests in securitizations, which allows it

38

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

to recognize changes in the fair value of these assets in the period the fair value changes. Changes in the fair value of the beneficial interests in securitizations are reflected in other (income) expense, net in the accompanying unaudited condensed consolidated statements of operations.

For beneficial interests in securitizations measured at fair value on a recurring basis, the Company's transfers between levels of the fair value hierarchy are deemed to have occurred at the beginning of the reporting period on a quarterly basis. There were no transfers out of Level 3 during the three and nine months ended September 30, 2023 or 2022.

In December 2021, the Company began selling certain of its beneficial interests in securitizations that are not required to be retained by the Risk Retention Rules. For the three and nine months ended September 30, 2023, the Company sold beneficial interests in securitizations for a purchase price totaling zero and $8 million, respectively. For the three and nine months ended September 30, 2022, the Company sold beneficial interests in securitizations for a purchase price totaling $40 million and $43 million, respectively.

The following table presents additional information about Level 3 beneficial interests in securitizations measured at fair value on a recurring basis for the three and nine months ended September 30, 2023 and 2022:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| | (in millions) | | | |
| **Opening Balance** | $ 335 | $ 401 | $ 321 | $ 382 |
| Received in securitization transactions | 68 | 24 | 160 | 148 |
| Payments received | (39) | (44) | (114) | (136) |
| Change in fair value | 7 | 9 | 12 | (1) |
| Sales of beneficial interests | — | (40) | (8) | (43) |
| **Ending Balance** | $ 371 | $ 350 | $ 371 | $ 350 |

**Fair Value of Financial Instruments**

The carrying amounts of restricted cash, accounts receivable, accounts payable and accrued liabilities, and accounts payable to related party approximate fair value due to their respective short-term maturities. The carrying value of the short-term revolving facilities were determined to approximate fair value due to their short-term duration and variable interest rates that approximate prevailing interest rates as of each reporting period. The carrying value of notes payable and sale leasebacks were determined to approximate fair value as each of the transactions were entered into at prevailing interest rates during each respective period and they have not materially changed as of or during the periods ended September 30, 2023 and December 31, 2022. The carrying value of the financing of beneficial interests in securitizations was determined to approximate fair value because in the event of a decline in the fair value of the pledged collateral of the financing, the repurchase price of the pledged collateral will be increased by the amount of the decline.

The fair value of the Senior Notes, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined using Level 2 inputs based on quoted market prices for the identical liability. The fair value of the Senior Notes as of September 30, 2023 and December 31, 2022 was as follows:

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| | (in millions) | |
| Carrying value, net of unamortized debt issuance costs, unamortized premium, and accrued PIK interest | $ 4,432 | $ 5,649 |
| Fair value | $ 3,444 | $ 2,533 |

39

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The fair value of finance receivables, which are not carried at fair value on the accompanying unaudited condensed consolidated balance sheets, was determined utilizing the estimated sales price based on the historical experience of the Company. Such fair value measurement of the finance receivables, net is considered Level 2 under the fair value hierarchy. The carrying value and fair value of the finance receivables as of September 30, 2023 and December 31, 2022 were as follows:

|  | September 30, 2023 | December 31, 2022 |
|---|---|---|
|  | (in millions) | |
| Carrying value | $ 650 | $ 1,334 |
| Fair value | $ 696 | $ 1,437 |

**Investment in Equity Securities**

In October 2021, the Company purchased Series A convertible preferred shares in Root, Inc. ("Root"), an equity security that does not have a readily determinable fair value. The Company elected to measure this investment using a measurement alternative pursuant to the accounting standards and recorded the investment at its cost of $126 million which will subsequently be adjusted for observable price changes. The Company considered all relevant transactions since the date of its investment and has not recorded any impairments or upward or downward adjustments to the carrying amount of its investment in Root, as there have not been changes in the observable price of its equity interest through September 30, 2023. On August 12, 2022, Root effected a reverse stock split of its Class A common stock and Class B common stock at a ratio of 18:1, whereby each 18 shares of Root's Class A common stock and Class B common stock were automatically combined into one share of Class A common stock or Class B common stock, respectively (the "Reverse Stock Split"). The shares of Root's Class A common stock issuable to the Company on the conversion of the Series A convertible preferred shares were adjusted proportionally.

Also in October 2021, the Company entered into a commercial agreement with Root, under which the Root auto insurance products were to be embedded into the Company's e-commerce platform. In accordance with the provisions of the commercial agreement, the Company received eight tranches of warrants to purchase shares of Root's Class A common stock (the "Warrants"). On September 1, 2022, the integrated auto insurance solution, which embedded into the Company's e-commerce platform (the "Integrated Platform"), was completed. One tranche of the Warrants, consisting of 2.4 million shares, as adjusted pursuant to the Reverse Stock Split, became exercisable upon completion of the Integrated Platform, and is considered a derivative instrument. The other tranches vest based on insurance product sales through the Integrated Platform and are considered derivative instruments. The Company used a Monte Carlo simulation to estimate the fair value of these Warrants, which are classified as Level 3. At contract inception, the Company recognized an asset of $30 million for the Warrants and deferred revenue, classified in other assets and other liabilities, respectively in the accompanying consolidated balance sheets. During 2022, the Company determined it was probable that the volume of insurance products required to earn the Warrants would be achieved and recorded an additional $75 million of Warrants and deferred revenue based on the contract inception date fair value as determined by the Monte Carlo simulation. The Warrants and deferred revenue are classified in other assets and other liabilities, respectively, in the accompanying unaudited condensed consolidated balance sheets.

The following table presents changes in the Company's Level 3 Warrants measured at fair value:

|  | 2023 |
|---|---|
|  | (in millions) |
| Balance at December 31, 2022 | $ 2 |
| Total unrealized gain [1] | 3 |
| Balance at September 30, 2023 | $ 5 |

(1) The Company recognized the increase in fair value in relation to the Warrants through other (income) expense, net in the accompanying consolidated statements of operations. The Company recognized an increase in fair value of $4 million and

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

$3 million during the three and nine months ended September 30, 2023, respectively, and a decrease in fair value of $72 million and $77 million during the three and nine months ended September 30, 2022, respectively.

**Derivative Instruments**

The Company utilizes non-designated cash flow hedges including interest rate cap agreements to minimize its exposure to interest rate fluctuations on variable rate debt borrowings. Interest rate caps provide that the counterparty will pay the purchaser at the end of each contractual period in which the index interest rate exceeds the contractually agreed upon cap rate.

In the first quarter of 2023, the Company entered into one interest rate cap agreement to limit exposure to interest rate risk on variable rate debt associated with finance receivables. The interest rate cap has a cap rate of 5.0% with a notional amount of $364 million, expiring in July 2027. In the second quarter of 2023, the Company entered into a second interest rate cap agreement to limit exposure to interest rate risk on variable rate debt associated with finance receivables. The interest rate cap has a cap rate of 5.0% and a notional amount of $236 million, expiring in April 2027.

The fair value of the Company's interest rate caps is impacted by the credit risk of both the Company and its counterparty. The Company has an agreement with its derivative financial instrument counterparty that contains provisions providing that if the Company defaults on the indebtedness associated with its derivative financial instrument, then the Company could also be declared in default on its derivative financial instrument obligation. In addition, the Company minimizes nonperformance risk on its derivative instrument by evaluating the creditworthiness of its counterparty, which is limited to major banks and financial institutions.

The Company does not apply hedge accounting to the interest rate caps and records all mark-to-market adjustments directly to other (income) expense, net in the accompanying unaudited condensed consolidated statements of operations. The fair value of the interest rate caps is categorized as Level 2 in the fair value hierarchy as they are based on well-recognized financial principles and available market data. For the three and nine months ended September 30, 2023, the Company recognized mark-to-market adjustments of $1 million and less than $1 million of expense, respectively, within other (income) expense, net in the accompanying unaudited condensed consolidated statements of operations. As of September 30, 2023, the fair value of the interest rate caps is recorded in the accompanying unaudited condensed consolidated balance sheets within other current assets and was $5 million.

**NOTE 19 — SUPPLEMENTAL CASH FLOW INFORMATION**

The following table summarizes supplemental cash flow information for the nine months ended September 30, 2023 and 2022:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2023 | 2022 |
| | (in millions) | |
| **Supplemental cash flow information:** | | |
| Cash payments for interest | $ 507 | $ 178 |
| **Non-cash investing and financing activities:** | | |
| Capital expenditures included in accounts payable and accrued liabilities | $ 2 | $ 43 |
| Operating lease right-of-use assets obtained in exchange for operating lease liabilities | $ 2 | $ 371 |
| Property and equipment acquired under finance leases | $ 46 | $ 300 |
| Warrants to acquire Root Class A common stock | $ — | $ 75 |
| Equity-based compensation expense capitalized to property and equipment | $ 7 | $ 6 |
| Fair value of beneficial interests received in securitization transactions | $ 160 | $ 148 |
| Reductions of beneficial interests in securitizations and associated long-term debt | $ 82 | $ 105 |

41

**CARVANA CO. AND SUBSIDIARIES**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(Unaudited)**

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the accompanying unaudited condensed consolidated balance sheets that sum to the total of the same amounts shown in the accompanying unaudited condensed consolidated statements of cash flows for all periods presented:

| | September 30, 2023 | | December 31, 2022 | | September 30, 2022 |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Cash and cash equivalents | $ | 544 | $ | 434 | $ | 316 |
| Restricted cash | | 72 | | 194 | | 161 |
| Total cash, cash equivalents and restricted cash | $ | 616 | $ | 628 | $ | 477 |

**NOTE 20 — SUBSEQUENT EVENTS**

**Floor Plan Facility Amendment**

Effective November 1, 2023, the Company amended its Floor Plan Facility with Ally Bank and Ally Financial Inc. to resize the line of credit to $1.5 billion through April 30, 2025. The amendment lowered the interest rate from a prime rate plus 1.00% to (i) a prime rate plus 0.10% when amounts drawn under the Floor Plan Facility are under 50% of the then current inventory balance and (ii) a prime rate plus 0.50% when amounts drawn are over 50%. Finally, the restricted cash requirements were amended to introduce a sliding scale whereby at least 12.5% of the total principal amount owed to the lender is required to be held as restricted cash if amounts drawn are under 50% of the then current inventory balance, which requirement increases to (i) 17.5% required to be held as restricted cash if amounts drawn are between 50% and 59.99%, (ii) 22.5% required to be held as restricted cash if amounts drawn are between 60% and 69.99%, and (iii) 25% required to be held as restricted cash if amounts drawn are equal to or over 70%.

42

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.**

*Unless the context requires otherwise, references in this report to "Carvana," the "Company," "we," "us," and "our" refer to Carvana Co. and its consolidated subsidiaries. The following Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is provided as a supplement to, and should be read in conjunction with, our audited consolidated financial statements, the accompanying notes and the MD&A included in our most recent Annual Report filed on Form 10-K, as well as our unaudited condensed consolidated financial statements and the accompanying notes included in Part I, Item 1 of this Form 10-Q.*

**Overview**

Carvana is the leading e-commerce platform for buying and selling used cars. We are transforming the used car buying and selling experience by giving consumers what they want - a wide selection, great value and quality, transparent pricing, and a simple, no pressure transaction. Each element of our business, from inventory procurement to fulfillment and overall ease of the online transaction, has been built for this singular purpose.

Our business combines a comprehensive online sales experience with a vertically integrated supply chain that allows us to sell high-quality vehicles to our customers transparently and efficiently at a low price. Using our website, customers can complete all phases of a retail vehicle purchase transaction. Specifically, our online sales experience allows customers to:

- ***Purchase a retail vehicle.***   As of September 30, 2023, we listed 34,090 total retail units on our website, where customers can select and purchase a vehicle, including arranging financing and signing contracts, directly from their desktop or mobile device. Selling vehicles to retail customers is the primary driver of our business. Selling retail vehicles generates revenue equal to the selling price of the vehicle, less an allowance for returns, and also enables multiple additional revenue streams, including the sale of finance receivables originated to finance the vehicle, vehicle service contracts ("VSCs"), GAP waiver coverage, other ancillary products, and trade-ins.

- ***Finance their purchase.***   Customers can pay for their Carvana vehicle using cash, financing from other parties such as banks or credit unions, or financing with us using our proprietary loan origination platform. Customers who choose to apply for our in-house financing fill out a short prequalification form, select from a range of financing terms we provide and, if approved, apply the financing to their purchase in our online checkout process. We generally seek to sell the loans we originate to financing partners or pursuant to a securitization transaction and, in each case, we generally earn a premium upon sale.

- ***Protect their purchase.***   Customers have the option to protect their vehicle with a VSC as part of our online checkout process. VSCs provide customers with protection against the costs of certain mechanical repairs after the expiration of their vehicle's original manufacturer warranty. We earn a fee for selling VSCs on behalf of an affiliate of DriveTime Automotive Group, Inc. (together with its consolidated affiliates, collectively, "DriveTime"), which is the obligor under these VSCs. We generally have no contractual liability to customers for claims under these agreements. We also offer GAP waiver coverage to customers in most states in which we operate. We have also partnered with Root, Inc. ("Root") to offer an integrated auto insurance solution, through which customers in most states may conveniently access auto insurance directly from the Carvana e-commerce platform.

- ***Sell us their car.***   We allow our customers to trade-in a vehicle and apply the trade-in value to their purchase, or to sell us a vehicle independent of a purchase. Using our digital appraisal tool, customers can receive a conditional offer for their vehicle nearly instantaneously from our site simply by answering a few questions about the vehicle condition and features. We generate trade-in offers using a proprietary valuation algorithm supported by extensive used vehicle market and customer-behavior data. When customers accept our offer, they can drop the vehicle off at a Carvana location or schedule a time to have the vehicle picked up at their home or elsewhere within one of our markets and receive payment, eliminating the need to visit a dealership or negotiate a private sale. We take their vehicles into inventory and sell them either at auction as a wholesale sale or through our website as a retail sale. Vehicles sold at auction typically do not meet the quality or condition standards required to be included in retail inventory displayed for sale on our website.

To enable a seamless customer experience, we have built a vertically-integrated used vehicle supply chain, supported by proprietary software systems and data.

- **_Vehicle acquisition._**   We primarily acquire our used vehicle inventory directly from customers when they trade in or sell us their vehicles and through the large and liquid national used car auction market. Acquiring directly from customers eliminates auction fees and provides more diverse vehicles. The remainder of our inventory is acquired from vehicle finance and leasing companies, rental car companies, and other suppliers, which suppliers may also provide reconditioning services. We use proprietary algorithms to determine which cars to bid on at auction and how much to bid. Our software sifts through over 100,000 vehicles per day and filters out vehicles with reported accidents, poor condition ratings, or other unacceptable attributes, and can evaluate the tens of thousands of potential vehicle purchases that remain per day, creating a competitive advantage versus in-person sourcing methods generally used by traditional dealerships. Once our algorithms have identified a suitable vehicle for purchase, bids are verified and executed by a centralized team of inventory-sourcing professionals. For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

- **_Inspection and reconditioning._**   Once we acquire a vehicle from a customer, we leverage our in-house logistics or a vendor to transport the vehicle to an inspection and reconditioning center or auction location with reconditioning capacity ("IRC"), at which point the vehicle is entered into our inventory management system. We then begin a 150-point inspection process covering controls, features, brakes, tires, and cosmetics. Each IRC includes trained technicians, vehicle lifts, paint-less dent repair, and paint capabilities and receives on-site support from vendors with whom we have integrated systems to ensure ready access to parts and materials. When an inspection is complete, we estimate the necessary reconditioning cost for accident-free vehicles to be deemed "Carvana Certified" and expected timing for that vehicle to be made available for sale on our website.

- **_Photography and merchandising._**   To provide transparency to our customers, our patented, automated photo booths capture a 360-degree exterior and interior virtual tour of each vehicle in our website inventory. Our photo booths photograph the interior and exterior of the vehicle while technicians annotate material defects based on visibility-threshold category. We also feature integrations with various vehicle data providers for vehicle feature and option information. We have instituted a unified cosmetic standard across all IRCs and certain auction sites to better ensure a consistent customer experience.

- **_Transportation and fulfillment._**   Third-party vehicle transportation is often slow, expensive, and unreliable. To address these challenges, we built an in-house auto logistics network backed by a proprietary transportation management system ("TMS") to transport our vehicles to customers in our markets. The system is based on a "hub and spoke" model, which connects all IRCs to vending machines and hubs via our owned and leased fleet of multi-car and single car haulers. Our TMS allows us to efficiently manage locations, routes, route capacities, trucks, and drivers while also dynamically optimizing for speed and cost. We store inventory primarily at the IRCs and other sites, and when a vehicle is sold, it is delivered directly to customers in our markets or transported to a vending machine or certain hubs for pick-up by the customer. Due to our robust and proprietary logistics infrastructure, we are able to offer our customers and operations team highly accurate predictions of vehicle availability, minimizing unanticipated delays and ensuring a seamless and reliable customer experience.

**Retail Vehicle Unit Sales**

Since launching to customers in Atlanta, Georgia in January 2013, we have historically experienced rapid growth in sales through our website www.carvana.com. Due to profitability initiatives and macroeconomic impacts, including rising interest rates during the first nine months of 2023, the number of vehicles we sold to retail customers decreased by 21.0% to 80,987, in the three months ended September 30, 2023 compared to 102,570 in the three months ended September 30, 2022. During the

44

nine months ended September 30, 2023, the number of vehicles we sold to retail customers decreased by 27.2% to 236,757, compared to 325,319 in the nine months ended September 30, 2022.

While our current focus is on profitability, we view the number of vehicles we sell to retail customers as the most important long-term measure of our performance, and we expect to continue to focus on building a scalable platform to efficiently increase our retail units sold. This focus on retail units sold is motivated by several factors:

- Retail units sold enable multiple revenue streams, including the sale of the vehicle itself, the sale of finance receivables originated to finance the vehicle, the sale of VSCs, GAP waiver coverage, other ancillary products, and the sale of vehicles acquired from customers.

- Retail units sold are the primary driver of customer referrals and repeat sales. Each time we sell a vehicle to a new customer, that customer may refer future customers and can become a repeat buyer in the future.

- Retail units sold are an important driver of the average number of days between when we acquire the vehicle and when we sell it. Reducing average days to sale impacts gross profit on our vehicles because used vehicles generally depreciate over time.

- Retail units sold allow us to benefit from economies of scale due to our centralized online sales model. We believe our model provides meaningful operating leverage in acquisition, reconditioning, transport, customer service, and delivery.

While our near-term objectives are geared towards a reduction in our selling, general and administrative ("SG&A") expenses, in the long-term, we plan to invest in technology and infrastructure to support efficient growth in retail units sold. This includes continued investment in our vehicle acquisition, reconditioning and logistics network, as well as continued investment in product development and engineering to deliver customers a best-in-class experience.

### Markets and Population Coverage

Our historical growth in retail units sold was driven by increased penetration in our existing markets and expansion into new markets. We define a market as a metropolitan area in which we have commenced local advertising and generally offer home delivery to customers with a Carvana employee in a branded delivery truck. We define our population coverage as the percentage of the U.S. population that lives within those markets. Opening a new market involves hiring a team of customer advocates, connecting the market to our existing logistics network and initiating advertising, both locally through a blend of brand and direct advertising channels, and on national television for increased brand awareness. As a market scales, we may elect to build a vending machine in the market to further increase customer awareness and enhance our fulfillment operations. Our advertising spend in each market is approximately proportionate to each market's population, subject to adjustments based on specific characteristics of the market, used vehicle market seasonality, and special events such as vending machine openings.

We served 316 markets as of September 30, 2023, covering 81.1% of the U.S. population. Over time, we have continually improved our market expansion playbook, which we believe provides us with the capability to efficiently execute our long-term growth plan. While we are currently focused on driving profitability through efficiency and expense reduction, we are continually evaluating consumer demand, our operational capacity and our long-term growth plan to determine our market opening and vending machine launch strategy.

### Revenue and Gross Profit

We generate revenue on retail units sold from four primary sources: the sale of the retail vehicles, wholesale sales of vehicles we acquire from customers, including sales through our wholesale marketplace, gains on the sales of loans originated to finance the vehicles, and sales of ancillary products such as VSCs and GAP waiver coverage.

Our largest source of revenue, retail vehicle sales, totaled $1.9 billion and $2.5 billion during the three months ended September 30, 2023 and 2022, respectively, and $5.7 billion and $8.2 billion during the nine months ended September 30, 2023 and 2022, respectively. We generally expect retail vehicle sales to trend proportionately with retail units sold, absent any material changes in macroeconomic conditions. We generate gross profit on retail vehicle sales from the difference between the retail selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale.

Wholesale sales and revenues includes sales of trade-ins and other vehicles acquired from customers that do not meet the requirements for our retail inventory. Subsequent to our acquisition of the U.S. physical auction business of ADESA U.S.

45

Auction, LLC ("ADESA") from KAR Auction Services, Inc. on May 9, 2022 (the "ADESA Acquisition"), we also include revenue earned from the sale of wholesale marketplace units by non-Carvana sellers through our wholesale marketplace platform, including auction fees and related service revenues, in wholesale sales and revenues. Wholesale sales and revenues totaled $610 million and $697 million during the three months ended September 30, 2023 and 2022, respectively, and $2.0 billion during each of the nine months ended September 30, 2023 and 2022. We generally expect wholesale sales to trend proportionately with retail units sold through trade-ins and from customers who wish to sell us a car independent of a retail sale and with the movement of wholesale marketplace units. We generate gross profit on wholesale vehicle sales from the difference between the wholesale selling price of the vehicle and our cost of sales associated with acquiring the vehicle and preparing it for sale. We generate a gross profit on wholesale marketplace units from the difference between the revenue earned from the sale of wholesale marketplace units through our wholesale marketplace platform less our cost of sales associated with operating the wholesale marketplace platform.

Other sales and revenues, which primarily includes gains on the sales of finance receivables we originate and sales commissions on ancillary products such as VSCs, GAP waiver coverage, and auto insurance totaled $214 million and $197 million during the three months ended September 30, 2023 and 2022, respectively, and $605 million during each of the nine months ended September 30, 2023 and 2022. We generally expect other sales and revenues to trend proportionately with retail units sold. We also expect other sales and revenues to increase as we improve our ability to monetize loans we originate, including through securitization transactions, and sell and offer attractive financing solutions and ancillary products to our customers, including products customarily sold by automotive retailers or insurance products customarily sold by traditional insurance companies, absent any material changes in macroeconomic conditions. Other sales and revenues are 100% gross margin products for which gross profit equals revenue.

During the current macroeconomic uncertainty, our highest priority will continue to be providing exceptional customer experiences while improving efficiency and utilizing our infrastructure to support efficient growth in retail units sold to help us move along the path to achieve profitability and positive free cash flow. Secondarily, we plan to pursue several strategies designed to increase our brand awareness and total gross profit per unit. These strategies may include the following:

- *Increase the purchase of vehicles from customers.* Over time, we plan to grow the number of vehicles that we purchase from our customers as trade-ins or independent of a retail sale. This will provide additional vehicles for our retail business, which on average are more profitable compared to the same vehicle acquired at auction, and expand our inventory selection. In addition, this in turn will grow our wholesale business.

- *Reduce average days to sale.* Our goal is generally to increase our sales at a faster rate than we increase our inventory size, which we believe would decrease average days to sale due to a relative increase in demand versus supply. Reductions in average days to sale lead to fewer vehicle price reductions, and therefore higher average selling prices, all other factors being equal. Higher average selling prices in turn lead to higher gross profit per unit sold, all other factors being equal.

- *Leverage existing inspection and reconditioning infrastructure.* As we scale, we intend to more fully utilize the capacity at our existing IRCs, which collectively have capacity to inspect and recondition approximately 1.1 million vehicles per year at full utilization. We also intend to use existing capacity in the facilities acquired in the ADESA Acquisition.

- *Increase utilization of our logistics network.* As we scale, we intend to more fully utilize our in-house logistics network to transport cars to our IRCs or other sites after acquisition from customers or wholesale auctions.

- *Increase conversion on existing products.* We plan to continue to improve our website to highlight the benefits of our complementary product offerings, including financing, VSCs, GAP waiver coverage, other ancillary products, and trade-ins.

- *Add new products and services.* We plan to utilize our online sales platform to offer additional complementary products and services to our customers.

- *Increase monetization of our finance receivables.* We plan to continue selling finance receivables in securitization transactions and otherwise expand our base of financial partners who purchase the finance receivables originated on our platform to reduce our effective cost of funds.

46

- *Optimize purchasing and pricing.* We are constantly improving the ways in which we predict customer demand, value vehicles sight unseen and optimize what we pay to acquire those vehicles. We also regularly test different pricing of our products, including vehicle sticker prices, trade-in and independent vehicle offers, and ancillary product prices, and we believe we can improve by further optimizing prices over time.

### Seasonality

Retail and wholesale used vehicle sales generally exhibit seasonality with sales peaking late in the first calendar quarter and diminishing through the rest of the year, with the lowest relative level of vehicle sales expected to occur in the fourth calendar quarter. Due to our historical rapid growth, our overall sales patterns in the past have not always reflected the general seasonality of the used vehicle industry. However, as our business and markets have and continue to mature, our results have become more reflective of typical market seasonality. Used vehicle prices also exhibit seasonality, with used vehicles depreciating at a faster rate in the last two quarters of each year and a slower rate in the first two quarters of each year, all other factors being equal. We expect to experience seasonal and other fluctuations in our quarterly operating results, including as a result of macroeconomic conditions, which may not fully reflect the underlying performance of our business.

### Investment in Growth

We have historically aggressively invested in the growth of our business. Due to the current macroeconomic environment, we are focused on driving profitability through operating efficiency and reducing expenses. While we intend to become increasingly efficient over time, we also anticipate that our operating expenses will increase substantially in the long-term as we continue to expand our logistics network, increase our advertising spending, and serve more of the U.S. population. There is no guarantee that we will be able to realize the desired return on our investments.

### Relationships with Related Parties

For discussion about our relationships with related parties, refer to Note 7 — Related Party Transactions of our accompanying unaudited condensed consolidated financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q.

### Key Operating Metrics

We regularly review a number of metrics, including the following key metrics, to evaluate our business, measure our progress and make strategic decisions. Our key operating metrics reflect the key drivers of our growth, including increasing brand awareness, enhancing the selection of vehicles we make available to our customers, and serving more of the U.S. population. Our key operating metrics also demonstrate our ability to translate these drivers into retail sales and to monetize these retail sales through a variety of product offerings.

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2023 | 2022 | 2023 | 2022 |
|---|---|---|---|---|
| Retail units sold | 80,987 | 102,570 | 236,757 | 325,319 |
| Average monthly unique visitors (in thousands) | 15,209 | 21,333 | 14,819 | 23,203 |
| Total website units | 34,090 | 71,365 | 34,090 | 71,365 |
| Total gross profit per unit | $ 5,952 | $ 3,500 | $ 5,583 | $ 3,237 |
| Total gross profit per unit, non-GAAP | $ 6,396 | $ 3,870 | $ 6,065 | $ 3,517 |

*Retail Units Sold*

We define retail units sold as the number of vehicles sold to customers in a given period, net of returns under our seven-day return policy. We view retail units sold as a key measure of our growth for several reasons. First, retail units sold is the primary driver of our revenues and, indirectly, gross profit, since retail unit sales enable multiple complementary revenue streams, including financing, VSCs, GAP waiver coverage, other ancillary products, and trade-ins. Second, growth in retail units sold increases the base of available customers for referrals and repeat sales. Third, growth in retail units sold is an indicator of our ability to successfully scale our logistics, fulfillment, and customer service operations.

47

*Average Monthly Unique Visitors*

We define a monthly unique visitor as an individual who has visited our website within a calendar month, based on data provided by Google Analytics. We calculate average monthly unique visitors as the sum of monthly unique visitors in a given period, divided by the number of months in that period. We view average monthly unique visitors as a key indicator of the strength of our brand, the effectiveness of our advertising and merchandising campaigns, and consumer awareness of our brand.

*Total Website Units*

We define total website units as the number of vehicles listed on our website on the last day of a given reporting period, including vehicles available for sale, vehicles currently engaged in a purchase or reserved by a customer, and vehicles that can be reserved that generally have not yet completed the inspection and reconditioning process. We view total website units as a key measure of our growth. Growth in total website units increases the selection of vehicles available to our consumers, which we believe will allow us to increase the number of vehicles we sell over time. Moreover, growth in total website units indicates our ability to scale our vehicle purchasing, inspection and reconditioning operations. As part of our inventory strategy, over time we may choose not to expand total website units while continuing to grow sales, thereby improving other key operating metrics of the business.

*Total Gross Profit per Unit*

We define total gross profit per unit as the aggregate gross profit in a given period, divided by retail units sold in that period including gross profit generated from the sale of retail vehicles, gains on the sales of loans originated to finance the vehicles, commissions on sales of VSCs, GAP waiver coverage and other ancillary products, and gross profit generated from wholesale sales of vehicles. We operate an integrated business with the objective of increasing the number of retail units sold and total gross profit per unit. Gross profits generated from the sale of retail and wholesale units are interrelated. For example, our nationwide reconditioning and inspection centers are designed to produce vehicles for both retail and wholesale sales, our vehicle storage locations have shared parking for both retail and wholesale vehicles, and our integrated multi-vehicle logistics and last mile delivery network is operated in service of both retail and wholesale sales. Such interrelationships require us to share finite operational capacity and optimize joint decisions between retail and wholesale sales, in order to position us to achieve our objective of increasing total gross profit per unit. As a result, the inclusion of gross profit generated from wholesale sales of vehicles in total gross profit per unit reflects our integrated business model and the interrelationship between wholesale and retail vehicle sales. We believe the total gross profit per unit metrics provide investors with the greatest opportunity to view our performance through the same lens that our management does, and therefore assists investors to best evaluate our business and measure our progress.

We define total gross profit per unit, non-GAAP as the aggregate gross profit, non-GAAP in a given period, divided by retail units sold in that period. Gross profit, non-GAAP is defined as gross profit plus depreciation and amortization in cost of sales, share-based compensation including the CEO Milestone Gift in cost of sales, and restructuring costs, minus revenue related to warrants to purchase shares of Root's Class A common stock (the "Warrants") as discussed in Note 18 — Fair Value of Financial Instruments. Refer to "Non-GAAP Financial Measures" for more information, including the reconciliation of non-GAAP financial measures to the most directly comparable U.S. GAAP financial measures.

## Components of Results of Operations

*Retail Vehicle Sales*

Retail vehicle sales represent the aggregate sales of used vehicles to customers through our website. Revenue from retail vehicles sales is recognized upon delivery to the customer or pick up of the vehicle by the customer, and is reported net of a reserve for expected returns. Factors affecting retail vehicle sales revenue include the number of retail units sold and the average selling price of these vehicles. Changes in retail units sold are a much larger driver of changes in revenue than are changes in average selling price.

The number of retail vehicles we sell depends on the volume of traffic to our website, our population coverage, our inventory selection, the effectiveness of our branding and marketing efforts, the quality of our customers' purchase experience, our volume of referrals and repeat customers, the competitiveness of our pricing, competition from other used car dealerships and general economic conditions. On a quarterly basis, the number of retail vehicles we sell is also affected by seasonality, with demand for retail vehicles generally reaching a seasonal high point late in the first quarter of each year, commensurate with the

48

timing of tax refunds, and diminishing through the rest of the year, with the lowest relative level of retail vehicle sales generally expected to occur in the fourth calendar quarter. In 2022, heightened inflation and rising interest rates resulted in lower demand for used vehicles. These trends continued into the first nine months of 2023, in which retail vehicles sales were also affected by a lower inventory size, lower advertising expense, and a focus on profitability initiatives. We expect these trends to continue through the remainder of the year.

Our retail average selling price depends on the mix of vehicles we acquire, retail prices in our markets, our pricing strategy, and our average days to sale. We may choose to shift our inventory mix to higher or lower cost vehicles, or to raise or lower our prices relative to market to take advantage of supply or demand imbalances, which could temporarily lead to average selling prices increasing or decreasing. We also generally expect lower average days to sale to be associated with higher retail average selling prices due to decreased vehicle depreciation prior to sale, all other factors being equal.

### Wholesale Sales and Revenues

Wholesale sales and revenues includes the aggregate proceeds we receive on vehicles we acquire and sell to wholesalers, and beginning in 2022, wholesale marketplace revenues. The vehicles we sell to wholesalers are primarily acquired from customers who sell a vehicle to us without purchasing a retail vehicle and from our customers who trade-in their existing vehicles when making a purchase from us. Factors affecting wholesale sales and revenues include the number of wholesale units sold and the average wholesale selling price of these vehicles. The average selling price of our wholesale units is primarily driven by the mix of vehicles we sell to wholesalers, as well as general supply and demand conditions in the applicable wholesale vehicle market. Wholesale sales and revenues includes aggregate proceeds we receive on vehicles sold to DriveTime through competitive online auctions that are managed by an unrelated third party and through the Company's wholesale marketplace platform. Wholesale marketplace revenues include revenue earned from the sale of wholesale marketplace units by third-party sellers and buyers through our wholesale marketplace platform, including auction fees and related services revenue.

### Other Sales and Revenues

We generate other sales and revenues primarily through the sales of loans we originate and sell in securitization transactions or to financing partners, reported net of a reserve for expected repurchases, commissions we receive on VSCs, sales of GAP waiver coverage, and commissions and Warrants we receive on sales of auto insurance.

We generally seek to sell the loans we originate to securitization trusts we sponsor and establish or to financing partners. The securitization trusts issue asset-backed securities, some of which are collateralized by the finance receivables that we sell to the securitization trusts. We also sell the loans we originate under committed forward-flow arrangements, including a master purchase and sale agreement, and through fixed pool loan sales, with financing partners who generally acquire them at premium prices without recourse to us for their post-sale performance. Factors affecting revenue from these sales include the number of loans we originate, the average principal balance of the loans, the credit quality of the portfolio, the price at which we are able to sell them in securitization transactions or to financing partners, and economic conditions in the capital markets.

The number of loans we originate is driven by the number of retail vehicles sold and the percentage of our sales for which we provide financing, which is influenced by the financing terms we offer our customers relative to alternatives available to the customer. The average principal balance is driven primarily by the mix of vehicles we sell, since higher average selling prices typically mean higher average balances. The price at which we sell the loan is driven by the terms of our securitization transactions and forward-flow arrangement, applicable interest rates, and whether or not the loan includes GAP waiver coverage.

In 2016, we entered into a master dealer agreement with DriveTime, pursuant to which we receive a commission for selling VSCs that DriveTime administers. The commission revenue we recognize on VSCs depends on the number of retail units we sell, the conversion rate of VSCs on these sales, commission rates we receive, VSC early cancellation frequency and product features. The GAP waiver coverage revenue we recognize depends on the number of retail units we sell, the number of customers that choose to finance their purchases with us, the frequency of GAP waiver coverage early cancellation, and the conversion rate of GAP waiver coverage on those sales.

In September 2022, we completed our integrated auto insurance solution with Root, through which customers may conveniently access auto insurance directly from the Carvana e-commerce platform. We receive commissions and Warrants based on the Root insurance policies sold through the Integrated Platform. The commission revenue we recognize depends on the number of retail units we sell, the conversion rate of auto policies on those sales, commission rates we receive, and

49

forecasted attrition. The revenue we recognize from Warrants as non-cash consideration depends on the probability of achieving certain auto policy sales thresholds within a specific timeline as well as our performance under the agreement.

***Cost of Sales***

Cost of sales includes the cost to acquire, recondition, and transport vehicles associated with preparing them for resale, and beginning in 2022, wholesale marketplace cost of sales. Vehicle acquisition costs are driven by the mix of vehicles we acquire, the source of those vehicles, and supply-and-demand dynamics in the vehicle market. Reconditioning costs consist of direct costs, including parts, labor, and third-party repair expenses directly attributable to specific vehicles, as well as indirect costs, such as IRC overhead. Transportation costs consist of costs incurred to transport the vehicles from the point of acquisition to the IRC or other site. Cost of sales also includes any necessary adjustments to reflect vehicle inventory at the lower of cost or net realizable value. Wholesale marketplace cost of sales include costs related to the sale of wholesale marketplace units by third-party sellers through our wholesale marketplace platform, including labor, rent, depreciation and amortization.

***Retail Vehicle Gross Profit***

Retail vehicle gross profit is the vehicle sales price minus our costs of sales associated with vehicles that we list and sell on our website. Retail vehicle gross profit per unit is our aggregate retail vehicle gross profit in any measurement period divided by the number of retail units sold in that period.

***Wholesale Gross Profit***

Wholesale gross profit is the vehicle sales price minus our cost of sales associated with vehicles we sell to wholesalers, and beginning in 2022, wholesale marketplace revenues less wholesale marketplace cost of sales. Factors affecting wholesale gross profit include the number of wholesale units sold, the average wholesale selling price of these vehicles, the average acquisition price associated with these vehicles, the buyer and seller fees, and the number of wholesale marketplace units sold.

***Other Gross Profit***

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in gross profit and the associated drivers are identical to changes in revenues from these products and the associated drivers.

***Selling, General and Administrative Expenses***

SG&A expenses include expenses associated with advertising and providing customer service to customers, operating our vending machines, hubs, physical auctions, logistics and fulfillment network and other corporate overhead expenses, including expenses associated with information technology, product development, engineering, legal, accounting, finance, and business development. SG&A expenses exclude the costs of inspecting and reconditioning vehicles and transporting vehicles from the point of acquisition to the IRC, which are included in cost of sales, and payroll costs for our employees related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.

***Interest Expense***

Interest expense includes interest incurred on our various tranches of Senior Secured Notes and Senior Unsecured Notes, our Floor Plan Facility, and our Finance Receivable Facilities (each as defined in Note 10 — Debt Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q), as well as our notes payable, finance leases, and long-term debt, which are used to fund general working capital, our inventory, our transportation fleet, and certain of our property and equipment. Interest expense also includes amortization of capitalized debt issuance costs, which is offset by amortization of debt premium and interest income earned on cash and cash equivalents. Interest expense excludes the interest incurred during various construction projects to build, upgrade or remodel certain facilities, which is capitalized to property and equipment and depreciated over the estimated useful lives of the related assets.

***Other (Income) Expense, Net***

Other (income) expense, net includes changes in fair value on our beneficial interests in securitizations, purchase price adjustment receivables, and fair value adjustments related to our Warrants as discussed in Note 18 — Fair Value of Financial Instruments of our financial statements included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q,

along with other general expenses such as gains or losses from disposals of long-lived assets. In the three and nine months ended September 30, 2023, other (income) expense, net also includes expense related to the recognition of our Tax Receivable Agreement reserve.

*Income Tax (Benefit) Provision*

Income taxes are recognized based upon our anticipated underlying annual blended federal and state income tax rates adjusted, as necessary, for any discrete tax matters occurring during the period. As the sole managing member of Carvana Group, LLC (together with its subsidiaries "Carvana Group"), Carvana Co. consolidates the financial results of Carvana Group. Carvana Group is treated as a partnership and therefore not subject to U.S. federal and most applicable state and local income tax purposes. Any taxable income or loss generated by Carvana Group is passed through to and included in the taxable income or loss of its members, including Carvana Co., based on its economic interest held in Carvana Group. Carvana Co. is taxed as a corporation and is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income or loss of Carvana Group, as well as any stand-alone income or loss generated by Carvana Co.

## Results of Operations

| | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | Change | 2023 | 2022 | Change |
| | (in millions, except unit and per unit amounts) | | | (in millions, except unit and per unit amounts) | | |
| **Net sales and operating revenues:** | | | | | | |
| Retail vehicle sales, net | $ 1,949 | $ 2,492 | (21.8)% | $ 5,737 | $ 8,186 | (29.9)% |
| Wholesale sales and revenues [1] | 610 | 697 | (12.5)% | 2,005 | 1,976 | 1.5% |
| Other sales and revenues [2] | 214 | 197 | 8.6% | 605 | 605 | —% |
| Total net sales and operating revenues | $ 2,773 | $ 3,386 | (18.1)% | $ 8,347 | $ 10,767 | (22.5)% |
| **Gross profit:** | | | | | | |
| Retail vehicle gross profit [3] | $ 218 | $ 116 | 87.9% | $ 532 | $ 334 | 59.3% |
| Wholesale gross profit [1] | 50 | 46 | 8.7% | 185 | 114 | 62.3% |
| Other gross profit [2] | 214 | 197 | 8.6% | 605 | 605 | —% |
| Total gross profit | $ 482 | $ 359 | 34.3% | $ 1,322 | $ 1,053 | 25.5% |
| **Unit sales information:** | | | | | | |
| Retail vehicle unit sales | 80,987 | 102,570 | (21.0)% | 236,757 | 325,319 | (27.2)% |
| Wholesale vehicle unit sales | 40,886 | 47,763 | (14.4)% | 122,449 | 153,342 | (20.1)% |
| **Per unit selling prices:** | | | | | | |
| Retail vehicles | $ 24,066 | $ 24,296 | (0.9)% | $ 24,232 | $ 25,163 | (3.7)% |
| Wholesale vehicles [4] | $ 9,612 | $ 10,552 | (8.9)% | $ 11,058 | $ 10,923 | 1.2% |
| **Per retail unit gross profit:** | | | | | | |
| Retail vehicle gross profit [5] | $ 2,692 | $ 1,131 | 138.0% | $ 2,247 | $ 1,027 | 118.8% |
| Wholesale gross profit | 618 | 448 | 37.9% | 781 | 350 | 123.1% |
| Other gross profit | 2,642 | 1,921 | 37.5% | 2,555 | 1,860 | 37.4% |
| Total gross profit | $ 5,952 | $ 3,500 | 70.1% | $ 5,583 | $ 3,237 | 72.5% |
| **Per wholesale unit gross profit:** | | | | | | |
| Wholesale vehicle gross profit [6] | $ 685 | $ 691 | (0.9)% | $ 906 | $ 626 | 44.7% |
| **Wholesale marketplace:** | | | | | | |
| Wholesale marketplace units sold | 221,368 | 193,061 | 14.7% | 662,830 | 304,944 | NM |
| Wholesale marketplace revenues | $ 217 | $ 193 | 12.4% | $ 651 | $ 301 | NM |
| Wholesale marketplace gross profit [7] | $ 22 | $ 13 | 69.2% | $ 74 | $ 18 | NM |

(1) Includes $4, $6, $14 and $27, respectively, of wholesale sales and revenues from related parties.

(2) Includes $35, $39, $104 and $137, respectively, of other sales and revenues from related parties.
(3) Includes $0, $2, $0 and $16, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(4) Excludes wholesale marketplace revenues and wholesale marketplace units sold.
(5) Includes $0, $19, $0 and $146, respectively, of share-based compensation expense related to the CEO Milestone Gift.
(6) Excludes wholesale marketplace gross profit and wholesale marketplace units sold.
(7) Includes $25, $22, $77 and $37, respectively, of depreciation and amortization expense.
NM = Not Meaningful (For the nine months ended September 30, 2022 only includes wholesale marketplace data from the date of the ADESA Acquisition of May 9, 2022.)

### Retail Vehicle Sales

*Three months ended September 30, 2023 versus 2022.* Retail vehicle sales decreased by $543 million to $1.9 billion during the three months ended September 30, 2023, compared to $2.5 billion during the three months ended September 30, 2022. The decrease in revenue was primarily due to a decrease in the number of retail vehicles sold to 80,987 from 102,570 during the three months ended September 30, 2023 and 2022, respectively. The decrease in retail units sold was driven by various macroeconomic factors including continued increased interest rates and inflation, leading to decreased vehicle affordability, as well as our continued increased focus on profitability initiatives, which have led to lower advertising levels and inventory size. Additionally, there was a decrease in the average selling price of our retail units sold to $24,066 in the three months ended September 30, 2023 from $24,296 in the prior year, due primarily to overall depreciation in the used vehicle market, despite improvements in turn times compared to the three months ended September 30, 2022.

*Nine months ended September 30, 2023 versus 2022.* Retail vehicle sales decreased by $2.4 billion to $5.7 billion during the nine months ended September 30, 2023 compared to $8.2 billion during the nine months ended September 30, 2022. The decrease in revenue was primarily due to a decrease in the number of retail vehicles sold to 236,757 from 325,319 during the nine months ended September 30, 2023 and 2022, respectively. The decrease in retail units sold was driven by various macroeconomic factors including increased interest rates and inflation, leading to decreased vehicle affordability, as well as our increased focus on profitability initiatives, which have led to lower advertising levels and inventory size. Additionally, there was a decrease in the average selling price of our retail units sold to $24,232 in the nine months ended September 30, 2023 from $25,163 in the prior year, due primarily to overall depreciation in the used vehicle market, despite improvements in turn times compared to the nine months ended September 30, 2022.

### Wholesale Sales and Revenues

*Three months ended September 30, 2023 versus 2022.* Wholesale sales and revenues decreased by $87 million to $610 million during the three months ended September 30, 2023, compared to $697 million during the three months ended September 30, 2022. The decrease in revenue was primarily due to a decrease in the number of wholesale units sold that were acquired from customers on our website to 40,886 from 47,763 during the three months ended September 30, 2023 and 2022, respectively. This was partially offset by wholesale marketplace revenues, which increased by $24 million to $217 million during the three months ended September 30, 2023, compared to $193 million during the three months ended September 30, 2022, primarily due to an increase in the number of wholesale marketplace units sold to 221,368 from 193,061 during the three months ended September 30, 2023 and 2022, respectively.

*Nine months ended September 30, 2023 versus 2022.* Wholesale sales and revenues increased by $29 million to $2.0 billion during the nine months ended September 30, 2023, compared to $2.0 billion during the nine months ended September 30, 2022. Wholesale marketplace revenues, which were only included in our results from operations subsequent to the ADESA Acquisition, were higher during the nine months ended September 30, 2023 at $651 million, compared to $301 million during the nine months ended September 30, 2022, primarily due to an increase in wholesale marketplace units sold to 662,830 during the nine months ended September 30, 2023, compared to 304,944 during the nine months ended September 30, 2022. This was partially offset by a decrease in wholesale units sold that were acquired from customers on our website to 122,449 from 153,342 during the nine months ended September 30, 2023 and 2022, respectively.

### Other Sales and Revenues

*Three months ended September 30, 2023 versus 2022.* Other sales and revenues increased by $17 million to $214 million during the three months ended September 30, 2023, compared to $197 million during the three months ended September 30, 2022. The increase was primarily due to an increase in gain on loan sales as a result of more loan sales during the three months

52

ended September 30, 2023. This increase was partially offset by the decrease in retail units sold during the three months ended September 30, 2023.

*Nine months ended September 30, 2023 versus 2022.* Other sales and revenues were unchanged at $605 million during each of the nine months ended September 30, 2023 and 2022, Other sales and revenues increased due to a higher level of finance receivables held for sale and revenue related to our Warrants. This increase was fully offset by a decrease in retail units sold during the nine months ended September 30, 2023 compared to the nine months ended September 30, 2022, leading to an overall unchanged level of other sales and revenues.

### Retail Vehicle Gross Profit

*Three months ended September 30, 2023 versus 2022.* Retail vehicle gross profit increased by $102 million to $218 million during the three months ended September 30, 2023, compared to $116 million during the three months ended September 30, 2022. This increase was driven primarily by an increase in retail vehicle gross profit per unit to $2,692 for the three months ended September 30, 2023, compared to $1,131 for the three months ended September 30, 2022. The per unit increase was primarily driven by lower average days to sale, wider spreads between wholesale and retail market prices, and lower reconditioning and inbound transport costs on retail vehicles sold during the three months ended September 30, 2023.

*Nine months ended September 30, 2023 versus 2022.* Retail vehicle gross profit increased by $198 million to $532 million during the nine months ended September 30, 2023, compared to $334 million during the nine months ended September 30, 2022. This increase was driven primarily by an increase in retail vehicle gross profit per unit to $2,247 for the nine months ended September 30, 2023 compared to $1,027 for the nine months ended September 30, 2022. The per unit increase was primarily driven by lower average days to sale and lower reconditioning and inbound transport costs on retail vehicles sold during the nine months ended September 30, 2023.

### Wholesale Gross Profit

*Three months ended September 30, 2023 versus 2022.* Wholesale gross profit increased by $4 million to $50 million during the three months ended September 30, 2023, compared to $46 million during the three months ended September 30, 2022. This increase was primarily driven by an increase in wholesale marketplace gross profit by $9 million to $22 million during the three months ended September 30, 2023, compared to $13 million for the three months ended September 30, 2022. This was partially offset by a decrease in wholesale vehicle gross profit per wholesale unit to $685 from $691 for the three months ended September 30, 2023 and 2022, respectively, and a decrease in wholesale units sold to 40,886 from 47,763, respectively.

*Nine months ended September 30, 2023 versus 2022.* Wholesale gross profit increased by $71 million to $185 million during the nine months ended September 30, 2023, compared to $114 million during the nine months ended September 30, 2022. This increase was primarily driven by an increase in wholesale marketplace gross profit by $56 million to $74 million during the three months ended September 30, 2023, compared to $18 million for the three months ended September 30, 2022, which only included the results of ADESA subsequent to acquisition. Additionally, the increase was driven by an increase in wholesale vehicle gross profit per wholesale unit to $906 from $626 in the nine months ended September 30, 2023 and 2022, respectively, partially offset by a decrease in wholesale units sold to 122,449 from 153,342, respectively. The increase in wholesale vehicle gross profit per wholesale unit was primarily a result of lower acquisition costs of wholesale vehicles sold during the nine months ended September 30, 2023.

### Other Gross Profit

Other sales and revenues consist of 100% gross margin products for which gross profit equals revenue. Therefore, changes in other gross profit and the associated drivers are identical to changes in other sales and revenues and the associated drivers.

53

*Components of SG&A*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | **2023** | **2022** | **2023** | **2022** |
| | (in millions) | | | |
| Compensation and benefits [1] | $ 160 | $ 221 | $ 500 | $ 705 |
| CEO Milestone Gift [2] | — | 2 | (1) | 26 |
| Advertising | 56 | 117 | 169 | 403 |
| Market occupancy [3] | 16 | 23 | 55 | 70 |
| Logistics [4] | 29 | 57 | 93 | 184 |
| Other [5] | 172 | 236 | 541 | 716 |
| Total | $ 433 | $ 656 | $ 1,357 | $ 2,104 |

(1) Compensation and benefits includes all payroll and related costs, including benefits, payroll taxes, and equity-based compensation, except those related to preparing vehicles for sale, which are included in cost of sales, and those related to the development of software products for internal use, which are capitalized to software and depreciated over the estimated useful lives of the related assets.
(2) CEO Milestone Gift includes all equity-based compensation and payroll tax costs associated with the Gift, except those Gift costs related to preparing vehicles for sale, which are included in cost of sales.
(3) Market occupancy costs includes occupancy costs of our vending machine and hubs. It excludes occupancy costs related to reconditioning vehicles which are included in cost of sales and the portion related to corporate occupancy which are included in other costs.
(4) Logistics includes fuel, maintenance and depreciation related to operating our own transportation fleet, and third-party transportation fees, except the portion related to inbound transportation, which is included in cost of sales.
(5) Other costs include all other selling, general and administrative expenses such as IT expenses, corporate occupancy, professional services and insurance, limited warranty, and title and registration.

Selling, general and administrative expenses decreased by $223 million to $433 million during the three months ended September 30, 2023, compared to $656 million during the three months ended September 30, 2022, and by $747 million to $1.4 billion during the nine months ended September 30, 2023, compared to $2.1 billion during the nine months ended September 30, 2022. During 2022, we implemented a number of profitability initiatives to reduce selling, general and administrative expenses including reducing our employee headcount, integrating real estate acquired as part of the ADESA Acquisition and reducing our corporate office footprint, improving the targeting of our advertising spend and reducing other selling, general and administrative expenses. In addition, the reduction in retail units sold contributed to reductions in several categories of selling, general and administrative expenses.

During the nine months ended September 30, 2023 and 2022, we realized a benefit of $1 million and an expense of $26 million, respectively, related to the CEO Milestone Gift within selling, general and administrative expense, which is presented separately above, as a result of more forfeitures than employees continuing to vest.

*Interest Expense*

Interest expense was unchanged at $153 million during each of the three months ended September 30, 2023 and 2022 primarily due to an increase in interest associated with the Senior Secured Notes, offset by a decrease in interest associated with working capital financing. Interest expense increased by $134 million to $467 million during the nine months ended September 30, 2023, compared to $333 million during the nine months ended September 30, 2022, primarily due to increased interest associated with the 2030 Senior Unsecured Notes, along with increased interest associated with the Senior Secured Notes.

*Gain on Debt Extinguishment*

Gain on debt extinguishment was $878 million during the three and nine months ended September 30, 2023 primarily due to the exchange of $5.5 billion in principal of Senior Unsecured Notes for $4.2 billion in principal of Senior Secured Notes and $341 million in cash, along with the write off of $66 million of debt issuance costs and a $40 million deferred premium on a portion of the Senior Secured Notes.

54

*Other (Income) Expense, Net*

Other (income) expense, net decreased by $54 million to an expense of $4 million during the three months ended September 30, 2023 compared to an expense of $58 million during the three months ended September 30, 2022. Other (income) expense, net changed by $69 million to income of $1 million during the nine months ended September 30, 2023 compared to an expense of $68 million during the nine months ended September 30, 2022. The change was primarily due to an expense related to the fair value associated with our Warrants during the three months ended September 30, 2022, partially offset by a tax receivable agreement expense associated with the gain recognized on the Offers.

*Income Tax Provision*

Income tax provision increased by $29 million to $29 million during the three months ended September 30, 2023 compared to less than $1 million during the three months ended September 30, 2022 and by $26 million to $27 million during the nine months ended September 30, 2023 compared to $1 million during the nine months ended September 30, 2022. The increase was primarily due to the income tax expense related to the cancellation of debt income recognized on the exchange of $5.5 billion in principal of Senior Unsecured Notes for $4.2 billion in principal of Senior Secured Notes and $341 million in cash.

<strong>Non-GAAP Financial Measures</strong>

To supplement the unaudited condensed consolidated financial statements, which are prepared and presented in accordance with U.S. GAAP, we also present the following non-GAAP measures: Adjusted EBITDA; Adjusted EBITDA margin; Gross profit, non-GAAP; Total gross profit per retail unit, non-GAAP; SG&A, non-GAAP; and Total SG&A per retail unit, non-GAAP.

***Adjusted EBITDA; Adjusted EBITDA margin; Gross profit, non-GAAP; Total gross profit per retail unit, non-GAAP; SG&A, non-GAAP; and Total SG&A per retail unit, non-GAAP***

Adjusted EBITDA; Adjusted EBITDA margin; Gross profit, non-GAAP; Total gross profit per retail unit, non-GAAP; SG&A, non-GAAP; and Total SG&A per retail unit, non-GAAP are supplemental measures of operating performance that do not represent and should not be considered an alternative to net income (loss), gross profit, or SG&A, as determined by U.S. GAAP.

Adjusted EBITDA is defined as net income (loss) plus income tax provision, interest expense, other (income) expense, net, depreciation and amortization in cost of sales and SG&A, goodwill impairment, share-based compensation including the CEO Milestone Gift in cost of sales and SG&A, and restructuring costs, minus revenue related to our Warrants and gain on debt extinguishment. Following the ADESA Acquisition, we are also excluding depreciation and amortization in cost of sales, which was historically only a small component of cost of sales. Adjusted EBITDA margin is Adjusted EBITDA as a percentage of total revenues.

Gross profit, non-GAAP is defined as GAAP gross profit plus depreciation and amortization in cost of sales, share-based compensation including the CEO Milestone Gift in cost of sales, and restructuring costs, minus revenue related to our Warrants. Total gross profit per retail unit, non-GAAP is Gross profit, non-GAAP divided by retail vehicle unit sales.

SG&A, non-GAAP is defined as GAAP SG&A minus depreciation and amortization in SG&A, share-based compensation including the CEO Milestone Gift in SG&A, and restructuring costs. Total SG&A per retail unit, non-GAAP is SG&A, non-GAAP divided by retail vehicle unit sales.

We use these non-GAAP measures to measure the operating performance of our business as a whole and relative to our total revenues and retail vehicle unit sales. We believe that these metrics are useful measures to us and to our investors because they exclude certain financial, capital structure, and non-cash items that we do not believe directly reflect our core operations and may not be indicative of our recurring operations, in part because they may vary widely across time and within our industry independent of the performance of our core operations. We believe that excluding these items enables us to more effectively evaluate our performance period-over-period and relative to our competitors. Adjusted EBITDA; Adjusted EBITDA margin; Gross profit, non-GAAP; Total gross profit per retail unit, non-GAAP; SG&A, non-GAAP; and Total SG&A per retail unit, non-GAAP may not be comparable to similarly titled measures provided by other companies due to potential differences in methods of calculations.

55

A reconciliation of Adjusted EBITDA to net income (loss), Gross profit, non-GAAP to gross profit, and SG&A, non-GAAP to SG&A, which are the most directly comparable U.S. GAAP measures, and calculations of Adjusted EBITDA margin, Total gross profit per retail unit, non-GAAP, and Total SG&A per retail unit, non-GAAP is as follows:

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
| | 2023 | | 2022 | | 2023 | | 2022 | |
| | (dollars in millions, except per unit amounts) | | | | | | | |
| Net income (loss) | $ | 741 | $ | (508) | $ | 350 | $ | (1,453) |
| Income tax provision | | 29 | | — | | 27 | | 1 |
| Interest expense | | 153 | | 153 | | 467 | | 333 |
| Other (income) expense, net | | 4 | | 58 | | (1) | | 68 |
| Depreciation and amortization expense in cost of sales | | 42 | | 36 | | 130 | | 71 |
| Depreciation and amortization expense in SG&A | | 45 | | 57 | | 140 | | 143 |
| Share-based compensation expense in cost of sales | | — | | 2 | | — | | 16 |
| Share-based compensation expense in SG&A | | 18 | | 16 | | 53 | | 57 |
| Root warrant revenue | | (6) | | — | | (16) | | — |
| Gain on debt extinguishment | | (878) | | — | | (878) | | — |
| Restructuring | | — | | — | | 7 | | 14 |
| Adjusted EBITDA | $ | 148 | $ | (186) | $ | 279 | $ | (750) |
| | | | | | | | | |
| Total revenues | $ | 2,773 | $ | 3,386 | $ | 8,347 | $ | 10,767 |
| Net income (loss) margin | | 26.7 % | | (15.0)% | | 4.2 % | | (13.5)% |
| Adjusted EBITDA margin | | 5.3 % | | (5.5)% | | 3.3 % | | (7.0)% |
| | | | | | | | | |
| Gross profit | $ | 482 | $ | 359 | $ | 1,322 | $ | 1,053 |
| Depreciation and amortization expense in cost of sales | | 42 | | 36 | | 130 | | 71 |
| Share-based compensation expense in cost of sales | | — | | 2 | | — | | 16 |
| Root warrant revenue | | (6) | | — | | (16) | | — |
| Restructuring | | — | | — | | — | | 4 |
| Gross profit, non-GAAP | $ | 518 | $ | 397 | $ | 1,436 | $ | 1,144 |
| | | | | | | | | |
| Retail vehicle unit sales | | 80,987 | | 102,570 | | 236,757 | | 325,319 |
| Total gross profit per retail unit | $ | 5,952 | $ | 3,500 | $ | 5,583 | $ | 3,237 |
| Total gross profit per retail unit, non-GAAP | $ | 6,396 | $ | 3,870 | $ | 6,065 | $ | 3,517 |
| | | | | | | | | |
| SG&A | $ | 433 | $ | 656 | $ | 1,357 | $ | 2,104 |
| Depreciation and amortization expense in SG&A | | 45 | | 57 | | 140 | | 143 |
| Share-based compensation expense in SG&A | | 18 | | 16 | | 53 | | 57 |
| Restructuring | | — | | — | | 7 | | 10 |
| SG&A, non-GAAP | $ | 370 | $ | 583 | $ | 1,157 | $ | 1,894 |
| | | | | | | | | |
| Retail vehicle unit sales | | 80,987 | | 102,570 | | 236,757 | | 325,319 |
| Total SG&A per retail unit | $ | 5,347 | $ | 6,396 | $ | 5,732 | $ | 6,467 |
| Total SG&A per retail unit, non-GAAP | $ | 4,569 | $ | 5,684 | $ | 4,887 | $ | 5,822 |

**Liquidity and Capital Resources**

*General*

We generate cash from the sale of retail vehicles, the sale of wholesale vehicles, and proceeds from the sale of finance receivables originated in connection with the sale of retail vehicles. We generate additional cash flows through our financing activities including our short-term revolving inventory and finance receivable facilities and real estate and equipment financing, and from time to time, the issuance of long-term notes and new issuances of equity. Historically, cash generated from financing activities has funded growth and expansion into new markets and strategic initiatives and we expect this to continue in the future. In response to the current macroeconomic environment, we have increased focus on driving profitability through initiatives to better conform our expense structure to unit volume levels. We expect our primary sources of cash to continue to be sufficient to fund our operating activities and cash commitments for investing and financing activities for at least the next 12 months.

Our ability to service our debt and fund working capital, capital expenditures, and business development efforts in the long-term will depend on our ability to generate cash from operating and financing activities, which is subject to our future operating performance, as well as to general economic, financial, competitive, legislative, regulatory, and other conditions, some of which may be beyond our control. Our future capital requirements will depend on many factors, including our ability to refinance indebtedness, our ability to obtain supplemental liquidity through additional debt, equity, including the issuance of equity pursuant to the ATM Offering discussed below, strategic relationships or other arrangements on terms available or acceptable to us, our rate of revenue growth, our construction of IRCs and vending machines, the timing and extent of our spending to support our technology and software development efforts, our advertising spend, and increased population coverage. If we need to obtain supplemental liquidity, there can be no assurance that financing alternatives will be available in sufficient amounts or on terms acceptable to us in the future.

On July 19, 2023, the Company entered into an agreement (the "Distribution Agreement"), pursuant to which the Company may offer and sell from time to time up to the greater of (i) shares of Class A common stock representing an aggregate offering price of $1.0 billion, or (ii) an aggregate number of 35 million shares of Class A common stock pursuant to one or more "at-the-market offerings," as defined in Rule 415(a)(4) promulgated under the Securities Act of 1933, as amended (the "ATM Offering"). In the three months ended September 30, 2023, we issued 7.2 million shares of Class A common stock at a weighted-average issuance price per share of $46.94, for gross proceeds of $336 million. However, there can be no assurance that we will sell further shares of Class A common stock through the ATM Offering, or otherwise.

In addition, on August 18, 2023, we entered into a Securities Purchase Agreement with the Garcia Parties providing for the purchase of an aggregate of 3.4 million Class A LLC Units in Carvana Group (the "Class A Units"), together with 2.7 million shares of Class B common stock, at a price equivalent to $46.31 per share of Class A common stock of the Company, or $37.048 per Class A Unit on an as-exchanged basis.

On September 1, 2023, we completed offers whereby we exchanged validly tendered senior unsecured notes (collectively the "Senior Unsecured Notes") for newly issued senior secured notes (the "Exchange Offers"). Concurrently with the Exchange Offers, we also completed a cash tender offer to purchase any and all outstanding 5.625% senior unsecured notes due 2025 (the "2025 Senior Unsecured Notes") for cash at a purchase price of 85.0% of the aggregate principal amount thereof (the "Cash Tender Offer" and together with the Exchange Offers, the "Offers"). Upon consummation of the Offers, we successfully exchanged Senior Unsecured Notes with an aggregate outstanding principal balance of $5.5 billion for $4.2 billion in aggregate principal balance of newly issued senior secured notes (collectively the "Senior Secured Notes"), paid $341 million in cash for validly tendered 2025 Senior Unsecured Notes, and paid $146 million in cash related to accrued and unpaid interest for validly tendered Senior Unsecured Notes.

Finally, we or our affiliates may, at any time, and from time to time, repurchase portions of our Class A common stock, our Senior Unsecured Notes, our Senior Secured Notes, or any other securities we may issue, from time to time, in open market transactions, privately negotiated transactions, in exchange for property or other securities or otherwise. Any repurchase decisions will be made after consideration of market conditions and liquidity needs and will be upon such terms and at such prices as we determine appropriate. However, there is no guarantee that a repurchase will take place.

*Liquidity Resources*

We had the following committed liquidity resources as well as pledging and other basket capacity available as of September 30, 2023 and December 31, 2022:

| | | September 30, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| | | (in millions) | | |
| Cash and cash equivalents | $ | 544 | $ | 434 |
| Availability under short-term revolving facilities [1] | | 1,043 | | 1,314 |
| Committed liquidity resources available | $ | 1,587 | $ | 1,748 |
| Unpledged real estate not included above [2] | | — | | 1,971 |
| Super senior debt capacity | | 1,262 | | — |
| Pari passu senior debt capacity | | 250 | | — |
| Unpledged beneficial interests in securitizations | | 83 | | 69 |
| Total liquidity resources | $ | 3,182 | $ | 3,788 |

(1) Based on pledging all eligible vehicles and finance receivables under the Floor Plan Facility and Finance Receivables Facilities, excluding the impact to restricted cash requirements.
(2) Total unpledged gross real estate assets minus committed sale leasebacks. Includes $1.1 billion of ADESA unpledged real estate assets as of December 31, 2022.

Our total liquidity resources are composed of cash and cash equivalents, availability under existing credit facilities, additional unpledged assets, including real estate and securities, on our balance sheet that can be financed using traditional asset-based financing sources, and additional capacity under the indentures governing our Senior Secured Notes, which allow us to incur additional debt that can be senior or pari passu in lien priority as to the collateral securing the obligations under the Senior Secured Notes.

Cash and cash equivalents includes cash deposits and highly liquid investment instruments with original maturities of three months or less, such as money market funds.

Availability under short-term revolving facilities is the available amount we can borrow under our existing vehicle inventory floor plan and finance receivable facilities based on the pledgeable value of vehicle inventory and finance receivables on our balance sheet on the period end date. Availability under short-term revolving facilities is distinct from the total commitment amount of these facilities because it represents the currently borrowable amount, rather than committed future amounts that could be borrowed to finance future additional assets. Effective November 1, 2023, we amended our vehicle inventory Floor Plan Facility to resize the line of credit to $1.5 billion through April 30, 2025.

As of September 30, 2023 and December 31, 2022, the short-term revolving facilities had a total commitment of $4.7 billion and $4.8 billion, an outstanding balance of $429 million and $1.5 billion, and unused capacity of $4.3 billion and $3.2 billion, respectively.

Unpledged real estate assets include real estate acquired as part of the ADESA Acquisition, and IRC, vending machine, and hub real estate assets that have not been sold and are not pledged on the period end date. Since our first sale-leaseback transaction in 2017, we have historically had flexible access to real estate financing and may continue to use various forms of real estate financing in the future, subject to the indentures governing the Senior Secured Notes. As of September 30, 2023, substantially all real estate was pledged as security for the Senior Secured Notes.

Super senior debt capacity and pari passu senior debt capacity represents basket capacity to incur additional debt that could be senior or pari passu in lien priority as to the collateral securing the obligations under the Senior Secured Notes, subject to the

terms and conditions set forth in the indentures governing the Senior Secured Notes. The availability of such additional sources depends on many factors and there can be no assurance that financing alternatives will be available to us in the future.

Unpledged beneficial interests in securitizations includes retained beneficial interests in securitizations that have not been previously pledged or sold. We historically have financed the majority of our retained beneficial interests in securitizations and expect to continue to do so in the future.

Additionally, we amended our Master Purchase and Sale Agreement for the purchaser to purchase up to a maximum of $4.0 billion of our finance receivables through January 2024, and such facility had approximately $1.3 billion of unused capacity as of September 30, 2023.

To optimize our cost of capital, in any given period we may choose not to maximize borrowings on our short-term revolving facilities, maximize revolving commitment size, or immediately sale-leaseback real estate and retained beneficial interests in securitizations. This has the benefit of reducing interest expense and debt issuance costs and providing flexibility to minimize financing costs over time.

We consider our total liquidity resources as an input into our planning. In general, changes in total liquidity resources fall into two broad categories: changes due to current business operations and changes due to investments in automotive retail assets.

Changes in liquidity due to current business operations include Adjusted EBITDA, non-real estate capital expenditures, including technology, furniture, fixtures, and equipment, and changes in traditional working capital, including accounts receivable, accounts payable, accrued expenses, and other miscellaneous assets and liabilities.

In the ordinary course of business, we sponsor and engage in securitization transactions to sell our finance receivables to a diverse pool of investors. These securitizations involve unconsolidated variable interest entities in which we retain at least 5% of the credit risk of the underlying finance receivable by holding at least 5% of the notes and certificates issued by these entities. We are exposed to market risk in the securitization market. See Note 9 — Securitizations and Variable Interest Entities, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, for further discussion regarding our transactions with unconsolidated variable interest entities.

In addition we also invest in and generate several types of assets, including vehicle inventory, finance receivables, retained beneficial interests in securitizations, and real estate. To maximize capital efficiency, we generally seek to finance these assets with matched sources of asset-based financing, including short-term revolving facilities for vehicle inventory and finance receivables, beneficial interests financing for retained beneficial interests in securitizations, and sale-leaseback or other real estate financing for IRCs and vending machines. We have historically used these sources of financing to finance our investment in these assets and expect to continue to do so in the future.

As of September 30, 2023 and December 31, 2022, our outstanding principal amount of indebtedness, including finance leases, was $6.0 billion and $8.4 billion, respectively, summarized in the table below. See Note 10 — Debt Instruments and

59

Note 16 — Leases included in Part I, Item 1, Financial Statements of this Quarterly Report on Form 10-Q for further information on our debt and finance leases.

| | September 30, 2023 | December 31, 2022 |
|---|---|---|
| | (in millions) | |
| **Asset-Based Financing:** | | |
| Inventory | $ 117 | $ 569 |
| Finance receivables and beneficial interests | 611 | 1,233 |
| Transportation fleet[(1)] | 297 | 375 |
| Real estate[(2)] | 487 | 489 |
| Total asset-based financing | 1,512 | 2,666 |
| Senior Secured Notes | 4,240 | — |
| Senior Unsecured Notes | 205 | 5,725 |
| Total debt | 5,957 | 8,391 |
| Less: unamortized debt issuance costs[(3)] | (58) | (82) |
| Plus: unamortized premium[(4)] | 39 | — |
| Total debt, net | $ 5,938 | $ 8,309 |

(1) Amount includes notes payable and finance leases.
(2) Amount includes real estate financing and notes payable.
(3) The unamortized debt issuance costs related to long-term debt are presented as a reduction of the carrying amount of the corresponding liabilities on our unaudited condensed consolidated balance sheets. Unamortized debt issuance costs related to revolving debt agreements are presented within other assets on our unaudited condensed consolidated balance sheets and not included here.
(4) The unamortized premium relates to a portion of the Offers (as defined in Note 10 — Debt Instruments) which was accounted for as a debt modification.

*Cash Flows*

The following table presents a summary of our consolidated cash flows from operating, investing and financing activities for the nine months ended September 30, 2023 and 2022:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2023 | 2022 |
| | (in millions) | |
| Net cash provided by (used in) operating activities | $ 1,042 | $ (585) |
| Net cash provided by (used in) investing activities | 22 | (2,568) |
| Net cash (used in) provided by financing activities | (1,076) | 2,994 |
| Net decrease in cash, cash equivalents and restricted cash | (12) | (159) |
| Cash, cash equivalents and restricted cash at beginning of period | 628 | 636 |
| Cash, cash equivalents and restricted cash at end of period | $ 616 | $ 477 |

*Operating Activities*

Our primary sources of operating cash flows result from the sales of retail vehicles, wholesale vehicles, loans we originate, and ancillary products. Our primary uses of cash from operating activities are purchases of inventory, personnel-related expenses, and cash used to acquire customers. Cash provided by and used in operating activities was $1.0 billion and $585 million during the nine months ended September 30, 2023 and 2022, respectively, an increase in cash provided by operating activities of $1.6 billion, primarily due to decreased net finance receivables held for sale and vehicle inventory acquisitions, along with decreased selling, general and administrative expenses and reconditioning costs.

60

*Investing Activities*

Our primary use of cash for investing activities is purchases of property and equipment to expand our operations. Cash provided by and used in investing activities was $22 million and $2.6 billion during the nine months ended September 30, 2023 and 2022, respectively, a decrease in cash used in investing activities of $2.6 billion, primarily driven by the $2.2 billion used for the ADESA Acquisition in May 2022 and decreased purchases of property and equipment as part of our effort to reduce our capital expenditures.

*Financing Activities*

Cash flows from financing activities primarily relate to our short and long-term debt activity, including paying down our short-term revolving facilities. Cash used in and provided by financing activities was $1.1 billion and $3.0 billion during the nine months ended September 30, 2023 and 2022, respectively, a decrease in cash provided by financing activities of $4.1 billion. In the nine months ended September 30, 2023 we launched an ATM Offering and sold Class A common stock for net proceeds of $327 million, entered into a Securities Purchase Agreement with the Garcia Parties and sold Class A LLC Units together with Class B common stock for proceeds of $126 million, and completed the Offers whereby we paid $341 million in cash for validly tendered 2025 Senior Unsecured Notes and $48 million in debt issuance costs. In the nine months ended September 30, 2022 we completed an equity offering for net proceeds of $1.2 billion and a notes offering of $3,275 billion as part of our financing for the ADESA Acquisition. The remaining change primarily relates to decreased net proceeds from short-term revolving facilities.

**Contractual Obligations and Commitments**

As of September 30, 2023, there have been no material changes to the contractual obligations or commitments previously disclosed in our most recent Annual Report on Form 10-K, filed February 23, 2023, other than the exchange of validly tendered Senior Unsecured Notes with an aggregate outstanding principal balance of $5.5 billion for $4.2 billion in aggregate principal balance of newly issued Senior Secured Notes.

**Fair Value Measurements**

We report money market securities, certain receivables, Warrants to acquire Root's Class A common stock and beneficial interests in securitizations at fair value. See Note 18 — Fair Value of Financial Instruments, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q, which is incorporated into this item by reference.

**Critical Accounting Estimates**

There have been no material changes to our critical accounting estimates from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 23, 2023.

**FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q, as well as information included in oral statements or other written statements made or to be made by us, contain statements that constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based on our current beliefs, expectations, and assumptions regarding the future of our business, future plans and strategies, and other future conditions. Forward-looking statements can be identified by words such as "anticipate," "believe," "envision," "estimate," "expect," "intend," "may," "plan," "predict," "project," "target," "potential," "will," "would," "could," "should," "continue," "ongoing," "contemplate," and other similar expressions, although not all

61

forward-looking statements contain these identifying words. Examples of forward-looking statements include, among others, statements we make regarding:

- short-term and long-term liquidity;

- expectations relating to the automotive market and our industry;

- macroeconomic conditions, economic slowdowns or recessions;

- future financial position;

- business strategy;

- budgets, projected costs, and plans;

- future industry growth;

- financing sources;

- potential sales of our Class A common stock, including through use of the at-the-market program;

- the impact of litigation, government inquiries, and investigations; and

- all other statements regarding our intent, plans, beliefs, or expectations or those of our directors or officers.

We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements, and you should not place undue reliance on our forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in the forward-looking statements we make. Important factors that could cause actual results and events to differ materially from those indicated in the forward-looking statements include, among others, the following:

- the impact on our business from the larger automotive ecosystem and macroeconomic conditions, including consumer demand, global supply chain challenges, heightened inflation and rising interest rates;

- our ability to raise additional capital, the quality of the financial markets, and our substantial indebtedness;

- our history of losses and ability to achieve or maintain profitability in the future;

- the impact of the Hamas-Israel war on geopolitical and other global matters;

- our ability to effectively manage our historical rapid growth;

- our ability to maintain customer service quality and reputational integrity and enhance our brand;

- the seasonal and other fluctuations in our quarterly operating results;

- our relationship with DriveTime and its affiliates;

- our management's accounting judgments and estimates, as well as changes to accounting policies;

- our ability to compete in the highly competitive industry in which we participate;

- the changes in prices of new and used vehicles;

- our ability to acquire desirable inventory;

- our ability to sell our inventory expeditiously;

- our access to structured finance, securitization, or derivative markets at competitive rates and in sufficient amounts;

- our dependence on the sale of automotive finance receivables for a substantial portion of our gross profits;

- our exposure to credit losses and prepayments on our interests in automotive finance receivables;

- our reliance on credit data for the automotive finance receivables we sell;

- our ability to successfully market and brand our business;

- our reliance on internet searches to drive traffic to our website and mobile application;

- the volatility of the trading price of our Class A common stock, including as a result of the use of the at-the-market program or the issuance of other equity, such as the issuance of Class A LLC Units;

- risks related to the actions of short sellers;

- our ability to comply with the laws and regulations to which we are subject;

- the changes in the laws and regulations to which we are subject;

- our ability to comply with the Telephone Consumer Protection Act of 1991;

- the evolution of regulation of the internet and e-commerce;

- our ability to grow complementary product and service offerings;

- the geographic concentration where we provide services and recondition and store vehicle inventory;

- our ability to obtain affordable inventory insurance;

- our ability to maintain adequate relationships with the lenders that finance our vehicle inventory purchases;

- the representations we make with regard to our finance receivables we sell;

- our reliance on our proprietary credit scoring model in the forecasting of loss rates;

- our reliance on internal and external logistics to transport our vehicle inventory;

- risks associated with the construction and operation of our IRCs, hubs and vending machines, including our dependence on one supplier for construction and maintenance for our vending machines;

- our ability to finance IRCs and vending machines;

- our ability to protect the personal information and other data that we collect, process, and store;

- disruptions in availability and functionality of our website and mobile application;

- our ability to protect our intellectual property, technology, and confidential information;

- our ability to defend against claims that our employees, consultants or advisors have wrongfully used or disclosed trade secrets or intellectual property;

- our ability to defend against intellectual property disputes;

- our ability to comply with the terms of open source licenses;

- conditions affecting automotive manufacturers, including manufacturer recalls;

- our reliance on third party technology to complete critical business functions;

- our dependence on key personnel to operate our business;

- our ability to successfully integrate the operations of ADESA;

- our minority equity investment in Root, Inc.;

- the diversion of management's attention and other disruptions associated with potential future acquisitions;

- the restrictions that could limit the flexibility in operating our business imposed by the covenants contained in the indentures governing our Senior Secured Notes and indentures governing future debt securities;

- the legal proceedings to which we may be subject in the ordinary course of business;

- risks relating to our corporate structure and tax receivable agreements;

- risks relating to our Section 382 Tax Asset Preservation Plan; and

- other factors disclosed in the section titled "Risk Factors" in our most recent Annual Report on Form 10-K and other filings we make with the Securities and Exchange Commission.

The forward-looking statements in this Quarterly Report on Form 10-Q represent our views as of the date of this Report. We undertake no obligation to publicly update any forward-looking statements whether as a result of new information, future developments or otherwise.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

There have been no material changes to our quantitative and qualitative disclosures about market risk from those described under "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our most recent Annual Report on Form 10-K, filed on February 23, 2023.

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including the chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were effective as of such date. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Changes in Internal Control Over Financial Reporting**

There were no changes to our internal controls over financial reporting that occurred during the three months ended September 30, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

64

**PART II. OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

From time to time, we are involved in various claims and legal actions that arise in the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we do not believe that the ultimate resolution of these actions will have a material adverse effect on our financial position, results of operations, liquidity and capital resources.

Future litigation may be necessary to defend ourselves and our partners by determining the scope, enforceability and validity of third party proprietary rights or to establish our proprietary rights. The results of any current or future litigation cannot be predicted with certainty, and regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors. For more information, see "Legal Matters" in Note 17 — Commitments and Contingencies, included in Part I, Item 1, Financial Statements, of this Quarterly Report on Form 10-Q.

**ITEM 1A. RISK FACTORS**

Other than as described below, there have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, filed on February 23, 2023 and in our Quarterly Report on Form 10-Q, filed on July 19, 2023.

**Risks Related to the Senior Secured Notes**

***The holders of the Senior Secured Notes have rights that are senior to the rights of holders of our Class A common stock and the indentures governing such Senior Secured Notes include certain restrictive covenants.***

In the event of our bankruptcy, dissolution or liquidation, the holders of our 2028, 2030, and 2031 Senior Secured Notes and our other indebtedness would be paid in full before any distributions can be made to the holders of our Class A common stock. As a result of these superior rights relative to our Class A common stock, the right of holders of our Class A common stock to receive distributions from us may be diluted and may be limited. Additionally, the indentures governing the Senior Secured Notes limit our ability to make certain restricted payments, including dividends, that could also affect the holders of our Class A common stock.

**Risks Related to the At-the-Market Offering Program**

***Holders of our Class A common stock will experience dilution as a result of any shares sold under the "at-the-market offering" program. You may also experience future dilution as a result of future equity offerings.***

We have issued, and expect to continue to issue, additional shares of Class A common stock through our at-the-market offering program. We will have discretion, subject to market demand, to vary the timing, prices, and number of shares sold under the Distribution Agreement. Holders of our Class A common stock will experience dilution as a result of the issuance of any shares of Class A common stock under our at-the-market offering program. In addition, in order to raise additional capital, we may in the future offer additional shares of our Class A common stock or other securities convertible into or exchangeable for our Class A common stock at various prices, such as the recent issuance of Class A Units to the Garcia Parties in connection with the Offers. Investors purchasing shares or other securities in the future could have rights superior to existing stockholders, and any future equity offerings will result in further dilution for our existing stockholders.

***We have broad discretion in how we use the net proceeds from the at-the-market offering program, and we may not use the proceeds effectively or in ways with which our stockholders agree.***

We have not designated any portion of the net proceeds from the at-the-market offering program to be used for any particular purpose. Our management will have broad discretion as to the application of the net proceeds from the at-the-market offering program and could use them for purposes other than those contemplated at the time of the execution of the Distribution Agreement. Our stockholders may not agree with the manner in which our management chooses to allocate and spend the net proceeds. Moreover, our management may use the net proceeds for corporate purposes that may not increase the market price of our Class A common stock.

65

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

**Recent Sales of Unregistered Securities**

We had no sales of unregistered equity securities during the period covered by this Quarterly Report on Form 10-Q that were not previously reported in a Current Report on Form 8-K.

During the three months ended September 30, 2023, pursuant to the terms of the Exchange Agreement entered into in connection with our IPO, certain LLC Unitholders exchanged less than 0.1 million LLC Units for less than 0.1 million newly issued shares of Class A common stock. These shares were issued in reliance on an exemption from registration pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

**Floor Plan Facility Amendment**

Effective November 1, 2023, the Company amended its Floor Plan Facility with Ally Bank and Ally Financial Inc. to resize the line of credit to $1.5 billion through April 30, 2025. The amendment lowered the interest rate from a prime rate plus 1.00% to (i) a prime rate plus 0.10% when amounts drawn under the Floor Plan Facility are under 50% of the then current inventory balance and (ii) a prime rate plus 0.50% when amounts drawn are over 50%. Finally, the restricted cash requirements were amended to introduce a sliding scale whereby at least 12.5% of the total principal amount owed to the lender is required to be held as restricted cash if amounts drawn are under 50% of the then current inventory balance, which requirement increases to (i) 17.5% required to be held as restricted cash if amounts drawn are between 50% and 59.99%, (ii) 22.5% required to be held as restricted cash if amounts drawn are between 60% and 69.99%, and (iii) 25% required to be held as restricted cash if amounts drawn are equal to or over 70%.

The foregoing summary of the amendment does not purport to be complete and is qualified in its entirety by reference to the complete terms of the amendment, as filed as Exhibit 10.6 to this Quarterly Report on Form 10-Q and incorporated herein by reference.

**ITEM 6. EXHIBITS**

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Amended and Restated Certificate of Incorporation of Carvana Co., dated April 27, 2017 (incorporated by reference to Exhibit 3.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 3.2 | Amended and Restated Bylaws of Carvana Co., dated April 27, 2017 (incorporated by reference to Exhibit 3.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on May 3, 2017). |
| 3.3 | Certificate of Designations of Series B Preferred Stock of Carvana Co., as filed with the Secretary of State of the State of Delaware on January 17, 2023 (incorporated by reference to Exhibit 3.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on January 17, 2023). |
| 4.1 | Second Amendment to the Indenture dated as of August 30, 2023, with respect to the 2025 Senior Unsecured Notes (incorporated by reference to Exhibit 4.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.2 | Second Amendment to the Indenture dated as of August 30, 2023, with respect to the 2027 Senior Unsecured Notes (incorporated by reference to Exhibit 4.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.3 | Second Amendment to the Indenture dated as of August 30, 2023, with respect to the 2028 Senior Unsecured Notes (incorporated by reference to Exhibit 4.3 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.4 | Second Amendment to the Indenture dated as of August 30, 2023, with respect to the 2029 Senior Unsecured Notes (incorporated by reference to Exhibit 4.4 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.5 | Second Amendment to the Indenture dated as of August 30, 2023, with respect to the 2030 Senior Unsecured Notes (incorporated by reference to Exhibit 4.5 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.6 | New 2028 Secured Notes Indenture dated as of September 1, 2023 with respect to the 2028 Senior Secured Notes (incorporated by reference to Exhibit 4.6 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.7 | New 2030 Secured Notes Indenture dated as of September 1, 2023 with respect to the 2030 Senior Secured Notes (incorporated by reference to Exhibit 4.7 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.8 | New 2031 Secured Notes Indenture dated as of September 1, 2023 with respect to the 2031 Senior Secured Notes (incorporated by reference to Exhibit 4.8 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.9 | Form of 9.0%/12.0% Cash/PIK Senior Secured Notes due 2028 (incorporated by reference to Exhibit A to Exhibit 4.6 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.10 | Form of 9.0%/11.0%/13.0% Cash/PIK Senior Secured Notes due 2030 (incorporated by reference to Exhibit A to Exhibit 4.7 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.11 | Form of 9.0%/14.0% Cash/PIK Senior Secured Notes due 2031 (incorporated by reference to Exhibit A to Exhibit 4.8 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |
| 4.12 | Amended and Restated Section 382 Rights Agreement, dated as of July 18, 2023, by and between Carvana Co. and Equiniti Trust Company, LLC, as rights agent. (incorporated by reference to Exhibit 10.5 to Carvana Co.'s Quarterly Report on Form 10-Q filed with the SEC July 19, 2023). |
| 10.1 | Transaction Support Agreement, dated as of July 17, 2023, by and among Carvana Co., Carvana Group, LLC, Ernest Garcia II, Ernest Garcia III, and each Initial Supporting Noteholder party thereto (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on July 19, 2023). |
| 10.2 | First Amendment to the Transaction Support Agreement, dated August 1, 2023, by and among Carvana Co, Carvana Group, LLC, Ernest Garcia II, Ernest Garcia III, and each Initial Supporting Noteholder party thereto (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on August 2, 2023). |
| 10.3 | Distribution Agreement, dated as of July 19, 2023, among Carvana Co., Carvana Group, LLC and Citigroup Global Markets Inc. and Moelis & Company, as sales agents (incorporated by reference to Exhibit 10.2 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on July 19, 2023). |
| 10.4 | Securities Purchase Agreement, dated as of August 18, 2023, by and between Carvana Co., Carvana Group, LLC, and the Purchasers (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on August 21, 2023). |
| 10.5 | First Amendment to the Inventory Financing and Security Agreement, dated as of September 1, 2023, by and among Ally Bank, Ally Financial Inc., and Carvana, LLC (incorporated by reference to Exhibit 10.1 to Carvana Co.'s Current Report on Form 8-K filed with the SEC on September 1, 2023). |

| 10.6* | Amended and Restated Inventory Financing and Security Agreement, dated as of November 1, 2023, by and among Ally Bank, Ally Financial Inc., and Carvana, LLC, filed herewith. |
| 10.7 | Consent and Agreement, dated as of September 1, 2023, by and among Carvana, LLC, Ally Bank, and Ally Financial Inc., filed herewith. |
| 31.1 | Certification of the Chief Executive Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 31.2 | Certification of the Chief Financial Officer Pursuant to Rule 13a-14(a), filed herewith. |
| 32.1 | Certification of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 32.2 | Certification of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, furnished herewith. |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document. |
| 104 | Cover Page Interactive Data File - the cover page XBRL tags are embedded within the Inline XBRL document. |

*Certain portions of this exhibit have been omitted in accordance with Item 601(b)(10)(iv) of Regulation S-K. The registrant agrees to furnish supplementally an unredacted copy of this exhibit to the Securities and Exchange Commission upon its request.

68

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date:    November 2, 2023

**Carvana Co.**
(Registrant)

By: /s/ Mark Jenkins
Mark Jenkins
Chief Financial Officer
(On behalf of the Registrant and as Principal Financial Officer)

69

**AMENDED AND RESTATED**

**INVENTORY FINANCING AND SECURITY AGREEMENT**

## I. THE PARTIES TO THIS AGREEMENT

This Amended and Restated Inventory Financing and Security Agreement ("Agreement") is effective as of November 1, 2023 (the "Effective Date"), and is made by and among the following parties:

    A. **Ally Bank (Ally Capital in Hawaii, Mississippi, Montana, and New Jersey), a** Utah state chartered bank (together with its successors and assigns, "Bank"), with a local business office located at 5851 Legacy Circle, Suite 200, Plano, Texas 75024; and

    B. **Ally Financial Inc., a** Delaware entity ("Ally") with a local business office located at 5851 Legacy Circle, Suite 200, Plano, Texas 75024 (together with Bank, the "Ally Parties" and Bank and Ally each being, an "Ally Party"); and

    C. **Carvana, LLC,** an Arizona limited liability company, with its principal executive office currently located at 300 E. Rio Salado Parkway, Tempe, Arizona 85281 ("Carvana").

## II. THE RECITALS

The essential facts relied on by Bank, Ally, and Carvana as true and complete, and giving rise to this Agreement, are as follows:

A.  This Agreement amends and restates in its entirety that certain Inventory Financing and Security Agreement dated as of September 22, 2022 (as previously amended, supplemented, or otherwise modified) entered into by and among the Ally Parties and Carvana.

B.  From time to time, Carvana has and/or intends to acquire one or more Vehicles (defined below) from one or more manufacturer, distributor, dealer, auctioneer, merchant, customer, broker, seller, or other supplier ("Vehicle Seller(s)"), for the principal purpose of selling or leasing Vehicles to retail and wholesale customers in the ordinary course of business.

C.  To enable Carvana to acquire and hold Vehicles in inventory, Carvana wants the Ally Parties to provide Carvana with wholesale inventory floorplan finance accommodations by (i) advancing the purchase price of the Vehicles directly to the Vehicle Sellers; (ii) advancing funds to other third parties who are not Vehicle Sellers; or (iii) by loaning money directly to Carvana for Vehicles that were previously purchased from Vehicle Sellers by Carvana ("Inventory Financing"). Vehicles acquired with or held as a result of Inventory Financing may be referred to as "Inventory Financed Vehicles."

D.  The Ally Parties are willing to provide Carvana with Inventory Financing in accordance with this Agreement.

E.  The Inventory Financing will be governed by this Agreement. Accordingly, this Agreement sets forth the rights and duties between the Ally Parties and Carvana concerning Inventory

Certain information has been excluded because it is both (i) not material and (ii) the type that the registrant treats as private or confidential.

Financing, including establishment of a credit line by which Inventory Financing will be made by either or both of the Ally Parties, payment of principal, interest, and other charges, the grant of security interests in collateral, and other terms and conditions.

### III. THE AGREEMENT

In consideration of the premises and the mutual promises in this Agreement, which are acknowledged to be sufficient, Bank, Ally, and Carvana agree to the following:

A. Inventory Finance Accommodations.

1. Definition of "Vehicle". As used in this Agreement, "Vehicle" means an automobile, van, or light duty truck that is not manufactured for a particular commercial purpose. Notwithstanding anything to the contrary in this Agreement or otherwise, Inventory Financing is available only for a Vehicle that can be registered for use on public highways, and is not a vehicle that is or has been titled outside the United States, in each case:

    (a) of the then-current model year, or twelve previous model years,

    (b) having fewer than 150,000 miles,

    (c) that Carvana has purchased for at least $1,500.00,

    (d) for which Carvana has received the title and purchase documentation,

    (e) that has not been purchased by Carvana for the use of its employees,

    (f) that is not subject to a current arbitration proceeding between the purchaser and the Carvana with respect to the sale of such vehicle, and

    (g) that is not subject to an existing consumer lease from Carvana or an affiliate of Carvana.

2. Establishment of a Committed Inventory Financing Credit Line. Subject to the terms and conditions of this Agreement:

    (a) Each of the Ally Parties commits to provide Inventory Financing to Carvana until the Maturity Date. Before the Maturity Date, Carvana may request that the Ally Parties extend this commitment, and the Ally Parties, in their sole discretion, may extend this commitment.

    (b) The sum of all Inventory Financing by each Ally Party, plus any obligation of each Ally Party to make specific advances to a Vehicle Seller or other party, constitutes a single obligation of Carvana to such Ally Party. The sum of all Inventory Financing plus the sum of all obligations of both of the Ally Parties to make specific advances to Vehicle Sellers or other parties constitutes Carvana's "Wholesale Outstandings."

    (c) The "Maturity Date" shall be 5:00 p.m. Eastern Time on April 30, 2025.

2

3. <u>Amount of the Credit Line</u>. The aggregate amount of credit available pursuant to this Agreement (the "Credit Line") will be $1,500,000,000.00.

4. <u>Advance</u>. The advance rate for Inventory Financing, is as follows:

    (a) Vehicles purchased from auction: initially funded within 30 calendar days of purchase, [***]% of:

        (i.) the purchase price of such Vehicle, plus

        (ii.) fees charged by an auction in connection with the purchase of such Vehicle, plus

        (iii.) post-sale inspection fees in connection with the purchase of such Vehicle.

The Ally Parties have no obligation to advance any amount for costs related to transportation or labor with respect to a Vehicle.

(b) Trade-in Vehicles, Vehicles purchased from rental companies, and Vehicles purchased directly from customers and any amounts initially funded for an auction Vehicle after 30 calendar days from the purchase date: [***]% of acquisition cost of such Vehicles.

(c) Any amounts re-borrowed under the Credit Line against a Vehicle after repayment of the initial advance: [***]% of the principal balance amount that was repaid on the immediately prior pay-off of such Vehicle.

5. <u>Method of Providing Inventory Financing</u>. The Credit Line must be used exclusively for Inventory Financing in any of the following ways:

    (a) <u>Advances Directly to Vehicle Sellers</u>. From time to time, upon notice from Carvana or Vehicle Sellers, either or both of the Ally Parties may advance money directly to Vehicle Sellers for Vehicles acquired or proposed to be acquired by Carvana as Inventory Financed Vehicles. The Ally Parties will make payment in accordance with and in reliance on any invoice, draft, debit, contract, advice, or other communication received by the Ally Parties from the Vehicle Seller. The amount that will be advanced on behalf of Carvana for the Vehicles will be determined in accordance with Subsection III.A.4, above. The Ally Parties are not required to verify the order or shipment of any Vehicle for which it pays a Vehicle Seller and are not responsible for any nonconformity of the Vehicle, delivery, or transaction between Carvana and a Vehicle Seller. If requested, Carvana will promptly provide invoices, bills of sale, title, and other transaction documents pertaining to such Vehicles.

    (b) <u>Advances Directly to or on behalf of Carvana</u>. From time to time, either or both of the Ally Parties may advance money directly to Carvana or to other third parties who are not Vehicle Sellers on behalf of Carvana to finance Vehicles then owned or proposed to be acquired by Carvana. The amount that will be advanced to or

3

[***] Redacted for confidentiality purposes.

on behalf of Carvana for the Vehicles will be determined in accordance with Subsection III.A.4 above. Upon request by either or both of the Ally Parties, Carvana must provide the Ally Parties with satisfactory evidence of the value, ownership, and title status of the Vehicle(s), including the manufacturer's certificate of origin or title certificate (original or valid copy), invoice or bill of sale, and the shipping receipt, bill of lading, and the like.

6. <u>Evidence of Inventory Financing</u>. The Ally Parties will maintain on their books and records in accordance with their usual practices, one or more accounts detailing the Inventory Financing, Wholesale Outstandings, and all Interest, Principal Reductions, net settlements (as described in Section III.C.4 below), Other Charges and any other related fees, costs, expenses, and payments owed by Carvana. From time to time, ordinarily monthly, the Ally Parties will furnish Carvana with statements of its account information ("Wholesale Billing Statement"). If only one Wholesale Billing Statement is provided by the Ally Parties, the Wholesale Billing Statement will indicate (by account number or otherwise) the Inventory Financing provided by each of the Ally Parties. Unless Carvana advises the Ally Parties in writing of any discrepancy on the Wholesale Billing Statement within ten (10) calendar days of receipt, and absent manifest error, the Wholesale Billing Statement will be deemed acknowledged and agreed to by Carvana and conclusive proof of Carvana's actual obligation to each of the Ally Parties as of the date of the Wholesale Billing Statement last received by Carvana.

7. <u>Other Financing Accommodations</u>. Upon Carvana's request, either or both of the Ally Parties may provide other forms of finance and/or credit accommodations which arise out of or relate to the business operations of Carvana and/or any of its owners, officers, or affiliates, including, without limitation, the discount purchase of retail installment sale and lease agreements, working capital, revolving credit, equipment, and realty loans (such accommodations from either of the Ally Parties being, the "Other Financing Accommodations"). The availability, amount, terms, conditions, provisions, continuation, documentation, and administration of Other Financing Accommodations are separate and distinct from the Inventory Financing under this Agreement and may be provided, if at all, only according to the terms and conditions of the written agreement between such Ally Party and Carvana. If Carvana requests additional Inventory Financing beyond the Credit Line, and the Ally Parties decline the request, then Carvana and the Ally Parties will negotiate in good faith to restructure the credit and collateral arrangements under this Agreement to facilitate Carvana's efforts to obtain the additional financing from another financial institution.

8. <u>Advance Floorplan Accommodation</u>.

(a)    The Ally Parties will allow Carvana to obtain Inventory Financing on Vehicles for which Carvana does not then hold a lien-free title, provided that: (i) Carvana owns the Vehicle and it is not in the process of being sold, (ii) the Vehicle is subject to a lien noted on the certificate of title by the financial institution that provided retail credit accommodations for the prior owner, and no other lien is noted on the title or otherwise exists (to the knowledge of Carvana), (iii) Carvana remits payment to that lienholder to discharge the retail lien before or upon requesting a floorplan advance for such Vehicle from the Ally Parties, (iv) the

4

floorplan proceeds are remitted directly to Carvana, and (v) the Vehicle's title is lien-free within [***] calendar days of the original floorplan advance date (collectively, "Advance Floorplan Accommodation").

(b)    Carvana must immediately repay any outstanding advance under the Advance Floorplan Accommodation for any Vehicle if the title for such Vehicle is not lien-free within [***] calendar days of the original floorplan advance date.

(c)    Carvana's outstanding floorplan advances under the Advance Floorplan Accommodation must be limited to a maximum of 10% of the Credit Line.

(d)    Advance Floorplan Accommodation is provided by the Ally Parties in their sole discretion. The Ally Parties may modify the terms, conditions, provisions, documentation, and administration of the Advance Floorplan Accommodation in their sole discretion. The Ally Parties reserve the right to rescind the Advance Floorplan Accommodation for any reason or no reason.

B.    Interest, Principal Reductions, Late Charges, Costs, Expenses and Other Charges and Fees.

1. Interest Accrual, Rate, and Method of Calculation. Wholesale Outstandings owed to the Ally Parties will bear interest on and from the day after each advance or loan through the date of repayment in full. Interest will be at a per annum rate and will be determined using a 365/360 simple interest method of calculation, unless expressly prohibited by law ("Interest"). The Interest rate applicable for all Wholesale Outstandings (the "Interest Rate Increment") will be either (a) the Prime Rate plus 10 basis points if the amount of Wholesale Outstandings divided by the Total Inventory Value is less than 50% or (b) the Prime Rate plus 50 basis points if the amount of Wholesale Outstandings divided by the Total Inventory Value is equal to or greater than 50%. The Ally Parties will adjust the Interest Rate Increment daily based on the Total Inventory Value listed in the previous day's Vehicle Report and the Wholesale Outstandings as of the same day.

The "Prime Rate" is the per annum rate of interest announced by Bank from time to time as its "prime rate." The Prime Rate and its effective date will be announced on the Ally Dash website, or a replacement source designated in a written communication by Bank to Carvana.

Notwithstanding the foregoing, to the extent the Prime Rate is more than 10 basis points different than the U.S. prime rate published by the Wall Street Journal, for a period of at least 7 calendar days, Carvana and the Ally Parties agree to negotiate in good faith regarding whether the Interest Rate Increment should be adjusted.

2. Maximum Interest. In no event will Interest owed to either or both of the Ally Parties under this Agreement exceed the maximum rate of interest allowed by law in effect at the time it is assessed. Each of the Ally Parties and Carvana intend to faithfully comply with applicable usury laws, and this Agreement is to be construed in accordance with this intent. If circumstances cause the actual or imputed interest contracted for, charged, or received by either or both of the Ally Parties to be in excess of the maximum rate of

5

[***] Redacted for confidentiality purposes.

interest allowed by law, Carvana must promptly notify the affected Ally Party(ies) of the circumstance, and such Ally Party(ies) will either, at their sole discretion, refund to Carvana, or credit the Wholesale Outstandings owed by Carvana to such Ally Party(ies), with so much of the imputed interest as will reduce the effective rate of interest to an amount one-tenth of one percent (0.10%) per annum less than the maximum rate of interest allowed by law for the applicable period.

3. Principal Reductions. Carvana must pay a monthly principal reduction of 10% of the original principal amount financed by the Ally Parties (each a "Principal Reduction") for each Vehicle on Carvana's floorplan for more than 120 days (regardless of repayment and re-borrowing) until the outstanding principal amount for that Vehicle is reduced to the lesser of 50% of the original principal amount financed by the Ally Parties or 50% of the clean wholesale value. Principal Reductions may be billed to Carvana and will reduce the amount of the Wholesale Outstandings when paid by Carvana. Any change in the Principal Reductions required by either or both of the Ally Parties will not constitute an amendment to this Agreement.

4. Late Charge. Unless prohibited by law, each of the Ally Parties may assess a late charge of up to five percent (5%) of any amount owed to such Ally Party(ies) that is not paid when due and payable after giving effect to applicable grace periods ("Late Charge"). The Late Charge is in addition to Interest.

5. Costs, Expenses, Fees. Unless prohibited by law, Carvana must pay all expenses and reimburse each of the Ally Parties for any cost, expense, or other expenditures, including reasonable attorney fees and legal expenses; amounts expended by the Ally Parties on behalf of Carvana; collection and bankruptcy costs, fees and expenses; and all other amounts incurred by each of the Ally Parties in the enforcement of any right or remedy, collection of any Obligation, or defense of any claim or action in respect of this Agreement.

6. Other Charges and Fees. The Ally Parties may assess, and Carvana will pay charges in connection with Inventory Financing in the areas of audit, collateral monitoring, non-compliance, and returned item ("Other Charges"). Provided no Default has occurred, the Ally Parties will provide advance notice of at least 30 calendar days of new charges or changes to existing charges.

7. Commitment Fee. Simultaneously with the signing of this Agreement, Carvana will pay to the Ally Parties a "Commitment Fee" in the amount of $[***].

8. Availability Fee. For each calendar quarter beginning with the fourth quarter of 2023 (i.e., Effective Date through December 31, 2023), Carvana will pay an "Availability Fee" equal to [***] basis points times the difference between the average outstanding floorplan balance for such quarter and the Credit Line. The Availability Fee will be calculated by the Ally Parties promptly after the end of each quarter and will be due and payable no later than the end of the month immediately following the end of such quarter.

C. Payments by Carvana.

1. Permissive Principal Payments. Except as otherwise expressly stated in this Agreement, Carvana may pay to the Ally Parties some or all of the Wholesale

6

[***] Redacted for confidentiality purposes.

Outstandings and any other payment obligations at any time before they are due and payable without premium or penalty.

2. Required Payments. Carvana must

(a)    fully, promptly, and faithfully pay to the Ally Parties the Wholesale Outstandings, Interest, Principal Reductions, Late Charges, Other Charges, costs, expenses, fees, and any other payment obligations due under this Agreement, as follows:

(i.)  the principal amount of the advance or loan by the Ally Parties for each Inventory Financed Vehicle as and when such Vehicle is sold,  leased, consigned, gifted, exchanged, transferred, or otherwise disposed of, registered, placed into service, or no longer in the possession of the Carvana, or if it is otherwise lost, stolen, confiscated, missing, or otherwise not received, or if it is damaged or destroyed: and

(ii.) the total amount specified in the Wholesale Billing Statement or other billing statements for Interest, Principal Reductions, Late Charges, Other Charges, costs, expenses, fees, and any other payment obligations, immediately upon receipt from the Ally Parties, it being understood and agreed by the parties that accrued Interest will be billed in the Wholesale Billing Statement monthly,

(b)  No later than the Maturity Date, Carvana will fully, promptly, and faithfully pay to the Ally Parties all unpaid Wholesale Outstandings, Interest, Principal Reductions, Late Charges, Other Charges, costs, expenses, fees, and any other payment obligations due and unpaid under this Agreement.

3.    Method of Payment. All payments must be made by Carvana to the Ally Parties  by one or more of the following methods: (i) in good funds by draft, check, or other negotiable instrument, (ii) in good funds by wire transfer, electronic fund transfer, automated clearing  house transfer, or other electronic means, or (iii) chattel paper  assigned to one of the Ally Parties that is acceptable to such Ally Party in its sole discretion. Upon request by either or both of the Ally Parties, Carvana must make all payments to such Ally Party(ies) in immediately available funds, certified check, bank check, and the like.
Carvana must remit all payments owed to Ally and Bank under this Agreement to Ally at the local business office set forth in Section I above, or any other place as each of the Ally Parties designates from time to time.

4.    "Full" Payment Defined.  The requirement for making payments "fully" as set forth in this Agreement means that the required payment amount must be either actually remitted to and received by the Ally Parties in whole, without setoff or recoupment, or credited by either of the Ally Parties or any affiliate of either of the Ally Parties in accordance with the SmartCash Agreement among the Ally Parties and Carvana. This does not include funds actually received by the Ally Parties from or on behalf of Carvana for specific application to a required payment by way of:

(a)    subvention, discount, subsidy, support, or supplementation from a Vehicle

7

Seller; or

(b)     credit, rebate, bonus, debit, disbursement, or other payment   from either of the Ally Parties or any other person for the purchase of chattel paper, distribution from finance reserve accounts, application of account balances, and the like.

Absent payment actually being remitted by Carvana to the Ally Parties or actually credited by either of the Ally Parties or any of their affiliates, payment is not "fully" made because either or both of the Ally Parties have:

(a)     a right of setoff, recoupment, and the like;

(b)     a Security Interest in or an assignment of Collateral, or the proceeds thereof; or

(c)     a direct or indirect claim against a Vehicle Seller, surety, guarantor, or any other person.

Carvana's obligation to pay each of the Ally Parties as set forth in this Agreement is independent of any other rights that Carvana or either of the Ally Parties may have to effect payment from other sources and persons, and neither of the Ally Parties has any duty to undertake the enforcement of any other rights.

5.     "Prompt" Payment Defined. Except for payments required in III.A.8(b), III.B.7 and 8, III.C.2(b), and III.C.5(a), the requirement for making payments "promptly" as set forth in this Agreement means that the required payment amount must be tendered to the Ally Parties within five (5) business days.

(a) Release Period. In their sole discretion, either or both of the Ally Parties may permit more time between the event and payment due date to take into account factors such as delays in the administration, processing, and delivery  of the payments ("Release Period"). The Release Period is available only when Carvana is not in Default under this Agreement and for payments required under Subsection III.C.2(a)(i) above. The existence, duration, terms, and continuation of the Release Period are subject to change from time to time by each of the Ally Parties. Changes in the Release Period by the Ally Parties do not constitute amendments of this Agreement.

Consistent with the foregoing, the following provisions will apply to the Release Period as of the effective date of this Agreement:

i.     With respect to vehicles sold by Carvana pursuant to a retail installment contract that becomes subject to the so-called "Flow Purchase" facility between the Ally Parties and Carvana and/or its affiliates, Carvana may make payment to the Ally Parties under Section IIIC.2(a)(i) on or before the earlier of one (1) business day after the Ally Parties fund Carvana (or its affiliate) under such Ally facility, or seven (7) business days after the date of sale;

8

ii.   In all other circumstances, Carvana will make payment to the Ally Parties under IFSA Section III, C.2(a)(i) on or before seven (7) business days after the date of sale; and

iii.   The Ally Parties reserve the right to adjust, increase or decrease these periods in the future, in their discretion with notice to Carvana of at least five (5) business days prior to the effect of such adjustment, increase or decrease.

6.   "Sold" Defined. "Sold" as set forth in this Agreement means the delivery or transfer of ownership, title, or interest in the property by Carvana to a third party (whether an affiliate or non-affiliate of Carvana).

7.   Source and Application of Payment. The source of all payments due under this Agreement is presumptively deemed to be Collateral. Absent Default, the Ally Parties will apply payments   pursuant to Carvana's instructions. Absent instruction from Carvana, or in the event of Default, the Ally Parties will apply payments against any obligation due and owing by Carvana under this Agreement or other Financing Accommodations. A payment is not final to the extent of any defeasance of it by application of law. Payment made by check, draft, or other instrument will be deemed made by Carvana not later than one (1) business day after the instrument is accepted by the payor bank. Except as otherwise provided in any SmartCash Agreement between Carvana and either or both of the Ally Parties, payments made by wire transfer, electronic fund transfer, automated clearing house transfer, and other electronic means will be deemed made by Carvana upon posting of such payment by the Ally Parties.

8.   Term, Maturity.   The term of this Agreement will commence on the Effective Date and expire on the Maturity Date. On the Maturity Date: (a) all obligations of the Ally Parties to provide Inventory Financing under this Agreement or otherwise, will cease, and (b) all unpaid Wholesale Outstandings, Interest, Principal Reductions, Late Charges, Other Charges, costs, expenses, fees, and any other payment obligations due and unpaid under this Agreement are due and payable. Notwithstanding the expiration of the term, Carvana will continue to comply with the terms and conditions of this Agreement until all Obligations arising under this Agreement are paid in full to the Ally Parties in good funds.

D.   The Ally Parties' Security Interests.

1.   Grant of Security Interest. Carvana hereby grants to each of Bank and Ally a continuing security interest in and a collateral assignment of (the "Security Interest") all of the following described property in which Carvana has or may have any rights, wherever located, whether now existing or hereafter arising or acquired (including property that is reacquired by Carvana for any reason, including but not limited to: voluntarily or involuntarily, through the unwinding of a transaction, by operation of law such as resulting from an avoidance action, or otherwise), and any and all accessions, additions, attachments, replacements, substitutions, returns, profits, and proceeds in whatever form or type, of any of the following property (the "Collateral"):

9

all Vehicles, including but not limited to those for which either of the Ally Parties provides Inventory Financing; accounts; general intangibles (including but not limited to all intellectual property and all licenses in relation thereto); chattel paper; all of Carvana's deposit accounts described on Exhibit A annexed to that certain Funds Flow Certificate, dated as of September 1, 2023 attached as Exhibit 1 to this Agreement (the "Funds Flow Certificate"), together with all replacements, substitutions, or additions to such deposit accounts (such deposit accounts collectively, the "Controlled Accounts"), along with all cash, cash equivalents, or other collections in such Controlled Accounts.

The Security Interest will not attach to (unless otherwise elected by Carvana) Excluded Assets, and Excluded Assets will not constitute Collateral.

The term "Excluded Assets" will mean: (i) any asset or property if, to the extent and for so long as the grant of a lien thereon is prohibited by any statute or regulation or (ii) any "intent-to-use" application for registration of a trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto and acceptance thereof by the United States Patent and Trademark Office, solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of or void any registration that issues from such intent-to-use application under applicable federal law; *provided*, *however*, that Excluded Assets will not include any accessions, additions, attachments, replacements, substitutions, returns, profits, and proceeds in whatever form or type, of any Excluded Assets referred to in clauses (i) and (ii) (unless such accessions, additions, attachments, replacements, substitutions, returns, profits, or proceeds would independently constitute Excluded Assets referred to in clauses (i) or (ii)).

2.    The Obligations Secured. The Collateral secures payment and performance of all debts, obligations, and duties of Carvana to Bank and Ally of every kind and description, now existing or hereafter arising under this Agreement, whether primary or secondary, absolute or contingent, due or to become due, direct or indirect, presently contemplated or not contemplated by Bank, Ally or Carvana, or otherwise designated  by the parties as secured or unsecured ("Obligations").

3.    Status of Collateral. The Collateral is held by Carvana in trust for each of the Ally Parties. The Collateral must be and shall remain free from all confiscations, assessments, forfeitures, loss, destruction, impairment, tax liens and other liens, security interests, pledges, claims, and encumbrances except for:

(a) the Security Interest arising under this Agreement or other agreements with the Ally Parties, or as otherwise contemplated by this Agreement or such other agreements with the Ally Parties;

10

(b) non-consensual statutory liens resulting from deposits made in the ordinary course of business in connection with workers compensation, unemployment insurance, social security, and other similar laws;

(c) security interests and liens incurred pursuant to or arising under (A) any Second Priority Debt Document (as defined in the First Lien/Second Lien Intercreditor Agreement, dated September 1, 2023, among Carvana, the Ally Parties, and U.S. Bank Trust Company, National Association (the "Intercreditor Agreement")), or (B) any Additional Senior Debt Document (as defined in the Intercreditor Agreement) (the Second Priority Debt Documents and the Additional Senior Debt Documents are collectively, the "Junior Debt Documents"); *provided* that notwithstanding anything to the contrary in this Agreement, any Second Priority Debt Document, or Additional Senior Debt Document (whether or not in effect as of September 1, 2023), both (x) the aggregate principal amount of obligations (inclusive of any premiums, fees and/or other similar amounts) under all Second Priority Debt Documents and Additional Senior Debt Documents (such amount, the "Junior Debt") will not exceed $6.125 billion (plus the accrual of interest, the accretion of accreted value, and the payment of interest in the form of additional indebtedness capitalized to the outstanding aggregate principal amount of such Junior Debt (*e.g.*, interest paid in-kind) (collectively, "PIK Interest")) and (y) any Junior Debt (I) will be expressly subject to the terms and conditions of the Intercreditor Agreement and (II) immediately before and immediately after giving effect such issuance or other extension of credit in connection with such indebtedness, no Default has occurred or is continuing;

(d) other security interests and/or liens to which each of the Ally Parties specifically consents in writing;

(e) liens with respect to outstanding motor vehicle fines and liens imposed by law, including carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction contractors' or other like liens, in each case for sums not yet overdue for a period of more than 60 days or that are bonded or being contested in good faith by appropriate proceedings;

(f) landlord's liens for sums not yet overdue;

(g) liens for taxes, assessments or governmental charges which are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings; *provided* that appropriate reserves required pursuant to GAAP (or other applicable accounting principles) have been made in respect thereof;

(h) licenses and sublicenses of intellectual property rights entered into in the ordinary course of business and not interfering in any material respect with the ordinary conduct of the business of Carvana;

11

(i) liens on the Controlled Accounts in favor of the depository institution holding such Controlled Accounts, which liens have been subordinated to the liens of the Ally Parties;

(j) non-consensual liens securing or otherwise arising out of judgments, decrees, attachments, orders, or awards, with each such lien not arising from a final judgment in excess of $1.0 million and which all such liens outstanding at any given time in the aggregate do not exceed $10.0 million, so long as (i) any appropriate legal proceedings which may have been fully initiated for the review of such judgment, decree, attachment, order, or award have not been finally terminated, (ii) the period within which such proceedings may be initiated has not expired, or (iii) no more than 60 days have passed after (A) such judgment, decree, attachment, order, or award has become final or (B) such period within which such proceedings may be initiated has expired; and

(k) Interests of consignors in vehicles that have been consigned to Carvana (the "Consigned Vehicles"), *provided* such consignors have: (i) filed UCC financing statements against Carvana specific to such Consigned Vehicles, (ii) sent written consignment notices to the Ally Parties, and (iii) otherwise complied with all requirements of the UCC for a consignor to protect its interest in consigned inventory.

The grant of the Security Interest and the execution of any document, instrument, promissory note, or the like, in connection with it or the Obligations do not constitute payment or performance of any of the Obligations, except to the extent of actual, indefeasible payment of the Obligations from the realization by Carvana or the Ally Parties of the Collateral or otherwise. Except as otherwise agreed to by the parties, the Security Interest continues to the full extent provided in this Agreement until all Obligations are fully and indefeasibly paid and performed, even if the Credit Line is from time to time modified, suspended, or terminated and reestablished.

4.    Perfection of Security Interest. Although Carvana acknowledges that all previously filed financing statements will remain in place during the term of this Agreement and will serve to perfect the Ally Parties' security interests, the Ally Parties may each file financing statements, note their liens on titles, and take any other steps in order to establish, confirm, and maintain a perfected Security Interest in the Collateral. Carvana will execute and deliver any documents necessary and appropriate for these purposes and otherwise irrevocably appoints each of the Ally Parties to do so. Each of the Ally Parties may require Carvana to pay any fee, cost, tax, or assessment required by any government entity to perfect and/or maintain each of the Ally Parties' Security Interest in the Collateral. All financing statements previously filed by either or both of the Ally Parties are hereby ratified and authorized by Carvana as of the date of filing.

12

5.   Protection of Security Interest. Unless expressly prohibited by law, in the event of Default and unless and until the Default is cured to the satisfaction of the Ally Parties or in the event of material jeopardy to 10% or more of the Collateral pledged hereunder (based on clean wholesale value), upon either of the Ally Parties' request, Carvana must immediately:

(a)  turn over to Ally or some other party designated by the Ally Parties custody or control of all manufacturer's certificates of origin, certificates of title, documents of title, bills of sale, invoices, and other records or instruments of ownership by Carvana pertaining to the Vehicles.

(b)  protect and defend the Collateral against the claims and demands of all other persons, including, but not limited to obtaining waivers from landlords, depository institutions and other parties which have access to or control over the Ally Parties'  Collateral or proceeds of the Ally Parties' Collateral; and

(c)  permit representative(s) of each of the Ally Parties to monitor Collateral by taking one or more of the following actions:

(i.)     to enter any locations where Carvana conducts business or maintains Collateral, and to remain on the premises for such time as such Ally Party(ies) may deem desirable;

(ii.)    to take possession and control over certificates of origin, title, and keys with respect to each Vehicle comprising Carvana's inventory or equipment;

(iii.)   to take constructive or actual possession and control over all documents, books; records, papers, accounts, chattel paper, electronic chattel paper, instruments, promissory notes, general intangibles, payment intangibles, supporting obligations, contract rights, software, or any similar types of tangible or intangible property relating to or comprising the Collateral;

(iv.)   to receive payment of all Collateral proceeds; and

(v.)    to take whatever additional actions as either or both of the Ally Parties may deem necessary or desirable to protect and preserve the Collateral, and to carry out, and to protect and preserve each of the Ally Parties' security rights and remedies.

6.   Offset. In addition to the Security Interest, each of the Ally Parties retains any and all rights of offset, recoupment, netting-out, and any other legal or equitable rights, in each case  provided  to  it  under  applicable  law,  to  credit  those  assets  of  Carvana  in  the possession or control of Ally Bank or Ally Financial, as applicable, against any Obligations of Carvana to Ally Bank or Ally Financial under this Agreement or any other auto finance related agreement (e.g., inventory financing; SmartAuction; purchase of retail installment sale contracts and leases), whether then matured, liquidated, or due. For clarity, the term "Obligations of Carvana" in the preceding sentence does not include the obligations of any affiliate of Carvana.

13

7. Authorization Regarding Proceeds of Collateral. Carvana hereby authorizes and empowers each of Bank and Ally to demand, collect and receive from auctions and others, and give such parties binding receipts for, all proceeds of Collateral and, in Carvana's name or otherwise, to prosecute suits therefor. With or without a default, each of the Ally Parties may, at any time notify auctions and others to make payment directly to the Ally Parties of proceeds of Collateral. Carvana unconditionally and irrevocably authorizes and instructs auctions and others to make payment of proceeds of Collateral directly to the Ally Parties as instructed and authorizes auctions and others to rely on a copy of this Agreement as evidence of the authorization and instruction. The Ally Parties will account to Carvana for all sums received pursuant to this Section III.D.7 and applied in the manner described in Subsection III.C.7 above. This authorization is irrevocable without the prior written consent of each of the Ally Parties and is provided as additional security for and not as payment of obligations now or hereafter arising to the Ally Parties. Carvana hereby appoints each Bank and Ally as its agent and attorney-in-fact for the sole purpose of executing or endorsing, on Carvana's behalf, any document, check or other instrument necessary to cause payment of proceeds of Collateral, or to perfect Bank's and/or Ally's security interest in the proceeds of Collateral.

8. On September 1, 2023, Carvana, Ally, and Wells Fargo Bank, National Association executed a deposit account control agreement relating to the Controlled Accounts (a "Deposit Account Control Agreement"). If any Controlled Account is established after the Effective Date, Carvana will provide a deposit account control agreement executed by Carvana and its depository institution to the Ally Parties (upon full execution, such deposit account control agreement shall be considered a Deposit Account Control Agreement) promptly following establishment of such Controlled Account and, in any event, prior to the deposit of any Ally Proceeds into such Controlled Account.

E.    Carvana's Handling of Vehicles.

1. Ownership and Taxes. Carvana will have and maintain absolute title to and ownership of each Vehicle, subject to each Ally Party's respective Security Interest in the Vehicle. Carvana will pay all taxes and assessments at any time levied on any Vehicle as and when they become due and payable.

2. Location. Carvana will keep Vehicles at Carvana's locations (including without limitation retail business locations, temporary holding locations, and inspection and repair center locations) and will not remove them from those locations (other than transportation and relocation among such locations or to customers after sale), except:

(a) for temporary relocation for repair, restoration, reconditioning, governmental inspection, and the like.

(b) upon advance or concurrent notice to the Ally Parties, for bailment to another person for upfitting, completion, upgrading, modification, and the like; or

(c) upon advance or concurrent notice to the Ally Parties, for storage and display at a temporary location.

14

3.    Condition. Carvana will keep Vehicles in good operating condition and repair, in good and marketable condition and will not alter or substantially modify any of them, except as otherwise contemplated in Subsection III.E.2(b) above.

4.    Usage. Carvana will not use Vehicles illegally or improperly and will hold and consider them as inventory held in the ordinary course of business (including without limitation for repair, restoration, reconditioning, storage, exhibition, sale or lease to retail customers).

5.    Inspection. Without any advance notice to Carvana, each of the Ally Parties may at all times have access to, examine, audit, appraise, verify, protect, or otherwise inspect the Vehicles (to the extent not in transit to a customer after sale) wherever located as frequently as each of the Ally Parties elects. The inspection may include examination and copying of all documents, titles, certificates of origin, invoices, instruments, chattel paper, computer records, bank statements, and all other books and records of the Carvana of or pertaining to the Vehicles or to determine compliance with this Agreement. Bank and Ally each have Carvana's continuing consent to enter the Carvana's premises to carry out inspections. In connection with the inspection, the Ally Parties may be assisted by, cooperate with, or discuss the financial and business affairs of Carvana with any of the officers, owners, employees, sureties, creditors, or agents of Carvana. Notwithstanding anything in this Agreement to the contrary and, the Ally Parties will not conduct such inspection and/or audit more than one (1) time in any calendar month unless a Default occurred and has not been cured to the Ally Parties' satisfaction.

6.    Report of Damage, Loss. Concurrent with discovery that a Vehicle has been destroyed, lost, stolen, or missing, Carvana will notify each of the Ally Parties of the discovery by reporting the Vehicle in the reports delivered pursuant to Section III.G.1. In addition, Carvana will notify each of the Ally Parties if more than 10% (based on clean wholesale value) of the Vehicles at, or attributable to, any Carvana retail location are damaged. Carvana must use reasonable means to diligently repair and restore such Vehicle to its original condition, replace, or locate any of these Vehicles, and keep the Ally Parties apprised of these efforts.

7.    Risks. Neither of the Ally Parties has any risk or responsibility concerning the ownership, location, condition, usage, inspection, or disposition of any Vehicle or other Collateral whether or not permitted by this Agreement, including fire, theft, vandalism, mischief, collision, acts of terrorism, acts of God, property damage, personal injury, public liability, and the like ("Risks"). Carvana bears and assumes the Risks, unless imposed by law on another person and except to the extent of any insurance proceeds actually received by the Ally Parties. Carvana will indemnify and hold harmless Bank and Ally against all Risks, including injury and damage to persons, property, or Collateral caused by any of these Risks.

8.    Insurance. Except to the extent that both of the Ally Parties obtain insurance for themselves on one or more of the Risks, Carvana must acquire and maintain one or more policies of insurance on losses which may arise as a consequence of the Risks on any of the Vehicles or, as requested by either or both of the Ally Parties, on other Collateral, in

15

such amounts and with such terms as Carvana and the Ally Parties deem reasonably adequate for the conduct of Carvana's business and the value of the Vehicles. Each of the Ally Parties must be named as a loss payee, as each of their interests may appear. Carvana must provide each of the Ally Parties with one or more certificates of insurance evidencing compliance with this Subsection III.E.8.

F.     <u>Representations and Warranties of Carvana</u>. Carvana represents and warrants to each of the Ally Parties the accuracy and completeness of each of the following statements as of the Effective Date. Carvana will immediately notify each of the Ally Parties of any known or expected material change to any of these statements. Otherwise, they are deemed as continuing and reaffirmed each time either of the Ally Parties provides Inventory Financing to Carvana.

1.     <u>Carvana Existence</u>. Carvana is duly formed, constituted, and is in good standing in the jurisdiction in which it is located, as "location" is determined under Article 9 of the Uniform Commercial Code, as amended from time to time. Carvana has all government and other permits, licenses, authorizations, and approvals necessary to do business lawfully in the jurisdiction in which any of its business operations are located.

2.     <u>Carvana Authorization</u>. Carvana is authorized and empowered to execute and deliver this Agreement and to do all things necessary and appropriate to fulfill and implement the terms and conditions of this Agreement.

3.     <u>Legal Compliance</u>. Carvana is in material compliance with all federal, state, and local laws, regulations, and ordinances.

4.     <u>Financial Condition</u>. Information on the financial condition of Carvana which has or may be submitted to either or both of the Ally Parties, either directly or indirectly (e.g., through a Vehicle Seller), by Carvana or an agent of Carvana (e.g., accountant), fairly presents the financial condition of Carvana in accordance with generally accepted accounting principles applied on a consistent basis.

5.     <u>Relationship of Ally Parties and Carvana</u>. The relationship between each of the Ally Parties and Carvana is one of creditor and debtor, respectively, based upon this Agreement and/or Other Financing accommodations. There is no fiduciary, trust, representative, confidential, partnership, or other special relationship between either of the Ally Parties and Carvana. The Ally Parties do not have and will not have any investment in Carvana, whether equity or otherwise. Carvana is not a counselor, advisor, agent or legal or another representative of Bank or Ally. Neither Bank nor Ally is a counselor, advisor, agent, or legal or other representative of the Carvana, except for the limited power of attorney expressly described in Subsections III.D.4. and 7. above and Subsections III.J.12. and III.K.18. below, and each of them recognize the ability, importance, and freedom to consult with any accountants, attorneys, agents, advisors, and business consultants of their choice in connection with the review, execution, and administration of this Agreement. Neither of the Ally Parties controls, supervises, or manages Carvana.

6.     <u>Relationship with Vehicle Sellers</u>. The Ally Parties do not represent the interests of any Vehicle Seller. The relationships of each of the Ally Parties and Carvana to any Vehicle

16

Seller are separate and distinct from one another. Neither of the Ally Parties is under the control of any Vehicle Seller, despite any business, consultative, investment, ownership, legal, or other relationship either of the Ally Parties may have with one or more Vehicle Seller. Nothing in this Agreement obligates Carvana to obtain Inventory Financing from the Ally Parties based on any relationship that either of the Ally Parties may have with one or more Vehicle Sellers.

7.    Controlled Account(s). All proceeds of the Collateral consisting of cash, cash equivalents, or other collections (the "Ally Proceeds") are transferred directly into the Controlled Accounts and are transferred out of the Controlled Accounts directly to the Operating Account, as outlined on the Funds Flow Certificate. No funds consisting of the proceeds of the collateral of any party (other than the Ally Parties and parties who have a junior security interest in the Collateral with the prior written consent of the Ally Parties, in which case no proceeds of any such parties' collateral other than the Collateral) have been deposited into or held at the Controlled Accounts.

G.    Additional Promises of Carvana. Carvana will:

1.    Provide (directly or by posting to a secure site accessible by the Ally Parties) each of the Ally Parties with accurate and complete information, data, books, records, documentation, and the like, concerning:

(a)    All financial and business matters of Carvana, upon request by either or both of the Ally Parties.

(b)    Any of the following proposed or actual changes, immediately:

(i.)    the Carvana's name, address, tax status, entity, structure.

(ii.)    the Carvana's solvency; and

(iii.)    any change in ownership of the Carvana.

(c)    All financial and other reports made, and information provided to any Vehicle Sellers and will allow each of the Ally Parties direct access to all such reports and information, and upon request by either or both of the Ally Parties, provide copies of such reports and information.

(d)    Daily reports about the Vehicles (the "Vehicle Report"), including (i) location of all Vehicles, Vehicle titles, and Vehicle keys and (ii) the sum of the collateral values of Carvana's total motor vehicle inventory (i.e. sum of acquisition costs, buyers fees, and parts and labor costs) ("Total Inventory Value").

(e)    A written report in form reasonably satisfactory to the Ally Parties identifying the Minimum Balance Mark Vehicles as of the last day of each month, and any other date as may be reasonably requested by the Ally Parties; the written report will include at least the VIN of each Minimum Balance Mark Vehicle and the date that such Vehicle was sold. Such report

17

must be delivered to the Ally Parties no later than the fifth day of the following month (e.g., January report must be delivered by February 5th).

2.    To the extent not publicly available, provide audited financial statements within 120 days after the end of each of its fiscal years, and unaudited financial statements within 60 days after the end of the first three fiscal quarters of each fiscal year.

3.    At all times, remain in good standing under, and have not received or sent notice of termination of, any contracts, franchise agreements, dealer sales and service agreements, and the like, provided by Vehicles Sellers which manufacture or distribute new Vehicles to Carvana.

4.    So long as Carvana owes any debt to Bank or until Bank otherwise agrees in writing, maintain at all times a Credit Balance (as defined in Carvana's Fourth Amended and Restated Credit Balance Agreement, dated September 1, 2023, as such agreement may be further amended, modified, or replaced (the "Credit Balance Agreement")) of at least:

(a)    12.5% of the total principal amount owed to Bank for used vehicle inventory financed by Bank under this Agreement if such principal amount divided by the Total Inventory Value is less than or equal to 49.99%;

(b)    17.5% of the total principal amount owed to Bank for used vehicle inventory financed by Bank under this Agreement if such principal amount divided by the Total Inventory Value is equal to or greater than 50% and less than or equal to 59.99%;

(c)    22.5% of the total principal amount owed to Bank for used vehicle inventory financed by Bank under this Agreement if such principal amount divided by the Total Inventory Value is equal to or greater than 60% and less than or equal to 69.99%;

(d)    25% of the total principal amount owed to Bank for used vehicle inventory financed by Bank under this Agreement if such principal amount divided by the Total Inventory Value is equal to or greater than 70%;

Carvana will increase the Credit Balance, as required by this subsection, no later than 5:00 pm Eastern Time based on the Total Inventory Value listed in the previous day's Vehicle Report.

5.    Maintain at all times unrestricted cash, cash equivalents and availability in operating lines of credit, excluding amounts restricted pursuant to the terms of the Credit Balance Agreement between Carvana and Bank, in an amount not less than 20.0% of the credit limit of the Credit Line.

6.    Maintain, at all times, at least 5% equity in its inventory, calculated as the amount expressed as a percentage equal to

(a)    1 minus

18

(b)    the amount of

(i.)    total Wholesale Outstandings divided by

(ii.)    with respect to Eligible Vehicles, 100% of the sum of:

■    the purchase price of such Vehicle net of unpaid lien payoffs,

■    fees charged by an auction in connection with the purchase  of such Vehicle,

■    post-sale inspection fees in connection with the purchase of such Vehicle, and

■ the reconditioning parts, repair parts, and related labor cost with respect to such Vehicle.

"Eligible Vehicles" means Vehicles that Carvana acquired   by any means, excluding   each Exception Vehicle.

"Exception Vehicle" means a Vehicle for which any part of the purchase price remains unpaid; a Vehicle that is or has been subject to a consumer lease from Carvana or an affiliate of Carvana; and/or a Vehicle provided to a Carvana employee or other representative for long-term use (i.e., a company vehicle).

(the foregoing calculation will not include any costs related to transportation with respect to a Vehicle).

7. Promptly notify the Ally Parties of any material reduction in availability of loans, financing, credit lines, or other credit accommodations provided or made available by any bank, finance company, or other source.

8. Deposit or cause to be deposited all Ally Proceeds according to the Funds Flow Certificate and, will only directly transfer Ally Proceeds from the Controlled Accounts into the "Operating Account" on Exhibit B annexed to the Funds Flow Certificate (the "Operating Account"), and will not directly deposit Ally Proceeds into any account other than the Controlled Accounts. Carvana will not deposit or cause to be deposited funds consisting of the collateral of any party other than the Ally Parties (other than parties who have a junior security interest in the Collateral with the prior written consent of the Ally Parties, in which case no proceeds of any such parties' collateral other than the Collateral) into the Controlled Accounts. For the avoidance of doubt, Ally Proceeds may be transferred at any time out of the Operating Account to the extent such transfer does not otherwise violate this Agreement or the Intercreditor Agreement.

9. Cause all Ally Proceeds received by Carvana to be transferred directly to a Controlled Account, regardless of the source from which such Ally Proceeds were received by Carvana, as follows (i) with respect to Ally Proceeds constituting cash or other forms of payment that are immediately transferrable, on a daily basis and (ii) with respect to Ally Proceeds constituting checks, ACH transfers or other forms of payment that are not

19

immediately transferrable, as promptly as such checks, ACH transfers or other forms of payment can be processed in the ordinary course of business.

10. Not change the accounts into which the Ally Proceeds will be directly deposited or create any new accounts into which Ally Proceeds may be directly deposited without the prior written consent of the Ally Parties and providing the Ally Parties with a Deposit Account Control Agreement (if such accounts are additions to, substitutions of, or replacements of, the Controlled Accounts) with respect to such new accounts in form and substance satisfactory to the Ally Parties.

11. At all times maintain a minimum cash balance in the Operating Account, of immediately available funds, equal to no less than all amounts received from the sale of Vehicles or proceeds of Vehicles whereby principal is owed by Carvana to the Ally Parties under Subsection III.C.2(a)(i) (such Vehicles are the "Minimum Balance Mark Vehicles").

12. Not grant a security interest over, pledge, or permit any confiscations, assessments, liens, or encumbrances on, the Operating Account or any Controlled Account, except for liens on the Operating Account or any Controlled Account, as applicable, (a) that constitute non-consensual liens permitted under Subsection III.D.3 or (b) in favor of the depository institution holding such Operating Account or such Controlled Account, as applicable, specifically for (i) fees or charges for the maintenance and administration of the Operating Account or the Controlled Account, as applicable, (ii) settlement amounts, or (iii) returned items. For the avoidance of doubt, this covenant is in addition to, and does not replace, the prohibition on encumbering the Controlled Accounts in Subsection III.D.3. The Ally Parties are permitted to note this covenant in financing statements and other public filings and to provide notices to third parties of all restrictions outlined in this Agreement that prohibit encumbering the Ally Parties' Collateral and the accounts described in this Subsection III.F.13.

13. Provide, or cause the depository bank(s) maintaining any Controlled Accounts or the Operating Account to provide, (i) bank statements no later than the 5th day of each month to the Ally Parties and (ii) upon request, evidence in form and substance satisfactory to the Ally Parties to confirm compliance with the terms of this Agreement.

14. Not make any payment or prepayment (whether in respect of a mandatory prepayment or voluntary prepayment) of any amount owed pursuant to the Junior Debt Documents unless, immediately before and after giving effect to any such payment or prepayment, no Default has occurred or is continuing or would be expected to result therefrom.

15. Not amend, restate, amend and restate, extend, supplement, or otherwise modify any Additional Senior Debt Document or Second Priority Debt Document to the extent that such amendment, restatement, amendment and restatement, extension, supplement or modification would be in violation of the terms or conditions of the Intercreditor Agreement or any Initial First Lien Inventory Financing Document (as defined in the

20

Intercreditor Agreement as in effect on the date such Intercreditor Agreement is executed), without the prior written consent of the Ally Parties.

16. Provide and make reasonable efforts to cause all consignors who have consigned vehicles to Carvana to provide, the following information to the Ally Parties to ensure that the Ally Parties have not and will not floorplan such Consigned Vehicles or include such Consigned Vehicles in calculating Carvana's equity in its inventory: vehicle identification number, vehicle ownership status, proof of ownership, and physical location.

17. Within thirty (30) calendar days of the filing or acquisition of any intellectual property or any license (other than an off-the-shelf or non-exclusive license) in relation thereto constituting Collateral by Carvana (or such longer period as agreed to in writing by the Ally Parties in their sole discretion), Carvana will notify Ally in writing, deliver a new executed intellectual property security agreement, and cooperate with the Ally Parties' perfection of the Security Interest in such Collateral as required in Subsection III.D.4.

18. Not transfer or otherwise dispose of, in any dispositions other than retail sales to consumers in the ordinary course of business, 10% or more of its Vehicles (whether nor not such Vehicles are Inventory Financed Vehicles), to one or more parties (whether nor not such parties are affiliated), whether in one or a series of transactions occurring in a seven (7) calendar day period, without first obtaining the Ally Parties' prior written consent to such sale or transfer.

19. Within fifteen (15) calendar days of the end of each calendar quarter, deliver an Officer's Certificate in the form attached as Exhibit 2 to this Agreement certifying compliance with the representations, warranties, promises, and covenants contained in this Agreement.

H. <u>Default by Carvana</u>. An occurrence of any one or more of the following events constitutes a default under this Agreement ("Default"):

1. Failure of Carvana to pay when due the full amount owing to either of the Ally Parties under Sections III.B or C above.

2. Material jeopardy to 10% or more of the Collateral (based on clean wholesale value) and such jeopardy has not abated for a period of two (2) calendar days after notice thereof by either of the Ally Parties.

3. The breach of, or the failure of Carvana to fully comply with or duly perform, any term, condition, or promise of this Agreement or any other Obligation (other than failure of the Carvana to pay any amount due and owing under Sections III.B and C) and such failure continues unremedied for a period of five (5) business days after notice thereof by either of the Ally Parties.

4. Any representation, statement, or warranty made by Carvana to either of the Ally Parties in this Agreement or otherwise, which was false or materially misleading when made.

21

5. The inability of Carvana to pay debts as they mature, or any proceeding in bankruptcy, insolvency, or receivership, instituted by or against Carvana or Carvana's property.

6. This Agreement is unenforceable or the security interest in the collateral created by this Agreement ceases to be in full force and effect.

7. An event or circumstance occurs that has a material adverse effect on the business, condition (financial or otherwise), operations, performance or properties of Carvana, or the ability of Carvana to perform its respective obligations under this Agreement or any of the following material financial agreements or obligations: (a) any mortgage, indenture or credit agreement having an aggregate principal amount equal to or exceeding $50.0 million; (b) any contract or other agreement providing for payments in excess of $25.0 million per annum; and (c) any lease for a facility where more than 5% of the Carvana's Vehicles are stored.

8. An "Event of Default" (or similar term) under any Junior Debt Document (after giving effect to all notice requirements and grace and cure periods thereunder); *provided* that unless the Ally Parties have already demanded the immediate payment in full of the Obligations pursuant to Subsection III.J.2, this Subsection III.H.8 shall not apply to any such "Event of Default" that is (a) cured by the relevant Note Parties or (b) with respect to which the requisite holders of indebtedness under the applicable Junior Debt Document have agreed to waive in full (including in the form of any permitted amendment) such "Event of Default" such that it is no longer continuing under the applicable Junior Debt Document and the Ally Parties have received written evidence of such waiver and the cessation of the "Event of Default" under this clause (b). For the avoidance of doubt, this Subsection III.H.8 and Subsection III.H.7 are not intended to replace or limit each other, and nothing in this Section III.H.8 shall affect any other Default under this Section III.H or the Ally Parties' rights and remedies with respect thereto.

9. A default or breach of the guaranty agreement guaranteeing any of Carvana's obligations hereunder dated as of November 1, 2023 (as such agreement is amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Guaranty"), by and among the Ally Parties and Carvana Group, LLC.

I.   Waiver and Modification of Certain Important Rights. Unless and only to the extent not expressly prohibited by law, Carvana, Bank and Ally expressly and affirmatively waive and modify certain very important rights, as follows:

1. Claims. Any and all claims, causes of action, suits, rights, remedies, disputes, complaints, defenses, and counterclaims between either or both of the Ally Parties on the one hand and Carvana on the other hand, or any of their officers, agents, employees, subsidiaries, affiliates, members, owners, or shareholders directly or indirectly arising out of or relating to the terms or subject matter of this Agreement, whether in contract, tort, equity, statute, or regulation, or pertaining to conversion, fraud, defamation, negligence, franchise, licensing, or distribution or the defect, non-conformity, price, or allocation of Vehicles by any Vehicle Seller, or otherwise, but not including actions for and enforcement of provisional remedies otherwise provided by law, equity, or

22

agreement between the parties, suits for debt, enforcement of security interests, or claims pursuant to Section III.J. below, ("Claim") are subject to each of the following:

(a) Claim Resolution. The resolution of any Claim ("Claim Resolution") will occur, if at all, only in accordance with the following provisions and sequence:

(i.) Informal discussion and negotiation between executive level managers of the Carvaim and the Ally Party(ies) asserting a Claim or against which a Claim is asserted;

(ii.) Mediation in accordance with the rules of commercial mediation as published from time to time by the American Arbitration Association, JAMS, or any other nationally recognized alternative dispute resolution organization, selected by the party against whom the Claim is being asserted; and

(iii.)Binding arbitration in accordance with the rules of commercial arbitration as published from time to time by the American Arbitration Association, JAMS, or other nationally recognized alternative dispute resolution organization, selected by the party against whom the Claim is being asserted ("Arbitration"), except that the Arbitration must be decided based upon the terms and conditions of this Agreement.

(b)    Jurisdiction and Venue.

(i.) All mediation and arbitration hearings and proceedings brought pursuant to Subsections III.I.1(a)(ii) and (iii) above shall occur at a location within fifty (50) miles of Ally's local business office set forth in Section I.B above, or the current replacement for it.

(ii.) The enforcement of any Claim or Claim Resolution provision and the enforcement of any Arbitration award must be brought, if at all, solely and exclusively in the state or federal court of original jurisdiction for the location of the Ally local business office set forth in Section I.B above, or the current replacement for it.

**(c) JURY WAIVER. BANK, ALLY, AND CARVANA WAIVE AND RENOUNCE THE RIGHT UNDER FEDERAL AND STATE LAW TO A TRIAL BY JURY FOR ANY CLAIM.**

2. Choice of Law. This Agreement must be construed, interpreted, and enforced in accordance with the laws of the state of Arizona without regard to its conflict of laws rules.

3. Limitation of type and nature of damage Claims for violation. With respect to any Claim:

(a)    Carvana's damages under this Agreement are expressly limited to the following:

(i.)  the actual dollar amount of Carvana's economic or financial loss; and

23

(ii.) reasonable dollar amount of lost future profits for not more than two (2) years from the accrual date of the Claim.

(b) Neither party may assert a claim for any of the following:

(i.) punitive or exemplary damages, unless the Claim would constitute a felony under the law of the state indicated in Subsection III.1.2, above; or

(ii.) consequential and incidental damages.

(c) Any liability of either Ally Party to Carvana related to any Claim is limited to and will not exceed the amount of total Interest assessed by the Ally Party(ies) against whom the Claim is brought and actually paid by Carvana under this Agreement in the twenty-four (24) calendar months immediately preceding accrual of the Claim.

4. Notification of information to Others. Bank and Ally each have the right, but not the obligation, to notify guarantors, sureties, Vehicle Sellers, Account Debtors, participants, permitted assignees, and other third parties (e.g., owners, officers, etc.) of the terms, administration, or performance of this Agreement.

5. Information From and To Third Persons.

(a) Carvana irrevocably and continuously consents to the disclosure of all types and kinds of information in any format concerning the Carvana by third persons to each of the Ally Parties and the obtaining of information by each of the Ally Parties from third persons, including, by way of example, credit, financial, and business information, whether of direct actual experience or obtained from other sources.

(b) Notwithstanding the provisions of Section III.1.6, Carvana agrees that (i) any Ally Party may disclose any data, documentation, materials or other information received by it from Carvana, its affiliates or otherwise in connection with this Agreement or the transactions contemplated thereunder to any of its permitted assignees or participants or their respective affiliates and (ii) any such permitted participant or assignee may share any fee letters or other agreements they enter into with Carvana or any of its affiliates in connection with this Agreement or the transactions contemplated thereunder (including any assignment or participation thereof) with any of the Ally Parties or their respective affiliates.

6. Confidentiality.

(a) Unless prior written approval is obtained from Carvana, the Ally Parties will not disclose Carvana's Confidential Financial Information to any third person or entity, other than state or federal regulators that have authority over the Ally Parties, or third persons or entities who provide services to the Ally Parties and who are under an obligation of confidentiality to the

24

Ally Parties. In this Section III.1.6, "Confidential Financial Information" means any financial information about Carvana or its subsidiaries, including, but not limited to, number of units sold, received by either or both Ally Parties from Carvana that: (i) is marked "Confidential"; and (ii) was not publicly available or previously known to the Ally Parties. The Ally Parties shall use Carvana's Confidential Financial Information only for legitimate business purposes in connection with existing or proposed transactions between Carvana and either or both Ally Parties.

(b) The Ally Parties acknowledge the Confidential Financial Information protected by the terms of this Section III.I.6 is of a special character, such that money damages would not be sufficient to compensate Carvana for any unauthorized use or disclosure. The Ally Parties agree that injunctive and other equitable relief may be pursued to prevent any actual or threatened unauthorized use or disclosure of Confidential Financial Information. The remedy stated above may be pursued in addition to any other remedies available at law or in equity.

(c) The Ally Parties acknowledge that United States securities laws prohibit any person who has material, non-public information from purchasing or selling Carvana's publicly traded securities or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

J. Default. Notwithstanding and without regard to the provisions of Section III.I. above, in the event of Default by Carvana, then either or both of the Ally Parties may exercise any one or more of the following provisional rights and remedies in addition to those otherwise provided in Section III.D.5 of this Agreement and by law. These provisional rights and remedies are cumulative and not alternative, are non-exclusive, and may be enforced successively or concurrently. The single or partial exercise of any right or remedy does not waive or exhaust any other rights or remedies or waive any present or future Default of any kind. Unless and until a Default is completely remedied to the Ally Parties' satisfaction:

1. Suspension. The Ally Parties may suspend the Credit Line immediately. Notwithstanding any notice periods provided in this Agreement, such suspension may occur without notice to the Carvana.

2. Demand. Either or both of the Ally Parties may demand at any time immediate payment in full of all Obligations owed by Carvana to such Ally Party(ies).

3. Repossession of Collateral. Either or both of the Ally Parties may take immediate possession of the Collateral, without demand, further notice to or consent of Carvana, and with or without legal process. Upon request by either or both of the Ally Parties, Carvana must assemble the Collateral and make it available to such Ally Party(ies) at a reasonably convenient place designated by such Ally Party(ies), including the Carvana premises. Carvana irrevocably authorizes and empowers each of the Ally Parties and their agents to enter upon the premises where the Collateral is located and remove it or render portions of it unusable ("Collateral Recovery"). Carvana irrevocably waives any bonds, surety, or

25

security which may be required by any rule, law, or procedure in connection with Collateral Recovery.

4.    Suit at Law or in Equity. Either or both of the Ally Parties may institute proceedings in a proper court of law or equity to enforce any and all provisional remedies such Ally Party(ies) have at law or equity, including injunctive relief and action for possession of Collateral, an order for accounting, appointment of a receiver or examiner, or the like. Either or both of the Ally Parties may apply for and have granted any equitable or other legal relief appropriate to enforce any right or remedy including specific performance and the issuance of any ex parte preliminary injunction to protect the Collateral.

5.    Consolidation of Collateral. Upon request by either or both of the Ally Parties, Carvana must consolidate and assemble the Collateral to minimize the number of collateral locations in order to facilitate the Ally Parties' rights to inspect, monitor, and liquidate Collateral.

6.    Refrain from Movement or Disposition. Upon request by either or both of the Ally Parties, Carvana will:

    (a)  cease the movement of all Vehicles or other Collateral, including but not limited to the movement of all funds from the Controlled Accounts; and

    (b)  refrain from selling, leasing, or otherwise disposing of any Vehicles or other Collateral without the prior written consent of each of the Ally Parties.

7.    Turnover of All Proceeds. All amounts received by Carvana upon the sale, lease, or other disposition of any Vehicle must be paid to the Ally Parties even if it exceeds the specific amount for which the Ally Parties provided Inventory Financing for that Vehicle. Payments may be applied by the Ally Parties to the Obligations, as determined by the Ally Parties, unless otherwise required by law.

8.    Direct Collection of Collateral. Either or both of the Ally Parties may make direct collection of any Collateral in the possession or control of any third party including but not limited to, chattel paper, accounts, accounts with Vehicle Sellers, instruments, and proceeds, which proceeds will include, but not be limited to funds held in the Controlled Accounts. Pursuant to the terms of an applicable Deposit Account Control Agreement, the Ally Parties may direct the financial institution(s) holding the Controlled Accounts to pay over all funds in the Controlled Accounts to the Ally Parties, and Carvana will not interfere or attempt to contravene such direction; provided, it being understood that the Ally Parties will rescind any notice of exclusive control (or the equivalent thereof) over such Deposit Accounts subject to the Deposit Account Control Agreement fourteen (14) business days after the date which all Defaults have been cured provided no other rights have been asserted in such Deposit Accounts."

9.    Disposition of Collateral. Following total or partial Collateral Recovery, either or both of the Ally Parties may sell, lease, or otherwise dispose of all or any portion of the Collateral not less than ten (10) calendar days after giving Carvana written notice of the public or private sale or as permitted by law which it proposes for the account of Carvana. The sale of Vehicles at an auction at which only other dealers or Vehicle Sellers are generally invited to attend is deemed to be a "private sale."

10. "Commercially Reasonable" Defined. Any of the following, nonexclusive, methods of Collateral disposition are deemed "commercially reasonable" in accordance with Article 9 of the Uniform Commercial Code:

(a)  repurchase of any Vehicle, parts, or accessories manufactured by the original Vehicle Seller pursuant to the terms of a repurchase agreement between such Ally Party and Vehicle Seller.

(b)  sale of any parts or accessories to the highest bidder in an auction sale, in lieu of a sale to a Vehicle Seller pursuant to a repurchase agreement, where the proceeds to either or both of the Ally Parties are reasonably believed to be higher than they would be under the repurchase agreement.

(c)  sale to the highest cash bid from dealers in the type of property repossessed, whether in bulk or parcels; and

(d)  sale at any physical or virtual auction, including SmartAuction, at which only dealers of multiple or single Vehicle manufacturer are generally invited to attend.

11. Deficiency. Carvana must fully and promptly pay to each of the Ally Parties any deficiency remaining after disposition of the Collateral, except to the extent expressly modified by each of the Ally Parties in writing.

12. Limited Power of Attorney. Carvana hereby irrevocably appoints each Bank and Ally, acting through any of their respective officers and employees, its true and lawful attorney for and in its name, stead, and behalf as if fully done by Carvana, to sign, endorse, execute, negotiate, compromise, settle, complete, and deliver:

(a)  any invoice, bill of sale, certificate of title, manufacturer's certificate of origin, application, and any other instrument or    document pertaining to title or ownership or the transference thereof of any Collateral.

(b)  any financing statement, notice, filing, or document pertaining to the enforcement   of the Security Interest in Collateral; and

(c)  any check, draft, certificate of deposit, credit voucher, or any other medium of payment, insurance   claims, proof of loss, instrument, or document pertaining to or proceeds  of any Collateral.

This limited power of attorney is coupled with an interest and may be relied upon by any third party without any duty to inquire as to its continued effectiveness. Neither Bank nor Ally will be liable for any acts or omissions, nor for any error of judgment or mistake of law or fact in the exercise of any authorization under this limited power of attorney.

13. Default Rate of Interest. To the extent permitted by law, each of the Ally Parties may immediately assess a default rate of Interest up to the current rate of Interest plus five percent (5%).

14. Duty of Care. Neither of the Ally Parties has any duty as to the collection or protection of Collateral, nor as to the preservation of any rights pertaining to it, except for the use of

27

reasonable care in the custody and preservation of the Collateral when in the possession of such Ally Party.

K.      Additional Provisions.

1. Authenticity and Authority. Each of the Ally Parties may rely and act upon any form of communication purportedly sent by Carvana as the authentic and duly authorized act of Carvana, in the implementation or furtherance of the purposes of this Agreement, whether by electronic, computer, telegraphic, facsimile, telephonic, personal or paper delivery, transmission, or otherwise; provided such Ally Party:

(a)     acts in good faith.

(b)     has no actual knowledge of information to the contrary; and

(c)     the practice is customary with dealers generally or Carvana specifically.

The Ally Parties have no obligation to scrutinize, inquire, or confirm any communication.

2. Written Waivers Only. A waiver, release, estoppel, or defense of any provision of this Agreement is effective only if it is in writing signed by the party sought to be bound by it.

(a) No course of dealing nor the delay or failure of either or both of the Ally Parties to enforce any right or remedy, in whole or in part, to demand payment or to declare an event of Default under this Agreement will:

(i.)     alter or affect any of Carvana's obligations or such Ally Party's(ies') rights and remedies; or

(ii.)    operate as a waiver, release, estoppel, or defense thereof.

(b) Any notice to or demand on Carvana by either or both of the Ally Parties in any event not specifically required under this Agreement does not entitle Carvana to any other or further notice or demand in the same, similar, or other circumstances unless specifically required by this Agreement.

(c) There can be no waiver of this Subsection III.K.2, except in writing signed by the party against whom the alleged waiver is asserted. Reliance by any party on an oral representation will be deemed unreasonable.

3.      Assignment. Carvana must not assign or cause the transfer of any duties or obligations under this Agreement without the express written consent of each of the Ally Parties. Each of the Ally Parties may freely (i) assign its interests, rights, duties, and obligations under this Agreement, so long as any assignee assumes all obligations under this Agreement or (ii) grant participations with respect to its interests, rights, duties and obligations under this Agreement.

For the avoidance of doubt, the Carvana must pay all expenses and reimburse each of the Ally Parties for any cost, expense, or other expenditures, including reasonable attorney fees and legal expenses, that arise in connection with any participations granted with respect to its interests, rights, duties, and obligations under this Agreement.

28

4.   Amendments. No amendment of any provision of this Agreement is effective without the written, signed agreement of Carvana and the Ally Parties.

5.   Use of Tracking Devices. If Carvana decides, in its sole discretion, to acquire internet accessible reporting with respect to any tracking device in or on any Vehicle used in order to locate the Vehicle, subject to applicable law, Carvana will provide the Ally Parties with access to such reporting.

6.   Definitions and Word Meanings. The word "may" or any other term in this Agreement signifying a permissive, elective, or optional right of a party to act or decide, or to refuse to act or decide, will mean and be construed as providing the complete and absolute prerogative of that party to do so in its sole, unfettered discretion. The word "will" be a mandatory word denoting an obligation to pay or perform. Otherwise, unless the context otherwise clearly requires, the terms used in this Agreement must be given the meaning ascribed to them in accordance with the capitalized definitions established throughout this Agreement; the Uniform Commercial Code, as amended from time to time; and common and ordinary usage in law and commercial practice, respectively.

7.   Section Captions. The captions inserted at the beginning of each article, section, and subsection are for convenience only and do not limit, enlarge, modify, explain, or define the text thereof nor affect the construction or interpretation of this Agreement.

8.   Termination. This Agreement is effective until terminated upon the earlier of the Maturity Date (as such date may be extended by agreement of the parties hereto); an event of Default, at the non-defaulting party's option exercised by sending written notice of termination to the defaulting party; or the parties mutually agree in writing to terminate the Agreement. Termination will not relieve any party from any duty or obligation incurred, or right, waiver, modification, or benefit bestowed, prior to the effective date of the termination.

9.   Binding. This Agreement is binding on Bank, Ally, and Carvana and their respective successors, administrators, and assigns.

10.  No Third-Party Beneficiary. Except as outlined in Section III.D, no Vehicle Seller or any person (other than Bank, Ally, and Carvana) may rely on this Agreement, or any term or provision contained in this Agreement.

11.  Severability. Any provision of this Agreement prohibited by law is ineffective only to the extent of the prohibition without invalidating the remaining provisions of this Agreement.

12.  Notice. Any notice required to be given by this Agreement or by law is deemed reasonably and properly given if sent to the other party within the time frames specifically set forth in this Agreement, and if no timeframe for notice of an action or event is specified, at least ten (10) calendar days, at the address set forth in Section I. above by any one of the following nonexclusive methods:

   (a)   United States certified, registered, or first-class mail, postage prepaid.

   (b)   Use of a commercially recognized express delivery service.

29

    (c)    Electronic mail or facsimile transmission; or

    (d)    Personal delivery.

13. Separate Credit Accommodations. Despite the fact that Ally may be acting as a servicer or agent on behalf of Bank, Carvana recognizes that Ally and Bank are providing separate credit accommodations to Carvana with the terms consolidated in a single document and credit line for the convenience of the parties. Bank is not responsible for the performance or conduct of Ally and Ally is not responsible for the performance or conduct of Bank. Carvana shall not assert against Bank any claim, defense or set-off relating to Ally and Carvana will not assert against Ally any claim, defense or set-off relating to Bank. This Agreement does not create any rights and obligations between Ally and Bank.

14. Time of the Essence. Time is of the essence as to this Agreement. There is no grace period, right to cure, or other indulgence provided in the terms and conditions of this Agreement unless expressly provided for in this Agreement or in a separate writing signed by the party against whom it is asserted.

15. Entire Agreement. This document contains the entire agreement of Bank, Ally, and Carvana concerning the subject matter set forth herein. There are no other oral or implied agreements, understandings, or representations between them. Carvana has not relied on any statement, promise, or representation made by anyone connected with Bank or Ally, except as provided in this Agreement or any related document.

16. No Interpretive Presumptions. The language in this Agreement will be construed according to the fair and usual meaning of the language and will not be strictly construed for or against either party.

17. Continued Cooperation. Carvana will execute and deliver to each of the Ally Parties any and all documents, notices, instruments, and other writings and perform all acts necessary and appropriate to fully implement the terms and conditions of this Agreement. Carvana hereby irrevocably appoints each Bank and Ally, acting through any of their officers and employees, its true and lawful attorney for and in its name, stead and behalf as if fully done by Carvana to execute, complete and deliver any other document, instrument, or agreement in connection with this Agreement to supply any omitted information and correct any patent errors in any of them. This limited power of attorney is coupled with an interest and may be relied upon by any third party without any duty to inquire as to its continued effectiveness. Neither Bank nor Ally will be liable for any acts or omissions, nor for any error of judgment or mistake of law or fact in the exercise of any authorization under this limited power of attorney.

18. Use of Pronouns. All personal pronouns, whether used in the masculine, feminine or neuter gender, will include all other genders; the singular will include plural, and the plural will include the singular.

19. Counterparts. This Agreement may be signed in one or more counterparts, each of which is deemed an original and all of which taken together constitute one and the same agreement. This Agreement and any amendment  hereof or certificate provided pursuant to this Agreement may be manually or electronically signed and transmitted by email or other means of electronic communication or by an internet-based e-signature platform.

Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission (including PDF) will be effective as delivery of a manually executed counterpart. The words "execution," "signed," "signature," and words of like import in this Agreement and any amendment hereof or certificate relating hereto will be deemed to include electronic signatures and the keeping of records in electronic form. Manual or electronic signatures appearing on electronically transmitted documents will be treated as original signatures for all purposes under applicable law (including admission into evidence in any legal proceeding), including without limitation, the Federal Electronic Signatures in Global and National Commerce Act and any state laws based on the Uniform Electronic Transactions Act and the parties to this Agreement waive any objection to the contrary.

[Signatures on Following Page]

31

Signature Page to

Amended and Restated Inventory Financing and Security Agreement

**Ally Bank**

By: /s/ Cindy Balint
Name: Cindy Balint
Title: Authorized Representative

**Ally Financial Inc.**

By: /s/ Cindy Balint
Name: Cindy Balint
Title: Authorized Representative

**CARVANA, LLC**

By: /s/ Paul Breaux
Name: Paul Breaux
Title: Vice President

32

*EXECUTION VERSION*

FUNDS FLOW CERTIFICATE

September 1, 2023

This Funds Flow Certificate ("**Certificate**") is delivered in accordance with the Inventory Financing and Security Agreement, dated as of September 22, 2022 (as amended by the First Amendment to Inventory Financing and Security Agreement, dated as of September 1, 2023 and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Financing Agreement**") by and among Carvana, LLC, an Arizona limited liability company ("**Dealership**") and Ally Financial Inc. and Ally Bank (the "**Ally Parties**"). Capitalized terms used but not otherwise defined herein shall have the respective meanings therefor set forth in the Financing Agreement.

The undersigned hereby certifies to the Ally Parties, solely in such undersigned's capacity as Vice President of Dealership, and not individually, as follows:

1. As of the date hereof, the undersigned has the title indicated below and as such is authorized to execute and deliver this Certificate on behalf of Dealership.

2. As of the date hereof, Dealership has deposited or caused to be deposited all Ally Proceeds into the "Controlled Accounts" as set forth on Exhibit A hereto, and will not directly deposit Ally Proceeds into any account other than the Controlled Accounts.

3. As of the date hereof, no funds consisting of the proceeds of the collateral of any party (other than the Ally Parties and parties who have a junior security interest in the Collateral with the prior written consent of the Ally Parties, in which case no proceeds of any such parties' collateral other than the Collateral) have been deposited into or held at the Controlled Accounts

4. As of the date hereof, Dealership will only directly transfer Ally Proceeds from the Controlled Accounts into the Operating Account on Exhibit B hereto.

5.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

33

**CARVANA, LLC**
By:\_\_/s/ Paul Breaux_____
Name: Paul Breaux
Title:   Vice President

34

## EXHIBIT A

### CONTROLLED ACCOUNTS

1.   The Retail ACH Account identified on Exhibit B (Account No. [***])

2.   The Retail Check Account identified on Exhibit B (Account No. [***])

3.   The Retail Wire Account identified on Exhibit B (Account No. [***])

4.   The Wholesale Account identified on Exhibit B (Account No. [***])

35

[***] Redacted for confidentiality purposes.

**EXHIBIT B**

**FUNDS FLOW DIAGRAM**



[***] Redacted for confidentiality purposes.

**Exhibit 2**

**Officer's Certificate**

Date: [●], 20[●]

This certificate (this "**Certificate**") is delivered in accordance with the Amended and Restated Financing and Security Agreement, dated as of November 1, 2023 (as such agreement is amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "**Financing Agreement**"), by and among Carvana, LLC, an Arizona limited liability company ("**Carvana**") and Ally Financial Inc. and Ally Bank (the "**Ally Parties**"). Capitalized terms used but not otherwise defined herein will have the respective meanings therefor set forth in the Financing Agreement.

The undersigned hereby certifies (solely in such undersigned's capacity as [●] of Carvana, and not in his/her/their individual capacity, and based upon facts and circumstances as such facts and circumstances exist as of the date hereof), on behalf of Carvana, to the Ally Parties as of the date hereof as follows:

1.      He/She/They has/have the title indicated below and as such is/are authorized to execute and deliver this Certificate on behalf of Carvana.

2.      All representations and warranties made by Carvana to the Ally Parties in the Financing Agreement continue to be accurate and complete.

3.      Carvana is in compliance with all promises and covenants contained in the Financing Agreement, including, but not limited to, the following:

a.      Carvana has satisfied all requirements applicable to Vehicles subject to Advance Floorplan Accommodations as outlined in Subsection III.A.8 of the Financing Agreement and Carvana's outstanding floorplan advances under the Advance Floorplan Accommodation do not exceed 10% of the Credit Line limit in effect as of the date of this Certificate.

b.      So long as Carvana owes any debt to Bank or unless Bank otherwise agrees in writing, Carvana has maintained the Credit Balance (as defined in the Fourth Amended and Restated Credit Balance Agreement (the "**Credit Balance Agreement**"), effective as of September 1, 2023, between Ally Bank and Carvana, as such Credit Balance Agreement may have been amended) in an amount sufficient to comply with Subsection III.G.4 of the Financing Agreement.

c.      Carvana's unrestricted cash, cash equivalents, and availability in operating lines of credit, excluding amounts restricted pursuant to the Credit Balance Agreement between Carvana and Bank, is not less than 20.0% of the credit limit of the Credit Line as of the date of this Certificate.

d.      Carvana's equity in its inventory, as calculated in Subsection III.G.7 of the Financing Agreement, is at least 5%.

37

e.      All Ally Proceeds have been and are transferred directly into and are transferred out of the Controlled Accounts directly to the Operating Account as outlined on the Funds Flow Certificate. No funds consisting of the proceeds of the collateral of any party (other than the Ally Parties and parties who have a junior security interest in the Collateral with the prior written consent of the Ally Parties, in which case no proceeds of any such parties' collateral other than the Collateral) have been deposited into or held at the Controlled Accounts.

f.      Carvana has caused all Ally Proceeds received by Carvana to be transferred directly to a Controlled Account, regardless of the source from which such Ally Proceeds were received by Carvana, as follows (i) with respect to Ally Proceeds constituting cash or other forms of payment that are immediately transferrable, on a daily basis and (ii) with respect to Ally Proceeds constituting checks, ACH transfers or other forms of payment that are not immediately transferrable, as promptly as such checks, ACH transfers or other forms of payment can be processed in the ordinary course of business.

g.      Carvana has not changed the accounts into which the Ally Proceeds are directly deposited or created any new accounts into which Ally Proceeds have been directly deposited, without the prior written consent of the Ally Parties and providing the Ally Parties with a Deposit Account Control Agreement (if such accounts are additions to, substitutions of, or replacements of, the Controlled Accounts) with respect to such new accounts in form and substance reasonably satisfactory to the Ally Parties.

h.      Carvana has at all times maintained a minimum cash balance in the Operating Account, of immediately available funds, equal to no less than all amounts received for Minimum Balance Mark Vehicles or proceeds of Minimum Balance Mark Vehicles whereby principal is owed by Carvana to the Ally Parties under Subsection III.C.2(a)(i) of the Financing Agreement.

i.      Carvana has not transferred or otherwise disposed of, in any dispositions other than retail sales to consumers in the ordinary course of business, 10% or more of its Vehicles (whether nor not such Vehicles are Inventory Financed Vehicles), to one or more parties (whether nor not such parties are affiliated), whether in one or a series of transactions occurring in a seven (7) calendar day period, without the prior written consent of the Ally Parties.

j.      Carvana has not granted a security interest over, pledged, or permitted any confiscations, assessments, liens, or encumbrances on the Operating Account or any Controlled Account, except for liens on the Operating Account or any Controlled Account, as applicable, (a) that constitute non-consensual liens permitted under Subsection III.D.3 of the Financing Agreement or (b) in favor of the depository institution holding such Operating Account or such Controlled Account, as applicable, specifically for (i) fees or charges for the maintenance and administration of the Operating Account or the Controlled Account, as applicable, (ii) settlement amounts, or (iii) returned items.

      k.      Carvana has not amended, restated, amended and restated, extended, supplemented, or otherwise modified any Additional Senior Debt Document or Second Priority Debt Document to the extent that such amendment, restatement, amendment and restatement, extension, supplement, or modification would be in violation of the terms or conditions of the Intercreditor Agreement or any Initial First Lien Inventory Financing Document (as defined in the Intercreditor Agreement), without the prior written consent of the Ally Parties.

      4.      No Default has occurred under the Financing Agreement and no event, circumstance, or condition has occurred or exists that with the passage of time, the giving of notice, or both, would constitute a Default under the Financing Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first stated above.

**CARVANA, LLC**

By: _____
Name: _____
Title: _____

**Exhibit 10.7**

## CONSENT AND AGREEMENT RELATING TO
## ADDITIONAL LIENS

This CONSENT AND AGREEMENT RELATING TO ADDITIONAL LIENS (this "**Agreement**"), dated as of September 1, 2023, is entered into by and among (i) Ally Bank (Ally Capital in Hawaii, Mississippi, Montana and New Jersey), a Utah state chartered bank (together with its successors and assigns, "**Bank**"), (ii) Ally Financial Inc., a Delaware entity ("**Ally**" and together with Bank, collectively, the "**Ally Parties**" and each, an "**Ally Party**"), and (iii) Carvana LLC, an Arizona limited liability company (the "**Dealership**").

## W I T N E S S E T H

**WHEREAS**, the Ally Parties and Dealership entered into that certain Inventory Financing and Security Agreement, dated as of September 22, 2022 (as amended by that certain First Amendment to Inventory Financing and Security Agreement, dated as of the date hereof (the "**IFSA Amendment**") and as may be further amended, restated, supplemented or otherwise modified from time to time, the "**Financing Agreement**"), pursuant to which, among other things, the Ally Parties agreed to make certain extensions of credit available to Dealership, and Dealership has granted to the Ally Parties a first priority security interest in the Collateral (as defined in the Financing Agreement). Capitalized terms used herein and not otherwise defined herein will have the meaning ascribed thereto in the Financing Agreement or, if not defined in the Financing Agreement, as defined in the other Transaction Documents (as defined below), as specified herein.

**WHEREAS**, (i) on October 2, 2020, Carvana Co., a Delaware corporation (the "**Issuer**"), issued in a private placement (a) $500 million aggregate principal amount of 5.625% Senior Notes due 2025 (the "**2025 Notes**") and (b) $600 million aggregate principal amount of 5.875% Senior Notes due 2028 (the "**2028 Notes**"), (ii) on March 29, 2021, Issuer issued in a private placement $600 million aggregate principal amount of 5.500% Senior Notes due 2027 (the "**2027 Notes**"), (iii) on August 16, 2021, Issuer issued in a private placement $750 million aggregate principal amount of 4.875% Senior Notes due 2029 (the "**2029 Notes**") and (iv) on May 6, 2022, Issuer issued in a private placement $3.275 billion aggregate principal amount of 10.250% Senior Notes due 2030 (the "**2030 Notes**" and, together with the 2025 Notes, the 2027 Notes, the 2028 Notes and the 2029 Notes, the "**Existing Notes**").

**WHEREAS**, (i) Issuer, (ii) Dealership, as a guarantor, (iii) each of the other guarantors party to the Second Lien Indenture described below (such guarantors, Dealership and Issuer, collectively, the "**Note Parties**" and each, a "**Note Party**"), and (iv) U.S. Bank Trust Company, National Association, as trustee and collateral agent (the "**Note Agent**") propose to enter into (a) the 2028 Secured Notes Indenture, relating to Issuer's 9.0% / 12.0% Cash / PIK Toggle Senior Secured Notes due 2028 in an aggregate principal amount up to $1.0 billion (such notes, the "**2028 Secured Notes**"), (b) the 2030 Secured Notes Indenture, related to Issuer's 9.0% / 11.0% / 13.0% Cash / PIK Toggle Senior Secured Notes due 2030 in an aggregate principal amount up to $1.5 billion (such notes, the "**2030 Secured Notes**"), and (c) the 2031 Secured Notes Indenture (together with the 2028 Secured Notes Indenture and the 2030 Secured Notes Indenture, each, a "**Second Lien Indenture**"), relating to Issuer's 9.0% / 14.0% Cash / PIK Toggle Senior Secured Notes due 2031 in an aggregate principal amount up to $1.876 billion (such notes, the "**2031 Secured Notes**", and together with the 2028 Secured Notes and the 2030 Secured Notes, the "**Secured Notes**"), and each Second Lien Indenture, together with any documents and agreements executed in connection therewith or thereunder (including, without limitation, all Note Documents (as defined in each Second Lien Indenture)), the "**Initial Second Lien Note Documents**", and together with any other Second Priority Debt Document (as defined in the Intercreditor Agreement (as defined below)) and any Additional Senior Debt Documents (as defined in the Intercreditor Agreement), collectively, the "**Junior Debt Documents**", and together with this Agreement, the Intercreditor Agreement, the IFSA Amendment, and each other document, agreement or instrument required to be delivered to the Ally Parties in accordance with the terms hereof, collectively, the "**Transaction Documents**"), in each case subject to the terms and conditions of the Intercreditor Agreement and the Financing Agreement, as applicable.

WHEREAS, to induce the Ally Parties to consent to the Transactions, Dealership, the Note Agent, and the Ally Parties have on or prior to the date of the Consent entered into that certain intercreditor agreement relating to the Secured Notes, in form and substance acceptable to the Ally Parties (as amended, restated, amended and restated, replaced, extended, supplemented, waived, or otherwise modified from time to time, the "**Intercreditor Agreement**"), relating to, among other things, the Note Agent's, the Second Priority Debt Parties' and the Ally Parties' respective rights, priority, remedies, and security interests in the Collateral (as defined in the Financing Agreement).

WHEREAS, in connection with and pursuant to the Junior Debt Documents, the Note Parties intend to: (i)(x) issue the Secured Notes (any such issuance of Secured Notes, an "**Notes Issuance**") and (y) from time to time, issue additional secured notes and/or incur another form of indebtedness pursuant to any Junior Debt Document (the "**Additional Secured Debt**") (any such issuance of Additional Secured Debt and, together with the Notes Issuance, the "**Debt Issuances**"); *provided* that, in each case, the accrual of interest, the accretion of accreted value, and the payment of interest in the form of additional indebtedness capitalized to the outstanding aggregate principal amount of the Debt Issuance (e.g., interest paid in kind) (collectively, the "**PIK Interest**") will be permitted under the Financing Agreement and excluded from any dollar baskets or caps therein; (ii) grant, pledge, or otherwise create security interests, liens, or encumbrances of any kind in the assets and property of each Note Party by such Note Party in favor of the secured parties (or any collateral agent, trustee or agent on behalf of the secured parties) with respect to any Debt Issuances and pursuant to any Junior Debt Documents; *provided* that any security interest, lien, or encumbrance granted by, or purported to be granted by, Dealership in the Collateral in favor of the secured parties under any Junior Debt Document (or any collateral agent, trustee, or agent on behalf of the secured parties) (x) shall not secure an aggregate principal amount of indebtedness under the Debt Issuances (inclusive of any premiums, fees and/or other similar amounts) in excess of $6.125 billion (exclusive of PIK Interest thereon) and (y) will be, and shall remain, junior and subordinate in all respects to the security interests, liens, and other encumbrances granted in the Collateral to the Ally Parties and will be subject to the terms of the Intercreditor Agreement and constitute a Second Priority Lien or Senior Lien (subordinate to the Ally Parties), as applicable, thereunder (the transactions in this <u>clause (ii)</u>, "**Security Grant**"); and (iii) engage in other transactions related thereto (together with the Junior Debt Documents, the Intercreditor Agreement, the Debt Issuances and the Security Grant, collectively, the "**Transactions**").

WHEREAS, Dealership has determined that the Transactions are necessary and appropriate to preserve the ongoing operations of Dealership and affiliates thereof, and Dealership has therefor requested that the Ally Parties consent in all respects to the Transactions, and, subject to the satisfaction of the conditions set forth in this Agreement, the IFSA Amendment, the Intercreditor Agreement, and any other agreements delivered in connection with this Agreement, the Ally Parties are willing to consent to the Transactions.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I.**
**CONSENT TO TRANSACTIONS**

Section 1.01.    <u>Junior Lien Consent</u>. Effective as of the Effective Date (as defined below), each of the Ally Parties hereby consents to the Transactions, subject to the terms of the Intercreditor Agreement and the satisfaction (or waiver by the Ally Parties) of the conditions set forth herein, including, for the avoidance of doubt, the conditions set forth in <u>Sections 2.01</u> hereof (the "**Junior Lien Consent**"). Notwithstanding anything herein or any Junior Debt Document to the contrary, the Junior Lien Consent does not extend to, and expressly prohibits: (i) any Debt Issuance which, taking into account all other Debt Issuances secured by the Collateral, would cause the total principal amount (inclusive of any premiums, fees and/or other similar amounts) of the Junior Debt (as defined in the IFSA Amendment) to exceed $6.125 billion (exclusive of PIK Interest thereon); (ii) any other issuance of any

2

notes or additional indebtedness secured by the Security Grant, including, without limitation, any "incremental" indebtedness permitted under any Junior Debt Document (whether or not such Junior Debt Document is in effect as of the date the Secured Notes are issued); and (iii) any sale, disposition, exchange, or other transfer of any portion of Collateral (or proceeds of any Collateral) without the prior written consent of the Ally Parties, other than (x) sales of inventory in the ordinary course of business; or (y) chattel paper sales, which will be subject to the terms of that certain Side Letter Agreement dated May 1, 2023.

Section 1.02.    Conditions to Consent. Notwithstanding anything herein or any Junior Debt Document to the contrary, the Junior Lien Consent with respect to all Debt Issuances is conditioned upon the satisfaction (or waiver by the Ally Parties) of the following:

a.    such Junior Debt being expressly subordinated to the obligations under the Financing Agreement pursuant to the Intercreditor Agreement;

b.    no Default under the Financing Agreement has occurred, and no Default will occur or be continuing as a direct result of the applicable Debt Issuance, and no event, circumstance or condition has occurred or exists that, with the passage of time, the giving of notice, or both, would constitute a Default under the Financing Agreement; and

c.    each such issuance does not cause the aggregate principal amount (inclusive of any premiums, fees and/or other similar amounts) of the Junior Debt to exceed $6.125 billion (exclusive of PIK Interest thereon) secured or purported to be secured by the Collateral.

**ARTICLE II.**
**CONDITIONS PRECEDENT**

Section 2.01.    Effective Date. This Agreement (including, without limitation, the Junior Lien Consent) will become effective on the date on which each of the following conditions have been satisfied (or waived by the Ally Parties) (such date, the "**Effective Date**"):

a.    delivery to the Ally Parties of counterparts of this Agreement duly executed by Dealership;

b.    delivery to the Ally Parties of counterparts to the IFSA Amendment duly executed by Dealership;

c.    delivery to the Ally Parties of a duly executed Intercreditor Agreement, by and among Dealership, the Note Agent, and the Ally Parties, in form and substance satisfactory to the Ally Parties;

d.    delivery to the Ally Parties of a duly executed intellectual property security agreement in respect of the Financing Agreement, by and among Dealership and the Ally Parties, in form and substance acceptable to the Ally Parties;

e.    delivery to the Ally Parties of a duly executed Fourth Amended and Restated Credit Balance Agreement, by and among Dealership and the Ally Parties in form and substance acceptable to the Ally Parties;

f.    delivery to the Ally Parties of a duly executed Deposit Account Control Agreement (as defined in the IFSA Amendment) by and among Dealership, the Ally Parties, and the financial institution(s) holding the Controlled Accounts (as defined in the IFSA Amendment) governing such Controlled Accounts, in form and substance satisfactory to the Ally Parties;

g.    delivery to the Ally Parties of evidence satisfactory to the Ally Parties of the establishment of the Controlled Accounts;

h.    delivery to the Ally Parties of duly executed copies of all material Initial Second Lien Note Documents, in each case in form and substance reasonably satisfactory to the Ally Parties;

3

i.  delivery to the Ally Parties of (i) customary legal opinions with respect to Dealership, (ii) customary evidence of authorization of Dealership, (iii) a customary officer's or secretary's certificate of Dealership, (iv) a solvency certificate of Dealership and (v) a good standing certificate (to the extent applicable) of Dealership from its jurisdiction of formation, in each case in form and substance satisfactory to the Ally Parties; and

j.  payment by Dealership of all reasonable and documented legal fees and expenses of Sidley Austin LLP, as counsel to the Ally Parties, incurred in connection with the Transaction Documents and all other related documents and the transactions contemplated thereby (to the extent invoiced in reasonable detail two (2) Business Days prior to the Effective Date).

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

To induce the Ally Parties to consent to this Agreement, Dealership hereby represents and warrants to the Ally Parties that, as of the Effective Date:

Section 3.01.  Power. Dealership has all requisite organizational power to execute, deliver, and perform its obligations under this Agreement.

Section 3.02.  Representations and Warranties. The representations and warranties of Dealership contained in the Financing Agreement are true and correct in all material respects (without duplication of any materiality qualifiers contained therein), in each case on and as of the date hereof (except in the case of any representation and warranty which expressly relates to a given date, such representation and warranty will be true and correct in all material respects as of such specified date, if earlier).

Section 3.03.  Authorization; No Contravention. Dealership is authorized and empowered to execute and deliver this Agreement and to do all things necessary and appropriate to fulfill and implement the terms and conditions hereof. Dealership is in material compliance with all federal, state, and local laws, regulations, and ordinances.

Section 3.04.  Binding Effect. This Agreement has been duly executed and delivered by Dealership, and this Agreement constitutes a legal, valid and binding obligation of Dealership, enforceable against Dealership in accordance with its terms, except as such enforceability may be limited by (i) Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally; (ii) general principles of equity; (iii) an implied covenant of good faith and fair dealing; (iv) the need for filings and registrations necessary to create or perfect the liens on the Collateral granted by Dealership in favor of the Ally Parties; and (v) the effect of foreign laws, rules and regulations as they relate to the granting of security interests in assets of, and pledges of equity interests in or indebtedness owed by, subsidiaries organized under the laws other than the United States of America.

Section 3.05  Solvency. As of the date hereof and immediately after giving effect to this Agreement and the Transactions, (i) Dealership (a) is and will be Solvent, (b) does and intends to pay its debts as they mature in the ordinary course, and (c) is not in default under any material obligation to pay money to any Person, and (ii) Dealership is not contemplating the commencement of any Insolvency or Liquidation Proceedings (as defined in the Intercreditor Agreement). For purposes hereof, "**Solvent**" means, with respect to any Person on a particular date, that on such date (a) the fair value of the present assets of such Person (on a going concern basis) is greater than the total amount of its debts and other liabilities, including, without limitation, subordinated or contingent liabilities, of such Person, (b) the present fair saleable value of the assets of such Person (on a going concern basis) is not less than the amount that will be required to pay the probable liability of such Person on its debts and other liabilities, including, without limitation, subordinated or contingent liabilities, as they become absolute and matured, (c) such Person has not incurred, and does not intend to, and does not believe that it will, incur debts or

4

other liabilities (including current obligations, subordinated or otherwise, and subordinated or contingent liabilities) beyond its ability to pay such debts and other liabilities as they mature in the ordinary course of business and (d) such Person is not engaged in business or a transaction (including, without limitation, the Transactions), and is not contemplating or about to engage in business or a transaction (including, without limitation, the Transactions), which would leave such Person with remaining property which would constitute unreasonably small capital or assets in relation to such business or transaction, taking into account the nature of the particular business conducted and to be conducted and the needs and anticipated needs for capital and assets of the business as conducted and as anticipated to be conducted by such Person following the Effective Date. The amount of contingent liabilities at any time will be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

## ARTICLE IV.
## MISCELLANEOUS

Section 4.01.    <u>Counterparts</u>. This Agreement may be signed in one or more counterparts, each of which is deemed an original and all of which taken together constitute one and the same agreement. This Agreement may be manually or electronically signed and transmitted by email or other means of electronic communication or by an internet-based e-signature platform. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic transmission (including, without limitation, PDF) will be effective as delivery of a manually executed counterpart. The words "execution," "signed," "signature," and words of like import in this Agreement will be deemed to include electronic signatures and the keeping of records in electronic form. Manual or electronic signatures appearing on electronically transmitted documents will be treated as original signatures for all purposes under applicable law (including, without limitation, admission into evidence in any legal proceeding), including, without limitation, the Federal Electronic Signatures in Global and National Commerce Act and any state laws based on the Uniform Electronic Transactions Act and the parties to this Agreement waive any objection to the contrary.

Section 4.02.    <u>Entire Agreement</u>. This Agreement contains the entire agreement of the Ally Parties and Dealership concerning the subject matter set forth herein. There are no other oral or implied agreements, understandings, or representations between them. Dealership has not relied on any statement, promise, or representation made by anyone connected with the Ally Parties, except as provided in this Agreement or any related document. Upon the Effective Date, this Agreement will be binding upon and inure to the benefit of the parties hereto and, subject to and in accordance with Subsection III.K.3 of the Financing Agreement, their respective successors and assigns.

Section 4.03.    <u>Severability</u>. Any provision of this Agreement prohibited by law is ineffective only to the extent of the prohibition without invalidating the remaining provisions of this Agreement.

Section 4.04.    <u>Section Captions</u>. The captions inserted at the beginning of each article, section, and subsection are for convenience only and do not limit, enlarge, modify, explain, or define the text thereof nor affect the construction or interpretation of this Agreement.

Section 4.05.    <u>Governing Law</u>. This Agreement must be construed, interpreted, and enforced in accordance with the laws of the state of Arizona without regard to its conflict of laws rules.

Section 4.06.    <u>JURY WAIVER</u>. EACH ALLY PARTY AND DEALERSHIP WAIVE AND RENOUNCE THE RIGHT UNDER FEDERAL AND STATE LAW TO A TRIAL BY JURY FOR ANY CLAIM.

Section 4.07.    <u>Amendment, Modification and Waiver</u>. This Agreement may not be amended, modified, or waived except as permitted by Subsections III.K.2 or III. K.4 of the Financing Agreement.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**CARVANA, LLC**,
as Dealership

By:   /s/ Paul Breaux
Name: Paul Breaux
Title: Vice President

**ALLY BANK**,
as an Ally Party

By:   /s/ Cindy Balint
Name: Cindy Balint
Title: Authorized Representative

**ALLY FINANCIAL, INC.**,
as an Ally Party

By:   /s/ Cindy Balint
Name: Cindy Balint
Title: Authorized Representative

SIGNATURE PAGE
TO
CONSENT AND AGREEMENT RELATING TO ADDITIONAL LIENS

<u>Exhibit 31.1</u>

**Certification of the Chief Executive Officer**
**Pursuant to Rule 13a-14(a)**

I, Ernest Garcia, III, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:        November 2, 2023                                                                /s/ Ernest C. Garcia, III
                                                                                             Ernest C. Garcia, III
                                                                                             *Chairman and Chief Executive Officer*

Exhibit 31.2

**Certification of the Chief Financial Officer**
**Pursuant to Rule 13a-14(a)**

I, Mark Jenkins, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Carvana Co.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:        November 2, 2023

/s/ Mark Jenkins
Mark Jenkins
*Chief Financial Officer*

Exhibit 32.1

**Certification of the Chief Executive Officer**
**Pursuant to Rule 18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended September 30, 2023, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Ernest Garcia, III, Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:       November 2, 2023                                    /s/ Ernest C. Garcia, III
                                                                Ernest C. Garcia, III
                                                                *Chairman and Chief Executive Officer*

<u>Exhibit 32.2</u>

**Certification of the Chief Financial Officer**
**Pursuant to Rule18 U.S.C. Section 1350**

In connection with the Quarterly Report on Form 10-Q of Carvana Co. (the "Company") for the quarter ended September 30, 2023, as filed with the U.S. Securities and Exchange Commission (the "Report"), I, Mark Jenkins, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:        November 2, 2023                                                              /s/ Mark Jenkins
                                                                                          Mark Jenkins
                                                                                          *Chief Financial Officer*