ROBBINS GELLER RUDMAN
   & DOWD LLP
DANIEL S. DROSMAN (CA 200643)
ERIKA L. OLIVER (CA 306614)
RACHEL A. COCALIS (CA 312376)
SARAH A. FALLON (CA 345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ddrosman@rgrdlaw.com
eoliver@rgrdlaw.com
rcocalis@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re Carvana Co. Securities Litigation | No. CV-22-2126-PHX-MTL |
| This Document Relates To:<br><br>    All Actions. | PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT |

4883-2521-8257.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS .................................... 3

III.    LEGAL STANDARD .......................................................................................... 5

IV.     AN UNRELATED STATE COURT CASE IS IRRELEVANT TO THE
        ADEQUACY OF THE ACC .................................................................................. 5

V.      THE ACC IS NOT A PUZZLE PLEADING .......................................................... 7

VI.     THE EXCHANGE ACT CLAIMS ARE ADEQUATELY ALLEGED ...................... 10

        A.     The ACC Adequately States a Scheme Claim .................................... 10

               1.     The Nature, Purpose, and Effect of Defendants' Scheme .................... 11

               2.     Defendants Committed Deceptive Acts ............................................... 12

               3.     Defendants' Arguments Are Unavailing .............................................. 15

        B.     The ACC Adequately States a Misrepresentation Claim ................... 21

               1.     Materially Misleading Statements and Omissions Concerning
                      Title and Registration ......................................................................... 21

               2.     Materially Misleading Statements and Omissions Concerning
                      Buying Cars from Customers ............................................................... 27

               3.     Materially Misleading Statements and Omissions Concerning
                      Retail Unit Sales Growth ..................................................................... 31

               4.     Materially Misleading Statements and Omissions Concerning
                      Expansion and Logistics Infrastructure .............................................. 33

               5.     Materially Misleading Statements and Omissions Concerning
                      Aged Inventory .................................................................................... 36

               6.     Materially Misleading Statements and Omissions Concerning
                      Profitability Per Vehicle Sold ............................................................. 37

        C.     Plaintiffs Allege a Strong Inference of Scienter .............................. 41

               1.     Defendants' $3.76 Billion Insider Sales Support a Strong
                      Inference of Scienter .......................................................................... 42

               2.     Defendants' Statements Support the Inference of Scienter ................ 49

               3.     Defendants' Decision to Cease Reporting Key Metrics Supports
                      Scienter .............................................................................................. 50

- i -

4883-2521-8257.v1

**Page**

4.    CW Accounts Further Bolster the Inference of Scienter ...................... 51

5.    The "Core Operations" Doctrine Supports Scienter............................ 53

6.    Abundant Additional Facts Support Scienter...................................... 56

D.    Plaintiffs Adequately Allege Loss Causation................................................... 57

1.    Defendants' Attacks on the April 20, May 10, November 3, 2022, and February 23, 2023 Corrective Disclosures Fail ............................ 57

2.    Defendants' Attacks on the August 10, 2021, October 22, 2021, June 24, 2022, and October 7, 2022 Disclosures Fail ......................... 61

E.    The ACC Adequately Alleges a §20(a) Claim ................................................. 64

F.    The ACC Adequately Alleges a §20A Claim.................................................... 66

VII.    THE SECURITIES ACT CLAIMS ARE ADEQUATELY ALLEGED ..................... 67

A.    Plaintiffs Adequately State a Claim Under §§11 and 12(a)(2) ........................ 67

1.    Plaintiffs Plead Material Misstatements or Omissions ......................... 68

2.    Plaintiffs Plead Actionable Omissions Under Item 105 ....................... 68

3.    The Securities Act Claims Do Not "Sound in Fraud" .......................... 69

4.    Defendants Have Not Proven Negative Causation ............................... 70

5.    Defendants Are Statutory Sellers Under §12(a)(2) .............................. 70

VIII.    CONCLUSION ............................................................................................. 72

4883-2521-8257.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*60223 Tr. v. Goldman, Sachs & Co.*,
   540 F. Supp. 2d 449 (S.D.N.Y. 2007)................................................................................ 63

*Abbate v. Wells Fargo Bank, N.A.*,
   2011 WL 9698215 (C.D. Cal. 2011)............................................................................16, 19

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) .......................................................................................................... 19

*Alich v. Opendoor Techs. Inc.*,
   2024 WL 2153529 (D. Ariz. 2024) .................................................................................... 70

*Alich v. Opendoor Techs. Inc.*,
   2024 WL 839146 (D. Ariz. 2024),
   *vacated in part on other grounds*,
   2024 WL 2153529 (D. Ariz. 2024).........................................................................18, 61, 69

*Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*,
   2022 WL 3598246 (D. Ariz. 2022) ...............................................................................18, 61

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................................ 5

*ATSI Commc'ns, Inc. v Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)................................................................................................. 11

*Austin v. Loftsgaarden*,
   675 F.2d 168 (8th Cir. 1982).............................................................................................. 56

*Avant-Garde, LLC v. Mountain Spa Props., LLC*,
   2010 WL 4537057 (D. Ariz. 2010) .................................................................................... 57

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. 2018)..............................................................................43, 47

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ..........................................................................21, 47

*Bajjuri v. Raytheon Techs. Corp.*,
   641 F. Supp. 3d 735 (D. Ariz. 2022).............................................................................24, 60

4883-2521-8257.v1

**Page**

*Baker v. SeaWorld Ent., Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019) ................................................................. 65

*Barnes v. Edison Int'l*,
2021 WL 2325060 (C.D. Cal. 2021),
*aff'd*, 2022 WL 822191 (9th Cir. 2022) ................................................................. 9

*Baron v. Hyrecar Inc.*,
2022 WL 17413562 (C.D. Cal. 2022) ............................................................. 46, 48

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................... 19, 20, 63

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. 2008) ............................................................... 43, 65

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................. 5

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................*passim*

*Borteanu v. Nikola Corp.*,
2023 WL 1472852 (D. Ariz. 2023) ........................................................... 12, 16, 43

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. 2020) ............................................................*passim*

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ............................................................................... 2

*Cal. Pac. Bank v. F.D.I.C.*,
885 F.3d 560 (9th Cir. 2018) ............................................................................. 20

*Camp v. Qualcomm Inc.*,
2020 WL 1157192 (S.D. Cal. 2020) .................................................................... 62

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ......................................................................... 63

*Christiana Tr. v. K & P Homes*,
288 F. Supp. 3d 1039 (D. Nev. 2017) ................................................................... 5

**Page**

*Christine Asia Co. Ltd. v. Ma*,
    718 F. App'x 20 (2d Cir. 2017) ........................................................................ 63

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
    2022 WL 4491093 (S.D. Cal. 2022) ...........................................................46, 47, 48

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
    2023 WL 1769810 (S.D. Cal. 2023) .........................................................25, 37, 40, 49

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017)............................................................................ 55

*City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*,
    2023 WL 155861 (D. Ariz. 2023) ................................................................46, 47

*City of Providence, R.I. v. Bats Glob. Mkts., Inc.*,
    878 F.3d 36 (2d Cir. 2017)......................................................................... 16, 19

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
    527 F. Supp. 3d 1151 (N.D. Cal. 2021) ............................................................ 31

*City of Warwick Ret. Sys. v. Carvana Co.*,
    No. CV 2022-013054, slip op. (Ariz. Super. Ct., Maricopa Cnty. Oct. 26, 2023)...5, 6, 7, 35

*Collier v. ModusLink Glob. Sols., Inc.*,
    9 F. Supp. 3d 61 (D. Mass. 2014)..................................................................... 45

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
    22 F.4th 1 (1st Cir. 2021) ..........................................................................51, 52

*Crews v. Rivian Auto., Inc.*,
    2023 WL 4361098 (C.D. Cal. 2023)..............................................................64, 68

*Cullen v. RYVYL Inc.*,
    2024 WL 898206 (S.D. Cal. 2024) ................................................................... 70

*Cupat v. Palantir Techs., Inc.*,
    2024 WL1374903 (D. Colo. 2024) ..................................................................... 9

*Cutler v. Kirchner*,
    696 F. App'x 809 (9th Cir. 2017)...................................................................... 35

**Page**

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
583 U.S. 416 (2018) ........................................................................................... 6

*Donley v. Live Nation Ent., Inc.*,
2024 WL 794641 (C.D. Cal. 2024)..................................................................... 32

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336................................................................................................57, 60

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ........................................................................... 72

*Eng v. Edison Int'l*,
2017 WL 1857243 (S.D. Cal. 2017) ................................................................... 62

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ........................................................................... 42

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024)........................................................................53, 55, 64

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)........................................................47, 49, 67

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995)............................................................................. 15

*Felipe v. Playstudios Inc.*,
2024 WL 1380802 (D. Nev. 2024) ..................................................................... 69

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
501 F. Supp. 3d 735 (N.D. Cal. 2020)................................................................ 55

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001)............................................................................. 50

*Flowers v. Carville*,
310 F.3d 1118 (9th Cir. 2002) ........................................................................ 5, 7

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. 2016)................................................................69, 70

**Page**

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................................. 15

*Friends of Yosemite Valley v. Kempthorne*,
    520 F.3d 1024 (9th Cir. 2008) ............................................................................................ 18

*FSP Stallion 1 v. Luce*,
    2009 WL 1219683 (D. Nev. 2009) ...................................................................................... 39

*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019) ................................................................................................ 23

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
    2022 WL 716653 (D. Utah 2022) ....................................................................................... 48

*George v. China Auto. Sys., Inc.*,
    2012 WL 3205062 (S.D.N.Y. 2012) .................................................................................... 48

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ....................................................................................... *passim*

*Glazer Cap. Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) .............................................................................................. 48

*Golubowski v. Robinhood Mkts., Inc.*,
    2023 WL 1927616 (N.D. Cal. 2023) .............................................................................. 29, 33

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) ........................................................................................ 60, 62

*Hearns v. San Bernardino Police Dep't*,
    530 F.3d 1124 (9th Cir. 2008) ............................................................................................ 1, 9

*Hefler v. Wells Fargo & Co.*,
    2018 WL 1070116 (N.D. Cal. 2018) .............................................................................. 33, 64

*Hildes v. Arthur Andersen LLP*,
    734 F.3d 854 (9th Cir. 2013) .......................................................................................... 67, 70

*Hollinger v. Titan Cap. Corp.*,
    914 F.2d 1564 (9th Cir. 1990) ............................................................................................ 65

**Page**

*Homyk v. ChemoCentryx, Inc.*,
2023 WL 3579440 (N.D. Cal. 2023) ................................................................................ 25

*Houghton v. Leshner*,
2023 WL 6826814 (N.D. Cal. 2023) ................................................................................ 71

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ......................................................................................... 64

*Huberman v. Tag-It Pac. Inc.*,
314 F. App'x 59 (9th Cir. 2009) ...................................................................................... 65

*In re Acadia Pharms. Inc. Sec. Litig.*,
2020 WL 2838686 ............................................................................................................ 61

*In re AGS, Inc. Sec. Litig.*,
2022 WL 17406100 (D. Nev. 2022) ................................................................................. 72

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021), *cert. denied*,
___ U.S. ___, 142 S. Ct. 1227 (2022) .....................................................................*passim*

*In re Alteryx, Inc. Sec. Litig.*,
2021 WL 4551201 (C.D. Cal. 2021) ................................................................................. 55

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ....................................................................... 15, 32

*In re Apple Comput. Sec. Litig.*,
886 F.2d 1109 (9th Cir. 1989) ......................................................................................... 46

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. 2020) .......................................................................... 1, 9, 32

*In re Aspeon, Inc. Sec. Litig.*,
168 F. App'x 836 (9th Cir. 2006) ..................................................................................... 45

*In re Bank of Am. Corp.*,
2011 WL 740902 (N.D. Cal. 2011) .................................................................................. 17

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010) ........................................................................... 69

**Page**

*In re Barrick Gold Sec. Litig.*,
  2015 WL 1514597 (S.D.N.Y. 2015) ..................................................................................... 62

*In re Bed Bath & Beyond Corp. Sec. Litig.*,
  687 F. Supp. 3d 1 (D.D.C. 2023) ......................................................................................... 20

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) .......................................................................................... 57, 62

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009) ........................................................................................ 71

*In re Connetics Corp. Sec. Litig.*,
  2008 WL 3842938 (N.D. Cal. 2008) ................................................................................... 67

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................................... 47

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................. 9

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ........................................................................................ 44, 63

*In re DVI, Inc. Sec. Litig.*,
  639 F.3d 623 (3d Cir. 2011) ................................................................................................ 63

*In re Eargo, Inc. Sec. Litig.*,
  656 F. Supp. 3d 928 (N.D. Cal. 2023) ................................................................................. 39

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) ................................................................................. 56

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) ................................................................................................ 23

*In re FirstEnergy Corp.*,
  2022 WL 681320 (S.D. Ohio 2022) ................................................................................ 20, 61

*In re FVC.COM Sec. Litig.*,
  136 F. Supp. 2d 1031 (N.D. Cal. 2000),
  *aff'd*, 32 F. App'x 338 (9th Cir. 2002) ............................................................................... 46

**Page**

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015)................................................................*passim*

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...................................................................... 5, 57

*In re GlenFed Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994)............................................................................ 1

*In re Glob. Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004)............................................................ 13

*In re Green Dot Corp. Sec. Litig.*,
    2024 WL 1356253 (C.D. Cal. 2024)............................................................... 39

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014).............................................................. 9

*In re Iso Ray, Inc. Sec. Litig.*,
    189 F. Supp. 3d 1057 (E.D. Wash. 2016) ................................................. 29, 31

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
    2010 WL 5129524 (D. Colo. 2010) ................................................................. 9

*In re Lyft Inc. Sec. Litig.*,
    484 F. Supp. 3d 758 (N.D. Cal. 2020)............................................................ 68

*In re Mattel, Inc. Sec. Litig.*,
    2021 WL 1259405 (C.D. Cal. 2021)............................................................... 63

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008)............................................................ 63

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010)............................................................ 17

*In re Micron Tech., Inc. Sec. Litig.*,
    2009 WL 453917 (D. Idaho 2009) .................................................................. 19

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    78 F. Supp. 3d 1215 (N.D. Cal. 2015)............................................................ 63

**Page**

*In re Musicmaker.com Sec. Litig.*,
   2001 WL 34062431 (C.D. Cal. 2001)...............................................................29, 65

*In re Mylan N.V. Sec. Litig.*,
   2018 WL 1595985 (S.D.N.Y. 2018) ......................................................................56

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008)............................................................. 4, 9

*In re Peregrine Sys., Inc. Sec. Litig.*,
   2005 WL 8158825 (S.D. Cal. 2005) .......................................................................33

*In re Peregrine Sys., Inc. Sec. Litig.*,
   310 F. App'x 149 (9th Cir. 2009)............................................................................ 19

*In re Petco Animal Supplies Inc. Sec. Litig.*,
   2006 WL 6829623 (S.D. Cal. 2006) .......................................................................67

*In re Plantronics, Inc. Sec. Litig.*,
   2022 WL 3653333 (N.D. Cal. 2022)........................................................................54

*In re Qualcomm Inc. Sec. Litig.*,
   2019 WL 1239301 (S.D. Cal. 2019) ........................................................................50

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ........................................................................*passim*

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022)................................................25, 26, 27, 30

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. 2013).................................................32, 45, 46, 47

*In re Qwest Commc'ns Int'l, Inc.*,
   396 F. Supp. 2d 1178 (D. Colo. 2004) ..............................................42, 43, 46

*In re Redback Networks, Inc. Sec. Litig.*,
   2007 WL 4259464 (N.D. Cal. 2007),
   *aff'd*, 329 F. App'x 715 (9th Cir. 2009) ..............................................................32

*In re RenovaCare, Inc. Sec. Litig.*,
   2024 WL 2815034 (D.N.J. 2024)............................................................................20

**Page**

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)...............................................................................24, 39, 69, 70

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003)................................................................................ 43

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. 2018)..................................................................................... 49

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999),
*as amended* (Aug. 4, 1999) ................................................................................................ 45

*In re Silver Lake Grp., LLC Sec. Litig.*,
__ F.4th __, 2024 WL 3515766 (9th Cir. 2024)..............................................................20, 67

*In re SolarCity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017)................................................................................. 48

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022)..............................................................................37, 40

*In re Stable Road Acquisition Corp.*,
2022 WL 2762213 (C.D. Cal. 2022)................................................................................... 54

*In re Syncor Int'l Corp. Sec. Litig.*,
239 F. App'x 318 (9th Cir. 2007),
*as amended on denial of reh'g* (Oct. 9, 2007) ................................................................... 32

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996).................................................................................................. 24

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008).................................................................................. 44

*In re Teva Sec. Litig.*,
671 F. Supp. 3d 147 (D. Conn. 2023) .................................................................................. 25

*In re Tezos Sec. Litig.*,
2018 WL 4293341 (N.D. Cal. 2018).................................................................................... 71

*In re UBS Auction Rate Sec. Litig.*,
2010 WL 2541166 (S.D.N.Y. 2010)..................................................................................... 17

**Page**

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009)...................................................................................... 47

*In re Vantive Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ................................................................................................. 46

*In re Vaxart, Inc. Sec. Litig.*,
2023 WL 3637093 (N.D. Cal. 2023)............................................................................15, 18, 66

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012).......................................................................................21, 54, 56

*In re Violin Memory, Inc. Sec. Litig.*,
2015 WL 1968766 (N.D. Cal. 2015).................................................................................... 72

*In re Violin Memory Sec. Litig.*,
2014 WL 5525946 (N.D. Cal. 2014)..................................................................................... 72

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
480 F. Supp. 3d 1050 (N.D. Cal. 2020) ................................................................................ 24

*In re WageWorks, Inc. Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. 2020)..................................................................................... 63

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007)................................................................................. 48

*Jaeger v. Zillow Grp., Inc.*,
644 F. Supp. 3d 857 (W.D. Wash. 2022).........................................................................37, 38

*Jennings v. Carvana LLC*,
2024 WL 1209746 (3d Cir. 2024) ................................................................................... 14, 19

*Johnson v. Aljian*,
394 F. Supp. 2d 1184 (C.D. Cal. 2004)................................................................................. 66

*Johnson v. Aljian*,
490 F.3d 778 (9th Cir. 2007).................................................................................................. 66

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. 2020).................................................................................*passim*

**Page**

*Kempen Int'l Funds v. Syneos Health, Inc.*,
  2024 WL 1805011 (S.D.N.Y. 2024).................................................................................... 9

*Kennedy v. Tallant*,
  710 F.2d 711 (11th Cir. 1983) ........................................................................................ 17

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018).....................................................................................*passim*

*Kolominsky v. Root, Inc.*,
  100 F.4th 675 (6th Cir. 2024) ........................................................................................ 25

*Lamartina v. VMware, Inc.*,
  2021 WL 4133851 (N.D. Cal. 2021)............................................................................... 47

*Lamartina v. VMware, Inc.*,
  2023 WL 2763541 (N.D. Cal. 2023)............................................................................... 67

*Leventhal v. Chegg, Inc.*,
  __ F. Supp. 3d __, 2024 WL 924484 (N.D. Cal. 2024)......................................................... 61

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ...................................................................................61, 62

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014)............................................................................................ 57

*Lorenzo v. SEC*,
  587 U.S. 71 (2019) .............................................................................................10, 11, 18

*Lowthorp v. Mesa Air Grp. Inc.*,
  2021 WL 3089118 (D. Ariz. 2021)...............................................................................67, 72

*Lu v. Align Tech., Inc.*,
  417 F. Supp. 3d 1266 (N.D. Cal. 2019) ............................................................................ 66

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
  2018 WL 6181241 (D. Ariz. 2018)...............................................................................53, 62

*Mehedi v. View, Inc.*,
  2024 WL 2696982 (N.D. Cal. 2024)................................................................................. 61

**Page**

*Melendres v. Arapaio,*
    784 F.3d 1254 (9th Cir. 2015) ................................................................................. 61

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
    540 F.3d 1049 (9th Cir. 2008) ............................................................................55, 57

*Middlesex Ret. Sys. v. Quest Software Inc.,*
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) ................................................................... 67

*Miller v. Thane Int'l, Inc.,*
    519 F.3d 879 (9th Cir. 2008) ................................................................................... 21

*Miller v. Thane Int'l, Inc.,*
    615 F.3d 1095 (9th Cir. 2010) ................................................................................. 63

*Mineworkers' Pension Scheme v. First Solar Inc.,*
    881 F.3d 750 (9th Cir. 2018) .............................................................................*passim*

*Mulligan v. Impax Lab'ys, Inc.,*
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................28, 62

*Murphy v. Precision Castparts Corp.,*
    2017 WL 3084274 (D. Or. 2017),
    *report and recommendation adopted,*
    2017 WL 3610523 (D. Or. 2017) ..........................................................................9, 31

*N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Pension Fund v.*
    *Impax Lab'ys, Inc.,*
    843 F. App'x 27 (9th Cir. 2021) ........................................................................58, 61, 62

*Nathanson v. Polycom, Inc.,*
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ...................................................................... 63

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) ...........................................................................*passim*

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.,*
    380 F.3d 1226 (9th Cir. 2004) .........................................................................2, 42, 43, 50

*Nursing Home Pension Fund v. Oracle Corp.,*
    242 F. Supp. 2d 671 (N.D. Cal. 2002) .................................................................... 45

**Page**

*Okla. Police Pension & Ret. Sys. v. Boulder Brands, Inc.*,
 2017 WL 1148689 (D. Colo. 2017) ........................................................................ 9

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
 780 F. App'x 480 (9th Cir. 2019) ......................................................................... 56

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
 575 U.S. 175 (2015) .......................................................................................*passim*

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
 774 F.3d 598 (9th Cir. 2014).......................................................................29, 31, 41

*Pino v. Cardone Cap., LLC*,
 55 F.4th 1253 (9th Cir. 2022) ........................................................................71, 72

*Pinter v. Dahl*,
 486 U.S. 622 (1988) .............................................................................................. 71

*Pirani v. Slack Techs., Inc.*,
 445 F. Supp. 3d 367 (N.D. Cal. 2020),
 *aff'd*, 13 F.4th 940 (9th Cir. 2021).......................................................................... 71

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
 759 F.3d 1051 (9th Cir. 2014) ........................................................................53, 55

*Primo v. Pac. Bioscis. of Cal., Inc.*,
 940 F. Supp. 2d 1105 (N.D. Cal. 2013) ...........................................................71, 72

*Prodanova v. H.C. Wainwright & Co., LLC*,
 993 F.3d 1097 (9th Cir. 2021) .............................................................................. 43

*Provenz v. Miller*,
 102 F.3d 1478 (9th Cir. 1996) ...........................................................................25, 43

*Rabkin v. Lion Biotechs., Inc.*,
 2018 WL 905862 (N.D. Cal. 2018)...................................................................11, 62

*Ramirez v. Exxon Mobil Corp.*,
 334 F. Supp. 3d 832 (N.D. Tex. 2018)................................................................... 30

*Reckstin Fam. Tr. v. C3.ai, Inc.*,
 __ F. Supp. 3d __, 2024 WL 734497 (N.D. Cal. 2024)....................................... 60

**Page**

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014)...................................................................................53, 55, 56

*Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*,
2023 WL 3613313 (N.D. Cal. 2023)..................................................................................... 61

*Roberti v. OSI Sys., Inc.*,
2015 WL 1985562 (C.D. Cal. 2015)..................................................................................... 49

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).............................................................................................33, 35

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001),
*abrogated by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023)................................................................................................. 33

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) .........................................................................................69, 70

*S. Ferry LP, #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009)........................................................................... 49

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008).............................................................................................41, 55

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977) ............................................................................................................. 17

*Scheller v. Nutanix, Inc.*,
450 F. Supp. 3d 1024 (N.D. Cal. 2020) ............................................................................... 53

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016).............................................................................................35, 38

*ScripsAm., Inc. v. Ironridge Glob. LLC*,
2015 WL 12747908 (C.D. Cal. 2015)................................................................................... 17

*SEC v. Honig*,
2023 WL 6386918 (S.D.N.Y. 2023)..................................................................................... 18

*SEC v. Talbot*,
530 F.3d 1085 (9th Cir. 2008) ............................................................................................. 18

**Page**

*Sharenow v. Impac Mortg. Holdings, Inc.*,
    385 F. App'x 714 (9th Cir. 2010)......................................................................... 48

*Shenwick v. Twitter*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........................................................*passim*

*Simpson v. AOL Time Warner Inc.*,
    452 F.3d 1040 (9th Cir. 2006),
    *vacated on other grounds sub nom.*
    *Avis Budget Grp., Inc. v. Cal State Tchrs' Ret. Sys.*,
    552 U.S. 1162 (2008) ..................................................................................... 15, 16

*Singh v. 21Vianet Grp., Inc.*,
    2017 WL 4322483 (E.D. Tex. 2017),
    *report and recommendation adopted*,
    2017 WL 4310154 (E.D. Tex. 2017)............................................................... 12, 13

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)................................................................................... 24

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) .............................. 23, 24

*Smilovits v. First Solar, Inc.*,
    2012 WL 6574410 (D. Ariz. 2012) ...................................................................... 26

*Smith v. Bayer*,
    564 U.S. 299 (2011) ............................................................................................. 7

*Sneed v. AcelRx Pharms., Inc.*,
    2023 WL 4412164 (N.D. Cal. 2023)..................................................................... 55

*Snellink v. Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012).................................................................. 48

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
    243 F. Supp. 3d 1109 (E.D. Cal. 2017).................................................................. 70

*Spinner Corp. v. Princeville Dev. Corp.*,
    849 F.2d 388 (9th Cir. 1988).................................................................................. 5

**Page**

*Standard Fire Ins. Co. v. Knowles*,
    568 U.S. 588 (2013) ................................................................................................ 7

*Stardock Sys., Inc. v. Reiche*,
    2019 WL 8333563 (N.D. Cal. 2019) ............................................................... 18, 20

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ......................................................................... 5, 18

*Stevelman v. Alias Rsch.*,
    174 F.3d 79 (2d Cir. 1999) ................................................................................. 46

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) .............................................................................. 18, 19, 20

*Strasburger v. Blackburne & Sons Realty Cap. Corp.*,
    2020 WL 6128223 (C.D. Cal. 2020) .................................................................. 56

*Swanson v. Interface, Inc.*,
    2022 WL 2003990 (E.D.N.Y. 2022) ................................................................... 62

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ............................................................................... 8

*Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
    690 F. Supp. 2d 959 (D. Ariz. 2010) ................................................................. 64

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..................................................................................*passim*

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................. 48

*Tsirekidze v. Syntax-Brillian Corp.*,
    2009 WL 275405 (D. Ariz. 2009) ...................................................................... 69

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2017 WL 3328543 (C.D. Cal. 2017) .................................................................. 22

*United States v. Reyes*,
    660 F.3d 454 (9th Cir. 2011) .............................................................................. 50

**Page**

*Vanguard Specialized Funds v. VEREIT Inc.*,
    2016 WL 5858735 (D. Ariz. 2016) ................................................................................ 64

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) .......................................................................... 35

*Voulgaris v. Array Biopharma Inc.*,
    2020 WL 8367829 (D. Colo. 2020) .............................................................................. 51

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    57 F. Supp. 3d 950 (D. Minn. 2014) ............................................................................ 11

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .......................................................................................... 27

*Waswick v. Torrid Holdings, Inc.*,
    2023 WL 9197563 (C.D. Cal. 2023) ....................................................................... 24, 37

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ........................................................................................ 65

*Weiss v. Amkor Tech., Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007) ............................................................................ 61

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 167708 (N.D. Cal. 2017) .......................................................................... 65, 72

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ......................................................................................... 41

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ................................................................... *passim*

*White v. Jackson*,
    865 F.3d 1064 (8th Cir. 2017) ...................................................................................... 20

*Wilson v. Merrill Lynch & Co., Inc.*,
    671 F.3d 120 (2d Cir. 2011) ......................................................................................... 17

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ...................................................................................... 25

**Page**

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*,
2024 WL 1327247 (N.D. Cal. 2024)...............................................................................*passim*

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*,
65 F.4th 459 (9th Cir. 2023) ............................................................................................ 50

*Zamir v. Bridgepoint Educ., Inc.*,
2016 WL 3971400 (S.D. Cal. 2016) ................................................................................ 45

*Zhu v. Taronis Techs. Inc.*,
2020 WL 1703680 (D. Ariz. 2020) .................................................................................. 62

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009),
*as amended* (Feb. 10, 2009) ...............................................................................43, 53, 55, 56

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§77k ...........................................................................................................................67, 69
§77o ......................................................................................................................67, 68, 72
§78j(b) ....................................................................................................................*passim*
§78t(a).................................................................................................................20, 64, 65, 66
§78t-1.........................................................................................................................66, 67
§78u-4(b)(1)(B) .................................................................................................................. 7
§78u-4(b)(2) ..................................................................................................................... 41

Federal Rules of Civil Procedure
Rule 8.....................................................................................................1, 9, 10, 64, 69
Rule 8(a) ............................................................................................................................ 9
Rule 9(b)................................................................................................................*passim*
Rule 12 .............................................................................................................................. 63
Rule 12(a)(2) ...........................................................................................................67, 70, 72
Rule 12(b)(6)..................................................................................................................... 57

17 C.F.R.
§229.105(a) ...................................................................................................................... 68
§240.10b-5 ..................................................................................................................10, 66
§240.10b-5(a)..............................................................................................................*passim*
§240.10b-5(b)................................................................................................................10, 11
§240.10b-5(c)...............................................................................................................*passim*
§240.10b5-1 ..................................................................................................................... 46

**Page**

**SECONDARY AUTHORITIES**

Petition for a Writ of Certiorari,
*Facebook, Inc. v. Amalgamated Bank*,
2024 WL 1009159 (U.S. Mar. 4, 2024) ............................................................................. 23

Appellant's Opening Brief,
*N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C. v. Impax Lab'ys, Inc.*,
2020 WL 957066 (9th Cir. Feb. 14, 2020) ........................................................... 62

Brief for the United States as Amicus Curiae,
*First Solar, Inc. v. Mineworkers' Pension Scheme* (U.S. May 15, 2019) (No. 18-164)...... 58

# APPENDIX OF DEFINED TERMS

| | |
|---|---|
| "ACC" or "Amended Complaint" | Lead Plaintiffs' Amended Consolidated Complaint for Violations of the Federal Securities Laws (ECF 71) |
| "Average Days to Sale" | ADTS |
| "Board" | Carvana's Board of Directors |
| "Carvana" or the "Company" | Carvana Co. |
| "CC" | Lead Plaintiffs' Consolidated Complaint for Violations of the Federal Securities Laws (ECF 36) |
| "CFPB" | The Consumer Financial Protection Bureau |
| "Class Period" | May 6, 2020 – February 23, 2023, inclusive |
| "CW(s)" | Confidential Witness(es).  The CWs are referred to as he/him to preserve their anonymity. |
| "Defendants" | The Exchange Act Defendants unless otherwise stated |
| "DOJ" | The Department of Justice |
| "DriveTime" | DriveTime Automotive |
| "Exchange Act" or "1934 Act" | The Securities Exchange Act of 1934 |
| "Exchange Act Defendants" | Defendants Carvana, Garcia Sr., Garcia Jr., and Jenkins |
| "GAAP" | Generally Accepted Accounting Principles |
| "Garcia Jr." | Defendant Ernest Garcia III, Carvana's Chief Executive Officer ("CEO") and Chairman |
| "Garcia Sr." | Defendant Ernest Garcia II |
| "GPU" | Gross Profit per Unit |
| "GS Motion" or "GMtn." | Ernest Garcia II's Motion to Dismiss the Amended Consolidated Complaint and Memorandum of Points and Authorities (ECF 85) |
| "Individual Securities Act Defendants" | Defendants Garcia Jr., Jenkins, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan |
| "IRC(s)" | Inspection and Reconditioning Center(s) |
| "Jenkins" | Defendant Mark Jenkins, Carvana's Chief Financial Officer ("CFO") |
| "MNPI" | Material, Non-Public Information |
| "Motion" or "Mtn." | Defendants' Motion to Dismiss Lead Plaintiffs' Amended Consolidated Complaint and Memorandum of Points and Authorities (ECF 82) |
| "NYSE" | The New York Stock Exchange |
| "Offering" or "2022 Offering" | Carvana's 2022 public offering on or about April 20, 2022 |

4883-2521-8257.v1

# APPENDIX OF DEFINED TERMS

| | |
|---|---|
| "Plaintiffs" or "Lead Plaintiffs" | Lead Plaintiffs United Association National Pension Fund ("UANPF") and Saskatchewan Healthcare Employees' Pension Plan |
| "PSLRA" | The Private Securities Litigation Reform Act of 1995 |
| "Registration Statement" or "RS" | Carvana's Form S-3 registration statement filed with the SEC on April 20, 2022, in connection with the Offering, including the prospectus supplement filed April 25, 2022, and all documents incorporated by reference |
| "RJNs" | Carvana Defendants' Request for Judicial Notice and Incorporation by Reference in Support of Carvana Defendants' Motion to Dismiss Lead Plaintiffs' Amended Consolidated Complaint (ECF 84) and Request for Judicial Notice in Support of Ernest Garcia II's Motion to Dismiss the Amended Consolidated Complaint (ECF 86) |
| "S&P 500" | Standard & Poor's Composite Stock Index |
| "SEC" | The U.S. Securities and Exchange Commission |
| "Securities Act" or "1933 Act" | The Securities Act of 1933 |
| "Securities Act Defendants" | Defendants Carvana, Michael Maroone, Neha Parikh, Ira Platt, Greg Sullivan, Garcia Jr., Jenkins, Stephen Palmer, Citigroup Global Markets Inc., and J.P. Morgan Securities LLC |
| "SOX" | Sarbanes-Oxley Act of 2002 |
| "The Garcias" | Defendants Garcia Sr. and Garcia Jr. |
| "*The WSJ* exposé" | *The Wall Street Journal*'s October 22, 2021 article: "Carvana Faces Government Scrutiny and Fines" |
| "Underwriter Defendants" | Citigroup Global Markets Inc. ("Citigroup") and J.P. Morgan Securities LLC ("J.P. Morgan") |
| "UW Motion" or "UWMtn." | Joinder of Underwriter Defendants in the Carvana Defendants' Motion to Dismiss Lead Plaintiffs' Consolidated Complaint (ECF 87) |
| "*Warwick II*" | *City of Warwick Ret. Sys. v. Carvana Co.*, No. CV 2022-013054 (Ariz. Super. Ct., Maricopa Cnty.) |

4883-2521-8257.v1

Lead Plaintiffs respectfully submit this Omnibus Memorandum of Law in Opposition to the Exchange Act Defendants' and Securities Act Defendants' motions.

## I.      INTRODUCTION

Defendants' overwrought motions call to mind the famous phrase "[thou] doth protest too much."  William Shakespeare, *Hamlet*, act 3, sc. 2.  While they express indignation at the ACC's allegations, Defendants cannot evade liability for defrauding shareholders simply because the CC was dismissed on technical pleading grounds in an order that did not address the substance of Plaintiffs' claims.  With their prior request for dismissal of the ACC rejected out of hand (ECF 73, 76-77, 79, 81), Defendants' instant 3,806-page dismissal bid invites reversible error by misstating the applicable legal standards, ignoring controlling precedent, and citing inapposite law while rewriting the ACC and introducing facts extraneous to it to construct their preferred narrative.  Though numerous, Defendants' arguments are meritless.  Their motions should be denied.

***First***, the ACC's length is necessary to: (i) sufficiently plead Defendants' complex and multifaceted fraud, involving numerous deceptive acts, dozens of misrepresentations and omissions, and billions of dollars in insider sales; and (ii) comply with the Court's February 29, 2024 Order (ECF 70) that Plaintiffs describe why each statement was false or misleading when made on "a statement-by-statement basis."  ECF 70 at 18.  The ACC's length in and of itself does not render the pleading a puzzle.  Indeed, the Ninth Circuit has held that a district court "abused its discretion" and made an "'error of law'" by adopting Defendants' proffered approach.  *See Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1129 (9th Cir. 2008).[1]  Further, Defendants ask this Court to ignore the inherent tension between complying with Rule 8 and complying with the PSLRA and Rule 9(b) – a tension that the Ninth Circuit has warned district courts to consider in securities cases such as this one.  *See In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *8 n.4 (N.D. Cal. 2020) (citing *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1555-56 (9th Cir. 1994)).  The claims should be adjudicated on the merits.

***Second***, Defendants' conclusory attacks on Plaintiffs' well-pleaded scheme allegations fail.

---

[1] Unless otherwise noted, emphasis is added, citations are omitted, and all "¶__" or "¶¶__" references are to the ACC.

- 1 -

The ACC sufficiently pleads the nature, purpose, and effect of Defendants' fraudulent scheme, as well as the deceptive acts taken by Defendants in furtherance of that scheme. Though Garcia Sr. attempts to evade liability by claiming that he is an indirect, remote third party with no influence over Carvana, this assertion is belied by the ACC's allegations that Garcia Sr. controlled Carvana and played a primary role in the scheme.

*Third*, Plaintiffs satisfy Rule 9(b) by alleging the who, what, where, when, and how of Defendants' misleading statements concerning: (i) *title and registration* (¶¶173-189); (ii) *buying cars from customers* (¶¶190-210); (iii) *retail unit sales growth* (¶¶211-215); (iv) *expansion and logistics infrastructure* (¶¶216-235); (v) *ADTS* (¶¶236-243); and (vi) *Retail GPU* (¶¶244-260). Unable to refute the allegations, Defendants resort to misstating the legal standard, disputing allegations that must be accepted as true, and improperly playing factfinder by declaring their (rewritten) misleading statements either true or inactionable. For example, Defendants claim that to plead falsity, "Plaintiffs were required to allege material facts that were not disclosed to investors *and that contradicted something Defendants said*." Mtn. at 1. But that is not the standard. "[A] statement that is literally true can be misleading and thus actionable" (*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)) "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists'" (*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).

*Fourth*, while motive is not an element of §10(b), the ACC also alleges the why, detailing Defendants' scheme to obscure Carvana's faltering growth story to buy time and cash in $3.76 billion of Carvana stock at artificially inflated prices before the truth – and inflation – came out. Defendants' "astronomical" stock sales strongly support scienter. *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004). Faced with their multi-billion-dollar motive, Defendants tell the Court to ignore it because they (mostly) traded pursuant to 10b5-1 plans. But this affirmative defense does not defeat insider sales allegations where, as here, Defendants manipulated their plans, rendering them useless – except as an artifice in furtherance of the scheme – "'signal[ing] that *the executives knew what was coming, and consequently took advantage of the lofty valuations to . . . sell their own equity*.'" ¶165.

4883-2521-8257.v1

*Fifth*, Defendants' overly restrictive loss causation argument has been repeatedly rejected by the Ninth Circuit. And, contrary to Defendants' claim that there is some requirement of how much a stock price must drop in response to a corrective disclosure, the Ninth Circuit has repeatedly upheld smaller drops than those at issue here.

*Sixth*, apart from the alleged fraud, the Securities Act claims adequately allege that the Securities Act Defendants made materially false and misleading statements in the RS associated with the 2022 Offering, for which they are liable.

Defendants' disregard for Plaintiffs' allegations, the appropriate standards, and controlling precedent should not be countenanced. Their summary judgment-style motions should be denied.

## II.    SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS[2]

The fraud alleged here involves a classic pump-and-dump scheme to pump up Carvana's stock price by concealing the true nature of Carvana's retail sales business – Carvana's bread and butter – so that Defendants could dump *$3.76 billion* of their own Carvana shares before their fraud unraveled. ¶¶1-18, 39-41, 125-172, 261-273.

In 2012, Garcia Sr. and his son, Garcia Jr., founded Carvana as a wholly-owned subsidiary of Garcia Sr.'s used car business, DriveTime. ¶¶4, 35, 37. In 2017, the father-and-son duo took Carvana public. ¶¶4, 26, 37. But Garcia Sr.'s felony rap sheet meant that he was banned from appearing to participate in Carvana's management. ¶¶26, 34, 37, 296, 304. So Garcia Sr. ran Carvana behind the scenes, retaining an 84% supermajority voting power and the ability to elect all of the members of Carvana's Board, appoint management, and control Carvana's "policies and operations." ¶¶4, 26, 37, 160, 280, 285, 297, 353. According to Professor Taylor of Wharton, Carvana's "'structure has allowed [the Garcias] to run [Carvana] as if it's a family firm and for the family's benefit.'" ¶¶37, 297. Indeed, leading up to and during the Class Period, Garcia Sr. emailed with his son regarding Carvana's material, internal business and induced Carvana to enter into almost a half-billion dollars of transactions with his other companies. ¶¶160, 296-303.

Upon taking Carvana public, the Garcias touted the Company as a limitless growth

---

[2] The ACC constitutes Plaintiffs' statement of facts. In the interest of brevity, detailed herein is a brief summary of the factual background.

- 3 -

4883-2521-8257.v1

machine – the Amazon of the used car industry – telling investors that their "business gets better as it gets bigger" because of its disruptive e-commerce model. ¶¶2, 8, 38, 154. Carvana's retail growth was essential to this false narrative and, by extension, the Company's valuation. ¶¶39-41, 281. Leading up to the Class Period, however, Defendants' story faltered as the Company's growth slowed. ¶¶5-6, 126. Analysts expressed alarm: "If the growth starts to slow significantly, and the company is still not profitable, *there will be a transition away from growth investors, and we believe that how investors think about the valuation of the stock will change*." ¶¶5, 126. In response to this slowed growth, Carvana's stock price fell to a multi-year low. ¶126.

To sell their Carvana shares for top dollar, Defendants needed to deceive investors into believing that Carvana's downward growth trend had reversed. *Id.* To that end, Garcia Sr., Garcia Jr., and Jenkins concocted and executed a scheme to inflate Carvana's retail vehicle sales – the Company's most important metric – to convince investors that Carvana would continue to deliver on its sustainable growth story. ¶¶7, 125-165. Garcia Jr. and Jenkins also issued a series of materially false and misleading statements and omissions. ¶¶173-260.

Defendants' conduct, misstatements, and omissions produced their desired effect of misleading the market. *See, e.g.*, ¶¶169, 181(c), 198(c), 221(d). Carvana was named one of the fastest companies to make the Fortune 500 based on purported organic growth alone. ¶¶8, 157. *Fortune* noted: "How did Carvana make it onto the Fortune 500? . . . [I]t turns out, the business is built on a foundation of legitimate scalability." ¶159. The market rewarded Defendants, pumping Carvana's stock price 318%. ¶¶18, 159, 327 n.169. But Defendants "'*knew it was short-lived*.'" ¶¶9, 162, 266. So, they manipulated their 10b5-1 plans to capitalize on the scheme, with Garcia Sr. modifying his *new* plan *twice* to accelerate the rate at which he could dump his shares. ¶¶8-9, 160-162, 265, 270. For his part, Jenkins adopted two new plans within nine months. ¶¶8, 160, 269-270. In total, Defendants dumped nearly 14.3 million shares at artificially inflated prices, reaping proceeds of *nearly $3.76 billion*. ¶¶3, 8, 163, 261. Their suspicious insider sales "'signal[ed]'" to Professor Taylor that "'*the executives knew what was coming, and consequently took advantage of the lofty valuations to . . . sell their own equity*.'" ¶165.

When the ramifications and negative economic effects of Defendants' scheme and

- 4 -

4883-2521-8257.v1

misrepresentations could no longer be concealed, the truth regarding Carvana's retail growth and business was revealed through a series of partial disclosures. ¶¶166-172, 307-328. In response, Carvana's stock price nosedived 98% from its Class Period high and caused investors to suffer substantial monetary damages. *Id.* But by then, Defendants' $3.76 billion purpose had already been realized, and investors were left holding the bag. ¶¶17-18, 160-165, 327 n.169.

## III.    LEGAL STANDARD

The Court must "accept all factual allegations in the complaint as true" and "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 326 (2007). A complaint need only contain sufficient factual matter that states a claim for relief that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding plausibility, the Court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (inferences in plaintiff's favor). A complaint may be dismissed only when defendants' plausible alternative explanation is so convincing that plaintiff's explanation is implausible. *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

## IV.    AN UNRELATED STATE COURT CASE IS IRRELEVANT TO THE ADEQUACY OF THE ACC

To hide the frailty of their arguments in **this** case, Defendants rely extensively on an unpublished, unrelated state court judge's exposition of federal law. *See* Mtn. at 3-4, 6, 14-16, 18, 20, 24-25, 44; UWMtn. at 7 (citing ECF 63, Ex. A at 16-22, 25-26 (Ruling, *Warwick II* (Oct. 26, 2023))). As an initial matter, it is well-settled that "a state court's opinion on an issue of federal law is only potentially persuasive, not binding." *Christiana Tr. v. K & P Homes*, 288 F. Supp. 3d 1039, 1044 (D. Nev. 2017). Moreover, an "unreported decision of a state trial court" may be relied on only "to the extent its reasoning is persuasive" (*Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388, 390 n.2 (9th Cir. 1988)), meaning that federal courts must "attach no weight to unreasoned conclusions in unpublished state decisions" (*Flowers v. Carville*, 310 F.3d 1118, 1125

- 5 -

(9th Cir. 2002)).  Thus, *Warwick II* may not be considered unless it is well-reasoned and, even then, only to the extent its reasoning is persuasive.

This is not the situation.  *Warwick II* is wholly inapplicable as that action involved different securities laws, different time periods, different claims, different defendants, different misrepresentations, and different omitted facts.  That case concerned only Securities Act claims arising out of Carvana's April 22, 2022 Offering.  ECF 63, Ex. A at 6.  Thus, there was no opportunity for the court to opine on whether misstatements, omissions, or deceptive acts predating the Offering could support liability under the Exchange Act during the May 6, 2020 through February 23, 2023 Class Period as to Defendants in this case (including Garcia Sr., who is a defendant here and not in *Warwick II*).  Thus, *Warwick II* does not speak to the sufficiency of the vast majority of Plaintiffs' fraud allegations here, which concern a fraudulent pump-and-dump scheme, insider trading, and misstatements under the Exchange Act apart from the 2022 Offering (¶¶1-364).  And even if *Warwick II* had any relevance, "1934 Act claims [unlike 1933 Act claims] **must** proceed in federal court."  *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 433 (2018).

Further, *Warwick II* and the ACC involve different misstatements.  For example, the *Warwick II* plaintiff alleged that the Offering documents included misstatements regarding Carvana's: (i) customer lifecycle stages of fulfillment and post-sale customer support (Amended Class Action Complaint for Federal Securities Laws Violations, ¶¶9-10, 168-169, *Warwick II* (Apr. 28, 2023) (the "SC")); (ii) risk disclosures concerning COVID (SC, ¶¶11-12, 180); (iii) risk disclosures related to Carvana's growth (SC, ¶¶11-12, 181); and (iv) revenue because of the impropriety of its revenue recognition and its GAAP violations.  *See* SC, ¶¶7-8, 13-14, 21, 49, 51, 167(d), 171(d), 176, 177(d), 183(d), 184-210.  These statements are not at issue in the ACC. Rather, the ACC alleges Defendants made misstatements regarding, for example, the drivers of retail unit sales (Statement Nos. 19-20), title and registration (Statement Nos. 1-8), and per-vehicle profitability (Statement Nos. 33-39) – statements that were not at issue in *Warwick II*.  Unlike *Warwick II*, the ACC says nothing at all about GAAP, COVID, or lifecycle stages of fulfillment.

The alleged omissions are dissimilar, too.  In *Warwick II*, the plaintiff alleged that Carvana

- 6 -

4883-2521-8257.v1

omitted information, including that: (i) Carvana bought cars from individuals because it was **more** profitable, but this caused title issues; (ii) Carvana's lots were filling up because it did **not** sell cars due to title and registration backlogs; and (iii) Carvana recognized revenue on cars sold without title in violation of GAAP and contrary to its revenue recognition policy. ECF 63, Ex. A at 11-12, 19-30. And because of this focus on GAAP, the plaintiff in *Warwick II* brought claims against Carvana's auditors. These are not Plaintiffs' allegations. Here, Plaintiffs allege that buying cars from customers was **less** profitable, net of expenses (*e.g.*, ¶192(c)), and that Carvana sold cars regardless of any purported title and registration backlogs and title status (¶¶144-149, 173-189). Further, unlike in *Warwick II*, the ACC's title and registration allegations in no way concern Carvana's auditors, revenue recognition practices, or GAAP.

Given these fundamental differences between *Warwick II* and the instant matter, the Court should "attach no weight" to the unpublished state court decision. *Flowers*, 310 F.3d at 1125. This is especially true considering the Supreme Court has repeatedly held that decisions in cases with an uncertified class have absolutely no *res judicata* effect. *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013); *Smith v. Bayer*, 564 U.S. 299, 315 (2011).

## V.    THE ACC IS NOT A PUZZLE PLEADING

Plaintiffs complied with the Court's February 29, 2024 Order. Plaintiffs dramatically cut the number of alleged misstatements and then identified the remaining allegedly false or misleading statements, specified whether each such statement is affirmatively false or misleading by omission, and described why each statement was false or misleading when made on a statement-by-statement basis. *Compare* ACC, §VII, *with* ECF 70 at 18-19. Plaintiffs reduced the number of alleged misstatements by more than 60%, from "***over a hundred different statements***" (ECF 50 at 2) (emphasis in original) to just 39. For those 39 statements, Plaintiffs drastically reduced paragraph references and included "all facts" that rendered each of the 39 misstatements or omissions false or misleading or rendered an omitted fact material, as required by the PSLRA. *See* 15 U.S.C. §78u-4(b)(1)(B) (plaintiffs in securities litigation are "[r]equire[d]" to "specify . . . the reason or reasons why [each] statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with

- 7 -

particularity ***all facts*** on which that belief is formed").[3]  Finally, with regard to the scheme liability claim, Plaintiffs explained "in a clear and concise manner" how the Exchange Act Defendants engaged in or employed the fraudulent scheme.  *See* ¶¶125-165 (detailing Defendants' individual participation in the fraudulent pump-and-dump scheme).  Defendants have no legitimate argument that the ACC's allegations are unclear.  They do not contend that they are unable to discern each false or misleading statement or deceptive act.[4]  Nor do Defendants claim that they are required to match statements with inter-referenced reasons why false.  As such, Plaintiffs complied with the Court's February 29, 2024 Order.

Defendants previously attacked the CC as a classic puzzle pleading requiring the reader to match up allegedly misleading statements with the reasons why false, complaining that Plaintiffs "rely[] on dozens of paragraphs [of misleading statements] . . . followed by a list of 'omissions' – without explaining how a particular omission contradicted a particular statement."  ECF 50 at 10-11.  Defendants continued: "Their laundry lists compound the issue by reciting purportedly omitted facts with vague references to large sections earlier in the Complaint."  *Id.* at 11 n.6.  Given that Plaintiffs have cured these deficiencies, Defendants now pivot, grousing that the ACC is long and repetitive.  Defendants cannot have it both ways.  To be sure, the ACC is longer and repeats certain facts.  In the CC, Plaintiffs saved space and avoided repetition by grouping multiple alleged misleading statements by subject matter and providing a litany of reasons why false applicable to that group of statements, cross-referencing applicable facts set forth elsewhere in the complaint.  Now, however, Plaintiffs have avoided doing so in order to "state with particularity all facts" why ***each*** statement is misleading on "***a statement by statement basis***," as required by this Court, and to remedy the shortcoming identified by the Court that the CC's "allegations of falsity [were] presented in a web of inter-referenced paragraphs."  ECF 70 at 17-18.  Thus, contrary to Defendants' claim, the reasons why each statement is false are tailored to that statement and the

---

[3] The ACC also satisfies Rule 9(b), which provides: "[A] party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This requires a plaintiff to include "'an account of the time, place, and specific content of the false representations' at issue."  ECF 70 at 12 (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)).

[4] Garcia Sr. correctly notes Plaintiffs made a single "typo" in the ACC by erroneously referencing Garcia Sr. instead of Garcia Jr. in ¶151.  GMtn. at 4 n.2.

- 8 -

specific point in time in which it was made. *E.g.*, *compare* ¶192(c) (explaining an increase in wholesale sales and comparing reported GPU in Q3 2020 for statement made in the Q3 2020 10-Q), *with* ¶196(c) (explaining an increase in wholesale sales and comparing reported GPU in Q4 2020 for nearly identical statement made in the Q4 2020 10-K).

While the ACC is not short, it is plain. The ACC's length does not warrant dismissal under Rule 8. As this Court made clear, "the length and scope of the Consolidated Complaint do not, by themselves, result in a puzzle pleading warranting dismissal." ECF 70 at 17. The court in *In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008), also distinguished between puzzle pleading (which may warrant dismissal), and length (which does not). In *New Century*, the court dismissed a 100-page complaint because it was unable to understand the plaintiffs' allegations. 588 F. Supp. 2d at 1218. Following dismissal, the plaintiffs filed a 375-page amended complaint. *Id.* In denying the motion to dismiss the amended complaint, the court aptly noted, "a long and detailed complaint is not a work of 'puzzle pleading' as a matter of law." *See id.* at 1219. Similarly, in *Hearns*, the Ninth Circuit held that a district court "abused its discretion" and made an "'error of law'" by doing precisely what Defendants urge this Court to do here – dismiss an amended complaint under Rule 8 due to its length. 530 F.3d at 1129-32. Indeed, the Ninth Circuit held that defendants' cited cases do not "stand[] for the proposition that a complaint may be found to [violate] Rule 8(a) solely based on excessive length, nor does any other Ninth Circuit case contain such a holding." *Id.* at 1131.[5]

---

[5] Unlike Defendants' many out-of-circuit cases (*Cupat v. Palantir Techs., Inc.*, 2024 WL 1374903 (D. Colo. 2024), *Kempen Int'l Funds v. Syneos Health, Inc.*, 2024 WL 1805011 (S.D.N.Y. 2024), *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 2010 WL 5129524 (D. Colo. 2010), and *Okla. Police Pension & Ret. Sys. v. Boulder Brands, Inc.*, 2017 WL 1148689 (D. Colo. 2017)), "the Ninth Circuit has cautioned against applying a strict requirement for a 'short' statement under Rule 8 in light of the heightened pleading standards of Rule 9(b) and PSLRA." *See Apple*, 2020 WL 2857397, at *8 n.4; *see also Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *7 (D. Or. 2017) (upholding complaint and noting plaintiffs "'abuse the principles of Rule 8 not because they are not short' but because they are not plain"), *report and recommendation adopted*, 2017 WL 3610523 (D. Or. 2017); *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (same); *Barnes v. Edison Int'l*, 2021 WL 2325060, at *6 (C.D. Cal. 2021) (dismissing complaint on other grounds, but holding 510-paragraph complaint (in contrast to the 448-paragraph ACC here) "meets the Rule 8(a) requirement"), *aff'd*, 2022 WL 822191 (9th Cir. 2022); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1156 (C.D. Cal. 2008) (sustaining 416-page complaint, noting that meeting Rule 9(b) and the PSLRA can be an "onerous task").

4883-2521-8257.v1

Defendants disparage Statement No. 9 of the ACC (¶¶191-192) as an example of puzzle pleading, claiming that Plaintiffs fail to explain how the GPU metric is relevant to Defendants' misstatement that they "assess vehicles on the basis of quality," among other factors, to identify "the most in-demand and profitable vehicles" to purchase. ¶191. Not so. By purchasing low-quality cars from customers, Defendants were forced to sell those cars wholesale at a loss. ¶192(c). In order to hide these losses, Defendants excluded certain costs from its wholesale GPU and did not disclose them separately so that investors could decipher the overall profitability of Carvana's wholesale sales. ¶192(c)(ii)(2). Equally unavailing is Defendants' contention that the ACC is a puzzle because it failed to include scienter facts in the falsity section. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) ("[A]lthough some facts might be used to support both an inference of scienter and an inference of falsity, our decisions issued after *Tellabs* have consistently refrained from co-mingling the inquiries.").

In sum, Plaintiffs complied with the Court's Order, Rule 8, Rule 9(b), and the PSLRA by: (i) identifying each Defendant's deceptive act in furtherance of the scheme; (ii) identifying 39 false or misleading statements; (iii) specifying whether each statement was false or misleading by omission; (iv) describing why each statement and/or omission was materially false or misleading when made; (v) specifying what the omission was and why the omission was material for any alleged omissions; and (vi) doing so "on a statement-by-statement basis" (ECF 70 at 18).

## VI.    THE EXCHANGE ACT CLAIMS ARE ADEQUATELY ALLEGED

### A.    The ACC Adequately States a Scheme Claim

Rule 10b-5(a) and (c) scheme claims are distinct from Rule 10b-5(b) misstatement claims because they require a showing of deceptive conduct. *See, e.g.*, *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015). Yet, as this Court recognized, "considerable overlap" exists among the subsections of Rule 10b-5, and a defendant's actions can, as here, violate Rule 10b-5(a), (b), and (c). ECF 70 at 15 (quoting *Lorenzo v. SEC*, 587 U.S. 71, 80 (2019)); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (the "argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*"), *cert. denied*, ___ U.S. ___, 142 S. Ct. 1227 (2022).

- 10 -

4883-2521-8257.v1

Unable to refute the ACC's well-pleaded, distinct scheme claim, Defendants insist in two paragraphs that the scheme claim "is no different from Plaintiffs' statement-based theory of fraud." Mtn. at 40. This accusation is belied by a cursory review of the ACC, which alleges that Garcia Jr., Garcia Sr., and Jenkins violated Rule 10b-5(a) and (c) by engaging in a scheme to defraud investors (¶¶125-172) and that Garcia Jr. and Jenkins violated Rule 10b-5(b) by making material misrepresentations and omissions (¶¶173-260). That some of the "alleged acts are closely connected to the alleged misrepresentations and omissions . . . does not mean that Plaintiffs' scheme liability claim is a mere recast of their misrepresentation claim." *Rabkin v. Lion Biotechs., Inc.*, 2018 WL 905862, at \*17 (N.D. Cal. 2018); *Galena*, 117 F. Supp. 3d at 1194 (same); *Lorenzo*, 587 U.S. at 80-82. Indeed, the Court recognized that "scheme liability under (a) and (c) can be based on a scheme to take advantage of misleading statements." ECF 70 at 15. To lay bare Defendants' error, Plaintiffs separately discuss the scheme allegations in detail below.

### 1.     The Nature, Purpose, and Effect of Defendants' Scheme

Rule 10b-5(a) prohibits "any device, scheme, or artifice to defraud," and Rule 10b-5(c) prohibits "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5(a), (c). "These provisions capture a wide range of conduct." *Lorenzo*, 587 U.S. at 79. For scheme claims, Plaintiffs "'need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.'" *Galena*, 117 F. Supp. 3d at 1193 (quoting *ATSI Commc'ns, Inc. v Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981 (D. Minn. 2014) (PSLRA's heightened pleading requirements do not apply to scheme claims). Rather, "[b]ecause 'the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation'" under Rule 9(b). *Galena*, 117 F. Supp. 3d at 1193; *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP Inc.*, 2024 WL 1327247, at \*13 (N.D. Cal. 2024).

The ACC satisfies this standard, alleging: (i) the ***nature*** of the scheme by detailing how Defendants employed seven artifices to inflate the Company's retail sales growth – its most important metric – and convince investors that this growth was sustainable (¶¶125-165); (ii) the

- 11 -

4883-2521-8257.v1

*purpose* of their scheme was to drive up Carvana's stock price, so that Jenkins and Carvana's founder, controlling shareholder, and CEO's father, Garcia Sr., could sell nearly $3.76 billion of stock (¶¶126, 160-165); and (iii) the *effect* of their scheme was that investors were deceived into believing Carvana's "rapid ascension [to the Fortune 500] mark[ed] the fastest *organic* growth of any automotive retailer" as its "business is built on a foundation of legitimate scalability," which, in turn, drove Carvana stock to reach its record-high price of $376 per share. ¶¶157-159.

### 2. Defendants Committed Deceptive Acts

Defendants concede that, to be liable for a scheme, each defendant need only have engaged in an act that had "the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." Mtn. at 40 (quoting *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *22 (D. Ariz. 2023)); *HP*, 2024 WL 1327247, at *13. Instead, they argue that Plaintiffs failed to allege each Defendant engaged in a deceptive act. Mtn. at 40. Not so. As detailed below, the ACC easily satisfies this standard by pleading each Defendant's individual involvement in the artifices, each of which advanced the pump-and-dump scheme.

**Artifice No. 1**. *Garcia Sr*. caused his private company, DriveTime, and ***his and Garcia Jr.'s*** public company, Carvana, to enter into a sham pass-through sales deal by September 2021. ¶¶125, 127. Under this arrangement, Carvana would acquire cars from DriveTime, sell those cars on its website, and then pass the entire proceeds from the sale back to DriveTime. ¶127. Although Carvana merely acted as DriveTime's middle man, it still recorded the revenue and unit sales on its books. *Id.* Thus, the clear purpose of the arrangement was to inflate Carvana's reported retail sales. *Id.* Their deceptive conduct worked. Although the full details regarding the arrangement were concealed through belated, piecemeal, and inconsistent disclosures, the sham transactions accounted for approximately 660% of Carvana's sequential growth in Q4 2021 and 17% of its reported annual FY 2021 growth. ¶129 & n.11. Because the "'sham transactions . . . had an inherent tendency to deceive,'" they are "'a "device" or "scheme" to defraud, or at least a "practice" or "course of business" which operated as a fraud or deceit upon the investing public.'" *Singh v. 21Vianet Grp., Inc.*, 2017 WL 4322483, at *3 (E.D. Tex. 2017), *report and*

- 12 -

*recommendation adopted*, 2017 WL 4310154 (E.D. Tex. 2017).[6]

**Artifice No. 2**. *Garcia Jr. and Jenkins* "drastically lower[ed] Carvana's purchasing and verification standards, buying low-quality cars to induce trade-in sales." ¶¶125, 130-133. While this practice materially increased retail sales (¶130), it caused Carvana to be flooded with "trash cars" that had to be sold wholesale (¶135). The increased wholesale volume ravaged Carvana's bottom line because, unbeknownst to investors, Carvana lost money on wholesale sales. *Id.* And the increased wholesale volume spiked Carvana's logistical expenses, eventually requiring Defendants to issue high-interest junk bonds to acquire the wholesale business ADESA to stay afloat. ¶137. Worse, *Garcia Jr. and Jenkins* doubled down on their deceptive conduct by concealing it and its devastating impact on Carvana. Indeed, they: (i) hid that Carvana lost money on wholesale sales by obscuring the actual profit earned on each wholesale vehicle sold; (ii) assured investors that Carvana "assess[ed] vehicles on the basis of quality"; and (iii) touted only the benefits of buying cars from customers. ¶¶136, 138, 190-210.

**Artifice No. 3**. *Garcia Jr. and Jenkins* spearheaded a nationwide expansion without regard to profitability to boost Carvana's retail sales. ¶¶7, 125, 139. As Garcia Jr. belatedly admitted, Carvana incurred materially higher costs in markets 100 miles or more from a Carvana IRC and at least $750 more in costs per retail car sold in markets 200 miles or more from an IRC. ¶¶139-140. Nevertheless, Garcia Jr. and Jenkins opened 90% of their new markets 100 miles or more away from an existing IRC, with 65% being at least 200 miles away from an IRC. *Id.* Thus, unbeknownst to investors, *Garcia Jr. and Jenkins* boosted retail sales with unprofitable sales in these new, far-flung markets. *Id.* Exacerbating matters, by the second half of FY 2021, Carvana was forced to rely on costly third-party logistics and reconditioning providers to make up for Carvana's deficient expansion model. ¶¶141-142. *Garcia Jr. and Jenkins* concealed this deceptive conduct and its devastating impact by, among other things, obscuring material per-vehicle operations expenses, which included these increased third-party costs. ¶143.

---

[6] *See also In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 337 (S.D.N.Y. 2004) ("Schemes used to artificially inflate the price of stocks by creating phantom revenue fall squarely within both the language of section 10(b) and its broad purpose . . . .").

4883-2521-8257.v1

**Artifice No. 4**. *Garcia Jr. and Jenkins* flouted state title and registration laws in order to secure retail sales before Carvana's competitors. ¶¶144-149. As confirmed by confidential witnesses, state officials, and the numerous suspensions and revocations of Carvana's licenses, this practice was systematic and nationwide. ¶¶145-146, 148. Defendants' undisclosed conduct increased sales but exposed Carvana to devastating financial, regulatory, legal, and reputational loss. ¶¶11, 148. Indeed, Carvana has been penalized or had its license suspended or revoked in North Carolina, Michigan, Illinois, Arizona, Pennsylvania, Florida, Texas, Maryland, and Ohio (*id.*), and is facing a class action suit regarding its failure to transfer title, which the Third Circuit recently upheld. *Jennings v. Carvana LLC*, 2024 WL 1209746, at *1 (3d Cir. 2024); ¶148 & n.12.

*Garcia Jr. and Jenkins* were critical to this artifice, discussing title and registration issues and suspensions in Board meetings since at least July 2020. ¶149. Further, when the news of these investigations and penalties began to leak publicly, Defendants minimized them as mere one-offs and trivialized the penalties imposed on Carvana. ¶¶148(c), 149, 152, 180-181.

**Artifice No. 5**. *Garcia Jr. and Jenkins* made materially misleading statements and omissions, which facilitated the scheme by concealing it and convincing investors that Carvana's growth was sustainable. ¶¶150-158; *see also infra* §VI.B.

**Artifice No. 6**. *Garcia Sr. and Jenkins* manipulated their 10b5-1 plans while in possession of MNPI to capitalize on the artificial inflation in Carvana's stock price. ¶¶125, 160-162. Remarkably, just four days into trading on a 10b5-1 plan adopted during the Class Period, Garcia Sr. modified it on November 4, 2020 to accelerate the rate at which he could dump his shares. ¶160. Less than six months later, on May 17, 2021, Garcia Sr. modified this amended plan *again* – at the height of the scheme – to accelerate the number of shares he could sell. ¶¶160-161. As Professor Taylor astutely noted: "*I've studied 20,000 10b5-1 plans [and] I can't recall another of this size where there are modifications every six months*." ¶162. He concluded: "*The Garcias knew it was short-lived . . . [and] the music would eventually end*." *Id.*

Likewise, *Jenkins* adopted two new 10b5-1 plans within nine months during the Class Period. ¶269. When Jenkins adopted his second new plan on March 15, 2021, unbeknownst to investors, he had been meeting with the Board about title and registration problems for eight

- 14 -

4883-2521-8257.v1

months, and Carvana had already had its license suspended in Ohio. *Id.*; *see In re Vaxart, Inc. Sec. Litig.*, 2023 WL 3637093, at *3 (N.D. Cal. 2023) (finding "chang[ing] [the company's] insider trading blackout period to capitalize on the [fraud]" supported a scheme claim); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (explaining a 10b5-1 trading plan may allow "'a clever insider [to] "maximize" their gain from knowledge of an impending price drop . . . and seek to disguise their [fraudulent] conduct'").

**Artifice No. 7**. ***Garcia Sr. and Jenkins*** sold nearly 14.3 million Carvana shares while in possession of MNPI for proceeds of nearly $3.76 billion. ¶¶125, 163-165, 261; *see, e.g.*, *Vaxart*, 2023 WL 3637093, at *3 (holding "s[elling] a substantial number of shares to profit from [misstatements]" was deceptive conduct in furtherance of a scheme).

### 3. Defendants' Arguments Are Unavailing

***The Scheme Was Not Merely A*** "***Disclosed Business Strategy***." Defendants' argument that the scheme was simply a fully disclosed business strategy (Mtn. at 40-41; GMtn. at 7) is meritless. For each deceptive act alleged, Plaintiffs explained above how that act advanced the scheme and deceived investors. Unable to refute those allegations, Defendants rewrite them. But they must accept ***Plaintiffs***' allegations "as true." *Tellabs*, 551 U.S. at 322-24. Further, Defendants' truth-on-the-market defense is "intensely fact-specific, so courts rarely dismiss a complaint on this basis." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008). "[O]nly if the adequacy of [Defendants'] disclosure . . . is 'so obvious that reasonable minds [could] not differ' [is this] issue[] 'appropriately resolved as a matter of law.'" *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). Defendants have not made this stringent showing.

**Artifice No. 1**. "There was ***no legitimate business purpose*** for the[] sham [DriveTime] deals as they ***lacked any economic substance*** for Carvana, and served only to inflate Carvana's reported retail sales." ¶127. Defendants' attempt to legitimize them by citing Carvana's purported profits "on VSCs" (Mtn. at 40-41; GMtn. at 7) is a red herring. "***Drivetime administer[ed] the VSCs***" sold to Carvana customers during the Class Period. ¶¶127 n.10, 299. Defendants' own authority supports Plaintiffs. Mtn. at 40-41; GMtn. at 7. In *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds sub nom. Avis Budget Grp., Inc. v. Cal State*

- 15 -

4883-2521-8257.v1

*Tchrs.' Ret. Sys.*, 552 U.S. 1162 (2008), the Ninth Circuit held that "'[s]ham business transactions with no legitimate business purpose,'" like the DriveTime deal here, "have a principal purpose of creating a false appearance," and thus, support a scheme claim. *Id.* at 1050, 1052-53.[7]

Defendants wrongly claim that the "'transaction's terms [were] fully disclosed.'" GMtn. 7-8; Mtn. at 40-41. In fact, despite attaching ***more than 3,500 pages*** of exhibits, Defendants fail to cite one document where ***all*** the "terms [were] fully disclosed." *Id.* And Carvana's belated, piecemeal, and inconsistent disclosures are wholly insufficient at the pleading stage. Indeed, although the sham sales made up approximately 17% of Carvana's FY 2021 growth, Carvana's 2021 10-K omitted that Carvana gave all the proceeds from those sales to DriveTime. ¶¶128-129 & n.11.[8] Rather, Defendants cryptically buried that fact in Carvana's 2022 Proxy Statement. ¶128. Further, they concealed the full extent of this arrangement, never reporting the retail sales pursuant to it and disclosing – only inconsistently – certain expenses incurred to purchase the cars. *Id.* For example, while Carvana's Q2 2021 10-Q disclosed only the "cost of goods sold" Carvana incurred pursuant to the deal, its 2022 Proxy Statement revealed only the "total expenses" incurred. *Id.* And Carvana's 2021 10-K issued just a month earlier failed to mention these terms at all. *Id.*

*City of Providence, R.I. v. Bats Glob. Mkts., Inc.*, 878 F.3d 36 (2d Cir. 2017) is on point. There, the Second Circuit vacated the dismissal of plaintiffs' scheme claim where the defendants – national securities exchanges that sold certain products to high-frequency trading firms – alleged that these transactions were fully disclosed. *Id.* at 48-50. The court rejected defendants' arguments and agreed that defendants failed to disclose the full range or cumulative effect of the transactions: "'***[T]here is a contested question of fact as to the extent and accuracy of the disclosure***.'" *Id.* at 50-51. So too here. Defendants failed to reveal the full terms and extent of the arrangement. ¶128. Further, under the buried facts doctrine, a disclosure is deemed inadequate if

---

[7] Defendants' other authority is inapplicable. *See Borteanu*, 2023 WL 1472852, at *24 (only act was "sign[ing] SEC filings containing possible misrepresentations" made by another defendant); *Abbate v. Wells Fargo Bank, N.A.*, 2011 WL 9698215, at *2 (C.D. Cal. 2011) (only act was "knowingly permitt[ing] wrongful statements [by others] to be distributed to investors").

[8] Tellingly, Defendants are silent as to the SEC's ongoing investigation of Carvana's related-party deals. ¶127 n.10.

- 16 -

it obscures the information sought to be disclosed where, as here, it is disclosed "through piecemeal release of subsidiary facts which if stated together *might* provide a sufficient statement of the ultimate fact." *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983).[9] Defendants cannot evade liability for their conduct by mischaracterizing it as a disclosed business strategy.

**Artifice No. 2**. Defendants' claim that "all plaintiffs allege [is] Carvana's disclosed business strategy" of "buying cars from customers *and selling them for a higher price*" (Mtn. at 40-41) is unmoored from the ACC. While Carvana disclosed that its growth strategy included increasing the purchase of cars from customers, it never disclosed it lowered or disregarded entirely its purchasing and verification standards. ¶¶12, 130-133; *cf. HP*, 2024 WL 1327247, at *13 (finding defendants' approval of steep discounts inconsistent with internal policies to increase sales supported a scheme claim). Further, "while investors were aware that buying cars from customers could potentially result in some increase in wholesale vehicles," investors did not know that Garcia Jr. and Jenkins's conduct "ensur[ed] a flood of wholesale cars [and] that *Carvana was losing money on wholesale vehicle sales*." ¶135. Indeed, this is because Garcia Jr. and Jenkins obscured Carvana's lack of profitability on wholesale sales and assured investors that Carvana "*assess[ed] vehicles on the basis of quality*" when buying cars from customers. ¶¶135-136, 151.

**Artifice No. 3**. Defendants publicly touted Carvana's "capital-light" nationwide expansion strategy during the Class Period (Mtn. at 40), but they simultaneously concealed that: (i) sales in these new markets were less profitable and in many cases outright unprofitable; (ii) the new markets were material distances from their existing infrastructure; and (iii) Carvana necessarily and materially relied on costly third parties due to their deficient model. ¶¶139-142. In fact, their Class Period disclosures led analysts to believe the opposite. *See, e.g.*, ¶221(d) (analyst exalting

---

[9] Garcia Sr.'s authority (GMtn. at 7-8 n.3) is inapposite. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 474 (1977) (shareholders "were furnished with *all* relevant information"); *ScripsAm., Inc. v. Ironridge Glob. LLC*, 2015 WL 12747908, at *11 (C.D. Cal. 2015) (plaintiff necessarily "had to . . . know[]" of deceptive conduct); *In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166, at *18 (S.D.N.Y. 2010) (conduct was "'fully disclosed'"); *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 391-92 (S.D.N.Y. 2010) (defendants fully disclosed that they "'routinely'" engaged in the precise misconduct alleged). In fact, Garcia Sr.'s authority acknowledges that insufficient disclosures provide "'no protection.'" *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011); *see also In re Bank of Am. Corp.*, 2011 WL 740902, at *9 (N.D. Cal. 2011) (disclosure insufficient where not "specific").

4883-2521-8257.v1

Carvana's launch of 100 new markets "***with minimal incremental cost by expanding into smaller adjacent markets that could be supported via their existing logistics and delivery network***"). Naturally, analysts were stunned when the truth was slowly revealed. *E.g.*, ¶169; *see Alich v. Opendoor Techs. Inc.*, 2024 WL 839146, at \*7 (D. Ariz. 2024) ("*Alich I*") (Liburdi, J.) ("'[t]he perceptions of analysts are an acceptable measure of what reasonable investors would have understood'"), *vacated in part on other grounds*, 2024 WL 2153529 (D. Ariz. 2024).[10]  In sum, Defendants' unsupported, alternate narrative that their scheme was a disclosed business strategy is not credible, much less, "so convincing" that it renders Plaintiffs' competing explanation "implausible," as is required by the Ninth Circuit for dismissal. *Starr*, 652 F.3d at 1216-17.

**Insider Trading Qualifies as a Deceptive Act**.  Contrary to Jenkins's and Garcia Sr.'s claim (GMtn. at 8; Mtn. at 40), the Ninth Circuit has established that trading "'on the basis of material, nonpublic information'" "qualifies as a '***deceptive device***' under Section 10(b)." *Galena*, 117 F. Supp. 3d at 1203 (quoting *SEC v. Talbot*, 530 F.3d 1085, 1090-91 (9th Cir. 2008)); *see also id.* at 1196; *Vaxart*, 2023 WL 3637093, at \*2.[11]

**Plaintiffs Can Establish Reliance**.  Garcia Sr. argues the scheme claim is foreclosed by *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148 (2008) because Plaintiffs cannot establish reliance.  GMtn. at 5-6.  But *Stoneridge* is wholly inapposite as it involved the conduct of ***unaffiliated third parties*** – "customers and suppliers" – who agreed to deals "that allowed [Charter, an unrelated] company to mislead its auditor and issue a misleading financial statement affecting the stock price." 552 U.S. at 152-53.  Thus, the Court held plaintiffs could not rely on the

[10] Garcia Jr. and Jenkins have not even argued that Artifice Nos. 4-7 – flouting title and title registration laws, manipulating 10b5-1 plans, making misrepresentations, and trading on the basis of MNPI – were disclosed business strategies.  Further, Garcia Sr. has no argument that his extraordinary modifications while in possession of MNPI were legitimate business strategies.  Thus, those arguments are waived.  *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived."); *see also Stardock Sys., Inc. v. Reiche*, 2019 WL 8333563, at \*3 (N.D. Cal. 2019).

[11] Defendants' authority is inapt.  GMtn. at 8-9; *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1017 (9th Cir. 2018) (decided before *Lorenzo* and, unlike here, plaintiffs "d[id] not specify what steps, if any, [defendants] took in furtherance of the alleged scheme"); *Alpine 4 Holdings Inc. v. Finn Mgmt. GP LLC*, 2022 WL 3598246, at \*5 (D. Ariz. 2022) (market manipulation claim where plaintiffs "failed to allege any connection between their transactions" and the fraud as they did not allege the prices at which they bought shares); *SEC v. Honig*, 2023 WL 6386918, at \*29 (S.D.N.Y. 2023) (addressing the issue of materiality for a misstatement claim).

- 18 -

4883-2521-8257.v1

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) or the *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) presumptions of reliance as the suppliers (i) "had no duty to disclose," and (ii) their deceptive acts were "in an indirect chain that [was] too remote for liability" because "nothing [the suppliers] did made it necessary or inevitable for Charter to record the transactions as it did." *Stoneridge*, 552 U.S. at 159-61. "***Charter was free to do it as it chose*** in preparing its books . . . and then issuing its financial statements. ***In these circumstances*** the investors cannot be said to have relied upon any of [the suppliers'] deceptive acts . . . ." *Id.* at 166-67. The Supreme Court's chief concern in *Stoneridge* was that a contrary holding would "provide a private cause of action against the entire marketplace in which the issuing company operates." *Id.* at 162-64.

Here, in stark contrast, Garcia Sr. was not an unaffiliated third-party supplier or customer with ***no*** control or influence over Carvana. Rather, he controlled Carvana's "operations, including the appointment of management" and the Board, as its controlling shareholder, wielding ***an 84% supermajority voting power***. ¶¶26, 160, 297. Put simply, while, in *Stoneridge*, 552 U.S. 148, "Charter was free to do as it chose" (*id.* at 166), Carvana was not. Indeed, unlike the agreements in *Stoneridge* between Charter and its suppliers, the DriveTime deal was a "related party transaction" that was "not negotiated at arm's length." ¶¶26, 127 & n.10, 299. Further, unlike the defendant in *Stoneridge* who merely aided-and-abetted another company in ***its*** scheme, Garcia Sr. was a primary "co-participant[]" in the pump-and-dump scheme and "profited by that scheme" not only through the DriveTime deal that generated tens of millions in profits for DriveTime, but also through his nearly $3.7 billion in insider trades of his ***Carvana*** stock. *Bats*, 878 F.3d at 51; *see also In re Micron Tech., Inc. Sec. Litig.*, 2009 WL 453917, at *3-*4 (D. Idaho 2009) (denying motion for partial judgment on the pleadings because "*Stoneridge* addressed liability for secondary, not primary, actors" and thus "the Supreme Court's principal concern in *Stoneridge* . . . is not a concern here").[12] Garcia Sr.'s own authority, *In re Peregrine Sys., Inc. Sec. Litig.*, 310 F. App'x 149 (9th Cir. 2009), which concerned the liability of an unaffiliated "business partner," recognizes the importance of control to the applicability of *Stoneridge*. *Id.* at 150 & n.2 (applying

---

[12] Garcia Sr.'s other authority, *Abbate*, also concerned a third party. 2011 WL 9698215, at *4-*5.

- 19 -

*Stoneridge* because, unlike here, the plaintiff did ***not*** allege that the defendant was "liable for primary violations under §20(a)").

Given Garcia Sr.'s primary role in the scheme, his 84% voting power and control over Carvana – including its deals with DriveTime – it is absurd to suggest that his conduct did not necessarily impact Carvana's retail sales, which were closely monitored and undisputedly relied upon by investors. *See Galena*, 117 F. Supp. 3d at 1198-99 (distinguishing *Stoneridge* where defendants' conduct, such as hiring a public relations firm or having "strong relationships with key investor websites," where misstatements were published, was not too "remote [or] attenuated" to establish reliance under *Basic*); *In re FirstEnergy Corp.*, 2022 WL 681320, at *27 (S.D. Ohio 2022) (upholding scheme claim against insiders ***and insiders of a related company*** as "[d]efendants have attributed too great a meaning to *Stoneridge* and other authorities, which speak to the concerns about presuming reliance to remote and indirect actors"); *In re RenovaCare, Inc. Sec. Litig.*, 2024 WL 2815034, at *2 n.3, *24-*26 (D.N.J. 2024) (upholding scheme claim against board member of defendant's predecessor entity).[13]  Thus, Plaintiffs are at least entitled to the *Basic* presumption of reliance, and Garcia Sr. cannot utilize *Stoneridge* to evade liability.

***The ACC Alleges Scienter and Loss Causation***.  In two sentences, Defendants claim that Plaintiffs failed to plead scienter or loss causation, noting only that they are "required for scheme liability" and citing their entire 10b-5(b) claim arguments.  Mtn. at 41; GMtn. at 6.  Such "perfunctory arguments are waived." *Reiche*, 2019 WL 8333563, at *3 n.3 (quoting *Cal. Pac. Bank v. F.D.I.C.*, 885 F.3d 560, 570 (9th Cir. 2018)); *see also Alphabet*, 1 F.4th at 698 (courts must "disregard '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements'").  In any event, the ACC pleads loss causation and scienter as to the overlapping deceptive conduct and misstatements. *See infra* §§VI.C., VI.D.; *see also In re Bed*

---

[13] Further, unlike in *Stoneridge*, Garcia Sr. owed a "duty" to "disclose or abstain" from trading while in possession of MNPI. *In re Silver Lake Grp., LLC Sec. Litig.*, __ F.4th __, 2024 WL 3515766, at *5 (9th Cir. 2024).  To the extent Garcia Jr. and Jenkins argue in half a sentence that Plaintiffs failed to establish reliance, that "perfunctory argument[] [is] waived." *Reiche*, 2019 WL 8333563, at *3 n.3; *White v. Jackson*, 865 F.3d 1064, 1076 n.1 (8th Cir. 2017) (same).  In any event, the "'fraud-on-the-market theory,' applies here because . . . [Garcia Jr. and Jenkins] made material misrepresentations in" furtherance of the scheme. *FirstEnergy*, 2022 WL 681320, at *26; *see also Galena*, 117 F. Supp. 3d at 1198.

4883-2521-8257.v1

*Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d 1, 19 n.5 (D.D.C. 2023) (rejecting same argument where defendants' loss causation and scienter arguments "from the other 10(b) claim" were unavailing).[14]

The scheme claim is adequately pleaded, and it should proceed.

### B.    The ACC Adequately States a Misrepresentation Claim

A complaint alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). A statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson*, 527 F.3d at 985. "'[L]iterally accurate'" statements may be misleading due to "'their context and manner of presentation.'" *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). "'[O]nce defendants . . . tout positive information . . . they [are] bound to do so in a manner that wouldn't mislead investors.'" *Khoja*, 899 F.3d at 1008-09.

### 1.    Materially Misleading Statements and Omissions Concerning Title and Registration

***Risk Disclosures (Statement Nos. 1-3, 5-7)***. Beginning on February 25, 2021, Defendants couched as a mere hypothetical Carvana's "failure to comply" with title and registration laws and regulations. ¶¶174, 176, 178, 182, 184, 186. Defendants purported to warn that the Company's hypothetical violations of state regulations and laws "***could***" result in penalties and/or cease-and-desist orders, which "***could*** damage our reputation and have a material adverse effect on our business, sales, and results of operations." *Id.* Each quarter through May 10, 2022, Carvana

---

[14] For example, the ACC alleges the proximately causal linkages between the partial disclosures and Defendants' scheme – *i.e.*, the "underlying facts concealed by fraud." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018); *see, e.g.*, ¶¶317-318 (detailing how Defendants' conduct "contributed to . . . the layoffs" disclosed on May 10, 2022, and that analysts "link[ed] it to the negative economic conditions caused by Defendants' scheme" to "grow[]-at-all-costs"); ¶320 (disclosure revealing Carvana flouted title and registration laws ***to secure sales faster than its competitors***). As detailed further *infra* (§VI.B.2.), Defendants judicially admitted that Carvana "***intentionally*** [bought] lower quality cars." *E.g.*, ¶192(a) & n.19. Garcia Sr.'s and Jenkins's extraordinary insider sales "weigh heavily in favor of a scienter inference" (*Tellabs*, 551 U.S. at 325), as do the "amend[ments] [to] their 10b5-1 plans" (*Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185 (S.D. Cal. 2009)). And, Garcia Jr.'s actual knowledge, repeated statements, position, and SOX certifications support a strong inference of scienter. *Infra* §VI.C.

4883-2521-8257.v1

assured investors that "[t]here have been no material changes" to this risk factor.  ¶¶176, 178, 182, 186.

In truth, the risk that Carvana "could" fail to comply with and violate title and registration laws had already come to fruition, as Carvana systematically: (i) sold cars before holding title to the vehicles; (ii) failed to register cars within the legally required timeframe; and (iii) issued out-of-state temporary tags and/or license plates in violation of numerous state laws.  ¶¶175(b), 177(b), 179(b), 183(b), 185(b), 187(c).  These allegations are supported by: six CWs; exposés founded on interviews with state officials and employees; states' investigations and findings set forth in press releases and settlements; allegations in a consumer class action recently upheld by the Third Circuit; and Defendants' own admissions.[15]

Moreover, Carvana's violation of state laws had *already* resulted in penalties:

- The Ohio BMV had investigated Carvana, suspended its temporary tag issuance privileges for all Ohio locations, and subjected the Company to increased oversight in *December 2020* (¶¶175(a), 177(a), 179(a), 183(a), 185(a), 187(a));

- By *February 2021*, the MDOS was investigating Carvana (¶¶175(a), 177(a), 179(a)), on *March 23, 2021*, MDOS had met with Carvana executives regarding MDOS' investigation, and on *May 7, 2021*, MDOS fined Carvana thousands of dollars and put it on an 18-month probation (¶¶177(a), 179(a)), probation which Carvana repeatedly violated and which was extended on *February 7, 2022* after multiple meetings between Carvana and MDOS (¶¶183(a), 185(a), 187(a)) and revoked its license near the end of the Class Period (¶187(a));

- North Carolina had fined Carvana and suspended its license for six months following an investigation and a *July 2021* hearing (¶179(a));

- No later than *October 22, 2021*, Carvana had settled a complaint with Florida for title violations, and Texas had fined Carvana thousands of dollars for violations related to title and registration (¶179(a)); and

- In *February 2022*, Illinois began investigating Carvana for issuing out-of-state temporary registration permits and for failing to timely transfer titles in violation of its laws (¶¶185(a), 187(a)), ultimately suspending Carvana's dealer license on *May 12, 2022* (¶187(c)).

Taken together, these "allegations are sufficient to meet the pleading requirement under the

---

[15] Defendants ask the Court to draw inferences in their favor, disputing in footnotes the CW allegations, Board documents, and Carvana's admission.  Mtn. at 14 nn.7-8, 15 n.10.  But resolving such fact disputes is premature, and inferences at this stage are to be drawn in *Plaintiffs*' favor.  *See Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 n.2 (C.D. Cal. 2017) (where parties disputed the interpretation of a board presentation, "Plaintiff's reading of the statistics [was] plausible" because "at the motion to dismiss stage the Court draws a reasonable inference that Plaintiffs' interpretation . . . is correct").

4883-2521-8257.v1

PSLRA." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1179 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011).[16] Indeed, Carvana's purported risk warnings are actionable. The Ninth Circuit held that "[r]isk disclosures that 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *Alphabet*, 1 F.4th at 703 (quoting *Berson*, 527 F.3d at 985-87). Similar to the risk warnings at issue in *Alphabet*, Carvana's "warning in each Form 10-Q of risks that '***could***' or 'may' occur is misleading to a reasonable investor" because Carvana "knew that those risks had materialized." *Id.* at 704; *see also Khoja*, 899 F.3d at 1016 (warning that "'new data . . . ***may*** be inconsistent with the conclusion that the interim analysis was successful'" actionable where company "allegedly knew already that the 'new data' revealed exactly that") (emphasis in original); *Siracusano*, 585 F.3d at 1181 (same).[17]

Rather than address these well-pleaded allegations or controlling authorities, Defendants attack a strawman, claiming Carvana did not state it "had never had a single run in with a regulator on ***any*** issue." Mtn. at 13 (emphasis in original). This misdirection does not defeat the allegations – Carvana systematically violated title and registration laws and regulations and was sanctioned by multiple states for doing so, while warning that these exact risks were mere hypotheticals.

Next, Defendants admit that "[m]any of the alleged penalties . . . pre-date . . . the challenged statement," confirming that their warnings about potential penalties were misleading.

---

[16] Defendants' assertions that the ACC does not allege material adverse effects on Carvana's business or violations of laws had materialized (Mtn. at 14) is perplexing in light of these detailed allegations and Defendants' own admission that the reputational damage from just one of these suspensions was "incalculable and irreparable." *E.g.*, ¶11. *Warwick II*'s observation that "selling cars prior to holding certificates . . . is not illegal" (Mtn. at 14) does not absolve Carvana of its actions, which multiple states found violated their laws and regulations. *E.g.*, ¶183(a). Given these states' actions, *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455 (2d Cir. 2019), is inapt.

[17] The Supreme Court's grant of certiorari in *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950 (9th Cir. 2023), does not undermine the holding in *Alphabet* or the sufficiency of the risk disclosures here. The question presented in *Facebook* concerns whether risk disclosures are false or misleading for failing to disclose a past risk that has materialized "***even if*** that past event presents no known risk of ongoing or future business harm." Petition for a Writ of Certiorari at *i, *Facebook, Inc. v. Amalgamated Bank*, 2024 WL 1009159 (U.S. Mar. 4, 2024). In contrast, here, as in *Alphabet*, Plaintiffs allege a known risk of business harm. 1 F.4th at 704. The ACC alleges both ongoing title and registration violations (not simply past events) ***and*** ongoing business harm via the state actions.

- 23 -

4883-2521-8257.v1

*Id.* at 13-14.[18] And contrary to Defendants' claim, Plaintiffs are not attempting to hold Defendants liable for future events they would have needed a crystal ball to predict.

Defendants again invite reversible error, asking the Court to dismiss the risk warnings as immaterial because they are "generic." Mtn. at 15. Under that logic, risk warnings would never be actionable. But that is not the law. *See Alphabet*, 1 F.4th at 704 ("warning[s] in each [SEC filing] of risks that '***could***' . . . ***occur***" – like the disclosures here – are "misleading to a reasonable investor when [the company] knew that those risks had materialized"); *see also Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 879 (N.D. Cal. 2023) (disclosures that pandemic "could" impact business misleading where "those risks may have already come to fruition"); *Siracusano*, 585 F.3d at 1181; *Berson*, 527 F.3d at 985-87.[19] In addition, "'[q]uestions of materiality . . . involv[e] assessments peculiarly within the province of the trier of fact'" and are thus premature at this stage. *Siracusano*, 585 F.3d at 1178.[20] A reasonable investor would expect that if the risks associated with breaking the law had come to fruition, Defendants would not speak of those risks as hypotheticals. *Alphabet*, 1 F.4th at 704. This is particularly true given Defendants' admission that "the damage to Carvana's reputation and goodwill posed by" even one "suspension order [wa]s incalculable and irreparable." ¶¶175(c), 177(c), 179(c), 183(c), 185(c), 187(d).[21]

[18] *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012), does not help Defendants. It is cited for the unremarkable proposition that statements must be pleaded as "misleading at the time they were made." *Id.* at 876; Mtn. at 13-14.

[19] The Ninth Circuit in *Alphabet* foreclosed Defendants' claim that they are absolved from liability because they used "could" instead of "if." Mtn. at 14.

[20] Defendants' (nonbinding) cases do not undermine this controlling authority. They are also distinguishable. In *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 480 F. Supp. 3d 1050 (N.D. Cal. 2020), the plaintiffs challenged a risk warning that warned generically of "product quality and potential recalls writ large" (*id.* at 1062), in contrast to the warnings here which specifically identified Carvana's subjection to "***title and registration***" requirements and presented Carvana's violation of such requirements and related penalties as mere future possibilities. *Waswick v. Torrid Holdings, Inc.*, 2023 WL 9197563 (C.D. Cal. 2023), involved warnings of "disruptions" and "delayed shipments," the occurrence of which the court chalked up to "part of everyday life." *Id.* at *7. *Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019), *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929-34 (9th Cir. 1996), and *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 746, 761 (D. Ariz. 2022) did not even involve risk warnings.

[21] Defendants are wrong that the timing of this admission is relevant to materiality. Mtn. at 15; *see Alphabet*, 1 F.4th at 703 (post-statement events "all support the materiality of the misleading omission"). *Warwick II* is distinguishable as it neither concerned title and registration risk disclosures nor "the same alleged penalties," as Defendants contend. Mtn. at 15. Contrary to

- 24 -

Defendants' truth-on-the-market argument that the title and registration violations were fully disclosed (Mtn. at 16-18) is similarly premature, as the defense is "'intensely fact-specific'" and, thus, for the factfinder. *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2023 WL 1769810, at \*6 (S.D. Cal. 2023). Further, Defendants have failed to meet their "heavy burden of proof" (*Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996)) to "prov[e] that the information that was withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations'" (*Acadia*, 2023 WL 1769810, at \*6). **None** of Defendants' disclosures revealed what Plaintiffs allege was concealed – Carvana's systematic violation of state title and registration laws and related penalties.[22] *See, e.g.*, *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at \*12 (N.D. Cal. 2023) (rejecting argument that statements about trial results were not misleading because defendants disclosed the results during the class period, as the results did not reveal the "existence," "nature," or "extent" of issues plaintiff alleged were concealed). These facts were not transmitted to the public with the requisite intensity when Defendants contemporaneously minimized Carvana's title and registration woes. *See In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 197 n.33 (D. Conn. 2023) ("[Plaintiffs] allege several times that the Defendants continued to deny any wrongdoing. So even if the truth-on-the-market defense was applicable, such information was counteracted by Teva's alleged contemporaneous statements."); ¶¶180, 188.

Nor were the risk warnings forward-looking. Mtn. at 17. They each spoke to Carvana's then-current title and registration requirements. *See In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 736 (N.D. Cal. 2022) (statements "about the current state of affairs" not forward-looking).[23] Even if they could be construed as forward-looking (they cannot), "cautionary

---

Defendants' claim, *Warwick II* never made any determination of the fines' materiality. *Id.*

[22] For this reason, Defendants' authorities – which all dealt with the disclosure about the very facts which the plaintiffs alleged were concealed – are distinguishable. Mtn. at 16-17.

[23] This is in contrast to Defendants' authorities, which concerned potential risks the company faced "'[a]s we grow'" (which the parties agreed was forward-looking) (*Kolominsky v. Root, Inc.*, 100 F.4th 675, 687 (6th Cir. 2024)), or as the company worked toward projections (*Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021)).

- 25 -

4883-2521-8257.v1

language is not 'meaningful' if it discusses as a mere ***possibility*** a risk that has already materialized." *Glazer*, 63 F.4th at 781. Finally, the "no material changes" statements are not opinions, as "[n]one of these statements use opinion-qualifying language such as 'I think' or 'I believe.' All express 'certainty' about an existing thing or occurrence." *QuantumScape*, 580 F. Supp. 3d at 739. These materially misleading statements are actionable.

***Statements Concerning Title and Registration Delays (Statement Nos. 4, 8)***. Once the truth began to leak out, Defendants trivialized Carvana's title violations, characterizing them as "North Carolina specific" and occurring "in a very small percentage of a very small percentage of instances," while touting their "productive" conversations with state regulators. ¶¶180, 188. In reality, Carvana's violations were rampant and impacting customers nationwide. CWs-3, 4, 8, 9, 10, and 11 each reported that Carvana routinely sold cars before receiving title. ¶¶181(b), 189(a). The Company's systematic inability to satisfy title and registration requirements was known to Defendants when they first spoke on August 11, 2021, as, by then, Ohio and Michigan entities had already penalized Carvana (¶181(a)), and these problems only got worse (¶189(b)). By omitting these material adverse facts, Defendants created an "impression" of the violations that "differ[ed] in a material way from the one that actually exist[ed]." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017); *see also Smilovits v. First Solar, Inc.*, 2012 WL 6574410, at *6 (D. Ariz. 2012) (statements "downplay[ing]" extent of issue misleading).

Defendants attack Statement No. 4 by plucking sentences out of context and asking the Court to credit their interpretation as the only conceivable one. Mtn. at 17. But when the challenged statements are read in context, as the law requires, Plaintiffs' interpretation that the issues were limited to North Carolina is more than plausible, and any further question is properly left for the factfinder. *See Berson*, 527 F.3d at 986 (defendants' interpretation "is hardly the only – or even the most plausible – one. It is just as likely that investors would interpret the underlined phrase" as plaintiffs did). In fact, that is precisely what analysts understood from Defendants' statements. ¶181(c) (analyst noting that "[a]fter speaking with management, . . . we are optimistic that this will be an isolated incident"); *see Shenwick v. Twitter*, 282 F. Supp. 3d 1115, 1136 (N.D.

- 26 -

Cal. 2017) (analysts' interpretation relevant to falsity).[24]  Defendants now point to the pandemic as creating the title violations.  Mtn. at 15-18.  That does not absolve them of liability.  Whatever the cause, Defendants concealed Carvana's title and registration violations.  *Quality*, 865 F.3d at 1144.

As to Statement No. 8, Defendants are incorrect that the ACC does not allege concealed material "facts suggesting that more than a 'small percentage' of customers had ***unlawful*** delays." Mtn. at 18.  Plaintiffs allege that Carvana's violations of title and registration laws were systematic, wide-reaching, and continuing at the time Statement No. 8 was made.  *See* ¶189(a)-(b). Nor are Defendants' statements puffery.  Mtn. at 18.  Not only did Defendants know Carvana's violations were widespread, but they also made repeated, specific statements that were intended to, and did, reassure investors to the contrary.  ¶¶180, 188; *see, e.g.*, *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *7 (N.D. Cal. 2020) (statements, such as "[i]t's a new day," we're "committed to enhancing safety" and "work[ing] tirelessly," were not puffery where Uber was trying to reassure investors that persisting problems were in the past) (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *11 (C.D. Cal. 2020) (statement that Stamps had a "great partnership with USPS" not puffery where USPS was investigating Stamps).  And Statement No. 8 is actionable even if it is literally true. "[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).  The materially misleading statements are actionable.

### 2. Materially Misleading Statements and Omissions Concerning Buying Cars from Customers

Defendants represented that they "assess vehicles on the basis of quality" and other factors "to identify what we believe represent the most in-demand and profitable vehicles" to purchase. ¶¶191, 195, 199, 203, 207, 209 (***Statement Nos. 9, 11, 13, 15, 17-18***).  Defendants claimed that

---

[24] To the extent Jenkins's statement that title and registration violations were confined to "'a small fraction of customers'" in North Carolina is an opinion (Mtn. at 18), the ACC details how that was "'objectively untrue.'" *QuantumScape*, 580 F. Supp. 3d at 739-40 (finding opinions actionable where they contained "assertion[s] capable of being proven true or false"); *see* ¶181(a).

- 27 -

4883-2521-8257.v1

buying cars from customers had "several advantages" for Carvana, asserting that this sourcing channel "performed very well" and they made "continual high-quality progress in both the number of cars we're buying, the cars we're buying relative to retail sales and the profits that we're making on cars that we buy from customers." ¶¶193, 197, 201, 205 (***Statement Nos. 10, 12, 14, 16***).  They also assured investors that Carvana had the capacity and logistics network to handle the increased volume.  *E.g.*, ¶193 (***Statement No. 10***).  These statements left investors with the misleading impression that buying cars from customers was a success and would be profitable.

In truth and as Defendants have admitted, Carvana was "***intentionally*** buying lower quality cars" to induce trade-ins and increase retail sales without regard to profitability.  ¶¶192(a)-(b), 194(a), 196(a)-(b), 198(a), 200(a)-(b), 202(a), 204(a)-(b), 206(a)-(b), 208(a)-(b), 210(a)-(b).  The CWs describe a dramatic shift in purchasing and verification standards, and CWs-1, 3, 4, 5, 8, 10, and 11 stated that it became Carvana's practice to purchase cars sight unseen without verifying the accuracy of sellers' representations.  *Id.*[25]  And buying low-quality cars from customers adversely impacted Carvana's bottom line by larding the Company with an overwhelming volume of "trash" cars that had to be sold wholesale at a loss.  ¶¶192(c), 194(b), 196(c), 198(b), 200(c), 202(b), 204(c), 206(c), 208(c), 210(c); *infra* §VI.B.6.  The rampant purchase of low-quality wholesale cars also crippled Carvana's logistics network and substantially increased its logistics expenses, ultimately necessitating the $3 billion purchase of ADESA – in stark contrast to Defendants' assurances that Carvana had "the capacity to sell the excess wholesale." ¶193; *see also* ¶205.

Defendants lob several arguments to challenge Statement Nos. 9, 11, 13, 15, 17, and 18.

---

[25] Defendants concede the reliability of five CWs, attacking only CW-3 and CW-11.  Mtn. at 19 n.15.  Those attacks are specious.  CW-3 was employed with Carvana through the first half of the Class Period, and his statements are included only as to statements made during that time.  ¶¶61, 192(b), 196(b), 198(a), 200(b), 202(a), 204(b).  CW-11 worked for Carvana for over a year during the Class Period (¶114), and CW-11's account is corroborated by several other CWs.  *See Glazer*, 63 F.4th at 767 ("corroborating facts" used to assess CW reliability); *Quality*, 865 F.3d at 1145 (crediting statements about defendants' "access" from CW who was not employed during the class period).  Defendants are also wrong that CWs-3 and 11 need personal knowledge of nationwide practices to be reliable.  Rather, the proper inquiry "is whether Plaintiffs have properly alleged facts suggesting that the confidential witnesses have personal knowledge ***about the incidents they address***." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 963 (N.D. Cal. 2014) (crediting indirect CW allegations regarding "pervasive and systemic" problems).  Plaintiffs have alleged that.  Further, the allegations must be assessed collectively, and Plaintiffs provide consistent CW accounts from across the United States.

- 28 -

*See* Mtn. at 18-20.  None is meritorious.  As a threshold matter, Defendants' arguments ignore the actual statements that are alleged to be misleading (*i.e.*, that which is emphasized).  Defendants said Carvana assessed quality in order "***to identify what we believe represent the most in-demand and profitable vehicles***" (*e.g.*, ¶191), not simply to determine an appropriate offer.  Mtn. at 19.  As Defendants admit, Carvana did ***not*** use quality to identify "the most in-demand and profitable vehicles," but instead "intentionally b[ought] lower quality cars."  Plaintiffs' interpretation is more than plausible, and as explained above, the statement as written is demonstrably misleading.  *See Berson*, 527 F.3d at 986; *see also In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1070 (E.D. Wash. 2016) (denying motion to dismiss in part where defendants disputed meaning of press release containing the alleged misstatement, even though defendants' interpretation was "a reasonable interpretation").  Thus, resolution of this disputed interpretation is for the trier of fact and is inappropriate on a motion to dismiss.  *See In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *19 n.13 (C.D. Cal. 2001) (question at pleadings stage is "whether a defendant deliberately made a statement which would mislead a reasonable investor, not whether there is any conceivable interpretation of the defendant's words according to which they were not false").

Defendants argue that their disclosures of Carvana's strategy to increase the purchase of cars from customers and that it purchased lower quality cars that it sold to wholesalers because the cars did ***not*** meet the Company's quality standards render these statements inactionable.  Mtn. at 19-20.  Defendants are wrong.  Neither discloses that Carvana lowered or abandoned its standards when buying cars from customers or that Carvana "was ***intentionally*** buying lower quality cars," ensuring a flood of wholesale cars that had to be sold at a loss.  ¶¶192(a)-(b), 194(a), 196(a)-(b), 198(a), 200(a)-(b), 202(a), 204(a)-(b), 206(a)-(b), 208(a)-(b), 210(a)-(b).[26]  Similarly unavailing is the assertion that the costs of buying low-quality cars and excluded logistics expenses are

---

[26] Thus, Defendants' cases are inapposite.  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (the fact that the defendant "recruited flawed students" was not concealed because the defendant previously disclosed that it "targeted individuals unable to attend traditional colleges and universities"); *Golubowski v. Robinhood Mkts., Inc.*, 2023 WL 1927616, at *9-*10 (N.D. Cal. 2023) (the defendant "provided sufficient disclosures" and "Plaintiffs allege[d] not that [the defendant] falsely misrepresented any facts but merely that [it] failed to live up to its lofty opinions and goals").

- 29 -

4883-2521-8257.v1

irrelevant. Mtn. at 19-20. These material expenses drove the profitability of each wholesale sale. How profitable – or, in this case, unprofitable – it was for Carvana to sell lower-quality cars is entirely relevant to whether it was misleading to tout that the Company assessed quality to identify the most profitable vehicles. Finally, it cannot be the case that Carvana *both* intentionally bought low-quality cars to sell them at a loss wholesale (as Defendants argue (Mtn. at 20 n.17)) *and* considered quality to identify the most profitable cars to purchase (as Defendants misrepresented).

Defendants lump Statement Nos. 10, 12, 14, and 16 together and argue none is actionable. Mtn. at 20-21. As an initial matter, Defendants do not challenge and thus concede the falsity of Statement No. 10's misrepresentation that Carvana had the "capacity to sell the excess [cars from customers] wholesale." ¶193.[27] Nor can they – Carvana admittedly lacked critical infrastructure necessary to process the huge volume of "trash" wholesale cars. ¶¶67, 194(a). The arguments Defendants do make are unavailing. It is simply not true that no statement "suggest[s] Carvana did not buy lower-quality cars." Mtn. at 21. Defendants said exactly this, claiming in Statement No. 16 that buying cars from customers "gets us access to *a higher-quality pool of inventory*." ¶205.[28] Defendants obfuscate by contending that the Company was not profitable overall. Mtn. at 21. But Defendants repeatedly said that Carvana "saw a massive, massive increase . . . in the profitability of buying cars from customers" and that such cars are, "more profitable." *E.g.*, ¶¶201, 205. These statements left the false impression that Carvana was making money by buying cars from customers irrespective of its overall profitability. *See, e.g.*, ¶198(c) (analyst concluding in response to Defendants' statement: "We believe the company has honed its efforts to efficiently acquire vehicles from the consumer and believe this represents a GPU growth opportunity over time."); *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 848-49 (N.D. Tex. 2018) (statement that oil operations were profitable when they were actually operating at a loss found actionable).

---

[27] Defendants' only challenges to Statement No. 10 are to the words "'advantages'" and "'very efficient ways.'" Mtn. at 20-21. The former does not appear in Statement No. 10 and the latter is not puffery, as explained *infra*.

[28] Statement No. 16 is not an opinion as Defendants contend. Mtn. at 21. Even if it were, the statement is actionable because whether buying cars from customers gave Carvana access to "a higher-quality pool of inventory that is, on average, more profitable" is "capable of being proven true or false." *See QuantumScape*, 580 F. Supp. 3d at 739-40.

4883-2521-8257.v1

Finally, Statement Nos. 10, 14, and 16 are not puffery or opinion. Mtn. at 21.[29] Defendants' snippets formed part of longer statements that, when viewed in their entirety and in context, served to mislead investors by "'creat[ing] an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Shenwick*, 282 F. Supp. 3d at 1135. Defendants did not just represent that Carvana enjoyed "continual high-quality progress," but rather that such progress was "both the number of cars we're buying, the cars we're buying relative to retail sales and the profits that we're making on cars that we buy from customers." ¶201. Statement Nos. 10, 14, and 16 are capable of objective verification and the type of statements that investors would rely on when making investment decisions. *See, e.g.*, *Iso Ray*, 189 F. Supp. 3d at 1071 (opinion that results were "'outstanding'" actionable because it "was 'moored' to the objective measures of the Study"); *Apollo*, 774 F.3d at 606 (statements "capable of objective verification are not 'puffery'").

### 3. Materially Misleading Statements and Omissions Concerning Retail Unit Sales Growth

During the Class Period, Defendants touted Carvana's retail unit sales growth ***and*** the purportedly organic drivers of such growth. ¶¶212, 214 (***Statement Nos. 19-20***). In truth, however, Carvana's sales growth was substantially fueled by the following unsustainable artifices: (i) flouting title and registration laws and regulations to secure sales before competitors; (ii) pursuing "less profitable sales" in "markets with lower profitability due to long distance from inventory"; (iii) lowering Carvana's purchasing and verification standards to increase trade-ins; (iv) artificially lowering prices to seek "sales that were less profitable in the immediate period"; and (v) causing a sham pass-through arrangement with DriveTime. ¶¶213, 215. By omitting that Carvana's sales growth was fueled by Defendants' machinations, Defendants' statements created the materially misleading impression that Carvana's growth was organic and sustainable. *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1181 (N.D. Cal. 2021) (statements about drivers of revenue growth were misleading by concealing coercive sales practices driving that growth); *Murphy*, 2017 WL 3084274, at *9 (finding "representations about

---

[29] Defendants also assert a statement at ¶196 is inactionable (Mtn. at 21), but that paragraph does not include a challenged statement.

- 31 -

organic growth [misleading because they] did not include disclosure of the additional facts that [the company] was aggressively pulling in sales").[30]

Defendants are wrong that these statements are inactionable because the unit sales were purportedly "accurate." Mtn. at 21.[31] "[T]echnically accurate" statements are actionable (*Khoja*, 899 F.3d at 1015) where, as here, defendants have attributed the growth to organic factors such as "strong demand" while omitting the actual, unsustainable drivers of that growth. *See, e.g.*, *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *14 (C.D. Cal. 2013) (finding accurate "reported annual revenues and earnings" were misleading "because Defendants concealed the true causes of the increased sales"). Even Defendants' authority, *Apple*, holds that "where a party goes beyond describing historical results and touts specific factors driving those results, ***it is obligated to disclose negative information related to those factors***." 2020 WL 2857397, at *10 (statements touting high upgrade rates required disclosure that new software, which slowed operations, contributed to the rates).

Defendants' factual dispute that the artifices were "disclosed car-buying and expansion business strategies" (Mtn. at 22-23) is for another day. *Amgen*, 544 F. Supp. 2d at 1025. Regardless, it fails. *See supra* §VI.A.3. Further, investors were not fully aware of Carvana's title and registration violations until late in the Class Period, and the DriveTime agreement was only inconsistently and incompletely disclosed. ¶322; *see supra*, §§VI.A.3, VI.B.1. Indeed, by Q2 2021 earnings, none of the state actions had been disclosed, and, as of Q4 2021 earnings, the Ohio and Illinois investigations and the full extent of the Michigan suspension were unknown to investors. Further, Defendants' attempt to distract by asserting Carvana made money on ancillary products associated with the DriveTime sales (Mtn. at 22-23) is unavailing. DriveTime

---

[30] *See also In re Syncor Int'l Corp. Sec. Litig.*, 239 F. App'x 318, 320 (9th Cir. 2007) (statements "attributing Syncor's success solely to legitimate practices" were misleading when they were also due to illegitimate practices), *as amended on denial of reh'g* (Oct. 9, 2007); *Donley v. Live Nation Ent., Inc.*, 2024 WL 794641, at *9 (C.D. Cal. 2024) (statement describing "success in the market due simply to its superiority in services is materially misleading" because it omitted the impact of defendant's exclusivity agreements).

[31] Defendants' authority is inapt. *In re Redback Networks, Inc. Sec. Litig.*, 2007 WL 4259464, at *3 (N.D. Cal. 2007) (unlike here, defendants did ***not*** attribute growth to nonfraudulent factors), *aff'd*, 329 F. App'x 715 (9th Cir. 2009).

- 32 -

administered many of Carvana's ancillary products, and Defendants' gripe does not alter the fact that the effect of the sham arrangement was to boost ***Carvana's*** retail sales with sales of ***DriveTime cars for DriveTime***.  ¶¶127 n.10, 129 & n.11.  At bottom, because these "sales" constituted approximately 660% of sequential retail unit sales growth in Q4 2021 (¶129 & n.11), it was misleading to attribute the growth that quarter to "growth within our market cohorts." ¶214.[32]

The ACC is not a mere "after-the-fact disagreement with Carvana's business strategy." Mtn. at 22.  Rather, the ACC describes undisclosed artifices, including violations of laws and deceptive related-party transactions, that rendered Defendants' statements about Carvana's sales growth misleading.  As discussed further *infra* §VI.C., because Plaintiffs have pleaded facts demonstrating that "defendants' statements were misleading given the information available to them ***at the time***," this is not fraud by hindsight.  *Uber*, 2020 WL 4569846, at *8; *cf.* Mtn. at 22. And these statements are not puffery.  Mtn. at 22.  Carvana's "Objective #1" was to "grow retail units and revenue." ¶¶213(b), 216(b); *see Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *6-*7 (N.D. Cal. 2018) (statements touting growth were not puffery where defendants stated company's "'model drive[s] revenue'").[33]  These materially misleading statements are actionable.

### 4. Materially Misleading Statements and Omissions Concerning Expansion and Logistics Infrastructure

Carvana's capital-light expansion model (*i.e.*, a model that did not require a substantial number of physical locations and capital) was an essential component of Carvana's ***sustainable*** growth story. ¶¶14, 216.  Thus, Defendants touted Carvana's expansion into new markets and its

[32] Defendants accuse Plaintiffs of mixing "apples and oranges" when it is Defendants who have made a fruit salad.  Defendants admit that, in order to approximate the impact of the DriveTime deal on retail units sold, Plaintiffs were forced to "cobble together numbers" from at least three different SEC filings.  Mtn. at 23 n.19.  In any event, they did not (nor could they) identify any "apples-to-oranges" in Plaintiffs' more conservative calculation, which still demonstrates the materiality of the DriveTime agreement.  ¶129.

[33] Defendants' authority is inapt. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (falsity allegations were insufficiently particularized and all statements were "protected by the 'bespeaks caution' doctrine and the PSLRA's safe harbor"); *Robinhood Inc.*, 2023 WL 1927616, at *10 (plaintiffs merely alleged the company "failed to live up to its lofty opinions and goals"); *In re Peregrine Sys., Inc. Sec. Litig.*, 2005 WL 8158825, at *38, *50 (S.D. Cal. 2005) (finding the statements misleading, but dismissing on scienter grounds); *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001) ("The complaint does not plead facts that show that company insiders knew what the complaint says 'would' occur in what was then the future."), *abrogated by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023).

- 33 -

purported population coverage, while also exalting its "capital-light" expansion and existing logistics capabilities. ¶¶216, 218, 220, 222, 224, 226, 228, 230, 232, 234 (***Statement Nos. 21-29***). From these statements, analysts understood that, for example, when Carvana "launched in a record 100 new markets in 2Q20, bringing coverage to 73.2% of the US population . . . [it did so] ***with minimal incremental cost by expanding into smaller adjacent markets that could be supported via their existing logistics and delivery network***." ¶221(d); *Shenwick*, 282 F. Supp. 3d at 1136 (analysts' interpretation relevant to what the market understood).

Unbeknownst to investors, however, sales in these new markets were not profitable because the distance between them and Carvana's existing IRCs was material. ¶¶216, 219(b), 221(b), 223(b), 227(b), 229(b), 231(b), 233(b). Indeed, although Carvana incurred $750 in additional per-vehicle costs in markets located 200 miles from an IRC and materially more in markets 100 miles away from an IRC, the vast majority of the new markets Carvana entered into were greater than 100 miles from an existing IRC. *Id.* Further, as Garcia Jr. admitted when belatedly purchasing ADESA, Carvana was actually "a big physical infrastructure business" (*i.e.*, capital-heavy), and "[a] major factor motivating the [ADESA] deal is the fact that an e-commerce used car retailer needs a physical footprint like Amazon." ¶¶225(a), 235(a). In addition, Carvana lacked the necessary infrastructure to complete such sales and was thus forced to rely on costly third-party providers to serve its far-flung markets. ¶¶225(b), 235(b). Indeed, servicing the new markets caused logistics expenses to spike by 300% from the start of the Class Period to Q1 2022. *Id.*; *see also* ¶¶225(c), 235(c).

At the end of the Class Period, Defendants abruptly changed course, conceding that Carvana would stop selling vehicles in new "markets with lower profitability due to long distance from inventory," while emphasizing that Carvana needed to "[r]educe third-party [reconditioning] volume," "inbound transport share," and "third-party shipping." *Id.* Given Defendants' prior misstatements, commentators were shocked upon realizing Carvana's growth was "for growth's sake and not necessarily growth to improve profitability." *E.g.*, ¶221(d); *Shenwick*, 282 F. Supp. 3d at 1136. Because Defendants touted the benefits of Carvana's expansion model, a duty arose to "'disclos[e] adverse information that cuts against th[at] positive information.'" *See Glazer*, 63

- 34 -

F.4th at 764 (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016)).[34]

Defendants' other scattershot arguments are meritless. Defendants' claim that they disclosed "that improving its logistics network was one of its 'rationales' for acquiring ADESA" is illogical. Mtn. at 24. Indeed, this statement is one of Plaintiffs' partial corrective disclosures because it occurred ***after*** Defendants' alleged misstatements regarding Carvana's nationwide expansion.[35] Statement Nos. 24, 26, and 29 are not puffery (Mtn. at 23-24 (citing ¶¶224, 228, 234)) because whether a company's expansion model is "capital-light" or whether "we basically have markets to fill in" (¶¶224, 228, 234) is verifiable and a "factual representation about" the expansion. *E.g.*, *Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017) (statements that business is "ready to scale" and capable of "integrating acquisitions 'quickly'" not puffery as they "describ[ed] what [the business] did and what practical aims it was supposed to achieve").[36] Nor are Statement Nos. 24 and 29 opinions. In those statements, Defendants said "[w]e believe there is a substantial opportunity to utilize our capital-light expansion model." ¶¶224, 234. The qualifying language "[w]e believe" modifies "substantial opportunity," not the purported existence of a "capital-light expansion model." As to Statement No. 26, Plaintiffs sufficiently alleged that Garcia Jr. did not honestly believe the purported opinions. *See Omnicare*, 575 U.S. at 184-86; ¶¶228, 229(c) (alleging that, when Garcia Jr. spoke about launching in the Pacific Northwest, he knew that Carvana would "incur all the cost associated with shipping the cars out there" because it

[34] Defendants' refrain that "Carvana was not required to disparage its business strategy" nor "'take a gloomy, fearful or defeatist view'" (Mtn. at 24 (quoting *Chang*, 355 F.3d at 174)) ignores that Defendants chose to tout the "success" of Carvana's strategy and, thus, had a duty to disclose information that undercut those statements. And Defendants' premature truth-on-the-market argument (Mtn. at 24 & n.20) is misplaced. Nowhere did Defendants disclose that markets which were 100 or 200 miles from an IRC imposed material costs. And a webpage identifying the market locations and IRCs, ***referenced in shareholder letters***, did not disclose this information. Mtn. at 24 n.20. Further, that webpage did not list the distances between markets and IRCs and obscured material facts. For example, the bare bones map did not differentiate between new and old markets, obscuring that 90% of the new markets were 100 miles away from IRCs. *E.g.*, ¶218.

[35] As such, *Warwick II*, which evaluated information disclosed as of the April 2022 Offering, is inapplicable to the expansion statements at issue here which end on February 24, 2022. Further, the court in *Warwick II* merely noted "Carvana disclosed logistics costs and operational constraints" (Mtn. at 24) ***with regard to Carvana's parking lot capacity***. ECF 63, Ex. A at 21-22.

[36] Defendants' authority (Mtn. at 23-24) is thus inapplicable. *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (unlike here, statements describing compliance as a focus and priority were "not capable of objective verification").

- 35 -

"didn't have an inspection center there"). These materially misleading statements are actionable.

### 5. Materially Misleading Statements and Omissions Concerning Aged Inventory

Carvana's ADTS metric measured how quickly the Company sold its rapidly-depreciating inventory. ¶236. Leading up to and during the Class Period, ADTS was a key operating metric as the "[f]ailure to expeditiously sell [Carvana's] inventory could have a material adverse effect on [Carvana's] business, sales and results of operations." ¶¶236, 239(b), 241(b), 243(b). In fact, Carvana's "business [wa]s dependent upon [its] ability to expeditiously sell inventory," and thus, maintain a low ADTS. *Id.* But in Q1 2021, Defendants stopped disclosing this metric to investors, claiming repeatedly thereafter that "our number of IRCs is a more important metric than [ADTS] due to the impact of IRC capacity on retail units sold and *the relative stability of [ADTS]* in recent years." ¶¶237-238, 240, 242 (**Statement Nos. 30-32**).

In truth, ADTS was anything but relatively stable. It was spiking by 20%, 38%, and 58% in Q4 2021, Q1 2022, and Q2 2022, respectively. ¶¶237, 239(a), 241(a), 243(a). By omitting this adverse information, Defendants' statements "'create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'" *Shenwick*, 282 F. Supp. 3d at 1135; *see also Weston*, 669 F. Supp. 3d at 881 (statements about demand misleading where defendants "saw a decline in product usage"). In addition, it was separately misleading to claim that the number of IRCs was "a more important metric" and, thus, an appropriate replacement, because IRCs have "almost no relation to [ADTS]," which is "useful" to evaluating Retail GPU. ¶¶239(f), 241(f), 243(f).

Defendants boldly claim that a significant spike in their stated key operational metric is immaterial. Mtn. at 25. To the contrary, Defendants have admitted that: (i) the "[f]ailure to expeditiously sell inventory could have a material adverse effect on our business, sales and results of operations"; and (ii) their "business [wa]s dependent upon our ability to expeditiously sell inventory." *E.g.*, ¶236. Notably, Defendants admitted Carvana's need to "reduce[] inventory" was one of the "*largest drivers*" of Carvana's disappointing retail unit sales decline in Q3 2022. ¶¶239(d), 241(d), 243(d). And, the spike caused Carvana to record a $52 million inventory

- 36 -

4883-2521-8257.v1

adjustment. *Id.* Accordingly, there is, at the very least, a genuine dispute as to whether a reasonable investor would find a 20% to 58% spike in ADTS important. ¶¶236, 239(b), 241(b), 243(b); *see Shenwick*, 282 F. Supp. 3d at 1141 (rejecting argument that metric was "similar" because "[p]laintiff has alleged that a 4% difference is ***substantial and material***").[37] In any event, "a jury should assess materiality as a question of fact." *Khoja*, 899 F.3d at 1013-14.

Defendants' truth-on-the-market argument (Mtn. at 25 & n. 22) that Carvana disclosed its total quarter-end inventory balances is similarly premature. *Acadia*, 2023 WL 1769810, at *6. Regardless, the average number of days that a car has been sitting on a lot cannot be determined by the number of cars on all Carvana lots at the end of a quarter. *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 941 (N.D. Cal. 2022) (disclosure of "high-level sales and marketing expenditure information" insufficient to make statements about marketing investment freezes not misleading).

Statement Nos. 30-32 are not opinions (Mtn. at 25) as they include no qualifying language. *See Omnicare*, 575 U.S. at 183-88. Nor are they puffery as they are the precise types of statements a reasonable investor would rely on, and whether a trend is "relatively stable" is objectively verifiable. *See Shenwick*, 282 F. Supp. 3d at 1141 (statement that trend was "similar" when it had declined was not puffery as it lacked typical "'feel good monikers'"); *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 873 (W.D. Wash. 2022) ("statements of fact and conclusions or projections drawn from facts . . . are not puffery").[38] These materially misleading statements are actionable.

### 6. Materially Misleading Statements and Omissions Concerning Profitability Per Vehicle Sold

Carvana's Retail GPU metric was described by Defendants and viewed by the market as a proxy for Carvana's "unit economics" (*i.e.*, how much was earned on each retail vehicle sold). ¶¶248(a), 250(a), 252(a), 254(a), 256(a), 258(a), 260(a). During the Class Period, Defendants touted positive Retail GPU, often attributing those results to cars bought from customers. ¶¶247,

---

[37] Defendants' claim that there are no facts suggesting that they knew about spiking ADTS at the time of these statements (Mtn. at 25) is belied by Plaintiffs' allegations that this data – though not provided to investors until August 2023 – was consistently monitored by Defendants because of its impact on Retail GPU. ¶¶237, 239, 241, 243.

[38] Defendants' authority is inapt. *See Torrid*, 2023 WL 9197563, at *4 (statements were puffery given merely "high-level, catch-all contentions of falsity"). Defendants' reliance on *Warwick II* is also meritless. Mtn. at 25. The state court never mentioned, much less evaluated, ADTS.

- 37 -

249, 251, 253, 255, 257, 259 (**Statement Nos. 33-39**).  Thus, Defendants' statements provided investors with the false impression that Carvana's retail sales were consistently profitable.  *Id.*

In truth, after incorporating all relevant expenses, Carvana's retail sales had negative unit economics and, thus, were ***consistently unprofitable***.  ¶¶248(a), 250(a), 252(a), 254(a), 256(a), 258(a), 260(a).  Defendants were able to portray false positive "unit economics" by: (i) excluding certain relevant per-vehicle expenses from its from its calculation of Retail GPU in order to boost the reported metric; and (ii) simultaneously not adequately disclosing or quantifying these excluded direct vehicle costs separately so investors could gauge the actual unit economics of Carvana's retail vehicle sales on their own.  *Id.*

Defendants' concealment is clear.  They do not dispute that they never disclosed the following material facts during the Class Period (Mtn. at 26-27):

- Internally, Defendants viewed "***two key drivers***" of Carvana's "unit economics": (i) the direct vehicle costs which Carvana included in its reported Retail GPU metric; ***and (ii) additional "operations expenses per retail unit sold" that had never previously been separately disclosed or quantified for investors in Retail GPU, SG&A, or anywhere else*** (¶¶248(b), 250(b), 252(b), 254(b), 256(b), 258(b), 260(b));

- Defendants previously buried and ***comingled*** operations expenses – *i.e.*, "the underlying costs of completing a sale" – in "SG&A" even though they were ***direct*** expenses incurred in selling retail vehicles and not typical SG&A costs, such as ***indirect*** or corporate overhead expenses (*id.*); and

- Operations expenses were direct "***expenses associated with completing retail and wholesale vehicle sales***." *Id.*  These direct expenses included "multi-car logistics, last-mile delivery, . . . logistics expenses, third-party transport . . . title and registration…expenses" associated with completing retail vehicle sales.  *Id.*

Nor do Defendants dispute that had these "key" operations expenses been separately disclosed or quantified for investors during the Class Period, investors would have been able to determine Carvana's actual average unit economics.  For example, had Defendants made such disclosures, investors would have been able to calculate that, for Q4 2021, Carvana's actual average "unit economics" on retail sales was a loss of $1,248 per vehicle, rather than the Retail GPU profit they disclosed of $1,495 per vehicle.  ¶260(a).  Because Defendants' omission of the above facts created an impression of positive unit economics materially different from the negative unit economics that actually existed, the statements were misleading.  *See Glazer*, 63 F.4th at 764; *Schueneman*, 840 F.3d at 705-06; *see also Shenwick*, 282 F. Supp. 3d at 1138 (statement that a user

- 38 -

engagement metric showed growth was misleading "in the absence of **companion** [daily active users] data," which was also a key measure of user engagement and demonstrated downward trends); *FSP Stallion 1 v. Luce*, 2009 WL 1219683, at *6 (D. Nev. 2009) (denying motion to dismiss where, internally, defendants had "materially different calculations of net operating income" than they disclosed to investors).

Further, Defendants' statements that, for example, "[t]he biggest driver [of Retail GPU] was certainly the performance [of] buying cars from customers" were also misleading because Defendants masked many of the logistics costs associated with buying cars from customers by burying them in SG&A and not including them in Retail GPU. ¶255; *see also* ¶¶247, 248(f), 249, 250(f), 251, 252(f), 257, 258(g), 259, 260(g); *In re Green Dot Corp. Sec. Litig.*, 2024 WL 1356253, at *4-*5 (C.D. Cal. 2024) (statement "that active accounts were growing" misleading where "new, mostly free products [that made up much of the growth] were not as profitable as legacy products").

Unable to dispute Plaintiffs' allegations, Defendants rewrite them, claiming that Plaintiffs are merely challenging Carvana's preferred method of accounting or classification of expenses. Mtn. at 26-27. Not so. As alleged, "Defendants could choose how to calculate Carvana's Retail GPU metric and whether to categorize certain expenses as SG&A, so as to exclude them from the Retail GPU metric it touted to investors." ¶246. What Defendants cannot do, however, is create a misleading impression by "touting positive Retail GPU *while failing to provide any meaningful disclosures or quantification of the per-vehicle operations expenses*" that would have revealed that Carvana's actual profit per retail vehicle was negative. *Id.*; *see, e.g.*, *Shenwick*, 282 F. Supp. 3d at 1138.[39]   And even if these statements were opinions (they are not), Plaintiffs satisfied *Omnicare* by alleging that Defendants did not believe Retail GPU was an accurate measure of per-

---

[39] Because Defendants misconstrue Plaintiffs' allegations, their cases are inapposite. *See Rigel*, 697 F.3d at 877-78 (plaintiffs merely "disagree[d] with the statistical methodology adopted by the doctors and scientists who designed and conducted [a clinical] study, wrote the journal article, and selected the article for publication"); *see also* ECF 83-6 at 205 (plaintiffs alleged that defendants' timing of revenue recognition was improper under GAAP); *In re Eargo, Inc. Sec. Litig.*, 656 F. Supp. 3d 928, 939-40 (N.D. Cal. 2023) (regarding subjective accounting judgments on the booking of reimbursement claims under GAAP).

- 39 -

unit profitability, as they internally viewed "'the underlying costs of completing a sale' as a critical component of Carvana's actual retail vehicle profitability." ¶¶248(c), 250(c), 252(c), 254(c), 256(c), 258(c), 260(c); *see Uber*, 2020 WL 4569846, at *8 (opinions actionable where plaintiff pleaded "the underlying facts of which it alleges defendants had knowledge, when and in what context those facts arose, and why they rendered the opinion misleading").[40]

Defendants' remaining potshots are equally unpersuasive. Indeed, it is irrelevant that Carvana "disclosed that it had never been [profitable]." Mtn. at 26. Carvana's GAAP net income, which includes expenses like interest and depreciation, in no way suggested to investors that Carvana lost money on a per-vehicle basis. In fact, Defendants repeatedly and explicitly told investors the opposite. And Defendants' assertion that Carvana's post-Class Period breakdown of operations expenses simply repeated Carvana's Class Period disclosures (Mtn. at 27) is belied by the allegations in the ACC and presents a factual dispute for another day.[41] As alleged in the ACC and confirmed by analyst reports, Defendants' scant Class Period disclosures of certain SG&A expenses did ***more*** to mislead investors than to provide transparency. *See, e.g.*, ¶248(d)(i) (analysts referring to SG&A as a "black box"); *see also* ¶¶248(d), 250(d), 252(d), 254(d), 256(d), 258(e), 260(e). Thus, Defendants have failed to show that the omitted facts were disclosed with "a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by" their statements. *Acadia*, 2023 WL 1769810, at *5; *Splunk*, 592 F. Supp. 3d at 941 (finding that "[d]efendants have not shown, however, that Splunk's SEC filings itemize each marketing-and-sales-related expenditure with a degree of specificity that would have allowed investors to discover, to a degree that reasonable minds could not differ, the adverse facts that

---

[40] Defendants' claim that Statement Nos. 34, 36-37 include "classic markers such as 'I think'" fails for the same reason. Mtn. at 28. Plaintiffs have adequately pleaded Defendants had no basis to believe and did not in fact believe that, for example, "cars that you acquire from customers are typically more profitable" nor that Retail GPU was an accurate measure of per-unit profitability. ¶249; *see also* ¶¶253, 255; *see* ¶¶250(f), 254(c), 256(f).

[41] Defendants' gripe that Plaintiffs rely on a post-Class Period investor presentation rings hollow. Courts routinely rely on events post-dating the statement at issue in finding material falsity adequately alleged. *See, e.g.*, *Alphabet*, 1 F.4th at 703 (relying on facts "alleged by the complaint to have occurred ***after*** disclosure" as "support[ing] the materiality of the misleading omission").

- 40 -

Defendants allegedly concealed from investors").[42]

Finally, Statement Nos. 36-38 are not forward-looking or puffery. *See* Mtn. at 27-28 (citing ¶¶253, 255, 257). Per-unit profitability was "a critical metric to investors" as Defendants reported Retail GPU in each earnings call, SEC filing, and shareholder letter (¶244) and is "capable of objective verification [and thus] not 'puffery'" (*Apollo*, 774 F.3d at 606). Even if these statements are forward-looking (they are not), they would not be protected by the safe harbor as they each speak of then-existing facts. *Compare* ¶253 (identifying "a tailwind to retail GPU as we move towards 2Q" during a conference call in 2Q), *with Quality*, 865 F.3d at 1142 (where defendants "make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement," the safe harbor does not apply).[43] These materially misleading statements are actionable.

### C.    Plaintiffs Allege a Strong Inference of Scienter

To satisfy the scienter requirement, a complaint must allege that defendants made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C. §78u-4(b)(2); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "The inquiry is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 310, 322-

---

[42] Defendants' before-and-after argument (Mtn. at 27) only underscores the inadequacy of their Class Period disclosures. Now, Defendants claim "inbound logistics and reconditioning costs (***incurred before a consumer purchases a vehicle***) are included within the GPU metric . . . but outbound logistics and title and registration costs (***incurred after a sale is made***) – are captured as operations expenses" and properly concealed. *Id.* But Carvana's own SEC filings confirm that its operations expenses, which include the cost to deliver a vehicle to a customer (*i.e.*, outbound logistics) are ***not*** "incurred after a sale is made." *Id.*; *see* ECF 83-4 at 40 (disclosing that "[r]evenue from used vehicles sales is recognized ***upon delivery to the customer***" ***after*** operations expenses *i.e.*, "last-mile delivery" and "title and registration" processing (¶248(b))). But Defendants fail to explain why or how this distinction is relevant to assessing unit economics. While Plaintiffs do not argue that "***all*** of those costs should have been reported in the GPU metric" (Mtn. at 27), as Defendants' own authority states, "a company can speak selectively about its business ***so long as its statements do not paint a misleading picture***." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 615, 620 (9th Cir. 2022) (statements not misleading as they offered a "much more qualified and less definitive characterization of" the product at issue and the status of the company's project to improve it).

[43] Defendants' contention that Statement Nos. 33-39 are inactionable reports of historical data (Mtn. at 27) misses the point. Plaintiffs do not challenge the calculation of Retail GPU but Defendants' failure to disclose material per-unit costs. As such, their authority is inapt.

- 41 -

4883-2521-8257.v1

23.  A "strong inference" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.  "[I]f two possible inferences – one fraudulent and the other nonfraudulent – are equally compelling, a plaintiff has demonstrated a strong inference of scienter." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033 (9th Cir. 2016).  As detailed below, Plaintiffs raise a strong inference of scienter.

### 1.    Defendants' $3.76 Billion Insider Sales Support a Strong Inference of Scienter

Stock sales provide evidence of scienter when, like here, they are "'unusual' or 'suspicious.'" *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003).  "'Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insiders' prior trading history.'" *Id.*

Defendants' insider trading is breathtaking, totaling ***nearly $3.76 billion worth of stock*** in less than 16 months.  ¶¶261-262, 268.  Defendants' multi-billion-dollar insider selling binge is the epitome of circumstances where "personal financial gain may weigh ***heavily*** in favor of a scienter inference." *Tellabs*, 551 U.S. at 325; *Galena*, 117 F. Supp. 3d at 1160, 1172 (finding insider sales of $16 million "weighs heavily toward an inference of scienter" as to the alleged scheme).  In fact, even in securities fraud actions where the stock sales are considered "truly astronomical," the sales proceeds come nowhere close to those in this case.  *Oracle*, 380 F.3d at 1232 ($900 million in sales "truly astronomical" and suspicious); *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1195-96 (D. Colo. 2004) ($11.5 million to over $1.5 billion in sales).  Tellingly, Defendants do not once ***mention*** in their motions the $3.76 billion of proceeds they realized because that stunning amount strongly supports scienter.

Garcia Sr. offloaded 13,950,000 shares (15% of his ownership) for nearly $3.7 billion, while Jenkins sold 336,922 shares (48%) for over $79 million.  ¶¶262-263, 268.  These "'amount[s] and percentage[s] of shares sold'" support a strong inference of scienter. *Am. W.*, 320 F.3d at 938.[44]  Garcia Sr. and Jenkins contend that their percentages sold are too small (Mtn. at 32-

---

[44] Not surprisingly, courts in the Ninth Circuit routinely find percentages similar to those here

4883-2521-8257.v1

33; GMtn. at 13), but the Ninth Circuit's opinion in *Oracle* is instructive. There, the court found a strong inference of scienter where the defendants sold just 2% of their stock. *Oracle*, 380 F.3d at 1232. "[W]here, as here, stock sales result in a truly astronomical figure," the Ninth Circuit has admonished that "less weight should be given to the fact that they may represent a small portion of the defendant's holdings." *Id.*[45]

Defendants' insider trades were also suspicious in timing, designed to take advantage of Carvana's artificially inflated stock price, and out of line with prior trading patterns. Garcia Sr. began trading every day for ten months once his scheme had artificially inflated share prices by 114% ***and abruptly stopped a mere nine trading days after the first corrective disclosure***. ¶263 & n.153.[46] Further, his rate of sale peaked just as Carvana's stock did. ¶¶263, 265; *see Am. W.*, 320 F.3d at 939 ("troubling is the fact that the stocks were sold . . . near the stock's peak . . . and just prior to the stock's decline . . . and subsequent plunge"). And because Garcia Sr. did not sell any personal holdings in the three years before the Class Period (¶264), his sales were dramatically out of line with his prior trading patterns and, thus, "weigh heavily in showing scienter." *Galena*, 117 F. Supp. 3d at 1171. Similarly, not only did Jenkins sell his shares when Carvana's stock price skyrocketed, but he also sold 97% of those shares prior to *The WSJ* exposé and sold roughly the same amount in one year during the Class Period as in the three years prior. ¶¶268, 313.[47] Further, his proceeds were ***over 206 times*** the amount he received in salary. *Qwest*, 396 F. Supp. 2d at 1195 (considering "whether profits reaped 'were substantial enough in relation to the

---

indicative of scienter. *See, e.g.*, *Provenz*, 102 F.3d at 1491 (20%); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at \*14-\*15 (C.D. Cal. 2008) (7%); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (7.6%); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at \*19 (N.D. Cal. 2018) (20%); *Weston*, 669 F. Supp. 3d at 885 (24%).

[45] Defendants' authorities are inapt, as none involve such substantial sums (and involve sums as small as $1 million in total sales). Mtn. at 32; GMtn. at 12-13; *e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) ($1 million in total sales), *as amended* (Feb. 10, 2009). *Borteanu*, 2023 WL 1472852, is even less helpful, as it does not involve defendants' sale of shares but only potential sales because of their ownership. *Id.* at \*30.

[46] Garcia Sr.'s claim that he "s[old] stock each day no matter what" (GMtn. at 14) is misleading.

[47] Defendants' reliance on *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097 (9th Cir. 2021) for the proposition that insider sales are indicative of scienter where insiders "sell[] shares before the company discloses negative information" is curious. *Id.* at 1107; Mtn. at 32. That is exactly what happened here.

- 43 -

4883-2521-8257.v1

compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud'").

Defendants offer a slew of meritless arguments. While Garcia Sr. concedes that he did not sell any of his personal holdings in the prior period, he nonetheless claims his prior trading is consistent because he sold shares "owned indirectly" through DriveTime or Verde. GMtn. at 12 (quoting ¶¶263-264). But courts do not consider indirect sales to be equivalent to direct sales. *E.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 276 (S.D.N.Y. 2008) (noting the defendant "did not sell any of his *directly held* shares during the pertinent time period" and finding sales of indirectly held shares "reveals no grounds for finding that the relevant stock sales by [the defendant] were sufficiently unusual to support an inference of scienter"). The difference is particularly meaningful here, given that Garcia Jr. and his children own nearly a quarter of DriveTime. ¶264. Thus, unlike his $3.7 billion in direct sales proceeds during the Class Period, Garcia Sr. pocketed less than $456.3 million in indirect proceeds.[48]

Contrary to his insistence, Garcia Sr. did not engage in "steady" and "consisten[t]" trading. GMtn. at 13-14. He started selling 30,000 shares per day and doubled that volume as Carvana's price increased, and he sold *four million shares* outside of these daily sales. ¶¶263, 265; ACC, App'x A. Incredibly, Garcia Sr. asserts that his sales were not timed to take advantage of the artificial inflation in Carvana's stock price because "[m]any" sales occurred at prices below $200 and most sales were below $300. GMtn. at 13-14. A cursory review of Appendix A reveals that Garcia Sr. engaged in *over 500 separate sales* at prices above $300 (including at Carvana's $376 peak), from which he reaped over $938 million in proceeds. In stark contrast, he engaged in only 63 transactions at prices below $200. *See* ACC, App'x A. Even his lowest selling price – $180.37 – is over 20 times Carvana's $8.01 per-share closing price at the end of the Class Period. ¶327 n.169; *see In re Daou Sys., Inc.*, 411 F.3d 1006, 1024 (9th Cir. 2005) (sales at $22.86 probative of scienter where class period high reached over $34).

Garcia Sr. is wrong that a finding of scienter requires him to dump all of his shares

---

[48] Naturally, all of the cases he cites (GMtn. at 12) compare defendants' *personally held* shares.

- 44 -

4883-2521-8257.v1

immediately before the first corrective disclosure. GMtn. at 13.[49] Indeed, "the fact that Defendants did not wait until the last possible moment to sell does not negate an inference of scienter." *Questcor*, 2013 WL 5486762, at *17 (sales ten months before first disclosure probative of scienter); *see also Karinski*, 2020 WL 281716, at *15 (sales "an entire year" before disclosures probative of scienter). Finally, Garcia Sr.'s purchases of 7 million shares for an average of *$65* per share – far from the $376 per-share Class Period high – near the end of the Class Period do not negate scienter. *See* GMtn. at 14; ¶266 n.157. Purchases do not "bear upon Plaintiffs' scienter allegations" where, as here, they occurred "'after a marked drop'" in stock price. *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 74 (D. Mass. 2014); *see also Galena*, 117 F. Supp. 3d at 1165 (defendants' purchases did not negate scienter when defendants purchased so that sales "would be mixed with insider buy[s]").[50]

For his part, Jenkins disputes the accuracy of his percentage of shares sold. Mtn. at 33 & n.27. He is wrong. Jenkins fudged his figures to include 322,023 shares of RSUs and options that he exercised or converted – a transaction that does *not* increase his ownership, as he already owned the securities that he converted – *and immediately sold*. Even his own authority recognizes this basic fact. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) ("*vested* stock options" should be considered owned as they "can be converted easily to shares and sold immediately"), *as amended* (Aug. 4, 1999). Jenkins further padded his ownership by including another 98,376 shares that were unvested by the end of the Class Period and therefore could not have been sold. *See id.* ("[T]he proportion of shares actually sold by an insider to the volume of shares *he could have sold* is probative of whether the sale was unusual or suspicious."); ECF 83-9

---

[49] Garcia Sr.'s reliance on the disapproved-of *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671 (N.D. Cal. 2002), does not undermine this logical conclusion. GMtn. at 13.

[50] Garcia Sr. misleadingly argues that his purchases somehow reduce the percentage he sold. GMtn. at 13. Not so. Percentage shares sold is calculated based on Defendants' *ownership*, which accounts for any purchases. Further, he did not "continue[] purchasing Carvana stock throughout the class period." *Id.* at 14. In contrast to the cases he cites, Garcia Sr. made two purchases once Carvana's stock price declined substantially towards the end of the Class Period and was nowhere close to being a net-gainer. *See In re Aspeon, Inc. Sec. Litig.*, 168 F. App'x 836, 839 (9th Cir. 2006) (CEO twice purchased stock during the time that Eminence Capital alleges Aspeon was inflating revenue); *Zamir v. Bridgepoint Educ., Inc.*, 2016 WL 3971400, at *10 (S.D. Cal. 2016) (defendants were net gainers).

4883-2521-8257.v1

at 58, 80.[51] Jenkins also attempts to twist his change in trading pattern in his favor, arguing that his trading stopped early in the Class Period and his prior trading is consistent. Mtn. at 33-34. The former assertion ignores that Jenkins traded at prices ranging from $200.00 to $342.08 (*24 to 42 times* the price at which Carvana stock traded at the close of the Class Period), while the latter ignores that his *condensed* selling spree during the Class Period was atypical. ¶¶268-269.[52] The fact that Jenkins stopped selling stock on November 8, 2021 "does not preclude a strong inference of scienter beyond that date." *Qwest*, 396 F. Supp. 2d at 1196; *see also Questcor*, 2013 WL 5486762, at *17; *Stevelman v. Alias Rsch.*, 174 F.3d 79, 85-86 (2d Cir. 1999) (misstatements made after sales could be probative of intent to keep stock price high to avoid detection of fraud).[53]

Despite Defendants' protests, Defendants' Rule 10b5-1 trading plans actually strengthen the strong inference of scienter raised by their $3.76 billion in sales. *See* Mtn. at 34-35; GMtn. at 14-15. Garcia Sr.: (i) entered into his 10b5-1 plan during the Class Period; (ii) modified that plan mere months later to accelerate the rate at which he dumped his shares; (iii) modified his plan again less than six months later to further accelerate his insider sales; and (iv) sold two million shares outside of his plan. ¶265.[54] Needless to say, Garcia Sr.'s 10b5-1 plan has no application to

[51] Unlike in *City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*, 2023 WL 155861 (D. Ariz. 2023), where the defendants' "overall holding of First Solar stock actually increased" (*id.* at *8) by the end of the class period, Jenkins's overall holdings declined by 48%. *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989) is also inapplicable because absent his doctored calculations he did not have "[l]arge sales of stock before the class period." *Id.* at 1117.

[52] Regardless, even where Plaintiffs do not plead "any trading history for [a defendant]," courts find stock sales support scienter where the other factors are present. *E.g.*, *Karinski*, 2020 WL 281716, at *15; *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *13 (S.D. Cal. 2022) (sales probative of scienter solely because "the amount of . . . stock sold by the individual [d]efendants . . . is substantial"); *Questcor*, 2013 WL 5486762, at *16 (trades support scienter where only two factors met); *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *15 (C.D. Cal. 2022) (same). And Defendants' authority (Mtn. at 33-34), which does not concern a change in patterns, is inapt.

[53] *In re Vantive Sec. Litig.*, 283 F.3d 1079, 1093-94 (9th Cir. 2002) is inapposite given that Garcia Sr. and Jenkins both sold at prices near Carvana's peak. Similarly, the sales in *In re FVC.COM Sec. Litig.*, 136 F. Supp. 2d 1031, 1040 (N.D. Cal. 2000), *aff'd*, 32 F. App'x 338 (9th Cir. 2002) were not designed to take advantage of artificially inflated prices, as the defendants did not sell shares shortly before the truth was revealed. Mtn. at 33.

[54] Academic studies confirm that 10b5-1 plans have become a tool for executives to attempt to engage in insider trading scot free, which the SEC sought to remedy by adopting new rules to target "loopholes that allowed corporate insiders to hide behind these trading plans." ¶¶271-272. Had the SEC's new rules applied, Defendants' sales would have been foreclosed. *Id.*

- 46 -

his nearly half billion in sales which occurred outside his plan. Further, because Garcia Sr. entered into his plan during the Class Period while in possession of MNPI, his plan cannot be used as an affirmative defense. *Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *12 (N.D. Cal. 2021) ("SEC regulations recognize [a 10b5-1 plan] as an affirmative defense . . . ***only if*** the insider adopted the plan '[b]efore becoming aware of [MNPI]'"). Finally, Garcia Sr. modified his plan twice. This supports scienter. *See Backe*, 642 F. Supp. 2d at 1185 ("amend[ments] [to] 10b5-1 plans to allow more stock sales . . . coupled with the unusual pattern of sales supports an inference of scienter"); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008) (modifications "defeat the very purpose of 10b5-1 plans").[55] Indeed, as Professor Taylor concluded about Garcia Sr.'s 10b5-1 plan modifications: "***What I'm saying is the Garcias knew it was short-lived . . . . The Garcias knew the music would eventually end***." ¶266.[56]

Jenkins entered into both of his plans ***after*** he embarked on the scheme and was in possession of MNPI. ¶269. Therefore, his plans do not negate scienter because the availability of this affirmative defense requires a finding of good faith – a question of fact that cannot be resolved at this stage.[57] *Acadia*, 2022 WL 4491093, at *13 (rejecting plans adopted "after the motive and opportunity to mislead investors allegedly arose"); *see also Lamartina*, 2021 WL 4133851, at *12.[58] Tellingly, Defendants have not even tried to make this showing.

---

[55] Similarly unavailing is Garcia Sr.'s reliance on *City of Pontiac*, 2023 WL 155861, where, unlike here, the trading defendants were "***net gain[ers]***," the trades – made at typical times – were worth less than $15.9 million, plaintiffs failed to provide any trading history, and no defendant sold $478.4 million in stock outside of their plan or modified their plan. *Id.* at *8.

[56] These facts distinguish this case from Garcia Sr.'s authorities and demonstrate the falsity of his claim that "the ACC lacks any particularized facts showing that a desire to exploit material non-public information was the impetus for the modifications." GMtn. at 14-15.

[57] *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) (finding that, while evidence of 10b5-1 plan "may ultimately provide the basis of an affirmative defense at a later stage . . . it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales"); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 n.3 (N.D. Cal. 2019) (same); *Questcor*, 2013 WL 5486762, at *16 (same); *Azar*, 2018 WL 6182756, at *4 ("'[A] 10b5-1 trading plan . . . requires an additional factual finding of good faith,' which a court cannot make [on] a motion to dismiss.").

[58] Defendants turn the burden of proof on their affirmative defense on its head, claiming the allegations that Jenkins had MNPI are conclusory. Mtn. at 34-35. Their claims are meritless. As explained *supra* §VI.B.1., Carvana's systematic violation of title and registration requirements was ***not*** disclosed ***and*** was known to Jenkins at the time of his plan modifications, rendering

- 47 -

4883-2521-8257.v1

Garcia Jr. incorrectly asserts that his lack of insider sales undermines an inference of scienter. *E.g.*, *Tellabs*, 551 U.S. at 325 ("[T]he absence of a motive allegation is not fatal."); *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 n.2 (9th Cir. 2010) (no "negative inference from the absence of stock sales"); *see also Am. W.*, 320 F.3d at 944. "Indeed, there are several explanations for why an individual defendant would not sell stock . . . such as a desire to avoid drawing the market's attention to the problem." *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016). Here, Garcia Sr.'s sales inured to Garcia Jr., particularly as he is a beneficiary of Garcia Sr.'s trusts. *See* ¶160 n.17; *e.g.*, *Baron*, 2022 WL 17413562, at *15 (brother's sales probative of defendants' scienter); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *2 (S.D.N.Y. 2012) (defendant's wife's sales supported his scienter). And Garcia Jr. discussed trading Carvana stock with Garcia Sr. Indeed, Garcia Jr. emailed Garcia Sr. during one of Carvana's offerings to "figure out [a] plan on [Garcia Sr.'s] money." ¶303 n.165. Finally, Garcia Jr.'s purchases in the 2022 Offering do not negate scienter because they were done in order to ensure its execution. *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 941 (C.D. Cal. 2012) (scienter not negated where defendants "did not sell Gulf's stock . . . but instead increased their holdings" because one defendant's "wife sold a large number of shares"); *see* ¶266 n.157.[59]

Defendants' remaining arguments fail. Their focus on the speaking defendants (Mtn. at 32) ignores that Garcia Sr. engaged in the scheme and in insider trading (*supra* §VI.A., *infra* §VI.F.).[60] *See Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2022 WL 716653, at *9 (D. Utah 2022) (finding scienter where non-speaking board members sold stock, demonstrating "individuals within the company knew that the statements were misleading [and] that the artificially propped up stock could soon crash"). And Plaintiffs are not required to precisely tie each sale to a false statement. Mtn. at 33; *see, e.g.*, *Acadia*, 2022 WL 4491093, at *13 (sales probative of scienter where

Defendants' reliance on *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1180 (C.D. Cal. 2007) misplaced.

[59] *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1011 (N.D. Cal. 2017), does not involve a defendant's family member selling stock and is thus unhelpful. Mtn. at 32.

[60] Thus, Defendants' reliance on *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008) is misplaced (Mtn. at 32), as that case did not concern omissions or deceptive acts. *See Glazer*, 549 F.3d at 740-41.

- 48 -

plaintiffs "do[] not allege . . . the timing of the sales within the nineteen-month period relative to any of the allegedly misleading statements").  In any event, the ACC details the dates of sales, misrepresentations, omissions, and deceptive acts.

Accordingly, Defendants' $3.76 billion in insider sales strongly supports scienter.

### 2.    Defendants' Statements Support the Inference of Scienter

"[S]cienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements."  *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. 2015).  Here, Jenkins and Garcia Jr. made and approved numerous specific statements regarding the very information that Plaintiffs alleged was false or misleading, evincing their knowledge and supporting a strong inference of scienter.  ¶¶287-288; *Shenwick*, 282 F. Supp. 3d at 1147 (finding scienter on actual access where defendant "'bridged the scienter gap . . . by referencing the [subject of the fraud] directly'").[61]  In addition, Defendants often made public statements in response to analysts' pointed questions.  ¶287; *S. Ferry LP, #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009) (responses to "***direct questioning***" "sufficient to satisfy the ***actual knowledge*** analysis and allows the Court to infer scienter") (some emphasis in original).[62]  In fact, Defendants fielded these questions as they repeatedly assured investors that they were "always focused on" and had visibility into markets, pricing, and demand, and had data showing "where inventory is, how much inventory is close to different markets, what delivery times are in different markets, [and] what inventory distribution looks like" (¶287(c)), such that "[they] knew what [they were] talking about." *S. Ferry*, 687 F. Supp. 2d at 1259-60; *see also Quality*, 865 F.3d at 1145.  To the extent Defendants "did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all." *S. Ferry*, 687 F. Supp. 2d at 1260.

In addition, Defendants issued false denials regarding the title violations.  *Supra* §VI.B.1.

---

[61] *McKesson*, 411 F. Supp. 3d at 601-02 (same); *see also Acadia*, 2023 WL 1769810, at *4 (same). Defendants repeatedly discussed: retail sales (*e.g.*, ¶214); buying cars from customers (*e.g.*, ¶¶193, 197, 201, 205); profitability (*e.g.*, ¶247, 249, 251, 253, 255, 257, 259); capital-light, nationwide expansion (*e.g.*, ¶¶226, 228); ADTS (*e.g.*, ¶238); Retail GPU (*e.g.*, ¶¶249, 251, 253, 255, 257, 259), and title issues (*e.g.*, ¶180).

[62] *See also In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. 2018) ("attempts to 'placate the market in reaction to the inquiries by . . . analysts'" support scienter).

- 49 -

Such "false exculpatory statements are additional indicia of scienter." *Karinski*, 2020 WL 281716, at \*16; *see also United States v. Reyes*, 660 F.3d 454, 466-67 (9th Cir. 2011) (same); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at \*11 (S.D. Cal. 2019) (same).

Defendants' belated admissions also support their knowledge. A "classic fact pattern[] giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001); *Oracle*, 380 F.3d at 1232-33 (reversing dismissal in part on admissions). This case follows that pattern. *See, e.g.*, ¶219(d) (Garcia Jr. admitting "an e-commerce used car retailer needs a physical footprint"); ¶284 (Defendants admitting "operations expenses," were one of "***two key drivers***" of per-unit profitability and direct costs of completing a vehicle sale); and *id.* (Garcia Jr. admitting he viewed "***the underlying costs of completing a sale***" as a critical component of Carvana's retail vehicle profitability). Where, as here, Defendants "disclosed information about [Carvana's retail business] that contradicted [their] own internal data" in violation of Rule 10b-5(a)-(c), there is "'a strong inference' that [they] 'knowingly misled' the public as to the state of the company." *York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 467-68 (9th Cir. 2023).[63]

### 3. Defendants' Decision to Cease Reporting Key Metrics Supports Scienter

As the consequences of Defendants' scheme mounted, they stopped reporting "statistics on buying cars from customers" and ADTS. ¶¶289-294. Their abrupt decision to cease reporting these key metrics to avoid tipping investors off to the scheme bolsters the inference of scienter, and renders "the competing inference" "not plausible." *Alphabet*, 1 F.4th at 707.

Defendants' claim that the metrics allegations are group pleaded and not tied to a specific Defendant's involvement fails. Nor were Defendants unaware of the change in reporting, as they themselves designated ADTS as a "***Key*** Operating Metric," and Garcia Jr. and Jenkins signed the Forms 10-K and 10-Q acknowledging the cessation of the metric's reporting. ¶290. ADTS was

---

[63] Tacitly conceding the strength of Plaintiffs' allegations, Defendants ignore this body of law, arguing in a single sentence that Plaintiffs "fail to show how Defendants' ***public*** statements demonstrate" their scienter. Mtn. at 38.

4883-2521-8257.v1

critically important because Carvana's business was admittedly "dependent upon [its] ability to expeditiously sell inventory." *E.g.*, ¶236. Defendants' assertion that ADTS was stable before the Class Period is irrelevant. Mtn. at 38-39. When Defendants pulled ADTS and repeatedly assured investors that it was stable, ADTS was unquestionably spiking, further demonstrating scienter.

Likewise, whether the volume of cars purchased was increasing is irrelevant to Defendants' removing their buying cars from customers metrics. *See id.* at 39. By ceasing to report these metrics, investors and analysts were misled to believe that the program was successful and profitable, when in reality Carvana was facing a mounting inventory of trash cars that it had to sell wholesale at a loss. *See* ¶294; *see, e.g.*, *Voulgaris v. Array Biopharma Inc.*, 2020 WL 8367829, at *24 (D. Colo. 2020) (selective change "to a narrower subset of patients" where use of entire dataset might not have received FDA approval "relevant to the scienter element").[64]  Even if Defendants did not know about these issues, they would still be liable for speaking on the subject without adequate knowledge. *See Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 10 (1st Cir. 2021) (strong inference of scienter where defendants "either inquired about [the product] before deciding to promote it to investors or were reckless in failing to do so").

### 4. CW Accounts Further Bolster the Inference of Scienter

The CWs further demonstrate that Defendants knew or recklessly disregarded that Carvana lowered its purchasing and verification standards when buying cars from customers to induce trade-ins, which spiked logistical constraints, expenses, and low-quality vehicles that had to be sold wholesale. ¶¶274-278. CW-2 was overruled when voicing concerns about the quality of vehicles as "leadership would say take it." ¶¶60, 277. CW-11 reported that Carvana was essentially purchasing vehicles "sight unseen." ¶115. CW-11 stated that he and other high-ranking employees had quarterly Zoom calls with C-level executives, including Garcia Jr. and Jenkins, at which someone in market operations raised the poor car quality. ¶¶118, 276. In early 2021, CW-11 attended a meeting where the issue of the poor quality of customer cars was again raised with Garcia Jr. and Jenkins, and a C-level executive responded: ***Carvana is "just worried***

---

[64] Defendants' cases do not concern a change in reporting metrics and are inapt. Mtn. at 38-39.

- 51 -

***about growth and not procedural" operations***. *Id.* And CW-5 attended a leadership summit at headquarters in April 2022 with Garcia Jr., in which employees again raised this issue. ¶¶87, 275.

Further, after operating under the directive "to purchase as much as was humanly possible," regardless of the quality, CW-1 explained that Carvana's inventory issues were "obvious to anyone with eyes." ¶¶55, 277. These issues were made explicitly known to Defendants and director-level employees. CW-8, who utilized Tableau, reported that, in fall and winter of 2021, his team began to raise concerns about the high level of inventory at weekly meetings every Thursday with an Associate Director. ¶¶98-101, 277.[65] CW-5, a Market Operations Manager, reported the bloated inventory at his hub to the other Operational Managers in weekly meetings. ¶85. And, in Q1 2021, CW-4 was told in a meeting with Directors and Associate Directors there would be "a huge increase" in the volume of wholesale cars. ¶71.

CW accounts also show Defendants knew or recklessly disregarded that, to boost sales, Carvana purchased and sold cars before it held title to those cars. CW-8 said that around the summer/fall of 2021 there was a lot of pressure to get every vehicle possible, with the expectation that titles could be acquired later. ¶100. CW-9 reported that, during a call in January 2022, employees told Garcia Jr. they were being inundated with calls regarding registration issues. ¶279. CW-3 discussed the title problems with his manager and at weekly meetings with the Director of Wholesale. ¶66. CW-10 also raised the title problems with a supervisor and a manager, only to be told other teams were experiencing similar issues. ¶112.

Faced with these compelling allegations, Defendants resort to contesting the CW accounts. Mtn. at 36. Here, because the CWs are particularly described by job description or responsibility, and duration of employment, their reliability and personal knowledge is sufficiently established (ACC, §V.). *Quality*, 865 F.3d at 1145. Nonetheless, Defendants quibble that the CWs are low-level employees that lack "any reliable or personal basis to report about any Defendant's state of

---

[65] CW-8 stated that Tableau included inventory data and metrics, including how many vehicles Carvana had in inventory, ADTS, and supply/demand ratios. ¶¶98, 283. CW-7 also explained that Carvana used Tableau to monitor inventory, which revealed declining GPU as Defendants embarked on the scheme. ¶¶92-94, 283. Defendants' comments about the data available to them and visibility into inventory (*e.g.*, ¶¶287-288) confirms their access to Tableau. *See* Mtn. at 37.

- 52 -

mind." Mtn. at 36. In doing so, "Defendants misapply the test" outlined in *Quality*. *Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *10 (D. Ariz. 2018) (rejecting identical claim). Further, the Ninth Circuit routinely credits low-level CW accounts even when the CWs did not interact with a defendant. *See, e.g.*, *Glazer*, 63 F.4th at 772 (crediting accounts of numerous low-level CWs who had no direct contact with defendants); *Quality*, 865 F.3d at 1144 (same).[66] And, while not required, multiple CWs recounted meetings that Garcia Jr. and Jenkins attended, and provided a reliable account in support of scienter based on those interactions. Lastly, Defendants' assertion that management "disagree[d]" with the CWs is pure conjecture and unsupported by anything in the ACC. *See Glazer*, 63 F.4th at 772 (rejecting similar claim); *see also Karinski*, 2020 WL 281716, at *18 (same).[67] In addition, the CW accounts establishing that Defendants violated the Company's own internal policies and state laws support scienter. *See Glazer*, 63 F.4th at 772. The CW accounts support a strong inference of scienter.

### 5. The "Core Operations" Doctrine Supports Scienter

This Court may also impute scienter to Defendants "based on the inference that [they] have knowledge of the 'core operations' of the company." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014). The core operations doctrine supports an inference of scienter where "defendants had actual access to the disputed information'" *or* where "it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* at 575-76. Here: (i) Defendants repeatedly acknowledged that Carvana's "business is dependent upon our ability to expeditiously sell inventory," "retail units sold [i]s the single most important metric in our business" and the "most important measure of our growth," and its "primary business objective is to . . . generate a profit" from its retail sales (¶¶40, 236, 244, 281); (ii) Defendants participated in the scheme to

[66] Relying on *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024 (N.D. Cal. 2020), Defendants argue accounts of "all-hands" meetings cannot support scienter. Mtn. at 37. But the Ninth Circuit recently credited an account from a "'sales kickoff'" event. *Glazer*, 63 F.4th at 772.

[67] Defendants' authority is inapt. *Zucco*, 552 F.3d at 999 (unlike here where Defendants violated their own internal policies, one CW sent an email suggesting an alternative course); *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 536-37 (9th Cir. 2024) (accounts from two CWs were not "reliab[le]" and based on "secondhand information"); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (plaintiffs relied on "a single statement by a lone witness, a clinical sales representative . . . who worked for Intuitive for three months" to allege that defendants knew they would not meet their projections).

- 53 -

inflate Carvana's retail sales, including by entering into an agreement with DriveTime (¶129); (iii) Carvana revamped its title department at least three times to handle the consequences of flouting state laws (¶320); (iv) several states were actively investigating and sanctioning Carvana (¶148); (v) Defendants had actual access to the information as demonstrated by their public statements about the relevant issues, including in response to analysts' questions, and the data available to them (¶¶280-288); and (vi) Garcia Jr. and Jenkins attended meetings, including quarterly Board meetings, where the omitted facts and issues were discussed (¶282).  As such, it is absurd to suggest Defendants were "without knowledge" of the scheme.  *Shenwick*, 282 F. Supp. 3d at 1147 (core operations inference supported finding of actual access to data where defendants spoke about the subject of the fraud).

Further, the Ninth Circuit has explained that "we may consider a senior executive's role . . . includ[ing] . . . whether, given the importance of the information, 'it would be "absurd" to suggest that management was without knowledge of the matter.'"  *Alphabet*, 1 F.4th at 706 (scienter alleged as it was absurd to suggest no one told the CEO about key operations information); *In re Stable Road Acquisition Corp.*, 2022 WL 2762213, at *10 (C.D. Cal. 2022) (same).  Here, it would be absurd to suggest that Carvana's controlling shareholder, CEO, and CFO were unaware of a widespread scheme devastating their core business they oversaw and involving Carvana's primary objective which purportedly drove the "***majority***" of its profit.  ¶41; *see Shenwick*, 282 F. Supp. 3d at 1145-46 (finding it would be "'absurd'" to argue defendants were unaware of trends in metric that "[w]as one of its five 'major growth drivers'"); *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *10 (N.D. Cal. 2022) (finding it would be absurd to argue CEO and CFO were unaware of scheme that led to $65 million inventory reduction, like the $52 million inventory adjustment here).  This is particularly true given the Garcias' "***iron grip*** on Carvana" and firing of any "[h]igher ups who went against the CEO."  ¶285 ("The culture is ***you either are on board with us and everything we do and say . . . or you . . . get out***."); *VeriFone*, 704 F.3d at 710 (hands-on management style weighs in favor of scienter).

Defendants gloss over this authority, stating only that establishing scienter via core operations is "'not easy.'"  Mtn. at 37-38.  But as explained above, Plaintiffs have satisfied the test,

- 54 -

and the doctrine is properly invoked here.  Defendants claim that Plaintiffs fail to plead their access to data (Mtn. at 37-38), but they ignore that they "'bridge[d] the gap'" themselves via their public representations.  *Reese*, 747 F.3d at 572.[68]  And they do not dispute that they attended Board meetings where title and registration violations were discussed.[69]

Garcia Sr. is also wrong that the ACC fails to plead his knowledge of the scheme.  GMtn. at 10-11.  As discussed *supra* §VI.A.2., the ACC pleads Garcia Sr.'s participation in and, thus, knowledge of his deceptive acts.  *Galena*, 117 F. Supp. 3d at 1171 (suspicious sales and participation in a deceptive act "demonstrate[d] that the inference of scienter argued by Plaintiffs is as least as compelling as any opposing inference of nonfraudulent intent").  It is not plausible, let alone as compelling as the opposing inference, that Garcia Sr. was unaware that all the sales proceeds from the sham sales were diverted to DriveTime – his private company.  Thus, Garcia Sr.'s assertion that Plaintiffs must demonstrate his "'actual exposure to information'" (GMtn. at 10) is meritless.  In any event, even his authority holds that "the core-operations inference can be ***one relevant part*** of a complaint that raises a strong inference of scienter."  *S. Ferry*, 542 F.3d at 784.[70]  Thus, the core operations doctrine further supports scienter.

---

[68] Defendants' authorities do not help them because, unlike here, the plaintiffs there did not identify any statements evincing scienter.  Mtn. at 37-38 (citing *Espy*, 99 F.4th at 535-40; *Intuitive*, 759 F.3d at 1061-64; *In re Alteryx, Inc. Sec. Litig.*, 2021 WL 4551201, at *7-*8 (C.D. Cal. 2021)).

[69] While Defendants attempt to cobble together a competing inference based on snippets they plucked from the Board materials (Mtn. at 37-38), they concede, as they must, that Jenkins and Garcia Jr. had access to information about title and registration violations via their participation at these quarterly meetings.

[70] *S. Ferry* is also distinguishable because the "core-operations inference [was] the ***only*** basis for scienter." 542 F.3d at 784.  Here, Plaintiffs also allege Garcia Sr.'s involvement in the scheme, $3.7 billion in stock sales, and manipulation of his 10b5-1 plan.  Garcia Sr.'s other authorities (GMtn. at 10-11) are also inapposite.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v Align Tech., Inc.*, 856 F.3d 605, 620-21 (9th Cir. 2017) (defendants were not involved with the company during the alleged fraud in any way and had less than $15 million in stock sales); *Zucco*, 552 F.3d at 1005 (plaintiffs "'fail[ed] to provide any information on the trading history'" of the stock sales or allege a scheme claim); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (no inference of scienter where two defendants' $33 million in stock sales were in line with prior patterns and they did not commit a deceptive act); *Sneed v. AcelRx Pharms., Inc.*, 2023 WL 4412164, at *9 (N.D. Cal. 2023) (arguing scienter through only "(1) access to information and (2) core operations"); *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 769 (N.D. Cal. 2020) (no allegations of "personal financial motive to defraud").

4883-2521-8257.v1

#### 6.    Abundant Additional Facts Support Scienter

***Given Garcia Jr.'s and Jenkins's positions and the importance of retail sales and GPU, their SOX certifications support scienter***. ¶295; *see Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019) (defendant's "position as CEO" and "the overall importance" of the omitted information to the company's "business model" supported scienter); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *13 (S.D.N.Y. 2018) (same).[71]

***The government investigations support scienter***.  Because the Ninth Circuit routinely infers scienter from government investigations, the host of investigations and findings of wrongdoing further bolster the inference of scienter.  *See VeriFone*, 704 F.3d at 706-07 (SEC complaint bolstered scienter); *Reese*, 747 F.3d at 574.  Further, the SEC investigation (¶127 n.10), even without proof of wrongdoing, supports scienter.  *Mylan*, 2018 WL 1595985, at *13.

***Garcia Sr.'s history of similar fraudulent conduct supports scienter***.  Scienter "is partially satisfied by allegations of a regular pattern of related and repeated conduct."  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 693 (S.D. Tex. 2002).  Here, Garcia Sr. followed his playbook for engaging in corporate fraud for financial gain.  After being convicted of engaging in criminal fraud, Garcia Sr. started Ugly Duckling, touting its (unsustainable) growth.  ¶¶304-305.  When its stock price dove 90%, Garcia Sr. "feather[ed] his own nest with Ugly Duckling's assets" and settled a number of investor suits.  ¶305.  His similar conduct in Ugly Duckling supports scienter here.[72]

Garcia Sr. argues that his criminal fraud conviction is irrelevant.  GMtn. at 15.  But that is not the law.  *Austin v. Loftsgaarden*, 675 F.2d 168, 180 (8th Cir. 1982) (evidence of defendant's

[71] Thus, Defendants' reliance on *Zucco* is unavailing as the court simply held that SOX certifications "'are not sufficient, ***without more***.'"  552 F.3d at 1004.  In addition, the timing of the statements – made within days and months of the corrective disclosures – further supports scienter.  *See Shenwick*, 282 F. Supp. 3d at 1148 (strong inference of scienter where only a few months elapsed between misstatements and disclosures); *see also Reese*, 747 F.3d at 571, 575 ("three to six months" between "statements and the contradictory disclosures" supports scienter).

[72] While Garcia Sr. suggests that Ugly Duckling might not have involved fraud (GMtn. at 15), there is a cogent and compelling inference to the contrary.  In Garcia Sr.'s authority, *Strasburger v. Blackburne & Sons Realty Cap. Corp.*, 2020 WL 6128223 (C.D. Cal. 2020), the court concluded that the "alleged pattern of related conduct" – comprising one other instance of similar alleged misconduct – "makes Plaintiff's scienter allegations all the more compelling" and denied the motion to dismiss.  *Id.* at *6.

- 56 -

prior fraud properly admitted in securities fraud trial to show intent). Garcia Sr.'s reliance on *Avant-Garde, LLC v. Mountain Spa Props., LLC*, 2010 WL 4537057 (D. Ariz. 2010) is misplaced because the plaintiff in that case alleged only the defendant's prior conviction "without more" and failed to detail the nature of the fraud. *Id.* at *6. Plaintiffs have alleged Garcia Sr.'s scienter.

### D.    Plaintiffs Adequately Allege Loss Causation

Pleading loss causation requires "no more than the familiar test for proximate cause," which simply requires a linkage between the alleged fraud and plaintiffs' loss. *First Solar*, 881 F.3d at 753. Pleading loss causation is "not meant to impose a great burden" (*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47) (2005), and "even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact.'" *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790, 794 (9th Cir. 2020). Thus, loss causation is ordinarily "'not to be decided on a Rule 12(b)(6) motion to dismiss.'" *Gilead*, 536 F.3d at 1057.

The ACC readily satisfies this standard by alleging that Defendants' scheme, misstatements, and omissions artificially inflated Carvana's stock; the inflation dissipated through eight disclosures that partially revealed the economic and operational truth concealed by the fraud; and each disclosure caused a Carvana-specific stock price decline. ¶¶307-328.

### 1.    Defendants' Attacks on the April 20, May 10, November 3, 2022, and February 23, 2023 Corrective Disclosures Fail

Relying on *Metzler*, 540 F.3d at 1063, and *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014), Defendants urge this Court to apply a more stringent standard than the Ninth Circuit requires, claiming Plaintiffs must demonstrate that investors "'learned of and reacted to the fraud'" as opposed to disappointing financial news. Mtn. at 29; *see* GMtn. at 15. But there is no requirement that a corrective disclosure admit fraud or the falsity of prior misstatements, or mirror the misrepresentations. Indeed, *First Solar* resoundingly rejected the same arguments Defendants make here, explaining that the "more restrictive test" *Metzler* and *Loos* suggest "should be understood as fact-specific variants of the basic proximate cause test" and holding that "'there are an "***infinite variety***" of ways for a tort to cause a loss.'" 881 F.3d at 753-54.

- 57 -

In *First Solar*, the Ninth Circuit affirmed the district court's holding that a press release which "simply revised the company's earnings and revenue guidance and 'did not mention the [subject of the fraud]'" was sufficient for loss causation as the revisions revealed "the financial impacts of [the fraud]."[73]   Thus, *First Solar* made clear that a "plaintiff may . . . prove loss causation by ***showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss***" as "'***[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss***.'"  881 F.3d at 753-54; *see also N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Pension Fund v. Impax Lab'ys, Inc.*, 843 F. App'x 27, 31 (9th Cir. 2021) (finding "district court erred by ruling plaintiffs did not allege causation for the losses following earnings announcements" where plaintiffs alleged the "misses were actually due to Impax's [price fixing scheme]"); *HP*, 2024 WL 1327247, at *21 ("According to Defendants, it is 'impermissible' to 'assume that every challenged statement was corrected' without specific correcting disclosures.  This is not the law.").  As shown below, Plaintiffs satisfy the applicable standard by alleging the disclosures revealed negative economic conditions caused by the scheme.

*April 20, 2022*.  After the market closed, Carvana disclosed: (i) disappointing Q1 2022 financial results and a stock offering to purchase ADESA; (ii) retail sales growth was hampered that quarter by significant "logistics network constraints," "reconditioning" expenses, and "higher wholesale volume from buying more cars from customers"; (iii) Carvana expected to sell fewer retail cars in 2022 as previously stated; and (iv) Carvana needed to purchase ADESA to "improve our logistics network" by placing the Company "within 200 miles of 94%" of the population, which "will have the benefit of reducing shipping distances, times, and costs." ¶314.  Further, as detailed in the ACC, certain yet-concealed ramifications of Defendants' fraud also contributed to Carvana's disappointing results. *Id.*  In the following days, Carvana further disclosed that it was raising $1.25 billion of stock and $3.275 billion of high-interest rate debt in part to fund the ADESA purchase. *Id.*  Carvana's stock price declined 10.1% on abnormally high trading volumes

[73] Brief for the United States as Amicus Curiae at 21, *First Solar, Inc. v. Mineworkers' Pension Scheme* (U.S. May 15, 2019) (No. 18-164).

- 58 -

on April 21, 2022, and continued to fall another 30.3% over the following six trading days. *Id.*

*May 10, 2022*. Carvana issued an 8-K revealing that it was: (i) laying off approximately 2,500 employees "to better align staffing and expense levels with sales volumes"; (ii) transitioning operations away from some logistical hubs and an IRC "[i]n connection with these right-sizing initiatives"; and (iii) that it would release "materials on Carvana's [updated] operating plan." ¶317. Defendants' fraud contributed to Carvana's disappointing news. *Id.* Indeed, mere days later, Defendants linked the negative news to significant logistics constraints and cost overruns associated with Carvana's expansion and surplus of wholesale cars purchased from customers. *Id.* The price of Carvana's stock declined 5.4% on unusually high trading volumes on the day of Defendants' disclosure, and it declined an additional 18.2% on the next trading day. *Id.*

*November 3, 2022*. Carvana issued disappointing Q3 2022 financial results, including that it: (i) suffered an 8% decline in retail unit sales from the prior year; (ii) had been "frequently acquir[ing] sales that were less profitable in the immediate period but . . . [c]urrently, as we are primarily focused on profitability, we are intentionally acquiring fewer of these sales"; (iii) "reduce[d] . . . advertising in distant markets with less profitable sales," including "markets with lower profitability due to long distance from inventory (*e.g.*, the Pacific Northwest)"; (iv) had "take[n] other actions to improve profitability, such as increasing long-distance shipping fees, in these [new, far-flung] markets"; (v) "reduced . . . inventory by -10%," which was one of the "largest drivers" of Carvana's retail unit sales decline that quarter; and (vi) was "continuing to normalize our inventory size and expect to further reduce inventory in Q4 [2022]." ¶323. Further, certain concealed negative conditions caused by Defendants' fraud contributed to the poor results. *Id.* The information above was revealed after market close, and, on the next trading day, the stock price fell 39% on abnormally high volumes. ¶324.

*February 23, 2023*. Carvana issued disappointing Q4 2022 financial results, including that Carvana: (i) experienced a retail unit sales decline of 23% year-over-year – a "first . . . in [Carvana's] history"; (ii) "stepped back on the key metrics of retail units sold"; (iii) saw gross profit decline by 63% year-over-year; (iv) had "significantly accelerated . . . reductions in inventory"; (v) had written off over $50 million of aged and impaired vehicle inventory that was

- 59 -

worth less than Carvana had paid to acquire it and prepare it for sale; (vi) was "significantly reducing retail vehicle acquisitions"; and (vii) was intentionally foregoing retail sales growth for the foreseeable future to focus on retail sales that were actually profitable. ¶327. This information was revealed after market close, and, on the next trading day, the stock price fell 20.5% on abnormally high trading volumes. *Id.*

Defendants' scheme, misrepresentations, and omissions artificially inflated Carvana's stock. As alleged, each of the above disclosures revealed negative impacts caused by Defendants' fraud and was followed by a significant stock price drop, giving Defendants an "indication" of the causal connection Plaintiffs "ha[ve] in mind," which is all that is required. *Dura*, 544 U.S. at 347.

Defendants' claim that these disclosures were generic earnings misses is belied by the specific disclosures alleged in the ACC and summarized above. It is also incompatible with *First Solar*, which recognized that disclosures similar to the ones here adequately allege loss causation.[74]    *See First Solar*, 881 F.3d at 753-54; *see also HP*, 2024 WL 1327247, at *21 (upholding loss causation where plaintiffs alleged defendants' scheme in violation of Rule 10b-5(a)-(c) contributed to disclosed "inventory corrections and revenue declines, [and] stock prices dropped – even though the [alleged] scheme was not known at the time"); *Weston*, 669 F. Supp. 3d at 887 (plaintiffs' "alleg[ations] that DocuSign's stock dropped after the company revealed billings misses . . . plausibly shows loss causation under [*First Solar*]"); *Karinski*, 2020 WL 281716, at *17 (upholding loss causation because plaintiffs alleged "both earnings reduction[s] were clearly related to the allegedly fraudulent conduct"). For the same reasons, Garcia Sr.'s argument that the

---

[74] Despite the Ninth Circuit's recognition that disclosures which occurred years after the false statements adequately pleaded loss causation (*First Solar*, 881 F.3d at 753-54), Defendants claim that the disclosures only revealed news from "that quarter." Mtn. at 29 & n.24. Not surprisingly, Defendants cite no authority supporting this outlandish assertion. The court in *Reckstin Fam. Tr. v. C3.ai, Inc.*, __ F. Supp. 3d __, 2024 WL 734497 (N.D. Cal. 2024) held "Plaintiffs have done enough at this stage to plead loss causation" where the plaintiffs pleaded corrective disclosures predating the false statements by a year. *Id.* at *24. In *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198 (9th Cir. 2020), the court stated the uncontroversial proposition that a misrepresentation must relate to the disclosure, which Plaintiffs have established here. *Id.* at 1207-09; *see also Bajjuri*, 641 F. Supp. 3d at 770 (loss causation not pleaded where claim was "based on a modest drop that quickly recover[ed]" for a "sustained" period). As to Garcia Sr.'s claim that his sales and the DriveTime deal were previously disclosed (GMtn. at 15), neither the sham deal nor the fact that his sales were made pursuant to a pump-and-dump scheme were fully or adequately disclosed. *See supra* §VI.A.3.

- 60 -

disclosures must have revealed his specific role or acts in the fraudulent scheme is unavailing. *First Solar*, 881 F.3d at 753-54; *Impax*, 843 F. App'x at 31; *see also FirstEnergy*, 2022 WL 681320, at *27-*28 & n.38 (rejecting identical argument because "'proof of loss causation requires demonstrating that the ***subject*** of the [fraud] was the cause of the actual loss suffered.  If the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct, [as it is here] loss causation is established.'") (emphasis in original).  Finally, the Ninth Circuit has repeatedly held that where, as here, "analysts note[] the probable relationship between" the alleged fraud and a stock price decline, plaintiffs have adequately pleaded loss causation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1202 (9th Cir. 2016); *Leventhal v. Chegg, Inc.*, __ F. Supp. 3d __, 2024 WL 924484, at *8 (N.D. Cal. 2024) (same); *see* ¶¶315, 318, 325, 328.[75]  Plaintiffs adequately allege loss causation.[76]

### 2.    Defendants' Attacks on the August 10, 2021, October 22, 2021, June 24, 2022, and October 7, 2022 Disclosures Fail

Grasping at straws, Defendants try to move the goalposts by inventing causation requirements that exist nowhere.[77]  ***First***, Defendants incorrectly suggest there is some absolute requirement of how much a stock price must drop.  Mtn. at 30-31.  The Ninth Circuit has found

---

[75] Defendants' authority (Mtn. at 28; GMtn. at 16) is inapposite. *Alich I*, 2024 WL 839146, at *15 (disclosures were not linked to the ramifications of the fraud and did not reveal anything new); *Alpine*, 2022 WL 3598246, at *3-*4 (plaintiffs did not allege reliance, "any losses," the prices at which they bought their shares, or that the misstatements caused their loss); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 947 (D. Ariz. 2007) (decided before *First Solar*).

[76] Defendants' claim that UANPF cannot attribute losses to the February 2023 disclosure because it sold its shares by November 2022 (Mtn. at 28 n.23) is irrelevant to the adequacy of the ACC. Indeed, a court recently relied on *Melendres v. Arapaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015), to uphold a complaint where the lead plaintiff sold all its stock after the ***first*** corrective disclosure. *HP*, 2024 WL 1327247, at *4.  And courts routinely appoint lead plaintiffs that sold their shares before the final corrective disclosure. *See, e.g.*, *Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.*, 2023 WL 3613313, at *4 (N.D. Cal. 2023) (collecting cases).  Defendants' authority was subsequently vacated and, unlike here, the sole lead plaintiff sold its shares prior to ***any*** partial disclosures. *Mehedi v. View, Inc.*, 2024 WL 2696982, at *9 (N.D. Cal. 2024).

[77] Appendix B, upon which Defendants rely, should be struck. *See* ECF 82-2.  Defendants did not include it in their RJNs or offer any support whatsoever for why or how this Court could consider it or Appendix A (ECF 82-1).  Further, because Appendix B is argumentative, it "veers toward an attempt by [Defendants] to insert its 'own version of events into the complaint' which is impermissible." *Weston*, 669 F. Supp. 3d at 872 (declining to consider counsel-generated chart); *see also In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *3 (S.D. Cal. 2020) (striking appendix as "an extension of Defendants' argument and thus . . . the 25-page limit").

- 61 -

4883-2521-8257.v1

loss causation adequately pleaded for a disclosure that was followed by a 2.7% stock decline. *Impax*, 843 F. App'x at 30-31; Appellant's Opening Brief at 15, *N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C. v. Impax Lab'ys, Inc.*, 2020 WL 957066 (9th Cir. Feb. 14, 2020).  In fact, Defendants' own authority, *Grigsby*, held a district court erred in dismissing a disclosure followed by 4.57% drop.  979 F.3d at 1203.  Courts, including those cited by Defendants, routinely find similar stock declines sufficient.  *See, e.g.*, *Maverick*, 2018 WL 6181241, at *9 (loss causation pleaded for eight disclosures, including one followed by a drop similar to those here).[78]  Notably, here, many of the declines were accompanied by concurrent increases in the S&P 500, and all were based on Company-specific information.  ¶¶311, 313.[79]  Further, these were ***partial*** disclosures and their corrective impact was tempered by Defendants' ongoing scheme and misstatements that continued to conceal the fraud.  ¶309; *e.g.*, ¶312 (assuring investors that violations were "North Carolina specific" and analysts subsequently reporting that "[a]fter speaking with management . . . we are optimistic that this will be an isolated incident").  And the Ninth Circuit has explained that certain disclosures may cause smaller stock drops where prior disclosures removed some of the inflation.  *Lloyd*, 811 F.3d at 1210.  Thus, while Carvana's stock dropped 5.5% on October 7, 2022 in response to the news that MDOS suspended Carvana's license, it had already dropped by ***more than 26%*** on three other partial disclosures concerning title violations.  ¶¶311, 313, 320, 322.[80]

---

[78] *See also Rabkin*, 2018 WL 905862, at *14-*15 (rejecting identical argument for 5.4% drop over two days); *Zhu v. Taronis Techs. Inc.*, 2020 WL 1703680, at *6 (D. Ariz. 2020) (loss causation pleaded where disclosure "had a ***minimal*** effect on . . . stock price"); *Swanson v. Interface, Inc.*, 2022 WL 2003990, at *3 (E.D.N.Y. 2022) (3.3%); *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *14 (S.D.N.Y. 2015) (3.2%).

[79] Carvana referred its investors to the S&P 500 for purposes of comparing its stock price performance to its peers and market.  ¶311 n.168.  Notably, the stock declined 5.5% on ***high trading volumes*** in response to the October 7, 2022 disclosure.  ¶322.

[80] Defendants' non-binding cases predate *Impax* and *BofI* and are distinguishable.  In *Camp v. Qualcomm Inc.*, 2020 WL 1157192 (S.D. Cal. 2020), unlike here, the stock price ***collectively*** fell 9% following alleged disclosures, "there [wa]s a more plausible explanation" for the declines that were "quite evident," and the plaintiffs neither alleged that defendants' tempered the corrective impact of the disclosures nor that a comparable index reacted in an opposite manner.  *Id.* at *6-*7.  In *Eng v. Edison Int'l*, 2017 WL 1857243 (S.D. Cal. 2017), the stock collectively dropped 9.21% in response to six disclosures, and the plaintiffs did not allege any information regarding the movement of an index or defendants' efforts to temper the impact of the disclosures.  *Id.* at *4.

- 62 -

***Second***, Defendants claim the market must react "immediately" to a disclosure. Mtn. at 30 n.25. But the Supreme Court has declined to "adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The Ninth Circuit is in accord. *See Am. W.*, 320 F.3d at 934 ("As recognized by the Supreme Court, [market] distortions ***may not be corrected immediately. . . . [A]doption of a bright-line rule assuming that the stock price will instantly react would fail to address the realities of the market***."). Thus, courts resoundingly reject Defendants' argument. *See, e.g.*, *In re WageWorks, Inc. Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. 2020) (two-day decline sufficient).[81]

***Third***, Defendants claim Plaintiffs must "account for most of Carvana's stock price decline[s]" during the Class Period. Mtn. at 30-31. But "[a] plaintiff [need not] show 'that a misrepresentation was the sole reason'" for a price decline (*Daou*, 411 F.3d at 1025), and "conclusively deciding reasons for the market's reaction is premature, and reasonable theories concerning that reaction do not warrant Rule 12 dismissal." *In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *12 (C.D. Cal. 2021); *see also Karinski*, 2020 WL 281716, at *18 (same); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) (noting "alternative causes for the losses" are "for resolution in the later stages," and finding defendant's claim "baseless [because c]ontrary to [his] apparent misconception, a stock price can decline during the class period").[82]

***Fourth***, Defendants are wrong that the disclosures "do not reveal any 'new' information relating to title and registration." Mtn. at 30. For example, on August 10, 2021, media outlets revealed for the first time that Carvana's license in Raleigh was suspended for violating the state's title and registration laws. ¶311. Likewise, on October 22, 2021, *The WSJ* "reveal[ed] that '[a]t

---

[81] *See also In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1227 (N.D. Cal. 2015) (same); *Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20. 22 (2d Cir. 2017) (same); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3d Cir. 2011) (same); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015) ("three-day window is common"). Even Defendants' case. *Miller v. Thane Int'l. Inc.*, 615 F.3d 1095 (9th Cir. 2010), held "markets are sometimes not immediately responsive." *Id.* at 1102.

[82] Defendants' cases are inapt as they do not argue this is a unique situation where Plaintiffs' "'loss coincides with a marketwide phenomenon causing comparable losses to other investors.'" *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (internet bubble bursting caused most companies' stocks to drop); *60223 Tr. v. Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007) (stock lost most of its value ***before*** any alleged disclosure).

4883-2521-8257.v1

least four states have disciplined Carvana or are investigating the company for violating vehicle-sales rules. . . . ***These actions haven't been previously reported***.'" ¶313.[83] Thus, Defendants' sole authority is inapt. *See Espy*, 99 F.4th at 542 (disclosure inadequate as it was based on "***[defendant]'s investor presentations, press releases***, . . . and SEC filings," amongst others, and plaintiff did not allege that this publicly available information would be difficult to "uncover and disseminate"). Loss causation is well pleaded.

### E.    The ACC Adequately Alleges a §20(a) Claim

Plaintiffs have established control as to Garcia Sr.[84] Control person claims are subject to Rule 8. *Vanguard Specialized Funds v. VEREIT Inc.*, 2016 WL 5858735, at *17 n.19 (D. Ariz. 2016) ("Defendants argue . . . Rule 9(b) . . . should apply to . . . controlling person allegations, but they do not.").[85] Further, "'[w]hether [a defendant] is a controlling person is an intensely factual question.'" *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "'[C]ontrol'" is defined as "'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, ***whether through ownership of voting securities***, by contract, or otherwise.'" *Id.* at 1065 n.9. Plaintiffs "need not show" the controlling person's scienter or that he "culpab[ly] particip[ated]" in the wrongdoing. *Id.* at 1065; *see also Am. W.*, 320 F.3d at 945-46 ("'it is not necessary to show actual participation or the exercise of power'").

Plaintiffs have undisputedly pleaded control as to Garcia Sr. – Carvana's controlling shareholder who held approximately 84% of the Company's voting power. ¶¶26, 297. As here, "a majority or otherwise controlling shareholder is prima facie a controlling person."

---

[83] *See also* ¶320 (June 2022 exposé "***revealed for the first time*** that Arizona had canceled Carvana's temporary plate program, that "***[i]nterviews with state officials*** . . . show the issue is wide[]-reaching," and that Carvana had revamped its title department three times and created an "undriveable-car task force"); ¶¶148, 322 (October 2022 disclosure first revealing that MDOS had suspended Carvana's license for "imminent harm to the public," "failing to make application for title and registration within" required time, "***committing fraudulent acts***," including, "***destroying" documents, and "violating terms of [an undisclosed] probation***").

[84] Because the ACC adequately alleges §10(b) violations against Garcia Jr., Jenkins, and Garcia Sr., and Garcia Jr. and Jenkins do not dispute their control, Plaintiffs' §20(a) claims must be upheld. *See Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *14 (C.D. Cal. 2023).

[85] *See also Hefler*, 2018 WL 1070116, at *14 (citing recent cases); *Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 969-70 (D. Ariz. 2010) ("20(a) control person claims are subject to . . . [Rule] 8(a)(2)").

- 64 -

*Musicmaker.com*, 2001 WL 34062431, at \*16-\*17 (37% indirect owner is "control person").[86] Further, Carvana's dual-class structure, which provides Garcia Sr. ten votes per share, ensures he maintains supermajority voting control. ¶¶37 & n.7, 297, 355. As Carvana's SEC filings put it: "***The Garcia Parties control us*** *and can, among other things*, "***elect all of the members of our Board***" *and* "***control our policies and operations***." ¶¶26, 37, 297 (some emphasis in original).[87] Moreover, prior to the Class Period, Carvana was the wholly-owned subsidiary of Garcia Sr.'s DriveTime. ¶¶4, 35. That relationship continued during the Class Period as Garcia Sr. made many deals with Carvana "not negotiated at arm's length," including lending agreements. ¶¶127-129, 299-301. Thus, all the "'traditional indicia of control'" are present. *Am. W.*, 320 F.3d at 945-46 (defendants' "prior lending relationship" with the company, 54.7% voting power, and "power to elect the majority of the members of [the defendant company's] Board" demonstrated control).

Garcia Sr. ignores these facts and the law by claiming that his controlling ownership is insufficient. But the Ninth Circuit has made clear "§20(a) was intended to impose liability on controlling persons, ***such as controlling shareholders***." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990). Not surprisingly, Garcia Sr. fails to proffer any case where a defendant has more than a minority ownership of 30%.[88] Lastly, Garcia Sr. cites his purported lack of an ***official*** day-to-day position (GMtn. at 16-17), but that has no relevance under §20(a). *See Am. W.*, 320 F.3d at 945-46 ("'it is not necessary to show actual participation or the exercise of power'"). In any event, Garcia Sr. was banned from holding such a formal position due to his felony conviction (¶¶4, 26, 34, 37, 296, 304), and, while he could not ***appear*** to have a daily role, he in

---

[86] *See also Batwin*, 2008 WL 2676364, at \*3, \*26 (68%); *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 946-47 (S.D. Cal. 2019).

[87] Garcia Sr.'s claim that Plaintiffs must show he "controlled Carvana's operations or disclosures" (GMtn. at 16) fails. His own authority holds that the "authority to exercise decision-making power" is sufficient, which is evident from Carvana's SEC filings. *See Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at \*13 (N.D. Cal. 2017).

[88] In addition to mere minority ownership, *Welgus*, 2017 WL 167708, is also inapt because the defendant was a corporation with tenuous connections to two directors it did not appoint, there were no specific allegations regarding voting power, and the company's SEC filings did not admit control. *Id.* at \*13; *Webb v. Solarcity Corp.*, 884 F.3d 844 (9th Cir. 2018), is unavailing as the dismissal of the §20(a) claims was solely for failure to state a predicate violation. *Id.* at 858. And *Huberman v. Tag-It Pac. Inc.*, 314 F. App'x 59 (9th Cir. 2009), is inapplicable as it reversed the district court's grant of summary judgment and adopted the standard Plaintiffs articulate. *Id.* at 62.

- 65 -

fact controlled Carvana's operations behind the scenes and emailed with his son regarding internal, material Carvana matters. ¶¶26, 37, 297, 303 & n.159 (detailing the Garcias' email about the list of potential investors for Carvana's undisclosed $500 million offering and their need to "figure out [a] plan on [Garcia Sr.'s] money"). As such, the §20(a) claims must proceed.

### F.    The ACC Adequately Alleges a §20A Claim

Plaintiffs readily established the elements of a §20A claim: (1) a predicate Exchange Act violation by trading while in possession of MNPI; and (2) contemporaneous trading with a corporate insider. *See Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007).

As demonstrated *supra* §§V., VI.A.-D., the ACC pleads a §10(b) claim. Further, the Ninth Circuit has established that trading "'on the basis of [MNPI]'. . . qualifies as a 'deceptive device' under Section 10(b)" and Rule 10b-5(a) and (c). *Galena*, 117 F. Supp. 3d at 1203; *Vaxart*, 2023 WL 3637093, at *2 (insider trading falls "under section 20A and Rule 10b-5(a) and (c)"); *see also Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1282-83 (N.D. Cal. 2019) (the "Ninth Circuit has acknowledged that insider trading in violation of §10(b) and Rule 10b-5 may serve as the predicate violation for a private section 20A claim").[89] Further, Garcia Sr. and Jenkins had MNPI at the time of their trades as the ACC adequately alleges they were aware of the undisclosed scheme. ¶¶160-162, 261-305; *supra* §§VI.A., VI.C.; *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004) ("a strong inference arises that such information was used by the insider in trading"). And the ACC detailed nearly twenty different related-party deals – "not negotiated at arm's length" – between Garcia Sr.'s companies and Carvana that generated $534 million for his companies and were material to Carvana's bottom line during the Class Period. ¶¶287, 299-300 & n.163. As a Carvana creditor explained, "*[a]s long as [Garcia] Sr. is involved in DriveTime, he's directly involved in Carvana*." ¶301. Thus, Garcia Sr.'s claim that the ACC contains "zero" allegations that he had MNPI (GMtn. at 17) is meritless. And, as explained *supra* §VI.A.3., that Garcia Sr.

---

[89] Defendants incorrectly claim that insider trading is not reflected in the counts for §10(b). Mtn. at 41-42 & n.33. But "Count I" for "Violations of §10(b) of the Exchange Act and Rule 10b-5" against Garcia Sr. and Jenkins "repeat[s] and allege[s] each and every allegation[] set forth above as if fully set forth herein," which includes countless allegations of insider trading. ¶341; *see also* ¶343. This is sufficient. *HP*, 2024 WL 1327247, at *13 (rejecting similar argument).

- 66 -

has "never been an officer, director, or employee" (GMtn. at 17) is a strawman.[90]

Further, Plaintiffs adequately alleged contemporaneity. While the "Ninth Circuit has not delineated the boundaries of contemporaneity," courts hold that trading between one to ten days suffices. *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at \*18-\*19 (N.D. Cal. 2023) ("a four-day trading gap [is] . . . contemporaneous"); *see also McKesson*, 411 F. Supp. 3d at 591 (nine days); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at \*37 (S.D. Cal. 2006) (eight days); *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at \*14-\*15 (N.D. Cal. 2008) (five days); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (same). The "Ninth Circuit has not endorsed [Defendants'] preferred standard for contemporaneousness (trading 'on the same day . . . or at most the day after')." *McKesson*, 411 F. Supp. 3d at 606. Garcia Sr. does not dispute contemporaneity (GMtn. at 17) and Jenkins concedes that Plaintiffs satisfy it for some his trades (Mtn. at 41). Because each of Jenkins's contested trades occurred within nine days of Plaintiffs' purchases (¶362), the §20A claims are well pleaded.

## VII.    THE SECURITIES ACT CLAIMS ARE ADEQUATELY ALLEGED

### A.    Plaintiffs Adequately State a Claim Under §§11 and 12(a)(2)

Sections 11, 12(a)(2), and 15 require companies to "make a 'full and fair disclosure of information' relevant to a public offering." *Omnicare*, 575 U.S. at 178. If Plaintiffs show "that (1) 'the [RS] contained an omission or misrepresentation,' and (2) 'the omission or misrepresentation was material'" (*Lowthorp v. Mesa Air Grp. Inc.*, 2021 WL 3089118, at \*6 (D. Ariz. 2021)), "[D]efendants will be liable for innocent or negligent material misstatements or omissions" (*Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859-60 (9th Cir. 2013)). Section 12(a)(2) "creates . . . liability for any person who offers or sells a security" through a materially misleading

---

[90] *Silver Lake*, 2024 WL 3515766, is distinguishable. There, unlike here, no defendant was an executive or attended meetings where the issues were discussed, and the "case d[id] ***not*** involve day-to-day operational issues, or even issues that occurred over a longer period of time." *Id.* at \*1, \*9. Further, the plaintiff in *Silver Lake* alleged the defendant "must have known" about a single meeting because it owned "9% of the [c]ompany." *Id.* at \*8. In stark contrast, Garcia Sr. held 84% of Carvana's voting power, Plaintiffs pled facts establishing he actually utilized that power to control, an email confirms his son shared MNPI information with him, and he necessarily knew of the sham arrangement and other related party transactions as they were with his private companies. *E.g.*, ¶¶4, 26, 37 & n.8, 127-129, 262-267, 296-303 & n.165.

- 67 -

"prospectus or an oral communication." *Uber*, 2020 WL 4569846, at *4. "Section 15 creates liability for anyone who 'controls' a defendant [and is] liable under Section 11 or 12(a)(2)." *Id.*

### 1.    Plaintiffs Plead Material Misstatements or Omissions

The ACC identifies three negligently prepared statements that are materially misleading:

**Statement A** concerns statements about Carvana's assessment of certain factors in acquiring vehicles, including "quality," (¶381), when in reality Carvana purchased vehicles without regard to quality (¶382);

**Statement B** concerns a statement regarding the driver of growth (¶383), while failing to disclose that these drivers resulted in less profitable sales, risked regulatory action, burdened Carvana with low-quality vehicles, and relied on an improper pass-through sales agreement with DriveTime (¶384); and

**Statement C** warned that Carvana was subject to penalties for violating state and local requirements related to licensing and title and registration (¶385), while negligently failing to disclose that such risks had materialized, and that Carvana was then facing regulatory penalties and state investigations (¶386).

The argument that certain information was available before the Offering (Mtn. at 43) is premature and wrong. *Supra* §§VI.B.1.-3. Disclosure of the ADESA acquisition, increased costs, and a retail sales drop reveals nothing of the alleged omitted facts, including purchasing cars without regard to quality and certain drivers of retail sales. Further, *The WSJ* exposé does not cure the misstatements as it disclosed "***in part*** certain of the Company's recent problems." ¶313. Because the Underwriter Defendants reassert Defendants' baseless challenges to the Exchange Act statements (UWMtn. at 4-8) (*see supra* §VI.B.1-3), the Securities Act claims survive, regardless of the pleading standard. *See Crews*, 2023 WL 4361098, at *15.

### 2.    Plaintiffs Plead Actionable Omissions Under Item 105

Item 105 of Regulation S-K creates a duty to disclose "material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105(a). Here, the RS failed to disclose risks associated with Carvana's titling issues and its practice of issuing temporary out-of-state licenses (¶¶387-389), which made an investment in Carvana speculative and risky as it materially increased the "risk of regulatory action" that "could damage [Carvana's] reputation and have a material adverse effect on our business, sales, and results of operations." ¶¶385, 390; *see In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 769 n.4 (N.D. Cal. 2020) (Item 105 pleaded for risk factors where defendant saw an "'increase in the number of sexual assaults'" and faced "'risk of

- 68 -

brand damage'"); *Felipe v. Playstudios Inc.*, 2024 WL 1380802, at *13 (D. Nev. 2024) (Item 105 pleaded for risk factors that "game *may* be delayed" where risk "'had . . . come to fruition'").

That Carvana disclosed it was "subject to" state and local laws (UWMtn. at 7-9; Mtn. at 43-44) says nothing of the specific risks concerning Carvana's titling issues and practice of issuing temporary licenses that *had already occurred* at the time of the Offering and made an investment in Carvana risky or speculative.  ¶¶389-390.  Thus, the risk disclosures fail "to render what was *not* disclosed, not misleading."  *Uber*, 2020 WL 4569846, at *6 (emphasis in original).[91]

### 3.   The Securities Act Claims Do Not "Sound in Fraud"

The Securities Act claims do not sound in fraud and are governed by Rule 8 because Plaintiffs "expressly plead only negligence" and "carefully crafted the complaint so that their negligence-based claims are wholly separate from their allegations of fraud." *Tsirekidze v. Syntax-Brillian Corp.*, 2009 WL 275405, at *7 (D. Ariz. 2009) (applying Rule 8 "[a]lthough plaintiffs rely on the same alleged consignment sales and 'tooling deposits' in both their 1933 Act and 1934 Act claims").  The Securities Act claims – which plead the negligent failure to disclose key information in the RS (¶¶365, 376-380, 382, 384, 386, 391) – neither rely on the same factual allegations as the Exchange Act claims, nor allege a unified course of fraudulent conduct with the scheme.  *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *17 (C.D. Cal. 2016) (Rule 8 applies where "Plaintiffs have 'stripped' their Securities Act allegations of fraud").  While "'a disclaimer alone is insufficient . . . here [Plaintiffs] made an effort to plead a non-fraudulent basis for Section 11 liability.'" *Uber*, 2020 WL 4569846, at *4.[92]  Regardless, "[n]owhere does the [ACC] suggest that

---

[91] That penalties prior to the Offering were purportedly "isolated" and "not materially affecting the business," does not negate Plaintiffs' claim that the practice of issuing temporary out-of-state licenses in lieu of title made an investment in Carvana risky as it materially increased the risk of further adverse regulatory action.  Indeed, this is precisely what transpired.  *See* ¶¶394-396.

[92] Here, the Securities Act claims rely on a different subset of statements than the Exchange Act claims.  *See, e.g.*, ¶238 (alleged misstatement from the 2021 10-K relevant only to the Exchange Act as it related to the fraudulent scheme).  Thus, *Alich I*, where "Plaintiffs allege[d] the exact same false or misleading statements," is distinguishable. 2024 WL 839146, at *16. The Company Defendants decry the similarity between the claims, but as their own case explains, "it is the conduct pled that matters."  *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010) (sounds in fraud where claims allege "'a unified course of *fraudulent conduct*' and 'rel[ies] *entirely* on that course of conduct'").  And both *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009) and *Rigel* require review "of the language and structure of the

- 69 -

the Underwriter[s or Directors] engaged in fraud of any kind, only that they failed to conduct a due diligence investigation." *Cullen v. RYVYL Inc.*, 2024 WL 898206, at *6 (S.D. Cal. 2024) (refusing to apply Rule 9(b) to underwriters); *Flynn*, 2016 WL 3360676, at *17 (same); ¶¶417-419.

### 4.    Defendants Have Not Proven Negative Causation

Loss causation is not an element of a Securities Act claim as Plaintiffs "'need only show a material misstatement or omission to establish [a] *prima facie* case.'" *Hildes*, 734 F.3d at 859. Negative causation is an affirmative defense, and defendants "bear[] a 'heavy burden' . . . of 'prov[ing], as a matter of law, that the depreciation of value of [the stock] resulted from factors other than the alleged false and misleading statements.'" *Id.* at 860-61. Thus, it "is better reserved for summary judgment." *Alich v. Opendoor Techs. Inc.*, 2024 WL 2153529, at *1 (D. Ariz. 2024) ("*Alich II*") (Liburdi, J.).

Here, Defendants point to no alternative factors and only reassert their ***loss causation*** argument that the disclosures reveal nothing about the misrepresentations. Mtn. at 45; UWMtn. at 8. But ***negative causation*** "requires more than a plaintiff's failure to allege loss causation." *Alich II*, 2024 WL 2153529, at *1. Regardless, their argument fails. *See supra* §VI.D. For example, the title statements "touch[] upon" the widespread title and registration issues and violations described in the *Barron's* exposé (¶395) and the regulatory penalties imposed on Carvana (¶¶394, 396) – *i.e.*, "the alleged reasons for Plaintiffs' claimed losses." *Alich II*, 2024 WL 2153529, at *1; *see also Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1123 (E.D. Cal. 2017) (no negative causation where, as here, the "'disclosure[s] reveal[ed] adverse information . . . that the misrepresentation had concealed, and this cause[d] a drop in stock price'").[93]  Because the misstatements "played a role in the causal chain," the Securities Act Defendants failed to meet their "'heavy burden.'" *Hildes*, 734 F.3d at 862.

### 5.    Defendants Are Statutory Sellers Under §12(a)(2)

A person is a "'seller'" where they "either: (1) pass[] title to the securities to the plaintiff; or

complaint" to determine whether it "re[lies] entirely on [a unified] course of conduct." *Rubke*, 551 F.3d at 1161; *Rigel*, 697 F.3d at 886.

[93] The same is true for Statements A-B as the alleged disclosures revealed the underlying costs and logistics constraints concealed by these statements. *See* ¶¶381-382, 384, 392-393, 397-398.

4883-2521-8257.v1

(2) 'engage[] in solicitation,' *i.e.*, 'solicits the purchase [of the securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'" *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1257-58 (9th Cir. 2022) (quoting *Pinter v. Dahl*, 486 U.S. 622, 643, 648 (1988)).[94] "Solicitation is broadly construed in the Ninth Circuit" and "whether each role was or is extensive enough to qualify as an actionable 'solicitation' for a particular . . . Defendant . . . should be tested on an evidentiary basis." *Houghton v. Leshner*, 2023 WL 6826814, at *3 (N.D. Cal. 2023); *see also Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 384 (N.D. Cal. 2020) (solicitation "is 'a factual question which should generally be left to the jury'"), *aff'd*, 13 F.4th 940 (9th Cir. 2021). Thus, Plaintiffs need only "allege[] more than mere participation" in the Offering. *Primo v. Pac. Bioscis. of Cal., Inc.*, 940 F. Supp. 2d 1105, 1126 (N.D. Cal. 2013).

Here, Plaintiffs allege each of the Securities Act Defendants "promoted and sold" Carvana stock to class members "for the benefit of themselves and their associates," and that without these efforts to publicize the Offering and solicit purchasers, the Offering could not have occurred. ¶439. The Individual Securities Act Defendants also signed the RS. These allegations suffice. *See, e.g.*, *Slack*, 445 F. Supp. 3d at 384 (claim stated where "all" defendants "signed the Offering Materials, that ***certain*** defendants solicited sales" and defendants "were financially motivated to solicit sales"); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 (N.D. Cal. 2009) ("As many courts have found, the registration statement is itself a solicitation document."). Further, they had control over Carvana's governance and the RS's contents. ¶¶446-447; *Houghton*, 2023 WL 6826814, at *5 (similar "allegations support[ed] [defendants] control over the solicitations").

The ACC further details the Underwriter Defendants' role in planning the Offering and preparing the defective RS (¶¶405, 407, 414-416, 440). *See, e.g.*, *In re Tezos Sec. Litig.*, 2018 WL 4293341, at *9 (N.D. Cal. 2018) ("comprehensive involvement" in "planning and execution" of offering shows more than "'collateral participa[tion]'"). The ACC also alleges they were motivated to receive $24 million in fees, and by their affiliates' involvement in other aspects of

---

[94] Cases requiring "direct" solicitation pre-date *Pino* or are out-of-circuit (Mtn. at 45; UWMtn. at 9-10), and thus rely on a misreading of *Pinter* that *Pino* rejected. *Pino*, 55 F.4th at 1259 ("*Pinter* contains no indication that Congress was concerned with regulating only a certain type of solicitation, let alone specifically targeted 'active and direct solicitations.'").

4883-2521-8257.v1

Carvana's capital raising activities. ¶¶407-413. Plaintiffs also bought shares directly from Citigroup (¶366), confirming that it is a statutory seller and "suggest[ing] that the other underwriter," J.P. Morgan, "acted as [Citigroup] did and support[ing] plaintiffs' allegation that these underwriters transferred title to members of the class." *In re Violin Memory, Inc. Sec. Litig.*, 2015 WL 1968766, at *3 (N.D. Cal. 2015).[95] Finally, the RS specified that the underwriters may be involved in the sale of securities and identified $24 million in discounts and commissions paid to ***both*** underwriters. ¶¶401-403. These allegations show that J.P. Morgan and Citigroup were statutory sellers. *See Violin*, 2015 WL 1968766, at *4 ("The terms of the agreement between the underwriters and [the company]" supported statutory seller allegations.); *see also Primo*, 940 F. Supp. 2d at 1126 (§12(a)(2) pleaded where defendants "participated in the preparation of, and signed, the purportedly misleading solicitation documents").[96]

## VIII. CONCLUSION

For the foregoing reasons, the motions should be denied. If the Court holds otherwise, Plaintiffs respectfully request leave to amend as the Court has not previously addressed the merits of the ACC. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "'with extreme liberality'").

---

[95] *Welgus*, 2017 WL 167708, at *22, is thus distinguishable. Defendants' other cases are inapt. *In re Violin Memory Sec. Litig.*, 2014 WL 5525946 (N.D. Cal. 2014) (court subsequently held allegations "concerning the Registration Statement's characterization of the roles of all underwriters" sufficed in *Violin*, 2015 WL 1968766, at *3); *In re AGS, Inc. Sec. Litig.*, 2022 WL 17406100, at *4 (D. Nev. 2022) (unlike here where the fees confirm that the Underwriter Defendants sold shares, the "allegation[s] . . . [were] vague and conclusory").

[96] Because the ACC adequately alleges predicate claims, ***the ACC's §15 claims survive***. *See Lowthorp*, 2021 WL 3089118, at *13. Underwriter Defendants' cases improperly require a direct buyer-seller relationship that was rejected in *Pino*, as discussed *supra*.

DATED:  July 29, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
   & DOWD LLP
DANIEL S. DROSMAN
(Admitted *pro hac vice*)
ERIKA L. OLIVER
(Admitted *pro hac vice*)
RACHEL A. COCALIS
(Admitted *pro hac vice*)
SARAH A. FALLON
(Admitted *pro hac vice*)


                    s/ Daniel S. Drosman
                  DANIEL S. DROSMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ddrosman@rgrdlaw.com
eoliver@rgrdlaw.com
rcocalis@rgrdlaw.com
sfallon@rgrdlaw.com

- 73 -

4883-2521-8257.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT M. ROTHMAN
(Admitted *pro hac vice*)
DAVID A. ROSENFELD
(Admitted *pro hac vice*)
BRENT E. MITCHELL
(Admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
drosenfeld@rgrdlaw.com
bmitchell@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

O'DONOGHUE & O'DONOGHUE LLP
DINAH S. LEVENTHAL
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
202/362-2640 (fax)
dleventhal@odonoghuelaw.com

Additional Counsel for Lead Plaintiffs

BONNETT FAIRBOURN FRIEDMAN
  & BALINT PC
ANDREW FRIEDMAN
7301 N. 16th Street, Suite 102
Phoenix, AZ  85020
Telephone: 602/274-1100
602/274-1199 (fax)
afriedman@bffb.com

Local Counsel

- 74 -

4883-2521-8257.v1