# EXHIBIT A

2024 WL 3708800
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

[Laborers District Council Construction
Industry Pension Fund](), et al., Plaintiffs,

v.

Sea Limited, et al., Defendants.

No. CV-23-01455-PHX-DLR
|
Filed 08/07/2024

**ORDER**

[Douglas L. Rayes]() Senior United States District Judge

**\*1** This is a federal securities class action lawsuit brought on behalf of a putative class of those who purchased or otherwise acquired Defendant Sea Limited's ("Sea") American Depository Shares ("ADSs") between November 15, 2022 and August 14, 2023. Lead Plaintiff Laborers District Council Construction Industry Pension Fund ("Plaintiff") asserts claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against Sea and Sea's executive officers: Forrest Xiaodong Li, Tony Tianyu Hou, Yanjun Wang, Gang Ye, and David Jingye Chen (collectively "Individual Defendants"). Pending before the Court is Defendant Sea's motion to dismiss,[1] which is fully briefed.[2] (Docs. 41, 47, 51.) For the following reasons, the motion is granted in part and denied in part.

**I. BACKGROUND**[3]

Sea is an international consumer internet company, organized under the laws of the Cayman Islands and headquartered in Singapore. (Doc. 31 ¶ 15.) Sea provides entertainment, e-commerce, and digital financial services through its three respective business lines: Garena, Shopee, and Sea Money. (*Id.*) This case arises from Defendants' allegedly false and misleading statements and omissions regarding the Garena and Shopee business lines only.

**A. Garena**

Garena is Sea's digital entertainment platform. It primarily licenses, publishes, and develops mobile and PC online video games for the markets in which it operates. Prior to December 2017, Garena exclusively licensed video games developed by third parties in order to publish and operate those games for consumption in Garena's Southeast Asia market. The most prominent example of such a game is the popular multiplayer online battle arena PC game, *League of Legends.* In December 2017, Garena launched a mobile battle royale game titled *Free Fire*, which is the first and only successful video game that it has developed.

Garena relies on a limited number of these popular online games for its revenue. Garena monetizes these games by selling virtual currency that users can then use to purchase in-game virtual items. (¶ 24.) Sea discloses various performance metrics for Garena, including Bookings (an estimation of cash spent by Garena users), Quarterly Active Users ("QUA"), and Quarterly Paying Users ("QPU"). (¶¶ 27–28.)

**B. Shopee**

Shopee is Sea's e-commerce platform and the largest e-commerce platform in Southeast Asia. The platform offers both consumer-to-consumer and business-to-consumers transactions. Shopee also purchases products from manufacturers and third parties and sells them directly to buyers on the platform. The online shopping business primarily earns revenue by offering sellers paid advertising services, charging transaction-based fees, and charging for value-added services. (¶ 25.) Sea discloses two key metrics for Shopee: Gross Merchandise Value ("GMV") and Orders. (¶¶ 32, 33.)

**C. Alleged Securities Fraud**[4]

**\*2** By fall 2022 (the start of the Class Period), Sea was in the midst of a self-described "crisis"—Garena's revenue and users were in consistent decline, Garena's only successful self-developed video game (*Free Fire*) had been banned in India, and Garena would soon be losing the publishing rights to one of the most monetized, popular PC games in the world: *League of Legends.* Meanwhile, Shopee was continuing to incur massive losses and had to shut down operations in key new markets. Thus, at Defendants' direction, Sea began a cost-cutting drive as it pivoted away from its expensive growth strategy.

Plaintiff alleges that in this context, starting on November 15, 2022, Defendants attempted to stop the bleeding and shore up the plummeting price of Sea securities by issuing a series of false and misleading statements that artificially inflated the price of Sea's ADSs.

First, Plaintiff alleges that Defendants falsely claimed in November 2022 that Garena's loss of its publishing rights to *League of Legends* (and its spinoff *Teamfight Tactics*) would have "no impact" on Garena's publishing business and that contributions from these games were "immaterial." Plaintiff asserts that contrary to these statements, Defendants knew that Garena's number of paying users would sharply decline in January 2023 when Sea turned over operations of these games to the games' developer, Riot Games ("Riot") —a wholly-owned subsidiary of Chinese technology giant Tencent. Plaintiff further alleges that although Defendants would go on to misleadingly claim in March and April 2023 that Garena's paying user base had stabilized and that any risks from a negative development in a key game were merely hypothetical, Defendants already knew that they had not achieved sufficient gains in paying users in other games to offset the significant loss of the *League of Legends* user base. Defendants ultimately acknowledged in May 2023 that Garena experienced a "weakening in monetization, mainly as a result of lower paying user ratio" in 1Q23 [5] due to the loss of millions of paying users. (¶ 5.)

Second, Plaintiff alleges that Defendants began misleading investors in November 2022 as to the sustainability of Sea's highly publicized "pivot to profitability" and the effect Sea's massive cost-cutting efforts would have on Shopee's growth and market share. For years, Shopee's tremendous growth in GMV had been driven by the use of expensive sales and marketing investments to undercut its competitors—such as free shipping, zero-commission sales, and varied monthly promotions. However, as Sea embarked on an aggressive cost-cutting effort in 2022 to turn profitable, Shopee discontinued these offerings and slashed hundreds of millions of dollars from its quarterly sales and marketing expense. Plaintiff alleges that while Shopee's GMV began to decelerate and decline as a result, and certain competitors aggressively expanded their offerings, Defendants misleadingly maintained that Shopee could operate profitably and continue to grow at the same time.

For instance, in November 2022, despite knowing that Shopee's GMV would see significant decline in 4Q22 with

Sea's ongoing sales and marketing cuts, Defendants spoke of this extant issue as a hypothetical risk, cautioning that this cost-cutting strategy "could" result in a decline in growth. Then, in March 2023, after reporting the largest GMV decline in Sea's history, Defendants doubled down and falsely claimed that the cost-cutting efforts would allow Shopee to "capture a larger share of the pie" and that there would be no "trade-off" between profitability and growth. Plaintiff alleges that Defendants misleadingly concealed further declines in Shopee's GMV by discontinuing disclosure of the metric for the first time in Sea's history; all the while, Defendants continued to falsely maintain that their cuts would drive "profitable long-term growth," that any slowdown in GMV was due to "seasonality trends," and that they could "execute growth and manage bottom line at the same time." Ultimately, however, Defendants acknowledged in August and November 2023 that Shopee could not meaningfully grow and compete with other e-commerce platforms in Southeast Asia without substantial reinvestments in sales and marketing expenses. (¶ 6.)

**\*3** Plaintiff alleges that Defendants' statements and omissions had their intended effect: on November 15, 2022 alone, Sea's ADS price jumped $16.51 per share, or 36%, as more than 42 million shares changed hands. Then, over the following months, as Defendants continued issuing allegedly false and misleading statements regarding the negative trends in Garena's and Shopee's businesses, Sea's ADSs continued to increase and trade at inflated levels, up to and exceeding $88 per share. At the same time, from April to June 2023, Defendants sold at least $27.9 million of Sea securities. (¶ 7.) Plaintiff claims that the truth concealed by Defendants' misrepresentations first began to reach the market in May 2023 and continued to leak out in August and November 2023. By that point, the price of Sea ADSs had fallen from a Class Period high of $88 per share to less than $36 per share—a decline of nearly 60%. (¶ 9.) Based on these facts, Plaintiff alleges that investors, including itself, who purchased or acquired Sea ADSs during the Class Period collectively suffered significant damage.

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In evaluating a Rule 12(b)(6) motion, the [C]ourt accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the light most favorable to the plaintiff." *Adams v. U.S. Forest Srvc.*, 671 F.3d 1138, 1142–43 (9th Cir. 2012).

Securities fraud claims, like the ones in this case, are also subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Rule 9(b) "requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading ... about the statement and why the statements were false or misleading at the time they were made." *Id.* Similarly, the PLSRA requires plaintiffs to: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b).

### III. SEA'S REQUEST FOR JUDICIAL NOTICE AND INCORPORATION BY REFERENCE

Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). There are, however, two exceptions to this rule: the incorporation-by-reference doctrine and judicial notice under Federal Rule of Evidence 201. Relying on these two exceptions, Sea has filed 23 exhibits spanning over 1,000 pages and requests that the Court consider these exhibits in deciding whether to grant the motion to dismiss. (*See* Docs. 42-1 to 42-23.)

Before determining whether the Court can properly consider these exhibits, the Court begins with an admonishment that other courts in this circuit have raised and that the Ninth Circuit has echoed:

> Although [the incorporation-by-reference doctrine and judicial notice] are two distinct doctrines with different legal requirements, they both can be used to get a court to consider extrinsic evidence on a Rule 12(b)(6) motion to dismiss. For a plaintiff, this consideration can mean having the courthouse doors slammed shut, such that there's no discovery, no further motion practice, no cross-examination, and no jury trial. For a defendant,

this consideration can mean avoiding lengthy litigation, arduous motion practice, and expensive, expansive discovery battles.

**\*4** This practical reality has led to inappropriate efforts by defendants to expand the two doctrines.... Nowadays, it seems more and more common to come across Rule 12(b)(6) motions to dismiss filed with hundreds of pages of attachments, authenticated through attorney declarations.... Too often, these mountainous motions make arguments more appropriate for a motion for summary judgment or some other later stage of the case.... Such trends are particularly troubling in the common situation of asymmetry, where a defendant starts off with sole possession of the information about the alleged wrongdoing.

*Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1281–82 (C.D. Cal. 2016); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) ("[W]e note a concerning pattern in securities cases like this one: exploiting [the incorporation-by-reference doctrine and judicial notice rule] improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage."). Sea's motion in this case is on par with this pattern of defendants burying district courts, at the earliest stage of litigation, in hundreds of pages of exhibits purportedly subject to judicial notice or incorporated by reference in the complaint but, indeed, better saved for a later stage of the case.

That said, the Court now turns to the 23 exhibits before it. Plaintiff only disputes the Court's consideration of some of the exhibits. Plaintiff has no objection to the Court's consideration of exhibits 1, 6, 8–16, and 18–20 and agrees that exhibits 2 and 4 may be judicially noticed.[6] (Doc. 48.) As such, the Court will consider these exhibits in its analysis.

Plaintiff objects, however, to the Court's consideration of exhibits 3, 5, 7, 17, and 21–23. Sea contends that the Court can consider exhibit 17 under the incorporation-by-reference doctrine and that exhibits 3, 5, 7, 17, and 21–23 are all subject to judicial notice. (Doc. 43.) Plaintiff disagrees, arguing that exhibits 3, 5, and 7 are documents that pre-date the Class Period by more than three years and therefore are not relevant to the instant motion and not properly subject to judicial notice; that Sea seeks to use the truth of the statements contained in exhibit 17 to argue disputed facts and thus judicial notice is inappropriate; and that exhibits 21 through 23 are press releases authored by third parties and not

referenced in the CAC and thus are also not relevant to the motion. (Doc. 48 at 5–8.)

Starting first with the incorporation-by-reference doctrine. "[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. A defendant may seek to incorporate a document "if the plaintiff refers extensively to the document or the document forms the basis of plaintiff's claims." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). However, "the mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Coto Settlement v. Einsenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

 **\*5** Exhibit 17 is a copy of Tencent Holding Limited's First Quarter 2023 financial results. (Doc. 42-17.) Sea contends that the CAC incorporates this exhibit by reference, pointing to ¶¶ 49 and 70 of the CAC. (Doc. 43 at 6.) Paragraphs 49 and 70 repeat the same assertion: that Tencent reported increased international gaming revenue in 1Q23, attributed in part to *League of Legends*.

It is not clear that the CAC is specifically referring to or relying on Tencent's publicly filed financial results (exhibit 17). Indeed, Plaintiff disputes this, arguing that ¶¶ 49 and 70 refer to "Tencent's 1Q23 earnings call transcript (Ex. 16)—not its 1Q23 press release." (Doc. 48 at 4.) The Court finds that the CAC does not refer to exhibit 17 extensively enough to warrant incorporation on that ground alone. Nor do Plaintiff's claims arise from the statements made in this document. As such, incorporation of exhibit 17 is not proper.

Turning next to judicial notice. Federal Rule of Civil Procedure 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." A fact is not subject to reasonable dispute if it is (1) generally known within the trial court's territorial jurisdiction or (2) can be accurately and readily determined from sources who accuracy cannot reasonably be questioned. Fed. R. Civ. P. 201.

The Court finds that exhibits 3, 5, 7, 17, and 21–23 are not subject to judicial notice. Throughout its motion to dismiss, Sea uses statements contained in these exhibits for their truth value in an attempt to present Sea's own version of the facts. For instance, the CAC alleges that Sea "sought to conceal [its] negative [GMV] trend by manipulating the Company's disclosures and withholding quarterly GMV and order information." (Doc. 31 ¶ 109.) To rebut this,

Sea points to exhibits 21, 22, and 23 (third-party press releases) and asserts that Sea's decision to withhold GMV metrics for two consecutive quarters was in line with other publicly listed companies. (Doc. 41 at 9–10.) Clearly, Sea is using its "request for judicial notice ... as a backdoor avenue for introducing evidence of the facts themselves." *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1088 (N.D. Cal. 2017). Yet, "[i]t is improper to judicial notice a [document] when the substance of the [document] is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Khoja*, 899 F.3d at 1000. Accordingly, the Court will not take judicial notice of exhibits 3, 5, 7, 17, and 21–23.

## IV. DISCUSSION

The Court now turns to the merits of Sea's motion to dismiss. Plaintiff asserts two claims: (1) violation of § 10(b) of the Exchange Act and Rule 10b-5 and (2) violation of § 20(a) of the Exchange Act. Both parties agree that the second claim's fate depends on the Court's resolution of the first.[7] (Doc. 41 at 30; Doc. 47 at 30.) Accordingly, the Court analyzes the sufficiency of Plaintiff's § 10(b) claim before turning to Plaintiff's claim for control person liability under § 20(a).

To state a claim under § 10(b) and Rule 10b-5, "a plaintiff must allege: (1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc. (Glazer II)*, 63 F.4th 747, 764 (9th Cir. 2023). Sea argues that the Court should dismiss the CAC because Plaintiff has not adequately pled either (1) falsity or (2) scienter. (Doc. 41.)

### A. Falsity

 **\*6** As already noted, securities fraud claims are subject to heightened pleading requirements under Rule 9(b) and the PSLRA. To plead falsity, the PSLRA requires the complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and believe, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4. The parties group the alleged false statements into two categories: (1) statements about the impact of Garena

losing *League of Legends* and *Teamfight Tactics* and (2) statements about the effect of Sea's "pivot to profitability" on Shopee's growth.

### 1) Statements concerning Garena

Right off the bat, Sea contends that "[i]n essence, Plaintiff's Garena claim is that Sea concealed the expiration of the License Agreement [for *League of Legends* and *Teamfight Tactics*] in accordance with its publicly filed terms, which allegedly had a material impact on Garena's results for the first quarter of 2023." (Doc. 41 at 12.) Not so. Plaintiff's claim is *not* that Sea concealed the publicly disclosed expiration date of Garena's licensing agreement for *League of Legends* and *Teamfight Tactics*. Rather, Plaintiff alleges that Defendants misled investors about the impact of the license's expiration on Garena's business. Indeed, the first page of the CAC makes that clear, stating that this case arises from Defendants' false and misleading statements about "the effect of losing the hit online game *League of Legends* on Garena's financial results and user metrics." (Doc. 31 ¶ 3.) Plaintiff identifies the following statements as misleading:

#### a. November 15, 2022 Earnings Call (3Q22)

First, on a November 15, 2022 earnings call to discuss 3Q22, Sea was asked about the impact the termination of the license agreement would have on Garena's publishing business. Wang [8] responded, "[T]he recent termination of the ... partnership with Riot as a result of the expiry of the agreement would have no impact on our overall publishing business as the contribution is immaterial from the particular game." (Doc. 31 ¶ 65.) To explain why this statement is misleading—that is, to explain why *League of Legends* was in fact material to Garena's business—Plaintiff alleges that:

- *League of Legends* is one of the most popular and monetized video games in the world, with more than 180 million monthly players in 2022 and was the second most-viewed video game in 2022 in terms of live streaming on Twitch, Youtube, Facebook. Because of its vast popularity and massive dedicated user base, the game is extremely profitable, generating well over a billion dollars of revenue per year through the use of in-game microtransactions. (¶ 41.)

- *League of Legends* is especially popular in the Southeast Asia markets where Garena previously operated the game. A 2021 consumer study found *League of Legends* to be the top-ranked video game brand in the entire Asia-Pacific region–and the top-ranked video game specifically for China, Korea, Hong Kong, Taiwan, and Vietnam (the latter three are markets where Garena formerly operated the game). (¶ 44.)

- Sea long acknowledged that *League of Legends* was one of Garena's most popular video games. Before Sea lost the rights to the game, Sea's Annual Reports on Form 20-F consistently listed *League of Legends* first among its popular licensed games. The forms also reported that Garena's top five games—which included *League of Legends*—accounted for more than 95% of Sea' digital entertainment revenue from 2020-2022 (¶ 45.)

- In 1Q23—the first quarter Garena no longer operated *League of Legends* and *Teamfight Tactics*—Garena experienced a "weakening in monetization, mainly as a result of lower paying user ration." Specifically, Sea reported that Garena lost six million paying users in 1Q23, even though active users increased by more than six million in the same period—leading to the lowest paying user ratio Sea has reported in four years. In contrast, Tencent (the company that took over the publishing of these games) reported that international gaming revenues increased significantly in 1Q23, which they attributed to increased performance in games like *League of Legends*. (¶ 49.)

**\*7** Plaintiff has sufficiently specified the statements alleged to have been misleading and the reasons why the statements are misleading. [9] Sea argues that *League of Legends* was not material to Garena's business and that "Garena's results in the years leading up to the expiration of the License Agreement were largely driven by the global success of its self-developed and self-published mobile hit, *Free Fire*." (Doc. 41 at 13.) That might be so, but resolving a factual dispute at the pleading stage is improper and premature. Moreover, in deciding a Rule 12(b)(6) motion to dismiss, the Court must accept the complaint's allegations as true. And here, those allegations—that *League of Legends* is one of the most monetized video games in the world, was the top-ranked video game in Asia in 2021, was among Sea's most popular games, and was one of five games that accounted for more than 95% of Sea's digital entertainment revenue from 2020 to 2022—create a reasonable inference that *League of Legends*

was material to Garena's publishing business, contrary to Wang's statement on the earnings call. Plaintiff has plausibly pled falsity as to this statement. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (noting that a statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists").

Sea further argues that Wang's statement is inactionable under the PSLRA's safe harbor. (Doc. 41 at 21.) The PSLRA's safe harbor exempts forward-looking statements that are either "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or made without "actual knowledge that it is false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)–(B). Plaintiff contends that Wang's statement that *League of Legends* is immaterial to Garena's business and thus the loss of its license would have no impact is not a forward-looking statement, but rather plainly related to current and historical facts. The Court agrees in part.

Wang's statement that *League of Legends*' "contribution is immaterial" to Garena's business is a statement about a current or past fact and therefore is not covered by the safe harbor. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) (noting that safe harbor is not designed to protect materially false or misleading statements about current or past facts). Wang's representation that the termination of the license agreement "would have no impact on our overall publishing business" is, however, a forward-looking statement. That said, where a forward-looking statement is accompanied by a non-forward-looking statement that is materially false or misleading, virtually "no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *In re Quality Sys.*, 865 F.3d at 1146–47. Wang's statement on the November 15, 2022 earnings call is actionable, and Plaintiff's allegations adequately plead its falsity.

### b. March 7, 2023 Earnings Call (4Q22) and April 6, 2023 Form 20-F

Next, Plaintiff asserts that in spring 2023, months after operation of *League of Legends* reverted back to Riot/Tencent, Defendants misleadingly claimed that (1) Garena's

paying user base had stabilized and (2) any risk of a negative development to a key revenue-earning game leading to a material decline in growth is "merely hypothetical."

Specifically, Plaintiff points to Sea's March 7, 2023 earnings call (4Q22), in which Li [10] stated that Garena's "paying user ratio and average revenue per user remain[ed] relatively stable quarter-on-quarter." (Doc. 31 ¶ 74.) During that same call, Wang stated that "for Garena, our focus now is continu[ing] to stabilize our user base." (¶ 76.) Plaintiff alleges that these statements are misleading by omission because Defendants knew, when they issued these statements, that "Garena's paying user ratio would take a sharp decline in 1Q23 with the loss of *League of Legends* and *Teamfight Tactics*." (¶ 78.) Further, because (1) Defendants monitored granular game-specific metrics, (2) the license agreement with Riot/Tencent required Garena to maintain records on the performance of and revenue generated by the games, and (3) these statements were issued in late 1Q23 (months after Riot took over operations of these games), Defendants knowingly omitted that Garena had not achieved sufficient gains in paying users in other games to offset the significant loss of the *League of Legends*' user base. (*Id.*)

**\*8**  In arguing that Plaintiff has failed to plausibly plead falsity, Sea asserts that "the first quarter results for 2023 actually showed improvement in the quarter-on-quarter decline for each of bookings, QAUs, and QPUs, indicating ongoing stabilization in Garena's business rather than any sharp decline as Plaintiff would have it." [11] (Doc. 41 at 13.) The Court is not persuaded. For one, Li and Wang's alleged misleading statements concern the stabilization of Garena's "paying user ratio"—not its bookings, QAUs, and QPUs. So, assuming *arguendo* that Garena's bookings, QAUs, and QPUs showed improvement in each metric's quarter-on-quarter decline, this would not establish the accuracy or truthfulness of Li and Wang's statements. Second, Plaintiff alleges that Garena's paying user ratio dropped from 9% in 4Q22 to 7.7% in 1Q23, the lowest ratio Garena had experienced in years. (Doc. 31 ¶ 31.) Accepting this allegation as true, the Court finds it plausible that Li and Wang's statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Plaintiff also points to Sea's Form 20-F for FY22, which Sea filed with the SEC on April 6, 2023. Specifically, in the "Risk Factors" section, Sea stated that it "derive[s] a significant

portion of digital entertainment revenue and gross profit from a limited number of online games.... In 2022, [Sea's] top five games, comprising *Free Fire* and games licensed to use by third-party game developers, contributed 97.9% of [Sea's] digital entertainment revenue, among which *Free Fire* contributed to a significant portion." (¶ 81.) Sea went on to note that "[a]ny negative developments or occurrences to any of our key-revenue earning games ... *could lead* to material decline or slower growth." (*Id.* (emphasis added).)

Plaintiff alleges that Defendants' statements in Sea's Form F-20 are misleading because Sea presented the risk that any "negative developments or occurrence to a key-revenue earning game leading to a material decline or slower growth" as merely a "hypothetical" risk, rather than one that had already materialized with the loss of *League of Legends*. (¶ 83.) Plaintiff again highlights the timing of Defendants' statements—that Defendants filed Form F-20 in 2Q23, several months after Riot/Tencent took over operation of *League of Legends*. By that point, Garena had lost millions of paying users, leading to the lowest paying user ratio that Sea had reported in years. (*Id.*) These allegations in tandem with Plaintiff's other allegations that Defendants regularly monitored game-specific metrics adequately plead falsity. [12] *See Berson*, 527 F.3d at 986 (holding that risk disclosures that speak "entirely of as-yet-unrealized risks" and fail to alert investors "that some of these risks may have already come to fruition" are misleading).

In sum, Plaintiff has sufficiently pled falsity as to Defendants' statements regarding Garena, so the Court denies Sea's motion on this ground.

### 2) Statements concerning Shopee

With respect to Shopee, Plaintiff alleges that Defendants misled investors about the sustainability of Sea's "pivot to profitability" and the effect that Sea's "drastic cost-cutting measures would have on Shopee's growth and market share." (Doc. 31 ¶ 3.) Plaintiff identifies the following statements as misleading:

#### a. November 15, 2022 Earnings Call (3Q22)

**\*9** First, Plaintiff alleges that on the 3Q22 earnings call on November 15, 2022, Defendants downplayed the effect Sea's "pivot to profitability" would have on Shopee's

competitiveness and market share, and "minimized" the impact that its cost-cutting efforts would have on GMV growth, portraying the risk of negative growth as merely "hypothetical." Specifically, in response to a question about cost-cutting measures and whether Shopee would be sacrificing its market share to competitors, Wang responded "I think from what we have so far observed in the market, well, we continued to maintain our strong market leadership, and our peers also have behaved in a relatively rational manner." (¶ 66.) Wang further remarked that,

> In terms of competition, I think as we continue to track our peers as well in this region, we believe our progressive leading position has been maintained in the third quarter. Of course, we take competition very seriously. And we make sure that our service offerings remain competitive and our monetization take rate is well justified by the value – additional value offering to our buyers and sellers in line with the overall market movement.

(¶ 67.)

Plaintiff alleges that Defendants' statements are "misleading for failing to disclose that other competitors[,] like TikTok Shop[,] were continuing to offer discounted promotions and lower take rates that would undercut Shopee and eat into its market share." (¶ 70.) Plaintiff further alleges that Defendants' statements that they "track [their] peers" and ensure that Shopee's "service offerings remain competitive" are "admissions that they were aware that TikTok was aggressively expanding in Southeast Asia" and did not "have [a] similar focus on cost cutting." (*Id.*)

Sea contends that Wang's statements are inactionable statements of opinion and puffery. (Doc. 41 at 19–20.) The Court agrees. "[V]ague, generalized, and unspecific assertions of corporate optimism or statements of 'mere puffing' cannot state actionable material misstatements of fact under federal securities laws." *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (citing *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)). Such statements are "not

capable of objective verification," and "lack[ ] a standard against which a reasonable investor could expect them to be pegged." *Id.*

Here, Wang's statements of "strong market leadership" and "progressive leading position" are vague, unspecific remarks of corporate optimism and therefore are inactionable. *See id.* (finding that claims of "industry leading growth," "measurable progress," and "continuing improvements" are "projections of general optimism, amounting to nothing more than a parade of rosy adjectives—unmoored to any objective measures—combined with general reiterations of the pursuit of [defendant's] growth strategy"); *see also In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1236 (N.D. Cal. 1994) (finding statement that "we have a sizable lead over our competition" is puffery); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076–77 (N.D. Cal. 2001) (finding that statements using the word "strong," "robust," "well positioned," "solid," and "improved" to be vague and nonactionable).

As to Sea's GMV growth, Plaintiff alleges that Li misled investors when he stated: "We believe our strong focus on cash flow and achieving self-sufficiency as much as possible is the right strategy to pursue at this stage, even though we may see no growth or even negative growth in certain operating metrics in the near term." (¶ 68.) Plaintiff also notes that when asked about "GMV outlook in the coming quarters or 2023," Wang responded,

> **\*10** [R]egarding the GMV growth, as we shared before, and at this point, our focus is very clearly on improving monetization and to achieve self-sufficiency. So GMV growth will be output until we get to that point. And then we can – we assess our situation and see what's the best path forward. Now as I shared ... our view of the long-term prospects of the market is unchanged. The short term, there will be a lot of factors, including macro environment, inflation, ForEx and the continued reopening trends as well as tough comparisons during COVID and our own focus on

> efficiency, cost management and improving monetization of the platform. *So there could be impact on ... some of the top line growth in operating metrics. There could be no growth or negative growth, and we can accept that. But on the other hand, as we shared, our long-term view is we want to emerge as the strongest winner in this market.*

(¶ 69 (emphasis added).)

Plaintiff contends that these statements regarding GMV's growth are misleading because they portray "no growth or negative growth" as a "hypothetical risk," rather than one that had already materialized. Plaintiff asserts that at the time Defendants made these statements—specifically, on November 15, 2022—Shopee was already experiencing stagnating and declining GMV. Plaintiff notes that in 1Q22, Shopee's GMV was $17.4 billion; in 2Q22, it was $19.0 billion; in 3Q22, $19.1 billion; and in 4Q22, $18.0 billion. (¶ 32)

Plaintiff fails to plead falsity with respect to these statements. Though Plaintiff asserts that the risk of negative growth had already materialized when Wang and Li made these statements, Plaintiff's allegations do not support this. Defendants made the above statements on November 15, 2022. Yet, Shopee's GMV only declined in 4Q22—and that quarter did not end until December 31, 2022.[13] In other words, when Defendants made these statements, Shopee's negative growth in GMV had not yet materialized. Nor does Plaintiff plead with particularity that as of November 15, 2022, Defendants had actual knowledge that Sea's GMV for 4Q22 would be less than it was in 3Q22. Thus, Plaintiff fails to plead with particularly how Defendants' statements regarding the risk of no growth or negative growth were false or misleading.

Moreover, these statements qualify for protection under the PSLRA safe harbor. These statements are forward looking given that they discuss Defendants' predictions regarding Sea's GMV in the "coming quarters." *No. 84 Employer-Teamster Joint Council Pension Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (noting that a forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management

for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues").

Defendants' statements were also accompanied with meaningful cautionary warnings. Take Wang's statement, for instance: immediately before discussing the risk of no growth or negative growth, Wang noted post-COVID reopening trends and inflation as some of the factors that could impact Shopee's GMV. Additionally, at the beginning of the earnings call, Sea warned that Defendants "may make forward-looking statements, which are inherently subject to risks and opportunities and may not be realized in the future for various reasons as stated in our press release." (Doc. 42-8 at 5.) These warnings are sufficient to trigger PSLRA protection. *See e.g.*, [City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.](#), 880 F. Supp. 2d 1045, 1062 (N.D. Cal. 2012) (finding that representative of company beginning all conference calls with a notice that "opinions and statements regarding revenue guidance were forward-looking and that actual results could vary based on risks and uncertainties identified in [company's] filings with the SEC" was sufficient cautionary language).

**\*11** In short, Defendants' statements on the 3Q22 earnings call are both inactionable puffery and protected by the PSLRA safe harbor, and thus cannot support a securities fraud claim under § 10b.

### b. March 7, 2023 Earnings Call (4Q22)

Plaintiff alleges that on the 4Q22 earnings call on March 7, 2022, Defendants assured investors that Shopee could achieve "sustainable growth" and "execute both growth and profitability" without a need for a "trade-off." (Doc. 31 ¶¶ 72–77.) Defendants stated that Sea's cost-cutting initiative would allow Shopee to "capture a larger share of the pie" and that "starting from '23 ... we'll see some natural growth hopefully." (*Id.*) Plaintiff alleges these statements are false and misleading because "Defendants knew that Shopee's GMV growth depended on massive investments in sales and marketing expense, and that Shopee was unable to grow while turning a profit." (¶ 78.) Plaintiff notes that at the time these statements were made, "Shopee reported its first ever profitable quarter at the expense of the largest GMV decline in [its] history, with GMV declining significantly to $18.0 billion in 4Q22 (down from $19.1 billion the prior quarter)." (*Id.*)

Plaintiff also alleges that during the call, Defendants announced that they would discontinue quarterly disclosures of Shopee's GMV: "GMV remains output. And we will discontinue any quarter-on-quarter disclosure of operating metrics like GMV and orders and we'll move to an annual disclosure in line with global peers." (¶ 77.) Plaintiff asserts that although Defendants claimed that they were discontinuing quarterly disclosures of GMV to be "in line with global peers," Defendants actually "discontinued quarterly disclosure of GMV and orders to conceal further declines in growth." (*Id.*) To support this claim, Plaintiff points to the timing of Defendants' decision—that after Shopee's "first ever third-quarter-to-fourth-quarter GMV decline (and the largest quarter-over-quarter GMV decline in [Shopee's] history) from 3Q22 to 4Q22, [Sea] announced that it would no longer disclose quarterly GMV numbers,[ ] only to do an about-face on that decision in 3Q23[ ] when that metric went up again." (¶ 32.) Plaintiff highlights that "in Sea's entire history as a publicly traded Company, 1Q23 and 2Q23 are the only quarters where it did not disclose GMV." (*Id.*)

The Court, again, agrees with Sea that Defendants' statements remarking on Shopee's potential for "sustainable" and "natural growth" are generalized assertions of corporate optimism. These are "feel good monikers" that lack an objective standard against which a reasonable investor could expect them to be pegged. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("This mildly optimistic, subjective assessment hardly amounts to a securities violation."); *see also Shenwick v. Twitter*, 282 F. Supp. 3d 1115, 1142 (N.D. Cal. 2017) (finding that comments about "exciting results" and "continuous improvements" to be mere puffery).

Defendants' statements also qualify for PSLRA safe harbor protection. Defendants' alleged misrepresentations do not discuss Shopee's present growth as of 4Q22 but rather predict Shopee's growth in the coming 2023 quarters; thus, these remarks are forward looking statements. And as with Defendants' statements on the 3Q22 earnings call, Defendants' statements here were accompanied with meaningful cautionary warnings. [14]

**\*12** As to Defendants' statement regarding Sea's decision to move from quarterly to annual GMV disclosures, Plaintiff fails to plead with particularity how this statement is false or misleading. To the extent that Plaintiff's argument is that

Defendants' assertion—that annual GMV disclosures is "in line with global peers"—is factually inaccurate, Plaintiff does not plead the falsity of this statement with particularity. [15]

And to the extent that Plaintiff's argument is that Defendants omitted their true *intent* behind the decision—*i.e.*, to conceal a decelerating GMV—Plaintiff's assertion is speculative. That Shopee's GMV declined in 4Q22 is not sufficient on its own to create a plausible inference that Defendants falsely represented why they were moving from quarterly to annual disclosures. What's more, as a general matter, "Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *In re Mellanox Techs Ltd. Sec. Litig.*, No. 13-CV-04909-JST, 2014 WL 12650991, at *17 (N.D. Cal. Mar. 31, 2014). Granted, a duty to disclose does arise when an omission "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *See Brody*, 280 F.3d at 1006. But in this case, Defendants' statement announcing Sea's shift to annual GMV disclosures did not affirmatively create an impression regarding the state of Shopee's GMV—Defendants' statement merely announced a business change. As such, the Court grants the motion to dismiss as to these statements.

### c. April 6, 2023 Form 20-F (FY22)

Plaintiff alleges that under Item 5(D) of Sea's Form 20-F for FY22, Defendants represented that they were "not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2022 that are reasonably likely to have a material adverse effect on [Sea's] net revenues, income, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial conditions." (Doc. 31 ¶ 82.) Plaintiff asserts Defendants' statement is materially misleading because at the time Defendants issued this statement, Defendants were aware that:

> (1) Shopee had already suffered a deceleration in GMV with the [Shopee's] smallest ever quarter-to-quarter GMV increase in 3Q22, as [it] scaled back on shipping subsidies and other marketing expenses; (2) Shopee subsequently suffered the largest GMV decline in its history with further significant declines in sales and market expense in 4Q22; and (3) 1Q23 was already over, so Defendants—who "huddl[ed] every month to

discuss cashflow projections, along with their regular weekly meetings" and closely monitored Shopee growth in every market it operated—were already aware that GMV declined further in 1Q23 in lockstep with further declines in sales and marketing expense

(¶ 83.)

Sea does not raise any specific challenges to this alleged false statement. Nonetheless, the Court turns to the adequacy of Plaintiff's allegations on this point.

The Court is not aware of any Ninth Circuit case law discussing the disclosure obligations under Item 5(D) of Form 20-F. Nor does either side point to any relevant, authoritative case law. Courts in other circuits, however, have likened the disclosure obligations of Item 5(D) to Item 303 of Regulation S-K. *See Sun v. Tal Educ. Grp.*, 22-cv-01015, 2023 WL 6394413, at *33 (S.D.N.Y. Sept. 29, 2023); *see also Garnett v. RLX Tech Inc.*, 632 F. Supp. 3d 574, 598 (S.D.N.Y. 2022) ("Item 303 compels disclosure of 'any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.' Likewise, Item 5(D) of Form 20-F requires that registrants 'discuss ... any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.' "). Accordingly, the Court looks to disclosures obligations under Item 303 as guidance for stating an adequate claim of misrepresentation as it relates to Item 5(D) for Form 20-F.

**\*13** To state a claim for failure to adhere to Item 303, a plaintiff must plausibly allege "(1) the existence of a trend or uncertainty; (2) known to management; (3) that is reasonably likely to have a material effect on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296–97 (9th Cir. 1998). A "trend" is defined as an "observed pattern that accurately reflects persistent conditions of the particular registrant's business environment." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263 (N.D. Cal. 2019). Here, Plaintiff maintains that Defendants were aware of the "ongoing trend of declining GMV" and that Defendants failed to affirmatively disclose this trend, thereby misleading investors. Plaintiff's allegations adequately support this.

To start, Plaintiff's allegations support a plausible inference that at the time Defendants filed Sea's Form 20-F, Shopee was experiencing an "ongoing trend of declining GMV." Given that Defendants halted quarterly disclosures of GMV for 1Q23 and 2Q23, Plaintiff is unable to point to those metrics to support its allegation of downward trending growth. Instead, Plaintiff points to other allegations, which the Court accepts as true, that create a reasonable inference that such a trend existed. For instance, Plaintiff notes that:

> Shopee's GMV and sales and marketing expense moved practically in lockstep with each other prior to and during the Class Period. In 2020 and 2021, both metrics grew sequentially each quarter, as the Company's massive use of promotions and other marketing tactics drove consistent GMV growth. In 2022, however, as the Company embarked on Defendants' aggressive cost-cutting initiative and slashed hundreds of millions of dollars in quarterly sales and marketing expenses, Shopee's GMV similarly began to decelerate and then decline – before Defendants abruptly stopped disclosing the metric altogether for the first two quarters of 2023.

(Doc. 31 ¶ 51.) Plaintiff further provides a graphic to illustrate the point: as Shopee's sales and marketing expense increased from 1Q20 to 4Q21, so too did Shopee's GMV. And as sales and marketing decreased starting in 4Q21, so too did GMV decelerate and then decline. (*Id.*) Thus, accepting as true that (1) GMV and Shopee's sales and marketing expense moved in lockstep and (2) Shopee's sales and marketing expense declined from 3Q22 to 1Q23, it is plausible that Shopee's GMV was also downward trending during this time. In turn, by failing to disclose this trend—one that was reasonably likely to affect Sea's financial condition—Defendants misled investors.

*d. May 16, 2023 Earnings Call (1Q23)*

Plaintiff alleges that despite obscuring Shopee's GMV for 1Q23, Defendants continued to assure investors on the 1Q23 earnings call that Sea's cost-cutting efforts would "reinforce our structural advantages in driving profitable long-term growth in our market" and that Shopee could "execute growth and manag[e] bottom line at the same time." (Doc. 31 ¶¶ 86, 89.) When asked whether Shopee was seeing "any further slowdown in GMV momentum" in 1Q23, Wang responded, "[W]hile we don't disclose GMV quarter-on-quarter, generally overall, the trend has been consistent in terms of seasonality trends we are seeing quarter-on-quarter with last [ ] year's first quarter." (¶ 87.) Wang reiterated that "the general trend[,] Q-on-Q, observed for this quarter versus last quarter is in line with what we observed in Q1 last year versus Q4 2021." (¶ 87.)

Plaintiff argues these statements are misleading because Defendants knew at the time they made these remarks that (1) Shopee had already reported a deceleration in GMV with its smallest ever quarter-to-quarter GMV increase in 3Q22, (2) Shopee subsequently reported the largest GMV decline in its history with further significant declines in sales and market expense in 4Q22, and (3) Shopee has experienced further undisclosed declines in GMV in 1Q23 alongside further reductions in sales and marketing expense.

 **\*14**  Again, Defendants' statements remarking on Sea's effort to establish "profitable long-term growth" and its ability to "execute growth and manag[e] bottom line at the same time" are forward-looking statements that qualify for safe harbor protection. They fail to provide an actionable basis for a securities fraud claim, and so the Court grants Defendants' motion to dismiss them.

However, Defendants' statements regarding Shopee's GMV trends remaining "consistent in terms of seasonality" are actionable. These are neither vague, unspecific remarks of corporate optimism nor predictive, forwarding-looking statements entitled to safe harbor protection. *See In re Quality Sys.*, 865 F.3d at 1144–45 (finding that defendant's reassurances to investors that sales were "unchanged, or even growing, compared to previous quarters" was a "concrete description," not a "feel good optimistic statement[ ]"). Plaintiff plausibly asserts that in refusing to disclose GMV and by stating that GMV trends were "in line with the overall seasonality trends," Defendants painted a misleading picture

of Shopee's growth—one that improperly concealed Shopee's ongoing GMV decline. Accordingly, the Court will not grant Defendants' motion to dismiss as to these statements.

### B. Scienter

Before proceeding with its scienter analysis and to better frame the foregoing discussion, the Court summarizes which of Plaintiff's allegations sufficiently plead falsity and which do not. First, Plaintiff's allegations regarding Garena sufficiently plead falsity. Specifically, Plaintiff has adequately pled that Defendants made misleading statements about the impact of Garena losing its licensing right to *League of Legends* and *Teamfight Tactics*. Second, only some of Plaintiff's allegations regarding Shopee sufficiently plead falsity. Plaintiff has adequately pled that (1) Sea's Form F-20 for FY22 misled investors by failing to disclose Shopee's downward trending GMV and (2) Defendants' misled investors on the 1Q23 earnings call (May 16, 2023) by claiming that Shopee's GMV was "in line with seasonality trends" while also omitting the fact that Shopee's GMV was experiencing an ongoing decline. However, the following allegations either are inactionable or fail to adequately plead falsity: (1) Defendants' Shopee-related statements on the 3Q22 earnings call (November 15, 2022) (Doc. 31 ¶ 70(b–c)); (2) Defendants' Shopee-related statements on the 4Q22 earnings call (March 7, 2023) (¶ 78(b–e)); and (3) Defendants' statements on the 1Q23 earnings call (May 16, 2023) regarding Sea's potential for "profitable long-term growth" and its ability to "execute growth and manag[e] bottom line at the same time" (¶ 90(a)). Accordingly, the Court analyzes scienter only as it pertains to the surviving allegedly false statements.

The PSLRA requires the complaint "state with particularity facts giving rise to a strong inference that the defendant" made the "false or misleading statements either intentionally or with deliberate recklessness." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir. 2009). "[A]n inference of scienter must be more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). That said, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inference." *Id.* (internal quotation marks omitted). Rather, "[t]he inquiry ... is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard." *Id.* at 322–23.

**\*15** Plaintiff brings its § 10(b) claim only against Li, Wang, Chen, and Sea. Because Sea is a corporation, it "can only act through its employees and agents and can likewise only have scienter through them." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015). The "scienter of senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." *Id.* Sea does not dispute that Li, Wang, and Chen were acting within the scope of their authority. As such, the Court's analysis focuses on whether Plaintiff had adequately alleged scienter as to Li, Wang, and Chen.

Starting first with Li and Wang: Plaintiff posits that it has sufficiently alleged with particularly that Li and Wang had actual knowledge of the subjects of the alleged misstatements —that is, the importance of *League of Legends* to Garena's business and Shopee's downward trending GMV in light of Sea's pivot to profitability. Plaintiff further contends that given the importance of both *League of Legends* and Shopee's GMV to Sea's core operations, it would be absurd to argue that Li and Wang were unaware of both matters. The Court agrees.

Under the "core operations" theory of scienter, "[a]llegations regarding management's role may help satisfy the PSLRA scienter requirements in three circumstances:

> First, the allegations may be viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter under the *Tellabs* standard. Second the allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information .... Third, in rare circumstances, such allegations may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it

would be "absurd" to suggest that management was without knowledge of the matter.

*Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (internal citations and quotation marks omitted).

Here, Plaintiff's allegations, which the Court takes as true, demonstrates how critical *League of Legends* was to Garena's success—so much so that it would be "absurd" to argue that Defendants were unaware of—or, as Sea contends in its motion to dismiss, "did not expect"—the impact the expiration of the game's license agreement would have on Garena's business. For instance, Plaintiff alleges that in the years leading up to the expiration of license agreement at the end of 2022, Sea's annual report on Form 20-F consistently listed *League of Legends* among Garena's most popular licensed games. To be specific: Sea listed *League of Legends* as one of its most popular games in FY17, FY18, FY19, FY20, and FY21. (Doc. 31 ¶ 45.) These same forms also reported that Garena's top five games accounted for more than 95% of Sea's digital entertainment revenue from 2020 to 2022. (*Id.*)

But *League of Legends* wasn't just one of Sea's most popular games—it was and continues to be one of the most popular and monetized video games in the world. In 2022, the last year Garena retained its right to publish the game, *League of Legends* had more than 180 million monthly players and was the second most-viewed live-streamed video game globally, with its *League of Legends* World Championship drawing 5.1 million concurrent viewers and becoming the second most-watched event in esports history at that time (¶ 41). *See Di Donato v. Insys Therapeutics Inc.*, No. CV-16-00302-PHX-NWV, 2017 WL 3268797, at *15 (D. Ariz. Aug. 1, 2017) (finding it implausible that defendant-CEO would not have known that most of the company's revenue was coming from a specific prescription drug).

**\*16** Granted, the importance of *League of Legends* to Garena's core operations is not alone sufficient to establish scienter. Rather, to establish scienter under the core operations theory, a plaintiff must produce either "admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring," or "witness accounts demonstrating that executives had actual involvement in creating false reports." *Police Ret. Sys. of St.*

*Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). Plaintiff sufficiently pleads the former.

Plaintiff alleges that throughout the Class Period, Li and Wang regularly acknowledged that they tracked Garena's user engagement, monetization metrics, and trends for specific games on a granular basis (Doc. 31 ¶ 106). Indeed, Garena's license agreement itself—to which Li served as Garena's signatory—required Defendants to maintain and provide Riot/Tencent with monthly and quarterly reports on the game's revenue and usage. (Doc. 42-2 at 23.)

Moreover, Defendants' allegedly misleading statements themselves further bolster the inference that Defendants were aware of the import of *League of Legends* on Garena's business. (*See e.g.*, Doc. 31 ¶¶ 65, 74, 76.) Take, for instance, Wang's statements on the 3Q22 earnings call, in which he fielded questions regarding the impact of the license agreement's expiration and explicitly represented that the game's contribution is "immaterial" to Garena's publishing business. Or, for another example, take Li's statements on the 4Q22 earnings call, in which he assured investors that Garena's paying user ratio and average revenue per user remained relatively stable. Among the possible inferences that could be drawn from these statements, the more compelling one is that Wang and Li were aware of Garena's key operating metrics and had access to information regarding the impact the license agreement's expiration would have on Garena's business. *Reese*, 747 F.3d at 572 (finding that an assertion that a defendant was unaware of an alleged issue can be "directly contradicted by the fact that [the defendant] specifically addressed it in [his] statements").

Li and Wang's respective leadership roles also support scienter. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) ("[W]e may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue. This includes consideration of the executive's access to the information, and, whether, given the importance of the information, it would be absurd to suggest that management was without knowledge of the matter.") Li and Wang are both among the highest-level executives at Sea. Li is one of Sea's cofounders and serves as its CEO and Chairman of the Board of Directors. (Doc. 31 ¶ 16.) And Wang is Sea's Chief Corporate Officer, Chief General Counsel, and Company Secretary. Wang and Li regularly attended and actively participated in Sea meetings and earnings call. (¶¶ 101–02.) Sea's Form F-20 for FY22

also states that Li "has control over key decision making as a result of his control of a majority of the voting power of our outstanding share capital and has substantial influence over our company." (¶ 98.)

Thus, piecing all these allegations together—that *League of Legends* was a key-revenue earning game leading up to 2022, that Li and Wang had access to and were aware of *League of Legends*' user engagement and monetization metrics, and that Li and Wang were among the highest-ranked executives—the Court finds Plaintiff's CAC raises a strong inference of Li and Wang's scienter as it pertains to the Garena-related misstatements.

**\*17** Plaintiff's allegations also support Li and Wang's scienter with respect to Shopee. Similar to the analysis above, Plaintiff's allegations present as a strong argument that GMV was a key metric for Shopee and that it would be "absurd" for Defendants not to have been aware of its trending decline in light of Sea's "pivot to profitability."

To start, Plaintiff alleges that Shopee's revenue is a function of GMV (gross merchandise sold over a given period of time) and fees charged. *See Shenwick*, 282 F. Supp. 3d at 1146 (finding that it would be absurd for defendants not to have been aware of a specific metric's adverse trends given the metric's "direct impact on Twitter's ability to generate revenue"). Since its inception as a publicly-traded company, Sea has regularly reported its GMV on a quarterly basis—the only exception being 1Q23 and 2Q23, the two quarters succeeding the largest GMV decline in Shopee's history. (Doc. 31 ¶ 32.) The importance of GMV as a key operating metric is further illustrated by the fact the GMV is one of only two operative metrics that Sea reports in its SEC filings for Shopee. (Doc. 42-1 at 49.)

Plaintiff also points to specific admissions by Li and Wang that they were aware of Shopee's GMV and how it was trending throughout the Class Period. (*See e.g.*, Doc. 31 ¶ 107.) Take for instance, Wang's remarks on the 1Q23 earnings call, in which he stated: "In terms of GMV ... we don't discuss quarter-on-quarter GMV numbers specifically. And what I mentioned though was that the trend we're observing, the general trend Q-on-Q observed for this quarter versus last quarter is in line as what we observed in Q1 last year versus Q4 2021." (¶ 87.) Wang's ability to comment on how Shopee's GMV was trending as compared to years prior while also refusing to disclose specific numbers to investors raises a strong inference of scienter. *See Shenwick*, 282 F. Supp. 3d

at 1147 (finding that although defendant "did not provide 'specific' data" about a key metric, defendant's statement regarding the metric's dependence on market forces strongly implied that he had access to the disputed information). Indeed, Wang "bridge[d] the [scienter] gap" himself by referencing the very metric that Sea argues Defendants lacked "actual access" to. *See Reese, 747 F.3d at 572.*

And although Defendants' decision to withhold quarterly GMV numbers for 1Q23 and 2Q23 may not itself be an actionable misrepresentation as currently pled in Plaintiff's CAC, the allegation further supports scienter. That Defendants decided to begin withholding this metric for the first time in Shopee's history *immediately after* Shopee experienced its largest GMV decline in history bolsters the strong inference that Li and Wang, at a minimum, were reckless in their statements and omissions to investors regarding Shopee's downward trending GMV. This is sufficient to survive a motion to dismiss.

Turning now to Chen: Plaintiff names Chen as having violated § 10(b) but, notably, does not attribute a single misleading statement to him during the Class Period. To the extent that Plaintiff asserts Chen's liability by virtue of his position as an executive officer of the company, district courts within this circuit have largely rejected the "group pleading doctrine" as a means of establishing falsity under § 10(b). *See In re Questcor Sec. Litig.*, 2013 WL 5486762, No. SA CV 12-01623 DMG, at \*9 (C.D. Cal. Oct. 1, 2023) (surveying cases). Moreover, the Supreme Court has held that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Deriv. Traders,* 564 U.S. 135, 142 (2011).

**\*18** Any particularized allegations regarding Chen focus on his alleged insider trading during the Class Period. (*See* Doc. 31 ¶¶ 91, 115–16.) But "[w]ithout more, [a defendant's] trading alone is insufficient to plead liability for securities fraud under [§] 10(b)." *In re Questcor Sec. Litig.*, 2013 WL 5486762, at \*10. As such, the Court dismisses Plaintiff's § 10(b) claim against Chen.

### C. Control Person Liability

As already noted, both parties agree that the fate of Plaintiff's § 20(a) claim for control person liability depends on the Court's resolution of Plaintiff's § 10(b) claim. The parties

have not provided any other arguments on the § 20(a) claim. Thus, because Plaintiff has adequately plead a section 10(b) violation, the Court denies Sea's motion to dismiss as to Plaintiff's claim for control person liability under § 20(a).

### V. CONCLUSION

To summarize, the Court denies Sea's motion to dismiss except as follows:

- Plaintiff's allegations that Defendants made false and misleading statements regarding Shopee on the 3Q22 earnings call (November 15, 2022) (Doc. 31 ¶ 70(b–c)) and the 4Q22 earnings call (March 7, 2023) (¶ 78(b–e)) fail to adequately plead falsity and therefore are dismissed.

- Plaintiff's allegations regarding Defendants' statements on the 1Q23 earnings call (May 16, 2023), in which Defendants remarked on Sea's "profitable long-term growth" and its ability to "execute growth and manag[e] bottom line at the same time" (¶ 90(a)), are also dismissed.

- Plaintiff's § 10(b) and Rule 10b-5 claim against Chen is dismissed.

All other claims and allegations survive.

**IT IS SO ORDERED** that Sea's Motion to Dismiss (Doc. 41) is **GRANTED IN PART** and **DENIED IN PART** as summarized in the preceding paragraph.

Dated this 7th day of August, 2024.

**All Citations**

--- F.Supp.3d ----, 2024 WL 3708800

### Footnotes

1    Individual Defendants join Sea's motion to dismiss. (Doc. 46.)

2    Sea's request for oral argument is denied because the issues are adequately briefed, and oral argument will not assist the Court in reaching its decision. *See* Fed. R. Civ. P. 78(b); LRCiv. 7.2(f).

3    This section draws primarily from the allegations contained in the Consolidated Amended Complaint ("CAC") (Doc. 31), which are accepted as true for the purposes of this order.

4    This section summarizes Sea's alleged misrepresentations. Defendants' specific statements that Plaintiff alleges were misleading are noted in the Court's analysis below.

5    "_Q2_" is used to denote each first, second, third, and fourth fiscal quarter of each full fiscal year ("FY"). Sea's fiscal year runs concurrent with the calendar year. So, for instance, 1Q23 refers to the first quarter of 2023.

6    Exhibit 2 is the Software License and Distribution Agreement between Garena and Riot, and exhibit 4 is Sea's Fourth Quarter and Full year 2021 financial results. Both documents were publicly filed with the SEC. Plaintiff notes that although exhibits 2 and 4 are subject to judicial notice, the truth of the matters asserted within these exhibits are not. (Doc. 48 at 5.) The Court agrees. *See Khoja*, 899 F.3d at 999 ("Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."); *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008) ("It is appropriate for the court to take judicial notice of the content of the SEC Forms 4 and the fact that they were filed with the agency. The truth of the content, and the inferences properly drawn from them, however, is not a proper subject of judicial notice under Rule 201.").

7 Claims under § 20(a) are "derivative and therefore require an independent violation of the Exchange Act, so the [Plaintiff] must successfully plead a [§] 10(b) claim to succeed" in its claim under § 20(a). *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 947 (9th Cir. 2023).

8 Wang is Sea's Group Chief Corporate Offer, Group General Counsel, and Company Secretary. (Doc. 31 ¶ 18.)

9 Sea asserts that Plaintiff has offered "no evidentiary facts" to support the claim that publishing license revenues for *League of Legends* were material to Garena's financial results in 2022. The numerous allegations listed above refute this.

10 Li is one of Sea's cofounders and is Sea's Group Chief Executive Officer and Chairman of the Board of Directors.

11 To illustrate this, Sea points to a graphic of Garena's QPUs from 1Q22 to 3Q23. (Doc. 31 at 11.) Sea does not dispute that Garena's number of paying users dropped from 43.6 million in 4Q22 to 37.6 million in 1Q23. Rather, Sea's argument is that this drop in paying users between 4Q22 and 1Q23—*i.e.*, a drop of 6 million —is an "improvement" compared to the prior quarterly drops, where, for instance, Garena lost 7.9 million paying users between 3Q22 and 4Q22. (*Id.*)

12 Sea baldly asserts that Defendants' statement regarding the risk of a negative development to a key revenue-earning game is an accurate statement of historical fact and therefore not actionable. (Doc. 41 at 18.) Sea, however, does not elaborate as to how this statement reflects accurate historical data. Moreover, "even if a statement is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–1008.

13 (*See* Doc. 31 ¶ 72 (noting that 4Q22 ended December 31, 2022).).

14 Sea warned investors at the start of the 4Q22 earnings call that Defendants "may make forward looking statements, which are inherently subject to risks and uncertainties and may not be realized in the future for various reasons as stated in our press release." (*See* Doc. 42-9 at 5.)

15 At most, Plaintiff alleges that market commentators noted concern regarding Sea's decision to move from quarterly to annual disclosures. (Doc. 31 ¶ 58.)

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 16