FENNEMORE CRAIG, P.C.
Douglas C. Northup (No. 013987)
Andrea L. Marconi (No. 022577)
2394 E. Camelback Road
Suite 600
Phoenix, Arizona  85016
Telephone:  (602) 916-5000
Email: dnorthup@fennemorelaw.com
Email: amarconi@fennemorelaw.com

LATHAM & WATKINS LLP
Jeff G. Hammel (*Pro Hac Vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: jeff.hammel@lw.com

LATHAM & WATKINS LLP
Andrew B. Clubok (*Pro Hac Vice*)
Susan E. Engel (*Pro Hac Vice*)
Matthew J. Peters (*Pro Hac Vice)*
555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Email: aclubok@lw.com
Email: susan.engel@lw.com
Email: matthew.peters@lw.com

*Counsel for Defendants Carvana Co., Ernest
Garcia III, Mark Jenkins, Stephen Palmer,
Michael Maroone, Neha Parikh, Ira Platt, and
Greg Sullivan*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| In re Carvana Co. Securities Litigation, | No. CV-22-2126-PHX-MTL |
|---|---|
| | **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS LEAD PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES** |
| | **Oral Argument Requested** |
| This Document Relates to:   ALL ACTIONS. | |

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    PLAINTIFFS FAIL TO PLEAD ANY EXCHANGE ACT CLAIM. .................. 2

    A.    Plaintiffs Fail to Plead Falsity. ................................................................ 2

        1.    Title and Registration (Statements 1-8) ...................................... 3

        2.    Buying Cars from Customers (Statements 9-18) ........................... 6

        3.    Retail Unit Sales Growth (Statements 19-20) ................................ 9

        4.    Nationwide Expansion (Statements 21-29) .................................. 11

        5.    Aged Inventory (Statements 30-32) .............................................. 12

        6.    Carvana's Retail GPU (Statements 33-39) ................................... 14

    B.    Plaintiffs Fail to Plead Loss Causation. ................................................. 16

        1.    Carvana's Disclosures Regarding Its Financial Condition ........................................................................................ 16

        2.    Media Reports Regarding Regulatory Actions ............................ 17

    C.    Plaintiffs Fail to Plead a Strong Inference of Scienter. ........................... 18

        a.    Plaintiffs Do Not Allege a Motive to Commit Fraud. ........................................................................................ 19

        b.    Plaintiffs Do Not Allege Deliberate Recklessness ................................................................................ 22

    D.    Plaintiffs Fail to Plead Scheme Liability. ............................................... 26

    E.    Plaintiffs Fail to Plead an Insider Trading Claim .................................... 28

II.   PLAINTIFFS FAIL TO PLEAD ANY SECURITIES ACT CLAIM. ................ 28

CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alich v. Opendoor Techs. Inc.*,
  2024 WL 2153529 (D. Ariz. 2024)............................................................................... 30

*Alich v. Opendoor Techs. Inc.*,
  2024 WL 839146 (D. Ariz. 2024)............................................................... 9, 17, 25, 29

*Bajjuri v. Raytheon Techs. Corp.*,
  641 F. Supp. 3d 735 (D. Ariz. 2022) .................................................................. 4, 16, 17

*Baron v. Hyrecar Inc.*,
  2022 WL 17413562 (C.D. Cal. 2022) .................................................................... 19, 22

*Borteanu v. Nikola Corp.*,
  2023 WL 1472852 (D. Ariz. 2023).......................................................................... 26, 27

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
  2020 WL 4569846 (N.D. Cal. 2020) .............................................................................. 29

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ..................................................................................... 3, 9

*Brown v. Ambow Educ. Hldg. Ltd.*,
  2014 WL 523166 (C.D. Cal. 2014) ................................................................................ 30

*Chapman v. Mueller Water Prods., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020) .............................................................................. 4

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms.*,
  2023 WL 1769810 (S.D. Cal. 2023)............................................................................... 15

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
  2022 WL 4491093 (S.D. Cal. 2022)............................................................................... 22

*City of Fort Lauderdale Gen. Emps.' Ret. Sys. v. Edison Int'l*,
  786 F. App'x 685 (9th Cir. 2019)................................................................................... 18

*City of Hollywood Firefighters Pens. Fund v. Atlassian Corp.*,
  2024 WL 235183 (N.D. Cal. 2024) ......................................................................... 23, 24

*City of Hollywood Firefighters Pens. Fund, v. Atlassian Corp.*,
  2024 WL 3823801 (N.D. Cal. 2024) .................................................................... 5, 24, 25

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- ii -

*City of Pontiac General Employees Retirement System v. First Solar*,
 2023 WL 155861 (2023) .......................................................................... 19, 20, 25

*City of Sunrise Firefighters' Pens. Fund v. Oracle Corp.*,
 2019 WL 6877195 (N.D. Cal. 2019) ........................................................... 10

*Constr. Indus. & Labs. Joint Pens. Tr. v. Carbonite, Inc.*,
 22 F.4th 1 (1st Cir. 2021) .......................................................................... 25

*Cupat v. Palantir Techs., Inc.*,
 2024 WL 1374903 (D. Colo 2024) ............................................................ 1, 2

*Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*,
 2024 WL 21971 (D. Nev. 2024) ................................................................. 18

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005) .................................................................................... 18

*Espy v. J2 Global, Inc.*,
 99 F.4th 527 (9th Cir. 2024) ....................................................................... 23

*Flynn v. Sientra, Inc.*,
 2016 WL 3360676 (C.D. Cal. 2016) ........................................................... 29

*FSP Stallion 1 v. Luce*,
 2009 WL 1219683 (D. Nev. 2009) .............................................................. 15

*George v. China Auto. Sys., Inc.*,
 2012 WL 3205062 (S.D.N.Y. 2012) ............................................................ 19

*Gera v. Palihapitiya*,
 2024 WL 3818602 (D. Ariz. 2024) ............................................................. 2

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
 63 F.4th 767 (9th Cir. 2023) ...................................................................... 24

*Glazer Cap. Mgmt., LP v. Magistri*,
 549 F.3d 736 (9th Cir. 2008) ..................................................................... 19

*Hefler v. Wells Fargo & Company*,
 2018 WL 1070116 (N.D. Cal. 2018) ........................................................... 11

*Hoang v. ContextLogic, Inc.*,
 2023 WL 6536162 (N.D. Cal. 2023) ........................................................... 9

*In re 3Com Sec. Litig.*,
 1999 WL 1039715 (N.D. Cal. 1999) ........................................................... 28

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

*In re Align Tech., Inc. Sec. Litig.*,
   2021 WL 1176642 (N.D. Cal. 2021), *aff'd sub nom. Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092 (9th Cir. 2022) ........................ 12

*In re Alphabet, Inc. Sec. Litig.*,
   1 F. 4th 687 (9th Cir. 2021) ................................................................. 23

*In re Bare Escentuals, Inc. Sec. Litig.*,
   745 F. Supp. 2d 1052 (N.D. Cal. 2010) ................................................. 28

*In re BofI Hldg., Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ................................................................ 18

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023), *cert. granted sub nom. Facebook, Inc. v. Amalgamated Bank*, 2024 WL 2883752 (U.S. 2024) ..................................... 5, 16, 17

*In re Galena Biopharma, Inc. Securities Litigation.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) ................................................. 20, 26

*In re Hansen Nat. Corp. Sec. Litig.*,
   527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................. 25

*In re Harmonic, Inc., Sec. Litig.*,
   2006 WL 3591148 (N.D. Cal. 2006) ....................................................... 30

*In re Intuitive Surgical Sec. Litig.*,
   2016 WL 7425926 ............................................................................... 18

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) .................................................... 21

*In re Mellanox Techs. Ltd. Sec. Litig.*,
   2014 WL 12650991 (N.D. Cal. 2014) ..................................................... 11

*In re Paypal Holdings, Inc. S'holder Derivative Litig.*,
   2018 WL 466527 (N.D. Cal. 2018) ......................................................... 4

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) ................................................................. 13

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) .............................................................. 16

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. 2013) ....................................................... 21

*In re Qwest*,
396 F. Supp. 2d 1178 (D. Colo. 2004)....................................................................20, 21

*In re Restoration Robotics, Inc. Sec. Litig.*,
417 F. Supp. 3d 1242 (N.D. Cal. 2019) .......................................................................13

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010) ..........................................................................18

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) .......................................................................................20

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) .........................................................................15

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ................................................................................21, 22

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) .......................................................................28

*Johnson v. Aljian*,
394 F. Supp. 2d 1184 (C.D. Cal. 2004) .......................................................................28

*Kairalla v. Advanced Med. Optics, Inc.*,
2008 WL 2879087 (C.D. Cal. 2008) ............................................................................22

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. 2020) .........................................................................17, 22

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .........................................................................................3

*Kolominsky v. Root, Inc.*,
100 F.4th 675 (6th Cir. 2024) ........................................................................................5

*Labs. Dist. Council Const. Indus. Pens. Fund v. Sea Ltd.*,
2024 WL 3708800 (D. Ariz. 2024)...................................................................13, 24, 25

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)........................................................................................................14

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ................................................................................20, 23

*Mineworkers' Pens. Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) .......................................................................................16

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ...................................................................................... 18

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America*
  *West Holding Corporation*,
  320 F.3d 920 (9th Cir. 2003) ...................................................................................... 20

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ............................................................................... 20, 21

*Ok. Firefighters Pens. & Ret. Sys. v. Ixia*,
  2015 WL 1775221 (C.D. Cal. 2015) ........................................................................... 19

*Omnicare, Inc. v. Labs. Dist. Council Constr. Indus. Pens. Fund*,
  575 U.S. 175 (2015) ............................................................................................... 8, 13

*Or. Pub. Emps. Ret. Fund v. Apollo Grp.*,
  774 F.3d 598 (9th Cir. 2014) ...................................................................................... 17

*Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pens. Plan*
  *v. First Solar Inc.*,
  2023 WL 4161355 (D. Ariz. 2023) .............................................................................. 24

*Petrie v. Elec. Game Card, Inc.*,
  2011 WL 13130015 (C.D. Cal. 2011) .......................................................................... 23

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020) ......................................................................... 30

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) .................................................................................... 23

*Prodanova v. H.C. Wainwright & Co.*,
  993 F.3d 1097 (9th Cir. 2021) .................................................................................... 19

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by City of*
  *Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...................................................................................... 24

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-*
  *Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ...................................................................................... 3

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ...................................................................................... 21

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

*Ryan v. FIGS, Inc.*,
2024 WL 187001 (C.D. Cal. 2024) ................................................................................ 30

*SEC v. SolarWinds Corp.*,
2024 WL 3461952 (S.D.N.Y. 2024) ................................................................................ 5

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........................................................................ 13

*Sherman v. Network Com. Inc.*,
346 F. App'x 211 (9th Cir. 2009) .................................................................................... 4

*Simpson v. AOL Time Warner Inc.*,
452 F.3d 1040 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d
1041 (9th Cir. 2008) ................................................................................................ 26, 27

*Singh v. 21Vianet Grp., Inc.*,
2017 WL 4322483 (E.D. Tex. 2017) .............................................................................. 27

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
243 F. Supp. 3d 1109 (E.D. Cal. 2017) ........................................................................ 30

*Stevelman v. Alias Rsch.*,
174 F.3d 79 (2d Cir. 1999) ............................................................................................ 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...................................................................................................... 24

*Tsirekidze v. Syntax Brillian Corp.*,
2009 WL 275405 (D. Ariz. 2009) .................................................................................. 29

*Veal v. Lendingclub Corp.*,
2020 WL 3128909 (N.D. Cal. 2020), *aff'd*, 2021 WL 4281301 (9th Cir.
2021) ............................................................................................................................... 4

*Voulgaris v. Array Biopharma Inc.*,
2020 WL 8367829 (D. Colo. 2020) ............................................................................... 25

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) ........................................................................................... 3

*Weston v. DocuSign, Inc.*,
669 F. Supp. 3d 849 (N.D. Cal. 2023) .......................................................................... 17

*Wochos v. Tesla*,
985 F.3d 1180 (9th Cir. 2021) ......................................................................................... 5

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

*York Cnty. ex. rel. Cnty. of York Ret. Fund v. HP Inc.*,
2024 WL 1327247 (N.D. Cal. 2024) ........................................................................... 17

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ..................................................................................... 22

## STATUTES

15 U.S.C. § 77k(a)(1) .................................................................................................... 30

15 U.S.C. § 78u-4(b)(2)(A) ........................................................................................... 18

## RULES

Rule 8............................................................................................................... 1, 2, 29

Rule 9(b) ................................................................................................... 1, 2, 26, 28

Rule 10b-5(a) ............................................................................................................ 26

Rule 10b-5(c) ............................................................................................................ 26

Rule 10b5-1 .............................................................................................................. 20

## REGULATIONS

17 C.F.R. § 229.105.................................................................................................... 5

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

# **INTRODUCTION**[1]

Plaintiffs' 320-page ACC violates this Court's order that any amendment be "clear and concise" and comply with the PSLRA, Rule 8, and Rule 9(b). Mot. at 10-12 (citing Dkt. 70 at 14, 17). The ACC's hundreds of pages amount to "recapitulation, boilerplate, and simply excess verbiage." *Cupat v. Palantir Techs., Inc.*, 2024 WL 1374903, at *2 & n.2 (D. Colo 2024). Nowhere in the ACC do Plaintiffs allege with particularity—or put Defendants on notice of—what they argue in hindsight:  a "pump-and-dump scheme."

There is no "pump," as Judge Coury already held in dismissing the state complaint that borrowed its allegations from this case. Even a cursory review of Judge Coury's decision belies Plaintiffs' argument that it is "wholly inapplicable." The state complaint pled a Securities Act claim arising out of the April 2022 offering based on the same title and registration delays, the same regulatory penalties, the same purported practice of buying low-quality cars despite the costs and logistics constraints, and the same post-April 2022 corrective disclosures—including the June 2022 *Barron's* article. And like the ACC, the state complaint failed even under Arizona's notice pleading standard. Hindsight pleading that ignores Carvana's disclosures and relies on de minimis penalties is not fraud.

There is also no "dump." Carvana's CEO (Garcia Jr.)—who made the bulk of the challenged statements and sits at the center of the so-called scheme—did not sell a single share. Plaintiffs have no fallback for scienter because they fail to allege a single fact suggesting that Garcia Jr. intended to mislead investors or conceal contradictory information when he, for example, described Carvana's strategy and online pricing, or signed filings reporting key metrics and material risks. The same is true for Carvana's CFO (Jenkins), who did not make a single trade outside a pre-determined trading plan, and even those trades were consistent with past practice and not timed to capitalize on the purported scheme. Plaintiffs are left with no strong inference of scienter for the Individual Carvana Defendants and thus for Carvana (whose scienter can only be imputed from its officers or

---

[1] Unless otherwise stated, capitalized terms have the same meanings as in the Motion to Dismiss (Dkt. 82), "¶_" references are to the ACC, citations omitted, and emphases added.

directors). And while they do not argue it, Plaintiffs also cannot reach Carvana through Garcia Sr. As Garcia Sr. explains, his trades were neither unusual nor suspicious—and in any event, his trades cannot show that any *Carvana Defendant* acted with scienter because Plaintiffs do not plead any particular facts suggesting Garcia Sr. was acting on Carvana's behalf.

Plaintiffs have taken a substantial stock decline that began in August 2021, halfway through the almost three-year Class Period, and they now seek to recover losses incurred on eight days with no explanation for the remainder of the 1.5 year-long decline. Securities lawsuits are not insurance for investor losses. The ACC should be dismissed with prejudice.

## ARGUMENT

The ACC is longer than the state version, but its hindsight theories are substantively the same and should be dismissed here too. The ACC is so long because Plaintiffs include argument rather than particular facts, and they repeat the same explanations for similar statements made over the course of almost three years without any attempt to explain either why a particular statement was misleading *when it was made*—or what a particular speaker or actor knew at the time and why they would have misled investors. The Opposition makes it worse by continuing to refer to "Defendants," instead of particular individuals, emphasizing different parts of the challenged statements, and repeatedly crying waiver—only further underscoring that Plaintiffs seek to survive their pleading burden through a puzzling game of gotcha. The ACC fails Rule 8's "plain and concise" command; it fails Rule 9(b)'s command to plead the particulars; and it fails the PSLRA's command to explain how a statement is misleading. This Court recently dismissed another complaint on grounds including puzzle pleading. *See Gera v. Palihapitiya*, 2024 WL 3818602, at *11-12 (D. Ariz. 2024); *Cupat*, 2024 WL 1374903, at *2 n.2. The same outcome is warranted here.

## I.    PLAINTIFFS FAIL TO PLEAD ANY EXCHANGE ACT CLAIM.

### A.    Plaintiffs Fail to Plead Falsity.

Plaintiffs cannot avoid the heightened pleading standard applicable to securities fraud claims. Opp. at 2 (arguing they need not allege contradictory facts). As the Ninth

Circuit has repeated, "[f]alsity is alleged when a plaintiff points to [the] defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). The PSLRA does not, as Plaintiffs suggest, Opp. at 2, lower the bar for misleading (as opposed to untrue) statements. The way a plaintiff pleads an "impression of a state of affairs that differs in a material way from the one that actually exists," *id.*, is by identifying omitted facts that contradict—or are inconsistent with—the statements. *See, e.g.*, *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 622 n.5 (9th Cir. 2022) (affirming dismissal where statement "uncontradicted by any of the plaintiffs' allegations"); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006-07 (9th Cir. 2002) (no claim where omission "consistent with" statement).

Undoubtedly, Plaintiffs seek to avoid the heightened standard because the omissions on which they rely are so attenuated from the challenged statements that no investor would have been led astray. This Court already warned Plaintiffs to plead "corresponding adverse facts," Dkt. 70 at 17, and the ACC should now be dismissed with prejudice.

### 1.      Title and Registration (Statements 1-8)

**<u>Risk Disclosures</u>**. The risk disclosures did not materially mislead investors without disclosing violations, Opp. at 22 (identifying omitted penalties), because the alleged omissions were not material; the risk disclosures were not misleading without them; and the risk disclosures were forward looking and are immune from challenge.

First, materiality *can be* resolved on a motion to dismiss, just as the state court did, where, as here, there are *no* factual allegations that already-incurred penalties would have "significantly altered the total mix of information." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274, 1277 (9th Cir. 2017) (too low a materiality standard "would bury the shareholders in an avalanche of trivial information"). Plaintiffs do not, for example, quantify the impact of the North Carolina penalty (which still allowed sales in the state) or explain how it could otherwise be material—particularly given that it was *publicly* reported and *discussed* with investors, Ex.

13.[2] For Ohio, Plaintiffs do not allege any financial impact from the temporary tag suspension or "increased oversight." Opp. at 22. For Michigan and Texas, fines of "thousands of dollars" are patently de minimis, *id.*, and Plaintiffs allege no financial impact, let alone a material one, from the May 2022 suspension of an Illinois license or the October 2022 suspension of a Michigan license—which in any event both post-date the challenged statements.[3] Individually or cumulatively, Plaintiffs fail to plead how these penalties "affected the company's financial statements and whether they were material in light of the company's overall financial position," *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 754-56 (D. Ariz. 2022) (dismissing on materiality grounds), particularly given the company's $14 billion in annual revenues, Ex. 33 at 63. *See also Sherman v. Network Com. Inc.*, 346 F. App'x 211, 213 (9th Cir. 2009) (recognizing that "[i]nvestors do not change their minds over these kinds of sums").

Plaintiffs' fallback is that Carvana should have disclosed it was "*systematic[ally]*" violating the law. Opp. at 22. That accusation is unsupported. Not a single CW suggests Carvana was violating the law, rather than addressing delays associated with DMVs "falling behind in their workload during the pandemic," ¶¶ 64-65, 74, and certainly no CW alleges any financial impact. *See Bajjuri*, 641 F. Supp. 3d at 756. Nor did Carvana have to accuse itself of "uncharged, unadjudicated wrongdoing." *See In re Paypal Holdings, Inc. S'holder Derivative Litig.*, 2018 WL 466527, at *3 (N.D. Cal. 2018).

Second, "read in context," the risk disclosures "cannot be understood as a guarantee that" Carvana had not been subject to regulatory investigations or penalties. *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 405-06 (S.D.N.Y. 2020); *see also Veal v. Lendingclub Corp.*, 2020 WL 3128909, at *8 (N.D. Cal. 2020), *aff'd*, 2021 WL 4281301 (9th Cir. 2021). The challenged statements are in the Risk Factor section of Carvana's

---

[2] Plaintiffs' "truth on the market" attempt to avoid disclosures of regulatory violations is not well taken, given that *Plaintiffs* allege those disclosures, including on the North Carolina penalty and in the *Wall Street Journal*, impacted the stock price. ¶¶ 311-13, 329.
[3] Plaintiffs also concede that the Michigan proceedings were public, and they continue to ignore that the Michigan judge *found no risk of harm* precisely because the suspension did not restrict all sales in the state. Mot. at 15; *see* Opp. 23 n.16.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- 4 -

filings and were required to warn investors of *risks—i.e.*, the possibility of *future* harm. *See* 17 C.F.R. § 229.105. Carvana *disclosed* the "known risk of business harm," Opp. at 23 n.17, namely, the risk of operating their ecommerce nationwide business model "subject to a wide range of evolving federal, state, and local laws and regulations." *E.g.*, ¶ 174. It also disclosed that it was obtaining dealer's licenses even where not required for the purpose of "invest[ing] in relationships with state regulators." Ex. 18 at 15. The securities laws do not require a company to bury investors in an avalanche of de minimis regulatory incidents, particularly where Carvana "had already disclosed the likelihood of these as . . . a fact of life." *SEC v. SolarWinds Corp.*, 2024 WL 3461952, at \*37 (S.D.N.Y. 2024).

Finally, Plaintiffs have no answer to the safe harbor and bespeaks caution doctrine. *See Kolominsky v. Root, Inc.*, 100 F.4th 675, 687-89 (6th Cir. 2024) (risk factors were protected as forward-looking statements). Plaintiffs are not challenging statements about "then-current title and registration requirements," Opp. at 25, but instead about Carvana's *warning* that legal violations "could" materially harm the company. *E.g.*, ¶ 175. If there were any doubt, Carvana specifically described the risk disclosures as forward looking. Ex. 18 at 1. The risk disclosures therefore are protected as forward-looking: (1) the disclosures themselves are cautionary language, *see Kolominsky*, 100 F.4th at 689, and independently, (2) Plaintiffs do not attempt to show Garcia Jr. or Jenkins (who signed the filings) made the statements with actual knowledge of their falsity. Mot. at 17; *see also Wochos v. Tesla*, 985 F.3d 1180, 1193-94 (9th Cir. 2021) (statements including risk disclosures protected).[4]

**Statement 4**. Plaintiffs admit that the undisclosed facts they are complaining about are the de minimis Ohio and Michigan penalties and CW allegations of delays supposedly "known to Defendants." Opp. at 26. But Plaintiffs do not point to any facts suggesting either Jenkins (or non-defendant Levin) knew about those penalties or had any contact with CWs—which alone defeats their claim. *See City of Hollywood Firefighters Pens. Fund, v.*

---

[4] *Cf. In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 956 (9th Cir. 2023), *cert. granted sub nom. Facebook, Inc. v. Amalgamated Bank*, 2024 WL 2883752 (U.S. 2024) (risk disclosures actionable where cautionary language did not meaningfully warn of risk of data misuse and plaintiffs alleged actual knowledge of data misuse and ensuing harm).

*Atlassian Corp.*, 2024 WL 3823801, at \*5 (N.D. Cal. 2024). In addition, the purportedly omitted penalties and delays are entirely consistent with what Jenkins (and Levin) said. Statement 4 speaks for itself when Jenkins described the North Carolina vending machine ban as "a relatively sort of unusual approach" and "unprecedented." Plaintiffs allege no facts suggesting Ohio or Michigan (or any other state) had "asked us to stop delivering cars from the vending machine." ¶ 180. In contrast, when Jenkins and Levin spoke about delays, both made clear they were an issue "in every single state." *Id.*; Ex. 13 at 5 (full context).[5]

**Statement 8**. Plaintiffs do not point to any particular facts—rather than conclusory assertions—that more than a "small percentage" of Carvana's customers, who in 2021 alone purchased 425,237 cars, experienced delays beyond "the time frame set forth by the respective states" for permanent license plates or transferred title. ¶ 188; Ex. 18 at 56. Not a single CW alleges any facts about delays *outside the time period prescribed by states' laws*, and like the state court plaintiff, Plaintiffs "do[] not allege that these delays were impermissibly long" or allege why the fact that "a few hundred customers, at most, allegedly suffered months-long delays" "would be important to a reasonable investor given the totality of information available." Dkt. 63, Ruling, "*Warwick II*," *Warwick Ret. Sys.*, CV 2022-013054, at 22 (Oct. 26, 2023). Plaintiffs also fail to respond to the ACC's failure to identify a single material fact that *both existed and remained undisclosed* at the time of Statement 8, Mot. at 18, which itself appeared in an article *discussing* Carvana's regulatory challenges (the June 2022 *Barron's* Article). Ex. 24.

### 2. Buying Cars from Customers (Statements 9-18)

**Statements 9, 11, 13, 15, 17, 18**. Plaintiffs claim Carvana's description of its online pricing was misleading because Carvana did not rely on quality at all and instead, supposedly without disclosing it, "'intentionally bought lower quality cars'" that were sold wholesale. Opp. at 29. Plaintiffs' argument is meritless.

---

[5] Plaintiffs also point to an analyst's "optimis[m] that [the NC vending machine ban] will be an isolated incident," Opp. at 26-27—but even with the benefit of 20/20 hindsight, the analyst's optimism was not a misimpression. Plaintiffs allege just two dealer license suspensions over the next two years. Opp. at 22.

At the threshold, Carvana did not say it bought *only* the most in-demand and profitable vehicles; it said it relied on factors including "quality," "consumer desirability," and "expected reconditioning costs" as a proxy for how in-demand and profitable a car would be—and so how much to offer. *E.g.*, ¶ 191. Plaintiffs do not allege that Carvana made its offers in any other way. Nor do Plaintiffs allege that Carvana offered a *higher* price for cars that it believed were *less* in-demand or *less* profitable.

Ignoring this context, Plaintiffs argue in their Opposition (but not in the ACC) that when Carvana said it identified "what we believe represent the most in-demand and profitable vehicles," Opp. at 29, Carvana misled investors into believing that Carvana did not buy *low quality* cars, which Plaintiffs complain were less profitably sold at wholesale. To the extent Plaintiffs now challenge this "believe" clause, their challenge fails because it is an opinion statement and Plaintiffs do not plead a single fact connecting Garcia Jr. or Jenkins to this statement (other than signing the SEC filings), or suggesting they did not believe it to be true. Regardless, not only does Plaintiffs' falsity theory impermissibly read one clause out of its context—how Carvana determined an offer price—but it also ignores Carvana's disclosures of its business strategy in the same challenged SEC filings, earnings calls, and shareholder letters. No investor could have believed that Carvana did *not* have a strategy of buying lower quality vehicles and selling them wholesale, when Carvana consistently disclosed that it *was doing exactly that*. *Warwick II* at 16-17 ("Carvana repeatedly disclosed its strategy of increasing the purchase of cars from its customers . . . [and] that it purchased lower quality cars that it sold to wholesalers."); *see also*, *e.g.*, Ex. 7 (2020 10-K) at 60-61. Plaintiffs supply zero allegations suggesting that buyers at wholesale auctions did *not* "demand" the lower-quality cars that Carvana sold. And Carvana's fulsome wholesale disclosures directly rebut Plaintiffs' repeated assertion that Carvana did not disclose "a flood of wholesale car [sales]." Opp. at 29.

Plaintiffs insist that Carvana's wholesale sales were not the "most profitable." Opp. at 30. But again, Carvana did not say it was buying only the most profitable cars—it repeatedly disclosed a strategy of buying more *from customers* to expand its inventory and

sell at both retail and wholesale. *Warwick II* at 16-17. It's not true that wholesale cars were sold "at a loss,"[6] but it's also beside the point because Carvana said it was identifying the cars it believed to be the *most* profitable. It did not guarantee profits; it said that buying cars from customers was *more profitable than* buying cars *from an auction. E.g.*, Ex. 18 (2021 10-K) at 55 ("We plan to grow the number of vehicles that we purchase from our customers . . . which are more profitable *compared to the same vehicle acquired at auction.*"). Plaintiffs complain that Carvana included certain logistics expenses in SG&A rather than in its cost of sales figures, but as discussed *infra*, Carvana was not required to include expenses where Plaintiffs preferred, and in any event, Plaintiffs fail to allege any facts showing expenses would have been less if only Carvana had bought different cars.

**Statements 10, 12, 14, 16**.[7] These car-buying statements are all inactionable opinions and puffery, not only because Defendants repeatedly said, "I think," but also because Plaintiffs do not identify a single fact suggesting any Defendant did not believe Carvana's strategy was successful at the time. ¶¶ 198, 206. Plaintiffs make a conclusory argument that Statements 10, 14, and 16 were "capable of objective verification" (waiving the argument for Statement 12), Opp. at 31, but fail to provide any explanation of how statements like "we've seen a lot of success" or "performed very well" could be objectively verified, Mot. at 21. Nor do Plaintiffs meaningfully contest that the statements were opinion or attempt to show they were actionable under *Omnicare*. Opp. at 31. An opinion "is not misleading simply because the issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare, Inc. v. Labs. Dist. Council Constr. Indus. Pens. Fund*, 575 U.S. 175, 176 (2015).

---

[6] There are numerous flaws in Plaintiffs' invented "total expenses" figure suggesting Carvana sold its wholesale vehicles at a loss, *e.g.*, it incorrectly assumes operations expenses for wholesale and retail vehicles are identical, and that all operations expenses are "per-vehicle" expenses. ¶ 210(c)(ii).

[7] Plaintiffs repeatedly attempt to defend their claims on the grounds that Defendants supposedly waived an argument by not responding to a particular phrase in their 300-plus page ACC. This only underscores the ACC is a puzzle pleading because if, as Plaintiffs claim, Defendants missed a few words buried within, then Defendants are not on notice of Plaintiffs' claims. In any event, nothing is waived. On Statement 10 in particular, Defendants argued that Statement 10 did not create any misleading impression, Mot. at 20-21, and that Carvana disclosed its operational constraints, Mot. at 5-7, 24.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

Even if the statements were actionable, Plaintiffs do not identify facts inconsistent with what Defendants said. Plaintiffs do not contest that Carvana in fact had "seen a lot of success" in wholesale and had capacity to sell wholesale at the time of Statement 10 (Feb. 25, 2021)—indeed, Carvana disclosed that wholesale vehicle sales had *increased* from 39,895 to 55,204 year-over-year at the time. Ex. 7 at 60. Nor do Plaintiffs plead customers were not Carvana's "#1 channel for sourcing inventory" at the time of Statement 12 (May 6, 2021), or that the number of cars bought from customers had not "massive[ly] increase[d]" at the time of Statement 14 (August 5, 2021). Plaintiffs insist that Carvana lied when it said buying cars from customers gets us a higher-quality inventory in Statement 16 (November 4, 2021), on the theory that Carvana was buying lower-quality cars. But the fact that Carvana was buying cars to sell wholesale does not mean it was not *also* buying high quality cars from customers that it sold retail. At the time of Statement 16, Carvana's retail sales had increased from 15,375 in Q3 2020 to 50,204 in Q3 2021. Ex. 15 at 16.

### 3.    Retail Unit Sales Growth (Statements 19-20)

Plaintiffs challenge descriptions of factors driving growth ("strong demand for our offering" and "rapid growth within our market cohorts"), ¶¶ 212, 214,[8] arguing that growth was driven by five undisclosed "artifices." Opp. at 31-32. Their claim is meritless.

At the outset, there is not a single fact alleged suggesting that "strong demand" and Carvana's "rapid growth" were not driving its increasing sales figures, which alone defeats their claim. *Brody*, 280 F.3d at 1006; *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *12 (N.D. Cal. 2023) (rejecting as "conclusory" allegations "that the increases were not 'primarily' caused by brand quality").[9] Indeed, Plaintiffs' "artifices" are *consistent* with "rapid growth" and "high demand" (*e.g.*, expanding into new regions and pursuing less profitable sales). *Alich v. Opendoor Techs. Inc.*, 2024 WL 839146, at *6 (D. Ariz. 2024) ("*Alich I*") ("practices were . . . consistent with the Opendoor Defendants' public

---

[8] Plaintiffs abandon any argument that the retail unit figures themselves were misleading. *See* Mot. at 21 (citing authority showing accurate historical results are inactionable).
[9] Plaintiffs' cited cases (Opp. at 31-32) involved concealed and illegitimate practices that unambiguously and quantifiably fueled earnings and growth, therefore making statements attributing success to other factors misleading.

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

statements").

Plaintiffs also fail to allege facts establishing that any of their five "artifices" were the real primary drivers of Carvana's sales figures. Opp. at 31. As to the first, not only is the "flouting title and registration laws" artifice unsupported, *see* Section I.A.1.a, *supra*, but Plaintiffs themselves allege that certain penalties *restricted* sales (*e.g.*, the North Carolina vending machine ban). ¶ 148(a). Plaintiffs also identify only *post-sale* title and registration processing delays. *E.g.*, ¶ 189. On the second, the fact that some sales were "less profitable" does not suggest the sales did not exist, and Carvana repeatedly told investors that it "ha[d] aggressively invested in the growth of our business," "[w]e anticipate that our operating expenses will increase substantially," and "[w]e expect to continue to incur losses as we invest in and strive to grow our business." *E.g.*, Ex. 7 (2020 10-K) at 18, 55; Ex. 18 (2021 10-K) at 18, 56. For the third, Plaintiffs do not explain how "increas[ing] trade-ins" was artificially inflating *sales*, and certainly buying lower-quality cars has no connection to *retail sales*, given Plaintiffs' own allegations that lower quality was sold *wholesale*. *E.g.*, Opp. at 10 ("By purchasing low-quality cars from customers, Defendants were forced to sell those cars wholesale at a loss."). The fourth about "artificially lowering prices" does not appear in the ACC. *Contra* Opp. at 31 (citing ¶¶ 213, 215). And Plaintiffs' "sham pass-through arrangement" is without factual basis. Not a single CW mentions DriveTime transactions, and Plaintiffs do not explain why Carvana was prohibited from including DriveTime sales in its sales figures, when those sales indisputably took place and as disclosed, Carvana *generated revenues* on them through financing and ancillary products, including commissions on VSCs. Mot. at 23; Ex. 18 (2021 10-K) at 68-69. Plaintiffs' response that "DriveTime administered many of Carvana's ancillary products," Opp. at 32-33, is beside the point, because Plaintiffs do not and cannot allege that Carvana did not generate revenue from those ancillary products.

Plaintiffs also do not quantify the alleged impact of any of the artifices to allege any was a "material driver" of sales growth. *City of Sunrise Firefighters' Pens. Fund v. Oracle Corp.*, 2019 WL 6877195, at *15-16 (N.D. Cal. 2019) (no claim where plaintiff did not

plead "volume of sales generated" via purportedly undisclosed sales practices). Plaintiffs only repeat their bizarre calculations that DriveTime transactions accounted for "660% of sequential retail unit sales growth," Opp. at 16, 33, but the Motion explained how their calculations were based on a confusion of "total expenses" with "costs of sales," Mot. at 23 n.19, to which Plaintiffs offer no meaningful response. Opp. at 33 n.32.

Independently, both challenged statements provided vague positive descriptions of, *e.g.*, "strong demand for our offering" or "enhanced marketing efforts," which were puffery. Mot. at 22. Plaintiffs' cited authority, *Hefler v. Wells Fargo & Company*, is inapplicable because that case involved statements attributing growth to a specific business practice. 2018 WL 1070116, at *6-7 (N.D. Cal 2018) (statements attributed company's success to cross-selling strategy which was misleading in light of inflated cross-selling metrics). Statements 19 and 20 attributed Carvana's retail unit sales growth to generic concepts such as "demand" rather than any particular practice. ¶¶ 212, 214; *see In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *8-9 (N.D. Cal. 2014) (statements that "strong quarterly revenue growth reflects the increased penetration of [products] in new markets" and growth "demonstrates the broader market acceptance" "constitute non-actionable, vague, unspecific assertions of corporate optimism").

### 4.      Nationwide Expansion (Statements 21-29)

Plaintiffs argue that Carvana "touted [its] expansion into new markets" through a "capital-light" expansion model, without disclosing that sales in the new markets "were not profitable" and imposed additional costs. Opp. at 33-34. Once again, Plaintiffs ignore what Carvana said. Carvana never said its expansion was *currently* profitable or costless. In fact, it said the opposite. *E.g.*, Ex. 7 (2020 10-K) at 18, 55 ("We have not been profitable since our inception . . . and expect to continue to incur losses as we invest in and strive to grow our business."); Ex. 18 (2021 10-K) at 18, 56 (same). Nor did Carvana's "capital-light expansion" phrase suggest that sales in those new markets would incur no logistics costs (which are *not* capital costs), just that Carvana's expansion required relatively less physical infrastructure than traditional dealers. *E.g.*, Ex. 7 (2020 10-K) at 6-7. And again,

Carvana disclosed those costs. *Warwick II* at 17-18; *see e.g.*, Ex. 7 (2020 10-K) at 62 (disclosing costs associated with "transportation fleet" and "third party transportation").

Plaintiffs point to purported "admi[ssions]," including the ADESA purchase halfway through the Class Period and Carvana's disclosed change of business strategy in 2022, Opp. at 34, but neither suggests that any statement was false or misleading *at the time it was made*—namely, when Carvana was openly pursuing growth as its #1 objective.

In any event, the challenged statements are all inactionable. Plaintiffs have *no response* to the fact that seven of the nine statements report accurate data. Mot. at 23. Plaintiffs argue that Statements 24, 26, and 29 are not puffery because they are "verifiable" "factual representation[s]" but make no attempt to explain how these statements can be objectively evaluated. Opp. at 35. For example, Plaintiffs do not define what makes a business "capital-light" versus "capital-heavy" and why Carvana, despite its undisputed ecommerce model, somehow fell into the latter category. Plaintiffs argue that Defendants' puffery statements are actionable based on an analyst interpretation, Opp. at 34, but such interpretations "cannot transform corporate optimism into a securities violation." *In re Align Tech., Inc. Sec. Litig.*, 2021 WL 1176642, at *4 (N.D. Cal. 2021), *aff'd sub nom. Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092 (9th Cir. 2022). Nor do Plaintiffs allege any particular fact suggesting that Garcia Jr. did not believe his statement about "launching the Pacific Northwest." ¶ 228; Opp. at 35. Plaintiffs argue that Garcia Jr. knew Carvana would "incur all the cost associated with shipping the cars out there," but they do not and cannot explain why that makes his opinion statement—which did not speak about costs or shipping—actionable. *Id.*

### 5. Aged Inventory (Statements 30-32)

Plaintiffs admit that "the law requires" statements to be "read in context," Opp. at 26, but then ignore their own instruction. The challenged statements explained why Carvana *stopped* reporting its ADTS metric in Q1 2021, and a reasonable investor would not have read Carvana's statements as *continuing to report* that metric. Mot. at 25. That is the context in which investors would have read it. *Cf. Labs. Dist. Council Const. Indus.*

*Pens. Fund v. Sea Ltd.*, 2024 WL 3708800, at *12 (D. Ariz. 2024) ("Defendants' statement announcing Sea's shift to annual GMV disclosures did not affirmatively create an impression regarding the state of Shopee's GMV—Defendants' statement merely announced a business change."). Plaintiffs have no response to this point. Opp. at 36-37.

Even if Carvana's statement could be read as continuing to report the ADTS metric, Plaintiffs do not grapple with the fact that Carvana referred only to the "relative stability" of the metric "in recent *years*," Mot. at 24-25, yet their complaint is about quarterly fluctuations. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1144 (N.D. Cal. 2017) (no misstatement where data was consistent with statements). Carvana's statement is unlike the statement in *Sea Ltd.*, which directly spoke about "relatively stable *quarter-on-quarter*" metrics, despite a significant quarter-on-quarter drop. 2024 WL 3708800, at *7-8.

Plaintiffs also argue that statements expressing judgments about the "relative stability" of the ADTS were not opinions because "they include no qualifying language." Opp. at 37 (citing *Omnicare*, 575 U.S. at 183-88). But "language like 'we believe' or 'we think' is *sufficient*—not *necessary*—to render a statement one of opinion rather than fact. Indeed, the [Supreme] Court went on to clarify that where a statement expresses an 'inherently subjective . . . assessment,' that is *also* sufficient." *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023).

With respect to the "more important metric" clause, Plaintiffs argue it was misleading to describe the number of IRCs that way because it was not an "appropriate replacement" for the ADTS metric and allegedly was less "useful to evaluating Retail GPU." Opp. at 36. But Plaintiffs' views about the adequacy of the metric are not sufficient to plead falsity. *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1258 (N.D. Cal. 2019) ("[I]t is Plaintiff's burden to show falsity, not inadequacy."). Moreover, Carvana simply never described the number of IRCs as *equivalent to* the ADTS metric: rather, Carvana offered the *different* IRC metric because it was "more important . . . due to the impact of IRC capacity on retail units sold," *e.g.*, ¶ 238, reflecting Carvana's increased focus on expanding its production capacity, Mot. at 25. Carvana never suggested the IRC

metric was more "useful to evaluating Retail GPU."

Plaintiffs have no meaningful response to Carvana's disclosures. Plaintiffs allege that Carvana's ADTS statements obscured a "glut of aging inventory," *e.g.*, ¶ 239(c)(i), but Carvana made extensive disclosures about those very facts, Mot. at 25. Plaintiffs complain that ADTS "cannot be determined by the number of cars on all Carvana lots," Opp. at 37, but Carvana had no obligation to continue disclosing the ADTS metric. As the state court held, Carvana's disclosures ensured that "a reasonable investor would understand that Carvana's storage lots and IRCs were filling up" by early 2022. *Warwick II* at 17-18.

### 6. Carvana's Retail GPU (Statements 33-39)

Plaintiffs claim that Carvana's reported Retail GPU metric hid the "truth" that "Carvana's retail sales had negative unit economics and, thus, [was] consistently unprofitable." Opp. at 37-38. But, their argument still boils down to disagreement with how Carvana should have calculated its Retail GPU, which does not state a claim. Mot. at 26. Plaintiffs' Opposition narrows the ACC's 70 pages of jumbled verbiage to three omitted facts: (1) Defendants internally viewed operations expenses as a "key" part of Carvana's "unit economics" and those expenses were never separately broken out for investors; (2) Defendants "buried and comingled" operations expenses in SG&A; and (3) "the operations expenses were direct 'expenses associated with completing retail . . . sales.'" Opp. at 38.

As to the first, Plaintiffs point to a post-Class Period document explaining that Defendants viewed operations expenses as "key" to reducing costs at that time. Opp. at 38. That does not show that the challenged Retail GPU metrics were *misleading at the time* they were reported—which was also a time Carvana was openly pursuing a growth strategy. And nothing in the Retail GPU metric suggested that operations expenses *were included*. Even post-Class Period, Carvana did not suggest that those expenses should be included within Retail GPU. Mot. at 27. Rather, post-Class Period, Carvana transparently provided *additional cost breakdowns*. But being transparent with additional details does not mean those details were previously required. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (no standalone duty to disclose even "material information").

Defendants also never "buried" anything. Opp. at 38. As Plaintiffs concede, "Defendants could choose how to calculate Carvana's Retail GPU metric and whether to categorize certain expenses as SG&A, so as to exclude them from the Retail GPU metric it touted to investors." ¶ 246; Opp. at 39. No investor could have believed Retail GPU included costs associated with outbound logistics and title registration costs when Carvana expressly stated that those costs were captured elsewhere, in SG&A. Mot. at 26; *see, e.g.*, Ex. 15 (Q3 2021 Shareholder Letter) at 17; Ex. 18 (2021 10-K) at 62.[10] Plaintiffs have not alleged any facts suggesting that Defendants calculated Retail GPU differently at any time.[11] *Cf. FSP Stallion 1 v. Luce*, 2009 WL 1219683, at *6 (D. Nev. 2009) ("Plaintiffs allege Defendants had in their possession but did not disclose the PWC Appraisal and the internal budget which contained materially different calculations of [financial metrics]").

As to the third, Plaintiffs' argument that operations expenses were direct expenses is simply another species of its argument that Carvana should have calculated the Retail GPU metric differently, which it had no obligation to do. Plaintiffs also now flip flop even on *which* operations expenses should have been included. No longer do they argue for all of them, *cf.* ¶¶ 260(a),(e)(iii), but instead they now *admit* that not "all" operations expenses should have been reported in the GPU metric, Opp. at 41 n.42, because even under their theory, some operations expenses are admittedly not attributable to individual unit sales.

In any event, the challenged statements are not actionable. Plaintiffs do not

---

[10] Plaintiffs' cited cases do not show that Defendants had to disclose its calculations any differently. *Acadia* involved disclosures made at specific healthcare conferences which the court found not "necessarily transmitted to the market with the same intensity as Defendants' allegedly misleading statements." *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms.*, 2023 WL 1769810, at *6 (S.D. Cal. 2023). Here, Defendants disclosed the components of its metrics within each of the very SEC filings and shareholder letters that were disseminated in conjunction with the challenged earnings call statements. *E.g.*, Ex. 17 (Q4 2021 Shareholder Letter) at 23. And unlike in *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 938-39 (N.D. Cal. 2022), Carvana's disclosures of the components of its Retail GPU figure and its SG&A figure, and that it was not profitable, quite literally said what Defendants argue they disclosed—no inferences or greater specificity was required.
[11] Plaintiffs, with no source attributed, repeatedly quote Garcia Jr. acknowledging a connection between profitability and "underlying costs of completing a sale," *see, e.g.*, ¶¶ 248(c), 250(c), 252(c), 254(c), 256(c), 258(c), 260(c), but allege no facts showing that "underlying costs of completing a sale" referred to operations expenses, especially *post-sale* outbound logistics expenses.

challenge the accuracy of reported Retail GPU, Opp. at 41 n.43, or argue that language like "strong quarter" and "feel really great about our retail GPU progress" are not quintessential puffery. For the forward-looking statements, *e.g.*, Statement 36 ("that's a tailwind to retail GPU as we move towards 2Q"), Plaintiffs argue they also discuss then-existing facts. Opp. at 41. But Plaintiffs do not and cannot dispute that the *forward-looking* portions are protected, as their own case law makes clear, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017), and they do not argue a lack of cautionary language or plead facts showing the speakers' knowledge of actual falsity.

### B.    Plaintiffs Fail to Plead Loss Causation.

### 1.    Carvana's Disclosures Regarding Its Financial Condition

Plaintiffs run away from their allegations that beginning in April 2022, disappointing financial news somehow "revealed" Defendants' alleged fraud. *E.g.*, ¶ 314. But those 2022 and 2023 financial disclosures plainly did not disclose anything about, *e.g.*, the ADTS metric or DriveTime transactions, or anything about 2020 and 2021 business strategies. Plaintiffs argue they need only point to "negative economic conditions caused by the scheme." Opp. at 58. That argument fails because Plaintiffs allege only *negative economic conditions*, without any allegations showing that those conditions were *caused by* any alleged fraud. *Mineworkers' Pens. Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) ("*First Solar I*"), did not hold, as Plaintiffs misleadingly suggest, that merely pointing to an earnings miss suffices to plead loss causation. Opp. at 58. Rather, Plaintiffs had to allege particular facts showing that the challenged fraud "foreseeably caused the plaintiff's loss," *First Solar I*, 881 F.3d at 754—and pointing to a "disappointing" "earnings performance alone cannot satisfy" Plaintiffs' burden. *In re Facebook*, 87 F.4th at 956; *see also Bajjuri*, 641 F. Supp. 3d at 771 ("Without specific, particularized allegations connecting Plaintiffs' theory of pervasive fraud and the stock drop after the DOJ investigation disclosure, Plaintiffs fail to plead loss causation even under the broadest

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- 16 -

proximate cause test.").[12]

Plaintiffs argue in conclusory fashion for each disclosure of disappointing financial news that "Defendants' fraud contributed to" it. Opp. at 58-59. But the Opposition does not point to any particular facts supporting the point (because there are none). *Or. Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action, including loss causation."); *cf. In re Facebook*, 87 F.4th at 956 (describing particular allegations of "causal relationship"). Nothing in the financial news has any alleged causal connection to allegations of fraud, including ADTS or other metrics or DriveTime transactions, particularly dating back to 2020 or 2021. Plaintiffs insist that corrective disclosures can be divorced temporally from the alleged fraud. Opp. 60 n.74. But not only are these disclosures divorced temporally but Plaintiffs "fail to connect" them *in any way* to the facts about which Defendants "allegedly lied." *Bajjuri*, 641 F. Supp. 3d at 771. Plaintiffs are flatly wrong that analysts "note[d] the probable relationship between the alleged fraud and a stock price decline," Opp. at 61—at best, certain analysts merely agreed with Plaintiffs' hindsight opinion that Carvana should have focused on profitability sooner. *E.g.*, ¶ 318. Moreover, even before Plaintiffs' first alleged disclosure of disappointing financial news, Carvana had already *warned investors* that slowing sales and mounting expenses would impact upcoming results, Ex. 17 at 3-4, 14-15, and so even the first time, it was old news. *See Alich I*, 2024 WL 839146, at *15 (no loss causation where announcement "merely confirmed a previous disclosure").

### 2.   Media Reports Regarding Regulatory Actions

Plaintiffs do not contest that the media reports are not alleged to have corrected any

---

[12] Plaintiffs' cited cases similarly underscore how plaintiffs relying on a theory that poor results were caused by a still-concealed fraud face a high bar for specifying a direct causal connection. *York Cnty. ex. rel. Cnty. of York Ret. Fund v. HP Inc.*, 2024 WL 1327247, at *21 (N.D. Cal. 2024) (defendants' "acceleration" scheme of offloading inventory to partners at steep discounts directly caused inventory corrections and lower revenues); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 862, 887 (N.D. Cal. 2023) (defendants misrepresented "sustainability of DocuSign's COVID-19 pandemic-driven growth" and earnings miss was directly due to admitted "underestimat[ion]" of COVID demand); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *5, 17 (C.D. Cal. 2020) (defendants' fraudulent scheme involved violating their contract with USPS and was directly tied to revenue losses flowing from USPS's discovery of such violations).

statements other than those relating to title and registration. Mot. at 30. Nor did they reveal "new" information, as Carvana's title and registration challenges had long been reported. *See* Section I.A.1.a, *supra*. Plaintiffs respond by pointing to specific penalties in news reports, Opp. at 63-64, but new information must be of a kind "that has not yet been incorporated into the [stock] price," as Carvana's regulatory challenges were. *In re BofI Hldg., Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).

Plaintiffs also have no answer to their failure to allege that, *in context*, the "share price fell significantly after the truth became known." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Absolute numbers do not help them; context is what matters. *Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*, 2024 WL 21971, at *11 (D. Nev. 2024) (determinations of a "significant drop . . . will vary depending on the average trading range for the particular stock"); *City of Fort Lauderdale Gen. Emps.' Ret. Sys. v. Edison Int'l*, 786 F. App'x 685, 686 (9th Cir. 2019) ("no indication . . . that the [stock price] drop plausibly reflected the 'market's concerns' about the investigation announcement"). In this case, the context is a total alleged stock price drop of $368.82, while the four disclosures on which Plaintiffs rely *cumulatively* account for a drop of only $15.81, falling as little as 1.38%, and on days with particularly *low* trading volume. Even crediting Plaintiffs' multi-day trading windows,[13] that fails to establish the necessary "correlation between 'revealed' facts and a decline in [Carvana's] stock price." Mot. at 31 (quoting *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 599-600 (S.D.N.Y. 2010)).

### C.   Plaintiffs Fail to Plead a Strong Inference of Scienter.

The Opposition confirms that Plaintiffs' allegations do not raise the requisite "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). This stringent pleading requirement has "teeth." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020). Yet the Opposition

---

[13] Courts have rejected multi-day loss causation windows because the efficient market that Plaintiffs rest their claims on, ¶ 395, "is said to digest or impound news into the stock price in a matter of minutes." *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14 (N.D. Cal. 2016) (two-day loss causation window inappropriate even where disclosure occurred five minutes before market close). The ACC alleges no unusual circumstances. Indeed, the timing of the "disclosures" here do not even present a close call. All relevant disclosures took place either before market open or after market close. App'x. B.

does not identify allegations pleading that Garcia Jr. or Jenkins had a plausible motive to commit fraud, let alone made any particular statement, or engaged in any particular act, "with an intent to deceive, manipulate, or defraud, or with deliberate recklessness," *Prodanova v. H.C. Wainwright & Co.*, 993 F.3d 1097, 1106 (9th Cir. 2021). For the same reasons, Plaintiffs fail to allege that Carvana acted with scienter. *See id.* at 1108 (a "corporation can only act through its employees").[14]

a.   <u>**Plaintiffs Do Not Allege a Motive to Commit Fraud.**</u>

Plaintiffs insist that Garcia Jr.'s lack of stock sales is not fatal to their scienter showing. Opp. at 48. While the absence of stock sales is not *always* fatal, it is fatal *here* because Plaintiffs have put their scienter eggs in the stock sale basket, and they do not allege any alternative pecuniary motive. Plaintiffs' unpled suggestion that Garcia Jr. *tipped off his father* in order to benefit from his father's sales as a trust beneficiary is inflammatory and without any footing in the complaint (or reality).[15] Plaintiffs also misleadingly point to Garcia Sr.'s purchases in a *pre-Class Period* offering, Opp. at 48 (¶ 303 n.165), which says nothing about scienter for Class Period conduct. Nor can Plaintiffs avoid Garcia Jr.'s purchase of two million shares during the Class Period with an unpled argument that those purchases supposedly were necessary to the April 2022 offering. Opp. at 48; ¶ 266 n.157. Regardless of whether purchases were necessary, the reason courts find that increasing holdings during the Class Period negates an inference of scienter is because *buying stock* refutes any plausible motive to *inflate the stock price* through deceptive conduct—as this Court recognized in *City of Pontiac General Employees Retirement System v. First Solar*, 2023 WL 155861, at *8 (2023) ("*First Solar II*"). Mot. at 33; *see also Ok. Firefighters Pens. & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *39 (C.D. Cal. 2015).

As to Jenkins, Plaintiffs admit *all* his Class Period sales were pursuant to non-

---

[14] Plaintiffs do not (and cannot) argue that Carvana can be charged with scienter except through Garcia Jr. or Jenkins. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008)**.**
[15] Plaintiffs' cases are inapposite. Opp. at 48. Both involve defendants who sold shares. *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *15 (C.D. Cal. 2022); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *2 (S.D.N.Y. 2012).

discretionary 10b5-1 plans. Opp. 47. While they declare the plans can't be considered on a motion to dismiss, *id.*, that is wrong. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008); Mot. at 34-35. And the Opposition's assertion that Jenkins entered into his 10b5-1 plans (on June 15, 2020 and March 15, 2021) "after he embarked on the scheme and was in possession of MNPI," Opp. 47, is unsupported by a single well-pled fact. Mot. at 34.[16] The only ACC paragraph Plaintiffs cite, Opp. 47 (¶ 269), alleges nothing about information Jenkins knew in June 2020. As to March 2021, Plaintiffs have only pled that Jenkins received a Board deck (Dkt. 71-3 at 7) showing efforts to reduce delays—which strengthens a *non-culpable* inference, Mot. at 34.

Even if the sales were not done pursuant to 10b5-1 plans (which Plaintiffs admit they were), none of the considerations that courts take into account when evaluating stock sales and scienter raise a strong inference for Jenkins. First, contrary to Plaintiffs' argument, Opp. at 42-49, the amount and percentage of shares that Jenkins sold were not suspicious. Plaintiffs rely on the $900 million figure from *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004), but that's 11 times Jenkins's alleged sales. Plaintiffs' remaining cases are equally inapposite. Opp. at 42.[17] Jenkins's alleged percentage of holdings sold (48%) also does not establish a strong inference of scienter.[18] *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir.

[16] As Defendants noted, Jenkins entering into 10b5-1 plans during the almost three year prolonged class period is unremarkable, Mot. at 34 n.29; *compare* Opp. at 47. And, in any event, Rule 10b5-1 plans initiated during a class period "may still 'mitigate any inference of improper motive surrounding [stock] sales.'" *First Solar II*, 2023 WL 155861, at *9.

[17] Plaintiffs mischaracterize the court's finding in *In re Galena Biopharma, Inc. Securities Litigation*. Opp. at 42. The court found that defendants' "dramatically out-of-line stock sales"—*not* sales totaling $16 million—favored a scienter inference. 117 F. Supp. 3d 1145, 1167, 1170-72 (D. Or. 2015). There, a defendant sold 87% of his stock *on a single day without* a pre-arranged 10b5-1 trading plan. *Id.* at 1167. In *Oracle* (Opp. at 42), the court found an inference of scienter because there were also admissions from a separate securities fraud litigation, and "*very importantly*, there [we]re the improper revenue accounting records." 380 F.3d at 1232-33. Finally, *In re Qwest* (Opp. at 42) found that, although three defendants received substantial proceeds from substantial amounts of sales, the allegations were "not sufficient to support an inference that these defendants were aware of the materiality and falsity of the alleged misrepresentations" and thus "[did] not support a strong inference of scienter." 396 F. Supp. 2d 1178, 1199 (D. Colo. 2004).

[18] In contrast, Plaintiffs' cited case, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corporation*, involved defendants that sold 88% to 100% of their shares. 320 F.3d 920, 939 (9th Cir. 2003). Even then, the court recognized "large

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- 20 -

1999) (selling 43.6% and 75.3% of holdings did not give rise to inference of scienter); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (selling 98% of holdings did not support a strong inference of scienter); Mot. at 32.

Second, the timing of Jenkins's sales was not suspicious, as demonstrated by Plaintiffs' allegation that Jenkins "sold almost 97% of [his] shares prior to the *WSJ*" article, Opp. at 43, 46. Consider Jenkins's first Class Period sale—which accounts for *more than half* (approximately 56%) of all of his Class Period sales and his largest sale by a factor of 19. That sale occurred more than a *year* before the *WSJ* article, almost a *year* before the first alleged corrective disclosure, ¶ 268, and *seven months* before the first alleged "pumping" statement about title and registration—the only MNPI that Plaintiffs allege Jenkins possessed while trading, ¶ 269. Not to mention the sale happened about a *year* before the stock peaked. ¶¶ 174, 269. His remaining smaller trades occurred in subsequent months, and all but one were complete before the *WSJ* article in October 2021. *See id.* These sales' timing put the lie to Plaintiffs' "pump and dump" theory, and the Opposition cannot not suggest otherwise. *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 384-85 (E.D.N.Y. 2003) ("[T]he long lapse of time between the sales and the alleged ultimate disclosures suggests that one or more other factors, unrelated to the alleged fraud, led to defendants' decision to make the sales."). Plus, almost a third of the challenged statements occurred *after* Jenkins stopped selling.[19] Mot. at 33; *see Ronconi*, 253 F.3d at 435-36 & n.31 (no strong inference of scienter where knowledgeable insiders did not sell stock at a time that would have taken advantage of allegedly fraudulent statements).

numbers [and percentages] do not necessarily create a strong inference of fraud." *Id.* (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002)). *Oracle*'s "instruct[ion]" is consistent; it suggests that "less weight" should be given to percentage of holdings in light of "truly astronomical" proceeds, but still requires that plaintiffs plead a strong scienter inference. 380 F.3d at 1232.

[19] Plaintiffs' cases suggesting that scienter is not negated by stopping stock sales prior to misstatements are inapposite because those cases all involved sufficient allegations to support a strong inference of scienter. *Qwest*, 396 F. Supp. 2d at 1196; *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *20 (C.D. Cal. 2013) (finding repeated sales right after alleged misstatements caused jumps in stock price and almost no sales in 18 months prior to class period supported a strong inference of scienter); *Stevelman v. Alias Rsch.*, 174 F.3d 79, 86 (2d Cir. 1999) (allegations taken together supported an inference of scienter).

Finally, Plaintiffs' Opposition confirms the ACC contains no particularized allegations showing that Jenkins's challenged trades were dramatically inconsistent with his prior trading history. Plaintiffs allege only that Jenkins sold "13,000 fewer" shares in the three years between Carvana's 2017 IPO and the Class Period than he sold during the Class Period. ¶ 268. That amounts to three percent of total shares, which the Opposition does not argue is dramatically inconsistent. *See* Opp. at 46; Mot. at 33. The Opposition instead pivots to argue that Jenkins's trades were suspiciously timed because his Class Period sales were "condensed." Opp. at 46. But the ACC does not allege the actual timing of Jenkins's pre-Class Period sales, and therefore does not provide a "meaningful trading history" to establish that Jenkins's stock sales were in fact more "condensed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009); Mot. at 33.[20] In any event, courts look at trades across the *entire* Class Period, not some portion, for purposes of assessing the alignment with prior trading history. *See Vantive Corp.*, 283 F.3d at 1095 (comparing sales in fifteen-month class period to sales in months prior); *Kairalla v. Advanced Med. Optics, Inc.*, 2008 WL 2879087, at *10 (C.D. Cal. 2008) (same).

b.    **Plaintiffs Do Not Allege Deliberate Recklessness.**

None of Plaintiffs' other theories demonstrate that any Defendant "made false or misleading statements either intentionally or with deliberate recklessness." Mot. at 35-36.

**Access to Information**. Many of Plaintiffs' theories—CW allegations, Defendants' statements, core operations, SOX certifications, government investigations—boil down to an argument that Defendants had access to information contradicting the challenged statements and therefore knew or should have known allegedly undisclosed facts. Opp. at 49-56. As explained below, none of Plaintiffs' allegations, individually or together, show

[20] Plaintiffs try to excuse this failure by arguing that failing to plead a defendant's trading history does not matter "where other factors are present." Opp. at 46 n.52. Plaintiffs' own cases do not support their argument, *see Karinski*, 2020 WL 281716, at *16 ("[T]he Court cannot determine as a matter of law that the sales do not support scienter, even if the sales would alone be insufficient."); *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *13 (S.D. Cal. 2022) (plaintiffs alleged an absence of any stock sales prior to class period, which supported an inference that sales were unusual); *Baron*, 2022 WL 1741356, at *15 (same), and they have not shown "other factors are present."

that Plaintiffs knew contradictory information. But at the threshold, Plaintiffs also entirely fail to show "[t]he important issue" for scienter, *Petrie v. Elec. Game Card, Inc.*, 2011 WL 13130015, at *7 (C.D. Cal. 2011)—namely, that any particular Defendant knew or should have known that their failure to disclose contradictory information "present[ed] a danger of misleading." *In re Alphabet, Inc. Sec. Litig.*, 1 F. 4th 687, 701 (9th Cir. 2021). That alone warrants dismissal. *See City of Hollywood Firefighters Pens. Fund v. Atlassian Corp.*, 2024 WL 235183, at *14 (N.D. Cal. 2024) (dismissing fraud claim where plaintiffs failed to allege that the speaker "knew [contradictory information] but recklessly chose not to reveal that information").

Plaintiffs' CW allegations do not help them because the CWs are low-level employees that did not say anything "indicative of scienter." *Espy v. J2 Global, Inc.*, 99 F.4th 527, 537 (9th Cir. 2024). The Opposition points to vague allegations that do not contradict any challenge statement, such as CW-11 alleging that an unknown "C-level" executive said the company was "'just worried about growth and not procedural' operations," Opp. at 51-52, and CW-5 alleging that "someone asked about what was going to be done regarding the quality issues with the vehicles that the hubs were receiving from the IRCs," *id.* at 52 (citing ¶ 87). CW-8's allegation that Tableau included "inventory data and metrics" does not allege any specific data or metrics, much less that any Individual Defendant used Tableau or received reports from it. Opp. at 51-52; *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (witness statements insufficient to support scienter "because they do not detail the actual contents of the reports the executives purportedly referenced or had access to . . . and the witnesses lack first hand knowledge regarding what the individual defendants knew or did not know about [company's metrics]"); Mot. at 37. Many of the allegations, such as CW-2 asserting that, when he/she reported that "he/she did not think" a particular vehicle should be purchased, "'leadership would say take it' anyway," ¶ 60; Opp. at 51, "point only to disagreement and questioning within [Carvana] about [business practices]." *Metzler*, 540 F.3d at 1069. Contrary to Plaintiffs' argument, evaluating who the CWs purport to be and what they

allege is not "misapply[ing] the test," Opp. at 53; it is precisely what the PSLRA requires. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 767, 772-73 (9th Cir. 2023).

And unlike Plaintiffs' cited authorities, the ACC lacks any CW accounts directly connecting Defendants to any allegedly concealed information. The Opposition ultimately relies on hearsay comments about all-hands calls and meetings that are akin to the "town hall allegations" where individual defendants attended and allegedly omitted issues were referenced that this Court has previously found "unavailing." *Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pens. Plan v. First Solar Inc.*, 2023 WL 4161355, at *4 (D. Ariz. 2023) ("*First Solar III*"); *Atlassian*, 2024 WL 3823801, at *10 (CW failed to show that executive meetings specifically discussed the allegedly omitted information).

Lacking sufficient CW allegations, Plaintiffs argue that Defendants' own statements support scienter. Opp. at 49. But Plaintiffs erroneously rely on cases where the speakers "'bridge[d] the [scienter] gap' . . . by referencing the data directly," thereby disclosing their knowledge of the alleged data. *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). Here, by contrast, Plaintiffs rely on a theory of falsity that is premised on "omissions and ambiguities," which "count against inferring scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007); *see also Atlassian*, 2024 WL 235183, at *14 (rejecting similar argument). Plaintiffs also fail to point to either any inaccurate factual statement about particular data or any information that contradicted any statement, Opp. at 51-52; Mot. at 12-28; *cf. Sea Ltd.*, 2024 WL 3708800, at *16-17 (statements regarding trends of specific metrics throughout the class period led to "more compelling inference" that defendants were aware of key operating metrics and had access to contradictory information).

The Opposition's attempt to salvage Plaintiffs' core operations theory is also unavailing. Opp. at 54. Plaintiffs allege no facts demonstrating Defendants' "detailed involvement in the minutia of [Carvana's] operations" or "actual involvement" in facilitating the scheme, and their allegations are insufficient to meet the high bar for

establishing scienter. *First Solar II*, 2023 WL 155861, at *7; *First Solar III*, 2023 WL 4161355, at *5; *Atlassian*, 2024 WL 3823801, at *10 (no scienter where statements concerned core metric comprising 90% of the company's business, but plaintiff failed to plead "specific" facts known to defendants about metric's decline).

Plaintiffs' makeweight arguments about SOX certifications do not support scienter, Mot. 39, and Plaintiffs do not point to any connection between an investigation supposedly about "related-party deals," ¶ 127 n.10, and this case. *Alich I*, 2024 WL 839146, at *12 (investigation unrelated to challenged statement did not support scienter).

**Decisions to Cease Reporting Metrics**. Plaintiffs pin their scienter hopes on *ipse dixit*—asserting that "Defendants" stopped reporting certain metrics because of their scheme. Opp. at 50. But Plaintiffs do not connect any particular Defendant to the decision to stop reporting certain metrics. The fact that Garcia Jr. and Jenkins *signed* the SEC filings "does not give rise to a strong inference of scienter." *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1159 (C.D. Cal. 2007). Plaintiffs allege no facts suggesting that Defendants were aware or should have been aware of underlying details about each metric, *particularly after* Carvana ceased reporting them. *Cf. Constr. Indus. & Labs. Joint Pens. Tr. v. Carbonite, Inc.*, 22 F.4th 1, 10 (1st Cir. 2021); *Sea Ltd.*, 2024 WL 3708800, at *17 (defendants commented on GMV's trends after ceasing reporting GMV in filings and reporting ceased immediately after Shopee experienced its largest GMV decline in history). As to the ADTS metric in particular, Plaintiffs have no response to the fact that their falsity argument rests on skewing Carvana's words to mean the precise opposite of what Carvana disclosed—that it was supposedly reporting ADTS even though it said it was *not*, Opp. at 51; Mot. at 39; *see also* Section I.A.1.e, *supra*—and the plausible reasons Carvana disclosed for the reporting change. Plaintiffs' argument about "buying cars from customers" metrics still makes no sense because Carvana repeatedly disclosed its desire to increase cars from customers and its success in doing so. Mot. at 39.[21]

---

[21] Plaintiffs' case, *Voulgaris v. Array Biopharma Inc.*, is inapposite because Carvana told investors that it would cease reporting metrics and its reasons why. ¶ 294; 2020 WL

### D.    **Plaintiffs Fail to Plead Scheme Liability.**

Plaintiffs' Opposition leans into their scheme claim on the ground that a watered-down pleading standard applies here too. Opp. at 11. Again, Plaintiffs are wrong, and their own case makes that clear in a sentence they omit: "[T]he conduct underlying claims for scheme liability must be alleged with particularity under Rule 9(b)." *Galena*, 117 F. Supp. 3d at 1193. Plaintiffs omit that sentence because their pleading falls far short. They do not "specify what deceptive acts were performed, which defendants performed them, when the deceptive acts were performed, and what effect the scheme had on the securities at issue." *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *22-23 (D. Ariz. 2023). Nor do they plead, for each allegedly deceptive act, that it had a "*principal purpose and effect*" of creating a "false appearance of fact," *id.* (quoting *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008)).[22]

Plaintiffs insist that "a cursory review of the ACC" reveals a "distinct scheme claim," Opp. at 11, but none of the "artifices" they identify are distinct from the statement claims—they are either challenged statements or omissions, Mot. at 40.

Independently, Plaintiffs' broad-strokes "artifices" pleading falls far short of Rule 9(b)'s requirements. Allegations that Individual Defendants "enter[ed] into a  sham-pass through sales deal," "spearheaded" an expansion plan, or supposedly "flouted" the law, ¶ 125, are conclusory group pleading, not particularized allegations identifying specific acts that each defendant performed and when. Plaintiffs' conclusory scheme allegations also fail to allege that any Defendant took any act with the "principal purpose and effect" of deceiving investors. *Simpson*, 452 F.3d at 1048. Plaintiffs respond to this argument with assumptions and speculation, but no facts. Take, for example, the DriveTime transactions. Plaintiffs do not identify a single act Garcia Jr. or Jenkins took to deceive investors via

8367829, at *16 (D. Colo. 2020) (defendants did not inform investors of change to "narrower subset of patients").

[22] Plaintiffs' citation to *Galena* for the proposition that insider trading can qualify as a "deceptive device" under Section 10(b), forming the basis of insider trading liability, Opp. at 18, is simply irrelevant to whether it may serve as a "deceptive act" substantiating a theory of scheme liability under Rule 10b-5(a) and (c).

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- 26 -

those transactions, other than arguing that Carvana is "Garcia Jr.'s public company." Opp. at 12. By that logic, every large shareholder and CEO could be sued by virtue of their position, but that is not the law. *Borteanu*, 2023 WL 1472852, at *22-23. Yet Plaintiffs insist that "the clear purpose of the [DriveTime] arrangement was to inflate Carvana's reported retail sales," Opp. at 12, on the theory that "Carvana gave all the proceeds from those sales to DriveTime," *id.* at 16. But Carvana *disclosed* that it passed the sales price back to DriveTime. Missing from Plaintiffs' allegations is a single fact showing that Carvana did not generate revenues on the transactions. As Carvana disclosed, it made money on retail sales not only through the sales price, but also on *selling ancillary products* and *financing* the sold vehicles. *See* Section I.A.1.c, *supra*. Plaintiffs do not allege a single particular fact showing that the transactions were a "sham" or were somehow "inherently unreasonable for a company acting in the regular course of business." *Borteanu*, 2023 WL 1472852, at *25.[23] Indeed, Plaintiffs do not allege a single fact showing that *any* of the so-called artifices did not generate revenues for Carvana and aid it in its #1 objective of growing the business, and Plaintiffs therefore fail to allege any act had "*no* legitimate business purpose." *Simpson*, 452 F.3d at 1050.

Plaintiffs were also required to plead scienter and loss causation for their scheme liability theory, but failed to do so. Mot. at 41. Plaintiffs again accuse Defendants of waiver, Opp. at 20, but they are wrong on waiver, *see* Mot. at 9, 41, and wrong on the merits. There is no plausible allegation of scienter or loss causation, including for the DriveTime transactions on which Plaintiffs focus. As to scienter, Plaintiffs fail to plead *any* facts suggesting that *any* particular Individual Defendant acted with an intent to mislead investors in including the DriveTime transactions within retail sales—there are no particular facts connecting any Individual Defendant to retail sales reporting at all, let alone to scheming about DriveTime transactions. *See* Section I.A.3.b, *supra*. As to loss causation,

---

[23] The conclusory DriveTime allegations are a far cry from conduct with "an inherent tendency to deceive," Opp. at 12, like the "round-tripping" in *Singh v. 21Vianet Grp., Inc.*, 2017 WL 4322483, at *3 (E.D. Tex. 2017), which involved distributing funds to affiliates for the sole purpose of "funnel[ing] the money" to the defendant's subsidiaries, allowing for the exact same funds to be recorded as additional revenues. *Id.* at *1, 3.

Plaintiffs point only to disappointing financial results throughout 2022 and media discussions of regulatory challenges, none of which "revealed" anything about DriveTime transactions or suggested they were a sham—and certainly are not connected to the complained-about *2021* DriveTime transactions. Mot. at 28-29.

### E.    Plaintiffs Fail to Plead an Insider Trading Claim.

Plaintiffs argue that the support for their insider trading allegations is somewhere in the various ACC paragraphs and Opposition sections cited. Opp. at 66 (citing ¶¶ 160-62, 261-305; Opp. Sections VI.A, VI.C.[24] That does not suffice. Plaintiffs have not alleged with particularity that any Defendant possessed MNPI at the time of any particular trade or at the time Jenkins modified his 10b5-1 trading plan on June 15, 2020 and March 15, 2021. ¶ 269; Mot. at 41 (citing *In re 3Com Sec. Litig.*, 1999 WL 1039715, at *8 (N.D. Cal. 1999)). Plaintiffs fall back on "nearly twenty different related-party deals," Opp. at 67, but *disclosed* related-party transactions are not MNPI. Mot. at 34-35 (citing *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1180 (C.D. Cal. 2007)).

## II.    PLAINTIFFS FAIL TO PLEAD ANY SECURITIES ACT CLAIM.

Plaintiffs try to evade Rule 9(b)'s heightened pleading standard for their Securities Act claim, Opp. 69 & n.92, but there is no hiding from it. Sprinkling the word "negligently" into their allegations and pushing the claim to a separate section does not change its "remarkable similarity" to the Exchange Act claims. Mot. at 42 (quoting *In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010)). Contrary to Plaintiffs' argument, the Securities Act claims *do* "rely on the same factual allegations," and in fact, two of the three challenged statements are *the same exact statements*, *compare* ¶ 381 (Statement A) *with* ¶ 209 (Statement 18); ¶ 385 (Statement C) *with* ¶ 184 (Statement 6), the other is a substantively identical statement from the same day, *compare* ¶ 383 (Statement B) with ¶ 214 (Statement 20), and *all of them* are challenged for the same

[24] Plaintiffs' case, *Johnson v. Aljian*, is inapposite because there the plaintiff adequately alleged that defendants possessed a report that contained the allegedly omitted information and traded while in possession of such information. 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004). Here, Plaintiffs have not shown that Defendants possessed any MNPI.

reasons as under the Exchange Act. Mot. at 42-43. Tellingly, Plaintiffs own Opposition *cross-references* their Exchange Act argument in attempting to defend the Securities Act claims. Opp. at 68. "[T]he fact that the claims are not brought against the exact same Defendants does not change the outcome." *Alich I*, 2024 WL 839146, at *16.[25]

Regardless, even under an inapplicable Rule 8 standard, the misstatement theories are the same and fail for the same reasons. Indeed, given that the April 2022 offering was relatively late in the Class Period, the cumulative weight of Carvana's consistent disclosures was particularly overwhelming at the time of the challenged statements. Mot. at 43 (cross-referencing Mot. Section III.A.1).

Plaintiffs' pure omission-based claim under Item 105 fares no better. The Registration Statement explicitly described the risks associated with violations of laws or regulations, and told investors that violations could result in penalties, which could have material adverse effects. Mot. at 43. The Opposition complains the Registration Statement failed to warn about unidentified "risks associated with Carvana's titling issues and its practice of issuing temporary out-of-state licenses." Opp. at 68. But those "risks" were potential regulatory penalties causing financial or reputational harm, and that's exactly what Carvana *did* warn about. ¶ 385; Ex. 18 (2021 10-K) at 24. And as the *Warwick II* court noted, prior to the Offering, "the issues involving delays in titles and registration were discussed by the Company and in the press" to such an extent that there could be no omission claim. Dkt. 63 at 25. Plaintiffs' Item 105 claim also fails because Plaintiffs fail to allege that any of the titling issues or the practice of issuing temporary out-of-state licenses caused a "material adverse effect on [Carvana's] business, results of operations, and financial condition," ¶ 385. In other words, Plaintiffs fail to supply allegations actually establishing that the warned-of risk "had . . . come to fruition." Opp. at 69; *see* Section 1.A.1.a, *supra*. Plaintiffs provide zero response to the point that pre-Offering penalties were

---

[25] In *Alich I*, this Court considered Plaintiffs' cited authorities, *Tsirekidze v. Syntax Brillian Corp.*, 2009 WL 275405 (D. Ariz. 2009), *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846 (N.D. Cal. 2020), and *Flynn v. Sientra, Inc.*, 2016 WL 3360676 (C.D. Cal. 2016), Opp. at 69, and concluded that they did "not compel an alternative conclusion" for reasons applicable here too. 2024 WL 839146, at *16.

*in the past* and thus were not presently one of the "most significant factors" making an investment in Carvana "risky," and that Carvana was not required to predict specific *future* penalties with "speculative future-facing warnings." Mot. at 44 (quoting *Ryan v. FIGS, Inc.*, 2024 WL 187001, at *16 (C.D. Cal. 2024); *see also Warwick II* at 17-22.

Independently, the Securities Act claim fails because negative causation is plain on the face of the complaint. None of the "disclosures" Plaintiffs plead following the offering "reasonably reveal anything about the purported misrepresentations." *Brown v. Ambow Educ. Hldg. Ltd.*, 2014 WL 523166, at *15 (C.D. Cal. 2014). Plaintiffs' own cases support this point, as they establish that negative causation is defeated only where the alleged disclosure actually "touch[es] upon" the challenged statement, Opp. at 70 (quoting *Alich v. Opendoor Techs. Inc.*, 2024 WL 2153529, at *1 (D. Ariz. 2024) ("*Alich II*")), or "reveal[s] adverse information that the misrepresentation had concealed," *id.* (quoting *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1123 (E.D. Cal. 2017)). Plaintiffs' alleged disclosures do not. Section I.A.2, *supra*.

Lastly, Plaintiffs' conclusory seller allegations, ¶¶ 400-20; Opp. at 71-72, are insufficient because, contrary to Plaintiffs' argument, Opp. at 71, the mere act of signing an SEC filing is not enough under Section 12. *In re Harmonic, Inc., Sec. Litig.*, 2006 WL 3591148, at *13-14 (N.D. Cal. 2006). While "every person who signed the registration statement" may be held liable under *Section 11*, 15 U.S.C. § 77k(a)(1), Congress made no such provision in Section 12. *Id.*[26]

### **CONCLUSION**

Defendants respectfully request that the Court dismiss the ACC with prejudice.

---

[26] Plaintiffs' cited cases alleged solicitation activities and financial benefit beyond signing. *See, e.g.*, *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 384 (N.D. Cal. 2020) (plaintiff alleged that "certain defendants solicited sales at the Investor Day" and were "financially motived to solicit sales" of their own shares in the direct offering).

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX

- 30 -

Respectfully submitted this 28th day of August, 2024.

FENNEMORE CRAIG, P.C.

By: ⟨signature: Andrea L. Marconi⟩

Douglas C. Northup
Andrea L. Marconi

LATHAM & WATKINS LLP
Jeff G. Hammel (*Pro Hac Vice*)
Andrew B. Clubok (*Pro Hac Vice*)
Susan E. Engel (*Pro Hac Vice)*
Matthew J. Peters (*Pro Hac Vice)*

*Counsel for Defendants Carvana Co.,
Ernest Garcia III, Mark Jenkins, Stephen
Palmer, Michael Maroone, Neha Parikh, Ira
Platt, and Greg Sullivan*

FENNEMORE CRAIG, P.C.
ATTORNEYS AT LAW
PHOENIX