# Exhibit A

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

RHONDA SCHERTZ, Derivatively on Behalf:
of CARVANA CO.,                          :
                                         :
              Plaintiff,                 :
                                         :
       v                                 : C. A. No.
                                         : 2023-0600-KSJM
ERNEST GARCIA II, ERNEST GARCIA III,     :
MICHAEL MAROONE, NEHA PARIKH, IRA        :
PLATT, DAN QUAYLE, GREGORY SULLIVAN,     :
PAUL BREAUX, DANIEL GILL, BENJAMIN       :
HUSTON, MARK JENKINS, RYAN KEETON, and:
THOMAS TAIRA,                            :
                                         :
              Defendants,                :
                                         :
       and                               :
                                         :
CARVANA CO., a Delaware corporation,     :
                                         :
              Nominal Defendant.    :

- - -

Chancery Court Chambers
Leonard L. Williams Justice Center
500 North King Street
Wilmington, Delaware
Wednesday, September 25, 2024
11:00 a.m.

- - -

BEFORE: HON. KATHALEEN St.J. McCORMICK, Chancellor

- - -

TELEPHONIC BENCH RULING ON DEFENDANTS' MOTION TO
DISMISS OR STAY PLAINTIFF'S VERIFIED AMENDED
STOCKHOLDER DERIVATIVE COMPLAINT

2

APPEARANCES:

    F. TROUPE MICKLER, IV, ESQ.
    Ashby & Geddes, P.A.
        -and-
    DANIEL TEPPER, ESQ.
    GREGORY M. NESPOLE, ESQ.
    of the New York Bar
    Levi & Korsinsky, LLP
      for Plaintiff


    R. GARRETT RICE, ESQ.
    BENJAMIN M. WHITNEY, ESQ.
    Ross Aronstam & Moritz LLP
        -and-
    MATTHEW J. PETERS, ESQ.
    STEPHEN T. NASKO, ESQ.
    of the District of Columbia Bar
    Latham & Watkins, LLP
      for Defendants and Nominal Defendant


                - - -

3

THE COURT:  Good morning.  This is Kathaleen McCormick.

Let's have appearances briefly for the record.

ATTORNEY TEPPER:  Your Honor, this is Daniel Tepper from Levi & Korsinsky in New York.  I'm here on behalf of the plaintiff.

ATTORNEY MICKLER:  Your Honor, this is Troupe Mickler from Ashby & Geddes as well.  I just joined, so I apologize for that.

ATTORNEY WHITNEY:  Good morning, Your Honor.  This is Benjamin Whitney of Ross Aronstam & Moritz speaking.  I also have Garrett Rice from my firm on the line, as well as Matthew Peters and Stephen Nasko from the Latham & Watkins firm.

THE COURT:  Good morning, everyone.  I called you-all together so I can deliver a bench ruling on the pending motion to dismiss.  I'll begin with a brief introduction.

Carvana Co. is an online used car company.  Beginning in 2020, Carvana faced regulatory scrutiny for its apparent fast-and-loose approach with state title and registration laws, which I'll call "T&R" laws.  It was fined for violations.  Its general

4

counsel also faced charges by the Illinois Secretary of State for activities related to state T&R laws. The media reported on Carvana's failings in August 2021. And by the end of 2022, Carvana's stock price plummeted. It has since recovered. Before the media reports, some Carvana directors and officers sold large portions of their holdings in the company. These sales prompted a federal securities complaint and this action.

The allegations in this case are similar to those of the federal complaint. The legal theories are different. The stockholder plaintiff here alleges that defendants knew about Carvana's T&R failings before they were made public and sold their shares based on material nonpublic information. The plaintiff also claims that the board utterly failed to implement a process to oversee T&R compliance and consciously chose to violate T&R laws. The plaintiff further asserts a novel controller oversight claim.

The defendants have moved to dismiss the complaint pursuant to Court of Chancery Rules 23.1 and 12(b)(6). I am granting the motion. For reasons I am about to explain, plaintiff has failed to state a claim under Rule 12(b)(6). The insider trading claim

5

is too vague to be material, and the market knew of Carvana's problems.  The board oversight claim is undermined by the fact that there was a process in place.  The controller oversight claim fails as a matter of law, and it was not well pled.  And plaintiff falls short of pleading the knowing violation of law claims.  That's the overview.

I'll turn now to the factual background, which I draw from the verified amended stockholder derivative complaint and the documents it incorporates by reference.

Carvana was co-founded by Ernest Garcia II, who I'll call "Garcia Senior," Ernest Garcia III, who I'll call "Garcia Junior," Ryan Keeton, and Benjamin Huston in 2012.  It is one of the largest used car sellers in the country.  Carvana's website allows customers to browse thousands of cars, many of which can be purchased from out of state.

In addition to selling cars to customers online, Carvana allows customers to trade in or sell their vehicles and provides financing for the vehicles it sells.  As stated in the complaint, Carvana's business model allows "as-soon-as-next-day [home] delivery or pickup at one of Carvana's

6

patented, automated Car Vending Machines."

Carvana's principal offices are in Tempe, Arizona, and, through the internet, Carvana buys and sells used cars in 316 markets across 33 states, allowing it to serve 80 percent of the population of the United States.

Garcia Senior has been Carvana's controlling stockholder since the company's founding. He holds approximately 84 percent of the company's voting stock. Garcia Senior is neither a director, officer, nor employee at Carvana because he was banned for life from serving in any of those capacities at any company listed on the New York Stock Exchange. His son, Garcia Junior, was installed by his father as Carvana's president and CEO in 2012. Garcia Junior lives next door to his father in Phoenix, Arizona. He owns approximately 13 percent of Carvana's voting power. Garcia Junior has served as a director since 2017 and is the current chairman of the Carvana board of directors, which I'll refer to as the "Board."

In 2017, Carvana went public. In 2021, Carvana sold more than 400,000 cars, a 74 percent increase from the prior year. During this period, Carvana touted its ability to continue to grow

7

in existing markets while positioning itself to expand into many small markets near existing infrastructure. Carvana also introduced touchless delivery and pickup in March 2020.

Online used car sales boomed during the COVID-19 pandemic. As new car production shrank due to supply chain problems, brick-and-mortar retailers of new and used cars were forced to temporarily close their businesses. Carvana incurred significant expenses on infrastructure and operational initiatives to respond to these business demand.

As the pandemic wore on, state DMVs struggled to keep up with their T&R responsibilities. This presented a problem for Carvana because vehicle titles are commonly issued by state DMVs, and each state has its own distinct process for vehicle titling.

In several states where Carvana does business — including Arizona, Texas, Pennsylvania, Michigan, and Illinois — it is illegal to sell a car without holding its title. And without a valid title, the buyer of a vehicle from Carvana is unable to lawfully operate that vehicle on a public road or purchase insurance for it.

8

To further complicate matters, titling rules in one state do not always apply in another. There are two standards consistent in every state, however: First, it's illegal to drive an unregistered vehicle, and second, it's illegal to drive without a valid license plate. A valid title is required to properly register a vehicle and to obtain a license plate.

Carvana began selling cars faster than they could properly register them to their new owners. Sometimes this involved selling cars before Carvana possessed the title to the vehicle — an illegal act in some of the states where Carvana does business. Carvana's internal systems did not inform its own employees as to whether Carvana had a valid title for a vehicle before delivering that vehicle to the customer. The volume of customer complaints regarding T&R issues increased significantly at the end of 2020. Carvana's title department claimed this was caused by increases in the number of vehicles sold.

The Board received reports concerning Carvana's T&R problems. As alleged in the complaint, at its meetings held in July 2020, the Board received a presentation concerning financial results. The

9

presentation referred to "Registration Delays" as a reason for declining Net Promoter Score, or "NPS," a customer satisfaction metric.  The minutes reflect that the Board had a high-level discussion regarding NPS.

The Board received another presentation at its meeting held in October 2020. Under the Q4 2020 "Key Focus Areas and Risks," the presentation acknowledged that "NPS is in steady decline" and that the "Registration Delays" are among the "[f]our key drivers."

The Board then received a presentation at its November 2020 corporate governance meeting. NPS was listed in a bullet point as a "special topic" to be discussed during "February [2021] board and committee meetings."  The presentation recognized that "Licensing and Title/Reg Processing" were among the Company's "Major Regulated Activities," and that defendant Paul Breaux, the company's general counsel, was among the "Primary Relevant Senior Leadership" responsible for this area.

At the meeting held in February 2021, the Board received a presentation stating that "retail NPS ... has been stable at a lower level post

10

COVID-19."  The presentation further stated that "Registration Delays" are among the "[f]our variables [that] are consistently the root cause(s) of poor NPS."

The minutes of the July 2021 Board meeting listed "registration challenges" among other factors harming NPS and referred to "the Company's short and long-term tactics and strategies to respond to the same."

At its October 2021 meeting, the Board received a presentation acknowledging that "Registration" is among the "key drivers of NPS" and that the company is "zeroing in on projects" to "address" it.  The presentation also addressed North Carolina's six-month suspension of company's dealer license, which I will discuss momentarily.

At its December 2021 off-cycle meeting, the Board received a presentation recognizing once again that "Licensing and Title/Reg Processing" were among the company's "Major Regulated Activities." The presentation also addressed the North Carolina situation and the legal issues there.  The presentation included that "customer comments [are] impacting NPS and how the registration process is

11

affected by varying DMV requirements."

Between 2021 and 2022, governments in more than ten states disciplinary actions against Carvana for T&R violations.

In February 2021, the Michigan Department of State had opened its own investigation into Carvana.  On May 17, 2021, the Michigan Department of State fined Carvana thousands of dollars and placed it on an 18-month probationary period. Carvana proceeded to violate the terms of this probation 127 times.  Ultimately, Carvana "agreed [that] it had violated the law and to have its dealer license revoked and be barred from reapplying for a new license for three years."

In North Carolina, Carvana's dealer license for its Raleigh facility was suspended for six months in August 2021 because it had "failed to deliver titles to the DMV, sold motor vehicles without a state inspection, and issued out-of-state temporary tags and plates for vehicles sold to customers in North Carolina."  The Wall Street Journal published that another Carvana location in North Carolina was "put on probation for more than a year" for "violating the state's dealer licensing laws."

12

In Delaware, a Carvana customer reported purchasing a vehicle in August 2020 and subsequently receiving four temporary tags from states other than Delaware while waiting for permanent registration.  A different Delaware resident purchased a vehicle from Carvana in January 2021 and thereafter "received numerous temporary tags issued by [Carvana] from various states including Pennsylvania and Arizona, but she had still not received permanent registration of the vehicle" as of January 2022.

By May 2022, Illinois suspended Carvana's automobile dealer license because Carvana consistently failed to provide timely transfer of title and improperly supplied its customers with out-of-state temporary tags, which caused some customers to receive police citations.  After initially lifting the suspension, Illinois officials reinstated it months later because Carvana continued to conduct business in a manner that violated Illinois law.

Also in May 2022, Illinois filed charges against Carvana's general counsel, Paul Breaux, which included 51 violations of Illinois law for improper use of out-of-state registrations, a

13

Class C misdemeanor.  Illinois simultaneously charged Breaux with 22 counts of violating other statutes.

Carvana's legal troubles — and the public disclosure of these issues — extended across the country.  Regulatory actions were taken against Carvana in California, Texas, Florida, Maryland, Ohio, Pennsylvania, Arkansas, Colorado, Connecticut, Georgia, Iowa, Kansas, Kentucky, Louisiana, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New York, North Carolina, Oklahoma, South Carolina, Utah, Vermont, and Wisconsin based on similar violations of state licensing, registration and titling laws.

Numerous news outlets reported on the regulatory actions taken against Carvana and the experiences of individual customers who faced significant difficulties obtaining proper title and registration for vehicles purchased from the company.

On August 10, 2021, ABC 11 Eyewitness News in Raleigh-Durham, North Carolina, first reported that Carvana's dealer license for the Raleigh facility was suspended for six months because it had "failed to deliver [the] titles to the DMV, sold motor vehicles without a state inspection, and issued out-of-state temporary tags and plates for vehicles sold to

14

customers in North Carolina."

Throughout late 2021 and early 2022, local media outlets across the country publicized the plights of Carvana customers in their areas where those customers had experienced excessive registration delays, often rendering their vehicles undriveable for extended periods.

I am not going to go through the news reports in detail, but I'll refer persons to paragraphs 137, 141, 158, 151, and 164 of the complaint.

Most notably, in June 2022, Barron's published an exposé titled "Carvana Sought to Disrupt Auto Sales.  It Delivered Undriveable Cars," which comprehensively detailed the extent of Carvana's T&R deficiencies.  The article featured interviews with Carvana customers who had experienced lengthy delays in receiving titles and registrations for their vehicles.  It also highlighted the regulatory scrutiny and legal troubles Carvana was facing in multiple states.

Other media reports throughout 2021 and 2022 similarly shed light on the widespread nature of Carvana's T&R issues.

15

On February 25, 2021, Carvana filed its 2020 10-K.  Regarding the regulatory risks, the 2020 10-K stated that the company's failure to comply with state laws could have a material adverse effect on the company's business.  Plaintiff alleges that the 2020 10-K failed to disclose that violations of various state laws and regulations concerning vehicle titling and registration were pervasive and ongoing, fueled by an aggressive growth strategy that placed the company in regulators' crosshairs and caused widespread dissatisfaction among customers.

On August 5, 2021, during an earnings call, Garcia Junior stated that one of the company's possible constraints "could show up in registration delays."

On August 11, 2021, Carvana presented at the J.P. Morgan Auto Conference.  During the company's presentation, Carvana was asked about the title and licensing issue in North Carolina.  Mike Levin, Carvana's Vice President of Investor Relations, stated that "this was a relatively unusual action, but is also pretty small in scope, relatively speaking."

In the meantime, the defendants sold over 3.8 billion in Carvana stock before June 24,

16

2022.  Garcia Senior sold over $3.67 billion worth of Carvana stock between October 30, 2020, and August 23, 2021.  Director Michael Maroone sold $2.62 million worth of Carvana stock on December 15, 2020.  Director Neha Parika sold over $480,000 worth of Carvana stock between August 9th and December 1, 2021.  Director Ira Platt sold over $24.5 million worth of Carvana stock between August 7, 2020, and August 10th of 2021.  Director Gregory Sullivan sold $850,000 worth of Carvana stock in September 2021.  Carvana officers collectively sold hundreds of millions of dollars worth of Carvana stock between August 2020 and November 2021.

Plaintiff Rhonda Schertz, who I'll refer to as "Plaintiff," is a Carvana stockholder.  She filed this action on June 7, 2023, and amended her complaint on October 18, 2023, asserting claims for breach of fiduciary duty and unjust enrichment against fiduciaries who sold Carvana stock before August 2021.  The defendants are six Carvana directors, who I'll call the "Director Defendants," Garcia Senior as controlling stockholder, and six Carvana officers, who I'll call the "Officer Defendants."  Together, I'll refer to the defendants simply as "Defendants."

17

The Director Defendants are Garcia Junior, Michael Maroone, Neha Parika, Ira Platt, Dan Quayle, and Gregory Sullivan.  The Officer Defendants are Paul Breaux; Daniel Gill, the Chief Product Officer; Benjamin Huston, the Chief Operating Officer; Mark Jenkins, the Chief Financial Officer; Ryan Keeton, the Chief Brand Officer; and Thomas Taira, who's President of Special Projects.

On December 18, 2023, Defendants moved to dismiss the complaint pursuant to Rules 12(b)(6) and 23.1.  The parties completed briefing on April 12th, and I held oral argument on July 1st of this year.

I'm going to take a brief pause to gain my breath, and then I'll turn to the legal analysis.

Turning now to the legal analysis, which I'll tackle on a count-by-count basis.

Count I alleges that the Director Defendants and Breaux breached their fiduciary duties under *Caremark*.  Count II alleges that the Director Defendants and Breaux breached their fiduciary duties under *Massey*.  Count III alleges that Garcia Senior breached his fiduciary duties under *Caremark* as a

18

controller.  Count IV alleges that the Officer Defendants, four of the six Director Defendants, and Garcia Senior breached their fiduciary duties under *Brophy* by selling their Carvana shares while in possession of material and nonpublic information. Count V alleges that the Officer Defendants, four of the six Director Defendants, and Garcia Senior were unjustly enriched as a result of the insider trades.

Defendants again have moved to dismiss all counts under Rule 12(b)(6) and 23.1.  Because I find that each count fails under 12(b)(6), I don't reach the 23.1 analysis.

The Rule 12(b)(6) standard in Delaware is reasonable conceivability.  When considering such a motion, the Court must accept all well-pled factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.  The Court, however, need not accept conclusory allegations unsupported by specific facts or draw unreasonable inferences in favor of the non-moving party.

Turning to Count I.  Under *Stone v.*

19

*Ritter*, to establish *Caremark* liability as to a director, a plaintiff must plead particularized facts showing that a director "completely fail[ed] to implement any reporting or information systems or controls."  The *Stone* court explained that "Failing to make that effort constitutes a breach of the duty of loyalty."  But directors have great discretion in designing context and industry-specific approaches tailored to their companies' businesses and resources when implementing such systems.  Where a complaint concedes the existence of board-levels systems of monitoring and oversight in a typical *Caremark* case, the claim must be dismissed even in the systems proved inadequate.

Count I is asserted against both the Director Defendants and Breaux, an officer.  Vice Chancellor Laster has helped clarify officer liability under *Caremark* in *In re McDonald's Corp.*, explaining that "[a]s with directors, officers only will be liable for violations of the duty of oversight if a plaintiff can prove that they acted in bad faith and hence disloyally."  *McDonald's* also states that "[t]he officer must consciously fail to make a good faith effort to establish information systems, or the

20

officer must consciously ignore red flags."  Further, "officers generally only will be responsible for addressing or reporting red flags within their areas of responsibility."

Here, Plaintiff repeatedly acknowledges that the Director Defendants and Breaux received information about T&R compliance, even while alleging that their oversight was insufficient.

For example, the complaint states that the Board was aware of Carvana's title and registration deficiencies at paragraph 170; that Breaux was aware of the company systematically failing to comply with state licensing, titling and registration laws at paragraph 245; that the Board knew that title registration deficiencies existed even prior to the pandemic and had previously instituted measures to address the problem at paragraph 174; that the entire Board knew of the company's title and registration deficiencies at paragraph 280; that throughout all of its meetings the Board consistently failed to implement board-level system of oversight over the company's mission-critical compliance with state licensing, titling, and registration laws. That's at paragraph 288.  And that's the count

21

unveiling the allegations.

Still, Plaintiff's concession that the Board knew and was repeatedly being told at board meetings of T&R deficiencies prior to the pandemic and discussed T&R compliance at its board meetings throughout the pandemic undermines Plaintiff's allegation that the Board did not have an information reporting system concerning T&R issues.

To paraphrase from *Teamsters v. Chou*, management that consistently receives T&R compliance information has implemented a reporting system, even if it's not a great one.

Similarly, Plaintiff's allegations that Breaux was at many of the same meetings where T&R compliance was addressed indicates that Breaux was, to borrow from *McDonald's*, "part of the effort by [the] [c]ompany management to address the problem."

Plaintiff faults the Board for tracking T&R compliance primarily through Carvana's NPS customer satisfaction metric rather than through other forms of board-level controls.  They say that T&R was mission-critical and deserved its own attention.

It is true under *Marchand v. Barnhill*

22

that the *Caremark* standard imposes a bottom-line requirement.  "*Caremark* imposes a "bottom-line requirement ... that ... the board make a good faith effort to put in place a reasonable board-level system of monitoring and reporting."  And that requirement compels the Court to evaluate, to a degree, the efficacy of any reporting system at the pleading stage.  But even a faulty system can pass muster if there are no allegations giving rise to bad faith.

Here, Plaintiff alleges nothing to suggest bad faith.  Instead, as pled, the complaint reflects that the NPS system captured concrete data on customer experiences with vehicle registration and titling and kept the Board and Breaux informed of the relevant risks.  These allegations undermine a claim that defendants abdicated their oversight duties by failing to institute a system for monitoring T&R compliance.

Count I is therefore dismissed under Rule 12(b)(6).

I'll turn now to Count II.  To plead a *Massey* claim, a plaintiff must raise a reasonable inference that corporate fiduciaries consciously decided to violate the law through affirmative acts,

23

which requires, as was stated in *NiSource*, "egregious facts" suggesting that "the company made a business out of breaking the law."

Plaintiff's *Massey* claim relies on two sets of allegations.  First, that Carvana had T&R compliance failures, and second, that management was dedicated to growing Carvana despite these failures. Plaintiff argues that this raises an inference of a "company-wide pattern of prioritizing ... profits over compliance."

The complaint, however, demonstrates that Carvana frequently engaged with regulators and worked to improve its T&R compliance, which again undermines the inference of deliberate law-breaking or that Carvana was making a business out of law-breaking.  So I'll plow through a couple of examples of allegations to this effect.

On an August 2020 earnings call, Carvana's CEO acknowledged T&R issues and stated that the company was "working to alleviate the operational constraints".  And that's at paragraph 19.

At paragraph 130, the complaint states that Carvana did not "want to be at war with [the] regulators."

24

At paragraphs 135 and 207, the complaint states that after North Carolina suspended Carvana's license, the company affirmatively engaged with state regulators and got the suspension lifted.

At paragraph 142 of the complaint, it states when issues arose in Florida, Carvana "demonstrated progress in registering hundreds of delinquent vehicles," leading regulators to withdraw their threat of a statewide license suspension.

And at paragraph 144, the complaint states that after Ohio suspended Carvana's privileges to issue temporary tags, the company provided "written assurance that prior practices have about halted," leading to the privileges being reinstated.

So these efforts show that Carvana took concrete steps to address compliance issues, and these allegations undermine an inference that the board acted as a reckless and rampant law-breaker or caused Carvana to do so.

Lacking the sort of egregious facts that Carvana consciously broke the law to make a business out of it, Plaintiff's allegations fail to meet the extreme standard to state a *Massey* claim.

Plaintiff relies on *Louisiana Police*

25

*Retirement System v. Pyott* to support their *Massey* claim, but that effort is unavailing.  In *Pyott*, board records incorporated into the complaint allowed the court to infer that the board had "knowingly approved and subsequently oversaw a business plan that required ill-legal off-label marketing and support initiatives for Botox."

Here, Plaintiff does not identify any Board-approved plan to seek profits by committing T&R violations.  Indeed, the allegations suggest that the opposite was true.

Perhaps recognizing the lack of firm *Massey* support against the Board, Plaintiff seeks to use Breaux's criminal convictions as a substitute. Delaware law does not impute liability to the Board in that way.  In any event, underscoring the relatively small scope of the T&R issues generally, Breaux pled guilty to 27 counts of Failure to Transfer Title by a Dealer, each of which Illinois classifies as a petty offense.

These aren't really the makings of a *Massey* claim.  Count II is therefore dismissed.

Next is Count III, a *Caremark* claim against Garcia Senior as controller.  Garcia Senior is

26

not and has never been an employee, officer, or director of Carvana.  He owns stock and is not alleged to have exerted his voting power in any way relevant to the T&R issues.  Imposing *Caremark* duties on a controlling stockholder like Garcia in circumstances like these would be a big move under Delaware law. And there are no facts compelling such a move here. The complaint contains no nonconclusory allegations showing that Garcia Senior exercised control over Carvana's T&R compliance or failed to do so in any relevant way.  The complaint lacks any allegations that Garcia Senior received information about Carvana's title and registration issues or that anyone was obligated to report those things to him.

So Plaintiff's conclusory assertion that Garcia Senior must have known about these issues by virtue of his controller status is insufficient to support a breach of fiduciary duty claim against him, much less a *Caremark* claim.  So Count III against Garcia Senior is dismissed.

Next is Count IV.  To state a claim under *Brophy*, Plaintiff must plead that Garcia Senior, Breaux, Gill, Huston, Jenkins, Keeton, Maroone, Parikh, Platt, Sullivan, and Taira, who I'll refer to

27

as the "Selling Parties," (1) possessed material and nonpublic information, and (2) used that information to make trades because the Selling Parties were motivated by the substance of that information.  The second requirement is the scienter requirement.

In *Clovis Oncology*, this court noted that at the pleading stage, a *Brophy* claim "rests on circumstantial facts and a successful claim typically includes allegations of unusually large, suspiciously timed trades that allow a reasonable inference of scienter."

Plaintiff fails to adequately allege that the Selling Parties possessed and traded on material nonpublic information.  Conclusory allegations that they must have known material nonpublic information by virtue of their positions generally are insufficient.

As to Garcia Senior, they are also unexplained.  Plaintiff alleges that the Selling Parties knew of "Carvana's systematic failure to ensure compliance with state T&R laws and its resulting pervasive T&R failures" when they made trades between August 2020 and November 2022.  And Plaintiff cites a handful of Board presentations from

28

this period that talk about registration delays. Indeed, some of the same presentations that undermined their *Caremark* claim.

Plaintiff claims that these presentations are enough to raise an inference that the Selling Parties knew Carvana had material undisclosed problems with T&R compliance.  Yet Carvana told the market almost the exact same information at almost the exact same time.

On May 6, 2020, Carvana expressly warned investors in its SEC filings that T&R compliance meant dealing with "a wide range of evolving federal, state and local laws and regulations, many of which have limited to no interpretation precedent as it relates to our business model."

On an earnings call on August 5, 2020, Carvana's CEO discussed "constraints" the company faced in clearing titles because of the pandemic, noting that "if customers would like to sell you their car and it takes longer ... to get their title cleared, et cetera, that's not a great experience."

In August 2021, on another earnings call, Carvana acknowledged "constraints ... across our

29

other operational groups" that could turn into "registration delays."  The company admitted that it was "behind," but also stated that it was "working hard to catch up."

The T&R information that Plaintiff claims was withheld is inconsistent with what this court has considered material nonpublic information at the pleading stage before.  In *In re Fitbit,* for example, the court inferred material nonpublic information where internal documents told the board about major product design flaws while the company was making "bullish" public statements.

In *Pyott*, the material nonpublic information was a board presentation saying that promoting off-label drug use is a violation of FDA rules and was a "Top Corporate Priority."

In *Macomb County Employees' Retirement System v. McBride*, the material nonpublic information was board knowledge that the company's main moneymaker was "imperiled[,] ... unsustainable[,]" and likely to be shut down.

And in *Coinbase*, the material nonpublic information was a valuation report prepared for the company that valued the company's stock "well

30

below its trading price."

Here, the most significant inside information are the Board decks talking about registration delays and constraints that might cause customer success scores to be lower.  This really just doesn't rise to the level of information that was available to *Fitbit*, *Pyott*, *McBride*, and *Coinbase*.

The facts here bear a greater resemblance to those at issue in *TrueCar*.  There, the plaintiffs said board presentations revealing problems with a website redesign constituted material nonpublic information that the company's business was failing.  But the court found that TrueCar's public disclosures "ma[de] clear [that] the company was rolling out a new website" and "that there were challenges with the rollout that negatively impacted financial performance for that quarter."  The board information conveyed "the same general type of information" as the public filings, and so the material nonpublic information element was not well pled.

So if the website troubles in *TrueCar* were not material nonpublic information because the disputed information was shared with the board and the public relatively concurrently, the T&R issues here

31

are not either.  The Board presentations covered the same general delays and constraints Carvana was warning its investors about throughout the relevant period.  Plaintiff does not allege that the delays were far worse than what investors were told.  And the market knew at the same time as the Board of investigations, fines, and media reports concerning the company's T&R issues.

The *Camping World* case is also informative on this point.  There, the company publicly disclosed a goal of operating 70 stores, but plaintiffs alleged that the company's board minutes demonstrated that the company lacked a "concrete plan to open 70 stores."  The court found that the company was "upfront about the reality that it might not operate 70 stores and that its plans were subject to change," and therefore, there was no material nonpublic information at issue.

Similarly, here, Plaintiff alleges Carvana publicly disclosed, as early as May 2020, that its business model was untested against the nationwide patchwork of T&R laws, and that any violation or even alleged violation of those laws could "damage [Carvana's] reputation and have a material adverse

32

effect on ... business, sales and results of operations."  And, as noted earlier, in August 2020, the company publicly disclosed in their earnings call that it was working to address T&R issues.  In other words, as was the case in *Camping World*, the fact that the company faced notable risks and issues with its T&R practices "was already known to the market" before the Selling Directors conducted the trades at issue.

In all, Plaintiff has not pled that the Selling Parties had material nonpublic information about Carvana's registration pains or that the market did not already know about these pains between August 2020 and November 2022.  I am dismissing Count IV.

Count V is easy.  Because I have already dismissed all of the other claims, Count V has no predicate.  It is dismissed.

So the motion is granted under Rule 12(b)(6).

Are there any questions?

ATTORNEY WHITNEY:  No questions from defendants, Your Honor.

ATTORNEY TEPPER:  No questions from plaintiff, Your Honor.

THE COURT:  Thank you all for getting

33

on the phone today.

We are adjourned.

(Proceedings concluded at 11:34 a.m.)

- - -

**CHANCERY COURT REPORTERS**
**500 N. King Street, Ste 11400, Wilmington, DE**
**(302) 255-0526**

34

CERTIFICATE

I, DENNEL NIEZGODA, Official Court Reporter for the Court of Chancery for the State of Delaware, Registered Merit Reporter, Certified Realtime Reporter, do hereby certify that the foregoing pages numbered 3 through 33 contain a true and correct transcription of the rulings as stenographically reported by me at the hearing in the above cause before the Chancellor of the State of Delaware, on the date therein indicated, except as revised by the Chancellor.

IN WITNESS WHEREOF I hereunto set my hand at Wilmington, this 30th day of September, 2024.


                    /s/ Dennel Niezgoda
                    -----------------------------
                    Dennel Niezgoda
                    Official Court Reporter
                    Registered Merit Reporter
                    Certified Realtime Reporter