**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United Association National Pension Fund, et al., | No. CV-22-02126-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Carvana Company, et al., | |
| Defendants. | |

This Court previously dismissed Plaintiffs United Association National Pension Fund and Saskatchewan Healthcare Employees' Pension Plan's consolidated class action complaint against Carvana, its founders, officers, board members, and underwriters as an impermissible puzzle pleading. (Doc. 70.) Plaintiffs have since filed an Amended Consolidated Complaint ("ACC"), spanning 448 paragraphs over 320 pages, wherein, they allege Defendants deceived investors and manipulated Carvana's stock price through a series of misstatements and misconduct to reap profits of nearly $3.76 billion. (Doc. 71.)

Pending before the Court are: (1) Defendants Carvana Co., Ernest Garcia III, Mark Jenkins, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan's (collectively, the "Carvana Defendants") Motion to Dismiss (Doc. 82), which Defendants Citigroup Global Markets Inc., and J.P. Morgan Securities LLC join (Doc. 87); and (2) Ernest Garcia II's Motion to Dismiss (Doc. 85).[1]

---

[1] The ACC does not allege any claim against Defendants Ryan Keeton and Benjamin Huston. This omission is legally significant as Plaintiffs' claims against Keeton and

## I.       BACKGROUND

The Court previously stated the facts, as alleged by Plaintiffs, in its prior order dismissing the consolidated complaint, and therefore, will not fully repeat them here. (*See* Doc. 70.) The following summary is taken from the allegations in the ACC, which the Court accepts as true for the purposes of assessing the pending motions. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

In 2012, father and son, Ernest Garcia II ("Garcia Senior") and Ernest Garcia III ("Garcia Junior"), founded Carvana as a wholly-owned subsidiary of Garcia Senior's used-car business, DriveTime Automotive Group, Inc. ("DriveTime"). (Doc. 71 ¶¶ 4, 35.) Carvana then went public in 2017. (*Id.* ¶ 37.) Carvana described itself as "the Amazon of the used car industry" and promised investors its "business gets better as it gets bigger." (*Id.* ¶ 2.) But investors grew wary of Carvana's self-proclaimed growth and profitability when its stock price fell in early 2020. (*Id.* ¶¶ 3, 5.) The ACC alleges that, to deceive investors into believing Carvana's growth was sustainable, Defendants Garcia Junior—the chief executive officer ("CEO"), Garcia Senior—a controlling shareholder, and Mark Jenkins—the chief financial officer ("CFO"), implemented a scheme to artificially "pump" Carvana's stock price. (*Id.* ¶ 6.)

This scheme required Carvana to: (1) enter into a "sham pass-through sales arrangement" with DriveTime to increase its reported sales; (2) flout state motor-vehicle title and registration laws and regulations; (3) abandon its purchasing and verification standards; (4) obscure critical metrics relating to its Retail GPU;[2] (5) implement an unsustainable nationwide expansion; (6) conceal critical information relevant to its average days to sale measure; and (7) misrepresent its per-vehicle profitability. (*Id.* ¶¶ 7,

---

Huston no longer exist. *Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010) (explaining, "[a]s a general rule, when a plaintiff files an amended complaint, '[t]he amended complaint supercedes the original, the latter being treated thereafter as non-existent'") (quoting *Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967)). Therefore, Defendants Keeton and Huston will be dismissed from this action.

[2] Carvana's "Retail GPU" stands for its Retail Gross Profit per Unit. (Doc. 91 at 24.) It captures "the gross profit Carvana earned per retail vehicle sold (before adding in other ancillary revenue and profit streams such as warranty, insurance, and financing)." (Doc. 71 ¶ 16.)

10-16, 126-72.) Plaintiffs allege Defendants accomplished this scheme through a series of material misstatements and omissions. (*Id.* ¶¶ 10, 173-260.)

According to the ACC, Defendants' scheme produced its desired results, and Carvana's stock price reached a high of $376.83 per share in August 2021. (*Id.* ¶¶ 8, 327 n.169.) From May 6, 2020, to February 23, 2023 (the "Class Period"), Plaintiffs purchased a significant number of shares of Carvana Class A common stock at these artificially inflated prices. (*Id.* ¶ 1.) With the stock sufficiently "pumped," the ACC further alleges that Defendants manipulated their 10b5-1 trading plans and began dumping their shares.[3] (*Id.* ¶¶ 8, 160-65.) Defendants Garcia Senior and Jenkins purportedly dumped around 14.3 million shares for profits of nearly $3.76 billion. (*Id.* ¶¶ 9, 163-65.) When Defendants' falsehoods came to light, Carvana's stock dropped 98% from its Class Period high to $8.01 per share, causing substantial monetary harm to investors. (*Id.* ¶¶ 166-72, 307-28.)

## II.    PROCEDURAL HISTORY

Plaintiffs originally filed this action in the United States District Court in the District of New Jersey. A similar action was also filed in the United States District Court in the District of New Jersey, styled *Rodeo Collection Limited v. Carvana Co. et al*, 2:22-cv-02190-MTL. These actions were consolidated in the District of New Jersey (Doc. 20) and were then transferred to this Court. (Doc. 24.) The Court held a status conference, granted Plaintiffs the opportunity to file a consolidated complaint, and set a new briefing schedule. (Doc. 32.)

Plaintiffs filed their consolidated complaint (Doc. 36), which this Court dismissed as an impermissible puzzle pleading after holding oral argument (Doc. 70). Plaintiffs then filed an amended complaint (Doc. 71), which all Defendants now move to dismiss (Docs. 82, 85, 87). Plaintiffs filed their omnibus response to the motions (Doc. 91), and Defendants filed their replies (Docs. 96, 97, 98).[4]

---

[3] A Rule 10b5-1 plan "allows for stock sales over a predetermined period without concern for the market." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 n.2 (9th Cir. 2017).

[4] The Court declines Defendants' request for oral argument, as oral argument would not aid the Court in resolution of the motions. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th

## III.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. A court may dismiss a complaint under Rule 12(b)(6) for two reasons: (1) lack of cognizable legal theory, or (2) insufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a Rule 12(b)(6) motion, the complaint must contain sufficient well-pleaded allegations, that if accepted as true, state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when it contains "factual content that allows the court to draw the reasonable inference" that the moving party is liable. *Ashcroft*, 556 U.S. at 678.

When considering a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031. But the Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### B.    The Private Securities Litigation Reform Act and Rule 9(b)

Because the ACC alleges securities fraud claims, Plaintiffs face heightened pleading standards. "At the pleading stage, a complaint stating claims under [S]ection 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act]" ("PSLRA"). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

Because allegations of fraud inescapably carry a degree of

Cir. 1998); *see also* LRCiv 7.2(f); Fed. R. Civ. P. 78(b).

> moral turpitude, Rule 9(b) imparts a heightened note of seriousness, requiring a greater degree of pre-discovery investigation by the plaintiff, followed by the plaintiff's required particular allegations, thereby protecting a defendant's reputation from frivolous and unfounded allegations and permitting a particularized basis for a defendant to respond to the particularized allegations.

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 404 (9th Cir. 2021) (citation omitted).

Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (emphasis in original).

## IV.    DISCUSSION

### A.    Judicial Notice

In deciding a 12(b)(6) motion, the scope of review is generally limited to the contents of the complaint, but courts may take judicial notice of facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). A court may also consider documents incorporated into the complaint by reference or matters of public record. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).

The Carvana Defendants seek judicial notice of 40 exhibits under the incorporation by reference doctrine and Fed. R. Evid. 201. (Doc. 84.) The exhibits include various publicly available documents such as Securities and Exchange Commission ("SEC") filings, shareholder letters, investor presentations, earnings call

- 5 -

transcripts, and news articles. (*Id.*) Garcia Senior also seeks judicial notice of his SEC Forms 4 spanning May 6, 2020, to February 23, 2023. (Doc. 86.) Plaintiffs do not oppose either request. (Doc. 92.) Because these exhibits are incorporated into the ACC by reference or otherwise matters of public record, the Court will take judicial notice of them all. *Burritt v. NutraCea*, No. CV-09-00406-PHX-FJM, 2010 WL 668806, at *3 (D. Ariz. Feb. 25, 2010) ("In the context of securities fraud, courts often consider [publicly] available financial documents on a motion to dismiss.").

### B. Puzzle Pleading

Moving to the substance of Defendants' motions: Defendants argue, as a threshold matter, that the ACC remains a puzzle pleading and violates the Court's directive to be "clear and concise." (Doc. 82 at 22-24; Doc. 85 at 11.) They contend that Plaintiffs fail to explain why each statement is misleading, improperly repeat the same omissions for each purported misstatement, and do not allege each Defendants' scienter. (Doc. 82 at 22-23; Doc. 85 at 11.)

"In the securities fraud context, the term 'puzzle pleading' refers to a pleading that requires a defendant and the court to 'match up' the statements that form the basis of the plaintiff's claims with the reasons why those statements are misleading." *In re Cisco Sys. Inc. Sec. Litig.*, No. 11-CV-01568-SBA, 2013 WL 1402788, at *5 (N.D. Cal. Mar. 29, 2013). Courts may "dismiss cases for 'puzzle pleading,' where the complaint recite[s] lengthy statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading." *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1274 (N.D. Cal. 2019) (internal quotations and citations omitted). The rationale for dismissal is that "[n]either courts nor defendants should have to wade through the morass of 'puzzle pleadings' as this wastes judicial resources and undermines the requisite notice for a defendant to respond." *In re New Century*, 588 F. Supp. 2d 1206, 1218-19 (C.D. Cal. 2008).

At a breathtaking 324 pages, the ACC recites over 448 paragraphs, largely

- 6 -

duplicating its arguments and allegations throughout. Despite its length and redundancy, however, the ACC is not so deficient that Defendants are incapable of identifying which statements are alleged to be false or misleading. *See id.* (denying dismissal of a 375-page amended complaint, reasoning "a long and detailed complaint is not a work of 'puzzle pleading' as a matter of law"). As directed in this Court's prior order of dismissal, the ACC appropriately identifies specific statements and sets forth detailed reasons as to why Plaintiffs believe each statement to be false or misleading. Accordingly, the Court concludes that the ACC is not a puzzle pleading.

### C.    The Securities Exchange Act Claims

The ACC alleges that Carvana, Garcia Junior, Garcia Senior, and Jenkins (collectively, the "Exchange Act Defendants") are each liable as a participant in a fraudulent scheme that caused Carvana Class A common stock to "trade at artificially inflated prices during the Class Period." (Doc. 71 ¶¶ 24-31.) Plaintiffs allege that each of the Individual Defendants (Garcia Junior, Jenkins, and Garcia Senior) "possessed the power and authority to control the contents of [Carvana's] reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market." (*Id.* ¶ 29.) Plaintiffs further assert the Exchange Act Defendants were provided copies of Carvana's "reports and press releases," which were "misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected." (*Id.* ¶ 30.)

The Carvana Defendants argue dismissal is appropriate because Plaintiffs fail to allege falsity, loss causation, or a strong inference of scienter. (Doc. 82 at 24-51.) For those reasons, Defendants argue Plaintiffs fail to allege Section 20(a) and Section 20A claims as well. (*Id.* at 53-54.) Garcia Senior separately moves to dismiss the Exchange Act claims against him. (Doc. 85.)

The Court addresses each Securities Exchange Act cause of action in turn.

### 1.    Count I: Section 10(b) and Rule 10b-5

Plaintiffs first allege the Exchange Act Defendants violated Section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 of the Exchange Act's regulations. (Doc. 71 ¶¶ 341-50.) Section 10(b) declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). Implementing Section 10b, SEC Rule 10b-5 explains it is unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

### a.    Fraud under Rule 10b-5

Claims brought under Rule 10b-5(a) and (c) are referred to as "scheme liability" claims, and claims brought under Rule 10b-5(b) are "maker liability" claims. *See Lorenzo v. SEC*, 587 U.S. 71, 80 (2019) (discussing differences between the provisions but recognizing "considerable overlap" between them); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (reasoning that the "argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*"). Plaintiffs assert both in the ACC; therefore, the Court analyzes each separately.

### i.    Maker Liability under Rule 10b-5(b)

The Court first considers Plaintiffs' "maker liability" claims under Rule 10b-5(b). To plead a misrepresentation claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant [("falsity")]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (cleaned up). Each of these elements must be independently satisfied. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (reasoning that failure to adequately plead an element constitutes "an independent basis" on which to affirm dismissal of a securities fraud complaint).

### 1)    Make

For liability to attach under Rule 10b-5(b), a party must actually "make" the material misstatement or omission. *Janus Cap. Grp. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. An entity is not the maker of a statement if it "contribute[s] 'substantial assistance' to the making of a statement but [did] not actually make it." *Id.* at 143 (cleaned up). Furthermore, a person who "provides the false or misleading information that another person then puts into the statement" is not the "maker" of the statement. *Id.* at 145. If, however, a person does not strictly make the statement, but "disseminate[s] false or misleading statements to potential investors with the intent to defraud," that is sufficient to allege falsity under Rule 10b-5(a) and (c). *Lorenzo*, 587 U.S. at 74.

Plaintiffs assert their maker liability theory against the Exchange Act Defendants, which includes Carvana, Garcia Junior, Garcia Senior, and Jenkins. (Doc. 71 ¶¶ 341-50.) Plaintiffs' maker liability allegations span 194 pages (*Id.* ¶¶ 173-260), yet not once do Plaintiffs allege a material misstatement or omission by Garcia Senior. Nor do Plaintiffs allege Garcia Senior—as a controlling shareholder—had a duty to correct an alleged omission or misrepresentation by the other Exchange Act Defendants. Therefore, insofar as Plaintiffs assert a maker liability claim against Garcia Senior, the ACC fails to state a claim for relief.

### 2)    Actionable False or Misleading Statements

In the pending motions, the Carvana Defendants argue that none of the statements

challenged in the ACC are actionable because Plaintiffs fail to allege the statements were false or misleading when made, the statements are protected under the PSLRA safe harbor, or the statements amount to inactionable opinion or corporate puffery. (Doc. 82 at 24-40.) Plaintiffs identify thirty-nine statements in the ACC alleged to be false or misleading; these statements concern Carvana's (1) title and registration; (2) customer purchases; (3) retail unit sales; (4) expansion; (5) aged inventory; and (6) profitability. (Doc. 71 ¶¶ 173-260.)

"A plaintiff can allege falsity by 'pointing to [the] defendant's statements that directly contradict what the defendant knew at the time." *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 870 (W.D. Wash. 2022) (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018)). "[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). "To be misleading, a statement must be 'capable of objective verification.'" *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quoting *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606).

The PSLRA imposes an additional barrier for establishing falsity at the pleading stage. "Even where a plaintiff has properly pleaded all six elements of a Section 10(b) violation, the allegedly false or misleading statement may still be shielded from liability by the 'safe harbor' provision of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).

> The PSLRA exempts from liability any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or that the plaintiff fails to prove was made "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). That is, a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary

language *or* is made without actual knowledge that it is false or misleading.

*Id.* (citation omitted). Below, the Court considers the alleged false or misleading statements in the ACC.

              **(a)**  **Title and Registration (Statements 1-8)**

Plaintiffs first challenge eight statements on risk disclosures by Carvana and comments the Exchange Act Defendants made with respect to state and title registration compliance. (Doc. 71 ¶¶ 173-89.)

Challenged Statement Nos. 1 and 6 were included in the "Risk Disclosures" section of Carvana's February 25, 2021 and February 24, 2022 Forms 10-K, providing:

> We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. . . . **[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business,** results of operations, and financial condition.
>
> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. **Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration** . . . .
>
> . . . .
>
> **The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results.**

(*Id.* ¶¶ 174, 184 (emphasis in original).) Statement Nos. 2-3 and 5 explain that "[t]here have been no material changes to the risk factors disclosed under the heading 'Risk Factors'" in Carvana's 2020 and 2021 Forms 10-K. (*Id.* ¶¶ 176-79, 182-83.) Statement No. 7 provides, "'[t]here have been no material changes to the risk factors

disclosed . . . except' as related to risks concerning a 'larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues.'" (*Id.* ¶¶ 186-87.) These statements were included in Carvana's Forms 10-Q, spanning May 6, 2021, to May 10, 2022. (*Id.* ¶¶ 176-79, 182-83, 186-87.))

According to Plaintiffs, the above statements were misleading because Defendants characterized the risk of harm—*i.e.*, the harm to Carvana's business and reputation if it violated state laws and regulations—as purely hypothetical, but in fact, these "harms had already materialized because states had begun investigating and penalizing Carvana for its title and registration noncompliance." (*Id.* ¶ 11.) Plaintiffs allege Carvana systemically sold cars before holding title, failed to timely register cars, and issued out-of-state temporary tags and license plates in violation of numerous state laws. (*Id.* ¶¶ 175-87.) Plaintiffs further assert that, unbeknownst to investors, multiple states revoked or suspended Carvana's dealer license throughout the Class Period. (*Id.* ¶¶ 148, 173-89.) In support of these allegations, Plaintiffs rely on six confidential witness accounts ("CWAs"), an exposé published by *Barron's* titled "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars," state investigations, press releases, settlements, allegations in a consumer class action, and Defendants' admissions. (*Id.* ¶¶ 173-89; Doc. 91 at 47.)

The Carvana Defendants offer several arguments for why these statements do not establish falsity. First, they argue the statements were not misleading because the risk that a company will violate the law is inherent in running a business, and no reasonable investor would interpret the disclosures to mean that Carvana was in perfect compliance with all applicable laws and regulations. (Doc. 82 at 25-26; Doc. 96 at 13-14.) The Court disagrees. The Ninth Circuit has recognized that "[r]isk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors." *In re Alphabet*, 1 F.4th at 703 (cleaned up). Indeed, the "Risk Factors" section of SEC filings are misleading if the disclosures only "discuss[] the *possibility* of future problems" but

fail to warn investors of the *existing issues* facing the company. *See Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) (emphasis added).

In this case, Carvana's risk disclosures framed the violation of title and registration laws and regulations as a mere "possibility," when, unbeknown to investors, these violations and resulting penalties were "existing issues." *Id.* For instance, Defendants' February 25, 2021 10-K omitted that in December 2020, the Ohio Bureau of Motor Vehicles "suspended Carvana's temporary tag issuance privileges for all Ohio locations and subjected the Company to increased oversight" and that as of February 2021, the Michigan Department of State "was investigating Carvana" and shortly after placed the company on an 18-month probation. (*Id.* ¶ 175.) Therefore, Plaintiffs adequately allege the above risk disclosures were misleading. *In re Alphabet*, 1 F.4th at 703.[5]

Next, the Carvana Defendants argue these statements are immaterial as they are "generic warnings," and Plaintiffs do not allege that any effect on the business or financial harm had materialized when the statements were made. (Doc. 82 at 26-27; Doc. 96 at 12-13.) Defendants explain, "Plaintiffs do not [] quantify the impact of the North Carolina penalty" (Doc. 96 at 12) and, as to the 2020 Ohio suspension, "Plaintiffs do not allege any financial impact from temporary tag suspension or 'increased oversight.'" (*Id.* at 13.) Defendants, however, conflate the "risk" with its "consequences"—an approach rejected by the Ninth Circuit. *See In re Facebook*, 87 F.4th at 934.

In *Facebook*, the challenged risk-factor statements provided:

> Any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data *could*

---

[5] The Court is not persuaded by Defendants' argument that its risk disclosures were not "purely hypothetical" because it used the word "could" instead of "if." (Doc. 82 at 26.) The Ninth Circuit has repeatedly found statements that a risk "could" occur misleading when the risks *have already* occurred. *See, e.g., In re Alphabet*, 1 F.4th at 703-04 (warning of risks that "*could . . . occur*" were misleading) (emphasis added); *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 944, 948-49 (9th Cir 2023) (hereinafter "*Facebook*") (warning that failure to prevent a data breach "could result" in the loss of data which "could harm" Facebook was misleading); *Cutler v. Kirchner*, 696 F. App'x 809, 812-13 (9th Cir. 2017) (warning that "a multi-year business transformation initiative . . . *could result* in higher than expected costs and/or *could* otherwise adversely impact" the business was misleading) (emphasis added).

> *result* in the loss or misuse of such data, which *could harm* our business and reputation and diminish our competitive position.
>
> We provide limited information to . . . third parties based on the scope of services provided to us. However, if these third parties or developers fail to adopt or adhere to adequate data security practices . . . our data or our users' data may be improperly accessed, used, or disclosed.

*Id.* at 958 (Bumatay, J., dissenting) (emphasis added). The Ninth Circuit reasoned that this statement was misleading "even if Facebook did not yet know the extent of the reputational harm it would suffer" because it represented the risk of a data breach as "purely hypothetical," when Facebook had known for over a year that a data breach already occurred. *Id.* at 949-50. The Ninth Circuit further held that business or reputational harm to Facebook need not have "materialized for a statement to be materially misleading." *Id.* at 949.

Applying that reasoning here, Plaintiffs were not required to allege harm to Carvana's reputation or business when these risk disclosure statements were made. Even if this were required, however, Plaintiffs satisfy that bar. The ACC details at length the various investigatory and regulatory actions initiated against Carvana and the corresponding penalties imposed for violating state title and registration laws.[6] Therefore, Defendants' argument that Plaintiffs fail to allege a materialized harm is unavailing.

The Carvana Defendants also argue that "Plaintiffs' omission theory cannot be reconciled with Carvana's repeated disclosures of title and registration delays and run-ins with regulators." (Doc. 82 at 28.) According to Defendants, Plaintiffs fail to explain how

---

[6] The ACC satisfies even the dissent's view in *Facebook. See id.* at 959 (Bumatay, J., dissenting) (disagreeing with the majority's falsity finding but recognizing that Facebook's risk statements may be misleading had the plaintiffs alleged "Facebook knew its reputation and business were *already* harmed" or that "Facebook was aware of government entities or users launching regulatory or legal actions" based on the data breach). Here, the ACC alleges both. For instance, Plaintiffs assert Defendants' own statements support a materialized harm, as Carvana stated "the damage to Carvana's reputation and goodwill posed by the suspension order is incalculable and irreparable" when it filed for a temporary restraining order after Michigan suspended Carvana's dealer's license in October 2022. (Doc. 71 ¶ 175(c); *see also* Doc. 83-5 at 214 (explaining that Carvana said "its business operations and goodwill will be immeasurably damaged with each passing day that injunctive relief does not issue").)

any of the alleged penalties were not already public knowledge or materially different from the information disclosed by the media. (*Id.*) Defendants rely on various press reports and point to four Carvana documents in support of its argument including its (1) 2020 Form 10-K; (2) Q1 2020 Shareholder Letter; (3) Q1 2020 Form 10-Q; and (4) 2021 Form 10-K. (*Id.*) Based on the Court's review of the record, none of these documents disclose the material omission Plaintiffs allege here—namely that Carvana systemically violated state title and registration laws.

Because Plaintiffs' challenged statements span over a year, however, Defendants' truth-on-the-market defense may negate falsity for at least some of the alleged omissions by revealing if, and when, the public became aware of Carvana's practices through other sources. "A truth-on-the-market defense is based on the theory that, if an alleged misstatement or omission of fact is already known to the market, then the fact will already be reflected in the stock price, and the market has not been misled." *Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-CV-06361-RS, 2020 WL 4569846, at \*6 (N.D. Cal. Aug. 7, 2020). But courts generally do not consider a truth-on-the-market defense at the pleading stage. "[A]s the Supreme Court and Ninth Circuit have explained, the truth-on-the-market defense is a method of refuting an alleged misrepresentation's *materiality*." *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (emphasis in original). Materiality is a "mixed question of law and fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). And "[p]roof of that sort is a matter for trial." *Basic Inc. v. Levinson*, 485 U.S. 224, 249 n.29 (1988). Therefore, while Defendants may have a viable truth-on-the-market defense, it would be premature for this Court to consider it at this stage of proceedings.

Lastly, the Carvana Defendants contend the challenged statements are inactionable under the PSLRA and bespeaks caution doctrine. (Doc. 82 at 29.) Defendants argue Statements 1 and 6 are themselves cautionary; Statements 2-3, 5 and 7 are opinion statements, and that Plaintiffs do not allege Defendants' actual knowledge of falsity under the PSLRA. (*Id.*) Under the PSLRA, "a defendant will not be liable for a false or

misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading." *In re Quality Sys.*, 865 F.3d at 1141. "The PSLRA's safe harbor provision exempts, under certain circumstances, a forward-looking statement, which is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (cleaned up).

It is not clear that any of Statements 1-8 can properly be termed "forward-looking" within the meaning of the PSLRA safe harbor. Statement Nos. 1 and 6 identified Carvana's then-existing responsibility to comply with applicable laws and regulations and the potential consequences if it failed. Even if these statements were forward-looking, however, Defendants' argument nonetheless fails because these statements are not accompanied by meaningful cautionary language. *Ferreira v. Funko Inc.*, No. LACV-20-02319-VAP, 2021 WL 880400, at *18 (C.D. Cal. Feb. 25, 2021) (finding risk disclosures were not meaningfully cautionary where they "set[] forth various hypothetical risks . . . without disclosing that th[e] risk had materialized"). And for the reasons discussed *infra* at 40-52, Plaintiffs sufficiently allege knowledge of falsity.[7]

The Court is also not persuaded that Statement Nos. 2-3, 5 and 7 are opinion statements. "Corporate puffing involves expressing an opinion that is not capable of objective verification." *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098 (9th Cir. 2022) (cleaned up). Whether Carvana was facing regulatory scrutiny for violating title and registration laws and regulations is an objectively verifiable fact. Therefore, these statements—that there were "no material changes" to Carvana's Risk

_____
[7] While knowledge of falsity and scienter are separate inquiries, the alleged facts support an inference of both. And because the Court finds Plaintiffs allege a strong inference of scienter, the ACC meets the less exacting requirements for alleging actual knowledge of falsity. *See Glazer Cap. Mgmt., LP v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) ("Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a *strong inference* standard of plausibility.") (emphasis in original).

Factors—cannot properly be classified as corporate puffery or opinion.

Lastly, the bespeaks caution doctrine does not rescue Defendants. Dismissal under the bespeaks caution doctrine "requires a stringent showing," and is only warranted where there is "sufficient 'cautionary language or risk disclosure such that reasonable minds could not disagree that the challenged statements were not misleading.'" *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996)) (cleaned up). The PSLRA is a statutory form of the bespeaks caution doctrine. *Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004). Defendants have not made this stringent showing.

Plaintiffs' remaining title and registration statements (Statement Nos. 4 and 8) consist of comments by Carvana employees on title and registration issues. (Doc. 71 ¶¶ 180-81, 188-89.) Statement No. 4 was made by Carvana's Vice President Mike Levin and Jenkins at the August 11, 2021 J.P. Morgan investor conference, where, in response to an analyst's question about the North Carolina DMV suspension, Levin and Jenkins explained:

> [Jenkins:] In this particular case, **I think we had quite a small fraction of customers that were impacted by title and registration delays, but it did happen in the state of North Carolina.** And so I think the DMV there thought that with having a set of customers experienced [sic] title and registration delays that they wanted to do something to reflect the fact that they didn't like customers in that state experiencing these delays.
>
> . . . .
>
> So what they did was they asked us to stop delivering cars from the vending machine in Raleigh. We can still deliver cars in the metro area of Raleigh, just not from the specific vending machine location. And we can also still do work in the vending team, but we just can't deliver cars from that particular location. And so that's what they elected to do. **Based on our research, that's a relatively sort of unusual approach for something like this and having a set of customers have title and registration delays, but that's where we are today.**

(*Id.* ¶ 180 (emphasis in original).) Then, when asked whether "this is a very North

- 17 -

Carolina specific issue and not something you might need to investigate in [] other states," Levin and Jenkins responded:

> [Jenkins:] Sure. Well, I would make 2 points on that. **One, our understanding is that this is quite unprecedented**. . . .
>
> [Levin:] **Yes**. . . . And I think this, based on the pandemic, what was an area where we saw delays. **And this was a relatively unusual action, but is also pretty small in scope, relatively speaking.**

(*Id.* (emphasis in original).) Plaintiffs allege this statement was misleading because Carvana represented the North Carolina action as "unusual," "unprecedented" and "specific" to North Carolina, when Carvana's systemically flouted state title and registration laws and had already been penalized in Ohio and Michigan. (*Id.* ¶ 181.) Plaintiffs rely on various CWAs, the *Barron's* exposé, Board meeting minutes, and other government investigations, plea agreements, suspensions, and media reports to support its allegations of falsity. (*Id.*)

Defendants argue that Plaintiffs' falsity theory rests on a misinterpretation of the statements. (Doc. 82 at 29-30.) According to Defendants, Jenkins and Levin were not suggesting that North Carolina was the *only* state experiencing title and registration delays; rather, that North Carolina's response to the delays was "unusual" and "unprecedented." (*Id.*) But context matters. While some of the statements could fairly be interpreted as Defendants suggest, Jenkins' statement "this is quite unprecedented" was made in *response* to the analyst's question "[is this] a very North Carolina specific issue and not something you might need to investigate in [] other states?" (Doc. 71 ¶ 180.) Considering this context, it is conceivable for a reasonable investor to interpret Jenkins' response as suggesting the North Carolina suspension was an anomaly.

To the extent Defendants argue Statement No. 4 is an inactionable opinion statement, that argument also fails. "[V]ague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws." *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d

367, 379 (9th Cir. 2003)). But opinion statements may be misleading in context if they "address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys.*, 865 F.3d at 1143 (citation omitted). That is precisely what happened here. Statement No. 4 was made in response to a specific question on Carvana's title and registration issues—an "area where [Carvana] saw delays." (Doc. 71 ¶ 180.) Therefore, the Court finds Plaintiffs sufficiently allege Statement No. 4 was misleading.

Statement No. 8 was made by a Carvana spokesman on June 24, 2022, who informed *Barron's*:

> "Carvana, like many dealers over the past two years, has in limited instances encountered challenges processing title and registration paperwork for its customers after the sale," the company says. **"In a very small percentage of a very small percentage of instances, customers did not receive permanent license plates or transferred title within the time frame set forth by the respective states."**
>
> . . . .
>
> **Carvana says the regulatory issues focus on a relatively small number of sales from 2020 and 2021. "We've had productive conversations with regulators in all of those states and feel very confident about our operations going forward,"** it says.

(*Id.* ¶ 188 (emphasis in original).) Plaintiffs allege this statement was misleading by suggesting customer delays and regulatory issues occurred in a "very small percentage of a very small percentage of instances," when the practice was widespread, and that operations would "go[] forward," when in fact, Carvana continued to face penalties. (*Id.* ¶ 189.)

Conversely, the Carvana Defendants argue falsity is not established because Plaintiffs have not alleged more than a "small percentage" of customers experienced unlawful delays, and in any case, the delays were disclosed. (Doc. 82 at 30.) And as to the "productive conversations with regulators"—Defendants contend this statement is inactionable puffery and opinion. (*Id.*) The Court is not persuaded. First, the ACC is replete with allegations that Carvana systemically violated title and registration

regulations, which resulted in customer delays and regulatory actions against Carvana. Second, by describing these delays as occurring in a "small percentage" of instances and alluding to "productive conversations" that would allow operations to continue, investors may have been led to believe that Carvana's days of regulatory scrutiny were in the past. This is sufficient to allege an actionable, misleading statement, and is not puffery as Defendants argue. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (telling investors FDA approval was "going fine" when the company knew approval would never come was not puffery and could mislead investors); *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (saying the company "anticipates a continuation of its accelerated expansion schedule" when the expansion already failed was not puffery and could be misleading).

In sum, the ACC sufficiently alleges that when these eight statements were made, a reasonable investor could believe Carvana was not systemically violating state title and registration laws, and knowledge of the omitted information would be material to investors. Accordingly, Plaintiffs sufficiently allege these eight statements were actionably misleading.

### (b)    Purchases (Statements 9-18)

In the second category of statements, Plaintiffs allege the Carvana Defendants misled investors because they stated Carvana considered the quality of its vehicles, but actually "drastically lowered (or disregarded) their purchasing and verification standards to significantly increase the number of cars they were purchasing from customers" and boost sales. (Doc. 71 ¶ 190.)

Challenged Statement Nos. 9, 11, 13, 15, 17, and 18 provide in relevant part:

> **Vehicle acquisition**. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. **We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory.** We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

(Doc. 71 ¶¶ 191-92, 195-96, 199-200, 203-04, 207-10 (emphasis in original).) These statements were included in Carvana's 2020 and 2021 Forms 10-K, and in Carvana's Forms 10-Q spanning October 29, 2020, to November 4, 2021. (*Id.*)

Plaintiffs also challenge a number of statements regarding Carvana's strategy in purchasing lower-quality vehicles from customers and selling them wholesale. Challenged Statement Nos. 10, 12, 14 and 16 provide:

- "And we've got very efficient ways to sell even wholesale cars. . . . And so we've seen a lot of success in that business. . . . If we're buying significantly more cars than we're selling, then we have the capacity to sell the excess wholesale." (Doc. 71 ¶¶ 193-94.)

- "I think our #1 channel for sourcing inventory has now become sourcing cars directly from customers, which has several advantages that we've talked about historically." (*Id.* ¶¶ 197-98.)

- "[W]e've built this channel of buying cars from customers that has performed very well for us over a long period of time. We've made continual high-quality progress in both the number of cars we're buying, the cars we're buying relative to retail sales and the profits that we're making on cars that we buy from customers. . . . We just saw a massive, massive increase in the number of cars we're buying from customers and in the profitability of buying cars from customers." (*Id.* ¶¶ 201-02.)

- " . . . I think the way that I would describe it is it's better. . . . [I]t gets us access to a higher-quality pool of inventory that is, on average, more profitable. And so we want to do as much of that as we possibly can. We want to build the business capacity to be able to handle as much of that as we possibly can." (*Id.* ¶¶ 205-06.)

According to Plaintiffs, these statements were misleading because Defendants touted the "advantages," "efficiency," "quality," and "progress" of Carvana's strategy and conveyed the impression that Carvana assessed a vehicle's "quality" without disclosing (1) that Carvana was intentionally buying lower-quality cars; (2) that Carvana

sold these vehicles wholesale at a loss; or (3) that Carvana lacked the infrastructure to process the surplus of wholesale vehicles, which led to logistics constraints and increased operational expenses. (*Id.* ¶¶ 190-210.) Moreover, Plaintiffs allege that because Carvana omitted these per-vehicle selling expenses, investors were unable to assess the overall profitability on wholesale sales per vehicle. (*Id.*)

The Carvana Defendants argue that the challenged statements were not misleading because none of them "suggest Carvana did not buy lower-quality cars, that the car-buying strategy was without challenges, or that—contrary to disclosures in every SEC filing—Carvana was actually profitable." (Doc. 82 at 33.)

The Court agrees with Carvana. The first group of statements detail how Carvana determined an appropriate offer to purchase a car; not whether the purchase was ultimately profitable. Thus, none of the alleged omissions relate to Statements 9, 11, 13, 15, 17-18. And even if Carvana was "intentionally buying lower quality cars," as Plaintiffs reallege thirty times in the ACC, these statements are arguably consistent with Carvana's business strategy in becoming the "Amazon of the used car industry." (Doc. 71 ¶ 2.) A classic investment tactic is to "buy low, and sell high," one which Plaintiffs—as sophisticated pension funds—are likely familiar with. It could be that purchasing lower-quality vehicles at a cheaper rate was more profitable for Carvana if those cars were refurbished in house and then sold for a larger profit margin. Whereas, purchasing high-quality vehicles with no issues at top dollar may cut into Carvana's profits. That Carvana's business strategy did not pan out does not, alone, make these statements false or misleading. *Golubowski v. Robinhood Mkts., Inc.*, No. 21-CV-09767-EMC, 2023 WL 1927616, at *10 (N.D. Cal. Feb. 10, 2023) ("Plaintiffs' disagreement" with defendants' "corporate approach" failed to state a claim for securities fraud). Vehicle quality was *one* factor Carvana considered in assessing overall profitability—Carvana never stated it was *the singular* factor.

In any event, Carvana disclosed its strategy to expand inventory by purchasing more vehicles from customers (including lower-quality vehicles that it either

reconditioned or sold to wholesalers) throughout the Class Period. In describing its wholesale sales revenue in its 2020 and 2021 SEC Forms, Carvana repeatedly identified wholesale sales as "sales of trade-ins and other vehicles acquired from customers that *do not meet the requirements* for our retail inventory." (Doc. 83-2 at 84; Doc. 83-3 at 58, 230; Doc. 83-4 at 41, 153; Doc. 83-5 at 77, 180, 285; Doc. 83-6 at 91; Doc. 83-8 at 48 (emphasis added).) Carvana also explained: "The Company sells vehicles to wholesalers," and these vehicles are primarily acquired from customers and "*do not meet the Company's quality standards* to list and sell through its website." (Doc. 83-1 at 192; Doc. 83-3 at 90; Doc. 83-4 at 183; Doc. 83-6 at 123 (emphasis added).) Moreover, in its Q3 2021 Shareholder Letter, Carvana explained, "[o]ur explosive growth in buying cars from customers over the last two quarters created significant operational constraints in our system." (Doc. 83-3 at 336.) Carvana disclosed its strategy and the operational constraints that followed; therefore, Plaintiffs fail to identify any material omission. *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) (explaining that the term "omission" "generally refers to the failure to disclose material information about a company, as opposed to affirmative manipulation").[8]

(c)     **Retail Unit Sales (Statements 19-20)**

Next, Plaintiffs allege Defendants' statements relating to Carvana's retail unit sales growth were false and misleading. (Doc. 71 ¶¶ 211-15.) The first challenged statement was included in Carvana's Q2 2021 Shareholder Letter, signed by Defendants Jenkins and Garcia Junior. (*Id.* ¶ 212.) It stated:

> **[R]etail units sold totaled 107,815 growing 96% YoY** vs. 55,098 in Q2 2020, and up 145% vs. Q2 2019. Q2 revenue grew to $3.336 billion, up 198% YoY from $1.118 billion, and up 238% vs. Q2 2019. **Year-over-year retail unit and**

[8] The Court also finds that Statement Nos. 12 and 16 are inactionable opinion statements, and Statement Nos. 10 and 14 are inactionable corporate puffery. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (finding the statement "we believe our employee relations are good" was inactionable puffery and similar to other inactionable statements, like "we're doing well and I think we have a great future," "business will be good this year," and "we expect the second half of fiscal 1992 to be stronger than the first half"); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) (explaining that phrases such as "I think" or "I believe" are opinion statements, denoting "a view, not a certainty").

- 23 -

> **revenue growth were . . . primarily driven by strong demand for our offering this year.**

(*Id.* (emphasis in original).) Plaintiffs also challenge a statement made by Jenkins during a Q4 2021 conference call, where Jenkins explained:

> **[R]etail units sold totaled 425,237, an increase of 74%, making us the fastest used automotive retailer to sell over 400,000 vehicles in 1 year. . . . Our exceptional growth in 2021 was driven by rapid growth within our market cohorts.**

(*Id.* ¶ 214 (emphasis in original).) According to Plaintiffs, these statements were misleading because they suggest Carvana's "growth" was organic and sustainable, as opposed to being driven by five unsustainable business practices. (*Id.* ¶¶ 212-15.) These practices included: (1) selling cars without proper title and registration, (2) pursuing sales in markets that were less profitable due to a long distance from inventory; (3) lowering its purchasing and verification standards to boost trade-ins, (4) artificially lowering prices to seek less profitable sales, and (5) entering a sham pass-through arrangement with DriveTime. (*Id.*) In response, Defendants argue that how Carvana describes its growth is inactionable puffery and opinion and that Plaintiffs fail to allege the company's growth was *not* primarily driven by a strong demand for its stock offering or Carvana's "rapid growth." (Doc. 82 at 33-35.)

The first part of each challenged statement—describing the number of retail units sold—describes historical results. Courts have reasoned that descriptions of historical performance do not represent anything about the causes of that performance or suggest that the performance will continue. *See In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2013 WL 211206, at *4 (N.D. Cal. Jan. 16, 2013) (finding "no duty to opine on how [the company] achieved its previously earned revenues or explain that those conditions would not continue throughout the class period"); *In re Caere Corp. Sec. Litig.*, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) (statements of past results "contain no implicit prediction that those events or conditions will continue"). Plaintiffs do not allege that the information reported was inaccurate. Therefore, to the extent Plaintiffs challenge

the first part of each statement, they fail to allege it was false or misleading.

Plaintiffs principally condemn the *attribution* of Carvana's revenue to a "strong demand for [Carvana's] offering" or its "rapid growth" as misleading by omitting the other fraudulent drivers of its increased revenues. (Doc. 71 ¶¶ 212-15.) When a company talks about revenue generally, it often has no duty to disclose the "drivers" of its revenue or growth—even if such drivers are the product of fraud. *See, e.g.*, *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-CV-04844-BLF, 2019 WL 6877195, at *12 (N.D. Cal. Dec. 17, 2019) (holding that the defendant did not have a duty to disclose its allegedly fraudulent sales practices when it discussed "revenue growth generally" and made no "affirmative representation" or "attribution of [its] revenue to other factors"). But "where a party goes beyond describing historical results and touts specific factors driving those results, it is obligated to disclose negative information related to those factors." *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020); s*ee also In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) (finding that a party touting "organic matches" was obligated to disclose its matches were artificially inflated through self-dealing).

In Statement Nos. 19 and 20, Carvana did more than just describe historical results—it attributed those results to its stock demand and expansion without disclosing the other drivers of its growth. Yet, the Court acknowledges that some of Carvana's car-buying and expansion business strategies were disclosed to investors. For instance, Carvana disclosed that it "benefited from [its] relationship and a series of arrangements with DriveTime that were not negotiated at arm's length" and "remained dependent on DriveTime for a number of important operations, including . . . vehicle inventory purchasing." (Doc. 83-1 at 21, 32.) Carvana also disclosed its vehicle service contract arrangement with DriveTime. (Doc. 83-4 at 302.) At the same time, some of Carvana's other expansion practices, such as its alleged practice of selling vehicles without proper title and registration, may not have been known to investors until a later date. Therefore, Plaintiffs have alleged a material omission as to these statements, and Defendants'

truth-on-the-market defense shall be reserved for another day.

**(d)    Expansion (Statements 21-29)**

In the fourth category of purported misstatements, Plaintiffs challenge Carvana's discussion of market figures (Statement Nos. 21-23, 25-28), and statements related to its logistic capabilities and "capital-light expansion model" (Statement Nos. 24, 29). (Doc. 71 ¶¶ 216-35.) Statements 21-23, 27, and 28 were included in Carvana's quarterly shareholder letters, wherein Carvana stated:

- "[W]e launched 15 new markets and 1 vending machine in Q1, bringing our total markets to 161, our total U.S. population coverage to 68.7%, and our total vending machines to 24 as of March 31, 2020." (Q1 2020 Shareholder Letter).

- "We opened a record 100 new markets in Q2 2020, increasing the total percentage of the U.S. population we serve in our 261 markets to 73.2%, up from 68.7% at the end of Q1 2020." (Q2 2020 Shareholder Letter).

- The Company "[a]dded five new markets, bringing our end-of-year total to 266 covering 73.7% of the population." (Q4 2020 Shareholder Letter).

- "In Q2 2021 we expanded the total percentage of the U.S. population we serve to 79.4%, up from 74.5% at the end of Q1 2021 through the addition of 27 new markets." (Q2 2021 Shareholder Letter).

- "In Q3 2021 we expanded the total percentage of the U.S. population we serve to 80.6%, up from 79.4% at the end of Q2 2021 through the addition of 9 new markets, taking another step toward our goal of 95% population coverage in the U.S." (Q3 2021 Shareholder Letter).

(*Id.* ¶¶ 218-23, 230-33.) Statement Nos. 25 and 26 were made by Jenkins and Garcia Junior during a May 6, 2021 conference call, where they explained:

> [Jenkins:] **So far in Q1, we have opened 22 new markets, bringing our total to 288 and increasing our population coverage to more than 77% of the U.S. population. In May, we also launched our first 5 markets in the Pacific Northwest,** adding the last major region to our nationwide footprint.
>
> . . .

**[Garcia Junior:] [W]e're excited about launching the Pacific Northwest. That was kind of the last region in our footprint that we weren't yet in. So I think opening that up is exciting because it basically means from here to roughly our 95% population coverage goal, in the long run, we basically have markets to fill in. So that's very exciting.**

(*Id.* ¶¶ 226, 228 (emphasis in original).) Plaintiffs do not challenge the accuracy of Carvana's reporting. Instead, Plaintiffs allege these statements were misleading because Carvana failed to disclose that all or most of the "new markets" and "population coverage" were 100 miles or more away from existing Inspection and Reconditioning Centers ("IRCs"), and that because of this distance, Carvana spent an additional $750 per vehicle in logistics and related expenses. (*Id.* ¶¶ 218-23, 226-33.) The Carvana Defendants argue these statements were not false or misleading because they accurately describe historical results, and in any case, Carvana disclosed the logistic costs and operational constraints incurred by its expansion. (Doc. 82 at 35-36.)

The Court agrees with Defendants. In *every* shareholder letter where Carvana touted its new markets and increased population coverage, it included a map of existing IRCs and where they were located relative to Carvana's new markets, vending machines, and headquarters. (*See, e.g.*, Doc. 83-2 at 31 (Q1 2020 Shareholder Letter); Doc. 83-3 at 157 (Q3 2020 Shareholder Letter); Doc. 83-3 at 175 (Q4 2020 Shareholder Letter); Doc. 83-9 at 86 (Q2 2021 Shareholder Letter); Doc. 83-3 at 338 (Q3 2021 Shareholder Letter); Doc. 83-4 at 79 (Q4 2021 Shareholder Letter); Doc. 83-4 at 325 (Q1 2022 Shareholder Letter); Doc. 83-5 at 119 (Q2 2022 Shareholder Letter); Doc. 83-5 at 227 (Q3 2022 Shareholder Letter); Doc. 83-6 at 11 (Q4 2022 Shareholder Letter).) The letters also directed shareholders to Carvana's website for more information on Carvana's "market opening history, estimated populations, and estimated total industry used vehicle sales by market, along with details on [Carvana's] IRCs." (*Id.*) Carvana also explained in its 2020 and 2021 Forms 10-K that its logistics component of its Selling, General and Administrative ("SG&A") expenses included "third-party transportation fees." (Doc. 83-3 at 66; Doc. 83-4 at 161.) Moreover, the Court finds that Statement No. 26 by Garcia

- 27 -

Junior is an inactionable puffery and opinion statement. *See Omnicare, Inc.*, 575 U.S. at 183-84 (explaining that phrases such as "I think" or "I believe" are opinion statements, denoting "a view, not a certainty").

Plaintiffs' remaining statements—Statement Nos. 24 and 29—are also unavailing. These statements were included in Carvana's 2020 and 2021 Forms 10-K, stating:

> Our business benefits from powerful network effects. **Our logistics capabilities allow us to offer every car in our inventory to customers across all of our markets.**
>
> . . .
>
> We believe there is a substantial opportunity to utilize **our capital-light expansion model** and proven go-to-market strategy to enter additional markets by expanding our existing logistics network and advertising in those markets.

(Doc. 71 ¶¶ 224, 234 (emphasis in original).) Plaintiffs aver these statements were misleading because, contrary to being "capital-light," Carvana's expansion required the buildout of costly IRCs and the acquisition of ADESA for $3 billion.[9] But Carvana disclosed this strategy from the time it went public and every quarter that followed. For example, in Carvana's Q1 2017 Shareholder Letter, it disclosed that "[g]rowth tops our priority list." (Doc. 83-1 at 925.) Carvana's 2017 Form S-1 also explained that the company "plan[s] to invest heavily in technology and infrastructure to support growth in unit sales. This includes continued investment in our acquisition, reconditioning, and logistics network." (*Id.* at 80.) And since its inception, Carvana warned investors that one of the main risks associated with its business is Carvana's "ability to effectively manage [its] rapid growth." (*Id.* at 18.) Carvana also explained that it has "not been profitable" since it was first formed in 2012, and Carvana planned to "make significant investments to further develop and expand [its] business." (*Id.* at 30.) Plaintiffs may disagree with Carvana's *disclosed* business strategy, but that disagreement alone does not make a securities fraud claim. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 533 (9th Cir. 2024)

---

[9] According to Plaintiffs, ADESA is "a wholesale auction company with locations nationwide." (Doc. 71 ¶ 14; *see also* Doc. 83-4 at 75 ("ADESA U.S. is the nation's 2nd largest network of physical auctions servicing a broad set of commercial and dealer customers with a range of wholesale used vehicle auction solutions.").)

("Dissatisfaction with a company's strategy, management, and approach to accounting, coupled with a stock drop, make for interesting reading but not an actionable securities fraud claim."); *Robinhood*, 2023 WL 1927616, at \*10 ("Plaintiffs' disagreement about how to 'democratize finance' on a trading platform does not mean that Robinhood violated the Securities Act by choosing a different corporate approach."). Therefore, Plaintiffs fail to allege that Statement Nos. 21-29 were false or misleading when made.

### (e)     Aged Inventory (Statements 30-32)

Plaintiffs also challenge three statements included in Carvana's SEC filings, wherein Carvana stated: "As we continue to grow, our number of IRCs is a more important metric than average days to sale ['ADTS'] due to the impact of IRC capacity on retail units sold and the relative stability of average days to sale in recent years" [or] "over the past three years." (Doc. 71 ¶¶ 238-43.) According to Plaintiffs, these statements were false because Carvana's ADTS metric increased throughout the Class Period due to Defendants' fraudulent scheme. (*Id.*) Plaintiffs also allege that Carvana's representation that its number of IRCs was more important than its ADTS was also false because Defendants always viewed ADTS "as a key internal metric" in assessing Carvana's Retail GPU. (*Id.*)

The Carvana Defendants offer several reasons as to why these statements are not actionable omissions. First, Defendants argue these statements are subjective assessments, and therefore, not actionable. (Doc. 82 at 36-37.) Defendants also contend that contrary to Plaintiffs' interpretation, these statements cannot be read as reporting Carvana's ADTS when they explain why the company stopped reporting its ADTS. (*Id.*) Moreover, Defendants assert Plaintiffs have not pleaded facts showing the metrics were not relatively stable or that it misled investors. (*Id.*)

The Court agrees with Defendants and finds that Plaintiffs fail to allege falsity as to these statements. Carvana's assessment that one metric is "more important" than another is an opinion statement, as it is not objectively verifiable. *See In re Cutera Sec. Litig.*, 610 F.3d at 1111. Moreover, that Carvana previously thought ADTS was a critical

metric does not mean Carvana was required to continue reporting it, especially when Carvana explained that its business priorities had changed and disclosed its increasing inventory. As to the latter part of the statement challenging the "relative stability" of Carvana's ADTS, Plaintiffs overlook a critical limitation on the metric's "stability"— namely that it is measured "*in recent years*" and/or "over the past *three years*." (*See* Doc. 71 ¶¶ 238-43.)

Upon reviewing Carvana's ADTS "in recent years," the Court finds that Plaintiffs have not alleged how Statement Nos. 30-32 were false or misleading. For example, the ACC explains that from 2018 to 2021, Carvana's ADTS were as follows: **64** in FY 2018; **62** in FY 2019; **67** in FY 2020; and ranging from **54-60** in Q1-Q3 2021.[10] (Doc. 71 ¶ 241(a) n.92.) While Carvana's ADTS increased in 2022, that does not make Carvana's statements, referring to the preceding three years, false or misleading. Therefore, the ACC fails to allege Statements 30-32 are actionably false or misleading.

### (f) Profitability (Statements 33-39)

In the last category of challenged statements, Plaintiffs allege Defendants' statements concerning Carvana's Retail GPU metric were false and misleading. (Doc. 71 ¶¶ 244-60.) These statements were all made by Jenkins during earnings calls taking place between May 2020 and February 2022. (*Id.*) Statement Nos. 33-39 reported:

- "Our growth in GPU was driven by strong retail GPU, which increased $299 to $1,581, our highest ever, driven primarily by buying cars from customers." (*Id.* ¶ 247.)

- "Retail GPU was $1,190," that "there are definitely some exciting trends in retail GPU," and "I think [purchasing more cars from customers is] obviously a positive, that drives wholesale GPU, that drives incremental retail GPU, because cars that you acquire from customers are typically more profitable than cars that you acquire at auction." (*Id.* ¶ 249.)

[10] In fact, Carvana's ADTS for FY 2021 is 61.25, after averaging the numbers reported for each quarter in the ACC, which is lower than all prior fiscal years. (*See* Doc. 71 ¶ 239(a) (explaining that the ADTS was 60 in Q1 2021; 54 in Q2 2021; 60 in Q3 2021; and 71 in Q4 2021).)

- "Growth in retail GPU was driven by a significant increase in the share of our vehicles sourced from customers." (*Id.* ¶ 251.)

- "Retail GPU declined slightly to $1,211 from $1,265 in Q4. . . . And so that's a tailwind to retail GPU as we move towards 2Q, other things being equal. Obviously, overall, we feel really good about our progress there." (*Id.* ¶ 253.)

- "[O]n retail GPU, we had our first quarter over $2,000 retail GPU. . . . But the $2,000 is a record for us. . . . The biggest driver there was certainly the performance [of] buying cars from customers. . . . [W]e feel really great about our retail GPU progress. Buying cars from customers continues to be a strong driver of the improvements in the business . . . ." (*Id.* ¶ 255.)

- "Retail GPU was $1,769 . . . . The change in retail GPU was primarily driven by higher reconditioning costs, in part resulting from the impact of the Delta variant on production throughput [sic], and higher wholesale acquisition prices, partially offset by higher customer-sourced ratio. . . . So we had a strong quarter on retail GPU in Q3, came in at $1,769." (*Id.* ¶ 257.)

- "Retail GPU increased by $230 in Q4, primarily driven by an increase in the percentage of retail vehicles sourced from customers." (*Id.* ¶ 259.)

According to Plaintiffs, Defendants reported a positive Retail GPU while concealing that Carvana generated negative per-vehicle profitability by: (1) excluding certain per-vehicle operational expenses from its calculation of Retail GPU; and (2) not disclosing or quantifying these excluded costs separately for investors.[11] (*Id.* ¶ 248.)

---

[11] Relying on Carvana's November 2023 "Cost Structure Details" presentation, Plaintiffs allege that the excluded "operations expenses" consist of:

> 1. Operations payroll, including customer care, multi-car logistics, last-mile delivery, and other operations payroll []
>
> 2. Non-payroll logistics expenses, including fuel, repairs and maintenance, and third-party transport services [], and
>
> 3. Transaction and other expenses, including limited warranty, title and registration, and finance platform expenses.

(Doc. 71 ¶ 248(b); Doc. 83-6 at 239.)

Despite internally viewing these expenses as a "key" part of Carvana's "unit economics" (*i.e.*, how much profit was realized for each retail vehicle sold), Plaintiffs allege Defendants "buried" the expenses in its SG&A category, which prevented investors from discovering that Carvana was losing money per vehicle sold. (*Id.*) The ACC further explains that Carvana disclosed these operations expenses to investors for the first time in November 2023. (*Id.*)

In response, the Carvana Defendants argue that Plaintiffs' disagreement with Carvana's cost allocation and accounting methodology is insufficient to establish falsity. (Doc. 82 at 38 ("Carvana allocated the costs Plaintiffs are complaining about . . . to a cost category (SG&A) different from the one Plaintiffs would have preferred []. That's not a securities claim.").) Plaintiffs dispute Defendants' characterization of their allegations, but the Court is not persuaded. In principle, Plaintiffs challenge Carvana's accounting methodology—one that, when considering Carvana's disclosures to investors and business priorities, is not misleading and indeed makes sense.

For example, prior to and throughout the Class Period, Carvana informed investors that its SG&A expenses "include expenses associated with . . . operating our vending machines and hubs, operating our logistics and fulfillment network and other corporate overhead expenses, including expenses associated with . . . business development." (*See* Doc. 83-1 at 89; Doc. 83-2 at 89; Doc. 83-3 at 63, 234; Doc. 83-4 at 45, 158; Doc. 83-5 at 81, 185, 290; Doc. 83-6 at 96; Doc. 83-8 at 53.)[12] And since Carvana went public, it informed investors that its primary goal was growth. (*See* Doc. 83-1 at 18 (detailing Carvana's five growth strategies to increase retail vehicle unit sales); Doc. 83-1 at 925 (explaining in its Q1 2017 Shareholder Letter that "[g]rowth tops our priority list").) Therefore, it makes sense that Carvana allocated certain expenses—such as shipping, third party transportation, and title and registration costs that Plaintiffs identify—to

[12] Carvana also repeatedly disclosed that its "logistics" component of SG&A includes outbound logistics such as fuel, maintenance, and third-party transportation fees, but inbound logistics and reconditioning costs were included in the cost of sale figure for calculating GPU. (*See, e.g.*, Doc. 83-1 at 92, 937; Doc. 83-2 at 20, 44, 92, 170; Doc. 83-3 at 66, 191, 237, 350; Doc. 83-4 at 48, 93, 161, 340; Doc. 83-5 at 84, 137, 189, 241, 295; Doc. 83-6 at 26, 100; Doc. 83-7 at 21, 57, 99.)

SG&A because these costs may have largely been due to Carvana's rapid expansion strategy. "Businesses have some discretion in making accounting estimates," and Plaintiffs do not plead that Defendants violated generally accepted accounting principles. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 609 (9th Cir. 2014).

Moreover, the November 2023 documents Plaintiffs rely on do not suggest that Carvana's "operations expenses" are currently and should have always been included in its Retail GPU calculations—as Plaintiffs allege. Rather, Carvana later broke out these expenses per unit, explaining that "[s]ince *shifting our focus to profitability*, we have reduced retail and wholesale vehicle operations expenses per unit." (Doc. 83-6 at 241; Doc. 83-7 at 6 (emphasis added).) Thus, this document disclosed information Carvana felt material given its business strategy shift from growth (during the Class Period) to profitability (following the Class Period). Even if Carvana now allocates its operations expenses differently, with a *different goal* in mind, that does not mean that how Carvana previously accounted its expenses, pursuant to *a different objective*, was false or misleading. Accordingly, the Court finds that Plaintiffs fail to allege Statement Nos. 33-39 were false or misleading.

### 3)    Conclusion

In sum, the Court finds that the ACC sufficiently alleges Defendants' title and registration statements (Statement Nos. 1-8) and its retail unit sales representations (Statement Nos. 19-20) were actionably false or misleading when made. Insofar as Plaintiffs allege a misrepresentation claim as to Statement Nos. 9-18 and 21-39, those statements fail to allege an actionable falsity and will be dismissed as to Count I.

### ii.    Scheme Liability under Rule 10b-5(a) and (c)

The Court now turns to Plaintiffs' 10b-5(a) and (c) allegations. The elements of a scheme-based claim are largely the same as a misrepresentation claim and include: (1) use or employment of any manipulative or deceptive device or contrivance; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance upon the deceptive or manipulative act by investors; (5) economic loss; and (6) loss causation.

*Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009). For scheme-based claims a defendant need not "make" the material representation to be liable; rather, a plaintiff need only plead that the defendant "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds by Avis Budget Grp., Inc. v. Cal. State Tchrs.' Ret. Sys.*, 552 U.S. 1162, 128 (2008). "Although the heightened pleading requirements of the PSLRA do not apply to claims under Rule 10b-5(a) and (c), such claims must be pleaded with specificity under Rule 9(b)." *Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, No. CV-15-8574-PSG, 2016 WL 6782768, at *14 (C.D. Cal. Aug. 9, 2016) (citations omitted). And given that "the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1193 (D. Or. 2015) (citation omitted).

Plaintiffs allege the Exchange Act Defendants engaged in a seven-part "pump and dump" scheme to defraud investors and "cash out their personal holdings in Carvana stock at a top dollar." (Doc. 71 ¶¶ 125-72.) The scheme begins with the related-party deals struck between Garcia Senior's DriveTime and Carvana. (*Id.* ¶¶ 127-29.) According to Plaintiffs, DriveTime entered a series of sham pass-through arrangements with Carvana, whereby "Carvana would acquire cars from DriveTime, sell the car on its website, and then pass the entire proceeds from the sale back to DriveTime." (*Id.*) Despite acting as DriveTime's middleman, Carvana reported the revenue and retail sales on its books to boost its recorded sales numbers and stock price, all while concealing the full extent of these transactions from investors. (*Id.*) Next, Garcia Junior and Jenkins lowered Carvana's purchasing and verification standards for cars it purchased from customers "to induce trade-ins and increase inventory" during the Class Period. (*Id.* ¶¶ 130-38.) This inflated Carvana's retail sales and stock price even though "Carvana was losing money on wholesale vehicle sales." (*Id.*)

In step three of the scheme, Plaintiffs allege Garcia Junior and Jenkins "spearheaded a rapid and unsustainable nationwide expansion plan" to further boost retail sales. (*Id.* ¶¶ 139-43.) But because these new markets were a significant distance from Carvana's existing IRCs, the resulting sales were less profitable, and Carvana eventually spent "millions of dollars on costly third-party logistics and reconditioning providers." (*Id.*) Garcia Junior and Jenkins concealed this information from investors by excluding relevant operations expenses from Carvana's wholesale and Retail GPU and by not adequately disclosing or quantifying these costs separately for investors. (*Id.*)

The fourth artifice required Garcia Junior and Jenkins to systemically ignore title and registration laws because compliance would "slow[] sales growth." (*Id.* ¶¶ 144-49.) This had the effect of increasing Carvana's SG&A expenses and exposing Carvana "to devastating financial, regulatory, legal, and reputational loss." (*Id.*) Plaintiffs further allege Defendants' scheme was accomplished through a series of materially false or misleading statements and omissions by Garcia Junior and Jenkins. (*Id.* ¶¶ 150-59.)

With the "pumping" of Carvana's stock price complete, Plaintiffs assert it was now time for Defendants to "dump" their holdings and "enjoy the fruits of [their] fraudulent labor." (*Id.* ¶ 160.) According to Plaintiffs, Garcia Senior manipulated his Rule 10b5-1 plans to "accelerate the number of shares he could sell per day while in possession of [material, non-public information]" ("MNPI"). (*Id.* ¶ 161.) Jenkins adopted two new 10b5-1 plans within nine months during the Class Period. (*Id.* ¶ 269.) Then, before investors learned Carvana's growth was anything but "sustainable," Garcia Senior and Jenkins sold approximately 14.3 million shares for a profit of $3.76 billion. (*Id.* ¶¶ 163-65.)

### 1) Garcia Senior

Garcia Senior separately moves to dismiss the scheme claim asserted against him. (Doc. 85 at 12-23.) In his motion, Garcia Senior argues that the ACC fails to allege he committed a deceptive act that investors relied on in exchanging securities. (*Id.* at 14.)

**(a)    Deceptive or Manipulative Act**

While the ACC details a seven-series scheme intended to defraud investors, Garcia Senior is alleged to have participated in just three of the purported "artifices." (Doc. 71 ¶¶ 127-29, 160-65.) Specifically, Plaintiffs allege Garcia Senior's "deceptive conduct" consisted of (1) brokering the sham transactions between DriveTime and Carvana; (2) modifying his 10b5-1 plans; and (3) selling his stock. (*Id.*)

As to the first artifice, Plaintiffs fail to allege the transactions between Carvana and DriveTime qualify as a manipulative or deceptive act because they were disclosed to investors. For instance, Carvana disclosed that it "benefited from [its] relationship and a series of arrangements with DriveTime that were not negotiated at arm's length" and "remained dependent on DriveTime for a number of important operations, including . . . vehicle inventory purchasing." (Doc. 83-1 at 31, 32.) Carvana also disclosed its vehicle service contract arrangement with DriveTime. (*Id.*) Plaintiffs have not alleged Garcia Senior brokered these transactions with the "primary purpose" of deceiving investors. Indeed, this arrangement was consistent with Carvana's disclosed course of business. To the extent Plaintiffs argue Carvana's disclosures were incomplete and misleading, that claim fails to assert liability against Garcia Senior specifically for lack of reliance—as discussed further below.

The ACC also does not allege Garcia Senior's 10b5-1 modifications or stock sales created a false impression of material fact. The Court acknowledges that it is unclear on the face of the ACC whether Plaintiffs independently assert an insider trading claim against Garcia Senior under Section 10(b), despite Plaintiffs' statements to the contrary. (Doc. 91 at 91 n.89.) Even drawing all inferences in favor of Plaintiffs, however, the ACC lacks any well-pled allegations to support such a claim.

A plaintiff bringing an insider trading claim must "allege specifically what information [a defendant] obtained, when and from whom he obtained it, and how he used it for his own advantage." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993). In the ACC, Plaintiffs do not allege the *type* of MNPI Garcia Senior possessed, *when* he

acquired said information, or *how* he used that information to his advantage. To the extent Plaintiffs allege Garcia Senior possessed MNPI based solely on his status as a controlling shareholder and the CEO's father, such bare assertions are insufficient to state a claim for relief.[13] *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard."). There are also no allegations that Garcia Senior had a duty to disclose or that he misappropriated any purported MNPI. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 328 F. Supp. 3d 963, 984 (N.D. Cal. 2018) ("To successfully bring a traditional insider trading claim, as is alleged here, a private plaintiff must establish that the defendant had a duty to disclose the information that was withheld.").

Therefore, Plaintiffs have not sufficiently alleged Garcia Senior committed a "deceptive" or "manipulative" act in furtherance of a scheme to defraud investors.

### (b)    Reliance

The Court will also address Garcia Senior's argument that Plaintiffs' scheme liability claim is foreclosed by *Stoneridge Investment Partners, LLC v. Scientific-Atlanta Inc.*, 552 U.S. 148 (2008). (Doc. 85 at 12-13.) The heart of Garcia Senior's argument deals with the element of reliance. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge*, 552 U.S. at 159. "This is because proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)).

In *Stoneridge*, the plaintiff-investors initiated a class action against Charter

---

[13] The only conceivable allegation that Garcia Senior possessed MNPI is in a passing footnote, where Plaintiffs describe an email from Garcia Senior to Garcia Junior. (Doc. 71 ¶ 303 n.165.) There, Plaintiffs assert Garcia Senior coordinated a list of potential investors and stated he would need to "figure out a plan on his money" prior the 500 million dollar offering. (*Id.*) The Court finds this bare assertion is insufficient to plausibly and particularly allege an insider trading claim under Rule 9(b) and the PSLRA.

Communications, a cable television company, and two unaffiliated supplier companies (the "Suppliers"). 552 U.S. at 153. The plaintiffs alleged that Charter Communications entered a series of transactions with the Suppliers with "no economic substance," whereby it overpaid the Suppliers for equipment, and in return, the Suppliers would purchase advertising. *Id.* at 153-54. The investors asserted scheme liability under Rule 10b-5(a) and (c) against the Suppliers, arguing that their participation in these transactions allowed Charter Communications to deceive its auditor into approving financial statements that reported artificially inflated revenues. *Id.* at 154, 159-60. The United States Supreme Court determined that the Suppliers were not liable to Charter Communications' investors because these transactions did not have "the requisite proximate relation to the investors' harm" and the Suppliers "had no role in preparing or disseminating Charter's financial statements." *Id.* at 155, 158-59. The Court also rejected the investors' argument that reliance could be established on the theory that the Suppliers' conduct (participating in these transactions) constitutes "deceptive conduct" in Charter's scheme to misrepresent its revenue, stating:

> In effect petitioner contends that in an efficient market investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect. Were this concept of reliance to be adopted, the implied cause of action would reach the whole marketplace in which the issuing company does business; and there is no authority for this rule.

*Id.* at 160.

Post-*Stoneridge*, courts have generally held that a company's transactional relationship with a secondary party is, by itself, insufficient to establish reliance on the secondary party's conduct for scheme liability—even if the party knew of or participated in the fraudulent conduct. *See, e.g.*, *Burnett v. Rowzee*, 561 F. Supp. 2d 1120, 1126-27 (C.D. Cal. 2008) (finding the plaintiffs' allegations of defendant's "general participation in the PIPES scheme" were insufficient to assert primary liability under *Stoneridge*); *Abbate v. Wells Fargo Bank, N.A.*, No. CV-10-6561-DOC, 2011 WL 9698215, at *3-5 (C.D. Cal. Nov. 17, 2011) (finding no deceptive act because the defendant's "alleged

participation in [another party's] misstatements is not conduct that can support a scheme liability claim" even if investors relied on those statements) (cleaned up). *But see Lopes v. Vieira*, 543 F. Supp. 2d 1149, 1177 (E.D. Cal. 2008) (finding that a secondary actor may be liable under scheme theory even if not publicly identified so long as it played a significant role in preparing the fraudulent disclosure).

Of the three acts Garcia Senior participated in, the ACC does not allege Plaintiffs relied on any in exchanging securities. In fact, Plaintiffs only allege that investors relied on *Carvana*'s recording *its* inflated revenue and sales from these transactions on *its* books, or *Carvana's* incomplete disclosures. (*See* Doc. 71 ¶ 127 ("While Carvana merely acted as DriveTime's middle man or agent, it still recorded the revenue and retail unit sales on its books to pump up Carvana's stock."); ¶ 128 ("Defendants concealed the full extent of these arrangements from investors, offering only piecemeal and inconsistent disclosures concerning the pass-through revenue arrangements.").) None of the allegations in the ACC suggest Garcia Senior was remotely involved in preparing the SEC forms with inflated revenues or the disclosures that investors purportedly relied on.[14] And Plaintiffs' arguments that *Stoneridge* applies only to the acts of unaffiliated third parties is without merit. (Doc. 91 at 43-45.) "[C]ontrary to Plaintiffs' position, *Stoneridge* has no language limiting its holding to conduct by third parties." *Yoshikawa v. Exxon Mobil Corp.*, No. 3:21-CV-0194-N, 2024 WL 3802997, at *5 (N.D. Tex. Aug. 12, 2024).

At best, Plaintiffs allege that Garcia Senior "aided and abetted" in the alleged scheme. This is insufficient to assert scheme liability under Section 10(b). *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) (holding that liability under § 10(b) extends only to primary violations and not to aiding and abetting a violation); *see also Borteanu v. Nikola Corp.*, No. CV-20-01797-PHX-SPL,

---

[14] Plaintiffs allege the SEC is currently investigating Carvana's related-party deals with Garcia Senior. (Doc. 71 ¶ 127 n.10.) But this is inapposite. As *Stoneridge* made clear, "[a]iding and abetting liability is authorized in actions brought by the SEC but not by private parties." 552 U.S. at 162 (citing 15 U.S.C. § 78t(e)). Adopting Plaintiffs' theory of liability would allow this Court to "undermine Congress' determination that this class of defendants should be pursued by the SEC and not by private litigants." *Id.* at 163.

2023 WL 1472852, at *26 (D. Ariz. Feb. 2, 2023) (dismissing the plaintiff's complaint because allegations that defendant aided and abetted the alleged scheme were insufficient to state a claim under Rule 10b-5(a) and (c)).

### 2)  The Carvana Defendants

The Carvana Defendants also move to dismiss the scheme liability claim asserted against them. (Doc. 82 at 51-53.) Defendants argue the alleged scheme "is no different from Plaintiffs' statement-based theory of fraud, and fails for the same reasons." (*Id.* at 52.) Because the Court finds Plaintiffs allege actionable misrepresentations, Defendants' argument is unavailing. *See Lorenzo v. SEC*, 587 U.S. 71, 80 (2019) (recognizing claims under Rule 10b-5(b) and 10b-5(a) and (c) may "considerabl[y] overlap"). Therefore, the Court finds the ACC adequately asserts falsity against the Carvana Defendants under a scheme theory for the same reasons it finds Plaintiffs sufficiently allege falsity in their misrepresentation claim.

### b.  Scienter

Next, the Court considers whether the ACC sufficiently alleges scienter. Securities fraud claims require a showing of scienter, *i.e.*, an intent to defraud. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (explaining that scienter refers to the "mental state embracing intent to deceive, manipulate, or defraud"). "Mere negligence—even head-scratching mistakes—does not amount to fraud." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1103 (9th Cir. 2021). In enacting the PSLRA, Congress extended Rule 9(b)'s particularity requirements to allegations of scienter; therefore, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A complaint supporting a strong inference of scienter must allege that each defendant made each false or misleading statements with an "intent to deceive, manipulate, or defraud," or with deliberate recklessness. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017). "Deliberate recklessness is not mere recklessness." *Prodanova*, 993 F.3d at 1106 (internal quotations and citation

omitted). Rather, it is "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation omitted).

To determine whether scienter has been adequately pleaded, the Ninth Circuit directs district courts to apply a two-part inquiry. First, the court "determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter." *Glazer Cap. Mgmt., LP v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (hereinafter "*Glazer II*"). If not, then the court "conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Id.* (citation omitted). In evaluating scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The Carvana Defendants move to dismiss Count I against them for the additional reason that Plaintiffs fail to allege scienter. (Doc. 82 at 43-51.) Plaintiffs argue scienter can be inferred considering: (1) Defendants' $3.76 billion insider sales; (2) Defendants' false and misleading statements; (3) Defendants' failure to report key metrics; (4) confidential witness accounts; (5) the "core operations" doctrine; and (6) additional facts.[15] (Doc. 91 at 66-82; Doc. 71 ¶¶ 261-306.)[16]

### i.    Financial Motive to Commit Fraud

Suspicious stock sales may provide evidence of scienter by inferring a financial

---

[15] These additional facts include: (i) Garcia Junior's and Jenkins' positions, the overall importance of retail sales and GPU, and Sarbanes-Oxley certifications; (ii) government investigations; and (iii) Garcia Senior's history of similar fraudulent conduct. (Doc. 91 at 81-82.)

[16] Because the Court finds Plaintiffs have not alleged a scheme liability claim against Garcia Senior, it need not consider his scienter or loss causation arguments. (Doc. 85 at 16-23.)

motive to commit fraud. *See Prodanova*, 993 F.3d at 1107. "[A] financial motive for securities fraud will be clear; for example, [when] someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information." *Id.* To evaluate suspiciousness of stock sales, courts consider three factors: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017) (citation omitted).

In the ACC, Plaintiffs allege Jenkins sold 48% of his stock for profits of around $79 million "just as Carvana's stock peaked." (*Id.* ¶ 268.) In the three years following Carvana's IPO, "Jenkins sold 13,000 fewer shares . . . for proceeds of only $18.5 million." (*Id.*) Plaintiffs also assert the timing of these sales was suspicious because they primarily occurred after Jenkins adopted a new 10b5-1 plan that Jenkins entered into while in possession of MNPI. (*Id.* ¶ 269.)

The Carvana Defendants argue their stock sales do not evince a financial motive to commit fraud sufficient to support a strong inference of scienter. (Doc. 82 at 43-47.) This is because Garcia Junior never sold a single share—and in fact purchased two million shares—during the Class Period. (*Id.* at 44.) Additionally, Defendants argue Jenkins sold fewer shares than he acquired, in a manner consistent with his 10b5-1 plan, and mostly *before* the stock price peaked. (*Id.* at 44-45.)

The Court agrees with Defendants. As to Garcia Junior—the ACC does not allege he sold a *single* share. Rather, Plaintiffs assert, in conclusory fashion, that Garcia Junior is a beneficiary of the DriveTime Trust and, therefore, benefitted indirectly from his father Garcia Senior's suspicious stock sales.[17] (Doc. 71 ¶ 160 n.17.) But the ACC offers no well-pled allegations substantiating this theory; nor does the ACC allege Garcia Junior even knew of his father's stock sales.

And considering Jenkins—while he realized profits of around $79 million, his

---

[17] The ACC alleges that during the Class Period, Garcia Senior offloaded 15% of his ownership (amounting to 13.95 million shares) for profits of nearly $3.7 billion after modifying his 10b5-1 trading plans twice within one year to accelerate the number of shares he could sell each day. (*Id.* ¶¶ 262-63, 265.)

trading was consistent with prior trading activity. (*See* Doc. 83-9 at 1-80.) *City of Dearborn Heights*, 856 F.3d at 621 ("[S]tock sales by corporate insiders are suspicious only when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.") (cleaned up); *In re Peregrine Sys., Inc. Sec. Litig.*, No. 02-CV-870-BEN, 2005 WL 8158825, at *62 (S.D. Cal. Mar. 30, 2005) (explaining that "[t]he mere fact that insider stock sales occurred does not suffice to establish scienter") (citation omitted). Therefore, the Court finds that Jenkins' stock sales are generally unsuspicious and, by itself, insufficient to support a strong inference of scienter. Yet, the Court notes that Jenkins did not present evidence of competing inference, so the Court will consider his stock sales in the *Tellabs* holistic review. *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (considering unsuspicious stock sales in holistic review when the defendant did not present evidence of a competing inference).

### ii.      Intent or Deliberate Recklessness

#### 1)      False and Misleading Statements

Plaintiffs urge Jenkins' and Garcia Senior's false and misleading statements support an inference of scienter. (Doc. 71 ¶¶ 287-88; Doc. 91 at 74-75.) The Carvana Defendants argue their statements cannot establish scienter because Plaintiffs do not show Defendants omitted information or that nondisclosure would materially mislead investors. (Doc. 82 at 48-50.) Generally, merely signing an SEC filing does not give rise to strong inference of scienter, unless there are allegations that the defendants knew of alleged misstatements contained within the SEC filings. *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1159 (C.D. Ca. 2007). Conversely, specific statements on the purported subject of fraud may give rise to a strong inference of scienter. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (holding defendants accountable for information related to the fraud, noting "once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors"); *Roberti v. OSI Sys., Inc.*, No. CV-13-9174-MWF, 2015 WL 1985562, at *12

(C.D. Cal. Feb. 27, 2015) ("[A]n inference of scienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements.").

The ACC alleges Defendants Jenkins and Garcia Junior made specific representations about Carvana's title and registration issues and retail unit sales and that Defendants included those statements in various signed SEC filings. (Doc. 71 ¶¶ 174-89, 212-15.) Indeed, some of these statements were made in response to direct questions from analysts. For example, when asked whether the DMV suspension was a "North Carolina specific issue," Jenkins represented the action as "unusual," "unprecedented" and specific to North Carolina. (*Id.* ¶ 180.) Yet, by this time, Carvana faced regulatory action in other states including Ohio and Michigan. (*Id.* ¶ 181.) This statement suggests Jenkins had actual knowledge of the alleged omission and, therefore, supports an inference of scienter. *See S. Ferry LP # 2*, 687 F. Supp. 2d at 1259-60 (holding that the defendant's statements were "sufficient to satisfy the actual knowledge analysis and allow[] the Court to infer scienter"). And even in the case Defendants reassured investors that the DMV suspension was "North Carolina specific" or that Carvana was in compliance with applicable title and registration regulations—*without* actual knowledge of the regulatory actions pending in other states—those statements would at least evince deliberate recklessness. *See id.* ("If [the defendant] did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all.").

Thus, the Court finds the ACC sufficiently alleges that the Carvana Defendants represented they had access to the information related to the company's title and registration issues and retail unit sales growth. These allegations support an inference of scienter.

### 2) Failure to Report Key Metrics

Plaintiffs also allege that scienter can be inferred by Defendants' decision to stop reporting key metrics that would alert investors of their scheme, such as their ADTS and customer-source ratios. (Doc. 71 ¶¶ 289-94; Doc. 91 at 75-76.) The Carvana Defendants argue that the company's decision to stop reporting these metrics does not support an

inference of scienter because the ACC does not allege Defendants were involved in this decision, nor that Defendants intended to deceive investors. (Doc. 82 at 50-51.) The Carvana Defendants also raise a competing inference—that Defendants stopped reporting these metrics because they considered other metrics more important, as Carvana informed investors. (*Id.*)

The Court agrees with Defendants for the same reasons the ACC fails to allege that statements related to Carvana's ADTS metric and customer purchases were false or misleading. Carvana disclosed why it chose not to report these metrics—namely, because the numbers were relatively stable, and it determined its number of IRCs to be a more important data point. This is a plausible competing inference that cuts against Plaintiffs' conclusory allegations that Defendants concealed these metrics to hide their fraudulent scheme from investors. Plaintiffs' fleeting allegations that Defendants knew Carvana's ADTS and customer purchases were spiking, and therefore, concealed the data with the intent to mislead investors do not meet the heightened pleading standards of the PSLRA. Accordingly, these allegations do not support an inference of scienter.

### 3)   Confidential Witness Accounts

The ACC further alleges that various CWAs support a strong inference of scienter. (Doc. 71 ¶¶ 274-79.) "Where the plaintiff relies upon statements by confidential witnesses, the complaint must also pass two additional hurdles." *In re Quality Sys.*, 865 F.3d at 1144. "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.*

In the ACC, Plaintiffs summarize accounts from confidential witnesses ("CWs") 3, 4, 8, 9, 10, and 11—all of whom report that Carvana routinely sold cars before receiving title. (Doc. 71 ¶¶ 181(b), 189(a).) The Court will discuss whether Plaintiffs'

allegations suffice to allege each CW's reliability and personal knowledge, as well as whether their statements are indicative of scienter.

CW-3 was employed as a dealer success advocate on Carvana's wholesale team from before the Class Period until the middle of the Class Period. (*Id.* ¶ 61.) CW-3 avers that "Carvana generally had around half of the titles for the vehicles they sold wholesale at the time of sale," and one of the reasons CW-3 quit working at Carvana "was because so many vehicles were missing titles." (*Id.* ¶ 64.) CW-3 received between ten and fifteen calls per week regarding title issues in early 2020, and as the year progressed, CW-3 began to receive "around 100 calls per week." (*Id.* ¶ 65.) CW-3 reported the issues to his/her manager, and the "issues also were discussed during weekly meetings," "but nothing was done." (*Id.* ¶ 66.)

CW-4 worked as an operations specialist from before the Class Period until early 2022. (*Id.* ¶ 69.) CW-4 characterized Carvana's title issues as "a huge mess" and by the time CW-4 quit, "there were over 70 wholesale vehicles at his/her IRC alone for which Carvana lacked the title and were just sitting around." (*Id.* ¶ 73.) CW-4 further explained that Carvana maintained a spreadsheet for vehicles needing title and stated, "there were 'a ridiculous amount of cars on the list.'" (*Id.*) Moreover, CW-4 avers "it was well known internally that title issues were a very common problem at Carvana, and everyone complained about it." (*Id.* ¶ 74.) CW-4 also alleges that just before Carvana announced the acquisition of ADESA, Carvana's chief operating officer, Benjamin Huston, mentioned that "ADESA's title department was good and Carvana would adopt their processes and improve the title process." (*Id.* ¶ 76.) This led CW-4 to believe "Huston must have known about the title issues." (*Id.*)

CW-8 was employed as a buyer and category analyst for over 18 months during the Class Period, which required CW-8 to "manage[] pricing operations" amongst other responsibilities. (*Id.* ¶ 97.) CW-8 explained that there was a lot of pressure on his/her team "to get every vehicle possible, no matter the price." (*Id.* ¶ 100.) To this end, CW-8 was told "that the titles for the vehicles could be acquired later if they were not available

at the time of purchase." (*Id.*)

CW-9 worked as a lead for customer experience for over six months during the Class Period. (*Id.* ¶ 102.) Prior to Q1 2022, part of CW-9's responsibilities included handling post-sales calls from customers "primarily pertaining to issues with vehicle delivery delays, registration and title delays, and vehicle quality and condition complaints." (*Id.*) CW-9 explains that the members of his/her team received ten to thirty calls per day and roughly half of them involved registration issues, and the number of calls increased beginning in Q1 2022. (*Id.* ¶ 104.) Further, CW-9 asserts that he/she attended Carvana all-hands calls with Garcia Junior, where, in response to employees' questions on what steps the Company was making to resolve title and registration issues, Garcia Junior told them "Carvana was working on a solution." (*Id.* ¶ 105.) CW-9 particularly remembers Garcia Junior addressing employees on a call in January 2022. (*Id.*)

CW-10 was employed as a registration specialist, which required him/her to validate certain documents, "complete[] vehicle title work with dealer and customer information," verify the information before submitting it to the DMV, and create temporary plates for customers. (*Id.* ¶ 109.) CW-10 provides examples of title issues and delays that were reported to supervisors and managers, noting that "getting the title could be a 'big mess.'" (*Id.* ¶¶ 110-13.) For instance, CW-10 explains that his/her team attempted to obtain title on two vehicles for over a year, "which meant the buyers had been unable to drive their vehicles," and in another instance, Carvana sold a car purchased in Texas to a buyer in Illinois without title because it "was unable to get a duplicate copy of the title." (*Id.*) CW-10 discussed these issues with his/her supervisor and then to a manager. (*Id.* ¶ 112.) According to CW-10, "it was a common opinion amongst personnel that Carvana was buying cars at a breakneck speed and that it was not adequately checking them." (*Id.* ¶ 113.)

CW-11 was hired as a market operations team lead for over a year during the Class Period and was responsible for delivering vehicles to customers that were

purchased online. (*Id.* ¶ 114.) CW-11 alleges that "selling vehicles without the title and issuing temporary plates from other states was a common practice at Carvana" and that other employees informed CW-11 "that there was a drawer of documentation for vehicles that had been sold by Carvana but which they could not get registered since the titles were missing." (*Id.* ¶ 119.) CW-11 also recalled the spreadsheet of cars that could not be registered for lack of title. (*Id.* ¶ 120.)

The Carvana Defendants argue that the CWs are "low-level employees who lack any reliable or personal basis to report about any Defendant's state of mind" and that "nothing they allege contradicts anything Defendants said." (Doc. 82 at 48.) The Court disagrees on both points. First, the Court notes that the ACC describes the personal knowledge and reliability for each CWA with sufficient particularity because Plaintiffs provide a job title and description for each. *Zucco Partners*, 552 F.3d at 995. Moreover, the ACC sufficiently alleges how and when the CWs became aware of Carvana's title and registration issues by detailing each CW's personal experience with the subject. Although many of the CWs did not have direct contact with the Carvana Defendants themselves, direct contact is not required. *Glazer II*, 63 F.4th at 772-73 (finding that accounts of CWs, who had no direct contact with defendants, supported an inference of scienter). Even then, the ACC includes allegations that CW-4 and CW-9 attended meetings where they, and other employees, discussed Carvana's title and registration issues with corporate officers, Huston and Garcia Junior.

Taken together, the CWAs are probative of Defendants' scienter by suggesting precisely what Plaintiffs allege—that Carvana's noncompliance with title and registration requirements was widespread and persistent, and Defendants were well aware of the issue. Accordingly, the Court finds the confidential witness accounts support an inference of scienter.

### 4)    Core Operations Doctrine

Plaintiffs also plead scienter through the "core operations" doctrine. (Doc. 71 ¶¶ 280-86.) A court may impute scienter to a defendant "based on the inference that [the

defendant has] knowledge of the 'core operations' of the company." *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014), *overruled on other grounds by City of Dearborn*, 856 F.3d 605. This theory "relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (internal marks omitted). Core operations may support a strong inference of scienter under three circumstances:

> First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

*S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (internal marks omitted). "Proof under this theory is not easy." *Intuitive Surgical, Inc.*, 759 F.3d at 1062. To successfully allege scienter under the core operations doctrine, "[a] plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.*

Plaintiffs allege that because Garcia Junior and Jenkins were CEO and CFO respectively, they had access to confidential proprietary information concerning the Company's operations and financials. (Doc. 71 ¶ 280.) The ACC further alleges Garcia Junior and Jenkins "repeatedly discussed title and registration risks and issues," and therefore, either knew of or recklessly disregarded the information pertaining to the alleged scheme and fraudulent misstatements. (*Id.* ¶ 280-81.) Plaintiffs point to Defendants' public statements about the relevant issues, Carvana's decision to "revamp[]

its title department at least three times," the regulatory actions and penalties imposed in several states, and Garcia Junior's and Jenkins' attendance at board meetings where Carvana's title and registration compliance was discussed. (Doc. 91 at 79 (citing Doc. 71 ¶¶ 148, 280-88, 320).)[18]

Considering all the above, the Court finds the ACC sufficiently alleges the Carvana Defendants had actual access to the information related to the misstatements that are actionably misleading. Moreover, as the CEO and CFO of Carvana, "it would be absurd to suggest" that Garcia Junior and Jenkins did not know of Carvana's title and registration issues, as well as the drivers of its retail unit sales. *S. Ferry LP, No. 2*, 542 F.3d at 785; *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (finding scienter because it would be absurd to suggest no one told the CEO about key operations information). Plaintiffs also allege the Garcias' employed a hands-on management style, which further supports an inference of scienter under the core operations doctrine. (Doc. 71 ¶ 285 (summarizing an account from a corporate insider who stated the Garcias' had an "iron grip" on Carvana's operations and would fire "[h]igher ups who went against the CEO").) *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) (reasoning that a hands-on management style weighs in favor of scienter through the core operations doctrine).

Therefore, the ACC contains sufficient allegations to support an inference of scienter under the core operations doctrine.

### 5)     Sarbanes-Oxley Certifications

As further evidence of scienter, Plaintiffs point to Garcia Junior's and Jenkins' Sarbanes-Oxley certifications. (Doc. 71 ¶ 295.)

Under Section 302(a) of the Sarbanes-Oxley Act, a company's "principal executive officer or officers and the principal financial officer or officers" must certify

[18] The Carvana Defendants argue the Board meeting materials support a competing inference that Defendants were actively trying to comply with relevant title and registration requirements. (Doc. 82 at 49-50.) The Court is not persuaded. If anything, these materials underscore the inference that, by attending and participating in these meetings, Garcia Junior and Jenkins had actual access to information about title and registration violations.

the accuracy and reliability of its quarterly financial reports. 15 U.S.C. § 7241(a). A signing officer must certify that after reviewing the report, it "does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made . . . not misleading," and that the report and any information included within the report "fairly present[s] in all material respects the financial condition and results of operations of the issuer." *Id.* In the Ninth Circuit, "Sarbanes-Oxley certifications are not sufficient, without more, to raise a strong inference of scienter." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747-48 (9th Cir. 2008) (hereinafter "*Glazer I*"). Therefore, while Carvana's Sarbanes-Oxley certifications are alone insufficient to create a strong inference of scienter, the certifications will be considered in the *Tellabs* holistic review.

### 6)    Government Investigations

Plaintiffs also argue the various government investigations and penalties against Carvana support an inference of scienter. (Doc. 91 at 81 (citing Doc. 71 ¶ 127 n.10).) Defendants do not challenge these allegations. Therefore, the Court will consider them in its holistic analysis insofar as they relate to the statements alleged to be actionably misleading. *See In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018) (explaining that "the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter," but "may be considered by the Court as part of its analysis") (citation omitted).

### 7)    Corporate Scienter

Lastly, the ACC alleges that Carvana acted with corporate scienter throughout the Class Period because "its officers, management, and agents, had actual knowledge of the misrepresentations and omissions" or "acted with reckless disregard for the truth." (Doc. 71 ¶ 306.) The Ninth Circuit, however, has not adopted this doctrine. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).[19]

---

[19] The Ninth Circuit has opined that the corporate scienter doctrine may apply if "a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *Glazer I*, 549 F.3d at 744 (quoting *Teamsters Loc. 445 Freight Div. Pension*

- 51 -

### iii.    Conclusion

Considering the above and weighing the allegations holistically, the Court finds that a reasonable person would deem the inference of scienter cogent and "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. Accordingly, Plaintiffs have adequately pled a strong inference of scienter as to the Carvana Defendants.[20]

### c.    Loss Causation

Lastly, the Court addresses the final disputed element of Plaintiffs' Section 10(b) claim: loss causation. Plaintiffs in securities fraud suits "must plead and ultimately prove that the defendant's wrongful conduct caused the plaintiff's injury." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020); *see also* 15 U.S.C. § 78u-4(b)(4) (codifying requirement to prove loss causation). "Typically, to establish loss causation, a plaintiff must show that the defendants' alleged misstatements artificially inflated the price of stock and that, once the market learned of the deception, the value of the stock declined." *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021) (citing *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119-20 (9th Cir. 2013)). This is known as the "fraud-on-the-market" theory. *Nuveen*, 730 F.3d at 1120. To advance this theory, "the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) the truth became known, and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding*, 977 F.3d at 789 (citation and quotation omitted).

"The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *Id.* at 790 (citing *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018) (per curiam)).

---

*Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). The Court, however, need not assess this narrow exception as Plaintiffs sufficiently allege an inference of scienter as to Garcia Junior and Jenkins individually.

[20] Plaintiffs' allegations related to Garcia Senior's fraud conviction and history of similar fraudulent conduct (Doc. 71 ¶¶ 304-05) have no bearing on whether Garcia Junior and Jenkins acted with scienter, and therefore, will not be considered by the Court.

Corrective disclosures occur "when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.* (quoting 15 U.S.C. § 78u-4(e)(1)). While determining what constitutes a corrective disclosure "has proved more challenging than might have been expected, a few basic ground rules can be sketched out." *Id.* Corrective disclosures do not require "an admission of fraud by the defendant or a formal finding of fraud by a government agency." *Id.* (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008)). Rather, a corrective disclosure can "come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." *Id.* (citation omitted). Also, corrective disclosures "need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures." *Id.* (citation omitted). While corrective disclosures "need not precisely mirror the earlier misrepresentation, [they] must at least relate back to the misrepresentation and not to some other negative information about the company." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1207-08 (9th Cir. 2020) (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).

Plaintiffs identify eight disclosures that allegedly reveal the "economic and operational truth" of Defendants' misstatements and scheme, and "caused a Carvana-specific stock price decline." (Doc. 91 at 82; Doc. 71 ¶¶ 307-28.) These disclosures encompass two categories: (1) Carvana's financial condition; and (2) its title and registration noncompliance.

### i.    Financial Condition

The Court will briefly summarize the four disclosures related to Carvana's financial condition. The first occurred on April 20, 2022, when Carvana reported disappointing Q1 2022 financial results. (Doc. 71 ¶ 314.) Therein, Carvana revealed that its retail sales growth was hampered by logistics constraints and expenses, that it was not on track to sell the 550,000 retail cars it projected, and that it planned to raise additional capital to purchase ADESA. (*Id.*) The following day, Carvana's stock price declined

10.1% and fell another 30.3% over the next six trading days. (*Id.*)

The second partial disclosure happened on May 10, 2022, when Carvana announced in its Form 8-K it was laying off 2,500 employees and implementing "right-sizing" initiatives. (*Id.* ¶ 317.) As a result, Plaintiffs allege Carvana's stock fell 5.4% that same day and an additional 18.2% the following day. (*Id.*) Plaintiffs also acknowledge, however, that despite this disclosure, Carvana's stock price remained "inflated" because Defendants also informed investors that it made changes "to better align staffing and expense levels with sales volumes" and the "macroeconomic environment." (*Id.* ¶ 319.)

In the third partial disclosure released on November 3, 2022, Carvana issued disappointing Q3 2022 results, but only partially disclosed the reasons for the decline in its retail unit sales and profitability. (*Id.* ¶ 323.) This caused Carvana's stock to fall 39% the following day and an additional 15.6% at the close of the next trading day. (*Id.* ¶ 324.) The final partial disclosure occurred on February 23, 2023, when Carvana disclosed disappointing Q4 2022 results. (*Id.* ¶ 327.) Its stock declined 20.5% the following day. (*Id.*) According to Plaintiffs, Defendants concealed that Carvana's disappointing financial results in Q3 and Q4 of 2022 were due to its aged inventory, logistic constraints, and increased operation expenses all flowing from its unsustainable expansion. (*Id.* ¶¶ 323, 327.)

The parties disagree on the law that applies when alleging loss causation. The Carvana Defendants argue that Plaintiffs must allege investors "learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." (Doc. 82 at 41 (citing *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) (quoting *Metzler*, 540 F.3d at 1063)).) *See also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392-94 (9th Cir. 2010) (holding that, to establish loss causation, the market must have learned of and reacted to the company's fraudulent practices as opposed to the financial impact of those practices). Plaintiffs argue the Ninth Circuit cabined the more restrictive test of *Loos* and *Metzler* as a "fact-specific variant[] of the

basic proximate cause test" in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018). (Doc. 91 at 82-83.)

Plaintiffs are correct. In *First Solar*, the Ninth Circuit made clear that the "ultimate issue" in assessing loss causation "is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." 881 F.3d at 754 (citation omitted). The Ninth Circuit clarified that the test pronounced in *Loos* and *Metzler* applies when a plaintiff alleges loss causation based on market revelation of the fraud. *Id.* But "[a] plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id.* Indeed, a "plaintiff need not show that a misrepresentation was the sole reason for a price decline, but rather that it was one substantial cause." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1183 (9th Cir. 2024) (cleaned up).

Plaintiffs, however, have not made this latter showing. The statements that the ACC sufficiently alleges as actionably misleading are so because, accepting the allegations as true, they represented (1) that Carvana had not violated state title and registration requirements; and (2) that Carvana's retail sales growth was organic and sustainable. Yet, Plaintiffs do not clearly or specifically allege how any of the four partial disclosures corrected any prior *actionable* falsity. "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Lloyd*, 811 F.3d at 1210 (citation omitted). The ACC reports negative financials but fails to allege how the results were due to either Carvana's title and registration compliance or sustainable growth representations. Plaintiffs offer no more than conclusory allegations that Carvana's disappointing financial news was due to Defendants' fraudulent scheme and omissions. But Plaintiffs do not "trac[e] the loss back to the very facts about which the defendant lied," as required. *First Solar*, 881 F.3d at 753 (cleaned up).

Accordingly, Plaintiffs' four partial corrective disclosures related to its financial condition fail to allege loss causation.

### ii.    Title and Registration

Plaintiffs also seek to establish loss causation through four media reports that partially disclosed Carvana's title and registration issues. (Doc. 71 ¶¶ 311-13, 320-22.) The first occurred on August 10, 2021, when local media in North Carolina reported that Carvana's dealer license was suspended for violating the state's title and registration laws. (*Id.* ¶ 311.) Plaintiffs allege this partial disclosure caused Carvana's share price to decrease 2.5% at the close of the market the next day. (*Id.*) The second partial disclosure consisted of the *Wall Street Journal* exposé published on October 22, 2021, which partially exposed the depth of Carvana's title and registration issues. (*Id.* ¶ 313.) The ACC explains that Carvana's stock dropped 1.4% that same day and another 1.8% the next trading day. (*Id.*)

Then, on June 24, 2022, the *Barron's* exposé was published, discussing Carvana's title and registration issues at length. (*Id.* ¶ 320.) Over the next two trading days, Carvana's stock price fell 21%. (*Id.*) The fourth and final partial disclosure occurred on October 7, 2022, when the Michigan Department of State announced that it suspended Carvana's dealer's license in Novi, Michigan—and this caused Carvana' stock to decrease 5.5% at the close of the next trading day. (*Id.* ¶ 322.)

The Carvana Defendants argue these disclosures fail to establish loss causation for two reasons—first because the reports did not correct any information that was previously concealed; and second, because they did not discernibly affect Carvana's stock price. (Doc. 82 at 41-43.) The Court is not persuaded by either argument. Plaintiffs allege Defendants concealed from investors its practice of violating state title and registration requirements. As alleged, the cited media reports partially exposed Carvana's noncompliance and contradicted Defendants' representations that the penalties it incurred in certain states were anomalous. As to Defendants' second point, they argue a 1.38 to 5.50% stock decrease is not a significant of enough drop to cause Plaintiffs' losses. (*Id.* at 42.) But Defendants have not identified, nor has this Court found, a threshold for how much a stock must drop to sufficiently allege loss causation at the pleading stage.

Plaintiffs allege that the fourth disclosure caused Carvana's stock price to drop 5.50%; yet, by that time, Carvana's stock had already dropped over 26% due at least in part to the three other partial disclosures on title violations. (Doc. 71 ¶¶ 311, 313, 320, 322.) The ACC further alleges that the impact of these partial disclosures was tempered by Defendants' ongoing misstatements to conceal the extent of their fraud. (*Id.* ¶¶ 309, 312.)

Loss causation "is a matter of proof at trial and [generally] not to be decided on a Rule 12(b)(6) motion to dismiss." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (citation omitted). Therefore, the Court finds these four corrective disclosures suffice to plausibly allege loss causation. *Grigsby*, 979 F.3d at 1206 ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate.") (citations omitted).

### d.    Conclusion

Because the Court finds that the ACC sufficiently alleges (1) falsity as to Defendants' title and registration statements, retail unit sales statements, and related scheme-based allegations, (2) Defendants' scienter, and (3) loss causation, the Court will deny the Carvana Defendants' motion to dismiss as to Count I.

The ACC, however, fails to state a Section 10(b) claim against Garcia Senior, and therefore, the Court will grant his motion to dismiss as to Count I.

### 2.    Count II: Section 20(a)

Next, the Court considers Plaintiffs' Section 20(a) claims against the Exchange Act Defendants. (Doc. 71 ¶¶ 351-57.) Section 20(a) of the Securities Exchange Act of 1934 "imposes liability on certain controlling individuals . . . for violations of [S]ection 10(b) and its underlying regulations." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1113 (9th Cir. 2021) (internal marks and citation omitted). Section 20(a) is "intended to prevent evasion of the law by organizing dummies who will undertake the actual things forbidden." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990) (cleaned up). To state a claim of control person liability under Section 20(a), a plaintiff must demonstrate "a primary violation of federal securities law" and that "the

defendant exercised actual power or control over the primary violator." *Zucco Partners*, 552 F.3d at 990 (citation omitted).[21] "Whether the defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

"There is no binding authority establishing whether a plaintiff must meet the [Rule] 9(b) pleading standard for alleging 'actual power or control,' and there is a split of authority among district courts in the Ninth Circuit on this issue." *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, No. 22-CV-03811-TLT, 2024 WL 3579322, at *13 (N.D. Cal. July 29, 2024) (citing cases). "[A]t the motion to dismiss stage, allegations about an individual's title and duties have been found to be sufficient to establish control." *Mueller v. San Diego Ent. Partners, LLC*, No. 16-CV-2997-GPC(NLS), 2017 WL 3387732, at *6 (S.D. Cal. Aug. 7, 2017).

Because Plaintiffs sufficiently allege a primary violation, the Court must determine whether the ACC sets out controlling liability as to Defendants Garcia Senior, Garcia Junior, and Jenkins.

### a.    Garcia Senior

Plaintiffs assert a Section 20(a) claim against Garcia Senior, alleging that he had "full control over the Company's most important decisions" because he possessed a majority of the voting power of all Carvana's outstanding shares. (Doc. 71 ¶ 353.) The ACC points to Carvana's SEC filings, creditor statements, and academic commentaries to allege Garcia Senior designed Carvana, controls Carvana, and runs Carvana to benefit himself and his family. (*Id.* ¶¶ 296-303.) Garcia Senior seeks dismissal of the Section 20(a) claim, arguing the ACC does not allege Garcia Senior is a "control person" under Section 20(a). (Doc. 85 at 23-24.) Garcia Senior further contends that Plaintiffs' vague allegations pertaining to his relationship with his son and Carvana's CEO, Garcia Junior,

---

[21] The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

and his business ties to two Carvana board members are insufficient to establish control. (*Id.*)

The Court finds Carvana's SEC forms decisive on whether the ACC plausibly alleges Garcia Senior was a controlling party under Section 20(a). If the ACC only sought to impose control liability on Garcia Senior by virtue of his *status* as a controlling shareholder alone, such allegations would likely be insufficient to allege a Section 20(a) claim. *See Welgus v. TriNet Grp., Inc.*, No. 15-CV-03625-BLF, 2017 WL 167708, at *13 (N.D. Cal. Jan. 17, 2017) (dismissing Section 20(a) claim against controlling shareholder where the complaint failed to allege the shareholder's "authority to exercise decision-making power, nor allegations of its day-to-day involvement in the operation of the Company"). Carvana's SEC filings, however, tell a different story. For instance, in describing Carvana's voting structure, the company disclosed to investors:

> This high/low vote structure will enable the Garcia Parties to control the outcome of matters submitted to our stockholders for approval, including the election of our directors, as well as the *overall management and direction of our company.* Furthermore, the Garcia Parties will continue to exert a significant degree of influence, *or actual control*, over matters requiring shareholder approval until they own as little as approximately 25% of our outstanding common stock. We believe that maintaining this control by the Garcia Parties will be important for enabling them to successfully guide the implementation of our company's growth strategies and strategic vision.

(Doc. 83-1 at 23 (emphasis added).) And, in every form where the "Garcia Parties" are identified, Garcia Senior is included. (*See, e.g.*, Doc. 83-1 at 7; Doc. 83-2 at 69; Doc. 83-3 at 16, 44; Doc. 83-4 at 23, 112, 252; Doc. 83-5 at 3.) As such, these forms suffice to allege that Garcia Senior was more than just a majority shareholder—he exercised "actual control" over Carvana, its officers, and directors. Courts have upheld Section 20(a) claims against shareholders under circumstances far less indicative of control. *See, e.g.*, *Ferreira v. Funko Inc.*, No. 2:20-CV-02319-VAP, 2021 WL 8820650, at *37 (C.D. Cal. Oct. 22, 2021) (finding control liability against non-controlling shareholders who "not only owned a significant portion of stock in [the defendant company]," but also placed

the director defendants on the board when the fraudulent statements were made).

Therefore, the ACC plausibly alleges a Section 20(a) claim against Garcia Senior. The Court will deny Garcia Senior's motion to dismiss as to Count II.

### b.     The Carvana Defendants

The Carvana Defendants also seek dismissal of Plaintiffs' Section 20(a) claim against them. (Doc. 82 at 54.) Defendants' only argument, however, is that "Plaintiffs' Section 20(a) claims fail due to the absence of a predicate Section 10(b) violation." (*Id.*) Because the Court finds the ACC sufficiently alleges a Section 10(b) violation, Defendants' arguments are without merit. Therefore, the Carvana Defendants' motion will be denied as to Plaintiffs' Section 20(a) claim. *See Crews v. Rivian Auto., Inc.*, No. 2:22-CV-01524-JLS-E, 2023 WL 4361098, at *14 (C.D. Cal. July 3, 2023) ("[B]ecause the Court has concluded that Plaintiffs' Section 10(b) and Rule 10b-5 claims are adequately pleaded, their Section 20(a) [claims] that are derivative of those claims may proceed as well.").

### 3.     Count III: Section 20A

The Carvana Defendants and Garcia Senior also move to dismiss Plaintiffs' Section 20A claim. (Doc. 82 at 53; Doc. 85 at 24.) Section 20A of the Exchange Act states:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a). "Section 20A of the Exchange Act creates a private cause of action for 'contemporaneous' insider trading. To satisfy § 20A, a plaintiff must plead (1) a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs and defendants occur 'contemporaneously.'" *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 1070116, at *12 (N.D. Cal. Feb. 27, 2018) (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1074-75 (C.D. Cal. 2008)).

**a.     Garcia Senior**

Garcia Senior argues that Plaintiffs' insider trading claim should be dismissed for two reasons. (Doc. 85 at 24.) First, because Plaintiffs fail to allege he committed a Section 10(b) predicate violation; and second, because the ACC "contains zero non-conclusory allegations that [he] possessed material non-public information." (*Id.*) The Court agrees. As previously noted, the ACC fails to sufficiently allege any deceptive act by Garcia Senior in furtherance of Defendants' purported "scheme." (*Supra* at 35-37.) Additionally, Garcia Senior is not a maker of any alleged omission. Therefore, Plaintiffs have not alleged a predicate violation of Section 10(b). *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 711 (9th Cir. 2012) ("To prevail on its claims for violations of § 20A, [the plaintiff] must first sufficiently allege a violation of § 10(b) or Rule 10b-5."); *Hefler*, 2018 WL 1070116, at *12-13 (dismissing Section 20A claim as to certain defendants against whom the plaintiff failed to allege an underlying securities violation).

Moreover, the Court finds the ACC does not contain any well-pled allegations that Garcia Senior was in possession of MNPI. *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1192 (9th Cir. 2024) (reasoning that "barebones pleadings do not meet the stringent pleading standards of the PSLRA because they do not allege what information [the defendant shareholder] specifically obtained or 'when and from whom' [the defendant] obtained it") (citation omitted). The Court will dismiss Count III against Garcia Senior.

**b.     Jenkins**

The Carvana Defendants argue Plaintiffs' Section 20A claim against Jenkins should be dismissed because the ACC does not allege he possessed MNPI at the time of a contemporaneous trade. (Doc. 82 at 53.) Plaintiffs allege Jenkins had MNPI when he adopted a new 10b5-1 trading plan in March 2021 because he "had been meeting with the Board about title and registration issues since July 2020." (Doc. 71 ¶ 269.) The ACC also asserts that Jenkins "participated in calls and attended meetings at which the low quality of cars being purchased from customers was frequently raised and discussed." (*Id.* ¶ 274).

Further, Plaintiffs argue Jenkins had MNPI because "the ACC adequately alleges [he was] aware of the undisclosed scheme." (Doc. 91 at 91.)

The Court finds Plaintiffs' Section 20A claim against Jenkins does not meet the stringent pleading standards set forth in Rule 9(b), Fed. R. Civ. P., and the PSLRA. While Plaintiffs generally allege Jenkins attended Board meetings where title and registration issues were discussed, the ACC lacks any allegations detailing what information Jenkins specifically obtained on those subjects. *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) (a complaint for insider trading must plead "times, dates, places, benefits received, and other details"). For instance, Plaintiffs do not allege Jenkins was told at these meetings that Carvana faced regulatory action in Ohio or Michigan, nor that such actions could impact Carvana's stock price. Plaintiffs also fail to allege how Jenkins used any information from these meetings to his own advantage. *See In re Silver Lake Grp.*, 108 F.4th at 1191 ("To plead possession, a plaintiff must 'allege specifically what information a defendant obtained, when and from whom he obtained it, and *how he used it for his own advantage*.'") (quoting *Neubronner*, 6 F.3d at 672) (emphasis added). Therefore, the Court finds the ACC fails to set out a claim for insider trading against Jenkins.

### D.    The Securities Act Claims

Plaintiffs also assert three Securities Act of 1933 claims against Carvana, the Individual Defendants, and the Underwriter Defendants (collectively, the "Securities Act Defendants").[22] (Doc. 71 ¶¶ 428-48.) These claims arise from Carvana's April 22, 2022 Public Offering. (*Id.* ¶ 365.)

### 1.    Count IV: Section 11

Section 11 of the Securities Act imposes liability for making false or misleading statements in the Registration Statement. 15 U.S.C. § 77k(a). It promotes compliance with the Securities Act "by giving purchasers a right of action against an issuer or designated individuals (directors, partners, underwriters, and so forth) for material

---

[22] The Individual Defendants include Garcia Junior, Jenkins, Carvana's Vice President of Accounting and Finance Stephen Palmer, and Carvana board members Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan. (Doc. 71 ¶¶ 367-70.) The Underwriter Defendants include Citigroup and J.P. Morgan Securities LLC. (*Id.* ¶ 371.)

misstatements or omissions in registration statements." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015). The text of the statute provides in relevant part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may . . . sue.

15 U.S.C. § 77k(a). Section 11 thus "creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc.*, 575 U.S. at 179.

To plead a Section 11 claim, a plaintiff must demonstrate "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (citation omitted). Scienter is not required for liability under Section 11. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996). Rather, a defendant is "liable for innocent or negligent material misstatements or omissions." *Id.* (citation omitted).

Defendants argue Plaintiffs' Section 11 Claim fails because (1) Plaintiffs have not alleged any materially false or misleading statement; (2) Plaintiffs have not pled a violation of Item 105; and (3) negative causation is apparent on the face of the ACC. (Doc. 82 at 54-57.) Plaintiffs disagree. (Doc. 91 at 92-97.)

### a.    Applicable Pleading Standard

The Court first addresses the parties' arguments as to whether Plaintiffs' Securities Act claims are governed by Rule 8 or Rule 9(b) of the Federal Rules of Civil Procedure. Importantly, "the heightened pleading requirements of the PSLRA do not apply to Section 11 claims." *Rubke*, 551 F.3d at 1161. Nonetheless, "plaintiffs are required to

allege their claims with increased particularity under Federal Rule of Civil Procedure 9(b) if their complaint 'sounds in fraud.'" *Id.* The Ninth Circuit has advised that where "a complaint employs the exact same factual allegations to allege violations of [S]ection 11 as it uses to allege fraudulent conduct under [S]ection 10(b) of the Exchange Act, [the Court] can assume that it sounds in fraud." *Id.* Otherwise, the Court must consider "whether the complaint 'allege[s] a unified course of fraudulent conduct' and rel[ies] entirely on that course of conduct as the basis of a claim." *Id.* (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003)) (alterations in original). If it does, the claim sounds in fraud. *See id.*

Plaintiffs argue Rule 8 governs their Securities Act claims because they do not sound in fraud and are instead, based on negligence. (Doc. 91 at 94-95.) Conversely, Defendants argue these claims are subject to Rule 9(b) because they are nearly identical to Plaintiffs' Section 10(b) claims. (Doc. 82 at 54.)

The Court finds that Plaintiffs' Section 11 claims sound in fraud because the exact same factual allegations underlie both Plaintiffs' Sections 10(b) and 11 claims. (*Compare* Doc. 71 ¶¶ 381-82, 383-84, 385-86 *with id.* ¶¶ 184-85, 209-10, 214-15.) Plaintiffs allege two of the exact same statements were false or misleading in the Section 10(b) and Section 11 context. (*Compare id.* ¶¶ 381, 385 *with id.* ¶¶ 184, 209.) And the remaining statement (Statement B) is very similar to Statement No. 20. (*Compare id.* ¶ 383 *with id.* ¶ 215.) Because the Section 11 claim "merely relies on the same alleged misrepresentations . . . that are central to Plaintiff[s]' [S]ection 10(b) fraud claim . . . Plaintiff[s]' [S]ection 11 claim is grounded in fraud" and "must meet Rule 9(b)'s pleading requirements." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).

### b. Actionable False or Misleading Statement

Plaintiffs allege Carvana's Registration Statement contained three materially false and misleading statements. (Doc. 71 ¶¶ 380-86.) The Court will discuss each in turn.

### i.      Purchases (Statement A)

The first statement, "Statement A," was included in Carvana's 2021 Form 10-K, providing:

> **Vehicle acquisition**. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. **We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory.** We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments.

(*Id.* ¶ 381 (emphasis in original).) According to Plaintiffs, this statement was false and misleading by omitting that Carvana abandoned its purchasing and verification standards and that Carvana was intentionally buying lower quality cars, which resulted in less profitable sales and a crippled logistics network. (*Id.* ¶ 382.)

The Court has already addressed whether the ACC adequately alleges this statement was false or misleading in the Section 10(b) context. (*Supra* at 20-23.) For the same reasons, Plaintiffs fail to assert that Statement A was false or misleading under Section 11.

### ii.      Retail Unit Sales (Statement B)

The second statement, "Statement B," reports:

> [A]n increase in the number of used vehicles sold to 425,237 from 244,111 during the years ended December 31, 2021 and 2020, respectively. **The increase in units sold was driven by growth in existing markets due to expanded inventory selection, enhanced marketing efforts, increased brand awareness, customer referrals, and growth in market population coverage to 81.0% as of December 31, 2021 from 73.7% as of December 31, 2020.**

(Doc. 71 ¶ 383 (emphasis in original).) This statement was also included in Carvana's 2021 Form 10-K. (*Id.*) Plaintiffs allege that the statement was false and misleading because Carvana failed to disclose that its growth was primarily driven by unsustainable practices. (*Id.* ¶ 384.)

In the Section 10(b) context, Plaintiffs sufficiently allege similar statements were false or misleading because Carvana identified specific drivers of its revenue, while omitting the purportedly fraudulent artifices that contributed to Carvana's sales. (*Supra* at 23-26.) There and here, Defendants argue these statements were not misleading because the "unsustainable practices" Plaintiffs identify were either disclosed by Carvana or known to the public, and therefore, cannot qualify as a misleading or material omission. (Doc. 82 at 33-35, 54-55.)

In this Court's discussion of Plaintiffs' Section 10(b) claims, the Court resisted considering Defendants' "truth-on-the-market defense" because questions of materiality are better reserved for summary judgment. (*Supra* at 15). But Defendants' arguments are more persuasive in the Section 11 context because as of April 2022, Carvana's title and registration issues had been a recurring subject in the news media. For instance, local media in North Carolina reported that Carvana's dealer license was suspended on August 10, 2021, and Carvana officers Jenkins and Levin spoke on the subject at an investor conference the following day. (*See* Doc. 83-3 at 301-05; Doc. 83-3 at 314-15.) Then, on October 11, 2021, the *Wall Street Journal* published an article revealing Carvana's title and registration issues across *multiple* states. (Doc. 83-3 at 323-31.) It could be, as Defendants contend, that by April 2022, when Carvana made its Offering, investors were well aware of Carvana's title and registration issues such that any omission of the assorted regulatory actions against Carvana was immaterial. But materiality is a "mixed question of law and fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Therefore, the Court will not decide this issue at this juncture.

For the same reasons previously stated, the Court finds the ACC adequately pleads that Statement B was false or misleading when made and reserves the issue of materiality for summary judgment.

### iii.    Title and Registration (Statement C)

The third and final statement, "Statement C," repeats the same Risk Disclosures Plaintiffs challenge under Section 10(b), which state that Carvana was subject to title and

registration laws and violations of those laws could result in penalties. (Doc. 71 ¶ 385.) Plaintiffs assert this statement was false or misleading because Defendants omitted that the disclosed risks "had already come to fruition." (*Id.* ¶ 386.)

For the reasons previously articulated, the Court finds Plaintiffs sufficiently allege that Statement C was false or misleading when made, and Defendants may contest the materiality of the alleged omission at summary judgment. *See City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, No. 3:21-CV-00762-WQH-NLS, 2023 WL 1769810, at *6 (S.D. Cal. Feb. 2, 2023) ("[T]he Court declines to draw an inference in favor of Defendants at the pleadings stage that all information disseminated at various conferences and in different forms was necessarily transmitted to the market with the same intensity as Defendants' allegedly misleading statements.").

### c. Item 105

Defendants also seek to dismiss the Section 11 claims on the grounds that Plaintiffs fail to allege a violation of Item 105 of Regulation S-K. (Doc. 82 at 55-56.) Item 105 imposes a duty to disclose "the material factors that make an investment in the registrant or offering speculative or risky," and failure to satisfy this requirement amounts to a Section 11 violation. 17 C.F.R. § 229.105(a). "[W]here a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies." *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998).

The ACC asserts that Defendants failed to disclose its widespread issues complying with title and registration requirements, and that it "faced a mounting risk of regulatory action across the country," which damaged the company's reputation. (Doc. 71 ¶¶ 389-90.) Defendants contend that the Registration Statement sufficiently disclosed the risks Plaintiffs identify—namely "that violations of laws or regulations could result in penalties, which could have material adverse effects." (Doc. 82 at 55.)

Because the Court finds the ACC sufficiently alleges Carvana's title and

registration compliance was materially different than its Risk Disclosures led investors to believe, the Court finds the ACC also alleges a violation of Item 105. *See Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-CV-06361-RS, 2020 WL 4569846, at \*6-7 (N.D. Cal. Aug. 7, 2020) (holding that the company's risk disclosures were misleading in violation of item 105 where the plaintiff plausibly alleged that the company's financial affairs were materially different than what was represented in its Registration Statement); *Felipe v. Playstudios Inc.*, No. 2:22-CV-01159-RFB-NJK, 2024 WL 1380802, at \*13 (D. Nev. Mar. 31, 2024) (holding that the plaintiffs pled an Item 105 violation for risk factors that the "game may be delayed" where risks "had . . . come to fruition").

### d.    Negative Causation

Defendants also argue dismissal is warranted because negative causation is apparent on the face of the ACC. (Doc. 82 at 56-57.) A Section 11 claim does not require proof of loss causation. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) ("[Plaintiffs] need only show a material misstatement or omission to establish [a] *prima facie* case."). Defendants may avoid Section 11 liability by establishing that the alleged losses "are not attributable to the alleged misrepresentation or omission in the registration statement." *Id.* at 860. This affirmative defense is known as "negative causation." *Id.* A defendant raising the negative causation defense bears the burden of proof, and it is a "heavy burden." *Id.* Negative causation is typically reserved for summary judgment unless it is apparent on the face of the complaint. *Brown v. Ambow Educ. Holding Ltd.*, No. CV-12-5062-PSG, 2014 WL 523166, at \*16 (C.D. Cal. Feb. 6, 2014).

Defendants argue negative causation is apparent on the face of the complaint because Plaintiffs failed to establish loss causation. (Doc. 82 at 56.) But Defendants improperly conflate Plaintiffs' burden of pleading loss causation under Section 10(b) of the Exchange Act with the Defendants' burden of proving a negative causation defense under Section 11 of the Securities Act. For a defendant to establish negative causation at the pleading stage, he must demonstrate *more* than a plaintiff's failure to allege loss

causation. Indeed, "[a] defendant must show that the depreciation in value of [the stock] resulted from factors other than the alleged material misstatement." *Hildes*, 734 F.3d at 860 (cleaned up). Defendants have not met that burden; therefore, the Court reserves this issue to be resolved at a later date.

### e.    Conclusion

In sum, Plaintiffs fail to allege that Statement A was a false or misleading statement included in Carvana's April 2022 Registration Statement, and therefore, Statement A cannot support Plaintiffs' Section 11 claim. But because Plaintiffs sufficiently allege the Registration Statement included false or misleading Statements B and C, and that the Registration Statement violated Item 105, the Carvana Defendants' motion to dismiss will be denied as to Count IV.

### 2.    Count V: Section 12(a)(2)

The Carvana Defendants also seek to dismiss Plaintiffs' Section 12(a) claim. (Doc. 82 at 57.) To state a claim under Section 12(a)(2), a plaintiff must allege:

> (1) the defendant qualifies as a statutory seller or offeror; (2) the sale was effected by means of a prospectus or oral communication; and (3) the communication contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading.

*Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1257 (9th Cir. 2022) (cleaned up); *see* 15 U.S.C. § 77l(a)(2).

Defendants argue dismissal is warranted because the ACC does not identify a material misstatement and Plaintiffs fail to allege any moving Defendant was a "statutory seller." (Doc. 82 at 57.) As to their first contention, the Court has already found Plaintiffs sufficiently allege Carvana's Registration Statement included material omissions under Section 11, and "[t]he 'misstatement or omission' requirement under Section 12(a)(2) is materially identical to that under Section 11." *In re Velti PLC Sec. Litig.*, No. 13-CV-03889-WHO, 2015 WL 5736589, at *31 (N.D. Cal. Oct. 1, 2015). Therefore, Plaintiffs sufficiently allege a false or misleading statement to support their Section 12(a)(2) claim.

As to Defendants' second argument, a person may be liable as a seller under Section 12(a) if the person either "(1) passes title to the securities to the plaintiff; or (2) engages in solicitation, *i.e.*, solicits the purchase of the securities, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pino*, 55 F.4th at 1257-58 (cleaned up). "Solicitation is broadly construed in the Ninth Circuit." *Houghton v. Leshner*, No. 22-CV-07781-WHO, 2023 WL 6826814, at *3 (N.D. Cal. Sept. 20, 2023). Generally, a plaintiff must allege the defendants were more than "mere collateral participants to [the] solicitations." *Id.* at *5.

Considering the Underwriter Defendants first, the ACC alleges Defendants Citigroup and J.P. Morgan would act as underwriters and "would collectively earn more than $24 million in underwriting discounts and commissions." (Doc. 71 ¶ 402.) Moreover, Plaintiffs allege the Underwriter Defendants "acted as Carvana's financial advisors," "marketed Carvana common stock to potential investors," "caused the Offering Documents to be filed with the SEC," and, in exchange for an indemnity agreement, "were willing to promote and sell Carvana's Class A common stock in the 2022 Public Offering." (*Id.* ¶¶ 404-10; *see also* ¶¶ 413-16, 440.) Plaintiffs also represent that they purchased shares directly from Citigroup. (*Id.* ¶ 366.) Accepting these allegations as true, Plaintiffs plausibly allege the Underwriter Defendants were more than mere collateral participants in planning the April 2022 Offering—rather, they were statutory sellers within the meaning of Section 12(a)(2). Therefore, the ACC sufficiently alleges a Section 12(a)(2) claim against the Underwriter Defendants.

But the ACC lacks *any* well-pled allegations that the Individual Defendants participated in the Offering in any manner other than by signing the Registration Statement. While Plaintiffs broadly allege "these Defendants promoted and sold, for the benefit of themselves and their associates, Carvana common stock to the Plaintiffs and other members" (*Id.* ¶ 439), this conclusory allegation does not suggest the Individual Defendants were more than collateral participants in the Offering. Additionally, the Court is not persuaded that signing a registration statement alone is sufficient to hold

Defendants liable as statutory sellers under Section 12(a)(2). *See In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1121 (D. Nev. 1998) ("Simple involvement in preparing a registration statement or prospectus, or participation in activities regarding the sale of securities is not enough by itself to establish the kind of relationship between plaintiff and defendant sufficient to establish statutory seller status."). Therefore, the Court will dismiss Plaintiffs' Section 12(a)(2) claim as to the Individual Defendants.

### 3.    Count VI: Section 15

Finally, Defendants seek dismissal of Plaintiffs' Section 15 claim. (Doc. 82 at 57.) Section 15 imposes secondary liability on someone who "controls any person liable" for a violation of Section 11 or Section 12 of the Act. 15 U.S.C. § 77o. An individual is a "control person" of a company if they possess "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. "Traditional indicia" of a controlling person of a company include "a prior lending relationship with the accused company, ownership of its stock, and a seat on its Board." *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 391 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021), *vacated and remanded on other grounds sub nom. Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023).

Defendants argue "Plaintiffs' Section 15 claim must be dismissed because there is no underlying primary violation." (Doc. 82 at 57.) Because the Court finds Plaintiffs sufficiently allege a primary violation of Section 11, Defendants' argument is without merit. The Court will deny Defendants' motion as to Count VI.

### E.    Leave to Amend

Plaintiffs request leave to amend. (Doc. 91 at 97.) District courts "shall grant leave to amend freely 'when justice so requires.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting Fed. R. Civ. P. 15 (a)). Courts in the Ninth Circuit are to apply this policy "with extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). The Court, however, may in its discretion "deny

leave to amend due to 'undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies . . . , undue prejudice to the opposing party . . . , [and] futility of amendment." *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Absent a "strong showing of any of [these] factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original).

Having previously granted Plaintiffs leave to amend, and considering the factors under *Foman*, the Court finds that leave to amend would be futile and unduly prejudicial to the Defendants' interests in finality. This case has been pending for over two years, and most of the arguments raised in the pending motions are repeated from those raised in Defendants' motions to dismiss the consolidated complaint. Under these circumstances, the Court has broad discretion to deny leave to amend. *See Zucco Partners*, 552 F.3d at 1007. Exercising that discretion, the Court will deny Plaintiffs leave to amend.

## V.   CONCLUSION

Accordingly,

**IT IS ORDERED** that the Carvana Defendants' Motion to Dismiss (Doc. 82) is **granted in part** as follows:

1. Statement Nos. 9-18 and 21-39 are dismissed without leave to amend as to Count I.

2. Count III is dismissed without leave to amend.

3. Statement A is dismissed without leave to amend as to Count IV.

4. Count V is dismissed against the Individual Defendants without leave to amend.

**IT IS FURTHER ORDERED** that Defendant Garcia Senior's Motion to Dismiss (Doc. 85) is **granted in part**. Counts I and III against Garcia Senior are dismissed without leave to amend.

**IT IS FURTHER ORDERED** that the Motions are **denied** in all other respects.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate Defendants Ryan Keeton and Benjamin Huston from this action effective as of the date of the ACC.

**IT IS FINALLY ORDERED** directing Defendants to answer the ACC within thirty (30) days of the date of this Order. The parties are advised that the Court is not inclined to extend this deadline, given that this case has been pending for over two years.

Dated this 16th day of December, 2024.

Michael T. Liburdi
Michael T. Liburdi
United States District Judge