UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **United Association National Pension Fund, et al.,** | ) ) ) | No. 2:22-cv-02126-MTL |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Phoenix, Arizona February 25, 2025 |
| **Carvana Company, et al.,** | ) ) | 9:03 a.m. |
| Defendants. | ) ) | |

**BEFORE:   THE HONORABLE MICHAEL T. LIBURDI, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**<u>RULE 16 SCHEDULING CONFERENCE</u>**

Official Court Reporter:
**Cathy J. Taylor, RMR, CRR, CRC**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiffs:
     ROBBINS GELLER RUDMAN & DOWD, LLP
     By:  **Mr. Daniel S. Drosman, Esq.**
          **Ms. Rachel A. Cocalis, Esq.**
     655 West Broadway, Suite 1900
     San Diego, California   92101

For the Defendants Carvana, et al.:
     LATHAM & WATKINS
     By:  **Mr. Jeff G. Hammel, Esq.**
          **Mr. Matthew Peters, Esq.**
     555 11th Street NW, Suite 1000
     Washington, DC   20004-1304
     - and -
     FENNEMORE CRAIG, PC
     **By:  Ms. Andrea Lynn Marconi, Esq.**
     2394 East Camelback Road, Suite 600
     Phoenix, Arizona   85016

For the Defendants Citigroup Global Markets, Incorporated, and
J.P. Morgan Securities, LLC:
     PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
     By:  **Ms. Kristina A. Bunting, Esq.**
     1285 Avenue of the Americas
     New York, New York   10019

For Defendant Ernest Garcia, Sr.:
     DLA PIPER, LLP
     By:  **Ms. Madeline Averi Cordray, Esq.**
     2575 East Camelback Road, Suite 800
     Phoenix, Arizona   85016

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings commence at 9:03 a.m.)

THE COURTROOM DEPUTY:  Civil Case 22-2126, United Association National Pension Fund vs. Carvana Company.  This is the time set for scheduling conference.

Please announce your presence for the record starting with the plaintiff.

MR. DROSMAN:  Good morning, Your Honor.  Daniel Drosman on behalf of plaintiffs.

THE COURT:  Good morning.

MR. DROSMAN:  I'm here with my colleague, Rachel Cocalis, from Robbins, Geller, Rudman & Dowd.

THE COURT:  Good morning.  Thank you for coming.

MR. HAMMEL:  Good morning, Your Honor.  Jeff Hammel and Matthew Peters from Latham & Watkins on behalf of the Carvana defendants.

THE COURT:  Good morning.  Thank you for traveling.

MR. HAMMEL:  Thank you.

MS. BUNTING:  Good morning, Your Honor.  Kristina Bunting from Paul, Weiss, Rifkind, Wharton & Garrison on behalf of Citigroup Global Markets and J.P. Morgan Securities.

THE COURT:  Good morning to you.  Thanks for coming to Phoenix.

MS. CORDRAY:  Good morning, Your Honor.  Madeline

Cordray with DLA Piper, LLP, on behalf of Garcia, Sr.

Good morning.  And Ms. Marconi.

MS. MARCONI:  Yes.  Andrea Marconi of Fennemore Craig on behalf of the Carvana defendants and underwriter defendants.

THE COURT:  Okay.  Well, thanks.  And thank you, too, for coming from Camelback and 24th Street.

MS. MARCONI:  It was a long --

THE COURT:  I know it was a long, long trip, but thank you.

Okay.  Well, good morning, everybody.  This is the Rule 16 conference for this case, which has existed, I think, for about two and a half years now.

I'm pretty fairly familiar with the factual allegations and the defenses, so I think I could skip that normal part of this hearing.

Unless, Counsel, if there's something that you feel like you really want to tell me about the allegations or the facts or something on the defendants' side, I'll give you that opportunity.

MR. DROSMAN:  Nothing from the plaintiffs.  There is, you know, some dispute with respect to the scope of the case, but that's something that I think is premature to discuss at this moment.  If it, you know, materializes later, we'll obviously bring that to Your Honor's attention.

THE COURT:  Okay.  Thank you, Mr. Cocalis.

And anything from the defendants' side?

MR. HAMMEL:  On the factual allegations, we would agree.  There's some disagreement, but hopefully we can work that through and not have to trouble Your Honor later.

THE COURT:  Very good.  All right.  Well, thanks.  And you all did a very nice job of summarizing your positions in the joint report.

Well, let's move on to the proposed schedule.  I might want to make some changes to this schedule to speed it up a little bit.  And I would just say that the case has been pending for a long time.  We've gone through two rounds of motion to dismiss briefing.  I've dealt with some other motions relatedly.  But I feel like a dispositive motion deadline in 2027 is a little too far down the road for my liking.

So what I typically do after telling lawyers that is I say you can go back to the drawing board and submit to me a revised schedule after we have a chance to talk about that in more detail, or I'll just do it myself.  And I think always the lawyers have taken me up on the offer to confer and see if they could come up with a different schedule, and I could fully understand why if I was in your position.  But if I were to do it, I think I would -- I wouldn't be too punitive to you.  I think I would think about what would be reasonable and what -- how quickly could I get a summary judgment briefing, understanding that there's a -- this is a class action.  We

have to go through class certification phase, et cetera.

So any comments on that before we get into the details?

Mr. Cocalis?

MR. DROSMAN:  Mr. Drosman, Your Honor.

THE COURT:  I'm sorry.  So sorry.  Who is Mr. -- oh, that's you.

MR. DROSMAN:  That's okay.

THE COURT:  I apologize.  Mr. Drosman.  Okay.  I came in here with a list thinking that I wouldn't make mistakes, and I ended up making a mistake from the get-go.

MR. DROSMAN:  It's not the first time people have called me by other names, so that's fine.

THE COURT:  Same here.  Go ahead.  Okay.  Mr. Drosman.

And you're Mr. Hammel?

MR. HAMMEL:  Yes, Your Honor.

THE COURT:  Okay.  Good.

MR. HAMMEL:  I'll respond to anything.

THE COURT:  Okay.

MR. DROSMAN:  So, yeah, I --

THE COURT:  All right.

MR. DROSMAN:  I was just going to say, it -- it does seem like the -- and, obviously, as plaintiffs we have an interest in, as you know, completing everything as expeditiously as possible, getting to trial as soon as

possible.  You know, in these cases, because of the complexity and often millions of pages of written discovery and depositions that I think may in this case exceed the ten deposition presumptive limit, there's often, you know, a 15-month period for fact discovery and then additional period for expert discovery.

So we can certainly sit down with defense counsel and try to truncate the schedule.  But, you know, I looked at some of the cases, the recent cases in the District of Arizona alleging 10(b) and Section 11.  And in this case, obviously, we have 1933 Act claims as well.  And I think we're on the shorter end, believe it or not, of the period.

I looked at the *First Solar* case, which I personally was involved in, and there we had a 23.5-month fact discovery period.

THE COURT:  Was that my case?

MR. DROSMAN:  No.  That was not your case --

THE COURT:  Okay.

MR. DROSMAN:  -- Judge.

THE COURT:  I had another solar case.

MR. DROSMAN:  Did you?

THE COURT:  I couldn't recall, but --

MR. DROSMAN:  That was Judge Campbell.

THE COURT:  Okay.

MR. DROSMAN:  You know, the *Twitter* case was

16.2 months for fact discovery.  I -- you know, this case, I think we have 15 months.  That is the shortest period of the four that I looked at.  The *Sea Limited* case was the other.  I guess that was also at 15 months for a fact discovery cutoff.

THE COURT:  Okay.

MR. DROSMAN:  So, I -- you know, we will certainly sit down and try to, you know, tighten the schedule up as much as possible.  But in these types of cases, as much as we want to get to trial as soon as possible, it can be difficult to do that in a shorter period.

THE COURT:  Well, it's helpful to hear that the plaintiffs' side is invested in this schedule, because, as you said, it's your interest to get to a resolution, however that might be, including a jury trial --

MR. DROSMAN:  That's right.

THE COURT:  -- if that's -- if that's the outcome.

Well, let's talk a little bit about class certification.  What kind of discovery do you anticipate requiring, and that would be a question for both sides, for class certification, including expert discovery?

MR. DROSMAN:  There are typically, and I suspect that there will be in this case, experts for market efficiency and so forth in class certification, the class certification context.  Typically discovery consists of taking the experts' depositions, obtaining written discovery from the experts.  You

know, in addition, some of the discovery that we would -- we would be obtaining through the facts discovery process may be relevant to class certification as well. We'll have started that process now, so we should have a fairly robust set of discovery materials by the time class certification rolls around. I think the deadline for our motion is January 15, 2026, so that should be fine.

But that's -- that's -- you know, that's typically how it -- it takes place in these sorts of cases. There are expert -- there is an expert for both sides typically, and there's some discovery taken from that expert.

THE COURT: Do you have an expert engaged at this point?

MR. DROSMAN: We -- we -- we have talked to experts. We do not yet have an expert engaged for the purpose of class certification --

THE COURT: Okay.

MR. DROSMAN: -- but that should be something we take care of shortly.

THE COURT: I see. I'm sure that you have connections with experts who you've used in other cases?

MR. DROSMAN: That's right, Your Honor.

THE COURT: All right. Thank you. So go ahead.

MR. HAMMEL: Yeah, I find myself largely agreeing with Mr. Drosman, which, frankly, is unusual, but we'll take it.

You know, the schedule, it's a complex case, as he said. You know, on class cert, you know, frankly, we went back and forth with them quite a bit on coming up with this schedule. And in all candor, you know, the dates we landed on for class cert were, in part, to try not to have things due right around the holidays, you know. We bumped it out a little bit, you know, for that reason. And there certainly will be at least one expert on each side I would think on class cert. We've looked for experts. We do not yet have one engaged.

And just on the length of the case overall, it sounds like we've done, you know, similar research on both sides. There are other cases where, you know, from the time from now until, you know, dispositive briefing, you know, 24 months. You know, Judge Rayes has a case, the *Sea Limited* case, if I'm calculating it right, 24 months from this conference to dispositive motions. Judge Logan, 18 months in the *Nikola* case.

And so I think we're in the ballpark. It is a long schedule, but I don't think it's, you know, unusually long.

THE COURT: Okay. *Nikola's* been in the news.

MR. HAMMEL: A little bit, Your Honor.

THE COURT: A little bit.

Well, let me ask you, Mr. Hammel, how would you attack plaintiffs' motion for class certification? So numerosity, I'm sure that they're going to be able to satisfy that.

And, by the way, I'm just speaking out loud here. I haven't made any decisions. I'm just trying to understand the needs of the case.

So numerosity, there's probably a lot of folks to satisfy the numerosity.

Commonality, I think common questions of law and fact will pre- -- prevail.

And then typicality, I'm not sure how there would -- how there would be an opposition of that since we're talking about a securities class action. You know, everybody bought -- unless we're talking about different periods in which the plaintiffs purchased the security and then sold the security or held the security, in which case there might be uncommon facts that might support an opposition to class certification.

Am I thinking about this in the right way?

MR. HAMMEL: I think you are, Your Honor. I would say, since you're putting me on the spot, if I had to say --

THE COURT: And I don't mean to. I'm -- as I said, I'm just trying to understand.

MR. HAMMEL: That's fine. That's what we're here for, to answer your questions.

Off the top of my head, I would say that there are two principle bases right now that I could foresee us attacking class cert. One is the adequacy of typicality of this particular plaintiff. We haven't had discovery yet, so I don't

know the merits of that, but depending on when they bought, why they bought, what they knew when they bought. You know, it's an institutional plaintiff, you know, its trading philosophy and all of that. Maybe they're not a typical or adequate plaintiff to represent this class. And so that's a very common basis.

You know, another basis that I could foresee us attacking on is price impact, which is -- you know, had a lot of case law recently, particularly the *Goldman Sachs* case, which has gone up and down to the Supreme Court a couple of times, which measures whether any of the statements that are challenged in the securities class action actually impact the stock price at the time they were made. It's sort of a market efficiency argument.

And here, since Your Honor whittled this case down from approximately 40 statements at the outset to about 10 statements now following the motion to dismiss decision, I think, through expert testimony and otherwise, there could be legitimate questions as to whether the statements that are still in this case, whether some or all of them actually impacted the stock price. And that's a class certification question.

THE COURT: Okay.

MR. HAMMEL: So those would be the two points.

THE COURT: Okay. Any response to Mr. Hammel's

comments?

MR. DROSMAN:  It used to be the case in securities class actions that defendants would stipulate to class certification for the reasons that you had articulated earlier, but now it's become an inflection point.  We expect that they will attack class certification on those grounds.  That tends -- those tend to be the grounds that we see in every one of these securities fraud cases now.

THE COURT:  Okay.  Will you be able to double-track fact discovery on the merits with class discovery?

MR. DROSMAN:  Yes, Your Honor.  That's typical in these cases, and that shouldn't be a problem.

THE COURT:  All right.  With the understanding that there's a separate round of experts --

MR. DROSMAN:  Correct.

THE COURT:  -- on the merits.  So maybe that comes later?

MR. DROSMAN:  That's correct.  The -- the expert discovery for the discovery for class certification with respect to experts would be just limited to the experts on class certification.

THE COURT:  Okay.  And will the parties be looking to engage merits experts in the short term, or are you going to wait down the road for whatever reason, maybe a ruling on the class certification motion?

MR. DROSMAN: My practice is to engage merits experts in the earlier part of the case. I think that can be helpful. So I probably wouldn't await. We haven't engaged any yet, but I anticipate that we would probably start engaging experts fairly shortly --

THE COURT: Okay.

MR. DROSMAN: -- for the merits portion.

THE COURT: Mr. Hammel, do you favor a similar approach?

MR. HAMMEL: We will certainly be engaging merits experts. We're talking to our client now about, you know, who and when. And so I don't quite have a finger on when exactly that would be, but I would think we would want to do it in the short term as well.

THE COURT: How does the defense group anticipate coordinating expert witnesses at both the class cert and the merits stage? Are you all going to have the same expert, or do you think that maybe the underwriters might need their own expert?

Does anybody want to take that one?

MS. BUNTING: Yes, Your Honor.

So normally we would sort of endeavor to ensure lack of duplication of experts, but I think there are unique defenses that are available to underwriters in Securities Act claims. And so we are thinking through whether we would need a

sort of unique expert on those particular issues, but we haven't come to ground on that quite yet.

THE COURT:  Okay.  So there might be another separate expert witness category for underwriters?

MS. BUNTING:  Yes, there could be, Your Honor.

THE COURT:  And how about for the individual defendants, like the Garcias?

MS. CORDRAY:  Your Honor, I think we are still evaluating whether we would be joining the Carvana defendant's opposition to class cert or pursuing our own individual theories as well.

THE COURT:  All right.  I see.  Thank you.

Now, you had suggested -- so I feel like moving on, then.  I don't think we have to talk about class cert anymore, unless somebody wants to.

But moving on, then, you're working on an ESI protocol.  And you had proposed a timeline for that, which I am thankful for you to -- all for thinking about that as a preliminary item, but what I don't think I'm going to do is suspend the schedule if you can't agree on a protocol.  What I would do instead, and what I'm going to do instead, is I'm going to appoint a magistrate judge to conduct settlement disputes.  And I've already asked that one be randomly assigned, and that's Judge John Boyle.  I'll issue an order after this hearing appointing Judge Boyle by random selection

to perform services for any discovery disputes.  And what I'll do is I'll build into the order, the scheduling order, that is, a requirement that if you do have a problem with agreeing to an ESI protocol, that you take it to Judge Boyle.

And I know Judge Boyle.  I'm sure maybe Ms. Car- -- Ms. Marconi or Ms. Cordray, you've probably had some settlement conferences with him.  But I have full confidence that he'll be able to turn around an order on that or any similar discovery disputes very quickly.

You've told me that there's a little bit of a disagreement on depositions.

And, Mr. Drosman, you alluded to that earlier.  I tend to agree with you that this case warrants somewhere over ten fact witness depositions.  If a party came to me and said they needed to take so-and-so's deposition and told me why and it was a good-faith basis, I generally allow them to do that in excess of the ten limit -- limited.  I mean, the ten is simply -- is like a -- you know, something here on discovery over an insurance dispute or a breach of contract or something like that.  But this is more of a complex case involving more complex issues.

So do you think you can -- you and Mr. Hammel could come to an agreement on a number, or do you want to just see how it plays out?  And then I would suggest you bring that to Judge Boyle.

MR. DROSMAN:  Thank you, Your Honor.  I'm hopeful that we can come to an informal agreement on this issue so we don't have to trouble Judge Boyle.  But if -- if we're -- you know, if we're at loggerheads at the end, at least after some period of discovery, we'll be able to point to specific individuals and specific reasons as to why we need their depositions.  So I -- I think it is something that we could probably get through informally, and we'll certainly make that effort.

THE COURT:  Okay.  Anything to add to that, Mr. Hammel?

MR. HAMMEL:  I agree with that.  You know, until we get further into discovery and we find out exactly who and how many, it seems like it's maybe an abstract discussion.

THE COURT:  Right.  Okay.  Well, that's why we have these preliminary hearings to cover, but I have confidence that you all will professionally work this out, understanding my general position.

So you've told me that you intend to engage a private mediator if settlements -- or when the prospects for settlement ripen.  So what I would do is, I'm not going to include the -- the language requiring that you provide me with a joint mediation plan since that language, again, is directed towards cases where there may not be lawyers as engaged in the federal process as you all might be.  That's to encourage lawyers to think about settlement early and to not delay thinking about if

you want to have a private mediator, then getting -- then having to wait to get on that mediator's schedule.  So you've told me that you're already thinking about it, so I don't think that I need to have that deadline.

But I do want to retain the good-faith settlement talk deadline in there.  And just to provide more context, in my view, in order to satisfy the good-faith settlement talks, you don't have to necessarily have a mediator involved.  You can if you want.  I think that would be helpful in a complex case such as this.  But it could be discussions amongst counsel in good faith with some degree of settlement authority from clients.  It's all spelled out in the order.  I think you could satisfy it that way.

Can I verify that you've all exchanged initial disclosure statements on February 18th?

MR. DROSMAN:  We have, Your Honor.

MR. HAMMEL:  Yes.

THE COURT:  And you're both satisfied with the initial disclosures --

MR. DROSMAN:  Yes, Your Honor --

THE COURT:  -- at this point?

MR. DROSMAN:  -- at this point.

THE COURT:  Okay.  All right.

And the individuals and the underwriters have made their initial disclosures?

MS. BUNTING:  Yes, Your Honor.

MS. CORDRAY:  Yes, Your Honor.

THE COURT:  Okay.  Oh, dep- -- getting back to depositions, there's also an issue that was flagged about deposition time for Messers Jenkins, Garcia, Sr., and Jr.

Do we wish to talk about that now?

MR. DROSMAN:  I think that's another issue that we'll crystallize later, and we can hopefully resolve it informally.  It really requires, I think, a fairly robust fact discovery set before we can have a sense as to how much time we need to spend with those individuals.  My experience has been that with respect to these, you know, major players in the case, sometimes more than seven hours is required.  But, again, I think it's probably premature to discuss, and we'll try to resolve that informally.

THE COURT:  Okay.  Are you on the same page?

MR. HAMMEL:  That makes sense to us, too, Your Honor.

THE COURT:  Okay.  And I think we're all of the understanding that seven hours means seven hours on the record as opposed to seven hours from start to finish.

There's an issue about amending the pleadings.  So I know that plaintiffs cited something that I said in the *Lowthorp* case, and maybe another case.  You know, I tend to learn things as I progress through this job over the years.  So I think I would refine what I said to say that I understand

20

that things happen throughout the course of discovery, but I would just defer to the rules on amending pleadings. I understand that there's the need for finality in a case, that we can't keep amending the pleadings every time new causes of action are discovered. I think I would say amending freely without leave of Court. So we should establish a deadline, and I think that the deadline should be sooner rather than later for amended pleadings, and then anything after that, I think, needs to satisfy the standard in the federal rules for an amended pleading.

So I think I would be inclined to be closer to the defendants' amended pleading date, April 16th. Not necessarily that day, April 16, 2025, but somewhere close to that.

Mr. Drosman, do you want to say something?

MR. DROSMAN: Sure.

Your Honor, I guess there's two issues really. Information continues to come out with respect to Carvana's liability for the title and registration violations. I think they just recently had a settlement with the Connecticut Attorney General over those issues. And so that's -- that's one issue.

The second issue is there's -- you know, through the document discovery and -- and the deposition discovery, we often discover new facts that support not so much new causes of action, but, for example, the falsity of statements that may

have already been dismissed.  And so we don't expect to bring new causes of action as much as facts that might support liability for statements that have been dismissed but now are demonstrably false given what we've found in discovery.

We certainly have no interest, as you know, in going back to square one at the last minute.  That is not plaintiffs' interest.  Plaintiffs' interest is just to make sure that there is a -- a just resolution of this case.  And so that's why we had proposed the end of fact discovery.  We -- at this time we have no current intention of amending, but we just don't know what information is going to come out both through the public domain and through the fact discovery in the future.

So I would ask that maybe we split the difference.  And then after that, we can move for leave through the federal rules if we find additional information that we believe -- and it has to be serious information that we believe is going to warrant amending.  This is not something we would take lightly or engage in lightly.

THE COURT:  Your response?

MR. HAMMEL:  Well, we have found an issue on which we disagree.

I just -- I want to be clear.  They do not have a right to amend right now.  They've amended once.  Your Honor denied further leave in the motion to dismiss.  And, as I read Rule 15(a)(2), they can only move -- they can only amend again

if we consent or Your Honor gives them -- leave for good cause is shown. The way I'm hearing Mr. Drosman, it sounds as though he thinks he has an automatic right to amend again, and he does not.

And in terms of Your Honor's inclination towards an earlier date, I mean, we think there shouldn't be a date at all. The parameters are set. That's why we went through two rounds of motions to dismiss. If they amend again, we'll have a right to file another motion to dismiss under the rules.

I think what I heard him say is he's going to see if they can revive some of the alleged misstatements that Your Honor already dismissed. That's not what the PSLRA is about. That's why we went through all those. If we go -- no matter when there's an amendment, you know, the further into discovery it goes, we'll have to redo a motion to dismiss. We'll have to redo class certification if they change the alleged misstatements, if they change the class period. There could be more discovery required.

It's a bird's nest, you know, the longer it goes. We think it shouldn't go at all. We offered April 16th as a good-faith compromise, but having it at the end of the discovery, to us, doesn't make any sense. And having it much later than that April 16th, we think it just creates --

THE COURT: Okay.

MR. HAMMEL: -- a potential for a lot of problems.

THE COURT:  Did you want to say --

MR. DROSMAN:  Sure.

THE COURT:  -- a few words?

MR. DROSMAN:  I was going to say Rule 15(a) of the federal rules contemplates that the Court should freely give leave to amend when justice so requires.  And that would be the standard under which we think we should operate.  We don't anticipate moving to amend.  That's not something that we have any basis right now to do, but we just don't know what the future will bring.  And that's the whole point of Rule 15(a).

THE COURT:  Okay.  All right.  Thank you for that discussion.

I don't know if there's anything else that we should discuss with regard to the schedule.  Did I miss something, or maybe you all have something else that you want to talk about?  No?

MR. DROSMAN:  I don't think so, Your Honor.

MR. HAMMEL:  No, Your Honor.

THE COURT:  All right.  Well, let me do this.  One moment.

What does the last item on your table on page 13 mean, "Pre-trial disclosures under 26(a)(3).  Adjourn sine die"?

Now, I spent some time at the legislature, and I know what that means in the context of a legislative body.  But I just -- I've just never used that in -- in the context of the

discovery timeline.

Does that mean you're -- you propose to dispense with final discovery?

MR. DROSMAN:  So that's something defendants added, so I'll defer to my colleague.

MR. HAMMEL:  I think what we had in mind there, Your Honor, is things like pretrial witness lists and all that, and we thought it made sense to not have a deadline for those.  And since there's no trial date, we thought --

THE COURT:  Right.  Okay.  So the way I handle that is after summary judgment is complete, if we get past summary judgment and we're on our way to a trial, I'll issue a -- an order setting trial, and that will have that information in there.

MR. HAMMEL:  Makes sense, Your Honor.  We hope not to get there but makes sense.

THE COURT:  Right.  Some judges, I guess, will set a trial date years ahead.  I just don't find that efficient, at least for the way I like to manage the case.

All right.  Well, you know, if you're all on board with this schedule, I'll go ahead and adopt it without having you go through the exercise.  I'm -- what I'm probably going to do on the amended pleadings is just say amendments to the pleadings will be governed by Rule 15 of the Rules of Civil Procedure and let you all deal with that.

And, Mr. Drosman, you're accurate on your position, but I think there's also the element of would it cause prejudice and delay. So we just have to deal with that in -- in the course of the case.

MR. DROSMAN: Understood, Your Honor.

THE COURT: Okay. So we'll go ahead and do that. But I also want you to know that I expect you to be diligent in this case. I have no reason to believe that you won't be, but I feel the need to always tell this to lawyers. I expect you to be diligent. I expect you to be working towards achieving success under these deadlines. And I'll leave it to you to determine whatever that means, "success." But you need to be working towards the deadlines. And barring some act of nature or your expert dies a week before the deposition and you're scrambling, I'm probably going to keep these deadlines and hold you to them. And I want to make sure you all know that.

Do you understand?

MR. DROSMAN: Yes, Your Honor. I -- I think your admonition that the deadlines are real is -- is well taken by at least plaintiffs.

THE COURT: Okay. And does defense counsel understand that?

MR. HAMMEL: Understood, Your Honor.

MS. BUNTING: Yes, Your Honor.

MS. CORDRAY: Yes, Your Honor.

THE COURT: Okay. And I'll let you know, I -- if you ask to extend the deadlines and I don't think it's warranted, I might even go back to the transcript in the order and cite this transcript, just so you know.

All right. So let me tell you a little bit about what to expect after the scheduling order issues either later today or perhaps tomorrow.

First of all, I would just repeat the deadlines are real. Continue to work towards them. Be diligent. I expect lawyers, particularly lawyers at large firms and experienced firms, such as every firm represented here, will be diligent and will work towards the deadlines. That's my expectation.

If you do find a need to seek a modification of the deadlines, the best practice is to file a joint motion after you've conferred and think about reasonable deadline extensions. And the motion needs to tell me what you've done in the case, what you have left to do, and why you couldn't achieve those objectives during the given schedule.

I read those motions, along with the clerk. It's not just the law clerk who reads them. And I also will personally go to the docket and look to see what kind of docket activity has taken place. The local Rules of Civil Procedure here in the District of Arizona require that counsel file notices of discovery activity. So I haven't checked, but if you've exchanged initial disclosures, there should be in the docket a

notice that you've exchanged them.

And, Ms. Marconi, you're nodding your head.

MS. MARCONI:  Yes.

THE COURT:  Okay.  So Ms. Marconi could confirm that that's been done, at least from her responsibility.

So I'm going to go and look for that.  So notices of written discovery, notices of depositions, 30(b)(6)s, all of that should be noticed in the docket so that it -- you know, the young people say they're bringing receipts on social media. That's your receipt so that I know that you're working.  And if I don't see that, I'm going to assume that you're not doing any work.

And that could be a completely unfair assumption and a wrong assumption to you, but I just have no way of doing -- of knowing what you're doing unless you're filing these important documents.  So please be on top of that.  And, remember, the docket is the way that we all communicate with each other outside of court, so it's important for you to be putting these things on the docket.

And if you have to file something and you're asking me to do something, the best thing to do is to file a motion.  So sometimes you may agree.  And stipulations are okay, but, you know, as Ms. Cordray, who was a law clerk here will know, things -- not for me.  For my friend upstairs, a friend and colleague.  But, you know, they're coded as motions, and that

helps me remember that there's something that I need to rule on. So stipulations are good, but they don't -- they don't keep -- we -- it's harder to keep track of those. So if you agree on something, I think the best thing to do is to file a stipulated motion so that I get it in that form and I know to act on that.

I've already mentioned I've referred this matter to Judge Boyle for discovery disputes. My scheduling order will have a very specific protocol for handling discovery disputes. And unless Judge Boyle says otherwise, you should follow my protocol, and that is a -- a joint three-page motion to resolve the discovery dispute. The motions -- page limitation does not mean that the caption, which is voluminous on page 1, that doesn't count as a page. The signature blocks don't count towards your page. It's three pages of argument that you should share per side. And I know that some issues, like attorney-client privilege issues or electronic discovery issues, might merit more than three pages, but if it does, just stick to the three pages and let me know. Say: We would ask the Court to permit supplemental briefing.

Even if you don't ask me to, I might read it and say, this requires supplemental briefing, and ask you all to submit supplemental briefs.

The joint motion is simply to give me an idea of what is happening in realtime so that I could act on it in realtime

such as that not -- won't delay the discovery timeline.

And, of course, if this is a discovery dispute over an interrogatory, for example, you're highly encouraged to attach that interrogatory along with the responding party's objections so that I can, you know, have a better idea as to what's happening.  And then you could also attach your email correspondence so I could see.  Like maybe one side thinks that an interrogatory is vague and ambiguous.  And then the propounding side says:  Well, I'll limit it or clarify it in this manner, but that's still not good enough.

Well, I think that is good enough, and go with it.

So it's helpful for me to see that back and forth.

I'll try and rule on it as quickly as I can.  Well, Judge Boyle will, I should say.  And if Judge Boyle requires a hearing, I'm sure that he'll ask for one.  And typically the practice here -- I don't want to speak specifically for Judge Boyle, but the practice is on discovery disputes, you don't have to come here from the East Coast or the Bay area, or wherever.  We get folks on the phone.  Interestingly, I've had high-stakes cases where the lawyers did come for the discovery disputes.  I didn't think that was necessary.  They wanted to. It's your choice.

Okay.  What's next?  Summary judgment motions.

I think I'm skipping over class certification because we've already talked about it.  Well, let me just say this

about class certification:  I'll probably want to have an oral argument on that, and in which case I like to have counsel here in the courtroom for an oral argument of that nature.

Summary judgment.  If you feel like you need more pages, just confer with each other and then come up with a stipulation as to how many extra pages you think everybody needs.

Is there an issue in the 26(f) report about the defense group with, like, the underwriters and the -- and the individuals?  Was there some sort of an issue as to how many summary judgment motions on the defense side?

Mr. Hammel.

MR. HAMMEL:  I don't think that came up in the -- in the report.

THE COURT:  I might be thinking of something else.

MR. HAMMEL:  Okay.

THE COURT:  How do you all intend to handle summary judgment motions?  The same way as the 12(b)(6) motions?

MR. HAMMEL:  I would think we would collaborate as much as possible to do a joint motion.  If either or both of the other defense -- defendants have their own arguments, you know, I certainly wouldn't want to speak for them, but I would think they they'd want to be able to bring their own motion as well.

THE COURT:  Would you validate that?

MS. BUNTING:  Yes, Your Honor.  I agree.  As I said earlier, there are some potentially unique defenses for the underwriters, so it may be that we need to include some separate argument there, but I think we could discuss that and hopefully come to some kind of agreement.

THE COURT:  Okay.

MS. CORDRAY:  We would agree, Your Honor.  I think we'd probably handle it very similar to the motions to dismiss.

THE COURT:  Anything to say from plaintiffs' point?

MR. DROSMAN:  And I think we dealt with multiple motions from the defense group on the motion to dismiss with an omnibus response.  Which my guess would probably be the most sufficient way to deal with it on summary judgment as well, but we could talk about it more as we get closer to that date.

THE COURT:  Okay.  Very good.  So I think that separate summary judgment motions seems to be the right approach, but I would just say don't repeat what Carvana says in its summary judgment motion.  There's no need.  You could say, the underwriters, the individuals join Carvana's arguments on A, B, C, but then you separately present Issues D, E, and F.  Something of that nature.

And then plaintiffs should have whatever opportunity, like whether it's an omnibus.  I think omnibus is the best for me for processing the motions, if that's what you wish to do.  But the page limitation for you all needs to be reasonable.  So

can you confer on page limitations?

I don't like excessive footnotes.  I don't know if it was this -- there was a case very recently where I had to admonish parties about excessive foot- --

MR. HAMMEL:  We've gotten the message, Your Honor.

THE COURT:  Okay.  Yeah, I just don't like reading lengthy footnotes.  I would much prefer to have exposition in the narrative form in the main body.  And in this case, I'm telling you, I'm generous on page limits to a point.  Okay?

MR. DROSMAN:  And I was just going to mention that as we get closer, we can certainly meet and confer on that. Hopefully we can reach an agreement on that.

THE COURT:  Okay.

MR. DROSMAN:  Okay.

THE COURT:  Very good.  Thank you.

I like to have oral argument on summary judgment motions, so just expect to be here in court on that day.  I'll be generous in the time.  You know, maybe two hours or so.  But even so, there's a lot to be said on summary judgment and a lot of parties here.  So remember, even if there's a lengthy amount of time, try and moderate your argument here.

I know that folks in cases like this like to present PowerPoints.  That's fine.  Make sure you coordinate with the courtroom deputy about technology so that you could hook up. You could hook up your computers.

Mr. Drosman, remind me.  Do you have local counsel?

MR. DROSMAN:  We do, Your Honor.

THE COURT:  Okay.  So that would be a good thing for local counsel, if you wish to have a PowerPoint presented, to maybe come in at a time convenient for the courtroom deputy to test --

MR. DROSMAN:  We'll do that.

THE COURT:  -- electronics.

MR. DROSMAN:  Thank you.

THE COURT:  And another thing is lawyers like to bring handouts of the PowerPoints.  That's fine as long as everybody's getting a copy of the handouts and you bring one for me, but also for the law clerk.  That's always very helpful.

You don't have to do a separate statement of facts. Your factual summary could be that statement of facts.  And you'll just cite to the record the way you normally would and attach your record exhibits and deposition transcripts as exhibits to the motion all in one ECF package.

I do like to have courtesy copies of dispositive motion briefing.  And add class certification briefing to that list.  So really anything that -- like of high importance, like a class certification motion, a summary judgment motion, *Daubert* motions, I like to have paper copies, because I actually do use paper copies.  That's just my preference, so

please have them sent to chambers.  And you don't have to have them hand-delivered.  That's very expensive.  And I just won't be able to get to them as quickly as a hand-delivery would justify.  So you could have them sent whichever way is most cost effective to you.

If there's a color exhibit, like perhaps there's a -- a chart or a graph that incorporates color, it's nice to have you slip the color copy in there, because I don't have a color copier in chambers.  There's a color copier somewhere in the building, but it's not convenient to use and access.

If I deny summary judgment in some respect that requires a trial, then I will set by separate order a trial setting conference.  As I mentioned, please come in person to the trial setting conference with not only your availability, but the availability of all of your witnesses, your client representatives, your expert witnesses.  Try to confer with everybody beforehand, to the extent you can, to determine how long you think the trial will require, including jury selection.  Maybe if you think you could stipulate to any exhibits that might make the trial process go more efficiently. And we're going to talk about all that at the trial setting conference.  And my intent will be to ultimately set a trial and a final pretrial conference.  So if you're not prepared for that, I'm just going to do it, and you're just going to have to figure that out after I set the trial.

35

We'll also set a joint pretrial -- a -- sorry -- a final pretrial conference.  And then in the order setting the final pretrial conference, that document will talk about the witness lists, the exhibit lists, the schedule for preparing the proposed joint final pretrial order, et cetera, et cetera.

I've said a lot.  I hope I made it worthwhile for you all to come here.

Is there anything that anybody wishes to talk with me about at this conference that I might not have addressed?  This is the time to do it.

MR. DROSMAN:  I -- you've been very -- it's been very helpful to hear Your Honor's practices, and I don't have anything right now to discuss further.

THE COURT:  Okay.

MR. HAMMEL:  Same for us, Your Honor.  This has been very helpful.  We appreciate your guidance as we go forward.

THE COURT:  Okay.  Thank you.

And other counsel?

MS. BUNTING:  No, nothing additional, Your Honor.  Thank you very much for the time.

MS. CORDRAY:  Nothing additional.  Thank you.

THE COURT:  All right.  Let me confer with my law clerk to make sure I didn't miss anything that she thinks is important.

(The Court and the law clerk confer.)

THE COURT:  All right.  I got the green light.  Safe travels home.

Court is adjourned.

(Proceedings conclude at 9:53 a.m.)

---oOo---

# C E R T I F I C A T E

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 27th day of February, 2025.

/s/ Cathy J. Taylor
Cathy J. Taylor, RMR, CRR, CRC

UNITED STATES DISTRICT COURT