# Exhibit D

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (CA 200643)
TOR GRONBORG (CA 179109)
ERIKA L. OLIVER (CA 306614)
RACHEL A. COCALIS (CA 312376)
MATTHEW J. BALOTTA (CA 310303)
SARAH A. FALLON (CA 345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ddrosman@rgrdlaw.com
torg@rgrdlaw.com
eoliver@rgrdlaw.com
rcocalis@rgrdlaw.com
mbalotta@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re Carvana Co. Securities Litigation | No. CV-22-2126-PHX-MTL |
| This Document Relates To: | LEAD PLAINTIFF SASKATCHEWAN HEALTHCARE EMPLOYEES' PENSION PLAN'S RESPONSES AND OBJECTIONS TO CARVANA DEFENDANTS' FIRST SET OF INTERROGATORIES (NOS. 1-13) |
| All Actions. | |

4921-8732-5237.v3

Pursuant to Federal Rules of Civil Procedure 26 and 33 and applicable Rules of Practice and Procedure of the U.S. District Court for the District of Arizona (the "Local Rules"), Lead Plaintiff Saskatchewan Healthcare Employees' Pension Plan ("SHEPP" or "Lead Plaintiff," and collectively with Lead Plaintiff United Association National Pension Fund, "Lead Plaintiffs"), by its attorneys, hereby provides the following objections and responses to the Carvana Defendants' First Set of Interrogatories to Lead Plaintiff SHEPP (Nos. 1-13) (the "Interrogatories"), served on March 19, 2025, as follows:

## I.      INTRODUCTION AND RESERVATIONS OF RIGHTS

1.      Lead Plaintiff's responses to these Interrogatories are made for the sole purpose of the above-captioned action (the "Action").  Each response is subject to all objections as to relevance, materiality, propriety, admissibility, privilege, privacy, and the like, and all objections are reserved and may be interposed at the time of trial.

2.      Lead Plaintiff's responses to the Interrogatories are based upon, and therefore limited by, records and information still in existence, presently recollected, and thus far discovered in the course of preparing these responses.  Consequently, Lead Plaintiff reserves the right to revise or supplement these responses, to the extent required by the Federal Rules of Civil Procedure, the Local Rules, or the rules and orders of this Court, if it appears at any time that inadvertent errors or omissions have been made, or additional or more accurate information becomes available.

3.      Lead Plaintiff's responses to all or any part of these Interrogatories shall not be construed as an admission of relevance, materiality, or admissibility of such information or the subject matter of such information or as a waiver or abridgement of any applicable privilege or of any objections set forth herein.  Lead Plaintiff reserves the right to object to the admissibility into evidence of any information provided in response to the Interrogatories.

4.      Lead Plaintiff expressly reserves, and these responses to the Interrogatories shall not constitute a waiver of, Lead Plaintiff's right to:

- 1 -

4921-8732-5237.v3

(a)    object on any ground to the use or admissibility into evidence for any purposes the information provided at any point;

(b)    object on any ground to other discovery requests that involve or relate to the subject matter of the Interrogatories; and

(c)    rely on at any time, including at trial, subsequently discovered information omitted from these responses as a result of mistake, error, oversight, or inadvertence.

5.    Although Lead Plaintiff's pre-filing and subsequent investigative efforts have been substantial, Lead Plaintiff has not completed fact discovery, expert discovery, or preparation for trial.  The following responses are based on information known at this time.

## II.    SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    Lead Plaintiff objects to the Interrogatories because they are vague, overbroad, unduly burdensome, disproportionate to the needs of the case, and seek information that is not relevant to the claims or defenses of the parties.  In particular, the Interrogatories do not specify a time period for which they seek information and therefore seek responses irrespective of time.  Unless otherwise stated, Lead Plaintiff will provide responses to these Interrogatories for the time period May 6, 2020 through October 7, 2022, inclusive (the "Class Period").

2.    Lead Plaintiff objects to the Interrogatories on the grounds that they seek disclosure of information that is protected from discovery by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, doctrine, immunity, statute, regulation, rule, restriction, or limitation on discovery.  In particular, Definition Nos. 18 ("SHEPP"), 20 ("UANPF"), and 21 ("You" and "Your") purport to define "SHEPP," "UANPF," "You," and "Your" as including "attorneys."  Lead Plaintiffs will not disclose privileged or otherwise protected information, and nothing contained in Lead Plaintiff's responses to the Interrogatories should be interpreted as a waiver of any such privilege or doctrine.  Nor shall the inadvertent disclosure of any privileged or otherwise protected communication constitute a waiver of any of those privileges as to any information contained

- 2 -

4921-8732-5237.v3

in the communication, or Lead Plaintiff's right to assert any of those privileges as to any other matter that arises during the course of this litigation, any related litigation, or any subsequent proceeding. For these reasons, Lead Plaintiff objects to Definition No. 9 ("Describe") and Instruction Nos. 8 and 10, which purport to require that Lead Plaintiff provide all information that "Your counsel have obtained, have access to, and/or are aware of" and "in the possession of Your present and former attorneys," and Instruction No. 15, which purports to impose on Lead Plaintiff obligations beyond those required by the Federal Rules of Civil Procedures and the Local Rules as they relate to claims of privilege.

3. Lead Plaintiff further objects to Definition Nos. 18 and 21 and Instruction Nos. 8 and 10 as overbroad, unduly burdensome, seeking information that is not relevant to the claims or defenses of the parties, disproportionate to the needs of the case, and purporting to impose requirements beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules because they purport to require Lead Plaintiff to provide information that is not within its possession, custody, or control, that is not maintained in the ordinary course of its business, or that must be obtained from persons or entities other than SHEPP. Lead Plaintiff will interpret "SHEPP," "You," and "Your" to mean Saskatchewan Healthcare Employees' Pension Plan and its Board of Trustees, officers, and directors, in their capacity as such, only.

4. Lead Plaintiff objects to Definition No. 17 ("Securities") as overbroad, unduly burdensome, seeking information that is not relevant to the claims or defenses of the parties, disproportionate to the needs of the case, and purporting to impose requirements beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules because they include securities that are not at issue in this Action. Lead Plaintiff will interpret "Securities" to mean Carvana's publicly-traded securities only.

5. Lead Plaintiff objects to Definition No. 19 ("Transaction(s)") as containing ambiguous terms, such as "or any other means," and as otherwise overbroad, unduly burdensome, seeking information that is not relevant to the claims or defenses of the parties, and disproportionate to the needs of the case because it purports to include securities that are not at issue here (as defined by the Carvana Defendants' Definition No. 17).

- 3 -

4921-8732-5237.v3

6.    Lead Plaintiff objects to Definition Nos. 5 ("Communication"), 6 ("Concern," "concerning," "reflect," "reflecting," "related," "relating," "relate(s)," "refer," and "referring," and other variations thereof, 9 ("Describe"), 10 ("Document"), 11 ("Identify"), and 16 ("Person") as overbroad, unduly burdensome, and disproportionate to the needs of the case because they purport to impose requirements beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules.  Lead Plaintiff will respond in accordance with its obligations under the Federal Rules of Civil Procedure and the Local Rules.

7.    Lead Plaintiff objects to Instruction Nos. 8 and 9 to the extent they impose requirements beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules, demand information that is unduly burdensome to collect and prepare, or are duplicative or cumulative of the Carvana Defendants' requests for the production of documents.  Lead Plaintiff also objects to Instruction Nos. 8 and 9 to the extent they purport to require Lead Plaintiff to provide information that is not within its possession, custody, or control, that is not maintained in the normal course of its business, or that must be obtained from persons or entities other than Lead Plaintiff, including through the use of objectionable terms such as "Your" and "Person."  Lead Plaintiff further objects to Instruction No. 9 to the extent it misstates the relevant legal standard.  *See Former S'holders of Cardiospectra, Inc. v. Volcano Corp.*, 2013 WL 5513275, at *2 (N.D. Cal. Oct. 4, 2013) ("'An answer to an interrogatory must be responsive to the question.  It should be complete in itself and should not refer to the pleadings, or to depositions or other documents, or to other interrogatories, *at least where such references make it impossible to determine whether an adequate answer has been given without an elaborate comparison of answers*.'").

8.    Lead Plaintiff objects to Instruction No. 13 as ambiguous, overbroad, and purporting to impose requirements beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules to the extent it requires Lead Plaintiff to "provide . . . any estimates, approximations, or beliefs that You consider reliable."  Lead Plaintiff has conducted a reasonable investigation into the non-objectionable portions of the

- 4 -

4921-8732-5237.v3

Interrogatories, and its responses below are based on that investigation and their own personal knowledge. Lead Plaintiff will not speculate or guess.

9.    Lead Plaintiff objects to the Instructions to the extent they seek to impose on Lead Plaintiff obligations beyond what is required by the applicable law and rules, including the Federal Rules of Civil Procedure and the Local Rules.

**III.    SPECIFIC RESPONSES AND OBJECTIONS TO THE INTERROGATORIES**

INTERROGATORY NO. 1:

Identify each Person, including, but not limited to, any Investment Advisor, broker, manager, consultant, or investment management firm, who had any involvement – such as evaluating, discussing, advising, deliberating, deciding, or reviewing – in Your decision whether or not to purchase or sell Carvana Securities.

RESPONSE TO INTERROGATORY NO. 1:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions. Lead Plaintiff also objects to this Interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of the case because it seeks the identification of "each Person . . . who had *any* involvement," no matter how tenuous, with Lead Plaintiff's investment decisions relating to Carvana Securities. Lead Plaintiff also objects to the terms "evaluating," "discussing," "deliberating," and "reviewing" as used in this Interrogatory because they are vague, ambiguous, and subject to multiple interpretations. Lead Plaintiff further objects to this Interrogatory to the extent it calls for information that is not in Lead Plaintiff's possession, custody, or control, and so purports to require Lead Plaintiff to seek, obtain, and verify information in the possession of third parties.

Subject to and without waiving the foregoing objections, Lead Plaintiff responds as follows: Pursuant to its agreements with its investment managers, Lead Plaintiff delegated all specific investment decisions to its investment managers, who had sole and exclusive authority to decide whether to buy or sell Carvana Securities, or any other security, within

- 5 -

4921-8732-5237.v3

the strictures of their investment policies and agreements with Lead Plaintiff. The following investment manager transacted in Carvana Securities on Lead Plaintiff's behalf during the Class Period: Baillie Gifford & Co.

INTERROGATORY NO. 2:

For any Persons You identified in response to Interrogatory No. 2, Identify the manner in which each Person was involved in Your decision whether or not to purchase or sell Carvana Securities.

RESPONSE TO INTERROGATORY NO. 2:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions. Lead Plaintiff also objects to the term "manner" as used in this Interrogatory because it is vague, ambiguous, and subject to multiple interpretations.

Subject to and without waiving the foregoing objections, Lead Plaintiff responds as follows: Pursuant to its agreements with its investment managers, Lead Plaintiff delegated all specific investment decisions to its investment managers, including Baillie Gifford & Co., who had sole and exclusive authority to decide whether to buy or sell Carvana Securities, or any other security, within the strictures of their investment policies and agreements with Lead Plaintiff. In accordance with Rule 33(d), the applicable investment policies and agreements will be produced in response to the Carvana Defendants' First Set of Requests for Production to Lead Plaintiffs.

INTERROGATORY NO. 3:

Identify all sources of information, including, but not limited to, Documents, Communications, reports, articles, or other investment advice, You reviewed or relied upon in making the decision(s) to purchase or sell Carvana Securities.

RESPONSE TO INTERROGATORY NO. 3:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions. Lead Plaintiff also objects to this

- 6 -

Interrogatory to the extent it seeks information that is not in Lead Plaintiff's possession, custody, or control to the extent "You" is defined to include any third parties.

Subject to and without waiving the foregoing objections, Lead Plaintiff responds as follows: Pursuant to its agreements with its investment managers, Lead Plaintiff delegated all specific investment decisions to its investment managers, including Baillie Gifford & Co., who had sole and exclusive authority to decide whether to buy or sell Carvana Securities, or any other security, within the strictures of their investment policies and agreements with Lead Plaintiff.  Accordingly, Lead Plaintiff did not review or personally rely on any documents, communications, reports, or articles in making the decision(s) to purchase or sell Carvana Securities.

INTERROGATORY NO. 4:

Identify the name and, if known, contact information for each Confidential Witness, including specifying which number You assigned to each CW.

RESPONSE TO INTERROGATORY NO. 4:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions.  Lead Plaintiff further objects to this Interrogatory to the extent it seeks information that is not in Lead Plaintiff's possession, custody, or control.  Lead Plaintiff objects to this Interrogatory as compound and consisting of a subpart.  Lead Plaintiff also objects to this Interrogatory on the grounds that Lead Plaintiff relied on counsel's factual investigation in connection with the Complaint and, thus, it seeks or requires disclosure of information that is protected by the attorney work product doctrine. *See, e.g.*, *Grae v. Corrs. Corp. of Am.*, 326 F.R.D. 482, 484-89 (M.D. Tenn. 2018) (denying motion to compel response to interrogatory seeking identification of former employee cited in securities fraud complaint because such information is not relevant and is protected work product).

INTERROGATORY NO. 5:

Identify any civil or criminal lawsuits, charges, complaints, proceedings, fines, disciplinary actions, decisions, or judgments filed, issued, or entered against You in any

- 7 -

4921-8732-5237.v3

federal, state, or other court, in any arbitration, or by any governmental agency, any stock exchange, or any self-regulating association or organization; any investigations of You by any governmental agency, stock exchange, or self-regulating association or organization; or any sanction imposed on You by any court or regulatory body.

RESPONSE TO INTERROGATORY NO. 5:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions. Lead Plaintiff further objects to this Interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of the case because it seeks identification of "*any*" legal or quasi-legal proceeding, "investigation," or the like that was "filed, issued, or entered against You in *any*" jurisdiction by "*any*" governmental or regulatory entity, body, or court, irrespective of subject matter or relevance to this Action. Lead Plaintiff also objects to this Interrogatory because it seeks information that is not relevant to the claims or defenses of the parties, including because it seeks information irrespective of subject matter or relevance to this Action and beyond the Class Period or the time period contemplated by 15 U.S.C. §78u-4(a)(2)(A)(v). Lead Plaintiff further objects to this Interrogatory as compound and consisting of multiple subparts as demonstrated by the Carvana Defendants' Request for Production No. 27, which identified each subpart as such. Lead Plaintiff also objects to the terms "complaints," "proceedings," "other court," and "self-regulating association or organization" as used in this Interrogatory because they are vague, ambiguous, and subject to multiple interpretations. Lead Plaintiff will limit its response to the period starting three years before its Certification Pursuant to Federal Securities Laws through the end of the Class Period. Lead Plaintiff will further limit its response to this Interrogatory to any civil or criminal charges, fines, sanctions, disciplinary actions, decisions, or judgments filed, issued, or entered against Lead Plaintiff in federal or state court, or by a governmental agency, or stock exchange.

Subject to and without waiving the foregoing objections, Lead Plaintiff responds as follows: In accordance with Rule 33(d), Lead Plaintiff will conduct a reasonable investigation for documents responsive to the Carvana Defendants' Request for Production

- 8 -

4921-8732-5237.v3

No. 27 and refers the Carvana Defendants to documents produced in response to that request, if any. Lead Plaintiff will amend the response to this Interrogatory with Bates number references, if any, after the relevant documents have been produced.

INTERROGATORY NO. 6:

Identify by full case name, jurisdiction, and case number each lawsuit, arbitration, bankruptcy, or administrative proceeding in which You have been, are, or sought to be a party, lead plaintiff or class member, including the attorneys who represented You or with whom You consulted about the lawsuit or proceeding, and whether You attempted to be appointed as the lead plaintiff but were unsuccessful.

RESPONSE TO INTERROGATORY NO. 6:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions. Lead Plaintiff also specifically objects to this Interrogatory as overbroad, unduly burdensome, and disproportionate to the needs of the case because it seeks identification of "*each*" lawsuit or other proceeding that "You have been, are, or sought to be a party, lead plaintiff or class member," irrespective of subject matter or relevance to this Action. Lead Plaintiff also objects to the term "consulted" as used in this Interrogatory because it is vague, ambiguous, and subject to multiple interpretations. Lead Plaintiff also objects to this Interrogatory because it seeks information that is not relevant to the claims or defenses of the parties, including because it seeks disclosure of information beyond the scope and time period contemplated by 15 U.S.C. §78u-4(a)(2)(A)(v). Lead Plaintiff also objects to this Interrogatory as seeking information that is duplicative of the Carvana Defendants' Request for Production No. 26. Lead Plaintiff will limit its response to this Interrogatory to the period starting three years before its Certification Pursuant to Federal Securities Laws through the end of the Class Period. Lead Plaintiff will further limit its response to this Interrogatory to litigation involving federal or state securities laws.

Subject to and without waiving the foregoing objections, Lead Plaintiff responds as follows: Lead Plaintiff refers the Carvana Defendants to Lead Plaintiff's: (a) Certification

- 9 -

Pursuant to Federal Securities Laws (ECF 9-3 at 7), dated August 30, 2022 and filed on October 3, 2022; and (b) Certification Pursuant to Federal Securities Laws (ECF 71 at 330), dated March 28, 2024 and filed on March 29, 2024, pursuant to Rule 33.

INTERROGATORY NO. 7:

Identify with particularity each statement by Carvana Defendants that You contend was false, misleading, incomplete or otherwise constituted a violation of the Securities Act of 1933.

RESPONSE TO INTERROGATORY NO. 7:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions. Lead Plaintiff also objects to this Interrogatory as compound as it contains multiple subparts seeking discrete information but purports to count as only one interrogatory for purposes of the limitations set forth in Rule 33. Lead Plaintiff also objects to the term "with particularity" and "incomplete" as used in this Interrogatory because they are vague, ambiguous, and subject to multiple interpretations.

Subject to and without waiving the foregoing objections, Lead Plaintiff identifies that, as alleged in the operative Complaint, the Registration Statement[1] omitted material facts required to be stated therein. In addition, the Registration Statement contained the following statements that Lead Plaintiff contends were false, misleading, incomplete, or otherwise constituted a violation of the Securities Act of 1933.

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[2] |
| --- | --- |
| Statement A – Complaint, ¶381: February 24, 2022 FY 2021 Form 10-K, signed and | ***Vehicle acquisition***. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. ***We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory***. We |

---

[1] "Registration Statement" collectively refers to Carvana's: April 20, 2022 SEC Form S-3 Registration Statement, April 25, 2022 SEC Form 424B2, and all documents incorporated therein.

[2] The relevant portions of the challenged statements are bolded.

- 10 -

4921-8732-5237.v3

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[2] |
|---|---|
| certified by Garcia Junior and Jenkins | utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments. |
| Statement B – Complaint, ¶383: February 24, 2022 FY 2021 Form 10-K, signed and certified by Garcia Junior and Jenkins | [A]n increase in the number of used vehicles sold to 425,237 from 244,111 during the years ended December 31, 2021 and 2020, respectively. *The increase in units sold was driven by growth in existing markets due to expanded inventory selection, enhanced marketing efforts, increased brand awareness, customer referrals, and growth in market population coverage to 81.0% as of December 31, 2021 from 73.7% as of December 31, 2020*. |
| Statement C – Complaint, ¶385: February 24, 2022 FY 2021 Form 10-K, signed and certified by Garcia Junior and Jenkins | We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations.  . . . *[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition*.<br><br>We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. *Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration* . . . .<br><br>*        *        *<br><br>*The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results*. |

- 11 -

4921-8732-5237.v3

INTERROGATORY NO. 8:

Identify with particularity each statement or deceptive act by Carvana Defendants that You contend was false, misleading, incomplete or otherwise constituted a violation of the Securities Exchange Act of 1934.

RESPONSE TO INTERROGATORY NO. 8:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions.  Lead Plaintiff also objects to this Interrogatory as compound as it contains multiple subparts seeking discrete information but purports to count as only one interrogatory for purposes of the limitations set forth in Rule 33.  Lead Plaintiff expressly reserves all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent court order modifying such limitations in this Action.

Lead Plaintiff also objects to this Interrogatory because it is vague and ambiguous. Lead Plaintiff also objects to the term "with particularity" as used in this Interrogatory because it is vague, ambiguous, and subject to multiple interpretations.

**Response to subpart (a)**: Subject to and without waiving the foregoing objections, Lead Plaintiff identifies the following statements that Lead Plaintiff contends were false, misleading, incomplete, or otherwise constituted a violation of the Securities Exchange Act of 1934.  Lead Plaintiff also contends that the documents identified below in the "DATE/EVENT" column omitted material facts required to be stated therein.

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
| --- | --- |
| Statement No. 1 – Complaint, ¶174: February 25, 2021 FY 2020 Form 10-K, signed and certified by Garcia Junior and | We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations.  . . . ***[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition***.<br><br>We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no |

---

[3] The relevant portions of the challenged statements are bolded.

- 12 -

4921-8732-5237.v3

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| Jenkins | interpretation precedent as it relates to our business model. ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration*** . . . . <br><br>          \*       \*       \* <br><br> ***The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results***. |
| Statement No. 2 – Complaint, ¶176: May 6, 2021 Q1 2021 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | ***There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, filed on February 25, 2021***. <br><br> [The risk factors in the 2020 10-K stated:] We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations.  . . . ***[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition***. <br><br> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. ***Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration*** . . . . <br><br>          \*       \*       \* <br><br> ***The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by*** |

- 13 -

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| | *regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results.* |
| Statement No. 3 – Complaint, ¶178: August 5, 2021 Q2 2021 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | ***There have been no material changes to the risk factors disclosed under the heading 'Risk Factors' in our most recent Annual Report on Form 10-K, filed on February 25, 2021.*** [The risk factors disclosed in the 2020 10-K, stated:] We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations.  . . . *[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition.* We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. *Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration . . . .* \*     \*     \* *The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results.* |
| Statement No. 4 – Complaint, ¶180: August 11, 2021 J.P. Morgan Auto Conference | [J.P. Morgan Analyst:] Great. Thanks. So maybe let's just get right into it. I wasn't expecting to ask this question, but since the news hit the headlines around the North Carolina DMV in the suspension – in the Raleigh region. Just curious to know, any update you could provide in up front, like what exactly happened. What's going on? Like is it just restricted to certain ZIP codes? Is it the whole state? Can you buy cars from consumers? Just if you could give us a quick rundown, just start would be helpful. [Jenkins:] Yes, sure. So the brief summary there is following COVID, I think there are a number of things that led to title and |

- 14 -

4921-8732-5237.v3

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
|  | registration getting backed up.  And I think since some of the delays associated with COVID, we've continued to be somewhat backed up in title and registration, and that's impacted the customer experience on title and registration in certain instances.<br><br>In this particular case, ***I think we had quite a small fraction of customers that were impacted by title and registration delays, but it did happen in the state of North Carolina***.  And so I think the DMV there thought that with having a set of customers experienced title and registration delays that they wanted to do something to reflect the fact that they didn't like customers in that state experiencing these delays.<br><br>So what they did was they asked us to stop delivering cars from the vending machine in Raleigh.  We can still deliver cars in the metro area of Raleigh, just not from the specific vending machine location.  And we can also still do work in the vending team, but we just can't deliver cars from that particular location.  And so that's what they elected to do.  ***Based on our research, that's a relatively sort of unusual approach for something like this and having a set of customers have title and registration delays, but that's where we are today***.  And yes, we announced it, and that's the background.<br><br>[J.P. Morgan Analyst:]  Got it.  ***And are you comfortable that this is a very North Carolina specific issue and not something you might need to investigate in like other states, just to make sure it's covered***?  Or just curious like has this led you to like maybe like just check what's happening and make sure that this is not more of a widespread issue?<br><br>[Jenkins:]  Sure.  Well, I would make 2 points on that.  ***One, our understanding is that this is quite unprecedented***.  But having said that, our goal is to provide the best customer experiences possible and make sure that we're – our processes are dialed . . . .<br><br>*       *       *<br><br>[Levin:]  ***Yes***.  Just I think that there is always a lot of room for us to improve, and the #1 focus here is on customer experience, and we work with DMVs in every single state around the country to achieve that goal.  And I think this, based on the pandemic, what was an area where we saw delays.  ***And this was a relatively unusual action, but is also pretty small in scope, relatively speaking***. |
| Statement No. 5 – Complaint, ¶182: November | ***There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, filed on February 25, 2021***. |

- 15 -

4921-8732-5237.v3

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| 4, 2021 Q3 2021 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | [The risk factors disclosed in the 2020 10-K stated:] We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations.  . . . *[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition*.<br><br>We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model.  *Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration . . . .*<br><br>*            *            *<br><br>*The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results*. |
| Statement No. 6 – Complaint, ¶184: February 24, 2022 FY 2021 Form 10-K, signed and certified by Garcia Junior and Jenkins | *We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. . . .   [O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition*.<br><br>We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model.  *Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration . . . .*<br><br>*            *            *<br><br>*The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-* |

- 16 -

4921-8732-5237.v3

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| | *desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results*. |
| Statement No. 7 – Complaint, ¶186: May 10, 2022 Q1 2022 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | *There have been no material changes to the risk factors disclosed under the heading "Risk Factors" in our most recent Annual Report on Form 10-K, filed on February 24, 2022, except [as related to risks concerning a] larger automotive ecosystem, including consumer demand, global supply chain challenges, and other macroeconomic issues*.<br><br>[The risk factors disclosed in the 2021 10-K stated:] We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. . . . *[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition*.<br><br>We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. *Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration* . . . .<br><br>*        *        *<br><br>*The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results*. |
| Statement No. 8 – Complaint, ¶188: June 24, 2022 *Barron's* | [Carvana spokesman:] "Carvana, like many dealers over the past two years, has in limited instances encountered challenges processing title and registration paperwork for its customers after the sale," the company says. "*In a very small percentage of a very small percentage of instances, customers did not receive permanent* |

- 17 -

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| article | *license plates or transferred title within the time frame set forth by the respective states*."<br><br>*   *   *<br><br>*Carvana says the regulatory issues focus on a relatively small number of sales from 2020 and 2021.* "*We've had productive conversations with regulators in all of those states and feel very confident about our operations going forward*," it says. |
| Statement No. 9 – Complaint, ¶191: October 29, 2020 Q3 2020 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | *Vehicle sourcing and acquisition*. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. *We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory*. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments. |
| Statement No. 10 – Complaint, ¶193: February 25, 2021 Q4 2020 earnings call | [Garcia Junior:] [W]e've got a model where we can sell cars across geographies and across makes and models and across the price spectrum. *And we've got very efficient ways to sell even wholesale cars*. It puts us in a position where we can be a very high-quality buyer. *And so we've seen a lot of success in that business*.<br><br>So I think that we're excited by where we are. I think going forward, it's – there's no – until we get extremely large, there isn't necessarily a fundamental ratio that we would shoot for with respect to cars bought relative to cars sold. I think we will just seek to grow both businesses as quickly as we possibly can because we've set up the business to do so. *If we're buying significantly more cars than we're selling, then we have the capacity to sell the excess wholesale*. If we're not, then we have the capacity to buy cars from other channels. And so we're just going to look to grow both businesses as quickly as we can independently. |
| Statement No. 11 – Complaint, ¶195: February 25, 2021 FY 2020 Form 10-K, signed and certified by Garcia Junior and | *Vehicle acquisition*. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. *We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory*. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments. |

- 18 -

4921-8732-5237.v3

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| Jenkins | |
| Statement No. 12 – Complaint, ¶197: May 6, 2021 Q1 2021 earnings call | [Jenkins:] Sure.  So I can take that one.  So I mean, ***I think our #1 channel for sourcing inventory has now become sourcing cars directly from customers, which has several advantages that we've talked about historically***.  I think we're certainly going to continue to focus on that.  That's a business that we want to build and continue to grow over the long term.  And so I think that's our #1 area of focus and would be the – sort of the first answer to that question. |
| Statement No. 13 – Complaint, ¶199: May 6, 2021 Q1 2021 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | ***Vehicle acquisition***.  . . .  For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer.  ***We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory***.  We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments. |
| Statement No. 14 – Complaint, ¶201: August 5, 2021 Q2 2021 earnings call | [Garcia Junior:] ***[W]e've built this channel of buying cars from customers that has performed very well for us over a long period of time.  We've made continual high-quality progress in both the number of cars we're buying, the cars we're buying relative to retail sales and the profits that we're making on cars that we buy from customers***.<br><br>*        *        *<br><br>I think the thing that we would point to is that is the biggest by a long, long way, is just buying cars from customers.<br><br>***We just saw a massive, massive increase in the number of cars we're buying from customers and in the profitability of buying cars from customers***. |
| Statement No. 15 – Complaint, ¶203: August 5, 2021 Q2 2021 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | ***Vehicle acquisition***.  . . .  For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer.  ***We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory***.  We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments. |
| Statement No. 16 | [Garcia Junior:] So I think first and foremost, on buying cars from |

- 19 -

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| – Complaint, ¶205: November 4, 2021 Q3 2021 earnings call | customers, I think that's – necessity would not be the way that I would describe it. ***I think the way that I would describe it is it's better***. It allows us to provide a high-quality experience to a customer that we're buying a car from, and then ***it gets us access to a higher-quality pool of inventory that is, on average, more profitable. And so we want to do as much of that as we possibly can. We want to build the business capacity to be able to handle as much of that as we possibly can***. |
| Statement No. 17 – Complaint, ¶207: November 4, 2021 Q3 2021 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | ***Vehicle acquisition***. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. ***We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory***. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments. |
| Statement No. 18 – Complaint, ¶209: February 24, 2022 FY 2021 Form 10-K, signed and certified by Garcia Junior and Jenkins | ***Vehicle acquisition***. . . . For vehicles sold to us through our website, we use proprietary algorithms to determine an appropriate offer. ***We assess vehicles on the basis of quality, inventory fit, consumer desirability, relative value, expected reconditioning costs, and vehicle location to identify what we believe represent the most in-demand and profitable vehicles to acquire for inventory***. We utilize a broad range of data sources, including proprietary site data, and a variety of external data sources to support our assessments. |
| Statement No. 19 – Complaint, ¶212: August 5, 2021 Q2 2021 Shareholder Letter, signed by Garcia Junior and Jenkins | ***[R]etail units sold totaled 107,815 growing 96% YoY*** vs. 55,098 in Q2 2020, and up 145% vs. Q2 2019. Q2 revenue grew to $3.336 billion, up 198% YoY from $1.118 billion, and up 238% vs. Q2 2019. ***Year-over-year retail unit and revenue growth were . . . primarily driven by strong demand for our offering this year***. |
| Statement No. 20 – Complaint, ¶214: February 24, 2022 Q4 2021 earnings call | [Jenkins:] ***[R]etail units sold totaled 425,237, an increase of 74%, making us the fastest used automotive retailer to sell over 400,000 vehicles in 1 year. . . . Our exceptional growth in 2021 was driven by rapid growth within our market cohorts***. |

- 20 -

4921-8732-5237.v3

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| Statement No. 21 – Complaint, ¶218: May 6, 2020 Q1 2020 Shareholder Letter, signed by Garcia Junior and Jenkins | *[W]e launched 15 new markets and 1 vending machine in Q1, bringing our total markets to 161, our total U.S. population coverage to 68.7%, and our total vending machines to 24 as of March 31, 2020*. |
| Statement No. 22 – Complaint, ¶220: August 5, 2020 Q2 2020 Shareholder Letter, signed by Garcia Junior and Jenkins | *We opened a record 100 new markets in Q2 2020, increasing the total percentage of the U.S. population we serve in our 261 markets to 73.2%, up from 68.7% at the end of Q1 2020*. |
| Statement No. 23 – Complaint, ¶222: February 25, 2021 Q4 2020 Shareholder Letter, signed by Garcia Junior and Jenkins | *[The Company] [a]dded five new markets, bringing our end-of-year total to 266 covering 73.7% of the population*. |
| Statement No. 24 – Complaint, ¶224: February 25, 2021 FY 2020 Form 10-K, signed and certified by Garcia Junior and Jenkins | Our business benefits from powerful network effects.  *Our logistics capabilities allow us to offer every car in our inventory to customers across all of our markets*.<br><br>\*      \*      \*<br><br>We believe there is a substantial opportunity to utilize *our capital-light expansion model* and proven go-to-market strategy to enter additional markets by expanding our existing logistics network and advertising in those markets. |
| Statement No. 25 – Complaint, ¶226: May 6, 2021 Q1 2021 earnings call | [Jenkins:] *So far in Q1, we have opened 22 new markets, bringing our total to 288 and increasing our population coverage to more than 77% of the U.S. population.  In May, we also launched our first 5 markets in the Pacific Northwest*, adding the last major region to our nationwide footprint. |
| Statement No. 26 – Complaint, | [Garcia Junior:] *[W]e're excited about launching the Pacific Northwest.  That was kind of the last region in our footprint that we* |

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| ¶228: May 6, 2021 Q1 2021 earnings call | *weren't yet in.  So I think opening that up is exciting because it basically means from here to roughly our 95% population coverage goal, in the long run, we basically have markets to fill in.  So that's very exciting.* |
| Statement No. 27 – Complaint, ¶230: August 5, 2021 Q2 2021 Shareholder Letter, signed by Garcia Junior and Jenkins | *In Q2 2021 we expanded the total percentage of the U.S. population we serve to 79.4%, up from 74.5% at the end of Q1 2021 through the addition of 27 new markets.* |
| Statement No. 28 – Complaint, ¶232: November 4, 2021 Q3 2021 Shareholder Letter, signed by Garcia Junior and Jenkins | *In Q3 2021 we expanded the total percentage of the U.S. population we serve to 80.6%, up from 79.4% at the end of Q2 2021 through the addition of 9 new markets*, taking another step toward our goal of 95% population coverage in the U.S. |
| Statement No. 29 – Complaint, ¶234: February 24, 2022 FY 2021 Form 10-K, signed and certified by Garcia Junior and Jenkins | Our business benefits from powerful network effects.  *Our logistics capabilities allow us to offer every car in our inventory to customers across all of our markets.*<br><br>\*        \*        \*<br><br>We believe there is a substantial opportunity to utilize *our capital-light expansion model* and proven go-to-market strategy to enter additional markets by expanding our existing logistics network and advertising in those markets. |
| Statement No. 30 – Complaint, ¶238: February 24, 2022 FY 2021 Form 10-K, signed and certified by Garcia Junior and Jenkins | *As we continue to grow, our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and the relative stability of average days to sale in recent years.* |
| Statement No. 31 – Complaint, | As we continue to grow, *our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity* |

- 22 -

4921-8732-5237.v3

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| ¶240: May 10, 2022 Q1 2022 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | *on retail units sold and the relative stability of average days to sale in recent years*. |
| Statement No. 32 – Complaint, ¶242: August 4, 2022 Q2 2022 Form 10-Q, signed by Jenkins and certified by Garcia Junior and Jenkins | As we continue to grow, *our number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and the relative stability of average days to sale over the past three years*. |
| Statement No. 33 – Complaint, ¶247: May 6, 2020 Q1 2020 earnings call | [Jenkins:] Our growth in GPU was driven by *strong retail GPU, which increased $299 to $1,581, our highest ever, driven primarily by buying cars from customers*. |
| Statement No. 34 – Complaint, ¶249: August 5, 2020 Q2 2020 earnings call | [Jenkins:] *Retail GPU was $1,190* . . . .<br><br>*           *          *<br><br>*[T]here are definitely some exciting trends in retail GPU*.  I think the most exciting is that, as I mentioned earlier, in July, we bought more than 100% as many cars from customers as we sold to customers. . . .<br><br>I think that's obviously a positive, that drives wholesale GPU, *that drives incremental retail GPU, because cars that you acquire from customers are typically more profitable* than cars that you acquire at auction. |
| Statement No. 35 – Complaint, ¶251: October 29, 2020 Q3 2020 earnings call | [Jenkins:] Retail GPU was $1,857 in Q3, an increase of $552. *Growth in retail GPU was driven by a significant increase in the share of our vehicles sourced from customers*. |
| Statement No. 36 – Complaint, | [Jenkins:] *Retail GPU declined slightly to $1,211 from $1,265 in Q4,* reflecting a continuation of approximately $200 per unit of |

- 23 -

| DATE/EVENT | FALSE AND MISLEADING STATEMENT[3] |
|---|---|
| ¶253: May 6, 2021 Q1 2021 earnings call | transitory costs . . . .<br><br>*    *    *<br><br>Q1 retail GPU was largely in line with our expectations when taking into account the transitory costs that we talked about in Q4. . . .  I think when we look at where we're headed from here, we did call out that we expect the majority of those transitory costs that impacted Q4 and Q1 this year to be gone by Q2.  And so ***that's a tailwind to retail GPU as we move towards 2Q, other things being equal.  Obviously, overall, we feel really good about our progress there*** . . . . |
| Statement No. 37 – Complaint, ¶255: August 5, 2021 Q2 2021 earnings call | [Jenkins:] [O]n retail GPU, ***we had our first quarter over $2,000 retail GPU***.  We've come close a couple of times before.  I think we've done $1,850 before and $1,700, not including adjustments also in 2020.  ***But the $2,000 is a record for us***.  I think if we think through the drivers, I think maybe it's helpful to think through it sequentially from Q1.  ***The biggest driver there was certainly the performance [of] buying cars from customers***.<br><br>*    *    *<br><br>***[W]e feel really great about our retail GPU progress.  Buying cars from customers continues to be a strong driver of the improvements in the business***, it's something we're going to look to continue to do going forward. |
| Statement No. 38 – Complaint, ¶257: November 4, 2021 Q3 2021 earnings call | [Jenkins:] ***Retail GPU was $1,769***, a decrease of $88.  ***The change in retail GPU was*** primarily driven by higher reconditioning costs, in part resulting from the impact of the Delta variant on production throughput, and higher wholesale acquisition prices, ***partially offset by higher customer-sourced ratio***.<br><br>*    *    *<br><br>So ***we had a strong quarter on retail GPU in Q3, came in at $1,769***. |
| Statement No. 39 – Complaint, ¶259: February 24, 2022 Q4 2021 earnings call | [Jenkins:] ***Retail GPU increased by $230 in Q4, primarily driven by an increase in the percentage of retail vehicles sourced from customers***. |

- 24 -

4921-8732-5237.v3

**Response to subpart (b)**: Subject to and without waiving the foregoing objections, SHEPP identifies the following deceptive acts that Lead Plaintiff contends constituted a violation of the Securities Exchange Act of 1934.

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| Complaint, ¶¶127-129 | To increase Carvana's retail unit sales, Garcia Senior caused his company, DriveTime, to enter into a series of revenue pass-through arrangements with Carvana by September 2021.  There was no legitimate business purpose for these sham deals as they lacked ***any*** economic substance for Carvana, and served only to inflate Carvana's reported retail sales.  Under this father-and-son deal, Carvana would acquire cars from DriveTime, sell the car on its website, and then ***pass the entire proceeds from the sale back to DriveTime***.  While Carvana merely acted as DriveTime's middle man or agent, it still recorded the revenue and retail unit sales on ***its*** books to pump up Carvana's stock.[4] |
| | Defendants belatedly buried the fact that Carvana "purchase[d] reconditioned vehicles from DriveTime . . . [and Carvana's] purchase price [paid to DriveTime] is the list price on Carvana.com after a customer has placed an order on the vehicle" (*i.e.*, Carvana's sales price) in its March 2022 Form DEF 14-A Proxy Statement (the "2022 Proxy Statement") signed by Garcia Junior.  Further, Defendants concealed the full extent of these arrangements from investors, offering only piecemeal and inconsistent disclosures concerning the pass-through |

---

[4]     Complaint, ¶127 n.10:

The SEC is currently investigating Carvana for its related-party deals.  Critically, Garcia Senior's privately-held companies sell VSCs and GAP insurance coverage to Carvana's customers, generating an even greater revenue stream ***for him personally (and for Garcia Junior via his DriveTime trust)***.  As a law professor at Washburn University stated, Garcia Junior and Garcia Senior "'have a convoluted tangle of interrelated companies and related-party transactions, and it's very difficult to understand or pull apart.'"  Jane Hahn, *Family Business Deals Help Fuel Carvana's Explosive Growth*, Wall St. J. (Dec. 17, 2021) (the "December 17, 2021 *The Wall Street Journal* article").  Moreover, "[t]he problem with related-party transactions with large shareholders . . . is 'they don't need to make money from this entity because they own the other entities.'"  Simply put, Carvana "'doesn't have to make money for [the Garcias] to make money.'"

- 25 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
|  | revenue arrangements.  For example, Carvana did not report actual retail unit sales sold pursuant to these arrangements.  Rather, they disclosed only information regarding the expense incurred to purchase vehicles from DriveTime.  Carvana also disclosed inconsistent facts about these arrangements across its SEC filings, which included SOX certifications signed by Garcia Junior and Jenkins.  For example, in Carvana's August 5, 2021 quarterly report on Form 10-Q for the period ended June 30, 2021 (the "Q2 2021 10-Q"), Defendants disclosed only the "cost of goods sold" incurred by Carvana.  Then, Carvana's 2022 Proxy Statement belatedly revealed that these transactions lacked economic value and provided the "total expenses" incurred by Carvana for the first time.  Tellingly, the Company's February 24, 2022 annual report on Form 10-K (the "2021 10-K"), for the fiscal year ended December 31, 2021 ("FY 2021") issued just a month before, fails to mention these terms, despite the fact that these deals had been occurring for months.<br><br>Garcia Junior and Garcia Senior's sham DriveTime pass-through arrangements had a material impact on Carvana's reported retail sales volume and growth.  Although the full details regarding them were concealed, certain expense figures can be used to estimate the number of cars involved in these arrangements.  As shown below, Carvana's estimated unit sales from these arrangements were material as they made up over 169% of Carvana's reported sequential growth in Q4 2021 and 19% of its sequential growth in Q3 2021.[5] |

[5]    Complaint, ¶129 n.11:

Given Defendants' inconsistent and piecemeal disclosures on these sham deals, the chart depicts a conservative calculation of the unit sales pursuant to these arrangements. Alternatively, if one utilized: (i) the estimated retail units sold pursuant to the Wholesale Vehicle Purchase Agreements that Carvana and DriveTime entered into on September 29, 2022; and (ii) the estimated retail units sold pursuant to other "Retail Vehicle Acquisition" agreements that Carvana and DriveTime entered into during Q2 2021, which Plaintiffs believe is an accurate way to calculate the estimated retail units sold pursuant to the sham arrangements, these sales would have actually accounted for 660% of Carvana's sequential growth in Q4 2021, 19% of its sequential growth in Q3 2021, and 17% of its reported annual growth.

- 26 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | |

|  | Q3 2021 | Q4 2021 |
|---|---|---|
| Cost of sales on DriveTime pass-through arrangement | $ 17,000,000 | $ 43,000,000 |
| Avg. cost of sale per retail unit | $ 21,902 | $ 23,869 |
| Estimated Carvana retail units sold pursuant to DriveTime pass-through arrangement | 776 | 1801 |
| As a % of reported sequential retail unit sales growth | 19% | 169% |

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| Complaint, ¶¶130-138 | As the Class Period progressed, Defendants drastically increased the number of cars Carvana purchased from customers to induce trade-ins and increase inventory, which increased retail sales and, thus, Carvana's stock price. To carry out this surge of purchases, unbeknownst to investors, Defendants abruptly and drastically lowered Carvana's purchasing and verification standards for the cars that it purchased following Q2 2020. |
| | For example, according to CW-3, before the beginning of the Class Period, Carvana was strict about not completing purchases when it discovered that sellers had not accurately described the condition of their vehicle, even making them re-submit questionnaires with accurate information. Immediately before and during the Class Period, however, CW-3 stated that Carvana relaxed its standards to accept "all vehicles" and did not genuinely inspect cars before purchasing them anymore. CW-3 observed that Carvana purchased a lot of "trash vehicles" after lowering its standards. CW-5 heard from his/her predecessor at the hub that the issues with the quality of the cars had gotten worse "all of the sudden." Likewise, CW-1 stated that Carvana lowered its standards when it came to accepting trade-ins as long as the customer bought a car from Carvana. In fact, CW-4 was told at a meeting of Carvana's initiative to buy "any car" to secure trade-ins. |
| | Indeed, CWs-1, 3, 4, 5, 8, 10, and 11 report that, during the Class Period, it was Carvana's general practice to purchase cars sight unseen and do little to nothing to verify the accuracy of sellers' representations of their vehicles. CW-11 reported that it appeared that the buying department did not actually care about the condition of the vehicles and just wanted to "get as many cars as they could." CW-5 stated that there was only a 50/50 chance that a vehicle would be reappraised if it did not match the seller's description. Likewise, CW-2 confirmed that he/she was overruled when voicing concerns about the quality of vehicles as "leadership would say take it." As CW-7 reported, he/she understood that the reason Carvana did this was the Company's "mission statement" to become the biggest online car company. |
| | CW-1 explained that Carvana "wouldn't care" about the poor quality. CW-1 said that as long as someone was also "buying from us," |

- 27 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
|  | then Carvana would take the trade-ins.  According to CW-1, this practice resulted in, for instance, Carvana purchasing cars as a trade-ins that were missing a backseat or were riddled with bullet holes. |
|  | By lowering Carvana's stated purchasing and verification standards as multiple CWs describe, Carvana was able to increase the number of cars bought from customers in Q3 2020 by a staggering 261% from the prior quarter.  Similarly, the following quarter, Carvana bought 100% more cars from customers than it had the prior year. |
|  | Unbeknownst to investors, Defendants' concealed course of conduct caused Carvana to be flooded with "trash cars" that were unfit to be sold retail and had to be sold wholesale.  Indeed, Carvana's wholesale volume spiked immediately after Defendants lowered their purchasing and verification standards, with wholesale volume growing over 100% year-over-year in Q4 2020 and Q1 2021 before surging 500% in Q2 2021.  While investors were aware that buying cars from customers could potentially result in some increase in wholesale vehicles, investors did not know that Carvana was intentionally ignoring its purchasing standards *to ensure a flood of wholesale cars or that Carvana was losing money on wholesale vehicle sales*. |
|  | Indeed, as alleged herein, Defendants concealed that Carvana lost money on its wholesale vehicle sales by obscuring one of its "*two key drivers of variable unit economics*" (*i.e.*, the amount of actual profit Carvana earned on each wholesale vehicle it sold): operations expenses. They did so by: (i) excluding certain per-vehicle operations expenses from its calculation of wholesale GPU; and (ii) not disclosing or quantifying these excluded costs separately so investors could calculate overall profitability of wholesale sales on their own.  These per-vehicle operations expenses, which were only separately broken out and quantified for the first time after the Class Period, included material *costs associated with completing a wholesale sale*, such as the full cost to ship a car to a wholesale auction site and title and registration costs. *See, e.g.*, ¶192(c)(ii) (further detailing how Defendants obscured that Carvana sold wholesale vehicles at a loss). |
|  | Further, unbeknownst to investors, this increase in wholesale volume created a costly, logistical nightmare as "wholesale units acquired from customers have typically been transported to the nearest Carvana IRC, generating additional vehicles [sic] moves and increased complexity in our multi-car logistics network."[6]  Defendants later |

---

[6]    Complaint, ¶137 n.12:

- 28 -

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | admitted that, on or about August 2021, the increased wholesale volume also led to "[m]ore vehicle moves, more miles traveled, . . . constrained routes," a "higher . . . backlog on constrained routes, . . . [l]ower performance on operational metrics," and "constraints in our logistics network." At bottom, the problems Defendants created to maintain their growth story came at a steep price. Indeed, in addition to the above, growth in wholesale volume from buying cars from customers spiked Carvana's logistical expenses, and eventually required Defendants to issue billions of dollars of high-interest junk bonds to acquire ADESA, a nationwide auction house (*i.e.*, a wholesale business), to stay afloat and address this strain. <br><br> Garcia Junior and Jenkins were critical to this artifice. In fact, as discussed in more detail below, they made materially false and misleading statements and omissions to further conceal this fraudulent conduct. *See* ¶151, *see also* ¶¶190-210. |
| Complaint, ¶¶139-143 | To boost sales, Garcia Junior and Jenkins also spearheaded a rapid and unsustainable nationwide expansion plan to more than double the Company's footprint in just six quarters. Critically, however, because Carvana had already achieved market coverage near its existing IRCs, the vast majority of new markets added were necessarily a significant distance from existing IRCs as demonstrated by the map below. Thus, unbeknownst to investors, Garcia Junior and Jenkins were increasing Carvana's retail sales with unprofitable and less profitable sales in far-flung markets. |

Update on Carvana Operating Plan Slide Deck (May 2022) (the "May 2022 Operating Plan"). Defendants' concealed conduct also created overwhelming inventory growth generally, as well, which similarly caused unsustainable "parking constraints," "load imbalances," and "increased the number of vehicles moved and total vehicle miles traveled, adding to costs and logistics network complexity."

- 29 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| |  Market opened prior to the Class Period; New market added during the Class Period, less than 100 miles from an existing IRC when opened; New market added during the Class Period, 200 miles or more from an existing IRC when opened; New market added during the Class Period, between 100 and 200 miles from an existing IRC when opened; IRC's during the Class Period (including IRC's opened on the following dates: Columbus, OH Q3'20; Orlando, FL & Memphis, TN Q4'20; Birmingham, AL Q1'21, Salt Lake City, UT Q4'21; Cincinnati, OH, San Antonio, TX, & Oklahoma City, OK Q1'22; Richmond, VA Q3'22) <br><br> Garcia Junior and Jenkins knew or recklessly disregarded that these new markets were *less profitable* due to their greater distance from Carvana's existing IRCs.  As stated in a September 13, 2022 *Vehicle Marketing* article, Garcia Junior knew all along, "'[y]ou need to warehouse and recon[dition] those cars to get them retail ready . . . .  You need a place to stage the logistics . . . .'"  In fact, Garcia Junior acknowledged he knew "how powerful proximity can be," when he later revealed that Carvana incurred at least $750 more in costs per retail car sold in markets 200 miles or more from a Carvana IRC.  Even markets that were 100 miles from an existing IRC materially increased costs because "SHORTER DISTANCE = SAVINGS . . .  Increased customer conversion; Faster inventory turn times; Lower inbound transport & logistics costs; [and] Lower shipping costs to customers."  Nevertheless, a full 90% of the new markets opened during the Class Period were more than 100 miles away from an existing IRC and 65% were more than 200 miles from an existing IRC. <br><br> In addition, unbeknownst to investors, Defendants' expansion ravaged Carvana's purportedly efficient nationwide logistics and reconditioning network and significantly increased Carvana's expenses.  Indeed, Defendants later admitted that, beginning on or around August 2021, it created "[m]ore vehicle moves, more miles traveled," a "[h]igher number of constrained routes," and a "[h]igher degree of backlog on constrained routes." |

- 30 -

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | Moreover, by the second half of FY 2021, Defendants were forced to begin spending millions of dollars on costly third-party logistics and reconditioning providers to make up for Carvana's internal logistics and reconditioning deficiencies. After the Class Period, Defendants disclosed "[r]econditioning and [i]nbound [t]ransport [c]osts [p]er [r]etail [u]nit" for the very first time, which revealed that, by Q3 2021, these costs had spiked $201 per vehicle and were continuing to steadily increase throughout the Class Period. In fact, between mid-2021 and Q4 2021, these costs had spiked $369 per vehicle. And by Q1 2022, they had spiked more than $600 per vehicle. Defendants further admitted the need to "[r]educe third-party inbound transport share," "[i]n-sourc[e] third-party pickups" for Carvana's "[l]ast-mile delivery," and "[r]educe third-party shipping" to curtail these excess logistics expenses. |
| | Garcia Junior and Jenkins were able to conceal this fraudulent course of conduct, in part, by: (i) excluding significant per-vehicle "operations expenses" (*i.e.*, "expenses associated with completing retail and wholesale vehicle sales"), which included outbound logistics and title and registration, from its calculation of wholesale and Retail GPU; and (ii) not adequately disclosing or quantifying these excluded costs separately so investors could calculate overall profitability of vehicle sales on their own. This concealment was meant to deceive investors as Garcia Junior included these operations expenses in assessing the profitability of each car sold internally, and Carvana later admitted that operations expenses (*i.e.*, "expenses associated with completing retail and wholesale vehicle sales") were one of the "two key drivers" of profitability per vehicle sold.[7] If Defendants had not obscured these expenses, investors would have known that the limitless growth story was a farce as the operations expenses skyrocketed with the scheme. |

[7]    Complaint, ¶143 n.13:

Indeed, during the Company's Q3 2022 earnings call held November 3, 2022, Garcia Junior told analysts:

***When we think about trying to aim for more profitable sales, what does that mean?*** There's certainly variability in the kind of gross profit associated with different types of sales. . . .

. . . There's also kind of variation in the underlying costs of completing a sale.

- 31 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| Complaint, ¶¶144-149 | Because complying with title and registration laws slowed sales growth, Defendants flouted these laws, pushing through retail sales to inflate Carvana's stock.  Indeed, as a June 24, 2022 *Barron's* article, entitled "Carvana Sought to Disrupt Auto Sales.   It Delivered Undriveable Cars" (the "*Barron's* exposé") later revealed, in Carvana's "haste to seize market share from competitors" and report additional units sold, Carvana sold cars to customers before it held title to those cars and before it could get them registered to their new owners. <br><br> Unbeknownst to investors, this practice was systematic and nationwide.  For example, CW-3 (Phoenix, Arizona) estimated that Carvana only had around **half** of the titles for the vehicles it sold wholesale at the time of sale.  Further, CW-3 reported that, after the Class Period, a "fire started" and he/she started receiving 10 times the number of calls per week regarding title issues than before the Class Period.  Corroborating CW-3's account, CW-9 (Tempe, Arizona) said the Customer Advocates on his/her team handled calls from all over the country.  Registration delays, which primarily meant that a title had not been provided to the customer, amounted to roughly half of the calls the team had handled before the team began handling both pre- and post-sale calls.  CW-9 said that he/she noticed an increase in the number of calls from customers experiencing title delays beginning in Q1 2022.  CW-10 (Tempe, Arizona) described instances where titles on vehicles Carvana sold could not be obtained for over a year, which meant the buyers were unable to drive their cars.  CW-8 (Corporate Headquarters) said that Carvana's practice was simply to assume that titles for vehicles could be acquired later if they were not available at the time of purchase.  CW-11 (Southeastern U.S.) reported that there was a drawer of documentation for vehicles that had been sold by Carvana but which could not be registered since the titles were missing.  CW-11 also described reviewing a Google spreadsheet of the vehicles for which registration could not be completed since the titles were missing.  Similarly, CW-4 (Midwestern U.S.) said there was a Google spreadsheet that tracked vehicles without titles for the entire IRC, and "there were a ridiculous amount of cars on the list."  According to CW-4, it was well known internally that title issues were a common problem. <br><br> Worse still, because Carvana could not register the cars it sold absent title, the Company issued countless temporary plates, sometimes as many as ten times to a single customer.  And these temporary plates were often issued by states with more liberal registration requirements than the state in which the car was purchased, in violation of state laws and regulations.  For example, CW-11 explained that the issuance of |

- 32 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | these temporary plates was a common practice at Carvana. Corroborating the confidential witness accounts, an October 22, 2021 *The Wall Street Journal* article, entitled "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints" (the "*WSJ* exposé") revealed that Carvana "provided [a Michigan buyer] with temporary registrations from Georgia, Tennessee and Arizona in lieu of registering his car in Michigan." Similarly, the *Barron's* exposé revealed that "[i]nterviews with state officials and former Carvana employees show the [registration delay] issue is *wide[]-reaching*," and described instances where Carvana had sent at least ten different license plates from different states to a customer.<br><br>        Defendants circumventing title and registration laws and regulations drastically increased Carvana's SG&A expenses. For example, in May 2022, Carvana belatedly admitted that it relied on costly third parties for "a significant portion of [its] title and registration processing." In addition, unbeknownst to investors, Carvana had to: (i) create a new department to deal with the title and registration problems in early 2021; (ii) hire even more new staffers, or "paperwork specialists," by fall 2021; and (iii) create the "undriveable-car task force" in 2022. Notably, unlike Carvana's competitors, Carvana excluded title and registration expenses from its Total and Retail GPU calculations. Instead, Garcia Junior and Jenkins buried these material costs in Carvana's "Other" SG&A category, where the costs were unquantified.[8]<br><br>        Worse, Defendants' undisclosed decision to boost sales by sidestepping title and registration laws and regulations exposed Carvana to devastating financial, regulatory, legal, and reputational loss. Indeed, as set forth below, multiple states revoked or suspended Carvana's dealer license:<br><br>        (a)    ***North Carolina***. Following an investigation and hearing on July 21, 2021, Carvana entered into a settlement agreement with the North Carolina Division of Motor Vehicles. Pursuant to the settlement, North Carolina suspended Carvana's dealer license for six months because Carvana failed to deliver titles, sold motor vehicles |

[8]    Complaint, ¶147 n.14:

        Defendants broke out "Other" SG&A for their first time in May 2022, revealing that transaction expenses, which primarily consisted of title, registration, and related expenses, totaled $410 dollars per unit in FY 2021.

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | without a state inspection, and illegally issued out-of-state temporary tags and plates for vehicles sold to customers in North Carolina.<br><br>(b)    *Michigan*.  Unbeknownst to investors, by February 2021, the Michigan Department of State (the "MDOS") was investigating Carvana and met with Company executives on March 23, 2021.  On May 7, 2021, unbeknownst to investors, Michigan fined Carvana thousands of dollars and placed Carvana on an 18-month probation.  Carvana repeatedly violated the terms of its probation agreement.  On February 7, 2022, following additional meetings between Carvana and MDOS, Carvana "admi[tted] . . . several more violations of the Code," paid thousands of dollars in additional fines, and agreed to extend its probation.  Nevertheless, Carvana continued violating title and registration laws.  Accordingly, on October 7, 2022, Michigan suspended Carvana's license for: (i) "failing to make application for title and registration within 15 days of delivery for 112 customers since agreeing to an earlier probation extension"; (ii) "committing fraudulent acts in connection with selling or otherwise dealing in vehicles where Carvana employees admitted to destroying title applications and all applicable documents pertaining to the sale of [certain] vehicles" that it later took back from customers; (iii) "improperly issuing temporary registrations"; and (iv) "violating [the] terms of a probation agreement 127 times."  In response, Carvana sued Michigan's Secretary of State, arguing that it was not given a hearing on the license matter, and that "'***the damage to Carvana's reputation and goodwill posed by the suspension order is incalculable and irreparable***.'"  Thereafter, on January 11, 2023, Carvana paid thousands of additional dollars in fines and signed a plea deal with Michigan, in which **Carvana** "'***agreed it had violated the law*** and to have its dealer license revoked and be barred from reapplying for a new license for three years.'"<br><br>(c)    *Illinois*.    In February 2022, unbeknownst to investors, Illinois began investigating Carvana for issuing out-of-state temporary registration permits and for failing to transfer titles in a timely manner as required by Illinois's regulations.  On May 12, 2022, Illinois suspended Carvana's dealer license.  According to the Illinois Secretary of State Office, Carvana was failing to timely transfer title and improperly supplying customers with out-of-state temporary plates, causing some consumers to receive police citations.  Illinois officials initially lifted the suspension.  As reported by *Barron's* mere months later, however, Illinois reinstated the suspension because "'***Carvana continued to conduct business in a manner that violates Illinois state*** |

- 34 -

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | *law*' . . . . *by again issuing out-of-state temporary plates to Illinois customers, which is illegal in Illinois*, and by missing required deadlines to process title and registration paperwork." Defendants, nevertheless, continued to fight the suspension in court and were granted a restrictive temporary restraining order. Garcia Junior referred to the suspensions as a "miscommunication" to inquiring analysts on August 4, 2022 during the Q2 2022 earnings call. But, in January 2023, Carvana entered into a settlement with Illinois's Secretary of State, in which *Carvana admitted to violating Illinois law*, agreed to abide by new restrictions and increased oversight, and surrendered its $250,000 bond. Moreover, the settlement agreement allows Illinois summarily to suspend and revoke Carvana's dealership license once again if it fails to comply with either the agreement or the law. |
| |        (d)    *Arizona*. As first reported in the *Barron's* exposé on June 24, 2022, the Arizona Department of Transportation (the "ADOT") canceled a program that allowed Carvana to issue temporary plates for sales that occurred in other states after receiving more than 80 complaints around "'such issues as missing, delayed, and altered title and registration documents, contract discrepancies, [and] significant odometer discrepancies.'" Further, while ADOT's spokesperson declined to provide further details due to open investigations into Carvana's registration practices, he confirmed that while "'ADOT tries to accommodate businesses like Carvana with their unique online business model as best we can . . . . for consumer protection, we need to make sure that all car dealers operating in Arizona are following state laws.'" |
| |        (e)    *Pennsylvania*. As a local Pennsylvania media outlet revealed mere days before the end of the Class Period, Pennsylvania had suspended the dealer license of one of Carvana's dealership locations in Pennsylvania. Initially, Carvana denied the reports until Pennsylvania officials provided the suspension letters to the media. It was later revealed that Pennsylvania had suspended both of Carvana's locations in Philadelphia for title and registration issues. |
| |        (f)    *Florida*. As first reported in the *WSJ* exposé, unbeknownst to investors, by October 22, 2021, Carvana had already settled a complaint with the Florida DMV for failing to provide title paperwork for a number of customers for up to eight months. In December 2021, Florida's Department of Highway Safety and Motor Vehicles threatened the Company with a statewide license suspension over Carvana's failure to timely register cars, identifying hundreds of vehicles with issues. While Florida withdrew that threat in February |

- 35 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | after the Company had demonstrated progress in registering the hundreds of delinquent vehicles, by August 2022, media outlets reported that Florida had filed two additional complaints identifying numerous cases in which consumers waited more than 100 days and, in one case, 253 days, to get the titles for their cars. |
| | (g)    *Texas*.  As first reported in the *WSJ* exposé, by October 2021, Texas had fined Carvana thousands of dollars for violations related to title and registration. |
| | (h)    *Maryland*.  On October 11, 2022, media outlets reported that Maryland had joined the mounting number of states fining Carvana.    Further, according to the Maryland Motor Vehicle Administration, Carvana failed to timely register approximately 10% of its sales from June 2021 to July 2022. |
| | (i)    *Ohio*.  On November 22, 2022, Fox 28 reported that Ohio had suspended Carvana's privileges to issue temporary tags nearly two years earlier.  Specifically, the Ohio Bureau of Motor Vehicles ("BMV") told Fox28: |
| | "In December of 2020, the Ohio BMV became aware of an inordinately high number of recent temporary tag issuances by Carvana.  After investigating the matter, it was determined that the issuances did not comply with Ohio law.  The Ohio BMV subsequently suspended temporary tag issuance privileges for all applicable Carvana locations in Ohio." |
| | Although the Ohio BMV has since reinstated Carvana's privileges "'[a]fter a number of meetings with Carvana representatives and written assurance that prior practices have been halted, . . . . [t]he Ohio BMV continues to monitor Carvana.'"[9] |
| | Garcia Junior and Jenkins were essential to this fraudulent conduct, discussing it in countless Board meetings since at least July 2020.  *See, e.g.*, Exs. 1-2.  And, critically, once the truth about |

---

[9]    Complaint, ¶148(i) n.15:

Over Defendants' vehement objections, on September 30, 2022, U.S. District Judge Edward G. Smith denied defendants' motion to dismiss a January 13, 2022 class action consumer complaint alleging that Carvana violated common law and the Pennsylvania Unfair and Deceptive Trade Practices Act by failing to timely transfer title.

- 36 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | Carvana's widespread title and registration violations began to leak out, they minimized and downplayed the violations, misleading investors. *See* ¶¶148(c), 152, 180-181. Their misstatements were intended to conceal the scheme and maintain the artificial inflation in Carvana's stock. |
| Complaint, ¶¶150-159 | In addition to the above methods and means, Garcia Junior and Jenkins also executed the pump-and-dump scheme through a series of materially false and misleading public statements and omissions, concerning the following subjects: (i) buying cars from customers; (ii) title and registration; (iii) average days to sale metric; (iv) gross profit earned per retail vehicle sold ("Retail GPU"); and (v) Carvana's "scalable" business model. Garcia Junior and Jenkins's public statements helped facilitate the fraudulent scheme and course of business by concealing the scheme and convincing investors that Carvana's growth was sustainable. |

**Garcia Junior and Jenkins Make False and Misleading Statements to Further Conceal the Fraudulent Scheme**

*First*, Garcia Senior and Jenkins misleadingly assured investors that Carvana "***assess[es] vehicles on the basis of quality***" when, in fact, they had substantially lowered their purchasing and verification standards and were "intentionally buying lower quality cars." *See* ¶¶191-192, 195-196, 199-200, 203-204, 207-210. In addition, they publicly touted the benefits of buying cars from customers (the good), while omitting that buying cars from customers was ravaging Carvana's bottom line by: (i) flooding Carvana with wholesale cars that had to be sold at a loss; and (ii) crippling its logistics network (the bad). *See* ¶¶193-194, 197-198, 201-202, 205-206.

*Second*, Garcia Junior and Jenkins signed Forms 10-K and 10-Q purporting to warn investors of risks and harms, such as "administrative, civil, or criminal penalties," – that "***could*** result" ***if*** Carvana failed to comply with state title and registration laws and regulations when those risks had already come to fruition. *See* ¶¶174-179, 182-187. Further, when news regarding Defendants' title and registration violations began to leak out, Garcia Junior and Jenkins provided a misleading impression of the violations when they assured investors that Carvana's violations were mere "miscommunication[s]" and "North Carolina specific." *See* ¶¶148(c), 180-181.

*Third*, Garcia Junior and Jenkins made misleading statements and omissions regarding Carvana's average days to sale metric to conceal the negative consequences of their scheme (growing inventory)

- 37 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | and prop up Carvana's stock price long enough for Garcia Senior and Jenkins to cash out at top dollar.  Average days to sale was one of Carvana's six "Key Operating Metrics" since becoming a public company.   As Defendants emphasized, Carvana's "business is dependent upon our ability to expeditiously sell inventory."  Simply put, an "increase [in] our average days to sale" served as a warning to investors that Carvana was failing to rapidly sell its inventory, which "could have a material adverse effect" on Carvana's margins because of depreciation.  Although Defendants continued to view average days to sale as a key metric during and after the Class Period, Defendants suddenly stopped publicly reporting the metric to investors.  Instead, Garcia Junior and Jenkins replaced it with a metric showing the number of IRCs (which has nothing to do with average days to sale).  Defendants repeatedly claimed that, somehow, Carvana's "number of IRCs is a more important metric than average days to sale due to the impact of IRC capacity on retail units sold and *the relative stability of average days to sale over the past three years*."  ¶¶238, 240, 242.  In truth, by the second half of the Class Period, Carvana was facing a glut of aging and rapidly depreciating inventory that was spiking the average days to sale metric far beyond historical norms as a result of Defendants' fraudulent scheme.  ¶¶239, 241, 243.  Thus, Garcia Junior and Jenkins's abrupt decision to hide this metric from the public ensured that investors were not alerted to the scheme. |
| | **Garcia Junior and Jenkins Make Their Manufactured Growth Appear Sustainable** |
| | Critical to the success of Defendants' fraudulent scheme was their fiction of sustainable hyper growth based on a scalable model where Carvana claimed: "*[O]ur business gets better as it gets bigger*." After all, if Carvana could pair its explosive unit growth with purported profitability and a scalable logistics model that could cost effectively expand across the country, the sky was the limit.  At bottom, to secure a high valuation so Garcia Senior and Jenkins could cash out at top dollar, Garcia Junior and Jenkins made the following misleading statements and omissions to persuade investors that Carvana's inflated retail sales growth was sustainable. |
| | *First*, throughout the Class Period, Garcia Junior and Jenkins touted Carvana's retail sales growth while simultaneously touting positive Retail GPU in all of Carvana's investor presentations, earnings calls, and shareholder letters. ¶¶247, 249, 251, 253, 255, 257, 259.  For example, the February 24, 2021 Q4 2021 letter to shareholders (the "Q4 2021 Shareholder Letter") stated "Retail GPU was $1,495," an increase |

- 38 -

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | of almost 20% over the prior year, "driven by an increase in the percentage of retail units sourced from customers." Investors viewed Retail GPU as a proxy for Carvana's retail "unit economics" (i.e., profitability per-vehicle). However, as alleged herein, Defendants concealed Carvana's actual per-vehicle profitability – or lack thereof. ¶¶248, 250, 252, 254, 256, 258, 260. They did so by: (i) excluding certain per-vehicle operations expenses from its calculation of Retail GPU; and (ii) not adequately disclosing or quantifying these excluded costs separately so investors could decipher overall profitability of retail sales on their own. These excluded operations expenses included material "costs associated with completing retail sales," such as the full cost to ship cars to customers and title and registration costs. Defendants' concealment of "operations expenses" when describing Carvana's retail profitability was especially misleading in light of the fact that Defendants internally viewed "the underlying costs of completing a sale" as a critical component of Carvana's actual retail vehicle profitability. Indeed, as Garcia Junior later acknowledged: <br><br> *When we think about trying to aim for more profitable sales, what does that mean?* There's certainly variability in the kind of gross profit associated with different types of sales. . . . <br><br> And then I think there's a number of other dynamics kind of across car type, et cetera. *There's also kind of variation in the underlying costs of completing a sale*. <br><br> By intentionally obscuring these significant operations expenses, investors were left to rely on the positive Retail GPU reported by Defendants as the sole measure of Carvana's per-vehicle retail profitability. Critically, had Carvana included these operations expenses in its Retail GPU calculation or separately disclosed and quantified the costs that were excluded from Retail GPU, *it would have revealed to investors that, on average, Carvana generated negative unit economics on every retail car sold during the Class Period*. ¶¶248, 250, 252, 254, 256, 258, 260. For example, in Q4 2021, rather than the $1,495 of positive Retail GPU reported by Defendants, Carvana actually generated negative unit economics of $1,248 per retail unit sold. This created an impression of a state affairs (positive per-unit profitability) that was materially different from the one that actually existed (negative per-unit profitability). *See, e.g.*, ¶260(a). <br><br> *Second*, Garcia Junior and Jenkins exalted Carvana's purportedly "capital-light" expansion model, and "logistics capabilities" in |

- 39 -

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | Carvana's 2020 and 2021 10-Ks. ¶¶224, 234. For example, the 2021 10-K touted that Carvana has a "lower variable cost structure at scale [as] . . . . [w]e do not require a network of brick-and-mortar dealerships . . . instead, we utilize . . . an in-house logistics network." They did so to persuade investors that "[a]s we grow – by expanding geographically . . . – our business becomes stronger[,] . . . . *[g]rowth . . . enables economies of scale*, . . . [and] these dynamics create a flywheel that drives even more growth." As discussed herein, Carvana neither had a capital-light expansion model nor groundbreaking logistics. ¶¶225, 235. |
| | When Carvana announced that it was "named to the Fortune 500 list for the first time, becoming one of the four fastest companies to ever make the list with organic growth, along with Amazon," Garcia Junior and Jenkins stated that this purportedly demonstrated that Carvana's business "*model has uniquely powerful unit economics and scalability*." Likewise, in a "paid" interview/advertisement between Garcia Junior and Fortune, Defendants touted "rapid ascension [to the Fortune 500] marks the fastest organic growth of any automotive retailer in U.S. history and is a testament to the strength of its . . . vertical integration, and innovative technology. Carvana boasts *its own efficient internal logistics network* that allows the company to purchase, inspect, and house its inventory."[10] |
| | To be sure, Garcia Junior and Jenkins' public statements facilitated Defendants' fraudulent scheme and course of business by deceiving investors regarding Carvana's purportedly disruptive business model and initiatives, persuading investors that Carvana was demonstrating growth and profitability, reassuring investors that Carvana could continue to do so because of its disruptive business model, and concealing the consequences of Defendants' scheme. |
| | Defendants' fraudulent scheme worked. The market rewarded Defendants for their purported "scalable" and sustainable growth, allowing Carvana's stock to reach its record-high price of $376 per share. In June 2021, Fortune noted: "How did Carvana make it onto the Fortune 500? . . . The business is a hub-and-spoke setup . . . . [I]t turns out, the business is built on a foundation of legitimate scalability . . . ." |
| Complaint, | After pumping up Carvana's stock price by inflating retail sales |

---

[10]   Complaint, ¶157 n.16:

Fortune made clear that its "editorial staff was not involved in its creation or production" of the paid article.

- 40 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| ¶¶160-162 | and profitability, Garcia Senior and Jenkins took action to enjoy the fruits of the Defendants' fraudulent labor.[11]  As such, during the Class Period, Garcia Senior – while in possession of MNPI – entered into a 10b5-1 plan on June 15, 2020.  On November 4, 2020 – just four days into trading and mere months into the new plan – Garcia Senior modified his trading plan while in possession of MNPI to accelerate the rate per day at which he could sell his shares to unsuspecting investors. Indeed, on November 4, 2020, Garcia Senior: (i) controlled Carvana; (ii) held approximately 84% of Carvana's voting power; (iii) was engaging in hundreds of millions of dollars in related-party deals that were material to both his privately-held companies and Carvana; and (iv) was participating in and aware of the fraudulent scheme.<br><br>Worse, on May 7, 2021 – less than six months after his first modification of his trading plan and weeks after Carvana was placed on probation in Michigan after admitting to violating state title and register laws (unbeknownst to investors), Carvana's shares continued to climb to record highs.  Once again, ***Garcia Senior modified his trading plan*** to accelerate the number of shares he could sell per day while in possession of MNPI.<br><br>Professor Taylor of the Wharton School of Business noted: "'I've studied 20,000 10b5-1 plans [and] I can't recall another of this size where there are modifications every six months.'"[12]  Unsurprisingly, he concluded: "'***The Garcias knew it was short-lived . . . .   The Garcias knew the music would eventually end***.'" |
| Complaint, ¶¶163-165 | Before the truth regarding Defendants' so-called "sustainable" growth was revealed, Jenkins and "'***the Garcias kn[owing] it was short-lived***'" and that "'the music would eventually end'" sold nearly ***14.3 million*** shares of their personal holdings of Carvana stock for proceeds of ***nearly $3.76 billion*** before the bottom fell out.<br><br>Jenkins' and Garcia Senior's suspiciously timed sales, made |

[11]  Complaint, ¶160 n.17:

Garcia Junior, who is a beneficiary of his father's trust, benefited by Garcia Senior's insider trading.

[12]  Complaint, ¶162 n.18:

Ben Foldy, *CEO's Father Gets a $3.6 Billion Stock Windfall at Carvana*, Wall St. J. (Sept. 17, 2021) (the "September 17, 2021 *The Wall Street Journal* article").

- 41 -

4921-8732-5237.v3

| COMPLAINT | DESCRIPTION OF DECEPTIVE ACT |
|---|---|
| | while each possessed MNPI, are summarized in the chart below, in which the vertical axis on the left shows Carvana's stock price and the vertical axis on the right depicts the dollar amount of stock sold.  A detailed description of the insider trading is set forth in Appendix A, attached hereto.o <br><br> <br><br> Simply put, as Professor Taylor concluded in a June 2022 The Wall Street Journal article: "'[T]he actions of [Carvana's] executives signal to me that *the executives knew what was coming, and consequently took advantage of the lofty valuations to . . . sell their own equity* . . . .'" |

INTERROGATORY NO. 9:

For each statement You Identified in response to Interrogatory No. 7, state the basis for Your assertion that the statement was false or misleading at the time it was made or performed, including any facts You claim were omitted from a particular statement.

- 42 -

4921-8732-5237.v3

RESPONSE TO INTERROGATORY NO. 9:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions.  Lead Plaintiff also objects to this Interrogatory as compound as it contains multiple subparts seeking discrete information but purports to count as only one interrogatory for purposes of the limitations set forth in Rule 33.  Lead Plaintiff expressly reserves all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent court order modifying such limitations in this Action.

Lead Plaintiff also objects to this Interrogatory because it is vague and ambiguous, calls for a legal conclusion, a legal argument, or constitutes a contention interrogatory that is premature at this early stage of the litigation as there are still 13 months of fact discovery remaining and the Carvana Defendants have not yet produced documents in response to Lead Plaintiffs' discovery requests. *See Smilovits v. First Solar, Inc.*, 2014 WL 12964695, at *1 (D. Ariz. Dec. 9, 2014) (ordering plaintiffs to respond "after the close of discovery" to "interrogatories focus[ing] on false statements at issue in this case . . . and other questions designed to determine what evidence underlies Plaintiffs' allegations of falsity, scienter, causation, etc." where the complaint "sets forth the alleged false statements with reasonable specificity, often quoting the alleged false statements and emphasizing particularly relevant portions"); *Folz v. Union Pac. R.R. Co.*, 2014 WL 357929, at *1 (S.D. Cal. Jan. 31, 2014) ("many courts have found that, within the framework of Rule 33, contention interrogatories need not be answered until the substantial completion of pretrial discovery") (citing *In re eBay Seller Antitrust Litig.*, 2008 WL 5212170 (N.D. Cal. Dec. 11, 2008) and *City & Cnty. of S.F. v. Tutor-Saliba Corp.*, 218 F.R.D. 219, 222 (N.D. Cal. 2003)); *see also Folz*, 2014 WL 357929, at *2 ("courts are reluctant to allow contention interrogatories, especially when the responding party has not yet obtained enough information through discovery to respond") (citing *In re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328, 338 (N.D. Cal. 1985) and *United States v. Bazaarvoice, Inc.*, 2013 WL 1739472 (N.D. Cal. Apr. 22, 2013)).  This is in accord with the Carvana Defendants' cited authority, *Former S'holders of Cardiospectra*, in the

- 43 -

4921-8732-5237.v3

Carvana Defendants' Interrogatories, which holds that "[i]n line with Rule 33, courts are reluctant to allow contention interrogatories when the responding party has not yet obtained enough information through discovery to respond." *Former S'holders of Cardiospectra*, 2013 WL 5513275, at *2.

Lead Plaintiff will respond to this Interrogatory at the appropriate time.

INTERROGATORY NO. 10:

For each statement You Identified in response to Interrogatory No. 8, state the basis for Your assertion that the statement was false or misleading at the time it was made or performed, including any facts You claim were omitted from a particular statement.

RESPONSE TO INTERROGATORY NO. 10:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions. Lead Plaintiff also specifically objects to this Interrogatory as compound as it contains multiple subparts seeking discrete information but purports to count as only one interrogatory for purposes of the limitations set forth in Rule 33. Lead Plaintiff expressly reserves all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent court order modifying such limitations in this Action.

Lead Plaintiff also objects to this Interrogatory because it is vague and ambiguous, calls for a legal conclusion, a legal argument, or constitutes a contention interrogatory that is premature at this stage of the litigation as there are still 13 months of fact discovery remaining and the Carvana Defendants have not yet produced documents in response to Lead Plaintiffs' discovery requests. *See Smilovits*, 2014 WL 12964695, at *1 (ordering plaintiffs to respond "after the close of discovery" to "interrogatories focus[ing] on false statements at issue in this case . . . and other questions designed to determine what evidence underlies Plaintiffs' allegations of falsity, scienter, causation, etc." where the complaint "sets forth the alleged false statements with reasonable specificity, often quoting the alleged false statements and emphasizing particularly relevant portions"); *Folz*, 2014 WL 357929, at *1 ("many courts have found that, within the framework of Rule 33, contention interrogatories

- 44 -

4921-8732-5237.v3

need not be answered until the substantial completion of pretrial discovery") (citing *eBay Seller Antitrust Litig.*, 2008 WL 5212170 and *Tutor-Saliba*, 218 F.R.D. at 222); *see also Folz*, 2014 WL 357929, at *2 ("courts are reluctant to allow contention interrogatories, especially when the responding party has not yet obtained enough information through discovery to respond") (citing *Convergent Techs.*, 108 F.R.D. at 338 and *Bazaarvoice*, 2013 WL 1739472).  This is in accord with the Carvana Defendants' cited authority, *Former S'holders of Cardiospectra*, in the Carvana Defendants' Interrogatories, which holds that "[i]n line with Rule 33, courts are reluctant to allow contention interrogatories when the responding party has not yet obtained enough information through discovery to respond." *Former S'holders of Cardiospectra*, 2013 WL 5513275, at *2.

Lead Plaintiff will respond to this Interrogatory at the appropriate time.

INTERROGATORY NO. 11:

For each allegedly omitted fact You Identified in response to Interrogatory No. 7, state the basis for Your contention that You did not know of that material fact at the time of the Offering.

RESPONSE TO INTERROGATORY NO. 11:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions.  Lead Plaintiff also specifically objects to this Interrogatory as compound as it contains multiple subparts seeking discrete information but purports to count as only one interrogatory for purposes of the limitations set forth in Rule 33.  Lead Plaintiff expressly reserves all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent court order modifying such limitations in this Action.

Lead Plaintiff also objects to this Interrogatory because it is vague and ambiguous, calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation as there are still 13 months of fact discovery remaining and the Carvana Defendants have not yet produced documents in response to Lead Plaintiffs' discovery requests. *See Smilovits*, 2014 WL 12964695, at *1 (ordering plaintiffs

- 45 -

4921-8732-5237.v3

to respond "after the close of discovery" to "interrogatories focus[ing] on false statements at issue in this case . . . and other questions designed to determine what evidence underlies Plaintiffs' allegations of falsity, scienter, causation, etc." where the complaint "sets forth the alleged false statements with reasonable specificity, often quoting the alleged false statements and emphasizing particularly relevant portions"); *Folz*, 2014 WL 357929, at *1 ("many courts have found that, within the framework of Rule 33, contention interrogatories need not be answered until the substantial completion of pretrial discovery") (citing *eBay Seller Antitrust Litig.*, 2008 WL 5212170 and *Tutor-Saliba*, 218 F.R.D. at 222); *see also Folz*, 2014 WL 357929, at *2 ("courts are reluctant to allow contention interrogatories, especially when the responding party has not yet obtained enough information through discovery to respond") (citing *Convergent Techs.*, 108 F.R.D. at 338 and *Bazaarvoice*, 2013 WL 1739472). This is in accord with the Carvana Defendants' cited authority, *Former S'holders of Cardiospectra*, in the Carvana Defendants' Interrogatories, which holds that "[i]n line with Rule 33, courts are reluctant to allow contention interrogatories when the responding party has not yet obtained enough information through discovery to respond." *Former S'holders of Cardiospectra*, 2013 WL 5513275, at *2.

Lead Plaintiff will respond to this Interrogatory at the appropriate time.

INTERROGATORY NO. 12:

Identify with particularity each fact that You alleged or contend corrected the statements You Identified in response to Interrogatory No. 8, including the specific facts You claim were relevant on August 10, 2021 (Compl. ¶ 311), October 22, 2021 (Compl. ¶¶ 146, 148(f), 179(a), 213(a)(i), 313), June 24, 2022 (Comp. ¶¶ 144, 148(d), 188, 320, 395), and October 7, 2022 (Compl. ¶¶ 148(b), 322, 396).

RESPONSE TO INTERROGATORY NO. 12:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions. Lead Plaintiff also objects to this Interrogatory on the grounds that it seeks or requires disclosure of information that is protected by the attorney work product doctrine. Lead Plaintiff also objects to this

- 46 -

4921-8732-5237.v3

Interrogatory as premature because it seeks documents or information related to expert discovery well in advance of the September 24, 2026 deadline. Lead Plaintiffs will produce expert materials in accordance with the Federal Rules of Civil Procedure, the Local Rules, and the Court's Scheduling Order (ECF 128). Lead Plaintiff also objects to this Interrogatory as vague and ambiguous because it contains unintelligible requests, such as a description of "the specific facts You claim were relevant on" particular dates. Lead Plaintiff also specifically objects to this Interrogatory because it is vague and ambiguous, calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation as there are still 13 months of fact discovery remaining and the Carvana Defendants have not yet produced documents in response to Lead Plaintiffs' discovery requests. *See Smilovits*, 2014 WL 12964695, at *1 (ordering plaintiffs to respond "after the close of discovery" to "interrogatories focus[ing] on false statements at issue in this case . . . and other questions designed to determine what evidence underlies Plaintiffs' allegations of falsity, scienter, causation, etc." where the complaint "sets forth the alleged false statements with reasonable specificity, often quoting the alleged false statements and emphasizing particularly relevant portions"); *Folz*, 2014 WL 357929, at *1 ("many courts have found that, within the framework of Rule 33, contention interrogatories need not be answered until the substantial completion of pretrial discovery") (citing *eBay Seller Antitrust Litig.*, 2008 WL 5212170 and *Tutor-Saliba*, 218 F.R.D. at 222); *see also Folz*, 2014 WL 357929, at *2 ("courts are reluctant to allow contention interrogatories, especially when the responding party has not yet obtained enough information through discovery to respond") (citing *Convergent Techs.*, 108 F.R.D. at 338 and *Bazaarvoice*, 2013 WL 1739472). This is in accord with the Carvana Defendants' cited authority, *Former S'holders of Cardiospectra*, in the Carvana Defendants' Interrogatories, which holds that "[i]n line with Rule 33, courts are reluctant to allow contention interrogatories when the responding party has not yet obtained enough information through discovery to respond." *Former S'holders of Cardiospectra*, 2013 WL 5513275, at *2.

Lead Plaintiff will respond to this Interrogatory at the appropriate time.

- 47 -

4921-8732-5237.v3

INTERROGATORY NO. 13:

For each allegedly omitted fact You Identified in response to Interrogatory Nos. 9 and 10, Identify when You first learned of that fact.

RESPONSE TO INTERROGATORY NO. 13:

Lead Plaintiff hereby incorporates the Introduction and Reservation of Rights, and the Specific Objections to Definitions and Instructions. Lead Plaintiff also specifically objects to this Interrogatory as compound as it contains multiple subparts seeking discrete information but purports to count as only one interrogatory for purposes of the limitations set forth in Rule 33. Lead Plaintiff expressly reserves all rights to treat each discrete subpart of this Interrogatory as a separate interrogatory for purposes of the limitations set forth in Rule 33 or in any subsequent court order modifying such limitations in this Action.

Lead Plaintiff also objects to this Interrogatory because it is vague and ambiguous, calls for a legal conclusion, a legal argument, or constitutes a contention discovery request that is premature at this stage of the litigation as there are still 13 months of fact discovery remaining and the Carvana Defendants have not yet produced documents in response to Lead Plaintiffs' discovery requests. *See Smilovits*, 2014 WL 12964695, at *1 (ordering plaintiffs to respond "after the close of discovery" to "interrogatories focus[ing] on false statements at issue in this case . . . and other questions designed to determine what evidence underlies Plaintiffs' allegations of falsity, scienter, causation, etc." where the complaint "sets forth the alleged false statements with reasonable specificity, often quoting the alleged false statements and emphasizing particularly relevant portions"); *Folz*, 2014 WL 357929, at *1 ("many courts have found that, within the framework of Rule 33, contention interrogatories need not be answered until the substantial completion of pretrial discovery") (citing *eBay Seller Antitrust Litig.*, 2008 WL 5212170 and *Tutor-Saliba*, 218 F.R.D. at 222); *see also Folz*, 2014 WL 357929, at *2 ("courts are reluctant to allow contention interrogatories, especially when the responding party has not yet obtained enough information through discovery to respond") (citing *Convergent Techs.*, 108 F.R.D. at 338 and *Bazaarvoice*, 2013 WL 1739472). This is in accord with the Carvana Defendants' cited authority, *Former*

- 48 -

*S'holders of Cardiospectra*, in the Carvana Defendants' Interrogatories, which holds that "[i]n line with Rule 33, courts are reluctant to allow contention interrogatories when the responding party has not yet obtained enough information through discovery to respond." *Former S'holders of Cardiospectra*, 2013 WL 5513275, at *2.

Lead Plaintiff will respond to this Interrogatory at the appropriate time.

DATED: April 18, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN
(Admitted *pro hac vice*)
TOR GRONBORG
(Admitted *pro hac vice*)
ERIKA L. OLIVER
(Admitted *pro hac vice*)
RACHEL A. COCALIS
(Admitted *pro hac vice*)
MATTHEW J. BALOTTA
(Admitted *pro hac vice*)
SARAH A. FALLON
(Admitted *pro hac vice*)

ERIKA L. OLIVER

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
ddrosman@rgrdlaw.com
torg@rgrdlaw.com
eoliver@rgrdlaw.com
rcocalis@rgrdlaw.com
mbalotta@rgrdlaw.com
sfallon@rgrdlaw.com

- 49 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT M. ROTHMAN
(Admitted *pro hac vice*)
DAVID A. ROSENFELD
(Admitted *pro hac vice*)
BRENT E. MITCHELL
(Admitted *pro hac vice*)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
drosenfeld@rgrdlaw.com
bmitchell@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

O'DONOGHUE & O'DONOGHUE LLP
DINAH S. LEVENTHAL
5301 Wisconsin Avenue, N.W., Suite 800
Washington, D.C.  20015
Telephone:  202/362-0041
202/362-2640 (fax)
dleventhal@odonoghuelaw.com

Additional Counsel for Lead Plaintiffs

BONNETT FAIRBOURN FRIEDMAN
  & BALINT PC
ANDREW FRIEDMAN
7301 N. 16th Street, Suite 102
Phoenix, AZ  85020
Telephone: 602/274-1100
602/274-1199 (fax)
afriedman@bffb.com

Local Counsel

- 50 -

4921-8732-5237.v3

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL S. DROSMAN (CA 200643)
TOR GRONBORG (CA 179109)
ERIKA L. OLIVER (CA 306614)
RACHEL A. COCALIS (CA 312376)
SARAH A. FALLON (CA 345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ddrosman@rgrdlaw.com
torg@rgrdlaw.com
eoliver@rgrdlaw.com
rcocalis@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re Carvana Co. Securities Litigation | ) | No. CV-22-2126-PHX-MTL |
| | ) | |
| | ) | |
| This Document Relates To: | ) | VERIFICATION |
| | ) | |
| All Actions. | ) | |
| | ) | |
| | ) | |

I, Pam Peters, hereby state and declare as follows:

I am currently employed by Saskatchewan Healthcare Employees' Pension Plan ("SHEPP") as Chief Financial Officer. I am authorized in that capacity to execute this Verification on behalf of SHEPP, and make this verification for that reason.

I have read SHEPP's Responses and Objections to Carvana Defendants' First Set of Interrogatories to Lead Plaintiff SHEPP ("Responses"). I am aware of the content of the Responses as they relate to SHEPP, and, based upon matters within my personal knowledge, I certify that SHEPP's Responses are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 17 day of April, 2025, at Regina, Saskatchewan.

_____

PAM PETERS, CHIEF FINANCIAL OFFICER

- 1 -

## DECLARATION OF SERVICE BY EMAIL

I, KATIE WOODS, not a party to the within action, hereby declare that on April 18, 2025, I served the attached LEAD PLAINTIFF SASKATCHEWAN HEALTHCARE EMPLOYEES' PENSION PLAN'S RESPONSES AND OBJECTIONS TO CARVANA DEFENDANTS' FIRST SET OF INTERROGATORIES (NOS. 1-13) on the parties in the within action by email addressed as follows:

**COUNSEL FOR PLAINTIFFS**:

| NAME | FIRM | EMAIL |
|---|---|---|
| Daniel S. Drosman<br>Tor Gronborg<br>Erika L. Oliver<br>Rachel A. Cocalis<br>Matthew J. Balotta<br>Sarah A. Fallon | Robbins Geller Rudman & Dowd LLP<br>655 West Broadway<br>Suite 1900<br>San Diego, CA  92101 | ddrosman@rgrdlaw.com<br>torg@rgrdlaw.com<br>eoliver@rgrdlaw.com<br>rcocalis@rgrdlaw.com<br>mbalotta@rgrdlaw.com<br>sfallon@rgrdlaw.com |
| Robert M. Rothman<br>David A. Rosenfeld<br>Brent E. Mitchell | Robbins Geller Rudman & Dowd LLP<br>58 South Service Road<br>Suite 200<br>Melville, NY  11747 | rrothman@rgrdlaw.com<br>drosenfeld@rgrdlaw.com<br>bmitchell@rgrdlaw.com |
| Andrew Friedman | Bonnett Fairbourn Friedman &<br>  Balint PC<br>7301 N. 16th Street<br>Suite 102<br>Phoenix, AZ  85020 | afriedman@bffb.com |

**COUNSEL FOR DEFENDANTS**:

| NAME | FIRM | EMAIL |
|---|---|---|
| Jeff G. Hammel<br>Kalana<br>  Kariyawasam | Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, NY  10020 | jeff.hammel@lw.com<br>kalana.kariyawasam@lw.com |
| Andrew B. Clubok<br>Susan E. Engel<br>Matthew J. Peters<br>J. Christian Word | Latham & Watkins LLP<br>555 Eleventh Street, N.W.<br>Suite 1000<br>Washington, D.C.  20004 | andrew.clubok@lw.com<br>susan.engel@lw.com<br>matthew.peters@lw.com<br>christian.word@lw.com |
| Meryn Grant | Latham & Watkins LLP<br>355 S Grand Avenue<br>Suite 100<br>Los Angeles, CA  90071 | meryn.grant@lw.com |
| Douglas C. Northup<br>Andrea L. Marconi | Fennemore Craig, P.C.<br>2394 E. Camelback Road<br>Suite 600<br>Phoenix, AZ  85016 | dnorthup@fennemorelaw.com<br>amarconi@fennemorelaw.com |

- 1 -

4921-8732-5237.v3

| Susanna M. Buergel David P. Friedman Kristina A. Bunting | Paul, Weiss, Rifkind, Wharton & Garrison LLP 1285 Avenue of the Americas New York, NY 10019 | sbuergel@paulweiss.com dfriedman@paulweiss.com kbunting@paulweiss.com |
|---|---|---|
| Cameron A. Fine Madeline A. Cordray | DLA PIPER LLP (US) 2525 East Camelback Road Suite 1000 Phoenix, AZ 85016 | cameron.fine@us.dlapiper.com madeline.cordray@us.dlapiper.com |
| Melanie Walker | DLA PIPER LLP (US) 2000 Avenue of the Stars Suite 400 Los Angeles, CA 90067 | melanie.walker@us.dlapiper.com |
| Yan Grinblat | DLA PIPER LLP (US) 444 West Lake Street Suite 900 Chicago, IL 60606 | yan.grinblat@us.dlapiper.com |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 18, 2025, at San Diego, California.

_____
KATIE WOODS

- 2 -

4921-8732-5237.v3