# EXHIBIT 1

FENNEMORE CRAIG, P.C.
Douglas C. Northup (No. 013987)
Andrea L. Marconi (No. 022577)
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: +1.602.916.5000
Email: dnorthup@fennemorelaw.com
Email: amarconi@fennemorelaw.com

LATHAM & WATKINS LLP
Jeff G. Hammel (*pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200
Email: jeff.hammel@lw.com

LATHAM & WATKINS LLP
Susan E. Engel (*pro hac vice*)
Matthew J. Peters (*pro hac vice*)
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200
Email: susan.engel@lw.com
Email: matthew.peters@lw.com

*Counsel for Defendants Carvana Co., Ernest Garcia, III Mark Jenkins, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan*

## UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| In re Carvana Co. Securities Litigation. | Case No. 2:22-cv-02126-PHX-MTL |
| | **DECLARATION OF JAMIE BROWN IN SUPPORT OF DEFENDANTS' POSITION ON THE COLLECTION, REVIEW, AND PRODUCTION OF LINKED DOCUMENTS** |

I, Jamie Brown, declare as follows:

1.    I am a Vice President of Global Advisory Services at Lighthouse.  I am an attorney and legal consultant, specializing in information law, which includes electronic discovery ("eDiscovery").  I have over 25 years of in-house, government, and law firm experience, which I draw upon to advise clients on various challenges related to the use of information and technology in the context of litigation and investigations.  My prior experience includes working for UBS, where, as Executive Director and Global eDiscovery Counsel, I was responsible for designing, implementing, and managing the company's global eDiscovery programs to support the firm's litigation and investigation docket.  I also worked for Barclays, leading and implementing a global program to reduce legal, regulatory and privacy risk associated with legacy systems and data.  Prior to my years in corporate practice, I spent several years in government service, first as a trial attorney in the Division of Enforcement at the U.S. Commodity Futures Trading Commission in Washington, D.C., and later, as Assistant General Counsel, Head of eDiscovery and Information Governance, where I served as the Agency's resident eDiscovery expert.  My career began as a litigation associate at King & Spalding LLP, and later, as a partner at Fennemore Craig specializing in information law.  I am a former law clerk to the Honorable Roslyn O. Silver for the District of Arizona and a Duke Law graduate.  Through the aforementioned roles, I have managed eDiscovery for hundreds of complex litigation matters (from inception through conclusion) and consulted with hundreds of clients on various challenges associated with information and technology, particularly as it evolves.

2. I have attached a copy of my CV detailing my experience, including in an expert capacity. In addition to what is contained in my CV, I have served (and continue to serve) as the expert of record for several matters involving the use of Google and Microsoft technology involving, among other things, disputes involving the collection, processing and production of linked documents (*e.g.*, Uber Rideshare MDL, In Re: Insulin Pricing MDL, In Re: Meta Pixel Healthcare MDL).

3. I submit this declaration at the request of Carvana Company ("Carvana"), Ernest Garcia III, Mark Jenkins, Michael Maroone, Stephen Palmer, Neha Parikh, Ira Platt, and Greg Sullivan (collectively, "Carvana Defendants"), and its outside counsel, Latham & Watkins LLP's ("Latham"), and in support of Carvana Defendants' position in the Proposed Joint Discovery Motion dated July 23, 2025. I understand a dispute has arisen involving Carvana's ability to collect and produce certain documents shared by email via reference links. I am familiar with the facts contained herein and am prepared to testify to the extent required.

4. In preparing this declaration, I reviewed certain documents, including:

- Proposed Joint Discovery Motion dated July 23, 2025, setting forth both parties' positions in connection with the pending dispute involving linked documents (including Exhibits 1-3);
- Letters between counsel for both parties in connection with this dispute (4/24/25 Letter from M. Peters (Latham) to R. Cocalis (Robbins Geller); 5/15/2025 Letter from R. Cocalis (Robbins Geller) to M. Peters (Latham); 5/29/25 Letter from L. Bays (Robbins Geller) to M. Peters (Latham); 6/15/25 Letter from M. Peters to L. Bays (Robbins Geller); 6/27/25 Letter from M. Peters (Latham) to L. Bays (Robbins Geller);
- Stipulated Electronic Discovery Agreement and Order, dated March 12, 2025, Dkt. 137

2

5.     I interviewed Lighthouse team members responsible for the collection of data on behalf of clients, including those familiar with a specific collection tool called Metaspike's Forensic Email Collector's ("FEC") and its current capabilities;

6.     I interviewed Ron Harry, eDiscovery Lead at Carvana, who has firsthand knowledge and experience with Carvana's systems and processes and to confirm Lighthouse's understanding of Carvana's implementation and use of Google Workspace and Google Vault in particular;

7.     I interviewed Scott Polus, Senior Vice President (Forensics) at Repario, Carvana's eDiscovery provider, to confirm Lighthouse's understanding of eDiscovery processes that were utilized.

**Google Workspace / Backupify**

8.     Carvana uses Google Workspace (Business and Enterprise Edition), which offers a suite of web-based applications, including but not limited to **Gmail** (for email) and **Google Drive** (for file storage and collaboration).  Carvana's edition of Google Workspace also includes a tool called **Google Vault** ("Vault") that, among other things, supports the collection, search and export of Google data.

9.     Carvana's retention policy for email is 4 years. It uses a tool called Backupify for the backup of Google data.  Backupify contains data older than 4 years although there are challenges retrieving data from the system.  As its name suggests, Backupify is first and foremost a backup system designed to restore or recover data in unforeseen circumstances (such as a data breach).  In contrast, it is not designed to serve as data management system, system of record or email archive, as it does not contain robust

3

features to support the routine collection, search and export of data needed for discovery purposes.

10.    It is my understanding that, in connection with this matter, Carvana's eDiscovery Team has collected (and is continuing to collect) relevant Gmail and Google Drive data using Vault; for documents older than 4 years (and former employee data), Backupify; and Slack using a tool called Onna, and that Carvana provided (and continues to provide) this data to its eDiscovery vendor, Repario, for processing, hosting and review by its outside counsel.

**Background on Shared Documents / Linked Drive Files**

11.    To provide some background, traditionally, documents have been shared by email or chat in one of two ways: by uploading a copy of a file as a physical attachment or by embedding the file into the message.  In both scenarios, the file was static (meaning, it was not subject to being modified by another user in the normal course of business), and metadata naturally existed that would allow for the ready association of that document to the message by an eDiscovery vendor.  Over time, this ready association paved the way for an industry standard of producing the attachment with the underlying message based on the notion that it was part of a "parent-child" relationship (where the message is the parent, and the child is the attachment).

12.    Cloud based technologies provide a very different file sharing mechanism that embeds a link within the body of the message that points to a document's storage location.  The underlying document is not static, but rather, dynamic – it can be edited, moved, or deleted, depending on how the system is configured, who has access to the

4

document, and how it is used over the course of time. Some systems allow for file sharing only via reference links, while others allow the option of providing a traditional attachment.[1]

13. Cloud based technologies also provide a different mechanism for creating versions of documents ("versioning") that is "system driven" as opposed to "user driven." System driven versioning refers to the automatic creation of a new version when changes are made to a document (based on system specifications); in practice, this can yield potentially hundreds of versions without any user intention or sometimes, even knowledge that a version is being created, whereas user-driven versioning (which was commonplace with word processing applications until they were replaced by cloud-based systems) relies upon a user to intentionally create a new version.[2]

14. Versioning is material to the discussion of shared documents because of how eDiscovery tools access and retrieve this information. Typically, there are two types of tools used to access and retrieve enterprise data: features that are built-in to a system

---

[1] These reference links are sometimes referred to as hyperlinks, although a hyperlink (by definition) is broader, as it also includes links to websites, web applications and data or document locations. The practice of hyperlinking dates back 20+ years and refers to the technical capability of moving from one data location to another for various purposes. Cloud providers adopt their own terminology to describe their file sharing technology, and Google uses the term "linked Drive files" (for reference, Microsoft uses the term "cloud attachment," and previously used the term "modern attachment").

[2] Within the context of system driven versioning, enterprise tools like Google Workspace (and M365) have their own way of defining what constitutes a version, and each system utilizes different versioning methods, some of which are not configurable and occur by default over the life of the document. For the same reason a document is dynamic (i.e., subject to edits, location change, deletion), so are the versions comprising the document. Understanding the dynamic nature of versioning is important, because it demonstrates the complexity of attempting to collect the version shared when the system's underlying architecture may not have been designed with this functionality in mind. Said differently, it can be like putting a square peg in a round hole.

"natively," such as those in Vault (for Google data) or Purview (for Microsoft data), or third-party collection tools that are used to access a company's systems for this purpose. In most cases, the built-in eDiscovery features used to collect data from enterprise systems cannot readily access and retrieve the precise version of the document shared ("version shared" or "contemporaneous version") when collecting communications, but rather, only the last version of the linked document, if at all.

15.    The same is true for Vault: if a Vault user seeks to collect and export shared documents (as part of a message collection), today, they can do so, but the only option is to include the last version of the linked Drive documents.[3]

16.    As a result of technical differences in the way documents are created (including versioning), stored, shared and managed within newer cloud-based technologies like Google Workspace, and the options users have to perform eDiscovery tasks within these tools (*e.g.*, using Vault), Lighthouse clients have successfully argued against the routine collection and production of shared or linked documents in discovery on the basis:

---

[3] Before December 2023, however, even this feature (of collecting shared documents as part of a message collection) did not exist within Vault. Rather, should a Vault user need to collect shared documents as part of a message collection, a Vault user would need to collect the Gmail or Google Chat first, then collect the individual custodian's Google Drive as two separate collection tasks and, even still, the collection would include only the last version. The company would then need to use a third-party tool or parser to associate the message with the shared document. The December 15, 2023 feature change simplified the process of collecting shared documents (as part of a message collection), although nothing changed with respect to the fact that Vault only provided the option of collecting the last version.

a.   Shared or linked documents are not, in fact, attachments for the reasons above;

b.   Given the lack of available metadata to readily associate the shared document (version shared or, in some cases, also last version) with the message, no natural association exists between the message and the shared document;

c.   Any linkage between the message and the shared document would require significant time, cost and burden to facilitate at scale;

d.   Even when metadata is available within the eDiscovery tool to link the last version with the message, that metadata alone does not establish an association, where the document may have been modified after the message was sent.  In other words, it is the contemporaneousness of the linked document that is more significant to the family relationship (to the extent it can even be established with certainty).

16.   Clients have further successfully argued that they will produce the version shared *only upon a showing of need* due to the extremely manual and cumbersome process involved, which I understand would be the case with Carvana.

17.   Where this is not possible (such as for a regulatory investigation), some clients have opted to produce the last version of the shared document in lieu of the version shared on the basis that, at least they have the option to collect and export the document using the built-in eDiscovery features (*e.g.*, Vault) that maintain the natural metadata linking the documents.  Note that, if the metadata does not exist naturally (*i.e.*, as part of the message export), it is often times impossible to create linkage between the documents post-hac.

18.   The practices set forth in paragraphs 15-17 have recently emerged as the new industry standard for the handling of shared or linked documents.

7

19.     Note that the collection of shared documents within Vault is not perfect and is subject to document access limitations.  For example, if at the time of collection the custodian's access permissions were removed, Vault will not collect the shared document (albeit last version), as the reference link will be considered broken.

20.     I understand that, for this matter, Carvana collected linked documents for Gmail using Vault's native capabilities – which again, is limited to the last version.  It also collected custodian and non-custodian Drive documents separately (using Vault, as well as Backupify), some of which may have also been shared by email as linked documents.  Note that the use of Vault to collect Google data, as set forth more fully below, is consistent with industry standards for the collection of Enterprise Google data.

21.     In producing the last version of shared documents, Carvana went over and beyond what most parties do today when collecting and producing documents in litigation, as this version is not necessarily part of the communication.

**Processing of Linked Documents**

22.     The processing of messages and linked documents is nuanced and largely depends upon the metadata contained with the data export that, in turn, depends upon the capabilities of the operative technology (in this case, Vault, Backupify).  These capabilities are informed by the company's license and specific configuration.  Upon receipt of a data export from the client, eDiscovery providers (like Lighthouse and Repario, which is Carvana's provider for this matter) process data using industry leading tools (like Nuix and Relativity) and established workflows (or internal processes for handling a particular type of data).  These tools and workflows are tested and validated to ensure accuracy,

8

efficiency, repeatability and adherence to best practices. As common enterprise tools evolve (e.g., Google Workspace, M365, Slack), eDiscovery technology and eDiscovery vendor workflows similarly evolve. Vendors dedicate significant resources developing and maintaining workflows as evergreen to ensure that the services they provide adhere to best practices.

23. Today, the workflows are designed to support data that is collected and exported using in-place tools designed with eDiscovery requirements in mind –for Google data, this contemplates the use of Vault, and for Microsoft data, this contemplates the use of Purview as the primary technology used to collect and export data residing in supported applications. Specifically, the requirements referenced include the collection, search and export of data *at scale* with available metadata that can be extracted using industry leading tools.

**Metaspike's FEC.**

24. Most major eDiscovery vendors work with clients to understand their needs in advance of collecting data. This includes discussion of in-scope data types, volumes and services, among other things; it also includes a review of the ESI Protocol or ESI Order. Once requirements are understood, the vendor will confirm it can accommodate the client's needs based upon the technology (and service offerings) it has. If a new need arises that was not contemplated, the vendor must determine if it can accommodate the client in a way that aligns with industry standards and best practices.

25. Plaintiffs propose that Carvana use a tool called Metaspike Forensic Email Collector ("FEC") as an alternative (or in addition) to Vault to collect linked documents

9

and, specifically, to collect the <u>version shared</u> given that Vault's capabilities are limited to collecting the <u>last version</u>.

26.    Lighthouse uses FEC to collect email and linked documents only in certain limited matters involving small data volumes and where the collection at issue is extremely targeted. Although FEC can be an effective tool when Vault is not an option (for example, collecting an individual's personal Gmail) or to collect an alternative version in cases that warrant it, there are numerous limitations, namely:

- FEC cannot access data via Vault; rather, it uses an API that connects directly to the individual Google applications (*e.g.*, Gmail, Drive), and therefore, can access only "active" data (*i.e.*, data that is available within an individual user's workspace). This is typically a subset of what is available within Vault, whose purpose is for information governance and eDiscovery.

- FEC does not allow for the collection of data across custodians; rather, one would need to collect custodian-by-custodian, which is impractical in a large matter.

- FEC does not allow for a "group export" of data; rather, one would need to export data on a custodian-by-custodian basis, which is impractical in a large matter.

- FEC does not permit the de-duplication of data across custodians.

- FEC has capabilities for logging errors received from Google, but the error descriptions are vague, necessitating extensive time to identify and investigate any errors that might be resolved (e.g., throttling, timing out, call limited exceeded).

- FEC collects any linked document in an email thread, but uses the date that exists in the most recent thread (i.e., top of the email chain) as the applicable version date for all linked documents; this means the version retrieved might not be collecting the version that was actually shared with the email.

- Although FEC purports to collect the version shared that predates the parent email, there are additional challenges, including artificially creating a relationship between a message and the shared document anytime the link appears in an email message thread. In this circumstance, FEC will collect the version of the document that existed at the time the email was sent (and each

subsequent reply), even if the document was not shared in subsequent replies. This presents a risk that a factfinder could conclude that certain email recipients received a copy of the shared document when, in fact, they did not – a risk that is compounded when a collection involves numerous custodians and large volumes of data. It also contributes to the overcollection of data (and costs associated therewith).

- FEC shares the same limitations as Vault when it comes to certain shared documents that are inaccessible (e.g., moved or deleted files).

27.    Given these limitations, Lighthouse uses FEC only in the limited circumstances described above, which is consistent with other vendors (including Repario). For these reasons, Lighthouse would not recommend using FEC for a matter like this one, where there is a large volume of data, as it is not as preferable to Vault due to FEC limitations and complexities of email threading, de-duplication, and relationships for Google data – all of which require established eDiscovery workflows that do not scale in the way Plaintiffs contemplate absent significant custom development. Further, Lighthouse would not recommend using FEC given that Carvana has Vault, which is considered fit for purpose for eDiscovery, as well as an industry standard tool that is used by thousands of other companies today.

28.    Plaintiffs are essentially demanding that Carvana use a tool that is considered non-standard for the collection of Enterprise Google data. This would constitute an extraordinary measure. In fact, I am unaware of any matter where a court has ordered a party to use FEC (or endorsed its use) in lieu of Vault for the collection of Enterprise Google data – despite certain Plaintiffs experts' attempts for more than 4 years.

I affirm under penalty of perjury of the laws of the State of New York that the foregoing statement is true and correct. Executed on July 24, 2025 in New York, New

York.

By:  *Jamie Brown*
Jamie Brown

# APPENDIX A



# Jamie A. Brown

**Vice President (Advisory and Strategic Consulting Services)**

A former regulator, law firm partner and in-house counsel, Jamie has more than 25 years of experience leading and litigating complex matters involving information and technology in federal and state courts and responding to investigatory demands brought by the U.S. Department of Justice and U.S. and foreign regulatory bodies. Jamie specializes in information law, pre-trial strategies, cross-border investigations, e-discovery and data protection issues.  At Lighthouse, Jamie is responsible for leading a discovery consulting practice focused on emerging technology use and risk mitigation, as well as expert testimony.

Jamie has worked for several leading financial institutions, including UBS (New York, NY), where, as Executive Director and Global eDiscovery Counsel, she was responsible for designing, implementing, and managing a centralized e-discovery program to support the firm's litigation and investigation matters worldwide. In this role, she advised internal and external counsel on strategies for the preservation, collection, search, review, and production of data, and personally managed several high-profile internal and regulatory investigations involving complex data issues. Jamie also worked for Barclays (New York, NY), leading and implementing a global program to reduce legal, regulatory, and privacy risk associated with legacy systems and data. The program included significant cross-functional alignment with divisions outside of legal on related privacy, information technology, risk, and compliance issues.

Prior to corporate, Jamie spent several years in government service, first as a trial attorney in the Division of Enforcement at the U.S. Commodity Futures Trading Commission (Washington, DC) and later, as Assistant General Counsel and Head of e-Discovery for the Agency. In this capacity, she advised more than 250 Enforcement attorneys on investigation techniques, strategies, and protocols on cases with global prominence. She also managed several key congressional investigations, Inspector General investigations, and internal investigations. Jamie also served as lead counsel for the Agency's first data breach involving compromised data.

Jamie has testified in federal court and has qualified as an e-discovery expert. In her corporate and government roles, she served as a 30(b)(6) designee for formal and informal testimony, and regularly interfaced with regulators and Congress on e-discovery strategy and internal practices. Independently, Jamie has advised corporate legal departments on ediscovery best practices and operating model development and enhancement, particularly in the face of regulatory scrutiny.

1

Jamie began her career as a litigation and government investigations associate at King and Spalding in Washington, D.C., and later, was a litigation partner at Fennemore Craig, in Phoenix, Arizona. Jamie is a graduate of Duke Law School and Arizona State University and a former law clerk to the Honorable Roslyn O. Silver of the U.S. District Court for the District of Arizona. She is a frequent speaker and lecturer at educational events and legal conferences internationally.

## Professional Experience
- Lighthouse – Vice President (2017 to present)
- Jamie A. Brown, LLC (Consultancy) – Founder and Owner (2016 to 2017)
  - Barclays – Program Lead (2016-2017)
  - John Deere – Consulting Attorney (2016)
- UBS, AG – Executive Director (2012-2016)
- U.S. Commodity Futures Trading Commission – Assistant General Counsel (2010-2012); Trial Attorney (2003-2005)
- Fennemore Craig, PC – Partner (2008-2010); Associate (2006-2007)
- U.S. District Court (D. Ariz.) – Law Clerk (2005-2006)
- King & Spalding, LLP – Associate (2000-2003); Summer Associate (1998, 1999)

## Deposition / Trial Testimony Experience
*Declaratory listing available upon request

*Tenet St. Vincent v. MNA,* NLRB 2024-00331 *(ULP Review),* testimony at trial

*Fresno Community Hospital v. Sante Health Foundation, et al.,* Case No. 22CECG0314 (Cal. Super. Ct. 2022), deposition

*In Re: Zantac (Ranitidine) Products Liability Litigation*, MDL No. 2924 (U.S. Fla. 2020), deposition

*In Re: Essure Product Cases,* JCCP No. 4887 (Cal. Super. Ct., 2018), deposition

*Commodity Futures Trading Commission v. Emerald Worldwide Holdings, et al.*, CV03-8339 (C.D. Cal., Nov. 18, 2003; May 11, 2004), testimony at evidentiary hearing/trial

*Commodity Futures Trading Commission v. Sun Platinum Group LLC, et al.*, CV03 7112 (S.D.N.Y. Sept. 12, 2003), testimony at evidentiary hearing/trial

*Commodity Futures Trading Commission v. Lexington Royce & Assoc., et al.*, CV04 02768 (S.D.N.Y. Apr. 12, 2004), testimony at evidentiary hearing/trial

*Commodity Futures Trading Commission v. Remco Capital Management, et al.*, CV04 9029 (S.D.N.Y. Nov. 16, 2004), testimony at evidentiary hearing/trial

2

 LIGHTHOUSE

*Commodity Futures Trading Commission v. Smithers, et al.*, CV05 80592 (S.D. Fla. Aug. 2, 2005), testimony at evidentiary hearing/trial

*Office of the Inspector General Investigation of Division of Enforcement's Investigative Records Disposition Policy* (2011), informal testimony

*Office of the Inspector General Investigation of the Oversight and Regulation by the CFTC of MF Global* (2012), informal testimony

*Congressional Investigation by Senator Chuck Grassley (R-Iowa) into the CFTC Oversight of MF Global* (2012), informal testimony

## Education
Duke Law School, J.D. 2000 (Moot Court)
Arizona State University, B.A. 1997 (Political Science)

*Continuing education as lecturer and participant in international conferences.

## Speaking Engagements/Publications
Conferences:
- Georgetown Advance eDiscovery Institute – eDiscovery Issues in Investigations; eDiscovery Issues Keeping In-House Counsel Awake At Night; Storage is Cheap – Over-Retention is Not; Advanced Technical Aspects of Collaboration Platforms (Washington, DC, 2012, 2014, 2023, 2024);
- Legal Tech/Legal Week – Real Advocacy Under the Federal Rules; Leveraging Microsoft 365 in a Post-Schrems World; Generative AI, From Innovation to Impact (New York, NY 2016, 2021, 2024)
- eDiscovery Institute (EDI) Leadership Summit – All Things Compliance; Data Breach and Combatting Information Threats; Mock Negotiation with the Government Regarding Discovery; Maintaining Vendor Relationships; Dodd Frank & More, Info Gov and Audio; Data Surveillance: Dealing with Privacy, Complex Data and Company Culture; Freedom Tower: What You Can Do In the Clouds; Microsoft 365: Gap Analysis and Recommendations for Defensibility; M365 Update (Various, 2012-2017, 2020, 2022-2025);
- Government Investigations and Civil Litigation Institute (GICLI) – Managing a High-Profile, Beth the Farm Investigation; A Recap of the Government's Focus on Insider Trading After Newman; Dealing with Unannounced Investigations and Raids; The Regulators Always Ring Twice; Managing a Destruction of Evidence Claim from the Government & Litigation; Experts as a Matter of Fact - When to Hire an External Witness for PMQ and 30(b)(6) Testimony, Modern Data Challenges in Investigations (Various, 2015-24);

3



- International Legal Technology Association – What is Information Governance in Copilot? (4-Part Online Series, 2024-25);
- Legal Talk Network – Generative AI, From Innovation to Impact (New York, NY, 2024);
- Federal Judiciary Center Training Program (EDI) – Ephemeral and Encrypted Communications (Ft. Lauderdale, FL 2018);
- Chief Information Governance Officer Summit – Information Governance in the Boardroom (Chicago, 2017);
- Information Governance Institute (Chicago, IL; 2017);
- Sedona Conference Institute Annual Program on eDiscovery – Technology Tools for Protecting Privacy and Security in Litigation (Charlotte, NC; 2017);
- Sedona Conference WG 6 Annual Meetings – In-house Perspectives (Zurich; Hong Kong 2014-2015);
- APAA Annual eDiscovery Forum – Best Practices and Case Studies (Seoul, Korea; 2015);
- IQPC Information Governance and eDiscovery Summit – Developing and Implementing an Effective, actionable Program that Unifies Stakeholders' Interests and Objectives (London, UK; 2014, 2016);
- Arkfeld eDiscovery and Digital Evidence Conference – Developments in Cross-Border eDiscovery; Government Investigations (Phoenix, AZ; 2013-2015);
- Federalist Society Nat'l Lawyers Convention - Document Retention, Litigation Holds and Legal Ethics (Washington, DC, 2014);
- Thomson Reuters/EDI Telepresence Event: A Consortium on Litigation, Information Law and eDiscovery – Creating a Breach Response Plan (New York, NY; 2013);
- Q1 Productions, eDiscovery in Highly Regulated Industries (Philadelphia, PA; 2013);
- Federal eDiscovery Working Group Annual Conference (Washington, DC; 2011-2013);
- Compliance Governance Oversight Council Annual Summit – Information Governance and the Regulator's Perspective (Washington, DC; Chicago, IL; 2012);
- International Data Law Forum – Leveraging Information Assets in a Privacy Forward Organization (Berlin; 2025);
- Microsoft client events/conferences (Various, 2017-2025);
- Lighthouse client events/conferences (Various, 2017-2025)

Written Materials:
- Author: First Annual eDiscovery Guidelines for the Commodity Futures Trading Commission (2012);
- Author: CFTC Enforcement Chapter, Government Investigations Civil Litigation Institute Manual (2017-2022)

Courses:
- Class: Practicing Litigation Institute – Government Investigations (Webinar; 2016); eDiscovery Challenges with Collaboration Tools (Webinar; 2024); Hot Topics in eDiscovery (Webinar; 2025)



- Class: Duke Law School and EDI eDiscovery Training Program: In-house Perspectives and the Future of eDiscovery (Online; 2017)
- Class: American University Law School, eDiscovery Course – Visiting Lecturer (2013)
- Class: University of Maine Law School, Technology Course – Visiting Lecturer (2015)



## Professional Affiliations

- Licensed attorney in D.C. (Active Member) and Arizona (Inactive Member)
- Government Investigations Civil Litigation Institute (Founding Board Member, Planning Committee and Faculty)
- The Electronic Discovery Institute (Planning Committee and Faculty)
- International Association of Privacy Professionals (Member)

6