# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

United Association National    )
Pension Fund, et al.,          )
                               )    No. 2:22-cv-02126-MTL
        Plaintiffs,            )
                               )
        vs.                    )        Phoenix, Arizona
                               )        August 11, 2025
Carvana Company, et al.,       )
                               )
        Defendants.            )
_____)


**BEFORE:   THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE**


**TRANSCRIPT OF PROCEEDINGS**


**TELEPHONIC MOTION HEARING**

**RE: JOINT MOTION FOR DISCOVERY**


Transcriptionist:
Christine M. Coaly
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

**A P P E A R A N C E S**

For the Plaintiffs:

    ROBBINS GELLER RUDMAN & DOWD LLP
    By:  **Mr. Daniel S. Drosman, Esq.**
        **Ms. Erika L. Oliver, Esq.**
    655 W Broadway, Ste. 1900
    San Diego, CA 92101


For the Defendants Carvana, et al.:

    LATHAM & WATKINS LLP
    By:  **Mr. Kalana Kariyawasam, Esq.**
    1271 Avenue of the Americas
    New York, NY 10020

    LATHAM & WATKINS
    By:  **Mr. Matthew Peters, Esq.**
    555 11th St. NW, Ste. 1000
    Washington, DC 20004-1304

For the Defendant Ernest Garcia, Sr.:

    DLA PIPER, LLP
    By:  **Ms. Melanie E. Walker, Esq.**
    2000 Avenue of the Stars, Ste. 400
    Los Angeles, CA 90067

For the Underwriter Defendants:

    PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
    By:  **Mr. David P. Friedman, Esq.**
    1285 Avenue of the Americas
    New York, NY 10019

**P R O C E E D I N G S**

THE COURT:  -- if there are other issues, let me know.

How would the defense like to begin?  Who would like to speak first?

MR. PETERS:  Good morning again, Your Honor.  This is Matthew Peters for the Carvana defendants.  I'd be happy to start for the defense.

THE COURT:  Sure.  Go ahead.

MR. PETERS:  Thank you.  The plaintiffs are not entitled to the original of the hyperlink documents.  There really are no originals of the hyperlink documents.  And an understanding of why begins with Carvana's Google Workspace, and also an explanation of what Carvana has already done with regard to document collection and review.

Carvana operates within the Google environment called Google Workspace.  And Workspace is completely different from Windows where files are created and edited by one person at a time and stored on a computer or a shared drive.  Workspace is cloud-based and designed to be a collaborative and accessible from anywhere in the world.  It includes many separate software applications, including Google Drive for collaboration and storage, and Gmail for e-mails.

And Google Drive documents are dynamic and living documents.  Anyone with access to a Drive document can work in these documents in real time, simultaneously with dozens of

other users.  These features make Drive documents kind of like huge whiteboards.  Anyone can grab a marker or an eraser and add, delete, or modify content simultaneously.

And in connection with this litigation, Carvana has collected documents from Google Drive.  It's also collected e-mails and attachments from Gmail, and also documents and communications from other sources.  And when searching for, collecting, and exporting Gmail communications, and also Drive documents, Carvana has used the native tool within the Google Workspace that's designed for those tasks.  That tool is called Google Vault.

And to be more specific about what Carvana has done, Carvana has run search terms against Drive and Gmail and used Vault, the native tool to the Workspace, to collect potentially responsive communications and documents.  To date, Carvana has collected roughly 850,000 e-mails and Drive documents.

And for Drive documents, if the document is responsive to the search term, Google Vault automatically collects the document as it exists at the time.  And importantly for Gmail, since December 2023, as reflected in the parties' submissions, Google Vault can automatically collect Drive documents hyperlinked in Gmail messages.  And when collecting those hyperlinked Drive documents, Vault collects the document as it exists at that time.

As of today, using Vault, the native tool to the

Google Workspace, Carvana's collected approximately 1,524 Drive documents that are referenced via active hyperlinks in Gmail communications.  This total, to be clear, is a baseline, and the actual number is likely -- of reference hyperlinks and Gmails is likely much higher, given discovery is ongoing, among other things.

And through these processes, Carvana has been following the industry-standard approach for discovery from the Google Workspace, as consistent with the Sedona Conference Principle 6.  It is also consistent with the ESI protocol in this litigation, and it's also consistent with Rule 34.

So what is this dispute about?  This dispute is about, however, that for each Drive document referenced via hyperlink in a Gmail, plaintiffs are demanding a copy that is near in time to when a hyperlink pointing to the Drive document was sent, and they want to assume that the content of the Drive document is like what was sent at the time.

But as I'll explain, such Drive documents would be technological fictions.  Regardless of the methodology used to collect Drive documents, it is not possible to know precisely what a Drive document's content was when a hyperlink referencing it was sent.  This is the simple reality of the Google Workspace given the computer code or the APIs underlying it.  So, consequently, these technological fictions would be unimportant to resolving the issues in this case, and they

provide no legitimate benefit to any party.

For example, no witness could say whether a version e-mail was what was actually sent due to these technological limitations.  No witness will be able to authenticate such Drive documents, nor will such Drive documents show what an e-mail recipient actually saw if or when she clicked on a hyperlink to a Drive document.  And all this is true for two reasons.

The first is because we're dealing with here something that is night and day from e-mails and attachments.  Hyperlinks are references in e-mails to locations in the completely separate and collaborative tool Google Drive.

With e-mails and attachments, a static document is included with the e-mail.  It's like the e-mail and the attachment are together in a manila envelope.  And that's why if you use Microsoft Outlook, for example, you can go back to an e-mail, select the attachment, and know that it has not changed since being sent to you, but, again, that is not true at all with what we're discussing today.

Unlike its e-mail attachment, the hyperlink is just a pointer to a Drive location containing a dynamic resource. It's not a fixed copy.  So a hyperlink is essentially like a map.  It merely tells the API, the computer code that operates everything, how to get from point A in a Gmail to a specific location in a separate Drive program.  But because that Drive

document is dynamic, you will not know what is there at the destination beforehand.

But what's really critical to also understand is that with hyperlink Drive locations, not only do we not know what the recipient saw, we have no idea what was actually sent.  And that's because the second reason, a critical reason, the realities of these technologies.

Again, the fundamental technology underlying this entire issue is the Google proprietary computer code called API.  APIs dictate versioning of Drive documents such as how and when versions are created, saved, and maintained.  The API creates and saves new versions of these Drive documents automatically so the user does not have to do anything affirmatively to save the document.

And, critically, the API does not create a new version for each change to a document or if a comment is added.  For example, changes can be grouped together into a single version. The API also combines and purges historical versions of Drive documents over time.  So it previously might have been a specific version of a Drive document, and Google's API might now be something different and contain edits or comments from previously separate versions.

This means we can't know what the exact content of a Drive document was sent at the time.  And APIs, they also control how any third-party software application works with and

communicates with Google Workspace.  And that includes Metaspike's FEC, which is the third-party software program that plaintiffs are advocating for.  And -- but before explaining some of FEC's many limitations, we should start with what does FEC, the third-party software, actually do?

So, notably, FEC does not even claim to be able to identify the, quote, contemporaneous version of a Drive document, that is the version of a Drive document containing the exact content at the time the e-mail was sent.  Again, FEC cannot do that because of the API and proprietary versioning.

What FEC does is it only looks for a version of a Drive document that it believes predates the most recent e-mail in a chain, and it assigns that date to every single hyperlink Drive document in the e-mail chain.  And that happens regardless of whether and when the hyperlink document was actually sent.  As a result, it creates lots of inaccurate and fictional copies.  And this is for many reasons these -- these processes result in technological fiction.

As noted, API does not create a new version for every change to a Drive document and it combines or removes versions over time.  And as explained by Mr. Polus, who is the only certified computer examiner who submitted a declaration in this matter, the API does not even show all of the versions of a Drive document to FEC.

This means that whatever version FEC grabs first, it

may not have existed at the time of the e-mail.

Second, it might not be the version actually e-mailed.

Third, even if it was the version e-mailed, the content at the time may have been completely different.

And, fourth, we cannot know, regardless, what the recipient actually saw when she opened the reference drive.

This is why this tool is not -- just flat not used at this scale for this specific purpose. And this is why plaintiffs' justification for trying to impose this third-party software on defendants to show precisely what was e-mailed to a witness or what a witness saw is not only impossible and mistaken, but it's flat out dangerous in a case like this. These versions would be technological fictions and of no value in the litigation.

But not only that, collecting and creating these technological fictions that FEC would manufacture would impose disproportionate and unnecessary burdens and costs on the Carvana defendants. Collecting these fictions that FEC would create would require, among other things, that Carvana abandon industry standard discovery practices, and that, as noted in the In re Meta Pixel Healthcare litigation, weighs against the processes, adopting the processes.

It would also require that Repario, Carvana's eDiscovery vendor, abandon all of its standard workflows and procedures for processing, for quality control, and for

production of data that it has developed over enumerable litigation matters spanning years.

And Carvana's -- and defendants and Repario would also need to use FEC at a scale and in a manner that would be unprecedented.  And Repario, as noted in Mr. Polus's declaration, would need to develop entirely new and untested workflows for the processing, quality control, and production.  And whether or not those processes will actually work is, quite frankly, unknown at this time.

As Mr. Polus explained in his declaration, at the absolute minimum, using FEC in the manner plaintiffs contemplate would cause Repario to spend at least ten additional hours of custom and manual forensics collection work and QC per custodian.  To date, the parties have agreed to 16 custodians.  So plaintiffs are currently demanding even more custodians for title and registration issues, and they're also demanding additional custodians for other issues in the case as well.

Separately, Repario would also incur at least, approximately, 300 percent increase in review time, and 12 hours of custom and manual quality check work for each production.  And these estimates are a best case scenario, which as Mr. Polus recognizes in his declaration, is probably not the most likely outcome.  This is because FEC using in this scale and in this manner is unprecedented.  There will be --

undoubtedly, be a lot of unforeseen issues and problems.

Beyond that -- beyond the Repario burden, which would -- there would also be additional hours required by attorneys to review responsiveness and privilege determinations and quality control of these documents as well.  But the disproportionate burden that results from those processes would be compounded by additional flaws that -- in FEC, that would result in an influx of inaccurate documents and necessitate even more untested and unproven processes and procedures.

For example, a significant flaw in FEC is that it relies on a single date to determine which versions of a link document to download.  So, again, what it does is FEC applies the date of the top most e-mail in a chain, which is the most recent e-mail, and where the chain contains more than one communication, it necessarily creates inaccurate copies of hyperlink Drive documents.  That's because there is a (indiscernible) to every single hyperlink Drive document in the chain.

So let me give you an example, all right, so one involving three e-mails within a single e-mail chain.  So, Your Honor, first, on August 1st your clerk e-mails you a Drive document, a hyperlink Drive document.  Then on September 1st you reply with a hyperlink to a Drive document.  And, finally, on October 1st your clerk replies with a link to a hyperlink Drive document.  So this is three e-mails in a chain with three

hyperlinked Drive locations sent one month apart.

When FEC collects the October 1st e-mail, the last e-mail in the chain, even though it only -- that e-mail only sent one hyperlink document, it will collect three copies of hyperlink Drive documents.

Furthermore, all three of those hyperlink Drive documents would be dated October 1st, regardless of when the hyperlink was actually sent. This is particularly significant because Carvana has agreed not to use e-mail threading in this litigation. So, therefore, presumably, in this scenario, Carvana is going to collect one copy of each e-mail, the August e-mail, the September e-mail, and the October e-mail.

This means that due to FEC's reliance on a single date, that program is going to collect six hyperlink Drive documents from the three e-mails. One is going to be dated August 1st, two will be dated September 1st, and three are going to be dated October 1st.

So in this example, again, even assuming FEC could reliably collect the actual version of a hyperlink document that was e-mailed -- and as we've discussed, it can't -- even in this example, 50 percent of the Drive documents collected by FEC are going to be inaccurate. This is part of the reason why nobody in the eDiscovery industry uses FEC at the enterprise scale to re-collect the, quote, like the last version before parent, which is the version that plaintiffs are seeking. This

issue would be repeated across thousands and thousands of documents in the course of discovery in this matter.

And compounding this serious flaw is that FEC cannot de-duplicate these inaccurate copies. Repario has confirmed through testing and also confirmed with Metaspike that FEC's developer, in connection with this litigation, that FEC cannot de-duplicate when trying to collect the version of hyperlink Drive locations that plaintiffs are seeking. It cannot.

So these multiple inaccurate copies, FEC cannot de-duplicate, meaning it can't whittle down and just keep the correct ones. You've got to keep them all. And that's because FEC relies on the Drive documents' IDs to de-duplicate, which is the same for all versions of a Drive document.

Moreover, Repario also confirmed with Metaspike in connection with this litigation that FEC cannot de-duplicate on a custodian-by-custodian basis. So that means you have to collect for each custodian in FEC, and then they're going to -- each custodian is going to have multiple inaccurate copies of documents that come in, again, documents that are ultimately technological fictions in the first place. And then the FEC cannot do really much or of anything about identifying which one is correct, so it will be up to Repario to break new ground and try to figure out how to account for all of these new inaccurate materials. And there increase -- is an increased risk that these inaccurate documents will infect the discovery

record in this matter.

THE COURT:  All right.  Let me jump in.

MR. PETERS:  All of this is contrary to Rule 1 --

THE COURT:  Okay.  Let me jump in.  I've taken notes. I just want to hone down and see if I can clarify on your example.

So on August 1 the clerk -- my clerk sends me an e-mail with the hyperlinked -- hyperlinked at the Google Drive. Can you go back with your API technology and show me the -- what was -- what was on the hyperlink document as of August 1? Let's say you didn't do it --

MR. PETERS:  Not necessarily, Your Honor.

THE COURT:  Just to be clear, let's say you're not doing it for every single case.  Let's say the plaintiffs came back to you and said, listen, this is a critical e-mail.  We want to see what the hyperlink document looked like on August 1 when the clerk sent it to the judge.  Can you go back in time and show me that hyperlinked document as it existed on August 1st?

MR. PETERS:  No, we -- we -- we cannot, Your Honor. So because of the proprietary versioning issues that I discussed before, as far as that Google API does not necessarily create a new version for every change, and it also consolidates and purges historical versions.  However, there is a -- there is a manual process, is my understanding, where you

can go into the API and see historical versions, but we have no way of knowing precisely what the exact content of a linked Drive location would be at the time sent.

THE COURT:  So your answer, as I hear it, is, no, we cannot now recreate the status of the hyperlink Google Drive document on August 1st?

MR. PETERS:  Not without --

THE COURT:  The reason I ask this question -- I'm sorry, for -- let me just -- the reason I ask this is in other cases, you know, other people have sought this same information, and it seems to me in every court they would say, as you've mentioned -- I guess the document evolves, as you mentioned, over time, people -- it's collaborative, it's changing.  Why are these people going back then and wanting the August 1st document, in your example, if it's not obtainable at all anyway?

MR. PETERS:  I cannot answer why they -- they would want that, but they -- you cannot identify why they -- what was precisely in that document at the time.  And it, quite frankly, could be a lack of understanding of how the Google API operates and the technological limitations they face.

THE COURT:  Okay.  Next question.  If you can go back, apparently, this -- you are able to go back and get different versions of what was on the Google Drive, if I heard you correctly.  You may not be able to say that's what it was on a

certain day, but apparently this -- API does keep historical versions of this document of some kind.

So my first question is, is that correct that there are different versions available, if you wanted to get all those versions for a specific attachment, here, for August 1, for example, are there 10 or 20 or 30 different versions stored somewhere in API that you can go back and pull them all out?

MR. PETERS:  I do not believe that there -- that there is a way to automatically pull historical versions of linked Drive locations.

THE COURT:  There is another issue, by the way, which is when I, in your example, look at this on August 1st, if this document is changing over time, am I looking at the August 1st version, am I looking at the August 31st version when I do -- when I reply?  So, I mean, there is that issue as well, if this document is evolving and there is enough time lapse, I don't -- it's not clear, even though you're looking at the very first August 1st hyperlink as it existed on August 1, if it's changing over time, I don't know when in October I -- or when in August I looked at it so that you would know what version I was reviewing when I sent my reply.  But, I mean, that's a question I'll ask for plaintiff.

Okay.  Let me -- to be --

MR. PETERS:  That is --

THE COURT:  Go ahead.

MR. PETERS:  Apologies.  But I would say that's exactly right, Your Honor.  Like when an e-mail was sent has nothing to do -- setting aside that we don't know exactly what was sent, what was sent has nothing to do with what a recipient saw, because it doesn't -- it matters when a recipient potentially opened it, or -- because they can change every second.  So there really isn't any, you know, August 1st version, August 2nd version, August 3rd version.  It is a continually evolving, essentially, living document, and that is -- that is a real critical part of this issue here.

THE COURT:  Next question.  We are appearing to talk about Google Drive documents.  Obviously, there are e-mails that have hyperlinks to things that are static, like a hyperlink to a Ninth Circuit oral argument or a Westlaw case.  So I assume that any hyperlinks that aren't related to Google Drive, you can get the originals to the plaintiff without any problem?

MR. PETERS:  I -- I am not sure if that is accurate.  If it's a -- if it's a -- if it is a external link to something that is not stored, like, for example, a website on the internet, I don't believe there is -- essentially, there is no actual content in the e-mail itself associated with the -- the link, as far as like the content of the link, so that would be separate and I don't believe is stored in the normal course, you know, in a company's ESI environment.  I -- I -- but I --

that's -- I'm happy to kind of go to my discovery vendor and --

THE COURT:  I'll ask the plaintiffs.

MR. PETERS:  -- ask followup questions if that would help --

THE COURT:  I'll just ask the plaintiffs if we're just talking about Google Drive here.  Okay.

Anything else that you want to add before I turn -- well, I'll finish up with the defense and then I'll turn to the plaintiff.

Anything else from you?  And I'll come back to you at the end.

MR. PETERS:  Thank you, Your Honor.  Okay.  Thank you.

No, I would say we also have the question of potentially are these hyperlinked Drive resources treated as attachments, but I'm happy to touch upon that after -- after we continue discussing this -- this specific topic.

THE COURT:  Okay.  Thank you.

Anyone else on the defense who wants to address this before I turn to plaintiff?

(No response.)

THE COURT:  Okay.  Hearing no one, let me turn to the plaintiff.  Who wants to -- Mr. Drosman, do you want to speak to this?

MR. DROSMAN:  Yes, Your Honor.

THE COURT:  Before you start --

MR. DROSMAN:  So --

THE COURT:  -- obviously you want to address this point of -- as -- as I mentioned in the prior hearing, and even now, I am sympathetic to the idea that if you could see the document that's hyperlinked and it's in an e-mail, you know, I would like you to get that.  What I'm hearing from the defense is, you know, we don't know -- it's not possible -- to go back to the August 1st example -- and look at what the status of that hyperlink document was because it evolves over time.  And I'm not even getting into other issues, but you want to address that point, among any others.

With that, go ahead.

MR. DROSMAN:  Thank you, Your Honor.

So I will just very briefly mention that it goes without saying that the contemporaneous version that we're seeking is crucial.  Even if defendants agree to give us a copy of the link document, we need the right copy, right, the version as it existed when the e-mail was sent.  That's a critical point.

And defendants so far have only offered to produce the current version of these Google Docs, the version as of now after years of potential edit.  And courts that have confronted this exact issue agree that the, quote, modern and correct approach is to compel production of the contemporaneous versions of hyperlink documents where feasible.

So it boils down to feasibility, right.  And I hear defendants saying it's simply not feasible, and that's not true, Your Honor.  There is a well-established tool, that Forensic Email Collector, FEC, and defendants resist using it.  They call it nonstandard and untested, but the record tells a different story.

FEC is a purpose-built tool for collecting e-mails together with linked documents from cloud systems like Google Workspace.  It's been used by government agencies, including the Department of Justice, and in large enterprise cases.  In fact, Your Honor, plaintiffs' expert, Jerry Bui, has personally used FEC for enterprise-scale collections, even at Lighthouse.  And that's the same company where defendants' expert, Ms. Brown, currently works.

Defendants claim that no court has ever ordered the use of FEC, implying that our request is unprecedented.  But courts have ordered parties, as Your Honor observed, to produce the exact information that FEC is designed to collect.  Of course, courts aren't going to prescribe the tool, they're going to simply say, give them the -- give plaintiffs the contemporaneous version.  And in those instances, for example, in Uber, when ordered to do so, what did defendants turn to, they turned to FEC to produce those contemporaneous versions.

And we knew that's the version that Uber actually employed, because --

21

THE COURT: So let me -- so, again, let me stop you.

MR. DROSMAN: Sure.

THE COURT: Because I do want to hit this point, which is there seems to be a clear disagreement here. I'm hearing from the defense, that this -- that you cannot go back -- and using that example of August 1st -- you cannot go back and look at the -- the status of that hyperlink document on August 1. It's -- it's just not available, and you're telling me FEC will pull it out, if I'm hearing you. So how do I determine which one of you is factually correct?

MR. DROSMAN: Well, Your Honor, you have three declarations from three different experts. Only one of those experts, Mr. Bui, has actually performed collections using FEC. Mr. Polus admits that he has never done this before. He has no idea how it works. And that's, I think, perhaps, the source of this confusion. He doesn't understand that that's absolutely technologically feasible, that the API exists for the version of the document that exists -- that existed immediately before the e-mail was sent.

That's what Mr. Bui has collected in the past, and that's what he used when he was at Lighthouse and collecting for the DOJ. It's just absolutely not true that the version of the document that existed seconds before the e-mail was sent doesn't exist. That's not true, Your Honor.

You know --

THE COURT:  Okay.  I'll come back to him for that.

MR. DROSMAN:  -- what FEC actually does is it retrieves --

Sure.

THE COURT:  I -- so, yeah, that's the -- that's the issue here.  As I said before, if you can get that document from August 1, and the hyperlinks gives you the document that was sent on August 1, then that -- it appears to me that you should get that.

Now, there is a question about proportionality and costs, we'll talk about it at the end, but I'm in agreement with you.  And I guess I'll -- and I'll come back to the defense in just a minute as to why we shouldn't at least try that, if -- if -- because I don't know, and if I have to decide one way or the other as to -- I hear the defense saying, nope, you can't go back and get it, and I hear the plaintiff telling me, yes, you can go back and get it with FEC.  And maybe we do a smaller tranche of documents, and then you come back to me in a month or two and tell me if it actually worked and you're getting what you want.

And I heard the defense complaints about chain of custody, or whether it's actually the correct document, et cetera.  And that's an issue I'll let you sort out with Judge Liburdi if these are trial documents, you know.  For now we're talking about discovery, so that obviously can be more broad as

than what might be admissible.  But, you know --

So let me ask you.  Is there -- is there a way to pare this down so that it's -- we have a smaller section of -- so that I reduce the costs, get you your documents, and then I'd be happy to hear from you all if this actually worked or not.  Otherwise I'm just deciding on these affidavits.

So with that, Mr. Drosman, your response.

MR. DROSMAN:  Sure, Your Honor.  I think that's -- that's a fine idea.  I think that we should test this on, you know, a select few custodians.  We have no idea what the volume of link documents are, so this is obviously a narrow request.  We're only seeking these documents for hyperlink -- hyperlinked documents that are mentioned in a particular e-mail.  We don't know what that volume is.  I think if we take 5 or 10 custodians and try it on those custodians, we'll have some sense at least as to the volume and as to the technological issues.

THE COURT:  Okay.  With that, I'm going to cut you off somewhat, but like I said, I'm sympathetic to your point.

What else -- I can go back to the defense and hear their thoughts on that before I have you continue with the rest of your argument.  Maybe they'll agree.  Is there anything I need to address with you right now before I go back to Mr. Peters?

MR. DROSMAN:  I'm happy to -- to respond after the

defendants, Your Honor.

THE COURT:  Okay.  Mr. Peters, let me come back to you with that idea.  Here, as you heard, I don't -- I hear you telling me that, no, you can't get the August 1st version.  And I understand that, like it's a malleable document.  It's a cooperative effort.  It changes over time.  What -- FEC won't go back and pick out the document from August 1st.  And as I said before, we don't know what the version was when I actually, as a judge, read it on September 1.

With all of that aside, I could just decide this on the affidavits or the arguments, but it seems to me somewhat, in a case this large, it might be more practical to actually find out what they're polling with FEC, and we do a very small percentage of a poll, whether it's a date range or a few custodians, and then you all come back to me and -- with actual information in this case and tell me what happened.

Does that work or not?

MR. PETERS:  Thank you, Your Honor.  Mr. Peters.

I would say that that's largely what the Carvana defendants have been proposing since the beginning is that what makes most sense, which is what was done in Noom, among other -- at Noom, and also in the Meta Pixel Healthcare case, is that Carvana defendants produce the e-mails.  And for the e-mails that contain hyperlinks to Drive locations about which plaintiffs believe that the -- that they need a specific

version of the hyperlink document, that we would consider those on a document-by-document basis. It's imminently reasonable. It would be proportional to the needs of the case. And it, again, is the appropriate approach that the Meta Pixel Healthcare litigation, Northern District of California, and the Nichols v Noom.

I would like to quickly address some of the points that Mr. Drosman made, though. Again --

THE COURT: Well, let me -- hold on. Before you do that, let me ask you. Let me ask you. On your agreement here and what you proposed in the past when they send that request and you give them the -- the hyperlink documents they've requested, are you giving them multiple timestamps on -- on the hyperlink, from X date to X date, so you're going to have 20 different versions of this hyperlink document? Do you know? Or are they just getting one version of the hyperlink document?

MR. PETERS: Well, if it was a specific e-mail and it would avoid some of the complications from what we discussed before, what we would -- my understanding is our vendor would try -- if it's -- depending on the volume, what the vendor would try to do would be to use either the -- the permissions in the API or the FEC to collect just that one hyperlink for that one e-mail. And the volume there is such that it obviates the concerns, and obviously lessens the burden, so less risk of not being able to correctly identify the inaccurate versions,

26

and the duplication issues are lessened.

So that would be the approach that we were planning on taking, and we still have all the concerns about the technological fictions that these actually are.

THE COURT:  I get the fictions issue.  I'm leaving --

MR. PETERS:  But we're willing to set those aside is my point.  We're okay with that for discrete requests.

THE COURT:  Right.  Let me be more clear then.  From your example, if they make this request for the hyperlink documents from this e-mail chain that you described, are they going to get three versions -- or six versions?  Are they going to get an August 1, two of September 1, and three of October 1?  Is that what they're going to receive if it's a specific e-mail chain?

MR. PETERS:  No.  It would be that the -- the -- if they flagged an e-mail, and they said that -- say it's the August -- an August e-mail with the top level e-mail has a link document, we would pull that link document.

Now, if they wanted other link documents in the version -- or in that e-mail chain, we would look back, or try to look back at the prior date, if possible, because -- and, again, it's a dynamic date.  I'm assuming they would want to try to -- they would be focused, as they are in their motions, on the send date of the e-mail.  So we would give them the link document as of the date of that e-mail and only in the top

chain.  We'll be producing the other e-mails, so if they want those, we would be happy to try to produce those as well.

THE COURT:  So you're saying you're only giving them one hyper -- one Google Drive snapshot?

MR. PETERS:  Correct, per -- yeah, per --

THE COURT:  Hyperlink.

MR. PETERS:  -- e-mail.

THE COURT:  And from my example then, just for clarity, are they getting three snapshots -- because there are three e-mails here.  There's the original one from the clerk, there is one from me, and one back from the clerk.  Are they getting three snapshots, or are they only getting one snapshot in this example?

MR. PETERS:  If they requested them for all the three documents, and, again, we'd be producing, presumably, one copy of each, then they would get three copies total.

THE COURT:  And those three copies, would they represent the status of the Google Drive document on August 1st, September 1st, and October 1st?

MR. PETERS:  We -- we cannot know that for certain due to the limitations that I described before.  But we would -- but we would use our ability to try to find the version that they want, which is some version, you know, version that predates the e-mail when it was sent.

THE COURT:  Okay.

MR. PETERS:  So it wouldn't be necessarily the current version, but we do not know if it would be the actual content of what was sent, because that's technologically impossible.

THE COURT:  Fair enough.

Okay.  You wanted to respond some more.  Go ahead.

MR. DROSMAN:  Sure, Your Honor.  Why don't I just take this issue.

Oh, I'm sorry.  Were you speaking to --

THE COURT:  Mr. Peters -- I'm sorry, Mr. Peters, I had told you that I would let -- I cut you off.  You wanted to make a -- have a response.

Did you have anything else you wanted to respond to before I go back to Mr. Drosman?

MR. PETERS:  I would just, for the sake of Mr. Polus -- and there is other points, I'll leave them aside -- he has used FEC.  He used it in his -- as his declaration indicates, he used it in connection with this matter and tested it for an extensive amount of time, including talking to Metaspike and its founder about its capabilities and running tests to assess.

In fact, plaintiffs, I think, were perhaps a little frustrated with us, how long it took to test this, but that's because he did an extraordinary amount of testing to see exactly how this would work in purpose.  And like Mr. Bui, I -- my understanding is FEC can be used in certain circumstances,

but when it's used at any sort of scale, it's used for the current version, to collect the current versions of link documents, not in the manner for these versions that plaintiffs are seeking.

And that is why we are providing the current versions that we agreed to, and that's because, as, again, both parties acknowledge, in December 2023, so after the Shenwick case, after the IQVIA case, Google Vault changed its capabilities so it can automatically pull the current version. So that is why we're doing that, the current version, because that's an industry-standard approach using the native tool to Carvana's Google environment.

THE COURT: I think we all get that. The idea is it's a dynamic document. We want to look back and see the status of the document, you know, prior in time. So here's why I do think that the test process works. The plaintiffs can identify --

And I'll turn to you, Mr. Drosman, and say give me a small scale here we can test. But you -- we'll get the results from that. We can see if they are helpful or accurate.

And then, secondly, we can see how much time this actually took. Because while I'm sympathetic to you getting all the original hyperlink documents, I am mindful of the fact that if we're talking about thousands of documents, and this is very expensive, then you might have to come back and -- and

suggest a way that might be more affordable or proportional. But, you know, I think we can -- I'll have more information, specific information about this in this case if we do the small tranche of document process.

So, Mr. Drosman, I want to come back to you. I think you're in agreement with this generally. If you are, or not, let me know first, and then, secondly, give me an example of a small scale run we can do here and a time frame.

Go ahead.

MR. DROSMAN: Sure. So let me answer your second question second. And I just want to clarify, Your Honor, because I think that Mr. Peters may be speaking about something different than what Your Honor is contemplating.

I notice that he kept -- he referenced a prior offer and kept repeating the word if requested, if -- if plaintiffs ask for, if plaintiffs request. What -- what Mr. Peters previously said is we'll pull all the documents, you'll get the current version, and then you can go back and we can meet and confer, and we'll pull some -- some contemporaneous versions if you ask for them.

I don't think that's what Your Honor's talking about. That's certainly not what we're seeking. And I don't think it's an adequate remedy either. What we're asking for, and I think what Your Honor is talking about, is testing some smaller discrete number of custodians, and seeing, A, whether this is

technologically feasible, it is; and, B, what the burden is.

There won't be any request by plaintiffs.  Defendants will pull the contemporaneous version using FEC, or whatever other tool they choose to use, and provide those versions to plaintiffs.  I think that's what Your Honor is talking about, but I just want to make -- make sure.

THE COURT:  Let me think.  You know, they both have merit.  Though the idea here is just to get a small sample with the actual information.  Yours has the benefit of having a background, if I have to scale this up, to all of it, and -- rather than having you now go through a thousand e-mails and pick the e-mails you want the originals from.  So I am more inclined to have the custodian approach work, but it's going -- again, a small test run.  With that --

I'll come back to you, Mr. Peters.

Mr. Drosman, what else do you want to add?

MR. DROSMAN:  So, I -- I -- I think that a small test run is appropriate.  We can assess feasibility and burden after that small test run.

The problem with -- with sort of post hoc, you know, requests for hyperlink documents is there is really no way sort of -- we're sort of recreating the -- we're attempting to recreate what the e-mail might have looked like at the time that the e-mail was sent, or the hyperlink document might have looked like, and it's impossible for us to know.  Because a

hyperlink document, the current version might be completely different than the hyperlink document looked at the time that the e-mail was sent years before.  And so if we only have the current version, we're not necessarily --

THE COURT:  I get it.

MR. DROSMAN:  It's not necessarily clear to us what doc -- what version --

THE COURT:  I get it.  I get it.  I get it.  We've gone over this.  I get that.

MR. DROSMAN:  Okay.  Okay.  No, I'm just saying -- I'm just -- I'm just distinguishing between, you know, a situation where we ask for the documents after versus a test run now, which I think is appropriate.  I mean, look, we can take, you know, three custodians now and do a test run on them and see what it looks like.

THE COURT:  Correct.  And you'll see what type of information you get back.  And then you're going to -- there will be issues of admissibility.  And I don't have to deal with all of those right now, so -- or, you know, the time frame. Like I said in my example, when the reader actually -- what document did the reader actually review prior to replying?  So those -- I don't want to -- I don't need to get into all of that right now.

So let me go back to Mr. Peters.  For the reason I said that -- although I -- your idea is very simple, like just

find a specific e-mail and we'll run it down and do that specific e-mail.  The custodian approach gives us a better time frame, or a better scope of if I have to go from one custody to 12, then, you know, we have a better correlation there.  So why shouldn't I just have them pick one or two custodians?

MR. PETERS:  Because we can -- Your Honor, I believe we can assess the feasibility and burden using the document-by-document approach.  And it has the added benefit of -- that plaintiffs will receive documents that they actually are interested in.

For example, I believe that the, you know, the -- the decisions of what to pull would largely probably be based, I'm guessing, on the e-mails themselves.  So it would be -- it would be beneficial that way.

And also, as far as the scope, like, the cases that do have -- the limited cases, really largely Uber for this purpose, but others, it's much more of a discrete set than entire custodians.  We're talking, in Noom I believe it was like 200 documents.  In Uber for the non-live Google environment it was 200 documents.  In IQVIA I think it was around maybe 2,000.  And these were, again, after production for most of these cases where there were specific documents that the plaintiffs were interested in.  And the, you know, the burden was justified because of the substance of the e-mails themselves.  And that seems to be the right approach here as

well.

THE COURT: All right. Let me say this. If I go with your approach and it turns out that I'm convinced later on that these -- that the FEC is pulling out information that -- from Google Drive that is, you know, relevant, potentially admissible, proportional, then at that point I'll say we went with your approach, and now I'm likely to skew the other way and -- and not be as persuaded that if there is ambiguities about the cost or the proportionality, I'm losing some of that data with your approach.

So I'll more inclined toward plaintiffs saying, well, we do need this. And when we ramp this up, we won't have as much information as we would have had under their custodian approach, but too bad, we went with the defendants' approach of e-mail-by-e-mail, and, you know, they'll have a little bit -- they'll have my ear a little bit more on that proportionality question.

Are you hearing what I'm saying, which is we're keeping this more limited for you right now to see if it's feasible, but if it is feasible, then I'm probably going to be more sympathetic to the plaintiffs on a bigger run later on. That's the -- the advantage and disadvantage of your approach. So, as I said, I'm happy to take your approach and make them identify these, but if it works, plaintiffs are going to have my ear on proportionality.

Mr. Peters, your final comment.

MR. PETERS:  Yeah, I -- I appreciate that, Your Honor. Then I -- what if we did, you know, one or two custodians? Three seems like -- I do believe, again, based on the cases and the numbers we see, that -- that that should give a good proxy, you know, a sufficient -- like one or two custodians is a sufficient proxy to assess burden.

THE COURT:  Okay.

MR. PETERS:  If that's okay with you and plaintiffs.

THE COURT:  All right.  I think that -- Mr. Drosman, two custodians.  Agreement?

MR. DROSMAN:  Sure, as long as, Your Honor, we can choose the custodians, I take it that that wouldn't be a problem?

THE COURT:  Well, if they're all equal, then it's no problem.  If there is one main one who does 90 percent of the work, then it would be a problem.

Mr. Peters, do you know?

MR. PETERS:  I do not know which custodians have more of -- potentially more link documents, but I can try to find that out.

THE COURT:  All right.  I'll let you all work that out.

MR. PETERS:  I do agree that I don't -- I don't think it's an even distribution.

MR. DROSMAN:  Your Honor.

THE COURT:  I'll let you work it out.  You all can confer --

Go ahead.

MR. DROSMAN:  I was just going to say, the concern is if defendants are choosing the custodian, then they can, obviously, skew the results, right?

THE COURT:  Sure.

MR. DROSMAN:  They can choose custodians who have much more --

THE COURT:  I get it.

MR. DROSMAN:  -- hyperlink documents --

THE COURT:  I was just going to say --

MR. DROSMAN:  -- or maybe have deleted hyperlink documents.

THE COURT:  Let me tell you.  I'm going to let you confer.  You can pick the two that you want to use.  If the defendants say, no, that's 90 percent of what would actually be done here, then just call me and I'll have to rule.  But, basically, we're talking about a small subset here.  However you work that out, go ahead, pick the custodians you want. That's fine.  But, you know, if it's not -- if it ends up being a large subset, the custodians you pick, you need to pick other ones.

Fair enough?

MR. DROSMAN:  That sounds fine, Your Honor.

THE COURT:  Okay.  All right.  Anything --

MR. DROSMAN:  Thank you very much for your attention.

THE COURT:  And then finally we need a time frame on this.

So, Mr. Peters, do you have any sense of a time frame, or should I let you all just work this out with, you know, a normal parameter of maybe 90 days, 120 days, and then we get extensions if needed.

Do you have a sense of timeline?

MR. PETERS:  Without knowing the custodian, Your Honor, I would prefer, if possible, to have an opportunity to go back to our discovery vendor and alert them and make sure that they give me their information about how -- the time.  But we can certainly -- I think I heard you say 90 days, happy to try that, and if extensions are possible, but also happy to have that contact with my vendor and then circle back and discuss with plaintiff.

THE COURT:  Sure.  I'd like to give you all 120 days, that way that gives you more time.  If you need an extension, you can request one.

Mr. Drosman, any problem with that timeline?

MR. DROSMAN:  That's fine, Your Honor.

THE COURT:  Okay.  Just come back to the Court if you don't agree on an extension, or if you are extending it, please

notify the Court, I'll send out a subsequent order extending the deadline if you both stipulate, as long as it's reasonable. I don't want it to be a year, but as long as it's reasonable, I'll grant it.

With that, Mr. Peters, anything else to address on 177 today?

MR. PETERS:  I believe the -- and please let me know if we've already decided this one.  I believe there is a second part to the argument about whether attachments -- or, sorry, whether hyperlink documents are to be treated as attachments for purposes of the review.

THE COURT:  Help me understand why that's something I need to -- why that's an issue today?

MR. PETERS:  I don't believe it necessarily is an issue we need to address today.  I -- my only point was --

THE COURT:  Are you talking about the --

MR. PETERS:  Well, I can defer to the plaintiffs, but I can go through the cases and other things if that would be helpful.

THE COURT:  Are you talking about the relevance issue?

MR. PETERS:  Yeah, correct, it's the -- the issue about reviewing link documents and e-mails as family members.

THE COURT:  Well, I'm sure you're going to be reviewing these, I mean, you're just -- under this proposal you're just going to send them the information.  If there is

some reason not to do that, you could confer with them, but I don't see that there is going to be a relevance review here.

MR. PETERS:  Apologies, Your Honor.  Yes, this was -- this was in the joint dispute statement.  It was teed up just more as a general approach for discovery in this matter.  Plaintiffs would like us to review e-mails and linked documents as attachments for the reasons we've really -- many reasons we've already covered, as well as cases that we have to go into, don't believe that's appropriate.  But if we prefer to leave that for -- understandable.

THE COURT:  Yeah, I think we can defer that.  This is the test run, so I don't think that's going to be an issue.

You agree, Mr. Drosman?

MR. DROSMAN:  Yeah, I think -- Your Honor, I think that the process that defendants are referring to is they would somehow conduct an independent review of the attachments versus the e-mails for responsiveness, and then only respond -- only produce one or the other depending on responsiveness.  Obviously, that creates all sorts of evidentiary --

THE COURT:  That's not happening here.

MR. DROSMAN:  -- orphan e-mails --

What's that?

THE COURT:  That's not happening here.  This -- under this approach, you're getting --

MR. DROSMAN:  Okay.  Yeah, that's fine, Your Honor.

One -- one -- I just wanted to raise one issue that occurred to me after Your Honor asked me about the time frame.

The 120 days brings us, I think into December.  We've got a substantial completion deadline where the parties are supposed to be substantially complete producing documents as of, I think it's December 28th -- I'm sorry, December 8th.  And so I think we may be butting up against that deadline with the 120-day deadline for these two test custodians.  That doesn't mean that we can't extend that deadline, but clearly we're not going to have substantial completion by December 8th if we have -- if they have 120 days to complete it.

THE COURT:  Well, if the search is a bust, you might be substantially complete, but if it isn't, then Judge Liburdi will have to rule -- I assume this is his order -- but you'd have ample grounds.  You can confer with me first and then put that in a motion, or we can -- why don't we cross that bridge when we get to it.  But I appreciate you letting me know.  Maybe you all -- maybe we should put a hard deadline on this then of December 1, give us at least a week before a deadline expires, so you all don't run afoul of Judge Liburdi.

Mr. Peters, does that work?

MR. PETERS:  We still -- I believe so.  Again, I'd have to confer with the discovery vendor.  Would it be possible to bring a potential need to an extension to --

THE COURT:  Sure.  Of course.

MR. PETERS: -- to your attention based on what we -- we experience when we actually get going on this?

THE COURT: Absolutely.

MR. PETERS: Okay.

THE COURT: It just gives us a deadline that we all have to look at this so that I can get involved. And, obviously, if I'm involved and I think it's important in the case and needs to be extended, I can even put that in a report and recommendation, or you can attach -- you can put my position in a motion to Judge Liburdi. So it just makes sure we're ahead of him and not behind him.

MR. PETERS: Understood. I appreciate that. Thank you.

THE COURT: Okay. All right. I would like -- given that I'm going to finish here at 11:50, I want to move on to 178.

So as I mentioned before, I was inclined to have a start date for January 1, 2020. I thought -- as I mentioned before, that's a year before Ohio DMV, wasn't making a ruling. It was about a year before the Michigan Department of State began investigating. It seemed to me that it was reasonable that some of this information might be in the discovery in early 2020. So January 1, 2020, seemed like an appropriate start date for me.

And that left the end date somewhere between January 1

and April 1 of 2023. I saw there is an allegation of the last subsequent event of February 2023, but let's just start with the beginning, and then we'll go to the end.

So let me start with defendants, or you can put both of these together. What's your position on an end date and a start date?

MR. KARIYAWASAM: Your Honor, thank you. This is Kalana Kariyawasam speaking on behalf of Carvana defendants.

So, you know, I'll briefly address that being in the discovery period first. I'll note as an initial matter that the beginning of the period is only at issue for Carvana defendants and Defendant Garcia Senior, but not for the underwriter defendants who -- who separately agreed with plaintiffs on that, so...

We agree with Your Honor that January 1st, 2020, is an appropriate start date for the discovery period. This case has a class period of May 5th, 2020, to October 7th, 2022. All the dates that matter fall into that range. And the question is just how far outside of that is justified by the task at hand?

And since plaintiffs allege the scheme started in May 2020, we believe it's fair for them to conduct discovery into the few months before that to take a look at whatever preceded the so-called scheme. And we don't believe plaintiffs have provided any justification for going all the way back to 2019, and so we think January 2020 provides a healthy margin

for any potentially relevant discovery to come in.  So I'm not trying to -- discussing the back end of the discovery period.

So Carvana defendants believe that a period of three years, so from the beginning of 2020, all the way through the end of 2022, is more than reasonable in this case.  This case originally did extend into 2023 under plaintiffs' allegations.

Plaintiffs pointed to Carvana's February 2023 earnings disclosures in their complaint and in their motion to dismiss briefing where they argued that the earnings disclosures revealed the falsity of defendants' statements and the alleged scheme.  And, now, Judge Liburdi considered those contentions and he rejected them.  He held that there was no connection whatsoever between the February disclosures and the alleged scheme.

Instead, Judge Liburdi held that all the alleged misrepresentations were publically corrected by the time of a news report on October 7th, 2022.  So by that time full scheme has come out, according to Judge Liburdi, and so that's where the asserted class period ends, as plaintiffs recognize.

And we don't think that the discovery period needs to be cut off right on that date, Your Honor, but we've proposed an end date almost three months past that, which is more than adequate to cover any potential internal chatter that -- that looks back to the October 7th, 2022, news report, or the conduct that preceded it.

And we believe the discovery period ending at the end of 2022 is also consistent with the Reform Act.  I'd just like to emphasize that this is not a typical civil discovery case.  This is a securities class action subject to the Private Securities Litigation Reform Act.  And the Reform Act contains some unique features, like a stay of discovery while a motion to dismiss is pending.

Congress set up the Reform Act to restrict the abuse of the discovery process to coerce settlement, and it was designed so that discovery may proceed only on allegations for which a court has sustained the legal sufficiency.  And now we know Judge Liburdi has rejected the idea that the February 2023 disclosures related to the alleged scheme, so a discovery period ending in 2022 is consistent not only with the order, but also with the Reform Act.

And, now, plaintiffs aren't happy with Judge Liburdi's ruling, and through this motion we believe they're trying to get around his order to bring back in the February 2023 disclosures.  They want discovery into dismissed claims, but, again, that would contravene the order and the Reform Act, and it would also not be proportional discovery.

Based on our current collections, we're estimating that every month of additional discovery implicates review of no less than 40 to 50,000 documents, and that's based on, you know, our latest agreed-upon search terms and custodians which

we're in the process of expanding already.  Even a small burden would make this discovery disproportionate, given that plaintiffs haven't articulated a likely benefit, but here we're talking about a rather extreme burden.

And I'd just like to end by emphasizing that defendants are eager to establish the absence of any so-called scheme and to provide fulsome discovery for the periods of actual relevance.  And as we've told plaintiffs, we are very happy to revisit the discovery period in the future, should plaintiffs come across a factual justification to do so.  But right now the only basis for extending the period is the dismissed claims, which isn't reasonable or proportional, and so that's why we request the discovery period of January 1st, 2020, through December 31st, 2022.

THE COURT:  Okay.  Thank you.

Anyone else from the defense?

MS. WALKER:  This is Melanie Walker on behalf of Mr. Garcia Senior.  I would just note very quickly, when we were before Your Honor a few months ago, there was some dispute about the proper reading of Judge Liburdi's motion to dismiss order.

I just wanted to clarify that that is not the case with respect to this time period dispute.  I think all of the parties agree that the last -- the final corrective disclosure that was upheld was in October of 2022.  So I think on -- on

that score, the question is -- is simply how far after the last corrective disclosure is it appropriate to go, and not a dispute over the proper reading of the motion to dismiss decision.

THE COURT:  Okay.  Thank you.

MS. WALKER:  Thank you.

THE COURT:  Anyone else on the defense?

MR. FRIEDMAN:  Your Honor, just briefly.  David Friedman for the underwriter defendants.

As counsel for Carvana defendants noted, we -- we don't have a dispute as to our start date.  We've agreed with plaintiffs on a July 1st, 2021, start date, which is about nine months before the April 2022 offering that's the subject of plaintiffs' Securities Act claims against my clients.

In terms of the end date, our last proposal to plaintiffs was for an end date of October 31st, 2022, so that's over six months after the April 2022 offering.  Plaintiffs haven't identified any reason to go beyond that date, other than speculation that the underwriter defendants may have documents relevant to the negative causation defense on their Securities Act claims, but we're already, you know, way out beyond the offering in October and our last proposal.

Plaintiffs' April 1st, 2023, end date, which is what they're seeking in this motion, would be almost a year after the offering at issue, and it would require review of over

30,000 additional documents for just the custodians we've agreed with plaintiffs on. And as with the Carvana defendants, plaintiffs are asking us to add additional custodians, so that number would go up even higher.

So, you know, weighing the burden against the limited relevance of communications that are so far out after the April offering, we think the end date for the underwriter defendants should be October 31st, 2022, or at the latest, December 31st, 2022, to align with the other defendants.

THE COURT: Okay. Thank you very much.

MR. FRIEDMAN: Thank you, Your Honor.

THE COURT: Anyone else on the defense?

(No response.)

THE COURT: All right. With that, let me turn to plaintiffs.

MS. OLIVER: Good morning, Your Honor. This is Erika Oliver for the plaintiffs.

Briefly, on the start date for Garcia Senior's and the Carvana defendants' document production, we agree with your observations that the -- that those document productions should include the full year of 2020. We do think that there is a basis for going back a couple of months to start at November 1, 2019.

The last time we were before Your Honor, Garcia Senior and the Carvana defendants, you made clear that they are

entitled to CW discovery in order to test the veracity of the CW allegations. In fairness, we think that we should be able to get discovery relating to the same time periods that CWs provide information on.

And I'm thinking in particular, Your Honor, about CW 3, who in paragraphs 62 and 67 provide information about Carvana's alleged lowering of purchasing standards that occurred, according to CW 3, sometime in 2019. The lowering of purchasing standards was an unsustainable business practice that we allege is relevant to statements 19 and 20, and it's also artifice to other (indiscernible) claim.

So, Your Honor, we think that there is a basis to go back to November 1, 2019. Also note that that's six months of pre-class period discovery and is consistent with the cases that the parties cite, because the court in Forescout, the court in Stamps.com, and the court -- and defendants cited the Hatamian case, all provided at least one year of pre-class period discovery. So for those reasons, Your Honor, for Garcia Senior and the Carvana defendants, we're requesting November 1, 2019, but at the latest, January 1, 2020.

Now, on the back end for the relevant period, we're seeking discovery through April 1, 2023, for all of the defendants. And, you know, Your Honor last time stated you wanted us to kind of point out the differences between January 1 and April 1, 2023. And I think, you know, I heard

Carvana defendants talking about the February 23 -- 2023, disclosure, which we have alleged in the complaint at paragraph 398 as an event subsequent to the 2022 offering that gives rise to the plaintiffs' Security Act claims.

So I don't disagree that Judge Liburdi, with respect to loss causation and the Section 10(b) plan under the Exchange Act said that plaintiffs failed to believe that the representation -- that the corrective disclosure related back to the misrepresentation, but that's loss causation for the Exchange Act claim.

On negative causation for the Securities Act claim, while it also concerns what caused a stock rate decline, it's a different inquiry.  The party who bears the burden and what that party has to plead and prove in order to carry their burden are two different things.  And Judge Liburdi himself made that clear in his motion to dismiss order.

So, yes, he dismissed the October 2022 disclosure for purposes of the 10(b) claim, but he expressly rejected the Carvana defendants' and the underwriter defendants' bid to dismiss Securities Act claim for negative causation grounds. And you can find that, Your Honor, at page 68 and 69 of the motion to dismiss order.

There Judge Liburdi said that defendants improperly conflate plaintiffs' burden of pleading loss causation under Section 10(b) of the Exchange Act with the defendants' burden

of proving a negative causation defense under Section 11 of the Securities Act. For a defendant to establish negative causation at the pleading stage, he must demonstrate more than a plaintiff's failure to allege loss causation. Indeed, a defendant must show that the depreciation in value of the stock resulted from factors other than the alleged material misstatement. Defendants have not met that burden; therefore, the Court reserves this issue to be resolved at a later date. Defendants in their answers have asserted a negative causation defense. Under Rule 26, we're entitled to discovery on that defense, Your Honor.

And I think, you know, Mr. Kalana, he made a point about us seeking discovery on dismissed claims. That's not what we're doing here. We've pointed to a specific reason why the information concerning February 23 is relevant to claims that are still at issue here.

And if we look at the BofI court, which I think is the most factually similar case to the current situation, the Court there at star cite 7 recognized that, yes, in principle plaintiffs cannot base the discovery request on allegations that have already been determined not actionable or claims that have been determined to fail as a matter of law.

So the Court recognized that discovery on these topics can still be permitted if the topics are relevant to a claim or defense that has not been dismissed or struck. And that's the

case here, Your Honor.  And, again, I think it's the closest factually, because there the plaintiffs had pleaded a class period that ended in March of 2016, but the only corrective disclosure that was sufficiently pleaded occurred in October of 2015, yet the Court provided eight months of post-disclosure discovery, even though that period covered disclosures that were dismissed as insufficiently pleaded, because the plaintiffs there pointed to events during that time period that were relevant to the operative claims.

As a final point, Your Honor, you know, none of the parties dispute that title and registration violations are -- are part of this case.  You know, the complaint pleads throughout that certain state agencies had conducted investigations and whatnot into those violations, and those are also collected at paragraph -- paragraph 148.

And in paragraph 148 we cite to certain things that occurred in January of 2023, specifically, that Carvana entered a plea deal with Michigan and settlement agreement with Illinois concerning those state agencies' investigations into class period misconduct.

Carvana admitted to violating the law with respect to that plea deal and that settlement, and so information concerning the -- concerning the circumstances of that plea deal and that settlement are relevant both to falsity and scienter of the title and registration statements, such as

statements 1 and 8, and also artifice 4 of -- of the scheme.

THE COURT:  Let me ask you a question about the underwriters.  Tell me why they should be passed October 31st of 2022.

MS. OLIVER:  Your Honor, the underwriters are also alleged -- are also making a negative causation defense.  They argue that at the pleading stage.  They reiterated that in their complaint -- or, excuse me, in their answer.  And if they're going to say that they're entitled to relief from the Securities Act claim because they can establish that the damages -- that the depreciation in the market value of the security is related to non-fraud related factors, then we should be able to take discovery on -- on that defense.

THE COURT:  Okay.  Thank you.

All right.  Let me turn back to defense.  We have about five minutes.  Who wants to begin?

MR. KARIYAWASAM:  Thank you, Your Honor.  This is Kalana Kariyawasam on behalf of Carvana defendants.  I'm happy to respond to the points that Ms. Oliver just raised.

So on the front end when it comes to, you know, she pointed to, I believe, some confidential witness allegations that mentioned 2019, I believe she mentioned paragraph 62, you know, I'm looking at that right now.  There is a confidential witness who vaguely, apparently, asserted that Carvana lowered standards in 2019.  We don't know, you know, what date that is

within 2019.  And I'll emphasize that these are confidential witnesses that in the July 28th hearing Ms. Oliver committed that plaintiffs will not be relying upon in this case.

Ms. Oliver also referred to various other cases that provided C class discovery, you know, did perhaps a year back. We think that the cases that plaintiffs cite on that point actually create examples of what's required to justify that. You know, all of those are cases where the plaintiffs had pointed to concrete, specific examples of information that existed from well before the class period.

For example, in the Quincy case, which is the one that went that far back, the plaintiff had specifically pointed to very pertinent communications that the defendant likely received from about a year ahead of the class period, and the Court ordered a discovery period starting then.  And so we have nothing like that here, Your Honor.

And then I'll turn to the points Ms. Oliver raised about the end of the class period.  So when it comes to the subsequent -- what they've referred to as the subsequent event, the February disclosures, it's true that Judge Liburdi was performing his analysis of those disclosures in the context of loss causation, but his analysis still answered the questions that we're interested in here.

You know, we're -- we're, of course, not here arguing about pleading burdens or whether elements were sufficiently

pleaded. That is all behind us. And our question is do the February disclosures relate to the alleged scheme and the statements in this case? And that is the exact question that Judge Liburdi was analyzing.

If we look to page 55 of his order, you know, he framed it as a question of: Do these disclosures relate back to the misrepresentations?

And he said: No, they do not. And that is a question of relevance, which the question we're answering here, does not apply.

And then, I believe finally Ms. Oliver pointed to certain regulatory plea deals and issues in 2023. Those regulatory events simply have nothing to do with the alleged fraud in this case. As Judge Liburdi held, that was fully, by plaintiffs' own allegations, revealed to the public by October. You know, this case is not about every regulatory interaction that Carvana has ever had in -- either before and after the class period. It's about specific regulatory issues that allegedly went undisclosed. And plea deals and whatnot that plaintiffs are pointing to are not part of those regulatory issues, Your Honor. And so we believe that discovery into 2023 would only be permitting discovery into dismissed issues.

THE COURT: All right. Mr. Friedman, I have about a minute for you. Anything you want to add?

MR. FRIEDMAN: No, Your Honor. I agree with

everything and echo what was just said by Carvana counsel.

And the only thing I would add is that, you know, even as to the negative causation defense where we, again, agree that Judge Liburdi's motion to dismiss order, you know, identifies the sort of path on these disclosures as to both sets of claims, but in any event, it's never been made clear why the underwriter defendants, these third parties involved in the offering, would have any relevant documents for the negative causation defense.  And the crux of the claims against the underwriter defendants are really based on, you know, the work leading up to the offering and the diligence that was done on the offering.

THE COURT:  All right.  Thank you.

And, Ms. Walker, was there anything you want to add?

MS. WALKER:  Nothing further from me.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you all for calling in.  I'll take this second issue under advisement.  I want to go back and look at the Judge's order on a few of these points.  I'll issue my ruling on this question for 178, as well as our general agreement on 177.

Thank you for calling in.  We are adjourned.  Have a good afternoon.

(The proceedings were adjourned.)

*          *          *

C E R T I F I C A T E


        I, CHRISTINE M. COALY, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


        DATED at Phoenix, Arizona, this 12th day of August, 2025.



                              /s/ Christine M. Coaly_____
                              Christine M. Coaly, RMR, CRR


UNITED STATES DISTRICT COURT