# Exhibit B





# Important eDiscovery Case Law Decisions for November 2025

Presented by:

**Doug Austin, Editor, eDiscovery Today**
**Tom O'Connor, Director, GLTC**
**Hon. Andrew Peck (Ret.), Senior Counsel, DLA Piper**
**Mary Mack, CEO, EDRM**

# Presenters









Doug Austin
Editor
eDiscovery Today

Mary Mack
CEO and Chief Legal
Technologist
EDRM

Judge Andrew Peck
Senior Counsel
DLA Piper

Tom O'Connor
Director
Gulf Coast Legal
Technology Center



## Overview

Case Topics to Be Discussed

- Production of Contemporaneous Hyperlinked Files

- Compliance with an ESI Protocol

- Waiver of Privilege on Emails after Sale of Server

- Sanctions for Failing to Conduct a Reasonable Search for ESI

- Production of Databases in Native Format

- Discovery of Outtake Footage for the True Crime Program Dateline

- Questions

Cover image created Microsoft Designer, using the term "robot pilgrims sitting down outside for a Thanksgiving dinner".




## Disclaimer

Ideas expressed here are not necessarily those of our clients or partners and may simply represent ideas intended to be helpful in the context of this seminar.

Important eDiscovery Case Law Decisions for November 2025

4



# Sources of Cases to Be Discussed



## Minerva26

44,501 lifetime Federal and State case law opinions*

*As of 11/14/2025



 

# Production of Contemporaneous Hyperlinked Files

## United Ass'n Nat'l Pension Fund v. Carvana Co., No. CV-22-02126-PHX-MTL (D. Ariz. Aug. 21, 2025)

- In this case involving claims of fraud over Defendants' stock price, Plaintiffs requested a copy of Google Drive hyperlinked documents as they existed at the time when emails were sent. Defendants asserted that Google Drive documents are designed to be modified by users over time, so it was highly unlikely any technology (including Plaintiffs' program – Forensic Email Collector (FEC) – would find them as they existed at a certain point in time;

- As Arizona Magistrate Judge John Z. Boyle stated: *"Plaintiffs state that Defendants refuse to produce versions of hyperlinked documents contemporaneous to emails that were sent during the relevant period…Defendants only offer the current versions of those documents that may differ from what the parties to the emails saw at the time because of edits made over the course of the ensuing months and years…This inhibits Plaintiffs' ability to establish 'who knew what and when'"*;

- Referencing the Court's March 11, 2025, Order governing production, Judge Boyle noting *"the Order provides as follows"*, stated: *"The parties understand that hyperlinked documents will be collected and produced in this case. The parties shall use their reasonable best efforts to collect documents that are links in documents and communications, including, but not limited to, Google G Suite, Microsoft 365, etc. Where the automatic collection of the hyperlinked document is technologically feasible, reasonable, and not unduly burdensome, the hyperlinked document will be collected"*;

- Stating *"The parties make contrasting representations regarding the potential feasibility and utility of implementing the proposed FEC tool to collect versions of hyperlinked documents contemporaneous to the emails sent"*, Judge Boyle said: *"The Court recognizes that the collection of hyperlinked documents existing as they did at the time of the email presents challenges. The Court acknowledged the potential for these challenges in the ESI Order. While Defendants insist the process will be difficult and that whatever documents FEC collects may lack evidentiary value, the Court finds a 'diligent' and 'collaborative' solution in the spirit of the ESI Order requires a compromise. The Court will not excuse Defendants from any efforts to produce contemporaneous hyperlinked documents outright simply because they elected to use a suite of cloud-based web applications that would make that process difficult."* So, he ordered Plaintiff to select up to two custodians, with Defendants to *"produce responsive documents—i.e., the versions of any documents as closely contemporaneous to, but preceding, the email communication as is feasible—on or before December 1, 2025, absent further order of the Court."*



# Compliance with an ESI Protocol

## Apothio, LLC v. Youngblood, No. 1:20-cv-00522-JLT-CDB (E.D. Cal. Oct. 10, 2025)

- In this case, Plaintiff was reportedly unsuccessful in attempting over several months to obtain Defendants' consent to an ESI protocol. The Court ordered the parties to file either a jointly proposed protocol governing production of ESI or, if agreement could not be reached, their respective proposed protocols and/or a statement setting forth why such protocol is unwarranted. Plaintiff complied with the Court's order and filed its proposed protocol. Defendants did not comply, prompting the Court to issue an order to show cause why they should not be sanctioned for failure to comply with a court order. Following receipt of Defendants' respective responses to the show cause order, the Court entered Plaintiff's proposed ESI protocol;

- Subsequently, Plaintiff sought an order enforcing the following provision of the ESI protocol regarding provision of search terms and custodians used to identify responsive materials, as well as a corresponding hit report. During the discovery dispute conference, Defendants did not object to complying with the provision but requested the Court enforce the provision upon all parties and provide clarification concerning the phrase "hit report";

- California Magistrate Judge Christopher D. Baker stated: *"In resolving earlier discovery disputes among the parties, the Court has confirmed that 'parties appropriately may seek discovery on an adversary's discovery efforts,' including through production of information revealing search and collection methodology, search terms used, and sources searched"*;

- Continuing, he said: *"The Court will require both parties to comply with Paragraph 5 of the ESI protocol. Specifically, each party shall provide the others with search terms and custodians used to date to identify responsive materials within the producing party's ESI, as well as a corresponding hit report that shows how many documents, exclusive and inclusive of families, contain each search term or string."* He also added: *"The Court declines Defendants' invitation to further define terms such as 'hit report' and 'families' as a reasonably diligent search of this Court's and the Circuit's jurisprudence governing ESI reveals that the terms are commonly accepted"*;

- Also, the Court had directed Defendants to provide amended responses to certain of Plaintiff's requests for production of documents ("RFPs") in a prior order. Plaintiff asserts that Defendants' amended responses to its RFPs did not include a privilege log, which, it asserts, constitutes a waiver by Defendants of any entitlement it has to invoke the privilege. But Defendants represent that they did not reassert in their amended responses to Plaintiff's RFPs an objection on grounds of privilege and, hence, were not required to produce a privilege log. So, Judge Baker ordered Defendants to provide *"(a) a statement for each RFP response whether any responsive documents are withheld and the basis for the withholding (i.e., whether attorney-client or work product privileges), and (b) a privilege log"* for each RFP response where they claimed attorney-client or work product privileges.

 

# Waiver of Privilege on Emails after Sale of Server

## Jim Daws Trucking, LLC v. Daws, Inc., No. 4:24CV3177 (D. Neb. Sept. 23, 2025)

- In this case, as part of an Asset Purchase Agreement, the Daws, Inc. server was transferred to JDT. Plaintiffs contended that the APA transferred all data on the server to JDT, which meant the emails on this server are now their property. Jim Daws, claiming to be not "tech savvy," stated he "did not 'intend' to sell the data contained on the server," including business communications for his other companies and personal emails. Upon reviewing the server's data, Rick Fernandez (co-owner of JDT) claimed to have discovered emails between Jim Daws and his attorneys outlining a plan to "create a mass resignation of employees from JDT, receive additional value for what was already sold to JDT, and/or devalue JDT to the point where Jim could reacquire it for far less than he sold it";

- Considering Defendants motion for a protective order on the emails, Nebraska Magistrate Judge Michael D. Nelson stated: *"Nebraska law is unclear as to which party bears the burden of proving waiver or absence of waiver, and courts have reached differing conclusions on this point... In this case, regardless of which party has the burden to establish waiver, the Court finds the outcome is the same: the attorney-client privilege was waived"*;

- Continuing, he said: *"With respect to Jim's pre-sale e-mail communications on the server, Defendants do not address the voluntary disclosure of allegedly privileged e-mails through the sale of the server. Notably, after the APA, neither Jim nor his attorneys ever instructed JDT, Rick, or Ricky to delete any pre-sale communications...After the asset sale, JDT took possession of the server, which included all pre-sale communications...Jim claims he did not intend to sell the data on the server that belonged to his other companies or his other personal communications...However, through the asset sale, Jim voluntarily disclosed the communications contained on the server, thereby waiving the attorney client privilege... The Court finds that while the attorney-client privilege may have previously existed, Jim waived such privilege as to pre-sale communications when he sold the server on which those communications were contained"*;

- For emails sent by Jim Daws after he became a JDT employee, Judge Nelson conducted a four-factor test to determine whether he had a reasonable expectation of privacy, finding with respect to Company Policy on Email Use, Company's Right to Monitor, Third-Party Access and Employee Notification of Policy that Jim Daws *"did not have a reasonable expectation of privacy in his post-sale e-mail communications,"* and therefore the attorney-client privilege was waived;

- Defendants also claimed privilege over two emails sent by Jim Daws's attorney to his old jim@daws-trucking.com email address on October 1 and October 9, 2024, after his employment had ended. Judge Nelson stated: *"Defendants provided no evidence of reasonable steps taken to protect the e-mails from inadvertent disclosure, nor do they provide evidence of reasonable steps taken to rectify the error after learning of it. As such, the Court finds the inadvertent disclosure operated as a waiver of the privilege in these October 2024 e-mails."*

# Sanctions for Failing to Conduct a Reasonable Search for ESI

[Sound Around, Inc. v. Friedman, No. 24-CV-1986 (DLC) (KHP) (S.D.N.Y. Oct. 8, 2025)](#)

- In this case, the Friedman Defendants moved for reconsideration of the Court's order denying their motion to compel Sound Around to produce certain documents. The Court held a hearing on the motion, at which time the Friedman Defendants informed the Court that a Sound Around witness who was deposed in September 2025 had identified a database called the "Data Warehouse" containing information pertinent to their sales and calculation of their commissions. They contended that the testimony demonstrated that Sound Around had lied to or misled the Court about the existence of data and failed to produce information that was responsive to their document requests. Accordingly, they made an oral motion for production of data from that database so that they can compute their commissions, which they contended in their counterclaims were improperly computed;

- Sound Around argued that it didn't know about the database before September 30 and was not required to produce information from the database because it consists of "raw data" and would require it to create a document, which it contended is not required by the Federal Rules of Civil Procedure. It also argued that the Friedman Defendants should have identified the database and proposed search terms for it. In response, counsel for Executive Laundry interjected as an officer of the Court to say that Sound Around's counsel was misrepresenting the data systems. The Court, *"troubled by these developments"*, ordered Sound Around to provide a letter to the Court, explaining itself and the contents of the Data Warehouse, why it had not been identified earlier and why relevant data elements relevant to the computation of defendants' commissions could not be produced in the form of a spreadsheet or other format;

- New York Magistrate Judge Katherine H. Parker finding it *"inappropriate to raise new arguments in a motion for reconsideration that were not raised in the initial motion"* and no clear error, denied the Friedman Defendants motion for reconsideration. However, she said: *"Sound Around's counsel is absolutely wrong that it is/was not required to produce responsive information stored as data in systems over which it has custody and control. Federal Rule of Civil Procedure 34 has long required responding parties to conduct a reasonable search for documents and information relevant to the claims and defenses. Perhaps Sound Around's counsel has not read Rule 34 or case law interpreting it in the last twenty years or is simply unaware of their ethical duty under New York Rule of Professional Conduct 1.1 to stay up-to-date on technology relevant to their practice and requirements of applicable rules of Civil Procedure...The Advisory Committee Notes to Rule 34 from 2006...make clear that 'documents' includes ESI and state that it is 'improper to allow a party to evade discovery obligations on the basis that the label [of "document"] had not kept pace with changes in information technology'"*;

- In granting the Friedman Defendants' oral motion for production of data and ordering discovery sanctions in the form of attorneys' fees and costs, Judge Parker stated: *"In sum, Sound Around and its counsel: 1) failed to conduct a reasonable search for relevant repositories of information; 2) failed to produce relevant data concerning Defendants' commissions; 3) failed to comply with Rule 34's requirements by identifying relevant information that was being withheld on the basis of objections and by failing to produce responsive data; 4) misled defense counsel and the Court as to the reasonableness of their search and the existence of information relevant to the computation of defendants' commissions; and 5) failed to comply with Rule 26(g) that requires counsel to sign discovery responses attesting that they are complete and correct as of the time it is made."*

Important eDiscovery Case Law Decisions for November 2025                    9

# Production of Databases in Native Format

## In re Concho Res., Inc. Sec. Litig., No. 4:21-cv-2473 (S.D. Tex. Oct. 10, 2025)

- In this class action, the Class Representatives sought certain databases in their native format from Concho's main data system: the ARIES database. They contended the ARIES database is Concho's main database that contains information relevant to the wells and revenue streams during the established Class Period. Defendants noted that during the lengthy four-year litigation, they had already produced more than 207,000 documents (totaling more than 2.83 million pages). The Class Representatives responded that the produced documents were cut-and-paste Excel spreadsheets of disorganized ARIES output data that do not "tie-in" to the other Excel spreadsheets, leaving the data incomplete and difficult for their experts to analyze, describing the production as a "disorganized document dump";

- Texas District Judge Andrew S. Hanen stated: *"At the direction of the Federal Rules of Civil Procedure and the Fifth Circuit, the Court uses the six balancing factors to determine whether the Class is entitled to the requested ARIES databases"*:

  - **The issues at stake weigh in favor of broad discovery:** "'Given that a central purpose of these securities laws is to protect investors and would-be investors in the securities market against misrepresentations,' the issues at stake in this case are undoubtedly important to deter corporations from misleading the public."

  - **The amount in controversy weighs in favor of broad discovery:** "The Class Representatives have asserted that the total damages model is...over $2.3 billion."

  - **Concho has the exclusive access to the ARIES database:** "The requested databases are only available through the ARIES database, and Concho has full control and exclusive access to the information."

  - **Concho has the resources to produce the requested data**: "While Concho makes arguments related to the apparent burden of producing the requested data, their Response is silent regarding the availability of resources to do so."

  - **The requested discovery is important and relevant to the underlying claims:** "The requested ARIES databases are reasonably calculated to lead to the discovery of admissible evidence related to falsity... Regardless of whether the Individual Defendants only glanced at the Excel spreadsheets or were active in the ARIES database, the native format of the data that produced those Excel spreadsheets is still reasonably calculated to lead to the discovery of admissible evidence related to the scienter of Concho or the Individual Defendants."

  - **The burden of production does not outweigh the likely benefit of the requested data:** "Here, the Class Representatives have correctly pointed out the deficiencies of the current production, and they are entitled to access a workable version of the ARIES databases that were used by Concho employees to distribute the Excel spreadsheets... With the concession that the tie-in settings and archived databases do exist, the Court does not find the arguments about the burdensome process to produce the data convincing—especially in light of the factors that weigh in favor of broad discovery and the Advisory Committee's admonitions about the fairness of ESI discovery."

eDiscovery Today    E·D·R·M

# Discovery of Outtake Footage for the True Crime Program Dateline

## Williams v. NBC Universal Media LLC, No. 25-mc-00122 (LJL) (S.D.N.Y. Aug. 25, 2025)

- Eric Lyle Williams, an inmate on death row in Texas, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the U.S. District Court for the Northern District of Texas, raising thirteen claims related to various alleged due process and Brady violations, ineffective assistance from counsel, and more. In Claim Nine, Williams claimed "The State violated Williams's due process rights under Brady by failing to disclose material impeachment evidence pertaining to a key state penalty phase witness" (which was Williams's ex-wife and co-defendant, Kim Williams). Dateline broadcast two episodes related to the murders. The episodes were largely the same, except the latter episode featured an interview with Kim Williams in prison, where she made comments that differed from her testimony;

- After the Northern District of Texas granted Williams's request for discovery over the opposition of the State, Williams issued a subpoena to NBCU seeking "[a]ll footage of interviews recorded in the production of" the two Dateline episodes, "including those that were not included in the final episode, complete and unedited, and any existing transcripts of those interviews, including but not limited to interviews with" eventually 9 individuals who appeared on camera in the two aired episodes. NBCU objected, relying in part on the 'journalists' privilege. Citing *Gonzales v. Nat'l Broad. Co., New York* District Judge Lewis J. Liman affirmed the controlling standard for compelling non-confidential journalistic materials. The party seeking discovery must demonstrate that the materials are: **1)** Of likely relevance to a significant issue in the case, and **2)** Not reasonably obtainable from other available sources;

- Judge Limon concluded that the unaired portions of the Kimberly Williams interview were *"likely relevant"* to the *"significant issue"* of whether the state withheld impeachment evidence (Claim Nine). This conclusion was not based on speculation but on reasonable inferences drawn from the aired content itself: **1) Contradicted Testimony:** The aired interview contained direct contradictions of her sworn penalty-phase testimony, particularly regarding a "celebratory" steak cookout after the murders. She claimed on Dateline this was "taken out of context" and part of a pre-planned family Easter tradition, not a celebration; **2) Emotional State:** She testified at trial that the mood was "happy, joyous," but told Dateline that while Eric Williams was happy, she "was so sick" and "didn't eat that weekend" **3) Prosecutorial Coaching:** She stated that prosecutors "told me not to cry" on the stand; **4) Impaired Mental State:** She described her mind as "very cloudy" at the time of the events due to heavy drug use, stating, "I was pretty much a zombie.";

- In contrast, Judge Limon found Williams's arguments for the relevance of the other eight interviews to be *"the very definition of a 'fishing expedition.'"* Having established the likely relevance of only the Kimberly Williams *Dateline* outtakes, Judge Limon also determined that information was not reasonably obtainable elsewhere, as a deposition wouldn't be practical. And he flatly rejected NBCU's argument that producing the Dateline outtakes posed an undue burden. NBCU estimated a minimum of 30 hours of labor to review and produce the 12.4 hours of raw footage for all nine interviews. Judge Limon was *"not moved by a burden of thirty hours,"* let alone the smaller fraction needed for the single interview of Kimberly Williams. So, he granted movant's motion to compel compliance with the subpoena in relation to the Dateline outtakes of the Kimberly Williams interview, while denying the motion to compel for the other eight individuals.



# Questions/Comments/Contact

Doug Austin
[daustin@ediscoverytoday.com](mailto:daustin@ediscoverytoday.com)

Tom O'Connor
[toconnor@gulfltc.org](mailto:toconnor@gulfltc.org)

Hon. Andrew Peck (Ret.)
[andrew.peck@dlapiper.com](mailto:andrew.peck@dlapiper.com)

Mary Mack
[mary@edrm.net](mailto:mary@edrm.net)

Save the Date!!

Next EDRM Case Law Webinar:

**Thursday, December 18th @ 1pm ET**






