UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United Association National Pension Fund, et al., ) | |
| ) | 2:22-cv-02126-MTL |
| Plaintiffs, ) | |
| ) | Phoenix, Arizona |
| vs. ) | November 17, 2025 |
| ) | 2:03 p.m. |
| Carvana Company, et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

BEFORE:　THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE

TRANSCRIPT OF PROCEEDINGS

TELEPHONIC MOTION HEARING

Transcriptionist:
Elva Cruz-Lauer
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona　85003
(602) 322-7261

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

UNITED STATES DISTRICT COURT

2

A P P E A R A N C E S


For the Plaintiffs:

  Robbins Geller Rudman & Dowd LLP - San Diego, CA
  By:  SARAH FALLON, ESQ.
    TOR GRONBORG, ESQ.
  655 W. Broadway, Ste. 1900
  San Diego, CA  92101

For the Defendants Carvana, et al.:

  Latham & Watkins - Washington, DC
  By:  MATTHEW PETERS, ESQ.
  555 11th St. NW, Ste. 1000
  Washington, DC  20004-1304


For the Defendant Ernest Garcia, Sr.:

  DLA Piper LLP (US) Los Angeles, CA
  By:  EMMA CAITLIN PEPLOW, ESQ.
  North Tower
  2000 Avenue of the Stars, Ste. 400
  Los Angeles, CA  90067



For the Defendant Citigroup Global Markets, Incorporated, and J.P. Morgan Securities, LLC:

  Paul Weiss Rifkind Wharton & Garrison LLP
  By:  DAVID PHILLIP FRIEDMAN, ESQ.
  1285 Avenue of the Americas
  New York, NY  10019

P R O C E E D I N G S

THE CLERK:  Court is now in session.  The Honorable John Z. Boyle is now presiding.

This is civil case No. 22-2126, United Association National Pension Fund versus Carvana, before the Court for a telephonic motion hearing.

Will the parties please announce for the record, starting with the plaintiffs?

MS. FALLON:  Good afternoon, Your Honor.  This is Sarah Fallon from Robbins Geller Rudman & Dowd on behalf the plaintiffs, and I am joined by Tor Gronborg.

MR. GRONBORG:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. PETERS:  Good afternoon, Your Honor.  This is Matthew Peters of Latham & Watkins on behalf of the Carvana defendants.  That is Carvana Company, Ernest Garcia III, Mark Jenkins, Steven Palmer, Neha Parikh, Ira Platt, Mike Maroone, and Greg Sullivan.

THE COURT:  Good afternoon.

MS. PEPLOW:  Good afternoon, Your Honor.  Emma Peplow from DLA Piper on behalf of defendant Ernest Garcia II.

THE COURT:  Thank you.

MR. FRIEDMAN:  Good afternoon, Your Honor.  David Friedman from Paul Weiss on behalf of the underwriter defendants, Citigroup Global Markets, Inc. and JP Morgan

Securities, LLC.

THE COURT:  All right.  Thank you.  That's everybody.
Good afternoon.  I read through the discovery motion and the
attachments.

Let me just start with plaintiffs.  Ms. Fallon, I
guess since you announced perhaps you're leading, but either
way, the questions are this:  Why hasn't the prior court order
worked so far?  And how specifically would you suggest that we
fix it?

I see your request, but how do I draft an order that
would identify all people whose  -- requiring defendants to
identify all people whose files are likely to contain that
information?

So those are my two questions.  Let me turn to you.

MS. FALLON:  Sure.  Thank you, Your Honor.  And yes,
this is Sarah Fallon on behalf of plaintiff.

As far as why the prior order hasn't worked, I'm not
exactly sure.  We have made our position clear to defendants
that we are looking for individuals relevant to the entire
scope of the case, including all of the drivers of retail unit
sales and all aspects of the scheme beyond title and
registration.

And as you I am sure saw from our position statement,
since your order, defendants have identified one additional
person beyond the 28 which they previously identified for title

and registration.

As far as how to proceed, we think that a good example of what defendants could do to address the remainder of the case would be something similar to what they did in their response to Interrogatory 2 for title and registration.

They appropriately identified multiple different groups within Carvana and multiple different levels, and, you know, these are -- we're looking for managerial level and above, just to get both the breadth and depth of information within Carvana.

THE COURT:  But how -- so describe for me how that order would read?

Is it directed to unit retail sales?  If I am going to -- and I'm sympathetic with your point.  I would like to hear from everybody.  But we need to establish there's good cause to have the Court issue the order, and then it has to be an order that makes sense so that it can be enforceable and understandable.  So go ahead.

MS. FALLON:  Sure, Your Honor.  So, for example, categories of the case and drivers of retail unit sales that we do not think are represented by the individuals who have been identified thus far include people with day-to-day operational responsibilities surrounding, for example, Carvana's arrangements with DriveTime.

The company's lowering of its purchasing and

verification standards, which includes the surge in lower quality vehicles. The need to sell those vehicles wholesale at a loss resulting in logistical issues.

And then Carvana's nationwide expansion, including the deficient infrastructure. Its limited number of IRCs. The salesmen's markets being less profitable, and then Carvana's eventual purchase of ADESA to backfill their deficient infrastructure.

So plaintiffs have done a review of some of the documents that Carvana has provided and also publicly available information, and some groups that are not included include, for example, infrastructure development, inspection center development, logistics, reconditioning verification, wholesale.

And in our position statement, we requested that defendants identify individuals within 14 days of any such order, and then that is really just to identify -- you know, all individuals are not -- more fulsome group of individuals from where the parties would negotiate appropriate custodians, some whom we would collect information and discovery in order to get discovery on these other aspects of the case.

THE COURT: All right. I have -- let me see if there's anything you want to add before I turn to defendants.

Okay. Of course I will be coming back to you in a minute.

MS. FALLON: Oh, I'm sorry.

THE COURT: That's fine. I really should turn to defendants here. So let me -- Mr. Peters, are you starting? I don't know how you all are dividing up these responses?

MR. PETERS: Yes, yes, Your Honor. I will be speaking on behalf of the Carvana defendants.

THE COURT: Well, let me start with you.

MR. PETERS: And thank you again.

THE COURT: Sure. I read your response, and part of your response is, listen, they need to identify the custodians who would possess that uniquely relevant information, and I think the plaintiffs are saying, listen, we don't know who these people are so we don't even know how to start, which prompted my question of, how are we going to get a search term that are going to, you know, identify who these people would be?

Because I think, from reading your response, is that you've complied so far. You've handed over what you needed to, and you don't think that we should be expanding this request.

But with that, let me turn it over to you. Your response to all of this?

MR. PETERS: Thank you, Your Honor. As you noted, the ESI order does call for the parties to identify persons whose files are likely to contain documents and ESI relating to the subject matter of this litigation. And that -- it has worked precisely as it should, and we have -- Carvana defendants have

fully complied with the order.

We identified 15 custodians in March, and these were the people responsible for running the company and the individuals who report to them about the relevant subjects.

And we also then identified another custodian at plaintiffs' request in April.  And then after this Court's ruling on the scope of the case, we carefully reevaluated our existing custodians and potential additional custodians and concluded that our custodians were already largely the right folks.

They are the people who likely possess documents regarding the subject matters in this litigation and that covers all the theories of liabilities that plaintiffs allege.

And this is not particular surprise, given this is a securities case and our custodians already included the CEO, CFO, COO, and the directors.

And to be clear, the fact that our custodians were largely the right people doesn't mean that nothing changed from our perspective.  I think the scope -- the number and scope of documents that we had to review increased significantly, and our review universe is upwards to a million documents already, and we already, nevertheless -- nevertheless we still then added two more custodians and -- who reported to the leadership and contained insights into Carvana's sources of demand and growth, as well as the acquisition strategies, inventory, and

expansion, among other topics.

And some of these sources we have already produced 26,000 documents and over 175,000 pages of information.  And in plaintiffs' position statement, essentially ignored that discovery and asserted the desire for more custodians and provided two justifications that I can go into.

Now, plaintiffs' counsel today have identified some other areas based on the discovery records.  These are new.  They never came up before in a meet and confer.  They were never previewed to us, so this is entirely new information to the Carvana defendants.

And we can take it under advisement, but in their actual position statement and in the meet and confers, plaintiffs essentially only did two things, right?

First, mischaracterized the ESI order.  They say it requires Carvana to identify "all" persons whose files are likely to contain relevant information -- or information related to the subject matter in this litigation.  You know, that is not what the ESI order says.

And if it did say that, that would simply throw out Rule 26's proportionality requirements.  And then they vaguely allude to 18 custodians that are generally -- that they generally not have any involvement seemingly in the broader scheme around T&R, but also that they're supposedly not sufficiently low-level employees, which again has now been

clarified a little bit during this hearing, that it sounds like managerial level or above employees is what they're looking for.  That was also not articulated to us before this hearing today.

All right.  And regarding plaintiffs' assertion -- because these are important -- they're pretty astounding arguments that plaintiffs are making.  The assertion that the custodians don't have any evident involvement here in the broader fraudulent scheme.

These custodians are the very people that plaintiffs are accusing of having designed, planned, and executed the fraudulent scheme.  And then, as far as the assertion, I guess, that the custodians are not sufficiently low-level employees and not involved in day-to-day operations, this is, again, the opposite of what plaintiffs have already put forth.

As I said, this is a case -- a securities fraud case. It's about a handful of the highest-level employees who enacted -- planned and enacted a high-level scheme to defraud by intentionally and unsustainably expanding the markets that were unprofitable to boost Carvana's stock price, and other high-level strategies, and made false or misleading statements.

And these are the -- these custodians are those leaders, and the people who are informing them about all the relevant areas of the company, and these are the leaders that plaintiffs allege, for example, that ran Carvana from the top

down with an iron grip.  That's paragraph 285 of the complaint.

Plaintiffs also rely on the cooperation theory, saying that these individuals who are custodians were intimately involved with all of Carvana's operations and received the relevant data.

Now, after tens of thousands of pages being -- or documents being produced and hundreds of thousand of pages of discovery, right, all of a sudden these custodians, these leaders, and the folks who report to them, are somewhat distant and unengaged, I guess, is plaintiffs' argument.

And so -- according to plaintiffs, right?  So now we need more custodians, and they must be some lower-level, I guess managerial level or above.  But, you know, what we shouldn't forget here today, is that there were lower-level employees relevant in this allegation -- in this action, right, and those were the 12 low-level confidential witnesses that plaintiffs relied upon to survive the motion to dismiss.

And they have completely and expressly disavowed any and all reliance on those confidential witnesses, right?  And they have never explained why they did that, but it might be because, again, this is a securities fraud case, and as plaintiffs themselves have pled it, what matters is the knowledge and actions of certain key persons at Carvana.

And those persons, again, they are the custodians.  They are currently the custodians.  And these -- and

12

lower-level individuals, they just cannot provide the insight to company-wide information or knowledge of Carvana's leadership that is relevant in this litigation.

And plaintiffs, it's worth noting also, that they rely on a case, a single case, the *Envision* case.  It's an unpublished Middle District of Tennessee opinion from 2000, right?

And in that case, unlike plaintiffs here, the plaintiffs there identified additional custodians, and through the discovery that had been produced, had identified specific documents for those -- for needing those new custodians. That's what plaintiffs should do here.

And also noteworthy is, like the low-level -- quote, unquote "low-level" employees in that case are, essentially exactly comparable to our current custodians.  Again*, Envision* custodians, they were looking for an executive vice president and division leaders.  They were looking, for example, for the VP of accounting.

Like we -- the current custodian already, in this case, is the VP of accounting.  And we have the vice president of inventory.  The exact subjects that this case is about, and I believe that my colleague just said -- or identified as areas where they would need individuals.  But those topics are already covered.

And so -- especially like this -- in short, Your

Honor, like the plaintiffs -- they believe -- they have articulated so far that our custodian wasn't sufficient, that we haven't complied with the ESI order, that there's a scope of dispute still lingering.  It's just -- it's not correct, and nothing in the position paper, or articulated today, creates grounds for this requested relief, right, which to our knowledge is, no court has ordered before.

And before I pause, I would just note that we have said to plaintiffs and continue today, and will say, that if they are able to identify areas where they're missing relevant information, based on the discovery to date, then we're more than willing to meet and confer and to continue to talk to them.

THE COURT:  So let me ask you about one point you made.  You said, these lower-level individuals would not have information.  You have gone through all of the operational folks, you have listed them.

And I draw your attention to some letters that were sent back and forth between the parties.  They're in Document 202 at 6, and 202 at 7.  One is from Erica Oliver.  There's a response from, I think, you.

And there's some individuals -- so on page 3 of doc 202-6, this is Ms. Oliver's letter, she indicates and your subsequent letter confirms, individuals were named, Kevin Hogan, Jordan Firman, Dan Gill, Kristin Thwaites, Christina

14

Keiser, et cetera, were not added.  Your response was, listen, any of their emails would have been covered by the person or -- person supervised by them.

The reason I bring this up as one example is, this is an identifiable point where these individuals wouldn't necessarily have all of their emails captured from their superior.

For example -- just using an example, of course I have no idea if this is true, but let's say Kevin Hogan was given a direction by the vice president and it wasn't in the vice president's emails, but then Hogan turns around and says to his team, listen, I have been given direction from up above, we need to start relaxing our standards, et cetera.

This is the kind of like derogatory information you might get from your first tranche of 175,000 pages where the plaintiffs have said, listen, now we have seven or eight or ten people here that might actually have information.

And for them, that's an identifiable individual.  They have narrowed it.  I am sympathetic to the point of like I don't -- this has to do with T&R, driver unit sales and scheme plan.  It's not -- as I said before, the discovery is relatively broad, but it's not unending.

On the other hand, you know, I think I get the sense from the plaintiffs they feel like, listen, we're casting this wide net and we're just not getting any information; we are

only getting people at the top and we'd like to sort of investigate it in the middle.

So all of that is sort of a background of asking you, for these units, for these individuals, if you remember, why shouldn't the plaintiffs be allowed to identify seven or ten people and say, listen, these people we actually think have information, and then allow you not to disclose that?

What would your response be to that?

MR. PETERS: Your Honor, thank you. That's a very good question. And as an initial matter, the individuals that you stated, we -- we have offered them to be custodians, as a compromise to try to avoid this dispute and taking up your time. And plaintiffs refused, right?

So that -- they would have to answer why those individuals were not acceptable to them. But it is important to also remember that these are -- this is -- it's not about, you know, title and registration, for example, or an extended (indiscernible) it's about a scheme to defraud, which is based on T&R and other aspects.

And those are the directives and the instructions that would come from and be formulated and distributed and overseen at the highest level and by the custodians we believe -- through the custodians that we've identified already.

THE COURT: Okay. Let me -- I'm going to come back to all of you. Of course we have to drill down more. I do want

to see -- I'll start with -- from my list just going to go from top to bottom.

So Mr. Friedman, Ms. Peplow, Mr. Peters, let me turn to each one of you, see if you want to add on this or is Mr. -- I'm sorry, Mr. Peters. Mr. Friedman, Ms. Peplow, if you want to be heard on any of these points. Mr. Friedman?

MR. FRIEDMAN: No, Your Honor. Thank you.

THE COURT: Ms. Peplow.

MS. PEPLOW: Nothing from me, Your Honor. Thank you very much.

THE COURT: Okay. At the end, or if at any time you want to be heard, let me know; otherwise, I'll let Mr. Peters speak on behalf of the defendants.

All right. Ms. Fallon, let me come back to you. As you can tell, as I've said, I'm sympathetic to the point that you don't even know who to ask for because you think this search is unnecessarily narrow where you are just not getting what you need.

On the other hand, a request that they identify all people whose files are likely to contain information seems overly broad. So that's the big picture.

The medium picture is, you have a lot of documents, and it appears you have been able to say, from all those documents, these names that I just read that were in your letters are identified, the specific individuals who might have

additional information, and that typically meets the good cause standard you would have to meet here in this type of request.

So I'm not leaning towards this overly broad idea of -- that defendants have to identify all people, but I am interested in listening to how -- this is your second proposal. How do you meet and confer on search terms to come up with a more narrow discovery request that would be both proportional and likely to be successful in a case?  Ms. Fallon.

MS. FALLON:  Yes, thank you, Your Honor.  And if I could just respond first to the individuals that you point out from Ms. Oliver's letter and that which are the same ones that Mr. Peters identified previously, and then go into kind of how practically we go about this.

As far as those people, you know, Mr. Peters suggested that we, you know, didn't want those people or those weren't necessary, but that's not our position.  We -- those were additional people who were identified again, for title and registration purposes.

Four of those people were relied upon for the truth of the title and registration statements, and three of them are described as working on title and registration issues.

So while plaintiffs retain their position that each of those seven people should be included as custodians and have relevant information, that doesn't -- the reason that plaintiffs rejected that proposal is because defendants offered

it as a means of replacing the current motion.

And given that those people are exclusively related to title and registration issues, that doesn't dispose of the current issue, which is defendants' compliance with the ESI order.

And I understand Your Honor's concern that we are not about -- you know, potentially seeking to have all people identified, and that's not what we're looking for.

You know, we never envisioned Carvana needing to identify, for example, a salesperson at a location in San Diego. We are really looking for -- that was, you know, my reference to managerial and above, you know, people on a corporate level who, as you suggested, may have had conversations with defendants.

And just to touch on Mr. Peters' point that this is about the CEO and the CFO and their involvement in the scheme and their -- the statements that they've made, plaintiffs are not denying that. That is, the CEO and the CFO and the other named defendants kind of necessarily have relevant information, because their knowledge is directly at issue in this case.

But it's also about not just what defendants knew but what defendants didn't know, and defendants aren't the only ones with information relevant to their own knowledge, and these lower-level people will also have information relevant to falsity and be able to provide insight into falsity.

So we are seeking an order that defendants identify persons whose files are likely to contain documents relating to the subject matter of this litigation in line with Judge Liburdi's ESI order.

And in light of Your Honor's July order that the subject matter of this litigation goes beyond title and registration.  And I do think that defendants have demonstrated that they know what we're looking for here, because they've been able to do this for title and registration.

So we're looking for them to do this with the other aspects of the case.  Title and registration is one driver of unit retail sales and one aspect of the scheme, and so we would like similar information as to the other units.

THE COURT:  Let me ask you a question.  Why -- haven't you already done that through your interrogatory and search terms you've requested?  Why haven't you covered unit retail sales and scheme plan from what you've already requested?

MS. FALLON:  Defendants' responses to the interrogatories have been limited to title and registration. They identified -- they added one more person to their responses to the interrogatories since your July order.

And we have been negotiating search terms related to the broader aspects of the scheme and the other drivers of retail unit sales, but it's the custodians that we've agreed upon, which is kind of the second step in this initial, you

know, identifying a group of people with relevant information.

We would then narrow into custodians whose documents would then be searched. So if we are searching documents of people who work on title and registration, then we won't -- the search terms will not be nearly as effective as if we're searching people whose documents primarily deal with things like the inspection centers or, for example, we had someone who worked at ADESA after Carvana acquired it.

THE COURT: Mr. Peters has indicated that from his view, all the people at the top have all been included in this search, and the argument can be made, how is he supposed to then distinguish what the middle level is here?

Because I hear you saying, listen, the lower-level people at a branch in San Diego, we are not seeking that. He says he's already given you everything at the top. So we now have substantial middle ground.

How do you propose the defendants are supposed to identify who it is they think you are searching for? I'm trying to draft an order for you that makes some sense, and just saying, without any sort of context, "Identify the people in the middle who might have files likely to contain information," it seems broad to me.

I do prefer my orders be somewhat simple and clear. This is a complicated case, but that seems pretty broad for me, and I'm asking for your help to try to narrow that.

Your thoughts, Ms. Fallon.

MS. FALLON:  Sure, Your Honor.  I think one solution would be, you know, identifying the head of each relevant department, and then perhaps identifying two people that report to that person in that department.

THE COURT:  You know how many departments there are?

MS. FALLON:  Well, there are -- I don't know how many departments there are, but I've identified -- we've reviewed a group of directories that Carvana has provided, and we've identified a list of counties, so about ten -- a dozen cost centers, which I think are probably broader than departments, that would have people in them with relevant information.

THE COURT:  Okay, let me turn to Mr. Peters.  I'll come back to you.

So I think you can see where the Court is coming from, Mr. Peters.  I think you've appeared to have complied with the top level.  They are not seeking the bottom level.  They are seeking these people in the middle.

It's possible there's information, and I think there's good reason to believe there might be information from some of them relevant to the case and in the ESI order from Judge Liburdi and my order, but I don't want it to be overly expansive.  You've already compiled substantial discovery.

And what I'm hearing or thinking about is, it's just allowing the plaintiff, with all of the information they have,

22

which is considerable, and they have access to great deal of information in the case itself, to say, listen, here are six names that we think are potential custodians and then come through with search terms, and then they get their chance to search those, and then maybe we're done.

I'm trying to, you know, keep this limited but also, as I said, sympathetic to the idea of having at least a chance to double-check information from the middle that might reflect on information that wasn't captured from the top group.

Mr. Peters, your thoughts.

Ms. Fallon, are you there?

MS. FALLON:  We're here, yes.

THE COURT:  Okay.

MR. PETERS:  Apologies.  I -- can you hear me?

THE COURT:  Yes.  You might have been muted.

MR. PETERS:  Apologies, Your Honor.  Just -- I wanted to start by -- just to make sure there's no misunderstanding about the -- what I can call the "compromised" custodians.

It sounded like they were being described as essentially exclusively relevant to the T&R, which couldn't be further from the truth.

These include our -- Carvana's chief products officer, whose work includes vehicle offerings, processing, unit economics, customer demands.

It includes the executive vice president for strategy.

It includes the director for market operations whose responsibilities include delivery, pick-up of individuals that Carvana purchased and sold.

And the same is true for our current custodians. For example, we have Boyd, who's responsible for essentially inventory at Carvana. We also have Grantham, who's responsible for predicting and analyzing demand.

So these, again, are the individuals who we, in careful deliberations with our client, identified and believe that they fully cover the theories -- all the theories of liability of this case.

My colleague also, if I heard her correctly, said --

THE COURT: Let me interrupt. I do want you to make a record, which is why -- before I let you speak for a long time, because I think it's important that you get a chance to put this all on the record.

And I agree with you. From what I've seen from the search terms, and as you can tell, I've read through the letters. I went through the attachments. There's got to be maybe 100 pages here, I don't know.

So it does appear that this is certainly broader than T&R. I just want to let you know, I tend to agree with you.

But with that, go ahead.

MR. PETERS: Thank you. And my colleague also, she noted that it would be helpful to have an employee who is at --

employed at ADESA after the acquisition. That is confidential witness number 12.

That is someone who worked at ADESA. ADESA was acquired, and continued to work at ADESA when it was then owned by Carvana. And this is an employee, a confidential witness, whom plaintiffs have expressly disavowed.

So I don't understand why we -- they literally have these lower-level, mid-level employees. And this was -- confidential witness number 12 was a mid-level, if not upper mid-level employee at ADESA, yet has disregarded them and now are asking essentially for, candidly a pretty amorphous, just someone arbitrary, ask for just more people.

And when we've -- when our list and the individuals are reflecting of the careful consideration and informing from our client. And to be clear, throughout the meet-and-confer process, we asked for these names and none were ever given to us.

They've had all the discovery we've given and -- for example, it sounds like, again, plaintiffs' counsel referenced what I believe is known as -- we've produced all kinds of documents which lists every employee at Carvana, including their job titles, contact information, supervisor information, cost centers, as was noted, hiring dates, these are spreadsheets with tens of thousands of lines of information, if -- prior to this.

None of this was raised.  No specific names.  Nothing specific was ever articulated to us.

THE COURT:  Okay.  There is now, though --

MR. PETERS:  So we have, Your Honor.  We have -- we have proposed these middle folks and others, and then they have these other individuals, this confidential witness that -- specifically from July.

So that's -- the difficulty from our position is just that lack of -- lack of clarity and -- where they're sounding like they're asking for stuff that we've already given them or that they've already had and disregard it.

THE COURT:  Well, I can help you with the clarity then.  I am going to ask specific questions.  You have indicated that as a proposal to avoid this motion and herein you had agreed to a list of names that -- in your view that plaintiffs did not accept.

Would you be prepared still to give the -- to confer on a search for those 12 individuals, custodians -- or whatever the number of people is?

MR. PETERS:  Yes.  Yes, Your Honor, we would be, and it's seven individuals.

THE COURT:  And then the next is the final step, which is, if plaintiffs identify, and I'll say six, I'm sure they would like 12, you prefer zero, six additional custodians, and the standard under the Ninth Circuit is good cause.  That a

party attempting to compel additional custodians, or has the burden to demonstrate good cause for imposing additional requirements, especially where plaintiffs' demands would upset a prior court-approved process.

That's from the Ninth Circuit. That's a Facebook case. So the point I want to make is, if they can demonstrate for you from those six people that there's good cause, and that's a relatively low standard, that -- and if they really are strong in their belief there's good cause and you don't agree, you can get back on the phone and I'll hear from all of you within a day.

If they give you a list of six and then -- because they've gone through the records, they're like, listen, we think these people are going to have information in the case, and then you -- we just take -- we finish that off.

And I would say to plaintiffs then, you know, those six unlock some kind of new information here, that opens a new door that you all can't agree on, you can come back.

I don't want to open up discovery forever, but the goal here is to keep narrowing it. So that's my proposal here, and it may be my order.

But let me hear from you, finally, Mr. Peters, and then I'll turn to plaintiffs.

MR. PETERS: Thank you, Your Honor. We would certainly consider anything that plaintiffs raised based on the

discovery record, which I will -- which I would note, you know, is obviously still ongoing.

We just produced documents, I believe, most recently on Friday and expect to probably make another production this week.

But to clarify, so it would be -- they could consider based on -- or they could identify up to potentially six.  Of these six individuals, is that -- am I hearing you correctly, or is it something beyond?

THE COURT:  That's my current thought, without making a ruling, because I'd like to hear from both of you.  Yes, six.

MR. PETERS:  Okay.  Thank you.  But yes, we would consider those, as we always would under good faith.

THE COURT:  So Ms. Fallon, the reason I propose this, is, this allows you to pick.  You get the 12, or whatever the number was that you had -- that had been proposed before.  We can -- you can put those on the record today, if you want, just to make sure that they are set.

And then you get an additional six from -- which is grounded in the discovery of what you have that is potentially likely to lead to more information that is connected to the discovery.  It allows it to be relatively narrow.  It gives you the opportunity to get more information.

And if from that, you find that there's -- you believe there really should be another additional custodian or several

that you just had no way of knowing about before, then I'd be sympathetic with -- again, opening up that.

But as you can see, this gets marrowed, and it allows you to get that access to that middle-level information that you don't appear to have now.

So Ms. Fallon, I would like to hear your overall thoughts.

MS. FALLON:  Thank you, Your Honor.  And just to clarify, is your thought that it would be the -- the 12 I was referring to were the 12 cost centers, and my proposal to that would be to get each person who has each cost center and then each of their direct reports.

Is your proposal those 12 and an additional six?

THE COURT:  Let me ask you.  Yeah, why would you need the direct reports if you have those 12?  If -- this direct reports to me would be that second level of like, hey, of these 12 people, we now see one of them has a direct report that we think -- we need discovery on that.

And then that would be identifiable, narrowed.  So I am not -- yes to the 12, not to the direct reports, with the caveat that perhaps in the future, the direct reports, if there was information to believe that there was good cause to get to those, we could do that.

Go ahead.

MS. FALLON:  Thank you, Your Honor.  And just to be

clear, we're not moving to add all of these people as custodians, but to save -- to make this more efficient, we are asking that defendants at least identify who those people are, and then we can determine from that what an appropriate set of custodians is.

And at this point, we think it's premature to settle on any specific number of individuals. But just to help list out the cost centers that we've identified that would be useful to have people from, and that includes analytics, customer care support, customer experience, infrastructure development, inspection center development, logistics, market operations, product management, reconditioning, retail development, verification, wholesale.

And then we've also previously raised with defendants the need for additional people from accounting and finance.

So, for example, the direct reports to Steven Palmer, who is an individual that defendants have identified previously, and we are just asking that defendants just identify who those people are.

We are not asking at this time that all of those people become custodians and that defendants go and search all those people's files. We think that within a reasonable amount of time, say two weeks from the Court's order, we can agree upon a group from those that we could establish as custodians and actually have defendants search those individuals' files.

THE COURT: So -- okay. Without -- switched. Your request now is that you want defendants to give you the names of all of the people in all of those positions for Carvana during an appropriate time range, is that -- am I hearing you correctly?

MS. FALLON: Yes, Your Honor. At this point we're at -- like, at stage one, just asking for defendants to identify people, because we don't currently have the ability to identify individuals.

THE COURT: How many people would that be? Can you give me an idea of what kind of an organizational chart we're talking about here? Are we talking about 50, or are we talking about 5,000?

MS. FALLON: We don't know, Your Honor, that's kind of the issue.

THE COURT: Because the 5,000 makes this completely different. That makes it less mid-level and much more low-level. So again, and I'm not inclined to go as low as the plaintiffs are requesting.

So how do we narrow this? My question for you is in identifying six custodians, you took a step back and said, no, we don't even want to get to that step now, you just want to talk about names.

So I will take a step back with you, but if you don't know how many people it is, let me just quickly ask Mr. Peters.

Given that long list that she's just listed, do we have any sense how many people we're talking about?  Do you have any idea?

MR. PETERS:  Thank you, Your Honor.  I personally -- I do not, at this time.  But I would note that it does sound expansive -- incredibly expansive.

And again, they are asking for seemingly information that we've -- and this is all new information.  We've not received this request in any of the meet-and-confers, anything at all.

But they are seemingly asking for information, I think, that we've already produced.  We've produced to them a list of every single Carvana employee, including their call center, including their supervisors.

And so they have this information, so it's unclear to me what they're asking for and the scope.  And it does -- to be clear, it does give pause for concern -- or some pause, is that I think we're talking about, we have 18 custodians, and that's already over, you know, a million documents under review.  And it sounds like potentially doubling it or adding to it substantially will greatly increase the discovery costs, but also the time and the burden on the Carvana defendants.

THE COURT:  We've also added another delay, which is now you have to get information about all these folks in the organizational chart, disclose it from there, and then they

give you a list of how many.  And again, I could limit it to pick six.

So Ms. Fallon, I'm working with you here, but your proposal seems very broad.  And I know this information would be helpful for you, but tell me how to narrow it, because I'm not potentially making the defendants give you an organizational chart with 5,000 people in it.

MS. FALLON:  Yes, Your Honor.  The 12 groups that I identified are again, cost centers.  And it's evident that Ben Huston does run many of those, and our request that we just get information concerning who runs them, and then their direct reports.

It's not going to be the number of people that are in Carvana's directories, which are a significant number of people and why we haven't gone that way (audio distortion).  And the directories are -- you know, defendants haven't necessarily -- have not represented to us that everyone in those directories would have relevant information.

They have up to 50,000 employees, so we do think that, you know, narrowing it to 12 groups, and then from there getting their direct reports.  And I do think if we want to settle on a number, to give Your Honor some comfort that this is not going to be, you know, 5,000 people, we would be comfortable with your previous suggestion that we do the 12 plus six, if I understood you correctly earlier, and end up

with a proposal of 18 custodians.  I think we can agree upon that for now.

But we do -- plaintiffs would like to reserve our right to request additional custodians upon, you know, the production of defendants' documents and a review of those documents.

THE COURT:  Okay.  So let me drill down on the 12 call centers.  You're focusing on -- specifically you want defendants to identify who from those call centers?

MS. FALLON:  The individuals who oversaw the cost center, and then those who directly reported to them.

THE COURT:  Do you have any idea how many direct reports there were per supervisor?

MS. FALLON:  I don't, Your Honor.

THE COURT:  You just want the names; am I correct?

MS. FALLON:  Yes.

THE COURT:  Mr. Peters, the 12 call center names of supervisors seems fairly de minimis.  The names of people who have direct reports, I don't know if you know Carvana well enough to know if that's a larger number or a smaller number?

MR. PETERS:  Yeah, to be clear -- thank you, Your Honor.  And so we've been focusing on cost centers, and so that is a term used in these census documents, which again are directories listing all Carvana employees.

It is unclear to me whether those cost centers

actually match up their mark up to actual organizational structures are parts of Carvana, so since this is a threshold issue, I am not sure that the plaintiffs' framing of this would be correct or even helpful.

But -- and there I -- and beyond that, no, I do not know how many direct reports the head of -- essentially assuming there are, you know, an official head of a cost center would have.

But I do suspect that some of those folks are -- again, are current custodians and who we have, but -- and another point, just again to be candid about the timeline here, the plaintiffs served their request for production March 11th.

Our deadline for substantial completion is December 8th, and we have 18 custodians with over a million documents, and the plaintiffs request to, essentially as of now, at least double the custodians at this late stage asking for an unknown list of -- in terms of people of volume of cost center heads, assuming that is an organizational unit, and their direct reports is just -- it's really untethered to anything that we've had so far in discovery.

THE COURT:  Well, you make a good point, and you have had substantial discovery.  You know, in these disputes I really try and understand where you're both coming from and analyze, you know, what's proportional, what's fair and doesn't slow down the case.

35

And I'm trying to come to this middle ground that satisfies at least the idea from the Court and from plaintiffs that it's difficult for them to really have comprehensive discovery when it's a larger organization.

They're getting the information at the top level, but we all know that there could be mid-level information that's certainly discoverable, but to do that in a way that doesn't overly burden you.

And if you are now telling me that these numbers of adding the 12 and then six is expanding it, I'm hearing you; I just didn't hear that before when you said you were prepared to add these 12 as a beginning point, and then I talked about adding six, and you thought that might be workable.

And now I hear you saying, well, actually, we've done so much discovery we don't really think that this is tethered to the case.  So Mr. Peters, I want you to, given where I'm coming from, find me a middle ground that you believe you want to advocate for defendants that is tethered to the case that meets my concerns.

MR. PETERS:  Yes.  Thank you, Your Honor, and I apologize if I was un -- if I was confused on my end.  I felt before we were talking about the seven custodians that we had previously proposed to plaintiffs.

The chief products officer.  The executive vice president of strategy.  The director of market operations,

among others, including Kevin Hogan, the associate general counsel that you referenced from our prior correspondence.

And I do believe -- you know, again, we propose those as a compromise to avoid burdening the Court.  And though we do think that a compromised custodian is comprehensive, it's deliberate.  It is -- lots of thought has gone into it, and it's obviously resulted in a substantial amount of discovery.

We would be willing to  -- we would be willing to consider, in good faith, you know, those additional custodians that we provided for --

THE COURT:  So how many?

MR. PETERS:  -- or proposed before.

THE COURT:  So how many custodians are you proposing that you're increasing from, just to be clear?

MR. PETERS:  We currently have 18, and the proposed compromised custodians would be seven more, so it would be a total 25.

THE COURT:  Okay.  And the plaintiffs' request regarding identifying these individuals from the call center, do you -- I am a little bit in the dark how to best fashion an order on this.

You've said that they've been given this information already, but it doesn't sound too difficult to get some of this information.  But the direct reports is a -- I have no idea how many direct reports there are and neither do any of the

parties, so that just, in some ways, sounds like a fishing expedition.

So my inclination is to say that the supervisors, or whatever the title of the person that runs each one of those, is what you'll make sure is given to plaintiffs. So I will come back to you.

Ms. Fallon, that's the two questions for you now then. Plaintiffs suggesting that you get to pick your seven. They have given you 18 already. Tell me if you agree or disagree with that.

And secondly, that you be given the names of the individuals who are running these cost centers?

MS. FALLON: Sure, Your Honor. And just so I'm clear, this is now -- the seven is not the ones that defendants have previously identified and that we've requested but a separate seven individuals?

THE COURT: Their proposal is you will get to pick. You can add from the list you've already given them, pick the seven, or you can use four of those and three new ones. That's how I would order this. Being sympathetic to your being able to direct the discovery, that you get to select your seven.

And as I said before, if you think that unveils some brand-new area from one of them or two of them, for example, then I'd be glad to hear from you again, but narrowing these, as you can see, as we go along.

38

MS. FALLON:  Sure, Your Honor.  I think our position was that those seven do have relevant information and should be included, and then an additional six.

But if Your Honor believes the best way to move forward is to identify seven, you know, potentially those -- potentially some of those, an additional, or all additional people who have been identified, then we will endeavor to do that, reserving our rights to potentially identify additional people.

THE COURT:  That's how I look at this.

MS. FALLON:  And then --

THE COURT:  Yeah, since that's a lower number --

MS. FALLON:  Okay.

THE COURT:  Obviously you would like a larger number than seven.  Given that it's a lower number now, I would be sympathetic if you wanted to add one or two more later because something was uncovered, rather than making them do 14 now and just taking a shot in the dark.

I think it's just more efficient and cost-effective to sort of layer this.  So yes, seven.

Go ahead.

MS. FALLON:  Sure, Your Honor.  And if I may, I'd like to just clear up a couple of --

THE COURT:  Please.

MS. FALLON:  -- points.

We understand, you know, defendants have provided significant -- have provided documents, but we have reviewed a substantial number of those documents, and it has been limited to title and registration, which confirms our, you know, analysis previously that their original identification of individuals was extremely focused on title and registration folks.

And we have, you know, previously represented to defendants through postal letters, through the letter that you mentioned, and I believe there was another one in August, our position that those individuals were significantly related to title and registration and did not comply with Your Honor's order.

But "yes" for Your Honor's suggestion that we would be able to identify an additional seven people, and then receive the names of those who run the relevant cost centers. We would be amenable to that, if you believe that's the best way to move forward.

THE COURT: I think it is. I'm trying to balance all of this for all of you, and I don't need to go through all of that again, but I think it's the appropriate step.

And I'm not sure I agree with you that -- well, I don't have the -- about the T&R being the main disclosure, but I don't have it from them the way you do, and I am not being asked to rule on it, so I will leave it to the side.

But let me then turn back about a timeline.  Let me turn to you.  What kind of timeline do you propose?  You'll have to -- obviously they'll give you the information about the 12 supervisors.  You need to give them the list of seven names.

How long will it take you to give them that?

MS. FALLON:  We think two weeks is appropriate, Your Honor --

THE COURT:  Okay.

MS. FALLON:  -- from the issuance of the order.

THE COURT:  Sure.

Mr. Peters, how long after you get the request for compliance?

MR. PETERS:  Thank you, Your Honor.  With the danger that I don't want to speak out of turn because it's obviously very extended on my client, correct?  And with the Thanksgiving holiday coming up, I would feel more comfortable with three weeks to make sure we have time to understand the request and to --

THE COURT:  No problem.

MR. PETERS:  -- comply.

THE COURT:  No problem.  I'll give you -- yeah, they'll have two, and then you'll have three on top of that.  So no problem at all, and if you can't meet that deadline for some reason, if this is -- in the sense of this being too large or there's some problem, let the Court know, I am glad to give

41

you a short extension.

Like we all have obligations during the holidays, so -- I want the case to keep moving forward, but I am happy to work with you around holiday deadlines.

MR. PETERS:  Thank you, Your Honor.

THE COURT:  All right.  To be clear then, within two weeks plaintiffs will identify seven additional names for search and search terms, if I am correct, in the way that it has been done before.  And -- am I correct on that, Ms. Fallon?

MS. FALLON:  Yes, that's what I understood.  Your suggestion would be that the seven additional names would be added as custodians, and then their files would be searched.

THE COURT:  Okay.  And then in three weeks after the request -- actually, it will just be three weeks from today.  It will be a month and a day, so -- and it won't be in a holiday week.

You'll have plenty -- it might be a little longer than that, Mr. Peters' time to comply with that request and the supervisors of the 12 centers.  And then I will indicate in the order that -- if there is good cause to --

MR. PETERS:  Wait.

THE COURT:  Go ahead.

MR. PETERS:  I apologize to interrupt, Your Honor.  Just so I am clear on my end, so the substantial completion deadline is --

THE COURT:  December 8th?

MR. PETERS:  -- December 8th, as I mentioned, and we've been working for -- since March responding to those requests and collecting documents and -- for these custodians.

It will take us -- it will -- realistically it will take us months, at least, to produce documents in response to seven additional custodians.

And I thought that the request was they would identify seven potential custodians, we assess whether there was good cause and move forward from there.

THE COURT:  Oh, I see.

MR. PETERS:  But I don't want to accidentally set, quite frankly, impossible limitation -- or expected timeline on my client and me, so it will take a lot longer for that -- any production if we're, you know, not doubling but substantially increasing the number -- the volume of discovery and number of custodians in this matter.

THE COURT:  Sure.  So tell me what you would like. We'll move the substantial completion back.  What are you requesting?

MR. PETERS:  To understand, we would be adding seven additional custodians?

THE COURT:  That is the plan.  I'm assuming they can establish good cause of all of the individuals, so -- I mean, I could reserve the right for you to come back to the Court and

object that there's no cause for a name.  If you'd like that, I would be glad to include it, but this seems like --

MR. PETERS:  I would need to -- yeah, I apologize.  We would need to -- I mean, we would need to collect their data to see what the volume is, see the search term hits.  Like it's -- again -- and apologies, I wish I could give some sort of --

THE COURT:  It's okay.

MR. PETERS:  I just feel like whatever I say would be a wild guess at best.  All I do know is we've been working extremely hard for -- since March, spending millions of dollars, and we're still working to produce documents.

So it would be a substantial extension to fit this discovery period is what I would anticipate, but we would certainly do the -- find the -- search the hit reports and understand the volume and the burden and then can come back with an informed estimate, as far as the timeline.

THE COURT:  How about this?  I move it back 90 days.  You have -- I give you -- after they give you the seven names, you have three weeks, as you had suggested, to file an objection, if you wish, with the Court, and I will hear from you.

And if I don't hear from you, then I'll assume that you'll, you know, have to comply with the Court's order and go through the discovery.  And if you need more time after the 90 days, I will be glad to do that.

So it allows you a circuit breaker to come back to the Court if you think there's -- the person they list is going to give you 50 million documents and you object.  But it allows us to keep moving forward, and it at least gives us a scope of what you have to do, and now it makes some sense to the Court as well.  So I -- perhaps that would address your concerns?

MR. PETERS:  I do appreciate that.  That does -- I still do have concerns.  We would need to stand up a -- likely stand up another review team, for example, a contract reviewer, engage them in a privileged review.

I do feel like, for example, Your Honor, we have, I believe, over 70 contract reviewers right now going, so without knowing the volume, I am unsure whether even 90 days would be sufficient.

But if -- so just to -- but if you propose 90 days, we would take that, but I do just emphasize that I do appreciate your offer and will certainly try to get whatever we need to get done as promptly as possible.  We do appreciate your note that we would be able to come back and potentially request more time if that's needed.

THE COURT:  I will be glad to consider that.  I do want to give you a deadline of some kind so we know we're working forward.  But I believe -- as I said, I reviewed all of this and I'm sympathetic to both of your positions, so if you did need more time, I'd likely be willing to grant that.

And I'll give you that circuit breaker if there's something that we missed here today that just makes this completely unfair, or there's something that we've missed -- because I'm trying to craft an order that works as a compromise that neither one of you really likes but it works for the case.

So anything else you'd like to be heard on?

MR. PETERS:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Knowing neither one of you is getting what you want, the overall goal, which you'll see in my order, is to fashion a compromise that allows plaintiff to get some additional discovery they don't feel they're getting in any way, but not unduly the defendant.

Plaintiff has some cause to do so, and it allows for at least some proportion of discovery, as far as we know now, but allowing the defendants the opportunity to revisit this if there's something that's completely unfair, unworkable, it would be your duty to establish why that is.

Because as I said, it seems fair now, but you do have the circuit breaker and the ability to come back, and I'll have that hearing within a day or two if you all request.

Okay.  I will come back to either one of you to see if there's anything else to discuss today, Ms. Fallon?

MR. GRONBORG:  Actually, Your Honor, this is Tor Gronborg on behalf of plaintiffs.

THE COURT:  Sure, go ahead.

MR. GRONBORG:  Two somewhat housekeeping issues, if you don't mind?

THE COURT:  No, please.

MR. GRONBORG:  One, on the schedule, appreciating that you're going to extend the substantial completion deadline 90 days, that's likely to have an impact on other items in the schedule, you know, (indiscernible) time for us to complete depositions.

I'm wondering if you think the best way to address that is to look at your order and then have the parties assess then the entire schedule, and whether that would be something, to the extent we can agree or there's a dispute about it, would go to you or would it be more -- or would that end up falling under Rule 16?

THE COURT:  Judge Liburdi.

MR. GRONBORG:  It should go --

THE COURT:  Judge Liburdi likes to drive his cases. He's a very proactive judge.  He's involved in them.  He reads up.  He's -- if you obviously had cases with him, you can tell he's very knowledgeable and a proactive judge, so I definitely on my end need to confer with him as well.

I cannot run afoul of any of his orders, but something has to give.  So leave that to me.  I'll confer with Judge Liburdi.  Thank you for noting it.  He is responsible for his case management order, and I'll have to make sure that if for

some reason my proposal here doesn't work with Judge Liburdi, then we'll have to come back to you all, but great point.

Next.

MR. GRONBORG:  The second would be, I'd like to believe that the parties will all be able to work out the remainder of their discovery disputes, but it is likely that we'll have more of these letter briefings.

An issue that's come up, probably affected both sides, is just the moving party will have their position statement, and then there's been sort of a disconnect on when the responding party needs to provide the response.

Sometimes we've been able to work out schedules; other times we haven't.  And I know it's Judge Liburdi's procedure, but I am wondering if you have either had cases where you have just entered an order saying, you know, for example, that once a position statement is exchanged, the opposing party provides theirs within five business days?

If that is something plaintiffs wanted, it is something that we would do as a motion, so using this letter-writing process to try to get such an order in place, or if you have any just suggestions there so that that process can be streamlined and the parties are not sort of having disputes every time a discovery dispute arises, as to what the timing is for responsive statements.

THE COURT:  So to be clear, what has been referred

down to me are discovery disputes.  Everything else does need to go through Judge Liburdi.  Regarding those discovery disputes, as you've just asked, I prefer to be as informal as possible so that even emails with two paragraphs each and putting you on the phone is acceptable to me, and we can shore up those deadlines.

I am happy to work as quickly or as slowly as you need me.  As I said before, I can usually have a hearing within a couple of days if you want.  These cases take priority for me, and I will not stand in your way.

So -- I don't know if you were asking me specifically or if you want me to change it.  But if you all meet and confer and can get that information to me, you do that as quickly as you can, I will get to you as quickly as you want.

Does that answer your question?

MR. GRONBORG:  Yeah, it may in the sense to date we've been trying to very strictly adhere to Judge Liburdi's procedure on the joint letters and if I am steering you right, to the extent it is faster -- the procedure can go faster, it may be whether it's an email or a quick letter, one party or the other can simply notify you --

THE COURT:  Correct.

MR. GRONBORG:  -- of an issue.

THE COURT:  Correct.  You can do that --

MR. GRONBORG:  As opposed to going --

THE COURT:  -- as quickly as you want.

MR. GRONBORG:  What we've been doing, sort of this -- process?

THE COURT:  Yes, and you can do --

MR. GRONBORG:  That makes sense.  That's helpful.

MR. PETERS:  Your Honor, this is Matthew.  Sorry to chime in.

We do have concerns about a party being able to unilaterally raise a, quote, unquote, "dispute."

There have been lots of -- several instances in this case so far where plaintiffs have declared that there is a dispute where we, quite frankly, disagree, and it's unclear what the dispute is or the parameters of it, which can lead to unripe issues.

Also, we have client considerations, as far as our ability to discuss issues and potential compromises with them, and --

THE COURT:  Hold on.  Hold on.  Hold on.

MR. PETERS:  And I think the --

THE COURT:  Any order referring --

MR. PETERS:  -- Judge Liburdi's process for --

THE COURT:  Mr. Peters, any order requires you have to -- if there's a discovery dispute, you all have to meet and confer and see if you agree, and then if you don't -- whether

you do it by motion or by letter or by email, it's the same process, but you have to meet and confer.  No one is filing a -- you know, unilateral motions announcing a discovery dispute.

Go ahead.

MR. PETERS:  Apologies.  That was my concern.  So it sounds like it isn't a concern.  That someone -- a party would be able to unilaterally submit some sort of discovery dispute statement without the other party agreeing that there's actually a dispute.

THE COURT:  No.  I just heard Mr. Gronborg say, how formal does this have to be and what kind of deadlines?  My point was, after you meet and confer, however you want to submit it to me is fine, and I'll do it as quickly as you wish.

Mr. Gronborg, is that correct?

MR. GRONBORG:  Yeah, I think we understand under the Local Rule 7.2 what the requirement is.  I guess the only commentary I would make is in an effort to avoid delay, what we want to avoid is an issue being held hostage by somebody, you know, effectively saying, "We're still considering it."

And you have seen a little of it here, that we had issues that we thought were ripe, and then after we provided a position statement, defendants have said, "We still want to consider it."  We've already given them time, but there's some points at which, you know, fish or cut bait.

And what we didn't want was for the sort of -- you know, for an issue that should be resolved quickly to just be held hostage. But all of that said, obviously we understand the local rules. We have always complied and will comply.

And I imagine all of defendants' counsel are the same, will comply with them. It was just at what point does a party need to wait for a response to a position statement, or as you noted simply, you know, file it as a letter or an email to get things rolling.

And so we understand the local rules. And this is -- what you described seems like it can be a more efficient process, especially given, you know, we're already kind of upsetting the schedule that exists. So I think we've all got an interest in moving things along as quickly as possible.

THE COURT: Yes. Please try to work these out as much as possible so that you can resolve them, but I'm happy to get involved when needed.

All right. Next point?

MR. GRONBORG: Nothing more from plaintiffs.

THE COURT: Okay. Certainly, Mr. Peters, on the defense side, anything else to address today?

MR. PETERS: No, Your Honor. Thank you.

THE COURT: Okay. I think I've put a system in place that's relatively flexible and protects you all but moves things forward. I'll still have to meet with Judge Liburdi.

I will send out this order probably tomorrow, but let me turn to other defendants just to see if there's anything else to address today.

Mr. Friedman?  Ms. Peplow?  Anything else that you would like to talk about?

MR. FRIEDMAN:  Nothing on behalf of the underwriter defendants, Your Honor.  Thank you.

MS. PEPLOW:  Nothing on behalf of Defendant Garcia Senior, Your Honor.  Thank you very much.

THE COURT:  All right.  Thank you both for listening in.  With that I wish you all a good afternoon.

We are adjourned.  Thank you.

(Proceedings conclude at 3:21 p.m.)

C E R T I F I C A T E

I, ELVA CRUZ-LAUER, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 19th day of November, 2025.

s/Elva Cruz-Lauer
Elva Cruz-Lauer

UNITED STATES DISTRICT COURT