UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United Association National
Pension Fund, et al.,            )
                                 )        2:22-cv-02126-MTL
            Plaintiffs,          )
                                 )        Phoenix, Arizona
        vs.                      )      December 12, 2025
                                 )          9:35 a.m.
Carvana Company, et al.,         )
                                 )
            Defendants.          )
_____)

    BEFORE:   THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE


TRANSCRIPT OF PROCEEDINGS

TELEPHONIC HEARING


Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003
(602) 322-7261

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

2

A P P E A R A N C E S


For the Plaintiffs:

            Robbins Geller Rudman & Dowd LLP - San Diego, CA
            By:  DANIEL S. DROSMAN, ESQ.
                 TOR GRONBORG, ESQ.
            655 W. Broadway, Ste. 1900
            San Diego, CA  92101

For the Defendants Carvana, et al.:

            Latham & Watkins - Washington, DC
            By:  MATTHEW PETERS, ESQ.
            555 11th St. NW, Ste. 1000
            Washington, DC  20004-1304


For the Defendant Ernest Garcia, Sr.:

            DLA Piper LLP (US) Los Angeles, CA
            By:  EMMA CAITLIN PEPLOW, ESQ.
            North Tower
            2000 Avenue of the Stars, Ste. 400
            Los Angeles, CA  90067



For the Defendant Citigroup Global Markets, Incorporated, and
J.P. Morgan Securities LLC:

            Paul Weiss Rifkind Wharton & Garrison LLP
            By:  MICHAEL J. PISEM, ESQ.
            1285 Avenue of the Americas
            New York, NY  10019

P R O C E E D I N G S

THE CLERK:  Case number 22-2126, United Association National Pension Fund versus Carvana Company.

The Honorable John Z. Boyle is now presiding.

Will the parties please announce for the record, starting with plaintiffs.

MR. DROSMAN:  Good morning, Your Honor.  Daniel Drosman on behalf of plaintiffs, from the law firm of Robbins Geller Rudman & Dowd, and I am here with my colleague, Tor Gronborg.

MR. GRONBORG:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. PETERS:  Good morning, Your Honor.  This is Matthew Peters of Latham & Watkins, here on behalf of the Carvana defendants.

THE COURT:  Good morning.

MR. PISEM:  Good morning, Your Honor.  Michael Pisem of Paul Weiss on behalf of Citigroup Global Markets, Inc. and J.P. Morgan Securities LLC.

THE COURT:  Good morning.

MS. PEPLOW:  Good morning, Your Honor.  Emma Peplow from DLA Piper on behalf of defendant Ernest Garcia II.

THE COURT:  All right.  Good morning.  Thank you all for calling in.

Since you all are requesting transcripts, we now have

a court reporter who is assisting us, so just an additional reminder to identify yourself when you start speaking with the Court.  Thank you in advance.

All right.  Let me give a quick background of where I think we're at, and I'll start by talking with Mr. Peters and then Mr. Drosman, as they were the lead the last time.  And Ms. Peplow, Mr. Pisem, if you want to be heard as well, I will always give you the opportunity.

So as way of background, we are here based on these discovery requests regarding documents in the Google Drive. And as we know, these emails can have static attachments like PDF, which would be easy, typically, just to copy and disclose.

The hyperlink documents have been the issue.  In Google Drive those documents are modifiable over time, and the goal has always been to try and determine if you can obtain a contemporaneous version of the attachment to the date of the email so that you can prove who knew what and when.

There was the dispute in the expert affidavits about whether or not documents that were put into Google Vault could discern that type of information.

Plaintiffs wanted to use FEC, and in our last discussion, the agreement was that to determine if we could obtain contemporaneous versions, we would take two custodians who I believe have been identified as Brian Boyd and Josh Johnson and use FEC and determine if we could answer that

5

question of whether or not we could in fact obtain contemporaneous versions of the hyperlinked documents.

Now, my understanding is there's a dispute about the defendants reviewing what has been produced from FEC and making decisions on whether or not those should be disclosed.

I will be happy to hear from you, Mr. Peters, but that's how I read the paragraph summaries you've submitted to the Court.

So let me tell you where I ruled before, and I did want to get you on the phone rather than just ruling on the documents, because I have a few questions.

Because the goal was always to produce the contemporaneous documents, the idea was, we use FEC on these two tests, and that information would be disclosed to plaintiffs.

It seemed to me that was the only way that they would have a chance to determine if FEC was working, if this went through the defendants' screening process of whether something was responsive, how would the defendants ever have the opportunity to have full information on whether FEC was working and how.

Now, there is a legitimate point that you're using this and you might have so many versions that are just obtained by FEC that we don't really know what they relate to, and a concern as well that later on we might have to subsequently

have defendants reproduce these if they've determined which ones are contemporaneous.

So all of that is by way of background. And we come to the first question I will ask you, Mr. Peters, which is, is FEC working to produce contemporaneous documents?

If the answer is yes, who is making that decision?

If the answer is no, why shouldn't I at least give plaintiffs what you have and allow them to review them themselves?

So that's where I come out. If any of that is summarized incorrectly, let me know.

Mr. Peters, what would you like to add?

MR. PETERS: Thank you, Your Honor. This is Matt Peters. The FEC test was completed pursuant to your order, and we have produced the documents and shared the results with plaintiffs; however, that is -- the plaintiffs are still, I believe, digesting that information.

And this dispute today is about different, separate documents than what was obtained through FEC. What their -- what this dispute is about is about the non-contemporaneous versions of documents. These are hyperlinks that did not hit on any search terms and might be separated -- their content could be separated from the email by hours, months, and even years.

And these are -- as Your Honor just recognized, these

are really documents that plaintiffs previously indicated were not relevant.  That was the argument for using FEC, because a -- contemporaneous versions were the relevant documents in this case.

And as I mentioned, we have -- pursuant to the Court's order, done the FEC exercise, and it's -- ultimately the exercise for using FEC returns approximately -- FEC was able to capture approximately .4 percent of the hyperlinked documents contained in top-level emails that were modified within 24 hours of that email being sent and shook out to approximately over $400 per each of those hyperlinked documents, which is about 105 times more expensive than Carvana's average per document cost in this litigation.

So we believe that the FEC test demonstrated conclusively that the FEC should not be used to collect all hyperlinked documents for all custodians.  It would be unduly burdensome and not proportionate under Rule 26.

But again, plaintiffs are considering those results, and they ultimately agree with us, but until we have that determination, it's premature to move forward with -- to decide the issue here, which is about these non-contemporaneous versions that do not hit on search terms and who might have been modified at some unknown time by unknown people after the email was sent.

THE COURT:  Okay.  Let me ask you a few questions.

The first is, if I hear you correctly, FEC is obtaining contemporaneous versions of the hyperlinked document. So, for example, if an email was sent on August 1st, and a second email was responded to on September 1st, you're able to show me the -- or the plaintiffs, the hyperlinked document, as it existed on August 1 when the email went out, and the status of the hyperlinked document on September 1 where it was responded to; am I hearing that correctly?

MR. PETERS: Thank you, Your Honor. No. Not -- no, that's not correct.

Only -- FEC was able to collect only .4 percent of essentially those hyperlinked documents. The hyperlinked documents that are linked to in a top-level email within an email chain and were modified within 24 hours of that email actually being sent.

THE COURT: So what did it find for the --

MR. PETERS: And --

THE COURT: -- other 99 percent?

MR. PETERS: FEC failed to collect that. We -- for the two custodians, FEC tried -- we tried to -- we instructed FEC to collect approximately 113,000 emails containing hyperlinks.

It was only -- of that set of emails, it was only able to collect roughly 7,500 of them. So out of the gate, FEC could not collect about 93 percent of the emails collecting

hyperlinks.

And then of those emails containing hyperlinks, it was only -- we used -- we did not use search terms to collect those, so again, this is the entire universe of potential hyperlink documents.

FEC -- we've produced approximately 1230 hyperlink documents. And ultimately, only .4 percent of the produced hyperlink documents were -- .4 -- sorry -- percent of the hyperlinked documents produced, compared to what was attempted to be collected, only roughly .4 percent of them were top-level -- contained top-level emails modified within 24 hours.

THE COURT:  Are you using the version of FEC the plaintiffs requested?

MR. PETERS:  Yes.  Yes, Your Honor.  We were using the version of FEC that plaintiffs requested.

THE COURT:  I think you were going to add more.  Go ahead.

MR. PETERS:  No, Your Honor.  I apologize if I overspoke.

THE COURT:  I'm trying to be mindful of our court reporter, so thank you for your patience.

My next question is, for this .4 percent, it's revealing the status of the hyperlink document at the time it was sent.  In my example, August 1 was the send date.  But a

person might not click to the hyperlinked document for a week, and in that time, the document could be modified five different ways. So does this tell us anything about when the document was viewed by the reader?

MR. PETERS: No, Your Honor, it does not. It does not provide any information about when the document was viewed by the recipient, if ever.

THE COURT: Okay. As you know, I'll come back to you in a minute.

Let me turn to Mr. Drosman. So there appear to be two questions now. One is whether the FEC program is working at all to get you the information that you want; and number two, whether your request is to have as many versions, essentially, of the hyperlinked document as they can find.

I heard Mr. Peters to be suggesting that that's your request, that it's not just that you want the status of the hyperlinked document at the time the email was sent, you want all the versions of the document that can be disclosed?

I might have heard that incorrectly, but let me hear your view on that, Mr. Drosman.

MR. DROSMAN: Sure, Your Honor. So I think this is really sort of two distinct issues. First, we're still meeting and conferring on the FEC issue, the collection.

We've received the protocol and the statistics from defendants. We've provided that to our expert. Our expert has

analyzed those statistics and has serious questions about the reliability and accuracy of them.  And so we've reached out to defendants in an effort to meet and confer regarding them.

And it certainly is not an issue that's ripe, as to whether the FEC collection was successful or unsuccessful. We're just -- we're -- like I said, we're very much in the early stages of determining whether this protocol they used and the statistics they've provided are even accurate.

But I think this issue is distinct from that one.  The way I view this, Your Honor, is they are conflating two distinct concepts; versioning, which is which draft of the document do we get, current versus historical, and the relationship, which is, is the document linked to the email? Okay.

So defendants are using whipsawing logic to avoid producing either.  In August, they told you that collecting historical versions via FEC was -- and I'm quoting them -- a "technological fiction."

They said it was impossible.  They insisted on producing current versions via Google Vault as the, quote, "industry standard."

Now, in November, they argue in their letter at least, here it appears that they may be backtracking from that, that those current versions would be duplicative or, quote, "a waste of time," because they might eventually produce historical

versions via the FEC test.

Your Honor, they cannot use the impossibility of historical versions to justify collecting current versions, and then use the, quote, "possibility" of historical versions, to refuse linking the current versions.

The logic results in plaintiffs receiving no linked documents.

We're not asking for them to re-collect data.  They admit they've already collected the emails and the Drive documents via Google Vault.  They are reviewing them right now.

All we're asking for, Your Honor, is that the Court enter an order compelling them to produce the entire family unit if either the email or the hyperlinked document is responsive.

And let me explain why that's really, really important in this case.  They -- defendants argue that they should only produce the hyperlinked document if it's independently responsive, and it violates the fundamental concept of context.

Consider two scenarios that are likely happening right now in defendants' review.  The first one I call the numbers track.  That's where the attached spreadsheet shows, for example, we're increasingly -- the email says, "The attached spreadsheet shows we're increasingly kicking cars from retail to wholesale," okay.  That contains one or more key words, and defendants then deem it responsive.

13

The link, the hyperlink, is entitled "Q3 report xlsx," okay, and it contains only numbers, no key words.  And defendants deem this document, quote, nonresponsive.

And the result is, defendants withhold the spreadsheet.  We get an email discussing numbers we cannot see, okay.  The second track is called -- this is the attached track.  And that's an email that says, quote, "see attached." No key words there, Your Honor.  That's deemed nonresponsive.

The link is called "Report on regulatory evasion dot PDF."  They deem that response.  So defendants withhold the email.  We get a report with no sender, no recipient, and no date.  Okay.

In securities fraud cases, where establishing who knew what and when, this is paramount.  Severing the link destroys that evidence.

This why the Court's March and August orders say, quote, "If any part of the communication or its attachment is responsive, the entire communication and attachment will be produced, except any attachments that must be withheld or redacted on the basis of privilege."

And Your Honor, this really is déjà vu all over again. Because you'll recall that at the August 11th hearing, defense counsel, Mr. Peters, tried to argue for this exact independent review.

He wanted to review links and emails separately.  And

I objected.  I warned the Court this would create orphan emails.  Your Honor interrupted me.  You didn't just disagree with defendants, you shut it down.  You said, quote, "That's not happening here."

There was no ambiguity then; there's no ambiguity now, zero.  Defendants argued that because the August 21 order set up a test run for versions, it somehow suspended the rule against orphans, and that's just a misreading of the order, Your Honor.

And defendants also point to a different quote from the same August hearing to claim that you, quote, "deferred" the entire issue.  They cite your statement, "Yeah, I think we can defer that.  This is the test run."

And that deferral was a reference to the results of the test run and whether the FEC should be used on all custodians.

In fact, immediately before Your Honor made that statement, you stated, quote, "I don't see that there is going to be a relevance review here."  Okay.

That's on page 39 of the hearing transcript.

So, Your Honor, what I'd say is, defendants have used -- really tried to whipsaw us into, you know, and conflate this issue of versioning versus relationship.  There should be no dispute that whether the document is a current document or whether it is a historical document, a contemporaneous

document, we get both the hyperlink document and the email.

And let me just say one more thing, Your Honor. Defendants contest.  They say, oh this will -- this will confuse the record.  They say, "It will create a false record," that's their quote, "to provide us with the historical version" -- "the current versions."

And they say, because the document may have been edited -- you heard this today -- in intervening years, they claim that presenting them as a family misleads the fact finder into believing the, for example, 2025 content is what the 2021 recipient saw.

And defendants are wrong for three independent reasons.  First, there's the best available evidence doctrine. If the defendants fail to preserve a static snapshot of the document in 2021, the 2025 version is the only evidence of the document's content.

We never said that document was irrelevant.  We said we'd rather have the contemporaneous version.

Producing the best available evidence is not creating a false record.  It's complying with their discovery duties.

Number two, the defendants' alternative, producing the email without the attachment, creates a truly false record.  It presents a communication as complete, when it is not.

An email stating, quote, "review the attached fraud strategy," produced without the strategy, is misleading.  It

heightens the subject matter.

And finally, Your Honor, the fact that a document is a, quote, "current version" goes to its weight and admissibility, not its discoverability. The defendants can mark the document as quote, "current version," in the metadata.

Fact finders are capable of understanding that a live document may have evolved. They cannot, however, evaluate a document they never see because it was withheld during the independent review.

THE COURT: So my question for you is, you are requesting, and this is what I've ordered, but I want to be clear before I turn to Mr. Peters, that if there's a responsive email, you get whatever hyperlinked versions FEC uncovers for that hyperlink for that email; is that accurate?

MR. DROSMAN: Yes, but not complete.

THE COURT: Okay. Go ahead.

MR. DROSMAN: We're also requesting -- we're also requesting that, to the extent that they're reviewing current versions, those that they've received through Google Vault and received -- and either the hyperlink document is responsive, or the email is responsive, we get both.

THE COURT: So if there's an email from August 1 and an email from September 1, and you're getting, say, six versions of those, or three versions of those, and let's say that's from 2020, that's subset one. That's the historical.

If I hear you correctly, you're saying there's -- if there's a 2025 version of that document now in existence, are you also asking for the current version?

MR. DROSMAN:  So I think there's a bit of a misunderstanding.

THE COURT:  Go ahead.  Thank you.

MR. DROSMAN:  What defendants have said all along is, they'll provide us with the current versions.  Those are the ones that are available.

And then they layered on top of that, but we're really going to provide you with the email and attachment if both are independently responsive.  They have never said, we'll provide you with multiple versions, including historical versions.

Then they ran this FEC test to determine whether they could provide us with the point in time or contemporaneous version.  And they've provided what we believe to be misleading statistics on that issue.

But in any event, they've never said that they're going to provide us more than one current -- I'm sorry, historical version, point-in-time version, contemporaneous version.

So I don't think the dispute is about multiple versions, it's about what -- what we're just asking is, whether they're producing the point-in-time document or the current document, produce the entire family set.

THE COURT:  Correct.  But -- and I am listening to you, but I'm trying to make sure I understand.

The historical, for August 1 and September 1, could have the version of the hyperlink attachment on August 1 and September 1 -- let's assume the system works.  And it might have other versions in the middle, I don't know.  But let's assume they can get you the versions from August 1 and September 1, that is what I hear you saying is historical, and you certainly want those, correct?

MR. DROSMAN:  That's correct, Your Honor.  We're not asking for the versions in between, but, yes.

THE COURT:  Okay.  Now, tell me what also you're getting when you say you want the current version?

MR. DROSMAN:  Sure.  So what defendants said, when we had this hearing back in August, is, hey, look, we're collecting right now hyperlink documents, but the only documents that we're collecting are the current version.

And we -- one of -- there were two issues.  One, is, Your Honor, they should at least try to run FEC and see whether they can collect the historical versions; and two, to the extent they are collecting current versions, we should receive the entire family set.  And it was that number two, the latter point, where Your Honor interrupted me and said, "Absolutely, they're not going to independently review the documents there."

So they have the current versions.  They possess them.

We're just asking that they produce them as a family group. That's all.

THE COURT: So that was my original question. If you get the versions of the hyperlinked attachments from 2020, and now there's a current version from 2025, are you asking for that current version?

MR. DROSMAN: The current version -- if they're able to produce a contemporaneous version, then the current -- we don't need the current version. But what they're using, Your Honor, is the possibility that they might somehow be able to produce a current version -- or a historical version as an excuse not to produce -- provide us with any of the current versions. And you've heard them today say, well, we got .4 percent, we really can't produce -- this FEC thing really doesn't work. So they are not even going to provide us with current versions, at the end of the day. They are going to find some loophole or excuse.

THE COURT: The reason I ask --

MR. DROSMAN: And then -- I'm sorry -- they're not going to provide us with historical versions, and then we're left with no version at all.

THE COURT: Yes. That's the universe that's unacceptable to the Court. The goal has always been to determine who knew what and when, which is why we wanted contemporaneous versions, which is why we went down the FEC

road, and whether that's going to be successful or not is not determined yet.

But you are, it appears to me now, asking for not just who knew what and when at the time, but potentially the family of what versions this document might have looked like all the way up until the current version of, let's say it still exists in 2025.  When there might be a cut-off of 2023 that nothing is relevant anymore regarding these emails.

We've just never had a time frame as yet discussed as to when the current version doesn't have a bearing on the lawsuit.  And if you disagree with that --

MR. DROSMAN:  Right.  I --

THE COURT:  -- I will hear from you.  Go ahead.

MR. DROSMAN:  No, no.  I think I -- as I understand, Your Honor, if plaintiffs are provided with historical contemporaneous versions, they don't need current versions.

If they can't -- if defendants can't produce historical contemporaneous versions, then we do need current versions, and we agree with that 100 percent, Your Honor.

I think that what's happening right now today, for documents other than the two cache custodians, is defendants are actively stripping context from those productions today.

You know, if we wait, we'll receive thousands of orphan emails that we can't decipher.  We'll then have to litigate a massive reproduction motion months from now.  And

our point is, it's more efficient to order them to maintain the family link now for those current versions, and we shouldn't receive broken versions in the interim as this FEC issue is discussed and decided.  That's the point.

THE COURT:  Okay, thank you.  Anything else you want to add before I turn to the defense?

MR. DROSMAN:  No, Your Honor.

THE COURT:  Okay.  First, Mr. Pisem, would you like to say anything or you want Mr. Peters to take the lead?

MR. PISEM:  The underwriter defendants have nothing at issue here.  Thank you, Your Honor.

THE COURT:  All right.  Then I'll leave you out for the remainder.

Ms. Peplow, anything you'd want to add or are you in the same position as Mr. Pisem?

MS. PEPLOW:  Yes.  The same position as Mr. Pisem.  Thank you, Your Honor.

THE COURT:  All right.  Thank you both for listening in.

So Mr. Peters, whether or not FEC is working yet, I think even you acknowledge to the Court, this is premature, and I agree with that.

But there is this issue of what is actually getting disclosed for whatever you're recovering.  And I have always had the view that if the email is responsive, then the

plaintiffs get the hyperlink attachment, however you have -- however you have it.

If you're able to determine through FEC that you have the historical accurate email, they get it.  If you're not able to determine that, then you should disclose what you pull out and send that to them, and then they can argue and you could argue whether or not this is working.

But there's just no universe where I think it's acceptable that you have versions of a hyperlink document and you get to determine that the plaintiffs get nothing.

So that's my concern.  I'd like to hear from you.

MR. PETERS:  Thank you.  This is Matt Peters.  And to be clear, there is no family link to maintain here.  The hyperlink documents and emails are maintained separately when they're created, as a matter of technology.  It's true, as far as collection for review and production.  So it is -- there is no technological link between these materials to maintain.

What is being asked here, it sounds like, is to create a connection between them.  And that is what has been -- that's what the cases have recognized.  That's what an -- that there is no connection, therefore these are not traditional attachments.

That's what *StubHub* concluded, *In re Insulin*, and most recently, in the Northern District of California, the *UAB versus Meta Platforms*.

In that case it was a very similar situation to ours, where the court concluded that hyperlink documents are not the same as attachments.  That the effort required to produce them is substantially different, and therefore, Meta did not have to produce nonresponsive hyperlink documents referenced in produced emails.

And here, we have -- we are talking about hyperlink documents that are not responsive to any search terms, and/or have been reviewed and deemed not responsive.

And if plaintiffs have the situations that they've asked about where there might be, I believe it was the orphan scenario, we have repeatedly told them, if there is any such -- anything like that and they would like for us to -- if they want us to -- to request the document, we are willing to listen to them and would consider it.

But the fiction here, it's kind of -- Mr. Drosman is assuming that there is essentially family relationship that is already preexisting, and that is just not true, and that's what's recognized universally across the relevant case law.

THE COURT:  One distinguishing factor is this is a test run, so we are using this to determine what works and what doesn't.  But the second question is, give me an example then of an email that's responsive, but you look at the hyperlink attachment through FEC and you determine that the hyperlink attachment is not responsive.  Give me examples of that.

MR. PETERS:  To be clear, Your Honor, this is not -- I think the universe we're talking about now is not the FEC test run, this is outside of it.  These are the -- the current versions of hyperlink documents do not hit on any search terms.

THE COURT:  Okay --

MR. PETERS:  There is a separate universe and a smaller universe at that.

THE COURT:  Thank you.  So let's use my question for the larger universe.  Again, give me an example of responsive email where you determine that the hyperlink attachment is not responsive and should not be disclosed.

MR. PETERS:  Yes, Your Honor.  So we ran our search terms -- our company has the search terms -- against emails, and then separately in Google Drive, which is where hyperlink documents reside, but not just hyperlink documents, there's -- it's just a document repository that is used.

We then ran our search terms against all documents that were associated with a custodian, and also any folders in Google Drive that had been identified as likely containing potentially relevant information.

We then reviewed those for the emails and the Google Drive documents for responsiveness, and again, they are not associated in any way at that time.  There's no family relationship.  And then we produced the responsive -- what is responsive and not privileged from that review.

THE COURT:  Well, it sounds to me like there's this area of potential orphans where your secondary search of the Google Drive might not contain the search terms, but nonetheless someone attached that hyperlink to the original email and thought that document had relevance and wanted the reader to see it.

So isn't the best way to require you to disclose whatever version of the hyperlink attachment you can get for each email?  Because I start with the presumption that the sender of the email put the hyperlink there for a reason and you're just not discovering it through your search terms.

Your response?

MR. PETERS:  The -- with the current versions of it, there is no way to know whether -- at the time of sent, what was in that linked document.  It would be -- it could be completely blank.  It could be otherwise.

And it's also drawing in -- for example, when we use FEC, some of the examples were that there was -- one of the hyperlink documents that was attached to an email was just a floor plan, an office floor plan.

So those are the types of hyperlink documents that were being responded to or attached when we included them as family members.

THE COURT:  Here's where I'm coming down on this, Mr. Peters, and I'll hear your final word.

My thought is that since this is a test run, that if you're unable to establish that you have the historical version of the hyperlink attachment at the time through FEC or something else, that instead of the system you are using now for this test run, you do in fact disclose whatever version of the hyperlink attachment exists now, and you send it to plaintiff.

Now, that could be overbroad, and I would be happy to hear from you about cost, even for the subset of this test of the two custodians.

But I definitely see a universe where we're leaving out discoverable information because your search of the Google Drive -- I'm sorry, the Google Vault, just isn't coming up with whatever hyperlink document was sent and deemed important by the sender.

So there's two questions there. One, anything else you want to hear, that's how I'm trending now, and if you have nothing else to add on that point, let's get to number two, for these small subsets of these two custodians, is there an expense issue here?

Go ahead.

MR. PETERS: Thank you, Your Honor. For the test run of FEC, we did what plaintiffs have asked. We did not use search terms for the collection of emails or these hyperlink documents. We treated them as family members.

So we did precisely the process that I believe plaintiffs were requesting, and those were the process that resulted, for example, in the production of hyperlink documents that were office floor plans.

And those -- again, that result of that test was that it came out where for even potentially, for top level emails with a hyperlink document that had been modified within 24 hours was over 100 times more expensive than it ordinarily was. But for the test run, we treated the documents as family members.

THE COURT:  But that was for FEC?

MR. PETERS:  Correct.  That is for the test run.  And I understood your question being about the test run.

For contemporaneous documents, I would be happy to go -- to clarify our process, which was the -- that was what I described as when we searched Google Drive and used search terms against Google Drive documents.

THE COURT:  Thank you.  So there are now subsets here. We have the two custodians that we are using FEC to run, and then as I hear you and Mr. Drosman, we have the larger 25 custodians where we -- you search Google Vault, and you're not disclosing as much as the plaintiff wants, which again my point was that you need to be disclosing something regarding those.

So am I correct in hearing you that the broader issue is that we're really talking about the 25 custodians and

hyperlink versions for those emails?

MR. PETERS:  Yes, correct.  We're talking about the larger universe of the 25 custodians, and the -- sorry, the current version of hyperlink documents.

THE COURT:  First, I want to thank you both for your patience.  I want to make sure I understand you both.  So thank you.

All right.  Then let me ask this question about your ability to disclose whatever version of the hyperlink attachment exists.  Do we wait for you all to determine if this FEC process is going to work at all before we tackle the larger issue of the remaining 23 custodians?  That's now how I read your email response, so that you don't have duplication issues.

Is that how you prefer to go forward on the issue of the overall searching?

MR. PETERS:  That's exactly right, Your Honor.

THE COURT:  Okay.

MR. PETERS:  We believe that the decision needs to be first made about which versions we are -- will be produced, the contemporaneous old versions versus the new versions, and then address the approach for the remaining custodians.

THE COURT:  Second, how expensive is it for you to disclose the current version of any hyperlink document for the -- for all the custodians, leaving aside relevance and other issues, but just to give a copy of the current version of

the hyperlink attachment for all these emails?  Is this easily accomplished or very expensive?

MR. PETERS:  It would be very expensive and cumbersome in part because of the -- that there is no natural association technologically, between those materials, among other reasons.

THE COURT:  Sure.  And these cases in some districts have allowed the plaintiff to pick 200, trying to weigh the costs and proportionality, and we're not there yet, but I'm just looking down the road as to how we're going to weigh this out so that it's not too expensive.

We are not there right now, but I am mindful of the cost, but I want to make sure plaintiffs have access to what they are entitled to.

So with that, I will go back to you, Mr. Drosman.

So as you heard from me, I am inclined to make sure that you get some version of whatever the hyperlink attachment is, and certainly if FEC works and you can get what you want for the historical versions at the time these emails were sent, then you should get those.

And if you can't get those, you should get the -- whatever they have.  But maybe we can't make a decision on disclosing for all 23 custodians right now until we decide whether or not, through your experts and your conferring with them, this FEC process works, so then we don't have a duplication of all these efforts and I don't have to make a

decision right now on the cost.

So let me hear your final thoughts.

MR. DROSMAN:  Sure, Your Honor.  I would -- I would say that that reading is incorrect, respectfully, Your Honor.

THE COURT:  Go ahead.

MR. DROSMAN:  Defendants say that if they treat -- and I'll explain why.

Defendants say that if they treat current Vault versions as families now and later you ordered these contemporaneous versions, they'll have to review and produce the same documents twice, creating duplicative work, right, that's the issue.

And that argument collapses under defendants' own admissions, because back at the August hearing, Mr. Peters told the Court that Carvana had run search terms in Vault, collected roughly 850,000 emails, and Drive documents, and that Vault, quote, automatically collects the document as it exists at the time, right, these are the current versions, for hyperlink Drive files.

He called that an industry standard, that's a quote, work flow, and confirmed they are, quote, providing the current versions on that basis.

And in fact, Your Honor, not surprisingly, we've seen some hyperlink documents attached.  I have an overlay right now that I'm looking at, some hyperlink documents attached to the

current versions, apparently where they found both were responsive, okay.

Now, in their November 20th letter, they confirm that for months they've been reviewing and producing those current versions.  So there's no extra review to avoid.  It is already happening.

The only extra step is linking the already reviewed documents to their emails and exporting them as families.  That's not an undue burden.  That is basic eDiscovery, Your Honor.  The burden has already been incurred.

To decide that a hyperlink document is nonresponsive, they have to look at it.  And by the way, Your Honor, this cost issue is perplexing, because although the documents may be stored in different sites, in other words, the hyperlink document may not be stored in the email database, you get the hyperlink document by clicking on the hyperlink, okay.

So -- and moreover, whether the document is blank, I doubt it, but whether it's blank or whether it's floor plans, who cares?  Produce it.  We want the entire family, okay.

This is ridiculous.  The defendants are playing games, and I just want to make sure that we don't have any more games played in another round of motions.

Because Your Honor made very clear that if the email is responsive, that we get the linked document.  I want to make sure that defendants understand that if the linked document is

responsive, we get the email as well.

THE COURT:  As I mentioned, I appreciate your patience in explaining this, and I listen to everyone closely.  But your discussion now doesn't -- does it answer the orphan document question?

Because my understanding from Mr. Peters is they searched the email.  They searched the hyperlinks in Google Vault.

And I thought your concern was that their search of the Google Vault for the hyperlinks would leave these orphans out there that you wouldn't get disclosed because they weren't using the right search terms.  On that issue, you are not worried about orphans if I follow your approach?

MR. DROSMAN:  No, Your Honor, we are.  What we're asking is that if a document is hyperlinked to a responsive email, that we get the hyperlinked document, even if it's the current version.  And if the current version of the hyperlinked document is responsive, we get the cover email.  So we are absolutely concerned about hyperlink documents.

I was responding to Mr. Peters' argument that because they're stored in -- somehow in different sites, they're somehow -- it's somehow burdensome to collect them.

They've already collected them.  I just don't understand -- I guess I'm -- they've already collected these documents.  He has said they've collected the documents.

They've produced hyperlinked documents.  I don't understand.  What we're saying is, just don't do this independent responsiveness review.

THE COURT:  I get it.

MR. DROSMAN:  Because it deprives us of the who, what, where, when, how, context.

THE COURT:  Mr. Peters, your response to that, that you've already searched both the emails and the hyperlinks.  You've already found this large group of email and documents, and you're currently reviewing them for responsiveness.

And the plaintiff is saying, you shouldn't have to do that.  You should just send that all over to them.  It matches the search terms for each, and you should disclose not just the email and the hyperlink, but if there's a hyperlink, then you also go back and disclose the email.

I would like to hear your thoughts on that.

MR. PETERS:  Thank you, Your Honor.  We -- it would be additional work and a burden.  It's not as simplistic as Mr. Drosman indicates.  And I heard him suggest, for example, that we go through and manually click on documents and pull them up.

When you run search terms and receive documents from Google Drive and from the email, these documents again, are not naturally associated with each other, so they do not appear as they are not family members.  They are not treated as family

members by the technology.

So when -- that is why you review one and you review -- and then you look. We produce the responsive ones. But it's not as if we produce an email, we automatically know that it had X linked document in it and that linked document therefore needs to be produced.

My understanding is that our vendor -- I think Mr. Drosman mentioned an overlay -- that was a manual process. My understanding is that was done at the time of production and after production that was done. This is not something that was automatically done through the, you know, technological solution in the first instance.

THE COURT: Let me ask specific questions. First, you have run all the search terms against the emails for these custodians and received a data dump; is that correct?

MR. PETERS: Correct.

THE COURT: And you ran the search terms in Google Vault and also received a data dump?

MR. PETERS: Correct. We received a -- there were returned documents, correct.

THE COURT: Since you already have both of those, why would you object to disclosing those to plaintiff at this time?

MR. PETERS: We have produced the responsive materials already. Plaintiffs already have those responsive materials. We review them for responsiveness and for privilege and produce

the responsive non-privileged results.

THE COURT:  Well, I agree with privilege, but why should you get to decide responsiveness if you put the search terms in and it came out with a Google Drive document?

MR. PETERS:  Because there are no links between them, Your Honor.  Just because a document is in Google Drive does not mean it's a hyperlink document, and there's no association between them that says what they are while we're reviewing them.

THE COURT:  So you're --

MR. PETERS:  Without looking at the Google Drive document.  That's why we review it for responsiveness.  That's why we produce it.

That's why we review each and every email, for privilege and responsiveness, and that's why when -- after we produce them, trying to be helpful to plaintiffs, we then, after production or essentially in connection with production, after they're all produced, our vendor created an overlay through their own process.

It wasn't automatically created to say, oh, well, it looks like this Google Drive document was in fact a hyperlink document, oh, and an email was produced, so here, that's the connection.

But they're not -- Google Drive document is not necessarily a hyperlink document, and there's no link or

association.  They're not family members.  There's no family link, no family connection between them.

THE COURT:  Give me an example of a search term that reveals a Google Drive document that has no bearing on this case at all and so it is not responsive.

MR. PETERS:  We have extensive search terms in this matter Your Honor I know appreciates, based on, I believe, some of the correspondence that has been submitted.  But, for example, one of our search terms is "title."  One of them -- so any reference to "title" outside of even the automobile context.

And another one is "city," I believe, for -- so "Citigroup," and that returns emails from Citigroup, but they have nothing to do with this matter.  And our search terms are intentionally extremely broad so -- trying to capture as broad of a universe as possible.

And we've done the -- you know, the validation that I think they are comprehensive in returning the right documents. But being returned by a search term does not mean that the document is relevant to the case, you know, at all.

THE COURT:  Let me turn to Mr. Drosman.

If the defendants are searching Google Vault with broad terms, and they are pulling up documents that have nothing to do with this litigation, are you suggesting that you should get those as well?

MR. DROSMAN:  No, Your Honor.

THE COURT:  So --

MR. DROSMAN:  No.  What we are suggesting is that if -- one, if they pull up an email, for example, that is responsive but don't pull up the associated hyperlink document because it doesn't contain the search terms, we should get the associated hyperlink document.

Vice versa, if they pull up a hyperlink document that is responsive because it fits our search terms and those search terms, for example, "title" don't bear on a book club, that we should then get the associated email.  That's all.

We're not asking them to do anything that they wouldn't otherwise be required to do in normal discovery.

THE COURT:  I agree with you on the first.  On the second, did I hear you say that if they have a responsive search term hit in Google Vault, then they should give you the attached email as well?

MR. DROSMAN:  Yes, Your Honor.  And the reason for that is the hypothetical that I gave you, where if they just give us the hyperlink document and don't give us the cover email, we -- and the hyperlink document is undated, not clear who authored it, who received it, the only way we can make that determination is through receiving the email itself.  Even if the email itself just says "see attached," right?  So that's not going to hit on any -- "see attached" email is not going to

hit on any search terms, but it's important.

THE COURT:  Well, you essentially want to determine whether you think it's responsive because even -- I mean, you would agree, a term about "city" could come back with book club, and you want the ability to determine whether the original email talked about something related to this litigation or something irrelevant related to book club.  You want the chance to do that, rather than allowing defendants to do it.

MR. DROSMAN:  I don't think so, Your Honor.  I think what we're saying is, if they look at a document -- let's just say hypothetically they look at a linked document, and a linked document is about a book club meeting -- to the analysis of a title, right?

We are not asking them to produce that document, nor are we asking them to provide us with the email.  The only instance in which we're asking for both is when one is responsive.

Your Honor, I will just remind you, that this is not some novel -- novel -- the ESI order in March requires it.  Your order in August requires it.  You required it at the hearing in August.

And, you know, by the way, the *Uber* case requires it.  So this is not a novel concept that we're seeking.

THE COURT:  I understand.  The point I'm asking these

questions for is to have a clear order.  I don't want to have you all come back.  So we're taking five to 10, 20 minutes here so we don't have to spend hours more on this later.

It's just always my preference to make things simple and clear, so, you know, we might revisit something a few times, but I'd rather spend that time here with you and just nail this down.

MR. DROSMAN:  I agree, Your Honor -- and thank you for your time, by the way.  I know that this is highly technical and it's taken some time out of your day.

THE COURT:  No, I'm happy to do it.  It's the job.  And I owe you all a duty of my best efforts to understand this, for both of you.  Even if one of you is frustrated or doesn't agree, at a minimum, our court system should make you feel at least that you were heard, even if you don't agree.

So I have a good sense of this issue.  I will give you all a chance to make any final statements.  I'm going to review this again and issue my order promptly.

So, Mr. Drosman, I'll let you start.

MR. DROSMAN:  Sure, Your Honor.  I don't want to belabor some of the points I've already made.  I would say all we're seeking in this case is enforcement of the Court's prior orders and the Court's prior directive at the hearing.

You know, the ESI order mandates that if any part of a communication family is responsive, the entire family must be

produced, okay.  And Your Honor's specific verbal order from the August 11th hearing said the same thing.

You ruled there that the creation of orphan emails, emails stripped of their attachments, is, and I quote, "not happening here."  And, you know, despite that clear directive, we're back again to litigate this same issue once again.

And all we ask, Your Honor, is that you enter an order compelling defendants to produce the entire family unit, if either the email or the hyperlink document is responsive.  They've already collected these documents.  There is no additional burden.

You know, all they need to do, Your Honor, is use this electronic act of mapping the parent ID to the child ID, they've already done it, and it includes both in the productions.

So there's no burden associated, certainly not an undue burden associated with providing us with both the hyperlink documents and the email should one of those documents be responsive.  That's all we're asking for.

THE COURT:  Define "entire family" for me, just so I understand your understanding of it?

MR. DROSMAN:  Sure.  So the definition of a "family" would be the cover email and any hyperlink documents referenced in that email.

THE COURT:  That would include the current version

today?

MR. DROSMAN:  It would be true -- you're right, Your Honor.  It would be true for the current version or the historical version.  If those are produced.

THE COURT:  Okay.  Thank you.

Mr. Peters, you get the last word.  Your response to that request.

MR. PETERS:  Thank you, Your Honor.  And to go back, when a document is in Google Drive, it does not mean it is a hyperlinked document.  There is no technical connection.  There is no family relationship, no link between them.

Plaintiffs are asking us to manufacture that connection for them, and that's why the most recent, for example, Sedona Conference commentary about collaborative platforms and data, just published in October, agrees with our position that the hyperlink documents are not necessarily family members.

They are not traditional attachments, which is what our universe considered family documents.  And it also -- Sedona Conference said that's why parties should not reflexively treat hyperlink documents as traditional attachments.  And that requests for all hyperlink documents, exactly what plaintiffs are doing here, should essentially not be done.

It would be -- there are burdens associated with

42

having to create that family -- manufacture a family relationship. But it does go back to the first principle that we were talking about before, where this is all premature until we know what versions of a hyperlink document are going to be produced in this case.

We have -- the FEC limited test run has been completed. We have given plaintiffs that result, and they have not reached out to us yet for a meet-and-confer, but it sounds like they will soon, and we'll have discussions about that.

But deciding this -- the treatment of these non-contemporaneous hyperlink documents that did not hit on any search terms now, without knowing how the treatment of so-called contemporaneous versions will go, would be putting the cart in front of the horse with significant potential burden implications for the Carvana defendants.

THE COURT: When do you envision your test run of the two custodians to conclude?

MR. PETERS: We concluded it on December 1st, and we've produced the documents, and we've also shared the -- the results with plaintiffs.

THE COURT: They're working with you because -- I assume they're concerned of the very low responsive rate of .4 percent. So is there going to be more work done in your view on discovery related to FEC and these two custodians?

MR. PETERS: Plaintiffs have not reached out to us yet

about those results or about the produced documents.  The first I've heard anything about their views were what Mr. Drosman has told you here in this hearing today.

So it sounds like they will have questions for us, which we'll be more than happy to hear and engage with, but there has been no feedback from plaintiffs as of yet.

THE COURT:  Well, if this process does not improve with FEC, do you have a sense of how you would want to -- you just want to go through discovery for the remaining 23 custodians the way you propose today?

MR. PETERS:  We would -- we believe that discovery for the -- well, we've produced many, many documents for these other custodians.  So for maybe any potential upcoming custodians, we would -- we would certainly -- we would follow the same procedures that we have been in order to continue discovery and continue the case moving forward, yes.

THE COURT:  Okay.  Thank you.  I will review all this one more time, issue my order promptly.  I think there might be another issue that you all are generating, but let me just ask, do we have another discovery issue that's on the horizon?

MR. DROSMAN:  Yes, Your Honor, we have two more.  We have one relating to Garcia Junior's interest in Garcia Senior's $3.6 billion in insider trading.

And then the second issue would be defendants' refusal to provide us with any information about the SEC inquiry that

we alleged in our complaint.

THE COURT:  Okay.  I'll wait for those.  Thank you all for calling in, and we are adjourned.

Have a good afternoon.

MR. DROSMAN:  Thank you.

MR. PETERS:  Thank you, Your Honor.

(Proceedings conclude at 11:41 a.m.)

C E R T I F I C A T E

I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 13th day of December, 2025.

s/Elva Cruz-Lauer
Elva Cruz-Lauer, RMR, CRR

UNITED STATES DISTRICT COURT