# EXHIBIT 32

ROBBINS GELLER RUDMAN
   & DOWD LLP
DANIEL S. DROSMAN (CA 200643)
TOR GRONBORG (CA 179109)
ERIKA L. OLIVER (CA 306614)
RACHEL A. COCALIS (CA 312376)
MATTHEW J. BALOTTA (CA 310303)
SARAH A. FALLON (CA 345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ddrosman@rgrdlaw.com
torg@rgrdlaw.com
eoliver@rgrdlaw.com
rcocalis@rgrdlaw.com
mbalotta@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re Carvana Co. Securities Litigation | ) | No. CV-22-2126-PHX-MTL |
| | ) | |
| | ) | DECLARATION OF JERRY BUI |
| This Document Relates To: | ) | |
| | ) | |
|     All Actions. | ) | |
| | ) | |

4927-1791-1427.v1

I, Jerry Bui, submit this declaration in support of Lead Plaintiffs United Association National Pension Fund and Saskatchewan Healthcare Employees' Pension Plan's ("Plaintiffs") Motion to Modify the Scheduling Order ("Motion") in the above-captioned litigation, and declare as follows:

## I.    Background and Expertise

1.    I am a Digital Forensics Examiner specializing in electronic discovery, digital forensics, and large-scale document review.  I have over 20 years of experience advising counsel, courts, and clients on discovery strategy, proportionality, and the use of advanced analytics, including Technology-Assisted Review ("TAR"), predictive coding, and statistical sampling.  I have overseen or consulted on numerous matters involving millions of documents, including complex securities litigation, regulatory investigations, and large corporate disputes.  My experience includes evaluating discovery burden, designing review workflows, and testifying regarding defensibility and proportionality.  *See* Exhibit A.

2.    I have been retained by Plaintiffs in the above-captioned litigation to serve as a consultant, and I submit this declaration in support of their Motion.

3.    I have personal knowledge of the matters set forth herein, and if called upon and sworn as an expert witness, I could and would competently testify thereto.

4.    I have reviewed, among other materials: (a) Lead Plaintiffs' Motion (ECF 217); (b) Defendants' Opposition to Lead Plaintiffs' Motion to Modify the Scheduling Order (ECF 229) ("Opposition"); (c) a draft of Lead Plaintiffs' Reply in Support of Motion to Modify the Scheduling Order ("Reply"); (d) a December 2, 2025 letter from Matthew J. Peters to Matthew Balotta describing Carvana's search-term strategy and validation testing; and (e) TAR literature by Maura R. Grossman and Gordon V. Cormack on validation protocols, elusion testing, and the misuse of statistics in eDiscovery.

## II.    Key Concepts

5.    In eDiscovery, the document universe is all collected documents.  The hit set is the subset that matched at least one search term and was reviewed.  The null set is the remainder: ***Documents that did not hit any search term***.

- 1 -

6.     An elusion test samples documents from the null set, has reviewers code them as responsive or not, and estimates what percentage of the null set is actually responsive. *Recall* is then estimated by combining: (a) documents coded responsive in the hit set; and (b) estimated responsive documents in the null set.

7.     Critically, both elusion and recall are calculated against the responsiveness criteria actually used in the review.  They do *not* independently validate whether those criteria properly reflect the full scope of the claims.

**III.    Affirmative Opinions**

8.     Based on my experience, training, and analysis, my opinions are provided below.

**A.     Elusion Only Validates the Process Against the Chosen Criteria**

9.     According to Matthew Peters' December 2, 2025 letter and Defendants' Opposition, the Carvana Defendants sampled approximately 1,535 documents from the null set using a 95% confidence level and 2.5% margin of error, reported an elusion rate of 0.651%, and translated that into a 96% recall figure.

10.     From a methodological standpoint, that calculation shows only the following: given the Carvana Defendants' chosen custodians, search terms, and responsiveness standard, relatively few additional documents in the null set were coded responsive under that same standard.

11.     It does not show that the Carvana Defendants selected the right custodians, the right search terms, or the right definition of "responsive" for this case, which now includes both: (a) Title & Registration ("T&R") issues; and (b) other drivers of retail unit sales including a broader alleged scheme to inflate vehicle sales.

12.     Put simply: elusion testing validates the review process against the search criteria; it does not validate the criteria themselves.  If those criteria are too narrow, a low elusion rate can give a false sense of completeness.

- 2 -

**B.    The Tested Universe Is Skewed Toward T&R and Under-Represents the Scheme Allegations**

13.    I understand from Plaintiffs' Motion that, for many months, Defendants treated this as a narrow T&R case, and the Carvana Defendants selected predominantly T&R-focused custodians.  I further understand that Plaintiffs' Motion represented that roughly 89% of the ~69,575 produced documents either contain "title*" or "reg*," or are in families that do – confirming a corpus heavily dominated by T&R subject matter.

14.    I also understand from Plaintiffs' Reply that the Carvana Defendants then applied approximately 100 T&R-centric search terms, representing 64% of all search terms applied, to that population of documents from the T&R-focused custodians.  If that is the case, then the null set on which the Carvana Defendants tested elusion therefore consists largely of documents from T&R custodians that did not hit T&R-centric search terms.

15.    In that setting, two things are predictable:

(a)    Most T&R-responsive documents will already have been captured in the hit set, driving the elusion rate down; and

(b)    Documents about non-T&R issues (other drivers of retail unit sales including a broader alleged scheme to inflate vehicle sales) are unlikely to appear in large numbers in the first place, because the custodians and terms were never designed to collect them.

16.    The result would be a biased test population because the Carvana Defendants are effectively measuring how completely they captured T&R-related material from a set of T&R-focused custodians.  That would say little about whether the Carvana Defendants have adequately searched and reviewed documents relevant to other drivers of retail unit sales and a broader alleged scheme.

17.    I further understand from Plaintiffs' Motion that only recently has the Court ordered the Carvana Defendants to collect from seven non-T&R-focused custodians, and that documents from those custodians were therefore not included in the null set tested.  If that is

- 3 -

the case, any elusion rate calculated before those collections are complete cannot credibly be treated as a global measure of completeness.

### C.     Carvana's Elusion Set Was Too Narrow

18.     In my opinion, the Carvana Defendants' elusion result must also be understood in light of what their test did ***not*** measure.  I understand that the elusion sample was drawn exclusively from a document population dominated by T&R custodians and T&R search terms.  Testing only that subset is analogous to shining a flashlight into one corner of a dark room: finding little in the illuminated corner does not mean the room is empty; it simply reflects the limited area illuminated by the light.  Likewise, the Carvana Defendants' elusion test reflects only the narrow portion of the discovery universe that their search terms and custodian choices allowed them to illuminate.  It does not provide a reliable basis to conclude that discovery is substantially complete for the much broader set of issues the Court has held are within scope.

### D.     There Is Missing Information About the Null Set Size

19.     The Carvana Defendants have not, to my knowledge, disclosed the size of the null set – that is, the number of collected documents that did not hit any search term.

20.     Without that number, it is impossible to verify whether a sample of 1,535 documents was sufficient or to translate the 0.651% estimate into an actual count of potentially responsive documents that may remain in the null set.

21.     By way of illustration only: If the null set contained 2,000,000 documents (which is consistent with the Carvana Defendants' representation that they "collected millions of documents" overall), a 0.651% elusion rate would imply roughly 13,000 potentially responsive documents still in the null set.  That is not an immaterial quantity in a securities case.

### E.     There Are Known Problems with Null-Set-Only Elusion in Low-Richness Populations

22.     The TAR literature has specifically cautioned that "Elusion test" protocols, when applied to low-richness populations like a null set, can produce "inconsistent and

- 4 -

improbably high recall estimates," calling into question their use as a sole validation method (*See* Exhibit B, "Comparison of Tools and Methods for Technology Assisted Review").

23.    In such settings, standard confidence-interval formulas assume a stable underlying prevalence that may not exist; the result can underestimate the true error and overstate how "precise" the elusion figure really is (*See* Exhibit C, "Vetting and Validation of AI-Enabled Tools for Electronic Discovery").

24.    In my opinion, the Carvana Defendants' reliance on a single null-set-only elusion calculation, in a T&R-dominated corpus, overstates the reliability of the claimed 96% recall.

**IV.    Conclusion**

25.    Based on the materials I reviewed and the assumptions described above, it is my opinion that Carvana Defendants' reported 0.651% elusion rate and 96% recall:

(a)    Do not establish that the Carvana Defendants' custodians, search terms, or responsiveness criteria adequately cover the full scope of Plaintiffs' claims, including the alleged scheme to inflate vehicle sales;

(b)    Are the product of an elusion test conducted on a biased, T&R-dominated document universe that substantially underrepresents non-T&R issues;

(c)    Cannot be independently verified or properly contextualized without disclosure of the size and composition of the null set; and

(d)    Rely on a validation protocol that the technical literature has criticized for producing overly optimistic recall estimates in low-richness populations (*See* Exhibit A).

26.    For these reasons, I do not regard Defendants' elusion and recall figures as reliable indicators that their document production is substantially complete for all relevant issues in this case.

- 5 -

4927-1791-1427.v1

27.    I reserve the right to amend or supplement these opinions if additional information becomes available.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on December 19, 2025 in Dallas, Texas.

_____
Jerry Bui
Senior Vice President, Digital Forensics
Purpose Legal

- 6 -

4927-1791-1427.v1

# EXHIBIT A



**Jerry Bui**
*Senior Vice President, Digital Forensics*
Office: (469) 949-8914
Direct: (714) 334-3673
Email: jerryb@purposelegal.io

Jerry Bui is a testifying expert witness in digital forensics. He is a keynote speaker and thought leader with over 20 years of experience assisting clients with emerging technology related aspects of investigations and he has testified 30+ times in support of civil matters.

Mr. Bui's clients include major companies within the areas of pharmaceutical life sciences, medical device, big tech, and other industries. His practice primarily focuses on emerging data sources in the cloud and the impact they have on eDiscovery workflows. He regularly assists clients through all phases of investigations; helping them to understand their options when responding to government subpoenas and requests from opposing parties. He also assists his clients to attack the methods and procedures used by opposing experts. Mr. Bui has testified in support of civil spoliation motions as well as on topics such as proper digital forensics procedures, the adequacy of efforts undertaken by opposing parties and topic related to the theft of trade secret information.

Mr. Bui is often personally requested to conduct in-depth forensic examinations of computers used by key persons of interest and to provide expert courtroom testimony to support his findings. In addition to his client-based responsibilities, Mr. Bui is an advisor to INTERPOL on their Metaverse and Synthetic Media Expert Groups. He does annual pro bono work in the country of Lesotho, South Africa to help establish a digital forensics lab along with training personnel to support the Directorate on Corruption and Economic Offenses. Mr. Bui also conducts periodic webinar trainings to AARP to help members avoid deepfake scams.

Previously, Mr. Bui was Founder & CEO at Right forensics, a data forensics company, where he helped launch the Digital Forensics Advisory Practice (DFAS) that offered services utilizing state-of-the-art technology and methodologies to dive deep into digital storage systems, uncovering and preserving critical evidence with the utmost accuracy and integrity.

Mr. Bui was a Managing Director of Digital Insights and Risk Management (DIRM) at FTI Consulting where he acted as the practice lead for M365, provided digital forensic services and evidence collection for investigation and litigation matters, and was responsible for the development of proactive risk management consulting services.

Mr. Bui worked for three of the Big Four advisory firms. At PricewaterhouseCoopers, he was the Advisory Director of Forensic Technology Services and Investigative Analytics where he focused on global supply chain fraud and compliance solutions in pharmaceutical life sciences and food trust. Mr. Bui was responsible for advising clients on regulatory affairs and enforcement trends involving the Food and Drug Administration and Department of Justice as it related to false claims, anti-bribery and anti-corruption, and food safety.

Mr. Bui has also held leadership positions at Ernst and Young, KPMG, Lighthouse and Navigant Consulting.



**Relevant Experience**

2024 – 2025: Mr. Bui was Founder & CEO at **Right Forensics,** a data forensics company that offered services utilizing state-of-the-art technology and methodologies to dive deep into digital storage systems, uncovering and preserving critical evidence with the utmost accuracy and integrity.

2021 – 2024: Mr. Bui was a Managing Director at **FTI Technology Consulting** in the Digital Insights and Risk Management practice offering proactive and reactive services including evidence collection, forensic analysis, expert testimony, and data analytics. Mr. Bui led the Microsoft 365 initiative for global alignment in Digital Forensics standard operating procedures and conducted biweekly global round table calls to stimulate discussion on the Microsoft 365 Road Map concerning Purview.

2018 – 2021: Mr. Bui was the Advisory leader of the digital forensics practice globally at **Lighthouse** offering proactive and reactive services including evidence collection, forensic analysis, expert testimony, and data analytics. Mr. Bui led an international remediation project for a large pharmaceutical and biotech company visiting Taipei, Taiwan and Wuhan, China to validate the deletion of trade secret documents from the Defendant's laboratory IT environments. He also conducted data acquisition from a Defendant's M365 cloud environment while on the ground in Ho Chi Minh City, Vietnam, speaking the local language during custodian interviews and coordinating with IT personnel.

2017 – 2018: Mr. Bui ran the entire digital forensics practice nationally as a Director at **Inventus** and he oversaw the forensic services and evidence collection work for investigation and litigation matters. One of Mr. Bui's notable client-facing consulting engagements included an information security risk assessment for a pre-FDA biotech company on current state gaps and delivered future state recommendations based on leading industry practice.

2017: Mr. Bui served as an Independent Contractor supporting an OFAC investigation for a large online retailer in response to a regulatory inquiry.

2015 – 2017: At **PwC**, Mr. Bui was an Advisory Director whose focus was on global supply chain fraud and compliance solutions in pharmaceutical life sciences and food trust using emerging forensic technology techniques for industry-specific challenges. He developed an open-source Tableau replacement using D3 and JavaScript to allow for flexible integration with other analytics components for end-to-end client solutions incorporating qualitative SME questionnaire responses, quantitative risk assessments, third-party onboarding and monitoring, risk-based sample selections, investigation case management and the remediation of fraud and misconduct. Mr. Bui also performed a current state assessment, gap analysis and future state recommendations for a healthcare pharmacy benefits manager to proactively address regulatory drug pricing probes that were being conducted by the government within the industry.

2013 – 2015: At **Ernst & Young**, Mr. Bui was a Senior Manager in Audit who provided proactive solutions within the life sciences industry. First, he developed a physician conflict of interest compliance monitoring dashboard using internal and external data for a large healthcare provider system. Mr. Bui also developed a continuous compliance monitoring dashboard and in-country scorecards for a leading pharmaceutical manufacturer incorporating compliance KPIs defined at the global and local levels. He further developed a continuous audit program for a medical device manufacturer incorporating fraud, bribery and corruption analytics, risk ranking and intelligent sample selections for repeatable in-country audits. Finally, Mr. Bui developed a competitive benchmark dashboard for several life sciences companies to assess risk surrounding outlier behavior of sales reps when engaging healthcare professionals for fee-for-service arrangements, samples distribution and meals and entertainment reimbursement.

2005 – 2013: At **KPMG**, Mr. Bui managed a multi-jurisdictional stock options back-dating litigation using an electronic document review platform for multiple law firms in three time zones lasting 18 months. He also managed a Federal Trade Commission "second request" anti-trust review of email communication between two web advertisement industry giants. As a practice development initiative, Mr. Bui launched the offshore ediscovery center in New Delhi,

India to enhance electronic document processing capacity for onshore litigation support and investigation matters. He was also responsible for an internal dashboarding platform mining more than 200 terabytes of data, providing performance metrics, margin analysis and KPI scorecards.

2004 – 2005: At, **Navigant Consulting**, Mr. Bui was an Associate Director who supported an AML lookback investigation on nation's oldest privately owned bank with homeland security implications. He also created the firm's first Analytics-as-a-Service platform with Microsoft SQL Server in a private cloud environment.

### Speaking Engagement/Lectures

Mr. Bui engages with law firms, corporate clients, and litigation support associations regularly to deliver educational sessions that he has developed on topics related to computer forensics and emerging data sources. Mr. Bui is considered a thought leader and is invited to speak at conferences and webinars. He has shared his industry perspective as a keynote speaker, moderator, and panelist.

### Publications

- January 2012 – Co-authored a KPMG whitepaper titled "The Case for Statistical Sampling in E-Discovery", arguing that a robust statistical sampling process can confirm whether technology-assisted results are as effective as human review.

- February 2015 – Co-authored an Ernst & Young whitepaper titled "Open Payment benchmarking and analytics: formulate a balanced product strategy", demonstrating the breakthrough use of federal data for competitive intelligence in the life sciences industry.

- March 2019 – Authored an article for JD Supra titled "Security v. Privacy", emphasizing the distinct difference between the two concepts as it relates to social media data and consumer protection.

- April 2020 – Authored an article on Medium titled "Adopting a Compliant & Defensible Remote Collections Strategy", warning about the new risks and vulnerabilities of a remote work force during the COVID-19 pandemic.

- May 2020 – Authored an article on Medium titled "Prevent IP Theft During a COVID RIF – Don't Let Your Trade Secrets Depart with Employees", warning that additional measures need to be taken by companies regarding mass layoffs during the COVID-19 pandemic.

- October 2022 – Co-authored an article on the FTI Technology Blog titled "The Modern Data Paradox: Power and Problems in Discovery and Investigations", warning that chat, collaboration, mobile, and social media sources present the latest data challenges for traditional ediscovery workflows.

- February 2023 – Co-authored an article on the FTI Technology Blog titled "Insider Risk Management in Microsoft 365", discussing the proactive stance that enterprises can take by leveraging insider risk management features built into Microsoft 365 for the detection and prevention of fraud and misconduct.

- September 2024 – Co-authored a whitepaper on the EDRM Blog titled "Deepfakes in Legal Proceedings: A Strategic Framework for Collaborative Solutions", proposing a collaborative approach between lawyers, AI detection firms, and forensic experts to detect and authenticate digital evidence

- May 2025 – Co-authored an article on ILTANET.org addressing the challenge that Signal's end-to-end encryption and self-destructing chats create for e-discovery, and laying out a defensible workflow grounded in explicit client consent, meticulous chain-of-custody, and repeatable validation



**Testimony, Reporting, Deposition and Declaration Experience**

Mr. Bui has testified over 30 times in Federal and State courts for civil matters. He has been qualified as an expert in computer forensics, document metadata, and cloud-based platforms.

- TRUMP MEDIA & TECHNOLOGY GROUP CORP. V ARC GLOBAL INVESTMENTS II, LLC
  Circuit Court of the Twelfth Judicial Circuit, Sarasota County, Florida Civil Division
  Case No. 2024-CA-001061-NC (2024)
  Expert report and trial testimony on behalf of Plaintiff.

- NICBYTE, LLC, ET AL. V. STARTOP INVESTMENTS, LLC, ET AL.
  Court of Chancery in the State of Delaware
  C.A. No. 2023-0637-NAC (2024)
  Expert report and rebuttal report on behalf of Plaintiff.

- MADISON JOINT VENTURE LLC V. CHEMO RESEARCH S.L., ET AL.
  United States District Court, District of New Jersey
  Civil Action No. 19-8012 (2024)
  Rebuttal report and deposition on behalf of Plaintiff.

- STATON TECHIYA, LLC AND SYNERGY IP CORPORATION V. SAMSUNG ELECTRONICS CO. LTD. and SAMSUNG ELECTRONICS AMERICA, INC.
  United States District Court for the Eastern District of Texas Marshall Division
  Case Nos. 2:21-CV-00413-JRG-RSP; 2:22-cv-00053-JRG-RSP (2023)
  Rebuttal report, deposition, and trial testimony on behalf of Plaintiff.

- VIKING THERAPEUTICS, INC. V. ASCLETIS PHARMA, ASCLETIS BIOSCIENCE, AND GANNEX PHARMA
  United States International Trade Commission Washington, D.C.
  Investigation No. 337-TA-1352 (2023)
  Declaration in support of Complainants motion of summary determination, expert report, rebuttal report, deposition, and trial testimony.

- PAMPA ENERGÍA S.A. (Argentina) V. PETROBRAS INTERNATIONAL BRASPETRO B.V. (The Netherlands)
  International Court of Arbitration of the International Chamber of Commerce
  ICC Case No. 25255/MK (2023)
  In-person testimony on behalf of Respondents

- AMAZON.COM, INC. V. WDC HOLDINGS LLC DBA NORTHSTAR COMMERCIAL PARTNERS
  United States District Court, Eastern District of Virginia Alexandria Division
  Case No. 1:20-cv-484-RDA-TCB (2023)
  Expert Report pursuant to Federal Rule 26(a)(2) on behalf of Plaintiff.

- MATTHEW D. VAN STEENWYK V. KEDRIN E. VAN STEENWYK
  United States District Court, Central District of California
  Case No. 2:20-cv-02375 FLA (AFMx) (2022)
  Expert Report pursuant to Federal Rule 26(a)(2) and deposition on behalf of Plaintiff.



- SYNGENTA SEEDS, LLC. V. TODD WARNER, JOSHUA SLEPER, FARMER'S BUSINESS NETWORK.
  United States District Court, District of Minnesota
  Case No. 20-1428-ECT-BRT (2021)
  Expert Report pursuant to Federal Rule 26(a)(2), rebuttal report, and declaration on behalf of Defendant.

- PLATTIN CREEK EXCAVATING, LLC. V. MICHAEL D. HARMAN, JR.
  Circuit Court of St. Louis Country, State of Missouri
  Case No. 21SL-CC04188 (2021)
  Affidavit for filing of temporary restraining order and preliminary injunction on behalf of Plaintiff.

- CANNACO RESEARCH CORPORATION V. SHAUNEEN MILITELLO
  Superior Court of the State of California, Los Angeles, CA
  Case No. 21STCV13314 (2021)
  Declaration in support of ex parte application to modify preliminary injunction on behalf of Plaintiff.

- HVI CAT CANYON, INC. CHAPTER 7 EVIDENTIARY HEARING
  United States Bankruptcy Court, Central District of California, Northern Division
  Case No. 9:19-11573 (2021)
  Declaration and in-person testimony on behalf of Trustee.

- PAMPA ENERGÍA S.A. (Argentina) V. PETROBRAS INTERNATIONAL BRASPETRO B.V. (The Netherlands)
  International Court of Arbitration of the International Chamber of Commerce
  ICC Case No. 25255/MK (2021)
  Expert report and rebuttal opinions on behalf of Respondent.

- MEMPHIS MEATS, INC. V. NAPAT TANDIKUL
  Northern District of California, Oakland Division
  Case No. 4:21-cv-03072-TSH (2021)
  Declaration on behalf of Plaintiff.

- APPLE INC. V. GERARD WILLIAMS III
  Superior Court of the State of California, Santa Clara, CA
  Case No. 19-CV-352866 (2021)
  Declaration in support of Defendant's opposition to TRO and expedited discovery, and deposition.

- DONNA AZIZ V. MURHPHY OIL USA, INC.; MURPHY USA, INC.; AND MURPHY OIL CORPORATION
  District Court of Tarrant County, Texas
  Case No. 017-315193-20 (2021)
  Declaration on behalf of Defendants.



- CARECENTRIX, INC. and NDES HOLDINGS, LLC V. MARCUS LANZNAR and SIGNIFY HEALTH, LLC
  District Court of the State of Delaware
  Case No. 20-1765 (LPS) (2021)
  In support of Defendants' answering brief in opposition to Plaintiffs' renewed motion for preliminary injunction, deposition.

- SUNPOWER CORPORATION V. GABRIELLA BUNEA
  American Arbitration Association, San Francisco, CA
  Case No. 01-19-0003-9663 (2021)
  Rebuttal opinions and in-person testimony on behalf of Respondent.

- SNAP! MOBILE, INC. V. VERTICAL RAISE, LLC, PAUL LANDERS
  District Court of Kootenai County, Idaho
  Case No. CV28-19-8796 (2021)
  Declaration in support of Defendant.

- GUSTAVO MARTINEZ V. CITY OF ASBURY PARK, MONMOUTH COUNTY, BOROUGH OF BELMAR, AMIR BERCOVICZ, DEWITT BACON, DANIEL SAVASTANO WILLIAM WHITLEY AND JOHN DOE OFFICERS 1-14
  District Court of the State of New Jersey
  Case No. 3:20-cv-8710 (2020)
  Declaration in support of Plaintiff.

- QUID, INC V. SEAN GOURLEY
  Judicial Arbitration and Mediation Services (JAMS), San Francisco, CA
  Case No. 1210036447 (2020)
  Summary of expert opinions, rebuttal opinions, deposition, and in-person testimony on behalf of Respondent.

- QUID, INC V. PRIMER TECHNOLOGY, INC.
  Superior Court of the State of California, San Francisco, CA
  Case No. CGC-19-574788 (2019)
  Declaration in support of Defendant's opposition to Plaintiff's application for preliminary injunction

- STATE OF MISSOURI, ex rel. Sheriff Paul Vescovo, III V. CLAY COUNTY, MISSOURI, ET AL.
  Circuit Court of Clay County, Missouri
  Case No. 19CY-CV04353 (2019)
  Affidavit of Webmail accounts collected and method of collection.

- JASON D. TRETER V. MUELLER CHARTER SCHOOL
  Superior Court of the State of California, San Diego, CA
  Case No. 37-2017-00002125-CU-WT-CTL (2018)
  Declaration in support of Plaintiff's opposition to Defendant's motion to compel.



- ASML US, INC. V. XTAL, INC.
  Superior Court of the State of California, Santa Clara, CA
  Case No. 16-CV-295051 (2018)
  Declaration in support of Defendant's opposition to Plaintiff's motion for preliminary injunction.

- MARKET PLACE NORTH CONDOMINIUM ASSOCIATION V. AFFILIATED FM INSURANCE COMPANY
  U.S. District Court, Western District of Washington at Seattle
  Case No.2:17-cv-00625-RSM (2018)
  Declaration in support of Defendant's motion for protective order.

- ARLINE RESTO V. 1545 SECOND AVENUE, LLC.
  Superior Court of the State of California, San Diego, CA
  Case No. 37-2016-00029001-CU-WT-CTL (2018)
  Declaration in support of Defendant's motion for terminating sanctions, deposition on behalf of Defendant.

- ASML US, INC. V. HUA-YU LIU AND SONG LAN
  American Arbitration Association, San Francisco Regional Office, San Francisco, CA
  Case No. AAA ref. No.: 01-16-100101-7373 (2017)
  Declaration on behalf of Respondents.

### Training

Forensic ToolKit (FTK), Access Data, 2005

Encase Fundamentals, Guidance Software, 2007

Encase Intermediate, Guidance Software, 2007

The Data Scientist's Toolbox, Coursera, 2015

R Programming, Coursera, 2015

Getting and Cleaning Data, Coursera, 2015

Exploratory Data Analysis, Coursera, 2015

Practical HACCP Training Certificate, International Food Safety & Quality Network, 2016

Forensic Fundamentals, Magnet Forensics, 2017

Axiom Examination, Magnet Forensics, 2017

Axiom Internet and Cloud Investigations, Magnet Forensics, 2018

### Associations

- Expert Advisor Co-Lead to INTERPOL Metaverse Forensics Program
- Academy of Court-Appointed Neutrals
- Association of Certified Fraud Examiners (ACFE)
- Forensic Expert Witness Association (FEWA)
- The Institute of Internal Auditors (IIA)
- Project Management Institute (PMI)

### Education

- Bachelor of Political Science, UCLA

### Expertise

- Digital Forensics
- Investigation Support
- eDiscovery
- Data Analytics

### Certifications

- Certified Fraud Examiner
- Private Investigator, State of Texas: License #158983102
- Microsoft Certified Professional

# EXHIBIT B

# Comparison of Tools and Methods for Technology-Assisted Review

Tom O'Halloran*
*Information Retrieval Services*
*Grant Thornton Ireland*
Dublin, Ireland
ohalloranthomas1@gmail.com

Bronagh McManus
*Information Retrieval Services*
*Grant Thornton Ireland*
Dublin, Ireland
bronagh.mcmanus@ie.gt.com

Andrew Harbison
*Information Retrieval Services*
*Grant Thornton Ireland*
Dublin, Ireland
aharbson@hotmail.com

Maura R. Grossman
*University of Waterloo*
Waterloo, Ontario, Canada
maura.grossman@uwaterloo.ca

Gordon V. Cormack
*University of Waterloo*
Waterloo, Ontario, Canada
gvcormack@uwaterloo.ca

*Abstract*—**In a large-scale eDiscovery effort in Irish litigation, human assessors participated in two technology-assisted reviews ("TAR") employing continuous active learning ("CAL") processes, one using Grossman and Cormack's logistic regression CAL tool and the other using a leading eDiscovery provider's support-vector-machine-based ("SVM") tool. In this work, we investigate the extent to which the different tools and associated methods impacted the effectiveness and efficiency of the competing TAR reviews across the same document population, measured by recall, precision, review effort, and the average cost incurred per relevant document found. Our results show that the tool and method underlying the TAR model matters – the CAL process outperformed the provider's process on all measures.**

*Keywords—Continuous active learning, CAL, logistic regression, support vector machine, SVM, LIBLINEAR, Technology-Assisted Review, TAR, information retrieval, Big data, knowledge management*

## I. Introduction

The objective of high-recall information retrieval ("HRIR") is to find all or nearly all relevant documents in a collection. Applications include electronic discovery (eDiscovery) in legal matters [1], systematic review in evidence-based medicine [2], and the creation of test collections for information-retrievals tasks [3, 4]. In the litigation context, it is typical for parties to review documents in response to requests for production ("RFPs") received from their adversaries, which specify categories of information sought concerning the dispute, either agreed on by the parties, or mandated by the Court or Arbitrator. The onus is on the producing party to identify as much responsive material relating to these RFPs as possible from their own datasets to hand over to the opposing side [2].

In the last 20 years, the discovery landscape has changed dramatically with the proliferation of electronically stored information ("ESI"). The total data created, captured, copied, and consumed globally has risen from 2 to 64 zettabytes ("ZB") from 2010 to 2020, with a forecasted increase to 181 ZB by 2025 [5]. The digitization of information and the continuous development of new forms of communication and unstructured data types subject to the eDiscovery process means that data volumes to be collected and searched for relevant material have grown year over year. The challenge imposed on the legal sector is, therefore, how to identify all or nearly all the relevant material in ever-expanding document collections in order for a party to discharge its discovery obligations in a manner that is proportionate and cost effective.

Traditionally, exhaustive manual review has involved the inspection of every document in a dataset to identify the responsive ones, either with or without pre-culling using Boolean search terms. This meant that the length of time required and the cost associated with completing a document review was directly proportional to the number of documents in the corpus. With continually growing corpora, this has raised significant issues for legal systems in the digital era, from both a practical and cost perspective. If the average reviewer can review approximately 300 documents per day, it would take them 9 years, with no days off, to review a collection containing one million documents, and the cost incurred in doing so might far outweigh the amount of the claim. One solution to this problem was introduced with the appearance of technology-assisted review ("TAR"). Studies have shown that TAR can achieve superior results in terms of recall, precision, and review effort compared to Boolean search methods and exhaustive manual review [6, 7].

The landmark U.S. decision in *Da Silva Moore v. Publicis Groupe*, which sanctioned the use of TAR in eDiscovery, means that the time and cost incurred in completing a legal review is now proportionate to the number and importance of relevant documents in a dataset, not the total number of documents to be searched. In his opinion, U.S. Magistrate Judge Andrew J. Peck opined [8] that:

> If the use of [TAR] is challenged in a case before me, I will want to know what was done and why that produced defensible results. I may be less interested in the science behind the "black box" of the vendor's software than in whether it produced responsive documents with reasonably high recall and high precision.

Unfortunately, as predicted by Goodhart's law [9], the focus on achieving "high recall and high precision" has encouraged gaming of metrics performed to validate a production effort.

The first objective of our study is to assess to what extent the "science behind the black box of the vendor's software" (or learning algorithm), impacts the user's ability to achieve high recall and high precision in real case scenarios with live case data. Our second objective is to address the notion of defensibility and defensible results through an analysis of the reliability of current validation methods used in practice to evaluate the quality of a review, as measured, in particular, by recall. Recall is defined as the fraction of all relevant documents found by the user [10].

We achieve our objectives by conducting a comparative analysis of the performance of CAL® against a leading eDiscovery provider's TAR tool, which uses a modified instance of LIBLINEAR, an open source algorithm. Effectiveness is measured using the metrics of recall, precision, review effort, and cost incurred per relevant document found. The results show the provider's tool to be less effective than CAL® on all metrics, suggesting that the underlying algorithm employed in a continuous active learning TAR review can profoundly impact the success of a review effort. The results also show that the validation protocol recommended by the provider, commonly referred to as the Elusion test [10] - produces inconsistent and improbably high recall estimates, calling into question its continued use in eDiscovery.

This work is novel because the study was conducted in the context of a real litigation with actual "live" data and trained barristers conducting the review, rather than in the lab with a non-representative, "clean" dataset and volunteer reviewers.

## II.  BACKGROUND AND RELATED WORK

HRIR has been a long-standing area of interest in the field of IR. As previously mentioned, the objective of TAR is to identify substantially all the relevant documents in a collection with a reasonable review effort. The TAR problem differs from other types of IR, such as text categorisation, pooling, routing, and others, insofar as it requires identifying all or most of the relevant documents in a collection with no prior knowledge of the dataset [1, 11]. This section highlights the principal related work and provides background on the HRIR methods we studied.

In their seminal 1985 study, Blair and Maron evaluated the effectiveness of using Boolean search queries to identify relevant documents with the goal of achieving a target of 75% recall. Experienced searchers stopped the review when they believed they had achieved that goal, but in fact, they had attained only 20% recall [12].

Additional forms of HRIR include the pooling method. This method is used to evaluate IR effectiveness by forming a judging pool from highly ranked representative documents relating to an information need, assessed for relevance and serving as the "gold standard" (or "ground truth") to evaluate the retrieval efforts used to form the pool [13]. Using their interactive searching and judging ("ISJ") method involving the review of highly ranked documents, Cormack et al. were able to yield a judging pool with equivalent IR evaluation effectiveness to a pooling method-derived pool that was five times larger than the ISJ pool, on the TREC 6 evaluation set [14].

Studies by Lewis show that SVM classifiers using SVMlight, applied to the Reuters RCV1 dataset, performed well in routing and text categorisation tasks achieving F1 =0.619 [15]. Both routing and text categorisation differ from the problem faced in the TAR context because they require identifying relevant material with respect to a known subject matter, within a new collection, instead of a previously unknown subject matter, as is typically the case in litigation. Routing updates document ranks for subsequent review, while text categorisation automatically tags as relevant all documents above a predefined rank cut-off, thereby not requiring further review [15].

Studying active learning, Grossman and Cormack show in their comparative study on three different TAR protocols that CAL® is superior to Simple Passive Learning ("SPL") and Simple Active Learning ("SAL") methods in terms of recall and review effort required to complete a TAR review [1]. SPL involves selecting a training set without using the learning algorithm, usually by selecting a random sample of documents. The training set is reviewed and used to generate a candidate review set. CAL® and SAL both use seed documents initially to train the algorithm. However, thereafter, SAL continues training using uncertainty sampling [16], whereas CAL® continues training using relevance feedback.

The current state of the art is an improved version of Grossman and Cormack's CAL® system, known as AutoTAR, but referred to simply as CAL® here for convenience. The difference lies in several improvements, including tf-idf features, a single relevant seed document, presumptively labelled 'not relevant' documents, and exponentially larger batch sizes, which together improve recall [11]. The Baseline Model Implementation ("BMI") is a free version of AutoTAR used by participants to automate the TREC 2015 Total Recall Track [17]. The primary difference between AutoTAR and BMI is the underlying algorithm, AutoTAR uses SVMlight and BMI uses logistic regression.

Additional noteworthy research [18, 19, 20, 21] addresses the commonly asked question associated with TAR reviews in eDiscovery: When can the review be stopped? Grossman and Cormack offer empirically and mathematically reliable methods in answering this question. One such method, which they have named "the Knee" Method, involves a geometric stopping procedure based on the shape of the gain curve, and achieves reliability for recall regardless of prevalence [18].

Volume estimation is a problem that relates to accurately predicting the number of relevant documents in a collection [22]. It is possible to achieve this result by combining the Knee Method (finding all high-scoring documents pre-knee) with stratified sampling techniques to estimate the likely number of relevant documents still unfound. Grossman and Cormack further improve on this stratified sampling method to create Scalable-Continuous Active Learning ("S-CAL"), which accurately and reliably predicts the number of documents requiring review to attain a given recall early in the TAR review [23]. This method importantly allows for cost and budget estimations and permits adjustments, reformulation, and refinement of RFPs, etc. where indicated.

We base our study on Grossman and Cormack's BMI of CAL® [17] and a leading eDiscovery provider's LIBLINEAR's linear kernel SVM classifier as employed in a widely used eDiscovery review platform [proprietary feature engineering and hyperparameter settings].

### III. METHODS AND MATERIALS

In this section, we describe our experiment in detail. We describe the search topics and document collection, the experimental design, the active learning algorithms and their implementation, and other details of the experiment, including how we measured performance and validation of each TAR tool and protocol.

#### A. Search Topics and Documents

Our document collection arose from the data collected on behalf of the plaintiff in a large-scale Irish litigation involving the accounting practices preceding the failure of a major insurance company, with claims of approximately US$1 billion.

In total, over 300 million documents were collected from many data custodians and sources. This collection included a subset of data consisting of 169,000 documents relating to three key custodians in their role as company administrators. The defendant requested that these data be reviewed and produced separately; therefore, this subset of documents was used for testing purposes. The defendant in the proceedings identified 55 individual RFPs specifying different categories of information sought. These were the basis of the search topics used in our test programme. There was considerable conceptual similarity and overlap among the 55 RFPs. Therefore, we decided to group these 55 RFPs into ten broader Consolidated-RFPs ("C-RFPs") to increase the speed of the review and to decrease the burden on reviewers in having to keep many issues in their minds at one time when reviewing for relevance. Previous studies show that such an approach is acceptable because a CAL® system using relevance feedback will achieve high levels of recall for multi-faceted RFPs without excluding any single RFP by applying a depth-first-by-width approach to identifying potentially relevant documents for review [24].

Each reviewer was provided with a briefing pack for the C-RFP they were assigned to review, which included the C-RFP description, seed documents, an appendix containing a non-exhaustive list of illustrative examples of relevant documents, as well as the wording of the underlying RFPs themselves to be referred to, if needed. Due to the commercially and personally sensitive nature of the case data and the ongoing confidentiality clause in the case settlement agreement, we are unable to release this document corpus into the public domain at present. However, the redacted wording of the C-RFPs is provided below (see Table I), and the reviewer coding decisions will be made publicly available to allow for verification of our statistical results.

#### B. Performance Metrics

As discussed above, eDiscovery tasks are generally understood to require high-recall retrieval. In terms of data volumes, only a tiny number of legal matters worldwide see a larger document review than our current example of 300 million documents. Given the size of the dataset, the only logistical way to conclude such a review within a reasonable timeframe and budget was to use TAR.

It is not uncommon in eDiscovery reviews for there to be two levels of relevance judging. The first-level reviewers will review the documents for relevance and categorize them into RFPs. The second level review, typically conducted using more experienced subject matter experts, consists of a QA review of the relevant documents to determine their final status and to complete a privilege and redaction review. In our experiment, we performed one review pass, plus quality control on a 10% sample, and adjudged all documents marked as responsive to be final.

TABLE I.  CONSOLIDATED REQUESTS FOR PRODUCTION

| C-RFP No. | C-RFP Instructions |
|---|---|
| 1 | Tag as relevant any documents which record or relate to [The Company]'s technical provisions (also called "technical reserves"), including how technical provisions were estimated. Documents regarding wider market practice / benchmarks for technical reserves should also be considered relevant. |
| 2 | Tag as relevant all [The Company] management information / reports and all documents relating to the management and oversight of [The Company], including in respect of regulatory and financial issues. |
| 3 | Tag as relevant any documents which relate to [The Company]'s claims handling function. In this context, "claims handling" covers the processing and administration of claims, as well as the setting / adjustment of claims reserves and the settlement of claims. |
| 4 | Tag as relevant any documents which relate to [The Company]'s underwriting or pricing policies, procedures or practices. (Note that information of general application is being targeted - individual contracts of insurance should be tagged as not relevant). |
| 5 | Tag as relevant all documents relating to [The Defendant]'s audit work for [The Company]. |
| 6 | Tag as relevant all documents relating to any assessments or analysis of the insurance market, [The Company]'s own business model / practices (and those of its competitors) and/or the geographic markets in which [The Company] operated (i.e., Ireland, the UK and Europe). |
| 7 | Tag as relevant (1) all documents relating to interaction between [Separate Entity] individuals[1] or entities[2] and [The Company] in relation to [The Company]'s technical provisions or claims reserving; (2) monetary transfers or reinsurance arrangements between [The Company] and [Separate Entity] entities (other than [The Company] subsidiaries) and (3) the decision of the directors of [Separate Entity] that it could prepare its accounts on a going concern basis from 2005 – 2009. |
| 8 | For each of the guarantor subsidiaries, tag as relevant documents related to [The Company]'s consideration of their management accounts / financial statements and any documents relating to [The Company]'s knowledge of the activities of the guarantor subsidiaries. |
| 9 | Tag as relevant (1) all documents relating to the original financing (and subsequent refinancing) of [Separate Entity] Limited by [The Bank]; and (2) all documents which relate to or demonstrate knowledge of the guarantees provided by [The Company] subsidiaries within [The Company] or the [Separate Entity]. |
| 10 | Tag as relevant all documents relating to the management of [The Company] by the Joint Administrators. |

Given the nature of the allegations and the amount claimed in this case, achieving a high-recall production was particularly important to both parties in the dispute. Therefore, the key performance measure used to evaluate the efficacy of both TAR systems was the recall they achieved.

The perceived success of any TAR review can also hinge on other factors, beyond recall. Precision [10] refers to the fraction of documents identified by a search or review effort that are relevant to the information request, and is often measured to ensure that an excessive amount of non-responsive information has not been included in the production [10]. Further, the time and effort it takes to complete a review are also considered important, given most reviews are carried out under a court-mandated deadline. Additionally, the amount of time spent looking at non-relevant documents, a wasted effort, is often important to the party responsible for paying for the cost of the review effort. Therefore, we included measures of the precision that reviewers achieved for each C-RFP review and the total review effort (i.e., total number of documents reviewed) as key performance indicators. Intrinsically linked to precision and review effort is the cost of identifying relevant documents. We determined the amount of time taken by each reviewer to complete their task, as determined from the review platform's audit logs, to calculate the average cost of identifying relevant documents per assessor.

It was apparent that, given the scale of the review and the likely proportion of relevant documents, a TAR-based approach was the only solution likely to be at all practical in reviewing this dataset. What we were concerned with was convincing the court that the use of CAL® for this review would not lead to an inferior production set as compared to the leading eDiscovery provider's TAR tool, which was what the adversary was using.

## C. Experiment Design

The question of when to terminate a review is a well-known problem in TAR reviews. The answer must factor in proportionality considerations, such as those outlined in U.S. Federal Rules of Civil Procedure 26(b)(2)(C) and 26(g)(1)(B)(iii), which state that the burden of review must not outweigh its benefits, and that discovery must not be unduly expensive. A good predictor of high-recall, and therefore an appropriate point to stop a review, is when marginal precision falls below a certain relevance rate for consecutive batches [24]. We denoted this as the "stopping point" for our reviews.

Our design specified that assessors – ten qualified and experienced barristers, paid commercial rates for their work – would review documents for relevance to one C-RFP at a time until marginal precision fell below 5% for three consecutive batches of 200 documents, our defined "stopping point." Assessors were grouped in five review pair teams; each assigned one odd and even numbered C-RFP to review on CAL® and the provider's platform. In two distinct review sessions, five review team pairs first applied the CAL® tool to C-RFPs 1, 3, 5, 7 and 9, and then the provider's tool to C-RFPs 2, 4, 6, 8 and 10. In a further two review sessions, the same C-RFPs were re-reviewed using the alternative tool, i.e., applying the provider's tool to C-RFPs 1, 3, 5, 7 and 9, and then the CAL® tool to C-RFPs 2, 4, 6, 8 and 10. The C-RFP review order is shown in Table II below.

TABLE II.          C-Rfp Review Order On Cal® And The Provider's Tool

| Review Order | TAR System | C-RFP |
|---|---|---|
| 1 | CAL | 1,3,5,7,9 |
| 2 | The Provider's Tool | 2,4,6,8,10 |
| 3 | The Provider's Tool | 1,3,5,7,9 |
| 4 | CAL | 2,4,6,8,10 |

This review order ensured there was a suitable lapse of time (i.e., washout period) between re-reviewing the same C-RFP. Having the review teams perform the review of a C-RFP for the first time on CAL® and the provider's tool reduced the risk of memory bias unduly advantaging one system over the other when the same C-RFP was re-reviewed.

As a seed set, a minimum of five responsive and five non-responsive documents were selected for each C-RFP by subject matter experts in the law firm responsible for case management. This was done because the provider's TAR tool recommends a minimum of five responsive and five non-responsive seed documents to "kick-start" their learning model.

Upon completion of each review, we computed recall for each C-RFP. In each case, an independent reviewer performed a blind review of a Confusion matrix sample to estimate recall for the CAL® and provider's tools. In the case of the tests of the provider's tool, we further evaluated recall for each C-RFP using an Elusion test sample, consistent with the evaluation procedure recommended by the provider. An Elusion test (a common form of evaluating recall in modern commercial litigation reviews) involves a review of a random sample of documents from the unreviewed population with a given confidence level and margin of error. Relevant documents identified can be used to calculate the estimated number of documents found, and, therefore, recall. The Confusion matrix is a more statistically robust validation protocol because it measures the performance of a classification model by breaking the review into actual and predicted results, and unlike the Elusion test, considers reviewer false positives and false negatives in its recall calculations. Table III provides a breakdown of the sub-collections and document count comprising the Confusion matrix sample, and the formula used to compute recall for both TAR systems. The recall formula used to calculate recall for each TAR system was the straightforward approach originally proposed in the legal case in *re Broiler Chicken Antitrust Litigation* [25].

Review effort is the total number of documents reviewed per C-RFP. Precision is measured as the proportion of relevant documents identified in each C-RFP.

We also measured the total time spent on the review platform by each assessor in reviewing each C-RFP. We then calculated the average cost incurred to identify each relevant document by taking the overall cost to review every document based on hourly rates / number of relevant documents found. Lapses of time >5 mins between coding documents were ignored as possible breaks in review.

TABLE III.    CONFUSION MATRIX SUB-COLLECTION PARTITIONS, SUB-SAMPLE SIZES, AND FORMULA USED TO ESTIMATE RECALL FOR THE PROVIDER'S TOOL AND CAL®.

| Subcollection Partitions | #Subsample Docs |
|---|---|
| Docs identified by both, coded responsive | 400 |
| Docs identified by the Provider's Tool NOT CAL, coded responsive | 400 |
| Docs identified by CAL NOT the Provider's Tool, coded responsive | 400 |
| Docs identified by both, coded unresponsive | 400 |
| Docs identified by the Provider's Tool NOT CAL, coded unresponsive | 400 |
| Docs identified by CAL NOT the Provider's Tool, coded unresponsive | 400 |
| Docs identified by both, coded responsive on the Provider's Tool, unresponsive on CAL | 400 |
| Docs identified by both, coded unresponsive on the Provider's Tool, responsive on CAL | 400 |
| Docs identified by CAL NOT the Provider's Tool, Rel judgment used for training (redundant Not Rel judgment) | 400 |
| Docs identified by CAL NOT the Provider's Tool, Not Rel judgment used for training (redundant Rel judgment) | 400 |
| Docs identified by neither the Provider's Tool NOR CAL | 1600 |
| **Recall formula for the Provider's Tool** | |
| Estimated Recall is calculated by the number of relevant documents in the sample for The Provider's Tool / the total number of relevant documents in the sample for both systems + the number of mislabelled relevant documents in the sample + the number relevant documents in the unreviewed population | |
| **Recall formula for CAL®** | |
| Estimated Recall is calculated by the number of relevant documents in the sample for CAL / the total number of relevant documents in the sample for both systems + the number of mislabelled relevant documents in the sample + the number relevant documents in the unreviewed population | |

## D. Validation Protocols

A major source of contention in the eDiscovery industry is the best method for demonstrating the effectiveness of a given review effort. The most-frequently employed metric used to assess the "completeness" of a review is by calculating an estimate of its recall. How this is done can vary widely, with some approaches yielding more accurate and reliable estimates than others. In practice, as opposed to in the lab, legal practitioners do not have the luxury of comparing the accuracy of their results to a "gold standard" evaluation set using the Cranfield Method [13]. In litigation, this is impossible for many reasons, not the least of which is that the very notion of relevance or responsiveness is subjective. It has been shown that reviewers will disagree with one another, and even with themselves when reviewing the same document set at different times, regardless of their level of expertise [26, 27, 13, 28, 7, 29, 30, 31, 32]. In order to be defensible, therefore, a validation

method used to calculate recall should be objective, unbiased, and independent.

The Elusion test is one of the most widely-utilised validation methods for estimating recall in eDiscovery, although it does not meet the criteria set forth above. As previously mentioned, this validation method typically occurs at the end of a review when the "stopping point" has been reached. A random sample of low-scoring documents targeting a particular confidence level and margin of error are taken from the unreviewed document corpus and assessed for relevance (often by the original reviewers who are aware the review task is almost complete and that the sample—referred to as a "null set" is not supposed to contain relevant documents). A typical sample size is 2,395, targeting a margin of error of 2.5% at a confidence level of 95%. The number of relevant documents found in this Elusion set allows for extrapolation across the unreviewed dataset to estimate the likely number of missing relevant documents still not found – known as "Eluded" documents. Therefore, Elusion test recall can easily be calculated by the total number of relevant documents found / the Eluded documents + the total number of relevant documents found.

Many legal practitioners consider the Elusion test the industry standard validation method. The accuracy and reliability of the results it produces are often accepted without question and relied upon by most as the benchmark of completeness [33]. We contend that this test is flawed because it is subject to reviewer bias and easily manipulated to achieve a desirably (but inaccurately) high recall estimate, and because the method lacks objectivity and independence. We advise against its continued use in the eDiscovery sector as a validation method and propose adopting a more statistically robust alternative: the Confusion test.

A Confusion test is a performance measurement for text classification exercises where output can be split into two or more classes (see Table III). The critical difference which renders it more reliable and accurate than an Elusion test is that it looks at predicted and actual results, which incorporate false negatives and false positives into recall calculations, whereas the Elusion test presupposes all documents marked as relevant on the first pass are accurately coded, which is pure fiction. Further, having an independent reviewer perform a blind review of each sub-collection sample of documents without knowing their previous coding decisions greatly reduces reviewer bias and makes the process more objective. Table IV below depicts a standard Confusion matrix table.

## E. CAL® and the Provider's Algorithms

LIBLINEAR is an open-source library that uses SVM classifiers in natural language processing tasks such as binary text classification. The aim of SVM classifiers in binary text classification exercises is to construct an optimal hyperplane margin in a high dimensional space that effectively splits the data into two classes, e.g. responsive or non-responsive in eDiscovery tasks [34, 35]. The provider's tool uses a linear kernel and modified libraries [proprietary feature engineering and hyperparameters].

TABLE IV.    CONVENTIONAL CONFUSION MATRIX TABLE

| | | Actual Values | |
|---|---|---|---|
| | | positive (1) | negative (0) |
| Predicted Values | positive (1) | TP | FP |
| | negative (0) | FN | TN |

The CAL® tool used for testing purposes is the BMI implementation of CAL® used by participants at the TREC 2015 Total Recall Track. All hyperparameters and feature engineering are unchanged. The logistic regression algorithm uses a sigmoid function on training data, mapping input features to a probability of 0 and 1 [36]. In binary classification exercises, this probability predicts the likelihood of an input belonging to a positive class, e.g., (responsive) in eDiscovery tasks.

### F. Participants

Participants in the study were qualified barristers with many years of experience performing TAR and manual reviews in Ireland. They were aware that their coding decisions would ultimately be used in legal proceedings. Therefore, they were all properly incentivised to perform to the best of their capabilities. They were paid commercial hourly rates for their efforts.

### IV. RESULTS

In this section, we discuss the outcome of our experiment in terms of the key performance metrics referenced above, i.e., recall, precision, review effort, and cost incurred per relevant document found.

### A. Precision and Review Effort

CAL® achieved a higher precision for every C-RFP than the provider's tool (see Table V). In most test cases, CAL® also required less review effort than the provider's tool. In C-RFP 4 and 8 instances, however, CAL® achieved higher precision and found more relevant documents than the provider's tool and, as a result, required additional review effort to do so before reaching the "stopping point".

### B. Recall

In every completed C-RFP, CAL® yielded higher recall than the provider's tool, substantially so for five out of six C-RFPs according to the Confusion test results, achieving recall >15% better in each instance. The CAL® reviews for C-RFP 2, 6 and 10 were terminated prematurely due to the resource limitations arising from the unanticipated case settlement. Consequently, no recall measure was calculated via a Confusion test for those C-RFPs. The review of C-RFP 8 was completed on both systems, however, the same issues also precluded the completion of a Confusion test. The C-RFP 3 review did not reach the defined "stopping point" for the provider's tool and was terminated for futility. However, because over 25% of the entire corpus was reviewed on both systems for this C-RFP, we calculated recall via a Confusion test for the given review effort.

There is a stark contrast between the recall estimations achieved using the Confusion test and the provider's Elusion test validation method. Table V shows the results of two separate Elusion tests of the provider's tool's results, in comparison to the Confusion test results for both the provider's tool and CAL®. For the C-RFPs 1, 3, 5, 7 and 9, the original assessor's Elusion test recall overestimates the provider's tool's recall by 29%, 20%, 16%, 25% and 36%, respectively, according to the corresponding Confusion tests. The Elusion test results appear entirely ungrounded in truth when compared to the more statistically reliable results achieved by the Confusion test and, in particular, when viewed in light of the fact that CAL® identified thousands of additional responsive documents than the provider's tool (see Table V precision rates) for these C-RFPs. The same logic can also be applied to the incompletely reviewed C-RFPs 2, 6 and 10, which estimate implausibly high recall.

TABLE V.    RECALL FOR CAL® AND THE PROVIDER'S TOOL, ACCORDING TO A CONFUSION MATRIX SAMPLE REVIEWED BY AN INDEPENDENT ASSESSOR. RECALL FOR THE PROVIDER'S TOOL, ACCORDING TO AN ELUSION TEST SAMPLE REVIEWED BY THE ORIGINAL ASSESSORS, AND THE SAME ELUSION TEST SAMPLE REVIEWED BY AN INDEPENDENT ASSESSOR.

| | C-RFP | 1 | 2* | 3* | 4 | 5 |
|---|---|---|---|---|---|---|
| CAL Review Effort (K-docs) | | 33.2 | 16 | 43.2 | 4.9 | 4 |
| | C-RFP | 6* | 7 | 8 | 9 | 10* |
| | | 5.7 | 4.7 | 11 | 4.4 | 24 |
| The Provider's Review Effort (K-docs) | C-RFP | 1 | 2* | 3* | 4 | 5 |
| | | 34.7 | 44.1 | 47.6 | 8.89 | 2.92 |
| | C-RFP | 6* | 7 | 8 | 9 | 10* |
| | | 15.8 | 9.03 | 9.81 | 4.7 | 23.7 |
| CAL Precision | C-RFP | 1 | 2* | 3* | 4 | 5 |
| | | 0.58 | 0.89 | 0.66 | 0.3 | 0.48 |
| | C-RFP | 6* | 7 | 8 | 9 | 10* |
| | | 0.94 | 0.54 | 0.55 | 0.55 | 0.98 |
| The Provider's Precision | C-RFP | 1 | 2* | 3* | 4 | 5 |
| | | 0.38 | 0.3 | 0.41 | 0.17 | 0.12 |
| | C-RFP | 6* | 7 | 8 | 9 | 10* |
| | | 0.31 | 0.19 | 0.11 | 0.23 | 0.34 |
| CAL Recall | C-RFP | 1 | 2* | 3* | 4 | 5 |
| | | 0.81 | n/a | 0.87 | 0.56 | 0.78 |
| | C-RFP | 6* | 7 | 8 | 9 | 10* |
| | | n/a | 0.59 | n/a | 0.93 | n/a |
| The Provider's Recall | C-RFP | 1 | 2* | 3* | 4 | 5 |
| | | 0.65 | n/a | 0.69 | 0.54 | 0.24 |
| | C-RFP | 6* | 7 | 8 | 9 | 10* |
| | | n/a | 0.42 | n/a | 0.55 | n/a |
| The Provider's Elusion Test Recall | C-RFP | 1 | 2* | 3* | 4 | 5 |
| | | 0.94 | 0.92 | 0.89 | 0.4 | 0.4 |
| | C-RFP | 6* | 7 | 8 | 9 | 10* |
| | | 0.98 | 0.67 | 0.51 | 0.91 | 0.89 |
| The Provider's Elusion Test Recall (Independent Review) | C-RFP | 1 | 2* | 3* | 4 | 5 |
| | | 0.94 | 0.96 | 0.98 | 0.54 | 0.32 |
| | C-RFP | 6* | 7 | 8 | 9 | 10* |
| | | 1 | 0.93 | 0.53 | 0.4 | 0.15 |

### C. Cost Incurred Per Relevant Document Found

Table VI shows the average cost incurred per relevant document reviewed on CAL® and the provider's tool. CAL® is far more cost-effective than the provider's tool, identifying relevant documents for half the price or less on six C-RFPs. The average cost per relevant document found for CAL® was 44% that of the provider's tool; this is offset somewhat by the fact that CAL® returned more relevant documents in each review.

TABLE VI.    AVERAGE COST INCURRED, IN EUROS, TO IDENTIFY ALL RELEVANT DOCUMENTS ON CAL® AND THE PROVIDER'S TOOL, ACCORDING TO THE AVERAGE TIME SPENT REVIEWING ALL DOCUMENTS PER TOPIC.

| C-RFP No. | CAL | The Provider |
|---|---|---|
| 1 | €3.37 | €5.67 |
| 2 | €2.75 | €4.95 |
| 3 | €2.93 | €4.81 |
| 4 | €8.15 | €11.34 |
| 5 | €5.49 | €20.15 |
| 6 | €2.97 | €6.31 |
| 7 | €3.91 | €10.84 |
| 8 | €2.78 | €9.29 |
| 9 | €3.81 | €8.08 |
| 10 | €2.25 | €5.81 |

### D. Incomplete Reviews

Resource limitations arising from the case settlement prevented the CAL® reviews for C-RFPs 2, 6, and 10 from reaching their designated "stopping point". However, for C-RFPs 2 and 6, CAL® surpassed the number of relevant documents identified by the provider's tool with a third of the review effort. For C-RFP 10, CAL® found three times as many relevant documents for the same review effort (see Table V). Consequently, the final recall for these C-RFPs was not calculated via a Confusion test. For the completed C-RFP 8, CAL® identified five times as many relevant documents than the provider's tool. Unfortunately, due to the case settlement, resources were unavailable to perform a Confusion test on this C-RFP. The provider's TAR review for C-RFP 3 also concluded slightly prematurely due to resource limitations once the matter settled. However, we calculated recall for the given review effort as both systems had comparable review efforts and had reviewed a considerable portion of the dataset. **Note: Reviews that did not reach the defined "stopping point" are marked with asterisks in the results tables.**

### V.  DISCUSSION

Our experimental results support our hypothesis that the effectiveness and efficiency with which assessors can complete a TAR review is directly impacted by the underlying tool and process it employs. Moreover, we found that the validation method adopted to measure a review's completeness can dramatically affect final recall estimates.

### A. CAL® vs The Provider's Tool: Main Findings

Our findings underscore that the order in which documents are presented to reviewers for assessment is an important differentiator between TAR systems. Document review order appears to have a significant effect on a tool's performance.

CAL® aims to find as many relevant documents as possible as soon as possible. By serving the reviewers with the next most-likely-to-be-relevant documents in an unbroken sequence from the outset, CAL® allows the algorithm to learn and develop its model based on high-scoring examples from start to finish. It often and quickly achieves sustained batches of >90% precision until the next most-likely-to-be-relevant documents are exhausted. At this point, marginal precision drops below the predetermined level (i.e., typically 5 to 10%), and the review is concluded. This benefits the end user in numerous ways. The continual provision of high precision batches to reviewers maximises the trade-off between the effort spent reviewing relevant documents and the wasted effort spent looking at non-relevant ones. High precision and minimised review effort reduce the time it takes to complete a review and, therefore, the overall cost of completing a review and identifying relevant documents. This approach also tends to surface the most relevant and important documents first.

Whereas CAL® adopts a greedy approach to identifying relevant documents, maintaining high-precision batches throughout the review, the provider's tool, on the other hand, hedges its bets by implementing a hybrid relevance feedback and uncertainty sampling approach. 70% of the documents that appear in the provider's review queue are the highest ranked, 20% are low-scoring (in the 40-60 range), and 10% are randomly selected. The rationale for such diversity sampling is to improve recall and the classifier performance by allowing the model to learn from all definitions of relevance, thus acting as "index health" documents. We can see from the results in Table V that this does not appear to work. What this process certainly does, however, is decrease the provider's tool's precision and increases review effort considerably by requiring users to examine 30% "index health" documents when it is unlikely that many, if any, of these documents will be relevant. Therefore, precision at the outset of the provider's TAR review will usually be at most 60-65% per batch of 200 documents and will only decline further while still in the early stages of the review. Further, while CAL® and the provider's tool will be resilient to some inconsistent reviewer behaviour, constructing an effective classifier requires reviewers to make consistent coding decisions. Inconsistent coding decisions applied at the outset of a review to conceptually similar documents may impede the learning model's ability to identify likely-to-be-relevant documents, causing relevance rates to stagnate. Therefore, including 30% "index health" documents from the outset throughout the review may contribute to why the provider's tool underperformed regarding the recall it achieved for every C-RFP.

Additionally, the 10% of random documents inserted by the provider's tool further compounds the effort to complete the review because they appear in the review queue regardless of their score or the past assessments made on conceptually similar material. Therefore, should the document corpus consist of numerous similarly non-relevant documents, the assessor may consistently see this subset of documents irrespective of their continued non-relevant classifications. Naturally, this can give rise to substantial duplication of review effort and not only protract the length of time it takes to complete a review but incur additional expense on the user. Conversely, CAL® leverages every relevance assessment to continuously update its model and document ranks to ensure that documents marked as non-relevant will suppress similar documents from appearing in future batches.

Our findings with respect to the precision achieved by the CAL® tool support our abovementioned observations. The final precision for the concluded CAL® C-RFPs 1, 3, 5, 7, 8 and 9 was 0.48 or better, meaning that CAL® identified one relevant document out of every two reviewed (see Table V). C-RFP 4 was an outlier, achieving 0.3 precision, likely due to the ambiguous nature of the material or the poorly constructed

definition of relevance in the C-RFP, or both. A typical characteristic of a CAL® review is to quickly achieve batches containing nearly 100% relevant documents, with the gain curve sharply inclining in the early stages of learning, plateauing at sustained high relevance before sharply dropping off when all likely-to-be-relevant documents are exhausted. Evidence of this is found by looking at the incomplete CAL® reviews for C-RFPs 2, 6 and 10. 89% relevance or above was maintained for these C-RFPs still in the plateau learning phase after reviewing thousands of documents.

Our findings for precision with respect to the provider's tool are quite different from how a well-performing TAR review should look. The low precision scores are symptomatic of the abovementioned issues, with some C-RFPs, 5 and 8, starkly contrasting to their CAL® counterpart, by identifying only one relevant document out of every 10. This indicates a learning model that has overfitted and cannot generalize well to make successful predictions in unknown data. The effect is a review process that never achieves sustained high precision. This is evidenced by comparing Figures 1 and 2, which show the review trajectory for C-RFP 3.

In contrast to CAL®, the learning curve for the provider's tool appears to decline far more gradually, with no definable pattern, resurging and dropping several times (see Figure 2). Towards the later stages, the review queue contains mostly ambiguous documents and the continued 30% "index health" documents. This adversely impacts the learning curve's ability to flatten quickly and signify the end of the review, dramatically decreasing precision and increasing review effort and cost. The provider's tool's decision boundary has failed to reach stabilization, which also has negative implications for recall because it is nearly impossible to determine when the review is complete with any degree of certainty.



Fig. 1.   Relevance rates for each reviewer per batch from the start to conclusion of the CAL®  review for C-RFP 3.



Fig. 2.   Consolidated relevance rates for each reviewer per batch from the start to end of the provider's TAR review for C-RFP 3. Note: C-RFP 3 concluded slightly before the "stopping point" due to resource limitations.

The results in Table VI translate the difference in review performance into the costs incurred to complete each C-RFP review. While it is apparent that CAL® is better than the provider's TAR tool at identifying more relevant documents, with better precision, and for less review effort, what needs to be more readily apparent is how these findings also have a direct and significant monetary impact on the user; their chosen TAR system could potentially save or cost them millions of euros. In our current test dataset of 169,000 documents, the difference in price in completing the review is already high, but extrapolated across the entire dataset of 300 million documents, it would have been prohibitively so.

It is the authors' understanding that the leading eDiscovery provider has recently reconfigured its tool to allow for the removal of the 30% "index health" documents. This modification was implemented after our testing programme was complete. The extent to which this could improve the TAR system's performance is unknown, but it will likely decrease review effort and, therefore, result in some improvement in precision. However, it is difficult to predict the level of improvement, if any, that will be seen in the classifier's effectiveness at achieving high recall. It is possible that the provider's modifications could cause the platform's performance in that respect (or in others) to deteriorate to some degree.  Only time will tell.

### B.  Review Validation: Elusion is an Illusion

The notion that there is a "ground truth" for the relevance for every document in a TAR review is illusory. Attaining 100% recall in a TAR review in a legal proceeding is impossible due to the subjective nature inherent in document reviews and the imprecision in the definition and assessment of relevance itself [26, 27, 13, 28, 7, 29, 30, 31, 32]. TAR users should be wary of service providers who report recall estimates closely approaching that number. However, what can be achieved using sound TAR tools and methods is reasonably high recall (i.e., 75%+) that is accurately reported through the proper application of a statistically robust validation protocol.

We demonstrate the influence of validation metrics by comparing the recall estimates provided through an Elusion test versus a Confusion test on the same production. Our results support our call for the immediate discontinuation of the Elusion test as a defensible validation protocol in eDiscovery.

Considering the precision and total number of relevant documents identified for C-RFPs 1, 2, 3, 6, 9 and 10 on the provider's tool versus CAL® (see Table V), the Elusion test recall estimates for these C-RFPs are dramatically overinflated (see Table V).

According to the original assessor's Elusion test reviews, the provider's tool achieves comparable recall for C-RFP 9 and superior recall than CAL® for C-RFPs 1, 3 and 7 (see Table V). However, the Confusion test clearly shows that the provider's tool achieves inferior recall and overestimates the provider's tool's recall by 36%, 29%, 20% and 25%, respectively. According to the Confusion test, the provider's tool did not achieve reasonably high recall (i.e. 75%) in any of the C-RFP reviews! This has potentially serious legal ramifications for users of this TAR system. Instead of achieving high recall as the Elusion test results would lead the producing party to believe, they are actually producing far fewer relevant documents than would likely be deemed adequate under the producing party's statutory obligation under, for example, (U.S.) Federal Rule of Civil Procedure 26(g)(1)(B), which requires attorneys to certify they have conducted a reasonable search to find all reasonably available relevant documents.

Why is it that the Elusion test is so fatally flawed? The answer is fourfold. First, in a voluminous dataset consisting of hundreds of thousands to millions of documents, with low prevalence, examining a relatively small random sample of documents with a confidence level of 95% and a margin of error of +/-21/2 to 3%, is a negligible representation of the entire collection that is unlikely to yield any positive examples, particularly when most of the relevant documents have already been removed. Therefore, the Elusion test predicts almost perfect recall (see C-RFP 6 in Table V), when that may not be the case. Our results show that the provider's TAR tool does not identify nearly as many relevant documents as CAL®. Yet, the Elusion test suggests an adequate result by calculating recall based on the number of relevant documents identified in a relatively small sample of the unreviewed collection and presupposing that all relevant judgments in the original review are infallible, which is an incorrect assumption. When combined, these make a recall estimate look better than it is. When a handful of relevant documents are identified in a low-prevalence Elusion test, this can drastically alter the final recall estimate [see C-RFP 9 in Table V for original and independent assessor divergence].

Second, for high-prevalence datasets, Elusion tests are rendered almost meaningless at accurately estimating recall because large numbers of relevant documents in an Elusion sample set have a negligible impact on reducing what appears as a high-recall estimate.

Third, it is often the case in practice that the same reviewers who conducted the original review also perform the Elusion test review and do so knowing that they are reviewing documents that are "supposed to be" non-responsive. This results in considerable reviewer bias and is subject to manipulation when review teams are acutely aware that the review is "nearly over," so they know they are not supposed to find more relevant documents, thereby achieving an acceptable Elusion recall estimate.

Fourth, and linked to the point above, is the notion of independence and objectivity that should be inherent in any reliable validation protocol. Studies have shown that a final recall estimate is positively impacted if the same assessor is used to train and validate the system performance [29]. One can easily receive full marks when assessing one's own work.

The Confusion test resolves all of these issues by incorporating both previously reviewed and unreviewed documents without providing the validation reviewer information about the prior coding (if any). This blind review of a sample of the entire dataset provides a more statistically robust overview of review performance, both of the TAR tool and the first-pass reviewers. Having an independent reviewer perform this exercise with no prior knowledge of the sub-collection from which the documents came or their previous coding decisions removes all bias and subjectivity. The outcome is a recall estimate that is defensible and accurate.

## VI. CONCLUSION

We tasked our barristers with finding as many relevant documents as possible before marginal precision dropped below our predefined TAR "stopping point" on two systems: Grossman and Cormack's logistic regression CAL® tool and a leading eDiscovery service provider's SVM-based tool. Our results show that the "science behind the black box" may be underappreciated in practice and in the case law. The effectiveness of the learning algorithm used by a TAR system and the accompanying TAR process can substantially impact a system's ability to achieve high recall and high precision for reasonable effort. For all C-RFPs, our results were consistent: CAL® achieved significantly superior recall to the provider's tool according to the completed Confusion tests, while concluding the reviews with a much higher precision for less review effort. In every instance, the provider's tool achieved low to unacceptably low recall estimates by industry standards.

A serious consideration before undertaking any document review, whether by exhaustive manual review or TAR, is the question: How much will this cost? Our results conclusively show that CAL® achieves its superiority over the provider's tool while also doing so for less money. This is particularly important in jurisdictions that provide for cost allocation following proceedings; it becomes highly relevant for legal practitioners to know when the opposing side is using a TAR system that unnecessarily drives up costs by failing to achieve high levels of precision. This becomes increasingly important with larger datasets with low prevalence.

The Elusion test gives the user a misleading picture of the results of a review effort. Recall estimated from an Elusion test paints an overly rosy picture as compared to a proper recall estimate using a Confusion test. In truth, Elusion tests can easily mask the true quality of a production which may be inadequate. The statistical flaws, bias and subjectivity inherent in the Elusion Test make it unsuitable as a validation protocol for eDiscovery.

The authors urge that its use be discontinued in legal practice and offer a readily available alternative in its place, one that is easily implemented without additional effort and that ensures defensible and reliable recall estimates - the Confusion test. Its adoption is a must for any TAR user who wants to certify that they have properly discharged their statutory obligation to make a reasonable production.

### Acknowledgment

The authors wish to express their gratitude to the Maples Group for their cooperation and support during this study. A special mention to Martin Elliott for his technical input.

### References

[1] G. V. Cormack and M. R. Grossman, "Evaluation of machine-learning protocols for technology-assisted review in electronic discovery," In Proc of. SIGIR '14, Jul. 2014, doi: 10.1145/2600428.2609601.

[2] J. Higgins, J. Thomas, J. Chandler, M. Cumpston, T. Li, M. Page, V. Welch (Editors), "Cochrane Handbook for Systematic Reviews of Interventions (2nd.ed.)," Chicester (UK): John Wiley & Sons, 2019.

[3] M. Sanderson and H. Joho, "Forming test collections with no system pooling," In Proc of. SIGIR '04, Jul. 2004, doi: 10.1145/1008992.1009001.

[4] G. V. Cormack and T. R. Lynam, "Spam Corpus Creation for TREC. In The Second Conference on Email and Anti-Spam," 2005, [Online]. Available at: https://www.ceas.cc/papers-2005/162.pdf

[5] P. Taylor. "Volume of data/information created, captured, copied, and consumed worldwide from 2010 to 2020, with forecasts from 2021 to 2025," Available at: https://www.statista.com/statistics/871513/worldwide-data-created/.

[6] M. R. Grossman and G. V. Cormack, "Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review," Richmond Journal of Law and Technology, vol. 17, no. 3, p. 11, Jan. 2011, [Online]. Available at: https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1344&context=jolt

[7] G. V. Cormack and M. R. Grossman, "Navigating Imprecision in Relevance Assessments on the Road to Total Recall: Roger and Me," In Proc of. SIGIR '17, Aug. 2017, doi: 10.1145/3077136.3080812.

[8] Da Silva Moore v. Publicis Groupe - 287 F.R.D. 182 (S.D.N.Y. 2012)

[9] C. Goodhart, "Problems of Monetary Management: The UK Experience. In: Monetary Theory and Practice," 1984, doi 10.1007/978-1-349-17295-5_4.

[10] M. R. Grossman and G. V. Cormack, "The Grossman-Cormack Glossary of Technology-Assisted Review," Fed. Courts. Law. Review, vol. 7, no. 1, 2013.

[11] G. V. Cormack and M. R. Grossman, "Autonomy and Reliability of Continuous Active Learning for Technology-Assisted Review," Apr. 2015, [Online]. Available at: https://arxiv.org/pdf/1504.06868.pdf

[12] D. Blair and M. E. Maron, "An evaluation of retrieval effectiveness for a full-text document-retrieval system," Commun. ACM vol. 28, no. 3, pp. 289-299, Mar. 1985, doi: 10.1145/3166.3197.

[13] E. M. Voorhees, "Variations in relevance judgments and the measurement of retrieval effectiveness," Information Processing and Management, vol. 36, no. 5, pp. 697-716, Sep 2000, doi: 10.1016/s0306-4573(00)00010-8.

[14] G. V. Cormack, C. R. Palmer, and C. L. A. Clarke, "Efficient construction of large test collections," In Proc of. SIGIR '98, Aug. 1998, doi: 10.1145/290941.291009.

[15] D. Lewis, Y. Yang, T. Rose, and F. Li, "RCV1: a new benchmark collection for text categorization research," Journal of Machine Learning Research, vol. 5, pp. 361–397, Dec. 2004, doi: 10.5555/1005332.1005345.

[16] D. Lewis and W. A. Gale, "A sequential algorithm for training text classifiers," arXiv (Cornell University), pp. 3–12, Aug. 1994, doi: 10.5555/188490.188495.

[17] "Baseline Model Implementation for Automatic Participation in TREC 2015 Total Recall Track," Available at: https://cormack.uwaterloo.ca/trecvm/. [Accessed 29 August 2023]

[18] G. V. Cormack and M. R. Grossman, "Engineering Quality and Reliability in Technology-Assisted Review," In Proc of. SIGIR '16, Jul. 2016, doi: 10.1145/2911451.2911510.

[19] D. Li and E. Kanoulas, "When to Stop Reviewing in Technology-Assisted Reviews: Sampling from an Adaptive Distribution to Estimate Residual Relevant Documents," ACM Trans. Inf. Syst. Vol. 38, no. 4, Article 41, pp. 1-36, Oct. 2020, doi: 10.1145/3411755.

[20] E. Yang, D. D. Lewis, and O. Frieder, "Heuristic stopping rules for technology-assisted review," In Proc of. DocEng '21, Aug. 2021, doi: 10.1145/3469096.3469873.

[21] A. Sneyd and M. Stevenson, "Stopping Criteria for Technology Assisted Reviews based on Counting Processes," . In Proc of. SIGIR '21, Jul. 2021, doi: 10.1145/3404835.3463013.

[22] H. Zhang, J. Lin, G. V. Cormack, and M. D. Smucker, "Sampling Strategies and Active Learning for Volume Estimation," In Proc of. SIGIR '16, Jul. 2016, doi: 10.1145/2911451.2914685

[23] G. V. Cormack and M. R. Grossman, "Scalability of Continuous Active Learning for Reliable High-Recall Text Classification," In Proc of. CIKM '16, Oct. 2016, doi: 10.1145/2983323.2983776.

[24] G. V. Cormack and M. R. Grossman, "Multi-Faceted Recall of Continuous Active Learning for Technology-Assisted Review," In Proc of. SIGIR '15, Aug. 2015, doi: 10.1145/2766462.2767771.

[25] In re Broiler Chicken Antitrust Litigation, No. 1:2016cv08637

[26] P. Bailey, N. Craswell, I. Soboroff, P. Thomas, A. P. de Vries, and E. Yilma, "Relevance assessment: are judges exchangeable and does it matter,". In Proc of. SIGIR '08, Jul 2008, doi: 10.1145/1390334.1390447.

[27] H. L. Roitblat, A. Kershaw, and P. Oot, "Document categorization in legal electronic discovery: computer classification vs. manual review," Journal of the Association for Information Science and Technology, vol. 61, no. 1, pp. 70–80, Oct. 2009, doi: 10.1002/asi.21233.

[28] W. Webber, D. W. Oard, F. Scholer, and B. Hedin, "Assessor error in stratified evaluation," In Proc of. CIKM '10, Oct. 2010, doi: 10.1145/1871437.1871508.

[29] A. Roegiest, G. V. Cormack, C. L.A. Clarke, and M. R. Grossman, "Impact of Surrogate Assessments on High-Recall Retrieval," In Proc of. SIGIR '15, Aug. 2015, doi: 10.1145/2766462.2767754.

[30] T. Saracevic, "Relevance: A review of and a framework for the thinking on the notion in information science," Journal of the American Society for Information Science, vol. 26, no. 6, pp. 321–343, Nov. 1975, doi: 10.1002/asi.4630260604.

[31] T. Saracevic, "Relevance: A review of the literature and a framework for thinking on the notion in information science. Part II: nature and manifestations of relevance," Journal of the Association for Information Science and Technology, vol. 58, no. 13, pp. 1915–1933, Jan. 2007, doi: 10.1002/asi.20682.

[32] T. Saracevic, "Relevance: A review of the literature and a framework for thinking on the notion in information science. Part III: Behaviour and effects of relevance," Journal of the Association for Information Science and Technology, vol. 58, no. 13, pp. 2126–2144, Jan. 2007, doi: 10.1002/asi.20681.

[33] "There Is No One Size Fits All Sample Size Appropriate for TAR Validation (Part II)," The ACEDS eDiscovery voice community blog, Mar. 2020, Available at: https://www.jdsupra.com/legalnews/there-is-no-one-size-fits-all-sample-42659/.

[34] B. E. Boser, I. M. Guyon, and V. N. Vapnik, "A training algorithm for optimal margin classifiers," In Proc of. COLT '92, Jul 1992, doi: 10.1145/130385.130401.

[35] R. E. Fan, K. W. Chang, C. J. Hsieh, X. R. Wang, and C. J. Lin, "LIBLINEAR: A Library for Large Linear Classification," J. Mach. Learn. Res. Vol. 9, pp. 1871-187, 2008.

[36] D. Cox, "The Regression Analysis of Binary Sequences," Journal of the Royal Statistical Society: Series B (Methodological), vol. 21, no. 1, p. 238, Jan 1959, doi: 10.1111/j.2517-6161.1959.tb00334.x.

# EXHIBIT C

# 13 Vetting and Validation of AI-Enabled Tools for Electronic Discovery

*Maura R Grossman
and Gordon V Cormack*

|  I. | Preface | 466 |
| II. | Introduction | 466 |
| III. | TAR and Non-TAR Methods and Their Effectiveness | 468 |
| IV. | Machine Learning Methods | 473 |
| V. | TAR Protocols | 477 |
| VI. | Measures of Effectiveness | 480 |
| VII. | The Use and Misuse of Statistics | 483 |
| VIII. | Establishing the Effectiveness of TAR Tools and Review Efforts | 490 |
| IX. | A TAR Checklist and Parting Words | 496 |

Appendix A .............................................................. 499
Appendix B .............................................................. 503

© [2021] Emond Montgomery Publications. All Rights Reserved.

## I. Preface

The use of technology-assisted review (TAR) in electronic discovery (e-discovery) is a well-developed application of artificial intelligence (AI) in law. It has been in use for over a decade. Unfortunately, along with its growing use has come well-developed "received wisdom" that is at best oversimplified and at worst misleading. That has necessitated the need for a more technical treatment, which this chapter supplies. We advise the reader that this chapter is written for a specialized audience that is well versed in e-discovery. For others, the major take-aways from the chapter are the two model validation protocols supplied in the appendixes, which stand alone and can be adapted for most matters where TAR is employed. The chapter itself provides an explanation and a justification for the proposed validation protocols and counters a number of prevalent but misleading notions associated with TAR and the statistics used to evaluate TAR efforts.

## II. Introduction

The process of document discovery in litigation has been almost entirely supplanted by e-discovery. In e-discovery, responsive electronically stored information (ESI)[1] must be identified and, unless withheld for privilege, produced to the requesting party. Although diverse sources and formats of ESI—such as email, text messages, social media, and scanned images subject to optical character recognition (OCR) to make them searchable—have replaced filing cabinets and banker's boxes filled with hard-copy documents, the term "document" has survived to describe any unit of ESI subject to production that is both relevant to the claims and defences of the matter at hand and can be found and produced without disproportionate burden and cost.

Along with the emergence of ESI, there has been an explosion in the number of potentially relevant "documents," along with the cost and burden of examining them to determine which are responsive and, among those that are responsive, which may be withheld for privilege. It is typically not feasible to review every email for a single

---

1   The term "electronically stored information" was first introduced in the 2006 amendments to the US *Federal Rules of Civil Procedure* as an umbrella term for computerized data, regardless of their format. See Maura R Grossman & Gordon V Cormack, "The Grossman-Cormack Glossary of Technology-Assisted Review" (2013) 7:1 Fed Cts L Rev 1 at 15 [TAR Glossary] (ESI is "[u]sed in Federal Rule of Civil Procedure 34(a)(1)(A) to refer to discoverable information 'stored in any medium from which the information can be obtained either directly or indirectly or, if necessary, after translation by the responding party into a reasonably usable form.' Although Rule 34(a)(1)(A) references 'Documents or Electronically Stored Information,' individual units of review and production are commonly referred to as Documents, regardless of medium."). The term "relevant" refers to ESI that is pertinent to a particular inquiry (e.g., an information request or a claim or defence in litigation); the term "responsive" refers to ESI that meets the criteria set forth in a request for production or subpoena: *ibid* at 28. Although the notion of relevance is more general than that of responsiveness, within the context of this article and in e-discovery practice more generally, the terms are often used interchangeably.

© [2021] Emond Montgomery Publications. All Rights Reserved.

individual let alone email for the key custodians of an organization, along with other sources of ESI, such as their word-processing files, text messages, and social media. Unlike filing cabinets and banker's boxes, email folders and other electronic documents are seldom well enough organized that just a few folders that are highly likely to contain the documents of interest can be identified.

Imagine a hypothetical "ideal" situation in which cost and timeliness are non-issues and in which you have an army of competent reviewers available to examine every potentially responsive document, sorting those that are responsive from those that are not. AI methods—collectively dubbed TAR—can effectively emulate this ideal even when there are thousands or millions of potentially responsive documents to be labelled. In 2011, we published the results of an experiment showing that two different TAR methods were at least as effective as exhaustive manual review, with a tiny fraction of the effort.[2] The two TAR methods we found to be more effective than exhaustive manual review were a *rule-based* method and a *supervised machine learning* method.[3]

Citing our work either directly or by reference, courts in the United States, Ireland, the United Kingdom, and Australia have approved the use of TAR for e-discovery.[4] Its use is now generally accepted, in principle, in these and other jurisdictions, including Canada. Controversy remains, however, as to precisely what constitutes a reasonable TAR process and, after following such a process, whether an acceptable result has been achieved.

In a perfect world, a recognized body would set standards for the application of TAR technology in e-discovery and would certify particular tools and protocols for their adherence to these standards. The practitioner could then enjoy a reasonable probability of success by properly applying a certified tool and could confirm success by applying a certified validation protocol. At the time of writing (January 2021), however, no organization had taken up the mantle.[5] Therefore, for now—and for the

---

2   Maura R Grossman & Gordon V Cormack, "Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review" (2011) 17 Rich JL & Tech 1 [JOLT study].

3   *Ibid* at 29-34. A rule-based TAR method relies on a set of rules created by one or more experts to emulate the human decision-making process for the purposes of classifying documents. A supervised machine learning TAR method is one in which an algorithm learns to distinguish between relevant and non-relevant documents using a training set and labelled human judgments. See TAR Glossary, *supra* note 1 at 28, 31. Supervised machine learning methods are discussed more fully in Section IV of this chapter.

4   See e.g. *Da Silva Moore v Publicis Groupe*, 287 FRD 182 (SDNY 2012); *Irish Bank Resolution Corp & Ors v Quinn & Ors*, [2015] IEHC 175 (HC); *Pyrrho Investments Ltd v MWB Property Ltd*, [2016] EWHC 256 (Ch); *McConnell Dowell Constructors (Aust) Pty Ltd v Santam Ltd & Ors (No 1)*, [2016] VSC 734.

5   The nascent ISO/IEC 27050 standard prescribes standards for the conduct of e-discovery but is currently silent on how to measure the effectiveness and reliability of e-discovery technology, including TAR. See "ISO/IEC 27050:2016+—Information Technology—Security Techniques—Electronic Discovery (Parts 1-3 Published, Part 4 DRAFT)" (last visited 24 January 2021), online: *IsecT* <https://www.iso27001security.com/html/27050.html>.

© [2021] Emond Montgomery Publications. All Rights Reserved.

foreseeable future—practitioners must take it upon themselves to identify reasonable tools, procedures, and validation protocols based on the best available information and augmented by their own vetting and evaluation efforts.

This chapter summarizes the available evidence concerning how AI-based TAR (and some non-TAR) e-discovery tools and processes work. It surveys which tools and processes have (and have not) been shown to be effective and how to measure their effectiveness. Furthermore, it offers practical guidance and model protocols covering both how to select and use a TAR tool and how to evaluate its efficacy—before, during, and after a particular e-discovery review effort.

## III. TAR and Non-TAR Methods and Their Effectiveness

Exhaustive manual review typically entails too much time, effort, and cost to be a viable strategy for all but the smallest matters. Prior to the advent of TAR, keyword culling was traditionally used to reduce the size of the document collection; it functions by excluding from review all documents that do not match a particular set of search terms. The excluded documents (the "null set") are presumed to be non-responsive, whereas the matching documents are subject to manual review and labelling for responsiveness, privilege, confidentiality, and sometimes specific issues related to the claims or defences in the litigation.

Before we examine the different TAR and non-TAR methods, we must first define the measures and related terms we will use to assess their efficacy. The *end-to-end recall* of a review effort (a measure of completeness) is the fraction of responsive documents in the collection that are correctly labelled as responsive. For the keyword-culling method described above, a document can be labelled responsive only when it is matched by the search terms *and* correctly labelled by the reviewer. The *end-to-end precision* of a review effort (a measure of accuracy) is the fraction of documents labelled responsive that are, in fact (i.e., truly), responsive.[6] It is possible to compute only an *estimate* of recall and precision by comparing the results to a gold standard. A "gold standard" is the best available determinant of relevance or non-relevance of all (or a sample) of a document collection, used as a benchmark to evaluate the effectiveness of a search and review effort.[7] It is also referred to as "ground truth."

It is important to distinguish the end-to-end recall of the review effort from the recall of the keyword culling alone (i.e., search-term recall). Search-term recall is the fraction of responsive documents that are matched by the keywords regardless of whether they are correctly labelled by the reviewer. Similarly, search-term precision is the fraction of documents matched by the keywords that are actually responsive, irrespective of human review. In general, search-term recall will be higher than end-to-end recall because

---

6   See TAR Glossary, *supra* note 1 at 27 and 25 for definitions of "recall" and "precision," respectively.

7   *Ibid* at 18 for the definition of "gold standard."

© [2021] Emond Montgomery Publications. All Rights Reserved.

manual review is imperfect, and reviewers will incorrectly exclude some relevant documents.[8] Search-term precision will generally be lower than end-to-end precision because manual reviewers will correctly exclude some non-relevant documents during the review process. In assessing the effectiveness of any review effort, it is important to consider end-to-end recall and precision so as to capture all sources of error—both technological and human. In unusual circumstances, the results of a keyword search may be produced without subsequent manual review. Only in such circumstances would the search-term recall and the end-to-end recall be one and the same.

> ▶ Beware of keyword culling.

In a seminal 1985 study, Blair and Maron[9] had lawyers and paralegals employ iterative searches and then review the resulting documents until they believed they had achieved at least 75 percent recall, which they considered to be adequate. Fifty-one different information needs (i.e., topics or requests for production [RFPs]) relating to a Bay Area Rapid Transit (BART) train accident were employed in the study.[10] These search and retrieval efforts achieved, on average, only 20 percent recall, at the same time achieving 79 percent precision.[11] From this result—which has not been contradicted in 35 years—we can conclude that it is difficult to achieve both high recall and high precision using search terms; that it is difficult to know whether high recall has been

---

8   See JOLT study, *supra* note 2 at 37, table 7 (showing recall estimates for human reviewers ranging from 25.2 percent to 79.9 percent, with an average of 59.3 percent); Herbert L Roitblat, Anne Kershaw & Patrick Oot, "Document Categorization in Legal Electronic Discovery: Computer Classification vs. Manual Review" (2010) 61 J American Society for Information Science & Technology 70 at 76, table 2 (showing recall estimates for human reviewers ranging from 45.8 percent to 53.9 percent, with an average of 50.3 percent). See also Scott M Cohen, Elizabeth T Timkovich & John J Rosenthal, "The Tested Effectiveness of Equivio>Relevance in Technology Assisted Review," Winston & Strawn e-discovery & Information Management White Paper (February 2014) at 6, figure 5, 7, online (pdf): *Equivio* <http://www.equivio.com/files/files/White%20Paper%20-%20Winston%20and%20Strawn.pdf> (showing a recall estimate of 52.4 percent for human reviewers). An example of the confusion between search-term recall and end-to-end recall can be seen in *In re Biomet M2a Magnum Hip Implant Prods Liab Litig (MDL 2391)*, Case No 3:12-MD-2391, 2013 WL 1729682, at *2 (ND Ind 18 April 2013), where the Court concluded that "a comparatively modest number of documents" had been missed by the TAR process when the search-term recall estimate was approximately 60 percent and the end-to-end recall estimate (including TAR and manual review) would necessarily have been substantially lower than that. See William Webber, "What Is the Maximum Recall in re Biomet?" (24 April 2013), online (blog): *Evaluating E-Discovery* <http://blog.codalism.com/index.php/what-is-the-maximum-recall-in-re-biomet/>.

9   David C Blair & ME Maron, "An Evaluation of Retrieval Effectiveness for a Full-Text Document-Retrieval System," (1985) 28:3 Communications of ACM 289.

10   *Ibid* at 291.

11   *Ibid* at 293.

© [2021] Emond Montgomery Publications. All Rights Reserved.

achieved; that searchers overestimate the recall of their searches;[12] and that high precision is often mistakenly construed to be an indicator of high recall.

Keyword culling yields dramatically inferior results to exhaustive manual review, but prior to the introduction of TAR, keyword culling was (and sometimes still is) considered a necessary evil. Even so, it was commonly recognized that some keywords were better than others and that some sort of validation of search terms was necessary.[13] This observation, in part, gave impetus to the National Institute of Standards and Technology's (NIST) Text REtrieval Conference (TREC) Legal Track, which, from 2006 through 2011, measured the effectiveness of various search methodologies by comparing their results to a gold standard created for that purpose.[14] The TREC Legal Track showed results for keyword culling consistent with those of Blair and

---

12   See also Maureen Dostert & Diane Kelly, "Users' Stopping Behaviors and Estimates of Recall" in Mark Sanderson et al, eds, *SIGIR '09: Proceedings of the 32nd International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: Association for Computing Machinery [ACM], 2009) 820 (showing that most subjects in an interactive information retrieval experiment reported that they had found 51 to 60 percent of the relevant documents when, on average, recall was only 7 percent).

13   See e.g. *William A Gross Constr Assocs, Inc v American Mfrs Mutual Ins Co*, 256 FRD 134 at 134 (SDNY 2009): "This Opinion should serve as a wake-up call to the Bar in this District about the need for careful thought, quality control, testing … in designing search terms or 'keywords' to be used to produce emails or other electronically stored information ('ESI')." The Court concluded (at 136): "[W]here counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians … and the proposed methodology must be quality control tested to assure accuracy in retrieval and elimination of 'false positives'"; *Victor Stanley, Inc v Creative Pipe, Inc*, 250 FRD 251 at 260 (D Md 2008): "While keyword searches have long been recognized as appropriate and helpful for ESI search and retrieval, there are well-known limitations and risks associated with them, and proper selection and implementation obviously involves technical, if not scientific knowledge." The Court continued (at 262): "Selection of the appropriate search and information retrieval technique requires careful advance planning by persons qualified to design effective search methodology. The implementation of the methodology selected should be tested for quality assurance"; *In re Seroquel Prods Liab Litig*, 244 FRD 650 at 662 (MD Fla 2007): "[W]hile key word searching is a recognized method to winnow relevant documents from large repositories, … [c]ommon sense dictates that sampling and other quality assurance techniques must be employed to meet requirements of completeness."

14   "The goal of the Legal Track at the Text Retrieval Conference (TREC) is to assess the ability of information retrieval techniques to meet the needs of the legal profession for tools and methods capable of helping with the retrieval of electronic business records, principally for use as evidence in civil litigation. In the USA, this problem is referred to as 'e-discovery.' Like all TREC tracks, the Legal Track seeks to foster the development of a research community by providing a venue for shared development of evaluation resources ('test collections') and baseline results to which future results can be compared": (last modified 10 May 2012), online: *TREC Legal Track* <https://trec-legal.umiacs.umd.edu/>.

© [2021] Emond Montgomery Publications. All Rights Reserved.

Maron[15] and dramatically superior results (compared to manual review) for two specific TAR methods.[16] To be clear, it also showed inferior results for the majority of TAR methods evaluated at TREC and inconsistent results for others.[17] Thus, the use of TAR is likely to yield an acceptable result only when TAR tools and methods that have been shown to be effective are properly applied and validated.

▶ Not all "TAR" is effective.

Myriad service providers were quick to repurpose (or simply relabel) their existing search and analytics offerings as "TAR," pointing to TREC and our 2011 JOLT study as (specious) evidence of the efficacy of these offerings. Along with these offerings came a number of misconceptions and prescriptions—many of which still persist today— about how TAR should be conducted and its results should be validated.[18] Many practitioners were disappointed by the results of using these "TAR" offerings. The adoption of TAR was hindered either because inferior results were obtained or because the prescribed rituals for the use of these tools were too complicated and burdensome.

---

15 See Douglas W Oard et al, "Overview of the TREC 2008 Legal Track" in Ellen M Vorhees & Lori P Buckland, eds, *The Seventeenth Text REtrieval Conference (TREC 2008) Proceedings*, NIST Special Publication: SP 500-277 (August 2009) at 4, 8-9, online (pdf): *National Institute of Standards and Technology* <https://trec.nist.gov/pubs/trec17/papers/LEGAL.OVERVIEW08.pdf> (showing an average recall for search terms of 24 percent over 45 topics); S Tomlinson et al, "Overview of the TREC 2007 Legal Track" in Ellen M Vorhees & Lori P Buckland, eds, *The Sixteenth Text REtrieval Conference (TREC 2007) Proceedings*, NIST Special Publication: SP 500-274 (August 2008) at 4, 10, online (pdf): *National Institute of Standards and Technology* <https://trec.nist.gov/pubs/trec16/papers/LEGAL.OVERVIEW16.pdf> (showing an average recall for search terms of 22 percent over 50 topics); Jason R Baron, David D Lewis & Douglas W Oard, "TREC—2006 Legal Track Overview" in Ellen M Vorhees & Lori P Buckland, eds, *The Fifteenth Text REtrieval Conference (TREC 2006) Proceedings*, NIST Special Publication: SP 500-272 (October 2007) at 4-5, 11, online (pdf): *National Institute of Standards and Technology* <https://trec.nist.gov/pubs/trec15/papers/LEGAL06.OVERVIEW.pdf> (showing an average recall for search terms of 57 percent over 43 topics).

16 See Bruce Hedin et al, "Overview of the TREC 2009 Legal Track" in Ellen M Vorhees & Lori P Buckland, eds, *The Eighteenth Text REtrieval Conference (TREC 2009) Proceedings*, NIST Special Publication: SP 500-278 (August 2010) at 17, table 6, online (pdf): *National Institute of Standards and Technology* <https://trec.nist.gov/pubs/trec18/papers/LEGAL09.OVERVIEW.pdf>.

17 *Ibid*.

18 See e.g. Karl Schieneman & Thomas C Gricks III, "The Implications of Rule 26(g) on the Use of Technology-Assisted Review" (2013) 7 Fed Cts L Rev 239. But see Maura R Grossman & Gordon V Cormack, "Comments on 'The Implications of Rule 26(g) on the Use of Technology-Assisted Review" (2013) 7 Fed Cts L Rev 285 (criticizing Schieneman and Gricks) [Grossman & Cormack, Comments on Rule 26(g)].

© [2021] Emond Montgomery Publications. All Rights Reserved.

More recently, the machine learning method we have found to be most effective—which has been trademarked as "Continuous Active Learning" or "CAL"[19] and is known generically in the e-discovery industry as "TAR 2.0,"[20]—has come to be recognized as the industry standard and the method of choice in most cases. A number of service providers have claimed to implement similar methods to CAL, typically branding their products either as "TAR 2.0" or with two of the three words "continuous," "active," or "learning." At the time of writing, no independent evaluation of these commercial offerings had been conducted.

The rule-based method that was found to be effective at the TREC Legal Track is a trade secret of H5.[21] What we do know is that it involves extensive interplay among subject-matter experts, linguists, and statisticians.[22] Some service providers have claimed to implement rule-based methods that are just as good as, if not better than, H5's version, but, again, as of the time of writing, there has been no independent verification of such claims. Overall, rule-based TAR methods have attracted less attention in e-discovery than supervised machine learning TAR methods, perhaps because they are more time and resource intensive and can be applied only by a highly trained team.

> ▶ Is keyword culling obviated by TAR?

TAR plays a similar role to keyword search in that it identifies a subset of documents that are likely to be responsive. Typically, all documents identified as potentially responsive by TAR are labelled by reviewers, in which case, TAR fulfills the same role as keyword culling: to identify for review only those documents that are likely to be responsive. As with keyword culling, it is important to consider the end-to-end recall and precision that take into account the accuracy of the TAR as well as the subsequent human review of the documents identified by TAR as potentially responsive.

---

19  "Continuous Active Learning" and "CAL" are registered trademarks of Maura R Grossman and Gordon V Cormack. See "Continuous Active Learning—Trademark Details" (last visited 29 January 2021), online: *Justia* <https://trademarks.justia.com/866/34/continuous -active-86634255.html>, and "CAL—Trademark Details" (last visited 29 January 2021), online: *Justia* <https://trademarks.justia.com/866/34/cal-86634265.html>, respectively.

20  See John Tredennick et al, *TAR for Smart People, Expanded and Updated*, 3d ed (Catalyst, 2018) at 21–22.

21  H5 is a San Francisco–based e-discovery service provider. See online: *H5* <https://www.h5 .com/about-us/>.

22  See JOLT study, *supra* note 2 at 29-31, n 145. See also Christopher Hogan et al, "H5 at TREC 2008 Legal Interactive: User Modeling, Assessment & Measurement" in Ellen M Vorhees & Lori P Buckland, eds, *The Seventeenth Text REtrieval Conference (TREC 2008) Proceedings*, NIST Special Publication: SP 500-277 (August 2009), online (pdf): *National Institute of Standards and Technology* <https://trec.nist.gov/pubs/trec17/papers/h5.legal.rev.pdf>.

© [2021] Emond Montgomery Publications. All Rights Reserved.

When using TAR, the primary reason for keyword culling—to save manual review effort by excluding likely non-responsive documents from review—no longer exists because TAR eliminates the need to review the vast majority of non-responsive documents. Despite this fact, many e-discovery practitioners believe it may still be necessary to use keyword culling to reduce the size of the collection prior to TAR, either because search is the only practical way to retrieve documents for review from the cloud or elsewhere or because of capacity limits or the costs of processing and ingesting documents into the TAR platform. In any event, the number of documents that can be reviewed by TAR is orders of magnitude greater than what can be manually reviewed.

Setting aside cost considerations, the better practice is *not* to use keyword culling before TAR. When search terms, TAR, and manual review are used together, the estimated end-to-end recall is equal to the product of the search-term recall, the TAR recall, and the reviewer recall. If it is possible to achieve 70 percent search-term recall, 70 percent TAR recall, and 70 percent reviewer recall, the estimated end-to-end recall will be $70\% \times 70\% \times 70\% = 34\%$. On the other hand, if it were possible to achieve 85 percent search-term recall, 85 percent TAR recall, and 85 percent reviewer recall, then the estimated end-to-end recall would be $85\% \times 85\% \times 85\% = 61\%$. Under the same assumptions, but without the keyword culling, estimated end-to-end recall for the TAR plus manual review would be $85\% \times 85\% = 72\%$.

If keyword culling must be used before TAR, it is desirable to use very broad keywords to achieve higher recall at the expense of more documents than would otherwise be practical for a manual review.

Regardless of whether keyword culling or TAR is used, end-to-end recall should be estimated with respect to the gold standard of an exhaustive manual review of the entire collection had that been performed. To do so, we recommend using a *stratified sample*,[23] with separate strata for (1) documents labelled responsive by reviewers, (2) documents labelled non-responsive by reviewers, (3) documents excluded from review by TAR, and (4) documents excluded from review by keywords. In this way, the gold standard provides an independent assessment to gauge effectiveness regardless of the method of search and review. The steps for taking and using stratified samples are described in detail in the appendixes to this chapter.

## IV.  Machine Learning Methods

The term "machine learning" encompasses two vastly different mechanisms with different purposes: (1) *supervised* machine learning, in which an algorithm is "taught" by showing it examples of human decision-making, from which it learns to emulate

---

23  A "stratified sample" is a sample formed as the aggregate of separate random samples for distinct subpopulations. For example, a stratified sample of Canadians might be formed by combining samples from each of the 13 Canadian provinces and territories in proportion to their respective populations. See Adam Hayes, "Stratified Random Sampling" (3 March 2020), online: *Investopedia* <https://www.investopedia.com/terms/stratified_random_sampling.asp>.

© [2021] Emond Montgomery Publications. All Rights Reserved.

that decision-making on new examples, and (2) *unsupervised* machine learning, in which the algorithm, without being taught, learns to organize or to draw inferences from the data without examples.

> ▶ Logistic regression and support vector machines are state-of-the-art TAR algorithms.

Although certain supervised machine learning algorithms and protocols have been shown to be effective for TAR,[24] certain unsupervised machine learning methods have been referred to as (or included with) "TAR" offerings, but their effectiveness has not been established.

Within the context of TAR, a supervised machine learning algorithm is "taught" using documents that have been labelled as responsive or non-responsive by a human reviewer. The algorithm learns to emulate the coding decisions of that reviewer either by predicting categorically whether the reviewer would label an as-yet-unlabelled document as responsive or by predicting the likelihood that the human reviewer would label the document responsive and then ranking the documents in the collection from most to least likely to be responsive. When using supervised machine learning for TAR, the most important choices are (1) which particular machine learning algorithm to use and (2) the protocol for selecting the documents from which the algorithm will learn to make distinctions between responsive and non-responsive documents. Common supervised machine learning algorithms for TAR include *support vector machines* (SVMs), *logistic regression*, and *nearest neighbour* (NN or 1-NN).[25]

Before applying a supervised machine learning method, it is necessary first to decompose each document into *features*,[26] which may be words, phrases, or word fragments, or *latent features* (e.g., concepts), generated using an unsupervised machine

---

24  See JOLT study, *supra* note 2; Gordon V Cormack & Maura R Grossman, "Evaluation of Machine-Learning Protocols for Technology-Assisted Review in Electronic Discovery" in *SIGIR '14: Proceedings of the 37th International ACM SIGIR Conference on Research & Development in Information Retrieval* (New York: ACM, 2014) 153 [SIGIR 2014]. See also Maura R Grossman, Gordon V Cormack & Adam Roegiest, "TREC 2016 Total Recall Track Overview" in Ellen Voorhees & Angela Ellis, eds, *The Twenty-Fifth Text REtrieval Conference (TREC 2016) Proceedings*, NIST Special Publication: SP 500-321 (December 2016), online (pdf): *National Institute of Standards and Technology* <https://trec.nist.gov/pubs/trec25/papers/Overview-TR.pdf>; Adam Roegiest et al, "TREC 2015 Total Recall Overview" in Ellen Voorhees & Angela Ellis, eds, *The Twenty-Fourth Text REtrieval Conference (TREC 2015) Proceedings*, NIST Special Publication: SP 500-319 (December 2015), online (pdf): *National Institute of Standards and Technology* <https://trec.nist.gov/pubs/trec24/papers/Overview-TR.pdf>; Hedin et al, *supra* note 16 at 17, table 6.

25  See TAR Glossary, *supra* note 1 at 31, 22, and 24, respectively, for definitions of "support vector machine," "logistic regression," and "nearest neighbour."

26  *Ibid* at 17 for a definition of "features."

© [2021] Emond Montgomery Publications. All Rights Reserved.

learning method. Based on a (manually) labelled set of training documents, the supervised machine learning algorithm constructs a *model*[27] to predict whether a document would likely be labelled as responsive based on its features. Within the context of TAR, the two algorithms that have been demonstrated to be most effective are SVM and logistic regression, using words, phrases, or word fragments as features. A common but much less effective method applies NN to latent features (i.e., concepts). A number of other methods, including "random forests," "k-nearest neighbour (k-NN)," "neural networks," and "deep learning," have shown promise in the scientific literature but have yet to be applied successfully to TAR.

SVMs employ a geometric interpretation of the document features, representing each document as a point in space—a space with many more than three dimensions—where each dimension represents the presence or absence of a feature. Think, for example, of what makes spam spam. It might be the use of caps or punctuation, the sender's email address, or an incorrect time zone (e.g., EDT instead of EST). Each of these (and other things) might be features that distinguish spam from non-spam. In the geometric representation of the document, each possible feature represents a dimension in space.

Responsive documents will tend to be nearer to one another in this space than to non-responsive documents, and vice versa. SVMs attempt to find a separating hyperplane in this space that best separates responsive from non-responsive documents. The distance from the hyperplane indicates the likelihood that a document is responsive: if the document is far from the hyperplane on the side with mostly responsive documents, it is likely to be responsive; if the document is far on the opposite side, it is very unlikely to be responsive; if the document is near the hyperplane, its responsiveness is uncertain.

*Logistic regression* employs a probabilistic interpretation of the document features, determining how well each feature distinguishes responsive from non-responsive documents and combining these estimates for all of the features in a document to determine the probability that it is responsive or not. Logistic regression has been used for nearly a century as a data analysis tool (e.g., to estimate the risk of cancer given a combination of environmental factors). For text categorization in general and TAR in particular, the scientific literature shows its effectiveness to be comparable or superior to the newer SVMs.

> ▶ Nearest neighbour is an inferior TAR algorithm.
> ▶ In e-discovery vernacular, "latent semantic analysis" and "latent semantic indexing" are synonyms for "nearest neighbour."

---

27   *Ibid* at 23, 30 for a definition of "model," which is also referred to as a "statistical model."

© [2021] Emond Montgomery Publications. All Rights Reserved.

**476**   PART V   AI-Enabled Litigation Tools

Like SVM, NN considers each document to be a point in hyperspace. The label for each document is deemed to be the same as the label of the nearest document in the training set (i.e., its "nearest neighbour"). Because responsive documents tend to be more similar to each other than to non-responsive documents, and vice versa, chances are that the correct label for a document is the same as its nearest neighbour. NN does not work well for the high-dimensional spaces arising from the use of words, phrases, or word fragments as features[28] and therefore is generally applied to latent features derived from an unsupervised machine learning algorithm, such as latent semantic analysis (LSA).[29] In the e-discovery literature, the method of NN with latent features is often referred to by the unsupervised latent-feature algorithm, meaning that when an article refers to LSA as a TAR method, it almost certainly means "NN with LSA features." In e-discovery, latent feature analysis is also sometimes referred to as "clustering"[30] or "concept clustering."

NN with LSA features falls short of the state of the art for TAR, and its shortcomings have engendered commonly held beliefs that do not apply to state-of-the-art TAR methods—for example, that TAR cannot be applied to short documents or spreadsheets, that not all labelled documents should be used as training examples, that the training set must be randomly selected, that the training set must be carefully hand-picked by a senior lawyer, or that one or a few mislabelled training documents can result in a cascade of TAR errors (i.e., "garbage in, garbage out").[31]

Other supervised machine learning methods, notably those involving deep learning, have received much attention of late. At the time of writing, none of these methods have been shown to be effective for TAR or to be efficient enough for the size of the document collections that typically arise in e-discovery.

---

28  See Rosalind B Marimont & Monte B Shapiro, "Nearest Neighbour Searches and the Curse of Dimensionality" (1979) 24 IMA J Applied Mathematics 59.

29  LSA is also referred to as latent semantic indexing (LSI). Other methods include probabilistic latent semantic analysis (PLSA) and latent Dirichlet allocation (LDA). See TAR Glossary, *supra* note 1 at 22 and 26, respectively, for definitions of LSA, LSI, and PLSA.

30  *Ibid* at 11 for a definition of "clustering."

31  The "garbage in, garbage out" (GIGO) problem is specific to NN, although in the e-discovery literature, it has been widely but inaptly offered as evidence to be wary of all TAR methods. See Adam Roegiest & Gordon V Cormack, "Impact of Review Set Selection on Human Assessment for Text Classification," in *SIGIR '16: Proceedings of the 39th International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: ACM, 2016) 861.

© [2021] Emond Montgomery Publications. All Rights Reserved.

## V.  TAR Protocols

> ▶ Continuous Active Learning (CAL or TAR 2.0) is state of the art in circumstances in which every document is to be reviewed before production.
> ▶ Simple Active Learning (SAL) is state of the art in circumstances in which documents are to be produced without prior review.
> ▶ Simple Passive Learning (SPL) is inferior, whether or not every document is to be reviewed before production.
> ▶ The generic term "TAR 1.0" encompasses both SAL and SPL.

Supervised machine learning protocols determine the method by which training examples are selected and labelled, how a supervised machine learning algorithm is applied, and how the results are harvested. The primary protocols in use today are Simple Passive Learning (SPL), Simple Active Learning (SAL), CAL, or a hybrid approach involving two or more of these protocols.[32] The machine learning literature in the domain of information retrieval (i.e., outside the field of e-discovery) refers to SPL as "supervised learning" and to SAL as "active learning," without qualification. Little non-TAR literature concerning CAL exists; however, in the information-retrieval literature, the term "relevance feedback" generally refers to a similar protocol used to refine keyword searches.[33]

A TAR tool may be used for one of two distinct purposes:

1. where the TAR tool identifies substantially all potentially responsive documents, which are then manually reviewed and labelled by human reviewers. Documents not identified by the TAR tool are deemed non-responsive following a validation process.
2. where the TAR tool classifies every document as responsive or not based on a limited training set and then labels the remaining documents according to the TAR tool's ranking or classification process, without any further human review.

---

32  See, generally, Grossman & Cormack, Comments on Rule 26(g), *supra* note 18; SIGIR 2014, *supra* note 24. See also Maura R Grossman & Gordon V Cormack, "Continuous Active Learning for TAR" (April/May 2016) Practical LJ 32 at 36, table.

33  See e.g. Christopher D Manning, Prabhakar Raghavan & Hinrich Schütze, *Introduction to Information Retrieval*, online ed (Cambridge: Cambridge University Press, 2009) at 178, online: *Stanford Natural Language Processing Group* <https://nlp.stanford.edu/IR-book/html/htmledition/relevance-feedback-and-pseudo-relevance-feedback-1.html>; see also TAR Glossary, *supra* note 1 at 28 (defining "relevance feedback" as a process in which the documents with the highest likelihood of relevance are labelled by a reviewer and added to the training set).

© [2021] Emond Montgomery Publications. All Rights Reserved.

In the traditional context of a review for production in litigation, the first purpose is the most common: the producing party typically wants to review every document to be produced in order to label those that are confidential, to avoid producing non-responsive or privileged documents, and to gain an understanding of their case. In some instances (e.g., "second requests,"[34] or matters where parties are cost sensitive or the collection is likely to contain few privileged or confidential documents), the burden of reviewing every document may outweigh the risk of producing non-relevant or privileged/confidential documents, occasioning the second approach.

For the first purpose, CAL is the most effective protocol of which we are aware. CAL is quite simple. At the outset, one or more responsive documents (typically real but possibly synthetic or contrived) are used to train the algorithm, which scores the remaining documents as to their likelihood of responsiveness. Some of the top-scoring documents are reviewed and coded as responsive or not and are used to train the algorithm. This process continues until very few of the top-scoring remaining documents are responsive, and those few responsive documents that remain are neither novel nor important.[35] Once this threshold is met, post hoc validation will very likely show high recall.[36] In the unlikely event that validation reveals that a substantial number of novel or important responsive documents have been missed, those documents can be used to train the algorithm, and the CAL process can be resumed and continued for as long as necessary.

For the second purpose, SAL is the most effective commercially available protocol of which we are aware. SAL starts out like CAL, using one or more responsive documents or synthetic documents to initiate the process, although some users prefer to begin with randomly selected documents, which we believe is an inefficient training strategy, especially when responsive documents are sparse in the collection. Then the machine learning algorithm chooses from all the yet-to-be-reviewed documents the ones from which it will likely learn the most. Two strategies that have been shown to be effective for SAL are *uncertainty sampling*[37] and *Scalable Continuous Active Learning*

---

34  Second requests are document requests propounded by the Antitrust Division of the US Department of Justice or the US Federal Trade Commission to investigate mergers and acquisitions that may have anti-competitive effects. Typically, second requests seek to gather information about the markets, sales, facilities, assets, and structures of the businesses that are parties to the intended transaction.

35  For a description of the CAL process, see Grossman & Cormack, "Continuous Active Learning for TAR," *supra* note 32. See also Grossman & Cormack, Comments on Rule 26(g), *supra* note 18 at 289-91; SIGIR 2014, *supra* note 24 at 154.

36  See Gordon V Cormack & Maura R Grossman, "Multi-Faceted Recall of Continuous Active Learning for Technology-Assisted Review" in *SIGIR '15: Proceedings of the 38th International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: ACM, 2015) 763.

37  With "uncertainty sampling," the machine learning algorithm selects the documents the relevance about which it is least certain for review by a human reviewer. See TAR Glossary, *supra* note 1 at 33-34.

© [2021] Emond Montgomery Publications. All Rights Reserved.

(S-CAL).[38] The selected documents are reviewed and labelled and used to train the machine learning algorithm. This process continues until a fixed number of documents (typically several thousand) have been reviewed and labelled or until "stabilization" occurs, indicating that further training examples would not substantially improve the model constructed by the algorithm. At this point, the model is used to label all the as-yet-unlabelled documents. Post hoc validation is conducted, as for any review effort. If validation shows that the estimated recall is too low, it can typically be increased (at the expense of decreased precision) by altering the threshold score above which the documents are presumptively labelled responsive.

Although we do not recommend SAL when all documents to be produced will be subject to human review, it has been and continues to be used. Its use follows the same course as if the documents were not subject to review in that the TAR tool is used to label every document responsive or not. But the documents labelled responsive by the TAR tool (said to constitute the "review set"), rather than being produced, are reviewed and labelled by a human reviewer. Only those documents deemed responsive by the human reviewer are produced. When used in this manner, estimated recall and precision must be calculated based on the final labels coded by the human reviewer, not the presumptive labels assigned by the TAR tool. Otherwise, they do not reflect the recall and precision of the end-to-end review effort but only that of a single phase (i.e., the TAR component, not including the manual review that follows).[39]

In the academic literature, the term "supervised learning" typically refers to the process we denote as SPL to distinguish it from SAL and CAL. In SPL, training examples are chosen not by the machine learning algorithm but solely by random selection and/or a human reviewer. SPL is not an efficient training strategy, especially when responsive documents are sparse in the collection, and has yielded results inferior to SAL and CAL in studies of TAR-protocol effectiveness.[40] The use of SPL has engendered much controversy as to how to choose the training examples, with requesting parties often insisting on micromanaging the process because of the belief that this method can easily be gamed. There is no empirical evidence that justifies ad hoc efforts to choose the "best" training documents or to use heroic efforts to ensure agreement on the labels used to teach the TAR algorithm. Nonetheless, if parties insist on using SPL (or any other TAR method for which evidence of efficacy is lacking), time is likely

---

38    For a description of S-CAL, see Gordon V Cormack & Maura R Grossman, "Scalability of Continuous Active Learning for Reliable High-Recall Text Classification" in *CIKM '16: Proceedings of the 25th ACM International Conference on Information and Knowledge Management* (New York: ACM, 2016) 1039. S-CAL is a patented method of Gordon V Cormack and Maura R Grossman. See "Systems and Methods for a Scalable Continuous Active Learning Approach to Information Classification," Patent Application Pub No US 2016/0371262 A1 (22 December 2016 [pub date]; allowed 2020), online (pdf): *FPO* <http://www.freepatentsonline.com/20160371262.pdf>.

39    See Grossman & Cormack, Comments on Rule 26(g), *supra* note 18 at 300-1.

40    See e.g. SIGIR 2014, *supra* note 24.

© [2021] Emond Montgomery Publications. All Rights Reserved.

better spent ensuring valid computation of recall and precision estimates rather than in arguing about the mechanics of the process.

## VI. Measures of Effectiveness

▶ Relevance is in the eye of the beholder.

One of the most difficult challenges of estimating review effectiveness is that *relevance* is a subjective concept.[41] Regardless of how clearly the criteria for responsiveness are set forth in an RFP or in a subpoena, equally knowledgeable and well-intentioned expert reviewers—whether lawyers, state archivists, or intelligence analysts—will disagree on the relevance of a surprisingly large number of documents.[42] Suppose that two separate, equally competent teams—Team A and Team B—were to independently review the same set of potentially responsive documents for responsiveness to an RFP or a subpoena, labelling each document as responsive or not. Scientific studies indicate that no more than about 70 percent of documents labelled "responsive" by Team A will also be labelled "responsive" by Team B, and vice versa.[43] This observation is a consequence of the fact that relevance is subjective, not that either labelling is necessarily defective.

▶ Effectiveness is quantified by "recall" and "precision" measured with respect to an independent gold standard.

Notwithstanding the subjectivity of relevance, the results of any competent review effort (e.g., Review A) can be used as a "gold standard" or "ground truth" against

---

41  See Tefko Saracevic, "The Notion of Relevance in Information Science: Everybody Knows What Relevance Is. But What Is It Really?" (September 2016) 8 Synthesis Lectures on Information Concepts, Retrieval, & Services; Peter Bailey et al, "Relevance Assessment: Are Judges Exchangeable and Does It Matter?" in Sung-Hyon Myaeng et al, eds, *SIGIR '08: Proceedings of the 31st Annual International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: ACM, 2008) 667.

42  See e.g. Gordon V Cormack & Maura R Grossman, "Navigating Imprecision in Relevance Assessments on the Road to Total Recall: Roger and Me" in *SIGIR '17: Proceedings of the 40th International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: ACM, 2017) 5 (the expert in this article being a senior state archivist); JOLT study, *supra* note 2 at 10-14; Roitblat, Kershaw & Oot, *supra* note 8 (the experts in this article being lawyers); Ellen M Voorhees, "Variations in Relevance Judgments and the Measurement of Retrieval Effectiveness" (2000) 36 Information Processing & Management 697 (the experts in this article being intelligence analysts). See also Adam Roegiest & Anne McNulty, "Variations in Assessor Agreement in Due Diligence" in *CHIIR '19: Proceedings of the 2019 Conference on Human Information Interaction and Retrieval* (New York: ACM, 2019) 243.

43  *Ibid*.

© [2021] Emond Montgomery Publications. All Rights Reserved.

which to evaluate another review effort (e.g., Review B), provided that *the review to be evaluated is independent of the review from which the gold standard is derived*. The two most common measures of effectiveness in the science of information retrieval are *recall* and *precision*, which are predicated on the convenient fiction that the gold standard is infallible and therefore denotes "true relevance." In theory, recall is the proportion of "truly relevant" documents that are identified by a review effort out of all of the "truly relevant" documents in the collection (i.e., a measure of the *completeness* of the review effort), whereas precision is the proportion of documents identified by the review effort that are "truly relevant" (i.e., a measure of the *accuracy* of the review effort). In practice, recall is estimated as the proportion of documents labelled "relevant" in the gold standard that are also labelled "relevant" in the review effort being evaluated, whereas precision is estimated as the proportion of documents labelled "relevant" in the review effort being evaluated that are also labelled "relevant" in the gold standard. Assuming that both the gold standard and the review effort being evaluated are conducted by "ideal" but independent, exhaustive manual reviews, we would not expect either estimate to exceed the typical positive agreement[44] between two independent reviews, or about 70 percent.[45]

> ▶ Exact recall and precision scores can never be known because they rely on an infallible gold standard that cannot be achieved.
> ▶ Recall and precision estimates fall short of the exact values.
> ▶ Recall and precision estimates are incomparable unless calculated according to precisely the same independent gold standard.
> ▶ Seventy percent recall (or any other recall score) is meaningless in isolation and inappropriate as an absolute standard of review effectiveness.

The scientific observation—that the recall and precision of a high-quality review effort, estimated with respect to an independent gold standard, are typically in the neighbourhood of 70 percent—has been widely misconstrued in the legal community to imply that 70 percent or even 75 percent recall (without specifying the recall of what and how it is measured) is necessary and sufficient to establish the adequacy of an e-discovery review effort.[46] This mantra is espoused by requesting and producing parties alike, either to set an unreasonably high and potentially unachievable recall target or to provide cover for inadequate or incomplete results.

---

44  "Positive agreement" is the proportion of documents labelled "relevant" by one review and labelled "relevant" by a second review. See TAR Glossary, *supra* note 1 at 25.

45  *Supra* note 41.

46  See Grossman & Cormack, Comments on Rule 26(g), *supra* note 18, at 303.

© [2021] Emond Montgomery Publications. All Rights Reserved.

As a preliminary matter, "70 percent recall" can never be established; at best, a party can demonstrate an *estimated recall* of 70 percent. If the estimate is conducted with respect to an ideal, independent gold standard, 70 percent estimated recall is indeed consistent with—but not proof of—an effective review effort.

A recall estimate is meaningless unless the gold standard is independent of the review effort for which it is calculated; an estimate of about 70 percent is merely the best that is likely to be achieved by *a single qualified reviewer, unassisted by quality control or by technology*.

Taking the following as an absurd example, an exact copy of the gold standard would achieve an estimated recall of 100 percent and an estimated precision of 100 percent when evaluated with respect to itself as the gold standard. But it would achieve no more than 70 percent estimated recall and 70 percent estimated precision when correctly evaluated with respect to an independent gold standard. Similarly, a copy of the gold standard as to which 30 percent of the documents labelled responsive were relabelled non-responsive would achieve an estimated 70 percent recall compared to the original gold standard—and might be offered as evidence of an adequate production—but recall correctly estimated *with respect to an independent gold standard* would show the recall estimate of the revised gold standard to be at most $70\% \times 70\% = 49\%$.

> ▶ Recall and precision can be used to compare review efforts only if calculated according to a common gold standard that is independent of the review efforts being compared.

We can compare the effectiveness of Reviews B and C by calculating their estimated recall and precision according to an independent gold standard, Review A. If Review B yields substantially higher estimated recall and precision than Review C, according to gold-standard Review A, we can say with some confidence that Review B is more effective than Review C. But what if Review B yields higher estimated recall, whereas Review C yields higher estimated precision? Which is more effective depends on the relative importance of finding *all* responsive documents (i.e., achieving high recall) versus finding *only* responsive documents (i.e., achieving high precision). In e-discovery, recall is generally the more important of the two measures, considering the aspirational goal of most productions: to find "all" responsive documents. However, if precision is very low (e.g., much less than 50 percent), the responsive documents that are produced can be overwhelmed and therefore obscured by the non-responsive documents.[47]

---

47   For example, this was precisely what happened in *In re Domestic Airline Travel Antitrust Litig*, MDL No 2656, Misc No 15-1404 (CKK), 2018 WL 4441507 (DDC 13 September 2018), where one of the defendants' productions had a recall of 97 percent but a precision of only 17 percent, meaning that only about 600,000 of the 3.5 million documents produced were responsive, or that five out of every six documents produced were non-responsive.

© [2021] Emond Montgomery Publications. All Rights Reserved.

> ▶ There is a trade-off between recall and precision, in both the conduct and the evaluation of a review effort.

The human reviewer (or the TAR tool) can be instructed to construe responsiveness broadly, thus increasing recall at the expense of precision, or to construe responsiveness narrowly, increasing precision at the expense of recall. For the purposes of e-discovery, Review B is generally considered superior to Review C if it achieves substantially higher recall while still achieving similar precision, or if it achieves similar recall and substantially higher precision.

> ▶ $F_1$ quantifies the extent to which a review effort achieves high recall and high precision.
> ▶ $F_1$ offers no insight into the recall–precision trade-off and should not be used as the sole measure to evaluate review effectiveness.

$F_1$ is the harmonic mean of recall and precision.[48] Unlike the traditional arithmetic mean, $F_1$ emphasizes the lesser of the two, so a high $F_1$ score is achieved only when recall and precision are both high and approaches zero as either recall or precision approaches zero. When recall and precision are equal, so is $F_1$. The same $F_1$ score can be achieved if recall is slightly higher and precision is slightly lower, or vice versa, but if either is substantially lower than the other, $F_1$ will fall. These properties justify the observation that an exhaustive manual review is unlikely to yield $F_1$ greater than 70 percent, which would be achieved if recall and precision were both 70 percent, or thereabouts, as measured with respect to an independent gold standard.

## VII. The Use and Misuse of Statistics

Statistics play an essential role in many human endeavours, including e-discovery, but are easily miscalculated, misapplied, or misinterpreted. A common use of statistics is to estimate a quantity that is too large to be counted, such as the number of people in a country who hold a particular opinion. Another common use is to estimate a quantity that can only be known in the future, such as how many people will contract a particular disease.

---

48  See TAR Glossary, *supra* note 1 at 16 for a definition of "$F_1$." A harmonic mean, "unlike the more common arithmetic mean (i.e., average), falls closer to the lower of the two quantities. As a summary measure, a Harmonic Mean may be preferable to an arithmetic mean because a high Harmonic Mean depends on both high Recall and high Precision, whereas a high arithmetic mean can be achieved with high Recall at the expense of low Precision, or high Precision at the expense of low Recall" (*ibid* at 18).

© [2021] Emond Montgomery Publications. All Rights Reserved.

> ▶ Numbers or percentages?

Statistical estimates may be expressed as numbers—for example, "approximately 760,000 Canadians believe the world is flat," or "[o]n average, 617 Canadians will be diagnosed with cancer every day."[49] Or they may be expressed as percentages—for example, approximately 2 percent of Canadians believe the world is flat,[50] or about 0.0017 percent of Canadians will be diagnosed with cancer tomorrow. To convert from one to the other, it is necessary to have an estimate of the size of the population of Canada, which, as of 2020, was about 38 million. Thus, the estimated number of Canadian flat-earthers is $2\% \times 38$ million $\approx 760{,}000$, whereas the estimated daily percentage of Canadians that will be diagnosed with cancer is $617 \div 38$ million $\approx 0.0017\%$. More generally, statistical estimates—whether numbers or percentages—tell an incomplete story absent an estimate of the size of the population from which they are derived.

> ▶ Counting found versus missed responsive documents.

In e-discovery, the principal application of statistics is to estimate *how many responsive documents have been identified for production and how many have been missed*. If the number missed is large compared to the number found, the review is incomplete; if the number missed is small compared to the number found, the review may be complete depending on the novelty and importance of the missed responsive documents.

From these estimates, we can derive an estimate of recall, which is the estimated number of responsive documents that are identified for production, as a percentage of the estimated overall number of responsive documents in the collection.[51] A recall of substantially greater than 50 percent indicates that the number found is greater than the number missed. For example, an estimate of 75 percent recall indicates that three times as many responsive documents were found than were missed.

Precision is the estimated number of truly responsive documents identified for production as a percentage of the total number of documents labelled responsive by the review effort. Precision greater than 50 percent indicates that the production

---

49  See "Cancer Statistics at a Glance" (last visited 31 January 2021), online: *Canadian Cancer Society* <https://www.cancer.ca/en/cancer-information/cancer-101/cancer-statistics-at-a-glance>.

50  See "What Canadians Believe: From Science and Spirituality to Conspiracies and the Supernatural" (2019), online (pdf): *Pollara* <https://www.pollara.com/wp-content/uploads/2017/12/Pollara-Beliefs2019-RptF2.pdf>.

51  The estimated overall number of responsive documents in the collection is simply the estimated number of responsive documents found plus the estimated number of responsive documents missed.

© [2021] Emond Montgomery Publications. All Rights Reserved.

contains more responsive than non-responsive documents. For example, an estimate of 75 percent precision indicates that three-quarters of the documents identified as responsive were actually responsive.

Remember that valid estimates of recall and precision rely on an independent gold standard of relevance—that is, they must be based on comparison to a *ground truth*. It is generally impractical to conduct an independent review of the entire collection of documents in order to form such a gold standard. Statistical sampling methods allow us to estimate, based on an independent review of many fewer documents, what the result would be were all the documents to be independently reviewed to establish the ground truth.

> ▶ Statistical sampling and blind review yield an independent gold standard.

To estimate the number of truly responsive documents identified for production, it is necessary to draw a random sample of the production set. To estimate the number of responsive documents that were missed, it is necessary to draw one or more random samples of all documents excluded from the production set for any reason—whether by keyword culling, by TAR, or by manual review. The documents labelled non-responsive by a search and review process are typically referred to as the "null set" (or sets). These different samples must be scrambled together and labelled by an independent reviewer, *who can have no knowledge of whether a document has been included or excluded from the production or why*. This is typically referred to as a "blind review."[52] The results of this independent review can be used to properly estimate end-to-end recall, precision, and other measures.

> ▶ Sample size, margin of error, and confidence level.

Estimates may differ from the hypothetical but unknowable true values for a variety of reasons. The first reason, uncertainty in the conception of relevance, is inherent in any recall or precision calculation, whether statistical or not. This error is mitigated by the use of an independent gold standard labelled diligently by one or more knowledgeable reviewers. It could be—but in practice rarely is—mitigated by labelling each document according to the majority vote of a panel of three (or more) reviewers.

---

52  In a blind review, certain information is withheld from the reviewer to reduce bias and error—for example, the population from which a sample was drawn or the prior responsiveness label given to a document. See Robert MacCoun & Saul Perlmutter, "Blind Analysis: Hide Results to Seek the Truth" (2015) 526 Nature 187. Blind review is discussed further in para F of Appendix A to this chapter.

© [2021] Emond Montgomery Publications. All Rights Reserved.

Compounding the error arising from uncertainty in relevance is the *error arising from statistical estimation*. The terms of art used in information retrieval to describe this error are "bias"—the extent to which the estimate systematically misses the mark—and "random error"—the extent to which the estimate differs from the true value by chance. Bias is mitigated by random sampling and blind independent review. Random error is mitigated by increasing sample size: the larger the sample, the smaller the random error.

The terms of art used to describe the magnitude of random error are "margin of error" and "confidence interval," which are always qualified by a "confidence level."[53] For example, we might say that "760,000 Canadians believe the earth is flat, with a margin of error of ± 76,000 and a confidence level of 95 percent." Equivalently, we might say that "the number of Canadians who believe the earth is flat falls in the confidence interval of 684,000 to 836,000 people, with a 95 percent confidence level." Either statement may be interpreted as strong evidence (but never proof ) that the true value is somewhere between 684,000 and 836,000 and likely nearer to 760,000 than the extremes of the interval. The confidence level of 95 percent has been widely, but somewhat arbitrarily, adopted as a standard for reporting results in the scientific literature.

Extreme caution must be used when expressing margin of error as a percentage and combining it with a numerical value. If we say "760,000 Canadians believe the earth is flat, with a margin of error of ± 10 percent," it is ambiguous whether we mean ± 10 percent of the 760,000 Canadians or ± 10 percent of all Canadians. When we translate these to numbers, we see that the first interpretation means 760,000 ± 76,000 people, whereas the second means 760,000 ± 3.8 million people (which would be a rather useless estimate). Yet e-discovery practitioners often commit the fallacy of plugging the numbers into a statistical calculator that uses the latter interpretation and representing the result as if it were the former.

> ▶ Margin of error is commonly miscalculated and misinterpreted.
> ▶ For estimates of a small percentage of the population, margin of error cannot be predetermined.
> ▶ For estimates of a very small percentage of the population, no reasonable estimate can be achieved by sampling.

The fallacy of misinterpreting margins of error has engendered a pervasive school of specious "learned wisdom" in e-discovery circles, which can be identified by its vernacular. The typical e-discovery practitioner is likely to encounter articles, briefs, and

---

53  See TAR Glossary, *supra* note 1 at 22-23, 12, and 12, respectively, for definitions of "margin of error," "confidence interval," and "confidence level."

© [2021] Emond Montgomery Publications. All Rights Reserved.

protocols calling for a "sample with a 2 percent margin of error at a 95 percent confidence level," or simply a "± 2 percent sample," or a "statistically significant sample." Depending on what statistical calculator is used, the size of such a sample turns out to be 2,395, 2,399, or 2,405. This sample size ensures a margin of error of no more than ± 2 percent of the Canadian population; in our flat-earth example, that would be ± 760,000 Canadians (i.e., $2\% \times 38$ million ≈ 760,000 Canadians). Thus, the margin of error would be 100 percent of the number of Canadian flat-earthers (760,000 ± 760,000), not 2 percent of the flat-earthers as implied. To achieve a margin of error of at most ± 2 percent of Canadian flat-earthers (15,200 people or 0.04 percent of all Canadians) would, according to the same assumptions and the same statistical calculator, require an absurdly large sample size of 518,000.

A more sophisticated analysis using a binomial calculator[54] yields a somewhat smaller margin of error, which can be calculated only after the sample has been reviewed. Suppose that in a sample of 2,400 Canadians, 48 were to believe the earth was flat. From the fact that 2 percent of the sample believed that the earth was flat, we can estimate that about 2 percent of all Canadians (i.e., 760,000 Canadians) also believe the earth is flat. Using a binomial calculator, we derive a confidence interval of 1.48 percent to 2.65 percent (or between 562,000 and 1,007,000) of Canadians who believe the earth is flat, with 95 percent confidence.

Suppose that 2,400 Canadians were surveyed on a particular day to determine whether they had received a cancer diagnosis that day. In all likelihood, none of them would respond affirmatively. From this result, we can conclude that being diagnosed with cancer on a given day is unlikely, but not much else. According to the binomial calculator, this result yields a confidence interval of 0 percent to 0.15 percent (or between zero and 57,000) of Canadians who receive such a diagnosis on a given day. The sample provides strong evidence that fewer than 57,000 Canadians received a positive diagnosis on that particular day but conveys no other information about the number of diagnoses on that particular day or on any future day. Clearly, a method other than simple sampling of a single day's data would be necessary to yield a meaningful estimate in this example. The reader is urged to eschew the received wisdom in e-discovery that any quantity can be estimated "± 2 percent" with a sample size of approximately 2,400. When necessary, hire a statistical expert to assist in calculating margins of error, confidence intervals, confidence levels, and appropriate sample sizes. Do not do this yourself.

---

54  A binomial calculator is a statistical method used to calculate confidence intervals based on the binomial distribution (as opposed to the Gaussian or normal distribution). When there are few relevant documents in the sample, the binomial estimation is more accurate than the Gaussian or normal estimation; when there are many relevant and non-relevant documents in the sample, then the binomial and the Gaussian (or normal) estimates are nearly identical. See TAR Glossary, *supra* note 1 at 9-10. An example of an online binomial calculator can be found at "Exact Binomial and Poisson Confidence Intervals" (last modified 25 May 2009), online: *StatPages* <https://statpages.info/confint.html>.

© [2021] Emond Montgomery Publications. All Rights Reserved.

**488**    PART V    AI-Enabled Litigation Tools

▶ Statistics for vetting and for validation.

The purpose of vetting a TAR tool is to estimate, in advance, how well it will work for a given review effort by examining how well it has worked for one or more past review efforts. For these purposes, it is feasible to spend considerably more time and effort in constructing a gold standard and in sampling to achieve a small margin of error compared to evaluating a single review effort. It is also feasible to repeat the process for many past reviews so as to aggregate the results. For example, the TREC 2016 Total Recall Track simulated 34 reviews for different information needs using the email collection from Jeb Bush's administration when he was the governor of Florida.[55] Six professional reviewers were employed for six weeks to create substantially complete gold-standard labels for each of the information needs.

Using such test collections, it is possible to assess the relative effectiveness and reliability of the methods employed by the participants at TREC 2016, or to assess the effectiveness and reliability of new methods, relative to those employed at TREC 2016. Such an assessment yields a reasonable prediction as to how effective the methods would likely be when applied to a new matter. At the time of writing, very few commercially available TAR tools have been vetted in this manner.

In contrast, the purpose of validation is to estimate the effectiveness of a particular review effort. The sample size that is used is limited by time and cost; a sample size of about 2,400 is often chosen for the specious reasons described above. Although a sampling strategy involving the review of 2,400 documents cannot possibly yield an estimate of recall or precision with a margin of error of ± 2 percent, it can yield a sufficiently precise estimate that can, along with other evidence, help confirm the effectiveness of a particular review effort.

The validation strategy that we propose is to use blind review of a combined stratified sample to compute separate estimates of (1) the number of truly responsive documents that are correctly coded relevant by the end-to-end review process, (2) the number of responsive documents incorrectly coded non-relevant by human reviewers, (3) the number of responsive documents incorrectly excluded from review by the TAR process, and, if employed, (4) the number of responsive documents incorrectly excluded by keyword culling or by any other culling method that may have been used. When combined, these estimates can provide an end-to-end estimate of the recall and precision of the entire search and review effort rather than just search-term recall or TAR recall, which can be misleading because they both make it appear as if the recall of the production set is higher than it actually is.[56]

---

55    Grossman, Cormack & Roegiest, "TREC 2016 Total Recall Track Overview," *supra* note 24.

56    A step-by-step guide for taking a blind stratified sample to compute end-to-end recall and precision for an individual review effort is provided in Appendix A to this chapter.

© [2021] Emond Montgomery Publications. All Rights Reserved.

The number of truly responsive documents identified in the production set will be a fairly large proportion—perhaps 70 percent—of all documents identified for production.[57] A sample of 400 documents is sufficient to estimate this proportion ± 5 percent with 95 percent confidence, which is sufficient for these purposes. The number of responsive documents incorrectly excluded by reviewers will be a smaller but still substantial proportion—perhaps 10 percent—of the total number of documents excluded by the reviewers. If it is 10 percent, a sample of 400 documents is sufficient to estimate this proportion ± 3 percent with 95 percent confidence, which is also sufficient for these purposes. The number of responsive documents incorrectly excluded by an effective TAR process is likely to constitute a very small proportion of the total number excluded—that is, the vast majority of excluded documents will be non-responsive. A sample of 1,600 may well reveal no responsive documents. In this event, we can conclude that, with 95 percent confidence, no more than 0.23 percent of the documents excluded by TAR are responsive. If search terms are used before TAR, an additional sample of 1,600 documents excluded by the keywords should be drawn. As with the TAR sample, this will, with high confidence, reveal whether an inordinate number of responsive documents have been missed by the keywords, but it can only provide a coarse upper limit of that number.

Assuming that no keyword culling was performed before TAR, we employ a combined sample size of 2,400 documents for the purposes of validation because that number is the one most often used in e-discovery today to evaluate review efforts (albeit for the wrong reasons, as described above) and because it should be sufficient and proportionate for most matters. The total size of the three samples—400 + 400 + 1,600 = 2,400 (or 2,400 + 1,600 = 4,000 if keywords were used)—can be adjusted on a case-by-case basis to balance the tension between validation review *effort* and the *precision of the estimates* achieved through the validation process. The estimates may be combined to yield estimates of recall and precision, which summarize the effectiveness of the end-to-end review effort. However, the separate estimates, and the samples themselves, can also offer deeper insights into potential shortcomings of various aspects of the review effort and opportunities for mitigation. A model protocol for determining the effectiveness of an individual review effort using this method is provided in Appendix A.

---

57  It will not be all (i.e., 100 percent) of the documents identified for production because the reviewer and the gold standard will sometimes disagree and because often document families are produced in whole, such that non-documents associated with responsive documents (i.e., attachments or "family members") are often produced automatically (i.e., along with the associated responsive parent email, or vice versa, document) even though they are not responsive in their own right. Such documents should not be counted when estimating recall and precision because they were not identified as responsive through the search and review effort that is being measured; their production is fortuitous.

© [2021] Emond Montgomery Publications. All Rights Reserved.

> ▶ Statistics such as accuracy, elusion, and $F_1$ do not tell the whole story.

Some statistics may convey the illusion of—but no actual insight into—review effectiveness. "Accuracy" is simply the overall proportion of documents that are correctly labelled as either responsive or non-responsive by the review effort (when combined together).[58] Suppose that 1 percent of the documents in a collection are responsive and that a vacuous review labels every one of them non-responsive. The accuracy of this review is 99 percent, although it does not identify a single responsive document. Accuracy is an uninformative measure of review effectiveness.

"Elusion" is the percentage of excluded documents that are responsive (i.e., the percentage of responsive documents found in the null set).[59] A small elusion number (e.g., 1 percent) is commonly touted as evidence of the effectiveness of a review effort. But a vacuous review that identifies no responsive documents could still achieve an elusion of 1 percent even though no responsive documents were identified. By itself, elusion conveys no useful information. Combined with the size of the excluded set, elusion can be used to estimate the number (as opposed to the percentage) of excluded responsive documents. This number can be compared to the number of produced responsive documents, but only if both are sampled and measured with respect to the same gold standard, derived from a blind review, as proposed above and in the appendixes to this chapter.

$F_1$ combines recall and precision. Arguably, a high $F_1$ score is evidence that both precision and recall are high, but a low $F_1$ score gives no indication as to which of the two is low or how to remedy the problem.

## VIII. Establishing the Effectiveness of TAR Tools and Review Efforts

As noted in the previous sections, estimates of effectiveness scores such as recall, precision, and $F_1$ can be used to compare the efficacy of review efforts given an independent gold standard. For the purpose of establishing the reasonableness of a particular review effort, it would be desirable to establish beforehand that the effort would be likely to achieve—and afterward that it did achieve—recall and precision comparable to or surpassing that of accepted practice or, better still, the hypothetical "ideal" of exhaustive manual review.

---

58  See TAR Glossary, *supra* note 1 at 8.

59  *Ibid* at 15.

© [2021] Emond Montgomery Publications. All Rights Reserved.

> ▶ The effectiveness of TAR tools and protocols should be established in advance; the effectiveness of review efforts should be validated after the fact. Neither is a substitute for the other.

The same approach may be used to establish the effectiveness of a surgical procedure. First and foremost, it is necessary to use tools, procedures, and surgeons whose outcomes have been validated for similar patients with similar conditions; second, it is necessary to verify for every case that post-operative tests yield results consistent with a successful surgery. Unfortunately, few e-discovery service providers have subjected their tools, procedures, or experts to anything resembling a "clinical trial" or to any sort of rigorous evaluation. In the future, a consortium of service providers, regulators, and/or practitioners should conduct such product testing. In the meantime, practitioners are on their own to vet the TAR tools and methods they choose to use and to establish the effectiveness of their individual review efforts after the fact. A model protocol for vetting the effectiveness of a TAR tool or protocol in advance is provided in Appendix B.

> ▶ TREC offers standard test collections that can be used as a benchmark to assess the effectiveness and reliability of TAR methods.

TREC is an annual conference that evaluates information retrieval methods using test collections consisting of a common set of documents, information needs (i.e., topics or RFPs), and independent gold-standard relevance assessments.[60] Each year, academic, government, and industry participants test various approaches to search and review on the test collections, and the results are reported in the TREC proceedings.

---

60   TREC was initiated in 1992. According to NIST's overview of TREC,

[i]ts purpose was to support research within the information retrieval community by providing the infrastructure necessary for large-scale evaluation of text retrieval methodologies. In particular, the TREC workshop series has the following goals:

- to encourage research in information retrieval based on large test collections;
- to increase communication among industry, academia, and government by creating an open forum for the exchange of research ideas;
- to speed the transfer of technology from research labs into commercial products by demonstrating substantial improvements in retrieval methodologies on real-world problems; and
- to increase the availability of appropriate evaluation techniques for use by industry and academia, including development of new evaluation techniques more applicable to current systems.

For more information about TREC, see online: *NIST* <https://trec.nist.gov/>.

© [2021] Emond Montgomery Publications. All Rights Reserved.

The test collections are also made publicly available so that they can be used to conduct experiments on methods and tools that were not represented at TREC.

Of particular interest here are the Legal Track, an evaluation campaign that ran at TREC from 2006 through 2011, and the Total Recall Track, which ran at TREC in 2015 and 2016. From 2006 through 2008, the Legal Track employed a collection of seven million documents from the tobacco litigation[61]; from 2009 through 2011, it employed a collection of about 700,000 documents captured from Enron at the time of its collapse.[62] Each year, information needs were specified using a mock complaint and mock RFPs. A gold standard was created for a statistical sample of the document collection and was used to estimate recall, precision, $F_1$, and other effectiveness measures for the TREC participants' retrieved results. The results are published in the TREC proceedings;[63] the collections and tools, which can be used to evaluate the results of future experiments, are available from NIST, subject to a usage agreement.[64]

> ▶ The Jeb Bush collection from the TREC 2015 and 2016 Total
> Recall Tracks offers 290,000 documents, 44 topics, and
> independent gold standards for research into the effectiveness
> of TAR tools and methods.

The TREC Total Recall Track employed six different collections: (1) a set of 290,000 emails from Jeb Bush's tenure as governor of Florida; (2) a set of 500,000 postings from two "black hat" web forums; (3) a set of 900,000 news articles from the Columbia region of North America; (4) a set of 90,000 clinical records from a hospital intensive care unit; (5) a set of 400,000 emails from Tim Kaine's tenure as governor of Virginia; and (6) a set of 300,000 emails from Rod Blagojevich's tenure as governor of Illinois.[65] Of these collections, the first three are publicly available for research purposes. Of most interest to practitioners is the Jeb Bush collection, for which 44 information needs

61  David D Lewis et al, "Building a Test Collection for Complex Document Information Processing" in Susan Dumais et al, eds, *SIGIR '06: Proceedings of the 29th Annual International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: ACM, 2006) 665.

62  Gordon V Cormack, "TAR Evaluation Toolkit Release 1.0.0" (2013), online: *University of Waterloo* <https://cormack.uwaterloo.ca/tar-toolkit/>.

63  "TREC Proceedings" (last modified 21 February 2020), online: *NIST*, <https://trec.nist .gov/proceedings/proceedings.html>. See also TREC Legal Track, *supra* note 14.

64  See "Data" (last modified 20 March 2020), online: *NIST* <https://trec.nist.gov/data.html> (for most TREC data sets, including the Legal Track), and "TREC Total Recall Information-Retrieval Text Research Collections" (last visited 31 January 2021), online: *Programming Languages Group* <https://plg.uwaterloo.ca/~gvcormac/total-recall/TR-group.html> (for the TREC Total Recall data sets).

65  Grossman, Cormack & Roegiest, "TREC 2016 Total Recall Track Overview," *supra* note 24. See also Roegiest et al, *supra* note 24.

© [2021] Emond Montgomery Publications. All Rights Reserved.

(i.e., topics or RFPs) and full gold-standard relevance assessments are available, as well as three alternate, mutually independent sampled sets of gold-standard assessments for the 34 TREC 2016 Total Recall topics.

We have used these collections—and similar collections from other evaluation efforts—in our research. Our paper comparing the effectiveness of rule-based and supervised machine learning methods for TAR to exhaustive manual review was based on a retrospective analysis of the TREC 2019 Legal Track results.[66] Our paper comparing the effectiveness of different supervised machine learning protocols for TAR reported a simulation study using the TREC 2019 Legal Track collection.[67] Our paper measuring the reliability of TAR methods used the TREC Total Recall collections, as well as several others.[68] Practitioners may use the same collections to evaluate commercial TAR tools and protocols.

> ▶ The results of a prior review effort can be used as the basis for a test collection to evaluate new tools and methods.

Many practitioners also have access to the results of a prior review that they believe was competently performed. The documents, RFPs, and relevance assessments for that review can be used to compare the effectiveness of two new methods—for example, TAR versus a traditional manual review or two TAR methods. For this purpose, the prior relevance assessments are used as the gold standard; in other words, the results of the prior review (presumably representing accepted practice) may be used to assess the effectiveness of the two new methods.

In the alternative, it is possible to compare the effectiveness of the prior review to that of a new review by creating a new independent gold standard. In this case, it is necessary to create the gold standard by conducting a blind review of a stratified sample of documents so as to populate a confusion matrix,[69] from which recall, precision, $F_1$, and other measures can be estimated.

---

66  See JOLT study, *supra* note 2.

67  See SIGIR 2014, *supra* note 24.

68  See Gordon V Cormack & Maura R Grossman, "Engineering Quality and Reliability in Technology-Assisted Review," in *SIGIR '16: Proceedings of the 39th International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: ACM, 2016) 75.

69  A confusion matrix (also sometimes referred to as a "contingency table") is a two-by-two table listing the values for the number of true positives (i.e., documents labelled responsive that are truly responsive), true negatives (i.e., documents labelled non-responsive that are truly non-responsive), false positives (i.e., documents labelled responsive that are truly non-responsive), and false negatives (i.e., documents labelled non-responsive that are truly responsive). Virtually all of the standard evaluation measures in information retrieval are algebraic combinations of the four values in the confusion matrix. For an example of a confusion matrix and the formulas for the information-retrieval measures that may be computed from it, see TAR Glossary, *supra* note 1 at 12.

© [2021] Emond Montgomery Publications. All Rights Reserved.

To compare review methods, A and B, the stratified sample must contain a number of documents selected at random from each of these four strata, as detailed in Appendix B, paragraph B:

1. documents labelled responsive by Review A and responsive by Review B;
2. documents labelled responsive by Review A and non-responsive by Review B;
3. documents labelled non-responsive by Review A and responsive by Review B; and
4. documents labelled non-responsive by Review A and non-responsive by Review B.

The documents in the samples are shuffled together and labelled by an expert reviewer, who is given no information regarding the stratum from which each document was derived. This blinding process is essential to the validity of any estimate derived from the gold standard. It is well established that, regardless of the motivation of the reviewer, they would be influenced by knowing from which stratum each document was derived or even by knowing some factor associated with the stratum—for example, the order in which the documents are presented for review.[70]

From the samples and the gold-standard assessments, we can estimate the number of documents labelled responsive by Review A that are also labelled responsive according to the gold standard (i.e., precision) and the number of documents that are labelled responsive according to the gold standard that are also labelled responsive according to Review A (i.e., recall). Precision and recall for Review B can be estimated in a similar manner and compared to those for Review A. A similar strategy can be employed to compare more than two methods, using strata to capture all combinations of relevance (and non-relevance) labels among the systems. Such an approach was used for the TREC 2008 through 2011 Legal Tracks.[71]

---

70   Adam Roegiest & Gordon V Cormack, "Impact of Review-Set Selection on Human Assessment for Text Classification" in *SIGIR '16: Proceedings of the 39th International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: ACM, 2016) 861; Falk Scholer et al, "The Effect of Threshold Priming and Need for Cognition on Relevance Calibration and Assessment" in *SIGIR '13: Proceedings of the 36th International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: ACM, 2013) 623; Mark D Smucker & Chandra P Jethani, "Human Performance and Retrieval Precision Revisited" in Hsin-Hsi Chen et al, eds, *SIGIR '10: Proceedings of the 33rd International ACM SIGIR Conference on Research and Development in Information Retrieval* (New York: ACM, 2010) 595; William Webber et al, "Assessor Error in Stratified Evaluation" in Xiangji Jimmy Huan et al, eds, *CIKM '10: Proceedings of the 19th ACM International Conference on Information and Knowledge Management* (New York: ACM 2010) 539; Mu-hsuan Huang & Hui-yu Wang, "The Influence of Document Presentation Order and Number of Documents Judged on Users' Judgments of Relevance" (2004) 55 J American Society Information Science & Technology 970; Michael Eisenberg & Carol Barry, "Order Effects: A Study of the Possible Influence of Presentation Order on User Judgments of Document Relevance" (1988) 39 J American Society Information Science & Technology 293.

71   *Supra* note 14.

© [2021] Emond Montgomery Publications. All Rights Reserved.

> ▶ One information need for one collection is sufficient as a proof
>   of concept; multiple information needs and multiple collections
>   are necessary to show reliability.

Each TREC collection entails a massive volunteer effort to construct a gold standard for each of many information needs. Given the results of a method over all of these information needs, it is possible to estimate reliability—the percentage of the time that the method succeeds, for some definition of success—in other words, a measure of consistency. We might say, for example, that a method is reliable if its estimated recall equals or exceeds that of standard practice for at least 95 percent of all information needs. Further evidence of reliability can be demonstrated by showing that a method is reliable using different test collections.

Although the literature provides evidence of the effectiveness and reliability of some search and review methods,[72] it is largely silent on the effectiveness and reliability of most commercially available TAR tools. We strongly advocate standardized testing to address these questions, but at the present time and for the foreseeable future, the practitioner's best recourse is to consider the available empirical evidence regarding the effectiveness of various methods, to consider critically service providers' claims as to which tools and methods they employ, to conduct proofs of concepts where feasible, to monitor the progress of their ongoing review efforts, and to evaluate their own results after the fact using stratified sampling and blind review, as set forth in the appendixes to this chapter.

At the very least, after-the-fact validation of a putative review effort should be based on the blind review of a stratified sample of documents, as detailed in the model validation protocol set forth in Appendix A, including both documents labelled responsive by the review effort and documents labelled non-responsive by the review effort.

From this blind review, estimates of end-to-end recall and precision—according to the gold-standard blind review—can be derived. As a rule of thumb, an estimate of 70 percent end-to-end recall and 70 percent end-to-end precision is consistent with an adequate review when estimated under these circumstances; however, cases of disagreement between the review result and the gold standard should be examined carefully to determine whether they indicate a systemic problem with the review effort. Moreover, responsive documents in the sample that were missed by the review effort should be examined for their novelty and importance to determine whether an identifiable class of responsive documents has been left behind.

A more convincing, but heretofore unused, method for after-the-fact validation would be to have the sample reviewed by two independent, equally qualified, teams—one arbitrarily chosen to serve as the gold standard and one as a control. If the estimated

---

72   *Supra* note 24.

© [2021] Emond Montgomery Publications. All Rights Reserved.

recall and precision of the actual review effort equal or exceed those of the control (when judged according to the gold standard), we can reasonably conclude that the review was as effective as the control, which represents exhaustive manual review.

Finally, we note that recall and precision are not the sole determinants of effectiveness. For a typical information need, the majority of responsive documents—perhaps 70 percent or more—will be similar and perhaps only marginally important. A minority of the documents may be dissimilar to the majority but very important. A review that systematically excludes these different-but-important documents is deficient, regardless of what estimate of recall and precision it achieves. As a preliminary matter, documents for which the review effort and the gold standard disagree should be examined for instances of excluded categories of responsive documents. Better still, auxiliary keyword searches of the collection and/or of the null set(s) should be conducted to try to find as many diverse examples of responsive documents as possible to determine if any have mistakenly been excluded by the review effort. This approach is akin to audit sampling in accounting. It is not the same as random sampling, but it can be very effective when the prevalence or richness of the collection is low (i.e., when there are few responsive documents to be found) and the nature of difficult-to-find responsive documents can be anticipated.

## IX.  A TAR Checklist and Parting Words

What follows is a checklist of our key take-aways from this chapter:

- *Not all search and review efforts are created equal.* In choosing a TAR tool and protocol, the user should rely first and foremost on independent, controlled studies as an indicator of which algorithms and protocols are most effective and reliable. To the extent that such independent product evaluations are unavailable, users should test the efficacy and efficiency of TAR tools and protocols themselves, in advance of their use, so they are not first learning about their (in)effectiveness after they complete a review effort. The TREC test collections, the user's own prior competent review efforts, and the procedures described in Appendix B provide users with all they need to vet search and review methods. Users should not settle for scripted searches demonstrated by the service provider's marketing team to make purchasing decisions. Most service providers use some version of the Enron data set for the purposes of their product demonstrations. At the very least, in vetting search tools, users can consult the TREC 2009 to 2011 Legal Track Overview papers[73] for possible information needs (i.e., topics or RFPs) to use for testing the system beyond the canned searches used in provider product demonstrations.

- *Search-term recall, TAR recall, and reviewer recall are not the same things as end-to-end recall.* Measuring only a single component of a review effort and presenting

---

73   See NIST, "TREC Proceedings," *supra* note 63.

© [2021] Emond Montgomery Publications. All Rights Reserved.

it as an estimate of the quality of the production set misrepresent the recall estimate so that it appears better than it actually is. Each culling or review step introduces its own error and reduces the overall (i.e., end-to-end) recall estimate, the combined effect of which can be substantial. Therefore, unless it is infeasible or too costly to do so, do not use keywords to cull before TAR. Your end-to-end recall will be considerably higher that way.

- *Know your TAR algorithms.* If at all possible, use an SVM or logistic regression. Do not confuse concept-clustering methods such as LSI and LSA with TAR.
- *Know your TAR protocols.* Use a CAL protocol when you intend to review all potentially responsive documents before production; use a SAL or S-CAL protocol when you do not intend to do so. If you are using a SAL protocol, make sure that the two components that make up the $F_1$ score (i.e., recall and precision) are both acceptable before you stop training. Begin the training process with examples of known or synthetic (i.e., contrived) responsive documents (as well as some known non-responsive documents) rather than random samples, which decrease efficiency, particularly when responsive documents are sparse in the collection.
- *Manage expectations about outcome.* Relevance is subjective, and two equally qualified reviewers will label the same documents differently about 30 percent of the time. Thus, without the use of quality control measures and technology, it is challenging to obtain recall estimates above 70 percent for manual review since that is the level at which reviewers typically agree. All review efforts entail a trade-off between recall and precision; the higher of one that is achieved, the lower the other will be. $F_1$ summarizes the two but does not show which is lower or what can be done about that.
- *Always measure recall and precision using a blind review of stratified samples that include examples of documents labelled responsive for any reason and examples of documents excluded or labelled non-responsive for any reason.* Only when measured in this manner, as described in Appendix A and according to an independent gold standard, can an end-to-end recall on the order of 70 percent to 80 percent be said to demonstrate an adequate review effort (assuming that no novel or important documents are identified during the validation process). We provide model protocols with step-by-step guidelines for vetting a TAR tool, a TAR protocol, or other review method (see Appendix B) and for evaluating an individual review effort (see Appendix A).
- *Statistics and online statistical calculators are not toys.* Beware of "learned wisdom" regarding margins of error, confidence intervals, confidence levels, and sample sizes; it is often wrong. For example, there is no such thing as a "statistically significant training set." There is no such thing as a guarantee that you have found 95 percent of all relevant documents or that you will find all of the relevant documents 95 percent of the time.

© [2021] Emond Montgomery Publications. All Rights Reserved.

Statistical terms such as "margin of error," "confidence interval," and "confidence level" apply only to the estimate of a particular quantity from a particular sample—for example, the number of relevant documents found or the number of relevant documents missed. The mantra that a sample of 2,395 (or any other magic number) documents will give you an estimate of these numbers ± 2 percent is misleading. The margin of error for the estimate of a *number* should be expressed as a *number*; the margin of error for the estimate of a *percentage* should be expressed as a *percentage*. The notion that a recall estimate with "a margin of error of ± 2 percent, with a confidence level of 95 percent," can be derived from a simple sample of 2,395 from the collection is simply false. Such a sample can yield nothing more than a coarse estimate of the proportion of a certain type of document (i.e., the "richness" or "prevalence" of responsive documents) in a collection, which, like the proportion of Canadian flat-earthers, is typically low. Compared to this low richness, a margin of error of ± 2 percent is enormous.

© [2021] Emond Montgomery Publications. All Rights Reserved.

# Appendix A

**A Model Validation Protocol for Examining the Effectiveness of an Individual Review Effort[1]**

A.  The review effort should be conducted using tools and protocols whose effectiveness has been established prior to the review effort under consideration. The review process should incorporate quality control and quality assurance measures to ensure that the selected review tool and protocol are performing as expected during the course of the review effort. Once the producing party reasonably believes that it has identified for production substantially all responsive non-privileged documents, it should conduct validation according to the sampling protocol described below. This Validation Protocol should apply to the review process regardless of whether keyword culling, manual review, or TAR (or any combination of them) was used by the producing party.

B.  The Document Collection (Collection) is defined as including all documents identified for review for responsiveness. This Validation Protocol assumes that the completeness or adequacy of the Collection has already been established.

C.  The Collection shall be partitioned into the following Subcollections as appropriate:

1.  documents identified by the review effort as responsive to at least one request for production (RFP), including any privileged documents but not including family members of responsive documents, unless those family members are deemed to be responsive in their own right (Subcollection C(1));

2.  documents coded as non-responsive by a human reviewer, regardless of how the documents were selected for review (Subcollection C(2));

3.  documents excluded from manual review as the result of a TAR process (Subcollection C(3)). If the review process did not employ TAR, the Collection will not include Subcollection C(3); and

4.  documents excluded from manual review by keyword culling (Subcollection C(4)).  If the review process did not employ keyword culling, the Collection will not include Subcollection C(4).

---

1  This validation protocol was adapted from the Order Regarding Search Methodology for Electronically Stored Information in *In re Broiler Chicken Antitrust Litig*, Case No 1:16-cv-08637, 2018 WL 1146371 (ND Ill 3 January 2018) (Special Master Maura R Grossman).

© [2021] Emond Montgomery Publications. All Rights Reserved.

D.   A sample shall be drawn consisting of the following:

1.   400 documents selected at random from Subcollection C(1) (Subsample D(1));

2.   400 documents selected at random from Subcollection C(2) (Subsample D(2));

3.   1,600 documents selected at random from Subcollection C(3) if TAR was used (Sample D(3)). If TAR was not used, there will be no Subsample D(3); and

4.   1,600 documents selected at random from Subcollection C(4) if keyword culling was used (Subsample D(4)). If keyword culling was not used, there will be no Subsample D(4).

E.   The sample sizes in paragraph D above are chosen so as to estimate the proportion of responsive documents in Subcollections C(1) and C(2) with a margin of error of no more than ± 5 percent and to determine if collections C(3) and C(4) contain more than 0.23 percent responsive documents, at the 95 percent confidence level.

Should smaller margins of error be required, sample sizes may be increased as follows. Quadrupling the size of D(1) and D(2) from 400 to 1,600 will halve the size of the confidence interval, from ± 5 percent to ± 2.5 percent. Doubling the size of D(3) and D(4) from 1,600 to 3,200 will halve the proportion of responsive documents that can be detected, from 0.23 percent to 0.12 percent.

Conversely, quartering the size of D(1) and D(2) from 400 to 100 will double the margin of error from ± 5 percent to ± 10 percent, whereas halving the size of D(3) and D(4) from 1,600 to 800 will double the proportion of responsive documents that can be detected, from 0.23 percent to 0.46 percent.

F.   The sample of documents composed of the documents from Subsamples D(1), D(2), and, if present, D(3) and/or D(4) shall be combined into a single Validation Sample.

The Validation Sample shall be reviewed and coded by a subject-matter expert (SME) who is knowledgeable about the subject matter of the litigation. This should be a lawyer who is familiar with the RFPs and the scope of relevance (i.e., the claims and defences at issue in the litigation) but need not be a senior partner. The documents shall be presented to the reviewer in random or arbitrary order (e.g., by MD5 hash value). During the course of the review of the Validation Sample, the SME shall not be provided with or have available to them any information concerning the Subcollection or Subsample from which any document was derived, the prior coding of any document, or the score afforded to any document by the TAR tool. The intent of this requirement is to ensure that the review of the Validation Sample

© [2021] Emond Montgomery Publications. All Rights Reserved.

is blind, as necessary to form an independent gold standard for the purpose of evaluating the production.

G.    Once the coding in paragraph F has been completed, the producing party shall prepare a table listing each of the documents in the Validation Sample. For each document, the table shall include:

1.    the Bates number of the document (for any documents previously produced) or a control/identification number (for any non-produced documents);

2.    the Subsample from which the document came (i.e., D(1), D(2), and, if present, D(3) or D(4));

3.    the SME's responsiveness coding for the document (i.e., responsive or non-responsive); and

4.    the SME's privilege coding for the document (i.e., privileged or not privileged). If the document is coded as non-responsive, a privilege determination need not be made for that document. All documents in the Validation Sample coded as responsive and privileged may be withheld from production (subject to logging or other stipulated requirements) but shall be counted as responsive for the purpose of this Validation Protocol.

H.    The following items shall be provided to the requesting party:

1.    the table described in paragraph G;

2.    a copy of each responsive, non-privileged document in the Validation Sample that was identified for production but was not previously produced to the requesting party; and

3.    the statistics and recall estimate detailed in paragraph J below.

I.    The parties shall meet and confer to determine whether they agree that the recall estimate and the quantity and nature of the responsive documents identified through the Validation Protocol indicate that the review is substantially complete. If the recall estimate and the samples indicate that Subcollections C(2) and/or C(3) and/or C(4) still contain a substantial number of non-marginal, non-duplicative responsive documents compared to Subcollection C(1), the review and quality control processes should continue, and the Validation Protocol should be repeated, as warranted. If the parties are unable to agree on whether the review is substantially complete or whether the Validation Protocol should be repeated, the parties shall seek the court's intervention.

J.    Method for Estimating Recall and Precision:

An estimate of recall and precision shall be computed to inform the decision-making process described in paragraph H above; however, the absolute numbers in their own right shall not be dispositive of

© [2021] Emond Montgomery Publications. All Rights Reserved.

whether a review is adequate or substantially complete. Also of concern is the novelty and materiality (or, conversely, the duplicative or marginal nature) of any responsive documents identified in Subsamples D(2) and/or D(3) and/or D(4). The estimates of recall and precision shall be derived as described below. It should be noted that, when conducted by an SME pursuant to paragraph F of this Validation Protocol, a recall estimate on the order of 70 percent to 80 percent is consistent with, but not the sole indicator of, an adequate (i.e., high-quality) review. A recall estimate somewhat lower than this does not necessarily indicate that a review is inadequate, nor does a recall in this range or higher necessarily indicate that a review is adequate; the final determination will also depend on the quantity and nature of the documents that were missed by the review effort.

**Recall Estimation Calculation:**

The number of responsive documents found ≈ the size of Subcollection C(1) × the number of responsive documents found in Subsample D(1) ÷ 400.

The number of responsive documents coded incorrectly ≈ the size of Subcollection C(2) × the number of responsive documents found in Subsample D(2) ÷ 400.

The number of responsive documents excluded by TAR ≈ size of Subcollection C(3) × the number of responsive documents found in Subsample D(3) ÷ 1,600 (if TAR is used; otherwise, 0).

The number of responsive documents excluded by keyword culling ≈ size of Subcollection C(4) × the number of responsive documents found in Subsample D(4) ÷ 1,600 (if keyword culling is used; otherwise 0).

Estimated recall ≈ the number of responsive documents found ÷ (the number of responsive documents found + the number of responsive documents coded incorrectly + the number of responsive documents excluded by TAR + the number of responsive documents excluded by keyword culling).

**Precision Estimation Calculation:**

Estimated precision ≈ the number of responsive documents found ÷ the size of Subcollection C(1).

© [2021] Emond Montgomery Publications. All Rights Reserved.

## Appendix B

**Model Validation Protocol for Vetting a TAR Tool or Comparing Two Different Review Methods**

A.  One method to establish the effectiveness of a new review tool or protocol is to compare it to the results of a prior review that is known to be of high quality. To this end, it is necessary to estimate the recall and precision of both the prior review (Review Effort A) and the new review (Review Effort B) for the same information need(s), according to the same independent gold standard.

B.  The first step in the process is to identify the following four Subcollections:

1.  documents identified as responsive by both Review Effort A and Review Effort B (Subcollection C(1));

2.  documents identified as responsive by Review Effort A but not Review Effort B (Subcollection C(2));

3.  documents identified as responsive by Review Effort B but not Review Effort A (Subcollection C(3)); and

4.  documents not identified as responsive by Review Effort A or by Review Effort B (Subcollection C(4)).

C.  From each of these Subcollections, a random sample of 600 documents is drawn, comprising Subsamples D(1), D(2), D(3), and D(4), respectively. These Subsamples are combined and reviewed blind by a subject-matter expert, as described above in Appendix A, paragraph F.

D.  A sample size of 600 yields an estimate of each proportion with a margin of error of no more than ± 4 percent, with 95 percent confidence. Quadrupling the sample size will halve the margin of error, whereas quartering the sample size will double the margin of error.

E.  ***Recall, Precision, and $F_1$ Estimation:***

The number of responsive documents found by Review Effort A and Review Effort B ≈ the size of Subcollection C(1) × the number of responsive documents found in Subsample D(1) ÷ 600.

The number of responsive documents found by Review Effort A but not by Review Effort B ≈ the size of Subcollection C(2) × the number of responsive documents found in Subsample D(2) ÷ 600.

The number of responsive documents found by Review Effort B but not Review Effort A ≈ the size of Subcollection C(3) × the number of responsive documents found in Subsample D(3) ÷ 600.

© [2021] Emond Montgomery Publications. All Rights Reserved.

The number of responsive documents found by neither Review Effort A nor Review Effort B ≈ the size of Subcollection C(4) × the number of responsive documents found in Subsample D(4) ÷ 600.

**Estimated Recall for Review Effort A** ≈ (the number of responsive documents found by Review Effort A and Review Effort B + the number of responsive documents found by Review Effort A but not Review Effort B) ÷ (the number of responsive documents found by Review Effort A and Review Effort B + the number of responsive documents found by Review Effort A but not Review Effort B + the number of responsive documents found by Review Effort B but not Review Effort A + the number of responsive documents found by neither Review Effort A nor Review Effort B).

**Estimated Recall for Review Effort B** ≈ (the number of responsive documents found by Review Effort A and Review Effort B + the number of responsive documents found by Review Effort B but not Review Effort A) ÷ (the number of responsive documents found by Review Effort A and Review Effort B + the number of responsive documents found by Review Effort A but not Review Effort B + the number of responsive documents found by Review Effort B but not Review Effort A + the number of responsive documents found by neither Review Effort B nor Review Effort A).

**Estimated Precision for Review Effort A** ≈ (the number of responsive documents found by Review Effort A and Review Effort B + the number of responsive documents found by Review Effort A but not Review Effort B) ÷ (the number of documents—whether responsive or not—in Subcollections C(1) + C(2)).

**Estimated Precision for B** ≈ (the number of responsive documents found by Review Effort A and Review Effort B + the number of responsive documents found by Review Effort B but not Review Effort A) ÷ (the number of documents—whether responsive or not—in Subcollections C(1) + C(3)).

**Estimated $F_1$ (for Review Effort A or Review Effort B)** ≈ 2 × (estimated recall × estimated precision of the review effort) ÷ (estimated recall + estimated precision of the review effort).

F.   If Review Effort B (the new tool or protocol) has comparable or superior recall and comparable or superior precision to Review Effort A, it is reasonable to conclude that Review Effort B is at least as effective as A. $F_1$ combines recall and precision into a single effectiveness measure, which is commonly reported, but may obscure the fact that Review Effort B has inferior recall or inferior precision to Review Effort A.

© [2021] Emond Montgomery Publications. All Rights Reserved.