UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **United Association National** | ) | |
| **Pension Fund, et al.,** | ) | No. 2:22-cv-02126-MTL |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | December 22, 2025 |
| **Carvana Company, et al.,** | ) | 3:50 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE MICHAEL T. LIBURDI, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION TO MODIFY SCHEDULING ORDER**

Official Court Reporter:
**Cathy J. Taylor, RMR, CRR, CRC**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiffs:
    ROBBINS GELLER RUDMAN & DOWD, LLP
    By:  **Daniel S. Drosman, Esq.**
         **Erika Limpin Oliver, Esq.**
    655 West Broadway, Suite 1900
    San Diego, California  92101


For the Defendants Carvana, et al.:
    LATHAM & WATKINS
    By:  **Meryn Grant, Esq.**
    355 South Grand Avenue, Suite 100
    Los Angeles, California  90071-1560

    LATHAM & WATKINS
    By:  **Matthew Peters, Esq.**
    555 11th Street NW, Suite 1000
    Washington, DC  20004-1304

    FENNEMORE CRAIG, PC
    By:  **Andrea Lynn Marconi, Esq.**
    2394 East Camelback Road, Suite 600
    Phoenix, Arizona  85016

For the Defendants Citigroup Global Markets, Incorporated, and
J.P. Morgan Securities, LLC:
    PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
    By:  **Susanna M. Buergel, Esq.**
    1285 Avenue of the Americas
    New York, New York  10019

For Defendant Ernest Garcia, Sr.:
    DLA PIPER, LLP
    By:  **Melanie E. Walker, Esq.**
    2000 Avenue of the Stars, Suite 400
    Los Angeles, California  90067

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings commence at 3:50 p.m.)

THE COURTROOM DEPUTY:  Civil Case 22-2126, United Association National Pension Fund vs. Carvana Company.  This is the time set for hearing on motion to modify scheduling order.

Please announce your presence for the record starting with the plaintiff.

MR. DROSMAN:  Good afternoon, Your Honor.  Daniel Drosman on behalf of plaintiffs from Robbins Geller Rudman & Dowd.  I'm here with my colleague Erika Oliver.

THE COURT:  Good afternoon.

MS. GRANT:  Good afternoon, Your Honor.  Meryn Grant from Latham & Watkins on behalf of Carvana defendants.  And I'm here with my colleague Matt Peters.

THE COURT:  Okay.  Good afternoon.

MS. WALKER:  Good afternoon, Your Honor.  Melanie Walker of DLA Piper on behalf of Ernest Garcia, Sr.

MS. BUERGEL:  Good afternoon, Your Honor.  Susanna Buergel from Paul Weiss for the underwriter defendants, Citigroup and J.P. Morgan.

THE COURT:  Okay.  Good afternoon to you all.

MS. MARCONI:  Last but not least.

THE COURT:  Sorry.

MS. MARCONI:  I'm hiding back here.  Andrea Marconi

from Fennemore Craig for the Carvana defendants and the underwriter defendants.

THE COURT:  Okay.  Good to see you all.  And thank you all for traveling here to be at this hearing.  I just felt it was necessary to have an in-person hearing given the aging nature of this case and the multiple discovery disputes that Judge Boyle has, I think, done a very good job of adjudicating on my behalf, and also to get a sense as to the nature of this request.

I've reviewed the briefing supplied by both sides and familiarized myself with Judge Boyle's orders.  I do, you know, have -- have my own personal recollection of the motion briefing back at the beginning stages of the case.  And I do recall having the Rule 16 scheduling conference where we did have quite a bit of discussion as to the schedule and the substantial completion deadline that was imposed in the scheduling order.  And I just -- I just thought we should come on in here, and I'm going to take stock.

So, Mr. Cross [sic], you want to go first?  This is your motion.

MR. DROSMAN:  Sure, Your Honor.

Your Honor, this motion is really a tale of two schedules.  We have -- on one timeline we have the Carvana defendants' schedule.  After months of delay and a record that showed they'd never collected from key departments, Magistrate

Judge Boyle entered the November 19th order.  And in that order he added seven new custodians from finance, inventory, and investor relations.  He gave Carvana until April 6th, 2026, to substantially complete their production from those custodians.  And these are not fringe players, Your Honor.  They're directors and vice presidents who ran business units at the heart of the alleged fraud.  They're in finance, they're in inventory, they're in logistics, and investor relations.  Key departments in this case.  The Court recognized they should have been in the case all along and gave Carvana four extra months to fix the omission.

On the other timeline, we have plaintiffs' schedule. Under the current scheduling order, Your Honor, we'd still assume a substantial completion date of December -- which still assumes a completion deadline of December 8th, 2025.  Our class certification motion is due in January, in about a month, 2026, and fact discovery closes on May 29th, 2026.

So under the existing order, we're supposed to brief class certification before Carvana finishes producing documents from the seven new custodians and finish all fact discovery, including depositions of the CEO, CFO, and those seven new custodians within weeks of Carvana's April 6th production deadline.

THE COURT:  Right.  And one of the points Carvana makes in response to this motion is you don't need this

discovery in order to brief your class certification motion.

MR. DROSMAN:  Would you like me to --

THE COURT:  Yes.

MR. DROSMAN:  -- discuss that, Your Honor?

THE COURT:  Why don't you focus on that, because I'm just interested in knowing what these -- what these custodians will have that would strengthen -- "would" may not be the right word.  It might be could.  How that could strengthen your class certification motion.

MR. DROSMAN:  Sure.  And I would just say it's not even a matter of strengthen.  It's a matter of certain necessity.  And as you know from our briefing in *Halliburton II*, the Supreme Court gave defendants a powerful tool at the class certification stage.  They can rebut the fraud on the market presumption by showing a lack of price impact.  And then we know how this will look in practice. Carvana will hire economists to argue that the alleged misstatements didn't impact the stock price, and they'll argue that the market already knew about the issues or that the supposed corrected disclosures didn't add any new information.

To rebut that, plaintiffs must be able to show internal emails and reports where executives discuss how the market is reacting to specific disclosures, internal documents showing that they expected a given announcement to move the stock evidence of anticipated price impact, or communications

with analysts, emails, and decs that show what was being said privately to the very entities whose reports move the market.

Right now the production contains a tiny handful of analyst communication documents.  The people who own this evidence, investor relations, finance, and certain operational VPs, are precisely the seven custodians whose productions will not be complete until April 6th, 2026.  And if we're forced to brief class certification under the current schedule, we'll be walking into a *Halliburton II* fight with our hands tight behind our back, Your Honor.  Carvana's experts will point to alleged lack of price impact, and we'll be limited to public-only data while the internal evidence that could rebut that narrative is still sitting in files the Court has said they should collect from but they haven't yet produced.

Class certification in a securities case is too important, Your Honor, a decision to make on a record that everyone knows is incomplete by design.

Do you have any questions about that particular --

THE COURT:  No, Mr. Cross.

MR. DROSMAN:  Okay.

THE COURT:  Thank you.

MR. DROSMAN:  Your Honor, I'd like to just sort of walk through the outline in our argument.  To show good cause, I'll cover three points:  The factual record; diligence versus obstruction.

The delay here is not the product of plaintiffs' inaction. It flows directly from Carvana's choices; hiding organizational information that -- for months, fighting the scope order, and then moving slowly in -- in fact, glacially, even after losing.

The fiction of substantial completion. The current production, 89 percent title and registration documents with an executive email black hole, is a Potemkin village of discovery. It looks big from the outside, but it's largely empty of the scheme documents that the Court has already held are discoverable.

And, finally, Your Honor, I'll talk about the importance of evidence for depositions and how plaintiffs absolutely need documents not just to take depositions, but to select from the universe of potential deponents. And that can't be done until we have a full panoply of evidence, Your Honor.

Rule 16(b)(4) asks whether we could have met the deadlines despite our diligence. That's the inquiry. Defendants say we waited too long to seek these new custodians. The timeline tells a very different story. Let me walk through the four phases.

So phase 1, Your Honor, is what I'll call the request and the denial, and that included the months of March and April of 2025. We started immediately. As you know, Your Honor, we

had our scheduling conference with Your Honor.  Less than two weeks later, on March 11th, 2025, after that conference we served our first set of requests for production.  We knew Carvana is a large and complex public company who ran company -- subdepartments like finance, inventory, logistics, and investor relations.  So we did what any competent plaintiffs' attorneys would do.  We asked for organizational charts and directories.  We asked for both of those things in our March 11th requests for production.  You can't responsively identify custodians without knowing who actually runs the relevant departments.

What did Carvana do?  Well, on April 24th, 2025, they wrote back to us in their responses to the requests for production and said no such org- -- organizational charts exist.  For a company of this size, that's an extraordinary representation.  No org charts.  No directories.  No maps of who reported to who.  We know that statement was wrong, but at the time we had to live with it.  That denial effectively blinded us.  We could not propose custodians in finance, inventory, or many other areas because we were being told we had no map.

Phase 2, Your Honor.  I'll call this the scope blockade, and this was the months of May through June of 2025. At the same time Carvana dug in on scope, they insisted the discovery was limited to title and registration issues alone.

UNITED STATES DISTRICT COURT

They refused to negotiate custodians or search terms for the broader scheme allegations; logistics failures, inventory valuation, or other sales artifaces, internal controls.  They labeled all of this derivative and said we were not giving you those documents.

We didn't accept that, as you know.  We brought the dispute to Magistrate Judge Boyle.  On July 1, 2025, we obtained a scope order, and it was clear that the case is not just about DMV paperwork.  It's about drivers of retail unit sales and the alleged larger scheme.  So by early July, the law was set.  Discovery covers the broader scheme allegations.

Then we moved on to phase 3.  I'll call this the summer of stalling, and it includes July and August of 2025.  And this is a critical diligence window for defendants.  A diligent defendant faced with the July 1 scope order would have pivoted immediately.  The Court has spoken.  They would have said we need to collect from finance, IR, inventory, logistics, and other relevant departments.  That's not what happened.  It took until August 7th, more than a month after the scope order, for Carvana to offer anything resembling a pivot.  And what they offered was thin; two new custodians and a single facially narrow search term.

When we pressed them on why they were moving so slowly, defense counsel explicitly cited summer vacations as one of the reasons they had not meaningfully engaged.  This is

a nine-figure securities fraud action with a court-ordered December 8th substantial completion deadline. Pointing to summer vacations as a reason you cannot identify key custodians or expand search terms is not diligence.

THE COURT: And that's summer vacations of -- of Carvana employees as opposed to lawyers?

MR. DROSMAN: Yes.

THE COURT: Am I understanding that correctly? I just want to make sure I understand you.

MR. DROSMAN: It was unclear, I think, from the letter. Either way, defendants said we've got summer vacations, so we're going to have to slow-boat this.

THE COURT: Okay. Well, maybe Ms. Grant or somebody else can answer the question more specifically.

But go on, Mr. Cross.

MR. DROSMAN: Sure. During that same period, plaintiffs continued to push. We wrote. We met and conferred. We warned -- and, as you know, you've seen all of the correspondence. We warned about the December 8th deadline. We could not force them to produce documents they were saying did not exist or identifying employees they were refusing to name.

And then we moved on to the final phase, what I call phase 4, the found, in air quotes, directories and November order. And that was the period September through November of 2025. And September, reality caught up. After months of being

told no organizational charts exist, we prepared a motion to compel.  And on September 12th, 2025, after defendants received our motion, and Carvana suddenly found the directories.  These were not trivial documents.  They revealed over 3100 managers and officers across dozens of business units.  For the first time we could see parts of the company that had been invisible.  We moved quickly.  We analyzed the directories in weeks, not months.

By October 9th, 2025, we filed a motion to compel additional custodians, including the directors and VPs in finance, inventory, and IR that we've been told we had -- we've finally been able to identify.  The motion led to the November 19th, 2025, order where Judge Boyle, after consultation with this Court, granted plaintiffs seven new custodians, the key operators in the very departments defendants had kept off the table.  Recognizing how late in the day this was, he also gave Carvana until April 6th, 2026, to substantially complete production from those custodial files.

That form of extension for Carvana was not a reward, Your Honor.  It was a recognition that because of their earlier obstruction, denying the existence of org charts, fighting scope and moving slowly after losing on scope, there was no realistic way to do what should have been done by December 8th.

So when defendants now argue that plaintiffs' dragged their feet in naming those custodians, they're ignoring a basic

fact.  We asked for the map in March.  They handed it over in September.  That six-month gap is not on us.  It's on them. And under Rule 16, in cases like *Pizana* and *Tivoli*, the kind of obstruction is classic good cause.  The schedule couldn't be met not because plaintiffs were dilatory, but because defendants had core -- hid core information and then needed a four-month do-over.

Here's why the substantial completion that defendants say has already occurred is a fiction.  Defendants say none of this matters because they have substantially completed production.  They put to volume.  Nearly 70,000 documents from millions collected, they say.  And they wield their .651 percent illusion rate as proof they haven't missed anything.  In eDiscovery, volume is not completeness.  You can produce a million pages of junk and still be in default.  You have to look at what's inside the box.  And three data points show why substantial completion is a fiction here.

Our analysis to their production shows approximately 89 percent of the documents they produced contained the term "title" or "registration."  Nine out of ten documents are about the very narrow issue Carvana wanted this case to be about. That's not what the scope order contemplated.  The Court held this case covers a company-wide alleged scheme involving logistics, inventory, finance, and sales artifaces.  Yet defendants' production treats it as if it's still a DMV case.

They flooded the zone with title and registration documents, and they starved the case of scheme documents.  From the outside, 70,000 documents looks impressive, but once you look inside, you see that same Potemkin village that I spoke about, a facade of volume built on content overwhelmingly limited to this narrow issue.

The skew becomes even more glaring when you look at the individual defendants.  We ran a simple check on the CEO's and CFO's productions excluding documents that hit title or registration.  Here's what we learned:  Ernest Garcia, III, he's the CEO, one of the named defendants, over a 1,154-day class period, Carvana has produced only 573 emails that do not contain title and registration.  Mark Jenkins, he's the CFO and also a named defendant, just 624 emails.  That's roughly one non-title and registration email every two days from the CEO and CFO during a period when Carvana went through explosive growth and then a dramatic collapse.  It's facially implausible, Your Honor, that the CEO and CFO of a large public company, during a multiyear period of alleged operational and financial misconduct, generated so few communications about anything other than title and registration.  The more plausible explanation is exactly what the record shows.  Their search terms and custodians were calibrated to find title and registration documents and very little else.  And many relevant communications about the broader scheme sit in the files of

people they refused to collect from until November when they were forced to collect these directors and VPs in finance, logistics, inventory, and investor relations.

They also discuss the illusion rate, Your Honor.  They tell the Court, our illusion rate is only .651 percent.  Our recall is 96 percent.  Discovery's done.  Our expert, Mr. Bui, calls this the flashlight effect.

Here's what actually happened:  Carvana chose a custodian set highly weighted to title and registration employees.  They chose search terms dominated by title and registration vocabulary with only a thin slice of non-title and registration terms for the entire rest of the alleged scheme.  They ran those searches, reviewed the hit set, and then sampled the null set, those documents that didn't hit on any search term, to see how many were, quote, responsive under this narrow definition.  In other words, they pointed a flashlight at title -- at the title and registration corner of a dark room.  They searched that lit corner thoroughly, found little more, and concluded we must have found everything.

That's all an illusion test on a biased population tells you.  It confirms that in the corner of the room, you choose to illuminate with custodians and terms designed to chase title and registration issues.  You didn't mention -- miss much more of the same thing.  It tells you exactly nothing about the parts of the room that are still in the dark;

finance, inventory, investor relations, logistics.  The files of the seven new custodians, it tells you nothing -- nothing about them.  They weren't even collected at the time the test was run.  Or whether you ever captured documents about logistics failures or inventory valuations, sales artifaces, or analyst communications.

And as Mr. Bui explains, applying a null set illusion test to a low-richness title and registration dominated population is a self-fulfilling prophecy.  You get a low illusion rate because the process is optimized to find title and registration documents and measure itself against that one topic.  You generate a false sense of completeness, a reassuring statistic that masks the absence of the very evidence the Court said we're entitled to.  And crucially we still do not know the size of the null set, Your Honor.  For example, if the null set is 2 million documents, a .651 percent illusion rate implies roughly 13,000 documents that are responsive.  In a securities case, that's significant.  And in this case, it would be about 20 percent of the documents defendants have already produced.

So when we step back, seven key custodians have produced zero documents so far.  The vast majority of what has been produced relates to title and registration alone.  The CEO and CFO non-title and registration email count is implausibly low.  And the illusion tells -- test simply confirms that title

and registration was searched thoroughly within a title and registration biased universe.  That is not substantial completion as the scheduling order contemplated it.  It's an unfinished job dressed up with statistics.

So we talked about *Halliburton II* and the need for internal evidence.  Let me turn to depositions, Your Honor.  The existing schedule creates what I call a deposition trial.  Under the current order, Carvana has until April 6th, 2026, to finish producing documents from the seven new custodians.  Fact discovery then closes on May 29th, 2026.  That leaves 53 days in those seven-plus weeks for plaintiffs to, first, ingest and review what could be hundreds of thousands of additional documents; second, identify key exhibits and incorporate them into the existing record; third, identify deponents; fourth, depose the new custody -- seven new custodians; and, then, fifth, depose the CEO, CFO, and other key witnesses who we discovered through this -- through these additional documents.

Carvana says just depose the CEO now.  That's a recipe for wasted effort and motion practice.  If we depose Mr. Garcia now, we'd have to do without emails from the VP of finance, internal reports from the director of inventory, or communications from investor relations to analysts about the very issues in the case.  Then in April, when we finally get the VP's documents and find a really important document, the email where, for example, the VP warns Garcia about the

artifaces driving retail sales, we'd have two options:  Live with an incomplete record or ask to reopen the CEO -- CEO's deposition.  And defendants have already indicated that they won't stipulate to reopening depositions.  So we'd end up right back here before Judge Boyle litigating whether we can redepose key witnesses because documents arrived after the fact.  That is trial by ambush, not ordinary discovery.  And it's worse because the scheduling order already anticipated the solution.  Documents first; then depositions.  Carvana's delayed production has inverted that sequence.  The fix is to put the sequence back where the Court set it in February.

Let me discuss briefly a few of the arguments the defendants make and why they're -- they're not, in fact, persuasive.

First, defendants say the motion is premature.  They say it's premature because they might finish producing all their documents before April 6th.  But Judge Boyle already set April 6th as the deadline Carvana told the Court it needed.  And the record shows Carvana has used every bit of every deadline it's been given, from org charts, to scope, to productions.  We can't manage a case of this size on might.  We manage it based on Court orders and demonstrated behavior.  Planning for the schedule the Court has already set is not premature.

THE COURT:  Did you --

MR. DROSMAN:  It's responsible.

THE COURT:  Pardon my interruption.

MR. DROSMAN:  No.

THE COURT:  Did you discuss with Judge Boyle requiring a rolling production of documents such that Carvana would need to produce documents in tranches as they're reviewed and quality controlled internally and so that they're not sitting on thousands, maybe ten thousands of documents that they're going to dump on plaintiffs on April 6th?

MR. DROSMAN:  Yeah, that's a really good question. And -- and if it hasn't been done, it should be done.  I -- it was a very lengthy hearing, maybe an hour and a half, and as I sit here right now, I just don't recall whether that was discussed.  I don't think it was, but I think it's a fine idea and one that we could suggest to --

THE COURT:  Okay.

MR. DROSMAN:  -- Judge Boyle.

THE COURT:  I could also handle that.  So we'll hear what Carvana's counsel has to say about that.

MR. DROSMAN:  Okay.

THE COURT:  All right.  What else, Mr. Cross?

MR. DROSMAN:  Sure, Your Honor.  Very briefly, there's -- you know, one of their other arguments is there's no scheme, so the lack of documents proves our case.  And that's a logical fallacy on multiple levels.  It's pure circular

reasoning.  Defendants start from the premise they want to prove, there's no scheme, then design a discovery process aimed at almost exclusively at title and registration issues and then point to the predictable absence of scheme documents in that narrow subset of proof, somehow proof that the scheme never existed.  That's not evidence.  It's a self-confirming loop.

You can't unilaterally define the search universe to exclude the very departments where scheme-related documents are most likely to reside and then cite the absence of scheme documents in your chosen corner as proof that there's no scheme.  And it's also contradicted by what they told Judge Boyle.  They told him during the scope dispute, Your Honor, that if discovery was expanded to include the scheme, it would include basically every document at the company.  I think that's a -- a direct quote, Your Honor.  I'm not even paraphrasing that.  So it's puzzling now a scheme that included basically every company -- every document at the company somehow ended up with, you know, one email for every two days for the individual defendants.

In short, defendants' position confuses we haven't looked in the right places yet with there's nothing to find.  The Court's prior Rule 12 ruling already confirmed that plaintiffs have pled a viable scheme.  Discovery can't be short-circuited by defendants' own artificially narrow search and a logically flawed inference built on what that skewed

search did not reveal.

And, finally, Your Honor, they say an extension prejudices defendants because it prolongs the case. They spent about a paragraph on that, so I won't spend much time. They asked for and received until April 26th to complete production from key custodians. They delayed org charts for six months, fought scope, moved slowly after moving, and then persuaded the Court they needed a four-month cusion. They cannot claim -- now claim unfair prejudice when plaintiffs ask for a symmetrical adjustment to the rest of the schedule so we can actually use the documents that extension will generate.

The prejudice here flows outward from Carvana's conduct. It lands on the class unless the Court adjusts the dates. Rule 16 exists to prevent exactly what is happening here, a schedule that looks neutral on paper but when combined with one party's discovery conduct creates trial by ambush and one-sided relief.

On November 19, the center of gravity of this case moved. When Judge Boyle ordered seven new custodians and extended Carvana's substantial completion deadline to April 6th, 2026, he effectively accepted the Carvana's production was not where it should have been on December 8th and gave them the time they said they needed to fix it. We're simply asking the Court to bring the rest of the schedule into alignment with that reality.

We're asking the -- we're respectfully asking the Court to move the class certification deadlines by four months, just as substantial completion is already slowed by four months, and to move the fact discovery and expert deadlines accordingly, preserving that the original sequence; documents, class certification, depositions, experts, and then summary judgment. To deny the motion would be to lock in a one-sided modification where defendants get more time to fix their discovery failures and plaintiffs are forced to brief class certification and take crucial depositions on an artificially compressed, incomplete record.

For all those reasons, Your Honor, we respectfully ask the Court to grant the motion and enter plaintiffs' proposed revised schedule.

THE COURT:  One question before you -- you sit down --

MR. DROSMAN:  Sure.

THE COURT:  -- Mr. Cross.

The -- the recollection that I have is -- and I don't think I have the -- I have a lot of paper up here.  I don't know if I have the original scheduling order here, but -- but help me out.

My recollection is is that substantial completion deadline was related to initial interrogatories or RFPs served by plaintiffs on the defendants.  Is that right?

And I think it was, like, before we had our scheduling

conference.  Or maybe contemporaneously with the scheduling conference there were these initial discovery requests.

Am I recalling that?

MR. DROSMAN:  You're -- you're 100 percent right, Your Honor.

THE COURT:  Okay.  So -- so we're -- we're still kind of litigating?  Or maybe Judge Boyle's more -- most recent order has foreclosed the last -- well, I don't want to get ahead of myself.

But I guess the question is, are we still litigating those initial discovery requests?  Is that what this comes down to?

MR. DROSMAN:  It does, Your Honor.  The -- we -- you're absolutely right.  I think our -- our Rule 16 conference was maybe at the end of February.  And then less than two weeks later, we served these first set of requests for production.  And we tried to be comprehensive, you know, not leaving some subjects for later.  They sort of encompassed the entire case.  And then, as you know, we had a long gap because of scope disputes and so forth.

We are still litigating certain aspects.  Defendants have provided us with facially inadequate, deficient searches.  Unfortunately -- and we met and conferred numerous times about those issues, Your Honor, providing them with proposals of our own, et cetera.  Defendants have more or less rejected those.

Unfortunately, those -- that particular issue can't be litigated until after we find out the source of the particular documents that we're going to be seeking, in other words, the seven custodians, because otherwise what -- because we have to tailor our particular searches for those departments.

So now that we have the custodians, we're going to file, and Judge Boyle has given us leave to file, a motion to compel search -- search -- a search protocol that would actually come up with broader search documents, broader scheme documents, Your Honor.  And that -- we expect to file that motion imminently.

THE COURT:  Okay.  Thanks, Mr. Cross.

MR. DROSMAN:  Sure.  Thank you.

Ms. Grant.

And we only have about 35 minutes left.  I know Mr. Cross has spoken for a while.  So, Ms. Grant, are you sharing time with counsel for the other defendants, or are you handling this?

MS. GRANT:  I will be handling it primarily, but I think if they need the opportunity to weigh in, I won't take a significant amount of the Court's time.

THE COURT:  Okay.  Go ahead.

MS. GRANT:  Thank you, Your Honor.  Again, Meryn Grant for the Carvana defendants.

I want to just address two questions that came up

while Mr. Drosman was arguing.  The summer vacations were the summer vacations of our clients who we need input from, obviously, to agree to add significant costs and search terms and their input on whether those would actually be effective in targeting relative documents.  So those were client summer vacations that were unavoidable.

And on the rolling productions issue, we have been making rolling productions, and we are committed to continue to --

THE COURT:  Okay.

MS. GRANT:  -- to do that.

THE COURT:  Let me address the summer vacation part. A lot of people in business -- I mean, like lawyers, we say we're going on vacation, but we work during vacations.  So, you know, when I read in the briefs this issue about summer vacations, I was a bit irritated because this is a federal case.  It's existed for a very long time.  We're -- you know, we're already into, I think, year -- over three and a half years.  I think your -- the -- not your clients, but the other individual clients and maybe the executives of Carvana, who may be subject to producing documents as custodians, they're sophisticated people.  They have Zscaler or -- or Remote PC, whatever they're called now.  They could -- they could work a bit when they're on the beach or in Park City.

So can you communicate that to your clients.  If they

have to cooperate to keep this case moving, they're going to need to do that.  That's my expectation.

MS. GRANT:  Yes, Your Honor.  And that is our expectation and intention as well, I think.

THE COURT:  Okay.

MS. GRANT:  The reference to summer vacations was in our communications more a reference to our inability to respond in two days necessarily to a significant request, not any sort of further delay.

THE COURT:  Sure.  I -- and I -- I get it.  I just want to make sure that people know if -- if they're -- if they're, you know, on vacation, they're going to have their phone, they're going to have their laptop, they have their assistants, they have their associates --

MS. GRANT:  Yeah.

THE COURT:  -- et cetera.  They can get the work done.

MS. GRANT:  As we all --

THE COURT:  Okay.

MS. GRANT:  As we all do.

THE COURT:  As I'm sure you do regularly.

MS. GRANT:  Yes, Your Honor.

So plaintiffs' motion for a four-month extension of the entire schedule, in our view, is not warranted by either the status of discovery or Judge Boyle's recent order allowing plaintiffs to select seven additional custodians of its

choosing to satisfy them that they are getting the documents that they want.  While we are not opposed to some modest extension, four additional months is too long and not necessary based on the current facts.

I want to principally address four points.  Happy to answer any questions that you have on those specific points.

But to start, we have been diligent.  And plaintiffs use the majority of their brief to complain about purported deficiencies in our document production in terms of search terms and the amount of documents produced, but that has not been ruled on by Judge Boyle.  And, in our view, those don't in any way establish that the production for the original 18 custodians is deficient.  And we have undertaken to perform significant analysis, which Mr. Drosman, I don't believe, understands, to ensure that discovery is substantially complete and not just limited to T&R issues.

THE COURT:  Wait a second.  I was calling him Mr. Cross.

Is that not your name?

MR. DROSMAN:  It's Drosman, Your Honor.

THE COURT:  How did I make -- I'm so sorry.

MR. DROSMAN:  It's okay.  I was not the least bit worried about it.

THE COURT:  Well, you should have corrected me.  So I heard Cross when you announced.

So thank you for -- for setting the record straight, Ms. Grant.

MS. GRANT:  No problem.

Second, the new custodians that Judge Boyle recently ordered don't justify an additional four months.  In the background, while this motion was being filed, obviously, the parties have been complying with Judge Boyle's order.  And we don't believe at this point that those four months are necessary to even complete discovery from those custodians.  Rather, we think it'll take more like two months.  And we're happy to make those productions on a rolling basis.  There's no --

THE COURT:  And is -- are you set up to do that, like, when you and your colleagues did -- are you using a -- an organization called -- I can't remember if it's called FEC?  Is that your vendor who's helping you?

MS. GRANT:  Repario is one of them, but we do have a first-level review team comprised of 50 reviewers at some point.  So we are set up for that.

THE COURT:  All right.  So is that -- is that going -- is that part of your firm and your team's protocol now, is that you're going to be doing these rolling productions?

MS. GRANT:  Yes, and it has been.

THE COURT:  Okay.  Have you communicated that to plaintiffs' counsel, or is this the first time to --

MS. GRANT:  I -- I believe that it was the understanding that we would always do rolling productions.  But if not, I'm doing so now.

THE COURT:  Okay.  Thank you.

Go ahead, Ms. Grant.

MS. GRANT:  Third, there is no reason based on what we know now why discovery can't proceed, including the deposition of custodians for which documents have been produced.  There's 18 of them.  As well as other individual defendants and third parties if plaintiffs wants to take depositions from them.  I think to the extent that those documents -- those custodians have produced documents, it should be the documents that have been produced from their custodial files that are subject to their depositions.

And, fourth, even if the Court grants some extension, we believe class certification should be heard in the near term.  While we don't agree with plaintiffs' contention that it needs internal documents for its reply brief in class certification, our counterproposal provides for an additional month that with the two months for the new custodians would address plaintiffs' concern that it wouldn't have all of the documents it needs to complete that briefing.

So, first, discovery has not been limited to T&R issues.  This was true from the beginning as our search parameters and custodians encompassed plaintiffs' challenges to

statements regarding the growth of unit -- retail unit sales, which they claimed were misleading because they failed to disclose allegedly unsustainable business practices.

THE COURT:  Well, let --

MS. GRANT:  And this is --

THE COURT:  I'm sorry to interrupt you, Ms. Grant, once again.

MS. GRANT:  Uh-huh.

THE COURT:  Can you be more specific in the response to plaintiffs' argument concerning *Halliburton II*.  And I just needed to go back and check their response brief and what Mr. Drosman had said specifically about the Supreme Court discussing price impact theories.  Because, as I -- as I think about class certification, I think about Rule 23.  And you think about the traditional factors but -- and now he's -- he's bringing up this case, which I admittedly haven't read.  I haven't had time.  But if it's accurate that there's some sort of a -- of a -- a insertion of merits-based theories, then that would give credibility to his argument.

MS. GRANT:  So, Your Honor, I think there have been numerous -- a number of Supreme Court cases starting with *Amgen*, *Halliburton I*, *Halliburton II*, most recently *Goldman Sachs* that really struggle with the issue of how much merits is heard at class certification, because the issues in a securities fraud case overlap to some extent with the merits.

But those issues, to be clear, are still focused on for plaintiffs' initial motion the market efficiency and the standards outlined in our brief, but typically their opening brief relies on their pleadings and expert evidence of market efficiency, the public nature of the statements.

In opposition then, based on *Halliburton II* and *Goldman Sachs* now, which is another Supreme Court case on the class certification issues, we have the ability to rebut the application of the presumption of reliance using evidence of price impact.  So that looks like whether or not the alleged misstatements or omissions had any impact on the price.  And then in reply, some plaintiffs may seek to rebut our rebuttal, the presumption of reliance, based on a recharacterization of the pled claims.

We don't believe that any of the documents from the seven new custodians are necessary to do that.  And Mr. Drosman specifically told the Court that plaintiffs need documents from executives about what they knew when they made the statements and what they knew of the scheme -- the alleged scheme as it was happening.  And plaintiffs already have those documents from the 18 original custodians who include the people who made the statements and allegedly perpetrated the scheme.

I think plaintiffs offer really no response to the numerous cases in our briefing where a motion for class certification was filed even before substantial completion

without reference to internal documents.  And when this schedule was initially set, plaintiffs' counsel had a discussion with Your Honor about the discovery necessary for class certification.  And nowhere in that discussion, which is Docket 129, page 8, line 21, to page 9, line 7, is a reference to internal documents from lower-level employees.  Rather he said, I quote, "Typically discovery consists of taking the expert depositions, obtaining written discovery from the experts."

And he said it may overlap some with, I'm paraphrasing now, merits discovery.  But I think even under our counterproposal for a schedule, they will have documents from both the original custodians that we believe would be the only ones relevant to class certification and the new custodians.

Does that -- does that answer your question?

THE COURT:  Yes.  Thank you.

MS. GRANT:  So I'll go back just to sort of the scope of the discovery, which took up the majority of the briefing. I think our original document custodians just by their titles were not limited to T&R issues.  Obviously, they included the CEO, the CFO, the COO, the VP of finance, the VP of investor relations, and many more.  And plaintiffs have claimed in their briefing and at the hearing that the search terms that we added after the scope dispute were insufficient.  I think they claim we added one string.  Just to be clear, we have added search

terms at plaintiffs' request on five different occasions for totaling review of more than 600,000 documents.  And on August 7th, we specifically agreed to add search terms further targeting all of the allegedly unsustainable business practices.  You can see a list of those terms in plaintiffs' Exhibit 16 to their motion, pages 1 and 2.  And so those target the four allegedly unsustainable business practices that both go to plaintiffs' scheme allegations and the retail unit sales.

And while plaintiffs point to various statistics in an attempt to establish a deficiency, including just the pure number of documents produced from executives, none of them can overcome the significant analysis we've undertaken to ensure our production is substantially complete and complies with Federal Rule of Civil Procedure 26.

So on the illusion rate, the assertions in plaintiffs' reply brief about our illusion rate are wrong.  To be clear, we reviewed a sample of 1500 documents from the original 18 custodians that did not hit on our search terms to determine whether those documents were relevant to any portion of plaintiffs' claims, and only .651 percent of those documents were potentially responsive or relevant to any of plaintiffs' claims.  None of those documents were particularly significant in our view or in our view material to plaintiffs' claims, but, nonetheless, we also produced the documents that even we identified during that analysis.

This week, in response to some of the claims in the briefing, we also analyzed custodial documents from Mr. Garcia's, Jr., who Mr. Drosman referenced, and we loaded 10,000 of those documents into an AI tool, ran several queries and, combined with attorney review, determined that an even lower rate of those documents was potentially responsive -- responsive to any of plaintiffs' claims.  And that percentage that we determined is 0.37 percent potentially responsive.

So Federal Rule of Civil Procedure does not -- 26 does not require perfection, and it does not require defendants to undertake the significant cost and burden of reviewing additional docs to identify every last responsive document.

The mere fact that we've refused to add certain search terms does not show a deficiency.  Our general process has always been to consider plaintiffs' requests, analyze whether the proposed search terms they give us are effective at targeting responsive documents, and whether the burden of reviewing documents that hit on those search terms is justified by our analysis of whether it returns responsive documents.

I'm going to turn now to the new custodians.  So Judge Boyle did not technically move the substantial completion date.  He set a new date without knowing what -- the parties admitted this in the transcript hearing -- without knowing how long practically it would take to produce documents from those custodians.  And plaintiffs filed this motion without

meaningfully meeting -- meeting and conferring on whether production from those documents would, indeed, take an additional four months.  They filed this motion on the same day that they identified the seven new custodians of their choosing.

And while we don't agree that any of those custodians are particularly meaningful to this case, and we don't see any immediate issues that we're going to hold up the production of any of those custodians, apart from one who I will mention.  A portion of their files appears to be corrupted.  We're working to resolve that corruption and have been able to in most instances, but we can't be sure.  And if we can't resolve that issue, we will allow plaintiffs to select another custodian in addition.

So over the past week, we've really worked to evaluate how long it would take to produce documents from those seven custodians.  And based on our estimates right now, we estimate it would take around two months to produce documents from them, again on a rolling basis.  So two months shorter than Judge Boyle allowed.  That timing is not meant to suggest that it will be a light lift with, again, a very large review team and significant cost, which we are bearing.

THE COURT:  If I were to adopt your recommended schedule modification, or something close to it, I could modify Judge Boyle's April 6th deadline if you thought that you can

achieve it earlier.

MS. GRANT:  Yes, Your Honor.  And that is part of the reason why we wanted to be prepared to tell you that today.  And our team has engaged in --

THE COURT:  Where did Judge Boyle get that date?  Is that something that he arrived at consulting with -- with you and your colleagues and --

MS. GRANT:  I mean --

THE COURT:  -- and --

MS. GRANT:  -- I think --

THE COURT:  -- plaintiffs' counsel?

MS. GRANT:  -- in the actual transcript it reflects nobody really knew because nobody really knew who the custodians were going to be.  And it depends on the custodians.  And he said to be safe, I'm going to give you four months.

What I'm saying now is I think we can complete that production much earlier.

THE COURT:  By when?

MS. GRANT:  I think two months.  So the end of February.  February 20th or February 27th were the dates that --

THE COURT:  February 27th is the last Friday.

MS. GRANT:  Yeah.

THE COURT:  Okay.  When do you expect to make your first production to plaintiffs?

MS. GRANT:  I can't say for sure, but it would be by mid-January, I would assume.

THE COURT:  Okay.

MS. GRANT:  The third point.  I believe depositions don't need to wait for production of documents from those additional custodians.  Plaintiffs to date have not noticed a single deposition.  And in their brief and today they claimed they shouldn't be forced to choose deponents before production is complete.  We don't view that as an adequate justification for waiting another four months to begin when they have the documents necessary for many of those potential deponents.  Surely plaintiffs intend to conduct depositions of the individual defendants and upper-level management whose documents they already have.  Those are 18 different custodians, and that's not to mention the other individual defendants and third parties they may seek depositions from.

Of course, if any of the remaining discovery from those additional custodians impacts depositions already taken, plaintiffs could always seek to reopen depositions based on a showing of good cause as required by the federal rules.  And our unwillingness to agree that second depositions could be taken for every one of those custodians, it should not be taken as an indication that we aren't willing to work with plaintiffs on that front.

Since I've already covered class certification, I will

end by just saying ultimately we need to move forward. Defendants should not be forced to endure another four months of discovery requests not limited or tethered to the new custodians and the significant burden that comes with that. And allowing a wholesale extension of four months of the entire case, particularly class certification briefing, is not warranted here.  And we would request that the Court adopt the more modest modification of the schedule at this time.

THE COURT:  Has the parties -- have the parties disclosed class certification experts?

MS. GRANT:  No, Your Honor.  That typically just comes with the opening brief.

THE COURT:  Okay.  Okay.  Thank you, Ms. Grant.

MS. GRANT:  Thanks.

THE COURT:  Mr. Drosman, briefly rebuttal.

MR. DROSMAN:  I could be very brief, Your Honor.

THE COURT:  Thank you.

MR. DROSMAN:  I think I just wanted to address one of the points that you brought up about extending the schedule by two months instead of four months, which, of course, we would be fine with if the substantial completion deadline was moved two and rather than four and all the other dates were -- were moved two as well.

Just something I wanted to bring up.  And perhaps defendants are fine with it, in which case we'll have no

issues.  But, as you know, we're moving for expanded search terms because defendants' searches to date have yield 90 percent title and registration; 10 percent rest of the case. So clearly their search terms are inadequate as they stand. We're moving for those.  I expect that Judge Boyle will impose additional search terms on defendants.  They'll have to search their existing custodians and their new custodians with those search terms, assuming Judge Boyle finds in our favor.

If they can produce all those documents within 60 days, that would be great.  But I -- you know, I just wanted to raise that so we're not back here in 45 days raising this issue again.

THE COURT:  Right.  Okay.  So I think I have the answer to the question I was going to ask you at the gate, that if I were to accelerate the defendants' production of the additional custodians, you would be -- you would -- you would be okay with -- with the more modest proposal to extend the deadlines from defendants.  And I understand what you're saying that -- that caveat.  And I would probably say I would be very unhappy if I had to extend the schedule again because of some search term issue.

Then the next -- the next question that I would have for you, I noted in your opening brief in Footnote -- I think it's Footnote 2.  Maybe it's -- maybe it's another footnote, but it's the deposition footnote where you foreshadow -- yeah,

it's Footnote 5.  My apologies.

MR. DROSMAN:  Of the opposition or --

THE COURT:  Docket 217, which is your motion.

MR. DROSMAN:  I think that's our -- our opening brief.

THE COURT:  Yes.  In Footnote 5 you mentioned the -- the potential need to take more than fact -- ten fact witness depositions.

And, again, I -- it's been a very busy day if you checked the calendar coming in.

MR. DROSMAN:  I'm sure.

THE COURT:  And the only reason I could get you in at -- today at all was to slot you at this late time.  But I just haven't had time to do all of the digging I normally would have done, but I do have a recollection that we talked about depositions at the Rule 16 scheduling conference.  And I think you even quoted something from the transcript, which is my general policy, which is if a party thinks they need more depositions than ten and they can justify it, then I'm generally -- I'm generally open to giving them the additional depositions as long as it's reciprocal that the other side would get another deposition.

So have you talked to Ms. Grant and her colleagues about -- about this idea that you may want more than ten?  And if you just remind me of the basic -- does the scheduling order simply limit the depositions to ten?

MR. DROSMAN:  No, it doesn't, Your Honor.  I think what -- if I recall, it's silent on the number, and it -- there -- the competing schedules.  I think both parties agreed that plaintiffs would seek more than ten; defendants would oppose it.  But, in any event, it was premature because the parties would need to meet --

THE COURT:  All right.

MR. DROSMAN:  -- and confer on that.

THE COURT:  So --

MR. DROSMAN:  It's one of those scenarios.

THE COURT:  -- is that just something that I could leave with you all right now understanding my general idea?  And, I mean, this is a major securities fraud case and -- and there are a lot of claims and a lot of custodians and decision makers, so I would tend to think that more than ten depositions noticed by plaintiff are appropriate, including 30(b)(6).

Are you -- are you intending to take a 30(b)(6)?

MR. DROSMAN:  We will, Your Honor.

THE COURT:  At least of Carvana.  And then I don't know any of the underwriting defendants.

MR. DROSMAN:  Correct.

THE COURT:  So you see what I mean?  I just feel like we're going to go over ten.  And hopefully I won't have to get involved.  Or Judge Boyle, hopefully he won't have to get involved.

Let's see.  I also flagged Footnote 2.  Let me just take another look in here, refresh my recollection, as we say.

Oh, the certification.

MR. DROSMAN:  Yes.

THE COURT:  I read defendants have some angst with this.  And I would, too, if I were in defendants' position, because you're asking them to certify, you know, lawyers.  And it may -- I mean, worst-case scenario, somebody's -- internally is withholding documents and lawyers don't know about it and it later comes up, and then they're kind of on the line for it if they don't know versus -- you understand?

MR. DROSMAN:  I do, Your Honor.

THE COURT:  I kind of --

MR. DROSMAN:  I understand.

THE COURT:  -- have a little bit -- I have angst for them.  So --

MR. DROSMAN:  I understand.

THE COURT:  -- I don't -- I don't know if I would include that.

MR. DROSMAN:  Okay.  That's fine.

THE COURT:  Do you -- do either of you -- did anybody on the defense side wish to address that?  I don't know if you have to --

MS. GRANT:  Yeah.

THE COURT:  -- at this point, but you --

MS. GRANT:  I --

THE COURT:  -- can.

MS. GRANT:  -- will briefly.

We do have significant angst, including because just the way that search terms and parameters work, we can't certify what's all in the null set.  The whole point of using search terms is that you may not be able to know, but you're doing your best to comply with Rule 26.

THE COURT:  Yeah.  I mean, if I -- if they were to do that, at best it would be a gotcha; at worst, it could be somebody's law license.  And I just feel like I don't want to go down that road.

MR. DROSMAN:  Okay.

THE COURT:  Okay?

MR. DROSMAN:  Understood.

THE COURT:  All right.  So, Mr. Drosman, is there anything else?

MR. DROSMAN:  Can I just --

THE COURT:  Yes.

MR. DROSMAN:  I just wanted to go back to one remark you made, because I'm afraid that it could be used in various ways, and I don't want there to be ambiguity.

THE COURT:  Sure.

MR. DROSMAN:  We talked a little bit about how the search term dispute may necessitate the production of

additional documents.  And you said -- I can't remember your exact words but something like I wouldn't love it if the schedule had to be delayed again or extended again --

THE COURT:  Yes.

MR. DROSMAN:  -- because of the search term issue.

I just wanted to make sure you weren't saying that we're not entitled to additional search terms.

THE COURT:  No.  Absolutely not.

MR. DROSMAN:  Okay.  Okay.

THE COURT:  And, in fact, I would encourage you -- if you reach an impasse with defendants' counsel, I would encourage you to engage Judge Boyle as soon as you can.  I know Judge Boyle is very diligent, and he's working very hard on this case.

MR. DROSMAN:  Great.

THE COURT:  I can tell.

MR. DROSMAN:  Okay.  That was -- that was the only question I had.

THE COURT:  Okay.

MR. DROSMAN:  So thank you very much, Your Honor --

THE COURT:  Okay.

MR. DROSMAN:  -- for your time and staying so late.

THE COURT:  I feel bad for calling you Mr. Cross.

MR. DROSMAN:  Oh, God.  I've already forgotten.

THE COURT:  As I said, it's been a long day.

MR. DROSMAN:  I've been called worse, Your Honor.

THE COURT:  Same here.

Okay.  So is there anything else that we should discuss in addition to this pending motion in the next three minutes or so?  Anyone else?

Does any -- any of the underwriter defendant lawyers, do you -- Ms. Boyle, do you have anything you want to say?

MS. BUERGEL:  It's -- I'm Ms. Buergel.

THE COURT:  Buergel.  I'm sorry.  I wrote it down, and my B looks like an O.

MS. BUERGEL:  No.

THE COURT:  My apologies.

MS. BUERGEL:  No problem at all.

No, we have nothing to add.  We appreciate Your Honor's time.  I -- I think we are pretty well-settled with the plaintiffs on our approach to discovery.  We're working through a couple of additional custodians that were added a little later in the process, but we expect to complete those productions by the end of the year.

THE COURT:  Okay.  Very good.

And, Ms. Marconi, you're local counsel?

MS. MARCONI:  Correct.

THE COURT:  All right.  So, Ms. Walker?

I hope I'm not mispronouncing your name.

MS. WALKER:  Mine is easy --

THE COURT:  Yes.

MS. WALKER:  -- as I got called on a lot in law school for that reason.

I represent Mr. Garcia, Sr.  We have -- we substantially completed our production.  I think we have one more document and a privilege log.

And appreciate Your Honor's time today.  I do think if -- if Your Honor extends the schedule by any amount, hopefully that will get all of the parties to sort of focus in on what's important here and focus on what they really need to move this -- this case forward.

THE COURT:  Okay.  Thank you.

And, Mr. Peters, you're with Ms. Grant; is that right?

MR. PETERS:  I am --

THE COURT:  Okay.

MS. GRANT:  -- Your Honor.

THE COURT:  If I may, have we reached the point where you could kind of start thinking about maybe a settlement discussion at some level?  Have you all thought about that maybe individually or collectively?

MR. DROSMAN:  We have not spoken about that yet, Your Honor.  I don't think it's premature to think about that.  I think that having the discovery will really help us to, you know, crystallize the value of the case and understand the strengths and weaknesses and all those sorts of things that go

into those discussions.  So I think maybe we're just a few months down the road from that.

THE COURT:  Okay.  And you don't have to respond substantively if you don't want to, Ms. Grant.  I just like to take the temperature.

MS. GRANT:  Yeah, I don't think Mr. Drosman is that far off.  I think we still view class certification as a significant gating point.  So class certification briefing is something that we would look to --

THE COURT:  Okay.

MS. GRANT:  -- to kind of determine -- those issues.

THE COURT:  When you were talking about the *Halliburton* case and reliance, I just started thinking about the *Walmart vs. Dukes* case and if there's -- and we may have talked about this maybe at the Rule 16.  I tend to repeat myself unnecessarily.  But is there some issue -- like if there is reliance in play, could that be, like, an individualized assessment?  Is that --

MS. GRANT:  Yes.

THE COURT:  Could that maybe be the trap that Mr. Drosman is worried about?

MS. GRANT:  I think, yes, Your Honor.  The reliance issue is really if you have to litigate reliance on an individual basis.

THE COURT:  Uh-huh.  It's not Rule 23 appropriate, at

least the argument?

MS. GRANT:  Exactly.  So securities cases, including *Halliburton II* and the others that I mentioned, are really grappling with when the fraud on the market presumption applies such that you can presume reliance for the class.

THE COURT:  Okay.  And I'm not making any prejudgments here, Mr. Drosman, whatsoever, but you're welcome to respond --

MR. DROSMAN:  No, Your Honor.  I --

THE COURT:  -- to the issue.

MR. DROSMAN:  I don't think I have anything to say in response.  Thank you very much, though.

THE COURT:  Okay.  Thank you.

Well, I again want to thank you all for coming out on short notice, those of you who have traveled from the East Coast.

And I think plaintiffs' counsel, you're just in California; correct?

MR. DROSMAN:  You're correct.

THE COURT:  Okay.  So maybe not -- I'm just kidding.

I think -- I'll just let you know I'm going to think about this a little bit.  I've -- I have somewhat of an order drafted, but what I'm inclined to do, subject to further -- kind of further reflection and -- and introspection is probably advance Judge Boyle's deadline but also grant -- grant plaintiffs' motion to provide some extra time.  You just --

just to kind of give that reciprocity, which -- which I'm a big proponent of. So that's what I'm inclined to do, but you'll see for sure when the order comes out very soon. Hopefully before Christmas. And I wish to share that with you so that you can continue to remain diligent. And, like, if plaintiffs have another motion that you want to get in front of Judge Boyle, don't waste your -- any more time. Get it in front of him so that he can -- he can do what he does.

MR. DROSMAN: Thanks. And Happy Holidays.

THE COURT: All right. Same to you all.

MS. GRANT: Thank you, Your Honor.

THE COURT: Thank you all again.

Court is adjourned.

(Proceedings conclude at 4:56 p.m.)

---oOo---

UNITED STATES DISTRICT COURT

**C E R T I F I C A T E**

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 23rd day of December, 2025.

*/s/Cathy J. Taylor*
Cathy J. Taylor, RMR, CRR, CRC

UNITED STATES DISTRICT COURT