UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **United Association National Pension Fund, et al.,** ) | No. 2:22-cv-02126-MTL |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Phoenix, Arizona |
| ) | January 8, 2026 |
| **Carvana Company, et al.,** ) | 2:05 p.m. |
| ) | |
| Defendants. ) | |
| _____ ) | |

**BEFORE:   THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE**


**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**


**<u>TELEPHONIC DISCOVERY HEARING</u>**


Official Court Reporter:
**Cathy J. Taylor, RMR, CRR, CRC**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S (TELEPHONIC)**

For the Plaintiffs:
    ROBBINS GELLER RUDMAN & DOWD, LLP
    By:  **Daniel S. Drosman, Esq.**
         **Tor Gronborg, Esq.**
    655 West Broadway, Suite 1900
    San Diego, California  92101


For the Defendants Carvana, et al.:
    LATHAM & WATKINS
    By:  **Matthew Peters, Esq.**
         **James Christian Word, Esq.**
    555 11th Street NW, Suite 1000
    Washington, DC  20004-1304

    LATHAM & WATKINS
    By:  **Kalana Kariyawasam, Esq.**
    1271 Avenue of the Americas
    New York, New York  10020


For the Defendants Citigroup Global Markets, Incorporated, and
J.P. Morgan Securities, LLC:
    PAUL WEISS RIFKIND WHARTON & GARRISON, LLP
    By:  **Michael J. Pisem, Esq.**
    1285 Avenue of the Americas
    New York, New York  10019

For Defendant Ernest Garcia, Sr.:
    DLA PIPER, LLP
    By:  **Emma Caitlin Peplow, Esq.**
    2000 Avenue of the Stars, Suite 400
    Los Angeles, California  90067

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings commence at 2:05 p.m.)

THE COURTROOM CLERK:  This is Civil Case Number 22-21026, United Association National Pension Fund vs. Carvana Company, before the Court for a telephonic discovery hearing.

Will the parties please announce for the record starting with the plaintiffs.

MR. DROSMAN:  Good afternoon -- good afternoon, Your Honor.  This is Daniel Drosman and Tor Gronborg on behalf of plaintiffs from the law firm of Robbins Geller Rudman & Dowd.

THE COURT:  Good afternoon.

MR. KARIYAWASAM:  Good afternoon, Your Honor.  This is Matthew Peters from -- of Latham & Watkins on behalf of the Carvana defendants.  I'll let my colleague introduce himself as well.

THE COURT:  Thank you.

MR. KARIYAWASAM:  Good afternoon, Your Honor.  This is Kalana Kariyawasam of the firm of Latham & Watkins also on behalf of the Carvana defendant.

THE COURT:  Thank you.

MR. PISEM:  Your Honor, this is -- Your Honor, this is Michael Pisem of Paul Weiss Rifkind Wharton & Garrison on behalf of J.P. Morgan Securities, LLC, and Citigroup Global

Markets, Inc.

THE COURT:  Thank you.

MS. PEPLOW:  Good afternoon, Your Honor.  This is Emma Peplow from DLA Piper on behalf of Defendant Ernest Garcia, II.

THE COURT:  Thank you.

I think that's everyone, so thank you.

Have I missed anyone?

Okay.  We have a few things to address; four, in my view, perhaps more.

Well, let's start with the proposed order.  I received your stipulation.  Let's talk about a couple of issues in it.  We'll talk, then, to discussion on 223 and 224 and, finally, talk about any scheduling issues.

Of course, you all know that Judge Liburdi has issued his new scheduling order.  And I think you can get a sense of his appreciation for deadlines, and I think it would be an uphill battle to get further extensions.  I can't speak for him, of course, but I'm operating under the premise that these deadlines are fairly set.  And, of course, you'd have to go back to Judge Liburdi to get extensions.  So keeping in mind that timeline, let's jump into the proposed order.

Mr. Drosman, I -- you typically have taken the lead on this, so I'll address you on this and then turn to the defense.

So let me turn to your stipulation.  Thank you for providing that to the Court.  I see two issues:  One, you'd

like to discuss what the "most contemporaneous version" means. And I see from page 1 to 2 your different proposals. I think I understand them -- or questions. And then there's the second issue of whether the 200 documents for the reverse search for emails is a limit. And let's talk about that.

So, first, Mr. Drosman, are those the two issues that you want me to talk with you about today regarding the proposed order, or is there anything else to add?

MR. DROSMAN: That is all, Your Honor.

THE COURT: Okay. Good.

So let's discuss what I meant by "the proposed order," and then I'll hear from both of you.

So the goal from FEC was to always attempt to find the most contemporaneous version of a hyperlink. And we did that by having this test run of two custodians using FEC. And we don't know if -- at least I don't know how well that's working and if it should be scaled up. But for the two that we have all agreed FEC will be used on, it's always been my view that you use FEC; you try to find the most contemporaneous version. If you can't, then the plaintiffs are certainly entitled to something. So they get whatever version of the hyperlink attachment is available that's closest in time to the parent email.

So I think the question here was is that then going to be translated for the other 23 custodians, that if traditional

search terms weren't working for all of those, you had to use FEC or something else.

So that's where I get a sense of this. I could be off base.

But let me turn to you, Mr. Drosman. How would you summarize this question about the proposed order and the getting you the most contemporaneous version?

Go ahead.

MR. DROSMAN: Sure. So I -- I -- I think Your Honor got the law and the equities exactly right and the tentative. There is just this question of interpretation relating to the phrase that Your Honor used, which was, I think, traditional ESI discovery techniques.

My understanding after speaking to our eDiscovery expert is there are at least two different ways that defendants can obtain contemporaneous versions of the ESI hyperlinks. The first version is through the use of I think it's Forensic Email Collection, which is FEC. And the second means is through the use of Google Vault and the use of a script on Google Vault that will provide that same information. And our eDiscovery expert informs me that that's quite straightforward to do and that he's happy to assist the defendants in performing that if they have any trouble with it.

Certainly Google Vault would be construed as a traditional ESI technique, so I don't think there's an issue so

long as defendants use the script to obtain the most contemporaneous version. My concern is that their interpretation would render the Court's ruling a nullity. And if they interrupt it to just simply mean Google Vault without a script, what we'll end up with is only the current version of the hyperlinked documents, which I don't think Your Honor intended given that Your Honor used "most contemporaneous version" throughout your order and certainly indicated that, you know, novelties should not trump discovery, and so forth.

So I -- you know, so long as defendants use -- we don't have a preference. If they want to use FEC, that's fine. If they would prefer to use Google Vault with a script, that's okay. My concern is that they don't use either of those two things and we essentially just get the current versions, which we're -- you know, in a case where the timing is the evidence, that would be deleterious to plaintiffs in a significant way. We would lack important evidence.

So, you know, that's -- that -- basically, you know, I think that that's our view. I just think that if the rule were otherwise, that hyperlinked documents would become a discovery, you know, loophole where -- which wouldn't obtain the contemporaneous documents because defendants would use Google Vault in a way that was not designed to obtain contemporaneous documents.

THE COURT: And it's your view that Google Vault with

a script is one way to get a contemporaneous version of the hyperlink attachment?

MR. DROSMAN:  Yes, Your Honor, it is.  And it's actually a fairly straightforward process.  And according to our expert, the script needs to be run; it needs to be QC'ed.  And once that happens, it's sort of that initial investment period, then the cost is -- is nothing.  I mean, it's -- you're just running the script.  So there are no additional costs associated with that once you've implemented the script.

And he -- he advised me that the same would apply to FEC.  In other words, the costs are front-loaded with FEC.  Once you've designed FEC and run that script, you can continue running it on different -- on -- on several subsequent custodians without incurring any additional costs.  It's the up-front cost of designing the script that, you know -- that -- that you bear.  And once you've done that, there are no additional costs.

THE COURT:  I'll turn to defense in just a moment, but let me ask why did we need to investigate FEC and go down the road with Google Vault if the script was an acceptable alternative?

MR. DROSMAN:  I think that Google Vault -- I mean, FEC is specifically -- it was a tool off the shelf designed specifically for this purpose.  And a script on Google Vault would require somebody to write the script, whereas FEC is the

most standard tool for this purpose.  It's already sort of off the shelf.  But if they want to -- if they want -- would prefer to do a script for Google Vault, plaintiffs are agnostic.

THE COURT:  Okay.  Thank you.

Let me turn to defense.  Who would like to address this?

MR. PETERS:  Thank you, Your Honor.  This is Matt Peters on behalf of the Carvana defendants.

THE COURT:  Go ahead.  Thank you.

MR. PETERS:  I think Your Honor asked exactly the correct question, is why Google -- did we have to go through the FEC process if any such script existed already.  This is the first that we are ever hearing of it, from what -- it's never been raised earlier, but from what Mr. Drosman just articulated, it sounds as if this is a nonexistent script that would have to be specifically written for this particular situation of unknown efficacy and cost and time and expense.

But regardless of how that would shake out, it is certainly not a traditional ESI discovery technique to write whole cloth a script for Vaults.  But what -- what is a traditional ESI discovery technique would be to the Google Vault within Carvana's Google environment.  And I'll walk you through kind of what we would envision under -- or how we would understand the Court's order to entail.  And it does get plaintiffs -- it addresses plaintiffs', you know, concern --

significant, you know, concerns that they've articulated before about working emails, which I think is important.

So we would use Google Vault to collect the hyperlinked documents for the 23-custodians produced emails. Now, we'll review each of those hyperlinked documents for privilege. And regardless of responsiveness of those hyperlinked documents, we will produce all non-privileged Google documents hyperlinked to the custodians-produced email. So that -- by that process, it would -- there would be no orphan emails, which up until this point has been a focus of plaintiffs. There would be no situation where they received unproduced email that reference a -- a non-privileged hyperlinked drive document that was not produced.

And these documents will be collected by Vault so they will be the current version, which may or may not be the most contemporaneous version. There very well may be. And, you know, as we told plaintiffs all along, we can entertain ad hoc requests for certain versions. But to have gone through the -- the very burdensome, but understandable why we did it, FEC exercise and to come on the other end and to have a new nontraditional, nonexistent script that it sounds like -- I'm not even sure who would -- how it would be created or who would create it or how long it would take. It's just not a traditional ESI discovery technique and not something that would be proportional under the federal rules.

THE COURT:  Under your current search of Google Vaults, to get the hyperlink attachment, are you going to get the most recent version of the hyperlink, period?  Which means that if you are searching for a hyperlink from a 2022 email and it's been modified five, ten, or 20 times for the 23 custodians, you're giving the plaintiffs whatever the version is in 2025?  That's what they're going to end up with; right?

MR. PETERS:  Correct.  It would be the version at the point of collection.  So it could be -- if it was modified after being sent, so it would reflect those modifications.  But if it was not modified, it would be, you know, changed from that point in time.  It would be the most recently saved version.

THE COURT:  So the goal has always been to try and find the version of the hyperlinked attachment in the state it was in at the time the email was sent, which is why we went down the FEC road.  And I'm now hearing about the script option, and we may have to address that.

But to answer this question about what's fair and proportional and unduly burdensome, at some level now I need to have an understanding of whether or not our test run of the two custodians for FEC worked; if, in fact, it was able to get plaintiffs a version of the hyperlinked attachment that was contemporaneous or closer in time to when the email was sent.

And I think now is the time, if we have that information, to start making a record on it.

So I think you probably have that information.  If you're not prepared to address it, we -- I think we're coming back on your new motion, and I'd like to at the end set that promptly after the briefing's done.  So I can give you time to address FEC if you want to delay that for a few weeks.

Go ahead.

MR. PETERS:  I'd be happy to talk through that now, Your Honor.  And I'm happy to talk through some -- some metrics for you.

So our -- this -- our discovery vender identified approximately 112,889 emails containing hyperlinks from just the two custodians that were selected by plaintiffs.  And we used FEC -- or instructed FEC to try to collect those emails that contained hyperlinked documents.  It only collected -- it was able to collect only seven -- approximately 7,592 of them.

And so -- sorry.  I should -- mis- -- I misspoke. Sorry.

So it -- we had 112,889 emails containing the hyperlinks.  And so for the vast majority, it was unable to collect the emails themselves that contained hyperlinks.  It -- I believe it only collected about 66 percent of those emails. But what's critical is that even of the emails containing hyperlinks that FEC was able to collect, it was unable to

collect hyperlinks from the vast majority.  So it would only collect -- was able to collect hyperlinked documents from about 7,000 -- 7,592 emails.  So we started with 112,889 emails containing hyperlinks, and FEC was able to collect hyperlinked documents from about 7,592.  That's about a 93 percent fail rate in its attempt to collect those.

And we produced the -- the resulting hyperlinked documents.  And -- and, tellingly, many of them, because of the inherent deficiencies in FEC that we've discussed previously, it had been modified after the time that the email contained a hyperlink was sent.  And that's the case where the hyperlink was in a lower-level email.  And then with the top-level emails, the hyperlinks contained there were also often sent -- sent well outside the days, months, even years before the email that contained a hyperlink was sent.  So it was an extremely high failure rate.  It was -- it did not return -- it returned the deficiencies -- or the inherent deficiencies in the date assignments played out as expected with FEC.

And, most notably, the burden for getting these hyperlinked documents was very extensive.  We spent about 1,170 hours of forensic analysis and attorney work.  It cost about $200,000 for this exercise.  That shakes out to -- and it shook out for the top-level hyperlinked emails -- or hyperlinked documents within 24 hours of the email was about $425 per document.  And the bottom line is it took about --

that's about 105 times more expensive than our average production cost per document.  So it's enormously expensive and time consuming and cumbersome.  And many of the produced emails, while responsive, are not really relevant or going to be of any importance to this litigation whatsoever.  They include -- those hyperlinked documents included floor plans for offices and office assignments.

So that's the -- our experience with FEC, was that it was -- it was really informative about how -- how FEC really failed to live up to the -- to the advertisements that plaintiff had given it in terms of success rates, actually getting anything contemporaneous -- remotely -- you know, arguably contemporaneous and the expense and burden.  And then the bottom line, the relevance of these documents was -- didn't -- does not justify the burden, and this would not be proportional to the needs of the case to do it at a broader blanket level.

And, as we've mentioned before, the -- we will consider ad hoc requests by -- by plaintiffs, but the blanket request to use FEC or -- for some sort of spoke script that doesn't exist currently is just not justified under the federal rules.

THE COURT:  Okay.  I'll come back to you in just a minute on the overall 223 document, but I do want to turn back to Mr. Drosman.

Mr. Drosman, the two questions I have is, number 1, is FEC working; and, number 2, if it's not, wouldn't it be better to go to an ad hoc system where you identify the important emails and say now we want you to run those and get us our most contemporaneous version?

And I say that because I've always been of a mind that you should have access to that if we could find it in a fair way.  I'm just not sure that that's happening.

So, Mr. Drosman, your thoughts?

MR. DROSMAN:  Sure, Your Honor.  So just for a little context, I'll back up.

When Your Honor ordered the two, I guess, sample custodians, we were immediately concerned that defendants might rig this process in a way that it was designed to fail.  So we sent them an -- a letter and said, look, can you provide us with certain parameters that you're using?  That our eDiscovery expert had said this is important, because we need to know sort of what process they're using in order to understand whether that process is going to work; right?

And defendants -- we were met with a big stonewall. Defendants told us to go pound sand.  They weren't going to provide us with any of that information.

Defendants then came back with another black box. They gave us the statistics.  And we asked a number of questions, and, again, many of them weren't answered.  And I'll

just give you a sampling of the few of the things that we don't know and that we've inquired about and still don't know.

You know, they say that 112,889 emails from the two test custodians had hyperlinks, but we don't know how they arrived at that number. We have no information as to how the number was derived. We don't know how Carvana defined hyperlinks for their representation. We don't know which of the email and document counts were before or after de-duplication. We don't know if the three -- 38,198, the 34 percent of emails that contained hyperlinks that they could not access using FEC could be attributed to a failing in FEC. We don't know if these emails were in custodians' active emails.

Carvana speculates the reason these emails were not identified is they were not -- that they were in Google Vault or Backupify. We knew we would not be able to retrieve hyperlinked documents from Backupify in an automated manner, so those aren't fair to include in the numbers. We knew at some point the FEC application would be supplemented by Vault to fill the gap of documents deleted by active email by retained by Vault due to the legal hold.

I could go on and on and on. I've got two pages of --

THE COURT: I've got it.

MR. DROSMAN: -- information that were --

THE COURT: I get it. You haven't had a chance to

test whether or not their analysis is accurate.

MR. PETERS:  It -- Your Honor, I -- I apologize for interrupting.  This is Matt with Carvana defendants.

I want to be clear.  We provided them the information about the system requirements they did, but, most importantly, I had a meet and confer with Mr. Drosman's colleagues on 12/29 and answered every single question about FEC they had.  They sent us a letter, and they -- they asked us multiple -- we answered every single question in their letter, including follow-up questions on the meet and confer about FEC.

So these -- these -- forgive me.  I suspect maybe it's just a miscommunication on plaintiffs' side, but that is just not accurate to say that we have not answered every question about FEC that they have posed to us.

THE COURT:  All right.

MR. PETERS:  We have been --

THE COURT:  First --

MR. PETERS:  -- an open book --

THE COURT:  I'm going to stop you.

MR. PETERS:  -- and given this to them.

THE COURT:  I would ask the attorneys not to interrupt.  I will always give you the option and the opportunity to respond.

Second, let me tell you both that the plaintiff is the one that really is going to drive the solution here.

Because, Mr. Drosman, your class certification deadline is April 6th.  And you are always welcome to go back to Judge Liburdi and ask for an extension, but I'm happy to work with you on a solution to get you what you need because I think that's the deadline you're most worried about.

So I don't need to resolve this issue of whether or not you would like to challenge the information, which I would certainly give you an option to do.  I'm asking you for a solution that can work for you within the time frame, unless you intend to go back to Judge Liburdi.

So, Mr. Drosman, how can the Court help you?  What do you want?

MR. DROSMAN:  Yes.  I appreciate that, Your Honor.  And we do not intend to go back to Judge Liburdi and seek a further extension.

I think that, look, if -- if Your Honor orders that if we have orphan emails and that if we can come back to the -- to the defendants and request contemporaneous versions of documents that -- or -- or hyperlinks that appear to be relevant and defendants will produce those promptly instead of dragging their feet for two months, we're happy to go that route.  I want to do what's most expedient.

THE COURT:  Fine.  How many emails do you think that would be if you were to put a limit on it now?

MR. DROSMAN:  It's tough to say because we have

literally not received a fulsome production, particularly given, you know, these new custodians and these new search terms that we're moving forward.

But, you know, I guess we could -- if you want to impose a limit, we start with a thousand with leave to come back to Your Honor to seek additional.

THE COURT:  All right.  Let me turn to Mr. Peters.  So the idea here is we're stopping FEC.  We're not determining the Google Vault script option.  We're turning to, as you said, ad hoc requests, which to me means individual emails that are identified by the plaintiff, and they want the most contemporaneous version of that.  And you meet and confer on how FEC is used to get the potential most contemporaneous version of that hyperlink.

That's how I hear Mr. Drosman.  And he suggested it's not going to be more than a thousand without leave from the Court.  Tell me your perspective from the defense.

MR. PETERS:  I -- the courts -- thank you, Your Honor.  The courts that have imposed -- I believe an ad hoc system does make sense.  That's been, I believe, our proposal since the beginning.  The courts that have looked at this, I believe including, if I remember correctly, the *Uber* case and others, proposed a -- a -- 200 as the number of documents that plaintiffs were to request with.  As always, should there be more, they can -- they can ask, and the -- the parties can meet

and confer and discuss specific documents.  But I believe that -- that number is a meaningful -- a more realistic and meaningful approach in this situation.

THE COURT:  That's fine.  I'm happy -- or I'm inclined to set a number at 250 but allow for a liberal amendment if it turns out this is working well.  And that's the goal.  If this is productive, it's necessary.  I will be willing to listen to expanding that number, maybe doubling it, but let's just find out what happens.

So the second question is how long will it take the defense to respond to an email request regarding 50 emails?  What's an appropriate timeline for you to get back the best potential contemporaneous document?

MR. PETERS:  I -- off the top of my head, Your Honor, I would -- I would say a -- I think less -- less than a week.  I would confer with -- we'd obviously have to alert our eDiscovery vendor and put them on alert and let them know, but I believe that would be a feasible response timeline.  And we'd, of course, from our perspective, just we would go as quickly as possible, but I think a week expectation would be sufficient.

THE COURT:  I would certainly give you ten days.  A week was probably too small of a time frame.

I -- so, Mr. Drosman, you have up to 250 initial requests, and they have ten days to get you this information.

I'm inclined, perhaps, even to go to 14 days because I believe you're going to want to get your requests in early to get the information as quickly as possible to see if you need more than 250.  You also don't want to run up against your class certification deadline.  So I think the motivation for you to act quickly is great, and 14 -- 10 to 14 days is reasonable.

Mr. Drosman, to finish this thought, your input?

MR. DROSMAN:  Sure, Your Honor.  I -- I would ask that the Court limit it to ten --

THE COURT:  Okay.

MR. DROSMAN:  -- because we do have deadlines.  And there is a rolling production, which means we're not getting -- we don't have all the documents all at once, so we can't ask for hyperlinks.  Right now, just for reference, we have about 600-plus hyperlinked documents missing from the emails.

And I just ask that -- defendant said as part of their standard protocol they can provide us with at least the current version upfront.  And then to the extent we want contemporaneous versions, we'll seek those.  But I would ask that they continue to provide us with at least the current version for all hyperlinked documents.

THE COURT:  So that's my final question, which is regarding my order in 223, we are now going to say that they're all being searched under the search terms for Google Vault, which means you're getting the 2025 version likely, or whatever

the year is.  And then you are requesting FEC use for up to 250 with liveral -- liberal leave to amend upon good showing.

That's how I read this now.  Does that work for you, Mr. Drosman?

MR. DROSMAN:  It does.  Thank you very much, Your Honor.

THE COURT:  Okay.  Mr. Peters, I think that ends 223. You agree?

MR. PETERS:  I -- yes, Your Honor, I believe that does.

THE COURT:  Okay.  Let's move to 224.

MR. GRONBORG:  Actually, Your Honor -- this is Tor Gronborg -- I think 223 and 224 are the two unrelated issues that are before you.

THE COURT:  Sorry.

MR. GRONBORG:  223 is the one that -- Ernest Garcia's trust --

THE COURT:  Pardon me.  You're right.  We started with the proposed order, so --

MR. GRONBORG:  Yeah.

THE COURT:  And so, yeah, we finished the proposed order issue.  All right.  Thank you.

All right.  Now let's move to 223.  Let me grab my note.

Okay.  Let me start with -- is -- Mr. Drosman, are you

addressing all of these?

MR. DROSMAN:  No.  Mr. Gronborg will address those two motions, Your Honor, or those two issues.

THE COURT:  Okay.  All right.  Let me ask a few specific questions, and then I'll hear your -- any of your thoughts, Mr. Gronborg.

Are -- let's be clear about the time frame of information that you want.  So if you could address that, if it's relevant to the time frame of this case's discovery as we discussed earlier or if it's broader.

MR. GRONBORG:  It's this -- it's this case is the discovery period, Your Honor.

THE COURT:  Okay --

MR. GRONBORG:  May I -- I -- of which a actual trust -- the trust document itself predated it.  We believe Garcia, Sr., is going to produce those.  But specifically for this motion, it would be the already decided relevant discovery period.

THE COURT:  So here's how I looked at this.  Obviously, documents that are relevant to the stock trades -- for example, if Garcia, Sr., had a stock trade and he received 80 percent of the benefit and Garcia, Jr., had 20 percent, undoubtedly you probably have that, but that would be relevant.

If after the stock trade, a week later, a $20 million house was bought from Garcia -- by Garcia, Sr., and given to

Garcia, Jr., you know, that seems very relevant.  And then you get into a cash transaction for something very personal related to Garcia, Jr., which would be a benefit.  But something like, you know, a cosmetic surgery or a donation to a -- a private cause or something that is just basically the transfer of money a year later which may not have a connection to the case.  And there are ways to solve that, but I'm trying to get a sense of -- of how broad this request is, because I think it matters.

And so if you can help the Court understand how limited or how broad is this request so I would know how to rule.

With that, Mr. Gronborg.

MR. GRONBORG:  Yeah, and I understand.  It's not as broad as you're -- I don't think it's as broad as sort of your example of something happening years later, because the reality here, as alleged and as we put it, is that the -- that Garcia, Jr., is, at least from public information that we've seen, and we don't have the trust materials, but is a beneficiary of his father's trust.  And so he stands to, you know, either acquire or inherit that money.  And so this is not did he get, you know, $20,000 for a surgery years later so much as it is during the class period is he aware that his father, who was selling stock at, you know, what was alleged to be an artificially inflated price that his father is in the process of accumulating, you know, almost $3.7 billion that he stands

to inherit.  Which I would wager almost any juror would find that's a financial motivation to inflate the stock price, so that your father can sell out his shares and then have that money knowing you're going to get it at some point.

And that's kind of the -- the simple of it. Obviously, you know, if there's a house bought here or there, that might be relevant, but that's -- that's not really what we've been aiming for.  This is really more about his knowledge that he's a beneficiary, his knowledge that the sales are occurring, that level of materials.

And so when I said it involves the relevant discovery period, that's right.  We're not looking to go outside the discovery period to see if his father bought him a Ferrari. You know, this is -- frankly, you know, the sums of money are -- are sort of a whole lot more than that that are at stake.

THE COURT:  So give me --

MR. GRONBORG:  Does that answer the question?

THE COURT:  It does --

MR. GRONBORG:  Yeah.

THE COURT:  -- but help me fashion an order that describes what "documents" means.

MR. GRONBORG:  I think the documents -- the documents here would be all the documents that, you know, identify his knowledge -- that identify Garcia, Jr.'s sort of knowledge or

involvement in the trust or any sales of stock by the trust.

THE COURT:  What --

MR. GRONBORG:  And that's the -- his father's trust.

THE COURT:  What would an example of that be?  Give me some actual documents.

MR. GRONBORG:  An example -- an example of it could be an email, you know, saying I know my father's going to be selling a million shares of trust -- of stock next week.  Or it may be one says, you know, Dad, sell the stock; don't sell the stock now.

You know, I assume it's communications with a relatively small number of people, whether it's his father, whether it's brokers, whether it's, you know, investor relations people at the company.  But it's communications with those sorts of people that are going to be evidencing his -- like I said, any involvement he has in those trusts, the trust stock sales, or his knowledge that those sales are occurring.

THE COURT:  Are you already getting that information from the discovery terms and searches you've already requested?

MR. GRONBORG:  We are not, no.  That's why from -- Car- -- Carvana defendants have taken the position that -- as you've seen in the motion, that it is not relevant or was somehow forbidden by Judge Liburdi's motion to dismiss opinion.

THE COURT:  Why is it relevant that Garcia, Jr., has a belief that he's going to inherit something?

MR. GRONBORG:  Because it is a financial -- sure. Sorry about that.

THE COURT:  Go ahead.

MR. GRONBORG:  Because, as we're alleging and would present it, it's a financial motivation for him to artificially inflate the stock price.  And to that end, as I said, Garcia, Sr., sold 13.95 million shares of Carvana stock during the class period when it is alleged that the stock price has been artificially inflated by fraud.  If he had sold that stock on -- on October 10th, 2022, which is right after the end of the class period, the proceeds of that sale wouldn't have been 3.7 billion.  They would have been 254 million.  You know, and Garcia, Jr., is the one who stands to ultimately profit from that extra $3.4 billion that was obtained by being able to sell the stock at an artificially inflated price.

So that would be plaintiffs' position on how it's -- how it's relevant to motive.  Motive, of course, is a key item, you know, key element of scienter in a case like this.

THE COURT:  Aside from emails, what else would you be requesting?

MR. GRONBORG:  Unfortunately, we're in a position of not knowing.  So, you know, are there memos?  Is he writing memos?  Is he writing letters?

So if it's that, unfortunately, we're -- we're not in the position to know.  I am -- so I always use the word

"communications."  That's where I would expect the lion's share of the documents to be.  It is -- you know, it's not a -- a file name with a regulatory agency or something like that.

But, unfortunately, that's kind of the best answer I can give you.  I assume it is.  If not wholly, it's something like communications.  If it's a broker, there may be account statements or something like that sort of identifying, you know, a transfer.  An estate-type document.  But, again, my hunch would be it would be primarily communications.

THE COURT:  Okay.  Thank you.

I'll turn to the defense now.  And let me introduce this topic by saying that the discovery that's permissible here, in my view, is -- and under the law is broader than what might or will be admissible at trial.  Those are issues for you all to resolve with Judge Liburdi.  And I do think that an email communication from Garcia, Jr., if it existed, that was so obvious as to say, you know, you should -- should or should not sell stock at this time or wait till we pump up the stock more before it's sold -- I'm not taking a view on the case. I'm just saying that such an email would be discoverable, in my view.

I have been trying to protect you all from both, number 1, the vague request of all documents; and, number 2, also not putting you in a position to have to use your attorney work product to try and decide what you think is evidence of

someone's state of mind.  So I'm trying to make this more concrete so it's just clear.

With those thoughts, let me turn to the defense and see who wishes to address the issue.

MR. KARIYAWASAM:  Thank you, Your Honor.  This is Kalana Kariyawasam on behalf of Carvana defendants.

So, you know, on a level set here and make clear that this -- this request from plaintiffs is for the details of the trust in which Garcia, Jr., is a beneficiary.  And Mr. Gronborg's position is premised on the belief that these trusts made sales of Carvana stock during the class period that could have benefited Garcia, Jr.  But the problem is the trust didn't make any stock sales during the class period.  And Mr. Gronborg is referencing, you know, a large quantity of stock sales by Garcia, Sr., during the car -- class period, but all of those sales were made directly by Garcia, Sr., not through any trust.  So, you know, plaintiffs are inaccurately conflating sales made directly by Garcia, Sr., which sales were made by the trust in which he is a trustee.

And, you know, this is why Judge Liburdi rejected plaintiffs' allegations back at the pleading stage.  Which, you know, of course, we understand that we're not dealing with pleading standards here, but, you know, his reasoning there, we believe, was instructive because, as he explained in his ruling, the complaint alleges only that Garcia, Sr., sold

15 percent of his ownership, not any shares held by the trust.

And, you know, it's not just that the allegations were unsubstantiated.  They are, in fact, untrue.  You know, as we mentioned in our brief, all of this information is publicly reported to the SEC.  In fact, I believe plaintiffs' motion actually concedes the point that Form 4s describe when a trust sale's occurred.  So plaintiffs have every opportunity to look through those SEC filings, which are -- which are made both by Garcia, Sr., and Jr., and they'll see the absence of any sales in the reported holdings of the trust through the class period, which are reported separately from and should not be confused with direct holdings.

And so when plaintiffs say they need to understand, you know, Garcia, Jr.'s benefit, you know, money he would have received from a stock sale by the trust during the class period, the answer to that is zero dollars and zero cents, because there were no sales.  And so because of that, the terms of these trusts necessarily cannot be relevant to the case.

THE COURT:  Is there a harm in disclosing to counsel the trust?  Is there something you're protecting against?

MR. KARIYAWASAM:  Your Honor, these are the -- the private financial documents of our client.  And if they have no relevance, no possible relevance to the case, we believe that it -- that their production would be inappropriate for that reason.  And that, you know -- I mean, just even considering

the -- the principles of proportionality, if something has no value, then essentially no burden is justified. And so we believe that it would be inappropriate given that there is no relevance.

THE COURT: You've addressed the trust document issue. What about the Garcia, Jr.'s correspondence by email or letter or otherwise referencing these sales? Are you opposed to disclosure of that?

MR. KARIYAWASAM: Your Honor, we -- we are not withholding documents like that. You know, that would be -- the issue as -- as framed, you know, this -- this discovery dispute is plaintiffs' motion to compel documents related to the trust. And if you -- so I'm a little confused by what plaintiffs believe is missing there, because we -- we are -- we are generally -- we do generally, you know, agree that documents that discuss stock sales from during the period would be relevant. So that's -- that's just not something that we are withholding.

THE COURT: Has your search agreement already disclosed any Garcia, Jr., emails on this topic?

MR. KARIYAWASAM: I am not -- I -- I'm not certain, but I -- I believe that our -- our terms were designed to capture communications regarding, you know, stock price movements, stock sales. And so, you know, to the extent those exist, my expectation is they would have been captured by our

terms and that we would have produced them.

THE COURT:  I'll come back to you.

Mr. Gronborg, I'm trying to understand the -- the scope of the dispute here.  I'm looking at RFP 29.  It reads, "Documents concerning any direct or indirect benefit or consideration that any of the Carvana Defendants received or intended to receive from another person's transaction in Carvana Securities for or during the relevant period."

And then that required information regarding whether Garcia, Jr., is a beneficiary of any trust in which Garcia, Sr., is the trustee where such trust transacted in Carvana Securities during the relevant period is a matter of public record.

So I was speaking with you about emails.  This question about the trust is the second issue to address.

So, Mr. Gronborg, first let's talk about the trust. If --

MR. GRONBORG:  Yes.

THE COURT:  If defense's statement is correct, that there were no sales out of the trust, what is it in that trust that would assist you?

MR. GRONBORG:  Well, I'm going to take a little issue with that statement.  And I guess I -- I could start with a motion, which is if that was the end all be all of this motion, you think it would have been in their argument.  It's not.  The

ref- -- the notion that in the motion to dismiss it was there was some dismissal based on the trust not having any sales, that's not what defendants argued.  Their argument was that the pleadings didn't include any information about Garcia, Jr.'s knowledge about the trust or involvement about the trust.

But at the end of the day, and it may be what you're alluding to in terms of an order, whether the stock sales are made by Garcia, Sr., through his trust or individually, the issue is is Garcia, Jr., a beneficiary.  Does he know he's a beneficiary?  So whether it's the trust as a trustee who received -- you know, and beneficiaries, whether Garcia, Jr., has a will.

And I'm telling you I can't imagine there's anybody with this kind of net worth who isn't operating through a trust.  You know, I -- I can't imagine someone has this kind of money and they just have a will that says this is where they leave their money.

But it -- what matters is is Garcia, Jr., a beneficiary -- I don't whether you really want to call it a trust -- from the individual money of a bank account where this money is held, does he know it, and has he had any communications with his father or any representative of his father about these stock sales, whether they're being made by Garcia, Sr., on his own, through a trust, or through some other vehicle.

And that's the -- the document request, obviously, goes to that.  It -- it was never limited in that way.  And, as I said, I think if you go through the -- the correspondence here, defendants have continually taken the position that it's not relevant, and you don't get the documents because Judge Liburdi said they're irrelevant.  Which is not true.

So I think the notion of we've been searching and would produce them is, frankly, inaccurate.  And so, you know, if that's true, then I guess an order requiring it is superfluous, but I don't think that's the case.

THE COURT:  I'm inclined to find the trust is disclosable for attorneys' eyes only under a protective order.

I assume you all have a protective order you've been working under?

Mr. Gronborg?

MR. GRONBORG:  Excuse me.  Sorry.  I -- about the protective order, Your Honor?

THE COURT:  You have one in place if I order this attorneys' eyes --

MR. GRONBORG:  Yes.

THE COURT:  -- only?

I don't need to --

MR. GRONBORG:  Yeah.

THE COURT:  -- add to that?

Okay.  Thank you.

Let me then get back to the broader question we started with, which is what else are you seeking that you don't have. And I'm having a hard time understanding why you don't already have or have requested Garcia, Jr.'s email or written correspondence on this topic.

MR. GRONBORG: Are you asking me, Your Honor, Mr. Gronborg --

THE COURT: Yes.

MR. GRONBORG: -- if -- so I -- my understanding the reason we don't have it is defendants haven't looked for it. They have -- they have repeatedly told us, and that's in the communication in front of you, that they are taking the position that these sort of communications are irrelevant. They haven't agreed to search terms. And I know we've got this sort of forthcoming dispute that is coming to you on search terms. And you'll see in there there are search terms in there that defendants have refused to use with regard to stock sales or stock trade.

So those are my understandings of why -- why we don't have it. And that that's why -- you know, why -- why we brought the motion. Frankly, if defendants had said we're willing to give those to you and let's figure out a way to get the documents to you, we wouldn't have filed the motion to compel, and they wouldn't have made the arguments that these materials are irrelevant. But that's just where we are.

THE COURT: All right. Mr. Kariyawasam, let me ask about emails. Do you think this is something you all can work on in short order? I don't think that expansive discovery on any potential benefit is disclosable, as I said at the beginning. But certainly information about stock trades, advice on stock trades, anticipated benefit from stock trades, that type of correspondence would be discoverable, in my view.

So, number 1, do you object to that conclusion; and, number 2, do you think this is something you can resolve?

MR. KARIYAWASAM: Thank you, Your Honor.

So we -- as a general matter, we don't object to that conclusion, and we've been considering such documents responsive. You know, this is simply not what plaintiffs have been asking to compel. You know, if we look through any of the letter exhibits to this motion, they all focus on plaintiffs' asked for the terms -- the specific terms of the trust. So, you know, this is not what we've been talking about, but this is something that we have considered responsive. And if they've hit on their search terms, we have produced them.

You know, I think plaintiffs are saying they haven't received, you know, an email where -- where a defendant says, hey, you know, the scheme is on; make the sales.

And that's because there is no scheme; right? They're assuming that, the existence of certain emails that they don't have. You know, I think the answer to that is probably that

the emails don't exist because there was no scheme.

And so, you know, to the extent there are documents that discuss stock sales or the reasons therefor, we have been looking for it and producing them.  If they don't exist in the form plaintiffs would like to see, that is -- you know, that's -- that's not a deficiency on our end.  That just -- that's just discovery showing that their theories are not being borne out.

THE COURT:  Regarding the trust, I will likely order its disclosure, but I want to ask you one question.  If there is something that's personally sensitive in the trust that you wish to redact, I would give you the opportunity to try and work with counsel in that regard.  And if you need an in-camera review from either party just to verify that's true, I'll be glad to do it.  I do think the scope of the trust is relevant, but if there is something personal that has nothing to do with the case that you would like to protect your client, I'm amenable to doing that if it has no relevance.

Mr. Kariyawasam, do you understand?

MR. KARIYAWASAM:  I understand, Your Honor.  And I -- and I apologize.  I'd just like to clarify something that -- that -- that Mr. Gronborg said, which is -- and just to make sure there's no confusion here.

You know, he -- he suggested that the question here is whether -- is Junior a beneficiary?  We know the answer to

that.  And if so, you know, does he have communications with his father about stock sales from the trust?

And, you know, I just want to emphasize to make sure there's no misunderstanding that the trust did not make any stock sales.  And so the terms of these trusts, you know, they -- they simply cannot be relevant to any benefit from -- from any alleged insider trading.

And, you know, what I might offer is that if plaintiffs are able to identify a -- you know, our position, of course, is that there is no transaction at issue.  If they're able to say that there is a transaction at issue, we can give them the details of the trust or of that transaction.  But, you know, they won't be able to, because no such sale's happening through the trust.

MR. GRONBORG:  Your Honor, if I could?

THE COURT:  Go ahead.

MR. GRONBORG:  I was just going to say we know there are transactions.  Garcia, Sr., sold 13,950,000 shares of stock.  And I think, respectfully, defendants' counsel is trying to sort of dance around that fact by whether or not one trust verse another where Garcia, Sr., himself sold the stock. The -- the end result is -- should be the same, which is, hey, we're entitled to documents regarding whether he is a beneficiary of his father's stock sales and communications about those.

And I would respectfully ask -- I guess to the extent defense counsel was saying they have been looking for those documents, the proper question, and maybe it can be, you know, in an order and they can tell us, is how.  Because they haven't identified the search terms that they're using.  So I -- so the notion of we've been looking and we haven't found any just begs the question of how -- how you've been looking.

THE COURT:  Thank you.  All right.  I'm clear.

MR. KARIYAWASAM:  Your Honor -- sorry.

THE COURT:  I don't -- I appreciate it, Counsel.  I'm ready to end this discussion.

The only way to test these arguments is to have you review it.  And there are nuances to the case that can only, in my view, be tested if the plaintiffs have an opportunity to look at a financial document, which is the trust.  It'll be attorneys' eyes only.  That's the protection.  If there's something personal, you can redact it.  If you need me to review something in camera, I'll do it.  But otherwise the only way to test this theory of the plaintiffs 'versus your contention is to disclose it.  And so I'm going to do that.  And I feel I have a good handle on that issue.

On the issue of the emails, I'll direct you to meet and confer and direct any question to me.  As you can tell, those emails should be fairly straightforward and directed.  If you've worked on that before, great.  If there's an additional

search that's reasonable, you can work it out.  It's not an unlimited scope.  As I said from the beginning, it needs to, in my view, be connected in a way that is more direct than just a broad search of every possible financial result.

So I don't need to discuss anything more on 223, unless I've overlooked something that I'm not -- I haven't ruled on yet on 223.

So in that regard, Mr. Gronborg, is there anything else on 223 I haven't addressed that you wish to?

MR. GRONBORG:  No, Your Honor -- Your Honor, other than to be clear it's trusts multiple, not just trust.

And then we understand what you're saying about meeting and conferring with regard to the other responsive documents.  And we'll do that in quick order and hopefully not have to come back to you on it.

THE COURT:  Mr. Kariyawasam, have I missed anything else to discuss?

MR. KARIYAWASAM:  No, Your Honor.

THE COURT:  All right.  Thank you both for listening and being patient.

Let's move to 224.  All right.  This concerns the SEC documents.  So as I do normally, let me tell you my questions, and then I'll hear from plaintiff.

I'd like to understand how the SEC materials that have been disclosed to the SEC, how those haven't already been

produced from all of the searching and requests you've made in this case so far. Which is a different way of saying, what's going to be in those documents that you don't already have? Perhaps you're just being diligent and trying to make sure you haven't missed anything. And if that's the case, let me know.

But the second issue is the scope. I don't know the scope of this SEC investigation. I looked at the attachments. I looked at the SEC attachment in Doc. A -- or Exhibit 1, I should say, and 2, but I still don't know the -- the -- the -- sort of the background of the SEC investigation; if it's broader than DriveTime, how long it went back for.

And the reason I ask that is this SEC disclosure, is it 5,000 pages? Is it ten years' worth of materials? Having some understanding of that scope helps me frame its relation to discovery.

So starting with plaintiffs, who would like to address this?

MR. GRONBORG: It's Mr. Gronborg again.

THE COURT: Go ahead.

MR. GRONBORG: All right. So on your first question is whether the SEC materials have already been produced so far, the -- the reason we -- we believe that isn't the case is because, of course, based on the claims of burden, the defendants here have insisted that we use a limited set of custodians, and -- and you know kind of how we feel about that

42

set, and also a limited set of search terms, some of which are under dispute. We have zero reason to believe that Carvana used the same sort of narrow scope of whether custodians are terms with the SEC. We could. We asked defendants to provide that, and they wouldn't provide it.

So the -- the short answer is, no, we're not just trying to be diligent. I think we have a real strong basis to believe that there are documents, you know, in those productions that would not have been captured with the custodians and the search terms we're using here.

The second, and this goes mainly to the 2020 request for information, is that it does capture some information prior to what the Court set as the relevant -- the start of the relevant discovery period. And while I think defendants like to think that January 1, 2020, date, you know, is just a wall and nothing can go -- you know, anything before that can't be relevant, the real issue is sort of an artifact and it's created, at least in -- in part, based on burden. There's just so far we can go back with millions of emails and have searches you've created.

Here there's no burden, of course. And the material that -- they've already been collected. They've been reviewed for privilege. It's a push of a button. You know, these could be produced tomorrow.

And so to the extent there are documents regarding

these related party transactions that predate the class period and the relevant class -- and the relevant discovery period but continued ongoing, those are relevant.  And in this case, we have a way of capturing them that has no burden impact.

So that's -- the first is sort of a -- I'm sorry.  Go ahead.

THE COURT:  No.  I didn't say anything.  Go ahead.

MR. GRONBORG:  Okay.  So that's kind of the -- the two components of it, where I'd say, one, we're certain we don't have them.  That's the temporal one.  And the second, we are fairly certain, and this -- that goes to both the 2020 and the 20- -- 2020 requests and the 2025 subpoena, that there's no indication that the search was done in the same way.  So it is likely capturing a different set of documents.

The -- the second question you had was the scope and you don't know what the scope of the requests or the SEC subpoena are.  We don't either.  We've asked them to produce those to us.  I wager -- on the part of the plaintiff I'm going to say this, that if, in fact, they were irrelevant, defendants would have given them to us.  That would have been the easy solution.  Instead of going to you, it could simply -- even if they wanted to do it attorneys' eyes only.  But here they are.  You could see they're asking for things that are unrelated to your case.  You know, and that would have been the end of it.  But everything we've seen that we can get, which is public

information, shows that they are directly related to allegations in the case.

And then the last part of that, is it 5,000 pages, 10,000 pages, 50 pages, we have no idea.

THE COURT:  Okay.  Thank you.  Let me turn to the defense.  Who would like to address this?

MR. KARIYAWASAM:  Thank you, Your Honor.  This is Kalana Kariyawasam.

So, yeah, you know, as Mr. Gronborg explained, there are two SEC investigations at issue here, and so I think it's important we talk about those two separately.

You know, first, there's the 2019 investigation.  And this one is particularly easy to set aside, because that investigation related exclusively to Carvana's disclosures of historical loan sales from 2019 and earlier.  It has nothing to do with the issues in this case, which alleges the scheme starting in May of 2020.

Now, you know, Mr. Gronborg's motion, it tries to speculate that the investigation may have been continuing to -- to 2024.  You know, there's -- there's no basis behind that, and that's just not the case.  You know, Carvana has not heard from the SEC on this investigation since April of 2020, and plaintiffs have no basis for their assertion that this investigation has any relationship to this case.

And so then I'll turn to the other investigation,

which is -- is much more recent.  It involves the SEC serving a subpoena in June of this year.  And that is largely related -- unrelated to the issues in this case.  However, it could overlap in small part with the DriveTime issues in this case because essentially the SEC's investigation relates to a short-seller report from January of this year.  And it's actually submitted as Exhibit 3 from plaintiffs.  And that report, as you'll see, it's an 85-page report, and it has a few paragraphs  amongst those 85 pages that reference this very lawsuit and its DriveTime allegations.  And so theoretically there's that potential for overlap with the DriveTime allegations with -- just with this more recent SEC investigation.

But that, too, is not a basis for Carvana to have to produce documents from the SEC's investigation for several reasons.  And the first point I'll make is that if plaintiffs want to see materials like the SEC's subpoena to Carvana, they should go to the SEC.  So the FOIA process exists for just that kind of request.  And now, as Plaintiffs' Exhibit 1 shows, the SEC generally doesn't want these investigation materials to be disclosed.  It routinely blocks FOIA requests for this kind of information on the basis that sharing information from an active investigation could interfere with enforcement activities.

And plaintiffs should not be trying to get around the

SEC by seeking investigation documents from us. You know, Carvana's not in the business of meddling with the SEC's decisions about which aspect of its investigation can be disclosed. And here, and this gets to the point Your -- Your Honor was asking about before, plaintiffs have no need to interfere with an SEC investigation. You know, we aren't withholding anything. If there's a document that hits our DriveTime search terms and it's not privileged, we are producing that to plaintiffs. And we've used I think it might be like 13 or -- you know, it's between nine and 13 search strings that this -- that include the word "DriveTime" and are targeting those DriveTime issues. Those have pulled tens of thousands of documents into our view. And I believe we've produced over 2400 of those documents that we determined were responsive.

So, you know, plaintiffs are getting the DriveTime-related discovery. And I know Mr. Gronborg speculated based on his dissatisfaction with the search terms that they must be missing something, but that kind of speculation is not a basis for more discovery.

So, you know, ultimately here plaintiffs don't have a basis to believe they're missing anything important. All they're asking for is what courts call discovery on discovery. You know, they want to check our work. And that's -- that's -- that's sort of inherent in the logic Mr. Gronborg was using,

was that, you know, they just believe that their search terms are not adequate and so they believe that the SEC search terms must have been broader, so there's just got to be something out there.  They want to check our work is the bottom line.

But, you know, the -- the cases that have looked at this -- for example, we cited the *Terpin* case, which looked at kind of the discovery-on-discovery issue -- those show that that's only appropriate when the requesting party has actually made a showing that productions to date have been inadequate.  And so, you know, plaintiffs haven't made that showing here.

So, I mean, ultimately we've produced fulsome discovery with respect to DriveTime, and so plaintiffs have no justification for interfering with an SEC investigation to check our work.

THE COURT:  Let me ask about the volume of materials disclosed under the 2025 action.  What is the number, if you know, of what was disclosed?

MR. KARIYAWASAM:  Your Honor, I -- I do not have information, you know, about how many documents were -- were disclosed as part of the SEC investigation.

THE COURT:  Second question:  Did you already review the SEC document disclosure for attorney-client and privileged information?

MR. KARIYAWASAM:  Your Honor, so, you know, we -- we are not -- we at Latham & Watkins are not counsel for Carvana

in the SEC investigation, and I am not familiar with -- with the process there.  You know, and what I -- what I know is our client's position with respect to this motion, which is -- which is that, you know, privileged processes and confidential SEC investigation documents are not relevant or -- or properly subject to discovery in this case.

THE COURT:  All right.  Next, lay some foundation for me regarding the 2019 matter and why the Carvana loan disclosure is different than this case.  I don't know a lot about what they were investigating in 2019 --

MR. KARIYAWASAM:  All right.

THE COURT:  -- but it does seem to me that it might be outside the scope here because -- just so you know, I'm tending to think that, yes, if the 2019 investigation really has no connection to this case, it doesn't matter to me if it's burdensome or not.  It's just not discoverable.  But the 2025 matter, if it's easily disclosed, it's already been reviewed, I am considering its order.

So we don't have to address that, but you can help me understand in more fulsome detail why the 2019 investigation has nothing to do with this case.  Can you describe it.

MR. KARIYAWASAM:  Certainly, Your Honor.

So around the middle of 2019, Carvana got a voluntary information request from the SEC, and that information request related to its -- Carvana's related party disclosures, you

know, in its existing SEC filing.  So we're talking early 2019 and -- and earlier, you know, related to accounting policies and procedures for historical loan sales and refinancings.

And, you know, Carvana disclosed -- made a disclosure about that information request around March of 2020, which is what -- what prompted plaintiffs to ask for this.  And then, you know, the SEC just two weeks -- about two weeks later made a flat communication to Carvana about that investigation.  So, you know, it's not like the nature of the investigation later changed or something.  That investigation has only ever related to historical loan sales disclosed -- the disclosures made by Carvana about historical loan sales from -- from 2019 or earlier.

And absolutely nothing in the complaint targets that subject matter.  You know, plaintiffs, if we look to, you know, paragraph 127 to 129 of the complaint, right there are plaintiffs' DriveTime allegations, which describe their theory that transactions with DriveTime inflated sales numbers for the third and fourth quarters of 2021, which is, you know, very far removed from -- completely unrelated -- related party historical loan sales from, you know, 2019 or earlier.

THE COURT:  Okay.  I will come back to you one more time.  Let me turn back to Mr. Gronborg for his arguments, and I'll give you the final word, Mr. Kariyawasam.

Mr. Gronborg.

MR. GRONBORG:  Thank you, Your Honor.

So I'll start with 2019.  And I understood where you were kind of leaning, but I -- but to kind of go in reverse order, Carvana's counsel cited to one part of the complaint but obviously ignored for purposes here paragraph 299.  And at paragraph 299 of the operative complaint, it specifically talks about that the allegations concern related party transactions that were leading up to, in other words, in 2019, and throughout the class period.

And so the fact -- even if it is correct that the SEC discovery in response to the 2020 information request is about these related party transactions -- and we list I think it's 19 different related party transactions that were going on. Even if it's about what was occurring in 2019, that doesn't make it irrelevant.  Carvana counsel somehow suggested that the argument is that the scheme didn't begin until May of 2020. May of 2020 is the beginning of the class period.

So that is the point at which, you know, we, on behalf of our clients, that certainly by that time this scheme was in, you know, full force, all of the aspects of it and inflating the stock price.  That doesn't mean that it wasn't going on before.  That doesn't mean that the stages for it weren't set well before then.  As I said, the January 1, 2020, sort of discovery period recognizes that, but it recognizes it with an eye towards burden.  And in this case, again, there's no burden

with respect to those documents.

I also -- what I didn't hear, and haven't heard at all sort of in the meet and confer process, is are all -- do all of the documents produced to the SEC in response to that 2020 information request, do they all predate 2019, or, you know, earlier, or is it not true?  Because like most -- most requests, frankly, we've sent under the federal rules and that the SEC sends have a continuing obligation.  So if they are continuing to produce documents pursuant to it, even if one were to create an arbitrary cutoff period, be it January 1, 2020, or otherwise, there's nothing that's, you know, been indicated to us that suggests documents that -- that defense are going to claim are responsive to that request don't -- don't date in, you know, what is the relevant discovery period. So I think that's -- those are the important considerations to -- with respect to the 2020 information requests.

And maybe before I go to 2025, I kind of want to deal with this argument that was in the middle about somehow the SEC investigation -- there being an interference with the SEC investigation.

Where Carvana's defendant is right is we tried to get these documents from the SEC.  Notably, what they never said was, no, these documents are irrelevant.  That was not the message that we got back.  The message we got back is, you know, for the protocol, there's an ongoing investigation and

UNITED STATES DISTRICT COURT

that had to do with both of these.

So, you know, the notion that the 2020 information request somehow came and went with a 2019 SEC filing doesn't seem right given that they -- that the message we got back -- and, frankly, they used the word "investigation," kind of suggesting that these two are -- are fundamentally related but that it has been ongoing.

And so it is right that the SEC won't produce them to us.  What is in no federal rule, what is in no SEC guidance, what is in no case I'm aware of is the notion that a company could say we're not going to give you what we've given the SEC because somehow that would interfere with an investigation.  That's sort of a rule of Carvana's own making here.  And, you know, it's certainly not one that they made in their argument to the Court, and it's not one that would stand up to scrutiny.

And then one last point before I go to 2025, and maybe I'm getting a little more short-stripped based on what you had said, but I'm, frankly, a little surprised that Carvana's defendant cited that to -- to *Terpin* and the notion that this is -- that that somehow prohibits the discovery here.  *Terpin* dealt with a document request, you know, from the plaintiff to the defendant about what the defendant's search terms were.  And defendants cited to say, you know, that it -- it relates -- it only allows discovery in similar or related matters.  It had nothing to do with similar or related matters.  It only had to

do with what was happening in that very case.

And so the request here isn't to say let's check your search terms.  The question was is the scope of this broader than the documents you're getting.  And the answer is almost certainly yes if you're using different terms or custodians or other means.  You're capturing relevant documents.  You're just doing it in a different way.

And so, last, if I could kind of get to 2025, I think it's clearly material.  I think you can't look at the short-seller report and not see that the emphasis there is on the related party transactions.  The notion that it's just some small bit of it is not true, although, again, defendants could just provide the subpoena and we could look.  But that, plus the fact that the SEC has sort of indicated that this is an ongoing investigation, and so it probably looks like it relates back to the 2020 information request, which was -- just talked about related party transactions suggested it's not -- you know, that that part of it is not nearly as broad as Carvana's counsel would suggest.

And you know the fact that they weren't counsel in that case, I -- I'm surprised they don't know what the volume is given.  I do believe originally they -- they did make a -- a burden argument with respect to this document request.

And then, last, sort of a notion that were they already reviewed for privilege, having practiced in this, you

know, realm for quite a while, I could tell you no -- no company is going to produce the documents to an SEC without doing a privilege review, because if they did so, it would be a waiver.  And then if and when the SEC was going to -- you know, if they were going to be produced, people like us would get them.

THE COURT:  First question.  Help me understand how an investigation into historical loan documents relates to the scheme here regarding the stock.  Connect that to me.  Because you talked about the related party transactions, but to your -- this investigation's historical loan documents.  So I need to -- you need to connect that to this scheme.

Go ahead.

MR. GRONBORG:  Yeah, the -- the loans are being made by Garcia, Sr., related companies.  So those are the related party transactions, is that Carvana -- you know, the allegations are that Carvana is benefitting by shifting loans onto -- you know, with -- to related parties.  So that -- so there's not a distinction.  Related party transactions and loan sales -- loan sales are part of the related party transactions.

Does that make sense?

THE COURT:  It does.  I -- honestly, it's attenuated.  I get your point.  I'll look at this again.  I'll look back at my prior order and Judge Liburdi's review of the case.

There's always been a broad emphasis on discovery,

even though Judge Liburdi has narrowed the case. But there is a point at which perhaps it's just too far removed. And that's -- I'm not saying one way or the other it's -- I've decided, but I need to look at that. And I appreciate your -- your giving me the argument.

MR. GRONBORG: It --

THE COURT: Go ahead. If you have --

MR. GRONBORG: If --

THE COURT: -- a --

MR. GRONBORG. -- I could, Your Honor?

THE COURT: Go ahead.

MR. GRONBORG: If I could, the 8-K that the company issued with respect to that 2020 request specifically said it related to -- that it was about related party transactions. It didn't say it was -- like I said, the loans are a subset, but it didn't limit it to loan sales.

THE COURT: Okay. Thank you.

Mr. Kariyawasam, I said I would give you the last word. I'm trending towards you on the --

MR. KARIYAWASAM: Thank you, Your Honor.

THE COURT: -- on the 2019 issue, but it was based on the statement by you that that investigation concerned historical loan documents.

Was the SEC request broader than that?

MR. KARIYAWASAM: Your Honor, so I believe that it was

historical loan -- disclosures about historical loan sales and refinancing.  So, you know, not -- not materially different.  Certainly nothing that is mentioned in the complaint.

And now Mr. Gronborg, I think, is -- his response to this was, you know, the loans -- the historical loan sales were being made by Garcia, Sr., related companies.  And their allegations in paragraph 299 are also about, you know, Garcia, Sr., related companies; therefore, this is relevant.

I think that's, you know, as Your Honor alluded to, drastically too attenuated.  Yes, some of these same entities might be involved.  That does not make the subject matter, you know, related whatsoever.  And, you know, importantly, paragraph 299 is not discussing, you know, any scheme or -- or any wrongdoing.  You know, this is -- these paragraphs just relate to plaintiffs' argument that Garcia, Sr., controls Carvana.  And, you know, they're mentioning, like, Garcia, Sr., has related party deals with Carvana,

So, you know, I think when Your Honor -- if Your Honor goes back to see everything that is listed in the paragraph Mr. Gronborg noted, paragraph 299, you'll see nothing about, you know, 20- -- 2018-2019 loan sales and refinancing as related parties.  And that answers the relevance question there.

Then when it comes to 2025, I think I was, you know -- there are a few points to address here that Mr. Gronborg made.

So one is when it comes to interference with an SEC investigation, if I heard right, I believe it sounds like plaintiffs have already tried to get this information from the SEC, and the SEC has already told them that it does not want to provide that information to them because it's related to an ongoing investigation. And this would constitute interference with an ongoing investigation, which is, you know, to us, then, that just shores up our point that plaintiffs are going around us -- sorry -- going around the SEC by trying to get these documents from us.

I believe he also talked about the *Terpin* case and how that related to a party checking the terms within the same case. And I think that actually means the point is more compelling here. You know, *Terpin* shows that courts are reluctant to force parties to -- to check their work even for search terms used within the same case because, you know, these processes are generally privileged and it's a part of a party's own processes. And so I think the logic is even stronger if/when it comes to forcing a party to turn over its processes in a separate matter.

And then I think, you know, finally, Mr. Gronborg suggested that, you know, that it's not the case that the DriveTime issues are a small part of the report. And he said it's all about related party transactions. And I think this is something -- this is a mistake that Mr. Gronborg has made

repeatedly here.  He keeps using the term "related party transactions."  He keeps talking about Garcia related companies as if everything that relates to a company owned by Garcia, Sr., is somehow relevant to this case.

That is not true.  You know, if you look -- if we look to the allegations -- again, if we -- while paragraph 299 is about control, the scheme allegations about related parties appear in paragraphs 127 to 129.  It is really a very narrow set of transactions with DriveTime that are at issue that could relate to the claims and defenses in this case.

And, you know, comparing Exhibit 3, the Hindenburg report, with those allegations, I believe Your Honor will see that there is incredibly little overlap between the two.

THE COURT:  Right.  A few questions.  And the first is to address this SEC request by the plaintiffs.  It seems perfectly normal to the Court, and it seems perfectly normal the SEC wouldn't disclose the materials while their case is opened.  It also seems to me that we don't delay this federal class action for as long as it takes the SEC to undergo its investigation.  We -- I make decisions on discovery here.

So I'm -- unless you have some response to that, I don't see that there's anything to be weighed whether or not plaintiffs did or did not ask the SEC.  The question has to do with whether these documents are discoverable.

So I don't know if you want to address that point, but

that's the Court's first --

MR. KARIYAWASAM:  Yes, Your Honor.

THE COURT:  Go ahead.

MR. KARIYAWASAM:  Thank you.

Yes.  So -- so in terms of whether the documents themselves are discoverable, you know, we totally -- I want to be clear that if there is a document that's related to DriveTime, you know, we've done a thorough and rigorous search for those documents, as we've employed several terms relating to DriveTime, and we are not withholding those on the basis that they are, like, involved in a SEC investigation.  We are producing those to plaintiffs.

You know, all that I'm saying should not be disclosed are things that are not independently discoverable.  So, you know, the SEC's subpoena.  You know, any search terms that Carvana used.  You know, just like the entire corpus of documents that -- that are being -- that are part of this largely unrelated SEC investigation, those are the documents that I'm saying are, you know, not independently discoverable here and are really up to the SEC whether or not it should be disclosed.  But in terms of DriveTime documents, in terms of the documents that themselves that plaintiffs are interested in, we -- we are producing those, and we are not withholding those on the basis of the investigation.

THE COURT:  And to finish my thought as well, if the

SEC closed its investigation tomorrow, it still wouldn't tell me whether or not it should be disclosed.  So it just doesn't matter to the Court that SEC is or isn't investigating or they asked or didn't ask.

I do want to turn to what -- if there's any reason you shouldn't tell me this -- what we're talking about.  What was the scope of the SEC request that materials were provided for?  Are you able to tell the Court that --

MR. KARIYAWASAM:  Sure, Your Honor.

THE COURT:  -- here?

Go ahead.

MR. KARIYAWASAM:  Yeah, yeah.  Yes.  So what I'm able to tell you is that, you know, the short-seller report, which plaintiffs attached to the motion as Exhibit 3 that we call it the Hindenburg report, it's a short-seller firm.  So, you know, a firm financially interested in Carvana's stock falling that is now defunct.  That firm published a report in January with, you know, 85 pages of kind of, you know, various accusations, many of them relating to related party transactions, accounting issues.  You know, kind of a wide variety of -- of topics.

One of the things that -- that that report contained was, you know, they did mention a lawsuit has been filed, and it is pending in the District of Arizona.  That asserts that, you know, Carvana was increasing its sales numbers through sham transactions with DriveTime.  And it -- basically it reproduces

the accusations that are made in this lawsuit.

And what I can tell you is that in general, you know, what the SEC often does is when these short-seller reports come out, the SEC wants to look into it and -- and will serve requests or subpoenas that essentially just generally cover the -- the topics, certain topics from -- from a report.

And so that -- that's what I'm able to share, is that in general the -- the subject matter is what's reflected in -- in the Hindenburg report, and that's what -- that's what the SEC is interested in at a high level.

THE COURT:  Thank you.

Two more questions.  If you disclose to plaintiffs only the materials that were given to the SEC, it seems to me that you would not be disclosing how you searched for those materials or what thoughts you put into your searches.  All you would be handing over are the documents.

Can you tell me why that belief could be incorrect.

MR. KARIYAWASAM:  Your Honor, I -- I believe that the documents that -- that, you know, Carvana has selected to respond to the SEC would reflect internal processes.  And I think that the important point is -- is that, you know, this looking to the Hindenburg report, it's apparent that these -- you know, that the DriveTime transactions at issue here are really a very narrow slice of what could possibly -- of what is potentially at issue with the SEC investigation.

So production of, you know, that -- that entire set of documents would be just drastically overbroad, and it would be -- provide plaintiffs with many confidential documents that has zero relationship to this case.

THE COURT:  Can you give me an example of a confidential document that would have been given to the SEC that would not have a relationship to this case?

MR. KARIYAWASAM:  Sure, Your Honor.  So, you know, for -- for example -- and -- and this -- this goes even for documents that might be, you know, for example, labeled with -- with DriveTime, because -- so, you know, the -- one -- one thing mentioned in the Hindenburg report, for example, are -- are loan sales or -- or financing issues, accounting issues. You know, none of those have -- have anything to do with this report.

And, you know, I can open up the Hindenburg report itself and -- and kind of -- you know, in flipping through its pages, the vast majority of the subject matter does not even relate to, you know, DriveTime.  You know, it relates to other parties or, you know, other financial issues that the short-seller was making accusations about.

THE COURT:  All right.  And I did have a third question, which is -- which has to do with burden.  I would think that any disclosure to the SEC would have been discrete, Bates stamped, identifiable, and easily reproducible.  I also

believe they would have already been reviewed for privilege.

If those things are incorrect -- in the future, if you determine otherwise.  But if those things are incorrect, it seems to me these materials could be discoverable and for one reason we haven't discussed, which is that reason for limiting the discovery previously in the case.  All of that had to do with the burden and the cost of you producing documents going back to 2015, so I narrowed the scope of the discovery.  We picked search terms so we would narrow the scope of discovery in a way that wasn't cost prohibitive for the defendants.  I've always been mindful of not burdening you with these massive costs but also trying to meet the needs of discovery.  In a case where this material's already been disclosed and reviewed and is easily handed over, it seems to me there's a very low burden threshold here.

And I still understand your other arguments, but on this issue of burden, am I missing anything?

MR. KARIYAWASAM:  Your Honor, I -- we haven't done sort of a -- a close examination of -- of exactly what this would require, but I think as a general matter your understanding is -- is consistent with mine, that -- that many of these documents generally would have -- would have already been reviewed for privilege and that it -- that it would be -- and I -- that the full set would be potentially an identifiable set.

THE COURT:  Okay.  Thank you.

I have enough information on 224.

And let me turn to Mr. Gronborg.  Is there anything on 224 we have not addressed?

MR. GRONBORG:  There's a lot I'd like to address, Your Honor, but I did get the sense that you don't want me to go back through the -- the last bit.

THE COURT:  I'll let you.  You know, I'll give you each one more chance since this is important to you.  We have time.  I'll give you each no more than three minutes each to -- to sum up anything you'd like me to consider.

Go ahead.

MR. GRONBORG:  Sure.  If we go -- if we're looking at the 2020 requests and paragraph 299, which Carvana's counsel seems to suggest, you know, was unrelated to the fraud, I mean, right there in the paragraph it refers to all the related party issues as being integral to the fraudulent scheme and occurring beforehand.

So I think there -- I think on this issue of -- you know, at one point Carvana's counsel said the SEC told us that getting the documents from them would be interference or getting these documents would be interference.  They, of course, never said that.  They simply said this is an ongoing investigation, so we can't respond to your request.

On the notion of *Terpin*, I suppose Your Honor's

already read it.  I'll give counsel credit for somehow suggesting that the false parenthetical that they ascribe to the case was somehow weaker than what the case actually said. It just has nothing to do with a subject matter like this, which is the SEC's production.

And then on this issue of 2025 and looking at -- looking at the short-seller report, I mean, one, you can look at the short-seller report.  I think the first substantive bullet point in it is our research uncovered $800 million in loan sales to a suspected undisclosed related party.  So that's the number 1 bullet point in it.  But, also, I think it's pretty clear the SEC doesn't send a subpoena to Carvana saying give us documents regarding this report.  There are things in the report, like the related party transaction, that the SEC is going to look at and send them requests.

So I think this notion of the SEC just said give us everything about the report is wrong.  And then the contention that most of the Hindenburg report is about third parties and others, well, then that would just reinforce the notion that, one, the SEC isn't ask -- going to be asking Carvana about third parties, and Carvana's not going to be producing documents.  I mean producing documents about their own issues, which overlap with the fraud.

So to end where you ended -- and I -- I think we eventually -- you know, Carvana's counsel did answer it

accurately.  There's effectively no burden here.  And if the issue was produce the documents but you don't have to produce the search terms or something like that, you know, we'll live with it.  We think the -- it's -- there's plenty of case law where subpoenas and search terms are provided.  But ultimately, you know, at the end of the day, it is the documents that matter and the documents that we're going to use in the case.

THE COURT:  Thank you.

Mr. Kariyawasam, you get the last word.

MR. KARIYAWASAM:  Thank you, Your Honor.

I think the point I'd like to make is that, you know, with respect to the 2025 investigation and documents, you know, if the Court is inclined to order some production there, you know, my request would be that we start with sharing the subpoena from the SEC to -- to Carvana, which will essentially, you know, provide more color on -- on what the actual scope was and -- and to kind of discuss from there what is actually potentially relevant to this case.  Because, as mentioned before, you know, in general our understanding is that this investigation really is -- is largely unrelated.

THE COURT:  Understood.

All right.  Thank you, Counsel.

Let me turn to any other counsel on the line.  Is there anyone else who wants to address a topic of any of these three that we've had that I haven't turned to yet?  Okay.

Seeing -- or hearing none, thank you all for listening.

So my final point was this schedule regarding the newest motion, I'm waiting for a response.  And I want you all to know that as soon as it's ready, I will try and schedule something quickly.  So we'll have a response.  My judicial assistant will contact you and try to set up an argument like this as soon as possible.  I am mindful of your April 6th deadline, and I'd like to, you know, get back to you in a day or two or as quickly as you're ready.  So just know that I'm available promptly when you are and just keep working with my chambers.

MR. GRONBORG:  Your Honor, this is Tor Gronborg.

THE COURT:  Yep.

MR. GRONBORG:  I'm sure you'll be -- I'm sure you'll be thrilled to hear that there's actually another discovery issue that appears to have reached an impasse, and we're going to need your assistance.  The reason I raise it is a bit of a housekeeping issue, which is, you know, on the plaintiffs' side -- and I'll back up.

This involves certain documents that are in the possession, custody, or control of Garcia, Sr., and a subpoena to Garcia, Sr.  And I believe his counsel, hopefully, is still on the line, but I won't be argumentative here.  It concerns certain documents that Garcia, Sr., has.

DriveTime, you know, which is a third party here, has

asserted that they have some standing to make arguments with respect to the -- that the end result has been while we're prepared to file our portion of the position statement, Garcia, Sr.'s counsel and DriveTime's counsel are not and have wanted to have, I believe, until February 6th.

And we're mindful of Judge Liburdi's instructions that we get these types of discovery disputes on file as soon as we can, and we were looking for leave from you to simply file our position statement so we can get it on file, and then Garcia, Sr., and DriveTime, I suppose, can respond as they see fit or as the Court orders.

THE COURT:  If you're asking me for permission to file a notice of a discovery dispute and place your version of it on record, that's fine.  You can do that out of order given our time constraints.  And you have the option, as well, to meet and confer and summarize these issues in a page each and submit that to me without filing it, and then we can have a hearing as well.  Whatever works for you all to get this done quickly, I'm happy to assist.

MR. GRONBORG:  Okay.  I appreciate it.

THE COURT:  All right.  All right.

MR. PETERS:  Your Honor --

THE COURT:  Go ahead.

MR. PETERS:  -- with apologies.  This is -- oh, sorry. This is Matt Peters with the Carvana defendants.  I'm cognizant

that the Court has been extremely generous with your time, which we all, I think, appreciate on the line.

I just wanted to flag that in the tentative -- in the stipulation that the parties submitted, the final paragraph, the Carvana defendants, we proposed some clarification language to the order about producing non-privileged documents from their Google Vault.  I think we covered this but just wanted to be clear.  The way it's currently ordered -- or drafted, I think it arguably requires production of all documents whether or not they're responsive or relevant or from our custodian.  So the language we added just was to -- I think consistent with the rest of the order and what we've talked about today, was just to add in that they're responsive and from the custodians' collections.  But I just wanted to -- to flag that for your awareness, but that's all.  I appreciate your time.

THE COURT:  No, thank you.  But I think the proposed order changes somewhat now.  We have standard ESI searches for the Google Vault, and then we have the 250 ad hoc requests for FEC search.

Does --

MR. PETERS:  I -- I believe that -- yeah, I believe that's correct, Your Honor, as well.  I just -- the -- the order, the actual last page of the order, I don't believe it actually referenced, like, responsive documents from Google Vault as opposed to all documents from Google Vault regardless

of whether they were responsive or relevant.  So that's -- I just wanted to explain why we added that last language there in the final paragraph of the stipulation.

THE COURT:  Got it.  All right.  I'll make a note of that.  Thank you for letting me know.

All right.  From plaintiff --

MR. PETERS:  Yeah.

THE COURT:  From plaintiff, anything else today?

MR. GRONBORG:  No, Your Honor.

THE COURT:  From defense?

MR. GRONBORG:  Thank you for your time.

THE COURT:  All right.

Anything else from the defense side?  Hearing nothing --

MR. KARIYAWASAM:  No, Your Honor.  Thank you very much for your time.

THE COURT:  Thank you all for calling in as well. Have a good afternoon.

We're adjourned.

(Proceedings conclude at 3:50 p.m.)

---oOo---

**C E R T I F I C A T E**

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 9th day of January, 2026.

*/s/ Cathy J. Taylor*
Cathy J. Taylor, RMR, CRR, CRC

UNITED STATES DISTRICT COURT