# EXHIBIT 14

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-551-FMO (PJWx) | Date | June 26, 2014 |
| --- | --- | --- | --- |
| Title | *Independent Living Center of Southern California, et al. v. City of Los Angeles, et al.* | | |

Present: The Honorable    Patrick J. Walsh, U.S. Magistrate Judge

| Jacob Yerke | XTR 6/26/2014 |
| --- | --- |
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| --- | --- |
| Timothy Smyth | Mark Byrne |
| | Jennifer Derwin |
| | Komal Mehta |
| | Robert Collins |
| | Alice Chu |

**Proceedings:**     Status Conference re: Quality Assurance in Predictive Coding Regimen for City's Production

Case called and appearances made. The purpose of the hearing is to address a final issue between the parties regarding the predictive coding scheme the Court has ordered them to use. As a brief summary, this case centers on Plaintiffs' claims that Defendants have not ensured that accessible housing is available to people with disabilities as required by state and federal law. The case has been pending since January 2012. In December 2012, the Court entered a scheduling order, giving the parties until September 2013 to complete discovery. Needless to say, that deadline was not met. In fact, little or no discovery was completed in that nine-month window. For that reason, in September 2013, the Court became involved in the process by attempting to work with counsel to forge a plan to proceed with discovery. Since then, the Court has held 13 hearings usually lasting an hour or longer to attempt to work through the various issues that the parties have had in discovery.

The primary area of contention has been electronically stored information. Defendant City of Los Angeles has approximately 2,000,000 documents that it needs to search to respond to Plaintiffs' requests for production. Obviously, this cannot be done manually and must be accomplished by using computer assisted technology. After months of haggling, the parties attempted to use key word searches to search through the documents of two of the City's 24 custodians. Those searches identified approximately 24,000 relevant documents. Assuming that key word searches were used for the other 22 custodians and that similar numbers of documents were tagged (minus duplications), it is likely that more than 150,000 documents and more likely 250,000 documents would have been tagged for production. This would have resulted in both sides spending tremendous amounts of time and money going through those documents.

In lieu of key work searches, the Court ordered the City to use predictive coding to locate the most relevant documents. To do this, the City was forced to hire an outside vendor at an initial cost of more than $50,000 to search its electronic records. The goal was to have the vendor load the 2,000,000

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-551-FMO (PJWx) | Date | June 26, 2014 |
|---|---|---|---|

| Title | *Independent Living Center of Southern California, et al. v. City of Los Angeles, et al.* |
|---|---|

documents into a computer platform and, after training the computer as to what was important, having the computer rank the documents in order of relevancy. The Court ordered that, after the computer ranked the documents, the City would be required to produce the 10,000 most relevant documents to Plaintiffs. The Court ordered that Plaintiffs would be allowed to obtain documents in addition to the 10,000 most relevant documents but would likely be required to pay the City's costs in producing those additional documents.

The parties identified a company called Equivio to perform the work and Equivio has now been hired by the City. As with many of the other issues in this case, however, counsel for Plaintiffs and counsel for the City have not agreed on the protocol to be used by Equivio in searching the data. The Court has painstakingly attempted to work with counsel to resolve these issues. The final issue separating the parties is whether quality assurance should be used to test the reliability of the system. Plaintiffs' expert believes that it should; Defendant's expert disagrees. In the face of this quandary, the Court dictated four questions for the experts to pose to the Equivio representative in a joint call and to report back to the Court on his responses. Not surprisingly, the experts disagree as to what the Equivio representative said. In a nutshell, Plaintiffs' expert reports that the representative told them that quality assurance was absolutely necessary. Defendant's expert reports that the representative said it was absolutely unnecessary. The two also disagree as to how much time would be required to perform the quality assurance. Plaintiffs' expert contends it is a little; Defendant's expert claims that it is a lot.

Thus, the Court is left to resolve another discovery issue based on two completely different versions of facts couched in the most relative of terms. In the end, the Court concludes that Plaintiffs may insist that quality assurance be performed if they pay one-half of the City's costs and attorney's fees in performing that step.

Plaintiffs object. They argue that before the Court can impose cost shifting it has to perform an analysis consisting of a series of steps aimed at determining whether it is appropriate. They point to case law to support their argument. The Court disagrees. Where as here, the quality assurance step is, at least according to the City, completely unnecessary and a waste of time and energy, the Court is not required to perform any balancing analysis. It could just as easily order that that step not be performed. Plaintiffs are not entitled to have Defendant spend money performing a useless act. Instead, the Court has chosen a middle ground where Plaintiffs can obtain the information that they believe is critical despite Defendant's argument that it is not provided that they share in the costs of producing that information.

Clearly, the Court could explore the issue more deeply. For example, it could allow the parties to brief the quality assurance issue and set up an evidentiary hearing in which the experts could testify about it. Where, as here, it is clear that the experts would disagree. The Court could order the parties to pay expert fees to the Equivio representative and have him appear and testify as well.

There are some obvious pitfalls to this option, however. To begin with, it would delay production in this case, which is now 30 months old, as, presumably, the briefing schedule would span

**CIVIL MINUTES - GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-551-FMO (PJWx) | | Date | June 26, 2014 |
|---|---|---|---|---|
| Title | *Independent Living Center of Southern California, et al. v. City of Los Angeles, et al.* | | | |

the rest of the summer and a hearing in September would insure that production was delayed until the Fall. It would also force the parties to spend a considerable amount of money to resolve the issue. This would seem a waste of money as Plaintiffs' expert has told the Court that the costs to the City to perform the quality assurance step will be minimal.

But there is another reason why the Court rejects Plaintiffs' arguments regarding cost shifting. The quality assurance step is not a document that the City has and that Plaintiffs want and are asking the City to produce. The quality assurance step is part of a program that the Court ordered the City to buy for $50,000 and use in this case. It is a feature that does not exist in traditional production, i.e., reviewing the documents and producing them to the other side. Nor is it a feature in key word searches, the method Plaintiffs were championing when the Court became involved and ordered the City to use predictive coding. It is a feature available in predictive coding which quantifies the level of accuracy in the search. The fact that it exists in the system does not mean that the City has to employ it and pay for it. If Plaintiffs truly believe that quality assurance step is important, they should pay for employing it by splitting the costs with the City.

For these reasons, the Court does not see the point in delaying production and increasing the costs for what appears to be no appreciable benefit to Plaintiffs. *See* Fed. R. Civil Pro. 1 ("[These rules] should be construed and administered to secure the just, speedy, and inexpensive determination in every action and proceeding.")

No later than Friday, June 27, 2014, the parties are to finalize the predictive coding protocol. The City should begin implementing that protocol on Monday, June 30, 2014. Counsel are to email the courtroom deputy clerk each Thursday, beginning on July 3, 2014, and provide updates as to the status of the production. If either side feels that the Court needs to be involved, it should send an email to the other side explaining why and, if counsel are unable to resolve their differences, they should contact the clerk and arrange for a time to meet on the phone with the Court and discuss these issues.

Counsel for the City is ordered to keep concise records of the costs associated with the quality assurance phase. At the conclusion of that phase, counsel should share those figures with Plaintiffs' counsel and Plaintiffs will be required to pay one-half of the costs in performing the quality assurance step. The Court is anticipating that the quality assurance will establish that the recall is 75%. If the percentage is lower than 75%, counsel should bring that issue to the Court's attention.

cc: all counsel of record.

S:\PJW\Cases-X\Independent v. City of LA\MO Tele Conf 6-26-14.wpd

:      35

Initials of Preparer            sr