# EXHIBIT 13
# [REDACTED]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re Carvana Co. Securities Litigation | ) | No. CV-22-2126-PHX-MTL |
| | ) | |
| This Document Relates To: | ) | DECLARATION OF JEFF JOHNSON |
| | ) | |
| All Actions. | ) | |
| | ) | |

4932-3598-4777.v1

I, Jeff Johnson, submit this declaration in support of Lead Plaintiffs United Association National Pension Fund and Saskatchewan Healthcare Employees' Pension Plan's ("Plaintiffs") Motion to Compel Defendants to Use Lead Plaintiffs' Proposed Search Terms ("Motion") in the above-captioned litigation, and declare as follows:

## I.      RELEVANT PROFESSIONAL EXPERIENCE

1.      I currently serve as Chief Innovation Officer at Purpose Legal ("Purpose"), an e-discovery vendor providing end-to-end legal services and technology solutions that assist corporations and law firms in the identification, processing, review, and production of electronically stored information.  I have provided e-discovery services for 25 years.  In my current role, I lead Purpose's Advisory Services group with a focus on large and complex matters.  I have supervisory responsibilities for ESI data processing, filtering, and review, and have extensive experience in all phases of e-discovery.  *See* Exhibit A.

2.      I have been retained by Plaintiffs in the above-captioned litigation to serve as a consultant on Defendants' search term methodology, approach to search term development, and protocol for search term validation, and I submit this declaration on behalf of Plaintiffs regarding the positions they have taken in the Motion and Reply in Support of the Motion ("Reply").

3.      I am generally familiar with the issues related to the document collection and review process that have been raised in this dispute.  I have personal knowledge of the matters set forth herein, except where stated to be based on information provided by counsel, and if called upon and sworn as an expert witness, I could and would competently testify thereto.

4.      Over the last 25 years, I have consulted on and/or managed the e-discovery process on hundreds of large and complex matters.  This experience includes the application of technology and workflows to effectively and appropriately reduce the effort and budget associated with attorney document review.  I develop the protocol and validation procedures to demonstrate the effectiveness of document search and review procedures, including statistically sound sampling and quality-control testing.  Moreover, I assist clients in

4932-3598-4777.v1

negotiating these protocols with opposing parties and government agencies (such as the Department of Justice and the Federal Trade Commission). I regularly present Continuing Legal Education ("CLE") seminars, panel discussions, and guest lectures discussing the effective use of technology in search and review workflows.

5. I have reviewed the following materials: (a) Lead Plaintiffs' Motion (ECF 244); (b) Defendants' Opposition to Lead Plaintiffs' Motion (FILED UNDER SEAL) ("Opposition to Motion"); (c) the Declaration of Matthew J. Peters in Support of Defendants' Opposition to Motion (FILED UNDER SEAL) ("Declaration"); (d) a January 8, 2026 letter from Matthew J. Peters to Erika L. Oliver describing Carvana Co.'s ("Carvana") methodology for search-term validation; (e) an August 7, 2025 letter from Matthew J. Peters to Rachel A. Cocalis regarding search terms; (f) a December 30, 2025 letter from Matthew J. Balotta to Matthew J. Peters delivering Plaintiffs' modified proposed search terms; (g) Defendants' Opposition to Lead Plaintiffs' Motion to Modify the Scheduling Order (ECF 229); (h) internal Carvana documents produced in discovery; (i) a draft of Plaintiffs' Reply in support of their Motion; and (j) an email dated January 20, 2026 from Natalie R. Salazar to Matthew J. Balotta. I have also relied on my review of exemplar documents and hit reports produced or described in the parties' meet-and-confer exchanges, as reflected in the record.

## II.    OVERVIEW OF STANDARD E-DISCOVERY PRINCIPLES

### A.    Search Term Filtering

6. Based on my experience, effective search term filtering must be an iterative, evidence-driven process based on substantive review of results, rather than a one-time exercise driven primarily by raw hit counts. Search terms must be tested, evaluated, and refined based on empirical results and an evolving understanding of how relevant concepts actually appear in the collected data. Initial search terms frequently fail to capture nuance, context, industry-specific, and custodian-specific (often informal) language, particularly where key issues may comprise a small percentage of the overall document population. Therefore, testing and evaluation incorporating sampling, hit analysis, and subject-matter

- 2 -

4932-3598-4777.v1

expert review is necessary to identify blind spots, gaps, incorrect assumptions, and ensure that material concepts are not overlooked.  Absent iteration, search terms may appear "successful" in the aggregate but fail to capture documents critical to specific claims, defenses, or factual issues in the case.

7.    Similarly, search terms that return large volumes of non-responsive documents should not be reflexively discarded where they also capture relevant, and potentially uniquely relevant, documents that may not be captured by other terms.  Over-inclusive results typically signal a need for refinement rather than rejection.  Standard, widely accepted techniques exist to reduce "noise" while preserving the responsive concepts, including adding contextual terms, applying proximity constraints, incorporating exclusions (*e.g.*, AND NOT logic), limiting by custodian or file type, and using reasonable date or metadata limitations.  Eliminating a term solely due to over-inclusiveness or high hit counts creates a high risk of excluding entire categories of responsive documents, particularly where relevant material represents a small fraction of the overall population or is concentrated in informal communications.  An effective search methodology therefore prioritizes targeted modification over wholesale elimination to ensure that substantively important information is not missed.

**B.    Elusion and Recall Rates**

8.    In e-discovery, and in the context of search terms, the "document universe" refers to all documents collected from agreed sources, custodians, and time periods.  The "hit set" is the subset of that universe that matches at least one search term and is therefore slated for review.  The "null set" is the remainder, *i.e.*, the documents that do not match any search term and are excluded from review.

9.    "Elusion" measures the rate at which responsive documents remain in the null set after the application of search terms.  An elusion test involves drawing a statistically valid random sample from the null set, having reviewers code those sampled documents for responsiveness, and then estimating what percentage of the null set is likely responsive.  "Recall," by contrast, measures how effectively the review process identifies responsive

- 3 -

documents overall, *i.e.*, the proportion of all responsive documents in the collected universe that are captured by the search and review process (including the search terms used to generate the hit set).

10.     Based on my experience, Defendants' emphasis on a single overall elusion rate or recall rate is not, by itself, a reliable indicator that the search terms adequately capture the issues the Court has authorized in discovery, particularly where critical issues may represent only a small fraction of the overall population.  This is because aggregate metrics alone can mask material deficiencies that directly affect discovery completeness and case outcomes.  For example, a protocol that captures 100% of documents on one aspect of a case but only 10% of another aspect could appear "successful" based on aggregate statistics but would actually be woefully deficient.

11.     A further limitation is that statistical estimates are valid only for the specific population tested and the specific collection from which the sample was drawn.  An elusion test performed on a null set of one collection only tests what was already collected.  The resulting statistical estimate cannot be applied to subsequent collections (*e.g.*, new custodians, new data sources, expanded date ranges, etc.).  Accordingly, even a properly executed elusion test cannot be used as a blanket assurance that the search protocol is adequate for materials that were not part of the sampled null set.

III.     DEFENDANTS' SEARCH METHODOLOGY IS FLAWED

12.     I understand from the Opposition to the Motion that, prior to the Court's July 1, 2025 Order on the scope of discovery ("Scope Order"), Defendants engaged in some degree of search term negotiation and iterative term development but only with respect to a narrow subset of issues relating to "Title and Registration."  However, I understand from the Motion that, following the Court's Scope Order, Defendants effectively abandoned the collaborative process and refused to meaningfully engage with Plaintiffs regarding search terms relating to the full scope of discovery the Court authorized, including all artifices of the scheme and drivers of Carvana's retail unit sales.  This occurred in spite of Defendants' own concession that the Scope Order would "greatly expand[] the scope of discovery . . . to

- 4 -

4932-3598-4777.v1

basically everything at the company." ECF 172 at 10:13-17. In particular, Defendants' first offer of terms to capture the full scope of discovery, made on July 23, 2025, was a single term: ("RUS" OR "Retail Unit Sale*"). Then, on August 7, 2025, only after Plaintiffs threatened to raise the dispute with the Court, Defendants offered 28 additional terms, which relied on overly formal language (*e.g.*, acquisition*, expansion) or unduly restrictive proximity limiters (*e.g.*, w/2). I understand that Defendants rejected all terms Plaintiffs proposed following Defendants' August 7 proposal. Defendants' shuttering of a collaborative process is important because it means that the iterative process necessary to reach an effective search term set has been cut off. From an e-discovery perspective, Defendants' decision to terminate the iterative, data-driven negotiation process is significant because it forecloses the very mechanism by which search terms are tested, refined, and corrected to ensure that substantively important information is not missed.

13.    Based on my experience, an over-reliance on specific formal language violates basic information-retrieval principles and predictably results in under-inclusive search results. Custodians communicating through informal channels such as email, chat, or internal messaging platforms typically use shorthand, abbreviations, and colloquial phrasing. Thus, a search methodology that relies on formal acronyms and phrases, such as "RUS," "Retail Unit," or "Retail Sales," while excluding more natural linguistic phrasing, is under-inclusive because it fails to reflect how business is actually conducted. Such a search protocol, therefore, materially increases the risk that relevant documents will be missed.

14.    Proprietary or company-specific jargon derived from the documents themselves is often among the most valuable inputs in an effective search strategy because it reflects how employees internally describe key issues. Where such terms are known, excluding them virtually guarantees under-collection. I understand from the Motion, Reply, and internal documents that Defendants produced in the litigation that Carvana employees used specific terms such as "kick" or "kick rate" to describe inventory that was rejected or diverted. Despite Plaintiffs having requested these terms, Defendants refuse to run these terms or any reasonable variation thereof. It is my professional opinion that Defendants'

- 5 -

4932-3598-4777.v1

refusal to run known proprietary jargon is inconsistent with accepted e-discovery practice and ensures that highly relevant evidence will not be captured by Defendants' search protocol.

15.    I further understand from the Motion that Defendants' termination of the iterative process resulted in a search term set heavily skewed toward "Title and Registration" documents, with approximately 65% of terms focused on this single issue.  By contrast, Defendants' search methodology includes comparatively few, and narrowly drawn, terms addressing other alleged drivers of the scheme, such as terms concerning Carvana's expansion and purchasing and verification standards, with many of these terms returning zero unique documents.  From an information-retrieval standpoint, this imbalance is a red flag: it reflects not the absence of responsive material on those topics, but a structurally constrained search design that suppresses their retrieval.

16.    In conclusion, it is my opinion that Defendants' search methodology is not merely imperfect, but under-inclusive and structurally skewed in a manner that is inconsistent with accepted e-discovery principles and inadequate to capture the full scope of discovery authorized by the Court.

## IV.    DEFENDANTS' VALIDATION EXERCISE IS MISLEADING

17.    Defendants' purported "validation" exercise is misleading and should not be relied upon.  I understand from an email dated January 20, 2026, from Natalie R. Salazar to Matthew J. Balotta that the null set elusion rate referred to in the Opposition to Motion and on which Defendants base their validation reporting, is the result of reviewing a null set elusion sample taken *only* from the original 18 custodians as opposed to all 25 of current custodians.  This is statistically inappropriate.  Defendants' 0.651% elusion rate simply cannot be accurately represented as applicable to the null set for all 25 custodians.  It is like saying that we did not find groceries in the bedroom so we know that there are no groceries in the house . . . but we did not look in the kitchen.

18.    Their purported validation exercise is also misleading because it presents estimates while effectively ignoring the margin of error inherent in the sampling

- 6 -

4932-3598-4777.v1

methodology. Based on my experience, doing so, especially when extrapolating from a small sample to a very large null set, is statistically incomplete and materially understates the estimate of responsive documents remaining in the null set and therefore excluded from production.

19. I understand from the Declaration that Defendants drew a random sample of 1,535 documents from a null-set population of 2,117,688 documents, yielding an elusion estimate with a 2.5% margin of error and 95% confidence level. I further understand that, of those 1,535 documents, Defendants' counsel coded ten as responsive. While Defendants' reported elusion rate of 0.651% (and the estimate of 13,786 responsive documents missed by Defendants' search terms) may be mathematically correct, it is incomplete because it ignores the margin of error. When that margin is properly accounted for, the elusion testing actually supports a 95% confidence level that as many as **66,728** responsive documents may exist in the tested null set and have been missed by Defendants' search terms, based on an elusion rate of up to 3.15% (0.651% + 2.5%). This is significant, particularly given that, to date, Defendants have produced a total of **69,757** documents. In other words, the number of responsive documents in the tested null set that were missed and not produced by Defendants is nearly equal to the entirety of Defendants' production. Indeed, once irrelevant material, including approximately 15,000 to 24,000 irrelevant image files (as discussed below in ¶23), are excluded from the count, the number of missed responsive documents may exceed the number of produced responsive documents.

20. Defendants' reliance on a headline "93% recall" figure is further misleading because basic elusion-testing protocols frequently inflate recall estimates. That inflation arises from the implicit assumption that documents reviewed and coded responsive during the main review would all be deemed responsive if subjected to the same independent review process used for elusion testing. In practice, that assumption is rarely true. I understand from Matthew J. Peters' January 8, 2026, letter to Erika L. Oliver that Defendants calculated recall by dividing the total number of documents reviewed and coded responsive by the total number of responsive documents in the collection (including those estimated to exist in the

- 7 -

null set by elusion testing). In my experience, however, when completed large scale responsiveness reviews are subjected to statistical precision testing, it is common for only 60% of the documents that are initially coded responsive to remain responsive under the same independent review standard used during elusion testing. To my knowledge, Defendants have not disclosed the actual number of documents they reviewed and coded responsive or subjected those documents to statistical precision testing, which is a critical input necessary to evaluate any recall estimate. Using the elusion estimate and recall formula provided in Mr. Peters' letters, I have extrapolated that Defendants' claimed 93% recall estimate implicitly assumes approximately 180,000 documents were reviewed and coded responsive.

21.     The result is materially changed if one applies more realistic assumptions to Defendants' own numbers and the extrapolated 180,000 documents estimated reviewed and coded responsive. Using (i) Defendants' reported elusion results (including margin of error), and (ii) a realistic 60% true responsiveness rate for the "reviewed and coded responsive" documents, Defendants' actual recall rate could be as low as 62% $((180,000 * 0.60) \div ((180,000 * 0.60) + 66,728))$. In my experience, an estimated recall below 70% is rarely considered acceptable in complex litigation and is completely inadequate in a case of this magnitude and complexity.

22.     The recall estimate is further called into question by review that may have taken place prior to the Scope Order, which may have led reviewers to code documents as nonresponsive based upon Carvana's pre-Scope Order responsiveness criteria. It is reasonable to assume that some portion of those reviewed documents, if re-reviewed post-Scope Order, might be coded as responsive. Best practice in these circumstances is to perform additional elusion sampling and review on documents previously reviewed and coded not responsive, which does not appear to have been done here.

23.     Finally, Plaintiffs' counsel have determined that 15,000 to 24,000 documents – up to approximately 34% of the 69,757 documents Defendants have produced – consist of irrelevant or low value image files. While these files may be embedded or attached to

- 8 -

otherwise relevant documents, their inclusion materially inflates production counts and obscures the true volume of substantive material produced.  As noted above, Defendants have not provided transparency regarding whether such files are included in their "reviewed and coded responsive" figures.  If they are, that fact would further and significantly reduce any reasonable estimate of Defendants' actual recall, compounding the deficiencies in Defendants' validation exercise.

## V.    PROPORTIONALITY AND BURDEN ANALYSIS

24.    <u>The "Lemonade" Fallacy</u>.  Defendants argue that certain terms proposed by Plaintiffs should be rejected as overbroad because they capture some irrelevant material. They cite "lemon*" as an example, a term Plaintiffs propose to capture references to defective vehicles that are colloquially referred to as "lemons," which are directly relevant to the alleged purchase of low-quality inventory and related internal discussion.  Defendants claim the term is overbroad because it may also return documents referencing "Schweppes Lemon."  In my professional opinion, reliance on raw hit counts and isolated false positives without applying standard exclusionary logic is not a valid measure of burden and is inconsistent with accepted e-discovery testing.  The industry-standard response to "noise" is targeted refinement and testing, not wholesale rejection of a relevant term.

25.    <u>Correction (Standard Exclusionary Logic)</u>.  The "Schweppes Lemon" noise can be materially reduced or eliminated through routine exclusion syntax, for example: lemon* AND NOT (drink OR beverage OR schweppes OR lemonade).

26.    <u>Proximity Remediation</u>.  Similarly, Defendants complain that Plaintiffs' proposed use of the term "junk" – a term included in search strings to capture references to Carvana purchasing low-quality vehicles from customers – may retrieve irrelevant references (*e.g.*, "junk food").  That type of false positive is common in keyword searching and easily remediated via additional proximity connectors and contextual terms, not discarding the term.

- 9 -

27.    <u>Correction (Contextual Proximity)</u>.   A standard refinement is: junk w/15 (vehicle* OR car OR cars OR inventor* OR unit OR units).

28.    <u>Hit Count ≠ Review Burden</u>.   Defendants' burden argument relies on raw, black box hit counts as though every "hit" translates into linear, manual attorney review. That premise is inconsistent with modern e-discovery workflows and is not an accurate measure of proportional burden.  Raw hit counts routinely overstate review volume because they do not account for standard technical workflow reductions, including, at a minimum, email threading suppression (which can be used to streamline review counts even if not used to reduce production counts).  In large matters, these steps often reduce the reviewable population by 30%-50% before substantive review even begins.  Defendants have not shown that their burden estimates incorporate these standard reductions.  Defendants also have not provided the transparency (*e.g.*, assumptions about threading and review rates) necessary to evaluate whether their claimed burden is real, proportional, or inflated by methodological choices.

## VI.    ANALYSIS OF DEFENDANTS' COST ESTIMATES

29.    <u>"Black Box" Calculations</u>.   I have reviewed Defendants' cost projections (estimating ███████████████ to review approximately 758,000 documents).  These estimates are not transparent and appear to rely on opaque inputs that materially affect the result.  Defendants have not disclosed their assumed review rate (documents per hour), assumed hourly cost per reviewer, assumed reviewer staffing model (*e.g.*, contract attorneys versus associates), assumed privilege-review approach, or whether they applied standard technological reductions and accelerated review protocols (such as email threading and near-duplicate identification) before projecting costs.  Without these basic inputs, Defendants' cost estimates cannot be independently evaluated and appear to reflect a worst-case, theoretical maximum rather than a realistic estimate based on standard e-discovery practice.

30.    <u>Inflation via Linear Review Assumption</u>.  Defendants' implied per-document cost (approximately ██████████ per document) suggests they are assuming a linear,

- 10 -

4932-3598-4777.v1

manual review[1] of every single search term hit as though each hit requires the same time and effort. That assumption is inconsistent with standard industry workflows in matters of this size.

31. In a modern review of this magnitude, review platforms routinely enable efficient review queuing and sorting so that reviewers can rapidly dispose of large volumes of repetitive false positives (including predictable "noise" categories like product names or food references cited by Defendants) in a matter of seconds per document rather than minutes.

32. More broadly, standard workflows – email-thread suppression at review, near-duplicate grouping, and targeted QC sampling – are designed to prevent precisely the kind of "every hit gets a full, linear read" assumption reflected in Defendants' cost narrative. By calculating costs likely based on a manual, linear review of hits, Defendants have inflated the projected burden by failing to account for standard efficiencies used in every major litigation.

33. It is my professional opinion that cost estimates derived from raw hit counts (without applying effective use of review organization and batching efficiencies) are inherently unreliable and materially overstate review costs.

## VII.   OPINION ON REASONABLENESS OF PLAINTIFFS' PROPOSED TERMS

34. I have reviewed Plaintiffs' proposed terms identified in Appendix A to their Motion. It is my opinion that they are not open-ended "fishing expeditions," but instead constitute a targeted, defensible set of searches tethered to the claims and discovery topics the Court has authorized. Plaintiffs' terms are designed to capture: (i) ordinary semantic variants that routinely appear in real-world internal communications (*e.g.*, "expand," "expanding," "expanded," not just the formal noun "Expansion"); and (ii) organization-specific proprietary jargon reflected in Carvana's own documents (*e.g.*, "kick," "kicks,"

---

[1]   As an example, Purpose would estimate under $1.50 per document to do the responsiveness review.

"kick rate"), which Defendants' protocol does not meaningfully address. From an information-retrieval perspective, these categories are among the most important to include when the goal is to avoid systematic under-collection of substantively important communications.

## VIII. CONCLUSION

35. Based on my review, training, and experience, it is my professional opinion that:

(a) Defendants' search methodology is under-inclusive regarding key "drivers" of the alleged scheme and is structured in a manner that predictably suppresses retrieval of documents on core, non-title topics;

(b) Defendants' validation exercise is misleading and unhelpful as it is the result of reviewing a null set elusion sample taken only from the original 18 custodians as opposed to all 25 of current custodians;

(c) Defendants' validation exercise contains further, significant methodological flaws that understate elusion and overstate recall. For example, properly interpreted, Defendants' own elusion testing suggests that up to approximately 66,728 responsive documents may remain in the tested null set and thus be omitted from production, a volume that is nearly equal to Defendants' entire production to date;

(d) Because of these methodological flaws and undisclosed inputs, Defendants' actual recall of responsive documents is likely significantly lower than claimed;

(e) Defendants' search terms and resulting recall rate may be adequate for certain issues in the case (particularly those heavily represented in their term set) while remaining materially deficient for other critical issues for which the Court has authorized discovery;

(f) Defendants' cost estimates are unsupported by transparent assumptions and appear inflated by reliance on raw hit counts and linear review premises that do not reflect standard, efficient e-discovery workflows; and

- 12 -

4932-3598-4777.v1

(g)     Defendants' claimed burden is inflated because it assumes avoidable review inefficiencies and does not account for routine, widely accepted mitigation techniques (such as exclusionary syntax (AND NOT), contextual/proximity refinement, email threading, and phased testing) to filter out noise while preserving retrieval of relevant documents.

36.     I reserve the right to amend or supplement these opinions if additional information becomes available.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 20, 2026, in Dallas, Texas.

_____
Jeff Johnson
Chief Innovation Officer
Purpose Legal

- 13 -

4932-3598-4777.v1

# EXHIBIT A





## JEFF JOHNSON

**Chief Innovation Officer**
**PHONE:** 972.954.8228
**EMAIL:** jeffj@purposelegal.io

## JEFF JOHNSON – STRATEGIC INNOVATOR

Jeff Johnson, Chief Innovation Officer at Purpose Legal, drives meaningful change across the legal services and technology space. With over 20 years of experience harnessing the synergy of people and technology, Jeff has been pivotal in redefining eDiscovery, document review, and litigation consulting services.

At the heart of his role is a commitment to not just innovate but to elevate — ensuring that our clients benefit from unparalleled expertise and workflow design, paired with cutting-edge AI and analytics solutions.

Jeff's leadership has empowered some of the world's premier corporations and law firms to achieve substantial savings and enhanced efficiency in eDiscovery.

His expertise in the development of generative ai and machine learning solutions, their practical application and validation within technology assisted review (TAR) processes is not just about innovation; it's about setting a standard for how technology, from classification algorithms to generative AI, can be used responsibly and effectively in the pursuit to improve both efficiency and effectiveness.

Jeff has co-authored multiple patents for methods applying machine learning to eDiscovery review and designed technical solutions successfully applying those methods in hundreds of matters of all sizes.

As a frequent speaker, panelist, expert witness, and content creator, Jeff continues to inspire and challenge the broader legal community, advocating for process evolution bringing people and technology together in new ways for improvement in accuracy, scale, and cost savings.

## AREAS OF EXPERTISE

- AI in eDiscovery
- eDiscovery Managed Services
- Application Design and Development
- Process Evaluation and Change
- Complex Problem Solving
- Software Change Control

## I CAN PRESENT ON

- Technology Assisted Review (Basic to Advanced)
- AI-Based Early Case Intelligence and pre-review culling
- Validating Technology Assisted Review results - a deeper dive
- Technology Assisted Review and Generative AI
- Analytics in eDiscovery Review

## EDUCATION

B.S. Accounting: Brigham Young University
Master of Accountancy/Information Systems: Marriott School of Management – Brigham Young University

**LinkedIn:** https://www.linkedin.com/in/jeffreyjohnsonsolutionseeker

