UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United Association National Pension Fund, et al., | ) ) ) | No. 2:22-cv-02126-MTL |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Phoenix, Arizona January 29, 2026 |
| Carvana Company, et al., | ) ) | 2:03 p.m. |
| Defendants, | ) ) ) | |
| _____ | ) | |

BEFORE:   THE HONORABLE JOHN Z. BOYLE, MAGISTRATE JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


(Telephonic Discovery Hearing)


Official Court Reporter:
Scott M. Coniam, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

A P P E A R A N C E S

For the Plaintiffs:

        Robbins Geller Rudman & Dowd, LLP
        By:  Mr. Daniel S. Drosman, Esq.
             Mr. Tor Gronborg, Esq.
        655 W. Broadway, Suite 1900
        San Diego, California 92101


For the Defendants:

        Latham & Watkins LLP
        By:  Mr. Jeff G. Hammel, Esq.
        1271 Avenue of the Americas
        New York, New York 10020

        Latham & Watkins LLP
        By:  Mr. James C. Word, Esq.
             Mr. Matthew Peters, Esq.
             Ms. Nicole Kerrigan, Esq.
        555 11th St. NW, Ste. 1000
        Washington, DC 20004-1304

        DLA Piper LLP
        By:  Mr. Yan Grinblat, Esq.
        444 W. Lake St., Ste. 900
        Chicago, Illinois 60606-0089

        DLA PIPER LLP
        By:  Mr. William J. Jenkins, Esq.
        2000 Avenue of the Stars, Ste. 400
        Los Angeles, California 90067

        Paul Weiss Rifkind Wharton & Garrison, LLP
        By:  Mr. Michael J. Pisem, Esq.
        1285 Avenue of the Americas
        New York, New York 10019

P R O C E E D I N G S

(Proceedings convened at 2:03 p.m.)

THE COURTROOM DEPUTY:  This is civil case number 22-2126, United Association National Pension Fund v. Carvana Company, before the court for a discovery hearing.

Will the parties please announce for the record, starting with the plaintiffs.

MR. DROSMAN:  Good afternoon, Your Honor.  Daniel Drosman on behalf of plaintiffs, Robbins Geller Rudman & Dowd. And I'm here with my colleague Tor Gronborg, as well as our expert witness, Jeff Johnson, who's on the line in case Your Honor has any questions.

THE COURT:  Thank you.  Good afternoon.

MR. HAMMEL:  Good afternoon, Your Honor.  This is Jeff Hammel from Latham & Watkins for the Carvana defendants.  And with me are my colleagues Christian Word, Matthew Peters, and Natalie Kerrigan.

THE COURT:  Thank you.  Good afternoon.

MR. HAMMEL:  Good afternoon.

THE COURT:  Is that everyone?

MR. GRINBLAT:  Good afternoon, Your Honor.  This is Yan Grinblat.  And I'm joined by my colleague, William Jenkins, for DLA Piper on behalf of Ernest Garcia, defendant.

THE COURT:  Thank you very much.

MR. PISEM:  I think I'm last.  This is Michael Pisem

from Paul Weiss Rifkind Wharton & Garrison on behalf of Citigroup Global Markets, Inc, and J.P. Morgan Securities, LLC.

THE COURT:  Okay.  Thank you.

All right.  Give me one minute.

All right.  I, as I normally do, will tell you how I'd like to approach the hearing.  And I have some questions for you all to write down so we can address them and then I'll be glad to consider anything else we talk about.

I'll start with Mr. Drosman.  The court has been inclined in the past to listen to your requests for discovery as I will do today.  I've been more expansive because I believe you're entitled to those additional documents and we've tried to fashion search procedures that would work to get you the discovery you deserve.

My view of today's issue is to determine if you are not getting the information you're entitled to and whether the additional disclosure, if you get it, is proportional to the needs of the case.

So unless you disagree with that paradigm of how I'm evaluating your request, what I'd like to do is let you address whether any of you have any objections to that standard, which I don't think the parties will, and then just dive into the four questions I'd like to speak about and you all can write them down and we'll dive in.

So my understanding, number one, is approximately

1.5 million documents have been disclosed.  I'd like to know if you agree with that.

And number 1-A is my understanding that the search term process has been discussed by the parties, modified several times, perhaps five times as defendants say, and it's still not yielding the discovery you're seeking.

If that's true that it's been modified, you have argued that it's not getting what you want because defendants objected to your search terms and I'd like to have you make your record here as to whether that's true and I'll hear the response from the defense of course.

So, again, that first issue has to do with the quantity you've received now, the modifications you've gone through, and why that's not working or is working so far.

All right.  The second question for you is what's the best evidence you have for me that what you're proposing now is going to get you what you believe you deserve?

Number three.  Judge Liburdi has set a timeline. Substantial completion of discovery is February 27.  And I show an August 18 of total completion of discovery.  So I'd like to hear from both parties as to whether or not we believe we're operating under the August 18 total completion deadline.  I imagine we are but I'd like to make sure we're all on the same page.

And, finally, Mr. Drosman, are you suggesting that I

go through all 44 of your requests that are listed in the proposed order and individually make a decision on whether each one of those is both likely to result in you receiving what you deserve and proportional?  I have to tell you that would be some difficult task for the court.

I've read through all of this.  Exhibit 7, which is long.  I've gone through that.  Exhibit 2 to Document 267 and it appears the plaintiff is requesting I just grant in all 44 of these and you think I just do that in one overriding view or are you suggesting I go case by -- you know, case by case, one, number two, number three?

So those are the four main areas.  We have time this afternoon.  This gives you all a chance to talk about them. Less time for you, Mr. Drosman, but you get the chance to speak first so there's that.

Mr. Drosman, go ahead.

MR. DROSMAN:  Sure, Your Honor.  I think I can address all of your questions.

I'll start with the sort of overarching framework that Your Honor discussed which was whether plaintiffs are getting the information that we're entitled to.  And I want to address that before I get to the individual search terms and the other questions that Your Honor propounded.

Let me describe the Carvana defendants' document production to date, as it raises some real serious red flags

about whether defendants performed, you know, an honest, reasonable search. We have some huge glaring gaps in the production that make it implausible that they've done so. And, you know, put bluntly, if a producing party tells the court that the disputed subject matter is, quote, everything at the company, the foundation of its business model, and then produces essentially no internal communications reflecting that subject matter, that does not pass the smell test for a good faith search, Your Honor.

And this is not a problem that can necessarily be cured by running additional search terms and we can get to that. It's a red flag suggesting -- you know, wrong custodians, wrong data sources, incomplete collection efforts. There's a real fundamental issue and I think Your Honor will agree after you hear from me.

Defendants' statistics -- and this gets to the 1.5 million documents. Defendants' statistics regarding the volume of documents produced are inflated and misleading. Defendants represent to the court that they produced nearly 70,000 documents covering all theories of liability. I believe that's a quote. That does not accurately describe their production in terms of numbers or more importantly, Your Honor, in terms of what is missing from the production. First, 70,000 documents produced is misleading. Approximately 25,000, 25,000 of those documents are embedded images like blank documents or

logos. Okay. These are not actual documents.

Defendants stamped a Bates number on them and included them in their totals. And when those embedded images are removed, the real production is approximately 45,757 documents. That's roughly 326,000 pages.

Second. It's not accurate to describe the total production as covering all theories of liability. No matter how defendants try to spin it, the vast majority of documents produced relate to Carvana's title and registration issues and that in balance is not just lopsided, it's implausible given what defendants themselves have told the court this case is about.

Let me help peel back the curtain so you can see what defendants document production actually looks like. The sheer number of documents produced is alarmingly low. We talked about the 45,000 documents when excluding those image files, Your Honor. Let me put that number in perspective. Okay.

As, you know, cases of this magnitude and this complexity, securities fraud cases, involve productions in the million of documents or millions of pages. We cited numerous cases in our briefing, Your Honor, the Garner case where there are 4.4 million, the Marsh McLennan case where there are over 44 million pages of documents. It goes on and on. And defendants don't dispute any of plaintiffs' authority on this point. In fact, defendants were the ones who touted these

cases when they were at the initial status hearing with Judge Liburdi.

Let's also look specifically at the number of emails produced by defendants because emails, as Your Honor's aware, are a good proxy for what's been produced because they exclude extraneous files like the embedded images I described and the number of other including attachments and linked files necessarily tracks the subject matter and volume of the emails produced.

So defendants have produced just 25,000 emails over a more than three-year period. And that number alone raises concern.

But the subject matter breakdown raises a much more serious problem. Of those 25,000 emails, approximately 85 percent concern title and registration issues or individual customer complaints about title delays. Okay. That leaves fewer than 3,700 emails over more than three years that do not involve title and registration or individual customer complaints about their title.

Okay. The relevant period in this case is over three years long. Defendants have therefore produced on average approximately 20 nontitle and registration emails per week across all their custodians. That doesn't pass the smell test, particularly given defendants' own description of the alleged scheme and the nontitle and registration issues as "basically

everything at the company, the foundation of the company, its entire business model."  That's what they said.  Okay.

Beyond the overall volume, there's an even more illustrative example that illustrates why these gaps are so alarming.  The complaint alleges a concentrated period of major events for the period from January 1, 2022, to mid-May 2022, during which Carvana stock price fell by 85 percent from $231 a share to $33 a share.  And during that short four-and-one-half-month window, Your Honor, Carvana issued its Q4 '21 results and Jenkins made one of the actual misstatements regarding retail sales.

Carvana issued its Q1 '22 financial results including disappointing retail sales growth hampered by significant logistics network constraints, reconditioning expenses, et cetera, all of which are consequences of defendants' unsustainable artifices.

Carvana completed the $3 billion purchase of ADESA, which we allege related to defendants' fraudulent scheme.

Carvana completed the 2022 offering which forms the basis of our 1933 Act claims.

And Carvana announced it was laying off 2,500 employees and implementing a major operational overhaul to cut back on unprofitable retail sales.

So it's simply not plausible that these events occurred without substantial internal email communications

responsive to plaintiffs' requests.

But that is not what defendants produced. For Garcia Junior during this period, Your Honor, the CEO, defendants produced only 44 emails during that entire four-and-a-half-month period. That is less than one email a day and fewer than three emails per week.

Of those 44 emails -- let's just dig down a little bit. 37, 37 concern title and registration issues or individual customer complaints. That leaves just seven total emails over this really important four-and-a-half-month period dealing with nontitle and registration issues that defendants have described as basically everything at the company, the foundation of the company, its entire business model. That is not a close call. That is a glaring gap that calls into question whether defendants have conducted a reasonable good faith search.

For Jenkins, the CFO who's directly involved in these events such as an offering, quarterly earnings announcements, defendants produced fewer than 100 nontitle and registration emails over that same four-and-a-half-month period. That's less than five emails per week for the CFO of a public company during a period involving two quarterly earnings announcements, numerous SEC filings, a secondary offering, and a $3 billion acquisition. Again, not plausible.

At this point the court is faced with a binary choice.

Either defendants' repeated representations to the court about what this case is really about, quote, everything at the company, quote, the foundation of the business model, are false, or defendants document production is badly incomplete. Both cannot be true.

The purpose of plaintiffs' requested relief is to determine which of these two possibilities is true and to do so in a proportional, objective way.

Now, let's talk about this imbalance across the custodians, Your Honor. Across all custodians, defendants produced fewer than 750 total during this critical window that -- total emails that do not concern title and registration or individual customer complaints. Approximately 80 percent of all emails produced during this period concern title and registration or customer complaints.

At this point, you know, we know that defendants' production is very deficient. Defendants claim they're done producing for Garcia Junior and Jenkins. Okay.

At the 11-17 hearing, defendants told the court that the 18 custodians they collected would, quote, cover all theories of liability. Here's what they said: The 18 custodians are the people who likely possess documents regarding the subject matter in the litigation and that cover all the theories of liability that plaintiffs allege.

And this is not a particular surprise given this is a

securities case, the more custodians already included the CEO, CFO, COO and the directors.  And to be clear, the fact that our custodians were largely the right people doesn't mean that nothing changed from our perspective.  I think the scope -- the number and scope of documents that we had to review increased significantly.

But those assurances, Your Honor, only heightened the concern because the resulting production doesn't match that representation.

Defendants, you know, own hit report confirms a real structural imbalance.  Defendants assert they collected that over 1.5 million documents that you referenced, yet they produced only 45,000 documents that don't include those images. That's roughly 3 percent of what they apparently reviewed.

And defendants own hit report speaks volume about where their collection is concentrated and where it isn't.  The total hits for all retail unit turns is 68,338 documents. That's roughly 4 percent of the documents collected that concern what defendants told the court is the foundation of the company.

The total hits for the title and registration terms is 917,797 documents, more than 61 percent of the documents collected and that number doesn't even include family documents.

Put simply, title and registration documents collected

in this case outnumber retail unit sales documents by more than 15 to 1, even though defendants describe the non-TNR issues as the foundation of the company, its entire business model.  And importantly this hit count includes the new custodians.  This confirms that the imbalance is structural.  It is driven by the collection and search design choices, not by plaintiffs' expectations.

And this is really important.  We're going to get to -- I want to get to the very first search term, Your Honor, and that involves the unit sales.  Now, in their briefs, defendants claim that they've run four search strings designed to broadly capture documents concerning retail sales growth.  They say they've produced 18,517 documents responsive to these terms.  And that number, Your Honor, doesn't withstand scrutiny.

When defendants say they produced 18,517 documents, they're not referring to the documents that actually hit on their search terms.  They're referring to families, a large portion of which did not hit on the search terms at all and may or may not be responsive.

When you strip away that inflation, the picture changes dramatically.  Here are the actual facts.  Defendants' retail unit sales terms, probably the most important search term in this case, Your Honor, hit on approximately 3,979 produced documents, not 18,000.

Roughly 80 percent of the number defendants cite consists of family documents that did not themselves hit on search terms. And included within defendants' headline number are hundreds, hundreds of extraneous files, including embedded image files that do not represent documents concerning retail sales growth in any meaningful sense.

So the starting point for any sufficiency analysis is about 4,000 documents, not 15,000. And when we look inside that roughly 4,000 document universe, the picture becomes even more revealing. Of those 4,000 documents, only 811, 811 are emails. And that alone is striking given that plaintiffs are seeking discovery into contemporaneous internal communications about the company's most important metric over a three-year period.

It gets worse. Of those 811 emails, at least 600 are emails circulating, attaching, or discussing external analyst reports. In other words, the overwhelming majority of email hits are not Carvana employees using the challenged terminology in ordinary internal communications. They're employees forwarding or reacting to analyst reports that themselves use formal terms like retail unit sales, that magic term. That distinction matters enormously. It means defendants' search terms are not capturing how Carvana employees talked about retail unit growth internally. They are capturing how analysts talked about retail unit growth and Carvana employees tacit

circulation of that language.

Once analyst-driven emails are removed, defendants are left with fewer than 200 internal emails that actually hit on their retail unit sales terms.

Okay. So the question becomes what do we do about these gaps? Your Honor asked that question. How do we remedy this imbalance when defendants claim their document production is nearly complete?

First. Defendants should be ordered to run all 44 of the search terms that we've identified. And I'm happy to speak about individual search terms, Your Honor, if that would be helpful to you or if you have any concerns about individual search terms.

Second. Defendants should be required to provide basic custodial email metrics so the court can assess whether the current production reflects a reasonable good faith effort to collect and produce the communications that almost certainly exist.

Specifically, the Carvana defendants should disclose the total volume of emails sent and received by each custodian for that four-and-a-half-month period from January 1, 2022, to mid-May 2022, and the total volume of documents and total volume of emails for each of the individual defendants for the entire relevant period. There is no burden on the defendants to produce this information.

And, third, we may need additional custodians, Your Honor. We're still assessing this and we'll seek relief if we conclude additional custodians are necessary.

And now let me turn to the timeline issue that Your Honor identified. Your Honor said that we've got -- correctly identifies that we've got this August 18th discovery cutoff. And I just want to make clear that at the hearing with Judge Liburdi, plaintiffs sought to move all dates back by four months to correspond with the fact that defendants had four months' delay to substantially complete their document production. That would be a four-month extension.

Defendants were absolutely adamant that four months wasn't necessary. That they only needed two-month extension on the entire -- on each of the dates for the schedule, including that August 18th discovery cutoff.

And, Your Honor, I said to them, Your Honor, we have a large -- I said to Judge Liburdi, we had a large motion to compel pending and if defendants are comfortable that they can produce documents should Judge Boyle grant our motion to compel, we're fine with the two-month instead of the four-month. And they said that's fine. We want two months. We don't need four months.

So any problem with -- that these deadlines might create is a problem of their own creation. We flagged this issue at the hearing in front of Judge Liburdi, said that two

months might not be enough.  Defendants listened to that and said they were satisfied with two months.  They can produce.

THE COURT:  Okay.  Let me jump in.

MR. DROSMAN:  You know, I can -- I didn't directly address Your Honor's third question, which I believe was what is the best evidence that these search terms will work?

THE COURT:  Right.

MR. DROSMAN:  Well, I mean -- so let me just preface that though by saying first we have to have a good faith review process by the defendants.  That is absolutely essential in order for this to work.  And it's assumed but it's cast in doubt by the statistics and the information that I just provided to Your Honor.  Okay.  So assuming that we had a good faith review process, these should work.

Let me just take that first search term that we have, that one dealing with unit sales, Your Honor.  Defendants' search terms are highly circumscribed, overly formalistic.  Okay.  They would not pick up emails like -- and ours would, by the way.  Ours would pick up comments in emails or documents like:  Units are behind plan this week.  We're behind targets on units for the quarter.  Unit sales variance versus forecast keeps widening.  We need the trade-in sales to count towards unit targets.  Vehicle deliveries are behind forecast because of registration delays.  On and on and on.  I can give you countless examples of remarks in emails or documents that our

search terms would pick up, that defendants' would not and that applies to all of them.

THE COURT: Let me stop you for a minute. I have a few questions about process.

Number one. Are you suggesting you need all of this information before your class certification deadline?

MR. DROSMAN: Your Honor, we do. And in particular the information about the stock price. I believe that we've provided that in -- I'll tell you what page of our -- we have -- as you know, we've categorized our revised Exhibit A which is under plaintiffs' Tab 15, Your Honor. Plaintiffs' Exhibit 15. And in that particular revised, we provided the heading: Stock price movements and analyst communications and that's on page 15. Begins at least on page 15 and runs through page 18. That is absolutely essential information that we need prior to our class certification motion.

THE COURT: Let me ask you a few questions. First, the reply was filed on the 20th. We all selected January 29th as our hearing before me today on this issue.

So we have a class certification I believe next month, which now makes me decide whether this process should have begun before because if you're asking me to make an extraordinary ruling that all of this information you're requesting, which I'm certain to hear from the briefing is going to be millions of pages, how could that possibly be done

over the course of several weeks?  And, therefore, I would have --

MR. DROSMAN:  The --

THE COURT:  Hold on.  I'm not done.

MR. DROSMAN:  I'm sorry.

THE COURT:  Which makes me go back and ask you about these modifications, whether it was one or five, these prior discussions you had with defense counsel on modifying the searches, which you have all been working together on and you have said that at some point the defendants refused to accommodate your request.  When did that refusal happen in relation to you filing this motion?  And the reason I ask is if that refusal is in August, don't you think you should have filed this motion in September or October rather than setting up a briefing schedule that has us argue this at the end of January?

So I'm giving you a chance to -- and I'll give the defense ample time to review all this and discuss it with me but, Mr. Drosman, if you want all this done within weeks, why -- tell me why you couldn't have briefed this earlier.

MR. DROSMAN:  Sure.  Let me just go back to the issue of the class certification brief, Your Honor.  It's actually -- the brief itself is due on April 6th and our reply is due on June 22nd.  So that gives us a little bit more breathing room, I think, than Your Honor had believed.

UNITED STATES DISTRICT COURT

But I think you asked an important question about sort of process and when the process actually broke down entirely. So defendants of course stated they engaged in this iterative process and they did, so long as it aligned with their narrow prescope view of the case which was cabined entirely to title and registration.

So when it became clear, after your July 1 scope ruling, that that was not the case, that's when defendants stopped collaborating. Okay. After the scope order, defendants proposed only a single search string on July 23rd, which generated just 9,469 hits and 470 unique documents. Okay. And then they refused to include or modify any of plaintiffs' proposed terms even after plaintiffs narrowed their terms.

And let me just answer your question directly. Despite plaintiffs identifying deficiencies on August 1st, submitting a counterproposal on September 8th, and narrowing that proposal further on November 4th, defendants ultimately rejected every version, culminating in a complete refusal to compromise on December 2nd, 2025. So that is when, Your Honor, it became clear that we needed to move.

THE COURT:  Okay.  Thank you.

MR. DROSMAN:  Sure.

THE COURT:  Does narrowing the dates of the 44 requests you have help alleviate any concerns I would have in

defendants' ability to even complete this requested search?

For example, I know the scope ruling says January of 2020 to early '23, if I recall. And if you're asking me to grant all 44 of these requests and I -- from the defense that can't get done in time, is narrowing the time frame something that's workable here?

I don't know what the response will be. I'm trying to consider my options, Mr. Drosman.

MR. DROSMAN: Yeah. No, I think that's an interesting suggestion.

I think rather than narrowing the time frame -- because really the entire time period is relevant to our scheme. It would probably be more effective if we need to narrow it, to narrow the number of custodians. So, for example, Your Honor, there's a total of 25 custodians. If we could choose 15 of 25, run these search terms on, we're obviously not going to get everything that we would have otherwise gotten from all 25, but that may be a solution that helps to reduce the volume.

THE COURT: Okay. Let me see if I have anything else for you. I do think I need to turn to defense after our discussion of half an hour. Of course I'm going to come back to you.

Let me -- I think I'm good with my questions for you.

So Mr. Grinblat or who's going to take the lead for

defense?  I'll go through the list after that.

MR. HAMMEL:  Thank you, Your Honor.  This is Jeff Hammel from Latham for the Carvana defendants.  I'll take the lead.

THE COURT:  Sounds good.  Thank you.

Go ahead.

MR. HAMMEL:  So Mr. Drosman said a lot.  A lot of numbers.  I'm not sure how many of your questions he answered.  So let me give you our view because it's fair to say we have a different view of the record and discovery than he does.

So a couple of, you know, broad things that I'll come back to in more detail.  One, as I think Your Honor has said in some of your decisions, discovery is broad but it's not limitless.  And in this case, it's important to remember -- and this is the second point -- discovery is completely a one-way street.  All the burden and all the expense is on the defendants.  Plaintiffs have produced a total of 474 documents and we had to pry those out.  And so when they say we should do more, they want to ask for more, they're doing it from a position of not having to do anything themselves.  And so I think it's important to keep that in mind.  It's a complete one-way street.

Back to discovery being broad.  It is broad.  We know it's broad.  We're not trying to relitigate the scope of this case.  But the standard is a good faith effort to produce

documents proportional to the needs of the case.  Standard is not perfection.  Standard is not producing every single document.

And here's what we've done.  And this shows abundant good faith.  We've collected millions of documents from 25 custodians, 18 of which were agreed upon with plaintiffs. Seven of which they chose.  Those are the 25 custodians that you've heard about.

We've reviewed and are reviewing manually, no search terms, all the text and Slack messages for those custodians and I think that amounts to about 386,000 documents that we've had to review.

For emails and certain other documents, we ran a total of 150 search strings.  I think if you look at the terms that are being proposed, it's not just a term here and there, it's lengthy strings.  79 of those 150 were proposed by plaintiffs. So when you hear that we have not been cooperative, more than half were proposed by them.  54 of those strings are not limited on their face to title and registration.  And 28 of those were added after the July 1st scope order.  All of which I think undercuts a lot of what you just heard.

We have had 90 -- nine zero -- contract reviewers working full-time, five days a week to review these millions of documents.  We've produced, as you heard, about 70,000 documents, about 350,000 pages, with more to come, all of this

at a cost of about $9 million to Carvana.  And it's the company and its shareholders who are paying for this.  There's not insurance money paying for this.  This is a direct expense to the company.

And we've proven and we've shown in our briefing and we've demonstrated to plaintiffs that our terms are more than adequate to meet the industry standard sampling.

You know, there's a lot of math and a lot of numbers in the submission, but here's the bottom line, to review more documents than what plaintiffs have asked, we would have to review a thousand unresponsive documents to find seven potentially responsive ones.  Plaintiffs offer no authority requiring that.  The cost would be massive.  And yet plaintiffs want more.  They want 44 new search terms which would add 758,000 documents to our review with no showing, none, that it would add meaningfully to, you know, what's been produced and enough is enough.  You know, this amount of expense has clearly met our burden to provide good faith discovery.  Further would be disproportionate to the case.  And importantly -- and this goes to one of your questions and I'll come back specifically to your questions, but the one that we were talking about on scheduling, if Your Honor were to grant the 44 new search strings that the plaintiffs ask, there's zero chance that substantial completion happens by February 27.  There's a very good chance, I think, that that August 18th deadline becomes in

jeopardy because that's not just a deadline for the completion of document production that's for the completion of depositions. And plaintiffs have taken the position I believe that they will not begin depositions until every last document has been produced and so you can see how that August 18th deadline becomes a fiction if plaintiffs get what they're asking for here. And there's no question they could have brought their motion sooner. They asked for -- as you heard, they asked for the scheduling conference and the extension of the schedule knowing that they were going to bring a motion but we didn't know what it was. And so, you know, I don't know that they should be given the ability now to reopen discovery at this level.

You know, on the question -- I think this was Your Honor's fourth question, do you need to go through all 44 of their requests, I believe you do. You know, you will see that some of them are on their face, you know, I think quite -- you know, there's little chance that they're going to yield responsive information. For example, at their Exhibit 15 at page 4 they want to search for the word kick, K-I-C-K. You can imagine how many unresponsive documents that's going to produce. Or the word lemon. That's also on page 15. You know, our numbers indicate that the word kick is going to produce nearly 30,000 documents that someone's going to have to produce, going to have to review. Lemon, 5,000 documents

someone's going to have to review.

My point being you can't just take their terms at face value.  We negotiated in good faith with them to come up with a set of terms.  The set of terms we used has yielded, you know, the documents that are responsive to their requests.  If they don't find the documents that they're looking for, maybe they -- you know, they're trying to support a theory that they invented around securities laws violations, it's not surprising that they're not finding documents to, you know, support that.

And so, you know, I guess I'll just end, Your Honor.  It's already taken a lot of time.  I think I've addressed each of your questions.

But in terms of the evidence -- this is your second question, what is plaintiffs' best evidence that they -- their terms will yield information that they want?  I think the actual answer is there is no evidence, because if you look at the analysis that we've done and the elusion sample testing and the recall rates, you know, there is no empirical reason to believe that the search terms that we've used on the universe of documents that we've collected from the 25 custodians that plaintiffs have either agreed on or chosen themselves, there's no reason to believe that yet more time and money is going to yield more information.  And so it is just wildly disproportionate to impose 44 new search terms on defendants and would blow up the schedule that Judge Liburdi recently set.

And I'll stop there, Your Honor.

(Beeping interruption.)

THE COURT:  Thank you.

Let me ask, are there any other defense counsel who wish to address this issue?

I don't hear anyone but I'm hearing a beeping on the line so let me just check.  Mr. Drosman, you're still there?

MR. DROSMAN:  I am, Your Honor.

THE COURT:  All right.  Mr. Grinblat, are you on the line?

MR. GRINBLAT:  Yes, Your Honor.

THE COURT:  And Mr. Pisem?

MR. PISEM:  Yes, Your Honor.  And, no, nothing to add for the --

THE COURT:  All right.  For a test, can I have all counsel mute their microphone for a moment.

(Pause.)

THE COURT:  Okay.  Assuming you've all mooted your microphone.

Okay.  The beeping stopped.

Just keep your microphone off in case that's the issue.

I have a question for you, Mr. Hammel.

MR. HAMMEL:  Yes, Your Honor.

THE COURT:  I have some concern about some of the

smaller quantity of disclosure of emails.  I'm not attributing that to anyone, but from what I'm hearing there does appear to be a smaller return of what I would have expected for a large company.

But I'm now faced with two issues.  One is a timeline issue.  We're on January 29th.  Assume I don't attribute any bad faith to either party, the delay is not responsible for one party or the other although I could get into that.  I think you all have been working on this.  But we are at January 29 and we do have a class certification deadline from Judge Liburdi of April 6.

And unless you all tell me now you're going to try and get an extension of that from Judge Liburdi, I have to operate in a system that sets any disclosure that's added to a scheme that's workable.

I could not order Carvana to disclose 52 million documents in 20 days.  I'm not saying that's going to happen here, but the point is if I do order disclosure, someone has to convince me that this is doable and tell me when that deadline would be.

So let's -- I have to have that framework done before I then also decide what's the appropriate ruling because I'm inclined to order something to meet the plaintiffs' request.  And what I would normally do would say pick one custodian, have that search done as a priority now, and then plaintiffs come

back to me and say this worked or didn't work but I don't know that we even have time for that.  That's option one.

The second option is just a more robust overall discovery but it just would have to be in a timeline I think that would end at the latest mid-March.  That means new searches.  The reviewers go through all of it.  It's privilege reviewed and then disclosed.

And so both parties will have to address that to me as far as process.

So, Mr. Drosman, let me go back to you.  I guess we have to talk about process now.  Do you agree that March is -- mid-March is the date you'd have to have this to you and, if so, what can you tell me about whether your request as it stands right now for 44 search terms that could yield 758,000 more documents can reasonably be even complied with by mid-March?

Mr. Drosman.

MR. DROSMAN:  Sure.  So first, as I explained before, this is an issue that I flagged and defendants essentially said no problem, Your Honor.  We just need two months.  So I'm not sure how plaintiffs are going to be -- should be prejudiced by that.

But, you know, look, if defendants are concerned about being able to produce all these documents within that period, there's an easy solution.  They can do these searches, run

these searches for the 44 search terms.  They pull the documents.  They do a privilege screen only.  And they produce all the documents without a responsiveness screening.  So at best we're getting irrelevant, nonresponsive documents.

THE COURT:  Okay.  To your point about their agreement of two months versus four months.  I hear what you're saying, but that's an issue then you'd have to go back to Judge Liburdi.  And if you are asking me to make decisions here or findings that would suggest you intend to go back to Judge Liburdi and say we want more discovery based on Judge Boyle's order and we're going to ask for more time, I can address that point in my order.  I'm not telling you I'm going to rule that way, but I'm trying to be available to meet your requests.

So specifically, Mr. Drosman, if I found that this was reasonable but could not be done by mid-March, are you telling me you would then ask Judge Liburdi to extend deadlines or are you going to stick with the April 6th class certification deadline regardless?

MR. DROSMAN:  Your Honor, let me just -- I want to answer that question.

If I could just back up for a moment.  Defendants say that our search terms hit on 758,000 documents.  Okay.  They've got 90 reviewers, they told you.  That's 8,400 documents per reviewer.  In 30 days, that's 280 documents a day.  They should be able to complete this, including with the responsiveness

review.

But, you know, look, so I don't think there should be a need for an extension. I think defendants may have been right when they said, Your Honor, we only need an additional two months, even if plaintiffs prevail on their motion.

THE COURT: Okay. Second, Mr. Drosman, are you in agreement that we don't try to have one custodian conducted in ten days and come back here the following day, that instead we should just stick with this overall plan with a 45-day window?

MR. DROSMAN: Yes, Your Honor. I told you about the -- they're beyond gaping holes. That's understatement. It really is. And we have to be able to proceed with litigating this case. And to date we don't have any documents that enable us to do so. And this like blasé remark that, well, that's because plaintiffs are alleging fraud and maybe their theory isn't supported is ridiculous.

What we're asking for, Your Honor, is documents related to retail unit sales. That was what this company was about. Defendants said it's the foundation of the company.

We stated defendants manufactured their sales growth. If defendants didn't manufacture their sales growth, there would be hundreds of thousands of documents about organic sales growth. Either way, those documents exist and should be produced.

THE COURT: Okay. Thank you.

Mr. Hammel, your response?

MR. HAMMEL:  Thank you.

So just on this question about emails and volume of emails.  You know, we collect lots of emails.  There just weren't that many that were responsive to plaintiffs' request, so I don't want there to be a misunderstanding that there was not a volume of emails.  It was just that, you know, plaintiffs asked for things that were not among them.

On the suggestion that all we need to do is do a privilege review and not worry about responsiveness, that's just an absolute nonstarter.  That's not how discovery works.  That's not how the federal rules work and that's not what we do here.  Mr. Drosman wouldn't do that for his own clients and we won't do it for ours.

Finally, on the deadline extension, if I heard him say that he thinks there should be no extension, that is one issue on which we agree, there should be no extension.  We never said in terms of him quote, unquote flagging some forthcoming motion to compel to us that we hadn't seen that we could provide all discovery relating to new terms that we hadn't even seen in a motion yet, so we never said we could do it.  We could not do it.  If you order the 44 new terms, we could not do it.  The motion -- the schedule should not move.  We should not have to do the new terms.

And on the class cert point, I would just say --

this isn't really the issue before the court but I think it's worth just dropping a footnote.  The idea that they need lots of discovery of the company to do class certification is just not accurate.  They filed -- we can put in front of you dozens of briefs from Robbins Geller in which they moved for class certification based on public information only, so that's just not true.

And so I think our position is clear.  The discovery we've provided has more than met our burden.  Providing more -- having to provide more is wildly disproportionate to what's muted here.  And, you know, just makes the schedule that Judge Liburdi installed a couple months ago, you know, a fiction.

THE COURT:  Mr. Hammel, what's your best evidence in your briefing, if you know off the top of your head, that demonstrates the process of reviewing these requests and the timeline?

In simple terms, I'm trying to get a sense of your burden so I weigh that with our timeline and your cost.

MR. HAMMEL:  So it's a good question.  If it's all right with Your Honor, I'll ask one of my colleagues to speak who's actually running the document review and could give you a more granular answer than I could --

THE COURT:  Please.

MR. HAMMEL:  -- if that's okay with Your Honor.

THE COURT:  Yes.

MR. HAMMEL:  Yeah.  Mr. Word, would you like to explain it, please.

MR. WORD:  I think that's better for Natalie, she's on the line, and her involvement in the discovery search terms.

MR. HAMMEL:  Okay.

MS. SALAZAR:  Hi, Your Honor.  This is Natalie Salazar.

THE COURT:  Go ahead.

MS. SALAZAR:  Thank you, Your Honor.

Yeah.  I mean, it is a tough question to answer.  I would flag that -- you know, Mr. Drosman said the 90 reviewers that we have could do this.  Those 90 reviewers are working on the seven custodians that were ordered, the seven new custodians, so this would be additional reviewers that we would need.  So I mean, I think if all were ordered, it would take us, you know, a few months for sure to get through these documents.

THE COURT:  Well, I am going to go through all 44.  I think that's appropriate.  I'll weigh it in the briefing.  I'll consider the timeline.

I'll tell you all I'm also considering a discovery that weighs in part trying to get the discovery needed by March 15th and perhaps discovery that can be provided after that date.

Sure plaintiffs would like all of this information

before class certification, but that's just an impossibility under any reasonable standard. I'm sure the plaintiffs would prefer discovery even if it was provided to them in April.

But, again, this is not an easy question for the court. I will review the briefing as well.

I'm going to give you all one more chance to address any of this. But as I try to do, I give you a sense of where I'm at so that, you know, you have the last chance to address it.

Overall -- and I'll start with Mr. Drosman and go back to Mr. Hammel -- I'm trending toward looking at this with an eye of there are gaps in discovery. I don't know that the search as it's been done now is yielding that information. Mr. Drosman has suggested this might not just be a search issue but also there should be some basic custodian metric evaluation provided to him. We haven't really addressed that. Mr. Hammel, make a note right now, if you want to in your concluding remarks to address that, I'd be glad to hear about it because that's a new procedure we haven't addressed.

But with an eye of whether or not plaintiffs will get more information from these requests, especially regarding retail unit sales, which of these is best designed to do that?

Mr. Drosman, you had mentioned that perhaps 15 custodians was a better way to narrow this. If you want me to consider those 15 custodians, how would I -- would I just take

you at your word that you think those are the most likely to produce results for you, which I think if you were producing it you'd probably know which ones are best, but I don't know who those 15 are if you're suggesting it. If there's an order that does put a number on this, you just give those 15 custodians to defendants and leave it at that. Perhaps I don't need to know. But if you want to make any record on that, go ahead.

Okay. So I will look at the 44 with an eye toward all of that and then weigh that against the proportional costs for defendants.

I'll look again at whether or not we've -- all of these efforts by defendants, which have been substantial and have cost them a great deal of money and effort, have really been insufficient under the standard.

And then I will rule promptly because I know you're on a deadline. I just don't now how quickly I can do all of this for you.

And with that, I'm going to go back to both counsel and then I have a couple housekeeping matters to address.

Mr. Drosman, that's where I'm at right now. Am I missing anything merits wise from your and our discussion or anything else you want to add?

MR. DROSMAN: No, Your Honor.

You know, I wanted to speak to the 15. I think your suggestion that we can choose 15 and provide that immediately

to the defendants within 24 hours of your ruling or 12 hours, whatever the case may be, is perfectly fine.

I know Mr. Gronborg wanted to address a separate issue relating to another one of your rulings.

And if I might be heard very briefly on proportionality because that has been mentioned as well, I'd appreciate it.

So first it's an absolute -- you know, unfortunately counsel who's speaking for the defense -- Carvana defendants today was not at the hearing with Judge Liburdi. And had he been there, he would have realized that the hearing I actually argued -- the hearing occurred exactly as I described it. Defendants knew exactly what was at issue. The 44 search terms were in front of them. We've reached an impasse. They knew that that was the subject matter of the motion to compel.

And I flagged very clearly the fact that additional time might be needed were we to prevail and Judge Liburdi said to defendants, what do you want? Do you want four months or two months? And they said two months. So I just wanted to clarify that issue really quickly.

With respect to proportionality, you know, we've got essentially, you know, defendants contending that plaintiffs' proposed search terms require review of 758 additional documents, costing, I don't know, the estimates are all over the map. Let's just call it 3.3 to 3.6 million. On top of an

existing production of roughly 70,000 documents where they claimed expenditures exceeding 9 million.  And that's elusory, Your Honor.  One-third of the production, one-third is junk.  Defendants claim to produce -- have produced 70,000 documents, implying a robust discovery record.  That figure is deceptive.  Nearly 24,000 of those documents are low to no value embedded images like logos.  We've attached several of them.  Some are blank pages that they counted as a separate document.  Okay.  They're junk.

34 percent of the 69,757 documents defendants produced consist of those irrelevant image files.  And so when the court strips away the 24,000 logos, et cetera, and 89 percent of the documents related solely to title and registration, the actual production regarding the core fraud allegations, unit sales, financials, sales pressure, expansion are astonishingly really small.

Further, hit counts do not equally review counts.  Defendants $3.6 million burden estimate relies on raw black box hit counts.  And as plaintiffs' eDiscovery expert Mr. Johnson explains, value of hits does not equal value of review because standard work flows like deduplication and threading for the purposes of review often reduce the reviewable population by 30 to 50 percent before substantive review even begins.  That's an automatic process.

And then, Your Honor, as this court has already

observed -- and I quote the court from a prior hearing.  This is a huge case.  I doubt we need to talk about proportionality given where we are on these allegations.  And defendants conceded that retail sales are the foundation of the company.  Its entire business model.  Yet they produced only 4,766 documents concerning their formal, quote, retail sales terms out of nearly 90,000 document review population, a production of less than .6 percent of the company's entire business model is disproportionately low.

And the cases are clear, a voluminous ESI case is always going to be burdensome, but that's an unfortunate reality of ESI heavy high dollar commercial cases.

And, finally, Your Honor, defendants have manufactured this burden.  They refused to include or modify any -- not a single one of plaintiffs' proposed terms.  Even after plaintiffs narrowed their terms to address defendants' asserted burden.

Spending $9 million to produce a database filled with 24,000 logos and additional title and registration documents doesn't satisfy Rule 26.  Okay.

Defendants' search terms must follow the scope order that Your Honor issued and not predate it.

THE COURT:  One question I forgot to ask.  The defense has indicated in their briefing that there were five -- let me go to it -- and I'm on Doc 267 at 5, defendants have already

augmented and expanded their search terms five times to incorporate requests from you.

Is that an accurate statement?  Have they expanded their searches five times or did you go back and forth five times and then there was a subsequent search?

MR. DROSMAN:  That, too, is deceptive, Your Honor.  As I think we explained in our reply, they were more than happy to engage in an iterative process that five times when they believed the case was limited solely to title and registration. Of course after Your Honor's scope order, then it became a single search term.  And then when we threatened to file a motion to compel, defendants proposed some additional search terms.  Never once did they go back and forth with our searches.  Okay.

THE COURT:  Understood.  Thank you.

Mr. Hammel, you get the final word.

MR. HAMMEL:  Thank you, Your Honor.

So going to your question around, you know, how to go through the 44 proposed search terms that plaintiffs have moved on.  I have, you know, two suggestions.  One, you know, in their Exhibit 15 of their reply set of exhibits, which I think is the current list of search terms and hit rates that they've put forward, I would ask Your Honor to be very aware of the hit rates because, you know, that is the one way to measure the burden and time it's going to take to actually get through

those.  Some of them have very high hits; some of them have lower.  And I would just ask Your Honor to consider that as one way of deciding which ones are doable in the time allowed.

THE COURT:  I will.

MR. HAMMEL:  The second suggests -- the second suggestion is -- depending on how broad an order you issue is, you know, given -- in an effort to not have to blowup the schedule completely if it's a broad -- if it's a broad set of search terms is to allow us to do some sort of a sampling along the lines of elusion testing that we already did to see if plaintiffs' terms are actually bringing up a substantial number of unique new documents.  Our analysis suggests that it won't and maybe we can cut the process short if that's true.  Rather than force us to go through the entire process, take months to do it and find out at the end of the process that it really wasn't worth doing.  Maybe we could figure out at the beginning using some sampling.  So those are my two suggestions.

On, you know, some of what Mr. Drosman said, you know, I would say again that it makes completely apparent what a one-way street this discovery is.  He kind of dismisses out of hand the $3 million that it may cost to do this because of course he's not paying it; Carvana shareholders are.  And so I would ask Your Honor to keep that in mind as well.

He also suggested that there -- I think he said, not just suggested -- I think he said that there's no sense of

proportionality in a case like this because it's a big case. That's obviously not what the law is.  He hasn't cited any cases that say that that's what the law is.  And it's not.  So obviously there has to be some proportionality involved here.

In terms of the metric he asked for and that Your Honor mentioned as well -- I appreciate you reminding me of that because I did want to mention it.  I think that's a new request.  I haven't seen any authority for it.  And honestly there's just no need for it.  It's just discovery on discovery. Now we would be taking discovery about discovery and we have enough on our hands already.  So I would urge Your Honor not to require us to engage in further, you know, discovery burdens.

And, finally, not to belabor it, but they keep coming back to this December hearing where supposedly we agreed that we could do and complete discovery in two months of discovery in response to a motion to compel that hadn't been filed yet. If Your Honor looks at page I believe it's 39 of the transcript of that hearing, it was quite clear that we said we could do in two months the additional seven custodians that had been ordered and the ones that we're working on now.  We did not say that we can complete it in response to a motion to compel that we hadn't seen yet.  So I just wanted to make sure the record was clear on that.

And, finally, Your Honor, we appreciate your attention to this matter.  I know it's got to be as riveting for you as

it is for us, so we appreciate it.

THE COURT:  Thank you for that.

Let me go back to you, Mr. Hammel, on this suggestion of yours that your elusion -- for our court reporter e-l-u-s-i-o-n -- which could work.  I would suggest to you perhaps something that counsel could work out with each other that you see my order and what's required but then in the middle if you both agree that you now have information that narrows this and makes it more efficient and helps you both, you get the ability to agree to modify my order so I don't have to get into those specifics and you all can be more flexible and timely working together.

Your suggestion is a good one.  I just don't know that that's something I can get involved in quickly.  I can let you all work that out.  Would that work for you, Mr. Hammel?

MR. HAMMEL:  I hope so.  You know, we would certainly, you know, work in good faith with plaintiffs to try to make it happen so that we could determine, you know, relatively quickly whether the whole endeavor is worthwhile or not.

THE COURT:  That's fine.  I'll draft my order accordingly.

Give me one minute.  I know there's -- you had mentioned something else you wanted to address before I forget mine.

Let me just tell you first I think we're concluded on

this motion request.

I'm pivoting now as a procedural issue my staff has asked you all to file a motion to seal, so if any documents have been lodged that are requested to be under seal, that you have a corresponding motion to seal and please do that by February 3rd.

MR. HAMMEL:  Yes, Your Honor.

THE COURT:  And in reference to 274 is the note I have.

All right.  The next housekeeping issue I have is I think we still have Garcia outstanding dispute.  Do we need to discuss that today but -- and any issues you want to talk about?

Go ahead, Mr. Drosman.

MR. DROSMAN:  Sure.  I was just going to say I think our reply is due tomorrow which we intend to file.  If it would be -- I would say to your Your Honor I'd prefer that we discuss it after you've had a chance to consider our reply.

THE COURT:  That's fine.  Okay.  Thank you.

MR. DROSMAN:  And then I know Mr. Gronborg wanted to address an issue as well.

THE COURT:  And I think we are there.  Counsel, what you would like to address with the court?

MR. GRONBORG:  Thank you for your time, Your Honor.  I appreciate it.  It's been a long day.

The issue had to do with the compliance with the court's January 14th, 2026, order --

THE COURT:  Hold on.  And this is Mr. -- for our court reporter this is Mr. Gronborg; right?

MR. GRONBORG:  Correct.

THE COURT:  Thank you.

Go ahead.

MR. GRONBORG:  And as you recall, that had to do with production of documents that were produced to the SEC and certain communications and documents regarding the Garcia Senior trust and stock sale and those documents are supposed to be completed by January 23rd, 2026.  And before I go into the specifics, we have real concerns that that order has not been complied with under the production to date, the materials haven't been produced.  I'm happy to go into our specifics about that but, you know, I'd first ask you if you want me to do that here or if there's some other forum in which you want us to address that?

THE COURT:  No.  We're here.

You're telling me that you don't have documents you believe you were entitled to by January 23rd?

MR. GRONBORG:  Correct.

THE COURT:  Just tell me what those are and I'll turn to the defense and hear their response.  Briefly what's -- what has not been disclosed?

MR. GRONBORG:  So -- yeah.  So as you recall, RFP number 2 required production of documents produced to the SEC and the court ordered that defendants produce the responsive documents with regard to the 2025 SEC subpoena.  Defendants had objected on the basis that that was burdensome.  Among other things it wouldn't be responsive.

What we received -- the production in response was a single document, an email with two attachments is all the defendants have produced with respect to that 2025 subpoena.  The email that was produced it appears that the Bates number that was used for the SEC production was blotted out.  And I'm just speculating here but it's probably because it would show that that production was far more extensive than that single email about DriveTime.

You'll recall defendants had also said that we didn't need that SEC production because it would just overlap with the DriveTime documents they were already producing to us pursuant to the search terms, you know, which certainly suggests that there were more than one document.  And we understood, pursuant to the order, that even if there were duplicative documents provided to the SEC, that those should have been produced.  They were compliant with the court's order.

And I -- you know, the speculation I have is that defendants are somehow taking the word responsive that was in the court order -- and I think specifically the wording was

that they were compelled to produce responsive nonprivileged documents provided to the SEC in response to the 2025 SEC subpoena.

Now, of course RFP 2 calls for documents produced to the SEC, so responsive documents would be the entire set of documents.

But in any event, look, if that entire production turned out and it was only one document, I don't know why we ever went through that motion.  Defendants could have just said that and, frankly, produce the document.  I think that is wrong.

But with respect to RFP 2, that's why we don't believe the documents have been produced.  We would ask that the court just simply order defendants to produce what they produced to the SEC.  It's already been reviewed for privilege.  There's no burden.  You know, it's a single set of documents.  And ask that they comply with the order they do it leaving the Bates numbers on that were used for the SEC production.  So that's RFP 2.

Unfortunately with regard on RFP 29, there also seems to be a concern about what was produced.  Defendants did -- and RFP 29 were the stock sales and there were two components the court ordered defendants to produce --

THE COURT:  Hold on.

MR. GRONBORG:  -- one was the --

THE COURT:  Let's stick with the SEC.  I'd like to do these one at a time.

I remember the SEC order.  My order, if I recall, was that anything that was sent to the SEC in response to the 2025 request would be disclosed except for items that were privileged.

So, number one, who's responding for the defense?

Number two, is that your understanding of my order?

And, number three, where does the defense stand on that discovery?

MR. HAMMEL:  This is Jeff Hammel, Your Honor.  I'll respond.

So we think your order is clear on page 9 that what Your Honor ordered was for us to produce from that SEC production the responsive documents responsive to plaintiffs' request, not -- it says in the order not nonresponsive documents.  And so the two documents we produced are the ones that are responsive to plaintiffs' request.

As for the speculation about the Bates numbers, we did not blot out Bates numbers.  These were the documents that we were given.  We were given the originals from the production to produce and we produced them.  And so the speculation and conspiracy theory going on is misplaced and so that's our position on those documents.

THE COURT:  So in your view, you've complied with the

order?

MR. HAMMEL:  We believe so, Your Honor, unless we misread it and Your Honor intended something differently, but that's what we believe the order to say and to require.

THE COURT:  Next question for you is I've heard that it was one email with two documents attached.  Can you tell me what was sent to the SEC that you deemed was not responsive or privileged?

What I basically want to know is if you've given over one email with two documents, did you hold back zero emails and only one document or did you hold back 900 emails with 800 documents?  Do you happen to know what was held back as in your view either nonresponsive or privileged?

MR. HAMMEL:  I don't know offhand, Your Honor.  And this issue was raised by plaintiffs, you know, in an email shortly before this hearing, so I didn't have time to take a look so I don't know the answer to that.

THE COURT:  That's a fair point.  The question here is what you've decided was nonresponsive and not disclosed to the plaintiff.  Helps me to understand if you think that's a very broad term or not.  And it's a fair point.  So how would you like to address this?

MR. HAMMEL:  So we understood the order to require us to produce documents from the SEC production that were responsive to the allegations in this securities case, not just

turn over an entire production about things that may have nothing to do with the securities case.  And so we proceeded accordingly.

And I'm being told, as we're doing this, that -- to try to answer your question about nonresponsiveness there was approximately 1,700 documents that were not responsive.

THE COURT:  So two were disclosed and about 1,700 were not?

MR. HAMMEL:  I believe that's correct, Your Honor.

THE COURT:  Okay.  Mr. Drosman, do I have an ex parte hearing with Mr. Hammel to go into the specifics of what's nonresponsive and privileged?  How would you like to bring this up?  Off the cuff I'm happy to address it.  How would you like to proceed?  I'm sorry, Mr. Gronborg.  How would you like to proceed?

MR. GRONBORG:  Well, Your Honor, the way you framed what the order said, you know, at the beginning of your question is what the order said, which is produce the material that you produced to the SEC.  That's responsive to request number 2.  You described the order as we understood it from the transcript and consistent with exactly what we asked for.  So when the motion to compel was granted with respect to the 2025 SEC subpoena, so I don't think there's any need for an ex parte.  I mean, what we're getting here is now becoming sort of the circular issue where we'll skip the one request, which

the motion was brought under, the materials produced to the SEC, and then apparently they're going through the other requests presumably layering in -- I don't know if it's inadequate time period, it's the search terms, none of that is needed here.  They can push a button and produce the 1,700 documents that were produced to the SEC and they should because one of the things they're presumably doing is they could say, well, let's layer on a time period issue here.  And the court order's very specific, you know, you were not buying off on the notion that the time period somehow affected the SEC production.

So I think it can be resolved quickly by saying comply with my order which required you to produce to plaintiffs the documents that were produced to the SEC in the manner in which they were produced to the SEC.

Back to the whether I'm a conspiracy theorist or not. I've seen a lot of productions to the SEC.  I've never seen a production, you know, 1,700 documents, more than that, to the SEC that weren't Bates numbered.  And I'm going to guess the SEC subpoena asked them to do just that.  But in any event, I think it's a simple order.  Comply with the January 14th order by producing the materials you produced to the SEC in response to the 2025 subpoena.  There's no need for anyone to do privilege reviews because that's already been done.  There's no need for responsive reviews.  There's no need to, you know,

pick apart that production.  It can all -- defendants can comply with the order by tomorrow afternoon.

THE COURT:  Mr. Hammel, let me ask you two questions. The first is:  Are you prejudiced if you disclose the nonresponsive documents?  And, number two, do you feel like you need an opportunity to be heard on any of this ex parte so that you can talk about these issues and not harm your client so you can discuss matters that are either privileged or not connected to this lawsuit in any way?  Your thoughts?

MR. HAMMEL:  Thank you, Your Honor.

You know, it seems like plaintiffs' response to anything is, you know, give me more.  It's no big deal.  But the purpose of discovery is not to just let plaintiffs root around in the files of a public company to see if they can come up with something.

You know, this SEC investigation concerned a different time period and unrelated issues.  And so it's unclear to me why they just want to poke around.  Obviously, you know, they always want more, so they're asking for it but it's really not required.  Your order did not require it.  And so the prejudice is just -- you know, this isn't how discovery gets conducted. Just because plaintiffs want to poke around in a closet or a file cabinet doesn't mean they get to do it and so there are boundaries, there's proportionality, and this falls on the other side of it.  So that's point one.

On point two, the ex parte point, like I said, this issue just came up. You know, I haven't given thought to whether we would want to talk to you, Your Honor, about it. If I could ask for, you know, till tomorrow morning to give you an answer on that, I'd appreciate it.

THE COURT: That would be fine.

Going back to your point though. One of the rulings -- reasons for my ruling was that the SEC documents had already been assembled and there would be very low cost in you transferring all of that to the plaintiff. It would be one way for them to test whether or not the discovery they've been getting through the search terms and the custodians was, in fact, productive or if your disclosure of the SEC investigation, which I did find to be topical and relevant unlike the prior SEC investigation which I found was not, that there was a low cost for you. It had the value of testing the discovery in the case. And if the SEC had requested it in relation to this case, then that tipped the balance in favor of its disclosure. So I don't think it was as simple as the plaintiff just requesting everything they could in my view at a low cost and a high value for several reasons.

So I will review my order and I will -- like to give you an opportunity to be heard. I certainly don't want you to submit 1,698 documents for an in-camera inspection, but I want to give you a chance to respond. So certainly by tomorrow, end

of the day if you could, advise me of where you stand on how to address the plaintiffs' concerns that 99 percent of the SEC investigation is not being disclosed to them so that I can make a ruling and you can propose whatever you think works.

I do not want to --

MR. HAMMEL:  Thank you.

THE COURT:  Yeah.  Okay.

MR. HAMMEL:  I was -- thank you, Your Honor.  And I'll just say like the SEC investigation concerned different issues other than the documents we produced and so while it may be low cost to produce it, plaintiffs have no entitlement to information not about this case.  It's the definition of some fishing expedition.  You know, like you don't just get it because they say they want it.  They have to get things that are relevant to this case and this production just is not.

THE COURT:  That's fine.  I don't know what the SEC --

MR. HAMMEL:  I appreciate you giving us until --

THE COURT:  Yeah.  And I'm also as you would be --

MR. HAMMEL:  We'll provide such an ex parte --

THE COURT:  All right.  Well, Mr. Drosman, what I'll do is I'll review that and just tell you now how I'm looking at this.

I am very sympathetic to the point that you are testing discovery.  You are entitled to this information regarding the SEC investigation.  It overlaps this case in any

way.  It was easily disclosed at low cost.  All of that I found for you before.

Now, if it turns out that this 25 -- 2025 request from the SEC 99 percent of it requested something from 2005, then that would be a carve-out and I would listen to that, but I have no idea what this is going to unfold.  So I want to make sure you're aware of the process.  And I think I will hear from Mr. Hammel, get his information.  If I see that he's disclosed it to you, I'll give you a chance to respond.  If he's just sent it to the court separately, I will allow him to do that ex parte, and then I will update you on where I think we stand and still give you a chance to give your input.

And I think that's the only way I can protect any privilege issues or make a record but also make sure that you are getting any discovery from the SEC investigation you're entitled to.  And I do think that it's the low cost and should be disclosed to you if it has any connection to the case.

So, Mr. Drosman, on that process, do you have any input?

MR. GRONBORG:  It's Mr. Gronborg.  And we're fine -- obviously we're not relitigating the motion, but based on everything you said, for some reason a subpoena which we've never seen asked for all the documents from 2005 or something like that, we agree that was extraneous.  I would have hoped defendants would have mentioned that sometime before we brought

the motion to compel, but I don't think that's going to be the case.

THE COURT:  Okay.  Fair enough.  And I'll try and work on this promptly as well.

From the court's perspective then -- we've gone through my questions, Mr. Gronborg.  What else would you want to add?

MR. GRONBORG:  So the second part of the January 14th order dealt with request for production number 29.  As I was starting to say, the court ordered the production -- sort of, one, of documents regarding the Garcia trust itself.  And then, two, communications from Garcia Junior regarding sort of benefits or et cetera from Garcia Senior's sale of stock or the sale of stock by entities connected to him.

On the former, defendants did produce 14 page of documents regarding the trust itself -- the trusts, I should say, plural, themselves, and we just asked them to confirm that that's all they have, then that's all they have.

On the communications, they did not produce any documents regarding communications about the stock.  Now, it -- and about the stock sales.  Now, obviously there is a possibility that Garcia Junior never had any communications regarding the billions of dollars in stock that his dad sold and whether he had any benefit or any interest in those, but the complete lack of documents, in part given the objections

which was this would be burdensome, seemed like an outlier. Again, you know, if, in fact, he never had any communications of those lines, I would expect defendants would just say that at some point in time.

So I -- my surmise -- and maybe I'll get called a conspiracy theorist again -- is that defendants -- in trying to comply with the order, defendants used search terms that wouldn't capture these materials primarily because these -- you know, any search terms they devise that were theoretically about stock sales were devised at a time when they were taking the contention that none of these -- none of the Garcia Senior stock sales were relevant. And you'll see as you go through the 44 terms that there are additional terms in there regarding stock sales. Maybe they would be better. I'd sort of venture that Garcia Senior -- excuse me -- Garcia Junior probably has a limited set of emails that could -- you know, who he would know the communications were with about the subject and they could certainly manually be identified. But in any event, it doesn't seem plausible that there are none.

And I do think in addition to kind of that term, maybe there's a point of clarification and it may also be why there are no documents. Still surprising is that the January 14th order calls for communications from Garcia Junior concerning any interest or benefit from Garcia Senior's sales of Carvana securities. And we had at least read the from there -- they

use the from to mean documents from Garcia Senior's communications, his emails and such.  In other words, if Garcia Junior received an email from somebody -- so he received an email from someone informing him that his father had sold, you know, hundreds of millions of dollars worth of Carvana stock and that he, Garcia Junior, was going to benefit from that sale, that would be produced.

And I -- there's also -- it seems likely that given sort of the narrow position defendants have taken that they would say, no, that's not responsive because it wasn't sent from Garcia Junior.  And so that might be -- the latter is a clarification; the former is -- it is probably added to the search term issue as a -- there's something -- you know, something seems to be amiss with the terms defendants are using at least with complying with the court's order on RFP number 29.

THE COURT:  Okay.  I understand your request regarding the trusts and the 14 pages and you want defendants to verify that's the sum of the discovery they've found on the trusts.

Can you be specific on your question for them regarding communications involving Garcia Junior?

MR. GRONBORG:  I guess the question would be is if there are no -- if there are no responsive documents, in other words no communications from the files of Garcia Junior regarding his father's stock sales, sort of his benefit from

those, for them to confirm that.  And if that is the case, then it would be how was that search done?  Given that the court's order came out January 14th, you know, how is it nine days later they were able to make that determination?

THE COURT:  Who would like to address that for the defense, if you're prepared to do so?

MR. HAMMEL:  Sure.  This is Jeff Hammel again, Your Honor.

And on this one I'll say I'm really not prepared to do so, you know.  I hear the question, you know, we're happy to talk about that with Mr. Gronborg and his colleagues and see if we can get them comfortable with, you know, what we did in response to the court's order which we believe we did comply with.

THE COURT:  All right.  How long will it take you to get that information and email, Mr. Gronborg?

MR. GRONBORG:  If we haven't already sent it, I can send it now.  And I do appreciate -- I mean, I don't think Mr. Hammel argued this motion previously and, like I said, I didn't want to wait and have to do a whole nother motion practice, so I'm happy, you know, having a conversation.  So I can put the question -- to the extent we haven't already sent it, I'll put it in a question, I'll make sure Mr. Hammel is included and ideally we can set up a call about it tomorrow.

THE COURT:  Okay.

MR. HAMMEL:  I would be happy to talk tomorrow.

THE COURT:  Work that out.  Yeah.  Thank you for making your record.  I'll let you work that out.  Email the court if you need involvement.

Okay.  That's fair.

MR. GRONBORG:  And this may be -- Mr. Hammel may be able to answer this now, I think sort of have this be part of our conversation then come back.  That issue of the from in the order, are plaintiffs reading that right, that from would mean from Garcia Junior's communications as opposed to being more limited, meaning just communications that Garcia Junior sent?

MR. HAMMEL:  I'll confess I'm not close enough to our document production to know the answer to that.  I don't think we would have taken nth view of things but, you know, we'll be happy to chat about that with you tomorrow.

THE COURT:  The court would take the view that from means from his entire email not just the ones he authored.  If someone emailed him about that, for example, Garcia Senior, that would be included in the request.  That's how I hear Mr. Gronborg reads it as well.  That's how I would read it.

Okay.  Anything else from the plaintiffs?

MR. GRONBORG:  No, Your Honor.

THE COURT:  Anything else, Mr. Hammel, from defense on your side?

MR. HAMMEL:  No, Your Honor.  Thank you.

THE COURT:  And other counsel I know on the line for defendants, anyone else want to be heard on any point?

UNIDENTIFIED VOICE:  No, Your Honor.  Thank you.

UNIDENTIFIED VOICE:  Nothing further from (audio distortion) either.

THE COURT:  All right.  Thank you, all, for calling in.

We're adjourned.  Have a good afternoon.

(Proceedings adjourned at 3:36 p.m.)

UNITED STATES DISTRICT COURT

C E R T I F I C A T E

I, SCOTT M. CONIAM, do herby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED January 30, 2026.


s/Scott M. Coniam_____
SCOTT M. CONIAM, RDR, CRR


UNITED STATES DISTRICT COURT