# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

|  |  |
|---|---|
| United Association National Pension Fund, et al., | |
| Plaintiffs, | |
| v. | Case No. CV-22-02126-PHX-MTL |
| Carvana Company, et al., | |
| Defendants. | |

EXPERT REPORT OF MATTHEW D. CAIN, PH.D.

April 6, 2026

**Table of Contents**

I.      Scope of Report and Opinions .................................................................................1

II.     Qualifications.........................................................................................................3

III.    Case Background ...................................................................................................5

     A.     Exchange Act Claims.................................................................................5

     B.     Securities Act Claims.................................................................................9

IV.     Bases for Opinions on Market Efficiency ...........................................................9

V.      Evaluation of Market Efficiency Factors for Carvana's Common Stock ..................12

     A.     *Cammer* Factor 1: Average Weekly Trading Volume.............................14

     B.     *Cammer* Factor 2: Analyst Coverage.....................................................16

     C.     *Cammer* Factor 3: Market Makers.........................................................18

     D.     *Cammer* Factor 4: SEC Form S-3 Filing Eligibility .............................21

     E.     *Cammer* Factor 5: Cause and Effect Relationship Between Company
         Information and Stock Prices....................................................................23

     F.     *Krogman* Factor 1: Market Capitalization.............................................32

     G.     *Krogman* Factor 2: Bid-Ask Spread .....................................................33

     H.     *Krogman* Factor 3: Public Float............................................................34

     I.     Additional Factor: Institutional Ownership .............................................35

     J.     Information Environment During the Class Period ..................................36

VI.     Calculation of Damages for Exchange Act Claims...........................................38

     A.     Calculation of Damages for Violation of §§ 10(b) and 20(a) of the
         Exchange Act............................................................................................38

     B.     Damages Methodology is Flexible and can Incorporate Alternative
         Findings....................................................................................................42

VII.    Calculation of Damages for Securities Act Claims...........................................43

     A.     Calculation of Damages for Violation of §§ 11 and 15 of the Securities
         Act............................................................................................................43

     B.     Calculation of Damages for Violation of § 12(a)(2) of the Securities
         Act............................................................................................................44

     C.     Defendants Carry the Burden of Proving Negative Causation ...............45

VIII.   Conclusion ...........................................................................................................46

## I.      Scope of Report and Opinions

1.      Lead Plaintiffs United Association National Pension Fund and Saskatchewan Healthcare Employees' Pension Plan ("Plaintiffs"), through their attorneys have asked me to determine whether the market for Carvana Co.'s ("Carvana" or the "Company") common stock ("Common Stock") was efficient during the period from May 6, 2020 to October 7, 2022, inclusive (the "Class Period").[1]

2.      In addition, Plaintiffs have asked me to opine on whether damages for investors who purchased Carvana's Common Stock during the Class Period can be calculated using a common methodology for all Class members that is consistent with Plaintiffs' claims under (i) § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities & Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, the "§ 10(b) claims"); and (ii) § 20(a) of the Exchange Act (collectively with the § 10(b) claims, the "Exchange Act Claims").[2]

3.      Plaintiffs have also asked me to describe the method by which damages can be calculated for investors who purchased Carvana Common Stock traceable to the Company's April 25, 2022 stock offering (the "Offering"), consistent with Plaintiffs' claims under §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") (collectively, the "Securities Act Claims").[3]

---

[1] *See* Lead Plaintiffs' Amended Consolidated Complaint for Violations of the Federal Securities Laws (Doc. 71) ("Complaint"); Order (Doc. 105) ("Order on Motion to Dismiss"); Order (Doc. 173) ("Order on Scope of Discovery"). I understand that the Complaint alleges fraud-related stock price declines after October 7, 2022 and a Class Period spanning May 6, 2020 to February 23, 2023, inclusive (the "Extended Period"). As part of my analysis, I also assess the efficiency of the market for the Common Stock and the appropriate damages methodology over this longer period.

[2] *See* Complaint. I understand defendants to the Exchange Act Claims to include Carvana, Ernest Garcia II (§20(a) only), Ernest Garcia III, and Mark Jenkins ("Exchange Act Defendants"). *See* Complaint ¶¶ 24-29.

[3] I understand defendants to the §§ 11 and 15 claims include Citigroup, J.P. Morgan Securities LLC (the "Underwriter Defendants"), Carvana, Ernest Garcia III, Mark Jenkins, Stephen Palmer,

1

4.       Based on my analysis to date and the evaluation of the factors described throughout this Report, I have formed the following opinions:

a.   The market for Carvana's Common Stock was efficient throughout the Class Period and the Extended Period.

b.   The *Cammer* and *Krogman* factors accepted and applied by courts to assess market efficiency corroborate that Carvana's Common Stock traded in an efficient market.

c.   Damages for the Exchange Act Claims in this matter can be calculated on a class-wide basis subject to a standard, common methodology. In particular, I demonstrate that the out-of-pocket damages methodology, which is routinely used in § 10(b) securities class actions, is reasonable and applicable given Plaintiffs' theory of liability.

d.   Damages for the Securities Act Claims in this matter can be calculated on a class-wide basis subject to a standard, common methodology. Specifically, the statutory formula set forth in § 11(e) of the Securities Act can be used to calculate damages for violations of §§ 11 and 15, and a commonly employed rescission methodology can be used to calculate damages for violations of § 12(a)(2). These methodologies are reasonable and applicable given Plaintiffs' theory of liability.

5.       The remainder of my Report is organized as follows: **Section II** describes my qualifications. **Section III** summarizes the case background. **Section IV** briefly explains the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency. **Section V** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section VI** addresses how damages can be calculated on a class-wide basis subject

---

Michael Maroone, Neha Parikh, Ira Platt, Greg Sullivan, (collectively with Underwriter Defendants, the "Securities Act Defendants"). I understand defendants to the § 12(a)(2) to include the Underwriter Defendants. *See* Complaint ¶¶ 367-372; *see also* Order on Motion to Dismiss pp. 69-70.

to a common methodology under the Exchange Act Claims. **Section VII** addresses how damages can be calculated on a class-wide basis subject to a common methodology for the Securities Act Claims. **Section VIII** summarizes my conclusions.

## II.    Qualifications

6.    I hold a Ph.D. in Finance from Purdue University and am a Senior Fellow at the New York University School of Law. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business.

7.    My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held fellowships with the Berkeley Center for Law and Business at UC Berkeley, Vanderbilt Law School, and the Harvard Law School Program on Corporate Governance, where I participated in teaching, research, and academic seminars.

8.    Before my current roles, I worked at the SEC between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations, and litigation, including cases alleging accounting fraud, improper revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities law violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

3

9.      Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

10.     Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

11.     In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

12.     I have published research in leading peer-reviewed journals in the fields of finance, accounting, law, and economics, including: *Journal of Financial Economics, Journal of Law and Economics*, *Journal of Accounting and Economics, Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis*. My curriculum vitae, attached as **Appendix A**, further details my publications.

13.     In addition to my teaching, research, and academic responsibilities, I provide consulting services and expert testimony in a variety of matters. As an expert in financial economics, I have conducted analyses or presented expert opinions related to market efficiency, valuation, securities trading, corporate disclosures, and loss causation/damages in over 75 cases.

4

My curriculum vitae, attached as **Appendix A**, further details my testimony experience.

14.    The materials I have considered in forming my opinions are listed and summarized in **Appendix B**. My time is billed at a rate of $1,100 per hour for my work on this matter. I have been assisted in this matter by staff at Fideres Partners LLP, working under my direction, and I receive additional compensation based upon their billings. My compensation is in no way contingent on the outcome of this case.

15.    My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

## III.    Case Background

16.    Carvana is an e-commerce platform for buying and selling used cars in the United States.[4] During the Class Period, the Company's common stock traded on NYSE under the ticker symbol "CVNA."[5]

17.    Plaintiffs allege two independent sets of claims under (i) the Exchange Act and (ii) the Securities Act.[6]

### A.    Exchange Act Claims

18.    Plaintiffs allege that throughout the Class Period, Defendants engaged in a scheme, made materially false and/or misleading statements, and failed to disclose material adverse facts about Carvana's business, operations, and prospects.[7]

19.    Throughout the Class Period, Defendants allegedly misled investors about the sustainability of Carvana's retail unit sales growth and profit margins Carvana generated on its

---

[4] Complaint ¶ 2.

[5] *Id.*¶ 24.

[6] *Id.*¶ 19.

[7] *Id.*¶¶ 2-3.

retail and wholesale unit sales.[8] While Defendants attributed retail sales growth to organic consumer demand driven by Carvana's innovative and scalable business model, Defendants allegedly failed to disclose the Company's sales growth was driven by, among other things, (i) sales that violated state or local law through non-compliance with vehicle documentation, registration, and/or title regulations, and (ii) purchase and sales tactics to boost reported sales growth at the expense of profits, including related-party deals with companies controlled by Garcia Senior.[9]

20.     The Complaint also alleges that the Risk Disclosure sections of Carvana's February 25, 2021 and February 24, 2022 Form 10-Ks were misleading, as they presented regulatory risks due to title and registration noncompliance that had allegedly already materialized.[10]

21.     The Complaint further alleges that during an August 11, 2021 J.P. Morgan investor conference, Carvana's Vice President represented that the regulatory issues the Company faced in North Carolina were "unusual," "unprecedented," and "specific," despite the fact that the Company was being investigated and had already been penalized for similar conduct in other states.[11]

22.     Defendants also allegedly made material omissions in Carvana's Q2 2021 Shareholder Letter and the Company's Q4 2021 conference call when they presented Carvana's growth as organic and sustainable, while not disclosing the extent to which that growth was driven by unsustainable business practices.[12]

23.     The relevant truth regarding the alleged scheme, misrepresentations, and omissions

---

[8] *Id.*¶¶ 6-8, 12-18.

[9] *Id.*¶¶ 7, 10-11, 13.

[10] *Id.*¶¶ 174-175, 184-185.

[11] *Id.*¶¶ 180-181.

[12] *Id.*¶¶ 230-231, 259-260.

was allegedly revealed to investors over a series of partial disclosures.[13]

24.     On August 10, 2021, local media in North Carolina reported that Carvana's dealer license had been suspended for violating the state's title and registration laws.[14]

25.     On October 22, 2021, a *Wall Street Journal* article allegedly continued to expose the depth of Carvana's title and registration non-compliance.[15] The article reported that Carvana had flouted state registration regulations by providing a Michigan-based customer with temporary registrations from Georgia, Tennessee, and Arizona.[16]

26.     On April 20, 2022, Carvana announced disappointing Q1 2022 financial results and a stock offering to support the purchase of ADESA, a wholesale auction company.[17] The announcements included that: (i) retail sales growth was impacted by significant logistics network constraints, expenses, and wholesale volume, (ii) the Company no longer expected to sell 550,000 retail cars in 2022, and (iii) the Company needed to purchase ADESA to improve its logistics network.

27.     On May 10, 2022, Carvana announced it was laying off roughly 2,500 employees, transitioning operations away from certain hubs in relation to right-sizing initiatives, and that it would issue a new operating plan.[18]

---

[13] *Id.* ¶¶ 307-328. I understand the MTD Order found that allegations regarding certain alleged corrective disclosures (April 20, 2022; May 10, 2022; November 3, 2022; February 23, 2023) were insufficiently plead, but the Order on Scope of Discovery stated (at p. 4): "The Court also could have held Plaintiff's scheme claims survived only to the extent they were based on title and registration issues, but the Court did not. No aspect of the scheme claim—including those related to other purported drivers of Carvana's retail unit sales—was expressly dismissed by the Court." (citations omitted).

[14] Complaint ¶¶ 311-312.

[15] *Id.* ¶¶ 146, 313.

[16] *Id.*

[17] *Id.* ¶¶ 314-316.

[18] *Id.* ¶¶ 317-319.

28.      On June 24, 2022, *Barron's* published an article discussing Carvana's title and registration issues.[19] The *Barron's* article reported that Carvana's temporary plate program in Arizona had been cancelled due to the Company's flouting of state laws, as well as other issues regarding the Company's title and registration practices.[20] Specifically, the article described that the Company had engaged in practices resulting in missing, delayed, and altered title registration documents, contract discrepancies, and significant odometer discrepancies.[21]

29.      On October 7, 2022, the Michigan Department of State announced it had suspended Carvana's dealer's license in Novi, Michigan, citing "imminent harm to the public."[22]

30.      On November 3, 2022, Carvana released its Q3 2022 results, which revealed disappointing financial results, including a decline in retail unit sales, among other issues.[23]

31.      On February 23, 2023, Carvana released its Q4 2022 results.[24] The financial results revealed that the Company's retail unit sales had continued to decline, that the Company had stepped back on key metrics of retail units sold, that annual gross profits had declined, that reductions in inventory and retail vehicle acquisitions had been significantly accelerated, that the Company had written off $50 million of aged and impaired vehicles that had declined in value since their acquisition, and that the Company was shifting focus from retail sales growth to profitability driven by retail sales. The disappointing Q4 2022 results were allegedly driven by factors related to Defendants' fraudulent scheme such as a 50% spike in operations expenses per vehicle, a near 40% annual spike in the Company's average days to sale metric, and Carvana's

---

[19] *Id.* ¶¶ 320-321.

[20] *Id.* ¶ 395.

[21] *Id.* ¶ 148.

[22] *Id.* ¶¶ 322, 396.

[23] *Id.* ¶¶ 323-326.

[24] *Id*. ¶¶ 327-328.

adoption of costly third-party providers caused by logistics constraints, which led to increased reconditioning and transport costs per retail vehicle.

32.     As a result of Defendants' allegedly fraudulent scheme and materially misleading statements and omissions, investors are alleged to have traded Carvana's Common Stock at artificially inflated prices during the Class Period.[25] **Exhibit 1** graphs the closing stock price and trading volume for Carvana Common Stock shares throughout the Class Period and the Extended Period.

### B.     Securities Act Claims

33.     In April 2022, the Securities Act Defendants assisted Carvana in raising $1.2 billion in a Common Stock offering.[26] In connection with the Offering, Carvana filed: (i) an SEC Form S-3 Registration Statement on April 20, 2022; and (ii) an SEC Form 424B2 on April 25, 2022 (collectively, the "Offering Documents").[27] The Offering Documents contained Risk Disclosures that presented regulatory risk from title and registration noncompliance as a potential risk. However, the Complaint alleges that the regulatory problems associated with Carvana's title and registration noncompliance were already occurring.[28] Plaintiffs further allege that the Offering Documents misled investors about the sources of the Company's growth, attributing that growth to organic factors rather than unsustainable business practices.[29]

## IV.     Bases for Opinions on Market Efficiency

34.     I understand that, with respect to their claims under § 10(b), Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, *i.e.*, that all persons and entities who

---

[25] *Id.*¶ 3.

[26] *Id.*¶¶ 373-375.

[27] *Ibid.*

[28] *Id.*¶¶ 385-391.

[29] *Id.*¶ 383-384.

purchased or otherwise acquired Carvana's Common Stock during the Class Period relied on the alleged misrepresentations and/or omissions through their effect on stock prices in an informationally efficient market.[30]

36. As courts, including the Supreme Court, have repeatedly explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors who purchase securities traded in an informationally efficient market during a class period rely on any public misrepresentations or material omissions of fact made during the class period because those statements or material omissions of fact are incorporated into the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[31]

36. The Supreme Court reaffirmed the availability of this theory to satisfy § 10(b)'s reliance requirement on a class-wide basis in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[32]

37. A market is considered informationally efficient when the market price of securities

---

[30] *Id.*¶¶ 343-350.

[31] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[32] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

begins to respond quickly to publicly available information.[33] Economic research and literature support the concept of market efficiency for publicly traded securities. For example, Nobel Prize winner Eugene Fama has observed that "[t]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse,"[34] and that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[35]

38.    Markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, are frequently granted a presumption of efficiency for virtually all securities traded on them.[36] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other rules for these exchanges practically guarantee a liquid market for securities traded on these exchanges.[37] The fact that Carvana's Common Stock traded on the NYSE leads to a strong presumption of market efficiency.

39.    In securities fraud cases, courts have endorsed the widely-cited five-factor test laid out in *Cammer v. Bloom* to evaluate whether a market is efficient for the purpose of establishing

---

[33] Academics often consider more stringent forms of market efficiency, *e.g.*, defining an efficient market as one in which prices reflect all material, widely available public information up to the point that any marginal profits to be gained from trading on existing information do not exceed trading costs. Eugene F. Fama, 1991, *Efficient Capital Markets: II*, Journal of Finance 46, at 1575 (1991).

[34] Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, Journal of Finance 25, at 383, 416 (1970).

[35] Eugene F. Fama, *Efficient Capital Markets: II*, Journal of Finance 46, at 1575, 1576 (1991).

[36] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*") ("'We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.'") (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

[37] *Id.*

the presumption of class-wide reliance.[38] Courts also accept additional factors for evaluating market efficiency, such as those in the widely-cited *Krogman v. Sterritt* opinion.[39]

40. Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency.[40] However, as explained below, it is important to understand that an assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of the factors together that allows one to reach the conclusion that a market for a security is efficient.[41]

## V.    Evaluation of Market Efficiency Factors for Carvana's Common Stock

41. In the following section, I discuss the *Cammer*, *Krogman*, and other factors and evaluate them in relation to Carvana's Common Stock.[42] In doing so, I compare the factors' application to Carvana's Common Stock against: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

42. As discussed below, my analyses and findings on the various market efficiency factors support the conclusion that Carvana's Common Stock traded in an efficient market throughout the Class Period.

---

[38] *Cammer*, 711 F. Supp. at 1264, 1286 – 1287.

[39] *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[40] *See, e.g.*, Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

[41] *Id.*, at 204-205.

[42] In addition to the *Cammer* and *Krogman* factors, I also note that the Company a) had call and put options traded on the Common Stock, and b) did not have a statistically significant autocorrelation coefficient on abnormal stock returns during the Class Period from my event study in Section V.E. These findings further support my conclusion that Carvana's Common Stock traded in an efficient market throughout the Class Period.

43. One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[43] In this peer-reviewed study, these authors examined two samples of firms. One sample included companies that eventually lost all analyst coverage (the "MRK Previously Covered Companies"); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered Companies"), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[44]

44. The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock. . . . Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[45]

45. The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to

---

[43] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, *Is There Life After the Complete Loss of Analyst Coverage?*, Accounting Review 88, at 667-705 (2013).

[44] MRK Study at 678, 681-682.

[45] MRK Study at 667.

[analyst-]covered peers."[46] Therefore, I interpret the sample of MRK Covered Companies as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets.

46.     Below, I compare several of Carvana's market efficiency factors to the samples of firms in the MRK Study, to samples of firms in other academic studies, and to the benchmarks set forth by courts, to assess whether Carvana's characteristics are consistent with firms operating in efficient markets.

### A.  *Cammer* Factor 1: Average Weekly Trading Volume

47.     Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity in a security, the more likely it is that new information will be quickly incorporated into the price of that security.[47] Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock.[48] Similarly, "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[49]

48.     The first *Cammer* factor, stock trading volume, was defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

---

[46] MRK Study at 681 (footnotes omitted).

[47] *See, e.g.*, Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, University of Illinois Law Review Online, at 101-102 (2020) (the "Bhole Study"); Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000); MRK Study at 681.

[48] *Id.*

[49] Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63, at 108 (2000).

Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[50]

49.    **Exhibit 2** graphs Carvana's Common Stock weekly trading volume as a percentage of shares outstanding throughout the Class Period.[51] The average weekly trading volume was 21.10% of Carvana's Common Stock outstanding over the Class Period.[52] This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court. Moreover, as further explained in **Section V.L**, Carvana's elevated trading volume from January 2022 through February 2023 does not indicate inefficiency or the inability of investors to cover or close out their short positions. As a result, Carvana's level of stock trading volume throughout the Class Period supports the conclusion that Carvana's Common Stock traded in an efficient market throughout the Class Period.

50.    I also note that the average weekly trading volume of Carvana's Common Stock over the Class Period was 19.46 million shares on the NYSE. This is a far larger weekly trading volume than was found for the MRK Previously Covered Companies (just 0.034 million shares), as well as the MRK Covered Companies (0.215 million shares).[53] Additionally, Carvana's daily turnover rate of 4.19% during the Class Period placed it above the 95th percentile of all companies

---

[50] *Cammer*, 711 F. Supp. at 1293 (quoting Bromberg, § 8.6).

[51] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[52] Carvana Common Stock experienced an average weekly trading volume of 35.40% during the Extended Period supporting the conclusion that Carvana's Common Stock traded in an efficient market throughout the Extended Period.

[53] MRK Study at 678 (Table 3). The median annual trading volume for MRK Previously Covered Companies was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK Covered Companies was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

listed on the NYSE and the NASDAQ.[54] This further supports the conclusion that Carvana's Common Stock traded in an efficient market throughout the Class Period.

**B.  *Cammer* Factor 2: Analyst Coverage**

51.    The second *Cammer* factor looks at the amount of analyst coverage the company at issue receives. An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or industry. Analysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock.

52.    Analyst coverage can be indicative of market efficiency since research analysts help to disseminate new important company-specific information to investors, thus impounding new information into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[55]

---

[54] According to the Bhole Study at 102, the 95th percentile of daily turnover for the 2016-2018 sample period is 2.95%. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[55] *Cammer*, 711 F. Supp. at 1286.

53.     In **Exhibit 3,** I review the analyst coverage of Carvana over the Class Period. I identified a total of 723 reports issued by analysts at 44 separate firms during that period.[56,57] The list of analyst reports that I was able to identify includes reports by firms such as J.P. Morgan, Wells Fargo, and Oppenheimer & Co, among others. Collectively, this is a significant degree of analyst coverage which helped to disseminate important new publicly available information to investors, including company news, financial performance, and forecasts.

54.     Empirically, this degree of analyst coverage is greater than that of most other publicly traded firms as documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by the Institutional Brokers' Estimate System ("I/B/E/S") received no analyst coverage in a given year.[58] Charles M.C. Lee and Eric So documented that, on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[59] Barber et al. found that coverage by one or two analysts strengthened the presumption of market efficiency.[60] Moreover, Carvana's high level of analyst coverage also placed it above the 95th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[61] The significant analyst coverage of Carvana during

---

[56] These statistics represent a lower bound of the analyst coverage of Carvana because many analyst reports are provided directly to investors but not captured by third-party data vendors.

[57] 45 analyst firms issued a total of 845 reports covering Carvana during the Extended Period. The significant analyst coverage of Carvana during the Extended Period supports the conclusion that Carvana's Common Stock traded in an efficient market throughout the Extended Period.

[58] MRK Study at 668.

[59] Charles M.C. Lee and Eric C. So, *Uncovering Expected Returns: Information in Analyst Coverage Proxies*, Journal of Financial Economics 124, at 336 (see Table 1, Panel B – "COV") (2017).

[60] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19, at 302 and 310-311 (1994).

[61] Bhole Study at 104 (95th percentile defined as 26 analysts). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

the Class Period supports the conclusion that Carvana Common Stock traded in an efficient market throughout the Class Period.

55.    While the *Cammer* court specifically discussed analyst coverage as indicating wide dissemination of information about a given company, thus supporting market efficiency, individual and institutional investors also had access to a variety of other sources of information about Carvana available during the Class Period. For example, I conducted a search of press and news articles about Carvana using Factiva, a well-known provider of access to business news across a comprehensive set of publications. This search identified 1,590 unique articles about Carvana published throughout the Class Period from leading news outlets, including *Dow Jones Institutional News*, *The New York Times*, *Reuters News*, and *Business Wire*, among others.[62]

56.    Moreover, Carvana produced numerous filings containing Company information that were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period.

57.    As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Carvana supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### C.  *Cammer* Factor 3: Market Makers

58.    The third *Cammer* factor examines market makers, which are firms that facilitate the buying and selling of shares among investors in a company's stock during trading hours.[63]

---

[62] 3,082 English language articles were identified through a Factiva search, including Carvana's company tag over all available sources. After excluding potential duplicates, 1,590 unique news articles were identified by this search.

[63] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[64]

59.     In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[65]

60.     The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting.

61.     Carvana had at least 137 market makers and brokers facilitating the buying and selling of the Common Stock over the Class Period, which supports a finding of market

---

[64] Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19, at 291 (1994).

[65] *Cammer*, 711 F. Supp. at 1293; *see also Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. Dec. 22, 2016) ("The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.").

efficiency.[66,67] Further, Carvana's Common Stock traded on the NYSE throughout the Class Period. Similar to other large, national exchanges, the NYSE reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient.[68] The *Cammer* court stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[69]

62.     I understand that courts typically view large, established stock exchanges with market makers (such as the NYSE and NASDAQ) as being informationally efficient.[70] Carvana's

---

[66] *See* Bloomberg "RANK" function ("RANK <GO> provides brokers' advertised trade volume on a post-trade basis, so you can analyze which brokers provide the greatest liquidity, assess how you rank against your peers, and evaluate the greatest liquidity providers in a corporation. RANK generates historical broker ranking reports, comparing broker activity in a single security or across an exchange, index, or portfolio, helping you trade with minimal market impact . . . RANK provides the equity market share data that is critical to helping buy-side firms identify which brokers potentially are the market makers in a stock in which they are interested, so that trading decisions can be made more accurately. Additionally, sell-side firms can demonstrate their historical ability to source liquidity for clients, while investment bankers can market their ability to manage their corporate finance clients' flow.").

[67] Carvana had at least 145 market makers and brokers facilitating the buying and selling of the Company's Common Stock over the Extended Period, supporting a finding of market efficiency over the Extended Period.

[68] *See* NYSE Equities, Market Participants, *NYSE*, available https://www.nyse.com/trade/equities: "Designated Market Maker. DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. There is one DMM assigned to each NYSE listed security."

[69] *Cammer*, 711 F. Supp. at 1292.

[70] *See, e.g., Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (citation omitted); *In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d 277, 297 n. 133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").

public listing on the NYSE, a well-developed and established national exchange, thus satisfies this market maker *Cammer* factor.

63. Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading.[71] Academic research has similarly found that institutional investors can facilitate trading liquidity. Carvana's Common Stock was held by at least 1,018 unique institutional investors during the Class Period, who owned an average of 98.32 million shares, or 100.18% of Carvana's Common Stock public float.[72]

64. In sum, Carvana easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for Carvana's Common Stock throughout the Class Period.

**D. *Cammer* Factor 4: SEC Form S-3 Filing Eligibility**

65. The fourth *Cammer* factor is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, ***such ineligibility was only because of timing factors***

---

[71] *See, e.g., In re Countrywide Fin'l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading." (citations omitted)); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

[72] *See* **Exhibit 10**. By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only nine institutional investors while the MRK Covered Companies had a median of 40 institutional investors (at 678 – Table 3). Carvana's institutional ownership base greatly exceeds both of these levels. Institutional holdings can exceed shares outstanding due to short interest and different timing in quarterly reporting of holdings. For example, the Bhole Study documents that many companies have institutional ownership exceeding 100% of shares outstanding (p. 106).

rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[73]

66.     Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has a float of at least $75 million, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[74] The logic and intuition behind this factor, as discussed by the *Cammer* court, is that investors in a company that makes timely financial filings with regulators will have ready and ample access to publicly available information about the issuer.

67.     As shown in **Exhibit 8**, Carvana's market capitalization averaged $15.2 billion over the Class Period. Moreover, **Exhibit 10** demonstrates significant public float of Carvana's public shares available for trading, with the number of shares held by investors other than insiders averaging 98.86 million over the Class Period. Multiplying these shares by Carvana's closing stock price on each quarter-end date indicates that the value of Carvana's public float ranged from $661.80 million to $27.81 billion during the Class Period, with an average of $15.00 billion.[75] Thus, at all times during the Class Period, the value of Carvana's public float far exceeded the S-3's minimum eligibility requirement of $75 million.

---

[73] *Cammer*, 711 F. Supp. at 1287 (emphasis added).

[74] *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf.

[75] Carvana's public float averaged $13.86 billion during the Extended Period, far exceeding the S-3 minimum eligibility requirement and consistent with the efficiency of the market for Carvana Common Stock throughout the Extended Period.

68.      Carvana also regularly filed financial reports with the SEC throughout the Class Period. The financial information in Carvana's SEC filings, supplemented by information conveyed by research analysts and news coverage, provided investors with access to financial information about Carvana on a continuous basis throughout the Class Period. Based on my research, Carvana made required filings with the SEC in a timely manner and satisfied the other Form S-3 requirements throughout the Class Period. Moreover, on March 30, 2020, just prior to the start of the Class Period, Carvana announced a sale of Class A common stock that was "being sold pursuant to a shelf registration statement on Form S-3 that was previously filed with the Securities and Exchange Commission (SEC) and declared effective on May 20, 2019."[76] As a result, this factor is consistent with the efficiency of the market for Carvana Common Stock throughout the Class Period.

### E.  *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

69.      The fifth *Cammer* factor relates to whether a company's stock price quickly responds to and incorporates new value-relevant information. The *Cammer* court held:

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[77]

70.      Below, I summarize my empirical analysis, which finds that Carvana's Common Stock exhibited the type of cause and effect relationship between company-specific information flow and price movement described in *Cammer*. As part of my analysis, I compared the behavior of Carvana's Common Stock on days when potential value-relevant news was issued via earnings releases and prereleases with its behavior on days when no such news was issued. This analysis

---

[76] Carvana March 30, 2020 press release at https://investors.carvana.com/news-releases/2020/03-30-2020-123011088.

[77] *Cammer*, 711 F. Supp. at 1291.

demonstrates that Carvana's Common Stock price reacted to company-specific news, and thus further supports the conclusion that Carvana's Common Stock traded in an efficient market throughout the Class Period.

i.      *Event Study Methodology*

71.      To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.

72.      Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[78] As Professor Eugene F. Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[79]

73.      To determine whether Carvana's Common Stock price movement on any given date was statistically significant, I performed an event study using generally accepted econometric

---

[78] *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 13 (1997).

[79] Eugene F. Fama, *Efficient Capital Markets: II*, Journal of Finance 46, at 1607 (1991).

methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices.

74. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study analysis, an economist tests whether the deviation from expected price movement (*i.e.*, the "abnormal return") is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the company's stock price return such that simple random movement can be rejected as the cause.

75. I applied these widely used and generally accepted econometric methodologies to perform my event study here. Specifically, in order to isolate the impact of company-specific news on Carvana's Common Stock price during the Class Period, I performed regression analyses to measure the relationship between Carvana's Common Stock price return and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Carvana's industry. By modeling how Carvana's Common Stock price moved relative to an overall market index and an industry index, I was also able to measure the response of Carvana's Common Stock to announcements of company-specific news.

76. I conducted my regression analysis over the Class Period, and the Extended Period plus one trading day (the "Extended Analysis Period")[80]. For each trading day, I constructed a

---

[80] The Extended Analysis Period extends one trading day beyond the Extended Period to capture the market reaction to Carvana's 4Q22 earnings release, which was announced after market trading hours on the final day of the Extended Period.

regression model using data from the prior 120 trading days (*i.e.*, six calendar months, the "Estimation Window").[81]

77.     To study the relationship between Carvana's Common Stock price return and overall market factors, I used the S&P 500 Index (the "Market Index"). To study the relationship between Carvana's Common Stock price return and changes in industry-wide factors that would be expected to impact all stocks in Carvana's particular industry, I used the S&P 500 Consumer Discretionary Distribution & Retail Index (the "Industry Index").[82] Carvana compared its performance to these Market and Industry Indices in the Company's annual reports.[83]

78.     I established the relationship between the daily return of Carvana's Common Stock, the daily return on the Market Index, and the daily return on the Industry Index over each

---

[81] I utilized an Estimation Window of 120 trading days, which equates to approximately six calendar months. This allowed my regression approach to adapt to the changing volatility of stock returns over time. *See, e.g.*, Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, The Business Lawyer 49 (1994); A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35, at 15 (1997) ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally, the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates."). The Estimation Windows exclude the alleged revelations of the relevant truth dates, and earnings dates, including the News Days identified in **Exhibit 6**.

[82] The index includes various consumer discretionary and retail companies such as Tiffany & Co, Amazon, eBay, and CarMax, among others. The index had between 21 and 25 members during the Class Period.

[83] *See* SEC EDGAR*, Carvana Co.*, February 24, 2022, Form 10-K for fiscal year 2021*, available at* https://www.sec.gov/Archives/edgar/data/1690820/000169082022000080/cvna-20211231.htm The Company referred to the S&P 500 Index and the "S&P 500 Retailing Index," which subsequently changed its name to the "S&P 500 Consumer Discretionary Distribution & Retail Index." See SEC EDGAR, Carvana Co., February 18, 2026, Form 10-K for fiscal year 2025, *available at* https://www.sec.gov/Archives/edgar/data/1690820/000169082026000009/0001690820-26-000009-index.htm.

Estimation Window.[84] As shown in **Exhibit 4**, the event study models revealed an evolving relation between the daily return of Carvana's Common Stock and those of the overall stock Market and Industry Indices throughout the Class Period. In other words, movements of the Market Index and the Industry Index help explain movements in Carvana's Common Stock price.

79.    Consistent with generally accepted econometric methods, these observed relationships allowed me to construct a model to predict the expected daily return of Carvana's Common Stock on any given date within the Class Period that controlled for that day's market and industry returns. Again, in accordance with standard event study methodology, I then subtracted this predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

80.    Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in Carvana's Common Stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility (or "randomness") remains in the price movement of Carvana's Common Stock after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

---

[84] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 35 (1997); Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, Journal of Finance 50, at 1597 (1995).

       *ii.*     *Cause-and-Effect Analysis Comparing Carvana's Common Stock Price Behavior on News Days versus No News Days*

81. A generally accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on days when potential value-relevant company-specific news is disclosed ("news days") with its behavior on other days with relatively little or no such news ("no news days").[85] A showing that a security's price is statistically significantly more volatile on "news days" than on "no news days" is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency.[86]

82. Importantly, research has shown that in an efficient market, it is possible for a security to exhibit some large price movements despite the absence of news and, conversely, for one to observe news without large price movements.[87] For instance, a company may announce earnings (or a lack thereof) that are in line with investor expectations – and while such an expected announcement is clearly important to investors, it may not elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information, which may effectively offset each other, which again could result in no statistically significant price movement. Further, if a company's disclosure conceals important information, the effect of the concealment will generally not result in a significant stock price movement, but will instead simply maintain the price at its then-current level.

---

[85] Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

[86] *Id.*

[87] *See* Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, *Information, Trading, and Volatility: Evidence from Firm-Specific News*, Review of Financial Studies 32, at 1004 (2019); Ray Fair, *Events That Shook the Market*, Journal of Business 75, at 713, 714 (2002).

83. Accordingly, a generally accepted, peer-reviewed methodology also accepted by numerous courts is to compare (i) a subject company's stock price behavior on a *group* of news days to (ii) its stock price behavior on a *group* of no news days.[88]

84. Here, I performed such an analysis comparing the behavior of Carvana's Common Stock on news days versus no news days. My analysis demonstrates that the price of Carvana's Common Stock was statistically significantly more volatile on news days than on no news days. This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price" for Carvana's Common Stock during the Class Period and, thus, further supports a finding of market efficiency. [89]

85. To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I identified Carvana's quarterly earnings releases during the Class Period (the "News Days").[90] These types of announcements represent a potential opportunity for the public release of new value-relevant Company information to investors. As shown in **Exhibit 6**, in total, Carvana issued 11 financial releases during the Class Period.

86. I then compared the stock returns and trading volume of Carvana's Common Stock on these News Days versus those metrics on trading days that contained the least news during the

---

[88] Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021). This approach has been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.*, *In re Teva Securities Litigation*, 2021 WL 872156, at *21 (D. Conn. 2021); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F.Supp.3d 415, 429 (S.D.N.Y. 2014); *In re: Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022); *Bond v. Clover Health Invs., Corp.*, 2023 WL 1999859, at *22 (M.D. Tenn. Feb. 14, 2023); *In re: QuantumScape Sec. Class Action Litig.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

[89] *Cammer*, 711 F. Supp. at 1291.

[90] If the release was issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day. I also include one earnings prerelease that was announced, because it falls within this News Day definition.

Class Period (the "No News Trading Days"). I identified No News Trading Days as days on which there were no News Day events, no alleged revelations of the relevant truth, no SEC filings, and no news articles from Dow Jones Newswires on Factiva tagged to Carvana.[91] The No News Trading Days provide a benchmark measurement of days on which relatively little or no new Carvana-specific information was provided to the market. If Carvana's Common Stock prices tend to move more significantly on News Days than on No News Trading Days, this would support a conclusion of market efficiency. As discussed below, there were 237 No News Trading Days during the Class Period.[92]

87.    **Exhibit 6** reports the list of 11 News Days. It also reports the results of my event study using Carvana's Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, and the p-value corresponding to statistical significance. Overall, four out of 11 Carvana News Days observed stock price movements that were statistically significant at the 95% confidence level or above. I compare this rate with that on the No News Trading Days in **Exhibit 7**.

88.    **Exhibit 7** summarizes the statistical comparison of Carvana's Common Stock returns and trading volume on the 11 News Days versus these metrics as measured on the 237 No News Trading Days. As shown in **Exhibit 7**, 36.36% of the News Day disclosures caused stock movements that were statistically significant at the 95% level. This compares to 6.75% of the No

---

[91] I ignore auto-generated articles that refer only to Carvana's stock price movements on a particular day from my identification of No News Trading Days.

[92] The 11 News Days and 237 No News Trading Days combined cover 41% of the trading days (248 of 612) in the Class Period.

News Trading Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at a level of greater than 99%.[93,94,95]

89.     These results provide strong evidence of a cause and effect relationship between new information and Carvana's Common Stock price movements. Moreover, relative to the No News Trading Days, the News Days had a higher average absolute abnormal return, with this difference being statistically significant at a level greater than 95%, and greater trading volume, with this difference being statistically significant at a level greater than 90%.[96]

90.     In summary, relative to No News Trading Days, Carvana's News Days resulted in a greater proportion of statistically significant stock price movements, higher absolute abnormal returns, and greater trading volumes, with these differences being statistically significant. These results establish a clear cause and effect relationship between the release of new company-specific information and Carvana's Common Stock price movements. As a result, this analysis of *Cammer* factor five supports the conclusion that Carvana's Common Stock traded in an efficient market during the Class Period.

---

[93] Based on a Fisher's Exact Test.

[94] Carvana issued 13 financial releases during the Extended Analysis Period. Five (38.46%) of the 13 financial release dates in the Extended Analysis Period experienced an abnormal return that was statistically significant at the 95% level versus 6.69% of the 269 no news trading days during the Extended Analysis Period. This difference is significant at the 99% level based on a Fisher's Exact Test, supporting the conclusion that Carvana's Common Stock traded in an efficient market during the Extended Analysis Period.

[95] Using a 90% significance level instead of the 95% level, 6 of Carvana's 11 (54.55%) News Days during the Class Period and 7 of Carvana's 13 (53.85%) News Days during the Extended Analysis Period experienced an abnormal return that was statistically significant at the 90% level. This compares to 9.28% of 237 No News Trading Days during the Class Period and 9.67% of 269 No News Trading Days during the Extended Analysis Period. The difference between these values for each period is significant at the 99% level based on a Fisher's Exact Test, consistent with my conclusion that Carvana's Common Stock traded in an efficient market during both the Class Period and the Extended Analysis Period.

[96] Based on a t-test for difference in means.

31

### F. *Krogman* Factor 1: Market Capitalization

91.     I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Krogman* court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[97]

92.     Conversely, as noted previously, the MRK Study found that companies that lack analyst coverage are also companies that are generally associated with other factors – such as relatively small market capitalization – that indicate that their shares trade in less developed and efficient markets. The median market capitalization of the MRK Previously Covered Companies – those that eventually lost all analyst coverage – was $27.91 million.[98] By contrast, the MRK Covered Companies – those with analyst-coverage – had a median market capitalization of $243.97 million.[99] This study thus supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

93.     **Exhibit 8** reports Carvana's market capitalization throughout the Class Period.[100] This market capitalization averaged $15.2 billion over the Class Period.[101] Carvana's total market capitalization places it above the 90th percentile of all companies listed on the NASDAQ and the

---

[97] *Krogman*, 202 F.R.D. at 478.

[98] MRK Study at 678 (Table 3).

[99] *Ibid.*

[100] Source: S&P Capital IQ, Bloomberg,

[101] Carvana's market capitalization averaged $13.3 billion during the Extended Period, consistent with the conclusion that the Common Stock traded in an efficient market during the Extended Period.

NYSE from 2016-2018.[102] Carvana's market capitalization also exceeded the median MRK Previously Covered Companies and MRK Covered Companies on an inflation-adjusted basis.[103]

94.    Carvana's market capitalization, shares outstanding available for trading, and its sizeable float, as discussed below, are consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period.

### G.  *Krogman* Factor 2: Bid-Ask Spread

95.    The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[104]

96.    The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example, relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

---

[102] Bhole Study at 107 (90th percentile of market capitalization defined as $12.9 billion). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[103] U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm.

[104] *Krogman*, 202 F.R.D. at 478.

97.     I analyzed the bid-ask spread of Carvana's Common Stock during the Class Period. **Exhibit 9** reports Carvana's bid-ask spread as a percentage of the bid-ask midpoint.[105] This spread averaged 0.06% over the Class Period.[106]

98.     By way of comparison, the MRK Study found that the MRK Previously Covered Companies had a median bid-ask spread of 4.55%, while the MRK Covered Companies had a median bid-ask spread of 1.69%.[107] Carvana's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade Carvana's Common Stock at very low relative cost. Additionally, Carvana's average bid-ask spread over the Class Period places it below the 50th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018 (lower percentile rankings correspond to smaller bid-ask spreads).[108]

99.     As a result, Carvana's bid-ask spread also supports the conclusion that Carvana's Common Stock traded in an efficient market throughout the Class Period.

### H. *Krogman* Factor 3: Public Float

100.    The *Krogman* court also considered the public float of a company in weighing market efficiency.[109]

101.    The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its C-suite employees and/or other insiders, then investors

---

[105] Source: S&P Capital IQ.

[106] Carvana's bid-ask spread averaged 0.07% during the Extended Period, supporting the conclusion that Carvana's Common Stock traded in an efficient market throughout the Extended Period.

[107] MRK Study at 678 (Table 3).

[108] Bhole Study at 105 (50th percentile of bid-ask spread defined as 0.14%). I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

[109] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

102.    **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for Carvana's Common Stock during the Class Period. During the Class Period, Carvana had between 69 million and 106 million shares of Common Stock outstanding. As shown in the exhibit, insiders held an average of 10.76% of Carvana's Common Stock over the Class Period, with non-insiders holding the remaining 89.24%.[110] This equates to an average public float of $15.0 billion during the Class Period. Overall, between 81 million and 140 million shares of Carvana Common Stock were available for trading in the public float during the Class Period.[111] Moreover, Carvana's public float greatly exceeded the $75 million minimum set by the SEC for S-3 filing eligibility.[112]

103.    The large public float of Carvana's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.

### I.    Additional Factor: Institutional Ownership

104.    I also analyze an additional indicator of market efficiency: the presence of institutional investors.[113] Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources

---

[110] Carvana's public float averaged 88.49% of shares outstanding during the Extended Period, supporting the conclusion that the Company's Common Stock traded in an efficient market throughout the Extended Period.

[111] Given the statistics demonstrating over 50 million shares outstanding, significant public float, sizeable ownership by over 1,000 unique institutions, and millions of shares traded weekly throughout the Class Period, Carvana's Common Stock ownership was numerous and was likely held and traded by thousands of individual investors.

[112] *See* SEC Form S-3, *available at* https://www.sec.gov/files/forms-3.pdf.

[113] *See, e.g., In re Countrywide Fin'l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market."); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

to allocate to investing decisions. These institutions and entities that invest on their behalf can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

105.    I report the total institutional ownership of Carvana Common Stock in **Exhibit 10,** which shows that at least 1,018 institutions held the stock at some point during the Class Period. By comparison, the MRK Study found that the MRK Previously Covered Companies had a median of only nine institutional investors while the MRK Covered Companies had a median of 40 institutional investors.[114, 115] Carvana's institutional ownership base greatly exceeds both of these levels. On average, institutional investors held 114.59% of Carvana's Common Stock outstanding during the Class Period.[116] This level placed it higher than the 95th percentile of NYSE and NASDAQ traded companies.[117] Thus, the significant institutional ownership base for Carvana's Common Stock supports the conclusion that Carvana traded in an efficient market throughout the Class Period.

### J.  Information Environment During the Class Period

106.    I also considered the general information environment regarding Carvana during the Class Period. In my review of news and analyst coverage of Carvana discussed throughout this report, I noted commentary speculating on the potential for Carvana to represent a meme stock

---

[114] MRK Study at 678 (Table 3).

[115] Carvana was held by at least 1,041 unique institutions during the Extended Period, supporting the conclusion that the Company's Common Stock traded in an efficient market throughout the Extended Period.

[116] As explained above, institutional holdings can exceed shares outstanding due to short interest and different timing in quarterly reporting of holdings.

[117] Bhole Study, at 106: 95th percentile defined as 103.98% of shares outstanding. I note that the 2016-2018 subsample time period is the most recent period reported in the Bhole Study.

targeted by retail investors, as well as the potential for Carvana to represent a short squeeze candidate.[118] I considered these aspects of the information environment for Carvana during the Class Period when conducting my market efficiency analyses.

107.    In my evaluation of the efficiency factors for Carvana's Common Stock, I considered whether the efficiency conclusion from these factors was undermined by other aspects of Carvana's public information environment such as retail investor interest, potential meme stock status, and short squeeze dynamics. If any of these aspects caused Carvana's Common Stock to be informationally inefficient, I would expect this inefficiency to be reflected in the various *Cammer*, *Krogman*, and other efficiency factors I evaluated. For example, if these dynamics caused Carvana's stock to no longer be informationally efficient, I would expect to observe the absence of any relation between relevant news and corresponding stock price movements. Yet, as explained above, my *Cammer* 5 analysis identified a statistically significant difference between returns on News Days versus those on No News Days. Because the *Cammer* and *Krogman* factors weigh in favor of market efficiency despite the status of Carvana as a potential meme stock and short squeeze candidate, I conclude that the market for Carvana's Common Stock was efficient throughout the Class Period and the Extended Period.

108.    Consistent with my conclusion based on the *Cammer* and *Krogman* factors, I note that Carvana's Common Stock price increased following positive financial results announced on August 4, 2022[119] and declined following negative financial results announced on November 3,

---

[118] *See, e.g.*: "Carvana Is Acting Like a Meme Stock. GameStop and AMC Closed Higher Too," *Barron's*, May 12, 2022; "9 Key Meme Stocks To Run Out Of Money In Less Than 2 Years," *Investor's Business Daily*, Aug. 30, 2022.

[119] *See* SEC EDGAR*, Carvana Co.*, August 4, 2022, Form 8-K for 2Q 2022*, available at* https://www.sec.gov/Archives/edgar/data/1690820/000169082022000252/0001690820-22-000252-index.htm.

2022[120] and February 23, 2023.[121] These stock price movements in response to disclosures of new Company-specific information occurred despite elevated trading volumes during these time periods. Moreover, the cost for short sellers to borrow shares remained relatively low during the Class Period (below 2%) and during the Extended Period (below 20%).[122] Further, on a dollar-volume basis, Carvana's weekly trading volume remained relatively stable through the end of the Class and Extended Periods (see **Exhibit 11**). These analyses are consistent with my conclusion that the market for Carvana's Common Stock was efficient throughout the Class Period and the Extended Period.

## VI.     Calculation of Damages for Exchange Act Claims

109.     I have also been asked to opine on whether per-share damages for traders of Carvana's Common Stock can be assessed for all Class members based upon a methodology common to all Class members and consistent with Plaintiffs' theory of liability. As discussed below, damages for each of Plaintiffs' claims can be calculated on a class-wide basis through a common methodology, the out-of-pocket damages methodology, which is also consistent with Plaintiffs' liability theory.[123]

### A.  Calculation of Damages for Violation of §§ 10(b) and 20(a) of the Exchange Act

110.     The Complaint alleges that, as a result of Defendants' fraudulent scheme, including misleading statements and material omissions, Carvana's Common Stock traded at artificially

---

[120] *See* SEC EDGAR*, Carvana Co.*, November 3, 2022, Form 8-K for 3Q 2022*, available at* https://www.sec.gov/Archives/edgar/data/1690820/000169082022000312/0001690820-22-000312-index.htm.

[121] *See* SEC EDGAR*, Carvana Co.*, February 23, 2023, Form 8-K for 4Q and FY 2022*, available at* https://www.sec.gov/Archives/edgar/data/1690820/000169082023000050/0001690820-23-000050-index.htm.

[122] Data Source: S3 Partners.

[123] This conclusion applies to both the Class Period and the Extended Period.

inflated prices during the Class Period.[124] Plaintiffs also claim certain Defendants are liable as control persons under § 20(a).[125]

111.    The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under § 10(b) of the Exchange Act. This approach calculates investor damages formulaically as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the Private Securities Litigation Reform Act of 1995 caps these investors' damages at the difference between the purchase price for the security and the "mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."[126] This cap on damages is also applied class-wide.

112.    The claims process produces information necessary for the calculation of damages for each Class member as inputs to the formula above, including the purchase and sale information for each Class member's trades (including transaction dates and quantity of shares traded). This information is available from brokerage statements, trade blotters, and/or other documentation of securities transactions.

113.    Another input to the above formula, the quantification of an artificial inflation ribbon per share, is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and such analysis often incorporates information produced during discovery. Nonetheless, the method employed to eventually calculate artificial inflation can

---

[124] Complaint ¶¶ 341-350.

[125] *Id.*¶¶ 351-357. § 20(a) provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. See 15 U.S.C. § 78t(a). Given § 20(a)'s derivative nature, Plaintiffs have instructed me to assume that § 20(a) damages can be calculated using the same methodologies for assessing § 10(b) damages.

[126] 15 U.S.C. § 78u-4(e)(1).

be applied class-wide as an input to the out-of-pocket formula. For example, event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to disclosures and materializations of the risks which dissipate the relevant truth that was concealed by alleged fraudulent misrepresentations, and do not rely on individual class member-specific information.[127]

114.    Separately, valuation models can also be relied upon to estimate artificial inflation. For example, the widely-used discounted cash flow analysis ("DCF") valuation approach estimates changes to firm value based on changes in future expected cash flows. As Fama and French explain: "A stock's price can always be expressed as the present value of expected future cash flows discounted at the expected return on the stock."[128] Discounting the changes in future expected cash flows resulting from alleged misrepresentations, omissions, and/or schemes to the net present value ("NPV") based on a firm's risk-adjusted discount rate can provide an alternative, reliable measure of artificial inflation as the input to the out-of-pocket damages methodology.[129] Such changes in valuation are also commonly measured through multiples analysis, in which a company's valuation is expressed as a multiple of financial performance, such as sales or earnings.[130]

115.    To the extent that reliable evidence is introduced to show that a significant portion of the difference in the artificial inflation between the purchase and sale of the securities may be

---

[127] For the purposes of this Report, I conducted an event study to assist with the evaluation of market efficiency. While this demonstrated the feasibility of using an event study to identify stock price movements caused by Carvana-specific disclosures, my event study in this Report was not intended to quantify artificial inflation.

[128] Eugene F. Fama and Kenneth R. French, *The Capital Asset Pricing Model: Theory and Evidence,* Journal of Economic Perspectives 18, at 41 (2004).

[129] *See, e.g.*, Frank Partnoy, *Market Prices vs. Fundamental Value: The Case for Using Discounted Cash Flow Analysis in Securities Class Actions,* The Business Lawyer 77, at 1060-1063 (2022).

[130] Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, John Wiley & Sons, Inc. (Hoboken), at 11 (2009).

attributed to non-fraud-related factors, the impact of such "confounding information" on the price of Carvana's Common Stock can be determined on a common, class-wide basis using various accepted methodologies, such as event study analysis, valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during discovery and will be based on the specific set of facts and circumstances present in the case.

116. A loss causation analysis also documents how artificial inflation per share evolved throughout the Class Period. That analysis and determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. Regardless of how artificial inflation is quantified, the level of artificial inflation remains the same across all Class members at any given point in time.

117. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per-share inflation equaled a constant dollar amount above the correct share price over the Class Period. This input to the out-of-pocket damages formula often calculates artificial inflation based upon the abnormal dollar value of a stock price decline utilizing an event study conducted around one or more corrective disclosures.

118. Alternatively, one can measure "constant percentage inflation," which assumes that each day's share price was inflated by a constant percentage amount above the correct stock price over the Class Period. This input to the out-of-pocket formula often calculates artificial inflation based upon the abnormal percentage return in the stock price as calculated through an event study around one or more corrective disclosures.

119. In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these

approaches, the calculations of artificial inflation and any potential disaggregation of confounding information are based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents.

120.    All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances. This is because, as noted above, the level of artificial inflation remains the same across all Class members at any given point in time, regardless of how it is calculated.

**B.  Damages Methodology is Flexible and can Incorporate Alternative Findings**

121.    The damages methodology I have laid out above is flexible and able to incorporate alternative findings of fact regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the Class Period. The methodology can be modified based on the specific findings the finder of fact may make, including, but not limited to: (1) the presence and degree of confounding information versus corrective information; (2) how to back-cast inflation over the Class Period; and (3) when the first actionable fraudulent conduct or misstatement occurred.

122.    First, irrespective of what the jury ultimately determines is the appropriate amount of abnormal return that can be attributed to the release of corrective versus confounding information, that percentage can easily be inserted into the standard out-of-pocket damages model that I have described above. Thus, regardless of whether a jury finds that the analysis I may conduct results in the most appropriate inflation figure, or they determine that based upon the evidence, a different amount is more appropriate, that finding can and will be an input into the formulaic out-of-pocket damages calculation.

123.    Second, should the jury determine that the true economic inflation in Carvana's Common Stock price evolved over the Class Period, my out-of-pocket damages model can still

account for such a scenario and can mechanically calculate damages on a class-wide basis.

124.    Third, should the jury decide that the first actionable misstatement or otherwise actionable fraudulent conduct happened at an alternative date other than the current start of the Class Period, this is easily accounted for in an out-of-pocket damages calculation. Prior to such date, inflation in the stock price could simply be set to zero.

125.    Additionally, if the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

126.    To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of the claims in this matter, however, I conclude that Carvana's Common Stock damages in this case can be calculated using a standard and well-established methodology applied on a class-wide basis.

## VII.    Calculation of Damages for Securities Act Claims

127.    I have also been asked to describe a method by which damages for investors who purchased Carvana Common Stock traceable to the Offering can be calculated on a class-wide basis subject to a common methodology. As discussed below, damages for the Securities Act Claims can be calculated by the application of statutory formulas.

### A.    Calculation of Damages for Violation of §§ 11 and 15 of the Securities Act

128.    Plaintiffs allege that the Securities Act Defendants are liable to members of the Class who acquired Carvana securities pursuant and/or traceable to the Offering for violations of § 11 of the Securities Act.[131] Plaintiffs also claim that the Securities Act Executive and Director

---

[131] Complaint ¶¶ 428-435.

Defendants are liable as control persons under § 15 of the Securities Act.[132]

129.    The statutory formula for calculating damages under § 11 claims is set forth in § 11(e) of the Securities Act, which states:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.[133]

130.    Thus the statute sets forth the methodology used to calculate damages for all eligible securities and Class members.

131.    For each eligible security purchase as subsequently sold on or prior to February 14, 2023 (the "date of suit"), damages are calculated as the difference between the amount paid for the security (not to exceed the price at which the security was offered to the public) and the price at which the security was sold.[134]

**B.  Calculation of Damages for Violation of § 12(a)(2) of the Securities Act**

132.    Plaintiffs allege that the Underwriter Defendants are liable to members of the Class who acquired Carvana Common Stock pursuant to the Offering for violations of § 12(a)(2) of the

---

[132] Complaint ¶¶ 443-448. § 15 provides that control persons shall be "jointly and severally [liable] with and to the same extent" as the controlled person(s) that violated the securities law. *See* 15 U.S.C. § 77o(a). Given § 15's derivative nature, Plaintiffs have instructed me to assume that § 15 damages can be calculated using the same methodologies for assessing § 11 damages.

[133] 15 U.S.C. § 77k(e).

[134] I understand that the first complaint alleging Securities Act claims in this matter was filed on February 14, 2023.

Securities Act.[135]

133.    § 12(a)(2) of the Securities Act prescribes that the seller of a security that falls within the provisions of the Act

> . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.[136]

134.    I understand that § 12(a)(2) provides for the remedy of rescission, if the plaintiff retains the security on the date of judgment, or for rescissory damages, otherwise. In the case of rescission, for each eligible security, Underwriter Defendants would owe a refund, calculated as: (1) the amount paid for the security, (2) plus statutory interest on that amount, (3) minus any dividends received.[137]

135.    In the case of rescissory damages, I consider two different scenarios for calculating the statutory pre-judgment interest. In Scenario 1, damages are calculated as (1) the amount paid for the security, (2) plus statutory interest on that amount from the date of sale through the date of judgment, (3) minus any dividends received, and (4) minus the sale price. In Scenario 2, statutory interest from the date of sale through the date of judgment is instead calculated on: (1) the amount paid for the security, (2) minus any dividends received, and (3) minus the sale price.[138]

### C. Defendants Carry the Burden of Proving Negative Causation

136.    The calculations above reflect the statutory damages recoverable under §§ 11 and

---

[135] Complaint ¶¶ 436-442.

[136] 15 U.S.C. § 77l(a)(2).

[137] I assume that investors who still hold their shares would tender them as of the date of judgment. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 583–84 (S.D.N.Y. 2015).

[138] My understanding is that Carvana has not paid any dividends to Common Stock holders.

12(a)(2) of the Securities Act. §§ 11 and 12(a)(2) allow Securities Act Defendants to reduce some or all of these damages if they can prove that financial losses under the statutory formula were not caused by the alleged false statements or omissions.

137.     § 11(e) provides:

> if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.[139]

138.     Similarly, § 12(b) provides:

> if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.[140]

139.     As of the date of this report, I am not aware of any evidence presented by Securities Act Defendants that establishes any negative causation.

## VIII.  Conclusion

140.     Based on my analyses of the market efficiency factors considered by courts, economists, and in academia, it is my opinion that Carvana's Common Stock traded in an efficient market throughout the Class Period and the Extended Period. Moreover, it is my opinion that damages for both the Exchange Act Claims and Securities Act Claims can be calculated on a class-wide basis utilizing common methodologies.

---

[139] 15 U.S.C. § 77k(e).

[140] 15 U.S.C. § 77l(b).

Respectfully Submitted,

_____

Matthew D. Cain

## Appendix A

## Matthew D. Cain, Ph.D. April 2026

E-mail: mdcain@outlook.com
Mobile: 574-485-8065

### Education

Ph.D., Finance, August 2007                     Purdue University, West Lafayette, IN
B.S., Finance, May 2001                            Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, New York University School of Law, 2024-Present

*Senior Fellow*, Berkeley Center for Law and Business, 2019-2024

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk
Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN,
2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

What is Price Impact? How the *Goldman* Decisions are Reshaping Shareholder Class Actions (with Per
Axelson), *Berkeley Business Law Journal* 22:2, 441-465 (2025).

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B.
Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon
Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr.,
and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden

A-2

- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania; Napa
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2026

A-3

LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business
FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Witness Experience**

- *Local 272 Labor-Management Pension Fund, et al. v. The Walt Disney Company, et al.*, Case No. 2:23-cv-03661-CBM (C.D. Ca.). Report March 2026.

- *Bucks County Employees Retirement System, et al. v. Norfolk Southern Corporation, et al.*, Case No. 1:23-cv-04175-SDG (N.D. Ga.). Report February 2026. Deposition April 2026.

- *Michael Farzad and Gregory Perri, et al. v. Trasimene Capital FT, LP II, Trasimene Capital Management, LLC, William P. Foley, II, Richard N. Massey, Erika Meinhardt, Mark D. Linehan, C. Malcolm*, C.A. No. 2023-0193-JTL (Del. Chancery). Report February 2026. Rebuttal Report March 2026.

- *City of Fort Lauderdale General Employees' Retirement System, et al. v. Holley Inc., et al.*, Case No. 1:23-cv-00148-GNS (W.D. Ky.). Report January 2026.

- *Securities and Exchange Commission v. Anthem Hayek Blanchard and Anthem Holdings Company*, Case No. 2:24-cv-02437-KHV-GEB (D. Kan.). Report January 2026.

- *In re SVB Financial Group Securities Litigation*, Case No. 3:23-cv-01097-NW (N.D. Ca.). Report January 2026. Rebuttal Report March 2026.

- *In re Seagate Technology Holdings plc Securities Litigation*, Case No. 3:23-cv-03431-RFL (N.D. Ca.). Report December 2025. Deposition January 2026. Report March 2026.

- *United States of America v. Andrew Left*, CR No. 2:24-cr-00456-TJH (C.D. Ca.). Declaration December 2025. Declaration February 2026.

- *Glazing Employers and Glaziers' Union Local #27 Pension and Retirement Fund, et al. v. iRhythm Technologies, Inc., et al.*, Case No. 3:24-cv-706 (N.D. Ca.). Report November 2025. Deposition December 2025. Rebuttal Report February 2026.

- *In re Virtu Financial, Inc. Securities Litigation*, Case No. 1:23-cv-03770 (E.D. N.Y.). Report October 2025. Deposition December 2025. Rebuttal Report March 2026.

- *In re SolarEdge Technologies, Inc. Securities Litigation*, Case No. 1:23-cv-09748 (S.D. N.Y.). Report October 2025. Deposition January 2026. Rebuttal Report February 2026.

A-4

- *Joe Fasano, et al. v. Dangdang Holding Company, Ltd., et al.*, Case No. 01-22-0003-8285 (AAA). Report September 2025. Rebuttal Report October 2025.

- *KAYNE MICHAEL MIDDLETON v. TELUS INTERNATIONAL (CDA) INC., et al.*, Case No. S-248620 (Supreme Court of British Columbia, Vancouver Registry). Report August 2025.

- *In re Doximity, Inc., Securities Litigation*, Case No. 5:24-cv-02281 (N.D. Ca.). Report August 2025. Rebuttal Report October 2025. Deposition November 2025.

- *In re The Estee Lauder Co., Inc. Securities Litigation*, Case No. 1:23-cv-10669 (S.D. N.Y.). Report July 2025. Deposition December 2025.

- *Genesee County Employees' Retirement System, et al., v. DocGo Inc., et al.*, Case No. 1:23-cv-09476 (S.D. N.Y.). Report July 2025.

- *YVONNE DOLBEC c. BANK OF MONTREAL, et al.*, Case No. 500-06-001335-245 (Province of Quebec, District of Montreal). Report May 2025.

- *In re National Instruments Corporation Securities Litigation*, Case No. 1:23-cv-10488 (S.D. N.Y.). Report May 2025. Deposition June 2025. Report July 2025. Rebuttal Report November 2025. Deposition November 2025.

- *MOUVEMENT D'ÉDUCATION ET DE DÉFENSE DES ACTIONNAIRES c. CAE INC., MARC PARENT, and SONYA BRANCO*, Case No. 500-06-001312-244, (Province of Quebec, District of Montreal). Report April 2025.

- *In re StoneCo Ltd. Securities Litigation*, Case No. 1:21-cv-09620 (S.D. N.Y.). Report April 2025. Declaration November 2025.

- *In re UiPath, Inc. Securities Litigation*, Case No. 1:23-cv-07908 (S.D. N.Y.). Report February 2025.

- *Ali Diabat, et al., v. Credit Suisse Group AG, et al.*, Case No. 1:23-cv-5874 (S.D. N.Y.). Report December 2024. Rebuttal Report January 2025.

- *San Antonio Fire and Police Pension Fund, et al., v. Dentsply Sirona Inc., et al.*, Case No. 1:22-cv-06339 (S.D. N.Y.). Report November 2024. Rebuttal Report February 2025. Report September 2025. Deposition October 2025.

- *Steven Leventhal, et al. v. Chegg, Inc., et al.*, Case No. 5:21-cv-09953 (N.D. Ca.). Declaration November 2024.

- *Miami Firefighters' Relief & Pension Fund v. Carl C. Icahn et al.*, Index No. 657447/2019 (N.Y. Sup. Ct.). Declaration September 2024. Rebuttal Report October 2024.

- *Securities and Exchange Commission v. American Renal Associates Holdings, Inc., et al.*, Case No. 22-cv-10651-NMG (D. Mass.). Report June 2024. Deposition September 2024.

- *Securities and Exchange Commission v. Kevin A. Van de Grift and Gil Friedman*, Case No. 1:23-cv-01491 (S.D. N.Y.). Report June 2024. Declaration November 2024.

A-5

- *El Paso Firemen & Policemen's Pension Fund, et al. v. InnovAge Holding Corp., et al.*, Case No. 21-cv-02770-WJM-SKC (D. Co.). Report May 2024. Rebuttal Report October 2024.

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024. Deposition April 2024. Rebuttal Report June 2024. Report July 2024. Hearing August 2024. Rebuttal Report October 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024. Deposition April 2024. Rebuttal Report December 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024. Deposition March 2024. Rebuttal Report July 2024. Declaration September 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024. Report February 2025. Rebuttal Report August 2025. Deposition August 2025.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024. Rebuttal Report March 2024. Report July 2024. Deposition August 2024. Rebuttal Report September 2024. Declaration January 2026.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024. Rebuttal Report February 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023. Report December 2024. Deposition March 2025.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024. Report September 2024. Rebuttal Report November 2024. Deposition January 2025.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

A-6

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022. Report March 2024.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

A-7

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021. Rebuttal Report March 2024. Report September 2024. Deposition November 2024. Rebuttal Report January 2025.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

A-8

## Appendix B

### Documents Considered

**Court Documents:**

- Consolidated Complaint for Violations of the Federal Securities Laws, dated March 29, 2024, Case No. 2:22-cv-02126-MTL (Doc. 71).

- Order Granting In Part And Denying In Part Carvana Defendants' Motion to Dismiss, dated December 16,2024, Case No. 2:22-cv-02126-MTL (Doc. 105).

- Memorandum & Order, dated July 1, 2025, Case No. 2:22-cv-02126-MTL(Doc. 173).

**Court Decisions and Securities Law:**

- *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012).

- *Bromberg & Lowenfels*, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).

- *Bond v. Clover Health Investments, Corp., et al.*, 2023 WL 1999859, at *22 (M.D. Tenn. Feb. 14, 2023).

- *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-1287, 1291-1293 (D.N.J. 1989).

- *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 583–84 (S.D.N.Y. 2015).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *6 (N.D. Cal. 2016).

- *In re Countrywide Fin'l Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009).

- *In re HealthSouth Corp. Sec. Litig.,* 257 F.R.D. 260, 281 (N.D. Ala. 2009*)*.

- *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 296-297 n. 133 (S.D.N.Y. 2008).

- *In re QuantumScape Corp. Sec. Class Action Litig.*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

- *In re Teva Securities Litigation*, 2021 WL 872156, at *21 (D. Conn. Mar. 9, 2021).

- *In re Under Armour Sec. Litig.*, 631 F. Supp. 3d 285, 311-12 (D. Md. 2022).

- *In re Winstar Commc'ns Sec. Litig.,* 290 F.R.D. 437, 449 n.16 (S.D.N.Y. 2013).

- *Krogman v. Sterritt*, 202 F.R.D. 467, 477, 478 (N.D. Tex. 2001).

- *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429 (S.D.N.Y. 2014).

- Private Securities Litigation Reform Act of 1995 dated December 22, 1995.

**Academic Literature:**

- A. Craig MacKinlay, *Event Studies in Economics and Finance*, Journal of Economic Literature 13 (1997).

- Brad M. Barber, Paul A. Griffin, and Baruch Lev, *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, Journal of Corporate Law 19 (1994).

- Bharat Bhole, Sunita Surana, and Frank Torchio, *Benchmarking Market Efficiency Indicators for Securities Litigation*, University of Illinois Law Review Online (2020).

- Charles M.C. Lee and Eric C. So, *Uncovering Expected Returns: Information in Analyst Coverage Proxies*, Journal of Financial Economics 124 (2017).

- Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, Journal of Finance 25 (1970).

- Eugene F. Fama, *Efficient Capital Markets: II*, Journal of Finance 46 (1991).

- Eugene F. Fama and Kenneth R. French, *The Capital Asset Pricing Model: Theory and Evidence,* Journal of Economic Perspectives 18, at 41 (2004).

- Frank Partnoy, *Market Prices vs. Fundamental Value: The Case for Using Discounted Cash Flow Analysis in Securities Class Actions,* The Business Lawyer 77, at 1060-1063 (2022).

- Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, *Information, Trading, and Volatility: Evidence from Firm-Specific News*, Review of Financial Studies 32 (2019).

- Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, John Wiley & Sons, Inc. (Hoboken), at 11 (2009).

- Mark L. Mitchell and Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, The Business Lawyer 49 (1994).

- Miguel O. Villanueva and Steven Feinstein, *Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors*, Review of Quantitative Finance and Accounting 57 (2021).

- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, *Good News, Bad News, Volatility, and Betas*, Journal of Finance 50 (1995).

- Randall S. Thomas and James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, Law and Contemporary Problems 63 (2000).

- Ray Fair, *Events That Shook the Market*, Journal of Business 75 (2002).

- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, *Is There Life After the Complete Loss of Analyst Coverage?*, Accounting Review 88 (2013).

**Data Sources:**

- Bloomberg Terminal
- Dow Jones Factiva News
- Investext
- S&P Capital IQ
- SEC EDGAR
- S3 Partners

**Other:**

- https://www.bls.gov/data/inflation_calculator.htm
- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers
- https://www.nyse.com/trade/equities
- https://www.sec.gov/files/forms-3.pdf
- All data and documents cited throughout this report

**Exhibit 1**



### Carvana Common Stock Closing Price and Daily Trading Volume
### May 6, 2020 – February 23, 2023

Data Source: Bloomberg, S&P Capital IQ

**Exhibit 2**



**Carvana Common Stock Weekly Volume**
**May 6, 2020 – October 7, 2022**

Data Sources: Bloomberg, S&P Capital IQ, SEC EDGAR

Note: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period. The weekly trading volume for the week of October 6, 2022 has been scaled by a factor of 5/2 as the final week of the Class Period contained only two trading days.

E-2

**Exhibit 3**

### Analyst Coverage
### May 6, 2020 – October 7, 2022

| Analyst Name | Reports Issued During the Class Period |
|---|---|
| Wedbush Securities Inc. | 90 |
| Needham & Company Inc. | 48 |
| William Blair & Company | 47 |
| Stephens Inc. | 45 |
| JPMorgan | 40 |
| Zacks Equity Research | 38 |
| Truist Securities | 32 |
| BuySellSignals Research | 29 |
| Wells Fargo Securities, LLC | 27 |
| Oppenheimer & Co., Inc. | 24 |
| BNP Paribas Exane | 23 |
| Wolfe Research | 23 |
| Cowen and Company | 21 |
| Piper Sandler Companies | 21 |
| RBC Capital Markets | 21 |
| JMP Securities | 20 |
| D.A. Davidson & Company | 19 |
| The Benchmark Company LLC | 15 |
| Deutsche Bank | 14 |
| Wright Reports | 13 |
| CFRA Equity Research | 12 |
| Morgan Stanley | 12 |
| Jefferies | 11 |
| Bank of America | 9 |
| ValuEngine, Inc | 9 |
| Credit Suisse | 7 |
| Validea | 7 |
| Davy | 6 |
| GlobalData | 6 |
| Sadif Analytics Prime | 6 |
| Corporate Watchdog Reports | 5 |
| Craig Hallum | 4 |
| Probes Reporter | 4 |
| S3 Partners | 3 |
| EVERCORE ISI | 2 |
| PriceTarget Research | 2 |
| Argus Research Corporation | 1 |
| Macrorisk Analytics | 1 |
| Northcoast Research | 1 |

E-4

| | |
|---|---|
| NUS RMI-CRI | 1 |
| Paragon Intel | 1 |
| Plunkett Research | 1 |
| Smart Insider | 1 |
| TheScreener | 1 |
| **Total** | **723** |

Data Sources: Investext, Counsel

**Exhibit 4**



**Coefficients from Rolling Event Study Regressions**
**May 6, 2020 – October 7, 2022**

Data Sources: Bloomberg, S&P Capital IQ, SEC EDGAR, Factiva, Complaint

Note: Regression models described in notes below **Exhibit 7**.

**Exhibit 5**

**Root Mean Squared Error (RMSE) from Rolling Event Study Regressions**
**May 6, 2020 – October 7, 2022**



Data Sources: Bloomberg, S&P Capital IQ, SEC EDGAR, Factiva, Complaint

Note: Regression models described in notes below **Exhibit 7**.

E-6

**Exhibit 6**

**Carvana News Days and Common Stock Abnormal Returns**
**May 6, 2020 – October 7, 2022**

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($) | p-Value | Sig Level | Description |
|---|---|---|---|---|---|---|---|
| [1] | May 7, 2020 | 7.15% | 4.45% | $4.06 | 0.491 | | Q1 2020 Earnings Release |
| [2] | Aug 6, 2020 | 28.07% | 26.38% | $45.93 | < 0.001 | *** | Q2 2020 Earnings Release |
| [3] | Sep 22, 2020 | 30.61% | 24.99% | $43.41 | < 0.001 | *** | Q3 2020 Earnings Prerelease |
| [4] | Oct 30, 2020 | -3.05% | 0.42% | $0.81 | 0.913 | | Q3 2020 Earnings Release |
| [5] | Feb 26, 2021 | 7.52% | 6.13% | $16.17 | 0.100 | * | Q4 2020 Earnings Release |
| [6] | May 7, 2021 | -5.94% | -6.95% | -$18.32 | 0.061 | * | Q1 2021 Earnings Release |
| [7] | Aug 6, 2021 | 2.57% | 2.82% | $9.51 | 0.306 | | Q2 2021 Earnings Release |
| [8] | Nov 5, 2021 | -0.90% | -1.48% | -$4.46 | 0.442 | | Q3 2021 Earnings Release |
| [9] | Feb 25, 2022 | 21.04% | 17.66% | $22.26 | < 0.001 | *** | Q4 2021 Earnings Release |
| [10] | Apr 21, 2022 | -10.12% | -4.14% | -$3.83 | 0.357 | | Q1 2022 Earnings Release |
| [11] | Aug 5, 2022 | 40.07% | 41.65% | $13.97 | < 0.001 | *** | Q2 2022 Earnings Release |

Data Sources: Bloomberg, S&P Capital IQ, SEC EDGAR, Factiva, Complaint

Notes: Regression models described in notes below **Exhibit 7**. "*", "**", "***" denote statistical significance at the 90%, 95%, and 99% confidence levels, respectively.

**Exhibit 7**

**Comparison of Statistical Significance of Carvana Common Stock Abnormal Returns
for News Days vs. No News Trading Days During the Class Period**

|  | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 11 | 237 | |
| Significant Days at 95% Confidence Level | 4 | 16 | |
| % Significant Days at 95% Confidence Level | 36.36% | 6.75% | 0.007 |
| Average Absolute Abnormal Return | 12.46% | 2.97% | 0.041 |
| Average Volume (Millions) | 10.85 | 2.89 | 0.066 |

Data Sources: Bloomberg, S&P Capital IQ, SEC EDGAR, Factiva, Complaint

Notes: The event study estimations are based on a 120-day rolling regression estimation window. The regression models control for the S&P 500 Index ("Market Index") and the S&P 500 Consumer Discretionary Distribution & Retail Index ("Industry Index"). The Estimation Windows exclude the dates of the alleged corrective disclosures and News Days identified in **Exhibit 6**. The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test. The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference in means.

**Exhibit 8**



**Carvana Common Stock Market Capitalization**
**May 6, 2020 – October 7, 2022**

Data Sources: S&P Capital IQ, SEC EDGAR

**Exhibit 9**



**Carvana Common Stock Average Bid-Ask Spread**
**May 6, 2020 – October 7, 2022**

Data Sources: S&P Capital IQ

Notes: The percentage bid-ask spread was calculated as: a) the closing ask quote less the closing bid quote divided by b) the average of the closing bid and ask quotes.

E-10

**Exhibit 10**

### Carvana Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings
### June 30, 2020 – December 31, 2022

| Quarter End | Shares Outstanding (mil) | Total Institutions Owning Stock | Insider Holdings (mil) | Short Interest (mil) | Public Float (mil) | Insider Holdings as % of Shares Outstanding | Inst. Holdings (mil) | Inst. Holdings as % of Shares Outstanding | Inst. Holdings as % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| Jun 30, 2020 | 69.16 | 345 | 7.35 | 21.36 | 83.16 | 10.63% | 81.84 | 117.81% | 97.98% |
| Sep 30, 2020 | 69.43 | 400 | 6.69 | 18.60 | 81.34 | 9.63% | 81.06 | 116.75% | 99.65% |
| Dec 31, 2020 | 70.58 | 501 | 6.27 | 17.63 | 81.93 | 8.89% | 84.78 | 120.12% | 103.47% |
| Mar 31, 2021 | 78.33 | 550 | 6.30 | 16.69 | 88.72 | 8.04% | 86.78 | 110.78% | 97.81% |
| Jun 30, 2021 | 80.97 | 574 | 6.35 | 16.54 | 91.16 | 7.84% | 91.75 | 113.31% | 100.64% |
| Sep 30, 2021 | 84.50 | 572 | 6.06 | 13.79 | 92.23 | 7.17% | 94.27 | 111.55% | 102.21% |
| Dec 31, 2021 | 85.59 | 549 | 6.07 | 10.78 | 90.30 | 7.09% | 101.90 | 119.06% | 112.85% |
| Mar 31, 2022 | 90.10 | 510 | 7.58 | 16.97 | 99.49 | 8.42% | 103.02 | 114.34% | 103.56% |
| Jun 30, 2022 | 105.74 | 427 | 16.41 | 29.82 | 119.15 | 15.52% | 118.13 | 111.72% | 99.15% |
| Sep 30, 2022 | 105.80 | 376 | 16.80 | 31.30 | 120.30 | 15.88% | 121.21 | 114.57% | 100.76% |
| Dec 31, 2022 | 105.95 | 299 | 20.43 | 54.10 | 139.62 | 19.28% | 117.10 | 110.53% | 83.87% |
| **Averages Over Class Period** | **86.01** | | **9.67** | **22.51** | **98.86** | **10.76%** | **98.32** | **114.59%** | **100.18%** |
| **Total Unique Institutions:** | **1,018** | | | | | | | | |

Data Sources: Bloomberg, S&P Capital IQ, SEC EDGAR

E-11

**Exhibit 11**



**Carvana Common Stock Weekly Traded Dollar Volume**
**May 6, 2020 – February 23, 2023**

Data Sources: Bloomberg, S&P Capital IQ

Note: Average weekly traded dollar volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period. The weekly traded dollar volume for the week of February 23, 2023 has been scaled by a factor of 5 as the final week of the Extended Period contained only one trading day.