LATHAM & WATKINS LLP
Andrew B. Clubok (*pro hac vice*)
J. Christian Word (*pro hac vice*)
Susan E. Engel (*pro hac vice*)
Matthew J. Peters (*pro hac vice)*
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
Email: christian.word@lw.com
Email: susan.engel@lw.com
Email: matthew.peters@lw.com

Jeff G. Hammel (*pro hac vice*)
Kalana Kariyawasam (*pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: jeff.hammel@lw.com
Email: kalana.kariyawasam@lw.com

Meryn C. N. Grant (*pro hac vice*)
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (424) 653-5500
Email: meryn.grant@lw.com

[*Additional counsel on signature page*]

*Counsel for Defendants Carvana Co., Ernest Garcia III, Mark Jenkins, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re Carvana Co. Securities Litigation | CASE NO. 2:22-cv-02126-PHX-MTL |
| | **EXCHANGE ACT DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

# REDACTED

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................... 1

II.   BACKGROUND ........................................................................................................ 4

    A.    Carvana's Stock Price Was Driven By Macroeconomic Trends ............................................................................................... 4

    B.    Only Claims Relating To T&R And Retail Unit Sales Remain................... 5

    C.    Carvana's T&R Issues Were Public Throughout The Class Period ................................................................................................ 7

    D.    Plaintiffs Filed A Boilerplate Motion For Class Certification .................... 8

III.  LEGAL STANDARD ............................................................................................... 8

IV.   ARGUMENT ............................................................................................................ 9

    A.    The Proposed Class Period Starts Early.......................................................... 9

    B.    Defendants Have Rebutted The *Basic* Presumption Of Reliance ............................................................................................... 10

        1.    The Actionable Statements Had No "Front End" Price Impact ................................................................................................... 10

        2.    The Corrective Disclosures Are Not Evidence Of Price Impact ................................................................................................... 12

            a.    Plaintiffs' Stock Drops Are Not Statistically Significant .................................................................... 13

            b.    The Corrective Disclosures Do Not Match The Statements ................................................................... 14

            c.    No Corrective Disclosure Evidences Price Impact................................................................................ 15

            d.    No Corrective Disclosure Relates To Non-T&R Fraud .................................................................................. 19

    C.    The Proposed Class Period Ends Too Late ................................................. 19

    D.    Plaintiffs Fail To Prove That Damages Can Be Measured Class-Wide ................................................................................................ 20

    E.    Plaintiffs Fail To Prove Adequacy ............................................................... 20

V.    CONCLUSION ....................................................................................................... 21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp.*,
77 F.4th 74 (2d Cir. 2023) ........................................................................ 11, 12, 15, 16

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988) .......................................................................................... passim

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
306 F.R.D. 175 (N.D. Ill. Aug. 21, 2014) .................................................................. 21

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ................................................................................................. 8, 20

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ................................................................................................... 9

*Epstein v. MCA, Inc.*,
50 F.3d 644 (9th Cir. 1995) ........................................................................................ 3

*Fosbre v. Las Vegas Sands Corp.*,
2012 WL 2848057 (D. Nev. July 11, 2012) ................................................................ 9

*Gambrill v. CS Disco, Inc.*,
2025 WL 3771433 (W.D. Tex. Dec. 16, 2025) .......................................................... 15

*Giancaspro v. Network Travel Exps., Inc.*,
2022 WL 19569513 (C.D. Cal. Nov. 3, 2022) ........................................................... 12

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
594 U.S. 113 (2021) ........................................................................................... passim

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198 (9th Cir. 2020) .................................................................................. 12

*Halliburton Co. v. Erica P. John Fund*,
573 U.S. 258 (2014) .......................................................................................... 8, 9, 10

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) .................................................................................... 12

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ......................................................... 11, 14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*In re Chicago Bridge & Iron Co. NV Sec. Litig.*,
2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) .......................................................................... 14

*In re Concho Resources, Inc. Sec. Litig.*,
2025 WL 1040379 (S.D. Tex. 2025) ...........................................................................passim

*In re Fibrogen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ....................................................... 13, 16

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. 2017) ...................................................................... 11, 12

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .................................................. 11, 15, 19

*In re Nvidia Corp. Sec. Litig.*,
2026 WL 821418 (N.D. Cal. Mar. 25, 2026) ...........................................................passim

*In re Qualcomm Inc. Sec. Litig.*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .................................................. 16, 17, 18

*In re Refco, Inc. Sec. Litig.*,
609 F. Supp. 2d 304 (S.D.N.Y. 2009) ........................................................................ 10

*In re The Boeing Co. Aircraft Sec. Litig.*,
2026 WL 734721 (N.D. Ill. Mar. 16, 2026) ............................................................ 17, 19

*In re Vaxart, Inc. Sec. Litig.*,
738 F. Supp. 3d 1259 (N.D. Cal. 2024) ....................................................................... 20

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods.*
*Liability Litig.*,
2 F.4th 1199 (9th Cir. 2021) ....................................................................................... 8

*Lytle v. Nutramax Labs., Inc.*,
114 F.4th 1011 (9th Cir. 2024) .................................................................................. 20

*Pardi v. Tricida Inc.*,
2024 WL 4336627 (N.D. Cal. Sept. 27, 2024) ....................................................... 17, 19

*Ramirez v. Exxon Mobil Corp.*,
2023 WL 5415315 (N.D. Tex. Aug. 21, 2023) ......................................... 11, 13, 14, 18

*Sali v. Corona Reg. Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) ..................................................................................... 20

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW

*Shiring v. Tier Techs., Inc.*,
244 F.R.D. 307 (E.D. Va. 2007) ................................................................................ 21

*Shupe v. Rocket Cos., Inc.*,
752 F. Supp. 3d 735 (E.D. Mich. 2024) .............................................. 11, 14, 15

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
798 F. Supp. 3d 416 (S.D.N.Y. 2025) ....................................................... 18

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
552 U.S. 148 (2008) ................................................................................... 10

*Venkataraman v. Kandi Techs. Grp., Inc.*,
2024 WL 4345571 (S.D.N.Y. Sept. 30, 2024) ............................................ 9

*Victorino v. FCA US LLC*,
322 F.R.D. 403 (S.D. Cal. 2017) .............................................................. 21

*Ward v. Apple, Inc.*,
784 Fed. App'x 539 (9th Cir. 2019) .......................................................... 20

*White v. Experian Info. Sols.*,
993 F. Supp. 2d 1154 (C.D. Cal. 2014) .................................................... 20

*Williams v. Sinclair*,
529 F.2d 1383 (9th Cir. 1975) .................................................................... 9

## OTHER AUTHORITIES

Axelson & Cain, *What is Price Impact? How the* Goldman *Decisions are
Reshaping Shareholder Class Actions*, Berkeley Bus. L. J., Vol. 22:2
(2025) .......................................................................................................... 3

# I.    INTRODUCTION

Carvana was one of four publicly traded online used-car retailers that emerged to challenge the traditional dealer model in the years leading up to the putative Class Period.[1] Each new entrant's stock price rode a wave of pandemic-era tailwinds—historically low interest rates, supply chain disruptions in the new car market, and surging consumer adoption of automotive e-commerce.  Likewise, beginning in mid-2021 each new entrant's stock price was exposed to the same wave of macroeconomic headwinds when interest rates rose at a pace not seen in nearly fifty years, and used car prices hit record highs causing demand to collapse.  When the dust settled, three of the new entrants were bankrupt, and the stock price of the fourth—Carvana—had fallen far from its highs.

Plaintiffs erroneously argue that the nearly identical arc of Carvana's stock price and the stock prices of these publicly-traded peers was all a coincidence.  In Plaintiffs' telling, Carvana's stock price did not rise in 2020 and 2021 because of the pandemic-era tailwinds that lifted every other new entrant; it rose because Defendants allegedly made misrepresentations about title and registration and retail unit sales that somehow "pumped" Carvana's stock price.  And Carvana's stock price did not fall in 2022 because of the macroeconomic headwinds that drove all the other new entrants into bankruptcy, or even because of the billions of dollars of debt Carvana took on immediately before those headwinds fully materialized.  It fell, according to Plaintiffs, because some grand "truth" about those misrepresentations was finally revealed.

Plaintiffs' argument defies common sense and is refuted by the evidence.  Indeed, it is now indisputable that the stock price declines were transitory and not the product of any revelations of fraud:  with macroeconomic conditions more normalized and debt concerns resolved, Carvana's stock price today is approximately five times its split-adjusted stock price at the time of the April 2022 secondary offering.[2]  The stock recovered

---

[1] Unless otherwise noted, capitalized terms have the definitions provided in Plaintiffs' Motion (Dkt. 356), emphasis is added, and citations are omitted.  Citations in the form "Ex.    " are to the exhibits to the concurrently filed Declaration of Meryn C. N. Grant.

[2] In May 2026, Carvana completed a five-for-one forward stock split.  Ex. 47.

when macroeconomic conditions stabilized, precisely as a stock whose decline was driven by macroeconomic forces, not concealed fraud, would.  And while this temporary macroeconomic shock impacted new entrant automotive retailers particularly severely, the trend persists across several industries:  most consumer-facing new entrants experienced a dramatic stock price decline and subsequent rebound during this same period.

Unlike at the motion-to-dismiss stage, where the Court was obligated to assume the truth of Plaintiffs' allegations, the Court now must consider the factual record, which tells a very different story and demonstrates that class certification should be denied.

First, none of the ten statements about title and registration or retail unit sales caused Carvana's stock price to increase at the time Defendants made them.  For eight of the ten statements, there was no statistically significant price movement at all.  For the remaining two—both made on February 24, 2022—the market was reacting not to the challenged statements but to Carvana's announcement of its acquisition of the nation's second largest wholesale vehicle auction, ADESA, which also included Carvana taking on billions of dollars of new debt at a time where macroeconomic headwinds were becoming more concerning.  That there was no "front-end" price impact is reinforced by the fact that (1) not a single analyst report published during the Class Period even mentions any of the ten statements at issue, and (2) the investment advisors for Lead Plaintiffs, along with fifteen of some of Carvana's largest shareholders, testified or attested that ██████████████ ███████████████████████████████████████████████████ ██████████████████████  Plaintiffs cannot show that the alleged fraud "pumped" Carvana's stock price when Plaintiffs' advisors who made the purchasing decisions say it played no role in their valuations.  That alone defeats class certification.

Nor can Plaintiffs fall back on their scheme claim to support class certification.  They admit in their Motion that the scheme claim had a price impact only through the challenged statements.  Plaintiffs do not (and cannot) point to any other public-facing deceptive conduct that had price impact, and so the statements' lack of price impact is fatal for the entire case at class certification.

Second, none of the four alleged corrective disclosures coincided with a statistically significant stock price decline. Zero analysts attributed the small price movements on those four dates to company-specific title and registration news. Instead, the analysts attributed the declines across the broader period to the macroeconomic environment that drove Carvana's new-entrant peers into bankruptcy.

Faced with this record, Plaintiffs hand-wave at the facts. They open their Motion with the assertion that securities fraud cases fit Rule 23 "like a glove," as if the Court need not look further. Mot. at 1 (quoting *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995)). That position is obsolete. *Epstein* was decided over three decades ago, long before the Supreme Court began the line of decisions that has reshaped securities fraud class certification, culminating in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021).

Today, courts must deny class certification where the alleged fraud did not affect the stock price, and *Goldman* expressly permits defendants to come forward with "all evidence" relevant to price impact—including the kind of evidence at issue here. *See id.* at 122. As Plaintiffs' expert recently acknowledged, following *Goldman*, "defendants' challenges to price impact have been increasingly successful." Axelson & Cain, *What is Price Impact? How the* Goldman *Decisions are Reshaping Shareholder Class Actions*, Berkeley Bus. L. J., Vol. 22:2, at 441 (2025). This case belongs squarely in that cohort.

Without any price impact, Plaintiffs cannot invoke the fraud-on-the-market presumption of reliance articulated in *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 (1988), and they have no other class-wide evidence of reliance. Predominance fails for that reason alone. Predominance fails for the additional independent reason that Plaintiffs have no class-wide evidence of damages, despite having the burden to provide a damages model that fits their theories of liability. Plaintiffs' speculation that they can figure out a methodology for measuring investors' out-of-pocket losses later in the case is not enough.

A third, independent reason to deny class certification is that Plaintiffs cannot satisfy Rule 23(a)(4)'s requirement of showing that Plaintiffs and their counsel can fairly and

adequately represent the class. The Court allowed Plaintiffs' claims to survive Defendants' motion to dismiss largely because Plaintiffs represented that former employees had personal knowledge that, among other things, Carvana "routinely sold cars before receiving title." But every confidential witness deposed to date has testified ████████████ ████████████████████████████████ CW-4, in particular, testified that an allegation attributed to him/her fourteen times in the complaint was flat wrong. CW-5 testified to material inaccuracies in every paragraph in which he/she is referenced. Counsel whose pleading is contradicted under oath by the witnesses on whom it was built cannot adequately represent a proposed class in pursuing claims of fraud.

Class certification should be denied.

## II.    BACKGROUND

### A.    Carvana's Stock Price Was Driven By Macroeconomic Trends

At the start of the Class Period, Carvana's stock, like the stock of other online used car retailers, was on an impressive upward trajectory. Ex. 25 ("Allen Rpt.") ¶¶ 2, 29. Even before the Class Period, Carvana grew its vehicle sales by 99-137% each year from the year of its IPO in 2017. *Id.* ¶ 13. Carvana reached the Fortune 500 in 2021 and remains the third fastest company to do so organically—only Amazon and Google were faster. *Id.* COVID-19 accelerated consumers' interest in conducting traditionally in-person transactions online, boosting online retailers' stock prices, including Carvana's. *Id.* ¶ 38. Chip shortages limited new car production, boosting demand for used cars. *Id.* ¶¶ 54-55. To scale its vehicle inspection and reconditioning capacity and provide even faster delivery time, Carvana acquired ADESA, a national used-vehicle auction house with 56 physical auction sites, incurring billions in debt to do so. Amended Consolidated Complaint ("ACC," Dkt. 71) ¶ 14. Just as Carvana made these investments, the macroeconomic tides turned. The post-COVID-19 "bubble" burst causing credit markets to tighten and demand for Carvana to fall. Allen Rpt. ¶¶ 2, 64. Carvana was now left with capacity that outpaced demand, and a balance sheet weighed down by investments to meet demand that had dried up. *Id.* ¶ 64. Unsurprisingly, Carvana's stock price began to fall, as did the stock price of

its closest peers, with once-promising competitors Shift and Vroom going bankrupt. *Id.* ¶¶ 2, 60.[3]

The market followed these developments. Analyst reports during the Class Period analyzed the impacts of COVID-19, the influence macroeconomic conditions had on consumers' willingness to make big ticket purchases, and Carvana's liquidity. *Id.* ¶¶ 38, 45, 48, 64. Views on how *these* macroeconomic considerations would affect Carvana drove its stock price. *Id.* ¶ 72. But this case does not deal with any of these considerations.

### B.    Only Claims Relating To T&R And Retail Unit Sales Remain

Plaintiffs' ACC presented multiple theories of fraud to support claims under the Exchange Act. ACC ¶¶ 173-260 (statements); *id.* ¶¶ 125-72 (scheme). One theory is that Carvana Defendants concealed from investors that Carvana was systematically violating T&R laws, a practice which was allegedly driving retail sales ("T&R" theory). *Id.* ¶ 11; Dkt. 105 ("MTD Order") at 2. Plaintiffs' second theory claimed Carvana Defendants failed to disclose that non-T&R business practices, including car-buying practices, nationwide expansion, and transactions with DriveTime, were driving Carvana's growth ("non-T&R" theories). ACC ¶¶ 3, 5, 10. Plaintiffs alleged the "truth" was revealed in eight corrective disclosures: four were related to Carvana's financial condition, and four were media or government reports of T&R issues. *Id.* ¶¶ 307-28.

This Court dismissed the non-T&R statements, MTD Order at 57,[4] finding the ostensibly omitted facts had been "disclosed . . . throughout the Class Period," *id.* at 22-23, 27, 30, 32-33. For the T&R claims, the Court recognized that a "truth-on-the-market defense may negate falsity," but found "it would be premature for this Court to consider it at [the MTD] stage." MTD Order at 15; *see also id.* at 25-26. The Court allowed Plaintiffs to proceed with claims based on ten statements. Six of them, dated between February 25,

---

[3] Carvana ultimately not only recovered but thrived—it just marked its ninth consecutive quarter as the most profitable and fastest-growing automotive retailer. Ex. 46 at 1.

[4] The Court also dismissed Plaintiffs' scheme claim against Garcia Sr. and insider trading claims against Garcia Sr. and Jenkins. The Court found that Garcia Sr. had not made any statements or committed any deceptive act at all, let alone a public-facing act that investors could have relied on for the scheme claim, MTD Order at 35-40, and that neither Garcia Sr. or Jenkins had any material non-public information, *id.* at 61-62.

2021, and May 10, 2022, are identical risk disclosures included or incorporated in Carvana's SEC filings, warning that Carvana's "failure to comply [with T&R laws], could have a material adverse effect on [its] business." ACC ¶¶ 174, 176, 178, 182, 184, 186 (Stmts. 1-3, 5-7, "T&R Risk Disclosures"). Two statements commented on Carvana's T&R issues, one at an investor conference on August 11, 2021, and the other in the *Barron's* Article on June 24, 2022. ACC ¶¶ 180, 188 (Stmts. 4, 8, "T&R Comments"). The remaining two statements, made August 4, 2021, and February 24, 2022, stated that Carvana's retail sales growth for particular quarters, Q2 2021 and Q4 2021, was a product of "strong demand," *id.* ¶ 212 (Stmt. 19), or "growth within [Carvana's] market cohorts," *id.* ¶ 214 (Stmt. 20) (together, "RUS Statements"). The Court allowed the RUS Statements to proceed for the same reason as the T&R Statements—"Defendants' truth-on-the-market defense shall be reserved for another day." MTD Order at 25-26.

The Court allowed Plaintiffs to proceed with the scheme claim "for the same reasons it finds Plaintiffs sufficiently allege falsity in their misrepresentation claim." *Id.* at 40; *see also id.* at 57 (denying dismissal as to "related scheme-based allegations"). Under that ruling, the scheme claim survived to the extent it was based on the alleged T&R issues but not to the extent it was based on the non-T&R issues the Court found were disclosed or otherwise inactionable, including those related to sales from DriveTime (Artifice 1), *see id.* at 25; car-buying strategy (Artifice 2), *see id.* at 22-23; expansion (Artifice 3), *see id.* at 27-29; alleged misstatements, to the extent dismissed by the Court (Artifice 5, in part), *see id.* at 33; and insider trading (Artifices 6 & 7), *see id.* at 60-62.

The Court found scienter adequately pled for the remaining actionable T&R theory on grounds that Carvana Defendants made certain T&R-related statements, *id.* at 44; CWs provided allegations relating to T&R issues, for which "the ACC describes the personal knowledge[5] and reliability for each CW," *id.* at 45-48; and executives would have known about T&R issues and the drivers of retail sales, *id.* at 50.

---

[5] As of this filing, Defendants have deposed four of the six CWs the Court relied upon. All have ███████████████████████████████████ ███████████████████████ MTD Order at 45. *See, e.g.*, Ex. 31 at 101:2-24; Ex. 34 at 104:14-22; Ex. 35 at 81:24-82:2, 187:13-16; Ex. 33 at 35:8-13.

On loss causation, the Court dismissed four financial condition disclosures, finding Plaintiffs did not allege how "any of the four partial disclosures corrected any prior actionable falsity" or resulted from "Defendants' fraudulent scheme and omissions." MTD Order at 55. The Court found Plaintiffs adequately pleaded four T&R-related disclosures:

- **NC Article (8/10/21)**: Local media in North Carolina reported that Carvana's dealer license in Raleigh (but not its local operations) was suspended for six months for violating T&R laws.

- *WSJ* **Article (10/22/2021)**: *WSJ* reported that Carvana was being investigated and was penalized for violating T&R laws in Michigan, Texas, California, and North Carolina.

- *Barron's* **Article (6/24/2022)**: *Barron's* reported that Carvana was dealing with "wide reaching" T&R issues.

- **Michigan Release (10/7/2022)**: The Michigan Department of State announced it suspended a Carvana dealership license (but not the local operations) due to alleged violations of Michigan laws.

### C.    Carvana's T&R Issues Were Public Throughout The Class Period

Carvana's T&R issues were immaterial and publicly known long before any of the alleged corrective disclosures. Even before the Class Period, analysts were asking Carvana's management about T&R complaints from customers because T&R issues are, by their very nature, a public-facing issue. Allen Rpt. ¶ 131. Similarly, consumer complaints were widespread on social media and reported in the news. *Id.* ¶¶ 133-39. COVID-19 caused disruptions and shutdowns at DMVs, which are an integral part of the T&R process, making completion of title and registration particularly challenging at a time Carvana was growing at an unprecedented rate. *Id.* ¶ 140. During the Class Period, the media published around 150 articles about Carvana's T&R issues. *Id.* ¶ 243, App'x C.

As a result, investors and analysts understood the T&R issues well, but also understood the regulatory penalties and operational impacts were not material. *Id.* ¶¶ 3, 148. Plaintiff SHEPP's investment advisor testified ███████████████ ███████████████ . 26 at 79:19-24, ███████████████ ███████████████ *id.* at 80:10-15. Similarly, Plaintiff UANPF's investment advisor

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

testified that ███████████████████████████████████

███████████████████ Ex. 27 at 195:4-9. The record also now leaves no doubt that, *at least as of Carvana's secondary offering* (on April 22, 2022), many investors were aware of T&R (and non-T&R) issues, and like Plaintiffs' investment advisors, many considered them immaterial. *See* Sec. Act Opp. at 8-11.

### D.     Plaintiffs Filed A Boilerplate Motion For Class Certification

The ACC alleged a Class Period of May 6, 2020, through February 23, 2023. ACC ¶ 1. That period began on the date of the first alleged misstatement and ended on the date of the last non-T&R corrective disclosure. Plaintiffs now seek to certify a single, shorter class of "[a]ll persons who purchased or otherwise acquired Carvana common stock from May 6, 2020 through October 7, 2022." Mot. at 1. The proposed Class Period ends on the last T&R corrective disclosure date but would start the Class Period nine months before the first actionable statement on February 25, 2021. Plaintiffs invoke the *Basic* presumption of reliance for their remaining statement and scheme claims. *Id.* at 9-11.

## III.     LEGAL STANDARD

Plaintiffs must "actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 275 (2014) ("*Halliburton II*"). And the Court "must conduct a rigorous analysis" to decide whether Rule 23 is satisfied. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

In securities fraud class actions, predominance hinges on whether plaintiffs can prove reliance—a necessary element of a Rule 10b-5 claim—on a class-wide basis. *In re Nvidia Corp. Sec. Litig.*, 2026 WL 821418, at *9 (N.D. Cal. Mar. 25, 2026). Plaintiffs' only way around proving reliance individually is to invoke the fraud-on-the market presumption outlined by the Supreme Court in *Basic*—that each investor relied on the statement by "rel[ying] on the integrity of the price set by the market." 485 U.S. at 226; *see also* Mot. at 9-10.[6] Defendants can rebut this presumption by showing "that the

---

[6] The *Affiliated Ute* presumption of reliance applies only in cases, unlike this one, that "primarily" involve "omissions." *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liability Litig.*, 2 F.4th 1199, 1202 (9th Cir. 2021). This presumption does not apply to this case and Plaintiffs do not invoke it in their Motion.

misrepresentation [or fraud] in fact did not lead to a distortion of price"—*i.e.*, had no "price impact." *Basic*, 485 U.S. at 248. The Supreme Court has repeatedly explained that "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption." *Id.* at 248-49; *see also Halliburton II*, 573 U.S. at 282. Defendants can "sever[] the link" with "direct evidence" showing the misrepresentations did not impact the price when they were made (*i.e.*, no "front-end" impact). *Goldman*, 594 U.S. at 119, 123. Defendants can also provide "indirect[]" evidence that the fraud had no price impact by showing that the market did not react to the corrective disclosures (*i.e.*, no "back-end" impact). *Id.* at 123.

The court must "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentation had a price impact." *Id.* at 126-27. Where it is more likely than not that there is no price impact, the presumption of reliance cannot apply and a class cannot be certified. *See id.* at 119; *Basic*, 485 U.S. at 242.

IV.    ARGUMENT

A.    The Proposed Class Period Starts Early

At minimum, the Class Period can only begin on February 25, 2021—*i.e.*, the date of the 2020 10-K, the earliest statement this Court found actionable. *See Venkataraman v. Kandi Techs. Grp., Inc.*, 2024 WL 4345571, at *4 (S.D.N.Y. Sept. 30, 2024). This is true for two reasons. First, no class member could have been injured before the first statements were made publicly, "and thereby could have begun affecting the price" of Carvana stock. *Id.* at *5; *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005). Beginning the class on the date of the first alleged misstatement properly limits the class to those who "purchased []or sold shares in reliance upon the alleged misrepresentation or concealment[].'" *Williams v. Sinclair*, 529 F.2d 1383, 1389 (9th Cir. 1975); *see also Fosbre v. Las Vegas Sands Corp.*, 2012 WL 2848057, at *19 (D. Nev. July 11, 2012) (limiting class period to "the first date of actionable alleged misconduct").

Second, Plaintiffs can only invoke the *Basic* presumption if the alleged

"misrepresentation[] w[as] publicly known" at the time Plaintiffs (and class members) purchased stock. *Halliburton II*, 573 U.S. at 268. This is true for both statement and scheme claims because only a public misrepresentation or public deceptive act can inflate the stock price. *Id.* (addressing statement claims); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (for scheme claims, the presumption of reliance does not apply to "deceptive acts [that] were not communicated to the public").

Plaintiffs offer no support in their Motion for including in the Class purchasers dating back to May 6, 2020. They identify no specific deceptive act on May 6, 2020, much less a public one, that inflated the stock price.[7] To the contrary, Plaintiffs concede that the *Basic* presumption applies to their scheme claims only "because Defendants made misstatements as part of their scheme." Mot. at 10. The first statement the Court found actionable was made on February 25, 2021. MTD Order at 29, 33. Before that date, "no member of the investing public had knowledge, either actual or presumed, of [Defendants' allegedly] deceptive acts." *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 318 (S.D.N.Y. 2009); *see also* MTD Order at 37-39 (applying *Stoneridge* and holding reliance not pleaded for alleged scheme where Garcia Sr. did not make public-facing acts).

**B.    Defendants Have Rebutted The *Basic* Presumption Of Reliance**

Plaintiffs claim the remaining statements and related scheme caused Carvana's stock price to "skyrocket[]." Mot. at 3. The Court was required to accept Plaintiffs' allegations at the motion to dismiss stage, but now the Court must assess the actual record of price impact. *Goldman*, 594 U.S. at 122. That record shows no price impact.

**1.    The Actionable Statements Had No "Front End" Price Impact**

The ten actionable statements were made between February 25, 2021, and June 24, 2022. ACC ¶¶ 174, 188. The evidence demonstrates that, contrary to Plaintiffs' theory, the actionable statements did not cause the stock price to "skyrocket[]." Mot. at 3. This alone defeats class certification where, as here, Plaintiffs are only claiming the statements made the stock price go up, rather than claiming the statements "maintained" the stock

---

[7] Allen also found no statistically significant price movement that day. Allen Rpt. ¶ 170.

price. *See In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at \*7-8 (N.D. Cal. 2017) (denying class certification where expert evidence showed no price impact on statement dates and plaintiffs did not advance price maintenance theory).

For eight of the ten statements, there was *no* statistically significant increase in the stock price. Allen Rpt. ¶¶ 3, 93. A statistically significant price movement is distinct from an increase or decline in price. The former is measured through an event study and measures whether the market reacted to company-specific news, as opposed to random day-to-day price fluctuations, or factors affecting market-wide or industry-wide prices. Allen Rpt. ¶¶ 89-91; *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp.*, 77 F.4th 74, 86 n.5 (2d Cir. 2023) ("*ATRS*"). At a minimum, this means any Class Period could not start before February 24, 2022, the date of the remaining two statements (Stmts. 6 & 20) that coincide with a statistically significant price increase. *See Finisar*, 2017 WL 6026244, at \*7-8.

But even that is not possible because there the evidence showed that the market did not react *to the challenged statements*. As Allen explains, the market was reacting to *other* positive company news, not to either statement. Allen Rpt. ¶ 102. Analyst commentary confirms this—none of the analysts mentioned either statement. *Id.* ¶¶ 101-02. Courts have repeatedly found that a lack of discussion in analyst reports is evidence that information had no price impact. *ATRS*, 77 F.4th at 104 ("[M]arket commentary can provide insight into the kind of information investors would rely upon."); *Nvidia*, 2026 WL 821418, at \*11; *Shupe v. Rocket Cos., Inc.*, 752 F. Supp. 3d 735, 779-81 (E.D. Mich. 2024); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at \*9 (S.D.N.Y. Mar. 29, 2024). Here, analysts attributed the price increase after the February 24, 2022, statements to Carvana's announcement of its ADESA acquisition. Allen Rpt. ¶¶ 104-05; *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at \*16-17 (N.D. Tex. Aug. 21, 2023); *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at \*6-7 (S.D. Tex. Feb. 9, 2024).

The absence of price impact makes sense because the T&R Risk Disclosure (*e.g.*, Stmt. 6) has language materially identical to Carvana's previously filed 10-Ks (and is the same language Carvana has disclosed since). Allen Rpt. ¶ 103. Assuming Carvana traded

in an efficient market, as Plaintiffs' expert contends, Cain Rpt. ¶ 42; Ex. 28 at 82:6-14, the repetition of the risk factor is not new information and cannot have caused the price increase. Allen Rpt. ¶ 103; *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020); Ex. 28 at 112:21-113:8 ███████████████████ ███████████████████ The risk factor also was "too general to cause a reasonable investor to rely upon [it]." *ATRS*, 77 F.4th at 101.

The RUS Statement on February 24, 2022 (Stmt. 20) likewise was already incorporated into the price because nearly the exact same statement had been made earlier that day in Carvana's shareholder letter. Allen Rpt. ¶¶ 160-61; *see IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (confirming nearly identical statements repeated later the same day had no price impact). The RUS Statement was also so general—commenting that Q4 2021's "exceptional growth" was due to "increased growth in our market cohorts," ACC ¶¶ 212, 214—that it was not likely to be relied on. Allen Rpt. ¶ 160; *see also ATRS*, 77 F.4th at 102-03; *In re Concho Resources, Inc. Sec. Litig.*, 2025 WL 1040379, at *14 n.18 (S.D. Tex. 2025).

## 2.    The Corrective Disclosures Are Not Evidence Of Price Impact

The Supreme Court explained in *Goldman* that when a plaintiff advances a price maintenance theory, they can prove statements' price impact "indirectly" by "point[ing] to a negative disclosure about a company and an associated drop in its stock price; alleg[ing] that the disclosure corrected an earlier misrepresentation; and then claim[ing] that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." 594 U.S. at 123. Plaintiffs do not invoke a price maintenance theory and therefore cannot rely on back-end price impact. *See Finisar*, 2017 WL 6026244, at *8.[8] The reason Plaintiffs do not mention a price maintenance theory is because the price movements following each of the four T&R disclosures were not statistically significant, meaning they cannot show any price declines were caused by the revelation of the supposed "truth." Even if Plaintiffs

---

[8] The Motion does not advance a "price maintenance" theory for the fraud, so Plaintiffs have forfeited the argument. *See Giancaspro v. Network Travel Exps., Inc.*, 2022 WL 19569513, at *3 n.6 (C.D. Cal. Nov. 3, 2022).

could overcome that fatal hurdle, any price movement cannot be attributed to the statements for two additional reasons:  there is a "mismatch" between the statements and corrective disclosures, and none of the corrective disclosures provide any new, value-relevant information that corrected an actionable fraud.

### a.    Plaintiffs' Stock Drops Are Not Statistically Significant

None of the corrective disclosures identified by Plaintiffs are associated with a statistically significant drop in Carvana's stock price.  This alone is powerful evidence of a lack of price impact.  At the motion to dismiss stage, this Court was unwilling to find that the small price drops accompanying the corrective disclosures were insufficient.  MTD Order at 56-57.  At the class certification stage, however, the record now includes expert evidence showing that even the small price drops were not "statistically significant price movement."  *Concho*, 2025 WL 1040379, at *11.  Defendants are aware of *no case* certifying a class after a finding that there were no statistically significant price movements accompanying the corrective disclosures.  Here, whether one uses Plaintiffs' event study or Allen's alternative (which controls for Carvana's then-closest competitors), none of the corrective disclosures results in a statistically significant price movement.  Allen Rpt. ¶¶ 4, 117; Ex. 28 at 160:22-161:10.

Analyst reports confirm that the corrective disclosures did not impact Carvana's stock price.  Of the between 23 and 27 analysts covering Carvana during each of the corrective disclosures, none ever mentioned three of the corrective disclosures.  Allen Rpt. ¶ 120; *see also* Ex. 28 at 288:6-24 (agreeing that ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ One analyst, William Blair, commented on Carvana's license suspension in Raleigh, Allen Rpt. ¶¶ 121-22, but only to report that the effect of the suspension was "*de minimis*."  *Id.*  No analyst, across the entire Class Period, ever suggested that T&R issues had any impact on Carvana's valuation.  Allen Rpt. ¶¶ 125-26.  "[T]he dearth of analyst commentary . . . suggests that the market likely did not consider [the T&R issues] to be significant."  *Exxon*, 2023 WL 5415315, at *16; *see also Nvidia*, 2026 WL 821418, at *19; *In re Fibrogen Sec. Litig.*, 2024 WL

1064665, at *12 (N.D. Cal. Mar. 11, 2024).

On the other hand, analysts explained that other factors were driving Carvana's stock price declines over the latter half of the Class Period. *Exxon*, 2023 WL 5415315, at *17. Carvana's stock price fell steadily because of macroeconomic headwinds. Allen Rpt. ¶¶ 58-60, 72. Given the overall decline, it is unsurprising that Plaintiffs can identify T&R-related news that coincided with insignificant declines. Correlation is not causation: that the stock price dropped does not mean there was a market reaction to negative news about Carvana. *See In re Chicago Bridge & Iron Co. NV Sec. Litig.*, 2019 WL 5287980, at *13 (S.D.N.Y. Oct. 18, 2019). It reflects that the market—and the online used car industry—was declining. Allen Rpt. ¶¶ 56-57, 66. Courts find no price impact where, as here, "all sources attributed the price increase [or decrease] to" factors unrelated to the alleged fraud. *Apache*, 2024 WL 532315, at *6-7; *Shupe*, 752 F. Supp. 3d at 779, 781-82.

**b.    The Corrective Disclosures Do Not Match The Statements**

Plaintiffs cannot rely on a "back-end" price drop for the T&R Risk Disclosures or the RUS Statements for the independent reason that these statements do not "match" the corrective disclosures. *Goldman* explains that the "inference . . . that the back-end price drop equals front-end inflation . . . starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." 594 U.S. at 123. That happens "when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')," *id.*, or when there is a "mismatch in subject matter." *Nvidia*, 2026 WL 821418, at *14.

Here, the four corrective disclosures are specific news articles reporting that North Carolina and other states were investigating and had in certain instances immaterially penalized Carvana for its T&R compliance. They do not "match" the statements.

Start with the six T&R Risk Disclosures. Just as in *Goldman*, there is a clear mismatch between the generic risk disclosures and the specific compliance issues identified in the corrective disclosures. The T&R Risk Disclosures warned generally about the risk

of regulatory non-compliance, while the corrective disclosures described specific penalties in particular states at particular times. Allen Rpt. ¶¶ 99, 116. That is directly analogous to the mismatch in *Goldman* between a general risk disclosure about controls for conflicts, and corrective disclosures that described specific previously-undisclosed conflicts. *ATRS*, 77 F.4th at 82-83; *see also Shupe*, 752 F. Supp. 3d at 781-82 (denying certification based on "considerable mismatch" between statements that "direct-to-consumer and partner networks were generally 'growing'" and disclosure of specific, disappointing projections). And as discussed *supra* Section IV.B.1, no analyst mentioned Carvana's risk disclosures in any report during the Class Period. Allen Rpt. ¶ 101. Coupled with the "common sense" notion applied in *Goldman* that investors do not rely on generic statements, this evidence "'sever[s] the link between' Plaintiffs' alleged 'back-end price drop' and their alleged 'front-end misrepresentation[s].'" *Shupe*, 752 F. Supp. 3d at 781 (quoting *Basic,* 485 U.S. at 248); *Gambrill v. CS Disco, Inc.*, 2025 WL 3771433, at *11 (W.D. Tex. Dec. 16, 2025).

The RUS Statements are both a generic and a substantive mismatch to the specific corrective disclosures about T&R penalties. *See Kirkland*, 2024 WL 1342800, at *7-8, 11. In *Kirkland*, the court examined similar statements to those here about organic growth being "the number one driver of our growth," and found they were not sufficiently matched to the specific corrective disclosures that mentioned growth (inorganic growth through M&A activity). *Id.* at *7-9. Here, too, Carvana's "broad statements about [Carvana's] . . . growth are far more generic than the announcement of a specific [T&R issue]." *Id.* at *8; *see also Concho*, 2025 WL 1040379, at *17 (no price impact where "Corrective Disclosure does not even implicitly mention the [topic] referenced in the . . . statements").

### c.    No Corrective Disclosure Evidences Price Impact

Apart from these independent reasons why Plaintiffs cannot rely on back-end evidence of price impact—no statistically significant price movement following the corrective disclosures and a mismatch to the statements—an analysis of each of the four corrective disclosures confirms it. Following *Goldman*, district courts in the Ninth Circuit apply a three-pronged inquiry to evaluate whether corrective disclosures are indirect

evidence that statements had price impact. The first prong focuses on whether the disclosed information was *corrective*. *FibroGen*, 2024 WL 1064665, at *12 (citing *Goldman*, 594 U.S. at 123-24). At class certification, the Court must find "a closer fit" between the statements and corrective disclosures than that "required when analyzing the loss causation element" at the motion to dismiss stage. *Nvidia*, 2026 WL 821418, at *14. The second prong asks whether the information was new to the market on the date of the corrective disclosure. *Fibrogen*, 2024 WL 1064665, at *12. If information is not new, and the market was already "privy to the truth," then the "market price would not have been affected by their misrepresentations, [and] the causal connection could be broken." *Basic*, 485 U.S. at 248; *see also In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12-13 (S.D. Cal. Mar. 20, 2023). The third prong asks whether information is "value relevant," *i.e.*, whether it caused part of a price decline. *FibroGen*, 2024 WL 1064665, at *12; *see also ATRS*, 77 F.4th at 104. All evidence is relevant "regardless whether the evidence is also relevant to a merits question like materiality." *Goldman*, 594 U.S. at 122.

Applying this rubric, no corrective disclosure is "back-end" evidence that *any* statements had price impact. As discussed *supra* Section IV.B.2.a, none were "value relevant" because there was no statistically significant stock price movement at the time of the disclosures and analysts never changed their valuations of the company in response to them. They also did not provide new or corrective information.

**Aug. 10, 2021, NC Article.** The NC Article reported *old* news and was not corrective of the three T&R Risk Disclosures and one RUS Statement (Stmts. 1-3, 19) that came before it. The NC Article was published after market close on August 10, 2021. Allen Rpt. ¶ 116. The NC suspension had already been reported by media *the day before*, after market close on August 9, 2021[9]—and Carvana's stock price went *up* on August 10

---

[9] In fact, the news was disclosed earlier on June 11, 2021. Allen Rpt. ¶ 116 n. 118. Public court filings showed that Carvana's license was revoked by the North Carolina DMV on June 10. *Id.* Carvana's license was reinstated pending resolution of legal proceedings, which resulted in Carvana and the DMV reaching a settlement on July 21. *Id.* That settlement suspended Carvana's Raleigh dealer's license, but not Carvana's delivery operations in Raleigh, starting August 2. *Id.* Only Statements 1 and 2 pre-date the settlement. Allen Rpt. ¶ 93; *see FibroGen*, 2024 WL 1064665, at *12 (recognizing that "a

to an all-time high.  *Id.* ¶ 29; *see also In re The Boeing Co. Aircraft Sec. Litig.*, 2026 WL 734721, at *21 (N.D. Ill. Mar. 16, 2026) (no price impact where prior publications "had already made the market aware" of the facts).  The NC Article also reported a specific penalty—restricting sales from a single vending machine in Raleigh, Allen Rpt. ¶ 116—which *Goldman* held does not correct a generic statement*, Goldman*, 594 U.S. at 123.  That generic-to-specific mismatch independently forecloses any finding that the NC Article evidences price impact.  *See id.*; *Concho*, 2025 WL 1040379, at *16-17.

**October 22, 2021, *WSJ* Article.**  The *WSJ* Article discussed the previously-reported suspension in North Carolina, an immaterial Florida settlement in September 2021, immaterial fines in Texas from October 2020 to August 2021, and a Michigan probation that started May 13, 2021.  Allen Rpt. ¶¶ 118, 243.  It also discussed consumer complaints publicly filed in various states.  *Id.*  None of this was new.  As Allen explains, Carvana's T&R compliance and customer complaints were public-facing and already publicly known.  *Id.* ¶¶ 3, 130-36.  By the time of the *WSJ* Article, T&R issues had been reported, including in the particular states mentioned in the *WSJ* Article with the exception of the Michigan probation.  Allen Rpt. ¶ 118, App'x C.  But the Michigan probation cannot be new information, given that "the same exact accusations had been publicly levied by [other states'] regulatory agencies" previously.  *Qualcomm*, 2023 WL 2583306, at *13.

The *WSJ* Article also could not have had price impact for the additional reason it was not corrective.  It is a mismatch to the T&R Risk Disclosures and RUS statements, as discussed *supra* Section IV.B.2.b.  And it did not correct the one T&R Comment that predated it.  Made on August 11, 2021, Statement 4 described the Raleigh suspension as "a relatively sort of unusual approach" that was "quite unprecedented," ACC ¶ 180.  There is no "close[] fit" between that Raleigh-specific statement and the issues discussed in the *WSJ* Article.  *Nvidia*, 2026 WL 821418, at *14.  Far from correcting Statement 4, the *WSJ* Article *confirms* the Raleigh suspension was unprecedented.  Every other regulatory action described was a minor fine or probation, while the Raleigh suspension uniquely prevented

[later] development . . . is not itself a correction of a previous misstatement"); *Pardi v. Tricida Inc.*, 2024 WL 4336627, at *11 (N.D. Cal. Sept. 27, 2024) (similar).

Carvana from making sales from one vending machine—without prohibiting Carvana from selling to any customers (via delivery or from other vending machines).  Allen Rpt. ¶ 118; *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 469 (S.D.N.Y. 2025) (no price impact where corrective disclosure "does not render [the statements] false").

**June 24, 2022, *Barron's* Article.**  *Barron's* catalogued immaterial regulatory actions in Pennsylvania, Illinois, North Carolina, Michigan, Arizona, Texas, and Nevada. ACC ¶ 148; Allen Rpt. ¶ 116.  Like articles before it, *Barron's* was not new but instead re-reported already-public information.  Allen Rpt. ¶ 118.  Indeed, Plaintiffs' own investment advisors testified that ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

Ex. 27 at 158:4-6; 203:13-205:24, 206:10-13; *see also* Ex. 26 Tr. 102:13-20, 79:6-25, 47:4-9; Ex. 29 Tr. 139:23-140:24.  Over 85 articles about T&R issues were published between the start of the Class Period and *Barron's*.  Allen Rpt. App'x C.  Fifteen investors who were allocated shares in Carvana's secondary offering on April 22, 2022, █████ attested ███████████████████  *See* Sec. Act Opp. at 8-11.

Nor did *Barron's* correct any statement.  Again, the specific compliance issues it reported are a mismatch with generic T&R Risk Disclosures and RUS Statements.  As to the August 2021 T&R Comment (Stmt. 4), *Barron's*, like the *WSJ* Article, confirms that when North Carolina restricted sales from one of Carvana's vending machines (but otherwise allowed continued operations), that action was "unprecedented."  Ex. 30 at 5.

**October 7, 2022, Michigan Release.**  The Michigan Release announced a suspension of one of Carvana's dealer licenses in Michigan.  Allen Rpt. ¶ 116.  By then, Carvana's T&R issues were well known.  *Id.* ¶¶ 3, 133-39.  Nothing about Michigan was different from or more severe than previously-reported penalties.  Repeating the "same exact accusations" is  not "new" information, *Qualcomm*, 2023 WL 2583306, at *13, and does not alter the "total mix of information," *Exxon*, 2023 WL 5415315, at *15.  As one court recognized, the suspension would not inflict material harm because the suspension did not impact "[Carvana's] overall online sales."  Ex. 43 at 4.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

The Michigan Release also was not corrective of any statement for all the reasons stated above, including the mismatch of an immaterial suspension announcement to generic statements. It also was not corrective because it reported a suspension contemporaneously, after every statement had been made. That is not "a revelation of allegedly omitted facts," but rather, "new regulatory developments." *Pardi*, 2024 WL 4336627, at *11.

**d.    No Corrective Disclosure Relates To Non-T&R Fraud**

Even if *non*-T&R fraud (including non-T&R omissions for the RUS Statements or any non-T&R artifices) were actionable, they had no price impact. The corrective disclosures reported T&R issues and said nothing about non-T&R fraud. Mot. at 2-3.

The law is clear that to demonstrate price impact, a corrective disclosure must, first and foremost, actually be corrective. There is no plausible argument that Plaintiffs' non-T&R fraud allegations came to light through the corrective disclosures. They do not even contain the same subject. Allen Rpt. ¶ 162; *see also Kirkland*, 2024 WL 1342800, at *11-12 (finding *Basic* presumption rebutted when corrective disclosures did not deal with topic of the alleged misstatements); *Concho*, 2025 WL 1040379, at *16-17 (same).

**C.    The Proposed Class Period Ends Too Late**

At the very least, Plaintiffs' proposed Class Period must end sooner than the proposed October 7, 2022. As set forth in the Securities Act Opposition, the record shows that investors had actual knowledge of the T&R (and non-T&R) issues as of the April 22, 2022, secondary offering. Sec. Act Opp. at 8-13. Numerous investors also attested that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 16. This evidence is relevant to the Exchange Act claims too: it confirms that as of April 22, 2022, whether any investor was misled, would have considered any omitted T&R issue to be material, and in fact relied on any purported misstatement, are all individual questions. Because class periods end on the date of the last corrective disclosure, *see Boeing*, 2026 WL 734721, at *18 ("[C]ourts are required to cut off the class period on the date of a statement or event that cures the market."), the Exchange Act Class Period must end on the date of the *WSJ* Article, October 22, 2021; the June 24, 2022, *Barron's* Article

post-dates when investors would have had individual knowledge of the alleged omissions.

### D.    Plaintiffs Fail To Prove That Damages Can Be Measured Class-Wide

In *Comcast*, the Supreme Court held that a plaintiff cannot satisfy Rule 23(b)(3)'s predominance requirement without "evidentiary proof" of a class-wide damages methodology that is consistent with the plaintiff's theory of liability.  569 U.S. at 33, 35. This requires plaintiffs to "show that they will be able to prove" damages "through common proof at trial." *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024).  To do so, Plaintiffs must "proffer [] a reliable method of obtaining evidence that will come into existence once a damages model is executed." *Id.*  But Plaintiffs' expert ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. 28 at 109:9-111:4; Allen Rpt. ¶ 235.  He did not even take a position on ████████████████ ████████████████████████ Cain Rpt. ¶¶ 115-20; Ex. 28 at 263:2-8.

*Comcast* does not impose a heavy burden, but "[m]erely gesturing at a model or describing a general method" to calculate class-wide damages is not sufficient. *Lytle*, 114 F.4th at 1032; *Ward v. Apple, Inc.*, 784 Fed. App'x 539, 540-41 (9th Cir. 2019).  Plaintiffs' failure is particularly stark given the "challenged statements span over a year" and a "truth-on-the-market defense may negate falsity for at least some of the alleged omissions by revealing if, and when, the public became aware of Carvana's practices through other sources."  MTD Order at 15.  When "Plaintiffs [offer] no guidance on how their expert would discern the waning effect of the fraud on the stock price," Rule 23 is not met. *In re Vaxart, Inc. Sec. Litig.*, 738 F. Supp. 3d 1259, 1267 (N.D. Cal. 2024).

### E.    Plaintiffs Fail To Prove Adequacy

Determining adequacy under Rule 23(a)(4) requires an inquiry into adequacy of plaintiff and counsel. *See Sali v. Corona Reg. Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018).  Counsel's "unethical conduct, both before and during the litigation in question, is relevant to" that Rule 23 inquiry. *White v. Experian Info. Sols.*, 993 F. Supp. 2d 1154, 1170 (C.D. Cal. 2014); *see Sali*, 909 F.3d at 1008 ("prior sanctions" are relevant "evidence

of inadequacy"). And a plaintiff's "lack of diligence and candor" weighs against adequacy. *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 317 (E.D. Va. 2007).

Here, Plaintiffs represented to the Court that CWs had personal knowledge that Carvana "routinely sold cars before receiving title." Dkt. 91 at 26, *id.* at 28 n.25; *see also, e.g.*, ACC ¶¶ 45, 175(b); *id.* at PDF pp. 325, 330 (Plaintiffs' PSLRA certifications). This Court relied on these representations. MTD Order at 45, 48. But in deposition testimony, CWs have testified repeatedly that ██████████████████████████ *See, e.g.*, Ex. 31 at 101:2-24; Ex. 32 at 50:9-51:16; Ex. 34 at 104:14-22; Ex. 35 at 81:24-82:2, 187:13-16; Ex. 33 at 35:8-13. Had Plaintiffs made clear that ███████████████ ████████████████████████████████████████████████ Ex. 31 at 178:1-12; Ex. 33 at 33:3-34:3; Ex. 35 at 80:8-81:18. ████████████████ Ex. 34 at 56:12-58:5, 60:16-61:25, 69:22-70:14, that would not have substantiated any claim of a concealed problem.[10]

"[T]his is not the first instance where Robbins Geller has engaged in similar misconduct." *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 306 F.R.D. 175, 179, 182 (N.D. Ill. Aug. 21, 2014) (sanctioning Robbins Geller for including unreliable and repudiated confidential witness accounts in complaint). While "not every ethical violation constitutes inadequacy under Rule 23," *Victorino v. FCA US LLC*, 322 F.R.D. 403, 408 (S.D. Cal. 2017), the discrepancies between Plaintiffs' allegations and the CW testimony, coupled with Plaintiffs' effort to prevent further CW depositions from continuing, raise "serious" concerns and provide yet another reason to deny class certification. *Id.*

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

---

[10] CWs have testified that dozens of Plaintiffs' allegations are inaccurate. For example, Plaintiffs allege CW-5 "report[ed] . . . it was Carvana's *general practice* to purchase cars sight unseen," ACC ¶ 132, but CW-5 explained there was "*no way*" a car could be purchased "sight unseen." Ex. 39 at 100:7-101:24; *see also id.* at 47:23-75:10, 84:20-89:8, 98:23-100:5. CW-4 similarly confirmed that contrary to an allegation repeated 14 times about a spreadsheet tracking retail vehicles without titles, *e.g.*, ACC ¶ 73, the only spreadsheet CW-4 saw related to wholesale vehicles, which are the vehicles Carvana sells to other dealers, not retail customers. *E.g.*, Ex. 31 at 140:9-141:15. Two CWs have testified Plaintiffs exaggerated their employment periods. *Compare* Ex. 39 at 18:11-14 *with* ACC ¶ 80; *compare* Ex. 31 at 27:13-16 *with* ACC ¶ 69.

Dated: May 18, 2026                    Respectfully submitted,

                                       LATHAM & WATKINS LLP

                                        */s/ Susan E. Engel*
                                       Andrew B. Clubok (*pro hac vice*)
                                       J. Christian Word (*pro hac vice*)
                                       Susan E. Engel (*pro hac vice*)
                                       Matthew J. Peters (*pro hac vice*)
                                       555 Eleventh Street, N.W., Suite 1000
                                       Washington, D.C. 20004
                                       Telephone: (202) 637-2200
                                       Email: andrew.clubok@lw.com
                                       Email: christian.word@lw.com
                                       Email: susan.engel@lw.com
                                       Email: matthew.peters@lw.com

                                       Jeff G. Hammel (*pro hac vice*)
                                       Kalana Kariyawasam (*pro hac vice*)
                                       1271 Avenue of the Americas
                                       New York, NY 10020
                                       Telephone: (212) 906-1200
                                       Email: jeff.hammel@lw.com
                                       Email: kalana.kariyawasam@lw.com

                                       Meryn C. Grant (*pro hac vice*)
                                       10250 Constellation Blvd., Suite 1100
                                       Los Angeles, CA 90067
                                       Telephone: (424) 653-5500
                                       Email: meryn.grant@lw.com

                                       FENNEMORE CRAIG, P.C.
                                       Douglas C. Northup (No. 013987)
                                       Andrea L. Marconi (No. 022577)
                                       2394 E. Camelback Road, Suite 600
                                       Phoenix, AZ 85016
                                       Telephone: (602) 916-5000
                                       Email: dnorthup@fennemorelaw.com
                                       Email: amarconi@fennemorelaw.com

                                       *Counsel for Defendants Carvana Co., Ernest Garcia III, Mark Jenkins, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan*

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

22