LATHAM & WATKINS LLP
Andrew B. Clubok (*pro hac vice*)
J. Christian Word (*pro hac vice*)
Susan E. Engel (*pro hac vice*)
Matthew J. Peters (*pro hac vice)*
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
Email: christian.word@lw.com
Email: susan.engel@lw.com
Email: matthew.peters@lw.com

Jeff G. Hammel (*pro hac vice*)
Kalana Kariyawasam (*pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: jeff.hammel@lw.com
Email: kalana.kariyawasam@lw.com

Meryn C. Grant (*pro hac vice*)
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (424) 653-5500
Email: meryn.grant@lw.com

[*Additional counsel on signature page*]

*Counsel for Defendants Carvana Co., Ernest Garcia
III, Mark Jenkins, Stephen Palmer, Michael
Maroone, Neha Parikh, Ira Platt, and Greg Sullivan*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re Carvana Co. Securities Litigation | CASE NO. 2:22-cv-02126-PHX-MTL |
| | **SECURITIES ACT DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

REDACTED

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION...................................................................................................... 1

II.   BACKGROUND ...................................................................................................... 3

    A.    T&R Issues Were Widely Reported In The Media Before The Offering .................................................................................................... 3

    B.    Carvana Issues New Shares In Secondary Offering On April 22, 2022 ........................................................................................................ 4

    C.    Securities Act Litigation Followed The Offering ...................................... 4

    D.    This Court Denied In Part And Granted In Part Defendants' Motion To Dismiss The Securities Act Claims......................................... 5

    E.    Plaintiffs Do Not Move For Certification Of A Securities Act Class ......................................................................................................... 6

III.  LEGAL STANDARD ............................................................................................. 6

IV.   ARGUMENT .......................................................................................................... 6

    A.    Knowledge Is An Individual Issue That Precludes Class Certification ............................................................................................... 6

        1.    Many Investors Knew The Alleged T&R Omissions ...................... 8

        2.    Many Investors Also Knew Carvana's Non-T&R Practices ........................................................................................ 12

        3.    Courts Deny Certification Where The Alleged Omission Was Publicly Available ................................................ 14

    B.    Plaintiffs Ignore Other Rule 23 Requirements........................................ 16

        1.    Plaintiffs Fail To Define A Securities Act Class ........................... 17

        2.    Plaintiffs And Counsel Have Impermissible Conflicts Of Interest....................................................................................... 18

        3.    UANPF Is Subject To A Unique Standing Defense ....................... 20

V.    CONCLUSION ..................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................. 18

*Andrews Farms v. Calcot, Ltd.*,
  268 F.R.D. 380 (E.D. Cal. 2010) ............................................................................. 19

*Betts v. Reliable Collection Agency, Ltd.*,
  659 F.2d 1000 (9th Cir. 1981) ................................................................................. 16

*Bishop v. Petro-Chem. Transp.*,
  582 F. Supp. 2d 1290 (E.D. Cal. 2008) ................................................................... 17

*Boston Retirement Systems v. Uber Technologies, Inc.*,
  2022 WL 2954937 (N.D. Cal. July 26, 2022) .......................................................... 15

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ..................................................................................................... 6

*Doyle v. Mastercard Int'l Inc.*,
  700 F. App'x 22 (2d Cir. 2017) ............................................................................... 20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ................................................................................................... 6

*Griffith v. Tiktok, Inc.*,
  2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) ........................................................... 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ................................................................................................... 6

*Hawkins v. Comparet-Cassani*,
  251 F.3d 1230 (9th Cir. 2001) ........................................................................... 16, 17

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) ................................................................................... 19

*Holmes v. Pension Plan of Bethlehem Steel Corp.*,
  213 F.3d 124 (3d Cir. 2000) .................................................................................... 20

*In re Barclays Bank PLC Sec. Litig.*,
  2016 WL 3235290 (S.D.N.Y. June 9, 2016) ............................................................ 18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*In re Century Aluminum Co. Securities. Litigation*,
729 F.3d 1104 (9th Cir. 2013) ...................................................... 2, 17, 18, 20

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015) ..................................................................... 7

*In re DJ Orthopedics, Inc. Sec. Litig.*,
2003 WL 27363735 (S.D. Cal. Nov. 17, 2003) ........................................... 15

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ............................................................... 15

*In re Initial Pub. Offering Sec. Litig.*,
227 F.R.D. 65 (S.D.N.Y. 2004), *rev'd on other grounds*, 471 F.3d 24
(2d Cir. 2006) ......................................................................................... 20

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) ......................................................... passim

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011) ..................................................................... 19

*In re Lyft Inc. Sec. Litig.*,
2021 WL 3711470 (N.D. Cal. Aug. 20, 2021) ........................................... 15

*In re Merix Corp. Sec. Litig.*,
2009 WL 10692857 (D. Or. Nov. 5, 2009).................................................. 17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) ..................................................................... 19

*In re PG&E Corp. Sec. Litig.*,
806 F. Supp. 3d 962 (N.D. Cal. 2025) ....................................................... 20

*In re Puda Coal Sec. Inc. Litig.*,
2013 WL 5493007 (S.D.N.Y. Oct. 1, 2013).................................................. 20

*In re Quarterdeck Off. Sys., Inc. Sec. Litig.*,
1993 WL 623310 (C.D. Cal. Sep. 30, 1993) ............................................... 21

*In re Superior Offshore Int'l, Inc. Sec. Litig.*,
2010 WL 2305742 (S.D. Tex. June 8, 2010)................................................ 14

*Krim v. pcOrder.com, Inc.*,
210 F.R.D. 581 (W.D. Tex. Oct. 21, 2002) .................................................. 21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*Lou v. Ma Labs., Inc.*,
   2014 WL 68605 (N.D. Cal. Jan. 8, 2014) ................................................................................ 18

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
   272 F.R.D. 160 (S.D.N.Y. 2011) ............................................................................................ 12

*Nat'l Air Traffic Controllers Ass'n. v. Dental Plans, Inc.*,
   2006 WL 584760 (N.D. Ga. Mar. 10, 2006) .......................................................................... 19

*Pino v. Cardone Cap., LLC*,
   139 F.4th 1102 (9th Cir. 2025) ................................................................................................. 7

*Pirani v. Slack*,
   127 F.4th 1183 (9th Cir. 2025), *cert denied*, 2025 WL 2824130 (Oct. 6,
   2025) ....................................................................................................................................... 17

*Slack Techs., LLC v. Pirani*,
   598 U.S. 759 (2023) ................................................................................................................ 17

*Terezini v. GoodRx Holdings, Inc.*,
   2022 WL 122944 (C.D. Cal. Jan. 6, 2022) ............................................................................. 18

*True Health Chiropractic, Inc. v. McKesson Corp.*,
   896 F.3d 923 (9th Cir. 2018) ................................................................................................ 6, 8

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) .................................................................................................................. 1

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
   283 F.R.D. 199 (S.D.N.Y. 2012) .............................................................................................. 7

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) .................................................................................................................. 6

*Valley Drug Co. v. Geneva Pharms. Inc.*,
   350 F.3d 1181 (11th Cir. 2003) .............................................................................................. 19

*Vignola v. Fat Brands*,
   2020 WL 1934976 (C.D. Cal. Mar. 13, 2020) ................................................................. passim

*White v. Symetra Assigned Bens. Serv.*,
   104 F.4th 1182 (9th Cir. 2024) ................................................................................................. 7

**STATUTES**

15 U.S.C. § 77k(a) ................................................................................................................ 1, 8

15 U.S.C. § 77l(a)(2) ....................................................................................................... 1, 7, 12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

**RULES**

Ariz. Rules of Prof'l Conduct 1.7(a)(1)-(2) ........................................................................ 22

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

## I.    INTRODUCTION

In sustaining Plaintiffs' Securities Act claims, the Court explained: "It could be, as Defendants contend, that by April 2022, when Carvana made its Offering, investors were well aware of Carvana's title and registration ["T&R"] issues such that any omission of the assorted regulatory actions against Carvana was immaterial. But materiality is a 'mixed question of law and fact.' *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Therefore, the Court will not decide this issue at this juncture." Dkt. 105 ("MTD Order") at 66. But now the time to decide it has arrived. Only 34 non-Carvana-affiliated investors ("allocants") received stock directly in Carvana's April 22, 2022, secondary offering ("Offering"). Fifteen of those 34 allocants, who received 87% of the non-Carvana shares issued, have submitted sworn declarations or testimony confirming their pre-Offering knowledge that Carvana had been investigated, fined, and had its dealer's licenses suspended in multiple states for T&R compliance issues. And two of the largest allocants who so testified—T. Rowe Price and Baillie Gifford—are Plaintiffs' own investment advisors, whose knowledge is imputed to UANPF and SHEPP, respectively. The Court also held as a matter of law that Carvana itself disclosed the non-T&R practices that Plaintiffs complained were concealed. The record now confirms many of the allocants were aware of all of these issues too. But not everyone attested to having knowledge. The record includes sworn declarations from another 11 out of 34 allocants that reflect differing levels of knowledge, including some who did not recall whether they knew the omitted issues or not, some who explained that their investment strategies would not have considered the allegedly omitted information, and some who claimed not to have known about T&R compliance issues. That variation in investor knowledge is fatal to any request to certify a class of Securities Act investors.

Absence of knowledge is an *element* of Plaintiffs' Securities Act claim under Section 12(a)(2), 15 U.S.C. § 77l(a)(2), and an affirmative defense to the Section 11 claim, 15 U.S.C. § 77k(a). Where the alleged omission was in fact public knowledge, courts deny certification because class members' actual knowledge of that information is necessarily

an individual question.  *See Vignola v. Fat Brands*, 2020 WL 1934976, at *5 (C.D. Cal. Mar. 13, 2020); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 152-54 (N.D. Tex. 2014).  Public availability of the allegedly omitted information cinches the result here.  The T&R issues were the subject of more than 50 media reports before the Offering, including in the *Wall Street Journal*.  Many allocants confirmed they read those reports.

That a smaller group of allocants may not have had actual knowledge of the publicly disclosed information does not save Plaintiffs—it confirms the problem.  ███████ and ███████ pursued index-based investment strategies; ███████ participated for arbitrage purposes; ███████ did no research into public information regarding Carvana at all.  Determining each allocant's knowledge—and the knowledge of any downstream purchaser to whom shares were resold—would require individual mini-trials.  That is the textbook predominance failure that leads courts to not certify a class.

Class certification of the Securities Act claims fails for three additional reasons.  First, Plaintiffs do not even move to certify a Securities Act class.  The single broad class they propose—every investor who bought Carvana stock between May 6, 2020, and October 7, 2022—sweeps in two and a half years of open market trading and ignores the small, defined universe of Offering purchasers who could actually assert Securities Act claims.  Plaintiffs do not address any of the Rule 23 requirements for that universe—and they cannot.  Indeed, certification fails on simple numerosity grounds because only 34 non-Carvana allocants participated in the Offering, and Plaintiffs put forward no evidence to show how many more class members there could be.

Second, Plaintiffs' counsel cannot adequately represent both Exchange Act and Securities Act class members because the two claims require opposing factual narratives.  Plaintiffs' Exchange Act loss causation theory holds that the truth was partially revealed in August and October 2021.  Their Securities Act damages theory requires the opposite—that the truth was still concealed on April 22, 2022.  Counsel cannot pursue both theories.  That conflict alone defeats Rule 23(a)(4) adequacy.

Third, Lead Plaintiff UANPF lacks standing to represent the putative class. UANPF's investment advisor, T. Rowe Price, commingled shares purchased in the Offering in a central fund account with previously issued Carvana shares. UANPF has not and cannot show that the shares it received on April 22, 2022, are traceable to the Offering or whether they were previously issued shares. Under *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104 (9th Cir. 2013), that is fatal to statutory standing.

Plaintiffs have not met—and cannot meet—their burden under Rule 23. Plaintiffs' Motion (Dkt. 356) should be denied as to the Securities Act claims.

## II.    BACKGROUND

### A.    T&R Issues Were Widely Reported In The Media Before The Offering

Even before the proposed Class Period, analysts were asking Carvana's management about T&R complaints from customers in earnings calls, because T&R issues are, by their very nature, a public-facing issue. Allen Rpt. ¶¶ 241-43. Similarly, consumer complaints about paperwork delays and temporary tags were all over social media and picked up in the news. *Id.* ¶ 243. The media continued reporting, including shortly before the Offering in April 2022, that Carvana had sold cars before holding title, and as a result, customers were not able to timely register their cars. *Id.* The media also reported that Carvana had issued out-of-state temporary tags and license plates. *Id.*; Ex. 37.[1] Local and state regulators responded, and this too was reported in the media before the Offering, including that Carvana was "slapped" with "fines and stop-sale orders" in multiple states. Allen Rpt. ¶ 243. In alleging the Exchange Act claims, Plaintiffs *admit* that T&R issues were disclosed as early as August 2021, in reporting the suspension of Carvana's license in Raleigh, North Carolina. Amended Consolidated Complaint ("ACC," Dkt. 71) ¶ 311 (citing local ABC article). The one article Plaintiffs cite was accompanied by at least nine others, including a *Wall Street Journal* article. Allen Rpt. ¶ 243. As the Court acknowledged, the *Wall Street Journal* published another article in October 2021

---

[1] Unless otherwise noted, emphasis is added and citations are omitted. Citations in the form "Ex.   " are to the exhibits to the Declaration of Meryn C. N. Grant. All capitalized terms have the same meaning as in the Exchange Act class certification opposition.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

"reveal[ing] Carvana's title and registration issues across *multiple* states." MTD Order at 66; Allen Rpt. ¶ 243; Ex. 37.

These articles were the tip of the iceberg. The ACC ignores the myriad news articles and lawsuits publicly reporting on T&R issues, including class action litigation. Allen Rpt. ¶ 243 (discussing, *inter alia*, Pennsylvania class action filed December 2021 alleging "months and months of delays in transferring vehicle titles"). The headlines continued up to the Offering. An April 7, 2022, article expressly warned that Carvana's delays with T&R paperwork were a "*systemic issue*" affecting "several other states, including Florida, Texas, Michigan, California and North Carolina." *Id.*; Ex. 38.

**B.    Carvana Issues New Shares In Secondary Offering On April 22, 2022**

On April 22, 2022, Carvana issued 15.6 million new shares of common stock in a secondary offering for $80 per share. ACC ¶ 373. This Offering was small, in comparison to the ~78.3 million Carvana shares that were already on the market. Dkt. 357-3 ("Cain Rpt") at Ex. 10. The participants were limited and determined by Carvana and the underwriters, Citigroup Global Markets Inc. and J.P. Morgan Securities LLC. Ex. 36. Two of those participants were Carvana CEO Ernest Garcia Jr. and another Carvana employee. *Id.* Ernest Garcia Sr. also purchased shares. *Id.* The remaining newly issued shares were allocated to 34 allocants in predetermined amounts ranging from 1,000 to 2.4 million shares. *Id.* Some allocants purchased shares in the Offering for themselves, while others, like Lead Plaintiffs' own investment advisors T. Rowe Price and Baillie Gifford, purchased for clients. No other investors purchased shares directly in the Offering. *See id.*

**C.    Securities Act Litigation Followed The Offering**

The first case that brought Securities Act claims challenging the Offering was filed in September 2022 in the Superior Court of Arizona. Ex. 44 (Compl., *City of Warwick Ret. Sys. v. Carvana Co.*, CV 2022-013054 (Sup. Ct., Maricopa Cnty.) ("*Warwick*") (Sept. 30, 2022)). Both that initial complaint and the amended complaint that followed were dismissed in their entirety, with Judge Coury holding that "the issues involving delays in titles and registration were discussed by the Company and in the press," several "news

articles were published prior to the [Offering] reporting on Carvana's title and registration problems," and the same issues were revealed by a public class action complaint filed in January 2022. Ex. 45 at 18-22, 25.

The present case was originally filed without any Securities Act claims in the District of New Jersey. Dkt. 1. Following transfer to this Court, Plaintiffs first asserted Securities Act claims in February 2023, alleging Defendants omitted Carvana's T&R issues. Dkt. 36 ¶ 441. And in the operative ACC, Plaintiffs brought Securities Act claims exclusively "on behalf of all persons who purchased Carvana common stock *directly in the 2022 Public Offering*." ACC ¶¶ 421-22.

**D.     This Court Denied In Part And Granted In Part Defendants' Motion To Dismiss The Securities Act Claims**

The ACC challenged three statements that appeared in Carvana's 2021 Form 10-K, dated February 24, 2022, and were incorporated by reference in the Offering documents. ACC ¶¶ 381-386. The Court dismissed one statement regarding Carvana's car-buying strategy, holding that "Carvana disclosed its strategy." MTD Order at 22, 65. Of the remaining two statements, one was a T&R Risk Disclosure warning investors that Carvana is subject to regulatory risk, ACC ¶ 385; the same T&R Risk Disclosure was challenged as Statement 6 under the Exchange Act, *id.* ¶ 184. The other statement described how growth in Carvana's retail units sold in Q4 2021 "was driven by growth in existing markets due to expanded inventory selection, enhanced marketing efforts, increased brand awareness, customer referrals, and growth in market population coverage" ("RUS Statement"). *Id.* ¶ 383. That statement was similar to one that Defendant Jenkins made on the Q4 2021 earnings call later the same day, challenged as Statement 20 under the Exchange Act, *id.* ¶ 214. The Court found these statements adequately pled for the "same reasons" as their Exchange Act counterparts, *i.e.*, they may have omitted Carvana's T&R issues. MTD Order at 66-67. In so ruling, the Court again "resisted considering Defendants' 'truth-on-the-market defense,'" while recognizing that "as of April 2022, Carvana's title and registration issues had been a recurring subject in the news media." *Id.* at 66. The Court

acknowledged that "[i]t could be, as Defendants contend, that by April 2022, when Carvana made its Offering, investors were well aware of Carvana's title and registration issues." *Id.*

### E. Plaintiffs Do Not Move For Certification Of A Securities Act Class

Plaintiffs now seek to certify a broad class of investors, consisting of "[a]ll persons who purchased or otherwise acquired Carvana common stock from May 6, 2020 through October 7, 2022," excluding Defendants, officers and directors of Carvana, and related persons. Mot. at 1. Plaintiffs do not seek to certify the narrower "Securities Act Class" alleged in their Complaint, which was limited to investors who purchased directly in the Offering. ACC ¶¶ 365, 421. Nor do they advance any evidence or argument as to why certification of a Securities Act class meets the requirements of Rule 23(a). Plaintiffs only address the Securities Act claims to argue that the Securities Act claims are subject to common proof under Rule 23(b)(3) because one element of those claims is a "material misstatement or omission" and damages can be calculated class-wide. Mot. at 8, 16.

## III. LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Plaintiffs must "actually *prove*—not simply plead—that their proposed class satisfies *each requirement* of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). That burden is no different for Securities Act claims. *Kosmos*, 299 F.R.D. at 151. The Court must conduct a "'rigorous analysis'" to determine whether Rule 23 is satisfied. *Comcast*, 569 U.S. at 35. Class certification must be denied if Plaintiffs fail to satisfy any prong of Rule 23 for any claim. *Halliburton*, 573 U.S. at 275.

## IV. ARGUMENT

### A. Knowledge Is An Individual Issue That Precludes Class Certification

Rule 23(b)(3) requires Plaintiffs to prove that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This analysis "begins, of course, with the elements of the underlying cause of action," *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011),

and any defenses that may be raised, *see True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018). When the evidence proving elements and defenses renders "individual issues" "more prevalent [] than" common issues, Rule 23(b)(3)'s predominance requirement is not met, and the class cannot be certified. *FAT Brands*, 2020 WL 1934976, at *5 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

Plaintiffs have failed to demonstrate, with actual evidence, that they have satisfied Rule 23(b)(3). *White v. Symetra Assigned Bens. Serv.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (plaintiffs must "affirmatively demonstrate their compliance with" Rule 23, including "the predominance requirement"). They argue that the misrepresentation element of the Securities Act claims is subject to common proof, yet turn a blind eye to the remainder of the claims, including the dispositive inquiry for Section 11 and Section 12(a)(2) claims: whether purchasers of stock issued in the offering had actual knowledge of the allegedly omitted information. For Section 12(a)(2), each plaintiff must show they lacked knowledge of the "untruth or omission" at the time they purchased the stock. 15 U.S.C. § 77l(a)(2); *see also Pino v. Cardone Cap., LLC*, 139 F.4th 1102, 1111 (9th Cir. 2025). Under Section 11, knowledge is an affirmative defense: Defendants can defeat liability with proof "that at the time of [] acquisition [the purchaser] knew of such untruth or omission," 15 U.S.C. § 77k(a). Courts have held that where class members' actual knowledge is an individual issue, class certification is inappropriate. *E.g.*, *FAT Brands*, 2020 WL 1934976, at *5; *Kosmos*, 299 F.R.D. at 152.

Because liability for Plaintiffs' Securities Act claims turns on whether investors had actual knowledge of the alleged omissions, the question is whether Plaintiffs have shown that knowledge can be litigated on a common basis. They have not—because Plaintiffs do not even address the issue. And they cannot. Defendants have submitted evidence showing the omitted information was widely reported, as well as declarations or testimony from 26 of the 34 allocants demonstrating that actual knowledge of the purportedly omitted information is an individual issue. Plaintiffs do not submit any evidence showing the

number of putative class members, but regardless, the allocants' knowledge is imputed to any investors on behalf of whom allocants purchased stock (including Plaintiffs). *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475-76 (9th Cir. 2015) (recognizing knowledge and actions of agent acting with scope of authority are imputed to principal); *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 213 n.109 (S.D.N.Y. 2012) ("knowledge and notice of these investment advisors is imputed to their clients"); Ex. 27 at 38:7-17; 39:9-12; Ex. 26 at 18:6-14. Individual inquiries into investor knowledge foreclose a finding of predominance.

### 1.    Many Investors Knew The Alleged T&R Omissions

Plaintiffs allege that the two remaining statements omitted T&R issues. MTD Order at 66-67 (discussing statements at ACC ¶¶ 384(a)(i), 386(b)). As this Court already recognized the T&R issues had, "as of April 2022," "been a recurring subject in the news media." *Id.* at 66. The record now shows that more than 50 articles were published on those issues by the time of the Offering, informing anyone who read them that Carvana had faced penalties and investigations for violations of state T&R laws. Allen Rpt. ¶ 243. The record further demonstrates that numerous allocants, including Plaintiffs' investment advisors, in fact read these articles and learned of the T&R issues: at least 15 out of 34 non-Carvana allocants, who received 87% of the non-Carvana shares issued in the Offering, had actual knowledge of T&R issues at the time of the Offering.[2] This means that the information was at least knowable. Others say they did not. *See, e.g.*, Ex. 2 ¶ 5 Because knowledge is claim-defeating, individualized inquiries will be required to determine which class members actually knew and which did not. Plaintiffs have not demonstrated predominance, and no class can be certified. *See True Health*, 896 F.3d at 931-32.

**Plaintiffs' Investment Advisors:** Plaintiffs' two investment advisors who allegedly purchased shares for them in the Offering knew at that time that Carvana was already facing violations of state T&R laws that had resulted in penalties. They were two of the largest

---

[2] Exs. 1, 3, 4, 6, 7, 10-11, 13, 15-16, 19, 22-23, 26, 27.

allocants in the Offering. Ex. 36. Plaintiff UANPF's investment advisor, T. Rowe Price, purchased ███████ shares and confirmed that before the Offering it read and "would dig further into articles mentioning title and registration compliance issues" and "usually ask the company about it too." Ex. 27 at 155:12-25. That included articles about the license suspension in North Carolina, and also the October 2021 *WSJ* Article cataloguing investigations and penalties in multiple states. *Id.* at 174:10-175:25; 181:2-183:25; 185:5-9. Plaintiff SHEPP's advisor, Baillie Gifford, purchased ███████ shares and ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████ Ex. 26 at 142:22-143:7.

Plaintiffs' investment advisors' knowledge alone confirms the need for individualized inquiries to determine Securities Act liability of each investor. *True Health*, 896 F.3d at 931-32 (finding that evidence showing affirmative defense requires individual inquiries precludes class certification); *see also FAT Brands*, 2020 WL 1934976, at *5; *Kosmos*, 299 F.R.D. at 153.

**Many Allocants Had Knowledge:** The majority, but not all, of the remaining allocants admit to having actual knowledge that Carvana had already faced penalties and investigations for violations of state T&R laws in multiple states. A key example is long-time investor ██████████████████████████ which purchased ███████ shares in the Offering. Ex. 36. ███████████[3] confirmed he knew "about title and registration issues in Carvana's business at some point in 2021," long before the April 22, 2022, Offering— and that he learned about them from "customer complaints, news articles and headlines regarding title and registration issues." Ex. 4 ¶ 13. He understood from these sources that Carvana "had settled complaints and paid fines in Florida and Texas related to delayed title

[3] ████████ i██████ founder and investment manager of ████. He first invested in Carvana on ███████ f██ in 2018, and between 2020 and 2022 ███ s "one of the largest, if not the █████t, third-██y shareholder" of Carvana stock. Carvana was then, and remains now, ██████ largest investment position. Ex. 4 ¶ 2.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

and registration issuance and improperly issuing temporary registrations; had a dealer license suspended in North Carolina for title and registration issues; and had settled an action in California for transporting vehicles without a state license." *Id*. He read the October 22, 2021, *WSJ* Article and a Denver article published right before the Offering ▮▮▮▮▮▮▮ describing violations of state law as a "systemic issue" for Carvana. *Id*. ▮▮▮▮▮▮ continued his extensive diligence after the Offering, and based on that diligence, he further avowed that "the publicly reported title and registration issues Carvana faced in several states" did not have any impact on his "decision to [] participate in the April 2022 Offering," *and he never learned any information after the offering* that led him to "believe that Carvana ever misrepresented its compliance with state title and registration laws or the impact on its business." *Id*. ¶¶ 16-17.

This is indisputably actual knowledge of the alleged T&R omissions. ▮▮▮▮▮▮▮ also made clear his view that the stock price declined in 2022 when "the world threw three once-in-a-generation curveballs at [Carvana] at the same time." *Id*. ¶ 7. It was "the combination of the macroeconomic factors—demand falling off a cliff, used car prices, interest rates— . . . that drove the stock price down," not T&R issues. *Id*. ¶ 8.

▮▮▮▮▮▮▮▮▮ do not stand alone. Many other investors confirmed in sworn declarations that they had actual knowledge of T&R issues from their extensive diligence into Carvana before the Offering. Allocants explained that they reviewed Carvana's SEC filings, shareholder letters and disclosures; they talked to Carvana—via investor calls, meetings with management, site visits and even interviews with former employees; they talked to experts; and they reviewed all sorts of public information—analyst reports, lawsuits, Twitter posts, customer complaints and news articles. Exs. 1-24. Allocants also subscribed to news alerts and third-party web scraping services like Yipitdata (which provides weekly statistics on inventory and sales, as well as news on Carvana's business). Ex. 27 at 151:4-7. Some allocants reported they had specific news articles in their diligence files, including about the August 2021 North Carolina dealership suspension, the October 2021 *WSJ* Article cataloguing issues in multiple states, and even the Denver article that

reported there was a "systemic issue" with Carvana's T&R compliance. *E.g.*, Ex. 22 ¶ 2; *see also* Ex. 11 ¶ 4; Ex. 1 ¶ 4; Ex. 6 ¶ 4; Ex. 13 ¶ 4.

Based on this extensive diligence, numerous allocants confirmed that they were well aware of Carvana's T&R issues. Exs. 6, 7, 13, 19, 22, 23. For example:

- ████████████████████████ was "aware that Carvana ████ ted to delays in title and registration processing" and that "several states were investigating the Company for violations of state laws related to title and registration requirements, some of which had already resulted in the payment of fines, suspension of dealer licenses, or similar penalties." Ex. 22 ¶ 7.

- ████████████████████ received YipitData reports as early as 2021 ████████ omers across multiple states (including Florida and North Carolina) were unable to receive title and registration documents" and reporting on suspensions in Raleigh and Florida. Ex. 23 ¶ 2.

- ██████████ knew that "Carvana had been investigated and penalized by ████ DMVs or equivalent entities for issues relating to title and registration processes." Ex. 19 ¶ 7.

- ███████████████████ was "well aware of the challenges Carvana ████ state and local title and registration regulations, including regulatory investigations and penalties in multiple states." Ex. 13 ¶ 4.

- █████████████████████ also knew "Carvana had been subject to ████ enalties in multiple states due to issues with providing customers with title and registration." Ex. 6 ¶ 4.

Other allocants confirmed that their diligence on Carvana contained articles published prior to the Offering regarding T&R issues, including articles on the North Carolina suspension and the *WSJ* Article. *E.g.* Ex. 10 ¶ 3, Ex. 16 ¶ 6. For example, the Chief Investment Officer at ███████████████ explained that the analyst primarily responsible for conducting diligence on Carvana is no longer employed there, but the CIO confirmed that he expected the diligence covered public news and in fact the analyst had shared with him *WSJ* articles from August 11 and October 22, 2021, around the time they were published. Ex. 15 ¶ 6.

If a class is certified, Defendants would need to conduct mini-trials for each absent class member presenting this evidence of knowledge to the jury to prove Plaintiffs failed to show lack of knowledge (Section 11) and Defendants prove their affirmative defense

(Section 12(a)(2)).   That precludes a finding that common issues predominate.  *FAT Brands*, 2020 WL 1934976, at *5.

**Some Allocants Testified They Lacked Knowledge Or Could Not Recall:**  Other allocants affirmatively testified that they *lacked* knowledge of T&R issues prior to the Offering.  *See, e.g.*, Ex. 2 ¶ 5.  Some, like ▮▮▮▮▮▮ had different investment strategies— such as purchasing shares in companies according to an investment index—and conducted no research prior to investing.  Ex. 24 ¶¶ 2-3; *see also* Ex. 18 ¶ 4; Ex. 10 ¶ 3.  Those allocants explained that they did not review articles regarding T&R issues, or even in some cases, Carvana's own SEC filings before purchasing stock.  Exs. 10, 18, 24.  And they testified they were not aware of the T&R issues prior to the Offering.  Exs. 10, 18, 24.  Another, ▮▮▮▮▮▮▮ confirmed that its clients "participated in the April 2022 Offering for arbitrage purposes" such that "research and analysis . . . likely were not material to the decision" to participate.  Ex. 17 ¶ 11.  Other allocants could not recall "whether or not any specific articles . . . were in fact reviewed" prior to the Offering.  *E.g.*, Ex. 5 ¶ 5; Ex. 12 ¶ 5.[4]

Plaintiffs cannot overcome this variation in knowledge, and again, they do not even try.  They offer no evidence or argument whatsoever showing that investor knowledge as to the T&R issues can be adjudicated on a class-wide basis.  Mot. at 8-9.  The Court should readily conclude that Plaintiffs have failed to carry their burden of demonstrating predominance.  *FAT Brands*, 2020 WL 1934976, at *5; *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 170 (S.D.N.Y. 2011).

**2.**     **Many Investors Also Knew Carvana's Non-T&R Practices**

[4] Even among that group, allocants attested that even if they had been aware of T&R issues, it would not have ▮▮▮▮▮▮ ecision to participate in the Offering. For example, an analyst from ▮▮▮▮▮▮ had "no recollection of receiving news articles, research reports ▮▮▮ h regard to Carvana Co.'s title and registration materials," but stated that even if he had, "it would not have been ▮▮▮▮ decision" to purchase shares in the Offering. Ex. 14 ¶ 3. An analyst from ▮▮▮▮▮▮ testified similarly:  he could not recall whether he became aware of T&R i ▮▮▮ after the April 2022 ▮▮▮▮, but "[r]egardless [] would not have considered those issues to be material to ▮▮▮ participation in the April 2022 offering." Ex. 21 ¶ 7.

Plaintiffs also challenge the RUS Statement based on an additional theory, namely, that Defendants failed to disclose that non-T&R practices drove Carvana's growth in retail units sold in Q4 2021 ("non-T&R" theories). ACC ¶¶ 3, 5, 10. The Court already found the allegedly omitted facts regarding those business practices were "disclosed . . . throughout the Class Period." MTD Order at 27 (expansion practices), 22 (purchasing standards); 25-28 (DriveTime transactions); 32 (profitability); *see also id.* at 66-67. The fact that the practices were disclosed in Carvana's SEC filings and discussed publicly means at least some investors learned of those practices before the Offering. ███████, one of Carvana's largest third-party shareholders, knew about all of these practices, and does "not believe that Carvana ever misled [him] regarding the drivers of its growth." Ex. 4 ¶¶ 10-11. And certainly, Plaintiffs have never pointed to *any* new information that ever came out about Q4 2021's retail unit sales.

The record confirms again that many allocants knew about the allegedly omitted business practices, and some say they did not. For example, investors were aware that:

- Carvana prioritized growth over profitability in the short-term, and had never been profitable. Exs. 1, 4, 7, 11, 13, 19, 20, 22.

- Carvana may pursue less profitable sales and that cars Carvana purchased "from customers were of lower quality and would be sold wholesale." Ex. 22 ¶ 11; *see also* Ex. 19 ¶ 14; Ex. 6 ¶ 6; Ex. 4 ¶ 10; Ex. 1 ¶ 15.

- Carvana's nationwide expansion meant it was expanding into new markets that were initially less profitable, Ex. 22 ¶ 11; *see also* Ex. 1 ¶ 14; Ex. 13 ¶ 6; Ex. 11 ¶ 8, based on "higher operational and logistics costs" associated with transportation costs for the new markets it entered. Ex. 4 ¶ 10; Ex. 22 ¶ 11.

- Carvana benefited from transactions with DriveTime that they understood were not negotiated at arms-length, Ex. 19 ¶ 15; Ex. 1 ¶ 15; Ex. 7 ¶ 3, including purchasing reconditioned cars from DriveTime where the purchase price was the same as the price it charged on its website, Ex. 27 at 187:22-188:20; Ex. 4 ¶ 10, Ex. 22 ¶ 11.

Again, other allocants invested on different bases, without reviewing research, or even Carvana's own SEC filings. *See, e.g.*, Exs. 9, 10, 17, 19, 24. It is undeniable that investors could have known this information and whether a class member actually knew it is a question the jury must decide on a class member by class member basis. In other words,

this issue predominates over common questions.

### 3.    Courts Deny Certification Where The Alleged Omission Was Publicly Available

Courts deny class certification on predominance grounds where "the allegedly omitted information . . . was public information, reported prior to" an offering and likely known to some investors before they made their purchase. *FAT Brands*, 2020 WL 1934976, at *5; *see also Kosmos*, 299 F.R.D. at 153. Here, there is testimony from allocants confirming that some did in fact know of the alleged omissions, which means the facts were knowable by all.

Several decisions have denied class certification based on the simple fact that the omissions were publicly disclosed. In *FAT Brands*, the court denied class certification because "even without evidence of actual knowledge of any putative class members," "it is likely that, before investing, some purchasers came upon, or discovered or were exposed to this allegedly omitted information regarding the bankruptcies, requiring individualized inquiries into each class members' alleged lack of knowledge." 2020 WL 1934976, at *5. Similarly, the court in *Kosmos* found "conference calls or press releases" and "'new' negative news . . . create[d] at least fourteen separate opportunities during the putative class period . . . for potential class members to have acquired varying levels of knowledge." 299 F.R.D. at 153. The court agreed that individualized inquiries were necessary because "investors within the putative class may or may not have been aware" of public information "based on their varying levels of due diligence," resulting in potential for "layers of disparate knowledge." *Id.* at 152-54; *see also In re Superior Offshore Int'l, Inc. Sec. Litig.*, 2010 WL 2305742, at *1 (S.D. Tex. June 8, 2010) (similar).

The record here goes well beyond that in *FAT Brands*, *Kosmos*, and *Superior Offshore*: not only have Defendants established the broad dissemination of public information regarding specific T&R fines, penalties, consumer actions, and complaints, *see supra* Section II(A), but Defendants also have submitted declarations from more than 15 of the allocants holding 87% of the non-Carvana allocation attesting to their knowledge of

the regulatory actions and penalties Carvana faced related to T&R compliance issues.  Nor is this record particularly surprising.  The crux of Plaintiffs' complaint involves *consumer complaints*, which were addressed by local and state regulators and the subject of litigation—all public facing conduct.  It also matters that Carvana's Offering was a secondary offering, meaning the allocants in Carvana's Offering had previously purchased Carvana stock and many had diligenced Carvana for years.  It is no surprise (and all the more likely) that many of them knew about the alleged omissions, including the non-T&R omissions related to Carvana's business practices.  *E.g.*, Ex. 1 ¶¶ 3-4, 13-16; Ex. 4 ¶¶ 10, 12; Ex. 6 ¶¶ 4-6; Ex. 21 ¶¶ 5, 7; Ex. 22 ¶ 11.

This case is therefore distinguishable from other cases where courts have found individualized inquiries on actual knowledge were not required, because the "misstatements and omissions relating to information that is internal, not widely publicly available." *FAT Brands,* 2020 WL 1934976,  at *5 (collecting cases); *cf. In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 312 F.R.D. 332, 342-43 (S.D.N.Y. 2015) (concerning internal financial information disclosed to a select group of investors); *In re DJ Orthopedics, Inc. Sec. Litig.*, 2003 WL 27363735, at *4 (S.D. Cal. Nov. 17, 2003) (similar). Or they involved initial public offerings and investors with only "a general awareness" of a larger problem: In *Boston Retirement Systems v. Uber Technologies, Inc.*, for example, the public disclosures concerned individual incidents that were only "pieces" of the allegedly omitted information, and the record on knowledge included only deposition testimony of a single investment manager's employees showing "that some employees had knowledge of pieces of information related to the alleged omissions."  2022 WL 2954937, at *3 (N.D. Cal. July 26, 2022).  The *Lyft* case involved an initial public offering with myriad new investors, and the court found that the news did "not describe the specific brake problem" allegedly omitted (it disclosed other problems), and that "the magnitude" of the allegedly omitted sexual assault problem was only revealed after the initial public offering. *See, e.g.*, *In re Lyft Inc. Sec. Litig.*, 2021 WL 3711470, at *6-7 (N.D. Cal. Aug. 20, 2021).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

15

Here, unlike *Lyft* and *Uber*, Carvana's secondary offering involved investors experienced in investing in Carvana, and the public disclosures speak to knowledge of the specific alleged omissions—including the violations and penalties that Plaintiffs claim rendered the statements misleading. MTD Order at 22, 25, 27. Allocants, who were long term investors, knew that Carvana "operate[s] in several highly regulated industries," subjecting it to "a wide range of evolving federal, state, and local laws and regulations," *e.g.*, Ex. 1 ¶ 10; Ex. 4 ¶ 12; Ex. 5 ¶ 5; Ex. 6 ¶ 4; Ex. 7 ¶ 4; Ex. 10 ¶ 3; Ex. 11 ¶ 4; Ex. 13 ¶ 4; Ex. 16 ¶ 5; Ex. 19 ¶ 7; Ex. 20 ¶ 4; Ex. 22 ¶ 6, and that Carvana had been penalized for violating numerous states' T&R laws.

In fact, the allocant declarations also make clear that later disclosed T&R issues—including the *Barron's* Article (ACC ¶ 144) and the additional license suspension in Michigan (ACC ¶ 322)—would not have changed their decision to participate in the Offering. *E.g.*, Ex. 14 ¶ 3; Ex. 21 ¶ 7; Ex. 17 ¶ 11. Many allocants confirmed that they "did not (and do not) believe that any of the regulatory challenges that Carvana faced between July 2019 and November 2023 materially impacted Carvana's business." Ex. 19 ¶ 10. Or, as ████ put it, "[n]othing we have learned since the Public Offering has led us to believe that any of the statements in the Offering Documents were false or misleading." Ex. 22 ¶ 10. Plaintiff UANPF's own investment advisor, T. Rowe Price, said it was "not surprised" by later disclosures regarding a suspension in *Illinois*, or the June 2022 *Barron's* article. Ex. 27 at 201:9-15; 202:10-205:24. As reflected in contemporaneous emails, T. Rowe Price confirmed it already knew about nearly all of the issues reported in the June 2022 *Barron's* article, with the exception of a class action lawsuit in Pennsylvania, which it believed was not material. *Id.* at 202:10-205:24; 206:10-13; Exs. 40, 41. Like other allocants, T. Rowe Price explained that it had not been misled. Ex. 27 at 199:25-200:12; 205:7-13; 211:15-212:1; *see* Ex. 1 ¶ 12; Ex. 22 ¶ 10.

**B.    Plaintiffs Ignore Other Rule 23 Requirements**

Even if knowledge could be litigated on a class-wide basis—it cannot—class certification should be denied because Plaintiffs' Motion ignores its burden to show that

any Securities Act class meets three other requirements of Rule 23.

### 1. Plaintiffs Fail To Define A Securities Act Class

Plaintiffs must define an appropriate class for each of its claims, *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001), and "each class and subclass 'must independently meet the requirements of Rule 23.'" *Griffith v. Tiktok, Inc.*, 2024 WL 4308813, at *4 (C.D. Cal. Sept. 9, 2024) (quoting *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981)). Plaintiffs do not even attempt to meet their burden of defining a class to litigate Securities Act claims. *Hawkins*, 251 F.3d at 1238 (holding "the burden is on Plaintiffs to submit" appropriate class definitions). It is not Defendants' or this Court's job to "construct[] subclasses." *Id.* Plaintiffs' proposal of a single class— "[a]ll persons who purchased . . . Carvana common stock from May 6, 2020 through October 7, 2022" (Mot. at 1)—is inappropriate for their Securities Act claims.

Plaintiffs conceded as much when they alleged a *narrower* "Securities Act Class" in the ACC limited to "all persons who purchased Carvana common stock directly in the 2022 Public Offering." ACC ¶¶ 421-22. Limiting the class of purchasers to those who purchased "directly in" the Offering is *required* for a secondary offering like Carvana's. Securities Act claims require a showing that all "purchased shares [are] traceable to the allegedly defective registration statement." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023) (Section 11 claims); *Pirani v. Slack*, 127 F.4th 1183, 1191-93 (9th Cir. 2025) (Section 12(a)(2) claims), *cert denied*, 2025 WL 2824130 (Oct. 6, 2025). For this reason, courts limit who can pursue Securities Act claims for a secondary offering to the class of investors who purchased shares directly in the Offering or those who can "trace the chain of title for their shares" to someone who did. *Century Aluminum*, 729 F.3d at 1106.[5]

---

[5] Obviously, investors who purchased shares *before* the Offering cannot claim those shares were issued later in (traceable to) the Offering. And purchasing shares after the Offering cannot establish traceability either, because the issued shares become immediately "commingled" with (and indistinguishable from) the "pool of previously issued shares." *Century Aluminum*, 729 F.3d at 1108; *see also, e.g.*, *In re Merix Corp. Sec. Litig.*, 2009 WL 10692857, at *2 (D. Or. Nov. 5, 2009).

Plaintiffs cannot fall back on the Securities Act class alleged in the ACC because they offered no evidence, and have waived any argument, that it satisfies Rule 23. *Bishop v. Petro-Chem. Transp.*, 582 F. Supp. 2d 1290, 1308-09 (E.D. Cal. 2008) (denying certification where "plaintiffs have not carried their burden" for Rule 23).

The numerosity requirement of Rule 23(a)(1) confirms why the Securities Act class cannot be certified. As Plaintiffs concede, the Ninth Circuit requires "40 or more members" for the class to demonstrate numerosity. Mot. at 5. But Plaintiffs offered no evidence about the number of investors who purchased stock directly *in the Offering*. *Cf.* Mot. at 5 (addressing only the number of investors who held stock "during the Class Period"). To the contrary, the only evidence in the record—submitted by Defendants—establishes that only 34 non-Carvana allocants received shares in the Offering. Ex. 36. Only those 34—or investors who received newly issued shares directly from allocants—have standing. *See Century Aluminum*, 729 F.3d at 1106-07. And many of them cannot be included in a class because they have claim-defeating knowledge of the alleged omissions. Yet Plaintiffs presented no evidence demonstrating the total number of remaining investors who could be included in an appropriate class.

**2.     Plaintiffs And Counsel Have Impermissible Conflicts Of Interest**

Rule 23(a)(4) requires that the persons representing the class must be able to "fairly and adequately protect the interests" of all members in the class. Fed. R. Civ. P. 23(a)(4). A representative is not adequate if that party is antagonistic or has interests that conflict with other potential class members. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 (1997). And the same counsel cannot vigorously represent classes with conflicting interests, as Rule 23(a)(4) requires. *See Lou v. Ma Labs., Inc.*, 2014 WL 68605, at *2 (N.D. Cal. Jan. 8, 2014) (conflicted counsel could not represent two classes with diverging interests).

Here, Plaintiffs and their counsel cannot adequately represent investors asserting both Exchange Act and Securities Act claims because their theories for recovery are in conflict. Plaintiffs' theory of loss causation for the Exchange Act claims limits the

damages investors could recover for their Securities Act claims.  The maximum amount of damages that Plaintiffs may recover for their Section 11 Securities Act claim is the difference between the $80 Offering price and the price on the date the first complaint alleging Securities Act claims was filed (here, September 30, 2022), Ex. 44[6]; Allen Rpt. ¶ 247.  Those damages can be limited by a negative causation defense—*i.e.*, a showing that any part of the price drop between the Offering and the filing of the complaint "not attributable to the alleged misrepresentation or omission in the registration statement." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013).  To maximize damages, investors in the Offering must show that the truth was revealed after they purchased on April 22, 2022, and before September 30, 2022.

Yet Plaintiffs are advancing arguments for the Exchange Act claims that undermine that showing.  Plaintiffs allege the truth was not fully revealed between April 22 and September 30, 2022.  Instead, they claim it was partially revealed in August and October 2021, but then remained at least partially concealed until October 7, 2022.  ACC ¶¶ 311, 313, 322.  Plaintiffs cannot have it both ways: the supposed truth cannot have been partially revealed as of August and October 2021 and yet still be unknown at the time of the April 22, 2022, Offering, nor can it have been revealed by the September 30, 2022, filing of the first Securities Act complaint, and yet still concealed until October 7, 2022.

This fundamental conflict between the putative class members precludes certification, as "[t]he selling out of one category of claim for another is not improbable here." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011); *see also Andrews Farms v. Calcot, Ltd.*, 268 F.R.D. 380, 388 (E.D. Cal. 2010). Plaintiffs fail to recognize, much less address the "antagonistic" interests of the two classes. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233

[6] Courts have consistently held damages are measured based on the date of the "the first-filed complaint, rather than [] a later-filed amended or consolidated complaint." *In re Barclays Bank PLC Sec. Litig.*, 2016 WL 3235290, at *5 (S.D.N.Y. June 9, 2016); *see also Terezini v. GoodRx Holdings, Inc.*, 2022 WL 122944, at *3 (C.D. Cal. Jan. 6, 2022) (dismissing Section 11 claim because there was "no drop below [the offering price] in the entire period until" the "date the initial complaint was filed").

(2d Cir. 2016). Counsel will have to choose either to advance what they presumably believe to be their strongest theory of loss causation for their Exchange Act claims and sell out absent class members' Section 11 claim, or to limit class members' claimed losses under the Exchange Act to save the Section 11 claim. The law is clear, they cannot represent members of both classes if they would have to make that choice. *See* ARIZ. RULES OF PROF'L CONDUCT 1.7(a)(1)-(2). Because there is, "at the very least, the potential for conflicting interests . . . for the class counsel . . . class certification should be denied." *Nat'l Air Traffic Controllers Ass'n. v. Dental Plans, Inc.*, 2006 WL 584760, at *4 (N.D. Ga. Mar. 10, 2006); *Valley Drug Co. v. Geneva Pharms. Inc.*, 350 F.3d 1181, 1194 (11th Cir. 2003) (potential for "antagonistic interests" is sufficient to deny class certification).

### 3.    UANPF Is Subject To A Unique Standing Defense

Plaintiff UANPF has not (and cannot) demonstrate standing to pursue the Securities Act claims. A class representative's standing to assert a Securities Act claim is "a prerequisite to class certification." *Doyle v. Mastercard Int'l Inc.*, 700 F. App'x 22, 25 (2d Cir. 2017). A lack of standing "qualifies as a 'unique defense' sufficient to defeat the typicality of a proposed class representative." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 120 (S.D.N.Y. 2004), *rev'd on other grounds*, 471 F.3d 24 (2d Cir. 2006); *see also Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 135 (3d Cir. 2000).

UANPF claims, without support, that they "[p]urchased directly in and/or traceable to the 2022 Public Offering." Mot. at 4; Dkt. 357-1 at 1; Dkt. 357-2 at 1 (same). That is not sufficient here, where UANPF admitted in its deposition that it lacked basic information about their transactions. *See, e.g.*, Ex. 42 at 362:20-363:12; *In re PG&E Corp. Sec. Litig.*, 806 F. Supp. 3d 962, 1011 (N.D. Cal. 2025) (dismissing claim lacking specific support for traceability in secondary notes offering). Testimony from UANPF's investment advisors confirms that UANPF cannot demonstrate the "factual specificity" required to trace the shares they purchased to the Offering. *Century Aluminum*, 729 F.3d at 1107. T. Rowe Price admitted that it kept all Carvana shares that it purchased for clients in a central fund account—*i.e.*, commingled with other previously purchased shares. Ex.

27 at 213:23-214:4. There is no way to determine whether the shares UANPF received on April 22, 2022, were shares purchased in the Offering. *Id*. 214:22-215:5, 288:19-289:1.

UANPF's "shares could have come from the secondary offering, but the 'obvious alternative explanation' is that they could instead have come from the pool of previously issued shares." *Century Aluminum*, 729 F.3d at 1108. The Ninth Circuit, and other courts, has rejected similar allegations as insufficient at the pleading stage to establish traceability for a secondary offering. *Id*.; *see also In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *7 (S.D.N.Y. Oct. 1, 2013) (finding plaintiff lacked standing to assert Section 11 claim due to inability to trace). The allegations therefore must also be insufficient at the class certification stage, when Plaintiffs must come forth with actual evidence. Where, as here, a proposed class representative cannot trace, the Court should deny class certification. *See Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 586-87, 591 (W.D. Tex. Oct. 21, 2002) (denying class certification where plaintiffs lacked standing); *In re Quarterdeck Off. Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *2–3, *7 (C.D. Cal. Sep. 30, 1993) (similar).

## V.    CONCLUSION

Plaintiffs' Motion for Class Certification should be denied.

Dated: May 18, 2026              Respectfully submitted,

LATHAM & WATKINS LLP

*/s/ Susan E. Engel*
Andrew B. Clubok (*pro hac vice*)
J. Christian Word (*pro hac vice*)
Susan E. Engel (*pro hac vice*)
Matthew J. Peters (*pro hac vice*)
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
Email: christian.word@lw.com
Email: susan.engel@lw.com
Email: matthew.peters@lw.com

LATHAM & WATKINS LLP

Jeff G. Hammel (*pro hac vice*)
Kalana Kariyawasam (*pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: jeff.hammel@lw.com
Email: kalana.kariyawasam@lw.com

Meryn C. Grant (*pro hac vice*)
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (424) 653-5500
Email: meryn.grant@lw.com

FENNEMORE CRAIG, P.C.
Douglas C. Northup (No. 013987)
Andrea L. Marconi (No. 022577)
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
Email: dnorthup@fennemorelaw.com
Email: amarconi@fennemorelaw.com

*Counsel for Defendants Carvana Co., Ernest Garcia III, Mark Jenkins, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan*

DATED: May 18, 2026

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

*/s/ David P. Friedman*
Susanna M. Buergel (*pro hac vice*)
David P. Friedman (*pro hac vice*)
Kristina A. Bunting (*pro hac vice*)
Michael J. Pisem (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone: 212.373.3000

LATHAM & WATKINS LLP
ATTORNEYS AT LAW

22

Email: sbuergel@paulweiss.com
Email: dfriedman@paulweiss.com
Email: kbunting@paulweiss.com

Email: mpisem@paulweiss.com

FENNEMORE CRAIG, P.C.
Douglas C. Northup (No. 013987)
Andrea L. Marconi (No. 022577)
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
Email: dnorthup@fennemorelaw.com
Email: amarconi@fennemorelaw.com

*Counsel for Defendants Citigroup Global Markets Inc. and J.P. Morgan Securities LLC*