**Exhibit 22**
REDACTED

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE CARVANA CO. SECURITIES LITIGATION | CASE NO. CV-22-2126-PHX-MTL |
| | **DECLARATION OF** ▮▮▮▮ ▮▮▮▮ |

I, ▮▮▮▮▮▮▮ the undersigned, declare as follows:

1. I am a co-founder of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which I co-founded with ▮▮▮▮▮ in September 2005. ▮▮▮▮▮ purchased ▮▮▮ shares of Carvana Co. ("Carvana" or the "Company") Class A common stock in Carvana's public offering that closed on April 26, 2022 (the "Public Offering"). ▮▮▮▮▮ and I were jointly responsible for ▮▮▮▮▮ decision to invest, and the information in this declaration is based on my personal knowledge.

2. ▮▮▮▮▮ and I regularly invest in the stock market, and make investment decisions on behalf of ▮▮▮▮▮ after conducting due diligence into companies' filings, news articles, third-party analyst reports, public lawsuits and other publicly available sources.

3. ▮▮▮▮▮ has been a long-term investor in Carvana. ▮▮▮▮▮ first purchased Carvana Class A common stock in March 2018, and has made several additional purchases thereafter, including in Q4 2021, throughout the year in 2022, and in 2025. ▮▮▮▮▮ continues to hold Carvana stock.

4. As with any of our active investments, throughout the time ▮▮▮▮▮ has had a position in Carvana, ▮▮▮▮▮ and I have performed regular ongoing diligence and research with respect to the Company. That has included closely monitoring publicly available information about Carvana, including reviewing news alerts from sources like Google and Bloomberg.

5. Our decision to participate in the Public Offering was based on all of our diligence and research to date at that time.

1

**Title & Registration**

6. Based on our diligence, I understood that Carvana offered an innovative, industry-disrupting business model on a nationwide scale that was unlike that of traditional used car dealers who typically operate exclusively in local physical locations. As a matter of common sense, I understood that Carvana's nascent business model was accompanied by the risk (or even likelihood) that Carvana would face challenges as it came up against regulations historically designed for traditional brick-and-mortar used car dealerships that do not account for processes adapted for a digitized platform serving a nationwide market. We viewed such issues as growing pains that did not materially impact our core theses about the Company.

7. So, for example, before we decided to participate in the Public Offering, we were aware that Carvana had received numerous customer complaints related to delays in title and registration processing. We were also aware that several states were investigating the Company for violations of state laws related to title and registration requirements, some of which had already resulted in the payment of fines, suspension of dealer licenses, or similar penalties. In particular, and given that we stay up to date on news related to Carvana, we were aware, prior to the Offering, of North Carolina's suspension of a dealer license in August 2021 (as contemporaneously reported in various media outlets), the regulatory issues described in the October 22, 2021, article published by *The Wall Street Journal* titled "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," and the issues described in the April 6, 2022, article published by Denver7 titled "Colorado regulators find 'systemic issue' with Carvana."

8. None of that news was surprising. We knew that Carvana's competitors—both brick-and-mortar used car dealers and used car dealers engaged in e-commerce—faced similar regulatory scrutiny and penalties. We were also aware that the COVID-19 pandemic had impacted state operations and created compliance challenges for used car dealers. We therefore understood that Carvana faced existing and potential legal liability and reputational damage as a result of regulatory scrutiny or penalties flowing from pandemic conditions, in addition to the risks associated with Carvana's business model.

9. In our view, regulatory scrutiny and penalties did not materially impact Carvana's overall operations and we did not believe they were material to Carvana's business at the time of the Public Offering, or that they would materially affect Carvana's business in the future.

10. Nothing we have learned since the Public Offering has led us to believe that any of the statements in the Offering Documents were false or misleading. Following the Offering, we reviewed information regarding addition regulatory investigations and penalties that Carvana faced, including from the period prior to the Public Offering, for example those described in the June 24, 2022, article published by *Barron's* titled "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars." Nothing we have learned regarding Carvana's compliance with title & registration requirements (or legal penalties as a result of such compliance issues) would have changed our decision to purchase Carvana stock in the Public Offering. Further, regulatory scrutiny and penalties after the Offering in 2022 have not materially affected our valuation of Carvana.

**Carvana's Business Model**

11. Leading up to the Offering, we reviewed multiple disclosures that set forth Carvana's business strategies and financial reporting in great detail, including its shareholder letters and SEC filings. Accordingly, we understood that Carvana's business model leading up to the Public Offering was focused, in the short-term, on growth over profitability, which is common for a pre-IPO or newly post-IPO technology company. Our expectation, of course, was that Carvana would eventually focus more on profitability, as it has. Our expectations about Carvana's prospects included our understanding that:

    a. As part of building its population coverage, Carvana would pursue customer sales that it might not pursue on the same terms if it adjusted its focus toward greater profitability.

    b. Ahead of the Public Offering, Carvana expanded its program of buying cars from retail customers. Overall, we believed that program was beneficial to Carvana because cars purchased from customers are more profitable on average due to lower average prices than Carvana would pay at auction for a comparable

vehicle. We understood that some of the vehicles Carvana purchased from customers were of lower quality and would be sold wholesale.

c.  Carvana had experienced and was experiencing costs and hurdles associated with its expansion across the United States, including higher operational and logistics costs associated with the transportation of cars to or from markets far from existing infrastructure, and those challenges could be exacerbated as Carvana continued to expand.

d.  Carvana engaged in related-party transactions with DriveTime (as disclosed in the 2022 annual proxy statement) pursuant to a wholesale vehicle purchase agreement under which Carvana purchased reconditioned vehicles from DriveTime. In certain instances Carvana's purchase price was the wholesale price of the vehicle plus a fee, which encompasses, among other things, transportation and reconditioning costs, and in other instances the purchase price was the list price on Carvana.com after a customer has placed an order on the vehicle.

12. Nothing that we have learned since the Public Offering has changed our understanding of Carvana's valuation at the time of the Public Offering.

I declare under penalty of perjury that the information submitted herein is true and correct.

Executed at New York, NY on May 4th 2026.

By: ████████████████