**Exhibit 25**
REDACTED

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| In re Carvana Co. Securities Litigation | Case No. CV-22-2126-PHX-MTL |

# EXPERT REPORT

# OF

# LUCY P. ALLEN

**May 18, 2026**

**TABLE OF CONTENTS**

I.    Scope of Assignment ..................................................................................................1

II.   Summary of Findings..................................................................................................2

III.  Qualifications and Remuneration ..............................................................................6

      A.  Qualifications..................................................................................................6

      B.  Remuneration..................................................................................................7

IV.   Materials Considered .................................................................................................7

V.    Background and Summary of Allegations..................................................................9

      A.  Background......................................................................................................9

      B.  Summary of Allegations ...............................................................................10

            1.  The alleged "pump-and-dump scheme".............................................11

            2.  The alleged misrepresentations and omissions...................................14

            3.  Sections 11, 12, and 15 Securities Act allegations ............................18

VI.   High-Level Analysis of Carvana's Stock Price Movement During the Alleged Class
      Period .......................................................................................................................19

      A.  Analysis of Carvana's stock price increase during the first half of the alleged
          Class Period ..................................................................................................21

      B.  Analysis of Carvana's stock price decline during the second half of the alleged
          Class Period ..................................................................................................32

VII.  Introduction to Price Impact ...................................................................................45

VIII. Carvana's Stock Price Reactions to the Alleged Misstatements and the Alleged
      Corrective Disclosures.............................................................................................49

      A.  Event study and statistical significance .......................................................49

      B.  Dr. Cain's event study model and alternative event study model.................54

      C.  None of the alleged misstatements caused a statistically significant increase in
          Carvana's stock price....................................................................................56

      D.  None of the alleged corrective disclosures caused a statistically significant
          decrease in Carvana's stock price.................................................................58

IX.   Price Impact Analysis of the T&R Alleged Misstatements.....................................60

      A.  A front-end analysis shows that the T&R alleged misstatements did not cause
          Carvana's stock price to increase when they were made..............................60

            1.  Front-end analysis of T&R Risk alleged misstatements.....................60

                                                                                                                          i

2.  Front-end analysis of T&R Other alleged misstatements .......................................64

B.  A back-end analysis shows that the correction of the T&R alleged misstatements
did not cause Carvana's stock price to drop ..........................................................67

1.  There is no price reaction to any of the T&R alleged corrective disclosures,
which is strong evidence that the T&R alleged misstatements had no price
impact...................................................................................................................68

2.  Analysis of analyst reactions to the alleged corrective disclosures strongly
demonstrates no price impact – the disclosures were of such little importance
that the vast majority of the analysts chose not to update their analyses or
issue reports following the disclosures .................................................................73

3.  Analysis of analyst reactions to the alleged corrective disclosures strongly
demonstrates no price impact – the only analyst that issued a report after any
of the alleged corrective disclosures and mentioned the T&R issues explicitly
indicated that the T&R issues were "de minimis"................................................74

4.  Analysis of analyst reactions to the alleged corrective disclosures strongly
demonstrates no price impact – not one analyst lowered its price target
because of the T&R alleged corrective disclosures ..............................................75

5.  Analysis of analyst reactions to the alleged corrective disclosures strongly
demonstrates no price impact – none of the analysts mentioned the T&R
issues as a risk factor to Carvana's business even after the alleged corrective
disclosures ............................................................................................................76

C.  Carvana's T&R issues were publicly known during the alleged Class Period and
before any of the alleged corrective disclosures, and thus, were not concealed by
the alleged misstatements ......................................................................................77

1.  Carvana's T&R issues were experienced directly by its customers, and thus
throughout the alleged Class Period information on those issues would have
been publicly available .........................................................................................77

2.  Before any of the T&R alleged misstatements were made, consumer
complaints about Carvana's T&R issues were already widespread on social
media and were reported by the news media ........................................................79

3.  Analysts commented that Carvana's T&R issues were "neither new nor
unknown," had been going on for years, and were largely "growing pains" ........83

D.  According to analysts, Carvana's T&R issues were driven by slow processing
times at the DMV as well as the impact of the Covid-19 pandemic, factors that
were "outside of Carvana's control"......................................................................84

E.  The T&R-related fines were economically small relative to the size of the
Company and the suspensions were of limited scope and time and had
workarounds, which is consistent with no price impact ...........................................87

F.  Summary of the price impact analysis of the T&R alleged misstatements .................90

X.   Price Impact Analysis of the Retail Unit Sales ("RUS") Alleged Misstatements ............91

A. A front-end analysis shows that the RUS alleged misstatements did not cause Carvana's stock price to increase when they were made..............................................91

    1. August 5, 2021, RUS alleged misstatement.............................................................92

    2. February 24, 2022, RUS alleged misstatement......................................................92

B. There is no evidence that the RUS alleged misstatements impacted Carvana's stock price at the back end.................................................................................................94

C. Analysts were tracking Carvana's RUS data during the alleged Class Period, and they used their own analysis to determine what was driving the increase in RUS independent of the alleged misstatements......................................................................96

XI.   Price Impact Analysis of the Alleged Scheme.................................................................96

A. Overall, the alleged scheme did not impact Carvana's stock price and was never corrected..........................................................................................................................97

    1. There was no statistically significant price increase at the start of the alleged scheme.......................................................................................................................97

    2. Carvana's stock price increase during the first half of the alleged Class Period, rather than being caused by the alleged scheme, was primarily due to well-documented, macroeconomic and industry-wide factors that also positively impacted the stock prices of its peers and other e-commerce companies..............98

    3. Carvana's stock price decrease during the second half of the alleged Class Period, rather than being due to the revelation of the alleged scheme, was primarily due to well-documented, macroeconomic and industry-wide factors that also negatively impacted the stock prices of its peers and other e-commerce companies..........................................................................................98

    4. Plaintiffs' overall claim that the alleged scheme concealed the fact that Carvana was not profitable is nonsensical on its face – it was widely known that Carvana was unprofitable during the alleged Class Period ...........................99

    5. Plaintiffs' claim that the alleged scheme concealed that Carvana's business was "unsustainable" is belied by the fact that Carvana's business, unlike its peers' businesses, proved to be "sustainable" and its stock price rebounded to new highs after the alleged Class Period, while its peers went out of business ..102

B. A detailed analysis of each part of the alleged scheme demonstrates no price impact.............................................................................................................................102

    1. The alleged "sham pass-through sales arrangement" with DriveTime................103

    2. The alleged lowering of purchasing and verification standards .........................106

    3. The alleged "flouting" of T&R rules ..................................................................108

    4. The alleged "unsustainable nationwide expansion" ...........................................109

    5. The alleged misstatements and omissions to "conceal the scheme and convince investors that Carvana's retail growth was profitable and sustainable"...............................................................................................................112

XII.    Analysis of the Four Alleged Corrective Disclosures That Were Dismissed by the Court ..................................................................................................................117

    A.    There was no statistically significant stock price decline to three of the four dismissed alleged corrective disclosures ................................................................119

    B.    The statistically significant stock price decline following the one dismissed alleged corrective disclosure was not due to any of the alleged misstatements or the alleged scheme ..................................................................................................119

XIII.   The Cain Report's "cause-and-effect" market efficiency test is fundamentally flawed because it explicitly fails to test the type of information that is at issue in this matter – and when that type of information is included in Cain's test, the result shows no significant cause and effect and thus is evidence against market efficiency ..................121

XIV.    Other Issues with Dr. Cain's Market Efficiency Analysis................................................130

XV.     Plaintiffs and Dr. Cain Fail to Propose a Common Damages Methodology That is Specific to and Consistent with Plaintiffs' Claims in This Case .....................................132

XVI.    Class Certification Issues with Plaintiffs' Section 11/12 Claims, Given the Widespread Publication of T&R Issues Before the 2022 Public Offering and Conflicts Between and Among the Securities Act and Exchange Act Claims.................................136

## I.    SCOPE OF ASSIGNMENT

1.    I have been asked by Counsel for Defendants Carvana Co. ("Carvana," the "Company," or "CVNA"), Ernest Garcia III, Mark Jenkins, Stephen Palmer, Michael Maroone, Neha Parikh, Ira Platt, and Greg Sullivan to review and comment on Plaintiffs' claims as alleged in the Amended Consolidated Complaint, filed March 29, 2024 (the "Complaint") and to review and comment on the Expert Report of Matthew D. Cain, Ph.D. filed on April 6, 2026 (the "Cain Report"). In particular, I have been asked to analyze the following issues:

- Whether there is price impact from the alleged misrepresentations that remain in the case that Plaintiffs claim inflated Carvana's stock price between May 6, 2020 and October 7, 2022 (the alleged "Class Period");[1]

- Whether there is price impact from the alleged "pump-and-dump scheme" that Plaintiffs claim inflated Carvana's stock price by "boost[ing] Carvana's reported retail sales growth, and mak[ing] the growth appear profitable and sustainable";[2]

- Analyze Dr. Cain's market efficiency analyses and whether they reliably prove market efficiency in this matter;

- Whether Plaintiffs' and Dr. Cain's proposed common damages methodology is capable of measuring damages on a class-wide basis, consistent with Plaintiffs' theory of liability in this case; and

- Analyze Plaintiffs' Securities Act allegations, including whether information related to the alleged scheme and misstatements was publicly available prior to the April 22, 2022 offering.

---

[1]    Plaintiffs' Motion for Class Certification and Memorandum of Points and Authorities, filed April 6, 2026 ("Plaintiffs' Motion for Class Certification"), p. 1.

[2]    Complaint, ¶¶ 3, 7.

1

## II.    SUMMARY OF FINDINGS

2.    In sum and described in more detail below, I find there is <u>no price impact from the alleged misstatements or the alleged scheme</u>. Plaintiffs allege that Defendants engaged in a "fraudulent pump-and-dump scheme" making misstatements that allegedly inflated Carvana's stock price during the alleged Class Period, and that the alleged "truth" was later revealed through a series of alleged corrective disclosures that caused Carvana's stock price to decline. A <u>high-level analysis</u> of Carvana's stock price movement during the alleged Class Period shows that Carvana's stock price increase during the first half and decrease during the second half of the alleged Class Period were primarily driven by well-documented macroeconomic and industry-wide factors. Those factors included dramatic changes in consumer behavior due to the COVID-19 pandemic, changes in interest rates, rising inflation, supply chain disruptions and government stimulus. Those same factors also impacted the stock prices of Carvana's peers and other e-commerce companies – tellingly, the stock prices of Carvana's closest peers Vroom, Shift, and CarLotz, online used car retail companies, all declined by almost exactly the same magnitude as Carvana's during the second half of the alleged Class Period. Furthermore, after the alleged Class Period, Carvana's stock price eventually recovered and reached new highs, while all three of its closest peers went bankrupt, which is evidence directly contradicting Plaintiffs' claim that Carvana's business was "pumped" by hidden "unsustainable" practices.

3.    <u>Focusing on the T&R alleged misstatements</u>, I find that there is no price impact from any of the T&R alleged misstatements. A front-end analysis, which focuses on the price and market reaction at the time each of the alleged misstatements were made, shows that the T&R alleged misstatements did not cause Carvana's stock price to increase when made. There was no direct evidence of price impact: there was no price increase that can be attributed to the T&R alleged misstatements, none of the analysts indicated that the topic of the alleged

2

misstatements – T&R issues – was important to Carvana's valuation or business, and, in fact, none of the analyst reports issued following the T&R alleged misstatements even mentioned the alleged misstatements. A back-end analysis, which focuses on the price and market reaction at the time of the alleged corrective disclosures, shows that the correction of the T&R alleged misstatements did not cause Carvana's stock price to drop and provides further evidence that there was no price impact. According to both Dr. Cain's event study and an alternative event study, there was no statistically significant price *decrease* after any of the T&R alleged corrective disclosures. An analysis of analyst reactions to the alleged corrective disclosures shows that the allegedly corrective information was not considered important to Carvana's stock price by any analyst. In particular, most of the analysts did not even mention any of the alleged corrective disclosures or even issue reports following the alleged corrective disclosures, which shows that the disclosures were of too little importance for analysts to choose to update their analyses or valuations. The one analyst that did mention one of the alleged corrective disclosures, the suspension in North Carolina, explicitly explained that the disclosure was not important in their view by calling it "de minimis." Thus, from both the front-end and the back-end analyses, I find that not one of the T&R alleged misstatements caused Carvana's stock price to rise when made and not one of the alleged corrective disclosures caused Carvana's stock price to drop, and not one analyst said the alleged misstatements were important to their valuation of the stock when made and not one analyst indicated that the alleged corrective disclosures were relevant to the value of the stock when disclosed. Moreover, I found that Carvana's T&R issues were not concealed by the alleged misstatements as they were publicly known before and during the alleged Class Period and before any of the alleged corrective disclosures, and the alleged corrective disclosures contained information that was not new to the market. The T&R issues were made public before each of the alleged corrective disclosures, including through customer

3

complaints and lawsuits, as well as state regulatory investigations and penalties. Further, an analysis of the economic materiality of the T&R issues demonstrates that these issues would not be expected to impact Carvana's stock price because the fines and suspensions were economically minuscule relative to the size of Carvana.

4.    Focusing on the RUS alleged misstatements, I find that there is no price impact from the two RUS alleged misstatements that remain in the case. On the front-end, the two RUS alleged misstatements did not cause Carvana's stock price to increase when made. There is no price increase that can be attributed to the RUS alleged misstatements and none of the analysts referenced these alleged misstatements or indicated that they obtained any new understanding about Carvana's business from them. On the back end, there was no statistically significant price decrease after any of the four remaining alleged corrective disclosures, and none of the alleged corrective disclosures, including those that were dismissed, revealed anything new regarding Carvana's RUS growth in either Q2 2021 or full year 2021, the two time periods discussed in the RUS alleged misstatements.  That is, the alleged corrective disclosures did not contain any information contradicting previous statements on the drivers of Carvana's RUS growth.

5.    Focusing on the alleged scheme, I find that there is no price impact from the alleged scheme. First, Plaintiffs' claim that the alleged scheme concealed Carvana's unprofitability is nonsensical on its face: Carvana's own SEC filings as well as analyst reports covering Carvana all made clear that Carvana was not profitable and had been losing money during the alleged Class Period. Similarly, Plaintiffs' claim that the alleged scheme concealed that Carvana's business was "unsustainable" is belied by the fact that Carvana's stock price eventually rebounded to new highs while Carvana's closest peers Vroom, Shift, and CarLotz all went bankrupt. Further, there is direct evidence of no price impact from the alleged scheme as

4

there was no statistically significant price increase when the alleged scheme supposedly started. In addition, there is no price increase that can be attributed to any of the alleged misstatements that according to Plaintiffs underlie the alleged scheme, and there is no statistically significant price decline to any of the alleged corrective disclosures that remain in the case. While I understand that all of the alleged misstatements and alleged "artifices" associated with the alleged scheme, with the exception of those relating to the alleged T&R issues, were dismissed by the Court, I nonetheless performed a detailed analysis of each part of the alleged scheme. Based on that analysis, I found that none of the "artifices" of the alleged scheme impacted Carvana's stock price. The alleged "artifices" were publicly known before and during the alleged Class Period and thus, the artifices would not have impacted Carvana's stock price.

6. <u>Regarding Dr. Cain's market efficiency analyses</u>, I find that Dr. Cain's cause-and-effect market efficiency test (the Cammer 5 test) is fundamentally flawed because it explicitly fails to test the type of information at issue in this matter. Dr. Cain's Cammer 5 analysis explicitly ignores the very type of statements that are at issue in this case, the alleged misstatements and the alleged corrective disclosures. Moreover, Dr. Cain's Cammer 5 test, rather than reliably testing the stock over the entire alleged Class Period, completely ignores the majority of days during the alleged Class Period, days on which Dr. Cain himself finds Company-specific news. When those excluded news days are included in Dr. Cain's Cammer 5 test, the result shows no significant cause-and-effect relationship between company-specific news and the company's stock price and thus is evidence against market efficiency. <u>Regarding Dr. Cain's proposed common damages methodology</u>, I find that it is not an actual damages method but simply a damages principle, and his proposed method of calculating inflation is simply a laundry list of mathematical possibilities. Tellingly, Dr. Cain's proposed damages method as detailed in his report is essentially the exact same "method" word for word that he

5

puts forth in all of his other class certification reports, despite his own admission that this case is "a bit more complicated than the typical case in terms of different claims."

7.    <u>Regarding Plaintiffs' Securities Act allegations</u>, I found widespread publication of information about Carvana's alleged T&R issues and allegedly "unsustainable practices" issues before the 2022 Public Offering. As the T&R issues impacted consumers directly, they were reflected in public consumer complaints, news articles, and legal actions both before and throughout the alleged Class Period. The widespread publication of these issues, as well as Carvana's business practices before the 2022 Public Offering, in addition to Carvana's own disclosures, supports the conclusion that many investors would have learned of these issues during their due diligence of Carvana. In addition, there are substantial conflicts of interest between and among the Section 11/12 and 10b-5 classes. These conflicts arise from the fact that the Section 11/12 claims and 10b-5 claims relate to different time periods, with the Section 11/12 claims focused on the 2022 Public Offering, almost two years after the start of the 10b-5 class period, and the different measures of damages applicable to those claims. In each class, investors will have an interest in bringing arguments that undermine the potential damages that could be recovered by the other class. These conflicts of interest are amplified because Carvana's stock bounced back to levels much higher than the 2022 Public Offering price, which is an unusual pattern in Section 11 cases.

## III.   QUALIFICATIONS AND REMUNERATION

### A.   Qualifications

8.    I am a Senior Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs

approximately 500 people in more than 20 offices worldwide. NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

9.      I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues. In my over 25 years at NERA, I have been frequently engaged as an economic consultant or expert witness to perform valuations and estimate damages. In the course of this work, I have analyzed the effect of information on stock prices of over 100 companies. I have testified at trials in Federal District Court and Delaware Chancery Court, before the American Arbitration Association and the Judicial Arbitration Mediation Service, and in depositions. My resume with recent publications and testifying experience is included as Appendix A.

### B.    Remuneration

10.      NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $1,325 per hour. NERA's fees are not in any way contingent upon the content of my opinions or the outcome of this matter.

## IV.    MATERIALS CONSIDERED

11.      In preparing this report, I considered the following categories of materials (a complete list of materials considered is included as Appendix B):

7

a)  Class Action Complaint for Violations of the Federal Securities Laws, filed August 3, 2022;

b)  Complaint for Violation of the Securities Act of 1933 in *City of Warwick Retirement System v. Carvana Co., et al.,* filed September 30, 2022;

c)  Lead Plaintiffs' Amended Consolidated Complaint for Violations of the Federal Securities Laws, filed March 29, 2024 ("Complaint");

d)  Defendants' Motion to Dismiss Lead Plaintiffs' Amended Consolidated Complaint and Memorandum of Points and Authorities, filed May 24, 2024;

e)  Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Consolidated Complaint, filed July 29, 2024 ("Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss");

f)  Order, filed December 16, 2024 ("Order");

g)  Plaintiffs' Motion for Class Certification and Memorandum of Points and Authorities, filed April 6, 2026 ("Plaintiffs' Motion for Class Certification");

h)  Expert Report of Matthew D. Cain, Ph.D., filed April 6, 2026 ("Cain Report"), including materials turned over;

i)  Deposition of Matthew Cain, Ph.D., May 8, 2026;

j)  Deposition of Christopher Graff, February 18, 2026;

k)  Deposition of David Ravera, February 25, 2026;

l)  Deposition of Mark Urquhart, April 24, 2026;

m)  Analyst reports on Carvana, the auto industry, and the e-commerce industry from Refinitiv Eikon and counsel;

n)  Carvana's filings with the U.S. Securities and Exchange Commission ("SEC");

8

o)    Press releases, conference call transcripts, and news stories on Carvana from Factiva and Bloomberg;

p)    Stock price and trading volume, shares outstanding, equity float, short interest, implied volatility, and institutional and insider holdings data for Carvana from FactSet Research Systems, Inc. and Bloomberg, L.P.;

q)    Price and return data for the stocks of other companies and market and industry indices from Bloomberg, L.P.;

r)    Academic literature and textbooks on finance, securities, valuation and statistics; and

s)    Legal decisions.

## V.    BACKGROUND AND SUMMARY OF ALLEGATIONS

### A.    Background

12.    Carvana is a leading e-commerce platform for buying and selling used cars.[3] The Company was founded as a subsidiary of DriveTime in 2012, spun off from DriveTime in 2014, and later went public with an initial public offering ("IPO") on April 28, 2017.[4]

13.    Carvana has experienced substantial growth since its IPO. In 2021, Carvana joined the *Fortune* 500,[5] a ranking of the largest companies by revenue in the United States that *Fortune* publishes every year.[6] Carvana was the third fastest company to join the Fortune 500.[7] Amazon and Google were the only companies that had reached the list faster from the time of launch. The table below shows the Company's number of vehicles sold, revenue, net income and

---

[3]    Carvana Co. Form 10-K for the Period Ended December 31, 2021, at p. 2.

[4]    Carvana Co. Form S-1, filed March 31, 2017, at p. i and "Carvana Announces Pricing of Initial Public Offering," *Carvana Co.*, April 27, 2017, https://investors.carvana.com/news-releases/2017/04-28-2017-043036860.

[5]    "How did Carvana make it onto the Fortune 500? Unconventional values-and car vending machines," *Fortune*, June 2, 2021, https://fortune.com/2021/06/02/carvana-car-vending-machines-fortune-500/.

[6]    "Fortune 500 Ranking," *Fortune*, https://fortune.com/ranking/fortune500/.

[7]    "How did Carvana make it onto the Fortune 500? Unconventional values-and car vending machines," *Fortune*, June 2, 2021, https://fortune.com/2021/06/02/carvana-car-vending-machines-fortune-500/.

9

earnings before interest, taxes, depreciation and amortization ("EBITDA") for each year from 2016 through its most recent completed fiscal year:

| | | Carvana's Annual Financial Results | | |
|---|---|---|---|---|
| Year Ended | Vehicles Sold | Revenue[1] | Net Income | EBITDA[2] |
| 2016 | 21,412 | $0.4B | -$0.1B | -$0.1B |
| 2017 | 50,761 | $0.9B | -$0.2B | -$0.1B |
| 2018 | 109,233 | $2.0B | -$0.3B | -$0.2B |
| 2019 | 217,444 | $3.9B | -$0.4B | -$0.2B |
| 2020 | 299,315 | $5.6B | -$0.5B | -$0.3B |
| 2021 | 595,293 | $12.8B | -$0.3B | -$0.0B |
| 2022 | 605,556 | $13.6B | -$2.9B | -$1.0B |
| 2023 | 469,392 | $10.8B | $0.2B | $0.3B |
| 2024 | 616,128 | $13.7B | $0.4B | $1.4B |
| 2025 | 894,284 | $20.3B | $1.9B | $2.2B |

**Notes and Sources:**
Data from Carvana Co. Form 10-Ks and earnings press releases.

[1] Total net sales and operating revenues.

[2] Consistent with Carvana's earnings press releases and Form 10-Ks, Adjusted EBITDA is shown for 2022 through 2025.

## B.    Summary of Allegations

14.    Plaintiffs allege that Defendants engaged in "a fraudulent pump-and-dump scheme to boost Carvana's retail sales growth, and a series of misrepresentations and omissions designed to artificially inflate Carvana's share prices for long enough to allow the Company's founders and executives to sell nearly $3.76 billion of their personally held stock at artificially

10

inflated prices."[8] Plaintiffs allege that "[a]s a result of Defendants' conduct, Carvana's stock price skyrocketed."[9]

15.     Plaintiffs allege three types of claims in connection with the alleged "pump-and-dump scheme," two of them under the Exchange Act and one of them under the Securities Act.[10] The Exchange Act claims allege a scheme to defraud in violation of Rule 10b-5(a) and (c) and allege misrepresentations and omissions under Rule 10b-5(b).[11] The Securities Act claims allege violations of Sections 11, 12, and 15 in connection with Carvana's secondary public offering of its common stock in April 2022 (the "2022 Public Offering").[12]

16.     In connection with their Exchange Act claims, Plaintiffs allege that "[t]hrough a series of partial disclosures," the alleged "truth" was revealed to the market.[13]

17.     Plaintiffs seek to certify a class consisting of all purchasers of the common stock of Carvana between May 6, 2020 and October 7, 2022.[14] It is my understanding that Plaintiffs do not seek to certify a separate class for their Securities Act claims.

### 1.     The alleged "pump-and-dump scheme"

18.     Plaintiffs allege that Defendants "engaged in a fraudulent pump-and-dump scheme and course of business to boost Carvana's retail sales – its most important metric – and

---

[8]   Complaint, ¶ 3.

[9]   Plaintiffs' Motion for Class Certification, p. 3.

[10]  Complaint, ¶¶ 341-364, 428-448.

[11]  Complaint, ¶¶ 10, 125-260.

[12]  Complaint, ¶¶ 365-427.

[13]  Complaint, ¶¶ 17-18, 307-328. It is my understanding that Plaintiffs claimed in their Complaint that the alleged misrepresentations were corrected through eight partial corrective disclosures but the Court has since dismissed four of them. (Order, pp. 53-55.) Nonetheless, the Cain Report includes a market efficiency analysis for an extended period spanning May 6, 2020 to February 23, 2023 that includes all eight alleged corrective disclosures ("Cain's Extended Period"). (Cain Report, footnote 1).

[14]  Plaintiffs' Motion for Class Certification, p. 1.

11

thus, its stock price for the purpose of selling shares at an artificially inflated price."[15] According to Plaintiffs, Defendants employed the following five "artifices" to "pump" Carvana's stock price: (1) entering into a "sham pass-through sales arrangement" with DriveTime, (2) lowering car purchasing and verification standards, (3) flouting state title and registration laws, (4) implementing a rapid and unsustainable nationwide expansion, and (5) making false and misleading statements to conceal the alleged scheme and make Carvana's growth appear sustainable.[16]

19.     Plaintiffs claim that with the "pumping" of Carvana's stock price complete, Defendants "dump[ed]" their holdings to "enjoy the fruits of [their] fraudulent labor."[17] Plaintiffs claim that before investors learned Carvana's growth was anything but "sustainable," Defendants Garcia Senior and Jenkins sold approximately 14.3 million shares.[18] It is my understanding that Plaintiffs' claims regarding Garcia Senior's and Jenkins' alleged "dump" of shares have been dismissed by the Court.[19] It is my understanding that the Court has allowed Plaintiffs' scheme claims to proceed only to the extent that Carvana's public statements relating to those claims

---

[15]   Complaint, ¶ 125.

[16]   Complaint, ¶¶ 7, 125. It is my understanding that the steps of Defendants' alleged scheme are characterized in slightly different ways throughout the case documents in this matter. Regardless of which characterization is used, my analysis of the alleged scheme would apply. For example, for how the Court characterized the alleged scheme, see, Order, dated December 16, 2024 ("Order"), pp. 34-35. For how Plaintiffs' Motion for Class certification categorizes the steps of the alleged scheme, see, Plaintiffs' Motion for Class Certification, p. 2.

[17]   Complaint, ¶¶ 8, 160.

[18]   Complaint, ¶ 163.

[19]   Order, pp. 36-37, 61-62 ("The Court acknowledges that it is unclear on the face of the ACC whether Plaintiffs independently assert an insider trading claim against Garcia Senior under Section 10(b), despite Plaintiffs' statements to the contrary. Even drawing all inferences in favor of Plaintiffs, however, the [Complaint] lacks any well-pled allegations to support such a claim. [...] Plaintiffs have not sufficiently alleged Garcia Senior committed a 'deceptive' or 'manipulative' act in furtherance of a scheme to defraud investors. [...] As previously noted, the [Complaint] fails to sufficiently allege any deceptive act by Garcia Senior in furtherance of Defendants' purported 'scheme.' [...] the Court finds the [Complaint] fails to set out a claim for insider trading against Jenkins.").

remain in this case.[20] Further, it is my understanding that the Court has dismissed many alleged misstatements relating to the same allegedly concealed facts underlying Plaintiffs' scheme claims, including those relating to lower purchasing and verification standards, nationwide expansion, and the DriveTime "pass-through arrangement."[21]

20.    Plaintiffs also allege that "Defendants' fraudulent scheme unraveled over several months during which Carvana acknowledged in a series of [eight] corrective disclosures that bigger was not better."[22] According to Plaintiffs, Carvana "announced disappointing earnings that were caused by Defendants' fraudulent scheme" and disclosed that it was laying off 2,500 employees "as a result of Defendants' fraudulent scheme," while media reports revealed that "Carvana routinely violated state title and registration laws and regulations."[23] Those eight alleged corrective disclosures are discussed in more detail in the sections below. It is my understanding that the four alleged corrective disclosures that dealt with the title and registration issues remain in this case, while the other four have been dismissed by the Court.[24]

---

[20]  Order, p. 40 ("the Court finds the [Complaint] adequately asserts falsity against the Carvana Defendants under a scheme theory for the same reasons it finds Plaintiffs sufficiently allege falsity in their misrepresentation claims.").

[21]  Order, pp. 20-23, 26-33, 36 ("The Carvana Defendants argue that the challenged [purchasing and verification standards] statements were not misleading… The Court agrees with Carvana… Carvana disclosed its strategy and the operational constraints that followed; therefore, Plaintiffs fail to identify any material omission. [...] The Carvana Defendants argue [the expansion] statements were not false and misleading… The Court agrees with Defendants… Plaintiffs fail to allege that [the expansion statements] were false or misleading when made. […] The Carvana Defendants offer several reasons as to why [the aged inventory] statements are not actionable omissions… The Court agrees with Defendants and finds that Plaintiffs fail to allege falsity as to these statements… the [Complaint] fails to allege [the aged inventory statements] are actionably false or misleading. […] the Court finds that Plaintiffs fail to allege [the profitability statements] were false or misleading. […] Plaintiffs fail to allege the transactions between Carvana and DriveTime qualify as a manipulative or deceptive act because they were disclosed to investors.").

[22]  Complaint, ¶ 166.

[23]  Complaint ¶¶167-172.

[24]  Order, pp. 52-57 ("Plaintiffs' four partial corrective disclosures related to its financial condition fail to allege loss causation… the Court finds [the four title and registration] corrective disclosures suffice to plausibly allege loss causation.").

13

### 2.    The alleged misrepresentations and omissions

21.    Plaintiffs allege that Defendants made "materially misleading statements and omissions designed to convince investors that Carvana's growth was profitable and sustainable."[25] In particular, Plaintiffs claim that Defendants made misleading statements and omissions during the alleged Class Period regarding the following six "subjects:" (i) title and registration; (ii) buying cars from customers at lower purchasing and verification standards; (iii) retail unit growth; (iv) expansion and logistics infrastructure; (v) aged inventory; and (vi) profitability per vehicle sold.[26]

22.    It is my understanding that the Court dismissed Plaintiffs' allegations concerning four of the six subjects of misrepresentations (buying cars from customers, expansion and logistics infrastructure, aged inventory, and profitability per vehicle sold) and that only the alleged misrepresentations concerning the subjects of title and registration and retail unit sales growth remain in this case.[27]

23.    Thus, it is my understanding that only ten alleged misstatements remain in the case: six relate to Carvana's title and registration risks ("T&R Risk"), two to other title and registration issues ("T&R Other"), and two to Carvana's retail unit sales ("Retail Sales"). The table below summarizes the ten alleged misstatements that remain in the case.

---

[25]  Complaint, ¶ 10.

[26]  Complaint, ¶ 10.

[27]  Order, pp. 20-23, 26-33.

**Summary of Alleged Misstatements**

| Event Date | Reaction Date | Misstatement Category | Excerpt of Alleged Misstatement |
|---|---|---|---|
| 1. 2/25/21 | 2/26/21 | T&R Risk | "[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition." |
| 2. 5/6/21 | 5/7/21 | T&R Risk | "[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition." |
| 3. 8/5/21 | 8/6/21 | T&R Risk | "[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition." |
| 4. *Same as above* | | Retail Sales | "Year-over-year retail unit and revenue growth were ... primarily driven by strong demand for our offering this year." |
| 5. 8/11/21 | 8/11/21 | T&R Other | "In this particular case, I think we had quite a small fraction of customers that were impacted by title and registration delays, but it did happen in the state of North Carolina. … And this was a relatively unusual action, but is also pretty small in scope, relatively speaking." |
| 6. 11/4/21 | 11/5/21 | T&R Risk | "[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition." |
| 7. 2/24/22 | 2/25/22 | T&R Risk | "[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition." |
| 8. *Same as above* | | Retail Sales | "Our exceptional growth in 2021 was driven by rapid growth within our market cohorts." |
| 9. 5/10/22 | 5/11/22 | T&R Risk | "[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition." |
| 10. 6/24/22 | 6/27/22 | T&R Other | "In a very small percentage of a very small percentage of instances, customers did not receive permanent license plates or transferred title within the time frame set forth by the respective states." |

Notes and Sources:
    Events from the Complaint and Cain Report.

24.     Plaintiffs claimed that the alleged misrepresentations and fraudulent scheme were revealed to the market through a series of eight partial corrective disclosures that caused the alleged "truth" to be revealed to the market and "caused a Carvana-specific stock price decline."[28] The alleged corrective disclosures encompass two categories: 1) Carvana's title and registration issues; and 2) Carvana's financial condition.[29] There are four alleged corrective

---

[28]  Complaint, ¶¶ 17-18, 307-328 and Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss, p. 57. Consistent with the Complaint, Dr. Cain testified in his deposition that ███████████████████ ████████████████████████████████████████████████ ████████████. Cain Deposition, 249:18-24.

[29]  Order, p. 53.

disclosures in each category. The following four alleged corrective disclosures relate to

Carvana's title and registration issues:

a) <u>August 10, 2021</u>: On this date, after market close, local media in North Carolina reported that Carvana's dealer license in Raleigh, North Carolina had been suspended for six months for violating the state's title and registration laws.[30]

b) <u>October 22, 2021</u>: On this date, *The Wall Street Journal* published an article reporting that Carvana was being investigated and disciplined for violating title and registration laws in Michigan, Texas, California, and North Carolina.[31]

c) <u>June 24, 2022</u>: On this date, after market close, *Barron's* published an article reporting that Carvana was dealing with "wide-reaching" title and registration issues.[32]

d) <u>October 7, 2022</u>: On this date, after market close, the Michigan Department of State announced that it had suspended the license of a Carvana dealership in Novi, Michigan due to title and licensing violations.[33]

25.     The following four alleged corrective disclosures relate to Carvana's financial

condition:

a) <u>April 20, 2022</u>: On this date, after market close, Carvana issued its financial results for 1Q 2022 and announced the 2022 Public Offering to support its purchase of ADESA. Carvana issued a letter to its shareholders and press releases and held a conference call with its investors discussing both the Company's results and its upcoming offering. According to Plaintiffs, Carvana's 1Q 2022 results were "disappointing" and the announcement of an offering in connection with the Company's purchase of ADESA

---

[30]  Complaint, ¶ 311.

[31]  Complaint, ¶ 313.

[32]  Complaint, ¶ 320.

[33]  Complaint, ¶ 322.

16

"partially revealed the ramifications and negative economic conditions caused by Defendants' fraudulent scheme and course of conduct."[34]

b)    <u>May 10, 2022</u>: On this date, Carvana issued an 8-K announcing that it was laying off approximately 2,500 employees.[35]

c)    <u>November 3, 2022</u>: On this date, after market close, Carvana issued its financial results for 3Q 2022. Carvana issued a letter to its shareholders and a press release and held an earnings conference call. According to Plaintiffs, Carvana's "disappointing" 3Q 2022 results "further revealed the unraveling of Defendants' fraudulent course of conduct and its negative economic conditions."[36]

d)    <u>February 23, 2023</u>: On this date, after market close, Carvana issued its financial results for FY 2022. Carvana issued a letter to its shareholders and a press release, and also held an earnings conference call. According to Plaintiffs, Carvana's "disappointing" FY 2022 results "disclosed the unraveling of Defendants' fraudulent scheme and course of conduct, including its negative economic conditions."[37]

26.    It is my understanding that the four alleged corrective disclosures that relate to Carvana's financial condition were dismissed by the Court because Plaintiffs have failed to show

---

[34]    Complaint, ¶ 314, "Q1 2022 Letter to Shareholders," *Carvana Co.*, April 20, 2022, "Carvana Announces First Quarter 2022 Results," *Carvana Co.*, April 20, 2022, https://investors.carvana.com/news-releases/2022/04-20-2022-210109625, "Carvana Co. Announces Proposed Offering of Class A Common Stock," *Carvana Co.*, April 20, 2022, https://investors.carvana.com/news-releases/2022/04-20-2022-215110258, and Carvana Co. 1Q22 Earnings Call, April 20, 2022.

[35]    Complaint, ¶ 317.

[36]    Complaint, ¶ 323, "Q3 2022 Letter to Shareholders," *Carvana Co.*, November 3, 2022, "Carvana Announces Third Quarter 2022 Results," *Carvana Co.*, November 3, 2022, https://investors.carvana.com/news-releases/2022/11-03-2022-200631763, and Carvana Co. 3Q22 Earnings Call, November 3, 2022.

[37]    Complaint, ¶ 327, "Q4 2022 Letter to Shareholders," *Carvana Co.*, February 23, 2023, "Carvana Announces Fourth Quarter and Full Year 2022 Results," *Carvana Co.*, February 23, 2023, https://investors.carvana.com/news-releases/2023/02-23-2023-212508630, and Carvana Co. 4Q22 Earnings Call. February 23, 2023.

17

how these four disclosures "corrected any prior actionable falsity."[38] Thus, only the four alleged

corrective disclosures relating to Carvana's title and registration issues remain in the case.

27.    The chart below shows Carvana's stock price, trading volume, and the alleged

misrepresentations and alleged corrective disclosures:[39]



### 3.    Sections 11, 12, and 15 Securities Act allegations

28.    Plaintiffs allege claims on behalf of purchasers in the 2022 Public Offering for

violations of Sections 11, 12 and 15 of the Securities Act.[40] Plaintiffs claim that certain

statements made by Carvana in its SEC filings filed in connection with its 2022 Public Offering

---

[38]    Order, p. 55

[39]    While the alleged Class Period starts on May 6, 2020, the first alleged misstatement that still remains in this case was on February 25, 2021.

[40]    Complaint, ¶ 421.

18

(the "Registration Statement") were false and misleading and caused damages.[41] In particular, Plaintiffs allege that Defendants failed to disclose (1) that Carvana had "abruptly and drastically lowered the Company's purchasing and verification standards," (2) that Carvana's retail unit sales growth "was primarily driven by a number of unsustainable practices," and (3) that the title and registration risks it warned investors about "had already come to fruition."[42] It is my understanding that for the same reasons as the Exchange Act claims, the Court dismissed Plaintiffs' Securities Act claims regarding Carvana's purchasing and verification standards and allowed the claims regarding retail unit sales and title and registration to proceed.[43]

## VI.    HIGH-LEVEL ANALYSIS OF CARVANA'S STOCK PRICE MOVEMENT DURING THE ALLEGED CLASS PERIOD

29.     The alleged Class Period is a two-and-a-half-year period that started shortly after the start of the COVID-19 pandemic ("Covid").[44] Carvana's stock price increased substantially during the first half of the alleged Class Period (essentially from the beginning of the alleged Class Period to August 10, 2021 when Carvana's stock price reached its peak) and declined during the second half.[45] Plaintiffs allege that Carvana's stock price movement during the alleged Class Period was due to a "pump-and-dump" scheme carried out by the Defendants and that as a

---

[41]  Complaint, ¶¶ 373-391, 431-435.

[42]  Complaint ¶¶ 380-386.

[43]  Order, pp. 65-67 ("The Court has already addressed whether the [Complaint] adequately alleges this statement [purchasing and verification standards] was false or misleading in the Section 10(b) context. For the same reasons, Plaintiffs fail to assert that [the purchasing and verification standards statement] was false or misleading under Section 11. […] For the same reasons previously stated, the Court finds the [Complaint] adequately pleads that Statement B [retail unit sales] was false or misleading when made and reserves the issue of materiality for summary judgment. […] For the reasons previously articulated, the Court finds Plaintiffs sufficiently allege that Statement C [title and registration] was false or misleading when made, and Defendants may contest the materiality of the alleged omission at summary judgment.").

[44]  Complaint, ¶ 1.

[45]  Data from Bloomberg, L.P.

result of Defendants' conduct, "Carvana's stock price skyrocketed."[46] According to Plaintiffs, the alleged scheme pumped up Carvana's stock price by inflating Carvana's retail unit sales and profitability,[47] and when the alleged "truth" was revealed to the market through a series of alleged corrective disclosures, Carvana's stock price declined.[48]

30.    However, Plaintiffs' allegations ignore the strong and changing macroeconomic and industry factors that affected Carvana and its stock price during this time period, including dramatic changes in consumer behavior due to Covid, changes in interest rates, rising inflation, supply chain disruptions and government stimulus. As discussed in more detail below, Carvana's stock price increase and decrease during the alleged Class Period were primarily driven by these well-documented macroeconomic and industry-wide factors, and those same factors also impacted the stock prices of Carvana's peers and other e-commerce companies. Lead Plaintiff Saskatchewan's investment advisor, Baillie Gifford, testified ███████████████████ ██████████████████████████.[49] The chart below shows Carvana's stock price around the alleged Class Period and highlights some of the macroeconomic and industry-

---

[46]    Complaint, ¶ 1 and Plaintiffs' Motion for Class Certification, p. 3. See, also, Complaint, ¶ 3 ("But, unbeknownst to investors, Carvana's sustainable growth machine was a lemon, built on a fraudulent pump-and-dump scheme to boost Carvana's retail sales growth, and a series of misrepresentations and omissions designed to artificially inflate Carvana's share prices"), Complaint, ¶ 6 ("Thus, to pump Carvana's stock price, Defendants planned and executed a scheme to inflate the Company's retail vehicle sales growth and convince investors that this growth was sustainable"), and Complaint, ¶ 172 ("The unsustainable growth-at-all-costs scheme – which pumped up Carvana's stock price to historic highs and enabled Garcia Senior and Jenkins to pocket *billions* of dollars in proceeds – proved very costly to investors.").

[47]    Complaint, ¶ 160.

[48]    Complaint, ¶¶ 166-172.

[49]    Deposition of Mark Urquhart, 39:15-40:15; 104:1-105:14; 106:17-107:11; and 115:4-15. ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

wide factors that, contrary to Plaintiffs' claim, were factors that caused Carvana's stock price to rise in the first half of the alleged Class Period and to decline in the second half.



### A.  Analysis of Carvana's stock price increase during the first half of the alleged Class Period

31.     Carvana's stock price increase during the first half of the alleged Class Period resulted from well-documented macroeconomic and industry-wide factors that also positively impacted the stock prices of its peers and other e-commerce companies.

32.     The alleged Class Period starts shortly after the beginning of the COVID-19 pandemic, which initially caused a market crash that impacted Carvana. In particular, from late February 2020 to late March 2020, stock markets across the globe, including the U.S. stock market, plummeted as Covid spread globally. During that time period, the S&P 500 dropped

21

30%, while Carvana's stock price dropped more than 70%, from a pre-Covid peak of $110 on February 21ˢᵗ to a low of $29 on March 20ᵗʰ.[50]

33.    Following the initial market crash in response to the pandemic, Carvana's stock price rebounded. By the start of the alleged Class Period, Carvana's stock price had gone back up to approximately where it was before the market crash caused by the pandemic.

34.    As the impact of Covid started to manifest across all walks of life, coupled with interest rate cuts from the Federal Reserve (the "Fed") and stimulus packages by the U.S. government, used-car retailers and e-commerce companies, including Carvana, began to benefit. These factors and their positive impact on Carvana's business are discussed below.

**Boom in E-Commerce**

35.    E-commerce benefited from the substantial lifestyle and behavior changes caused by the COVID-19 pandemic. Widespread lockdowns, health concerns, and business restrictions pushed consumers away from in-person shopping and toward online alternatives for both essential and nonessential goods. That shift accelerated digital adoption – consumers formed new habits and businesses quickly pivoted to online models to survive. Carvana's e-commerce platform for buying and selling used cars benefited from this trend.

36.    Analysts covering Carvana and its peers repeatedly discussed the boom in e-commerce and its impact on the market in their analyst reports issued during this time period.

37.    Analyst reports are periodic reports issued by professional financial analysts who perform research and analysis on specific industries and companies. These reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time.

---

[50]   Data from Bloomberg, L.P.

22

38.    For example, analysts from the investment bank JMP commented that Covid "dramatically accelerated the adoption of all things digital." Similarly, analysts from Wells Fargo commented that "pure play online auto dealers have been on a tear" as consumers shifted purchases online.

> "...**the COVID-19 pandemic has dramatically accelerated the adoption of all things digital**, with the car-buying industry—which is significantly behind in eCommerce penetration—no different..." [JMP analyst report on Vroom, dated July 6, 2020, emphasis added]

> "**The pure play online auto dealers have been on a tear**...we believe demand built throughout [2Q20] as consumers utilized government stimulus benefits, shifted purchases online, and increased focused (sic) on vehicle ownership (at the expense of mass transit or ride share)." [Wells Fargo analyst report, July 29, 2020, emphasis added]

39.    The boom in e-commerce during the first half of the alleged Class Period is evidenced by macroeconomic data. For example, data from the U.S. Census Bureau indicated that total online consumer spending increased by 43.7% year-over-year in the second quarter of 2020, rising from $140 billion to $201 billion.[51] For full year 2020, total online consumer spending grew by over 30%, from $602 billion in 2019 to nearly $800 billion.[52] Analysts and news stories reported on the e-commerce boom during the first half of the alleged Class Period. For example, analysts from J.P. Morgan wrote that "[d]uring the initial months of the COVID-19 pandemic, total online consumer spending increased by 43.7 percent year-over-year."[53] As another example, CNBC reported that "U.S. e-commerce sales in 2020 grew more than 30%

---

[51]  United States Census Bureau, "Quarterly E-Commerce Report Historical Data," United States Department of Commerce, https://www.census.gov/retail/ecommerce/historic_releases.html.

[52]  United States Census Bureau, "Quarterly E-Commerce Report Historical Data," United States Department of Commerce, https://www.census.gov/retail/ecommerce/historic_releases.html.

[53]  "The COVID Shock to Online Retail: The persistence of new online shopping habits and implications for the future of cities," *JP Morgan Chase & Co.*, November 2021, https://www.jpmorganchase.com/institute/all-topics/community-development/covid-shock-to-online-retail.

23

from 2019 […] as the coronavirus pandemic and nationwide lockdowns pushed shoppers to rely on internet retailers for their consumer needs."[54]

40.      During this e-commerce boom, the stock price of Carvana, as well as the stock prices of many other online retailers and e-commerce companies, increased substantially. For example, as can be seen in the chart below, from the beginning of the alleged Class Period to its height during the first half of the alleged Class Period, Carvana's stock price quadrupled.[55] Similarly, Stitch Fix, an online clothing company, saw its stock price increase by as much as a factor of seven.[56] At the onset of the pandemic, as traditional clothing retailers struggled, Stitch Fix, with its online, on-demand, and direct-buy model that uses proprietary algorithms to curate clothing specifically for each user's fit, taste, and price point, succeeded.[57] Analysts took note of the Covid-driven shift to e-commerce and Stitch Fix's success, with a Truist analyst covering Stitch Fix commenting that "[t]he ongoing pandemic has continued to push more consumers towards online shopping channels and away from physical brick-and-mortar retail, as evidenced by both temporary and permanent store closures and market share gains for ecommerce players such as SFIX [Stitch Fix]."[58]

---

[54]   "Groceries and sporting goods were big gainers in the Covid e-commerce boom of 2020," *CNBC*, February 19, 2021, https://www.cnbc.com/2021/02/19/e-commerce-surged-during-covid-groceries-sporting-goods-top-gainers-.html.

[55]   Data from Bloomberg, L.P.

[56]   Data from Bloomberg, L.P.

[57]   Stitch Fix, Inc. Form 10-K for the Period Ended July 31, 2021, at pp. 4-7.

[58]   Truist analyst report on Stitch Fix, dated December 7, 2020.



Notes and Sources:
Data from Bloomberg L.P. Events from the Complaint, Order, and Cain Report. Only showing alleged misstatements that remain in this case according to Order.

41.    As another example, Vroom, an online used car retailer and one of Carvana's closest direct peers,[59] completed its IPO on June 9, 2020 (approximately one month after the start of the alleged Class Period), and its stock price more than doubled from the IPO price within its first day of trading.[60] Analysts attributed Vroom's stock price increase around this period to "Covid-driven opportunities," "accelerating online adoption," and "an acceleration in the shift to buying cars online due to the pandemic":

> "The pure play online auto dealers have been on a tear, with CVNA shares +66% since early May (vs. +13% SPX) and **VRM [Vroom] +129% post-IPO** (vs. +1% SPX), **as investors see COVID-driven opportunities in** a large addressable

---

[59]    Piper Sandler analyst report, dated July 27, 2020 ("using a more traditional valuation method for growth-oriented stocks (EV-to-Revenue), our price target implies a multiple of 6.6x, based on our 2020 estimate. This suggests a premium vs. VRM (CVNA's closest publicly-traded peer). As a better-established company with higher market share and a clearer path to market consolidation, we think CVNA deserves a premium multiple.").

[60]    "Vroom Announces Pricing of Initial Public Offering," *Vroom, Inc.*, June 8, 2020, https://ir.vroom.com/news-releases/news-release-details/vroom-announces-pricing-initial-public-offering/, Vroom, Inc. Form 10-K for the Period Ended December 31, 2020, at p. 53, and Bloomberg, L.P.

market ($800B+), high fragmentation and **accelerating online adoption.**" [Wells Fargo analyst report, dated July 29, 2020, emphasis added]

"Vroom's inventory has doubled since the start of 3Q as demand accelerates […] We note a benefit of increased inventory is greater traffic conversion and with Vroom's national advertising campaign, we believe its investment in inventory is leading to 3Q's accelerating eCommerce demand. **Underscoring greater overall demand, in our view, is an acceleration in the shift to buying cars online due to the pandemic.** Recent research from Google/Kantar suggest that ~10% of used vehicle transactions in March were online and 63% of shoppers said they would consider ordering cars online in the future. This compares to 1% penetration in 2018. Also, given online auto buying lags overall eCommerce penetration (which we believe is now in the low 20% range), **we expect the secular shift to continue to deliver significant growth for Vroom going forward.**" [JMP analyst report on Vroom, dated September 23, 2020, emphasis added]

42.    In addition to online auto retailers, analysts covering e-commerce companies operating in various other product categories expressed similar sentiments on the stock price boost such companies received because of the pandemic. For example, in a report covering five e-commerce stocks (including Amazon and online pet product retailer Chewy), a Jefferies analyst commented:

> "**E-comm stocks have meaningfully outperformed YTD** (87% vs. NASDAQ 20%), **benefiting from a step-change in online consumption** as people avoid crowded places." [Jefferies industry analyst report, dated July 19, 2020, emphasis added]

43.    A Needham analyst took similar note of Chewy's strong performance resulting from the shift to e-commerce, categorizing Chewy as "a beneficiary of the pandemic," and reporting that the company's stock price was up "117% YTD vs +17% for the NASDAQ" since "Covid-19 [had] accelerated digital adoption for virtually every product category."[61]

**Low Interest Rates**

44.    Carvana and its peers benefited from close-to-zero interest rates during the first half of the alleged Class Period. To counteract the economic shock caused by the COVID-19

---

[61]    Needham analyst report on Chewy, dated November 16, 2020.

pandemic, the Federal Reserve aggressively lowered interest rates to support household and business spending in early 2020.[62] By the start of the alleged Class Period, interest rates had declined to near zero, where they remained for the first half of the alleged Class Period, as shown in the chart below.



45.     The low interest rates benefited Carvana because they increased the affordability of cars for consumers by providing cheap financing. As noted by analysts at Morgan Stanley:

> "As credit remains available with **record low financing rates**, […] dealers have reported **a strong increase in consumer traffic looking to buy cars**." [Morgan Stanley industry analyst report, dated June 5, 2020, emphasis added]

46.     Similarly, analysts covering the auto industry noted that the record low interest rates benefited their businesses:

---

[62] "Fed Cuts Rates to Near Zero and Will Relaunch Bond-Buying Program," *The Wall Street Journal*, March 15, 2020, https://www.wsj.com/articles/fed-faces-crucial-decisions-to-alleviate-virus-shock-11584303662.

"What drove the surge in used car prices in 2021? Simply put, an unprecedented supply/demand imbalance in the auto market. Coming into 2021, demand for new and used vehicles was strong, driven by a combination of factors including the COVID economic recovery, stimulus, **low interest rates**, and increasing consumer demand for private transportation (driven in part by shifts away from public/shared transportation and deurbanization) [...] Also, with limited availability of new cars, consumers were pushed into the used car market, which was also dealing with tight supply, resulting in a surge in used car pricing. Used car prices ended 2021 up 33% y/y and 44% vs pre-pandemic levels." [Guggenheim industry analyst report, dated January 26, 2022, emphasis added]

47.    Moreover, as the chart above shows and as discussed in more detail below, when interest rates began to rise in the second half of the alleged Class Period, Carvana's business was negatively affected and its stock price declined, as the higher interest rates made used cars less affordable for consumers.

### Shift from Mass Transit to Private Cars

48.    Carvana benefited from the increase in demand for cars caused by the shift in consumer preference from using mass transit to driving private cars during the first half of the alleged Class Period. In particular, issues associated with the COVID-19 pandemic caused consumer wariness of public transportation and an increase in migration out of cities and into rural and suburban areas where cars are needed. Both of these trends increased the demand for used cars and thus benefited Carvana's business. Analysts commented on these trends and their positive effect on Carvana's business. For example:

"We are increasingly of the view that […] **sales of higher-quality pre-owned vehicles could improve meaningfully** […] as a larger section of the **population forgoes mass transportation in favor of personal cars**, at least for a while." [Oppenheimer industry analyst report, dated April 28, 2020, emphasis added]

"The pure play online auto dealers have been on a tear...**we believe demand built throughout [2Q20] as consumers** […] **increased focused (sic) on vehicle ownership (at the expense of mass transit or ride share)**." [Wells Fargo analyst report, dated July 29, 2020, emphasis added]

49.    Similarly, analysts covering other used car retailers noted that their businesses benefited from the shift to private cars:

28

"**The trends are strong for used cars**, with a shortage of new car inventory, manufacturers pulling back on incentives, and **potential tailwinds from de-urbanization**, mass transit, ride sharing, and travel." [Morgan Stanley analyst report on CarMax, dated June 22, 2020, emphasis added]

"Category tailwinds shifting towards the used online model. In addition to VRM-specific initiatives, we see several tailwinds favoring used vehicle purchases and the online model. We see potential for consumers to trade down to used vs. new vehicles in the current recession (with ~15M+ people unemployed)**, a growing preference for auto ownership vs. mass transit or ride sharing, and an increased need for vehicles should consumers migrate from urban centers to rural and suburban locations post- COVID.**" [Wells Fargo analyst report on Vroom, dated July 6, 2020, emphasis added]

"**Subsequent to the initial dip in demand (and decline in used car values) due to lockdowns, we attribute the sharp rise in prices to** heightened demand for personal vehicles (consumers wary of public transportation, **migration into more suburban/rural areas where a car is needed**), stimulus checks and inventory constraints." [RBC analyst report on CarMax, dated December 21, 2020, emphasis added]

**Government Stimulus Programs**

50.    Carvana and its peer companies benefited from the government stimulus programs, which increased consumers' purchasing power, including their ability to purchase cars.

51.    The U.S. government issued three rounds of stimulus checks to consumers during the first half of the alleged Class Period. The first round of stimulus checks provided $1,200 for each adult, $500 for each child, and $600 per week for the unemployed.[63] The stimulus program was first proposed on March 17, 2020, and was officially signed into law as part of the CARES Act on March 27, 2020.[64] During the ten-day period between when the stimulus program was

---

[63]  Congress.gov. "Text - H.R.748 - 116th Congress (2019-2020): CARES Act." March 27, 2020. https://www.congress.gov/bill/116th-congress/house-bill/748/text.

[64]  "White House expresses support for immediate cash payments to Americans as part of coronavirus stimulus package," *Washington Post*, March 17, 2020, https://www.washingtonpost.com/us-policy/2020/03/17/trump-coronavirus-stimulus-package/ and Congress.gov. "Text - H.R.748 - 116th Congress (2019-2020): CARES Act." March 27, 2020. https://www.congress.gov/bill/116th-congress/house-bill/748/text.

29

first proposed and the law was passed, Carvana's stock price increased by 21%.[65] Two additional

rounds of stimulus checks followed in December 2020 and March 2021: The COVID-Related

Tax Relief Act of 2020, enacted in December 2020, authorized additional payments of $600 to

eligible adults and children and $300 per week in enhanced unemployment benefits.[66] The

American Rescue Plan, enacted in March 2021, provided additional payments of $1,400 to

eligible adults and dependents and maintained $300 per week in enhanced unemployment

benefits.[67]

52.    According to analysts, government stimulus measures contributed to higher used-

vehicle demand, which benefited the used car industry:

> "The increase in used vehicle values we suspect is driven by: […] (3) **general price inflation and increased liquidity owing to multiple government stimulus measures**." [J.P. Morgan industry analyst report, dated August 10, 2020, emphasis added]

> "**An additional third round of stimulus ($1,400 in checks)** […] coupled with **extended unemployment benefits** and delayed tax refunds that are getting processed and issued **provides additive support to used vehicle industry demand and could extend the spring selling season well into June.**" [Wedbush industry analyst report, dated March 24, 2021, emphasis added]

53.    Analysts noted that Carvana particularly benefited from the government stimulus

checks:

> "With CVNA's Qs print approaching (on 8/5) **we model +22% unit growth** comprised of April -10% and May/June+35-40% **as we believe demand build throughout the quarter as consumers utilized government stimulus benefits**, shifted purchases online, and increased focused (sic) on vehicle ownership (at the expense of mass transit or ride share)" [Wells Fargo analyst report, dated July 29, 2020, emphasis added]

---

[65]  Data from Bloomberg, L.P.

[66]  Congress.gov. "Text - H.R.133 - 116th Congress (2019-2020): Consolidated Appropriations Act, 2021." December 27, 2020. https://www.congress.gov/bill/116th-congress/house-bill/133/text.

[67]  Congress.gov. "Text - H.R.1319 - 117th Congress (2021-2022): American Rescue Plan Act of 2021." March 11, 2021. https://www.congress.gov/bill/117th-congress/house-bill/1319/text.

"We note that near-term benefits from tax refunds and **stimulus checks likely helped drive some demand**" [Baird analyst report, dated September 22, 2020, emphasis added]

"For CVNA, Growth trends were steady in Jan/Feb before **accelerating sequentially each week in March** as y/y compares erased and **stimulus rolled out**" [Wells Fargo industry analyst report, dated April 27, 2021]

**Supply Chain Disruptions Hurt New Car Sales but Benefited Used Car Sales**

54.    Carvana benefited from supply chain disruptions that hurt the production and availability of new cars and increased the demand for used cars. In early 2021, carmakers began to face numerous supply chain disruptions, causing a substantial curtailment of new vehicle production. The limited supply of new cars available benefited used car retailers, as used car prices increased, and more consumers opted for used cars instead of waiting for new cars to be produced.

55.    According to the *Financial Times*, "[t]he world's largest carmakers [were] facing a potentially crippling shortage of semiconductors, as chipmakers reserve supply for tech groups producing smartphones, tablets and gaming devices."[68] In addition, *The Wall Street Journal* reported that many automakers were "shutting down production lines for weeks at a time and furloughing employees as a result of the chip shortage."[69] Similarly, according to *The New York Times*, "chip shortage and other supply chain snarls curtailed [new car] production by 1.3 million vehicles in the first three months of [2021]."[70] In addition to the shortage of chips, seat foam and

---

[68]    "Car manufacturing hit by global semiconductor shortage," *Financial Times*, January 8, 2021, https://www.ft.com/content/e264fd41-7ee9-4fba-be3c-21446298efd9?syn-25a6b1a6=1.

[69]    "For Auto Makers, the Chip Famine Will Persist," *The Wall Street Journal*, September 22, 2021, https://www.wsj.com/opinion/auto-car-makers-industry-semiconductor-chip-shortage-covid-19-taiwan-vietnam-11632329226.

[70]    "Chip Shortage Creates Chaos for Carmakers," *The New York Times*, April 24, 2021.

31

shipping container shortages similarly constrained the supply of new cars.[71] Analysts commented on these supply chain disruptions for new cars. For example:

> "Tight supplies in the new vehicle market, heightened by reduced production owing to **supply constraints of semiconductors supports positive pricing and demand momentum for used vehicles** into the second half of 2021." [Benchmark analyst report, dated February 26, 2021, emphasis added]

> "**New vehicle supply is expected to remain tight for the new [sic] few months due to** ongoing challenges from the pandemic as well as **lacking semiconductors and seat foam shortages**." [Wedbush industry analyst report, dated March 24, 2021, emphasis added]

> "Going forward, we remain cautious on 2021 as the strong demand trend will likely continue as the economy begins to recover in earnest, **while inventory will remain constrained by a multitude of supply chain disruptions, including the global semiconductor shortage and shipping container shortage**." [Bank of America industry analyst report, June 10, 2021, emphasis added]

## B. Analysis of Carvana's stock price decline during the second half of the alleged Class Period

56. While there were numerous macroeconomic and industry factors that benefited Carvana during the first half of the alleged Class Period, there was a substantial shift in the second half of the alleged Class Period, and numerous factors had a negative impact on the businesses and stock prices of Carvana and its peers. During the second half of the alleged Class Period, demand for used cars declined as interest rates rose, inflation soared, government stimulus checks were phased out, and supply chain disruptions eased, increasing the supply of new cars. On the cost side, rising labor costs compressed Carvana's profit margins.

57. Evidence of these negative macroeconomic and industry effects is that Carvana's closest peers, Vroom, Shift Technologies ("Shift"), and CarLotz, publicly traded companies that were also online used car retailers, similarly saw their stock prices and sales decline during the

---

[71] Wedbush industry analyst report, dated March 24, 2021 and Bank of America industry analyst report, dated June 10, 2021.

second half of the alleged Class Period. [72] Driven primarily by these macroeconomic factors, Carvana's stock price dropped 95% from its peak on August 10, 2021 to the end of the alleged Class Period.[73] During the same time period, the stock prices of Carvana's peers dropped by a similar magnitude: Vroom dropped by 97% and Shift and CarLotz by 93%, which is clear evidence that Carvana's stock price drop was primarily due to these macroeconomic factors instead of the alleged fraud.[74]

---

[72]    William Blair analysts routinely issue reports on the Automotive/E-commerce industry that focuses on Carvana, Shift, Vroom, and CarLotz. See, for example, William Blair industry analyst reports on Automotive/E-commerce industry, dated April 29, 2021, July 28, 2021, and October 26, 2021. Similarly, Wedbush analysts categorized Carvana, Vroom, Shift, and CarLotz as "online used auto retailers." Wedbush industry analyst report, dated October 11, 2021. Vroom went public on June 8, 2020, shortly after the start of the alleged Class Period. "Vroom Announces Pricing of Initial Public Offering," *Vroom, Inc.*, June 8, 2020, https://ir.vroom.com/news-releases/news-release-details/vroom-announces-pricing-initial-public-offering/. Shift went public on October 14, 2020, through a de-SPAC transaction. "Insurance Acquisition Files 8K – Changes to Hldr Rights," *Dow Jones Institutional News,* October 14, 2020. CarLotz went public on January 22, 2021, through a de-SPAC transaction. "CarLotz, Inc. Closes Business Combination and Will Trade on the Nasdaq Stock Exchange Under the Ticker LOTZ," *GlobeNewswire*, January 21, 2021. CarLotz merged with Shift on December 9, 2022. "Shift Closes Merger with CarLotz, Creating a Differentiated Used Omnichannel Auto Retailer, and Announces Shift Board of Directors Changes," *Shift Technologies, Inc.*, December 9, 2022.

[73]    Data from Bloomberg, L.P.

[74]    Data from Bloomberg, L.P.

| | **% Price Drop from Carvana's Peak on 8/10/21 to…** | |
| **Company** | **End of Alleged Class Period** | **End of Cain's Extended Period** |
| (1) | (2) | (3) |
| Carvana | -94.8% | -97.3% |
| *Peer Companies* | | |
| CarLotz | -93.0% | n.a.[1] |
| Shift | -93.2% | -97.7% |
| Vroom | -97.1% | -97.3% |

**Carvana and Peer Companies**

**Notes and Sources**

Data from Bloomberg L.P.

[1] CarLotz ceased trading on December 9, 2022 after it merged with Shift.

58.    The chart below shows that the stock prices of Carvana and its peers Vroom, Shift, and CarLotz all declined similarly during the second half of the alleged Class Period.

34



**Vroom, Shift and CarLotz Pegged to August 10th, 2021**

**Notes and Sources:**
Data from Bloomberg, L.P. Events from Complaint, Cain Report, and Order. Only showing alleged misstatements that remain in this case after Order.

59.     The chart below shows how much Carvana and its peers' revenues increased and decreased over the alleged Class Period. As the chart shows, revenues at all four companies had very similar trends: first increasing at a very fast pace during the first half of the alleged Class Period, then beginning to slow down in August 2021, and finally beginning to decrease in approximately mid-2022.[75]

---

[75]    The last data point shown for CarLotz is 3Q22 because CarLotz merged into Shift in December 2022. "Shift Closes Merger with CarLotz, Creating a Differentiated Used Omnichannel Auto Retailer, and Announces Shift Board of Directors Changes," *Shift Technologies, Inc.*, December 9, 2022.

**Revenue Change Since the Beginning of the Alleged Class Period**
**Carvana, Vroom, Shift, and CarLotz**

Notes and Sources:
Data from FactSet Research Systems, Inc. and SEC filings. Revenue change calculated relative to each company's last reported financial results before the start of the Alleged Class Period. CarLotz merged into Shift in 4Q22. Shift filed for bankruptcy in 3Q23.

60.    The fact that Carvana's stock price and revenues decreased along with its peers during the second half of the alleged Class Period demonstrates that the decline was caused by these common macroeconomic and industry-wide factors, and not because Carvana's business was based on hidden unsustainable practices as Plaintiffs claim.[76] Tellingly, while all three peers went bankrupt (CarLotz merged with Shift approximately 10 months before Shift went bankrupt),[77] Carvana was able to recover from these negative macroeconomic and industry factors, and its stock price reached new highs after the alleged Class Period. Each of those negative factors is discussed in detail below.

**Rising Interest Rates**

---

[76]    Complaint, ¶¶ 17-18, 172, 213, 215.

[77]    "Shift Closes Merger with CarLotz, Creating a Differentiated Used Omnichannel Auto Retailer, and Announces Shift Board of Directors Changes," *Shift Technologies, Inc.*, December 9, 2022, "Ex-SPAC Car Seller Shift Will Shut Down, File for Bankruptcy," *Bloomberg*, October 6, 2023, "Press Release: Vroom Announces Equity-for-Debt Recapitalization," *Dow Jones Institutional News*, November 12, 2024.

36

61.     In the second half of the alleged Class Period, interest rates increased dramatically from the historically low rates that were benefiting Carvana during the first half. Interest rates started to increase in mid-2021 due to inflationary pressure and the market began to price in further tightening of monetary policy, which in fact materialized throughout the remainder of the alleged Class Period.[78] From Carvana's stock price peak in August 2021 to the end of the alleged Class Period in October 2022, interest rates (based on 2-year Treasury yields) increased by almost 20-fold, from 0.23% to 4.30%.[79] The chart below shows Carvana's stock price along with interest rates represented by the 2-year Treasury yield during the alleged Class Period. As the chart shows, Carvana's stock price *increased* when interest rates were at historical *lows* in the first half of the alleged Class Period and just as interest rates *began to rise*, the stock started to *decline,* a pattern that continued throughout the second half of the alleged Class Period as interest rates continued to rise and Carvana's stock continued to decline.

---

[78]  "U.S. Government Bond Yields Rise After Fed Decision," *The Wall Street Journal*, June 16, 2021, https://www.wsj.com/finance/investing/u-s-government-bond-yields-slip-ahead-of-fed-decision-11623861689 and "Central banks raise rates again as Fed drives global inflation fight," *Reuters*, September 22, 2022, https://www.reuters.com/markets/europe/central-banks-raise-rates-again-fed-drives-global-inflation-fight-2022-09-22/.

[79]  Data from Bloomberg, L.P.

37



62.     The continued dramatic increase in interest rates negatively affected Carvana's business in numerous ways. First, high interest rates made cars less affordable for consumers since their financing costs would be higher. For example, analysts at Wedbush explained that "affordability challenges are growing as used car prices soar, interest rates rise and consumer discretionary income slows."[80] Analysts at Jefferies similarly commented that macro headwinds such as a "sudden rise in interest rates" led to an unaffordability of used cars that was "negatively impacting demand."[81]

63.     Second, high interest rates reduced Carvana's profits from its financing business because selling asset-backed securities ("ABS") on its auto loans became less profitable. For example, in early 2022, analysts from Wedbush explained that they expected rising interest rates

---

[80]  Wedbush industry analyst report, dated January 21, 2022.

[81]  Jefferies analyst report, dated May 13, 2022.

to create a "$150 headwind to financing GPU [gross profit per unit]," or in other words

Carvana's gross profit was expected to decrease by $150 per vehicle sold due to rising interest

rates, while analysts from Jefferies noted that "rising interest rates could pressure the near-term

spread [*i.e.* margin]" of Carvana's financing business:

> "In 2Q19, CVNA reported $100-$150 tailwind to financing GPU [gross profit per unit] from reduction in benchmark interest rates (even with hedging), in a period when 2-year Treasury yields decreased ~100 bps and CVNA's gain on loan sales rate increased +130 bps sequentially; conversely finance GPU sequentially decreased by -$66 in 4Q17 as 2-year Treasury yields inflected higher by ~50 bps. **Thus far in 2021, 2-year Treasury yields have increased ~75 bps. Forecasting another 50 bps increase in 2022, for 125 bps total, and noting that with hedging and less sticky consumer rates in a rising rate environment, we estimate a $150 headwind to financing GPU from rising rates in 2022**." [Wedbush industry analyst report, dated January 21, 2022, emphasis added]

> "We believe CVNA's heavier use of securitizations to monetize its loan portfolio since 2019 should result in higher gain on sale margin over the long-term, but **we are concerned that rising interest rates could pressure the near-term spread given the delay between issuing the loan to the consumer and monetizing it in the securitization market.** In addition, with affordability on used cars already negatively impacting demand, **we are concerned that CVNA has less flexibility to raise APRs on consumers to offset rising benchmark rates** because that would further worsen affordability." [Jefferies analyst report, dated May 13, 2022, emphasis added]

64.     Third, Carvana needed to raise large amounts of debt to fuel its acquisition of

ADESA. Analysts commented that the macroeconomic factors, including rising interest rates and

a decline in used car demand, exacerbated the burden of the ADESA acquisition and eventually

led to concerns over Carvana's liquidity. As analysts noted:

> "Combo of Adesa integration & incremental leverage could drive some investor indigestion. **The most common bearish argument we've heard historically on CVNA is that with the company's general history of not making money, the combination of balance sheet leverage and potential shareholder dilution necessary to build inventory could set the company up for a big fall in the event interest rates rose meaningfully or default rates were to see an uptick.** While it's certainly debatable, **the Adesa acquisition could certainly be viewed as furthering this argument with the incremental $3.275B of debt** bringing its total to $9B and doesn't contemplate future raises to support higher inventory levels" [RBC analyst report, dated April 5, 2022, emphasis added]

39

"Raising debt to buy ADESA: a sound strategic decision, but crummy timing. Some investors may rightly note that long-term potential is meaningless if CVNA cannot survive the coming quarters. Due to deteriorating market conditions and a hefty debt burden, there are definitely some scenarios that imply fair equity value of $0/share. **As background, Carvana's predicament can largely be traced to the acquisition of ADESA, which was financed using a $3.275B junk bond carrying a 10.25% interest rate. The acquisition offers a capital-efficient way to expand capacity (much less costly than greenfield expansion), but CVNA was forced to accept onerous terms because the timing of the deal coincided with unraveling in the capital markets.**" [Piper Sandler analyst report, September 11, 2022, emphasis added]

"CVNA has been bleeding cash flow at an unsustainable rate for 2 years now. Certainly, **the semi-logical but incredibly poorly-timed ADESA acquisition in May, 2022 –adding over $3 billion of debt at a very high interest rate- pushed the cash flow gap right off the cliff.**" [Huber Research analyst report, dated November 7, 2022, emphasis added]

"**The May '22 ADESA acq. appears untimely at this point, as CVNA funded the deal with $3.275BN in 10.25% notes due 2030. While the acq added unit capacity, unit growth began to decline shortly after given macro headwinds.** It now seems that the added real estate is best fit to act as a form of near-term financing. Nonetheless, longer-term, ADESA's infrastructure should help drive shorter delivery times, higher buyer conversion, and reduced logistics costs." [Cowen analyst report, dated November 21, 2022, emphasis added]

"For perspective, our model has CVNA running out of cash in 1Q23 without an additional infusion. **The deterioration in liquidity** was precipitated by worsening unit economics and **higher interest payments**, **following the $3.275B debt issuance in May 2022 tied to the U.S. ADESA acquisition**." [Jefferies analyst report, December 8, 2022]

**High Inflation**

65.     During the second half of the alleged Class Period, high inflation was another factor that negatively affected Carvana and its stock price. According to data from the Federal Reserve, inflation surged during the second half of the alleged Class Period, going from 0.3% at the beginning of the alleged Class Period to 9.0% in June 2022, the highest inflation level since 1981, and remaining high through the end of the alleged Class Period.[82] This high inflation made

---

[82]  U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: All Items in U.S. City Average," Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/CPIAUCSL.

used cars less affordable and negatively affected Carvana's unit sales. The table below shows the inflation rate at different points before and during the alleged Class Period and at the end of Cain's Extended Period.

**Year-over-Year Growth in Consumer Price Index**
**During the Alleged Class Period**

| Date | Inflation | Commentary |
|---|---|---|
| Jan 2017 to Dec 2019 (pre-Alleged Class Period) | 2.01% | |
| May 2020 (beginning of Alleged Class Period) | 0.20% | Inflation near historic low |
| Jun 2022 (*Barron's* article) | 9.00% | Highest inflation since 1981 |
| Oct 2022 (end of Alleged Class Period) | 7.76% | Inflation 4x pre-Alleged Class Period |
| Feb 2023 (end of Cain's Extended Period) | 5.96% | Inflation 3x pre-Alleged Class Period |

**Sources:**
Data from the Federal Reserve, reported monthly.

66.    During the second half of the alleged Class Period, many analysts commented that the high prices (including high used car prices and high gas prices) had made used cars less affordable and dampened demand. For example:

> "**With prices at extreme levels and interest rates rising**, **used car affordability is already pressuring demand for the low-mid income consumer**… At the same time, consumer confidence has taken another step back to the lowest level since 2011 and **the mix of survey respondents with a negative perception of the current prices of big-ticket items and consumer durables reached a 50-year high**." [Wedbush industry analyst report, dated February 3, 2022, emphasis added]

> "The prolonged period of logistical headwinds, supply chain pressures and **elevated used vehicle prices needs to end, as it's become increasing clear that transitory headwinds are disruptive to CVNA's business**, and we look forward to a time when CVNA can prove otherwise." [Wells Fargo analyst report, dated May 3, 2022, emphasis added]

> "We believe 4Q22 is the most likely start to the accelerated normalization period — shifting the used car landscape towards how things were pre-COVID including 1) overall lower margin structure 2) more normalized car depreciation, and 3)

41

normalized loan originations. **Today, these trends are being accompanied by record-high inflation levels and lingering macro uncertainty for the consumer. To be clear, we believe these are dealer trends and not just Carvana specific.**" [Raymond James analyst report, dated July 27, 2022, emphasis added]

"**We expect Carvana, Vroom, and Shift to all miss Street expectations for second-quarter units sold, with decelerating trends across all three companies,** spiking gasoline prices on top of rising interest rates, and **elevated used car prices weighed on results—with some consumers likely even priced out of the value car market given inflationary pressures.** While still elevated, wholesale used car pricing had moderated since the beginning of the year (+10% in June and May, versus +14% in April), but reversed course in Manheim's mid-July reading with a 13% increase and is only down a modest 6% on an absolute basis since peaking in January." [William Blair industry analyst report, August 1, 2022, emphasis added]

"From a sales perspective, **softer demand due to rising affordability challenges fueled by broad-based inflation** and rising interest rates have likely **pushed some consumers out of the market**, a trend highlighted by publicly-traded franchised dealers who reported 2Q22 results showing used unit comps sequentially decelerating and inflecting negative for the first time since 4Q20 when the industry was facing significant inventory constraints." [Wedbush analyst report, dated August 3, 2022, emphasis added]

"Our checks and industry data suggest **overall used car demand already in a recession given lack of affordable supply**. Pain is likely not over as retail prices are still ~35-40% above pre-pandemic levels" [J.P. Morgan industry analyst report, dated September 7, 2022, emphasis added]

### Fading of Stimulus Checks

67.    Stimulus checks helped increase the demand for used cars during the first half of the alleged Class Period and this effect faded during the second half of the alleged Class Period. As the stimulus checks stopped, consumer purchasing power weakened further and the affordability of used cars deteriorated, negatively impacting Carvana's sales. Analysts commented on this issue:

"For the full year 2023, latest published forecasts from Cox Auto currently point to used vehicle sales at 35.6m (-2% y/y) and used retail vehicle sales at 18.9m (-1% y/y) as high vehicle prices, higher rates, overall less trade-ins and **lack of economic stimulus checks likely continue to weigh on the overall consumer**." [Wedbush industry analyst report, dated October 19, 2022, emphasis added]

42

"Into 2022, as interest rates started to tick higher in response to monetary tightening and as used vehicle prices continued to hover around record-high levels **while fiscal stimulus benefits faded, consumer affordability and sentiment (particularly for lower-income/ lower-credit customers) started to deteriorate**, which combined with transient headwinds from Russia-Ukraine conflict and related gas price increases in 1H22, led to a downturn in industry used car volumes." [J.P. Morgan industry analyst report, dated December 14, 2022, emphasis added]

### Record Low Consumer Sentiment

68. The various macroeconomic factors that depressed consumer demand led to a record low consumer sentiment, which is a measure of consumer attitudes on the business climate, personal finance and spending.[83] As summarized by analysts from J.P. Morgan in mid-2022, "rising rates, broader inflationary trends and higher gas prices weigh on consumer health and also in the context of fading fiscal stimulus benefits."[84] The same analysts later noted that "[m]acro indicators… continue to unfold unfavorably as persistent inflation and related monetary tightening weigh on consumer sentiment (University of Michigan Consumer Sentiment Index registered a record low in June) and purchasing power at a time when new vehicle prices track close to record highs and used vehicle prices are ~30% higher vs. pre-pandemic levels, which is ultimately pushing consumers to the sidelines."[85] The worsening consumer sentiment resulted in weaker demand for used cars which negatively impacted Carvana's sales.

### High Labor Costs

69. Labor costs increased during the second half of the alleged Class Period, which translated to higher costs for Carvana, negatively impacting its profit margin. According to data from the Bureau of Labor Statistics, at the start of the alleged Class Period wages were growing

---

[83]  "Survey Description," *University of Michigan*, August 2025, https://data.sca.isr.umich.edu/survey-description.php#.

[84]  J.P. Morgan industry analyst report, dated July 19, 2022.

[85]  J.P. Morgan analyst report, dated October 21, 2022.

at a rate similar to the historical average, but during the second half of the alleged Class Period, wages grew more quickly, surpassing the highest growth rate seen since 2000.[86] The table below shows that by February 2022, wages were growing at almost twice the historical average rate, remaining at elevated levels through the end of the alleged Class Period and Cain's Extended Period.

**Year-over-Year Growth in Median Hourly Wages**
**During the Alleged Class Period**

| Date | Wage Growth | Commentary |
| --- | --- | --- |
| Jan 2017 - Dec 2019 (pre-Alleged Class Period) | 3.45% | |
| May 2020 (beginning of alleged Class Period) | 3.50% | Wage growth near pre-Alleged Class Period |
| Feb 2022 | 5.80% | Wage growth above pre-Alleged Class Period |
| Jun 2022 (*Barron's* article) | 6.70% | Wage growth reaches 25-year peak |
| Oct 2022 (end of alleged Class Period) | 6.40% | Wage growth at almost 2x pre-Alleged Class Period |
| Feb 2023 (end of Cain's Extended Period) | 6.10% | Wage growth at almost 2x pre-Alleged Class Period |

**Sources:**
Data from the Federal Reserve, reported as 3-month moving average.

70.     The substantial rise in labor costs negatively affected Carvana's profit margin and contributed to the Company's supply constraints. Analysts commented on this issue:

> "Wage inflation impacted reconditioning cost and production. Our updated wage analysis suggests around a mid single digit EBITDA headwind if hourly pay hits $20+/hr. Transport cost rose 27% per unit in 3Q as wage/transport inflation headwinds persist." [Evercore analyst report, dated November 5, 2021]

> "Carvana saw pressure in compensation, other overhead, and logistics (we think is market driven)." [BNP Paribas analyst report, dated November 5, 2021]

> "Higher labor costs could also weigh on retail gross profit per unit (GPU) for as well as SG&A." [Wedbush analyst report, dated January 21, 2022]

**Consumer shift back to new vehicles as production recovered**

---

[86]  Federal Reserve Bank of Atlanta, "3-Month Moving Average of Unweighted Median Hourly Wage Growth: Overall," Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/FRBATLWGT3MMAUMHWGO.

44

71.    Covid caused supply chain disruptions that increased the price of new cars and hurt new car unit sales during the first half of the alleged Class Period. That, in turn, increased the demand for used car sales. As supply chain disruptions eased in the second half of the alleged Class Period, car companies started ramping up production of new cars, which decreased the demand for used cars, negatively affecting Carvana's sales. Analysts discussed these trends:

> "**US OEM plants are back online and ramping production** and we've seen production levels grow sequentially MoM. **We expect stabilization, then declines in used car pricing**." [Morgan Stanley industry analyst report, dated December 7, 2021]

> "New car supply still the biggest area of uncertainty. **Commentary from OEMs suggest that allocations should improve in 2H22; pace of recovery and demand satiation key to eventual used car pricing moderation**" [J.P. Morgan industry analyst report, dated July 19, 2022, emphasis added]

> "Indeed, in the near-term, consumer demand could remain under significant pressure as interest rates continue to rise, inflation stays elevated, a recession is looming **and new vehicle supply improves**; many sub-prime consumers are dropping out of the market due to affordability issues, adding to demand pressures for CVNA." [Wedbush industry analyst report, dated October 19, 2022]

72.    In sum, while numerous macroeconomic and industry factors benefited Carvana during the first half of the alleged Class Period, there was a substantial shift in the second half of the alleged Class Period, including rising interest rates, high inflation, fading of government stimulus, high labor costs, and improved supply of new cars. Those well-documented macroeconomic factors primarily caused Carvana's stock price to decline after August 10, 2021.

## VII.    INTRODUCTION TO PRICE IMPACT

73.    In securities class actions, the presumption of reliance provides a means of establishing reliance on a class-wide basis without requiring individualized inquiries. Under this framework, investors are presumed to rely on the integrity of the market price when buying and selling the relevant securities (which in this case is Carvana's common stock). The premise underlying this presumption is that, in an efficient market, the price of a security reflects all

45

publicly available information, including any alleged misstatements, and as a result, when an investor buys and sells at the market price, that investor is presumed to have relied indirectly on any alleged misstatements reflected in that price. This framework is commonly referred to as the fraud-on-the-market doctrine.[87]

74.     Defendants can rebut the presumption of reliance and defeat class certification. As the Supreme Court explained in *Basic,* "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff […] will be sufficient to rebut the presumption of reliance."[88] An analysis of price impact is an analysis of whether the alleged misstatements affected the company's stock price when they were made.[89] A lack of price impact means that the alleged misstatements did not impact the company's stock price and therefore severs the link between the alleged misstatements and the stock price and rebuts the presumption of reliance.

75.     In general, the price impact of an alleged misrepresentation (or scheme) can be analyzed in at least two ways: (1) directly by analyzing the market reaction following an alleged misrepresentation (*i.e.*, analyzing the "front-end" market reaction), including analyzing the stock price movement and examining market and analyst commentary following an alleged misrepresentation, or (2) indirectly by analyzing the market reaction when the truth concealed by an alleged misrepresentation is later revealed by a corrective disclosure (*i.e.*, analyzing the "back-end" market reaction).[90]

---

[87]   *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

[88]   *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988).

[89]   See, for example, *Halliburton I*, 131 S. Ct. 2179, 2186 (2011) ("'[P]rice impact' – that is, whether the alleged misrepresentations affected the market price in the first place.").

[90]   See, for example, *Halliburton II*, 134 S. Ct. 2398 (2014).

76.    To analyze price impact of the alleged misrepresentations and scheme in this case, I examined publicly available information related to Carvana and Plaintiffs' allegations. I reviewed Plaintiffs' claims in the Complaint and other pleadings, and the Cain Report, and examined the alleged misrepresentations and the alleged corrective disclosures (including what information was allegedly false, when the alleged truth was purportedly revealed to the market and what information was alleged to be corrective). I analyzed publicly available information on Carvana, including analyst reports, press releases, conference call transcripts, SEC filings, and news stories from Bloomberg and Factiva.[91] I conducted both front-end and back-end analyses of price impact. I used event studies to analyze Carvana's price reactions when the alleged misstatements were made, as well as when the truth concealed by the alleged misstatements is later revealed through the alleged corrective disclosures. I analyzed what the market knew about the alleged misrepresentations and how the market reacted in terms of analyst and other market commentary to the alleged misrepresentations and the alleged corrective disclosures.

77.    Analyst reports are periodic reports issued by professional financial analysts who perform research and analysis on specific industries and companies. Analysts analyze companies by studying publicly available information, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management. Analysts use this information to model and value companies and industries. Using their valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the

---

[91] Bloomberg is a commonly used provider of financial data and news, and Factiva is an online news reporting service and archive owned by Dow Jones & Company, Inc. that aggregates news content from nearly 33,000 sources from around the world.

company's future financial performance (such as estimates of future unit sales, revenue, profits), and give recommendations to buy, hold or sell the stock.[92]

78.    Analysts are a valuable source to identify and understand what is important to the valuation and stock price of a company. They typically issue reports when material, value-relevant information about a company is released. In those reports, analysts typically evaluate the new information, discuss its implications, and incorporate it into their valuation models and price targets. As the Cain Report notes, "[a]nalysts typically publish reports in which they assess recent company business developments, review historical financial performance and provide forecasts of future operating performance."[93] These reports therefore help disseminate information and capture market knowledge and sentiment at a given time, while signaling what type of information is important and how that information affects a company's valuation and share price.

79.    The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock, and thus, for determining whether a piece of information had price impact. This position is echoed by Dr.

---

[92]    The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock. In particular, courts have relied on analyst reports in determining what information is important to the market in valuing a stock and in determining the cause of stock price movements. See, for example, *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (M.D. Fla. March 30, 2006) ("Specifically, the analyst reports on September 3, 2002, September 23, 2002, October 8, 2002, and January 23, 2003 address ratings cuts, opinions, and predictions regarding TECO's stock value but do not reference any misstatements, omissions, or accounting practices by Defendants as the reason for the bleak forecasts or changes in market conditions.") and *Barrie v. Intervoice-Brite, Inc.*, No. 3:01-CV-1071-K (N.D. Tex. Oct. 26, 2009) ("Barry's review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated."). The First Circuit has also recommended analyzing contemporaneous content for explaining stock price movements, citing a paper that specifically describes performing content analysis of analyst reports and commentary. *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014), citing David Tabak, "Making Assessments About Materiality Less Subjective Through the Use of Content Analysis," 2007.

[93]    Cain Report, ¶ 51.

48

Cain: in his report he explains that "analysts help to disseminate new important company-specific information to investors, thus impounding new information into stock prices quickly and efficiently"[94] and in his deposition he testified that ███████████████████████ ████████████████████████████████████████.[95]

## VIII. CARVANA'S STOCK PRICE REACTIONS TO THE ALLEGED MISSTATEMENTS AND THE ALLEGED CORRECTIVE DISCLOSURES

### A. Event study and statistical significance

80.    An event study can be used to test whether a stock's price reacts to a particular announcement. An event study is a commonly accepted statistical analysis that measures the movement in a stock's price after an event or public announcement, typically adjusting for the movement in the overall market or industry.[96] Academics often use an event study to determine how stock prices respond to new information.[97]

---

[94] Cain Report, ¶ 52. Dr. Cain states in his report that the review of analyst reports is one of the "accepted methodologies" to determine that portion of stock price movement that is due to "non-fraud-related factors." Cain Report, ¶ 115. Dr. Cain has used analyst reports to disaggregate the impact of confounding information in other cases. See, for example, Dr. Cain's expert report in *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.,* dated January 21, 2021, pp. 35-47 and his expert report in *Mouvement d'éducation et de défense des actionnaires c. CAE inc., Marc Parent, and Sonya Branco,* dated April 30, 2025, pp. 40-46.

[95] Deposition of Matthew Cain, Ph.D., May 8, 2026, 118:10-119:08. (███████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████") (emphasis added).

[96] See, for example, Alexander, Janet C., "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, 41: 1994, Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38: 1982, and Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19.

[97] See, for example, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997, and Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting* 10(4): 1983.

49

81.    To conduct an event study, one typically uses a statistical analysis tool called a regression. Specifically, a regression estimates the relationship between two or more variables.[98] In this scenario, the variables are the company's daily stock price returns and the daily returns of market and/or industry indices. The relationship is often estimated over a control period.[99] Using the regression results and the returns of the indices, the predicted stock price movement ("predicted return") can be calculated for the day being tested. The difference between the actual return on a day and the predicted return is called "excess return." For example, if a stock is predicted to increase 1% on a day given the movement of market and/or industry indices, but it actually increased 5%, the excess return on that day is 4%.

82.    Stock prices often move randomly when no new information has been released, therefore a positive excess return does not always mean that there was a price reaction. A test of statistical significance is needed to say with more certainty whether an excess return could be due to more than just random variation. If a price reaction is not statistically significant, that means the movement is not statistically distinguishable from zero and is within the expected range of variation that could occur on that given day. As described in the Reference Manual on Scientific Evidence, when a result is statistically significant that means "the observed data are far from what is expected...too far to be readily explained by the operations of chance."[100]

83.    When analyzing the statistical significance of a price reaction to an event, the 5% significance level is the commonly applied standard typically used by academics and courts.[101]

---

[98]  See, for example, Hogg, Robert V. and Elliot A. Tanis, *Probability and Statistical Inference*, (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997), pp. 438-442.

[99]  See, for example, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997, p. 15.

[100]  Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), p. 251. (Reference Manual)

[101]  For a discussion of statistical significance levels, see, for example, Reference Manual, pp. 243-246.

For example, as explained by the Reference Manual on Scientific Evidence published by the Federal Judicial Center (the "Reference Manual"), "In practice, statistical analysts typically use levels of 5% and 1%. The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure."[102]

84.    The 5% significance level is sometimes referred to as the 95% confidence level. The 5% significance level is a reference to the size of the p-value, which, in the context of price reaction, tells us how unusual the price movement is if there is no material company-specific news. The confidence level is simply 1 minus the p-value. When reported in terms of 95% confidence level instead of the p-value, the meaning of the statistical test is commonly misinterpreted. For example, one common misconception is that a price movement that is statistically significant at the 95% confidence level means that there is a 95% probability (or that one can be 95% sure) that the price movement was due to company-specific news rather than random variations in stock price. This interpretation is wrong. Similarly, if a price movement is significant at the 51% confidence level, some may claim that it means that it is more likely than not that the price movement was due to news and demonstrates a preponderance of the evidence. That is also wrong. Rather than quantifying how confident one should be that a price movement is actually due to company-specific news, the confidence level is a statistical term that describes the probability of seeing a price movement of a smaller magnitude when there is no news and assuming the model is correct.

85.    The Reference Manual explains this misconception in the context of a hypothetical gender discrimination lawsuit. According to the Reference Manual:

> "In some cases, the *p*-value has been interpreted as the probability that defendants are innocent of discrimination. However, as noted earlier, **such an interpretation is wrong:** *p* merely represents the probability of getting a large test statistic, given

---

[102]  Reference Manual, p. 251.

51

that the model is correct and the true coefficient for gender is zero. Therefore, even if we grant the model, **a *p*-value less than 50% does not demonstrate a preponderance of the evidence against the null hypothesis**."[103]

The Reference Manual uses p-value in its explanation, and as discussed above, p-value and confidence level are just the two sides of the same coin. If a test result is statistically significant at the 51% confidence level, that means it has a 49% p-value (*i.e.* the confidence level is simply 1 minus the p-value, expressed in percentages). Thus, rewording the quote above using confidence levels in place of p-values would be the following:

> "In some cases, the *confidence level* has been interpreted as the probability that defendants are *guilty* of discrimination. However, as noted earlier, **such an interpretation is wrong:** *confidence level* merely represents the probability of getting a *smaller* test statistic [*i.e.,* a less extreme data point than what is observed], given that the model is correct and the true coefficient for gender is zero. Therefore, even if we grant the model, **a *confidence level higher* than 50% does not demonstrate a preponderance of the evidence against the null hypothesis**."[104]

86.     The fact that a 51% confidence level does not demonstrate a preponderance of the evidence can also be illustrated using the following commonsense example. Suppose a person flips a coin 100 times and gets 51 heads and 49 tails. This is clearly not an unusual result and would not make anyone think that it is evidence that the coin is biased.[105] Yet, a statistical analysis will show that this result is statistically significant at above the 51% confidence level.[106] Thus, just because a result is statistically significant at a confidence level above 50% does not mean it is more likely than not that the result is due to a defect or a fraud rather than chance alone.

---

[103] Reference Manual on Scientific Evidence, p. 271, fn. 138, emphasis added and internal citations omitted.

[104] Words being replaced shown in italics.

[105] When using a fair coin, seeing 51 or more heads can happen 46% of the time, or almost half of the time, when such experiments are done.

[106] In fact, seeing 51 heads is statistically significant at the 54% confidence level.

87.    To further illustrate, below is a diagram showing the distribution of the number of heads in 100 tosses. To be statistically significant at the 95% confidence level (or 5% significance level), the number of heads must be so unusual that it would happen only 5% of the time by chance if a fair coin is used. Those are the results that fall into the two tails of the distribution (colored in blue). As discussed above, seeing 51 heads is not unusual even using a fair coin and thus it is not in the two tails and not considered statistically significant at the 95% confidence level.



88.    Testing whether a price reaction is statistically significant, while more complicated, is essentially using the same statistical framework as the coin toss example. Overall, a price movement that is significant at the 95% confidence level can be evidence that the movement is due to company-specific news, but it does not provide definitive evidence on

53

the probability that such movement is indeed due to company-specific news. Even at the 95% confidence level one will still have a 5% chance of mistakenly finding a price reaction to be due to company-specific news when there is no material company-specific news.[107] That is why a lower confidence level, like 80%, is not used, because at such a confidence level, one will make a mistake every five times, or, in terms of trading days, 1 in 5 days (*i.e.,* 1 in each week).[108]

## B.    Dr. Cain's event study model and alternative event study model

89.    To test whether Carvana's daily stock returns are statistically significant, *i.e.* whether the price movements are abnormally large and cannot be explained by random variations, I used both Dr. Cain's exact event study model and an alternative event study model. For both models, I used the same methodology that Dr. Cain used, which reports whether Carvana's stock price had a statistically significant one-day price reaction at the 95% confidence level.[109]

90.    Dr. Cain uses an event study model that controls for the daily stock price movements of the S&P 500 Index and the S&P 500 Consumer Discretionary Distribution & Retail Index ("S&P Consumer Discretionary Index").[110] His control period consists of a rolling period of 120 trading days before each event tested, excluding the dates of the alleged corrective disclosures and earnings dates, including the "News Days" identified in Exhibit 6 of the Cain

---

[107]  Dr. Cain testified in his deposition that ███████████████ ████████████████████████████████████████████ ." Deposition of Matthew Cain, Ph.D., May 8, 2026, 189:24-190:3.

[108]  Dr. Cain testified in his deposition that "███████████████████████████████ ██████ ." Deposition of Matthew Cain, Ph.D., May 8, 2026, 191:7-191:9.

[109]  Cain Report, ¶ 87 (**Exhibit 6** […] reports the results of my event study using Carvana's Common Stock returns. […] Overall, four out of 11 Carvana News Days observed stock price movements that were statistically significant at the 95% confidence level or above."). Dr. Cain testified in his deposition that "████████████ ██████████████████████████████████ ." Deposition of Matthew Cain, Ph.D., May 8, 2026, 113:2-113:4.

[110]  Cain Report, ¶ 77.

54

Report.[111] Dr. Cain selected the S&P Consumer Discretionary Index to purportedly control for industry-wide price movements because Carvana's annual reports include a chart that compares Carvana's stock performance to that index, as well as the S&P 500.[112] However, Dr. Cain ignores that the companies in the S&P Consumer Discretionary Index are not direct competitors of Carvana, with the vast majority not even being in the automotive industry. Of the 27 companies that appeared in the S&P Consumer Discretionary Index during the alleged Class Period, just three are included in Carvana's specific list of "current and future competitors" within the same annual reports that Dr. Cain cites.[113] The other 24 companies in the S&P Consumer Discretionary Index included non-auto companies such as Tiffany & Co, Dollar Tree, Nordstrom, and Kohl's.[114] The lack of similarity between the companies in Dr. Cain's industry index and Carvana means that his industry index may not reflect the effect of macroeconomic factors to the same extent, or in the same manner, as Carvana.

91.    In addition to adopting Dr. Cain's event study, I used an alternative event study specification that controls for the daily stock price movements of six of Carvana's used car retail peers, AutoNation, CarGurus, CarMax, Shift Technologies, TrueCar, and Vroom. The control period consists of a rolling period of 120 trading days (approximately six months) before each event tested.

---

[111] Cain Report, ¶ 76 and footnote 81.

[112] Cain Report, ¶ 77, Carvana Co. Form 10-K for the Period Ended December 31, 2021, at pp. 50-51.

[113] Data from Bloomberg, L.P., Carvana Co. Form 10-K for the Period Ended December 31, 2020, at pp. 20-21, Carvana Co. Form 10-K for the Period Ended December 31, 2021, at p. 21, and Carvana Co. Form 10-K for the Period Ended December 31, 2022, at p. 22.

[114] Data from Bloomberg, L.P.

55

### C. None of the alleged misstatements caused a statistically significant increase in Carvana's stock price

92.    I analyzed whether the market reacted to any of the 10 alleged misstatements when made. Specifically, I used both Dr. Cain's event study as well as the alternative event study to analyze each of the 8 reaction days corresponding to the 10 alleged misstatements. As discussed above, a test of statistical significance is needed to say with more certainty whether a price movement could be due to more than just random variation. If a price movement is not statistically significant, that means the movement is not statistically distinguishable from zero and is within the expected range of variation that could occur on that given day.

93.    I find that there was no statistically significant positive price increase corresponding to any of the days with the exception of February 24, 2022, a day with 2 alleged misstatements. In other words, there was no statistically significant positive reaction after 8 of the 10 alleged misstatements. The event study results are shown in the table below.

**Carvana Plaintiff-Style Price Reactions Following the Alleged Misstatements**

| | Event Date | Reaction Date | Misstatement Category | Excerpt of Alleged Misstatement | Cain Event Study[1] | | Alternative Event Study[2] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | % Price Reaction | Stat. Sig. Increase?[3] | % Price Reaction | Stat. Sig. Increase?[3] |
| 1. | 2/25/21 | 2/26/21 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | 6.1% | No | 6.6% | No |
| 2. | 5/6/21 | 5/7/21 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | -7.0% | No | -5.5% | No |
| 3. | 8/5/21 | 8/6/21 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | 2.8% | No | 4.5% | No |
| 4. | Same as above | | Retail Sales | "[Retail] unit and revenue growth were ... primarily driven by strong demand for our offering this year." | | No | | No |
| 5. | 8/11/21 | 8/11/21 | T&R Other | "[The NC suspension] was a relatively unusual action, but is also pretty small in scope, relatively speaking." | -2.9% | No | -0.3% | No |
| 6. | 11/4/21 | 11/5/21 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | -1.5% | No | -1.4% | No |
| 7. | 2/24/22 | 2/25/22 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | 17.7% | Yes | 10.1% | Yes |
| 8. | Same as above | | Retail Sales | "Our exceptional growth in 2021 was driven by rapid growth within our market cohorts." | | Yes | | Yes |
| 9. | 5/10/22 | 5/11/22 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | -11.3% | No | -15.7% | No |
| 10. | 6/24/22 | 6/27/22 | T&R Other | "In a very small percentage of instances ... customers did not receive permanent license plates." | 0.0% | No | -3.7% | No |

**Notes and Sources:**

Data from Bloomberg L.P. and Cain Report turnover. Events from the Complaint and Cain Report.

[1] Event study controls for the daily stock price movements of the S&P 500 Index and the S&P 500 Consumer Discretionary Distribution & Retail Index.

[2] Event study controls for the daily stock price movements of Carvana's peers, consisting of AutoNation, CarGurus, CarMax, Shift Technologies, TrueCar, and Vroom.

[3] Significance is based on the price reaction's t-statistic, calculated as the percent price reaction divided by the standard error of the regression over the sample period. Significance is indicated at the 5% level.

94.    The only day that did have a significant increase was February 24, 2022, which corresponded to two of the alleged misstatements. One misstatement was from Carvana's Form 10-K and the other was made in Carvana's Earnings Call.[115] As I will discuss further, I find that neither of these alleged misstatements were the cause of Carvana's stock price increase.

---

[115]  Both of these alleged misstatements were made after market close on February 24, 2022, therefore the day that was tested was February 25, 2022 as that would be when the market reacted to those events.

**D.    None of the alleged corrective disclosures caused a statistically significant decrease in Carvana's stock price**

95.    I analyzed whether any of the alleged corrective disclosures caused a statistically significant decrease in Carvana's stock price. As discussed above, it is my understanding that 4 alleged corrective disclosures remain in this case and 4 are dismissed by the Court.[116] However, to be thorough, I analyzed all 8 alleged corrective disclosures.

96.    There was no statistically significant negative price reaction to 7 of the 8 alleged corrective disclosures using either Dr. Cain's event study or the alternative event study. In particular, there was no statistically significant reaction to any of the 4 alleged corrective disclosures that remain in this case. The only alleged corrective disclosure date with a statistically significant negative price reaction was November 3, 2022. This date is one of the Financial Condition Alleged Corrective Disclosures that was previously dismissed by the Court. The event study results are shown in the table below.

---

[116] Order, pp. 52-57 ("Plaintiffs' four partial corrective disclosures related to its financial condition fail to allege loss causation… the Court finds [the four title and registration] corrective disclosures suffice to plausibly allege loss causation.").

**Carvana Plaintiff-Style Price Reactions Following the Alleged Corrective Disclosures**

| | Event Date | Reaction Date | Category | Alleged Corrective Disclosures | Cain Event Study[1] % Price Reaction | Cain Event Study[1] Stat. Sig. Decrease?[3] | Alternative Event Study[2] % Price Reaction | Alternative Event Study[2] Stat. Sig. Decrease?[3] |
|---|---|---|---|---|---|---|---|---|
| 1. | 8/10/21 | 8/11/21 | T&R | Media reports Carvana's dealer license suspension for violating North Carolina's T&R laws. | -2.9% | No | -0.3% | No |
| 2. | 10/22/21 | 10/22/21 | T&R | The *Wall Street Journal* publishes an article discussing Carvana's T&R issues. | -0.6% | No | -0.4% | No |
| 3. | 4/20/22 | 4/21/22 | Financial Condition | Carvana releases its Q1 2022 financial results. | -4.1% | No | -4.6% | No |
| 4. | 5/10/22 | 5/10/22 | Financial Condition | Carvana announces it is laying off roughly 2,500 employees. | -3.2% | No | -5.9% | No |
| 5. | 6/24/22 | 6/27/22 | T&R | *Barron's* publishes an article discussing Carvana's T&R issues. | 0.0% | No | -3.7% | No |
| 6. | 10/7/22 | 10/10/22 | T&R | The Michigan Department of State announces it is suspending Carvana's dealer's license in Novi, Michigan. | -3.4% | No | -4.0% | No |
| 7. | 11/3/22 | 11/4/22 | Financial Condition | Carvana releases its Q3 2022 results. | -41.9% | Yes | -35.2% | Yes |
| 8. | 2/23/23 | 2/24/23 | Financial Condition | Carvana releases its Q4 2022 results. | -16.9% | No | -13.3% | No |

**Notes and Sources:**
Data from Bloomberg L.P. and Cain Report turnover. Events from the Complaint and Cain Report.
[1] Event study controls for the daily stock price movements of the S&P 500 Index and the S&P 500 Consumer Discretionary Distribution & Retail Index.
[2] Event study controls for the daily stock price movements of Carvana's peers, consisting of AutoNation, CarGurus, CarMax, Shift Technologies, TrueCar, and Vroom.
[3] Significance is based on the price reaction's t-statistic, calculated as the percent price reaction divided by the standard error of the regression over the sample period. Significance is indicated at the 5% level.

97.    Regarding November 3, 2022, the only alleged corrective disclosure that had a statistically significant negative price reaction, I find that Carvana's stock price decrease on that day was not due to information corrective of any of the alleged misstatements. Instead, as will be detailed in a later section, it was due to news about macroeconomic and industry trends that were affecting Carvana's business, including declining demand for used vehicles and rising interest rates, and the impact of those trends on Carvana's liquidity.

98.    In sum, the event study results provide strong evidence that there is no price impact from the alleged misstatements, including the fact that there was no statistically significant price increase after 7 of the 8 alleged misrepresentation dates and no statistically significant price decrease after any of the 4 alleged corrective disclosures that remain in the case.

59

## IX.    PRICE IMPACT ANALYSIS OF THE T&R ALLEGED MISSTATEMENTS

### A.    A front-end analysis shows that the T&R alleged misstatements did not cause Carvana's stock price to increase when they were made

#### 1.    Front-end analysis of T&R Risk alleged misstatements

99.    It is my understanding that 10 alleged misstatements remain in this case, and 6 of the 10 relate to Carvana's title and registration "risks" (referenced in this report as the T&R Risk alleged misstatements). The alleged misstatements on these 6 days are exactly the same. They are part of the "Risk Disclosures" section in Carvana's 10-K filings with the SEC (and are incorporated by reference in the 10-Q filings).[117]

> We operate in several highly regulated industries and are subject to a wide range of federal, state, and local laws and regulations. . . . **[O]ur failure to comply [with these laws and regulations], could have a material adverse effect on our business, results of operations, and financial condition.**
>
> We are subject to a wide range of evolving federal, state, and local laws and regulations, many of which may have limited to no interpretation precedent as it relates to our business model. **Our sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, state laws, regulations, and systems and process requirements related to title and registration** . . . .
>
> ….
>
> **The violation of any of these laws or regulations could result in administrative, civil, or criminal penalties or in a cease-and-desist order against some or all of our business activities, any of which could damage our reputation and have a material adverse effect on our business, sales, and results of operations. Additionally, even an allegation that we violated these laws, by regulators, competitors, individuals, or consumers, could result in costly litigation with uncertain results.**

---

[117] Complaint, ¶¶ 174-179, 182-187, emphasis original. Note that the challenged 10-Q disclosures did not repeat verbatim the risk-factor language alleged to be misleading. Rather the 10-Qs simply said that the risk factors from the prior 10-K had not materially changed. See, for example, Carvana Co. Form 10-Q for the Period Ended March 31, 2021, at p. 48. ("There have been no material changes to the risk factors disclosed under the heading 'Risk Factors' in our most recent Annual Report on Form 10-K, filed on February 25, 2021.").

60

100.    First of all, there was no statistically significant positive price reaction on 5 of the 6 days when this alleged misstatement was made according to either Dr. Cain's event study or the alternative event study. The lack of price reaction to misstatements that allegedly "pump" up the stock price is evidence that the misstatements had no price impact.[118] The results of this analysis are shown in the table below.

| | | | | Cain Event Study[1] | | Alternative Event Study[2] | |
|---|---|---|---|---|---|---|---|
| Event Date | Reaction Date | Misstatement Category | Excerpt of Alleged Misstatement | % Price Reaction | Stat. Sig. Increase?[3] | % Price Reaction | Stat. Sig. Increase?[3] |
| 1. 2/25/21 | 2/26/21 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | 6.1% | No | 6.6% | No |
| 2. 5/6/21 | 5/7/21 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | -7.0% | No | -5.5% | No |
| 3. 8/5/21 | 8/6/21 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | 2.8% | No | 4.5% | No |
| 4. 11/4/21 | 11/5/21 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | -1.5% | No | -1.4% | No |
| 5. 2/24/22 | 2/25/22 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | 17.7% | Yes | 10.1% | Yes |
| 6. 5/10/22 | 5/11/22 | T&R Risk | "[O]ur failure to comply ... could have a material adverse effect on our business." | -11.3% | No | -15.7% | No |

**Carvana Plaintiff-Style Price Reactions Following the T&R Risk Alleged Misstatements**

Notes and Sources:
Data from Bloomberg L.P. and Cain Report turnover. Events from the Complaint and Cain Report.
[1] Event study controls for the daily stock price movements of the S&P 500 Index and the S&P 500 Consumer Discretionary Distribution & Retail Index.
[2] Event study controls for the daily stock price movements of Carvana's peers, consisting of AutoNation, CarGurus, CarMax, Shift Technologies, TrueCar, and Vroom.
[3] Significance is based on the price reaction's t-statistic, calculated as the percent price reaction divided by the standard error of the regression over the sample period. Significance is indicated at the 5% level.

101.    Importantly, none of the analysts repeated or referenced these alleged misstatements in their reports issued after these alleged misstatements. The review of analyst reports is a standard and generally accepted methodology for determining what information is

---

[118] To the extent that Plaintiffs' theory is different and Plaintiffs claim that this statement is misleading based on an alleged failure to disclose negative information, the back-end analysis discussed below demonstrates that this alleged misstatement did not have price impact.

important to the market in valuing a stock, and thus, for determining whether a piece of information had price impact.

102.    On the one day when there was a statistically significant positive price reaction following a T&R Risk alleged misstatement, February 24, 2022, the evidence clearly indicates that the price increase was not due to the alleged misstatement for at least three reasons. First, no analyst mentioned the alleged misstatement in any of their reports issued after the alleged misstatement, which is direct evidence that the alleged misstatement is not the cause of Carvana's stock price increase. In fact, of the 22 analysts who issued reports following this alleged misstatement, only one even mentioned the document that contained the alleged misstatement, the Form 10-K.[119]

103.    Furthermore, evidence shows that the alleged misstatement on February 24, 2022 was not new news, and thus, in an efficient market, would not have impacted Carvana's stock price. Specifically, the alleged misstatement on February 24, 2022, contains the exact same or nearly the exact same language as *all* of the 10-Ks Carvana had previously filed with the SEC since its IPO,[120] including the language in the prior alleged misstatements, and thus is not new information. In an efficient market, repeated or confirmatory information should not cause a

---

[119] Note that some analyst reports may have referenced the 10-K only by including financial figures from the 10-K in tables. Only one analyst discussed the 10-K in the body of the report, mentioning Carvana's disclosure of its liquidity. BNP Paribas analyst report, dated February 25, 2022 ("However, in the press release and the 10-K, the company provided incremental disclosure on its liquidity, which should make it easier for more investors to digest.").

[120] In some of Carvana's 10-Ks filed prior to the beginning of the alleged Class Period, there are minor word differences or a sentence missing compared to those filed in 2020 and 2021. For example, Carvana's 2019 10-K states that the Company's "sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, **state laws related to title and registration**…" while their 2020 10-K states that Carvana's "sale and purchase of used vehicles and related activities, including the sale of complementary products and services, are subject to state and local licensing requirements, **state laws, regulations, and systems and process requirements related to title and registration**…" (emphasis added). Carvana Co. Form 10-K for the Period Ended December 31, 2019, at p. 23 and Carvana Co. Form 10-K for the Period Ended December 31, 2020, at p. 24.

stock's price to move. If information that is not new affects a stock's price, that is an indication that the market for that stock is not efficient. Thus, assuming Carvana traded in an efficient market, this alleged misstatement could not be the cause of Carvana's stock price increase.

104. There was other news announced on the same day that explains the price increase. In particular, on that day Carvana announced an intended acquisition of "the nation's #2 wholesaler" ADESA, and analysts explicitly said they viewed the ADESA acquisition as positive news for Carvana.[121] For example, Evercore analysts upgraded their rating of Carvana stock from "In Line" to "Outperform" and raised their target price for Carvana stock due to the ADESA acquisition.

> "**We are upgrading CVNA from In Line to Outperform following the acquisition of the nation's #2 wholesaler ADESA.** The ADESA acquisition has game-changing potential as it dramatically increases Carvana's ability to recondition used vehicles. Carvana gains a) 2mn incremental units of production capability over the next few years (vs EVR estimate 10+ years otherwise) – causing us to raise our long term used unit outlook from 2mn+ to 3mn+ (<8% used vehicle market share), and b) Carvana should realize $750/car of margin enhancement from inbound/outbound logistic saves/ reconditioning efficiency bringing high single digit+ EBITDA margins into focus." [Evercore analyst report, dated February 25, 2022, emphasis original]

105. As another example, Truist analysts stated that the ADESA acquisition "accelerates progress towards the 'Amazon of auto retail'" and expected the acquisition to improve Carvana's margins:

> "Acquisition of ADESA U.S. from KAR Global accelerates progress towards the 'Amazon of auto retail,' in our view. Carvana announced that it has agreed to purchase ADESA's US physical auction business (ADESA U.S.), a subsidiary of KAR Global (Stephanie Moore, Hold), for $2.2B in cash. We estimate that CVNA can generate ~$1.2B in annual costs savings through the acquired locations at scale (assuming $750 in savings per unit from reduced transportation costs and ~80% capacity utilization on the 2M annual recon capacity added). We believe addition and utilization of IRCs at ADESA locations over next 3-5 years brings CVNA's LT goal of 8-

---

[121] Evercore analyst report, dated February 25, 2022.

13.5% EBITDA margin into sharper focus." [Truist analyst report, dated February 25, 2022]

### 2. Front-end analysis of T&R Other alleged misstatements

106. Of the 10 alleged misstatements that remain in this case, 2 concern title and registration issues beyond the six risk disclosures discussed above (referenced in this report as the T&R Other alleged misstatements). These 2 other alleged misstatements appear to be characterized as "affirmative" misrepresentations by Plaintiffs in their Complaint. In particular, Plaintiffs claim these statements, which were made after partial alleged corrective disclosures, "misleadingly reassured investors" by downplaying the T&R issues.[122] Thus, it appears that Plaintiffs' theory is that these 2 alleged misstatements provided investors with new positive information about Carvana's business.

107. However, as shown in the table below, there was no statistically significant price *increase* following either of those two alleged misstatements. The lack of price reaction to misstatements that allegedly "pump" up the stock price is strong evidence that the misstatements had no price impact.

| | | | | Cain Event Study[1] | | Alternative Event Study[2] | |
|---|---|---|---|---|---|---|---|
| Event Date | Reaction Date | Misstatement Category | Excerpt of Alleged Misstatement | % Price Reaction | Stat. Sig. Increase?[3] | % Price Reaction | Stat. Sig. Increase?[3] |
| 1. 8/11/21 | 8/11/21 | T&R Other | "[The NC suspension] was a relatively unusual action, but is also pretty small in scope, relatively speaking." | -2.9% | No | -0.3% | No |
| 2. 6/24/22 | 6/27/22 | T&R Other | "In a very small percentage of instances ... customers did not receive permanent license plates." | 0.0% | No | -3.7% | No |

**Carvana Plaintiff-Style Price Reactions Following the T&R Other Alleged Misstatements**

Notes and Sources:
Data from Bloomberg L.P. and Cain Report turnover. Events from the Complaint and Cain Report.
[1] Event study controls for the daily stock price movements of the S&P 500 Index and the S&P 500 Consumer Discretionary Distribution & Retail Index.
[2] Event study controls for the daily stock price movements of Carvana's peers, consisting of AutoNation, CarGurus, CarMax, Shift Technologies, TrueCar, and Vroom.
[3] Significance is based on the price reaction's t-statistic, calculated as the percent price reaction divided by the standard error of the regression over the sample period. Significance is indicated at the 5% level.

---

[122] Complaint, ¶¶ 312, 321. See, also, Plaintiffs' Motion for Class Certification, p. 2 ("And, once the truth began to leak out, Defendants misleadingly trivialized Carvana's title violations, characterizing them as 'North Carolina specific' and occurring '[i]n a very small percentage of a very small percentage of instances.'").

64

108.    In addition, a detailed analysis of analyst commentary following these two affirmative T&R alleged misstatements shows that analysts did not view the information contained in these alleged misstatements as value relevant, which, coupled with the lack of statistically significant price increase, is direct evidence of no price impact from these two alleged misstatements.

**T&R Other Alleged Misstatement on August 11, 2021**

109.    The first T&R Other alleged misstatement was made by Carvana at a J.P. Morgan investor conference on the automotive industry on August 11, 2021, which was one day after the August 10, 2021 alleged corrective disclosure that reported Carvana's dealer license suspension in North Carolina. This alleged misstatement is shown below.[123]

> In this particular case, **I think we had quite a small fraction of customers that were impacted by title and registration delays, but it did happen in the state of North Carolina**. And so I think the DMV there thought that with having a set of customers experienced [sic] title and registration delays that they wanted to do something to reflect the fact that they didn't like customers in that state experiencing these delays.
>
> . . . .
>
> So what they did was they asked us to stop delivering cars from the vending machine in Raleigh. We can still deliver cars in the metro area of Raleigh, just not from the specific vending machine location. And we can also still do work in the vending team, but we just can't deliver cars from that particular location. And so that's what they elected to do. **Based on our research, that's a relatively sort of unusual approach for something like this and having a set of customers have title and registration delays, but that's where we are today**.

110.    22 of the 23 analysts that covered Carvana did not even issue a report following this alleged misstatement. If, according to Plaintiffs' theory, this statement provided material new information that would be important to investors, one would expect analysts to issue reports after it was made.

---

[123]  Complaint, ¶ 180, emphasis original.

65

111.    The one analyst who issued a report shortly after the statement did not reference the alleged misstatement or even the J.P. Morgan Automotive Conference at all. Instead, the analyst performed an independent analysis of Carvana's T&R issues in North Carolina and concluded the impact was "de minimis." The analyst's conclusion that the impact to Carvana was too small to matter is consistent with the lack of a statistically significant price reaction to the North Carolina dealer license suspension news released the day before, which Plaintiffs allege was a corrective disclosure. Below is the analyst's analysis and discussion of the T&R issues.

> "Separately, Raleigh suspended Carvana's ability to sell cars for 180 days due to failure to deliver titles to the motor vehicle department and selling cars without state inspections. North Carolina accounted for roughly 4.8% of the pool balances on Carvana's most recent ABS offerings, and Raleigh represents about 4.6% of North Carolina's population, suggesting the impact is likely to be de minimis at likely under .3% of sales impacted. After speaking with management, we believe COVID-related backups on titles and registrations contributed to the issue, and we are optimistic that this will be an isolated incident." [William Blair analyst report, dated August 11, 2021]

**T&R Other Alleged Misstatement on June 24, 2022**

112.    The second T&R Other alleged misstatement, which is shown below, is from a *Barron's* article published on June 24, 2022, which is also claimed by Plaintiffs as an alleged corrective disclosure.[124]

> "Carvana, like many dealers over the past two years, has in limited instances encountered challenges processing title and registration paperwork for its customers after the sale," the company says. "**In a very small percentage of a very small percentage of instances, customers did not receive permanent license plates or transferred title within the time frame set forth by the respective states.**"
>
> . . . .
>
> **Carvana says the regulatory issues focus on a relatively small number of sales from 2020 and 2021. "We've had productive conversations with**

---

[124] Complaint, ¶ 188, emphasis original.

**regulators in all of those states and feel very confident about our operations going forward**," it says.

113.    None of the 22 analysts covering Carvana at the time issued reports at all following this alleged misstatement, let alone repeated or referenced the alleged misstatement. If, according to Plaintiffs' theory, this statement provided material new information that would be important to investors, one would expect analysts to issue reports after it was made.

114.    In sum, the two T&R Other alleged misstatements did not cause any stock price increase, and none of the analysts covering Carvana ever mentioned or referenced the two T&R alleged misstatements. This is direct evidence that these alleged misstatements did not have price impact.

### B.    A back-end analysis shows that the correction of the T&R alleged misstatements did not cause Carvana's stock price to drop

115.    A "back-end analysis" analyzes the price impact of the alleged misstatements by analyzing the market reaction when the truth concealed by the alleged misstatements is later revealed. If the alleged misstatements impacted Carvana's stock price when made by causing Carvana's stock price to increase (or preventing Carvana's stock price from falling in the case of price maintenance), all else equal one would expect the correction of the alleged misstatements to impact Carvana's stock price and cause Carvana's stock price to decrease as the alleged inflation dissipated. However, if the release of the very information that Plaintiffs claim was corrective of the alleged misstatements does not cause Carvana's stock price to decrease, then this fact alone is strong evidence that the alleged misstatements did not have price impact and did not cause the stock to be inflated.

67

**1.    There is no price reaction to any of the T&R alleged corrective disclosures, which is strong evidence that the T&R alleged misstatements had no price impact**

116.    Plaintiffs claim the alleged truth regarding Carvana's T&R issues was revealed on 4 different days. They are as follows.

- o **North Carolina Article (8/10/21)**: On this date, after market close, local media outlet *ABC11* in North Carolina reported that Carvana's dealer license in Raleigh, North Carolina had been suspended for six months for violating the state's title and registration laws.[125] While Plaintiffs allege that the suspension in North Carolina was first reported on August 10, 2021 by *ABC11*, local news media *CBS17* had already reported on the same regulatory action the day before, on August 9, 2021.[126] Moreover, information regarding the suspension was first publicly available in Court documents in June 2021.[127]

- o ***WSJ* Article (10/22/21)**: On this date, *The Wall Street Journal* published an article discussing Carvana's compliance issues and regulatory penalties in several states, including Michigan, Texas, North Carolina, California, and Florida.[128]

---

[125] "NC suspends Carvana vehicle sales at Wake County location for 6 months," *ABC11*, August 10, 2021, https://abc11.com/post/carvana-wake-county-suspended-car-vending-machine/10943046/.

[126] "NCDMV revokes Carvana's dealer's license in Wake County until 2022," *CBS17*, August 9, 2021, https://www.cbs17.com/news/local-news/wake-county-news/ncdmv-revokes-carvanas-dealers-license-in-wake-county-until-2022/. According to both Dr. Cain's event study and the alternative event study there was no statistically significant stock price drop to the release of this news either.

[127] On June 11, 2021, the North Carolina Superior Court, Wake County, granted Carvana's request for a temporary restraining order reinstating Carvana's Raleigh, North Carolina dealer license after it was revoked on June 10, 2021, and enjoined the North Carolina DMV from revoking Carvana's Raleigh dealer license until a hearing on June 22, 2021.  On July 21, 2021, Carvana and the North Carolina DMV reached a settlement, that included a six-month suspension of Carvana's Raleigh dealer license. The suspension took effect on August 2.  See, Order, *Carvana, LLC d/b/a Carvana v. N.C. Div. of Motor Vehicles*, No. 21 CVS 8116 (N.C. Super. Ct. Wake Cnty. June 11, 2021) and Settlement Agreement, *Carvana, LLC d/b/a Carvana v. N.C. Div. of Motor Vehicles*, No. 21 CVS 8116 (N.C. Super. Ct. Wake Cnty. July 21, 2021). According to both Dr. Cain's event study and the alternative event study there was no statistically significant price reaction on any of the events discussed above.

[128] "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," *The Wall Street Journal*, October 22, 2021, https://www.wsj.com/business/autos/carvana-faces-government-scrutiny-and-fines-following-consumer-complaints-11634902676.

68

- o ***Barron's* Article (6/24/22)**: On this date, after market close, *Barron's* published an article reporting that Carvana was dealing with "wide-reaching" title and registration issues.[129]

- o **Michigan Release (10/7/22)**: On this date, after market close, the Michigan Department of State issued a news release announcing that it had suspended the license of a Carvana dealership in Novi, Michigan due to title and licensing violations.[130]

117.    There was no statistically significant negative price reaction to any of these 4 alleged corrective disclosures using either Dr. Cain's event study or the alternative event study. In other words, the release of the very information that Plaintiffs claim is corrective of the T&R alleged misstatements did not cause Carvana's stock price to drop, which is strong evidence that the T&R alleged misstatements did not have price impact in the first place. The results of this analysis are shown in the table below.

---

[129] "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars," *Barron's*, June 24, 2022, https://www.barrons.com/articles/carvana-used-cars-registration-problems-51656111441.

[130] "Department of State suspends Novi Dealership," *Michigan Department of State*, October 7, 2022, https://www.michigan.gov/sos/resources/news/2022/10/07/department-of-state-suspends-novi-dealership.

69

**Carvana Plaintiff-Style Price Reactions Following the T&R Alleged Corrective Disclosures**

| | Event Date | Reaction Date | Category | Alleged Corrective Disclosures | Cain Event Study[1] | | Alternative Event Study[2] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | % Price Reaction | Stat. Sig. Decrease?[3] | % Price Reaction | Stat. Sig. Decrease?[3] |
| 1. | 8/10/21 | 8/11/21 | T&R | Media reports Carvana's dealer license suspension for violating North Carolina's T&R laws. | -2.9% | No | -0.3% | No |
| 2. | 10/22/21 | 10/22/21 | T&R | The *Wall Street Journal* publishes an article discussing Carvana's T&R issues. | -0.6% | No | -0.4% | No |
| 3. | 6/24/22 | 6/27/22 | T&R | *Barron's* publishes an article discussing Carvana's T&R issues. | 0.0% | No | -3.7% | No |
| 4. | 10/7/22 | 10/10/22 | T&R | The Michigan Department of State announces it is suspending Carvana's dealer's license in Novi, Michigan. | -3.4% | No | -4.0% | No |

**Notes and Sources:**
Data from Bloomberg L.P. and Cain Report turnover. Events from the Complaint and Cain Report.
[1] Event study controls for the daily stock price movements of the S&P 500 Index and the S&P 500 Consumer Discretionary Distribution & Retail Index.
[2] Event study controls for the daily stock price movements of Carvana's peers, consisting of AutoNation, CarGurus, CarMax, Shift Technologies, TrueCar, and Vroom.
[3] Significance is based on the price reaction's t-statistic, calculated as the percent price reaction divided by the standard error of the regression over the sample period. Significance is indicated at the 5% level.

118.     Moreover, most of the information in these 4 alleged corrective disclosures was not new news. As discussed further in Section IX.C, T&R issues are inherently public issues, based on consumer complaints and regulatory actions which are similarly public, and much of the information Plaintiffs point to as allegedly corrective was public before the articles were published.  Specifically:

> o  **The North Carolina Article** on August 10, 2021, was not the first time news related to the suspension was publicly available.  As discussed above, public court documents from June 2021 showed that the North Carolina DMV was taking regulatory action against Carvana.[131] Further, the news of Carvana's dealer license suspension in North Carolina was reported by local news media on August

---

[131]  See, Order, *Carvana, LLC d/b/a Carvana v. N.C. Div. of Motor Vehicles*, No. 21 CVS 8116 (N.C. Super. Ct. Wake Cnty. June 11, 2021) and Settlement Agreement, *Carvana, LLC d/b/a Carvana v. N.C. Div. of Motor Vehicles*, No. 21 CVS 8116 (N.C. Super. Ct. Wake Cnty. July 21, 2021).

9, 2021, one day before the alleged corrective disclosure alleged by Plaintiffs.[132] In an efficient market, news is incorporated into the stock price when it is first disclosed, so the appropriate measure of the stock price reaction to news of the North Carolina suspension is to look at the stock price reaction immediately after that news was announced. Yet, on August 10, 2021, the day after the suspension was reported, there was no statistically significant price decline either. In fact, Carvana's stock increased and reached an all-time high on August 10, 2021.[133]

o **The *WSJ* Article** that Plaintiffs claim as a corrective disclosure discussed the same T&R issues in North Carolina that were allegedly corrected by the earlier August 10, 2021 alleged corrective disclosure, as well as T&R issues in other states that had previously been reported on. For example, the regulatory actions discussed in the *WSJ* article had been previously disclosed. The Complaint claims that the *WSJ* article "first reported" that "Carvana had already settled a complaint with the Florida DMV for failing to provide title paperwork for a number of customers for up to eight months."[134] However, about a month earlier, a *WFLA* story reported that Florida state regulators had reached a settlement agreement with Carvana for $6,000 over title delays dating back to February 2020.[135] The Complaint also suggests the *WSJ* Article "first reported" that "Texas had fined Carvana thousands of dollars for violations related to title and

---

[132] "NCDMV revokes Carvana's dealer's license in Wake County until 2022," *CBS17*, August 9, 2021, https://www.cbs17.com/news/local-news/wake-county-news/ncdmv-revokes-carvanas-dealers-license-in-wake-county-until-2022/.

[133] Data from Bloomberg, L.P.

[134] Complaint, ¶ 148.

[135] "State regulators settle with Carvana for $6K over title delays from 2020," *WFLA*, September 22, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/state-regulators-settle-with-carvana-for-6k-over-title-delays-from-2020/.

registration."[136] But those fines were publicly reported on the Texas DMV website.[137] Notably, other than the North Carolina suspension, every other regulatory action discussed in the *WSJ* Article, such as the Florida and Texas actions, involved only minor fines or probations. As the *WSJ* Article itself makes clear, the customer complaints underlying these regulatory actions were public, recorded on public websites.[138]

o **The *Barron's* Article** listed regulatory actions in specific states that had previously been reported by other news outlets, like the North Carolina suspension and Michigan probation that had been reported on in the media since August and October 2021, respectively.[139]  The *Barron's* Article itself acknowledged that "[d]isgruntled Carvana customers have long shared their gripes about registration delays and other issues−including late deliveries, undisclosed vehicle damage, and missing accessories−on online message groups and to the media."[140]  The investment advisor for Lead Plaintiff United Association National Pension Fund ("UANPF") testified in this matter that the only new information he learned from the *Barron's* article was about a consumer class action lawsuit filed against Carvana in Pennsylvania, which did not affect

---

[136]  Complaint, ¶ 148.

[137]  Texas Department of Motor Vehicles, "Independent (GDN) Motor Vehicle Dealers List," https://texasdmv.my.salesforce-sites.com/dealers/motorvehicledealerliststaging.

[138]  "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," *The Wall Street Journal*, October 22, 2021, https://www.wsj.com/business/autos/carvana-faces-government-scrutiny-and-fines-following-consumer-complaints-11634902676. ("This year through September, the Better Business Bureau has collected 899 complaints from Carvana shoppers reporting problems with the experience.").

[139]  See, for example, "NCDMV revokes Carvana's dealer's license in Wake County until 2022," *CBS17*, August 9, 2021 and "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," *The Wall Street Journal* , October 22, 2021.

[140]  "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars," *Barron's*, June 24, 2022, https://www.barrons.com/articles/carvana-used-cars-registration-problems-51656111441.

72

his valuation of Carvana's business.[141]  That class action was filed more than six months prior to the *Barron's* article and previously discussed in news articles.[142]

**2.    Analysis of analyst reactions to the alleged corrective disclosures strongly demonstrates no price impact – the disclosures were of such little importance that the vast majority of the analysts chose not to update their analyses or issue reports following the disclosures**

119.    A review of all the analyst reports on Carvana issued after the alleged corrective disclosures was performed to examine if there is any evidence that the allegedly corrective information was important to Carvana's stock price. In addition, this review of analyst reports was used to see whether there *could have been* a statistically significant negative reaction to the allegedly corrective information that was dampened by positive confounding news.

120.    This review of analyst reports further supports the finding that there is no price impact from the T&R alleged misstatements. In particular, the vast majority of analysts did not even issue reports following the 4 T&R Alleged Corrective Disclosures, which is strong direct evidence that analysts did not view the T&R alleged misstatements or their alleged correction as economically material or value relevant to Carvana's stock price. Specifically:

- o  **North Carolina Article (8/10/21):** 24 out of 25 analysts covering Carvana at the time did not issue a report. The one analyst that issued a report said they thought the effect of the North Carolina suspension was "de minimis."[143]

- o  *WSJ* **Article (10/22/21):** none of the 23 analysts covering Carvana issued a report.

---

[141] Deposition of Christopher Graff, February 18, 2026, 205:17-206:13. ("Q. And the lawsuit was sort of the new thing that you had taken from the Barron's article; right? A. Yes. Q. You were aware of the other issues discussed in various states in the Barron's article? That's […] correct. […] Q. Do you recall if you asked Mike Levin about the Pennsylvania lawsuit? A. I do not. […] Q. Did you ever learn that the Pennsylvania lawsuit was a material issue that affected your valuation of Carvana? A. No.").

[142] "Carvana faces 2 class-action lawsuits over registration delays amid deadline to fix title problems in Florida," *WFLA*, December 24, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/carvana-faces-2-class-action-lawsuits-over-registration-delays-amid-deadline-to-fix-title-problems-in-florida/.

[143]  William Blair analyst report, dated August 11, 2021.

73

- *Barron's* **Article (6/24/22):** none of the 25 analysts covering Carvana issued a report.

- **Michigan Release (10/7/22):** 26 of 27 analysts covering Carvana did not issue a report. The one analyst that issued a report did not mention the alleged corrective disclosure or the T&R issues.[144]

### 3. Analysis of analyst reactions to the alleged corrective disclosures strongly demonstrates no price impact – the only analyst that issued a report after any of the alleged corrective disclosures and mentioned the T&R issues explicitly indicated that the T&R issues were "de minimis"

121. There was only one analyst, William Blair, that issued a report after any of the T&R Alleged Corrective Disclosures and mentioned the T&R issues. The William Blair report was issued on August 11, 2021, the day after it was reported by *ABC11* that Carvana's dealer license in Raleigh, North Carolina had been suspended. The focus of that William Blair report was not the T&R issues, but the announcement on August 11 of Carvana's partnership with Root, an insurance company, to develop an integrated auto insurance solution for Carvana's customers. The William Blair report stated that they were not making any changes to their valuation of Carvana based on this newly announced partnership given the "uncertainty on the launch of the insurance offering as well as the economics to Carvana."[145]

122. The William Blair report contained a paragraph that discussed the T&R issues as follows:

> "Separately, Raleigh suspended Carvana's ability to sell cars for 180 days due to failure to deliver titles to the motor vehicle department and selling cars without state inspections. North Carolina accounted for roughly 4.8% of the pool balances on Carvana's most recent ABS offerings, and Raleigh represents about 4.6% of North Carolina's population, suggesting **the impact is likely to be de minimis** at likely under .3% of sales impacted. After speaking with management, we believe COVID-related backups on titles and registrations contributed to the issue, and we

---

[144] Northcoast Research analyst report, dated October 10, 2022.

[145] William Blair analyst report, dated August 11, 2021, p.1.

74

are optimistic that this will be an isolated incident." [William Blair analyst report, dated August 11, 2021, emphasis added]

123.    The commentary in the William Blair report is evidence contrary to Plaintiffs' allegation of price impact from the T&R alleged misstatements. First, the William Blair analysts did not mention the alleged misstatements or in any way connect the alleged corrective disclosure to any prior alleged misstatement. Instead, as the quote above shows, the analysts noted that, based on their own independent analysis, they expected the impact of Carvana's T&R issues to be "de minimis." In other words, consistent with a lack of a negative price reaction on this date, the William Blair report noted that they expected the impact of the T&R issues to be of de minimis value and did not change their estimate of Carvana's stock as a result.

124.    Thus, following all the alleged corrective disclosures, there is only one analyst that even mentions the alleged corrective disclosure and that analyst explicitly says that the effect is de minimis, or not important to, the value of Carvana's stock.

### 4.    Analysis of analyst reactions to the alleged corrective disclosures strongly demonstrates no price impact – not one analyst lowered its price target because of the T&R alleged corrective disclosures

125.    Further evidence that the T&R issues did not impact Carvana's stock price is that none of the analysts lowered their price target for Carvana because of the T&R alleged corrective disclosures. A price target represents what an analyst believes the stock of a company is worth based on his or her professional judgment, and thus, whether a piece of information affects an analyst's price target is indicative of whether the analyst viewed such information as important to the company's stock price.

126.    A review of analyst reports issued immediately following each of the 4 alleged corrective disclosures shows none of the analysts covering Carvana lowered their price targets at

75

all.[146] Moreover, a review of analyst reports issued later shows that when analysts did lower their price targets, they lowered them for reasons other than the alleged corrective disclosures.

**5.     Analysis of analyst reactions to the alleged corrective disclosures strongly demonstrates no price impact – none of the analysts mentioned the T&R issues as a risk factor to Carvana's business even after the alleged corrective disclosures**

127.    In addition, none of the analysts even mentioned the T&R issues as a risk factor to Carvana's business, even after the alleged corrective disclosures were made. This is further evidence that the T&R alleged misstatements or their alleged correction were not viewed by the market as information that affected Carvana's stock price. During the alleged Class Period, analysts discussed in detail potential risks that might affect Carvana's business. However, none of the analysts listed the T&R issues as a risk, even after the alleged corrective disclosures were made.

128.    For example, below are the risk factors to Carvana's business according to a Citi analyst in a report issued on August 17, 2021, a week after the August 10, 2021 alleged corrective disclosure. As shown below, none of these risks relate to T&R issues and instead include:[147]

> "1) CVNA's ability to leverage its logistics infrastructure; 2) producing market share gains in new MSAs consistent with previous cohorts; 3) volatility driven by high short interest (investor skepticism); 4) volatility in car prices (driven by factors like macro-economic conditions or the supply of new or used cars) could impact CVNA's gross margin; and 5) CVNA is a controlled company, and it has several important agreements with control affiliates that could result in value leakage."

129.    As another example, below are the risk factors to Carvana's business according to Oppenheimer analysts in a report issued on August 16, 2022, when many of the T&R alleged

---

[146] Based on a review of analyst reports issued in the 5 days following each of the alleged corrective disclosures.

[147] Citi analyst report, dated August 17, 2021.

76

corrective disclosures had already occurred. As shown below, none of these risks relate to T&R issues:[148]

> "Risks to our price target include an inability of management to execute successfully on a now unprofitable and experimental business model, macro challenges including potentially waning demand for new and used vehicles, higher gasoline prices, and low consumer confidence, and stepped-up competition in the sector, either from online or traditional dealers."

### C. Carvana's T&R issues were publicly known during the alleged Class Period and before any of the alleged corrective disclosures, and thus, were not concealed by the alleged misstatements

130.    Plaintiffs claim that the alleged misstatements concealed Carvana's T&R issues and that those issues were disclosed through the four T&R Alleged Corrective Disclosures.[149] Plaintiffs claim that Carvana's T&R issues consisted of 1) selling cars before holding titles to the vehicles; 2) failing to register cars within the legally required timeframe; and 3) issuing out-of-state temporary tags and/or license plates in violation of numerous state laws.[150] However, Plaintiffs' claim is nonsensical because, as discussed in detail below, all of these different T&R issues were publicly known before and during the alleged Class Period and before any of the alleged corrective disclosures, and thus, were not concealed by the alleged misstatements.

#### 1. Carvana's T&R issues were experienced directly by its customers, and thus throughout the alleged Class Period information on those issues would have been publicly available

131.    The alleged T&R issues that Plaintiffs are complaining about were directly experienced by Carvana's customers, and, as discussed in more detail below, many customers publicly complained about those T&R issues as they happened on various public platforms, such as social media and news reports. Thus, investors had information on these T&R issues from

---

[148] Oppenheimer analyst report, dated August 16, 2022.

[149] Complaint, ¶¶ 311, 313, 320-322.

[150] Complaint, ¶¶ 175, 177, 179, 183, 185, 187.

publicly available sources, and it makes no sense to suggest that investors would have been misled by the alleged misstatements. This is particularly true given that in December 2021, class action complaints were filed on behalf of customers against Carvana in Pennsylvania and Arizona alleging that Carvana delayed title transfers in violation of state laws. Tampa Bay, Florida-based news station *WFLA* reported shortly after the lawsuits were filed that "Carvana faces 2 class-action lawsuits over registration delays amid deadline to fix title problems in Florida."[151] Moreover, all of the Texas regulatory actions were publicly available on the Texas DMV website.[152] Tellingly, as early as 2019, analysts from Bank of America already noticed that there was an increasing number of T&R-related complaints filed against Carvana based on their own research, and the Bank of America analysts asked management about those issues during Carvana's 3Q19 earnings call:

> "Yes. Hi, just a couple of quick questions. One, as I've looked at and I know these are biased because they only tend to report when there's a complaint, **but if I find complaints, it's one of the things that I really saw those stark new change was a lot of complaints on title transfer,** I know that happened recently. Is that related to the fact that you're suddenly buying so many new cars from consumers and making it more challenging in some cases to do it. And I don't believe this is happening at a significant rate. It's just those are the complaints that I'm hearing that you didn't see before?" [Carvana Co. 3Q19 Earnings Call, November 7, 2019, emphasis added]

132. The fact that the Bank of America analyst was independently finding those T&R complaints shows that these issues were public and observable to the investors all the time. And even if other analysts were not aware of the issue before, they certainly would have known about it upon hearing this question. Further, as the analyst explained, investors knew that complaints

---

[151] "Carvana faces 2 class-action lawsuits over registration delays amid deadline to fix title problems in Florida," *WFLA*, December 24, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/carvana-faces-2-class-action-lawsuits-over-registration-delays-amid-deadline-to-fix-title-problems-in-florida/.

[152] Texas Department of Motor Vehicles, "Independent (GDN) Motor Vehicle Dealers List," https://texasdmv.my.salesforce-sites.com/dealers/motorvehicledealerliststaging.

could be rising just because the company's sales were growing. Thus, during the alleged Class Period as Carvana's sales grew, it would not be surprising to investors that Carvana received more T&R-related complaints (and not to mention the impact of Covid on T&R processing).

### 2. Before any of the T&R alleged misstatements were made, consumer complaints about Carvana's T&R issues were already widespread on social media and were reported by the news media

133. Clear evidence that Carvana's T&R issues were public information is that before any of the T&R alleged misstatements were made, consumer complaints about Carvana's T&R issues were already widespread on social media and were reported by the news media. For example, as shown below, there were numerous complaints on Twitter in 2020, including complaints dated before the beginning of the alleged Class Period.[153]



anders
@AndersReynolds
Follow

Yo, @carvana! You've had all my documentation for weeks - but still no plates! What gives? I'm paying for a car I can't drive (expired temporary tags), at a time where public transportation is an increasingly risky way to catch a piece of a major global pandemic. Little help? 🦠 🚗

10:30 AM · Mar 12, 2020 from Washington, DC

Eric Dorre
@ericdorre
Follow

@Carvana . You sold me a car in Jan. Temp registration expired a week ago & you have yet to transfer title. Now my car is not registered/ legal to drive. Why do you promise what you can't deliver? Why can't you offer me rental? Anything? Hours on with your agents & no answers.

7:13 PM · Mar 31, 2020

---

[153] Twitter post by @AndersReynolds at 10:30 AM on March 12, 2020, accessed at https://x.com/AndersReynolds/status/1238110017548673024, Twitter post by @ericdprre at 7:13 PM on March 31, 2020, accessed at https://x.com/ericdorre/status/1245127037787856897, and Twitter post by @Leavitt86 at 3:29 PM on August 27, 2020, accessed at https://x.com/LeavittL86/status/1299066615733137413, all last accessed May 14, 2026.



134.    There were numerous similar complaints throughout 2020 and 2021. Below are a few examples from February 2021, right before the first T&R alleged misstatement was made (which was on February 25, 2021).[154]





[154] Twitter post by @HLCullen at 12:21AM on February 10, 2021, accessed at https://x.com/HLCullen/status/1359371769002491904, Twitter post by @pcnerd37 at 1:22 PM on February 11, 2021, accessed at https://x.com/pcnerd37/status/1359930841237889028, and Twitter post by @geekpondering at 9:18 PM on February 11, 2021, accessed at https://x.com/geekpondering/status/1360050550474211334, all last accessed on May 15, 2026.

Joshua David 💙 💛
@geekpondering

Hi @TravisCountyTax @FTC, I talked to @Carvana about my expired temporary plates from a car I purchased in OCTOBER, and they gave me another temporary plate for the state of @ArizonaDOT. Is this legal? They seem to have a problem with fulfilling plates that I've already paid for.

9:18 PM · Feb 11, 2021

135.    Similarly, there were numerous complaints on Reddit before the T&R alleged misstatement. For example, in a post that is dated 6 years ago (which means it was posted in 2020 or earlier), a Reddit user complained about the "Worst registration experience ever," and numerous other users made similar complaints in the comment section.[155]

---

[155]  beanTHEbarista, "Worst registration experience ever," Reddit post, https://www.reddit.com/r/carvana/comments/iqbaxt/worst_registration_experience_ever/, accessed May 11, 2026.



136.    These customer complaints were reported by traditional news media as well. For example, *WMAR*, a Baltimore news outlet, reported in early 2021 that a Carvana customer in Maryland waited six months to get his license plate and received temporary tags from four different states:

"When he purchased the truck in August, **it came with temporary tags from Georgia**. Coulson figured he'd get his Maryland plates soon, instead, **he received temporary tags from Indiana, Ohio, and Tennessee**. '**The mistaken temporary tag that's still available on my computer is for somebody else's vehicle in New York City and, incidentally, it's a Tennessee tag. It's not a New York tag, it's a Tennessee tag**,' Coulson said." ["Carvana customer waits six months for Maryland license plates," *WMAR*, February 16, 2021, emphasis added]

    **3.**    **Analysts commented that Carvana's T&R issues were "neither new nor unknown," had been going on for years, and were largely "growing pains"**

137.    The analysts covering Carvana commented that Carvana's T&R issues were "neither new nor unknown," had been going on for years, and were largely "growing pains." For example, following news of a potential suspension in Florida due to T&R issues (which did not eventually happen as Carvana was able to resolve the issues),[156] RBC analysts commented that "CVNA's title issues are neither new nor unknown to investors. […] mainstream news is reporting on an issue that's been going on for years."[157] Consistent with RBC analysts' commentary, when this news of the potential suspension in Florida was first announced, on December 17, 2021, Carvana's stock price did not drop.[158]

138.    According to analysts, these T&R issues were largely "growing pains" for Carvana due to its rapid growth and the fact that Carvana was "the pioneer of online car buying:"

"We are cognizant of several well-publicized articles regarding customer complaints for Carvana's purchasing process, delays in securing titles/registrations, and other paperwork associated with vehicle purchases. […] That said, **we view these issues largely as the "growing pains" of any rapidly accelerating consumer concept, especially during a 12-18 month period of escalating demand and significant operational hurdles in the current post-COVID environment** (annual retail unit volumes have more than doubled vs. 2019 levels), not to mention **being the pioneer of online car buying. We see**

---

[156] "Carvana sales can go on in Florida, Raleigh, N.C.," *Automotive News*, February 7, 2022, https://www.autonews.com/retail/carvana-clears-regulatory-hurdles-florida-nc/.

[157] RBC analyst report, dated December 20, 2021.

[158] Based on Carvana's stock price reaction on December 17, 2021 using either Dr. Cain's event study or the alternative event study.

83

**CVNA eventually working through these issues as the company moves beyond its hyper-growth phase and evolves into more of an established operator over time.**" [Wolfe Research analyst report, dated November 10, 2021, emphasis added]

139.    Not only did analysts explicitly say that these issues were known, expected, and

de minimis, but Plaintiffs' own investment advisor testified that ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████.[159]

**D.    According to analysts, Carvana's T&R issues were driven by slow processing times at the DMV as well as the impact of the Covid-19 pandemic, factors that were "outside of Carvana's control"**

140.    Contrary to Plaintiffs' theory that there is Carvana-specific fraud and/or a scheme

related to the T&R issues, analysts attributed the T&R issues to the slow processing times at the

DMV as well as the impact of the Covid-19 pandemic and noted how those issues were "outside

of Carvana's control." For example:

> "We think these operational constraints have also manifested in a number of areas. **From our understanding getting titles and registration with DMV's has been a significant constraint and to some degree it may be outside of Carvana's control given labor constraints at the DMV**. […] As the labor market continues to loosen and as Carvana re-invents many of its processes to become more efficient, we believe these constraints will be solved**. If the DMV were ever modernized and brought into the 21st century that would also be a significant benefit to efficiency for Carvana.**" [BNP Paribas analyst report, dated October 29, 2021, emphasis added]

> "As we highlighted at the time of our J.P. Morgan Automotive Conference in mid-August, **CVNA's dealer license in Wake County, North Carolina was suspended in August due to pandemic induced title and registration delays** faced by a small subset of consumers." [J.P. Morgan analyst report, dated October 11, 2021, emphasis added]

---

[159] Deposition of Mark Urquhart of Baillie Gifford, investment advisor for Saskatchewan (SHEPP), April 24, 2026, 99:4-12.

141.    Carvana's peers experienced similar issues due to delays at the DMV and the pandemic. For example, Shift, one of Carvana's closest peers, discussed the negative impact from "state DMV titling and registration services" caused by the Covid-19 pandemic in its SEC filings.[160] Vroom, Carvana's other closest peer, reported that "Covid-19-related restrictions also continue to have a significant effect in areas such as the titling and registration of vehicles sold to customers, due to processing backlogs and limited service capacity of state division of motor vehicle offices across the United States."[161] CarGurus, an online marketplace for cars, similarly noted that Covid-related government orders had "clos[ed] or reduc[ed] the services provided by the agencies that process the registration of automotive titles."[162]

142.    Moreover, just like Carvana, Vroom faced regulatory actions regarding its T&R issues. For example, *CBS* reported in April 2022 that "Online car dealer Vroom faces dozens of state violations as customer complaints mount,"[163] and a later article from *Barron's* in July 2022 reported that Vroom had to "Pay Fine in Florida Over Customer Complaints" and that "Other States Are Watching Too."[164]

143.    AutoNation, another used car retailer, also faced T&R issues, including a lawsuit alleging that starting in 2019, AutoNation "failed to timely submit and, as applicable, resubmit to the DMV applications for transfer of registration of used vehicles and failed to deliver

---

[160]  Shift Technologies Form 10-K for the Period Ended December 31, 2020, at p. 45.

[161]  Vroom, Inc. Form 10-Q for the Period Ended September 30, 2020, at p. 34.

[162]  CarGurus, Inc. Form 10-Q for the Period Ended September 30, 2020, at p. 20.

[163]  "Online car dealer Vroom faces dozens of state violations as customer complaints mount," *CBS Texas*, April 19, 2022, https://www.cbsnews.com/texas/news/online-car-dealer-vroom-faces-dozens-of-state-violations-as-customer-complaints-mount/.

[164]  "Vroom to Pay Fine in Florida Over Customer Complaints. Other States Are Watching Too," *Barron's,* July 11, 2022, https://www.barrons.com/articles/vroom-florida-fine-vehicle-transfers-complaints-51657376697.

85

certificates of ownership for those vehicles in a timely manner as prescribed by law."[165]

AutoNation settled the lawsuit in February 2025 by agreeing to pay $650,000.[166]

144.    Similar to the complaints posted by Carvana's customers on social media, customers of Carvana's peers also complained about T&R issues throughout the alleged Class Period. Below are some examples of customer complaints against Vroom.[167]



145.    Below are some customer complaints against CarMax.[168]

[165]    The People of the State of California v. Allison Bavarian, Complaint, Case No: 25CV457431, January 24, 2025, ¶ 58.

[166]    "California AutoNation Dealerships Settle Consumer Protection Lawsuit for $650,000," *Los Angeles County District Attorney's Office,* February 26, 2025, https://da.lacounty.gov/media/news/california-autonation-dealerships-settle-consumer-protection-lawsuit-650000.

[167]    Twitter post by @JSimsOfficial at 10:51 AM on May 28, 2021, accessed at https://x.com/JSimsOfficial/status/1398290903522029570, Twitter post by @lifewithtkg at 5:05 PM on July 12, 2021, accessed at https://x.com/lifewithtkg/status/1414692513693196297, both last accessed on May 15, 2026.

[168]    Twitter post by @SteveSchirmer at 10:56 AM on April 5, 2021, accessed at https://x.com/SteveSchirmer/status/1379085491946000390, and Twitter post by @AnaCaro98192618 at 1:22 PM on February 13, 2022, accessed at https://x.com/AnaCaro98192618/status/1492927259786817538, both last accessed on May 15, 2026.





### E. The T&R-related fines were economically small relative to the size of the Company and the suspensions were of limited scope and time and had workarounds, which is consistent with no price impact

146. When the suspension in North Carolina was announced, William Blair analysts performed independent research on the potential impact of the suspension and concluded that the impact "is likely to be de minimis."[169] The same is true for the other regulatory actions and fines that Carvana received due to the T&R issues over the alleged Class Period. The T&R-related fines were economically small relative to the size of Carvana's business, and many of the regulatory restrictions against Carvana were of limited scope and time and had workarounds. This is direct evidence consistent with no price impact.

---

[169] William Blair analyst report, dated August 11, 2021.

87

147.    Although Plaintiffs emphasize fines and suspensions tied to Carvana's T&R issues, the majority of states where Carvana operated dealerships did not initiate any T&R regulatory actions against Carvana during the alleged Class Period.

148.    When fines were imposed on Carvana for T&R issues, they were economically immaterial to Carvana and thus would not be expected to affect Carvana's stock price. During the alleged Class Period, Carvana received T&R-related fines in five states, ranging from $700 to $17,000, with the combined total representing less than 0.001% of Carvana's $12.8 billion in 2021 revenue.[170]

149.    Carvana received T&R suspensions in six states. Those suspensions had limited economic impact on Carvana for several reasons: (1) they were short-lived; (2) they were confined to small geographic areas within the states; and (3) they did not prevent Carvana from selling vehicles in the state through its online channel, with the exception of Illinois – which imposed a statewide ban for less than a month.

150.    The table below shows the 23 states where Carvana operated licensed dealerships, along with T&R regulatory actions (or the lack thereof) on Carvana's operations in those states.

---

[170] Details on fines shown in table below. Carvana Co. Form 10-K for the Period Ended December 31, 2021, at p. 60.

88

**T&R Regulatory Actions on Carvana by State During the Alleged Class Period**

| State | Suspension? | Fine? | Comment |
|-------|-------------|-------|---------|
| Alabama | No | No | |
| Arizona | No | No | |
| Arkansas | No | No | |
| California | No | No | |
| Florida | No | Yes | $6K fine[1] |
| Georgia | No | No | |
| Illinois | Yes | No | Lasted less than a month in total[2] |
| Indiana | No | No | |
| Kentucky | No | No | |
| Maryland | No | Yes | $17K fine[3] |
| Massachusetts | No | No | |
| Michigan | Yes | Yes | $8K fine; certain operations interrupted for 5-6 days, online sales continued throughout MI following that period[4] |
| Missouri | No | No | |
| New Jersey | No | No | |
| New York | No | No | |
| North Carolina | Yes | Yes | $700 fine; only Raleigh, NC vending machine suspended, online sales unaffected[5] |
| Ohio | Yes | No | Temporary plates suspension ended "after a number of meetings"[6] |
| Oklahoma | No | No | |
| Pennsylvania | Yes | No | Suspension limited to after-sales paperwork processing authority at two vending machines, sales operations unaffected[7] |
| Tennessee | No | No | |
| Texas | No | Yes | $11K fine[8] |
| Virginia | No | No | |
| Wisconsin | No | No | |

Notes and Sources:

Data from Factiva and Google. Licensed dealership locations found in Carvana Co. Form 10-K for the Period Ended December 31, 2021, at p. 15.

[1] "State regulators settle with Carvana for $6K over title delays from 2020," *WFLA*, September 22, 2021.

[2] "Carvana can do business in Illinois again after judge orders temporary reprieve," *FOX 32*, August 1, 2022.

[3] "Maryland joins other states in fining Carvana for title delays," *WMAR 2*, October 11, 2022.

[4] "Department of State suspends Novi Dealership," *Michigan Department of State*, October 7, 2022 and Verified Complaint for Injunctive Relief, *Carvana, LLC v. Benson*, filed October 13, 2022.

[5] "NC suspends Carvana vehicle sales at Wake County location for 6 months," *ABC11 WTVD*, August 10, 2021.

[6] "No titles, no registration: Car owners in Ohio file complaints against Carvana," *WSYX ABC 6*, November 22, 2022.

[7] "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars," *Barron's*, June 24, 2022.

[8] "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," *The Wall Street Journal*, October 22, 2021.

151.    As the table shows, Carvana's T&R-related fines were economically small relative to the size of Carvana's business, and many of the regulatory restrictions against Carvana were of limited scope and time and had workarounds. Thus, the alleged T&R issues were not expected to have price impact.

89

### F.   Summary of the price impact analysis of the T&R alleged misstatements

152.   In sum, a detailed review and analysis of Carvana's stock price movements and the analyst and market commentary shows that there is no price impact from the T&R alleged misstatements. A front-end analysis shows that the T&R alleged misstatements did not cause Carvana's stock price to increase when made. There was no direct evidence of price impact: there was no price increase that can be attributed to the T&R alleged misstatements, none of the analysts indicated that the topic of the alleged misstatements – T&R issues – was important to Carvana's valuation or business, and, in fact, none of the analyst reports issued following the T&R alleged misstatements even mentioned the alleged misstatements. A back-end analysis shows that the correction of the T&R alleged misstatements did not cause Carvana's stock price to drop and provides further evidence that there was no price impact. According to both Dr. Cain's event study and an alternative event study, there was no statistically significant price *decrease* after any of the T&R alleged corrective disclosures. An analysis of analyst reactions to the alleged corrective disclosures shows that the allegedly corrective information was not considered important to Carvana's stock price by any analyst. Moreover, I found that Carvana's T&R issues were not concealed by the alleged misstatements as they were publicly known before and during the alleged Class Period and before any of the alleged corrective disclosures, and the alleged corrective disclosures contained information that was not new to the market. Further, an analysis of the economic materiality of the T&R issues demonstrates that these issues would not be expected to impact Carvana's stock price because the fines and suspensions were economically minuscule relative to the size of Carvana.

90

## X.    PRICE IMPACT ANALYSIS OF THE RETAIL UNIT SALES ("RUS") ALLEGED MISSTATEMENTS

### A.    A front-end analysis shows that the RUS alleged misstatements did not cause Carvana's stock price to increase when they were made

153.    There are two alleged misstatements relating to Carvana's Retail Unit Sales ("RUS") that remain in the case. As part of the front-end analysis of those two RUS alleged misstatements, I first examined whether there were statistically significant price increases when those statements were made. The results are shown in the table below.

| | Event Date | Reaction Date | Misstatement Category | Excerpt of Alleged Misstatement | Cain Event Study[1] | | Alternative Event Study[2] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | % Price Reaction | Stat. Sig. Increase?[3] | % Price Reaction | Stat. Sig. Increase?[3] |
| 1. | 8/5/21 | 8/6/21 | Retail Sales | "[Retail] unit and revenue growth were ... primarily driven by strong demand for our offering this year." | 2.8% | No | 4.5% | No |
| 2. | 2/24/22 | 2/25/22 | Retail Sales | "Our exceptional growth in 2021 was driven by rapid growth within our market cohorts." | 17.7% | Yes | 10.1% | Yes |

**Carvana Plaintiff-Style Price Reactions Following the Retail Sales Alleged Misstatements**

Notes and Sources:
Data from Bloomberg L.P. and Cain Report turnover. Events from the Complaint and Cain Report.
[1] Event study controls for the daily stock price movements of the S&P 500 Index and the S&P 500 Consumer Discretionary Distribution & Retail Index.
[2] Event study controls for the daily stock price movements of Carvana's peers, consisting of AutoNation, CarGurus, CarMax, Shift Technologies, TrueCar, and Vroom.
[3] Significance is based on the price reaction's t-statistic, calculated as the percent price reaction divided by the standard error of the regression over the sample period. Significance is indicated at the 5% level.

154.    As the table shows, following the first RUS alleged misstatement, there was no statistically significant price reaction according to either Dr. Cain's event study or the alternative event study. Following the second RUS alleged misstatement, there was a statistically significant price increase. However, as discussed in more detail below, the statistically significant price increase was not due to the alleged misstatement. Moreover, none of the analysts repeated or referenced either of the two RUS alleged misstatements in their reports issued after these alleged misstatements.

91

### 1.    August 5, 2021, RUS alleged misstatement

155.    The first RUS alleged misstatement is from Carvana's Q2 2021 shareholder letter included in an 8-K filed on August 5, 2021, which stated:

> "Year-over-year retail unit and revenue growth were . . . primarily driven by strong demand for our offering this year."

156.    None of the analysts who issued reports after the alleged misstatement repeated or referenced the alleged misstatement. Because the alleged misstatement coincided with Carvana's Q2 2021 earnings release, most analysts issued reports after the announcement. In total, 25 analyst reports by 20 analysts were issued in the 2 days following the announcement, for a combined 253 pages of reports. These reports all focused on the Company's financial results, and in those 253 pages there was no mention of the alleged misstatement at all. Coupled with the fact that there was no statistically significant price increase to this alleged misstatement, this is strong evidence that the market did not view the information in the alleged misstatement as value relevant to Carvana's stock price.

### 2.    February 24, 2022, RUS alleged misstatement

157.    The second RUS alleged misstatement was made during Carvana's Q4 2021 conference call on February 24, 2022, in which the Company stated:

> "Our exceptional growth in 2021 was driven by rapid growth within our market cohorts."

158.    Carvana's market cohorts are the groups of markets that Carvana began operating in each year. Carvana routinely published data before and throughout the alleged Class Period on its market cohorts.[171] The evidence shows that this alleged misstatement referencing Carvana's

---

[171] For example, Carvana Co. Form 10-K for the Period Ended December 31, 2019, at pp. 51-53, "Q4 2019 Letter to Shareholders," *Carvana Co.*, February 26, 2020, at pp. 7-10, Carvana Co. Form 10-K for the Period Ended December 31, 2020, at pp. 51-53, "Q4 2020 Letter to Shareholders," *Carvana Co.*, February 25, 2021, at pp. 5-8, and "Q4 2021 Letter to Shareholders," *Carvana Co.*, February 24, 2022, at p. 8.

92

market cohorts did not provide any new value-relevant information about Carvana's business to the market. None of the analysts covering Carvana at this time referenced this alleged misstatement or indicated that they obtained any new understanding about Carvana's business from it. In particular, none of the 22 analyst reports issued following this alleged misstatement, with a combined 207 pages of information, mentioned the alleged misstatement, which is clear evidence that the market did not view the information in this alleged misstatement as important to Carvana's stock price.

159.    There was a statistically significant price increase following this alleged misstatement. However, the evidence indicates that this reaction was not caused by the alleged misstatement but by other news announced on the same day. (Note that this alleged misstatement was made on the same day as one of the T&R alleged misstatements discussed above.) In particular, as discussed in Section IX.A above, analysts explicitly said they viewed the ADESA acquisition announced on this day as positive news for Carvana.

160.    Moreover, the alleged misstatement is simply repeating a more detailed discussion of that same topic that is not being challenged in this case. Specifically, Carvana's Shareholder Letter, issued on the same day but before the alleged misstatement, contains a more detailed discussion of Carvana's cohort growth, which is not being challenged by Plaintiffs. The statement from Carvana's Shareholder Letter is below.[172]

> We continue to see rapid growth in our cohorts. In Q4 2021, our 2013-2020 cohorts grew retail units sold by 52%, and our oldest cohort of Atlanta grew by 51% to 3.53% market penetration, a new company record. We also continue to see broad based gains across cohorts. As of Q4 2021, 95% of our 311 markets are ramping faster than Atlanta at the same age, and record numbers of markets are crossing key market penetration thresholds.

---

[172] "Q4 2021 Letter to Shareholders," *Carvana Co.*, February 24, 2022, at p. 8.

93

161.     This statement in Carvana's Shareholder Letter provides a more detailed discussion of Carvana's cohort growth and makes the same claim that Carvana is seeing "rapid growth in our cohorts" as in the alleged misstatement. However, Plaintiffs are not challenging this statement, which was issued on the same day but before the alleged misstatement. In an efficient market, only new news should affect a company's stock price, and confirmatory or repeated news should not impact the stock price.

**B.     There is no evidence that the RUS alleged misstatements impacted Carvana's stock price at the back end**

162.     Plaintiffs do not specifically allege which alleged corrective disclosures corrected the two RUS alleged misstatements. The four T&R alleged corrective disclosures and the four dismissed alleged corrective disclosures did not reveal anything new about Carvana's retail unit sales discussed in the two RUS alleged misstatements. The first RUS alleged misstatement was a comment regarding Carvana's RUS growth in Q2 2021, while the second was a comment regarding Carvana's RUS growth in full year 2021.[173] None of the alleged corrective disclosures correspond to either of those issues. The T&R alleged corrective disclosures were about Carvana's T&R issues, while the four dismissed alleged corrective disclosures were about Carvana's financial performance and operations in 2022.[174] A comprehensive review of all the analyst reports following the four T&R alleged corrective disclosures, as well as the four dismissed alleged corrective disclosures, revealed that none of the analysts indicated that they learned anything new regarding Carvana's RUS in either Q2 2021 or full year 2021. Moreover, none of the analysts indicated that they had found out that RUS were previously overstated or were the result of any of the alleged "unsustainable practices." This is important because Dr.

---

[173] Complaint, ¶¶ 212, 214.

[174] Order, pp. 56–57, 53–55.

94

Cain acknowledged in his deposition that ████████████████████████████████████

███████████████████████████████████████████.[175]

163.    Moreover, to the extent that the T&R alleged corrective disclosures (*i.e.,* the North Carolina article, the *WSJ* article, the *Barron's* article, the Michigan release) discussed in the sections above can be considered corrective of the RUS alleged misstatements, the fact that there was no statistically significant price reaction to any of those alleged corrective disclosures is direct evidence of no price impact from the RUS alleged misstatements.[176] To the extent that the 4 alleged corrective disclosures that are dismissed by the Court can be considered corrective of the RUS alleged misstatements, as discussed in more detail in Section XII below, none of those 4 dismissed alleged corrective disclosures caused Carvana's stock price to decline (and while there was a statistically significant price decline after one of the four dismissed alleged corrective disclosures, the stock price decline was not due to information corrective of the RUS alleged misstatements).[177]

164.    Thus, there is no evidence that the RUS alleged misstatements impacted Carvana's stock price at the back end.

---

[175] Deposition of Matthew Cain, Ph.D., May 8, 2026, 33:21-34:12 ("██████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████.")

[176] See, ¶ 117.

[177] See, ¶ 215.

### C. Analysts were tracking Carvana's RUS data during the alleged Class Period, and they used their own analysis to determine what was driving the increase in RUS independent of the alleged misstatements

165.    Contrary to Plaintiffs' allegation that the market was misled about Carvana's RUS, a review of analyst reports covering Carvana shows that during the alleged Class Period analysts were using proprietary and third-party data to track Carvana's retail unit sales. Analysts incorporated this data into their analysis to arrive at their own conclusions about what was driving the increase in retail unit sales independent of the alleged misstatements.

166.    For example, Baird analysts used data from a third-party provider to analyze Carvana's retail unit sales and to gauge changes in consumer demand:

> "Raising estimates following rapid improvement in consumer demand. Based on third-party tracking data (e.g., Dataweave) as well as our inventory tracker and pricing checks, we expect Q2 unit sales of roughly 54k units."[178]

167.    Similarly, BNP Paribas analysts scraped Carvana's website to obtain data and insights on Carvana's retail unit sales:

> "We see upside from CVNA shares if Retail unit growth continues to accelerate with scrape data suggesting that bottlenecks are improving and CVNA is able to meet some of the excess demand on its platform."[179]

168.    These independent analyses are evidence against Plaintiffs' allegation that the RUS alleged misstatements impacted Carvana's stock price.

## XI.    PRICE IMPACT ANALYSIS OF THE ALLEGED SCHEME

169.    Plaintiffs allege that Defendants "engaged in a fraudulent pump-and-dump scheme" that boosted Carvana's retail sales while concealing that Carvana's business was "unprofitable" and "unsustainable."[180] As discussed below, Plaintiffs' overall claim makes no

---

[178]  Baird analyst report, dated July 8, 2020.

[179]   BNP Paribas analyst report, dated October 5, 2020.

[180]  Complaint, ¶ 125.

economic sense as Carvana's stock price increase and decrease during the alleged Class Period were primarily due to well-documented, macroeconomic and industry-wide factors that also impacted the stock prices of its peers and other e-commerce companies. Plaintiffs' claim that the alleged scheme concealed Carvana's unprofitability is nonsensical on its face, as it was widely known that Carvana was unprofitable. Moreover, while Plaintiffs claim that the alleged scheme concealed that Carvana's business was "unsustainable," Carvana turned out to be more "sustainable" than its closest peers, Vroom, Shift, and CarLotz, all of which went bankrupt, while Carvana's stock price reached new highs after the end of the alleged Class Period.

### A. Overall, the alleged scheme did not impact Carvana's stock price and was never corrected

#### 1. There was no statistically significant price increase at the start of the alleged scheme

170.    Plaintiffs claim that the alleged scheme had the effect of "pump[ing]" Carvana's stock price.[181] However, when the alleged scheme supposedly started, the first day of the alleged Class Period, Carvana's stock price did not increase. Specifically, according to both Dr. Cain's event study model and the alternative event study model, there is no statistically significant stock price increase on May 6, 2020, the first day of the alleged Class Period. Moreover, as discussed above, none of the remaining alleged misstatements in this case caused Carvana's stock price to increase. It is my understanding that Plaintiffs invoke the fraud-on-the-market presumption for the alleged scheme based on the fact that the alleged scheme contained alleged misstatements.[182]

---

[181]  Complaint, ¶ 172.

[182]  Plaintiffs' Motion for Class Certification, p. 10. ("The fraud-on-the-market theory premises that, 'in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.'") (cleaned up).

Thus, the fact that none of the alleged misstatements caused Carvana's stock price to increase is direct evidence that the alleged "pump-and-dump" scheme did not have price impact.

> **2. Carvana's stock price <u>increase</u> during the <u>first half</u> of the alleged Class Period, rather than being caused by the alleged scheme, was primarily due to well-documented, macroeconomic and industry-wide factors that also positively impacted the stock prices of its peers and other e-commerce companies**

171. Contrary to Plaintiffs' allegations that Carvana's stock price increase was due to the alleged "pumping," Carvana's stock price increase during the first half of the alleged Class Period was primarily due to well-documented, industry-wide factors that also positively impacted the stock prices of its peers and other e-commerce companies. As discussed in more detail in Section VI.A above, the alleged Class Period started when Carvana's stock price just rebounded from the market crash caused by Covid and when macroeconomic factors and Covid-related behavioral changes started to benefit Carvana as well as other used-car retailers and e-commerce companies. The macroeconomic factors and Covid-related behavioral changes that benefited Carvana and other used-car retailers and e-commerce companies included a boom in e-commerce due to people shifting their purchases online, people shifting from mass transit to driving private cars, record low interest rates, stimulus packages by the U.S. government, various supply chain disruptions faced by car producers that limited the supply of new cars, etc. The fact that Carvana's stock price rise was primarily due to these macroeconomic factors was well-recognized by analysts.

> **3. Carvana's stock price decrease during the <u>second half</u> of the alleged Class Period, rather than being due to the revelation of the alleged scheme, was primarily due to well-documented, macroeconomic and industry-wide factors that also negatively impacted the stock prices of its peers and other e-commerce companies**

172. Likewise, contrary to Plaintiffs' claim that Carvana's stock price decrease was due to the "unraveling" of the alleged scheme, Carvana's stock price decrease during the second

98

half of the alleged Class Period was primarily due to well-documented, industry-wide factors that also negatively impacted the stock prices of its peers and other e-commerce companies. As discussed in more detail in Section VI.B above, Carvana's stock price began to decrease when there was a substantial shift in the macroeconomic environment, which impacted not only Carvana's business but that of its peers as well. During the second half of the alleged Class Period, demand for used cars declined as interest rates rose, inflation soared, government stimulus checks were phased out, and supply chain disruptions eased, increasing the supply of new cars. On the cost side, rising labor costs compressed Carvana's profit margins. The fact that the stock prices of Carvana's peers declined along with Carvana's during the second half of the alleged Class Period is clear evidence that Carvana's stock price decrease was caused by these common macroeconomic and industry-wide factors.

4. **Plaintiffs' overall claim that the alleged scheme concealed the fact that Carvana was not profitable is nonsensical on its face – it was widely known that Carvana was unprofitable during the alleged Class Period**

173. Plaintiffs claim the alleged scheme concealed the unprofitability of Carvana's business.[183] However, that claim makes no economic sense because it was widely known that during the alleged Class Period Carvana was focusing on growth, not profitability, and that Carvana's business was unprofitable with negative net income, EBITDA and profit margins in 2020, 2021 and 2022.

174. Specifically, as reported in Carvana's SEC filings, Carvana had negative net income, negative net margin, and negative EBITDA in FY20, FY21, and FY22, the three years

---

[183] Complaint, ¶¶ 7, 125, 308-309.

that cover the entirety of the alleged Class Period.[184] The table below shows Carvana's net income, net margin, and EBITDA in those three years.

| Carvana's Annual Financial Results | | | |
|---|---|---|---|
| | Net Income | Net Margin[1] | EBITDA[2] |
| FY20 | -$0.5B | -8% | -$0.3B |
| FY21 | -$0.3B | -2% | -$0.0B |
| FY22 | -$2.9B | -21% | -$1.0B |

**Notes and Sources:**
Data from Carvana Co. Form 10-Ks and earnings press releases.
[1] Net income ÷ total net sales and operating revenues.
[2] Consistent with Carvana's earnings press releases and Form 10-Ks, Adjusted EBITDA is shown for 2022.

175.    The fact that Carvana was unprofitable was widely recognized by the investment community. For example, one article on Motley Fool that Plaintiffs themselves cited in their Complaint, acknowledges that "Carvana isn't profitable and has never been so for any full year of its existence."[185]

176.    Many analysts covering Carvana also discussed the unprofitability of Carvana's business. For example:

> "**Will Carvana Ever Make Money? We see Carvana turning profitable in 3-4 years**, with long term EBIT margin potential below CarMax at 5%, and above average franchised new car dealers at 2-3%. We believe Carvana is doing the right things to generate a profitable and sustainable business model – but as multichannel investments ramp up and the brick and mortar assets grow we'd expect CVNA to eventually need 50+ IRCs or 5x current

---

[184]  Carvana Co. Form 10-K for the Period Ended December 31, 2020, at pp. 49, 64, 77, Carvana Co. Form 10-K for the Period Ended December 31, 2021, at pp. 60, 64, 76, Carvana Co. Form 10-K for the Period Ended December 31, 2022, at pp. 63, 67, 80.

[185]  "3 Signs Carvana Hit the Wall," *Motley Fool*, February 2, 2023, Complaint, ¶ 169.

levels. **The market's patience can be fickle for companies with negative EBITDA, and while we believe CVNA will get there eventually, it's still likely three or more years away**." [Evercore analyst reports, dated May 5, 2020, May 7, 2020, July 2, 2020, and August 3, 2020, emphasis added]

"While we believe the company is on the doorstep of turning EBITDA profitable — and likely sustainably so — **we're not overly focused on some Herculean margin ramp as we recognize there're going to be significant further investments made to expand capacity to support growth**… We expect the company to likely begin flirting with the GPU range within the next 1-2 years, however, **we think target EBITDA is likely further off simply because there's so much capacity yet to add given the growth**." [RBC analyst report, dated May 26, 2021, emphasis added]

"We believe that Carvana, an e-commerce platform for buying and selling used cars, has competitive advantages over traditional dealerships in vehicle selection, price, quality, and user experience. **However, the company is not yet profitable.**" [Argus Research analyst report, dated August 18, 2022, emphasis added]

177.    In addition, analysts commented that Carvana had negative operating cash flows, which is another indicator that Carvana's business was unprofitable. As explained by analysts at Needham:

"CVNA doesn't make money in its core business, selling used cars to consumers. Their cash flow statement provides a window into this (negative Cash Flow from Operations, offset by positive Cash Flow from Financing) and as such they will need to keep raising capital to fund operating losses." [Needham & Company analyst report, dated September 7, 2021]

178.    In fact, Carvana had negative cash flow from operations in FY20, FY21, and FY22, the three years that cover the entirety of the alleged Class Period.[186]

179.    Thus, given that it was widely known that Carvana was unprofitable, Plaintiffs' overall claim that the alleged scheme concealed the unprofitability of Carvana is nonsensical on its face.

---

[186]  Carvana Co. Form 10-K for the Period Ended December 31, 2020, at p. 66, Carvana Co. Form 10-K for the Period Ended December 31, 2021, at p. 66, Carvana Co. Form 10-K for the Period Ended December 31, 2022, at p. 70.

**5.    Plaintiffs' claim that the alleged scheme concealed that Carvana's business was "unsustainable" is belied by the fact that Carvana's business, unlike its peers' businesses, proved to be "sustainable" and its stock price rebounded to new highs after the alleged Class Period, while its peers went out of business**

180.    Plaintiffs' overall claim that the alleged scheme concealed that Carvana's business was "unsustainable" is belied by the fact that Carvana's business proved to be "sustainable" and its stock price rebounded to new highs after the alleged Class Period while its peers went out of business. Specifically, as the chart below shows, Carvana's closest peers, Vroom, Shift, and CarLotz (which merged with Shift in December 2022), went bankrupt shortly after the alleged Class Period, while Carvana's stock price reached new highs.



**B.    A detailed analysis of each part of the alleged scheme demonstrates no price impact**

181.    According to Plaintiffs, Defendants employed the following five "artifices" to "pump" Carvana's stock price: (1) entering into a "sham pass-through sales arrangement" with

DriveTime, (2) lowering car purchasing and verification standards, (3) flouting state title and registration laws, (4) implementing a rapid and unsustainable nationwide expansion, and (5) concealing the alleged scheme and convince investors that Carvana's retail growth was profitable and sustainable.[187] It is my understanding that the alleged misstatements and omissions associated with the alleged scheme, with the exception of those relating to title and registration issues, were already dismissed by the Court, including because the allegedly unsustainable business practices were disclosed to the market before the alleged Class Period and/or before the alleged corrective disclosures. Regardless, to be thorough, I analyzed each of the alleged five "artifices" of the alleged scheme in detail and found that none of them impacted Carvana's stock price.

### 1.    The alleged "sham pass-through sales arrangement" with DriveTime

182.    Plaintiffs allege that Carvana entered into a sales agreement with DriveTime under which "Carvana would acquire cars from DriveTime, sell the car on its website, and then pass the entire proceeds from the sale back to DriveTime."[188] Plaintiffs allege this arrangement "lacked any economic substance for Carvana, and served only to inflate Carvana's reported retail sales."[189] However, a detailed analysis of this part of the alleged scheme shows that there is no evidence that the alleged "sham pass-through sales arrangement" had the effect of "pumping" up Carvana's stock price as Plaintiffs allege.

183.    First, Carvana's arrangement with DriveTime was publicly disclosed. As the Court in this case found, "Plaintiffs fail to allege the transactions between Carvana and

---

[187] Complaint ¶¶ 7, 125, Order, p. 34-35. I understand that the steps of Defendants' alleged scheme are characterized in slightly different ways throughout the case documents in this matter. Regardless of how the steps are characterized, my analysis of the alleged scheme is the same.

[188] Complaint, ¶ 127.

[189] Complaint, ¶ 127.

DriveTime qualify as a manipulative or deceptive act because they were disclosed to investors."[190] The Court found that "Carvana disclosed that it 'benefited from [its] relationship and a series of arrangements with DriveTime that were not negotiated at arm's length' and 'remained dependent on DriveTime for a number of important operations, including . . . vehicle inventory purchasing.' Carvana also disclosed its vehicle service contract arrangement with DriveTime."[191]

184.    Consistent with the Court's findings, a review of news articles and analyst reports covering Carvana shows that the market had an understanding that the arrangements between Carvana and DriveTime were not at "arm's length." For example, as early as 2019, before the beginning of the alleged Class Period, J.P. Morgan analysts noted that Carvana "has a number of agreements with DriveTime that are not negotiated at arm's length."[192] Similarly, analysts from B. Riley repeatedly noted in their reports throughout 2020 that "all business transactions between the two entities [Carvana and DriveTime]" were "less than arm's length."[193] As another example that this information was public, a *Barron's* article published in August 2021 quoted Carvana's annual report stating that the relations between Carvana and DriveTime were "not negotiated at arm's length."[194]

185.    Second, there is direct evidence that the alleged "sham pass-through sales arrangement" did not impact Carvana's stock price: there was no statistically significant price reaction when the DriveTime arrangement was allegedly "belatedly" disclosed. According to

---

[190] Order, p. 36.

[191] Order, p. 36.

[192] J.P. Morgan analyst report, dated September 26, 2019.

[193] B. Riley analyst reports, dated February 25, 2020, May 19, 2020, October 30, 2020, among others.

[194] "Streetwise: Carvana Finds Itself In the Fast Lane. Why It Can Keep the Pace," *Barron's,* August 13, 2021, Carvana Co. Form 10-K for the Period Ended December 31, 2020, at p. 20.

Plaintiffs, in its March 2022 Form DEF 14-A Proxy Statement, Carvana allegedly "belatedly" disclosed that the DriveTime arrangement involved buying cars from DriveTime and then selling to customers at the same price.[195] If Plaintiffs' allegations were true, Carvana's disclosure in its 2022 Proxy Statement that there was this "sham" pass-through sales arrangement would be viewed as new negative information. However, there was no statistically significant negative price reaction to this alleged disclosure of the "sham" arrangement using either Dr. Cain's event study or the alternative event study. In other words, the disclosure that according to Plaintiffs' own theory would have corrected this alleged scheme did not cause Carvana's stock price to drop. A review of analyst reports published following the release of the 2022 Proxy Statement shows that none of the analysts even mentioned the disclosure, which is further evidence that the market did not view the disclosure as new information important to Carvana's stock price.

186.    Third, in an efficient market, if Plaintiffs' allegations were true, the DriveTime arrangement would *not* have had the effect of pumping up Carvana's stock price because the sales arrangement with DriveTime would, according to Plaintiffs, have the effect of lowering Carvana's profit margin. Specifically, Plaintiffs allege that the arrangement created "pass-through" sales that generated no profit for Carvana, and thus the arrangement would have lowered Carvana's GPU, a metric that analysts reported and followed.[196]

---

[195] Complaint, ¶ 128. The investment advisor for Lead Plaintiff United Association National Pension Fund ("UANPF"), agreed in his testimony in this matter that Carvana's 2022 Proxy Statement disclosed that Carvana was purchasing vehicles from DriveTime for the same price that they were selling those vehicles to customers. Deposition of Christopher Graff, investment advisor for UANPF at T. Rowe Price, February 18, 2026, 186:5-188:20. See also, Carvana Co. Form DEF 14-A Proxy Statement, filed March 23, 2022, at p. 50.

[196] See, for example, William Blair analyst report, dated May 6, 2020, Evercore analyst report, dated July 2, 2020, J.P. Morgan analyst report, dated October 19, 2020.

## 2.    The alleged lowering of purchasing and verification standards

187.    Plaintiffs allege that "unbeknownst to investors, Defendants abruptly and drastically lowered Carvana's purchasing and verification standards" to induce trade-in sales, increase retail sales and allegedly increase Carvana's stock price.[197] Plaintiffs further allege that the low-quality cars that Carvana purchased were unfit to be sold through retail channels and had to be sold through wholesale channels at a loss.[198] However, a detailed analysis of this part of the alleged scheme shows that there is no evidence that the alleged lowering of purchasing and verification standards had the effect of "pumping" up Carvana's stock price as Plaintiffs allege.

188.    The Court in this case found that Plaintiffs "fail to identify any material omission" with regard to the alleged lowering of purchasing and verification standards.[199] As the Court explained, Carvana did not suggest that it did not buy low-quality cars, and "even if Carvana was 'intentionally buying lower quality cars'" that would be "arguably consistent with Carvana's business strategy in becoming the 'Amazon of the used car industry.'"[200] The Court further found that, "[i]n any event, Carvana disclosed its strategy to expand inventory by purchasing more vehicles from customers (including low-quality vehicles that it either reconditioned or sold to wholesalers) throughout the Class Period."[201]

189.    Consistent with the Court's findings, a review of analyst reports covering Carvana shows that investors knew throughout the alleged Class Period that trade-in cars helped increase Carvana's retail sales and that many of those trade-in cars were of low quality and had to be sold through the wholesale channel. For example, before the alleged Class Period, Carvana explained

---

[197] Complaint, ¶ 130.

[198] Complaint, ¶ 135.

[199] Order, p. 23.

[200] Order, p. 22.

[201] Order, pp. 22-23.

106

in its 2019 10-K that "as our retail unit sales have increased, so have the trade-ins we receive"

and that the trade-ins made up the majority of its wholesale inventory, which consists of cars that

"do not meet the Company's quality standards to list and sell through its website:"

> "*Fiscal 2019 Versus 2018.* Wholesale vehicle sales increased by $194.0 million to $267.6 million during the year ended December 31, 2019, compared to $73.6 million during the year ended December 31, 2018. **We primarily obtain our wholesale inventory by acquiring vehicles from customers. As our retail unit sales have increased, so have the trade-ins we receive.**" [Carvana Co. Form 10-K for the Period Ended December 31, 2019, at p. 60, emphasis added]

> "The Company sells vehicles to wholesalers. **These vehicles sold to wholesalers are primarily acquired from customers that do not meet the Company's quality standards to list and sell through its website.**" [Carvana Co. Form 10-K for the Period Ended December 31, 2019, at p. 90, emphasis added]

190.    The fact that Carvana's trade-in cars alone were not profitable was publicly

known even before the start of the alleged Class Period. For example, Wedbush analysts

commented in February 2020, several months before the beginning of the alleged Class Period,

that "'Sell us your car'" is "a money-losing investment so far" and that Carvana "will need to

[…] become more disciplined in its offers to customers if it is to be profitable:"

> "'**Sell us your car' a money-losing investment so far**. While CVNA believes that its investments in 'sell us your car' 'yielded good returns' in 4Q19, it is clear that the company is losing increasing amounts of money on this initiative. […] As the company only earned $431 in wholesale GPU and likely a similar amount in incremental retail GPU, **it is far from making this a profitable investment**. CVNA will need to scale more, leverage advertising and **become more disciplined on its offers to customers if it is to be profitable.**" [Wedbush analyst report, dated February 27, 2020, emphasis added]

191.    During the alleged Class Period, analysts from Truist and Raymond James

similarly noted that Carvana's trade-in cars were more likely to be sold in the wholesale channel

due to their lower quality:

> "Over 70% of Carvana customers chose to finance their vehicle purchase using the company's financing option, which attests to the role of financing

107

in reducing friction and improving conversion and monetization. The company also allows customers to trade-in existing vehicles by providing an online quote. **Many vehicles acquired via trade-ins often get resold via wholesale sales**." [Truist analyst report, dated December 14, 2020, emphasis added]

"This segment [wholesale revenue] consists of total sales of used vehicles to wholesalers (15% of sales in 2021 vs. 4% in 2018). Carvana mainly acquires these units from customers, whether through a purchase or trade-in. This segment has increased as a percentage of total as Carvana has been acquiring more cars from customers, and **these units are more likely to be resold in the wholesale channel, given they sometimes do not meet Carvana's retail standards to be sold on their website**." [Raymond James analyst report, dated May 10, 2022, emphasis added]

192. Moreover, even assuming for the sake of argument that Carvana did conceal material negative information regarding its trade-in sales from investors as Plaintiffs allege, it is unclear how it could have caused any price impact or damages to investors, as Plaintiffs do not allege any corrective disclosure for this part of the alleged scheme.

### 3. The alleged "flouting" of T&R rules

193. As discussed extensively in Section IX above, there is no price impact from the alleged T&R issues. The T&R alleged misstatements did not cause Carvana's stock price to increase when they were made and the correction of the alleged T&R issues did not cause Carvana's stock price to decline. Throughout the alleged Class Period, Carvana's T&R issues were widely known by investors and by the general public, including by Carvana's customers who experienced those issues firsthand, and thus, these issues were not concealed by the alleged scheme. Moreover, as detailed above, the T&R-related fines and suspensions were economically too small relative to the size of Carvana to impact the price.[202]

---

[202] See Section IX.E above.

### 4.    The alleged "unsustainable nationwide expansion"

194.    Plaintiffs allege that Defendants "spearheaded a rapid and unsustainable nationwide expansion plan" and that, "unbeknownst to investors," this expansion plan had the effect of "increasing Carvana's retail sales with unprofitable and less profitable sales in far-flung markets."[203] Plaintiffs further allege that "unbeknownst to investors, Defendants' expansion ravaged Carvana's purportedly efficient nationwide logistics and reconditioning network and significantly increased Carvana's expenses."[204] However, a detailed analysis of this part of the alleged scheme shows that there is no evidence that the alleged "unsustainable nationwide expansion" had the effect of "pumping" up Carvana's stock price as Plaintiffs allege.

195.    The Court in this case found that Plaintiffs fail to allege that the alleged misstatements relating to Carvana's nationwide expansion were false or misleading when made.[205] The Court agreed with Defendants' position that "Carvana disclosed the logistic costs and operational constraints incurred by its expansion" and noted that "in every shareholder letter where Carvana touted its new markets and increased population coverage, it included a map of existing IRCs [Inspection and Reconditioning Centers] and where they were located relative to Carvana's new markets, vending machines, and headquarters."[206] The Court further found that Carvana disclosed, "from the time it went public and every quarter that followed," that the Company was focused on growth and that one of the main risks associated with its business is its ability to effectively manage its rapid growth.[207]

---

[203] Complaint, ¶ 139.

[204] Complaint, ¶ 141.

[205] Order, p. 29.

[206] Order, p. 27.

[207] Order, p. 28.

109

196.    Consistent with the Court's findings and contrary to Plaintiffs' allegations, a review of Carvana's SEC filings shows that Carvana disclosed throughout the alleged Class Period the details of its expansion that were allegedly "unbeknownst to investors." In particular, Carvana included details in its filings regarding the percentage of the U.S. population it currently covers, how many existing markets it has, and its plans for opening new IRC facilities.[208] Carvana also noted that it "plan to continue to expand our network into additional markets."[209] In addition to making its plans for expansion clear, Carvana explicitly stated in its filings that there were risks involved with these new markets, entering those new markets came with "significant" expenses, and some of those new markets may never be profitable:

> "Our expansion into these markets will place us in competitive and regulatory environments with which we are unfamiliar and **involve various risks, including the need to invest significant resources and the possibility that returns on such investments will not be achieved for several years, if at all.** In attempting to establish new service or product offerings, we expect to incur significant expenses and face various other challenges" [Carvana Co. Form 10-K for the Period Ended December 31, 2021, at p. 26, emphasis added]

197.    Similarly, a review of analyst reports covering Carvana shows that the market knew throughout the alleged Class Period the details of the expansion that were allegedly "unbeknownst to investors." The market knew that Carvana's nationwide expansion required substantial investment, that the expansion would negatively affect the Company's profit margin, and that the expansion would put a strain on Carvana's operations. For example:

> "Carvana has scaled its business to cover roughly two thirds of the U.S. population and 7 IRCs (Inspection and Reconditioning Center) installed so far. **Continuing to scale its physical presence will likely see multichannel investments (Vending Machines & IRCS, advertising, labor) persist**

---

[208]  See, for example, "Q2 2020 Letter to Shareholders," *Carvana Co.*, August 5, 2020, at p. 4, "Q1 2021 Letter to Shareholders," *Carvana Co.*, May 6, 2021, at p. 4, "Q4 2021 Letter to Shareholders," *Carvana Co.*, February 24, 2022, at p. 9.

[209]  Carvana Co. Form 10-K for the Period Ended December 31, 2020, at p. 2.

**and continue to pressure EBIT margins**.” [Evercore analyst report, dated February 6, 2020, emphasis added]

“We are increasing our 2021 and 2022 revenue estimates due to strong demand and increased capacity, but **maintaining our 2021 and 2022 EBITDA estimates due to investments in logistics and capacity and increased marketing expenses due to market expansion.**” [KeyBanc analyst report, dated May 6, 2021, emphasis added]

“Management highlighted plans to launch an additional eight IRCs in 2022, bringing total annual capacity to roughly 1.25 million units (up from 680,000 earlier this year). While we previously highlighted **this faster expansion of infrastructure could limit near-term EBITDA margin expansion**, we note there is still potential for upside to unit sales growth” [Baird analyst report, dated December 27, 2021, emphasis added]

“Carvana's vertically integrated model is **operationally intensive** and **requires investments** in expansion of its inspection and reconditioning centers (IRCs), its delivery network, and its Car Vending Machines, as well as **significant marketing efforts** to grow brand awareness and drive customer acquisition. **Since inception seven years ago, Carvana has aggressively invested in various aspects of its operations** (logistics, IRCs, tech, Capex, last-mile delivery, etc.), **resulting in cumulative negative FCF of $2B+**” [Truist analyst report, dated December 14, 2020, emphasis added]

198.    Plaintiffs claim that as part of the alleged scheme Carvana excluded the logistics costs associated with selling cars in far-flung markets from its GPU calculation and thus concealed the unprofitability of those markets.[210] However, as the Court found, those costs were reflected in Carvana's Selling, General, and Administrative (SG&A) expenses.[211] Plaintiffs do not claim that Carvana's SG&A expenses were misstated. Thus, in an efficient market, the impact of such costs on Carvana's business would have already been impounded into the stock price.

---

[210] Complaint, ¶ 143.

[211] Order, p. 27, 32-33.

111

### 5.    The alleged misstatements and omissions to "conceal the scheme and convince investors that Carvana's retail growth was profitable and sustainable"

199.    Plaintiffs allege that in addition to the "methods and means" discussed above, Defendants "executed the pump-and-dump scheme through a series of materially false and misleading public statements, concerning the following subjects: (i) buying cars from customers; (ii) title and registration; (iii) average days to sale metric; (iv) gross profit earned per retail vehicle sold ('Retail GPU'); and (v) Carvana's 'scalable' business model."[212] However, a detailed analysis of this part of the alleged scheme shows that there is no evidence that the alleged misstatements and omissions had the effect of "pumping" up Carvana's stock price as Plaintiffs allege. The first two "subjects," buying cars from customers and title and registration, are already discussed in the sections above. The other three "subjects" are discussed below.

#### "Average days to sale metric"

200.    Plaintiffs allege that by the second half of the alleged Class Period, "Carvana was facing a glut of aging and rapidly depreciating inventory that was spiking the average days to sale metric," and Carvana's decision to stop reporting this metric "ensured that investors were not alerted to the scheme."[213] However, an analysis of this part of the alleged scheme shows that there is no evidence that Carvana's decision to stop reporting its average days to sale metric had the effect of "propping up" Carvana's stock price.

201.    According to Carvana, average days to sale measures the "average number of days between when we acquire the vehicle and when we deliver it to a customer."[214] In early 2022, Carvana stopped reporting this metric explaining that the number of Inspection and

---

[212] Complaint, ¶ 150.

[213] Complaint, ¶ 153.

[214] Carvana Co. Form 10-K for the Period Ended December 31, 2019, at p. 56.

112

Reconditioning Centers ("IRCs") had become a more meaningful metric. As Carvana explained, average days to sale had become relatively stable over the past few years, while the changing IRC capacity had become more important to understanding retail unit sales.[215]

202.    The Court in this case found that Carvana's rationale for discontinuing the average days to sale metric was not false or misleading. Specifically, the Court found that Carvana previously thinking average days to sale was "a critical metric does not mean Carvana was required to continue reporting it, especially when Carvana explained that its business priorities had changed and disclosed its increasing inventory."[216] Moreover, the Court found that "While Carvana's ADTS [average days to sale] increased in 2022, that does not make Carvana's statements, referring to the preceding three years, false or misleading."[217]

203.    A review of analyst reports covering Carvana *after* Carvana stopped reporting its average days to sale shows that the market was still able to track this metric, as well as track Carvana's inventory. This is direct evidence against Plaintiffs' claim that Carvana was able to "hide" the alleged scheme by not reporting its average days to sale. For example, in 2022, after Carvana stopped reporting average days to sale, Wedbush analysts were able to track that metric using their "proprietary data," and they were aware that Carvana had "aged inventory:"

> "We update our used retail GPU estimate to $1,051 (-48% y/y) from $1,213 vs. consensus $1,203 as we see more downside risk driven by **still elevated days' to sale based on our proprietary data**, **an increased mix** *[sic]* **aged inventory** that could require markdowns, and continued unfavorable market pricing dynamics with retail prices falling faster than wholesale prices based on data from Cox Auto." [Wedbush analyst report, dated July 5, 2022, emphasis added]

**Retail GPU**

---

[215]  Carvana Co. Form 10-K for the Period Ended December 31, 2021, at p. 57.

[216]  Order, pp. 29-30.

[217]  Order, pp. 29-30.

204.    Plaintiffs claim that Defendants "touted" Carvana's positive Retail GPU throughout the alleged Class Period but "concealed Carvana's actual per-vehicle profitability – or lack thereof" by excluding certain operations expenses from its calculation of Retail GPU.[218] Plaintiffs claim that as a result "investors were left to rely on the positive Retail GPU reported by Defendants as the sole measure of Carvana's per vehicle profitability."[219] However, an analysis of this part of the alleged scheme shows that investors were not left to rely on Retail GPU as the sole measure of Carvana's profitability and instead investors understood that Carvana's Retail GPU did not include all costs, and took account of all costs when analyzing Carvana's profitability.

205.    The Court in this case found that Carvana's calculation of retail GPU is not misleading and "indeed makes sense."[220] Specifically, the Court found that since Carvana went public "it informed investors that its primary goal was growth," and thus "it makes sense that Carvana allocated certain expenses […] to SG&A [instead of Retail GPU] because these costs may have largely been due to Carvana's rapid expansion strategy."[221] Moreover, the Court found that, throughout the alleged Class Period, Carvana informed investors of the types of expenses that were included in its SG&A and thus not in Retail GPU.[222]

206.    Consistent with the Court's finding, a review of analyst commentary shows that the market had an understanding that Carvana's Retail GPU did not include all costs, and that the market took account of Carvana's SG&A costs when analyzing Carvana's profitability. For example, Wedbush analysts indicated that "SG&A remains a barrier to profitability" for

---

[218] Complaint, ¶ 154.

[219] Complaint, ¶ 155.

[220] Order, p. 32.

[221] Order, pp. 32-33.

[222] Order, p. 31.

Carvana,[223] and J.P. Morgan analysts commented that "the biggest open question that still remains is longer-term leverage on advertising, and 'other SG&A,' which will be needed to hit normalized profitability targets."[224]

207.    A review of analyst commentary shows that Plaintiffs' claim that "investors were left to rely on the positive retail GPU […] as the sole measure of Carvana's per vehicle profitability" is flat out wrong. Contrary to Plaintiffs' suggestions, analysts used a variety of metrics to assess Carvana's profitability, including EBIT (earnings before interest and tax) per unit, EBITDA (earnings before interest, tax, depreciation and amortization) per unit, and operating profit per unit. The market understood that Carvana was not profitable overall, as well as not profitable on a per unit basis, during the alleged Class Period. For example:

> "How often have we heard the car sales person tell us that "hey, I'm losing money on this deal"? Well for now, in Carvana's case, it may be true as **the company does generate a significant loss per unit on both the EBIT and EBITDA line**… This will lead to $313 in profit per unit 2022 on the EBIT line, compared to our estimate of a nearly $1,200 loss this year." [D.A. Davidson analyst report, dated November 9, 2020, emphasis added]

> "In fact, by our math, **the company spent $674 for each incremental car it bought from customers in 2019, far outpacing the incremental gross profits from reselling those cars to retail and wholesale customers— that boosts GPU but ultimately reduces operating profit. For that reason, it is more important to consider operating profit per unit instead of GPU**. To that end, weighed down by $4,777 SG&A per unit (up 2% y/y), CVNA 4Q19 operating profit per unit was -$1,919 despite 82% retail unit sales growth." [Wedbush analyst report, dated February 27, 2020, emphasis added]

208.    Moreover, Plaintiffs' allegation that Carvana's GPU calculation is misleading is mathematically nonsensical. Carvana's GPU is simply equal to retail gross profit divided by the number of retail cars sold. Plaintiffs do not allege that Carvana's retail gross profit or its number

---

[223] Wedbush analyst report, dated July 30, 2020.

[224] J.P. Morgan analyst report, dated August 6, 2020.

115

of retail cars sold are misstated or misleading, so it makes no sense how the simple division of one number by the other can somehow be misleading.

### "Scalable" Business Model

209.    Plaintiffs allege that Defendants "exalted" Carvana's "capital-light" expansion model and "logistics capabilities" when in fact Carvana "neither had a capital light expansion model nor groundbreaking logistics."[225] Plaintiffs allege that Defendants "did so to persuade investors that […] 'growth […] enables economies of scale.'"[226] However, an analysis of this part of the alleged scheme shows that investors knew that Carvana's growth strategy required large amounts of investments.

210.    The Court in this case found that Carvana's statements regarding its "capital-light" expansion model and "logistics capabilities" are not misleading. Specifically, the Court found that Carvana has explained to the market that the Company "plan[s] to invest heavily in technology and infrastructure to support growth in unit sales. This includes continued investment in our acquisition, reconditioning, and logistics network."[227] The Court found that "Plaintiffs may disagree with Carvana's *disclosed* business strategy, but that disagreement alone does not make a securities fraud claim."[228]

211.    Consistent with the Court's findings, a review of analyst reports shows that the market had an understanding that Carvana's growth strategy required large amounts of investments. For example:

> "Carvana has scaled its business to cover roughly two thirds of the U.S. population and 7 IRCs (Inspection and Reconditioning Center) installed so far. **Continuing to scale its physical presence will likely see multichannel**

---

[225] Complaint, ¶ 156.

[226] Complaint, ¶ 156.

[227] Order, p. 28.

[228] Order, p. 28.

116

**investments (Vending Machines & IRCS, advertising, labor) persist and continue to pressure EBIT margins**." [Evercore analyst report, dated February 6, 2020, emphasis added]

"Given a sizable TAM, low ecommerce penetration for the category, **Carvana has been prioritizing growth investments over profitability over N/M term in order to increase share and grow brand awareness**." [Truist analyst report, dated December 14, 2020, emphasis added]

"Will Carvana's EBITDA inflect in CY23? Yes. **We see Carvana turning consistently profitable longer term, but CY22 is still an investment year as used car nirvana cycles**." [Evercore analyst report, dated February 25, 2022, emphasis added]

## XII.    ANALYSIS OF THE FOUR ALLEGED CORRECTIVE DISCLOSURES THAT WERE DISMISSED BY THE COURT

212.    In addition to the T&R-related alleged corrective disclosures discussed in the sections above, Plaintiffs also allege four Financial Condition Alleged Corrective Disclosures. They are as follows:

- **Q1 2022 Earnings (4/20/22)**: On this date, after market close, Carvana issued its financial results for Q1 2022 and announced the 2022 Public Offering to support its purchase of ADESA. According to Plaintiffs, Carvana's "disappointing" 1Q 2022 results and "stock offering to support its purchase of ADESA" "partially revealed the ramifications and negative economic conditions caused by Defendants' fraudulent scheme and course of conduct."[229]

- **Layoff Announcement (5/10/22)**: On this date, Carvana issued an 8-K announcing that it was laying off approximately 2,500 employees. According to Plaintiffs, this announcement revealed that "the ramifications and negative economic conditions caused by their fraud contributed to the right-sizing initiatives, the layoffs, and the need to issue a new operating plan that Carvana disclosed."[230]

---

[229] Complaint, ¶ 314.

[230] Complaint, ¶ 317.

117

- **Q3 2022 Earnings (11/3/22)**: On this date, after market close, Carvana issued its financial results for 3Q 2022. According to Plaintiffs, Carvana's "disappointing" 3Q 2022 results "further revealed the unraveling of Defendants' fraudulent course of conduct and its negative economic conditions."[231]

- **Q4 2022 Earnings (2/23/23)**: On this date, after market close, Carvana issued its financial results for FY 2022. According to Plaintiffs, Carvana's "disappointing" FY 2022 results "disclosed the unraveling of Defendants' fraudulent scheme and course of conduct, including its negative economic conditions."[232]

213.    I understand that the four Financial Condition Alleged Corrective Disclosures were dismissed by the Court:

> The statements that the ACC sufficiently alleges as actionably misleading are so because, accepting the allegations as true, they represented (1) that Carvana had not violated state title and registration requirements; and (2) that Carvana's retail sales growth was organic and sustainable. **Yet, Plaintiffs do not clearly or specifically allege how any of the four partial disclosures corrected any prior *actionable* falsity.** "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Lloyd*, 811 F.3d at 1210 (citation omitted). **The ACC reports negative financials but fails to allege how the results were due to either Carvana's title and registration compliance or sustainable growth representations. Plaintiffs offer no more than conclusory allegations that Carvana's disappointing financial news was due to Defendants' fraudulent scheme and omissions.** But Plaintiffs do not "trac[e] the loss back to the very facts about which the defendant lied," as required. *First Solar*, 881 F.3d at 753 (cleaned up).
>
> Accordingly, Plaintiffs' four partial corrective disclosures related to its financial condition fail to allege loss causation.[233]

214.    Regardless, to be thorough, I analyzed whether there was a statistically significant stock price decrease following any of the four Financial Condition Alleged Corrective Disclosures.

---

[231] Complaint, ¶ 323.

[232] Complaint, ¶ 327.

[233] Order, p. 55, emphasis added.

118

**A.    There was no statistically significant stock price decline to three of the four dismissed alleged corrective disclosures**

215.    There was no statistically significant negative price reaction to 3 of the 4 dismissed alleged corrective disclosures using either Dr. Cain's event study or the alternative event study. The results of this analysis are shown in the table below.

| | | | | Cain Event Study[1] | | Alternative Event Study[2] | |
|---|---|---|---|---|---|---|---|
| Event Date | Reaction Date | Category | Alleged Corrective Disclosures | % Price Reaction | Stat. Sig. Decrease?[3] | % Price Reaction | Stat. Sig. Decrease?[3] |
| 1. 4/20/22 | 4/21/22 | Financial Condition | Carvana releases its Q1 2022 financial results. | -4.1% | No | -4.6% | No |
| 2. 5/10/22 | 5/10/22 | Financial Condition | Carvana announces it is laying off roughly 2,500 employees. | -3.2% | No | -5.9% | No |
| 3. 11/3/22 | 11/4/22 | Financial Condition | Carvana releases its Q3 2022 results. | -41.9% | Yes | -35.2% | Yes |
| 4. 2/23/23 | 2/24/23 | Financial Condition | Carvana releases its Q4 2022 results. | -16.9% | No | -13.3% | No |

**Carvana Plaintiff-Style Price Reactions Following the Financial Condition Alleged Corrective Disclosures**

Notes and Sources:
Data from Bloomberg L.P. and Cain Report turnover. Events from the Complaint and Cain Report.
[1] Event study controls for the daily stock price movements of the S&P 500 Index and the S&P 500 Consumer Discretionary Distribution & Retail Index.
[2] Event study controls for the daily stock price movements of Carvana's peers, consisting of AutoNation, CarGurus, CarMax, Shift Technologies, TrueCar, and Vroom.
[3] Significance is based on the price reaction's t-statistic, calculated as the percent price reaction divided by the standard error of the regression over the sample period. Significance is indicated at the 5% level.

**B.    The statistically significant stock price decline following the one dismissed alleged corrective disclosure was not due to any of the alleged misstatements or the alleged scheme**

216.    The one day that had a statistically significant price decrease was the day after Carvana's announcement of Q3 2022 earnings on November 3, 2022. I analyzed the information released on that day and reviewed analyst reports issued following the announcement to examine if there is any evidence that the price decrease on that day could be due to any of the alleged misstatements or the alleged scheme. I found no such evidence.

217.    Not only did none of the analysts suggest that the information released in the Q3 2022 earnings announcement was a revelation of any fraud, but none even indicated that they learned anything new about the Company's performance earlier in the alleged Class Period, including at the time of the alleged misstatements. Instead, analysts focused on the impact of

119

new negative news in the current quarter – the substantial deterioration in macroeconomic and industry conditions. Analysts indicated that the "current macro back-drop create[d] significant near-term challenges for Carvana" and that Carvana had to "rid[e] out the storm" of "a challenging demand backdrop."[234] Analysts indicated that there was a sharp decline in the demand for used vehicles in the past quarter due to "rising interest rates, and still-elevated prices limiting vehicle affordability."[235] Moreover, analysts indicated that these "macro headwinds" were leading to "liquidity concerns" for Carvana.[236] For example:

- o "Carvana's weak 3Q performance **largely reflected the near-term challenges associated with the waning macro backdrop**, with volumes declining for the first time YoY driven by **weakening consumer demand, rising interest rates, and still-elevated prices limiting vehicle affordability**." [Deutsche Bank analyst report, dated November 4, 2022, emphasis added]

- o "**CVNA is clearly feeling broader macro and industry pressures** amid a flurry of unique circumstances, including: (1) rapid wholesale price declines, (2) increasing interest rates challenging affordability, and (3) ongoing supply challenges as OEMs remain constrained. […] We still see substantial upside to shares longer term, although **near term macro concerns will weigh shares and quarter-to-quarter results**." [JMP analyst report, dated November 7, 2022, emphasis added]

- o "According to NADA [National Automobile Dealers Association], US sales of used vehicle[s] dropped 13.1% in the third quarter and were down 12.9% YTD. **Declining industry demand and a sharp decline in market prices has created a headwind for used vehicle retailers, and the trends are expected to continue into 2023**." [Benchmark analyst report, dated November 4, 2022, emphasis added]

- o "Riding Out the Storm. Carvana is taking action to ride out a challenging demand backdrop that is likely to linger into 2H23 (or longer) in our view. [Evercore analyst report, dated November 4, 2022]

- o "The **current macro back-drop creates significant near-term challenges for Carvana** as it has to significantly improve operations and cut costs to reduce the cash burn while the unit environment continues to worsen and put transitory pressure on $GP/U's… near-term it's difficult to be excited until the unit or rate

---

[234] BNP Paribas analyst report, dated November 3, 2022 and Evercore analyst report, dated November 4, 2022.

[235] Deutsche Bank analyst report, November 4, 2022.

[236] Bank of America analyst report, dated November 4, 2022.

environment turns more favorable." [BNP Paribas analyst report, dated November 4, 2022, emphasis added]

o "At the current share price, it is clear that investors believe the company will go out of business. **We acknowledge that macro headwinds and liquidity concerns are valid concerns**, and we believe the company will more than likely need to raise capital at some point next year as current cash burn is not sustainable." [Bank of America analyst report, dated November 4, 2022, emphasis added]

o "When we upgraded CVNA in September (obviously prematurely) we knew the balance sheet was a risk. That remains the case today. If anything, **the used car market has deteriorated further since September**, complicating CVNA's operating plan." [Piper Sandler analyst report, dated November 3, 2022, emphasis added]

## XIII. THE CAIN REPORT'S "CAUSE-AND-EFFECT" MARKET EFFICIENCY TEST IS FUNDAMENTALLY FLAWED BECAUSE IT EXPLICITLY FAILS TO TEST THE TYPE OF INFORMATION THAT IS AT ISSUE IN THIS MATTER – AND WHEN THAT TYPE OF INFORMATION IS INCLUDED IN CAIN'S TEST, THE RESULT SHOWS NO SIGNIFICANT CAUSE AND EFFECT AND THUS IS EVIDENCE AGAINST MARKET EFFICIENCY

218.    One of the tests Dr. Cain performs to test whether Carvana's stock traded in an efficient market is the cause-and-effect test, also known as the Cammer 5 test.[237] Courts have characterized this Cammer 5 test as the "most important" factor in determining market efficiency,[238] the "essence of an efficient market," and the "foundation for the fraud on the market theory."[239] The cause-and-effect test is supposed to test the relationship between company-specific news, such as the alleged misstatements, and the company's stock price to see if the type of information that Plaintiffs are complaining about is impounded into the stock price

---

[237] Cain Report, ¶¶ 41, 69-90.

[238] "The fifth factor (cause-and-effect relationship) is 'in many ways, the most important,' … and was recognized in Cammer itself as 'the essence of an efficient market and the foundation for fraud on the market theory[.]'" See *In re PolyMedica Corp. Litig.*, 453 F.Supp. 2d 260, 266 (D. Mass. 2006). See also, *Loritz v. Exide Techs.*, 2015 WL 6790247, at *9-10 (C.D. Cal. July 21, 2015); *In re 2TheMart.Com, Inc. Sec. Litig.*, 114 F.Supp.2d 955, 964 (C.D. Cal. 2000); *Cammer*, 711 F.Supp. at 1287.

[239] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

121

and thus whether Plaintiffs can assert the "fraud-on-the-market" theory of class-wide reliance, *i.e.*, that "all persons and entities who purchased or otherwise acquired Carvana's Common Stock during the Class Period relied on the alleged misrepresentations and/or omissions through their effect on stock prices in an informationally efficient market."[240]

219.    Dr. Cain's Cammer 5 test is fundamentally unable to test the cause-and-effect relationship to the type of misstatements alleged in this matter. His cause-and-effect test explicitly ignores the very type of statements that are at issue in this case, the alleged misstatements and the alleged corrective disclosures. Moreover, Dr. Cain's Cammer 5 test, rather than reliably testing the stock over the entire alleged Class Period, completely ignores the majority of days during the alleged Class Period, days on which Dr. Cain himself finds Company-specific news. When those excluded news days are included in Dr. Cain's Cammer 5 test, the result shows no significant cause-and-effect relationship between company-specific news and the company's stock price and thus is evidence against market efficiency.

220.    Dr. Cain's Cammer 5 test purports to test the cause-and-effect relationship of information, such as the alleged misstatements, on Carvana's stock by comparing the stock's behavior on news days versus non-news days. According to Dr. Cain, a "showing that a security's price is statistically significantly more volatile on 'news days' than on 'no news days' is considered powerful evidence that the security responds promptly to news and, therefore, strongly supports a finding of efficiency."[241]

221.    Dr. Cain categorizes news on Carvana issued during the alleged Class Period into two types: earnings news and other news. The earnings news is defined by Dr. Cain as Carvana's

---

[240]  Cain Report, ¶ 34.

[241]  Cain Report, ¶ 81.

earnings announcements made each quarter throughout the alleged Class Period.[242] Dr. Cain

identifies the other news as Carvana's SEC filings, including 10-Ks, 10-Qs and non-earnings 8-

Ks, and any article from a Dow Jones news source on Carvana such as *The Wall Street Journal*,

*Barron's*, *MarketWatch* and *Dow Jones Newswires*.[243]

222.   Dr. Cain then groups the news into days, categorizing "News Days" as days when

there was earnings news, "No News Days" as days when there was no earnings news or other

news, and ignoring the third group that includes only other news.[244] He then finds that there is a

statistically significant difference between News and No News days with regard to the fraction of

days that have statistically significant price reactions and concludes that "[t]hese results provide

strong evidence of a cause and effect relationship between new information and Carvana's stock

price movements" and "strongly support[] a finding of efficiency."[245] The table below

summarizes the results of Dr. Cain's Cammer 5 test.

---

[242]  Cain Report, ¶ 85.

[243]  Cain Report, ¶ 86. Dr. Cain defines No News Trading Days to exclude days with SEC filings or Dow Jones Newswires articles on Factiva tagged to Carvana. Because those days are neither News Days, nor No News Trading Days, Dr. Cain's definitions place them in a separate category of non-earnings, Carvana-specific "other news" days. Dr. Cain claims that his other news includes all "news articles from Dow Jones Newswires," but the materials he turned over shows that his other news not only includes news from *Dow Jones Newswires* but also includes all news from any publishers affiliated with Dow Jones & Company, including *The Wall Street Journal, Barron's,* and *MarketWatch*. Dr. Cain's other news also includes any alleged corrective disclosures that are not earnings announcements.

[244]  Cain Report, ¶¶ 85-86.

[245]  Cain Report, ¶¶ 81, 89.

**Cain's Cammer 5 Test**

| | Cain's News Days | Cain's No News Days | Other News Days Cain Ignores |
|---|---|---|---|
| Number of Days | 11 | 237 | 364 |
| Statisticallly Significant Days | 4 | 16 | 29 |
| % Significant Days | 36.4% | 6.8% | 8.0% |

<span style="color:red">**Cain finds a statistically significant difference**</span>

**Notes and Sources:**

Data from Cain Report Exhibit 7 and Cain Report turnover. Statistical comparison of % Significant Days at 95% Confidence Level based on Fisher's Exact Test at 95% Confidence Level.

223.    Dr. Cain's Cammer 5 test is fundamentally flawed. First, it fails to analyze the purported cause-and-effect relationship for the majority of days with news during the alleged Class Period. As the table below shows, the days with news that Dr. Cain ignores and drops from his analysis make up approximately 60% of the days during the alleged Class Period.

**Cain's "Cause-and-Effect Analysis" Ignores the Majority of Trading Days in the alleged Class Period**

| | # of Trading Days | # of Days Cain Analyzes | # of Days Cain Ignores | % of Days Cain Ignores |
|---|---|---|---|---|
| Alleged Class Period (5/6/20 − 10/7/22) | 612 | 248 | 364 | 59.5% |

**Notes and Sources:**
Data from Cain Report and Cain Report turnover.

224.    Second, Dr. Cain's Cammer 5 test explicitly fails to test the cause-and-effect relationship to the very type of statements that Plaintiffs allege are the alleged misstatements. In fact, almost all of the alleged misstatements and alleged corrective disclosures are what he would consider other news and explicitly excluded from his tests. Of the 10 alleged misstatements that

124

remain in the case, only one is in an earnings announcement and thus examined in his test.[246] The other 9 alleged misstatements are either categorized as other news, which he ignores, or as no news. In particular, there are 7 alleged misstatements that Dr. Cain categorizes as other news that he ignores: 2 are in Carvana's 10-Ks, 4 in Carvana's 10-Qs, and 1 in a *Barron's* article. There are 2 alleged misstatements that Dr. Cain categorizes as no news: 1 from Carvana's comments at a J.P. Morgan conference on the auto industry and 1 from a conference call. The table below details how Dr. Cain's "cause-and-effect" analysis treats the alleged misstatements that remain in this case.

---

[246] Note that this one alleged misstatement is not in the actual earnings announcement but in a shareholder letter that is attached to the 8-K with the earnings announcement.

**How Cain's Cause-and-Effect Market Efficiency Test
Treats the Alleged Misstatements**

| | Event Date | Alleged Misstatement | Category According to Cain | | |
|---|---|---|---|---|---|
| | | | News | News Cain Ignores | No News |
| | (1) | (2) | (3) | (4) | (5) |
| 1. | 2/25/2021 | FY20 Form 10-K | | ✖ | |
| 2. | 5/6/2021 | 1Q21 Form 10-Q | | ✖ | |
| 3. | 8/5/2021 | 2Q21 Form 10-Q | | ✖ | |
| 4. | 8/5/2021 | 2Q21 Shareholder Letter | ✔ | | |
| 5. | 8/11/2021 | J.P. Morgan Auto Conference | | | ✖ |
| 6. | 11/4/2021 | 3Q21 Form 10-Q | | ✖ | |
| 7. | 2/24/2022 | FY21 Form 10-K | | ✖ | |
| 8. | 2/24/2022 | FY21 Earnings Call | | | ✖ |
| 9. | 5/10/2022 | 1Q22 Form 10-Q | | ✖ | |
| 10. | 6/24/2022 | *Barron's* article | | ✖ | |
| | | | 1 | 7 | 2 |

**Notes and Sources:**
    Events from Complaint, Cain Report, and Cain Report turnover.

225.    The same inapplicability can be seen with how Dr. Cain's Cammer 5 test treats news of the same type as the alleged corrective disclosures. All of the announcements associated with the 4 alleged corrective disclosures that remain in the case are ignored or treated as no news in his test. In particular, Dr. Cain categorizes 2 alleged corrective disclosures as other news that he ignores, and 2 he classifies as no news. The table below details how Dr. Cain's "cause-and-effect" analysis treats the alleged corrective disclosures that remain in this case.

126

**How Cain's Cause-and-Effect Market Efficiency Test
Treats the Alleged Corrective Disclosures**

| | Event Date | Alleged Corrective Disclosure | Category According to Cain | | |
| --- | --- | --- | --- | --- | --- |
| | | | News | News Cain Ignores | No News |
| | (1) | (2) | (3) | (4) | (5) |
| 1. | 8/10/2021 | Local media in North Carolina (*ABC 11*) report | | | ✘ |
| 2. | 10/22/2021 | *The Wall Street Journal* article | | ✘ | |
| 3. | 6/24/2022 | *Barron's* article | | ✘ | |
| 4. | 10/7/2022 | Michigan Department of State press release | | | ✘ [1] |
| | | | 0 | 2 | 2 |

**Notes and Sources:**

Events from Complaint, Cain Report, and Cain Report turnover.

[1] Cain's analysis stops on October 7, 2022. Category based on Cain Report turnover.

226.    If, instead of limiting his analysis to the days with earnings news, Dr. Cain had included all days that he deems to have Carvana-specific news, both earnings and other news, he would have found *no statistically significant difference* between news days and no news days.[247] In particular, he would have found that during the alleged Class Period there is *no* statistically significant difference between news and no news days with regard to the fraction of days that have statistically significant price reactions. Thus, when the excluded news days are included in Dr. Cain's Cammer 5 test, the results show no significant cause-and-effect relationship between company-specific news and the company's stock price, and thus are evidence against market efficiency. The table below summarizes the results of Dr. Cain's Cammer 5 test as well as Dr. Cain's test once all news he deems to be Carvana-specific news is included.

---

[247] The p-value for the difference between news days and no news days is 44.5%. Because statistical significance at the 5% level would require a p-value equal to or smaller than 5%, the result is not statistically significant.

127

**Cain's Cammer 5 Test Corrected
to Include All News Days**

|  | Cain's News Days | Other News Days Cain Ignores | All News Days | Cain's No News Days |
|---|---|---|---|---|
| Number of Days | 11 | 364 | 375 | 237 |
| Statistically Significant Days | 4 | 29 | 33 | 16 |
| % Significant Days | 36.4% | 8.0% | 8.8% | 6.8% |

**No statistically significant difference between News and No News days**

**Notes and Sources:**
Data from Cain Report Exhibit 7 and Cain Report turnover. Statistical comparison of % Significant Days at 95% Confidence Level based on Fisher's Exact Test at 95% Confidence Level.

227.    Dr. Cain's Cammer 5 test is fundamentally flawed for another reason. It is biased because it is designed to ignore days that would be explicit evidence against market efficiency. In other words, compared to an unbiased analysis, Dr. Cain's test design makes it more likely for him to reach the conclusion that Carvana traded in an efficient market. Here is why: assume that on a particular day, Carvana's stock price had a large and statistically significant price increase but there was no company-specific news to explain this movement. A proper cause-and-effect analysis should categorize that day as a no news day, and the statistically significant price increase on that day would be evidence against market efficiency. However, when stocks have large and unusual movements there are often articles commenting on those movements. Thus, using Dr. Cain's study design, such days would fall into his category of other news instead of no news and would be completely ignored. So, for example, if Dr. Cain were to perform the same analysis for meme stocks he would ignore the many days on which their stock prices moved up or down for no reason just because there are articles commenting on those movements. In effect,

128

Dr. Cain's method would tend to ignore large price movement days that are not earnings announcement days (because there is likely to be news commenting on the large price movement), which are days that potentially could be direct evidence against a cause-and-effect relationship and market efficiency.

228.    An example of a day during the alleged Class Period when this type of news was released is May 12, 2022. On that day, Carvana's stock price increased by as much as 48% intraday and trading in Carvana's stock was halted five times due to its volatility. There was no news released on that day that would explain Carvana's stock price movement.[248] This large and unusual price movement in Carvana's stock prompted *Barron's* to publish an article on the same day titled "Carvana Is Acting Like a Meme Stock."[249] The article states that:

> **The meme stocks GameStop and AMC unexpectedly soared on Thursday, joined by the used-car retailer Carvana**, even as the broader market hit its lowest point in 2022. **It wasn't clear what news, if any, was behind the gains.**
>
> Early Thursday morning, shares of the videogame (sic) retailer GameStop (ticker: GME) popped more than 32% to $108.05. AMC Entertainment (AMC), the theater chain, rose almost 30% to $13.46. Trading for GameStop, which ended the day 10% higher, was halted four times. AMC closed 8% higher.
>
> **Carvana (CVN) joined the surge and rose as much as 48%, to $44.41, on Thursday, closing 25% higher from Wednesday. It was halted five times**. These stocks rallied when the Dow Jones Industrial Average and the S&P 500 had both fallen by 1.5%, respectively.

---

[248] Many news articles on this day reported on the trading halts, and because of that Dr. Cain's analysis categorizes this day as an "other news" day and ignores it in his analysis. See "Carvana Up Over 21%, on Pace for Largest Percent Increase Since September 2020 — Data Talk," *Dow Jones Institutional News*, May 12, 2022, "Carvana Co. Cl A (CVNA) Paused Due to Volatility," *Dow Jones Institutional News*, May 12, 2022, "S&PGR Assigns Carvana Auto Rec Trust 2022-P2 Prelim Ratings," *Dow Jones Institutional News*, May 12, 2022, Joy Wiltermuth, "Carvana, Coinbase junk bonds tumble Wednesday as layoffs, losses hit prices," *MarketWatch*, May 11, 2022. The Dow Jones articles on Carvana's price increase reported the movement itself, not news that caused the movement. The other two Carvana-related articles do not explain the May 12, 2022 stock price increase because the S&PGR article concerned preliminary ratings for an auto receivables trust, and the MarketWatch article reported old news.

[249] "Carvana Is Acting Like a Meme Stock. GameStop and AMC Closed Higher Too." *Barron's*, May 12, 2022 (emphasis added).

229.    News articles reporting that Carvana traded like a meme stock during the alleged Class Period, which is a glaring example of market inefficiency, are completely undetectable by Dr. Cain's market efficiency test.

## XIV.  OTHER ISSUES WITH DR. CAIN'S MARKET EFFICIENCY ANALYSIS

230.    In addition to the issues with Dr. Cain's Cammer 5 test discussed above, there are other issues with Dr. Cain's market efficiency analysis. Three of these additional issues are discussed below.[250]

231.    Dr. Cain uses a study by Simona Mola, P. Raghavendra Rau, and Ajay Khorana (the "MRK Study") as the benchmark for many of his market efficiency tests.[251] This creates numerous issues. First, Dr. Cain completely mischaracterizes the MRK Study by suggesting that the study offers evidence on market efficiency. For example, Dr. Cain claims that the MRK study "supports the view that firms with larger market capitalizations tend to trade in more efficient markets."[252] However, the paper does not address or analyze market efficiency. In fact, the phrase "market efficiency" or "efficient market" does not appear in the MRK Study at all. The MRK Study entitled "Is There Life After the Complete Loss of Analyst Coverage?" finds that "firms that lose all analyst coverage for one year are significantly more likely to delist" than firms that had analyst coverage.[253] In short, the MRK Study is an analysis of the effect of analyst coverage on firms, not a study on market efficiency.

---

[250] In addition, Dr. Cain's analysis of *Cammer* factor 2, analyst coverage, appears to have numerous issues even after his corrections, including discrepancies among the materials he turned over and inconsistencies between his analysis and his testimony. The analysis also appears to mistakenly include analyst reports for companies other than Carvana.

[251]  Cain Report, ¶ 43.

[252]  Cain Report, ¶ 92.

[253]  Simona Mola, P. Raghavendra Rau, and Ajay Khorana, "Is There Life After the Complete Loss of Analyst Coverage?," *The Accounting Review* 88, no. 2 (2013): 667.

130

232.    Moreover, Dr. Cain compares Carvana's data during the alleged Class Period to data in the MRK Study.[254] But the data in the MRK study is not a reliable benchmark for that analysis. The data in the MRK study is based on a sample period that ranges from 1984 to 2008.[255] Thus, Dr. Cain is comparing data from Carvana to data that ranges back to 40 years ago. Since the 1980s, there have been substantial changes to the size of the U.S. stock market and how it operates, and Dr. Cain provides no rationale for why data from 40 years ago is a reasonable benchmark for testing market efficiency during the alleged Class Period.

233.    The only metric for which Dr. Cain attempts to account for the difference in time between the MRK Study and the alleged Class Period is market capitalization.[256] However, Dr. Cain's method for doing so is plainly erroneous. He brings the average market capitalization for the sample time period from the MRK Study forward with a CPI inflation adjustment.[257] However, such an adjustment is inappropriate as it ignores that the market capitalization of companies has grown much faster than CPI inflation. Dr. Cain applies his adjustment using the CPI inflation from 1996 (the mid-point of the MRK Study sample period) to the end of the alleged Class Period, and during that time period CPI had a 2-fold increase while the average market capitalization of S&P 500 companies had an eight-fold increase, or four times larger than CPI inflation.[258]

---

[254]  Cain Report, ¶¶ 43-46 and Simona Mola, P. Raghavendra Rau, and Ajay Khorana, "Is There Life After the Complete Loss of Analyst Coverage?," *The Accounting Review* 88, no. 2 (2013): 667–705.

[255]  Simona Mola, P. Raghavendra Rau, and Ajay Khorana, "Is There Life After the Complete Loss of Analyst Coverage?," *The Accounting Review* 88, no. 2 (2013): 668. ("These sample firm-year observations represent 19 percent of all U.S. firms covered by I/B/E/S from 1984 through 2008.")

[256]  Cain Report, ¶¶ 91-94.

[257]  Cain Report, ¶ 93. ("Carvana's market capitalization also exceeded the median MRK Previously Covered Companies and MRK Covered Companies on an inflation-adjusted basis").

[258]  Data from Bloomberg, L.P. and U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm.

## XV.    PLAINTIFFS AND DR. CAIN FAIL TO PROPOSE A COMMON DAMAGES METHODOLOGY THAT IS SPECIFIC TO AND CONSISTENT WITH PLAINTIFFS' CLAIMS IN THIS CASE

234.    The damages methodology proposed in the Cain Report is non-specific and inconsistent with Plaintiffs' claims in this case and thus, Dr. Cain's proposed damages methodology fails to affirmatively demonstrate that damages are measurable on a class-wide basis through a common methodology and is not a detailed methodology that is consistent with Plaintiffs' theory of liability.

235.    Dr. Cain's damages methodology is simply to assert that damages can be calculated using the "out-of-pocket" method.[259] According to Dr. Cain, this means that damages would be calculated as the difference between inflation at purchase and inflation at sale.[260] However, that is not a methodology but a damages principle, in the same way benefit-of-the-bargain or rescission are damages principles. Dr. Cain does not tell you how to actually calculate the inflation at purchase or inflation at sale – which is the critical element in the measure of damages. Dr. Cain's description of the "out-of-pocket" method tells the Court nothing about whether it is capable of measuring the alleged inflation in Carvana's stock price consistent with Plaintiffs' theory of liability. In essence, Dr. Cain's "out-of-pocket" method is simply saying damages are the amount that you overpaid for the stock less the amount that the buyer whom you sold to overpaid for their purchase. This is no more a specific damages methodology than, for example, saying you will measure damages in an auto consumer class action by the amount that consumer overpaid for the car.

---

[259]  Cain Report, ¶¶ 109, 111, 113. ("[D]amages for each of Plaintiffs' claims can be calculated on a class-wide basis through a common methodology, the out-of-pocket damages methodology").

[260]  Cain Report, ¶ 111. ("This approach calculates investor damages formulaically as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale.").

132

236.    The term "out-of-pocket" is a general term that has been used by courts to differentiate different types of damage theories, not how to actually calculate damages. In particular, courts have used the term "out-of-pocket" to differentiate out-of-pocket losses from benefit-of-the-bargain losses. Courts generally define out-of-pocket losses as the difference between the value that would have been received had there been no fraud and the value actually received, while benefit-of-the-bargain losses are defined as the difference between the value that was bargained or expected to have been received absent the fraud and the value actually received. As explained by the court in *In re DaimlerChrysler AG Securities Litigation*:

> "Out-of-pocket losses are measured by 'the difference between the fair value of all that the seller received and the fair value of what he would have received had there been no fraudulent conduct.' […] 'Benefit of the bargain damages' are measured by the difference between what the plaintiff expected he would have received absent the defendant's fraud, and the amount the plaintiff actually received." [*In re DaimlerChrysler AG Securities Litigation*, 294 F. Supp. 2d 616, 626 (D. Del. 2003)]

237.    Dr. Cain does not explain how he intends to calculate the alleged inflation in Carvana's stock price attributable to Defendants' alleged scheme and misstatements on each day of the two-and-a-half-year alleged Class Period. Instead, Dr. Cain only makes vague references to event studies and valuation models as potential ways to estimate the alleged inflation. For example, Dr. Cain's proposed methodology indicates that the alleged inflation could be calculated using an event study to measure the price reactions on the alleged corrective disclosure dates but fails to indicate how that calculated inflation should be moved back to the purchase and sale dates, and how to decide how much of that inflation came into the stock and when.[261] Dr. Cain claims a "frequent" method for "modeling the evolution of inflation is to

---

[261]  Cain Report, ¶ 113. ("[E]vent studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to disclosures and materializations of the risks which dissipate the relevant truth that was concealed by alleged fraudulent misrepresentations, and do not rely on individual class member-specific information.").

133

assume 'constant dollar inflation,'" an "alternative" method is to "measure 'constant percentage inflation'" and "in other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements."[262] Thus, Dr. Cain is in essence saying the inflation could be constant or changing and it could be a fixed amount or depend on the stock price.  This just seems like a laundry list of mathematical possibilities of the pattern of inflation, not a methodology, and says nothing about how to determine the magnitude of the inflation. Thus, he does not even begin to explain what factors he would consider to make the determination of which pattern of inflation would be appropriate.

238.    Instead, Dr. Cain is essentially saying that he will figure it out sometime later. There is, however, no evidence that he will be able to do so. It is my understanding that at this stage of the case Plaintiffs need to show an actual common damages methodology that would work with the specifics of the case and not just make a general claim that damages can be estimated on a class-wide basis.[263] Note that his damages method as detailed in his Carvana

---

[262] Cain Report, ¶ 117-119.

[263] Courts have found that plaintiffs must show the feasibility of their proposed damages methodologies. For example:

- *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013). (A "model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory[…]courts must conduct a 'rigorous analysis' to determine whether that is so.")

- *Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS 173789, at *47 (N.D. Cal. Dec. 15, 2014). ("[T]he Court is obligated to do more than rubberstamp a proposed damages class merely because the plaintiff's expert purports to … use[] a peer reviewed methodology….")

- *Bruton v. Gerber Prods. Co.*, 2018 U.S. Dist. LEXIS 30814, at *34 (N.D. Cal. Feb. 13, 2018).  ("[R]eal explanation is necessary";  "a clearly defined list of variables"; "a meaningful explanation as to how the variables will be addressed"; "the data related to … [the] proposed … variables exists.")

- *In re Graphics Processing Units Antitrust Litig.,* 253 F.R.D. 478, 492 (N.D. Cal. 2008). ("'[C]ourts[…]are increasingly skeptical of … experts who offer only generalized and theoretical opinions that a particular methodology may serve [their] purpose without also submitting a functioning model that is tailored to market facts in the case at hand.'")

- *In Re BP plc Securities Litigation,* Civil Action No. 4: 10-md-2185 (S.D. Tex. Dec. 6, 2013). ("*Comcast* signals a significant shift in the scrutiny required for class certification[…] Following *Comcast*, circuit and district courts have rigorously examined proposed damages methodologies in

134

report is ███████████████████████████████████████████████████████████

████████████.[264] The fact that this generic description of an approach applies equally to all cases is further evidence that Dr. Cain's method is not an actual damages method.

239.    The vagueness of Dr. Cain's damages methodology is particularly problematic and inadequate in this case since Plaintiffs claim Defendants engaged in "a fraudulent pump-and-dump scheme to boost Carvana's retail sales growth, and a series of misrepresentations and omissions designed to artificially inflate Carvana's share prices for long enough to allow the Company's founders and executives to sell" their shares at artificially inflated prices.[265] Under this liability theory, it appears Plaintiffs are claiming whatever artificial inflation the alleged scheme or misstatements introduced into the stock price occurred gradually over time – not all at once when the alleged scheme began or the first alleged misstatement was made. As discussed above, according to Dr. Cain's own event study, there was no statistically significant price increase when the alleged scheme began, there was no statistically significant price increase due to any of the alleged misrepresentations, and there was no statistically significant price decline due to any of the alleged corrective disclosures, and therefore Plaintiffs need a way to calculate how that supposed inflation crept in and dissipated over time, to determine how much investors who bought and sold stock at different points in time over the two-and-a-half-year alleged Class Period overpaid or over-received due to the alleged fraud. Moreover, it is unclear how Dr. Cain would calculate damages associated with the RUS alleged misstatements, given that they do not

---

putative class action cases[… and] some of these examinations have resulted in denials of class certification.")

[264]   Deposition of Matthew Cain, Ph.D., May 8, 2026, 196:9-20 ( ██████████████████████
██████████████████████████████████████████████████████████████████████████
████████████████ ").

[265]   Complaint, ¶ 3.

seem to have any corresponding alleged corrective disclosures. Dr. Cain testified in his

deposition that ███████████████████████████████████████████████████████████

███████████████████████[266] Furthermore, any damages calculation will be complicated by

many other issues specific to the alleged scheme, including 1) the alleged scheme started before

any of the remaining alleged misstatements and 2) to the extent that Plaintiffs allege that the

scheme was carried out non-publicly and was concealed, how one would measure the impact of

such scheme on Carvana's stock price. In fact, Dr. Cain acknowledged in his deposition that

"██████████████████████████████████████████████████████████████"[267]

However, while acknowledging the complexity, Dr. Cain fails to propose a common damages

methodology that addresses all the complicated issues specific to this case.

240.    In sum, Dr. Cain's methodology is not well-specified and, given the specific

issues in this case, is not sufficient to demonstrate that there is a common method of estimating

damages that can be reliably applied on a class-wide basis.

## XVI.  CLASS CERTIFICATION ISSUES WITH PLAINTIFFS' SECTION 11/12 CLAIMS, GIVEN THE WIDESPREAD PUBLICATION OF T&R ISSUES BEFORE THE 2022 PUBLIC OFFERING AND CONFLICTS BETWEEN AND AMONG THE SECURITIES ACT AND EXCHANGE ACT CLAIMS

241.    Plaintiffs' Section 11/12 claims lead to substantial class certification issues given

the widespread publication of information about Carvana's alleged T&R issues and allegedly

"unsustainable practices" issues before the 2022 Public Offering, as well as conflicts between

---

[266] Deposition of Matthew Cain, Ph.D., May 8, 2026, 33:21-34:12 ("████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████").

[267] Deposition of Matthew Cain, Ph.D., May 8, 2026, 86:12-14.

and among Plaintiffs' Section 11/12 claims and Plaintiffs' 10b-5 claims and Carvana's stock price movements after the offering. As the T&R issues impacted consumers directly, they were reflected in public consumer complaints, news articles, and legal actions both before and throughout the alleged Class Period.[268] The widespread publication of these issues and Carvana's business practices before the 2022 Public Offering, in addition to Carvana's own disclosures, raises individual issues of investor knowledge. Also, because the specific claims relate to different time periods, with the Section 11/12 claims starting at the 2022 Public Offering, almost two years after the start of the 10b-5 class period, conflicts arise for both the proposed classes and counsel.[269] These conflicts are amplified because Carvana's stock bounced back to levels much higher than the 2022 Public Offering price, which is an unusual pattern in Section 11 cases.

242.    As an initial matter, there are class certification issues among the proposed Section 11/12 class members because of the very allegations made by Plaintiffs. Specifically, Plaintiffs claim that two statements in the 2022 Public Offering documents were false or misleading because they omitted issues related to T&R, including that Carvana "repeatedly sold cars before holding title to the vehicles, failed to register cars within the legally required timeframe, and issued out-of-state temporary tags and/or license plates in violation of numerous state laws" ("T&R omissions").[270] Plaintiffs also claim the offering documents omitted that Carvana's retail unit sales growth "was primarily driven by a number of unsustainable practices," in addition to "sales to customers awaiting proper title and registration processing," which included:

---

[268]  See, for example, Section IX.C above.

[269]  Complaint, ¶¶ 421-422.

[270]  Complaint, ¶ 386.

   i.     "'less profitable sales' in 'markets with lower profitability due to long distance from inventory'"

   ii.    "trade-in sales resulting from Carvana's lowered purchasing and verification standards"

   iii.   "sales, pursuant to a pass-through sales agreement with Garcia Senior's DriveTime," and

   iv.   "sales that were less profitable in the immediate period" (together, the "non-T&R omissions").[271]

243.    However, and as discussed in the sections above, the T&R and non-T&R omissions were disclosed or otherwise knowable at different points in time and in different regions prior to the 2022 Public Offering through Carvana's SEC filings, analyst reports, news articles, social media, personal experiences, and other sources.[272] In fact, over the alleged Class Period there were around 150 news articles reporting on the subject of T&R omissions. Over 50 of those articles were issued prior to the 2022 Public Offering. These news articles, which are listed in Appendix C, included:

- February 16, 2021, *WMAR*, "Carvana Customer Waits Six Months for Maryland License Plates," discussing the temporary tags from Georgia, Indiana, Ohio, and Tennessee a customer received. The news outlet also quotes a Maryland Motor Vehicle Administration spokesperson who met with Carvana's corporate counsel and stated, "this sale is technically an out-of-state transaction and is not subject to Maryland's 30 day titling and temporary tag requirements."

- At least thirteen news articles between August 9-12, 2021 reporting on North Carolina's $500 civil penalty and suspension of Carvana's dealership license in

---

[271] Complaint, ¶ 380-386. Plaintiffs also alleged a misstatement relating to purchasing and verification standards that was separate from Plaintiffs' RUS alleged misstatement and it is my understanding that that alleged misstatement was already dismissed by the Court, see Order, p. 65.

[272] See, for example, Section IX.C above.

the Raleigh area following an administrative hearing where "the DMV accused the company of 'failing to deliver titles to DMV, selling motor vehicles without a state inspection, and issuing out-of-state temporary tags/plates for a vehicle sold to a person in NC.'"[273] These articles included:

- o August 9, 2021, *CBS-17*, "NCDMV revokes Carvana's dealer's license in Wake County until 2022"
- o August 10, 2021, *Spectrum News*, "DMV bans Carvana from selling cars in Raleigh until 2022"
- o August 10, 2021, *WRAL*, "Vending machine out of order; Carvana loses license to sell in Wake Co"
- o August 10, 2021, *ABC11*, "NC suspends Carvana vehicle sales at Wake County Location for 6 months" (the "North Carolina Article")
- o August 11, 2021, *The Wall Street Journal,* "Carvana Barred From Selling Vehicles in Raleigh, N.C., Area Until January"
- o August 11, 2021, *Automotive News*, "Carvana dealer license suspended in N.C. county for 180 days"
- o August 11, 2021, *Investing.com*, "Carvana Falls As North Carolina Bars It from Selling in Raleigh Area"
- o August 11, 2021, *NBC – 17 WNCN*, "Carvana on probation in Charlotte through Nov. 2022"
- o August 11, 2021, *Triangle Business Journal*, "Carvana Gets Booted in Raleigh"
- o August 12, 2021, *Charlotte Business Journal*, "Why Carvana is in Hot Water with NC Officials"
- o August 12, 2021, *Fox 46 Charlotte*, "Carvana on probation in Charlotte through Nov. 2022, suspended in Raleigh"
- o August 12, 2021, *The News & Observer*, "Car vending machine retailer Carvana cannot sell cars in Raleigh until 2022 DMV says"
- o August 12, 2021, *WSOC TV*, "Carvana in hot water with North Carolina officials"

- From August to October 2021, Florida news outlet, *WFLA*, reported that undelivered titles were keeping buyers from registering their vehicles, Carvana's

---

[273] "DMV bans Carvana from selling cars in Raleigh until 2022," *Spectrum News*, August 10, 2021.

139

issuance of multiple out-of-state temporary tags were causing issues, and Florida

regulators had settled with Carvana over 2020 title delays. The *WFLA* articles

included:

- o August 16, 2021, *WFLA*, "4 months after buying SUV from Carvana, Riverview man still has no permanent tag, registration"
- o September 21, 2021, *WFLA*, "Tampa Bay area Carvana buyers stuck with cars they can't legally drive"
- o September 22, 2021, *WFLA*, "State regulators settle with Carvana for $6K over title delays from 2020"
- o October 6, 2021, *WFLA*, "Carvana offers to buy back vehicles after failing for months to fork over titles" (reporting that Carvana had sold numerous vehicles, but "then failed to turn over the titles so [customers could] register the cars.")
- o October 18, 2021, *WFLA*, "Carvana buying back Tesla after failing to fork over title to Tampa Bay buyer"

- October 22, 2021, *The Wall Street Journal,* "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," cataloguing compliance issues and regulatory penalties in Michigan, Texas, North Carolina, California, and Florida, and further customer complaints in Kentucky, Ohio, Texas, Georgia and North Carolina. It also reported on the costs and impacts of these penalties to Carvana, specifically:

  - o In August, 2021 "[Carvana] paid $850,000 to settle a civil lawsuit with four counties in California after selling and transporting cars without licenses to do so."
  - o In July 2021, Carvana paid a $6,000 fine to "settle[] a different complaint in Florida after the state's motor-vehicles department found it had failed to provide title paperwork to 12 customers for up to eight months."
  - o "The company has been assessed $10,500 in fines in Texas for paperwork issues, according to a state website."
  - o "In Michigan, the company is on probation after admitting to violating state laws including those governing title transfers and vehicle registration."

- Hundreds of (public) complaints had been made reporting "incorrect paperwork, delays getting titles and registration and troubles with the purchasing process."

- Some customers "had been unable to drive their cars" because they hadn't received title and couldn't register their cars; others were driving with "no registration" and "expired temporary tags" they received from Carvana.

- From November 2021 through January 2022, articles discussed T&R-related issues including that Carvana had been subject to a federal consumer class action in Pennsylvania, was facing possible suspension in Florida for T&R delays, and since 2019, was cited in Texas for over 30 violations and $10,000 in fines.

  - November 15, 2021, *CBS DFW* (Texas), "I-Team: Online Car Seller Carvana Hit with Dozens of State Violations as Customers Report Paperwork Troubles"

  - November 17, 2021, *WFLA*, "8-month Carvana title delay forces Tampa Bay paramedic to park car, get rental to drive to work" (discussing regulators' action in Florida, North Carolina, and Texas)

  - November 29, 2021, *Autoblog*, "Some Carvana buyers have waited months for license plates" (stating that Carvana was "slapped" with "fines and stop-sale orders" in multiple states)

  - December 7, 2021, *Dayton Daily News* (Ohio), "How to Avoid Negotiating When Buying a Car" ("Word of Caution about Carvana . . . Several states have sanctioned Carvana or put it under review for failing to handle title transfers and vehicle registrations on time")

  - December 10, 2021, *classaction.org*, "Carvana Hit with Class Action Over Alleged 'Months and Months' of Delays in Transferring Vehicle Titles" (discussing Pennsylvania class action)

  - December 14, 2021, *WJXT*, "I-TEAM uncovers state action & federal lawsuit against Carvana"

  - December 17, 2021, *WFLA*, "Florida threatens to pull Carvana's dealer license over ongoing title issues"

  - December 21, 2021, *Automotive News*, "Why Florida is threatening to suspend Carvana's dealer," reporting that Florida had threatened to "suspend Carvana's dealer license" based on evidence showing Carvana had failed to transfer titles for numerous sales "dating [back] to 2019"

  - December 24, 2021, *WFLA*, "Carvana faces 2 class-action lawsuits over registration delays amid deadline to fix title problems in Florida"

  - January 10, 2022, *WJXT*, "I-TEAM: State threatening to suspend Carvana's license to sell cars in Florida"

141

- o January 31, 2022, *WJXT*, "I-TEAM: Carvana faces Monday deadline to submit information to state"

- April 7, 2022, *Denver7*, "Colorado regulators find 'systematic issue' with Carvana," shortly before the 2022 Public Offering, a Denver news outlet warned the public that Colorado regulators found Carvana's delays in providing T&R paperwork were a "systemic issue," that was affecting "several other states, including Florida, Texas, Michigan, California and North Carolina."

244.    Carvana itself disclosed information regarding the T&R omissions prior to the 2022 Public Offering. Carvana's management warned investors of challenges with title and registration in its 2020 Form 10-K, including that processing titles could take longer than it did pre-COVID-19.[274] In statements at the J.P. Morgan Automotive Conference on August 11, 2021, Carvana acknowledged delays in title and registration processing had occurred, as well as the North Carolina suspension.[275] And in its Q3 2021 shareholder letter, Carvana told investors that "[b]uying more cars from customers leads to . . . more complex title processing requirements, which in turn leads to more complex registration processing" and that to address these concerns, Carvana disclosed that it was "enhancing [its] systems and processes to adapt" to title and registration processing challenges.[276]

245.    Details regarding other alleged unsustainable practices were also disclosed before and during the alleged Class Period. As noted by the Court, Carvana disclosed strategies relating to its expansion to new markets, its increased trade-ins with customers, including of "lower-quality vehicles that it either reconditioned or sold to wholesalers," its sales from DriveTime, and

---

[274]  Carvana Co. Form 10-K for the Period Ended December 31, 2020, at p. 17.

[275]  Mark Jenkins, "J.P. Morgan Automotive Investor Conference," New York, August 11, 2021.

[276]  "Q3 2021 Letter to Shareholders," *Carvana Co.*, November 4, 2021, at p. 3.

142

its focus on growth over profitability.[277] Thus, it is my understanding that according to the Court, the only actionable omissions of alleged unsustainable practices remaining in this case are those related to T&R issues.[278]

246.    These public articles and disclosures, in different publications made on different dates, mean that the individual Section 11/12 putative class members will have differing individual knowledge regarding the alleged T&R and non-T&R omissions. Given that the T&R and non-T&R omissions were public prior to the offering documents, many investors likely had knowledge of those issues when deciding to purchase shares in the 2022 Public Offering. Moreover, among investors that had knowledge of the alleged issues, the degree of their knowledge and their willingness to undertake the known risk could vary.[279] For example, some investors might only have knowledge of issues discussed on social media or news articles, others might have knowledge from Carvana's SEC filings, while others might have knowledge from the in-depth analyses in analyst reports. Further, by the time of the April 20, 2022 Registration Statement, according to Plaintiffs' own Complaint, two of the T&R alleged corrective disclosures had already occurred (the August 10, 2021 North Carolina article and the October 22, 2021 *Wall Street Journal* article reporting that Carvana was breaking title and registration laws in Michigan, Texas, California, and North Carolina).[280] Thus, according to Plaintiffs' own theory, proposed class members who were ~~aware~~ of those alleged corrective disclosures would have more knowledge of the alleged T&R omission.

---

[277] Order, pp. 22-23, 25, 27, 28.

[278] Order, pp. 67, 69. One alleged misstatement relating to Carvana's RUS remains, however it is my understanding that the RUS alleged misstatement remains only to the extent that the alleged "unsustainable practices" remain. See, Order, pp. 65-66.

[279] See ¶ 243 above.

[280] Complaint, ¶¶ 311, 313.

143

247.    In addition, Plaintiffs' allegations create substantial conflicts within and between the Section 11/12 and 10b-5 classes. According to Plaintiffs, all of the proposed class members in the Section 11/12 case are also in the 10b-5 class. However, the timing of both classes is very different, with the Section 11/12 class starting much later, almost two years after the 10b-5 class.[281] In addition, the Section 11/12 and 10b-5 classes have different damages measures. Thus, the difference in the timing and the different damages measures along with Carvana's unusual price movements create substantial issues and conflicts, including the following:

- **Conflicts and issues created by the different but overlapping relevant time periods of the Section 11/12 and 10b-5 classes given the alleged misrepresentations in both cases are essentially identical.** Dr. Cain indicates that Section 11/12 damages can be reduced by proving negative causation (i.e., "financial losses under the statutory formula [that] were not caused by the alleged false statements or omission") but notes that he is "not aware of any evidence presented by Securities Act Defendants that establishes negative causation."[282] However, Plaintiffs' own Complaint has evidence of negative causation. In particular, the Complaint identifies alleged corrective disclosure dates for the 10b-5 class that fall within the Section 11/12 relevant time period.[283] Thus, given the alleged misrepresentations in both cases are essentially identical, according to Plaintiffs' own theory there was no information correcting the alleged misstatements on any other days over the Section 11/12 relevant period, which is evidence of negative causation

---

[281]  Complaint, ¶¶ 1, 366.

[282]  Cain Report, ¶¶ 136, 139.

[283]  Complaint, ¶¶ 320-322.

for the Section 11/12 claims.[284] Moreover, conflicts arise from the fact that the relevant period for the 10b-5 class is much longer and includes time periods that are not relevant for the Section 11 class. The 10b-5 class starts almost two years before the April 22, 2022 offering, the beginning of the relevant period for the Section 11 class. Since the Section 11 damages are focused on the period from the offering to the filing date for the first complaint alleging Section 11 claims, the proposed Section 11 class members will maximize damages by arguing that all of the alleged truth came out between April 22 and September 30, 2022 (the date the complaint alleging Section 11 claims was filed in *City of Warwick Ret. Sys. v. Carvana Co*.), because they will not be able to collect any damages for the part of the alleged truth that was revealed outside this period. On the other hand, the proposed 10b-5 class will have proposed class members who can benefit from claiming damages associated with alleged corrective disclosures that happened before the offering or after the complaint filing date. This is particularly problematic in this case since Plaintiffs claim that two of the four alleged corrective disclosures occurred before the offering and one occurred after the first complaint was filed.[285] The chart below shows Carvana's stock prices and the different relevant periods for the Section 11 and 10b-5 classes. The chart highlights the fact that some of the alleged corrective disclosures (red dots) and

---

[284] It is my understanding that Section 11(e) includes a provision, commonly referred to as the negative causation defense, which limits or eliminates shareholders' recoverable damages if the defendants prove that the decline in stock price between the offering and the relevant measuring date (date sold or time suit was filed) did not result (in whole or in part) from the portion of the registration statement which is alleged to be false.

See, Securities Act of 1933, Section 11, Civil Liabilities on Account of False Registration Statement, Part (e). ("Provided, that if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.").

[285] Complaint, ¶¶ 311, 313, 322.

dismissed alleged corrective disclosures (red squares) are before and after the Section

11 relevant period and that Carvana's stock rebounds well above the offering price.



**Carvana Stock Price and 10b-5 and Section 11 Periods**

Notes and Sources:
Data from Bloomberg, L.P. Alleged corrective disclosures and alleged misstatements from Complaint, Cain Report, and Order. Other events from court filings and Carvana's SEC filings.

- **Conflicts and issues created by the fact that Carvana's stock price rebounded well above the offering price.** Section 11 damages are statutorily capped at the difference between the offering price and the sale price.[286] Because Carvana's stock

---

[286]  It is my understanding that the maximum amount of damages a shareholder can potentially recover under Section 11 is limited to the difference between the offering price and the price at the time the complaint was filed. If a shareholder sold at a price higher than the complaint filing price, they can potentially recover only the difference between the offering price and their sale price.

See, Securities Act of 1933, Section 11, Civil Liabilities on Account of False Registration Statement, Part (e). ("The suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: Provided, that if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a

146

price recovered and increased to levels substantially above the offering price, proposed class members who sell their shares now would have their damages capped at zero. Thus, Section 11 class members who are currently still holding their shares will not get any damages if they sell their shares before the case is resolved (assuming prices stay around current levels when they sell). These proposed class members would want the Section 11 claims to be resolved quickly so that they could sell their shares without worrying about losing their potential recovery from those claims. In contrast, Section 11 class members who have already sold their shares at prices above the offering price cannot receive any Section 11 damages and thus have no incentive to spend resources on resolving the Section 11 claims. Instead, those class members want Plaintiffs' lawyers to focus on the 10b-5 case, where they could potentially get damages under Dr. Cain's 10b-5 damages methodology.

Lucy P. Allen

May 18, 2026

---

material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.").

147



**Lucy P. Allen**
Senior Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# Appendix A

## LUCY P. ALLEN
## SENIOR MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

| | |
|---|---|
| 1994-Present | **National Economic Research Associates, Inc.** Senior Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics. Managing Director (2016-2023). Senior Vice President (2003-2016). Vice President (1999-2003). Senior Consultant (1994-1999). |
| 1992-1993 | **Council of Economic Advisers, Executive Office of the President** Staff Economist.  Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*.  Working Group member of the President's National Health Care Reform Task Force. |
| 1986-1988 1983-1984 | **Ayers, Whitmore & Company (General Management Consultants)** Senior Associate.  Formulated marketing, organization, and overall business strategies including: Plan to improve profitability of chemical process equipment manufacturer. Merger analysis and integration plan of two equipment manufacturers. Evaluation of Korean competition to a U.S. manufacturer. |

1

Lucy P. Allen

Diagnostic survey for auto parts manufacturer on growth obstacles. Marketing plan to increase international market share for major accounting firm.

Summer 1985      **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983      **Arthur Andersen & Company**
<u>Consultant</u>.  Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company.

## Teaching

1989- 1992      **<u>Teaching Fellow</u>, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

"Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Testimony (4 years)

Testimony before the United States District Court for the Southern District of Texas, Houston Division in *In re Concho Resources Inc., Securities Litigation*, 2025.

Deposition Testimony before the United States District Court for the Southern District of New York in *In re Waste Management Securities Litigation,* 2024.

Deposition Testimony before the United States District Court for the Southern District of Texas, Houston Division in *Miriam Edwards, et al. v. McDermott International, Inc., et al.,* 2024.

Deposition Testimony before the United States District Court for the Southern District of Texas, Houston Division in *Kingstown Capital Management, L.P., et al. v. McDermott International, Inc., et al.,* 2024.

Testimony and Deposition Testimony in private arbitration proceeding, *HBC US Holdings, LLC v. National Fire & Marine Insurance Company,* 2024.

Deposition Testimony before the United States District Court for the Southern District of Texas, Houston Division, in *In re Concho Resources Inc., Securities Litigation,* 2024.

Testimony before the District Court of Vermont, in *Vermont Federation of Sportsmen's Clubs et al. v. Matthew Birmingham, et al.*, 2024.

Testimony before the United States District Court for the Central District of California in *In re Prime Healthcare ERISA Litigation,* 2024.

Testimony and Deposition Testimony before the Superior Court of the State of Delaware in *Janco FS 2, LLC et al. v. ISS Facility Services, Inc.,* 2024.

Deposition Testimony before the 139th Judicial District Court of Hidalgo County, Texas in *Doctors Hospital at Renaissance, Ltd. v. Employers Insurance Company of Wausau et al.,* 2024.

Deposition Testimony before the Superior Court of Fulton County, Georgia in *Corvex Master Fund LP et al. v. Mohawk Industries, Inc., et al., Value Recapture Partners LLC v. Mohawk Industries, Inc., et al., Incline Global Master LP et al. v. Mohawk Industries,*

Lucy P. Allen

*Inc., et al., and Soroban Opportunities Master Fund LP v. Mohawk Industries, Inc., et al.,* 2024.

Deposition Testimony before the United States District Court for the Eastern District of Tennessee at Chattanooga in *City of Taylor General Employees Retirement System v. Astec Industries, Inc. and Benjamin G. Brock,* 2024.

Deposition Testimony before the United States District Court, Eastern District of Arkansas, in *Robert Murray v. EarthLink Holdings Corp., et al.,* 2023.

Deposition Testimony before the District Court of Harris County, Texas in *Houston Livestock Show and Rodeo, Inc. v. Hallmark Financial Services, Inc. D/B/A Hallmark Specialty Insurance Company, et al.,* 2023.

Testimony and Deposition before the United States District Court for the Southern District of Texas in *In re Apache Corp. Securities Litigation,* 2023.

Deposition Testimony before the United States District Court for the Central District of California in *In re Prime Healthcare ERISA Litigation,* 2023.

Deposition Testimony before the United States District Court for the Southern District of Texas in *Delaware County Employees Retirement System v. Cabot Oil & Gas Corporation, et al.,* 2023.

Testimony and Deposition before the United States District Court for the District of Oregon in *Oregon Firearms Federation, Inc. et al. v. Tina Kotek et al.*, 2023.

Testimony and Depositions before the United States District Court for the Southern District of Texas, Houston Division in *Miriam Edwards, et al. v. McDermott International, Inc., et al.,* 2023.

Deposition Testimony before the District Court of Harris County, Texas in *Boxer Property Management Corp. et al. v. Illinois Union Ins. Co. et al.*, 2022.

Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

5

Lucy P. Allen

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.*, 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

6

# Appendix B
# Materials Considered

**A. Case Documents, Filings, and Court Decisions in this Matter**

1. Class Action Complaint for Violations of the Federal Securities Laws, filed August 3, 2022
2. Lead Plaintiffs' Amended Consolidated Complaint for Violations of the Federal Securities Laws, filed March 29, 2024
3. Defendants' Motion to Dismiss Lead Plaintiffs' Amended Consolidated Complaint and Memorandum of Points and Authorities, filed May 24, 2024
4. Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Consolidated Complaint, filed July 29, 2024
5. Order, filed December 16, 2024
6. Plaintiffs' Motion for Class Certification and Memorandum of Points and Authorities, filed April 6, 2026
7. Expert Report of Matthew D. Cain, Ph.D., filed April 6, 2026, including materials turned over

**B. Depositions in this matter, including**

1. Deposition of Matthew Cain, Ph.D., May 8, 2026
2. Deposition of Christopher Graff of T. Rowe Price, investment advisor for Lead Plaintiff United Association National Pension Fund (UANPF), February 18, 2026
3. Deposition of David Ravera of Jennison Associates, investment advisor for Lead Plaintiff United Association National Pension Fund (UANPF), February 25, 2026
4. Deposition of Mark Urquhart of Baillie Gifford, investment advisor for Saskatchewan Healthcare Employees Pension Plan (SHEPP), April 24, 2026

**C. Data on Lead Plaintiffs' securities holdings and trades**

1. BGO-CVNA-0000578.csv
2. BGO-CVNA-0000234.pdf
3. JENN 00002171.pdf
4. T.Rowe Price's Carvana Transactions.pdf

**D. Carvana's SEC Filings and Press Releases (2017 to 2023)**

**E. Carvana's Conference Call Transcripts from Factiva (2020 to 2023)**

**F. Data**

*Data from Bloomberg, L.P.*

1. Price, volume, shares outstanding, equity float, short interest, and implied volatility data for Carvana stock
2. Intraday price and volume data for Carvana stock
3. Price and return data for the S&P 500 Index, S&P 500 Consumer Discretionary Distribution & Retail Index, AutoNation stock, CarGurus stock, CarMax stock, CarLotz stock, Shift stock, Stitch Fix stock, TrueCar stock, and Vroom stock

**Appendix B**
**Materials Considered**

4. Data on members of the S&P 500 Consumer Discretionary Distribution & Retail Index
5. Data on 2-year treasury yields

*Data from FactSet Research Systems, Inc.*

1. Institutional holdings, insider holdings, and revenue data for Carvana stock
2. Revenue data for CarLotz, Shift, and Vroom

*Data from the Federal Reserve and the U.S. Census Bureau*

1. Data on the Consumer Price Index and wage growth from the Federal Reserve
2. Data on online consumer spending from the U.S. Census Bureau

**G. News Stories from Factiva, Bloomberg, and Google (2020 to 2023) and Posts on Twitter and Reddit mentioning T&R issues at Carvana and peer companies**

*News Stories mentioning Carvana's T&R issues, including the following as well as those listed in Appendix C:*

1. "Carvana customer waits six months for Maryland license plates," *WMAR*, February 16, 2021, https://www.wmar2news.com/matterformallory/carvana-customer-waits-six-months-for-maryland-license-plates
2. "NCDMV revokes Carvana's dealer's license in Wake County until 2022," *CBS17*, August 9, 2021, https://www.cbs17.com/news/local-news/wake-county-news/ncdmv-revokes-carvanas-dealers-license-in-wake-county-until-2022/
3. "NC suspends Carvana vehicle sales at Wake County location for 6 months," *ABC11*, August 10, 2021, https://abc11.com/post/carvana-wake-county-suspended-car-vending-machine/10943046/.
4. "DMV bans Carvana from selling cars in Raleigh until 2022," *Spectrum News*, August 10, 2021, https://spectrumlocalnews.com/news/2021/08/10/dmv-bans-carvana-from-selling-cars-in-raleigh-until-2022
5. "Vending machine out of order; Carvana loses license to sell in Wake Co," *WRAL*, August 10, 2021, https://www.wral.com/story/vending-machine-out-of-order-carvana-loses-license-to-sell-in-wake-co-until-2022/19820588/
6. "Carvana Barred From Selling Vehicles in Raleigh, N.C., Area Until January," *The Wall Street Journal*, August 11, 2021, https://www.wsj.com/business/autos/carvana-barred-from-selling-vehicles-in-raleigh-n-c-area-until-january-11628694947
7. "Carvana dealer license suspended in N.C. county for 180 days," *Automotive News*, August 11, 2021, https://www.autonews.com/retail/carvana-dealer-license-suspended-nc-county-180-days/
8. "Carvana Falls As North Carolina Bars It from Selling in Raleigh Area," *Investing.com*, August 11, 2021, https://www.investing.com/news/stock-market-news/carvana-falls-as-north-carolina-bars-it-from-selling-in-raleigh-area-2587113
9. "In addition to its suspension in Wake Co. Carvana on probation in Charlotte through Nov 2022," *WNCN,* August 11, 2021, https://www.cbs17.com/news/cbs17-investigates/in-addition-to-its-suspension-in-wake-county-carvana-on-probation-in-charlotte-through-nov-2022/

2

**Appendix B**
**Materials Considered**

10. "Carvana Gets Booted in Raleigh," *Triangle Business Journal*, August 11, 2021, https://www.bizjournals.com/triangle/news/2021/08/11/tbj-plus-raleigh-durham-apartment-rents-racing-up.html

11. "Why Carvana is in Hot Water with NC Officials," *Charlotte Business Journal*, August 12, 2021, https://www.bizjournals.com/charlotte/news/2021/08/12/cbj-morning-buzz-carvana-nc-dealer-license-suspend.html

12. "Carvana on probation in Charlotte through Nov. 2022, suspended in Raleigh," *Fox 46 Charlotte*, August 12, 2021, https://www.qcnews.com/news/u-s/north-carolina/carvana-on-probation-in-charlotte-through-nov-2022-suspended-in-raleigh/

13. "Car vending machine retailer Carvana cannot sell cars in Raleigh until 2022 DMV says," *The News & Observer*, August 12, 2021, https://www.newsobserver.com/news/business/article253391658.html

14. "Carvana in hot water with North Carolina officials," *WSOC TV*, August 12, 2021, https://www.wsoctv.com/news/local/carvana-hot-water-with-nc-officials/WNMTST2TBZH3PC77DGBCX7K33I/

15. "4 months after buying SUV from Carvana, Riverview man still has no permanent tag, registration," *WFLA*, August 16, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/four-months-after-buying-suv-from-carvana-riverview-man-still-has-no-permanent-tag-and-registration/

16. "Tampa Bay area Carvana buyers stuck with cars they can't legally drive," *WFLA*, September 21, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/tampa-bay-area-carvana-buyers-stuck-with-cars-they-cant-drive-after-dealer-fails-to-fork-over-titles/

17. "State regulators settle with Carvana for $6K over title delays from 2020," *WFLA*, September 22, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/state-regulators-settle-with-carvana-for-6k-over-title-delays-from-2020/

18. "Carvana offers to buy back vehicles after failing for months to fork over titles," *WFLA*, October 6, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/carvana-offers-to-buy-back-vehicles-after-failing-for-months-to-fork-over-titles/

19. "Carvana buying back Tesla after failing to fork over title to Tampa Bay buyer," *WFLA*, October 18, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/carvana-buying-back-tesla-after-failing-to-fork-over-title-to-tampa-bay-buyer/

20. "Carvana Faces Government Scrutiny and Fines Following Consumer Complaints," *The Wall Street Journal*, October 22, 2021, https://www.wsj.com/business/autos/carvana-faces-government-scrutiny-and-fines-following-consumer-complaints-11634902676

21. "I-Team: Online Car Seller Carvana Hit with Dozens of State Violations as Customers Report Paperwork Troubles," *CBS DFW (Texas)*, November 15, 2021, https://www.cbsnews.com/texas/news/online-car-seller-carvana-hit-texas-state-violations-customers-paperwork-troubles/

22. "8-month Carvana title delay forces Tampa Bay paramedic to park car, get rental to drive to work," *WFLA*, November 17, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/8-month-carvana-title-delay-forces-tampa-bay-paramedic-to-park-car-get-rental-to-get-to-work/

23. "Some Carvana buyers have waited months for license plates," *Autoblog*, November 29, 2021, https://www.autoblog.com/carbuying/carvana-complaints-registration

24. "How to Avoid Negotiating When Buying a Car," *Dayton Daily News (Ohio)*, December 7, 2021

**Appendix B**
**Materials Considered**

25. "Carvana Hit with Class Action Over Alleged 'Months and Months' of Delays in Transferring Vehicle Titles," *classaction.org*, December 10, 2021, https://www.classaction.org/news/carvana-hit-with-class-action-over-alleged-months-and-months-of-delays-in-transferring-vehicle-titles

26. "I-TEAM uncovers state action & federal lawsuit against Carvana," *WJXT*, December 14, 2021, https://www.news4jax.com/i-team/2021/12/14/i-team-uncovers-state-action-federal-lawsuit-against-carvana/

27. "Florida threatens to pull Carvana's dealer license over ongoing title issues," *WFLA*, December 17, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/florida-threatens-to-pull-carvanas-dealer-license-over-ongoing-title-issues/

28. "Why Florida is threatening to suspend Carvana's dealer," *Automotive News*, December 21, 2021, https://www.autonews.com/retail/why-florida-threatening-suspend-carvanas-dealer-license/

29. "Carvana faces 2 class-action lawsuits over registration delays amid deadline to fix title problems in Florida," *WFLA*, December 24, 2021, https://www.wfla.com/8-on-your-side/better-call-behnken/carvana-faces-2-class-action-lawsuits-over-registration-delays-amid-deadline-to-fix-title-problems-in-florida/

30. "I-TEAM: State threatening to suspend Carvana's license to sell cars in Florida," *WJXT*, January 10, 2022, https://www.news4jax.com/i-team/2022/01/10/i-team-state-threatening-to-suspend-carvanas-license-to-sell-cars-in-florida/

31. "I-TEAM: Carvana faces Monday deadline to submit information to state," *WJXT*, January 31, 2022, https://www.news4jax.com/i-team/2022/01/31/i-team-carvana-faces-monday-deadline-to-submit-information-to-state/

32. "Carvana sales can go on in Florida, Raleigh, N.C.," *Automotive News*, February 7, 2022, https://www.autonews.com/retail/carvana-clears-regulatory-hurdles-florida-nc/

33. "Colorado regulators find 'systematic issue' with Carvana," *Denver7*, April 7, 2022

34. "Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars," *Barron's*, June 24, 2022, https://www.barrons.com/articles/carvana-used-cars-registration-problems-51656111441

35. "Carvana can do business in Illinois again after judge orders temporary reprieve," *Fox 32*, August 1, 2022, https://www.fox32chicago.com/news/carvana-can-do-business-in-illinois-again-after-judge-orders-temporary-reprieve

36. "Department of State suspends Novi Dealership," *Michigan Department of State*, October 7, 2022, https://www.michigan.gov/sos/resources/news/2022/10/07/department-of-state-suspends-novi-dealership

37. "Maryland joins other states in fining Carvana for title delays," *WMAR 2*, October 11, 2022, https://www.wmar2news.com/matterformallory/maryland-joins-other-states-in-fining-carvana-for-title-delays

38. "No titles, no registration: Car owners in Ohio file complaints against Carvana," *WSYX ABC 6*, November 22, 2022, https://abc6onyourside.com/on-your-side/problem-solvers/no-titles-no-registration-car-owners-in-ohio-file-complaints-against-carvana-vehicles-bureau-of-motor-vehicles-bmv-attorney-general-david-yost

4

**Appendix B**
**Materials Considered**

*Other News Stories, including:*

1. "Fed Cuts Rates to Near Zero and Will Relaunch Bond-Buying Program," *Wall Street Journal*, March 15, 2020, https://www.wsj.com/articles/fed-faces-crucial-decisions-to-alleviate-virus-shock-11584303662

2. "White House expresses support for immediate cash payments to Americans as part of coronavirus stimulus package," *Washington Post*, March 17, 2020, https://www.washingtonpost.com/us-policy/2020/03/17/trump-coronavirus-stimulus-package/

3. "Car manufacturing hit by global semiconductor shortage," *Financial Times*, January 8, 2021, https://www.ft.com/content/e264fd41-7ee9-4fba-be3c-21446298efd9?syn-25a6b1a6=1

4. "Groceries and sporting goods were big gainers in the Covid e-commerce boom of 2020," *CNBC*, February 19, 2021, https://www.cnbc.com/2021/02/19/e-commerce-surged-during-covid-groceries-sporting-goods-top-gainers-.html

5. "Chip Shortage Creates Chaos for Carmakers," *The New York Times*, April 24, 2021

6. "U.S. Government Bond Yields Rise After Fed Decision," *The Wall Street Journal*, June 16, 2021, https://www.wsj.com/finance/investing/u-s-government-bond-yields-slip-ahead-of-fed-decision-11623861689

7. "Streetwise: Carvana Finds Itself In the Fast Lane. Why It Can Keep the Pace," *Barron's,* August 13, 2021

8. "For Auto Makers, the Chip Famine Will Persist," *The Wall Street Journal*, September 22, 2021, https://www.wsj.com/opinion/auto-car-makers-industry-semiconductor-chip-shortage-covid-19-taiwan-vietnam-11632329226

9. "The COVID Shock to Online Retail: The persistence of new online shopping habits and implications for the future of cities," *JP Morgan Chase & Co.*, November 2021, https://www.jpmorganchase.com/institute/all-topics/community-development/covid-shock-to-online-retail

10. Joy Wiltermuth, "Carvana, Coinbase Junk Bonds Tumble Wednesday as Layoffs, Losses Hit Prices," *MarketWatch*, May 11, 2022

11. "Carvana Up Over 21%, on Pace for Largest Percent Increase Since September 2020 — Data Talk," *Dow Jones Institutional News*, May 12, 2022

12. "Carvana Co. Cl A (CVNA) Paused Due to Volatility," *Dow Jones Institutional News*, May 12, 2022

13. "S&PGR Assigns Carvana Auto Rec Trust 2022-P2 Prelim Ratings," *Dow Jones Institutional News*, May 12, 2022

14. "Carvana Is Acting Like a Meme Stock. GameStop and AMC Closed Higher Too." *Barron's*, May 12, 2022, https://www.barrons.com/articles/carvana-gamestop-gme-stock-meme-surge-51652367445

15. "Central banks raise rates again as Fed drives global inflation fight," *Reuters*, September 22, 2022, https://www.reuters.com/markets/europe/central-banks-raise-rates-again-fed-drives-global-inflation-fight-2022-09-22/

16. "3 Signs Carvana Hit the Wall," *Motley Fool*, February 2, 2023, https://www.fool.com/investing/2023/02/02/3-signs-carvana-has-hit-the-wall/

5

# Appendix B
# Materials Considered

*Twitter and Reddit Posts mentioning T&R issues at Carvana and peer companies, including:*

1. Twitter post by @AndersReynolds at 10:30 AM on March 12, 2020, accessed at https://x.com/AndersReynolds/status/1238110017548673024
2. Twitter post by @ericdorre at 7:13 PM on March 31, 2020, accessed at https://x.com/ericdorre/status/1245127037787856897
3. Twitter post by @LeavittL86 at 3:29 PM on August 27, 2020, accessed at https://x.com/LeavittL86/status/1299066615733137413
4. Twitter post by @HLCullen at 12:21AM on February 10, 2021, accessed at https://x.com/HLCullen/status/1359371769002491904
5. Twitter post by @pcnerd37 at 1:22 PM on February 11, 2021, accessed at https://x.com/pcnerd37/status/1359930841237889028
6. Twitter post by @geekpondering at 9:18 PM on February 11, 2021, accessed at https://x.com/geekpondering/status/1360050550474211334
7. Twitter post by @SteveSchirmer at 10:56 AM on April 5, 2021, accessed at https://x.com/SteveSchirmer/status/1379085491946000390
8. Twitter post by @JSimsOfficial at 10:51 AM on May 28, 2021, accessed at https://x.com/JSimsOfficial/status/1398290903522029570
9. Twitter post by @lifewithtkg at 5:05 PM on July 12, 2021, accessed at https://x.com/lifewithtkg/status/1414692513693196297
10. Twitter post by @AnaCaro98192618 at 1:22 PM on February 13, 2022, accessed at https://x.com/AnaCaro98192618/status/1492927259786817538
11. beanTHEbarista, "Worst registration experience ever," Reddit post, https://www.reddit.com/r/carvana/comments/iqbaxt/worst_registration_experience_ever/

H. **Academic Literature and Textbooks on Finance, Securities, Valuation, and Statistics**

1. Alexander, Janet C., "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, 41: 1994
2. Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting*, 10(4): 1983
3. David Tabak, "Making Assessments About Materiality Less Subjective Through the Use of Content Analysis," 2007
4. Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19
5. Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38: 1982
6. Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011)
7. Hogg, Robert V. and Elliot A. Tanis, *Probability and Statistical Inference*, (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997)
8. MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997
9. Simona Mola, P. Raghavendra Rau, and Ajay Khorana, "Is There Life After the Complete Loss of Analyst Coverage?," *The Accounting Review* 88, no. 2 (2013): 667

6

# Appendix B
# Materials Considered

I.  **Analyst Reports**

*Analyst reports on Carvana*
1.    2019.09.26 - J.P. Morgan
2.    2019.12.06 - Wells Fargo
3.    2020.01.09 - Benchmark
4.    2020.01.15 - J.P. Morgan
5.    2020.01.17 - Needham
6.    2020.01.21 - Citi
7.    2020.01.22 - Morgan Stanley
8.    2020.01.24 - Morgan Stanley
9.    2020.02.03 - Baird
10.   2020.02.06 - Evercore
11.   2020.02.12 - Wells Fargo
12.   2020.02.18 - William Blair
13.   2020.02.21 - Wedbush
14.   2020.02.24 - Deutsche Bank
15.   2020.02.26 - Citi
16.   2020.02.26 - J.P. Morgan
17.   2020.02.26 - J.P. Morgan
18.   2020.02.26 - Morgan Stanley
19.   2020.02.27 - Deutsche Bank
20.   2020.02.27 - B. Riley
21.   2020.02.27 - Baird
22.   2020.02.27 - Citi
23.   2020.02.27 - Citizens
24.   2020.02.27 - Craig Hallum
25.   2020.02.27 - Evercore
26.   2020.02.27 - Morgan Stanley
27.   2020.02.27 - Needham
28.   2020.02.27 - Oppenheimer
29.   2020.02.27 - Stephens
30.   2020.02.27 - Benchmark
31.   2020.02.27 - Wedbush
32.   2020.02.27 - Wells Fargo
33.   2020.02.27 - William Blair
34.   2020.02.27 - Wolfe Research
35.   2020.03.03 - William Blair
36.   2020.03.04 - Barrington Research
37.   2020.03.13 - J.P. Morgan
38.   2020.03.20 - B. Riley
39.   2020.03.24 - J.P. Morgan
40.   2020.03.30 - B. Riley
41.   2020.03.30 - Baird
42.   2020.03.30 - Baird
43.   2020.03.30 - Citi
44.   2020.03.30 - Evercore
45.   2020.03.30 - J.P. Morgan
46.   2020.03.30 - Morgan Stanley
47.   2020.03.30 – Stephens

7

# Appendix B
# Materials Considered

I. **Analyst Reports (cont.)**

48. 2020.03.31 - Citizens
49. 2020.04.01 - Needham
50. 2020.04.02 – Citi
51. 2020.04.07 - William Blair
52. 2020.04.09 - Wedbush
53. 2020.04.17 - Craig Hallum
54. 2020.04.21 - Morgan Stanley
55. 2020.04.21 - Wells Fargo
56. 2020.04.22 - Morgan Stanley
57. 2020.04.27 - Morgan Stanley
58. 2020.04.28 - Needham
59. 2020.04.29 - J.P. Morgan
60. 2020.04.29 - William Blair
61. 2020.05.05 - Evercore
62. 2020.05.06 - Citi
63. 2020.05.06 - J.P. Morgan
64. 2020.05.06 - Wells Fargo
65. 2020.05.06 - William Blair
66. 2020.05.07 - B. Riley
67. 2020.05.07 - Baird
68. 2020.05.07 - Citizens
69. 2020.05.07 - Craig Hallum
70. 2020.05.07 - Evercore
71. 2020.05.07 - J.P. Morgan
72. 2020.05.07 - Morgan Stanley
73. 2020.05.07 - Morgan Stanley
74. 2020.05.07 - Needham
75. 2020.05.07 - Stephens
76. 2020.05.07 - Wedbush
77. 2020.05.08 - Benchmark
78. 2020.05.11 - Oppenheimer
79. 2020.05.12 - Deutsche Bank
80. 2020.05.13 - Citi
81. 2020.05.19 – B. Riley
82. 2020.05.19 - J.P. Morgan
83. 2020.05.22 - Morgan Stanley
84. 2020.05.22 - William Blair
85. 2020.05.26 - Wells Fargo
86. 2020.05.26 - William Blair
87. 2020.06.01 - Baird
88. 2020.06.10 - Needham
89. 2020.06.10 - William Blair
90. 2020.06.25 - Citi
91. 2020.06.26 - Morgan Stanley
92. 2020.07.02 - Evercore
93. 2020.07.06 - Citizens
94. 2020.07.06 - Wedbush
95. 2020.07.08 – Baird

8

## Appendix B
## Materials Considered

**I.   Analyst Reports (cont.)**

96.   2020.07.10 - J.P. Morgan
97.   2020.07.10 - Morgan Stanley
98.   2020.07.27 – Citi
99.   2020.07.28 - William Blair
100.  2020.07.29 - Wells Fargo
101.  2020.07.29 - Needham
102.  2020.07.30 - Wedbush
103.  2020.08.03 - Evercore
104.  2020.08.05 - B. Riley
105.  2020.08.05 - Baird
106.  2020.08.05 - Citi
107.  2020.08.05 - Evercore
108.  2020.08.05 - J.P. Morgan
109.  2020.08.05 - Piper Sandler
110.  2020.08.05 - Wells Fargo
111.  2020.08.05 - William Blair
112.  2020.08.06 - Deutsche Bank
113.  2020.08.06 - Citizens
114.  2020.08.06 - Craig Hallum
115.  2020.08.06 - J.P. Morgan
116.  2020.08.06 - Morgan Stanley
117.  2020.08.06 - Needham
118.  2020.08.06 - Stephens
119.  2020.08.06 - Wedbush
120.  2020.08.07 - Benchmark
121.  2020.08.10 - Citi
122.  2020.08.10 - Oppenheimer
123.  2020.09.22 - Wells Fargo
124.  2020.09.22 - B. Riley
125.  2020.09.22 - Baird
126.  2020.09.22 - Citi
127.  2020.09.22 - Evercore
128.  2020.09.22 - J.P. Morgan
129.  2020.09.22 - Stephens
130.  2020.09.22 - Wedbush
131.  2020.09.22 - William Blair
132.  2020.09.23 - B. Riley
133.  2020.09.23 - Citizens
134.  2020.09.23 - Needham
135.  2020.09.23 - Benchmark
136.  2020.09.29 - Piper Sandler
137.  2020.10.05 - BNP Paribas
138.  2020.10.05 - Morgan Stanley
139.  2020.10.08 - Baird
140.  2020.10.16 - Piper Sandler
141.  2020.10.19 - Piper Sandler
142.  2020.10.20 - William Blair
143.  2020.10.21 – Citi

9

## Appendix B
## Materials Considered

**I.  Analyst Reports (cont.)**

144.  2020.10.26 - Needham
145.  2020.10.27 - Evercore
146.  2020.10.28 - Piper Sandler
147.  2020.10.29 - Baird
148.  2020.10.29 - Citi
149.  2020.10.29 - Evercore
150.  2020.10.29 - J.P. Morgan
151.  2020.10.29 - J.P. Morgan
152.  2020.10.29 - Morgan Stanley
153.  2020.10.29 - Needham
154.  2020.10.29 - Piper Sandler
155.  2020.10.30 - B. Riley
156.  2020.10.30 - BNP Paribas
157.  2020.10.30 - Craig Hallum
158.  2020.10.30 - Needham
159.  2020.10.30 - Stephens
160.  2020.10.30 - Wedbush
161.  2020.10.30 - Wells Fargo
162.  2020.10.30 - William Blair
163.  2020.11.02 - Citi
164.  2020.11.02 - Citizens
165.  2020.11.02 - Morgan Stanley
166.  2020.11.02 - Benchmark
167.  2020.11.05 - Deutsche Bank
168.  2020.11.09 - DA Davidson
169.  2020.12.04 - Jefferies
170.  2020.12.14 - DA Davidson
171.  2020.12.14 - Truist
172.  2020.12.16 - KeyBanc
173.  2021.01.06 - Baird
174.  2021.01.11 - Bank of America
175.  2021.01.11 - Jefferies
176.  2021.01.27 - Citi
177.  2021.02.05 - Craig Hallum
178.  2021.02.15 - Baird
179.  2021.02.16 - Wedbush
180.  2021.02.22 - Truist
181.  2021.02.23 - Cowen
182.  2021.02.25 - Wells Fargo
183.  2021.02.25 - Baird
184.  2021.02.25 - Citi
185.  2021.02.25 - DA Davidson
186.  2021.02.25 - J.P. Morgan
187.  2021.02.25 - Piper Sandler
188.  2021.02.25 - Benchmark
189.  2021.02.26 - Morgan Stanley
190.  2021.02.26 - Bank of America
191.  2021.02.26 – Cowen

# Appendix B
# Materials Considered

I. **Analyst Reports (cont.)**

192. 2021.02.26 - BNP Paribas
193. 2021.02.26 - Citizens
194. 2021.02.26 - DA Davidson
195. 2021.02.26 - Evercore
196. 2021.02.26 - J.P. Morgan
197. 2021.02.26 - KeyBanc
198. 2021.02.26 - Needham
199. 2021.02.26 - Stephens
200. 2021.02.26 - Truist
201. 2021.02.26 - Wedbush
202. 2021.02.26 - William Blair
203. 2021.03.01 - Deutsche Bank
204. 2021.03.01 - Citi
205. 2021.03.09 - Morgan Stanley
206. 2021.03.09 - Huber Research
207. 2021.03.11 - Jefferies
208. 2021.04.09 - Jefferies
209. 2021.04.15 - Baird
210. 2021.04.19 - Evercore
211. 2021.04.19 - J.P. Morgan
212. 2021.04.28 - Wedbush
213. 2021.04.29 - Oppenheimer
214. 2021.05.03 - Bank of America
215. 2021.05.04 - Cowen
216. 2021.05.04 - Truist
217. 2021.05.06 - CIMB
218. 2021.05.06 - Baird
219. 2021.05.06 - Citi
220. 2021.05.06 - J.P. Morgan
221. 2021.05.06 - KeyBanc
222. 2021.05.06 - Piper Sandler
223. 2021.05.06 - Raymond James
224. 2021.05.07 - Morgan Stanley
225. 2021.05.07 - Bank of America
226. 2021.05.07 - Cowen
227. 2021.05.07 - Wells Fargo
228. 2021.05.07 - BNP Paribas
229. 2021.05.07 - Citizens
230. 2021.05.07 - DA Davidson
231. 2021.05.07 - Evercore
232. 2021.05.07 - J.P. Morgan
233. 2021.05.07 - Stephens
234. 2021.05.07 - Benchmark
235. 2021.05.07 - Truist
236. 2021.05.07 - Wedbush
237. 2021.05.07 - William Blair
238. 2021.05.10 - Citi
239. 2021.05.10 – Oppenheimer

11

## Appendix B
## Materials Considered

**I.  Analyst Reports (cont.)**

240.  2021.05.11 - Deutsche Bank
241.  2021.05.17 - Huber Research
242.  2021.05.19 – Jefferies
243.  2021.05.26 - RBC
244.  2021.05.27 - Truist
245.  2021.06.03 - William Blair
246.  2021.06.17 - Baird
247.  2021.06.23 - J.P. Morgan
248.  2021.06.25 - Wells Fargo
249.  2021.07.25 - KeyBanc
250.  2021.07.30 - Truist
251.  2021.08.03 - Wedbush
252.  2021.08.05 - CFRA
253.  2021.08.05 - CFRA
254.  2021.08.05 - Cowen
255.  2021.08.05 - Citi
256.  2021.08.05 - J.P. Morgan
257.  2021.08.05 - KeyBanc
258.  2021.08.05 - Piper Sandler
259.  2021.08.05 - Stephens
260.  2021.08.05 - William Blair
261.  2021.08.06 - CFRA
262.  2021.08.06 - Benchmark
263.  2021.08.06 - DA Davidson
264.  2021.08.06 - Morgan Stanley
265.  2021.08.06 - Bank of America
266.  2021.08.06 - CIMB
267.  2021.08.06 - Cowen
268.  2021.08.06 - Wells Fargo
269.  2021.08.06 - BNP Paribas
270.  2021.08.06 - Evercore
271.  2021.08.06 - J.P. Morgan
272.  2021.08.06 - Raymond James
273.  2021.08.06 - RBC
274.  2021.08.06 - Stephens
275.  2021.08.06 - Truist
276.  2021.08.06 - Wedbush
277.  2021.08.07 - CFRA
278.  2021.08.09 - JMP
279.  2021.08.09 - Deutsche Bank
280.  2021.08.09 - Citizens
281.  2021.08.09 - Needham
282.  2021.08.11 - William Blair
283.  2021.08.14 - CFRA
284.  2021.08.16 - Benchmark
285.  2021.08.17 - Citi
286.  2021.08.21 - CFRA
287.  2021.08.23 - Huber Research

# Appendix B
# Materials Considered

**I.  Analyst Reports (cont.)**

288.  2021.08.28 - CFRA
289.  2021.09.04 - CFRA
290.  2021.09.07 – Needham
291.  2021.09.11 - CFRA
292.  2021.09.14 - Citi
293.  2021.09.15 - Truist
294.  2021.09.18 - CFRA
295.  2021.09.22 - Baird
296.  2021.09.25 - CFRA
297.  2021.10.02 - CFRA
298.  2021.10.09 - CFRA
299.  2021.10.11 - J.P. Morgan
300.  2021.10.11 - Wedbush
301.  2021.10.11 - Wedbush
302.  2021.10.16 - CFRA
303.  2021.10.27 - Stephens
304.  2021.10.27 - Citi
305.  2021.10.27 - Evercore
306.  2021.10.27 - Jefferies
307.  2021.10.27 - RBC
308.  2021.10.27 - Wells Fargo
309.  2021.10.27 - William Blair
310.  2021.10.28 - Truist
311.  2021.10.29 - BNP Paribas
312.  2021.11.02 - Wedbush
313.  2021.11.03 - Cowen
314.  2021.11.04 - Wells Fargo
315.  2021.11.04 - Baird
316.  2021.11.04 - Citi
317.  2021.11.04 - DA Davidson
318.  2021.11.04 - J.P. Morgan
319.  2021.11.04 - KeyBanc
320.  2021.11.04 - Piper Sandler
321.  2021.11.05 - Bank of America
322.  2021.11.05 - CIMB
323.  2021.11.05 - Cowen
324.  2021.11.05 - BNP Paribas
325.  2021.11.05 - Evercore
326.  2021.11.05 - J.P. Morgan
327.  2021.11.05 - Needham
328.  2021.11.05 - Raymond James
329.  2021.11.05 - RBC
330.  2021.11.05 - Stephens
331.  2021.11.05 - Benchmark
332.  2021.11.05 - Truist
333.  2021.11.05 - Wedbush
334.  2021.11.05 - William Blair
335.  2021.11.08 – Citi

13

**Appendix B**
**Materials Considered**

I.    **Analyst Reports (cont.)**

336.   2021.11.09 - Morgan Stanley
337.   2021.11.09 - Deutsche Bank
338.   2021.11.10 - Wolfe Research
339.   2021.11.10 - Benchmark
340.   2021.11.12 - Huber Research
341.   2021.11.16 - CIMB
342.   2021.12.03 - Wells Fargo
343.   2021.12.07 - Wolfe Research
344.   2021.12.20 - J.P. Morgan
345.   2021.12.21 - Needham
346.   2021.12.23 - Wolfe Research
347.   2021.12.27 - Baird
348.   2022.01.05 - Wolfe Research
349.   2022.01.06 - RBC
350.   2022.01.14 - Wolfe Research
351.   2022.01.21 - Wolfe Research
352.   2022.01.21 - Wedbush
353.   2022.01.24 - Morgan Stanley
354.   2022.01.26 - BNP Paribas
355.   2022.02.02 - Wells Fargo
356.   2022.02.03 - Wolfe Research
357.   2022.02.05 - Deutsche Bank
358.   2022.02.08 - Truist
359.   2022.02.09 - Davy Stockbrokers
360.   2022.02.23 - DA Davidson
361.   2022.02.24 - Morgan Stanley
362.   2022.02.24 - Wells Fargo
363.   2022.02.24 - Baird
364.   2022.02.25 - KeyBanc
365.   2022.02.25 - Bank of America
366.   2022.02.25 - Cowen
367.   2022.02.25 - Wolfe Research
368.   2022.02.25 - BNP Paribas
369.   2022.02.25 - DA Davidson
370.   2022.02.25 - Davy Stockbrokers
371.   2022.02.25 - Evercore
372.   2022.02.25 - Needham
373.   2022.02.25 - RBC
374.   2022.02.25 - Benchmark
375.   2022.02.25 - Truist
376.   2022.02.25 - Truist
377.   2022.02.25 - Wedbush
378.   2022.02.25 - William Blair
379.   2022.02.27 - J.P. Morgan
380.   2022.02.28 - Stephens
381.   2022.03.03 - Morgan Stanley
382.   2022.03.07 - Wedbush
383.   2022.03.08 - Wolfe Research

14

# Appendix B
## Materials Considered

### I.  Analyst Reports (cont.)

384.  2022.03.15 - BNP Paribas
385.  2022.03.25 - Wedbush
386.  2022.03.29 - BNP Paribas
387.  2022.04.01 - Huber Research
388.  2022.04.01 - Needham
389.  2022.04.05 - Deutsche Bank
390.  2022.04.05 - RBC
391.  2022.04.11 - Northcoast Research
392.  2022.04.18 - Wedbush
393.  2022.04.19 - Bank of America
394.  2022.04.19 - Cowen
395.  2022.04.19 - Truist
396.  2022.04.20 - Morgan Stanley
397.  2022.04.20 - Wells Fargo
398.  2022.04.20 - DA Davidson
399.  2022.04.20 - Huber Research
400.  2022.04.20 - Stephens
401.  2022.04.21 - Bank of America
402.  2022.04.21 - Cowen
403.  2022.04.21 - Wolfe Research
404.  2022.04.21 - Baird
405.  2022.04.21 - BNP Paribas
406.  2022.04.21 - Davy Stockbrokers
407.  2022.04.21 - Evercore
408.  2022.04.21 - Jefferies
409.  2022.04.21 - Needham
410.  2022.04.21 - Northcoast Research
411.  2022.04.21 - Piper Sandler
412.  2022.04.21 - RBC
413.  2022.04.21 - Stephens
414.  2022.04.21 - Benchmark
415.  2022.04.21 - Truist
416.  2022.04.21 - Wedbush
417.  2022.04.21 - William Blair
418.  2022.04.22 - William Blair
419.  2022.04.28 - Morgan Stanley
420.  2022.05.03 - Wells Fargo
421.  2022.05.03 - BNP Paribas
422.  2022.05.03 - Wedbush
423.  2022.05.04 - Morgan Stanley
424.  2022.05.10 - Morgan Stanley
425.  2022.05.10 - CIMB
426.  2022.05.10 - Baird
427.  2022.05.10 - Raymond James
428.  2022.05.10 - Stephens
429.  2022.05.10 - Truist
430.  2022.05.10 - William Blair
431.  2022.05.11 – Wedbush

15

# Appendix B
## Materials Considered

**I.   Analyst Reports (cont.)**

432.   2022.05.13 - Deutsche Bank
433.   2022.05.13 - Jefferies
434.   2022.05.15 – Baird
435.   2022.05.15 - DA Davidson
436.   2022.05.16 - Morgan Stanley
437.   2022.05.16 - CIMB
438.   2022.05.16 - Cowen
439.   2022.05.16 - Deutsche Bank
440.   2022.05.16 - Wells Fargo
441.   2022.05.16 - Wolfe Research
442.   2022.05.16 - BNP Paribas
443.   2022.05.16 - Evercore
444.   2022.05.16 - Huber Research
445.   2022.05.16 - J.P. Morgan
446.   2022.05.16 - Needham
447.   2022.05.16 - Northcoast Research
448.   2022.05.16 - Raymond James
449.   2022.05.16 - RBC
450.   2022.05.16 - Stephens
451.   2022.05.16 - Truist
452.   2022.05.16 - Wedbush
453.   2022.05.16 - William Blair
454.   2022.05.17 - Deutsche Bank
455.   2022.05.17 - Benchmark
456.   2022.05.18 - Bank of America
457.   2022.05.20 - Wedbush
458.   2022.06.01 - Baird
459.   2022.06.08 - William Blair
460.   2022.06.09 - Jefferies
461.   2022.06.13 - Stephens
462.   2022.06.15 - Jefferies
463.   2022.06.23 - Huber Research
464.   2022.07.05 - Wedbush
465.   2022.07.11 - Northcoast Research
466.   2022.07.20 - Wells Fargo
467.   2022.07.27 - CIMB
468.   2022.07.27 - Raymond James
469.   2022.08.01 - Evercore
470.   2022.08.01 - Truist
471.   2022.08.02 - Bank of America
472.   2022.08.02 - Cowen
473.   2022.08.03 - Wedbush
474.   2022.08.04 - Wells Fargo
475.   2022.08.04 - Wolfe Research
476.   2022.08.04 - Baird
477.   2022.08.04 - Stephens
478.   2022.08.05 - Morgan Stanley
479.   2022.08.05 - Bank of America

16

**Appendix B**
**Materials Considered**

### I.   Analyst Reports (cont.)

480.   2022.08.05 - CIMB
481.   2022.08.05 - Cowen
482.   2022.08.05 - Deutsche Bank
483.   2022.08.05 - BNP Paribas
484.   2022.08.05 - Citizens
485.   2022.08.05 - DA Davidson
486.   2022.08.05 - Davy Stockbrokers
487.   2022.08.05 - Evercore
488.   2022.08.05 - Huber Research
489.   2022.08.05 - Needham
490.   2022.08.05 - Raymond James
491.   2022.08.05 - RBC
492.   2022.08.05 - Stephens
493.   2022.08.05 - Benchmark
494.   2022.08.05 - Truist
495.   2022.08.05 - Wedbush
496.   2022.08.05 - William Blair
497.   2022.08.08 - Citizens
498.   2022.08.08 - J.P. Morgan
499.   2022.08.08 - Northcoast Research
500.   2022.08.09 - Stephens
501.   2022.08.11 - Benchmark
502.   2022.08.16 - Oppenheimer
503.   2022.08.18 - Argus Research
504.   2022.08.19 - Huber Research
505.   2022.08.23 - Baird
506.   2022.08.25 - Wedbush
507.   2022.08.26 - J.P. Morgan
508.   2022.09.06 - Wedbush
509.   2022.09.08 - J.P. Morgan
510.   2022.09.11 - Piper Sandler
511.   2022.09.12 - Jefferies
512.   2022.09.16 - Baird
513.   2022.09.23 - Wedbush
514.   2022.09.26 - Piper Sandler
515.   2022.10.03 - Bank of America
516.   2022.10.04 - Truist
517.   2022.10.10 - Northcoast Research
518.   2022.10.11 - Morgan Stanley
519.   2022.10.18 - Baird
520.   2022.10.18 - Wedbush
521.   2022.10.19 - Wells Fargo
522.   2022.10.20 - Huber Research
523.   2022.10.21 - J.P. Morgan
524.   2022.10.28 - Evercore
525.   2022.10.31 - CIMB
526.   2022.10.31 - Raymond James
527.   2022.11.01 – Cowen

# Appendix B
# Materials Considered

**I.    Analyst Reports (cont.)**

528.  2022.11.01 - DA Davidson
529.  2022.11.01 - J.P. Morgan
530.  2022.11.02 - Bank of America
531.  2022.11.03 - Wells Fargo
532.  2022.11.03 - Wolfe Research
533.  2022.11.03 - BNP Paribas
534.  2022.11.03 - Citizens
535.  2022.11.03 - J.P. Morgan
536.  2022.11.03 - Piper Sandler
537.  2022.11.03 - Stephens
538.  2022.11.03 - Truist
539.  2022.11.04 - Morgan Stanley
540.  2022.11.04 - Bank of America
541.  2022.11.04 - CIMB
542.  2022.11.04 - Cowen
543.  2022.11.04 - Deutsche Bank
544.  2022.11.04 - Baird
545.  2022.11.04 - DA Davidson
546.  2022.11.04 - Davy Stockbrokers
547.  2022.11.04 - Evercore
548.  2022.11.04 - Needham
549.  2022.11.04 - Raymond James
550.  2022.11.04 - RBC
551.  2022.11.04 - Stephens
552.  2022.11.04 - Benchmark
553.  2022.11.04 - Wedbush
554.  2022.11.04 - William Blair
555.  2022.11.07 - Citizens
556.  2022.11.07 - Huber Research
557.  2022.11.07 - Northcoast Research
558.  2022.11.08 - J.P. Morgan
559.  2022.11.11 - Benchmark
560.  2022.11.15 - Oppenheimer
561.  2022.11.16 - Wedbush
562.  2022.11.18 - Citizens
563.  2022.11.18 - Stephens
564.  2022.11.21 - Cowen
565.  2022.11.21 - Argus Research
566.  2022.11.29 - Citizens
567.  2022.11.30 - Bank of America
568.  2022.12.06 - Morgan Stanley
569.  2022.12.06 - Baird
570.  2022.12.07 - Citizens
571.  2022.12.07 - J.P. Morgan
572.  2022.12.07 - Wedbush
573.  2022.12.07 - William Blair
574.  2022.12.08 - Jefferies
575.  2022.12.08 - Davy Stockbrokers

## Appendix B
## Materials Considered

I.   **Analyst Reports (cont.)**

576.  2022.12.09 - Needham
577.  2022.12.13 - William Blair
578.  2022.12.16 – Wedbush
579.  2022.12.28 - Wedbush
580.  2023.11.01 - Cowen
581.  2023.11.02 - DA Davidson
582.  2023.11.02 - Morgan Stanley
583.  2023.11.02 - Stephens
584.  2023.11.02 - Wells Fargo
585.  2023.11.03 - BNP Paribas
586.  2023.11.03 - Citizens
587.  2023.11.03 - Cowen
588.  2023.11.03 - J.P. Morgan
589.  2023.11.03 - Needham
590.  2023.11.03 - RBC
591.  2023.11.03 - Stephens
592.  2023.11.03 - Benchmark
593.  2023.11.03 - Piper Sandler
594.  2023.11.03 - Wedbush
595.  2023.11.03 - William Blair
596.  2023.11.07 - Benchmark
597.  2023.11.08 - Oppenheimer
598.  2023.11.14 - RBC
599.  2023.11.16 - Morgan Stanley
600.  2023.11.16 - William Blair
601.  2023.11.17 - Deutsche Bank
602.  2024.09.11 - Stephens
603.  2025.01.07 - Needham

*Industry analyst reports*

1.   2019.12.06 - Stephens
2.   2019.12.06 - Morgan Stanley
3.   2019.12.11 - J.P. Morgan
4.   2019.12.16 - Stephens
5.   2019.12.18 - Stephens
6.   2020.01.08 - Stephens
7.   2020.01.08 - RBC
8.   2020.01.08 - Morgan Stanley
9.   2020.01.09 - J.P. Morgan
10.  2020.01.21 - Stephens
11.  2020.02.07 - Stephens
12.  2020.02.07 - RBC
13.  2020.02.07 - Morgan Stanley
14.  2020.02.08 - Credit Suisse
15.  2020.02.10 - J.P. Morgan
16.  2020.02.11 - Guggenheim
17.  2020.02.18 – Stephens

19

## Appendix B
## Materials Considered

**I.    Analyst Reports (cont.)**

18.    2020.02.24 - Barrington Research
19.    2020.02.25 - B. Riley
20.    2020.03.06 - RBC
21.    2020.03.06 - Morgan Stanley
22.    2020.03.09 - J.P. Morgan
23.    2020.04.02 - J.P. Morgan
24.    2020.04.06 - Morgan Stanley
25.    2020.04.07 - RBC
26.    2020.04.07 - Morgan Stanley
27.    2020.04.08 - J.P. Morgan
28.    2020.04.13 - Stephens
29.    2020.04.15 - Morgan Stanley
30.    2020.04.16 - Stephens
31.    2020.04.17 - Wedbush
32.    2020.04.20 - Morgan Stanley
33.    2020.04.20 - Morgan Stanley
34.    2020.04.20 - Morgan Stanley
35.    2020.04.20 - J.P. Morgan
36.    2020.04.20 - Wolfe Research
37.    2020.04.21 - Morgan Stanley
38.    2020.04.21 - Deutsche Bank
39.    2020.04.27 - Bank of America
40.    2020.04.28 - Oppenheimer
41.    2020.04.28 - Needham
42.    2020.04.29 - J.P. Morgan
43.    2020.04.30 - Citizens
44.    2020.04.30 - J.P. Morgan
45.    2020.05.04 - Bank of America
46.    2020.05.04 - Baird
47.    2020.05.05 - Morgan Stanley
48.    2020.05.05 - B. Riley
49.    2020.05.07 - RBC
50.    2020.05.08 - J.P. Morgan
51.    2020.05.12 - Credit Suisse
52.    2020.05.13 - Wedbush
53.    2020.05.15 - Stephens
54.    2020.05.19 - J.P. Morgan
55.    2020.05.20 - J.P. Morgan
56.    2020.05.21 - Stephens
57.    2020.05.21 - Barclays
58.    2020.05.26 - Wedbush
59.    2020.05.27 - Needham
60.    2020.06.01 - Stephens
61.    2020.06.01 - Morgan Stanley
62.    2020.06.01 - Bank of America
63.    2020.06.02 - Morgan Stanley
64.    2020.06.04 - RBC
65.    2020.06.05 – Stephens

20

## Appendix B
## Materials Considered

I. **Analyst Reports (cont.)**

66.  2020.06.05 - RBC
67.  2020.06.05 - Morgan Stanley
68.  2020.06.05 – Guggenheim
69.  2020.06.08 - J.P. Morgan
70.  2020.06.08 - Bank of America
71.  2020.06.09 - Benchmark
72.  2020.06.11 - Bank of America
73.  2020.06.11 - Bank of America
74.  2020.06.12 - Bank of America
75.  2020.06.16 - Morgan Stanley
76.  2020.06.18 - Wedbush
77.  2020.06.18 - Stephens
78.  2020.06.18 - J.P. Morgan
79.  2020.06.19 - J.P. Morgan
80.  2020.06.19 - Needham
81.  2020.06.22 - Morgan Stanley
82.  2020.06.26 - Needham
83.  2020.07.01 - J.P. Morgan
84.  2020.07.02 - Morgan Stanley
85.  2020.07.04 - William Blair
86.  2020.07.05 - Wells Fargo
87.  2020.07.06 - Wedbush
88.  2020.07.06 - Bank of America
89.  2020.07.06 - JMP
90.  2020.07.06 - Wedbush
91.  2020.07.08 - Stephens
92.  2020.07.08 - RBC
93.  2020.07.08 - J.P. Morgan
94.  2020.07.09 - J.P. Morgan
95.  2020.07.15 - Morgan Stanley
96.  2020.07.16 - Morgan Stanley
97.  2020.07.17 - Stephens
98.  2020.07.20 - J.P. Morgan
99.  2020.07.21 - Morgan Stanley
100. 2020.07.21 - J.P. Morgan
101. 2020.07.27 - Stephens
102. 2020.07.27 - Piper Sandler
103. 2020.07.28 - Wedbush
104. 2020.07.28 - Deutsche Bank
105. 2020.07.29 - Wells Fargo
106. 2020.07.29 - Needham
107. 2020.07.29 - Wells Fargo
108. 2020.07.29 - William Blair
109. 2020.07.30 - J.P. Morgan
110. 2020.08.04 - Morgan Stanley
111. 2020.08.04 - J.P. Morgan
112. 2020.08.07 - Stephens
113. 2020.08.07 – RBC

# Appendix B
# Materials Considered

I. **Analyst Reports (cont.)**

114. 2020.08.07 - Wedbush
115. 2020.08.10 - J.P. Morgan
116. 2020.08.12 - Wells Fargo
117. 2020.08.13 - Bank of America
118. 2020.08.13 - Citizens
119. 2020.08.13 - J.P. Morgan
120. 2020.08.13 - Wedbush
121. 2020.08.13 - William Blair
122. 2020.08.14 - Benchmark
123. 2020.08.17 - Stephens
124. 2020.08.19 - J.P. Morgan
125. 2020.08.19 - Piper Sandler
126. 2020.08.21 - Stephens
127. 2020.08.25 - Piper Sandler
128. 2020.09.03 - Credit Suisse
129. 2020.09.08 - RBC
130. 2020.09.08 - Morgan Stanley
131. 2020.09.08 - J.P. Morgan
132. 2020.09.09 - Stephens
133. 2020.09.09 - J.P. Morgan
134. 2020.09.09 - J.P. Morgan
135. 2020.09.14 - Wells Fargo
136. 2020.09.15 - Wedbush
137. 2020.09.16 - William Blair
138. 2020.09.17 - Benchmark
139. 2020.09.18 - J.P. Morgan
140. 2020.09.21 - Piper Sandler
141. 2020.09.22 - Bank of America
142. 2020.09.23 - Bank of America
143. 2020.09.23 - Citizens
144. 2020.09.25 - Stephens
145. 2020.09.29 - Piper Sandler
146. 2020.09.30 - Deutsche Bank
147. 2020.10.01 - Morgan Stanley
148. 2020.10.02 - Guggenheim
149. 2020.10.05 - Stephens
150. 2020.10.05 - BNP Paribas
151. 2020.10.07 - Stephens
152. 2020.10.07 - Credit Suisse
153. 2020.10.08 - J.P. Morgan
154. 2020.10.15 - Jefferies
155. 2020.10.19 - J.P. Morgan
156. 2020.10.20 - Needham
157. 2020.10.21 - Wedbush
158. 2020.10.22 - Benchmark
159. 2020.10.23 - Wells Fargo
160. 2020.10.30 - J.P. Morgan
161. 2020.11.02 - J.P. Morgan

**Appendix B**
**Materials Considered**

I.   **Analyst Reports (cont.)**

162.  2020.11.03 - Stephens
163.  2020.11.06 - RBC
164.  2020.11.06 – RBC
165.  2020.11.09 - J.P. Morgan
166.  2020.11.17 - Piper Sandler
167.  2020.11.17 - Jefferies
168.  2020.11.19 - Piper Sandler
169.  2020.11.19 - Seaport Global
170.  2020.12.07 - RBC
171.  2020.12.08 - Wedbush
172.  2020.12.08 - J.P. Morgan
173.  2020.12.11 - J.P. Morgan
174.  2020.12.21 - RBC
175.  2021.01.06 - Piper Sandler
176.  2021.01.08 - RBC
177.  2021.01.11 - J.P. Morgan
178.  2021.01.11 - Truist
179.  2021.01.15 - Stephens
180.  2021.01.27 - J.P. Morgan
181.  2021.02.01 - Stephens
182.  2021.02.02 - J.P. Morgan
183.  2021.02.02 - Bank of America
184.  2021.02.04 - Guggenheim
185.  2021.02.04 - Truist
186.  2021.02.05 - RBC
187.  2021.02.05 - J.P. Morgan
188.  2021.02.10 - Benchmark
189.  2021.02.11 - Benchmark
190.  2021.02.16 - Benchmark
191.  2021.02.16 - Wells Fargo
192.  2021.02.17 - Stephens
193.  2021.02.17 - Jefferies
194.  2021.02.17 - William Blair
195.  2021.02.18 - Stephens
196.  2021.02.24 - Jefferies
197.  2021.02.26 - Jefferies
198.  2021.03.05 - RBC
199.  2021.03.08 - Stephens
200.  2021.03.08 - J.P. Morgan
201.  2021.03.21 - Seaport Global
202.  2021.03.23 - Barrington Research
203.  2021.03.24 - Wedbush
204.  2021.03.24 - Truist
205.  2021.03.29 - J.P. Morgan
206.  2021.04.07 - RBC
207.  2021.04.09 - J.P. Morgan
208.  2021.04.09 - Credit Suisse
209.  2021.04.22 - J.P. Morgan

23

# Appendix B
# Materials Considered

## I.  Analyst Reports (cont.)

210.  2021.04.23 - Truist
211.  2021.04.25 - Seaport Global
212.  2021.04.26 - J.P. Morgan
213.  2021.04.27 - Wells Fargo
214.  2021.04.29 - William Blair
215.  2021.04.30 - J.P. Morgan
216.  2021.05.04 - BTIG
217.  2021.05.05 - J.P. Morgan
218.  2021.05.07 - RBC
219.  2021.05.07 - Morgan Stanley
220.  2021.05.07 - Jefferies
221.  2021.05.10 - J.P. Morgan
222.  2021.05.10 - J.P. Morgan
223.  2021.05.10 - J.P. Morgan
224.  2021.05.11 - William Blair
225.  2021.05.17 - Stephens
226.  2021.05.20 - Seaport Global
227.  2021.05.20 - Samsung Securities
228.  2021.05.21 - HSBC
229.  2021.05.21 - J.P. Morgan
230.  2021.05.24 - J.P. Morgan
231.  2021.05.25 - Bank of America
232.  2021.05.27 - BTIG
233.  2021.05.27 - Bank of America
234.  2021.06.01 - William Blair
235.  2021.06.03 - Jefferies
236.  2021.06.03 - RBC
237.  2021.06.07 - RBC
238.  2021.06.07 - Morgan Stanley
239.  2021.06.08 - J.P. Morgan
240.  2021.06.08 - Stephens
241.  2021.06.08 - Piper Sandler
242.  2021.06.08 - J.P. Morgan
243.  2021.06.10 - Bank of America
244.  2021.06.10 - Wells Fargo
245.  2021.06.16 - Truist
246.  2021.06.18 - Wells Fargo
247.  2021.06.20 - Seaport Global
248.  2021.06.22 - Wells Fargo
249.  2021.06.23 - Jefferies
250.  2021.06.28 - Morgan Stanley
251.  2021.06.29 - Piper Sandler
252.  2021.07.08 - RBC
253.  2021.07.08 - Morgan Stanley
254.  2021.07.09 - J.P. Morgan
255.  2021.07.09 - Macquarie Research
256.  2021.07.12 - Huber Research
257.  2021.07.12 – Truist

24

**Appendix B**
**Materials Considered**

I.    **Analyst Reports (cont.)**

258.  2021.07.19 - Guggenheim
259.  2021.07.20 - DA Davidson
260.  2021.07.20 - J.P. Morgan
261.  2021.07.28 - William Blair
262.  2021.07.28 - Wells Fargo
263.  2021.08.03 - CIMB
264.  2021.08.03 - Raymond James
265.  2021.08.06 - RBC
266.  2021.08.06 - Jefferies
267.  2021.08.09 - Stephens
268.  2021.08.09 - J.P. Morgan
269.  2021.08.11 - Credit Suisse
270.  2021.08.16 - J.P. Morgan
271.  2021.08.17 - Piper Sandler
272.  2021.08.18 - Jefferies
273.  2021.08.24 - Oppenheimer
274.  2021.08.24 - Oppenheimer
275.  2021.08.31 - Stephens
276.  2021.09.08 - RBC
277.  2021.09.08 - Guggenheim
278.  2021.09.09 - J.P. Morgan
279.  2021.09.20 - J.P. Morgan
280.  2021.09.20 - Guggenheim
281.  2021.09.23 - Wedbush
282.  2021.09.28 - Jefferies
283.  2021.09.30 - Truist
284.  2021.10.01 - Guggenheim
285.  2021.10.01 - Morgan Stanley
286.  2021.10.01 - Stephens
287.  2021.10.01 - Wedbush
288.  2021.10.07 - RBC
289.  2021.10.08 - BNP Paribas
290.  2021.10.11 - Wedbush
291.  2021.10.15 - Needham
292.  2021.10.19 - Wedbush
293.  2021.10.26 - Wells Fargo
294.  2021.10.26 - William Blair
295.  2021.11.01 - Bank of America
296.  2021.11.04 - Oppenheimer
297.  2021.11.04 - Cantor Fitzgerald
298.  2021.11.04 - Cantor Fitzgerald
299.  2021.11.05 - Stephens
300.  2021.11.05 - Jefferies
301.  2021.11.08 - Credit Suisse
302.  2021.11.08 - J.P. Morgan
303.  2021.11.09 - Deutsche Bank
304.  2021.11.15 - Stephens
305.  2021.11.16 - Raymond James

25

# Appendix B
## Materials Considered

I. **Analyst Reports (cont.)**

306. 2021.11.17 - Bank of America
307. 2021.11.18 - Jefferies
308. 2021.11.23 - William O'Neil
309. 2021.12.07 - Stephens
310. 2021.12.07 - RBC
311. 2021.12.07 - Morgan Stanley
312. 2021.12.07 - J.P. Morgan
313. 2021.12.08 - J.P. Morgan
314. 2021.12.13 - Jefferies
315. 2021.12.13 - Piper Sandler
316. 2021.12.17 - Jefferies
317. 2021.12.19 - Seaport Global
318. 2021.12.20 - Bank of America
319. 2021.12.20 - RBC
320. 2021.12.22 - Morgan Stanley
321. 2021.12.23 - Guggenheim
322. 2021.12.23 - J.P. Morgan
323. 2021.12.23 - Wedbush
324. 2022.01.05 - Wedbush
325. 2022.01.07 - RBC
326. 2022.01.07 - Morgan Stanley
327. 2022.01.12 - Wedbush
328. 2022.01.12 - Deutsche Bank
329. 2022.01.12 - RBC
330. 2022.01.13 - Deutsche Bank
331. 2022.01.13 - Bank of America
332. 2022.01.14 - Morgan Stanley
333. 2022.01.18 - Stephens
334. 2022.01.18 - J.P. Morgan
335. 2022.01.19 - KeyBanc
336. 2022.01.21 - Wedbush
337. 2022.01.21 - Wedbush
338. 2022.01.24 - J.P. Morgan
339. 2022.01.24 - J.P. Morgan
340. 2022.01.25 - William Blair
341. 2022.01.25 - RBC
342. 2022.01.26 - Guggenheim
343. 2022.02.01 - RBC
344. 2022.02.03 - Wedbush
345. 2022.02.06 - Seaport Global
346. 2022.02.07 - Stephens
347. 2022.02.07 - RBC
348. 2022.02.08 - Evercore
349. 2022.02.16 - J.P. Morgan
350. 2022.02.16 - Evercore
351. 2022.02.21 - RBC
352. 2022.02.24 - Stephens
353. 2022.02.25 - Credit Suisse

26

## Appendix B
## Materials Considered

### I.  Analyst Reports (cont.)

354.  2022.02.25 - Jefferies
355.  2022.02.25 - Stephens
356.  2022.03.04 - Morgan Stanley
357.  2022.03.07 - RBC
358.  2022.03.07 - Stephens
359.  2022.03.07 - Morgan Stanley
360.  2022.03.07 - BTIG
361.  2022.03.07 - Guggenheim
362.  2022.03.08 - Deutsche Bank
363.  2022.03.08 - Credit Suisse
364.  2022.03.08 - J.P. Morgan
365.  2022.03.09 - Bank of America
366.  2022.03.15 - J.P. Morgan
367.  2022.03.22 - RBC
368.  2022.03.24 - Jefferies
369.  2022.03.29 - Jefferies
370.  2022.04.07 - RBC
371.  2022.04.07 - Morgan Stanley
372.  2022.04.07 - Deutsche Bank
373.  2022.04.07 - RBC
374.  2022.04.08 - Deutsche Bank
375.  2022.04.08 - Oppenheimer
376.  2022.04.13 - Needham
377.  2022.04.21 - Guggenheim
378.  2022.04.22 - Morgan Stanley
379.  2022.04.25 - Wolfe Research
380.  2022.04.27 - William Blair
381.  2022.04.28 - RBC
382.  2022.04.29 - Seaport Global
383.  2022.05.02 - Huber Research
384.  2022.05.02 - Needham
385.  2022.05.04 - Stephens
386.  2022.05.04 - BTIG
387.  2022.05.06 - Deutsche Bank
388.  2022.05.06 - Morgan Stanley
389.  2022.05.09 - J.P. Morgan
390.  2022.05.11 - Deutsche Bank
391.  2022.05.13 - Morgan Stanley
392.  2022.05.31 - BNP Paribas
393.  2022.06.07 - RBC
394.  2022.06.07 - Morgan Stanley
395.  2022.06.09 - Stephens
396.  2022.06.09 - J.P. Morgan
397.  2022.06.16 - Bank of America
398.  2022.06.22 - Credit Suisse
399.  2022.06.23 - Wedbush
400.  2022.06.28 - RBC
401.  2022.06.30 – JMP

27

**Appendix B**
**Materials Considered**

**I.   Analyst Reports (cont.)**

402.  2022.07.01 - William Blair
403.  2022.07.04 - Jefferies
404.  2022.07.08 - Morgan Stanley
405.  2022.07.08 - Deutsche Bank
406.  2022.07.11 - RBC
407.  2022.07.12 - Stephens
408.  2022.07.19 - J.P. Morgan
409.  2022.07.20 - RBC
410.  2022.08.01 - William Blair
411.  2022.08.01 - RBC
412.  2022.08.05 - Morgan Stanley
413.  2022.08.05 - Jefferies
414.  2022.08.08 - Stephens
415.  2022.08.08 - Jefferies
416.  2022.08.12 - Wells Fargo
417.  2022.08.15 - J.P. Morgan
418.  2022.08.16 - Morgan Stanley
419.  2022.08.16 - Wedbush
420.  2022.08.24 - William Blair
421.  2022.08.30 - RBC
422.  2022.09.07 - J.P. Morgan
423.  2022.09.08 - Morgan Stanley
424.  2022.09.08 - Deutsche Bank
425.  2022.09.09 - Northcoast Research
426.  2022.09.15 - Stephens
427.  2022.09.16 - Wedbush
428.  2022.09.20 - JMP
429.  2022.09.22 - William Blair
430.  2022.10.03 - Morgan Stanley
431.  2022.10.03 - Stephens
432.  2022.10.07 - RBC
433.  2022.10.07 - Morgan Stanley
434.  2022.10.07 - Deutsche Bank
435.  2022.10.07 - Morgan Stanley
436.  2022.10.10 - Wedbush
437.  2022.10.11 - DA Davidson
438.  2022.10.18 - Bank of America
439.  2022.10.18 - Wedbush
440.  2022.10.19 - Bank of America
441.  2022.10.19 - Wedbush
442.  2022.10.19 - Evercore
443.  2022.10.19 - William Blair
444.  2022.10.24 - Bank of America
445.  2022.10.31 - J.P. Morgan
446.  2022.10.31 - RBC
447.  2022.11.01 - William Blair
448.  2022.11.03 - Jefferies
449.  2022.11.06 - Seaport Global

**Appendix B**
**Materials Considered**

I. **Analyst Reports (cont.)**

450.  2022.11.07 - RBC
451.  2022.11.07 - Morgan Stanley
452.  2022.11.07 – Jefferies
453.  2022.11.08 - DA Davidson
454.  2022.11.17 - Jefferies
455.  2022.11.18 - William Blair
456.  2022.11.21 - Deutsche Bank
457.  2022.11.21 - Stephens
458.  2022.11.22 - J.P. Morgan
459.  2022.12.05 - Wells Fargo
460.  2022.12.07 - Stephens
461.  2022.12.07 - RBC
462.  2022.12.07 - Morgan Stanley
463.  2022.12.12 - Deutsche Bank
464.  2022.12.12 - Oppenheimer
465.  2022.12.12 - Stephens
466.  2022.12.12 - Stephens
467.  2022.12.13 - J.P. Morgan
468.  2022.12.14 - J.P. Morgan
469.  2022.12.14 - William Blair
470.  2022.12.20 - Truist
471.  2022.12.23 - J.P. Morgan
472.  2022.12.27 - Morgan Stanley
473.  2023.01.04 - Morgan Stanley
474.  2023.01.09 - RBC
475.  2023.01.09 - Morgan Stanley
476.  2023.01.10 - Stephens
477.  2023.01.10 - Jefferies
478.  2023.01.10 - Jefferies
479.  2023.01.19 - Credit Suisse
480.  2023.01.31 - UBS
481.  2023.02.01 - Jefferies
482.  2023.02.02 - Craig Hallum
483.  2023.02.07 - Truist
484.  2023.02.07 - RBC
485.  2023.02.07 - Morgan Stanley
486.  2023.02.08 - Stephens
487.  2023.02.09 - Morgan Stanley
488.  2023.02.10 - Morgan Stanley
489.  2023.02.13 - J.P. Morgan
490.  2023.02.17 - Wedbush
491.  2023.02.21 - Wedbush
492.  2023.02.21 - Wedbush
493.  2023.02.21 - J.P. Morgan
494.  2023.02.21 - Jefferies
495.  2023.02.22 - Wedbush
496.  2023.11.03 - Jefferies
497.  2023.11.10 - William Blair

29

**Appendix B**
**Materials Considered**

I. **Analyst Reports (cont.)**

498.  2023.11.13 - Citizens
499.  2025.01.06 - Wells Fargo

*Analyst reports on publicly traded e-commerce companies*

1.  2020.02.03 - SFIX - BMO
2.  2020.03.20 - AMZN - Oppenheimer
3.  2020.04.09 - SFIX - JPMorgan
4.  2020.04.17 - AMZN - Bank of America
5.  2020.06.03 - SFIX - Barclays
6.  2020.06.05 - CHWY - Barclays
7.  2020.06.09 - CHWY - Credit Suisse
8.  2020.06.09 - SFIX - BMO
9.  2020.07.19 - AMZN - Jefferies
10.  2020.07.31 - AMZN - Canaccord
11.  2020.09.09 - SFIX - Deutsche Bank
12.  2020.09.18 - SFIX - Telsey Advisory Group
13.  2020.11.13 - CHWY - Piper Sandler
14.  2020.11.16 - CHWY - Needham
15.  2020.12.07 - SFIX - Truist
16.  2021.03.09 - SFIX - Barclays
17.  2021.03.09 - SFIX - Morgan Stanley
18.  2021.06.07 - SFIX - Canaccord
19.  2021.08.06 - SFIX - Wells Fargo
20.  2021.09.17 - SFIX - JPMorgan
21.  2021.09.21 - SFIX - Wells Fargo
22.  2021.10.04 - SFIX - Wedbush
23.  2021.12.01 - SFIX - UBS

*Computer-generated and other reports on Carvana or industry*

1.  2020.03.20 - Egan-Jones
2.  2020.04.09 - Pechala's
3.  2020.06.11 - FactSet CallStreet Transcripts
4.  2020.08.06 - FactSet CallStreet Transcripts
5.  2020.09.24 - Moody's
6.  2020.10.30 - FactSet CallStreet Transcripts
7.  2020.11.19 - FactSet CallStreet Transcripts
8.  2020.12.03 - FactSet CallStreet Transcripts
9.  2021.01.11 - Zacks Research
10.  2021.01.27 - Probes Reporter
11.  2021.02.01 - Zacks Research
12.  2021.03.01 - GlobalData
13.  2021.03.03 - Zacks Research
14.  2021.03.23 - Zacks Research
15.  2021.04.20 - Egan-Jones
16.  2021.04.26 - Zacks Research
17.  2021.05.18 - Zacks Research

30

## Appendix B
## Materials Considered

**I.   Analyst Reports (cont.)**

18.   2021.05.26 - Plunkett Research
19.   2021.06.01 - GlobalData
20.   2021.06.07 - Zacks Research
21.   2021.06.25 - Zacks Research
22.   2021.07.13 - Zacks Research
23.   2021.08.05 - S&P Global
24.   2021.08.06 - Jefferson Research
25.   2021.08.09 - Marktfeld
26.   2021.08.10 - Zacks Research
27.   2021.08.13 - Jefferson Research
28.   2021.08.14 - Marktfeld
29.   2021.08.18 - Kailash Concepts
30.   2021.08.20 - Jefferson Research
31.   2021.08.23 - Marktfeld
32.   2021.08.27 - Jefferson Research
33.   2021.09.02 - GlobalData
34.   2021.09.02 - S&P Global
35.   2021.09.03 - Zacks Research
36.   2021.09.03 - Jefferson Research
37.   2021.09.09 - SADIF Investments
38.   2021.09.10 - Jefferson Research
39.   2021.09.17 - Jefferson Research
40.   2021.09.20 - Probes Reporter
41.   2021.09.24 - Jefferson Research
42.   2021.09.29 - Zacks Research
43.   2021.10.07 - SADIF Investments
44.   2021.10.07 - S&P Global
45.   2021.10.08 - Jefferson Research
46.   2021.10.15 - Jefferson Research
47.   2021.10.19 - Marktfeld
48.   2021.10.19 - Wright Investors Service
49.   2021.10.20 - Zacks Research
50.   2021.10.22 - Jefferson Research
51.   2021.11.12 - Zacks Research
52.   2021.12.01 - GlobalData
53.   2021.12.07 - Zacks Research
54.   2021.12.20 - Hanwha Securities
55.   2021.12.27 - Zacks Research
56.   2022.01.18 - Zacks Research
57.   2022.02.08 - Zacks Research
58.   2022.03.01 - GlobalData
59.   2022.03.07 - Zacks Research
60.   2022.03.28 - Zacks Research
61.   2022.04.13 - Plunkett Research
62.   2022.04.14 - Zacks Research
63.   2022.04.18 - Egan-Jones
64.   2022.04.22 - Zacks Research
65.   2022.05.24 – NUS

31

# Appendix B
# Materials Considered

### I.  Analyst Reports (cont.)

66.  2022.05.24 - Zacks Research
67.  2022.05.31 - Zacks Research
68.  2022.06.01 – GlobalData
69.  2022.06.23 - Zacks Research
70.  2022.06.28 - Probes Reporter
71.  2022.07.01 - Probes Reporter
72.  2022.07.13 - Zacks Research
73.  2022.08.02 - Zacks Research
74.  2022.08.02 - Probes Reporter
75.  2022.08.27 - Zacks Research
76.  2022.08.31 - Zacks Research
77.  2022.09.01 - GlobalData
78.  2022.09.15 - Plunkett Research
79.  2022.09.21 - Zacks Research
80.  2022.10.02 - Disclosure Insight
81.  2022.10.17 - Zacks Research
82.  2022.11.02 - Disclosure Insight
83.  2022.11.17 - Zacks Research
84.  2022.12.01 - Disclosure Insight
85.  2022.12.20 - GlobalData
86.  2022.12.22 - Zacks Research

### J.  Legal Decisions

1.  *Barrie v. Intervoice-Brite, Inc.*, No. 3:01-CV-1071-K (N.D. Tex. Oct. 26, 2009)
2.  *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).
3.  *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82 (1st Cir. 2014)
4.  *Bruton v. Gerber Prods. Co.*, 2018 U.S. Dist. LEXIS 30814 (N.D. Cal. Feb. 13, 2018)
5.  *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
6.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013)
7.  *Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System,* 594 U. S. (2021)
8.  *Halliburton I*, 131 S. Ct. 2179, 2186 (2011)
9.  *Halliburton II*, 134 S. Ct. 2398 (2014)
10. *In re 2TheMart.Com, Inc. Sec. Litig.*, 114 F.Supp.2d 955 (C.D. Cal. 2000)
11. *In Re BP plc Securities Litigation,* Civil Action No. 4: 10-md-2185 (S.D. Tex. Dec. 6, 2013)
12. *In re DaimlerChrysler AG Securities Litigation*, 294 F. Supp. 2d 616 (D. Del. 2003)
13. *In re Graphics Processing Units Antitrust Litig.,* 253 F.R.D. 478 (N.D. Cal. 2008)
14. *In re PolyMedica Corp. Litig.*, 453 F.Supp. 2d 260 (D. Mass. 2006)
15. *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101, M.D. Fla. March 30, 2006
16. *Loritz v. Exide Techs*., 2015 WL 6790247 (C.D. Cal. July 21, 2015)
17. *Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS 173789 (N.D. Cal. Dec. 15, 2014)

32

# Appendix B
# Materials Considered

## K. Expert Reports and Depositions of Matthew Cain, Ph.D. in other matters

## L. Miscellaneous

1. "How did Carvana make it onto the Fortune 500? Unconventional values-and car vending machines," *Fortune*, June 2, 2021, https://fortune.com/2021/06/02/carvana-car-vending-machines-fortune-500/
2. "Fortune 500 Ranking," *Fortune*, https://fortune.com/ranking/fortune500/
3. Complaint for Violation of the Securities Act of 1933 in City of Warwick Retirement System v. Carvana Co., et al., filed September 30, 2022
4. Verified Complaint for Injunctive Relief, *Carvana, LLC v. Benson*, filed October 13, 2022
5. Order, *Carvana, LLC d/b/a Carvana v. N.C. Div. of Motor Vehicles*, No. 21 CVS 8116 (N.C. Super. Ct. Wake Cnty. June 11, 2021)
6. Settlement Agreement, *Carvana, LLC d/b/a Carvana v. N.C. Div. of Motor Vehicles*, No. 21 CVS 8116 (N.C. Super. Ct. Wake Cnty. July 21, 2021)
7. Mark Jenkins, "J.P. Morgan Automotive Investor Conference," New York, August 11, 2021
8. CarGurus, Inc. Form 10-Q for the Period Ended September 30, 2020
9. "CarLotz, Inc. Closes Business Combination and Will Trade on the Nasdaq Stock Exchange Under the Ticker LOTZ," *GlobeNewswire*, January 21, 2021
10. Shift Technologies Form 10-K for the Period Ended December 31, 2020
11. "Insurance Acquisition Files 8K – Changes to Hldr Rights," *Dow Jones Institutional News,* October 14, 2020
12. "Shift Closes Merger with CarLotz, Creating a Differentiated Used Omnichannel Auto Retailer, and Announces Shift Board of Directors Changes," *Shift Technologies, Inc.*, December 9, 2022
13. "Ex-SPAC Car Seller Shift Will Shut Down, File for Bankruptcy," *Bloomberg*, October 6, 2023
14. Stitch Fix, Inc. Form 10-K for the Period Ended July 31, 2021
15. Vroom, Inc. Form 10-Q for the Period Ended September 30, 2020
16. Vroom, Inc. Form 10-K for the Period Ended December 31, 2020
17. "Vroom Announces Pricing of Initial Public Offering," *Vroom Inc.*, June 8, 2020, https://ir.vroom.com/news-releases/news-release-details/vroom-announces-pricing-initial-public-offering/
18. "Online car dealer Vroom faces dozens of state violations as customer complaints mount," *CBS Texas*, April 19, 2022, https://www.cbsnews.com/texas/news/online-car-dealer-vroom-faces-dozens-of-state-violations-as-customer-complaints-mount/
19. "Vroom to Pay Fine in Florida Over Customer Complaints. Other States Are Watching Too," *Barron's,* July 11, 2022, https://www.barrons.com/articles/vroom-florida-fine-vehicle-transfers-complaints-51657376697
20. "Press Release: Vroom Announces Equity-for-Debt Recapitalization," *Dow Jones Institutional News*, November 12, 2024
21. The People of the State of California v. Allison Bavarian, Complaint, Case No: 25CV457431, January 24, 2025
22. "California AutoNation Dealerships Settle Consumer Protection Lawsuit for $650,000," *Los Angeles County District Attorney's Office,* February 26, 2025, https://da.lacounty.gov/media/news/california-autonation-dealerships-settle-consumer-protection-lawsuit-650000

33

**Appendix B**
**Materials Considered**

23. *Stimulus Package:* Congress.gov. "Text - H.R.748 - 116th Congress (2019-2020): CARES Act." March 27, 2020. https://www.congress.gov/bill/116th-congress/house-bill/748/text
24. *Stimulus Package:* Congress.gov. "Text - H.R.133 - 116th Congress (2019-2020): Consolidated Appropriations Act, 2021." December 27, 2020. https://www.congress.gov/bill/116th-congress/house-bill/133/text
25. *Stimulus Package:* Congress.gov. "Text - H.R.1319 - 117th Congress (2021-2022): American Rescue Plan Act of 2021." March 11, 2021. https://www.congress.gov/bill/117th-congress/house-bill/1319/text
26. Securities Act of 1933, § 11(e), 15 U.S.C. § 77k(e)
27. Texas Department of Motor Vehicles, "Independent (GDN) Motor Vehicle Dealers List," https://texasdmv.my.salesforce-sites.com/dealers/motorvehicledealerliststaging
28. "Survey Description," *University of Michigan*, https://data.sca.isr.umich.edu/survey-description.php#

34

## Appendix C
## News Stories on Carvana's Title and Registration Issues

*News stories that mentioned Carvana's T&R issues during the alleged Class Period include:*

| | Date | Source | Article Title |
|---|---|---|---|
| 1. | 2/21/2021 | WMAR | Carvana customer waits six months for Maryland license plates |
| 2. | 8/9/2021 | CBS-17 | NCDMV revokes Carvana's dealer's license in Wake County until 2022 |
| 3. | 8/10/2021 | Spectrum News | DMV bans Carvana from selling cars in Raleigh until 2022 |
| 4. | 8/10/2021 | WRAL News | Vending machine out of order; Carvana loses license to sell in Wake Co |
| 5. | 8/10/2021 | ABC11 | NC suspends Carvana vehicle sales at Wake County Location for 6 months |
| 6. | 8/11/2021 | Automotive News | Carvana dealer license suspended in N.C. county for 180 days |
| 7. | 8/11/2021 | Investing.com | Carvana Falls As North Carolina Bars It from Selling in Raleigh Area |
| 8. | 8/11/2021 | NBC - 17 WNCN | Carvana on probation in Charlotte through Nov. 2022 |
| 9. | 8/11/2021 | Triangle Business Journal | Carvana Gets Booted in Raleigh |
| 10. | 8/11/2021 | Wall Street Journal | Carvana Barred From Selling Vehicles in Raleigh, N.C., Area Until January |
| 11. | 8/12/2021 | Charlotte Business Journal | Why Carvana is in Hot Water with NC Officials |
| 12. | 8/12/2021 | Fox 46 Charlotte | Carvana on probation in Charlotte through Nov. 2022, suspended in Raleigh |
| 13. | 8/12/2021 | The News & Observer | Car vending machine retailer Carvana cannot sell cars in Raleigh until 2022 DMV says |
| 14. | 8/12/2021 | WSOC TV | Carvana in hot water with North Carolina officials |
| 15. | 8/14/2021 | News & Record | Carvana barred Raleigh until 2022, DMV says |
| 16. | 8/16/2021 | Carscoops | Carvana Banned From Selling Used Cars in NC Area until 2022 |
| 17. | 8/16/2021 | Jalopnik | Carvana Banned From Selling Cars In North Carolina County Until 2022 |
| 18. | 8/16/2021 | WFLA | 4 months after buying SUV from Carvana, Riverview man still has no permanent tag, registration |
| 19. | 8/19/2021 | Riverside Press-Enterprise | POMONA; City tells Carvana to cease activity |
| 20. | 8/20/2021 | Riverside Press-Enterprise | POMONA; Carvana OKs leaving Fairplex |
| 21. | 9/21/2021 | WFLA | Tampa Bay area Carvana buyers stuck with cars they can't legally drive |
| 22. | 9/22/2021 | WFLA | State regulators settle with Carvana for $6K over title delays from 2020 |
| 23. | 10/6/2021 | WFLA | Carvana offers to buy back vehicles after failing for months to fork over titles |
| 24. | 10/18/2021 | WFLA | Carvana buying back Tesla after failing to fork over title to Tampa Bay buyer |
| 25. | 10/22/2021 | Wall Street Journal | Carvana Faces Government Scrutiny and Fines Following Consumer Complaints |
| 26. | 10/23/2021 | Wall Street Journal | Carvana Hits Some Bumps in the Road |
| 27. | 11/15/2021 | CBS DFW | I-Team: Online Car Seller Carvana Hit With Dozens of State Violations |
| 28. | 11/17/2021 | WFLA | 8-month Carvana title delay forces Tampa Bay paramedic to park car, get rental to drive to work |
| 29. | 11/23/2021 | WFLA | Pasco tax collector calls for state action against Carvana for delayed or missing titles |
| 30. | 11/29/2021 | Autoblog | Some Carvana buyers have waited months for license plates |
| 31. | 11/29/2021 | KPRC 2 Click2Houston | KPRC 2 Investigates: Car dealer selling cars customers can't drive |
| 32. | 12/7/2021 | Dayton Daily News | How To Avoid Negotiating When Buying a Car |
| 33. | 12/8/2021 | WJXT | I-TEAM investigates car dealer facing fines in multiple states including Florida |
| 34. | 12/10/2021 | ClassAction.org | Carvana Hit with Class Action Over Alleged 'Months and Months' of Delays in Transferring Vehicle Titles |
| 35. | 12/10/2021 | WJXT | I-TEAM Complaints mount against car dealer facing fines in multiple states including Florda |
| 36. | 12/14/2021 | WJXT | I-TEAM uncovers state action & federal lawsuit against Carvana |
| 37. | 12/17/2021 | WFLA | Carvana title troubles Florida threatens to pull license |
| 38. | 12/17/2021 | WFLA | Florida threatens to pull Carvana's dealer license over ongoing title issues |
| 39. | 12/21/2021 | Automotive News | Why Florida is threatening to suspend Carvana's dealer license |
| 40. | 12/24/2021 | WFLA | Carvana faces 2 class-action lawsuits over registration delays amid deadline to fix title problems in Florida |
| 41. | 1/5/2022 | WFLA | Proposed bill would take away car dealer requirement to transfer title within 30 days |
| 42. | 1/10/2022 | WJXT | I-TEAM State threatening to suspend Carvana's license to sell cars in Florida |
| 43. | 1/11/2022 | WFLA | Second Florida lawmaker proposes taking away |
| 44. | 1/24/2022 | WFLA | Lawmakers quiet on proposal to take away dealer's license |
| 45. | 1/31/2022 | WJXT | I-TEAM: Carvana faces Monday deadline to submit information to state |
| 46. | 2/1/2022 | WFLA | Florida regulators say they won't go after Carvana's dealer license - for now |
| 47. | 2/1/2022 | WJXT | I-TEAM: Changes by Carvana will allow company to continue to operate in Florida |
| 48. | 2/2/2022 | DENVER7 | Aurora woman says Carvana sold car with 40K mile discrepancy |
| 49. | 2/3/2022 | WNCN | Carvana has dealer's license reinstated in Raleigh following 6-month probation |
| 50. | 2/7/2022 | Automotive News | Carvana sales can go on in Florida, Raleigh, N.C. Titling scrutiny issues are resolved |

**Appendix C**
**News Stories on Carvana's Title and Registration Issues**

*News stories that mentioned Carvana's T&R issues during the alleged Class Period include:*

| | Date | Source | Article Title |
|---|---|---|---|
| 51. | 2/9/2022 | FOX4KC | Multiple states investigating Carvana's business practices |
| 52. | 2/10/2022 | FOX4KC | Missouri man waits almost a year to get title for vehicle bought from Carvana |
| 53. | 2/11/2022 | Tampa Bay Times | Despite warnings, Florida could give car dealers more time to turn over titles |
| 54. | 2/16/2022 | FOXBusiness | Carvana allegedly leaving car buyers on the hook after selling cars without title |
| 55. | 2/25/2022 | ABC13 | Carvana purchase, months after waiting for car registration |
| 56. | 4/7/2022 | DENVER7 | Colorado regulators find 'systemic issue' with Carvana |
| 57. | 4/28/2022 | KJRH | Owasso family frustrated after buying used car from Carvana |
| 58. | 5/12/2022 | 6ABC | Carvana lawsuit alleges unfair, deceptive practices |
| 59. | 5/13/2022 | Barron's | Illinois Suspends Carvana's Dealer's License Over Late Registrations and 'Improper' Tags |
| 60. | 5/16/2022 | Automotive News | Carvana's dealer license suspended in Illinois |
| 61. | 5/16/2022 | Chicago Sun-Times | Illinois stops Carvana sales over delays with registrations, titles |
| 62. | 5/16/2022 | Top Class Actions | Carvana Class Action Alleges Company Fails to Register Vehicles in Timely Manner |
| 63. | 5/17/2022 | ABC7 Chicago | Carvana's dealer license suspended in Illinois; Skokie will pause tower plans |
| 64. | 5/17/2022 | Fox Business | Carvana banned from doing business in Illinois over registration, title issues |
| 65. | 5/17/2022 | Kelley Blue Book | Carvana's License to Sell Suspended in Illinois |
| 66. | 5/17/2022 | NBC Chicago | Illinois Suspends Carvana Sales Over Delays With Registrations Titles |
| 67. | 5/17/2022 | Patch Media | Skokie Carvana Tower On Hold After Suspension |
| 68. | 5/17/2022 | WFLA | Carvana's license suspended in Illinois |
| 69. | 5/17/2022 | WHO | Carvana loses license to operate in Illinois |
| 70. | 5/17/2022 | WSAV | Carvana loses license to operate in Illinois |
| 71. | 5/17/2022 | WTTW Chicago | Skokie Officials Pump Brakes on Carvana Tower After Illinois Suspends Company's Dealer's License |
| 72. | 5/18/2022 | CarScoops | Carvana's Problems Pile Up After Losing License To Sell Cars In Illinois Over Title Issues |
| 73. | 5/18/2022 | Chicago Tribune | Carvana development hits brakes in Skokie |
| 74. | 5/18/2022 | Chicago Business | Timeline Carvanas rough stretch in 2022 |
| 75. | 5/18/2022 | Reuters | Carvana's license to sell vehicles in Illinois suspended |
| 76. | 5/18/2022 | WBAL | Lawsuit claims Carvana failed to register cars in timely manner |
| 77. | 5/18/2022 | WBAL TV 11 | Class action suit filed against Carvana in Pennsylvania |
| 78. | 5/18/2022 | WJXT | I-TEAM Carvana's license to sell cars in Illinois suspended |
| 79. | 5/18/2022 | CBT | Carvana's operations in Illinois have been suspended |
| 80. | 5/19/2022 | Repairer Driven News | Carvana dealer license suspended in Illinois, under probation in Charlotte, NC |
| 81. | 5/23/2022 | Motor1 | Carvana's License To Sell In Illinois Suspended Over Title Issues |
| 82. | 5/26/2022 | Reuters | Illinois officials order stay on Carvana |
| 83. | 5/26/2022 | Wall Street Journal | REFILE-Illinois officials order stay on Carvana's temporary license suspension |
| 84. | 5/27/2022 | Barron's | Illinois Suspends Sales Halt on Carvana as Compliance Improves |
| 85. | 5/30/2022 | Automotive News | Carvana OK to sell in Ill., with conditions; Retailer is required to use remitters for titles |
| 86. | 6/2/2022 | Chicago Tribune | Carvana OK to sell in state, but Skokie dealership stalled |
| 87. | 6/10/2022 | TheStreet.com | Carvana, 'The Amazon of Car Dealers', Fights its Biggest Battle |
| 88. | 6/24/2022 | Barron's | Carvana Sought to Disrupt Auto Sales. It Delivered Undriveable Cars |
| 89. | 6/25/2022 | Dow Jones, Barron's | Carvana and the 'Undriveable-Car Task Force' |
| 90. | 6/27/2022 | Barron's | Carvana and the 'Undriveable-Car Task Force' --- Carvana sought to disrupt the used-car market |
| 91. | 6/30/2022 | Class Action Reporter | CARVANA CO Faces Class Action Over Deceptive Trade Practices |
| 92. | 7/1/2022 | Barron's | Carvana's Paperwork Pothole |
| 93. | 7/11/2022 | Barron's Online | Vroom to Pay Fine in Florida Over Customer Complaints. Other States Are Watching Too |
| 94. | 7/18/2022 | Barron's Online | Illinois Officials Have Suspended Carvana's License. Again. |
| 95. | 7/18/2022 | NBC Chicago | For The Second Time Carvana is Banned From Selling Cars in Illinois |
| 96. | 7/18/2022 | Patch Media | Carvana Again Suspended From Selling Cars In Illinois |
| 97. | 7/19/2022 | Automotive News | Why Illinois suspended Carvana's license again |
| 98. | 7/19/2022 | Chicago Business | Carvana suspended again in Illinois |
| 99. | 7/20/2022 | Barron's | Carvana Fights New Legal Battles as Wall Street Troubles Mount |
| 100. | 7/20/2022 | Fortune via Yahoo Finance | Carvana's Illinois problems continue. |

**Appendix C**
**News Stories on Carvana's Title and Registration Issues**

*News stories that mentioned Carvana's T&R issues during the alleged Class Period include:*

| | Date | Source | Article Title |
|---|---|---|---|
| 101. | 7/21/2022 | Washington Times | Illinois cracks down on Carvana for second time over out-of-state registration permits |
| 102. | 7/22/2022 | Chicago Tribune | Skokie officials Carvana is 'in a holding pattern' |
| 103. | 7/25/2022 | NBC Chicago | Carvana Drama Customers Report Delivery Delays Miscommunication After Recent State Ban Went Into Effect |
| 104. | 8/1/2022 | WTTW Chicago | Carvana Back in Hot Water With State of Illinois License Suspension Reinstated |
| 105. | 8/1/2022 | Fox 32 Chicago | Carvana can do business in Illinois again after judge orders temporary reprieve |
| 106. | 8/2/2022 | carscoops.com | Carvana Can Once Again Start Selling In Illinois After Losing License For The Second Time |
| 107. | 8/2/2022 | Chicago Tribune | DuPage County judge gives Carvana reprieve |
| 108. | 8/2/2022 | Repairer Driven News | Carvana takes Illinois Secretary of State to court over dealer license |
| 109. | 8/4/2022 | Barron's | Carvana Is Asking Its Customers to Push Back on Illinois Regulators |
| 110. | 8/5/2022 | St. Louis Post Dispatch | Missouri records complaints against online car seller Carvana over title delays |
| 111. | 8/8/2022 | NBC Chicago | Judge Gives Carvana Green Light to Sell Cars in Illinois Ahead Of Late-August Hearing |
| 112. | 8/12/2022 | WFLA | Florida files new complaints against Carvana over title delays |
| 113. | 9/7/2022 | NBC Chicago | Carvana Allowed to Buy Sell Cars in Illinois While Defending Legal Challenges |
| 114. | 9/27/2022 | WSAZ | "We have our money back": Carvana issues refund after being unable to provide car title |
| 115. | 9/30/2022 | Barron's | Carvana Could Face Class-Action Suit for Late Car Registrations |
| 116. | 10/3/2022 | Automotive News | Carvana exec charged with licensing violations |
| 117. | 10/8/2022 | Bay City Times | Carvana dealer has license suspended by state of Michigan |
| 118. | 10/10/2022 | Detroit Free Press | Michigan suspends Novi car dealership Carvana 's license citing 'imminent harm' to public |
| 119. | 10/10/2022 | Detroit News Online | State suspends license of Carvana dealership in Novi over alleged code violations |
| 120. | 10/10/2022 | Oakland Press | Carvana license suspended; revocation to be sought |
| 121. | 10/10/2022 | WJBK | Carvana dealership in Novi suspended for several violations |
| 122. | 10/11/2022 | Baltimore Business Journal | 8 things you need to know today |
| 123. | 10/11/2022 | Detroit Free Press | Carvana Novi license suspended for 'imminent harm' to pub Several violations of Mich.Vehicle Code |
| 124. | 10/11/2022 | Detroit News | Carvana dealer's license suspended Novi dealer contends alleged violations are 'baseless and reckless' |
| 125. | 10/11/2022 | WMAR | Maryland joins other states in fining Carvana for title delays |
| 126. | 10/12/2022 | Battle Creek Enquirer | Carvana Novi license suspended by state for 'imminent harm' to public Several violations of Michigan |
| 127. | 10/12/2022 | Lansing State Journal | Carvana license suspended for harm to public Novi dealership accused of several violations of Michigan Veh. Code |
| 128. | 10/14/2022 | Bay City Times | Carvana dealer asks court to intervene after Michigan suspends its license |
| 129. | 10/14/2022 | Detroit Free Press | Carvana sues Michigan after officials suspended its license to sell cars |
| 130. | 10/14/2022 | Detroit News | Carvana seeks temporary restraining order against Michigan after license suspension |
| 131. | 10/15/2022 | Detroit News | Carvana fires back at state regulators |
| 132. | 10/17/2022 | Crain's Detroit Business | Carvana asks Michigan consumers to sign petition; Dealer suspended for alleged vehicle code violations |
| 133. | 10/17/2022 | Crain's Detroit Business | Why Michigan suspended Carvana dealership |
| 134. | 10/19/2022 | The Motley Fool | Why Carvana Stock Hit the Brakes Today |
| 135. | 10/20/2022 | Detroit News | Carvana 's request to lift Novi license suspension denied |
| 136. | 10/21/2022 | Detroit Free Press | Judge rejects Carvana bid for restraining order targeting Michigan |
| 137. | 10/21/2022 | Detroit News | Carvana denied bid to restore license Online user-car retailer accused of state violations |
| 138. | 10/21/2022 | Oakland Press | Judge denies Carvana 's request for temporary restraining order against Benson over license suspension |
| 139. | 10/26/2022 | Novi Note | Carvana denied temporary restraining order |
| 140. | 11/6/2022 | MotorBiscuit | Carvanas Problems That Led to Their Struggle to Stay Intact |
| 141. | 11/15/2022 | Motor1 | Carvana Faces Title And Registration Issues Again, This Time In PA |
| 142. | 11/21/2022 | Law360 | Carvana's Deceptive Ads Cost NC Dealerships Biz, Suit Says |
| 143. | 12/19/2022 | Automotive News | Carvana will be in fight of its life in pivotal 2023; Onetime stock market darling must tread careful |
| 144. | 12/28/2022 | Newton Citizen | The Dramatic Fall of Carvana, The Amazon of Used Cars |
| 145. | 1/11/2023 | Detroit Free Press | Carvana, Michigan reach deal that leaves used car megastore without license in state |
| 146. | 1/24/2023 | 5 Chicago | Carvana Admits to Violating State Laws Over Titling and Registering Cars It Sold Last Year in Illinois |
| 147. | 1/24/2023 | Chicago Sun-Times | Carvana, Illinois settle fight over vehicle titles, registrations |
| 148. | 1/24/2023 | Dow Jones | Carvana Sales Broke State Law in Illinois, According to New Settlement |
| 149. | 2/22/2023 | Inside Edition | Carvana Customers Claim Company Didn't Promptly Transfer Registrations |