**Exhibit 27**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

In re                                ) Case No.

Carvana Co Securities Litigation ) 2:22-cv-02126-PHX-

) MTL

)

_____  )

)

)

This Document Relates to:          )

ALL ACTIONS.                       )

)

_____  )

VIDEO-RECORDED DEPOSITION OF

CHRISTOPHER GRAFF, PMQ OF T. ROWE PRICE

Wednesday, February 18, 2026

San Francisco, California

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 7896088

Page 1

retire and fund -- fund their dreams and goals later in life.

Q.   Okay.   So fair to say that T. Rowe Price invests assets on behalf of pension funds and institutional investors?                    08:28:29

A.   That's correct.

Q.   Okay.  With the goal of growing those assets in long term?

A.   Yep.

Q.   Okay.  And T. Rowe Price invests in both   08:28:35 equity and fixed income funds in the U.S.; is that correct?

A.   That's right.

Q.   Can you explain what the difference is between an equity fund and a fixed income fund?   08:28:50

A.   Equity fund, you buy equity securities. Fixed income, you buy debt securities.  There's nuances in the strategy, but I am not a fixed income PM or analyst, but tho- -- those are the simple contours.                                             08:29:03

Q.   Yeah.

     You're on the equity side?

A.   Correct.

Q.   And equity just generally means you're investing in public companies in the stock market?   08:29:09

Page 37

A.    Largely.  There's nuance in private. There's private equity, also.  But, yes, you're still buying a -- a portion of a company that, hopefully, the overall value of that company and your proportion of that company grows at a nice    08:29:25 rate.

Q.    Okay.  T. Rowe Price was engaged by the plaintiff here, UANPF, to provide investment services; is that right?

A.    That I understand.  Again, I lar- --    08:29:36 largely the individual client complexion is opaque to us for a reason.  We're supposed to do our job and pick the right investments.  I don't know, again, the individual client base all that well.

Q.    Okay.    08:29:52

A.    But, ye- -- yes, in this case, I understand that that was our client.

Q.    So granted that your understanding is limited, what is just a high-level description of the services that T. Rowe Price provided to UANPF in    08:30:04 the period from 2020 to 2022?

A.    If they are like most of our clients, it was to, again, take their capital and grow it at a -- as high as possible rate, but largely, a [verbatim] attractive risk adjusted rate, that    08:30:25

Page 38

would, then, you know, pay into, you know, herd --
herd pension in the name.

This is largely retirement accounts for
individuals that are not savvy enough or have enough
time to manage portfolios on their own.                    08:30:39

And so, it is our professional job to
allocate capital in a productive and profitable
manner for them.

Q.   Okay.  So they rely on you as the
investment experts --                                      08:30:50

A.   That's right.

Q.   -- is that fair?

MS. GRANT:  I'm going to mark another
exhibit as Exhibit 33.

(Graff Deposition Exhibit 33 was marked     08:30:59
for identification.)

THE WITNESS:  You can have this, I think.

MR. GRONBORG:  For the record, it's just
previously marked as Exhibit 6.

THE COURT REPORTER:  Mr. Gronborg, did you  08:31:34
say 26?

MR. GRONBORG:  Six.

Six.

BY MS. GRANT:

Q.   Mr. Graff, have you ever seen this        08:31:40

Page 39

document before?

A.   I have not.

Q.   Okay.  I'm going to ask you to -- well, first, let me represent that this is an investment contract between T. Rowe Price Associates and UANPF.  08:32:07 It was dated beginning December 1st, 2016.

And I'm just going to ask you to look at one part of it, so you can explain T. Rowe Price's services.

A.   Mm-hmm.                                          08:32:28

Q.   So Exhibit A, which is page 7 of the document.  This outlines a statement of overall investment objectives and policy.  And it references a style, large cap growth.

Can you explain to the jury what the large  08:33:11 cap growth portfolio is?

A.   La -- large refers to market cap, which is just shares outstanding times share price.

Q.   Sure.

A.   And definitions have changed with the       08:33:24 distortion of markets but usually large cap is anything above 50 to a hundred billion in -- in market cap.

A lot more of those companies today than there were, you know, 15 years ago, but -- but    08:33:39

Page 40

margin loss"?

A.    Well, small is proportional to usually the market cap, but it's -- the market cap was probably 10 billion then, 15 billion, something like that. It should say here actually.                            11:16:11

40 -- 40 billion.  So maybe it's a few hundred million loss in relation.

Q.    Okay.  So they're getting closer to profitability but not yet there?

A.    That's right.                              11:16:20

Q.    And, "EBITDA," the acronym, what does it stand for?

A.    Shorthand for free cash flow.

Q.    Okay.

A.    It's not exactly, but...                   11:16:26

Q.    Okay.  There's -- there's a discussion on page 5 that starts with the Yipit data.

It says "Yipit data confirms Carvana's inventory" available -- "availability issue."  [As read]                                            11:17:24

Isn't it worthy that Carvana sold more -- more cars than it produced in 2020.

Do you see that?

A.    Yeah.

Q.    So this Exhibit 2A here, in the report,   11:17:35

Page 150

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

that's taken from the Yipit data; right?

A.   This should be taken from the Yipit report, yes.

Q.   Okay.  So Yipit, the weekly third-party scrubbing data, that analysts like T. Rowe Price get, is reporting on inventory status?           11:17:50

A.   Yes.

Q.   Okay.  And then there's a note that Ernie -- I assume is Ernie Garcia --

A.   Yes.                                           11:18:09

Q.   -- Junior, "confirmed on the call that Carvana is scaling the third-party partner inventory experiment as the platform remains at a deficit" on industry -- "on inventory."  [As read]

Can you explain what that means?          11:18:23

A.   Again, reference to what we were discussing before.  The core business model is to acquire their own, recondition their own, and sell on their own, but they're having inventory issues.

So what they can do is, call up Ford         11:18:38
dealerships and other competitors, if you will, in the market and say, Hey, can we put a picture of your car on our website.

That functionally seems no different to the consumer, so the consumer sees more selection        11:18:57

Page 151

available, and gets a better experience.  So it is a way to increase inventory without the ability to physically increase the inventory.

Q.   Okay.  And on those third-party inventory sales, again, Carvana might be making little to no    11:19:11 net revenue on them?

A.   It depends, but I would say ze- -- zero is unlikely.  Small amount of revenue, though, yes.

Q.   Okay.  But they would still be included in retail unit sales?                                    11:19:29

A.   Yes.

Q.   And Carvana's scaling the third-party inventory experiment because it needs more inventory to grow and realize economies of scale; is that right?                                                 11:19:40

A.   That's right.

MR. GRONBORG:  Objection.  Form.

BY MS. GRANT:

Q.   Okay.

MS. GRANT:  Can I do that 10-K.          11:19:56

Hand you what's been marked as Exhibit 48.

(Graff Deposition Exhibit 48 was marked

for identification.)

MR. SHAHEEN:  Thank you.

BY MS. GRANT:                               11:20:29

Page 152

A.   I would say the regulation that I was most concerned about is title and registration, which is a state regulation.  And facilitating these transactions in a new business model, that most local economies didn't like too much, was a competitive tension.                                    11:22:35

And so, you can imagine that the DMV maybe wasn't as efficient in managing with their relationship with Carvana with -- with warmth.

So despite Carvana creating a strong value proposition for customers, they're still reliant on regulatory bodies to facilitate a transaction.                    11:22:53

Q.   Okay.  You mentioned -- you said it was most concerned about the title and registration regulation.  Why were you concerned about it?                    11:23:21

A.   If they don't have a license to sell in market, you shut out a full state.  So they can't grow in Illinois if the state doesn't give them a license to operate a used car market there.  So there were many instances throughout their history where there would be some problem with title and registration, and the state would pull their license.                    11:23:39

So I think Michigan was one for a while, kind of the main couple.  There have been four or                    11:23:52

Page 154

five states where they effectively could not sell in
market without the blessing of the regulators.

Q.   Okay.  Is that something that T. Rowe
Price analysts would have tracked over time?

A.   Yes.                                          11:24:03

Q.   How did you track that?

A.   Largely news flow.  This was not published
all that much.  So a -- a more vibrant news feed and
making sure I'm picking up all the different news
flows from Tallahassee and Idaho and all the          11:24:15
different markets around the U.S.

Q.   Okay.  So -- and we talked about earlier
about your daily review of -- or news headlines, and
you would dig into things that you viewed as value
relevant.  You would dig further into articles        11:24:33
mentioning title and registration compliance issues;
is that fair?

A.   Yes, and we'd usually ask the company
about it too --

Q.   Okay.                                         11:24:44

A.   -- realtime.

Q.   Would you also look into publicly
available information, for example, on a state DMV
website --

A.   Yes.                                          11:24:52

Page 155

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q.   -- about issues?

And you mentioned that you thought the DMV maybe wasn't as effective in managing their relationship with Carvana with warmth -- warmth. What did you mean by that?                    11:25:25

MR. GRONBORG:  Object to form.

THE WITNESS:  Every situation is different.  I'm certain in some form, Carvana wants it to act with speed, and certain bodies, officials maybe don't want to work at the same speed.  So    11:25:39 those are sort of the honest mistakes, if you will, in the warmth of we don't care how fast you want to move, we move at this pace, and so, you're not getting a license until we get to it, which is Q3 or something.                                          11:25:55

But generally the intent of Carvana relative to the motivation of the regulatory body differed to the point where perhaps there were times when regulatory bodies would not allow transactions to continue because of local interests.  These     11:26:13 are -- used car dealer owners are businesspeople on the Lion's Club or whatever the local business organizations are, and they maybe influence some of those decisions.

So the -- the give and take of making sure   11:26:27

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

that transactions are safe and not fraudulent

relative to being upset that there's a new

competitor in market was a [verbatim] area of

tension for a long time for the company.  Not as

much anymore, but certainly during this time when          11:26:42

they were scaling up.  You know, growing 300

percent, that -- that's incredible growth and

impacts the local markets quite a bit.

BY MS. GRANT:

    Q.    Okay.  And the company in this risk factor     11:26:53

is disclosing that it doesn't know how the laws are

going to apply to their disruptive business model or

how these relationships are going to go; is that

fair?

    A.    That's right.                                   11:27:09

        MR. GRONBORG:  Object to form.

BY MS. GRANT:

    Q.    It also states in the middle of these

paragraphs, "The violation of any of these laws or

regulations could result in administrative, civil or     11:27:15

criminal" -- "criminal penalties or a

cease-and-desist order against some or all of our

business activities, any of which could damage our

reputation and have a material adverse effect on our

business, sales, and results of operations."  [As        11:27:32

Page 157

read]

Do you see that?

A. Yes.

Q. So you followed these issues while you were analyzing Carvana; right?                                    11:27:40

A. Yes.

Q. Did you ever come across an issue that had a material effect on Carvana's business?

A. Subjective. But certainly many times the potential compounding effect of each of these                11:28:03 individual cases worried me. But no individual case I thought meaningfully impacted the long-term expectation for the business.

Q. Okay. So -- and as a person who analyzes these SEC filings, you would expect Carvana to                 11:28:33 disclose issues that had a material effect on their business; is that fair?

A. Absolutely.

Q. Okay. And if it suffered immaterial penalties or fines or cease-and-desist orders from                   11:28:47 state regulators, you would not expect them to necessarily disclose that in their 10-K; right?

A. Right.

MR. GRONBORG: Object to form.

(Interruption in room.)                                    11:29:32

Page 158

MS. GRANT:  Pretty sure that's fireworks, but let's continue.

BY MS. GRANT:

Q.   By the way, do you believe this -- this statement about the risk to Carvana's business act- -- accurately captures the risk that they were facing?                                            11:29:48

MR. GRONBORG:  Object to form.

THE WITNESS:  The bold up here or (indicating)?                                            11:30:02

BY MS. GRANT:

Q.   To the bold -- we'll start there.

A.   Yes.

Q.   And then the paragraph that I read earlier starting with "The violation of any of these laws."   11:30:14

MR. GRONBORG:  Same objection.

BY MS. GRANT:

Q.   Do you believe that statement is accurate?

A.   Yes.

Q.   Okay.  All right.                                11:30:28

So I'm going to ask you to turn back to -- actually, let's do page 57 quickly.  There's a discussion of "Wholesale Vehicle Sales."

Do you see that?

A.   Yes.                                            11:31:17

Page 159

re- -- reported on for a few quarters.

Do you see that?

A.   Which chart?

Q.   Sorry.

I'm looking just at the "Third-Party    11:52:15
Inventory" --

A.   Okay.

Q.   -- discussion.

A.   Yes.  Yes.

Q.   Okay.  And here there's a quote from a    11:52:22
dealer, I think, that's been included in the report.

Do you see that?

A.   Yes.

Q.   Do you know where that quote's from?

A.   I don't.    11:52:48

Q.   Okay.  The quote says "They pay me the
retail price.  They pay me the price that I have
online for the car."

Do you see that?

A.   Yes.    11:52:56

Q.   Does that mean Carvana is paying the
dealer the list price for their car?

A.   Yes.

MR. GRONBORG:  Object to form.

BY MS. GRANT:    11:53:04

Page 173

Q.    And if Carvana is paying the dealer the list price for their car and the dealer isn't paying them anything, Carvana's not recognizing net revenue for that sale; is that right?

A.    Economically, yes.                                    11:53:20

Q.    Okay.  But that sale would still be included in retail unit sales?

A.    Yes.

Q.    Okay.  Continue moving.

        MS. GRANT:  Hand you what has been marked    11:54:05
as Exhibit 52.

        (Graff Deposition Exhibit 52 was marked

        for identification.)

BY MS. GRANT:

Q.    Do you recognize this document?             11:54:23

A.    Yes.

Q.    What is it?

A.    It's a news report on Carvana losing their license in North Carolina.

Q.    Right.                                       11:54:36

        And that news of that event came out -- was published here on August 10th, 2021.

        Do you see that?

A.    That's what it looks like, yep.

Q.    And this is the type of news article that    11:54:48

Page 174

T. Rowe Price analysts would review in monitoring and valuing Carvana's business; is that right?

A.   Yes.

Q.   Okay.  The news article discusses a six-month suspension of one dealership in North Carolina; is that right?                                    11:55:08

A.   Yes.

Q.   And that suspension resulted from Carvana's failure to deliver titles to the DMV, selling motor vehicles without a state inspection,     11:55:27 and issuing out of state temporary tags and plates for vehicles sold to customers in North Carolina; is that right?

A.   Yes.

Q.   Do you know -- Carvana had other -- other     11:55:39 dealerships in North Carolina at that point; right?

A.   Likely, but I can't say conclusively.  I don't know that market well enough.

Q.   Okay.  It says Carvana's going to pay a civil penalty of $500, an administrative fee of        11:56:01 $200; right?

A.   Yes.

Q.   Those penalties would have not have been material to Carvana's business; right?

A.   No [verbatim].                                11:56:11

Page 175

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q.   Okay.

MS. GRANT:   Hand you what has been marked as Exhibit 53.

(Graff Deposition Exhibit 53 was marked for identification.)   11:56:48

BY MS. GRANT:

Q.   This is an e-mail exchange between Yan Zhang and Paul Greene, produced with the Bates number at TRP_CARV_0000489.

Have you seen this e-mail before?   11:57:14

A.   I have not.

Q.   Okay.  But this is an e-mail between Yan Zhang and Paul Greene, that would have been created in the regular course of business; right?

MR. GRONBORG:   Object to form.   11:57:34

THE WITNESS:   Yes.

BY MS. GRANT:

Q.   And, in fact, they're discussing the analysis of Carvana for purposes of T. Rowe Price's investment business; right?   11:57:46

A.   Yes.

MR. GRONBORG:   Object to form.

BY MS. GRANT:

Q.   Okay.  I'm going to start in sort of the back page, ending in Bates number, these funny page   11:57:54

Page 176

Q.    Great.

MS. GRANT:  Do you need a break?  Okay. I'm happy to keep -- I actually I'm going to do one more document, if that's okay.

BY MS. GRANT:                                          12:01:59

Q.    In Exhibit 34, after the report about the North Carolina suspension came out in -- on August 10th, 2021, T. Rowe Price continued to purchase shares on behalf of UANPF; is that fair?

A.    Yes.                                            12:02:27

Q.    In fact, the day after that report came out, T. Rowe Price purchased shares on behalf of UANPF; right?

A.    Yes.

Q.    And the day of the e-mail that we just        12:02:42
looked at, which is August 31, 2021, T. Rowe Price continued to purchase shares on behalf of UANPF; right?

A.    Yes.

MS. GRANT:  Do you have the Wall Street            12:03:11
Journal?

Hand you what has been marked Exhibit 54.

(Graff Deposition Exhibit 54 was marked

for identification.)

MR. SHAHEEN:  Thanks.                              12:03:25

Page 180

BY MS. GRANT:

Q.   Have you seen this document before?

A.   Probably.  I don't explicitly recall it.
But I know what it is.

Q.   Okay.  And it's a Wall Street Journal          12:03:49
article published on October 22nd, 2021, entitled
"Carvana Faces Government Scrutiny and Fines
Consumer Complaints."

Do you see that?

A.   Yes.                                           12:04:12

Q.   And this would be an article that T. Rowe
Price analysts would be aware of in their diligence
on Carvana; is that fair?

A.   Yes.

Q.   And likely would have reviewed as part of     12:04:23
their diligence?

A.   Correct.

Q.   The third paragraph of the article
references "dozens of complaints with state
regulators and hundreds with the Better Business   12:04:42
Bureau about issues that include incorrect
paperwork, delays getting titles and registrations,
and other troubles with the purchasing process."

Do you see that?

A.   Yes.                                           12:04:59

Page 181

Q.    Was T. Rowe Price aware of those issues around this time in October 2021?

A.    Yes.

Q.    And as part of the diligence into Carvana would have looked into them in the states that it    12:05:13 was aware of?

A.    Yes.

Q.    Okay.  There are at least four states, according to this article, that have disciplined Carvana or are investigating the company for    12:05:26 violating vehicle sales rules.

Do you see that?

A.    Yes.

Q.    Those four states are referenced in the article as Michigan, Texas, North Carolina, and    12:05:45 California; is that right?

A.    Yes.

Q.    At this point, Carvana is a $40-billion plus company and is doing 425,000-unit sales in 2021.    12:06:25

Would 899 complaints with the Better Business Bureau be a material issue?

MR. GRONBORG:  Object to form.

THE WITNESS:  No, they would not.

BY MS. GRANT:    12:06:34

Page 182

Q.   Okay.  And the fines that are referenced here, so $10,500 fine in Texas, would that be a material issue?

A.   No.

Q.   Page 6, there's a reference to Florida.          12:06:46

A.   I don't have a page numbers.  This one (indicating)?

Q.   That guy.

A.   Okay.

Q.   Yeah.                                            12:07:09

At the bottom, there's a reference to a $6,000 fine.

Would that have been material to Carvana's business?

A.   No.                                             12:07:18

Q.   Okay.  Fair to say at this point, T. Rowe Price did not change its valuation of Carvana, based on reported issues regarding title and registration compliance?

A.   That's correct.                                12:07:38

Q.   And, in fact, if you go back to Exhibit 34, T. Rowe Price eventually purchased after reports of these complaints came out in December of 2021; right?

A.   Yes.                                           12:08:18

Page 183

Q.    In page 5 of the article, so the one
before we were looking at -- sorry.

The bottom, there's a sentence, "Carvana
isn't the only online auto retailer encountering
customer-satisfaction complaints, and at least one    12:08:47
has a higher rate of such grievances."

Do you see that?

A.    Mm-hmm, yes.

Q.    And on the next page, there's a reference
to more complaints against Vroom, which is another    12:08:57
online car seller.

Do you see that?

A.    Yes.

Q.    What is the significance of more
complaints against another online car seller when    12:09:09
you're evaluating the issue?

A.    Carvana's a better actor than its
competitor, which is much smaller.

Q.    Okay.  Does it also suggest that there's a
lot of complexity with complying with these laws    12:09:34
and, like the risk disclosure we discussed, it's
part of the risk of operating an online car seller?

A.    Yes.

MR. GRONBORG:  Object to form.

BY MS. GRANT:                                          12:09:47

Page 184

Q.   So T. Rowe Price understood that it was still a significant risk of Carvana's business created with -- sorry.  Strike that.  Terrible question.

T. Rowe Price understood that compliance   12:10:10 with various sti- -- state title and registration laws created material risk for Carvana's business; is that fair?

A.   Yes.

MS. GRANT:  All right.  You want to take a   12:10:35 break?

THE COURT REPORTER:  Yes, please.

MS. GRANT:  How long have I been --

THE VIDEOGRAPHER:  This is end of Media 3.

We're off the record at 12:10 p.m.   12:10:44

(Lunch recess taken.)

THE VIDEOGRAPHER:  This is the start of Media 4.

We're back on the record at 12:56 p.m.

BY MS. GRANT:   12:57:00

Q.   Welcome back, Mr. Graff.

You understand you're still under oath?

A.   Yes.

Q.   Okay.  I'm going to hand you what has been marked Exhibit 56 -- 55.   12:57:08

Page 185

(Graff Deposition Exhibit 55 was marked for identification.)

MR. SHAHEEN:  Thank you.

BY MS. GRANT:

Q.    Do you recognize this document?                12:57:27

A.    Generally, yes.

Q.    What is it?

A.    It is an offering to sell new securities, I think.

Q.    It says "Schedule 14A."                          12:57:44

So is that a proxy?

A.    Oh, yes, proxy.  Sorry.

Q.    That's okay.

And is a company's proxy statement something that T. Rowe Price would review in the     12:57:56 regular course of its diligence on a company it's invested in?

A.    Yes.

Q.    Okay.  I'm going to ask you to turn to page 50.  It's kind of odd with the numbering.        12:58:08

A.    5- -- 5-0?

Q.    5-0.  It spans over two pages, which is weird.  But...

A.    Yep.

Q.    And on that page, there are a number of          12:58:20

Page 186

disclosures related to agreements with DriveTime.

Do you see that?

A.   Yes.

Q.   Okay.  And if you flip over to sort of the tail end -- actually, so there's a disclosure in   12:58:39 the -- yeah, the tail end of that section, bottom of page 50 --

A.   Yep.

Q.   -- that has "retail vehicle acquisition agreements."   12:58:56

Do you see that?

A.   Not yet, I guess.  Bottom of here (indicating) 50?  Or --

Q.   Yeah.  "Retail Vehicle" --

A.   Okay.  Yeah.   12:59:08

Q.   -- "Acquisition Agreements.

And in that section, Carvana disclosed that "Effective September 29, 2021, we entered into Wholesale Vehicle Purchase Agreements with DriveTime" --   12:59:25

A.   Yeah.

Q.   "Pursuant to which we purchase reconditioned vehicles from DriveTime."

Do you see that?

A.   Yes.   12:59:31

Page 187

Q.   And it also disclosed in the end of the paragraph that in -- there are certain instances where Carvana's "purchase price is the list price on Carvana.com after a customer has placed an order on the vehicle."                                    12:59:50

Do you see that?

A.   Yes.

Q.   So Carvana is disclosing that it's purchasing vehicles from DriveTime where its purchase price is the same as the price that it's     01:00:04 charging on its website; right?

A.   Yes.

MR. GRONBORG:  Object to form.

BY MS. GRANT:

Q.   And in those instances Carvana would not     01:00:11 recognize net revenue on those sales; is that fair?

A.   Yes.

Q.   But they would be included in retail unit sales?

A.   Yes.                                          01:00:24

Q.   Okay.

MS. GRANT:  Next one.

BY MS. GRANT:

Q.   You can put that to the side.

Going to hand you what's been marked as     01:00:35

Page 188

Exhibit 56.

(Graff Deposition Exhibit 56 was marked

for identification.)

MR. SHAHEEN:  Thank you.

BY MS. GRANT:                                      01:00:52

Q.   Do you recognize Exhibit 56?

A.   I do.

Q.   But what is it?

A.   It is my initiation of Carvana.

Q.   So this report would be the result of your   01:01:00
two to three months of diligence on Carvana in
evaluation of its business model; is that fair?

A.   That's correct.

Q.   And why did you take over analyzing
Carvana?                                           01:01:18

A.   Yan was being transitioned to TRPIM, our
sister organization that we split.  So he was
dropping coverage.

Q.   Okay.  And in preparing this report, you
did all of the diligence that we talked about      01:01:34
earlier, so reviewing SEC filings, publicly
available information, Yipit data, S- -- public
statements from the company to prepare this
analysis; right?

A.   Yes.                                           01:01:52

Page 189

Q.   Okay.  So one more question on page 7.
Sorry.  Actually, I'm going to flip ahead to one of
the final pages.  You have a section on governance
and related party transactions.

A.   Oh, eight -- 18?                                01:08:08

Q.   Yeah.  Sounds about right.

A.   Yep.

Q.   I'm mixing up my pages?

There's a discussion of the DriveTime
transaction we were referring to earlier.           01:08:21

Do you see that?

A.   Yes.

Q.   And you note that "Carvana frequently
transacts with DriveTime including the purchase of
thousands of cars from the company in 2021."         01:08:30

A.   Yes.

Q.   So you're picking up on the disclosure
that we just discussed from the March proxy
statement?

A.   Yes.                                            01:08:40

Q.   Okay.  In your DCF analysis did you have
any sort of risk multiple for issues with title and
registration compliance?

A.   Not with the title really.

Q.   Okay.  And you don't have any significant     01:09:06

Page 194

discussion in here of title and registration compliance issues; is that fair?

A.   Yes.

Q.   So the issues that you were already aware, the North Carolina suspension, the issues discussed    01:09:20 in the Wall Street Journal article, those did not materially affect your valuation of Carvana; is that fair?

A.   They do not, yes.

Q.   You can set that aside.    01:09:35

Okay.  I'm going to hand you what has been marked Exhibit 57.

(Graff Deposition Exhibit 57 was marked for identification.)

BY MS. GRANT:    01:10:09

Q.   Do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's an e-mail from me to another analyst, but he -- he only really worked on one fund.  But an    01:10:21 e-mail to a colleague.

Q.   And it contains your analyst report from April 20th, 2022?

A.   Yeah.  This looks like I published the quarterly earnings report that goes out to e-mails    01:10:39

Page 195

to everyone and then he replied back and that was the exchange.

Q.   Okay.  I want to actually look at the analyst report.  So, again, this is -- you're still at a 2 rating; right?                                    01:11:01

A.   Yep.

Q.   And your long-term thesis hasn't changed at this point; right?

A.   It had not, no.

Q.   And you are aware that Carvana had          01:11:13 materially missed expectations for at least GPU and EBITDA; right?

A.   Yes.

Q.   And that's big missed expectations for profitability?                                        01:11:24

A.   Yes.

Q.   Your recommendation, I want to talk about that.  You say, "For those not familiar with the business, I cannot recommend exposure given the volatility heartburn inherent in this highly        01:11:36 macro-sensitive stock."

        Do you see that?

A.   Yes.

Q.   Why were you telling people not to invest if they were familiar with the business?            01:11:47

Page 196

A.   I did.

Q.   -- offering.

And what was your role?

A.   Analyze the opportunity set at the new diluted prices and recommend if we should buy more in that offering.                                    01:13:23

Q.   Okay.  And so, you recommended that at least that T. Rowe Price should buy some in the offering?

A.   Yes.                                              01:13:32

Q.   And you did so knowing all of the information in the previous analyst reports that we've covered today?

A.   Yes.

Q.   Okay.  I may come back to that, but I'm going to keep going.                                     01:13:43

Do you recall that Barron's reported further issues about Carvana's compliance with state title and registration laws in, roughly, May 2022?

A.   Directionally.  I don't remember the specific article, but, yeah, there was many instances.                                           01:14:23

Q.   Okay.

MS. GRANT:  I'm actually -- can I just do the e-mail?                                            01:14:32

Page 198

Hand that to you.

Can mark as Exhibit 58.

(Graff Deposition Exhibit 58 was marked

for identification.)

BY MS. GRANT:                                           01:15:02

Q.   Do you recognize this e-mail?

A.   Yes.

Q.   And it's an e-mail that you sent to Mike

Levin, who is Carvana's director in the investment

relations -- investor relations; is that true?        01:15:13

A.   Yes.

Q.   And you sent it based on an article that

you read about title and registration issues in

Illinois?

A.   Yep.                                              01:15:26

Q.   And you ask Mike Levin whether this means

Carvana cannot sell vehicles in Illinois right now;

is that right?

A.   Yes.

Q.   And wh- -- how does he respond?                   01:15:40

A.   He's saying that that's not exactly true.

They can send in cars from out of state and do other

things to facilitate transactions in the state

still.

Q.   Okay.  What was your assessment of whether        01:15:55

Page 199

that suspension in Illinois materially affected Carvana's business?

A.    This was the fourth or fifth kerfuffle, and nothing had transpired in a substantive material way yet.  So fact pattern, by the time it's the fourth, fifth, sixth of this general presumption that they would clean this up and it wouldn't materially impact the business.

Q.    Okay.  So your evaluation of Carvana did not materially change, based on the report of the suspension in Illinois?

A.    It did not.

Q.    Okay.

MS. GRANT:  Hand you what's been marked Exhibit 59.

(Graff Deposition Exhibit 59 was marked for identification.)

BY MS. GRANT:

Q.    And in Exhibit 59, Paul Greene then asks you about the same issue; is that right?

A.    Yep.

Q.    And then he writes at the beginning forwarding a summary of an article about the Illinois suspension and asks if you spent any time looking into the issue; is that right?

Page 200

A.    Yes.

Q.    And he asks you what it means; fair?

A.    Yes.

Q.    And in your response you say "It's growing pains.  It shouldn't happen, but I'm not surprised    01:17:33 given the complexity of the minutia at scale."

Do you see that?

A.    Yes.

Q.    And so you weren't surprised by another title and registration compliance issue popping up    01:17:46 with -- in an individual state; is that fair?

MR. GRONBORG:  Object to form.

THE WITNESS:  You -- you'd not like to see it but, again, doesn't surprise me.  There's a lot to this business.                                         01:17:59

BY MS. GRANT:

Q.    Okay.  And then you summarize -- well, let me ask you:

What is the rest of this e-mail doing?

A.    It is aggregating all of the problems    01:18:09 across the U.S. and summarized where we stand in each of the states.  For the most part Carvana has gotten back to good standing.

Q.    Okay.  And fair to say at this point, you've looked into each of the individual issues and    01:18:27

Page 201

determined that they're not materially affecting the

valuation of Carvana?

A.   That's correct.

MS. GRANT:   Hand you what's been marked

Exhibit 60.                                              01:18:56

MR. SHAHEEN:   Thank you.

(Graff Deposition Exhibit 60 was marked

for identification.)

BY MS. GRANT:

Q.   Do you recognize this e-mail?                  01:19:12

A.   Yes.

Q.   What is it?

A.   It is an e-mail exchange with another

portfolio manager at T. Rowe.

Q.   I'm going to start with the bottom e-mail.   01:19:26

And it's forwarding an article from Barron's

entitled "Carvana Sought to Disrupt Auto Sales It

Delivered Undrivable Cars."

Do you see that?

A.   Yes.                                           01:19:47

Q.   An e-mail says that there were serious

charges levied against Carvana and is asking whether

T. Rowe is missing warning signs; is that fair?

A.   Yes.

Q.   And this e-mail eventually gets forwarded    01:19:59

Page 202

to you and you're asked to comment; is that right?

A.    Yes.

Q.    And you have a similar response to the response that you sent in May 2022 to Paul Greene; is that fair?                                          01:20:24

A.    Yes.

Q.    You say, "Again, it's unfortunate growing pains.  This clearly should not happen, but I haven't been surprised, given the complexity of the minutia dealing with the DMV at scale."          01:20:37

Do you see that?

A.    Yes.

Q.    So here, again, you're not surprised by another article summarizing the issues that Carvana has had with state title and registration          01:20:47 compliance?

A.    Yes.

Q.    And you, again, list out your analysis of the issue in various states.  This one also includes Pennsylvania.  Right?                                01:21:07

A.    Yes.

Q.    And I think the question that was asked to you was about -- actually, no.  Strike that.

Can you explain what you're saying in the bottom portion of this e-mail, where it says "In    01:21:33

Page 203

terms of liability"?

A.   (Witness reviews.)

So I'm noting that the company is unlikely to give us a perfectly crisp answer, given ongoing litigation, but also noting the likely immateriality, both from a response from them, but also quantifying the market in Arizona had 80 complaints.

If you can read these complaints, which we're able to often, they're very minor.  So to make a credibly legal case against Carvana would be pretty low probability.  So the net DCF of this potential litigation seemed quite low, in my mind.

Q.   Okay.  I'm just going to break that down so we're clear.

So you're saying, the company's probably not going to tell you how much the lawsuit is worth because it's ongoing and it doesn't believe it has merit; right?

A.   Yes.

MR. GRONBORG:  Object to form.

BY MS. GRANT:

Q.   And your analysis of the -- at least consumer litigation issue, is that, these complaints don't give rise to a material issue that would

Page 204

change your valuation of Carvana; is that fair?

A.   That's fair.

Q.   And you also say you've "spoke with the company about it a few times earlier this year."

Do you see that?                                01:23:26

A.   Yes.

Q.   So in those conversations, you had the opportunity to ask Carvana questions about its title and registration issues; right?

A.   Yes.                                       01:23:37

Q.   Do you believe they misled you about the title and registration issues?

A.   I don't think so.

Q.   And then you note you're going to ping them again about the lawsuit; is that fair?       01:23:52

A.   Yes.

Q.   And the lawsuit was sort of the new thing that you had taken from the Barron's article; right?

A.   Yes.

Q.   You were aware of the other issues          01:24:02
discussed in various states in the Barron's article?

THE WITNESS:  That's --

MR. GRONBORG:  Object to form.

THE WITNESS:  -- correct.

MS. GRANT:  I'm actually going to do both    01:24:20

Page 205

at the same time.  Do you have the response?  Do you have Mike's response?  Okay.

BY MS. GRANT:

Q.   Do you recall if you asked Mike Levin about the Pennsylvania lawsuit?                01:24:34

A.   I do not.

MS. GRANT:  This one.  Okay.

That's fine.

BY MS. GRANT:

Q.   Did you ever learn that the Pennsylvania    01:24:54 lawsuit was a material issue that affected your valuation of Carvana?

A.   No.

Q.   Okay.

MS. GRANT:  Okay.  I'll take the report.    01:25:19

BY MS. GRANT:

Q.   I'm going to jump ahead a little bit.

Hand you what's been 61.  Exhibit 61.  Thank you.

(Graff Deposition Exhibit 61 was marked    01:25:51 for identification.)

BY MS. GRANT:

Q.   Do you recognize this document?

A.   Yes.

Q.   What is it?                                01:25:59

Page 206

A.   It is a published report by me on Carvana's earnings results.

Q.   Okay.  And it's dated November 3rd --

A.   Yes.

Q.   -- 2022?                                    01:26:16

A.   Yes.

Q.   And in this report you recommend exiting the position; right?

A.   Yes.

Q.   The price of Carvana stock is now at $13 a   01:26:28
share; right?

A.   Yep.

Q.   And what -- in your view, what had driven this price decline?

A.   So the debt that they put on a company was   01:26:38
too great at that point in time.  And so interest
ca- -- cash interest was far too high, organic free
cash, so it would not cover interest, which
technically means they will go bankrupt.

So the progression of the business, in          01:26:56
terms of volume, they were -- units were declining,
margins were collapsing, and their capital structure
could not support the -- the business was not
supported by the capital structure.

So, again, the decision tree of outcomes        01:27:12

Page 207

would not have added all that debt, he could have cost cut his way and this -- we wouldn't have gotten as close to the brink.

But the probabilities of calling the macro, as I shared earlier, we don't feel                01:29:47
comfortable with that.  And so the -- the outcomes ahead started to look far less favorable to us, even though in certain scenarios, of course we see a 10x potential, but the probability adjusted outcome was not high conviction for us.                01:30:03

Q.    Okay.  But even with a low probability, Ernie was able to thread the needle, so to speak, and stave off bankruptcy and turn things around; is that fair?

A.    Yes.                01:30:15

Q.    Okay.  And Carvana stock rebounded over the next few years significantly; is that fair?

A.    Material -- material move upwards in the stock, yes.

Q.    Do you know what it's trading at today?                01:30:30

A.    It was about 350 [verbatim] earlier today. But there was earnings today, so it might be up -- it's either up or down 10 or 15 percent right now.

Q.    Okay.  So fair to say, if T. Rowe Price had held the stock that it owned at this point,                01:30:46

Page 210

it -- there would have been tremendous upside?

A.   We ended up buying it back, so we earned a lot more money later --

Q.   Okay.  Fair.

A.   But if we never would have sold it, yes,      01:30:56
there would be more profit that we would have captured.

Q.   Okay.  Nothing in this report suggests that Carvana defrauded its investors; is that right?

A.   That's right.                               01:31:11

Q.   And nothing in your analysis suggests that the reason why T. Rowe Price sold was that it felt misled; is that fair?

A.   That's fair.

Q.   Sitting here today, do you have any reason   01:31:25
to believe that Carvana misled you about its title and registration compliance issues in various states?

A.   No.

MR. GRONBORG:  Object to form.                    01:31:41

BY MS. GRANT:

Q.   Sitting here today, do you have any reason
to believe that Carvana misled you about the factors driving the growth in its retail sales units?

MR. GRONBORG:  Object to form.                    01:31:56

Page 211

THE WITNESS:  No.

BY MS. GRANT:

Q.    Sitting here today, do you have any reason to believe that Carvana engaged in a scheme to defraud its investors by pursuing a national -- an    01:32:09 aggressive national expansion strategy?

MR. GRONBORG:  Object to form.

THE WITNESS:  No.

BY MS. GRANT:

Q.    Sitting here today, do you have any reason    01:32:20 to believe Carvana engaged in a scheme to defraud its investors by buying lower quality of vehicles from its customers that it would then sell wholesale?

A.    No.    01:32:35

MR. GRONBORG:  Object to form.

BY MS. GRANT:

Q.    Sitting here today, do you have any reason to believe that Carvana engaged in a scheme to defraud its investors by -- in the way that it    01:32:46 priced the cars it was selling?

A.    No.

Q.    So fair to say you don't believe that Carvana engaged in a scheme to defraud its investors in any way?    01:33:05

Page 212

MR. GRONBORG:  Object to form.

THE WITNESS:  No.

BY MS. GRANT:

Q.   Okay.  I want to go back to the offering and ask a few questions about that.  So I think you have the April 20th report, which was probably two reports back.   01:33:20

MS. TSENG:  Exhibit 57.

MS. GRANT:  Exhibit 57.

THE WITNESS:  Oh, 57.   01:33:44

BY MS. GRANT:

Q.   Based on your involvement in recommending T. Rowe Price participate in the offering, you've read the offering documents; is that fair?

A.   Yes.   01:34:03

Q.   Do you believe that any of the statements in the offering documents were misleading about Carvana's business model?

MR. GRONBORG:  Object to form.

THE WITNESS:  No.   01:34:12

BY MS. GRANT:

Q.   Okay.  Okay.

So how does it work in an offering when T. Rowe Price has allocated a certain number of shares, how do those shares get to individual clients?   01:34:27

Page 213

A.   It's all proportional.  So whatever Paul believes the bet size should be, he will allocate that much to the fund level, which then flows through to the individual accounts.

Q.   Okay.                                      01:34:45

A.   So each SMA from prior should roughly be the same portfolio mix as his master fund.

Q.   Okay.  Was Paul the only manager that took an allocation in the offering?

A.   I don't think so.  I think Taymour, who is   01:35:01 on one of these e-mails, did as well.  There were two or three --

Q.   Okay.

A.   -- different funds that took it.  But Paul was the biggest.                                 01:35:11

Q.   Do you know if T. Rowe Price purchased any other shares on the open market for its clients on or before April 22nd, 2022?

A.   During the time of offering?

Q.   Yeah.                                      01:35:29

A.   I don't know the answer.

Q.   Okay.  If it did -- if it did, is there any way of knowing which clients got the shares that were purchased in the offering versus purchased in -- on the open market?                       01:35:45

Page 214

MR. GRONBORG:  Object to form.

THE WITNESS:  From a timing perspective, you could probably figure it out.  But there -- there would be no difference in the way that it's allocated internally.                          01:35:55

BY MS. GRANT:

Q.   Okay.  Does T. Rowe Price possess the physical certificates of Carvana stock for clients like UANPF?

A.   I don't know the answer to that question   01:36:05 either.

Q.   Okay.  Do you know if T. Rowe Price has a participant account at DTC?

A.   I don't know.

Q.   Okay.  Do you know if UANPF ever contacted   01:36:23 T. Rowe Price prior to filing this securities fraud lawsuit against Carvana?

A.   I don't know.

Q.   Okay.  You personally were never contacted by UANPF regarding this lawsuit?                    01:37:00

A.   I was not.

Q.   And you weren't contacted by UANPF's counsel prior to filing -- them filing this lawsuit; is that fair?

A.   That's fair.                                 01:37:15

Page 215

Q. Okay. So they didn't ask about the research that you had done or T. Rowe Price had done to support its decision to purchase Carvana stock on their behalf?

A. No.                                               01:37:30

Q. Okay.

MS. GRANT: I think I'm going to reserve the rest in case I have any followup.

MR. GRONBORG: Okay.

Want to just go off the record?        01:37:39

THE COURT REPORTER: Can we go off the record?

MR. SHAHEEN: Sure.

THE VIDEOGRAPHER: This is the end of Media 4.                                          01:37:44

We are going off the record. The time is 1:37 p.m.

(Short recess taken.)

THE VIDEOGRAPHER: This is the start of Media Number 5.                                  01:44:16

We're back on the record at 1:44 p.m.

///

///

///

///

Page 216

Q.   Yes.  Yes, sir.

MR. SHAHEEN:  Did -- did he say "is that all right" at the end?

MS. GRANT:  Yeah.

THE WITNESS:  Oh, sure.  Yes.                    03:23:50

BY MR. PISEM:

Q.   I can't -- sorry.  I'm having a bit of trouble hearing -- hearing the responses.

And when I refer to the April 2022 offering, I'm referring to the public offering of     03:24:03 50,625,000 shares of Carvana's Class A common stock at $80 per share on April 26th, 2022; is that okay?

A.   Yes.

Q.   I apologize.  I can't hear you.

A.   Yes.                                          03:24:22

Q.   Thank you.

THE COURT REPORTER:  Counsel, do you want to go off the record.  I can help you out.

MS. GRANT:  Sure.

MR. PISEM:  Let's -- let's go on.  If we      03:24:33 have a problem, we'll go off the record.

BY MR. PISEM:

Q.   Mr. Graff, if you could turn to Exhibit 32 for a minute -- I'm sorry, Exhibit 34 for a minute.

MS. GRANT:  That's the list of trades.     03:24:50

Page 287

THE WITNESS:  Okay.

BY MR. PISEM:

Q.   And if you could look at page 3, five rows from the bottom.

Am I correct that that shows a purchase of 1,455 shares at $80 per share on 4/22/2022?   03:25:05

A.   That's right.

Q.   Does that, in your understanding, represent the UANPF's purchase of shares on the day of the public offering?   03:25:35

A.   That's what I understand.  Again, I was not privy to the individual account purchases.  But at an aggregate level, Paul Greene and I think at least one other strategy, bought securities in that $80 offer, so yes, this is how I interpret it.   03:25:54

Q.   The following rows on that page show a number of sales; is that correct?

A.   Yes.

Q.   Is there any way for you to tell whether those sales are sales of the same shares that were purchased on 4/22/2022?   03:26:10

A.   Not that I know of.  But I know just with personal brokerage accounts, you can explicitly buy and sell certain lots.  So I don't think it's an impossibility.  But I don't -- I don't have any idea   03:26:31

Page 288

here.

Q.   Okay.  Earlier you had testified, I think, that you weren't sure whether T. Rowe Price has physical certificates for the Carvana stock for any Carvana stock; is that right?                03:26:52

A.   That's right; I -- I don't know.

Q.   Do you have any understanding of how T. Rowe purchased the shares from Carvana?

MR. GRONBORG:  Object to form.

THE WITNESS:  Specificity, no -- no, I        03:27:07
think is the answer.

BY MR. PISEM:

Q.   I'm sorry, can you repeat that?

A.   No.

Q.   And do you have any understanding of how    03:27:19
UANPF -- UANPF's shares are accounted for relative -- by T. Rowe Price and segregated from those of any other T. Rowe Price client?

A.   I -- I don't know the mechanics, no.

Q.   Appreciate that.  So I'll ask you        03:27:46
literally maybe four or five more questions.

Do you know if T. Rowe Price received any Citi or JPM promotional materials in connection with the April 2022 offering?

A.   Like offering documents?            03:28:13

Page 289

Q.   Promotional materials, not the publicly filed documents.

A.   I -- I don't know.  I don't believe so.

Q.   You know if UNP -- UANPF received any promotional materials in connection with the April 2022 public offering?                          03:28:26

A.   I don't know.

Q.   Did T. Rowe attend any investor presentations held by Citi or JPM in connection with the April 2022 public offering?                03:28:44

A.   I don't know.  I should probably know the answer to that.  We -- we had plenty of conversations with the company during that time, but I -- I can't cogently recall if we had a presentation to us.                           03:29:02

Q.   Do you know if UANPF attended any investor presentations --

A.   I don't --

Q.   -- by Citi or JPM in connection with the April 2022 public offering?                          03:29:15

A.   I don't know.

Q.   Just to be clear, you -- you recall that there were -- you recall that T. Rowe attended presentations with -- strike that.  Strike that.

          MR. PISEM:  That's all of my questions.    03:29:37

Page 290

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

In witness whereof, I have hereunto subscribed my name.

Dated: 2/24/26

Hanna Kim, CLR, CSR No. 13083

Page 297